UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-18-0422-PHX-SPL |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 5, 2018 |
| Michael Lacey, | ) | 10:50 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE STEVEN P. LOGAN, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

HEARING ON PENDING MOTIONS - VOLUME I

(Pages 1 through 60, inclusive.)

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                         A P P E A R A N C E S

2     For the Government:

3                     U.S. Attorney's Office
                      By: PETER SHAWN KOZINETS, ESQ.
4                         ANDREW C. STONE, ESQ.
                          MARGARET WU PERLMETER, ESQ.
5                         KEVIN M. RAPP, ESQ. (Telephonic)
                      40 North Central Avenue, Suite 1200
6                     Phoenix, AZ  85004

7                     U.S. Attorney's Office
                      By: JOHN JACOB KUCERA, ESQ. (Telephonic)
8                     312 North Spring Street, Suite 1200
                      Los Angeles, CA  90012
9
                      U.S. Department of Justice
10                    By: REGINALD E. JONES, ESQ. (Telephonic)
                      1400 New York Avenue NW, Suite 600
11                    Washington, DC  20530

12    For the Defendant Lacey:

13                    Liptsitz Green Scime Cambria
                      By: PAUL JOHN CAMBRIA, JR., ESQ.
14                    42 Delaware Avenue, Suite 120
                      Buffalo, NY  14202
15
      For the Defendants Lacey and Larkin:
16
                      Davis Wright Tremaine
17                    By: ROBERT CORN-REVERE, ESQ.
                      1919 Pennsylvania Avenue NW, Suite 800
18                    Washington, DC  20006

19                    Davis Wright Tremaine
                      By: JAMES C. GRANT, ESQ.
20                    1201 3rd Avenue, Suite 2200
                      Seattle, WA  98101

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

```
1    For the Defendant Larkin:

2              Bienert Miller & Katzman
               By: THOMAS HENRY BIENERT, JR., ESQ.
3                  WHITNEY Z. BERNSTEIN, ESQ.
               903 Calle Amanecer, Suite 350
4              San Clemente, CA  92673

5              Schulte Roth & Zabel
               By: SEETHA RAMACHANDRAN, ESQ.
6              919 Third Avenue, Suite 2013
               New York, NY  10022
7
     For the Defendant Spear:
8
               Feder Law Office
9              By: BRUCE S. FEDER, ESQ.
               2930 East Camelback Road, Suite 160
10             Phoenix, AZ  85016

11   For the Defendant Brunst:

12             Kimerer & Derrick
               By: MICHAEL D. KIMERER, ESQ.
13             1313 East Osborn Road, Suite 100
               Phoenix, AZ  85014
14
               Bird Marella Boxer Wolpert Nessim
15              Drooks Lincenberg & Rhow
               By: ARIEL A. NEUMAN, ESQ.
16             1875 Century Park E, Suite 2300
               Los Angeles, CA  90067
17
     For the Defendant Padilla:
18
               Piccarreta Davis Keenan Fidel
19             By: MICHAEL L. PICCARRETA, ESQ.
               2 East Congress Street, Suite 1000
20             Tucson, AZ  85701

21   For the Defendant Vaught:

22             Karp & Weiss
               By: STEPHEN M. WEISS, ESQ.
23             3060 North Swan Road
               Tucson, AZ  85712
24

25
```

UNITED STATES DISTRICT COURT

1   For Henze Cook Murphy, PLLC:

2           Mitchell Stein Carey Chapman
            By: LEE DAVID STEIN, ESQ.
3               ANNE MICHELLE CHAPMAN, ESQ.
            2 North Central Avenue, Suite 1450
4           Phoenix, AZ  85004

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Criminal case 18-422, United States of

2  America versus Michael Lacey and others.

3          This is the time set for hearing on pending motions.

4          Please announce your presence for the record.

5          MR. KOZINETS:  Thank you.  Peter Kozinets from the

6  U.S. Attorney's Office for the government.  With me here is

7  Andrew Stone and Margaret Perlmeter.  In addition we have on

8  the phone Kevin Rapp from our office, John Kucera from the U.S.

9  Attorney's Office in the Central District of California, and

10  Reginald Jones from the Criminal Division at main justice.

11          THE COURT:  Good morning to all of you.

12          MR. KOZINETS:  Good morning.

13          MR. CAMBRIA:  Good morning, Your Honor.  Paul Cambria

14  on behalf of Michael Lacey.

15          THE COURT:  Good morning.

16          MR. CORN-REVERE:  Good morning, Your Honor.  Robert

17  Corn-Revere on behalf --

18          THE COURT:  I'm sorry, sir.  I need you to speak into

19  a microphone, if you would, please.

20          MR. CORN-REVERE:  Okay.  Good morning, Your Honor.

21  Robert Corn-Revere on behalf of defendants James Larkin and

22  Michael Lacey.

23          THE WITNESS:  Good morning to you as well.

24          MR. GRANT:  Good morning, Your Honor.  Jim Grant on

25  behalf of defendants Michael Lacey and James Larkin.

1          THE COURT:  Good morning.

2          MR. BIENERT:  Good morning, Your Honor.  Thomas

3    Bienert and Whitney Bernstein on behalf of defendant Jim

4    Larkin, who is present in court on bond.

5          And I will point out, we also have a paralegal, but

6    I'd have Ms. Ramachandran, who is sitting here on the asset

7    forfeiture issues, if we get to them in a substantive way

8    today.  So she may be joining us.

9          THE COURT:  Good morning to all of you.

10         MR. FEDER:  Bruce Feder for Scott Spear, who is in the

11   audience.

12         MR. WEISS:  Morning, Your Honor, Steve Weiss on behalf

13   of Joye Vaught, and I waive her presence.

14         THE COURT:  Good morning to you.

15         MR. PICCARRETA:  Good morning, Judge Logan.  Mike

16   Piccarreta on behalf of Andrew Padilla, and I have waived his

17   presence in our pleading.

18         THE COURT:  Good morning to you all as well.

19         MR. KIMERER:  Good morning, Your Honor.  Michael

20   Kimerer and Ariel Neuman on behalf of Jed Brunst, who is

21   present in the courtroom at this time.

22         THE COURT:  Good morning to you all as well.

23         As you all know, at this -- I'm sorry.

24         MR. STEIN:  Good morning, Your Honor.  Lee Stein and

25   Anne Chapman on behalf of the law firm of Henze Cook and

1    Murphy.  And Tom Henze and Janey Henze are here as well.

2              THE COURT:  Good morning to all of you.  Thank you.

3              As you are all aware, we are here this morning because

4    I have several questions about the pending issues.

5              I plan to cover the following today:  The Government's

6    Motion to Disqualify Counsel, which is Document Number 118.  I

7    have the Government's Motion to Resolve Attorney-client

8    Privilege Issues, which is Document Number 195.  I have

9    Defendant's Lacey's Motion for Disclosure of Documents Related

10   to Carl Ferrer's Waiver of Privilege.  I have Defendants Lacey

11   and Larkin cross-motion to obtain discovery and address

12   privilege issues.

13             I also have defendant Padilla's Motion for Itemization

14   of Brady Giglio Material, which is Document 273.  And last I

15   have the Government's application for an order regarding

16   criminal forfeiture of property in government custody.

17             Again, I am going to ask you all if -- there's a

18   number of questions that I have, and when I call for an

19   attorney to respond to some questions, I think it would be

20   easier if you would approach the lectern and speak directly

21   from the lectern.  That would be very, very helpful.

22             But before we get to that, Mr. Stone, I have Document

23   Number 331, which was filed yesterday.  It is a supplement of

24   Defendant Lacey and Larkin's opposition to the United States'

25   Motion to Disqualify Counsel.  Have you had a chance to read

1    through this 15-page document?

2              MR. STONE:  We did, Your Honor.

3              THE COURT:  Was it the government's intent to file a

4    motion to strike the filing as an improper sur-reply?

5              MR. STONE:  Obviously we haven't done so yet, but it

6    crossed our mind when it was filed at noon yesterday.

7              THE COURT:  Well, who is the author of this?  If you

8    would please stand.

9              MR. GRANT:  I am, Your Honor, Mr. Grant.

10             THE COURT:  Sir, is there any reason why you filed

11   this so late?

12             MR. GRANT:  Yes.  The reason is -- two different

13   rationales for filing the paper.  One, is because the

14   government raised a number of new issues in connection with

15   their reply, which we -- fact issues that we had no opportunity

16   to respond to.

17             They filed a supplement without leave.  We did not

18   object to their supplement.  But we also wanted to make sure

19   that the Court was up to speed in terms of what's happened,

20   because the motions have been pending as long as they have

21   been, circumstances of various cases.

22             One, in particular, the government mentioned the

23   Washington State case, the J.S. case, that case has now

24   progressed much further.  The order that the Court -- or that

25   the government talks about has actually been stayed pending

1    appeal, and the appeal is pending.  So we wanted the Court to

2    have a full picture of where matters stand today.

3              THE COURT:  Okay.  I just want to let all the parties

4    know, please make sure that you read the Court's order, in

5    terms of your filings, so you don't have something very, very

6    important that gets stricken from the record.

7              If you do need some additional time, you need to reach

8    out to the Court and let me know.  This is a case that has a

9    lot of different pleadings, and I certainly appreciate and

10   respect the work of all parties, but it makes it very difficult

11   for the Court to respond to anything if I only have a number of

12   hours to deal with it right before a hearing.

13             The first thing I want to take up is the Government's

14   Motion to Disqualify Counsel.  Do I have any argument from the

15   government?

16             MR. KOZINETS:  Yes, Your Honor.  Good morning.

17             THE COURT:  Since we have so many lawyers that are

18   present, what would be very, very helpful to me is when you

19   come to the lectern, if you can tell me who you are again that

20   would be great.

21             MR. KOZINETS:  Sure.  I am Peter Kozinets from the

22   U.S. Attorney's Office.  The Davis Wright and Henze Cook law

23   firms have a very stark conflict of interest, and there are

24   these forming points that warrant disqualification here.

25             The first point is that Seattle state court order that

1   was just discussed.  In a case brought by two minor victims who

2   had been trafficked by Backpage, the state court judge sua

3   sponte ordered the Davis Wright firm disqualified under the

4   ethical rules, pointing that they had jointly represented

5   Mr. Ferrer, Mr. Lacey, Mr. Larkin, Backpage, and a number of

6   entities, in several cases throughout the country, that those

7   cases were substantially related to the trafficking and tort

8   claim issues in the Washington court, and also to the issues in

9   this court, and that because of all of that, there's a, quote,

10  high possibility that the Davis Wright firm, quote, will

11  encounter an impermissible conflict of interest jeopardizing

12  the effective administration of justice if they continue to

13  represent Mr. Lacey and Larkin.

14          We recognize that order has -- is now under appeal,

15  but because it was entered sua sponte, that really emphasizes

16  how strongly the Court felt about these issues.

17          Secondly, in criminal cases, the law is clear that in

18  precisely this kind of situation, disqualification is required

19  where you have a former client who is now expected to be a key

20  prosecution witness and counsel for that former client now

21  seeks to represent a current defendant in the case.

22          This sort of factual scenario is addressed in multiple

23  cases cited in our brief.  The Moscony case is just a great

24  example.

25          Very briefly, Your Honor, a real estate firm's

1    employees were under federal investigation.  One law firm

2    represented all those employees.  When two employees were

3    indicted, one of those defendants sought to hire that law firm

4    to represent him in the criminal case, but because two of the

5    other employees who had also been jointly represented were

6    going to be key prosecution witnesses, the government moved to

7    disqualify, the District Court granted the motion, the Court of

8    Appeals affirmed finding there was an actual obvious conflict

9    of interest.

10            THE COURT:  Counsel, I will allow you to finish with

11   your argument, and I'm very, very familiar with all of the

12   pleadings that have been filed in the case.  We have gone over

13   those numerous times.

14            I need to focus on a few questions that I need

15   answered.  First, does Ferrer's waiver of attorney-client

16   privilege in the proffer agreement constitute a waiver of the

17   confidential privileged information sought to be protected by

18   this motion to disqualify?

19            MR. KOZINETS:  No, Your Honor.  And the reasons for

20   that are many, but the key reason why that kind of waiver is

21   really immaterial, is that the ethical rule of confidentiality

22   sweeps far broader than the evidentiary attorney-client

23   privilege.

24            This proffer agreement relates to evidentiary

25   privilege, it doesn't relate to counsel's ethical duty to

1    maintain in confidence all information it learned about

2    Mr. Ferrer in the course of its multi-year,

3    multi-jurisdictional representation of him, personally and in

4    connection with other Backpage defendants.

5         And that -- kind of the broad scope of the

6    disqualification rule has been expanded by more recent Arizona

7    cases, including the Foulk case, Arizona Ethics Opinion 91-05,

8    which addresses precisely the scenario we have here.  A witness

9    formerly -- the same scenario addressed in that Moscony case.

10        We also have an independent duty of loyalty that these

11   lawyers continue to owe to their former client.  That's been

12   independently recognized in the law, and that is separate and

13   unrelated to this privilege waiver notion.

14        So the conflict though really is so extreme and stark

15   in this case because this isn't a situation where you just have

16   one relevant former representation of Mr. Ferrer.  Instead what

17   you have is a multi-year litigation campaign waged by these two

18   law firms over five to six years throughout the country in

19   which they frequently communicated with Mr. Ferrer, met with

20   him, drafted written testimony for him and/or prepared him for

21   oral testimony in different proceedings.

22        The whole point of that legal strategy was to

23   consistently deny any knowledge of any wrongdoing regarding

24   rampant prostitution advertising on the Backpage website.  And

25   that strategy has now essentially collapsed.  Because you have

1   Mr. Ferrer and Mr. Hyer, the sales manager, pleading guilty and

2   essentially admitting that Backpage was principally in the

3   prostitution advertising related business.

4          And as a consequence of that, you have litigants in

5   these other cases who are starting to file motions for

6   sanctions involving these issues.

7          So in that Washington state court, for instance, the

8   state court judge who disqualified Davis Wright also imposed a

9   $200,000 sanction on Davis Wright's clients.

10         In the hearing involving that sanctions issue, Davis

11  Wright lawyers pointed the finger back to Mr. Ferrer and said

12  that he may be subject to cross-examination or discovery about

13  his prior inconsistent statements.  Prior inconsistent

14  statements including many declarations that the Davis Wright

15  firm drafted for Mr. Ferrer and filed in these other

16  proceedings.

17         Similarly -- just real briefly, Your Honor.

18  Similarly, in Chicago Federal Court, there's another case

19  called Backpage versus Dart, where there's currently pending a

20  motion for sanctions directly against the Davis Wright firm.

21         And in their response to that motion, Davis Wright

22  asserted that Ferrer, quote, will have to answer for

23  differences between his plea agreement and his prior testimony,

24  including the declarations that Davis Wright prepared.

25         So you have a conflict that is -- it's difficult to

1    imagine a starker conflict with lawyers expressly reserving the

2    right to impeach their former client with testimony that they

3    drafted for him.

4          Mr. Ferrer hasn't consented to that conflict.  He

5    hasn't waived that conflict, and disqualification is necessary

6    for those reasons as well.

7          THE COURT:  Sir, can you provide the Court with the

8    government's understanding of the joint defense agreement and

9    your position on how that agreement impacts this motion to

10   disqualify?

11         MR. KOZINETS:  Yes.  Yes, Your Honor.  So from our

12   reading of the pleadings, it looks like the defendants have

13   pointed to three different types of agreements.

14         One is a December 12th, 2016 engagement letter, or

15   what might be called a joint representation agreement, where

16   Davis Wright agreed to jointly represent Backpage, the company,

17   plus Mr. Ferrer, Mr. Lacey, and Mr. Larkin.

18         And what we know from that agreement, to the extent it

19   is quoted in Mr. Ferrer's letter to Davis Wright terminating

20   their representation of him, it requires Davis Wright to

21   withdraw if a conflict arises between those three individuals.

22         Broader, says that in the event of that kind of

23   conflict, Davis Wright could continue to represent Backpage

24   itself, but Backpage itself has also pleaded guilty in this

25   proceeding, and Davis Wright no longer represents Backpage

1    itself.  So that's that first agreement.

2          The second agreement they call a Common Interest in

3    Litigation Management Agreement, dated December 30th, 2016.

4    Common interest sounds like a joint defense agreement.

5          Joint defense agreements are agreements that are

6    entered to allow separately represented parties to share

7    information with each other's attorneys without losing the

8    attorney-client privilege.  And those provisions typically must

9    be clear and explicit in order to provide notice to the clients

10   of what rights they're waiving.

11         That's recognized in the Stepney case.  United States

12   versus Stepney, from the Northern District of California, 2003.

13   The JDA should identify the signatory attorneys who the client

14   is seeking not to seek disqualification of.  And they must be

15   clearly drafted to ensure that the client can get informed

16   consent.

17         Our understanding is that Davis Wright Tremaine, nor

18   any other outside counsel, signed this common interest

19   agreement.  In fact, in the pleading filed yesterday, shortly

20   before noon, page 8, footnote 6, Davis Wright says it did not

21   draft that agreement and it had no role whatsoever in its

22   negotiation or execution.

23         So the fact that Davis Wright wasn't a party is

24   important.  It is important because it means that under the

25   Stepeny case, the chances of any sort of informed consent were

1    greatly, greatly compromised.

2            There's a third JDA -- a third agreement, which is

3    actually called the Joint Defense Agreement, which Your Honor

4    perhaps may be referring to, dated, I think, June, 2017.

5            And again, a JDA is a limited kind of agreement which

6    just allows sharing of confidential information among

7    separately represented counsel.

8            The fact that Mr. Ferrer might have been involved in

9    one or two JDAs is really irrelevant.  The key issue is whether

10   he was represented by Davis Wright Tremaine directly, as

11   established in that December -- that first agreement, that

12   December 12th, 2016 agreement.

13           And that agreement clearly sets forth that Davis

14   Wright is required to withdraw in the event of a conflict such

15   as the one we have here.

16           I'm happy to address further why there was no informed

17   consent to any waiver that might appear in any of these

18   agreements.

19           THE COURT:  Well, counsel, what objection would the

20   United States Government have to allowing Davis Wright Tremaine

21   and Henze Cook Murphy law firms to continue with the

22   representation in their limited roles that were outlined in the

23   pleadings, since the defendants have already conceded that they

24   will not participate as it relates to the trial preparation?

25           MR. KOZINETS:  The government objects, Your Honor,

1   because the law is clear that this kind of proposed limited

2   representation is just not permitted under the ethical rules.

3            The federal cases cited by briefs on both sides, from

4   the defense and from the government, contain cases where courts

5   have explicitly rejected the use of co-counsel to kind of avoid

6   these types of conflict issues.  Those are the Chesire cases,

7   the Williams case, and also the United States versus Locascio

8   case.

9            THE COURT:  And what's your understanding, counsel, of

10  their limited role?

11           MR. KOZINETS:  Well, that's another really good

12  question, Your Honor, because it's really not clear.

13           THE COURT:  Have you talked to them about it?

14           MR. KOZINETS:  Yes, we have.  So the Henze Cook firm

15  has expressed an interest in limiting representation to

16  forfeiture issues and supervised release issues.

17           And we understand just from the pleadings, that the

18  Davis Wright firm would not serve as trial counsel, but this is

19  just simply not permitted under the case law, and under Arizona

20  cases as well.

21           The Roosevelt Irrigation District case from this

22  Federal Court in 2011 expressed grave concerns about screening

23  attorneys and emphasized that the screened attorney must have

24  no role in a new case posing a conflict.

25           Arizona Ethnics Opinions 91.05 prohibits precisely

1   this kind of concept as well, finding there is a complete

2   prohibition.  An attorney may not represent the defendant in

3   the current criminal proceeding where this kind of conflict is

4   involved.

5           The Court's rules also do not allow limited

6   representation in a criminal case.  The local rules provide

7   that when an attorney or a law firm enters a Notice of

8   Appearance, it shall be deemed responsible as attorney of

9   record in all matters in the case.

10          These proposals would also create monitoring problems,

11  practical monitoring problems.  We really have no way of

12  enforcing any sort of limited representation agreement.

13          So the case law recognizes really that in these

14  conflict situations, the law really doesn't -- the law is

15  extremely concerned about whether an attorney who has worked on

16  a case in the past can really screen themselves from using that

17  knowledge in their subsequent representation.

18          And in this Arizona Ethics Opinion, the State Bar

19  Ethics Committee expressly stated, the use of co-counsel won't

20  solve the conflict because these kinds of scenarios, quote,

21  necessarily -- because lawyers, quote, necessarily will engage

22  in many communications about the criminal defense of the

23  defendant.  They will have to coordinate their facts,

24  coordinate their theories, and coordinate their arguments.  And

25  that is absolutely the case here and further underscores the

1    government's objection to that limited representation.

2              THE COURT:  Well, counsel, would the government expect

3    an order from this Court to prevent HCM and DWT from acting as

4    an adviser in this role as well?

5              MR. KOZINETS:  Yes, Your Honor.

6              THE COURT:  So you see adviser and limited role

7    representation as the same thing?

8              MR. KOZINETS:  Yes, because it is really impossible to

9    monitor that kind of scenario, and it's really impossible to

10   know whether these law firms will be using, either consciously

11   or even unconsciously, information, knowledge, that they have

12   from their prior representations.

13             I think that's particularly the case here where we

14   have Davis Wright, for instance, which communicated over

15   several years with Mr. Ferrer, drafted declarations for him.

16   For all we know, that firm still has within its files, the

17   record of its communications, knowledge about those

18   communications.

19             And the law recognizes that it's really impossible to

20   disregard that kind of knowledge.  You can't really unring the

21   bell, so to speak, once you've had that kind of very close,

22   continuing and extensive relationship with a former client.

23             THE COURT:  Well, counsel, give me some feedback as it

24   relates to how I can enforce what you are asking me to do as it

25   relates to these firms from being somewhat involved in this

1    case.

2          Because I see an adviser role, I also see a limited

3    role, and obviously, I can order the parties that you cannot,

4    you know, talk to these clients that you've assisted in the

5    past, but what do you -- what do you see as the textbook answer

6    for this?

7          MR. KOZINETS:  The textbook answer, Your Honor, is

8    that a limited role or advisory role representation is just

9    strictly and absolutely prohibited.

10         Again, I would direct the Court to the Arizona Ethics

11   Opinion 91.05, which recognized that Ethical Rule 1.9(a) takes

12   a broad prophylactic approach that flatly prohibits the lawyer

13   from even entering a relationship where misuse of former client

14   confidence is possible.

15         THE COURT:  Before you indicted these individuals, did

16   they have any kind of pre-indictment roles?  Or was this

17   something where -- refresh my memory, did you have an

18   indictment that was sealed and the parties didn't know about

19   it?  Sometimes the government will work with parties before

20   indicting criminal defendants.

21         MR. KOZINETS:  Yes, Your Honor.  The government did

22   have pre-indictment communications, but not with -- to my

23   knowledge, those communications were with criminal defense

24   counsel.

25         THE COURT:  Okay.  Mr. Stone, do you have any

1     additional information on that?  You can just speak into the

2     microphone.

3               MR. STONE:  From back here, Your Honor?

4               THE COURT:  Just go to the lectern with your partner

5     there.

6               MR. STONE:  Your Honor, I just wanted to supplement

7     the record on that particular issue, is that there was some

8     intensive pre-indictment litigation in this case that involved

9     the government and compliance with a subpoena that went before

10    Judge Campbell, and in that case, both, I believe, Henze Cook

11    and certainly Davis Wright Tremaine were involved in that

12    litigation.

13              THE COURT:  I appreciate that.

14              Counsel, is there anything else that you wanted to

15    place on the record as it relates to the government's motion,

16    which is Document Number 118?

17              MR. KOZINETS:  We would just like to reserve the right

18    to respond to any argument offered by the defense.

19              THE COURT:  This is your last chance, as it relates to

20    118.

21              MR. KOZINETS:  The only thing that I would add, Your

22    Honor, is that in 1988, the U.S. Supreme Court recognized the

23    importance of taking up disqualification issues.

24              In the Wheat versus United States case, the government

25    objected to a conflict presented in that case and moved to

1    disqualify, the government's motion was granted.  And the Court

2    recognized that the Sixth Amendment right to choose one's own

3    counsel is circumscribed in several important respects.

4          And in discussing different scenarios, the Supreme

5    Court said, quote, nor may a defendant insist on the counsel of

6    an attorney who has a previous or ongoing relationship with an

7    opposing party.

8          The Court also said that district courts must be

9    allowed substantial latitude to address these issues, and even

10   to refuse conflict waivers where there's an actual conflict or

11   a serious potential for conflict.  Because the district courts

12   have an independent interest in ensuring that criminal trials

13   are conducted within the ethical standards of the profession

14   and that legal proceedings appear fair to all who observe them.

15         So in this context, Your Honor, we would respectfully

16   submit that the Government's Motion to Disqualify should be

17   granted.

18         And just one other further point.  There was some

19   argument about whether these defendants are adequately

20   represented, even without these two additional law firms.

21         And I would just like to point out that the defendants

22   are represented by at least six, maybe more than six, law firms

23   that have very experienced, very knowledgeable criminal defense

24   attorneys from Arizona to California, all the way to New York.

25   So this isn't a case where they will experience severe hardship

1    from granting a motion such as this.

2          THE COURT:  But that's in your opinion?

3          MR. KOZINETS:  It's the -- it is the government's

4    position that that hardship will not materialize here for those

5    reasons, and also because really, the issues, the legal issues

6    that these firms have worked on, are really kind of now in the

7    past.  The landscape of the litigation has now shifted from

8    kind of legal, more theoretical issues, to much more factual

9    issues about specific knowledge, trial issues that call for

10    representation by experienced criminal defense lawyers.

11          A lot of the First Amendment and Internet law issues

12    have already been resolved and resolved really against these

13    defendants through substantial litigation in the District of

14    Columbia, in the Senate Permanent Subcommittee on

15    Investigations case against Backpage, through extensive

16    litigation, grand jury investigation in the District of Arizona

17    before Judge Campbell, where he recognized that there's really

18    no First Amendment protection for the knowing publication of

19    prostitution advertisements, from the internal discovery that

20    has now been obtained, pulling back the curtain on Backpage's

21    internal practices, from the indictments that have been issued

22    in this case and from the -- the guilty pleas as well, of

23    Mr. Ferrer and Mr. Hyer and Backpage, which essentially admit

24    that this was a prostitution related advertising business.

25          THE COURT:  Thank you very much.

1           MR. KOZINETS:  Thank you, Your Honor.

2           THE COURT:  Next, I want to take up Defendant Lacey's

3     response in defense of HCM, which is Document Number 174,

4     whoever that lawyer is that will argue.  I also want the lawyer

5     for 176 to come forward.  That's HCM's response, and defendant

6     Lacey and Larkin's response in defense of DWT, which is

7     Document Number 180.  And of course Defendant Padilla's

8     response in defense of W -- I'm sorry, DWT Document Number 177.

9           MR. BIENERT:  Your Honor, Thomas Bienert for

10    Mr. Larkin.  If I may approach?

11          May I just comment on Your Honor's --

12          THE COURT:  Can you come up to the microphone so we

13    have a recording?

14          MR. BIENERT:  Yes, Your Honor.  In terms of the

15    documents that you referenced, if it's okay with Your Honor, I

16    am individual counsel for Mr. Larkin, and I am going to address

17    Document 180.

18          But Mr. Grant of Davis Wright Tremaine will address

19    some of the substantive allegations and the waivers and that

20    sort of stuff, in terms of the documents at issue.  And then we

21    have individual counsel in the other documents you reference

22    that would come next, if that's okay?

23          THE COURT:  Well, the reason why I wanted all the

24    counsel up -- and we'll do it one by one if that's the easiest

25    way to go about it, is I have some questions that I pose to all

1    of you, and I am just curious what your positions may be.

2         But if you feel you want to place the positions on the

3    record individually, I would appreciate that as well.

4         So go ahead.

5         MR. BIENERT:  Thank you, Your Honor.  And I think I am

6    going to kind of start where counsel left off, namely, the

7    reason there are multiple law firms representing my client, and

8    the harm to my client if they get the order that they are

9    seeking.

10        Number one, he points out that we have lawyers, and I

11   assume he is alluding somewhat to my firm, from California,  to

12   here, to New York.

13        Well, we have California counsel.  Ms. Bernstein and

14   I, we are criminal counsel.  We will be trial counsel.  We will

15   try this case.  But we are not First Amendment lawyers.  This

16   is a First Amendment case.

17        The primary issue that is just kicking along with the

18   indictment is -- it's a First Amendment case, the defense is --

19   largely rides on First Amendment issues.

20        Government counsel is, unfortunately just inaccurate

21   when he says the First Amendment issues have been decided.

22   Your Honor will be seeing a lot of motions coming relating to

23   the First Amendment aspect.

24        But plain and simple, this is our position.  Our

25   clients are not guilty, because what is alleged here against

| | |
|---|---|
| 1 | our clients is not a crime as it relates to them.  Why? |
| 2 | Because of the First Amendment. |
| 3 | The First Amendment issues make clear that publishers |
| 4 | are not responsible for any criminal acts of people who take |
| 5 | out ads in their published materials. |
| 6 | Now, the government disputes that, I get it, but that |
| 7 | is the main principle of our defense -- before we even get to |
| 8 | all of the factual issues.  So first and foremost, the First |
| 9 | Amendment issues infect this case from cradle to grave. |
| 10 | Number two, my client absolutely wants his First |
| 11 | Amendment counsel who frankly are among, if not the best in the |
| 12 | country, in this case.  It is very nuancey.  It is very |
| 13 | substantive.  And this particular firm has successfully |
| 14 | represented Backpage on at least nine different matters, and I |
| 15 | think seven or eight different districts, where -- against |
| 16 | allegations just like these.  Courts have held and dismissed |
| 17 | cases because, as a matter of law, publishers are not |
| 18 | responsible, civilly or criminally, for the acts of people who |
| 19 | place ads in their publication.  That's our defense. |
| 20 | So we need First Amendment counsel.  I am a pretty |
| 21 | quick study, I'd like to think, but I am nowhere near the |
| 22 | counsel that Mr. Grant is and Mr. Corn-Revere, when it comes to |
| 23 | First Amendment issues. |
| 24 | So my client needs them.  He wants them.  To the |
| 25 | degree that the Arizona ethical rule kind of goes in two |

1    directions, Your Honor.  1.9 looks to the old client, in this

2    case, Mr. Ferrer.  1.7 points to the current client, my client.

3    He waives any conflict that there could be under 1.7 in having

4    assistance from a counsel for several of us who is a First

5    Amendment specialist.

6         So he would like that.  I would like to reiterate that

7    my client definitely is going forward with his right, as noted

8    in the case law, to have counsel of his choice.  And

9    unfortunately, I don't agree with the government that somehow

10   First Amendment issues aren't significant.

11        Finally, just from a case management, from a time and

12   expense, as the government points out, Davis Wright Tremaine

13   has a history of several years on the very issues in this case,

14   for Backpage, and it makes absolutely no sense.

15        It's a definite detriment to my client to lose that

16   institutionalized -- about that company, to lose the expertise

17   about the company's issues, and frankly, just from a financial

18   standpoint, to have to somehow start from scratch on the First

19   Amendment issues.

20        So on that point, I would submit that he's entitled to

21   his Sixth Amendment right, and it would certainly trump any

22   concern the government has.

23        Only one other point on that and then I'm going to sit

24   and turn it to over to Mr. Grant.  And that is this, I think

25   the single most significant feature of this issue -- well,

1    there are two.  They're the fact that Mr. Ferrer waived all of

2    these issues, and Mr. Grant will talk about that.  But that

3    sets it apart from any and every case cited by the government.

4           And number two, it is Exhibit B to Mr. Piccarreta's

5    motion, where he attaches the letter from the government

6    responding to issues about this conflict of interest.  And the

7    government acknowledges that Mr. Ferrer refused to join in this

8    Motion to Disqualify.

9           So the person who they claim should have the concern

10   under 1.9 and certain case law, has affirmatively said he's not

11   joining in this motion.  I think Mr. Grant can give a good

12   explanation to the Court of maybe why he's saying that, because

13   frankly he's waived that right several times.

14          But the simple reality is, under the case law where

15   Your Honor has to acknowledge on the one hand a criminal

16   defendant's right to counsel of his choice, and on the other

17   hand factor in, well, what happens if I keep this counsel here,

18   the only purported victim of this, if we can even use that

19   terminology, would be Mr. Ferrer, who has affirmatively decided

20   not to be a part of a motion to recuse counsel.

21          So on that, Your Honor, I would submit that that's

22   sort of the particularized position of Mr. Larkin.  And then

23   Mr. Grant will be speaking for Mr. Larkin and others on the

24   other issues.

25          THE COURT:  I appreciate that.  Thank you very much.

1          MR. BIENERT:  Thank you, Your Honor.

2          MR. GRANT:  Morning, Your Honor.

3          THE COURT:  Good morning to you.

4          MR. GRANT:  Your Honor, on behalf of Defendants Larkin

5   and Lacey, let me sort of outline the things that I wanted to

6   discuss.

7          The Court --

8          THE COURT:  Sir, what defense motion are you related

9   to?

10         MR. GRANT:  At this point, I am addressing, I think

11  it's 180 is our opposition.  This is the Motion for

12  Disqualification from the government as it relates to Davis

13  Wright Tremaine.

14         THE COURT:  Go ahead.

15         MR. GRANT:  And I was going to say this, there are

16  three different things that I wanted to touch on, but given

17  that the Court has sort of questions in mind, let me lay out

18  the topic, and then if there are specific questions in those

19  topics that you would like to address, or anything else, of

20  course --

21         THE COURT:  Well, what I want is -- I just want the

22  defenses' position, since there are so many different

23  defendants that are here, I want all the positions, and then I

24  have some questions to pose to all of you, is what I would like

25  to do.

1          MR. GRANT:  Fair enough.  Your Honor, the three things

2     that I wanted to touch on are to make sure the Court first

3     understands the relationship of the parties, many different

4     parties, and the nature of the agreements they entered into

5     about joint representation.

6          Second is the application of the appropriate rules of

7     professional conduct which expressly allow the kind of

8     representation that Davis Wright did jointly on behalf of all

9     of the defendants.

10          And the third point, I just want to come back to

11     something that Mr. Kozinets was saying about the JS case and

12     the sua sponte order that had been entered in that case.  This

13     is the Washington State trial court, the decision that's

14     pending on appeal and has already been stayed.

15          So first of all, Your Honor, I think it's very

16     important to understand what the parties are, what their

17     relationships were.

18          It's not just that there is a Backpage.com and then

19     there are three other individuals, Mr. Ferrer, Mr. Larkin, and

20     Mr. Lacey.  And, in fact, I heard Mr. Kozinets refer to that,

21     and the government sort of lumped things together repeatedly.

22     Backpage is not a single entity.  It never has been.

23          From its founding in 2004 until 2015, April 2015,

24     Backpage.com was a subsidiary of a company owned by other

25     entities of Mr. Larkin and Mr. Lacey.  The company is Village

1    Voice Media Holdings.  That was the parent company.  That

2    company still exists today.  There has been a name change, but

3    the company that was still exists and the parent company is

4    there.

5            Throughout that period of time from 2004 -- let's say

6    2008 to 2015, Mr. Ferrer held roles as essentially an employee

7    of the company.  He was first vice president, and then later he

8    was a CEO of Backpage.com.  But at all times, the company was

9    controlled, owned by those Voice Media Holdings.

10           From 2010 to 2015, there was, I think the government

11   alluded to, there were a number of different lawsuits filed

12   against Backpage.com and Village Voice Media Holdings, and

13   other cases that were brought and prosecuted by the companies.

14           My firm began representing Backpage and Village Voice

15   Media in 2012.  But at all times, the litigation, the retention

16   of counsel, the management of counsel, was the responsibility

17   of Village Voice Media Holdings.  They held the privilege.

18   They had the responsibility.

19           Mr. Ferrer's role throughout that time was as a

20   corporate representative.  As would be true in any corporation,

21   we have to deal with the employees, the officers, the

22   directors, in order to be able to defend the corporation, and

23   that's what we did.

24           And throughout that time, there were no instances ever

25   where there had been personal charges or claims brought against

1    Mr. Ferrer or against any other individual.  It was all in the

2    corporate capacity.  And at no time throughout that period, or

3    at any time, did Mr. Ferrer ever request of Davis Wright that

4    it represent him in a personal capacity.

5            THE COURT:  Well, Mr. Grant, let me ask you this.  And

6    my apologies for interrupting you.  I will allow you to finish.

7            But what is your specific position on the current

8    state or the plain text of the ethical rules and the ethical

9    opinions that actually require or may require disqualification

10   under these circumstances?

11           MR. GRANT:  The plain text of the rule, and we're

12   talking about obviously 1.7 and 1.9.

13           THE COURT:  Correct.

14           MR. GRANT:  The plain text of the two rules is that

15   when there's a situation that there has not been informed

16   consent provided by a party, that in certain circumstances the

17   Court may rule that there can be disqualification.

18           We have a situation here where Mr. Ferrer expressly

19   provided his informed consent.  He did it both in his capacity

20   originally as a representative of Backpage, and in that role he

21   was not being personally represented.  But secondly, he did it

22   expressly in the joint representation agreements.  And let me

23   touch on that.

24           There are three different agreements.  Two of them are

25   joint representation agreements.  The third is a joint defense

1    agreement.  There's a difference between those things.

2         The joint representation agreements were -- have to do

3    with a single counsel, in this case, Davis Wright Tremaine,

4    although the agreements are broader than just Davis Wright,

5    representing a number of different parties.

6         The ethical rules specifically contemplate that

7    happening.  They recognize that that's actually a beneficial

8    arrangement in a lot of circumstances.  It's more efficient, it

9    provides for a common defense.

10        But at the same time, they recognize that in order to

11   do that, it's incumbent on counsel, and the parties, to spell

12   out the nature of the relationship and understand that there

13   could be conflicts.  And, in fact, that's exactly what happened

14   in this case.

15        THE COURT:  Well, tell me about the limited role that

16   Mr. Kozinets had talked about on the record?  Tell me about

17   this -- the definition of the limited role, if you can.

18        MR. GRANT:  Well, first of all, Your Honor, it's not

19   necessary under these circumstances that there be a limited

20   role.  I have to say that at the outset.  Because under the

21   circumstances, the agreement that Mr. Ferrer entered into, and

22   not just him, but all of his companies, was that if in fact he

23   were to withdraw from the joint representation, this is, by the

24   way, Exhibit B in the in camera declaration, if he were to

25   withdraw from the joint representation, then Davis Wright or

1   any other counsel could continue to represent Larkin, Lacey, or

2   other Medalist parties -- that's the name of their companies.

3           And he could not and would not seek to disqualify

4   them, and he waived all conflicts related to that

5   representation, either in the past, in the present, or in the

6   future.

7           It's very broad and very specific waiver of conflict

8   issues, and recognition for the continuing joint

9   representation.

10          And I commend the Court, look at the express language

11  of Exhibit A and Exhibit B to the declaration.  They very

12  clearly spell this out.

13          But let me answer your question, I apologize it took

14  me a lead-up to get there.

15          In terms of limitations, what we have said throughout

16  is that we have been counsel on First Amendment issues, we've

17  been counsel on Internet issues, and related issues that have

18  to do with Internet publishers.  That's part of our expertise,

19  Your Honor.  But -- and we have said that we're not going to be

20  lead counsel for this case.

21          Each one of the defendants, at all times, since there

22  has been any threat or actual charges brought against them

23  individually, each one of the defendants has always had his own

24  personal counsel.  That was true in the California --

25  previously.  It is true still here today.  And those are the

1    lead trial counsel for purposes of defendants throughout this

2    case.

3         So the role that we would anticipate having --

4    certainly is to participate in connection with those counsel,

5    but, again, not to cross-examine Mr. Ferrer.  There are other

6    very capable counsel who can and will do that, and not to act

7    as the lead trial counsel, because each defendant should have

8    his own lead trial counsel for purposes of this case.

9         So that's the limited role that I think is appropriate

10   under these circumstances.  And Mr. Kozinets' comments that you

11   can't have any sort of lesser alternative than outright

12   disqualification, I'd say, Your Honor, that's not what the law

13   of Arizona says.

14        The Alexander case in Arizona suggests that there are

15   five different factors you look at to determine whether the

16   extreme remedy of disqualification is appropriate or not.

17        And can the Court suggest that there are other means

18   or other ways to manage the issue?  And here I would suggest

19   the Court may want to consider the question of

20   cross-examination of Mr. Ferrer.  I understand that.  But

21   beyond that, any greater limitations as to the role of Davis

22   Wright, and again, I am focusing on my firm, Your Honor, I

23   think are inappropriate.

24        And I would offer a parallel to that.  And this will

25   take me to the Washington State case.  First of all, I have

1    to -- the government points to the JS case and the sua sponte

2    disqualification order there as though that should be

3    indicative of what this court should do.  There are a couple of

4    major problems with that.

5            First of all, as I said, it was a sua sponte order.

6    The Court heard no motion.  The Court did not read the joint

7    defense agreements in connection with the proceedings.  The

8    Court permitted no argument.  And under Washington State law, a

9    sua sponte dismissal like that is more or less per

10   se reversible.  The Court of Appeals of Washington State will

11   have to address that issue.

12           But at the same time, another court in Massachusetts

13   considered the same issue.  This is Judge Sorokin's order,

14   which we provided to you, and actually did read the joint

15   representation agreements, did consider them, and held that in

16   fact disqualification was not appropriate.

17           The Court said in that circumstance that he wanted

18   confirmation from the clients, Mr. Larkin and Mr. Lacey, that

19   they wanted to continue with representation of Davis Wright

20   Tremaine.  They said, yes, we do.  And the Court further said,

21   well, I will consider it down the road if there's any issue

22   here having to do with cross-examination of Mr. Ferrer.  But it

23   is not appropriate under the ethics rules to disqualify Davis

24   Wright outright.

25           I have to point out one other thing about this use of

1    the state court cases.  It is apparent that what's happened

2    here is the government has been using and coordinating with

3    plaintiff's counsel in the various state civil cases in order

4    to pursue this idea of disqualification.

5            Keep in mind, Your Honor, Mr. Ferrer has not moved for

6    disqualification in any case, not in any of the civil cases,

7    not in this case, not in the Grand Jury proceedings, the

8    situation was a bit different there, but the government knew of

9    Davis Wright's involvement.

10           And throughout all -- and in fact has said,

11   specifically in the Washington State case, that Backpage and

12   Mr. Ferrer cannot support and will not support a motion for

13   disqualification.

14           So we have this circumstance where Ferrer and Backpage

15   are saying, we are not seeking disqualification, and there's a

16   reason for it.  They can't.  Because Backpage and Ferrer both

17   agreed in the Common Interest Litigation Management Agreement

18   that they would not do so.

19           But we have the government, through Mr. Ferrer's

20   counsel, sending letters to 15 different courts.  It's not a

21   motion, not a Request to Disqualify, it's just a letter, sort

22   of unsolicited, saying, hey, there's an issue here.  Mr. Ferrer

23   doesn't consent to continued representation by Davis Wright

24   Tremaine.

25           So they have sort of planted this seed of this

1    disqualification order in various courts.  That's part of the

2    reasons -- we will come to the disclosure motions that we've

3    brought.  That's part of the reason we want to know exactly

4    what coordination has taken place and how that came about.

5         Because in part, federal law actually expressly

6    prohibits the government from pursuing this sort of use of the

7    civil cases as a ruse to try to set up a Motion for

8    Disqualification or other purposes in this case.

9         18 U.S.C. 3509(k) which incidentally was cited by

10   Backpage in a pleading we believe brought by or with

11   coordination of the government, says that the government

12   cannot -- not only in its civil actions where the parallel

13   criminal proceedings such as this must be stayed, but that the

14   government cannot even mention the civil action in the context

15   of the criminal case, and yet that's exactly what the

16   government is doing here.  They sort of set up these stalking

17   horses of these other cases in order to pursue their

18   disqualification motion here.

19        Fundamental point though, Your Honor, is that under

20   Rules 1.7 and 1.9, well taken in pieces, 1.9 has to do with the

21   consent of the existing clients.  Here we have Mr. Larkin and

22   Mr. Lacey, both of whom agreed that they want to continue with

23   the representation of Davis Wright.

24        1.7 says, if there is informed consent, and it can

25   be -- prior informed consent, as is the case here, under the

1    December agreement with Davis Wright and then further under the

2    joint interest agreement, the common interest agreement in

3    December of 2016, then joint representation is permissible, and

4    disqualification is inappropriate.

5          Other questions?

6          THE COURT:  I don't.  Thank you very much.

7          Just to make sure I am clear with all of you, if --

8    the pleadings are very, very detailed.  If you don't feel the

9    need to make an argument on the record, you don't -- I am not

10    requiring you to do that, but if you would like to -- we are

11    going to have to try to limit the time for you to place your

12    information on the record, or we will be here through Sunday.

13          So, sir, if you will step forward and tell me who you

14    are, and I will give you 10 minutes.

15          MR. CAMBRIA:  Thank you, Your Honor.  My name is Paul

16    Cambria, and I represent Mr. Lacey.

17          I did file the opposition in 180.  And Your Honor has

18    put your finger precisely on the Achilles heel in the

19    government's disqualification motion when you asked the

20    question about waiver in the proffer agreement.

21          Here is why.  They are relying on 1.9, and they refer

22    you to ethics opinions with regard to 1.9.  And specifically, I

23    would like to read this language to you from the ethics opinion

24    that dealt precisely with that issue.

25          It is as follows:  It says, one must remember that

1    ER1.9(a) is designed to protect W -- the witness.    It is

2    intended to give the witness the assurance that her lawyer

3    client confidences will not be used against her.  1.9

4    specifically requires the existence of confidences that have

5    not been waived.

6              And in addition to that, there has been mention here

7    of the Alexander case.  Well, Alexander is the Supreme Court of

8    Arizona interpreting 1.9.  And we know that 1.9 requires two

9    things.

10             It requires not only the lawyer's situation, but it

11   requires that the matter be in a same or substantially related

12   matter.

13             And the Alexander case, the Court said there that

14   where there are no confidences, the substantially related

15   aspect is taken out of the mix.

16             Here's what the Court said:  The present case does not

17   involve any disclosures of confidential information from --

18   they name a law firm -- thus the substantial relationship test

19   is not applicable.

20             So here, the very rule that the government is relying

21   on, 1.9, in the ethics opinion that they are also relying on,

22   it is clear there must be the existence of a confidence.  The

23   Supreme Court of Arizona has said that in order for it to be

24   substantially related, there must be a confidence.

25             And so then we move to the actual meat of the

1    argument, if you will.  It is the proffer agreement.  Now, this

2    proffer agreement is drafted by the government.  Their words,

3    they are trying to back away and say, oh, well, it wasn't

4    supposed to be a waiver of personal privileges.  It clearly

5    says that it was.  It is clearly drafted by them.

6         Mr. Ferrer had two personal attorneys not in any way

7    connected with any of us, or any of the history of us, advise

8    him and sign as witnesses to this waiver.  He used the waiver

9    obviously to his advantage in the proffer.  Because as we all

10   know in proffers, the government wants to make sure, number

11   one, that they ask about all of the information; and number

12   two, they want to be in a position where they can use that

13   information.

14        So that's why they put in that proffer agreement a

15   waiver, so that somewhere down the line, somebody couldn't say,

16   oh, well, he told you something that's privileged, you can't

17   use it, you used it, et cetera.  That's their design.  That's

18   why they are there.

19        So Mr. Ferrer uses the waiver to his advantage in the

20   proffer agreement, but -- and the government uses the waiver to

21   their advantage, and then here today they come in here and say,

22   oh, no, that's not a waiver, that's not what it says it is,

23   because now we want you disqualified.

24        Well, 1.9 requires a confidence.  Alexander

25   interpreted it.  It requires a confidence.  They are all

1    waived.  They are waived.  If they are waived, this can't

2    happen, a disqualification can't happen.

3         And here's the other thing.  They cite a number of

4    cases.  He cited the irrigation case and so on.  Your Honor,

5    those are civil cases.  They do not have a right of counsel

6    under this Sixth Amendment in a criminal case context.  Those

7    are civil cases.

8         And it's interesting because when you look at those

9    cases, because they are civil, there is actually parties, one

10   against the other.  Here, Mr. Ferrer is going to be a witness.

11   Whatever happens in this case, whether it be an acquittal or a

12   conviction, has no impact, or shouldn't have any impact, on

13   Mr. Ferrer, unless the government is prepared to say, we are

14   going to give him this sentence if we get a conviction, and he

15   is going to get that sentence if we get an acquittal.  I doubt

16   they're going to take that position here for us.  So that means

17   that really there's no impact on him.

18        So now he has clearly waived all of his confidences

19   with all prior lawyers under the plain language of that proffer

20   agreement.  He used it to his advantage.  They drafted it.  And

21   so now we have the benefit of it.

22        THE COURT:  Just to let you know, you have about two

23   minutes left.

24        MR. CAMBRIA:  Thank you, Your Honor.

25        So in the end, in the end, the question now is, I have

1    the Henze Cook law firm that I have asked that they can play a

2    limited role here.

3            And the limited role is as follows:  We have

4    conditions on bail that require reporting on financial

5    transactions and so on.  That's what I've asked that they be

6    allowed to do.

7            And the other part is, in connection with forfeitures,

8    they've seized all of my client's liquid assets and strangled

9    us, as far as trying to defend ourselves.  We are working our

10   way through that.

11           We have a case under decision now in Los Angeles where

12   they originally got their seizure orders, and all I have asked

13   is that the Henze Cook firm, who have been personal business

14   lawyers and so on for my client, be able to supply me with

15   financial information and things like that, banking records,

16   tracing, et cetera.  Nothing whatsoever to do with the defense

17   of this case.  In any event, everything has been waived.

18           Thank you, Your Honor.

19           THE COURT:  Sir, thank you very much.  Is there anyone

20   else?  Mr. Stein, come on up.

21           He got up first, sir.  I'm sorry.

22           MR. PICCARRETA:  He was quicker than I am.

23           THE COURT:  He is very fast.

24           MR. STEIN:  I would have to take that.

25           Good morning, Your Honor.  Lee Stein on behalf of

UNITED STATES DISTRICT COURT

1    Henze Cook Murphy.  I would just first like to urge the Court

2    to consider the positions of Davis Wright Tremaine and Henze

3    Cook Murphy separately.  Their facts and circumstances are

4    different, and I think the analysis is different.

5             Let me also say, Your Honor, that I think the

6    government has the legal standard exactly backwards.

7    Disqualification is not required.  There's no automatic rule.

8    That's within the Court's discretion.

9             And here we have fashioned a limited role carefully

10   for the Henze Cook Murphy firm so we avoid the issues of 1.9.

11            THE COURT:  Well, Mr. Stein, let me go back to about

12   57 minutes ago.

13            MR. STEIN:  Okay.

14            THE COURT:  What is a limited role?

15            MR. STEIN:  Yes.

16            THE COURT:  Because the government has no idea what it

17   means.

18            MR. STEIN:  I will tell you, Your Honor.  It is to

19   work with pretrial services and the Court, if necessary, on

20   issues of release.  And you might wonder, why do you need to be

21   counsel of record to do that?  And it's because pretrial

22   services won't talk to them if they are not counsel of record.

23            Ms. Henze has been dealing with Justin Lauby, the

24   pretrial services officer, on paying bills and providing

25   information, that sort of thing, to ensure compliance.  And

1    Mr. Lacey is -- he is 70 years old.  He's got a complicated

2    life, and he's in a fight for his life, and he wants people

3    standing next to him who he trusts.  And so having him in this

4    limited role, they are not trial counsel, they won't be

5    preparing cross-examination, they won't be sitting at counsel

6    table.  They are here in the criminal case to ensure his

7    compliance with pretrial release conditions and to make sure

8    that he is complying at all times.  And that would be the

9    limited role.  Nothing else.  And that doesn't put Mr. Lacey's

10   interest materially adverse to Mr. Ferrer's interest.  And so

11   1.9 is not implicated in that capacity.

12          With respect to forfeiture, the role -- and I think

13   Mr. Cambria explained it well, it's -- they've got a long

14   history with Mr. Lacey.  They can help with tracing assets,

15   figuring out the financial information, sorting through that

16   stuff, not litigating the forfeiture issues with respect to

17   whether Mr. Ferrer is right or is not right or anything like

18   that.  It's to help Mr. Cambria sort through the forfeiture

19   issues, that would be the limited role there.

20          And when the government says that's not permitted,

21   they are just wrong.  That is within your discretion to control

22   your courtroom how you see fit, and there are many, many

23   circumstances.

24          I am in one right now in another district where the

25   Court has approved a limited role for counsel, and what's

1    important there is that the client, who is the defendant,

2    agrees -- consents to that limited role after consulting with

3    counsel.

4            That's happened here, and Mr. Lacey would come into

5    court and Your Honor could question him on that and he would

6    indicate his consent on the record, and that's to prevent an

7    appellate case later down the road, I was not provided

8    effective counsel because my counsel was somehow limited by a

9    conflict of interest.

10           So there are cases in which the limited role of

11   counsel is approved by the court, honored by the court, and

12   carried out.

13           And I guess I would also add, Your Honor, that the

14   cases that the government cites are really all distinguishable,

15   and that's because those are cases involving trial counsel.

16   Lawyers who want to be at the table, asking questions.  And

17   they say, well, you can't really be at the table and not help

18   your co-counsel with cross-examination and that kind of stuff.

19   That's not the case here.

20           THE COURT:  I'm sorry for interrupting you, Mr. Stein.

21           Mr. Kozinets, do you agree with that last position

22   that Mr. Stein just placed on the record?

23           MR. KOZINETS:  With respect to --

24           THE COURT:  Trial counsel versus limited role counsel.

25           MR. KOZINETS:  No, Your Honor.  The government

1   believes that the case law and the ethical rules absolutely

2   prohibit representation in a case like this where the conflict

3   is so extreme, based on many years of prior representation in

4   many, many different cases.  So under any conceivable kind of

5   balancing test --

6           THE COURT:  So your answer is, no, I disagree?

7           MR. KOZINETS:  Correct, Your Honor.

8           THE COURT:  Okay.  Go ahead.

9           MR. STEIN:  I would ask that the government produce

10  one single case that didn't involve trial counsel.  Every one

11  of their cases is a trial counsel case.  This is not trial

12  counsel.  I mean, that distinction is important.

13          And I guess -- let me address just one last issue, and

14  then I will sit down, Your Honor.  You asked some questions

15  about monitoring and how do we make sure that this is followed.

16  Well, we're talking about Tom and Janey Henze, who are well

17  known in this community, who are members of the bar and if they

18  give their word about what they will do and what role they will

19  play in the case, the Court can believe that.  There's no

20  reason why they can't.  They are members of the bar, and

21  they've got great integrity and great respect in this

22  community, and I think you can take their word for it.

23          THE COURT:  Thank you very much, counsel.

24          Anyone else?

25          MR. PICCARRETA:  Yes, Your Honor.

1          THE COURT:  Sir, come on up.  Tell me who you are,

2     again.

3          MR. PICCARRETA:  Yes, I am Mike Piccarreta from

4     Tucson, representing Mr. Padilla.

5          THE COURT:  Nice to see you again.

6          MR. PICCARRETA:  Judge, we filed a separate motion,

7     due to the importance of this issue.  And I would suggest that

8     this issue may be the most important ruling that will be made

9     in the case, and the reason I say this, is the Ninth Circuit

10    has said that if there's an erroneous denial of right to

11    counsel, it's an automatic reversal without showing of

12    prejudice.  That's how serious the issue is taken.

13         When you look at the state cases, the words they use

14    on this is, they bear a heavy burden to do this, to sever a

15    defendant from the people most able to represent their

16    interests.  It could create fundamental injustice.

17         In some cases they say, the prosecutor has no standing

18    to even argue it.  They can present it to the court, not argue

19    it.  That it's unseemly on the state to do so, should only

20    happen in extreme circumstances, and they shouldn't even be

21    participating in this issue.  And I've been doing this for a

22    couple of years, and I haven't seen the vigor of a prosecution

23    to disqualify criminal defense counsel.

24         Now, I am not making any aspersions as to motives, but

25    if this motion is granted, they will gain a huge, huge tactical

1    advantage over the defense.  The reason is, for all of the

2    defendants, and I have been told they join in my remarks to

3    avoid having to say, me, too, this counsel Davis Wright

4    Tremaine has been the leading counsel on First Amendment

5    issues, the leading counsel on Section 230 issues, issues that

6    are going to be presented to the Court, and we need them to

7    present them.

8           It would take us -- well, first of all, never would we

9    be able to have that expertise, no matter how much time.  But

10   hundreds of hours to gain that level of knowledge that they

11   have off the top of their heads.

12          There's a joint defense agreement here signed by

13   Mr. Ferrer.  And joint defense agreements in this district, I

14   can speak to, are normally -- and there are two main areas that

15   everyone is aware of what might happen.  One, you want to keep

16   the privilege.

17          But, two, if a defendant negotiates a plea and

18   cooperates, they won't disqualify all of the other lawyers that

19   they have shared confidences with.  And they agree to do that,

20   and that is what was agreed to do here, and that was relied

21   upon by my client in the joint defense agreement and -- both

22   orally and in writing, and we relied upon it for the case.  We

23   are similarly situated to Mr. Lacey and Mr. Larkin, as to Davis

24   Wright Tremaine, because if they were the people who were going

25   to be presenting these motions, we would be joining into their

1    work.

2         And, you know, I have had a lot of cases with joint

3    defense agreements, and I have had a lot of cases where people

4    cooperated, but I have never seen the government, until today,

5    come in trying to disqualify counsel, and especially counsel

6    that will not have a role in cross-examining the witnesses at

7    trial.

8         Now, sir, we have those cases --

9         THE COURT:  I'm sorry.  I just need to go back.  Tell

10   me what your position is as it relates to the plain text of

11   this ethical rule that we've been discussing this morning.

12        MR. PICCARRETA:  Yes, I will.  Judge, when I was bar

13   president, one of the things we had to do was to review

14   complaints about lawyers in the middle of litigation trying to

15   disqualify the other one, virtually always in a civil context.

16        And what we did then, and I can't speak for the bar

17   now, is that they would say, we're not going to let the bar get

18   used as a matter of trial tactics.

19        When the case is over, if there's an ethical

20   violation, we deal with it.  If there's not an ethical

21   violation, we deal with it.  But during the trial thing here we

22   have, one, a situation where there are no confidences.  There's

23   been waivers on multiple documents.

24        And three, Mr. Ferrer, pursuant to the joint defense

25   agreement, has provided all sorts of information to it.

1          So, one, I don't think that having the Court enforce

2     the ethical rule to gain tactical advantage in a criminal case

3     should happen.

4          Two, we have the Fifth and Sixth Amendment issues that

5     are always raised whenever they try and disqualify counsel.

6     The bar just deals with the language of the ethical rule.  And

7     I would suggest if they think there's a violation, the bar can

8     deal with it when the case is done.

9          Two, Mr. Ferrer is a witness.  Davis Wright Tremaine

10    will not be involved in the cross-examination of him.  He does

11    not have a substantial interest in the outcome of the case,

12    apart from the fact he has waived all confidences in not just

13    one document, not just two documents, I think they are now up

14    to three and four.

15         And we relied upon those documents.  When lawyers sign

16    those documents, as Mr. Ferrer's counsel did, and then later

17    come in before your court and try and disqualify other lawyers,

18    I agree with the Arizona courts that said, that's unseemly.

19         So, Judge, I don't think Rule 1.7 applies.  B, we all

20    have independent criminal trial counsel who are going to be

21    handling the actual courtroom, so the activities will not

22    impact the trial itself.  Three, he's waived every confidence

23    that we can think of, both in documents and through

24    consultation.  And four, the prejudice level, the prejudice

25    level is indescribable.

1          The role of these people for all of these defendants

2     and the role to present to the Court the best possible

3     knowledge on First Amendment.  And they try and sprinkle a

4     little fairy dust on the case and go, it's no First Amendment.

5     Really?

6          They've indicted a publisher who is posting things on

7     the web and holding them responsible for actions of third

8     parties in cases that have been either dismissed or modified in

9     nine separate cases, many of them federal courts.  That they

10    have a novel theory, as one federal judge has called it, of

11    prosecution.  That they have to show specific knowledge, and

12    that's just on the facts.

13         There will be motions before you to dismiss this

14    entire prosecution on First Amendment grounds, and those will

15    be the motions that are the responsibility of Davis Wright

16    Tremaine and will not require any cross-examination of

17    Mr. Ferrer.

18         He has no -- apart from not even being here, he has no

19    prejudice.  We have insurmountable levels of prejudice, and we

20    have Fifth and Sixth Amendment rights to be represented by

21    counsel of our choosing.  And I would submit, Judge, if they

22    have an ethical problem, there's other places to deal with it.

23         Trial management problems in this courtroom are here,

24    and I think that this is a big case.  It's going to -- it's

25    the leading First Amendment case in the country in many, many

1    years, and it is in this court.

2              And I understand their desire to get the people that

3    know it the best off the case and the tactical advantage that

4    will ensue.  But, Judge, I urge you not to punish these

5    defendants and severely prejudice them on this issue.

6              My view is, I thought the motion -- I won't say

7    frivolous, but not well taken.  And you can ask yourself, as a

8    U.S. Attorney and as a Judge, how many of these motions do I

9    see?

10             Normally, it's when we represent someone, and then

11   they become the key witness against you when they're

12   cross-examined.  You've seen it, when they represent them on

13   various matters with Joint Representation Agreements?  Have you

14   seen it with people with JDAs, which are frequently, where one

15   pleads, tries to disqualify the others?  You haven't.

16             So why are we here for this motion?  Why are they

17   willing to risk an automatic reversal if they are wrong to get

18   these folks out of the case?

19             And it's troubling, and I have dealt with these

20   issues, mostly civil lawyers are the ones who always accuse

21   each other of a variety of things and try, you have a conflict,

22   you have this.  The criminal lawyers traditionally don't do

23   that.

24             And ask yourself, how many of these have you seen, and

25   say, on this case, this is the one?  Why is that?  Why Davis

1   Wright Tremaine?

2           And I am not saying that their intent is to gain a

3   tactical advantage.  I am not accusing them of improper

4   motives.  I am saying, the result of their behavior gives them

5   huge tactical advantage.  And as a result, that's why you have

6   got pleadings this big from them.

7           If they were in state court, the judge would go, you

8   have no say over who these folks' lawyer is.  They have a right

9   to counsel of their choice.  They have constitutional rights.

10  You brought it to my attention, I appreciate your hard work, I

11  will deal with it, and I guess dealt with later.

12          Here, you've got pleadings a foot high trying to get

13  rid of the lawyers of choice, and it impacts every defendant

14  sitting here today, every defendant.  Because we all

15  understood, we all agreed orally, in writing, that everyone

16  knew that these guys were going to do it.

17          And if Mr. Padilla had been the one to plead, I

18  wouldn't get up and say, these guys have to go.  Because I

19  agreed in writing to the contrary, and that's maybe why

20  Mr. Ferrer is not here, because he signed it.

21          So here's the aggrieved party, Mr. Ferrer, who is not

22  even a party anymore, over lawyers who won't be questioning him

23  at trial.

24          I have been the public criminal counsel, Judge, and I

25  would urge you to not accept this cunning invitation to, at

1    this point, issue a court order that interferes with all of our

2    Fifth and Sixth Amendment rights and would impact the whole

3    litigation, which is going to go on, for a while, at least

4    until January 2020, if they are acquitted, and if they are not,

5    for years afterwards on a very, very important First Amendment

6    case involving a publisher.  And to remove the lawyers who are

7    most acquainted with it and the most qualified, in the whole

8    United States, from the case, is obvious, obvious, obvious

9    prejudice.

10             THE COURT:  I appreciate that, sir.  Thank you.

11             Is there anyone else?  Sir, come on up.  Tell me your

12   name again, and what you would like to tell me.

13             MR. WEISS:  Yes.  Thank you, Your Honor.  My name is

14   Steve Weiss, and I represent Defendant Joye Vaught, and I'll be

15   very brief.

16             I've joined in the Document 180 the objection to

17   disqualification.  I certainly adopt Mr. Piccarreta's remarks.

18   My client was a low-level employee of Backpage.com.  I have not

19   been in this case for a long period of time, just as of around

20   April.

21             But one of the things that I did realize is that the

22   case involves significant critical First Amendment issues, and

23   that Davis Wright Tremaine lawyers are the preeminent First

24   Amendment lawyers in the country.

25             For me to try and even get anywhere near that, I'd

1    have to try and reinvent the wheel, and I just couldn't do it.

2              My client wants them to continue in their role, and if

3    they were disqualified, her Sixth Amendment and Fifth Amendment

4    rights, as Mr. Piccarreta eloquently explained to the Court,

5    would be violated.  And so we would ask the Court to deny the

6    motion to disqualify.

7              THE COURT:  I appreciate that, sir.  Thank you very

8    much.

9              I don't think we have any additional defense counsel

10   that wish to place -- sir, come on up.  Tell me who you are.

11             MR. NEUMAN:  Thank you, Your Honor.  Ariel Nueman on

12   behalf of Mr. Brunst, defendant number 4.  I don't know if this

13   is necessary, but I just want to officially, on the record,

14   adopt the arguments of Mr. Weiss and Mr. Piccarreta on behalf

15   of Mr. Brunst as well.

16             THE COURT:  I appreciate you doing that.  Thank you

17   very much.

18             Is there anyone else?

19             MR. FEDER:  I want to do the same thing, Judge -- or

20   can I just say it from here?

21             THE COURT:  You can stand from there, as long as you

22   speak up, Mr. Feder.

23             MR. FEDER:  We join in all of the --

24             (Courtroom phone begins to ring.)

25             THE COURT:  Just one moment, please.  The folks

|   |   |
|---|---|
| 1 | calling in, I guess we lost them, and they're trying to get |
| 2 | back to us. |
| 3 | THE CLERK:  They should be there. |
| 4 | THE COURT:  Okay.  Thank you. |
| 5 | Go ahead, Mr. Feder. |
| 6 | MR. FEDER:  Let me just add something to what |
| 7 | Mr. Piccarreta said.  I was on the state bar's professional |
| 8 | rules committee for about 20 years, and this is the very reason |
| 9 | why we would never, generally speaking, consider objections by |
| 10 | one counsel against the other counsel, to oppose them during |
| 11 | litigation is to gain strategic advantages. |
| 12 | It was pretty much, if you have a problem with your |
| 13 | behavior, then you can ask us a question, but not to try to get |
| 14 | leverage over somebody else on the other side.  This is a |
| 15 | perfect example of why the committees of the bar at least don't |
| 16 | engage in this kind of activity. |
| 17 | THE COURT:  I appreciate you all. |
| 18 | Mr. Kozinets, I will give you two minutes. |
| 19 | MR. KOZINETS:  Thank you, Your Honor.  I just want to |
| 20 | emphasize a couple of things.  First, the Wheat, Ross, Stepney, |
| 21 | and many other criminal cases that we've cited from the U.S. |
| 22 | Supreme Court on down, recognize that this kind of |
| 23 | disqualification motion is eminently proper when you have an |
| 24 | actual conflict of interest, particularly the one as stark as |
| 25 | we have here. |

1          With respect to the litigation in Washington State,

2     it's actually the R.O. case, not the J.S. case.  There was a

3     sua sponte order, but my understanding is that there was a

4     motion to reconsider that was filed before that state court

5     judge and that was denied.

6          And the Massachusetts District Court order that

7     Mr. Grant referred to actually explicitly recognizes a very

8     severe potential for conflict arising from Davis Wright's

9     continued representation of Mr. Lacey and Mr. Larkin there.

10          With respect to any notion of coordination between the

11     government and civil cases, that is just preposterous.

12          THE COURT:  I just have one question for you.

13          MR. KOZINETS:  Yes.

14          THE COURT:  One question.  Did you file the motion to

15     gain an unfair advantage over the defense?

16          MR. KOZINETS:  No, absolutely not, Your Honor.  In the

17     Wheat case, and then in United States versus Iorizzo case, from

18     the Second Circuit, says that where a conflict like this

19     arises, the government actually has an affirmative obligation

20     and should file a motion like this before trial, rather than

21     not addressing the issue, letting a conflict-riddled trial to

22     then occur, only to see it reversed later on appeal.  So we

23     were duty bound to raise these issues for Your Honor's

24     consideration.

25          THE COURT:  Thank you very much.  We are going to take

1   our morning recess of about 15 minutes, and what I need you all

2   to do is, as I stated before, the pleadings that I have already

3   received and I am very familiar with, I don't need you to step

4   up here and tell me what you've already given to me in writing.

5       I need you to make your best arguments, and if you

6   would like to speak in one voice, you can certainly do that.  I

7   know all of your time is incredibly valuable, so I want to make

8   sure we pare this all down.

9       So the Court is in recess until 10:45 so you can pare

10  down your arguments.

11      (Recess is taken at 10:31 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>C E R T I F I C A T E</u>

2

3          I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 6th day of October,

12   2018.

13

14                                 s/Elva Cruz-Lauer
                          Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT