ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Michael Lacey, et al.,<br><br>　　　　　Defendants. | CR-18-422-PHX-SPL (BSB)<br><br>**UNITED STATES' MOTION FOR ACCESS TO THE JOINT REPRESENTATION AND JOINT DEFENSE AGREEMENTS PREVIOUSLY SUBMITTED BY DEFENDANTS MICHAEL LACEY AND JAMES LARKIN FOR *IN CAMERA* REVIEW** |

Preliminary Statement

The United States respectfully seeks an order compelling Defendants Michael Lacey and James Larkin to provide the government with copies of the following joint representation and joint defense agreements that they previously submitted for *in camera* review as Exhibits A-C to the Declaration of James C. Grant (*see* CR 180 at 6-8):

Exhibit A	Joint Engagement Letter dated December 12, 2016 (Engagement Letter);

Exhibit B	Common Interest/Litigation Management Agreement dated December 31, 2016 (Joint Representation Agreement, or JRA); and

Exhibit C	Joint Defense Agreement dated June 2017 (JDA).

These *in camera* filings played a central role in the Court's analysis of two recently-litigated motions: (1) the government's motion to disqualify Davis Wright Tremaine LLP (DWT) and Henze Cooke Murphy LLP (HCM); and (2) the government's motion to resolve certain attorney-client privilege issues. (CR 338 (Disqualification Order) and CR 345 (Privilege Order)). The Court based the Disqualification Order primarily on its finding that "[t]he express terms of the JRA and JDA are fatal to the Government's argument for disqualification." (CR 338 at 7.) The Court similarly grounded the Privilege Order on its finding that "the plain text of the JDA" prevented Backpage.com's CEO and 100% owner, Carl Ferrer, from waiving Backpage.com's corporate attorney-client privilege without "first obtain[ing] the written consent of all parties who may be entitled to a claim of privilege over the materials." (CR 345 at 4; *see id*. at 4 (the JDA "set[s] forth other protections for information and communications exchanged between [the] parties").)

In entering these orders, the Court recognized "it may be difficult for the Government to understand what it cannot see…." (CR 338 at 9.) For several reasons, the government respectfully seeks access to these agreements so that it may evaluate their contents and make informed decisions about next steps in this litigation and related issues.

## Argument

**I.   THE AGREEMENTS ARE NOT PRIVILEGED.**

Lacey and Larkin asserted the agreements "are privileged" and may only be provided to the Court *in camera*. (CR 180 at 6 ("Because the agreements about DWT's representation are privileged, they are provided *in camera* declaration [sic] and are described here only generally.").) However, engagement letters and similar agreements generally are *not* privileged, and the agreements should be disclosed for this threshold reason.

1     The attorney-client privilege protects from discovery "confidential communications
2  between attorneys and clients, which are made for the purpose of giving legal advice."
3  *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011). The privilege is "narrowly and
4  strictly construed," and the party asserting it bears the burden of proving that it applies.
5  *Vasudevan Software, Inc. v. IBM Corp.*, 2011 WL 1599646, at *1 (N.D. Cal. Apr. 27,
6  2011); *accord United States v. Bergonzi*, 216 F.R.D. 487, 493 (N.D. Cal. 2003) (party
7  asserting privilege "must make a *prima facie* showing" that privilege applies).

8     "The Ninth Circuit has repeatedly held retainer agreements are not protected by the
9  attorney-client privilege or work product doctrine." *Gusman v. Comcast Corp.*, 298 F.R.D.
10 592, 599–600 (S.D. Cal. 2014); *Hoot Winc, LLC v. RSM McGladrey Fin. Process
11 Outsourcing, LLC,* 2009 WL 3857425, at *1-2 (S.D. Cal. Nov. 4, 2009) (citing *Ralls v.
12 United States,* 52 F.3d 223, 225 (9th Cir. 1995); *United States v. Blackman,* 72 F.3d 1418,
13 1424 (9th Cir.1995); *In re Michaelson,* 511 F.2d 882 (9th Cir.1975)); *see also Carrizosa
14 v. Stassinos,* 2006 WL 2529503, at *3 (N.D. Cal. Aug. 31, 2006) (under Ninth Circuit law,
15 fee agreements generally fall outside the scope of the attorney-client privilege; disclosure
16 warranted where litigant describes terms of the agreement in court filings). Moreover,
17 "[c]ommunications between attorney and client that concern the identity of the client, the
18 amount of the fee, the identification of payment by case file name, and the general purpose
19 of the work performed are usually not protected from disclosure by the attorney-client
20 privilege." *Clarke v. Am. Commerce Nat'l Bank,* 974 F.2d 127, 129 (9th Cir. 1992).
21 However, documents that reveal the client's "motive…in seeking representation, litigation
22 strategy, or the specific nature of the services provided" may be privileged. *Id.*
23 Engagement letters are often publicly disclosed in this District when a party submits an
24 application for attorneys' fees. *See* LRCiv 54.2(d)(2).

25    Here, Defendants have made no showing that the attorney-client privilege applies
26 to any of the three agreements identified above. Defendants have not demonstrated that
27 any of the agreements reveal confidential communications between a client and a lawyer
28 transmitting legal advice. The JRA, for example, consisted of a 10-page, single-spaced

contract between Lacey, Larkin, Ferrer, and entities they respectively controlled; it was *not* a communication between a client and a lawyer. (CR 193-9, Exhibit I, Declaration of Carl Ferrer (Ferrer Decl.) ¶¶ 28-29.) While the agreements may set forth the terms of the certain representations, or understandings among parties regarding how they propose to arrange their business and/or legal relationships, there is no indication that the agreements disclose the specific contents of any confidential legal advice, particular litigation strategies or theories, or the details of any legal services performed. Accordingly, the agreements are not privileged and should be disclosed. *See, e.g., United States v. Stepney*, 246 F. Supp. 2d 1069, 1078 (N.D. Ca. 2003) ("To the extent that joint defense agreements simply set forth the existence of attorney-client relationships—implied or otherwise—between various attorneys and defendants, the contents of such agreements do not fall within the attorney-client privilege."); *Pacific Coast Steel v. Leany*, 2011 WL 4572008, at *3 (D. Nev. Sept. 30, 2011) ("Joint defense agreements are generally not privileged. They serve only to formalize the invocation of the joint defense or common interest."); *Rodriguez v. Gen. Dynamics Armament and Tech. Products, Inc.*, 2010 WL 1438918, at *2 (D. Haw. Apr. 12, 2010) (Joint Defense Agreement held not to contain "any privileged or protected material"); *United States v. Hsia*, 81 F. Supp. 2d 7, 11 n.3 (D.D.C. 2000) (expressing doubt that "either the existence or the terms of a [joint defense agreement] are privileged").

## II.   THE AGREEMENTS ARE HIGHLY RELEVANT AND MATERIAL.

The Disqualification and Privilege Orders both relied on the cited agreements and stated that the government does not dispute the "validity" of the agreements. (*See* CR 388 at 7 n.5 ("Importantly, the Government does not dispute the existence or validity of either agreement [the JRA and JDA]."); CR 345 at 4 n.3 ("Neither party disputes the validity of the agreements [the JRA and JDA].").) In fact, the government – and Ferrer – vigorously disputed the agreements' validity. (*See, e.g*., CR 193 at 6-9; CR 193-9, Ferrer Decl. ¶¶ 23-44.) In his Declaration, Ferrer made clear that the conflict waivers cited by Defendants did *not* reflect his informed consent and cannot support the conclusion that the waivers are valid and enforceable. Ferrer explained he never "gave informed written consent to DWT's

joint representation of me, Mr. Larkin and Mr. Lacey, even if we were to become adverse in a later criminal case." (CR 193-9, Ferrer Decl. ¶ 24.) Rather, it was his understanding, after signing the December 12, 2016 Engagement Letter, "that if any of the individual defendants became adverse to one another, that DWT would immediately cease representing all the previously represented individual defendants. I never agreed to waive all conflicts regarding such joint representation, and, especially, regarding criminal charges that may be brought against me in the future." (CR 193-9, Ferrer Decl. ¶ 26.)[1]

To the extent other language in the Engagement Letter purports to suggest that Ferrer waived, in advance, his right to seek disqualification of DWT from representing Larkin and Lacey in criminal proceedings adverse to himself, any such waiver was not the product of informed consent. Rather, Ferrer averred that he "did not consult with any independent lawyer before signing the joint representation letter with DWT, and no DWT attorney ever recommended that I do so. I also do not recall ever discussing the nature of potential conflicts that may arise, or the potential impact on my interests with DWT or any other lawyer before signing this engagement letter." (CR 193-9, Ferrer Decl. 27.)

Ferrer similarly did not provide informed consent regarding any waiver in the December 31, 2016 JRA. The JRA was sent to him with other documents as part of a larger re-negotiation of the debt he owed to Lacey and Larkin. (CR 193-9, Ferrer Decl. ¶¶ 30-34.) He was given only 48 hours to review and sign the JRA, and felt he had to sign ("I had no choice but to sign it") to avoid losing his entire investment and "facing financial ruin." (CR 193-9, Ferrer Decl. ¶¶ 30-34.) The JRA was not an attorney-client communication, but rather was a contract among businessmen and the entities they controlled. (CR 193-9, Ferrer Decl. ¶¶ 28-29.)

---

[1] This is consistent with the quoted language of the Engagement Letter in Ferrer's letter to DWT dated April 13, 2018, and attached as Exhibit A to the government's disqualification motion. (*See* CR 118-1 at 2, n.1, quoting Engagement Letter, Page 3, para. 1: "If an incurable conflict were to arise among the three of you…and agreement cannot be reached regarding DWT's continued representation of one or more of you, DWT will withdraw from representing each and all of you individually, while continuing to represent Backpage.com, as set forth above.")

- 5 -

1   Critically, when he signed the JRA, Ferrer did not intend to waive any future conflicts of interest regarding his attorneys, especially conflicts that could arise in future criminal proceedings.  (CR 193-9, Ferrer Decl. ¶ 35.)  Rather, Ferrer averred "[t]he possibility of future conflicts of interest among the parties was never discussed before I signed that agreement."  (CR 193-9, Ferrer Decl. ¶ 36.)  Still worse, Mr. Larkin's lawyer, Don Moon, discouraged Ferrer from discussing the JRA with his own personal lawyers, "because he said that doing so would be a 'waste of time.'"  (CR 193-9, Ferrer Decl. ¶ 37.)  This is the opposite of "informed consent."  *See, e.g.*, ER 1.0(e) (informed consent requires the lawyer to communicate to the client "adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct"); ER 1.7, comment 21 (an open-ended advance waiver "ordinarily likely will be ineffective, because it is not reasonably likely that the client will have understood the material risks involved"); *Roosevelt Irrigation Dist. v. Salt River Project Agricultural Improvement and Power* Dist., 810 F. Supp. 2d. 929, 950-57 (D. Ariz. 2011) (waiver invalid because it did not address the scenario that later resulted in conflict).

The government should at a minimum be afforded access to the JRA so that it may analyze whether and to what extent the JRA detailed the types of future conflicts that may arise, explained the risks and benefits of proceeding with joint representation in view of those potential future conflicts, and confirmed that the signatories had obtained, or been afforded sufficient and meaningful opportunity to obtain, independent legal advice.

The government and Ferrer also vigorously contested whether the June 2017 JDA contained an advance conflict waiver regarding conflicts his personal attorneys (including DWT) might develop in the future.  Ferrer stated it was his understanding that the JDA "was formed to allow the lawyers for the individual targets and subjects to share materials and access a shared database of Backpage.com documents."  (CR 193-9, Ferrer Decl. ¶ 40.)  It was not his understanding that, by signing the JDA, he "would be waiving any future conflicts of interest involving my own personal attorneys."  (CR 193-9, Ferrer Decl. ¶ 41.)  As far as he knew, DWT was not a party to the JDA.  (CR 193-9, Ferrer Decl. ¶¶ 42-43.)

- 6 -

Courts have long recognized that JDA provisions must be clear and explicit in order to provide notice to the clients and the ability to obtain informed consent. The JDA should identify the signatory attorneys whom the client is agreeing not to seek disqualification of. *Stepney*, 246 F. Supp. 2d at 1085 (adopting ABA model JDA which identifies signatory attorneys). Based on Ferrer's description, the June 2017 JDA failed these tests. The government should be allowed access to the JDA to assess whether the JDA complied with the foregoing requirements.

Access to the JDA is warranted for another reason: In the Privilege Order, the Court rejected the government's primary argument – that Ferrer had executed a written waiver of Backpage's attorney-client privilege in his capacity as Backpage's CEO and 100% owner – based entirely on the contents of the JDA. (CR 345 at 3-4.) The Court wrote: "Based on the Court's *in camera* review…the Court finds that the plain text of the JDA states that the materials shared between the parties to the JDA are to be protected from disclosure unless the disclosing party first obtains the written consent of all parties who may be entitled to a claim of privilege over the materials." (CR 345 at 4.) Because Ferrer had not obtained consent from the other "listed parties to the JDA before executing his written waiver of attorney-client privilege," "the Government's argument for access to the privileged communication fails." (CR 345 at 4.) The Court specifically found that the JDA "not only established joint-defense privileges, but also set forth other protections for information and communications exchanged between parties to the agreement." (CR 345 at 4.) The Court concluded that Ferrer's written privilege waiver constituted an ineffective attempt "to circumvent the terms of the JDA." (CR 345 at 4.) The government cannot meaningfully evaluate the Court's ruling without having access to the terms of the JDA.

Moreover, as in the Disqualification Order, the Privilege Order is premised in significant part on the notion that the government does not dispute the "validity" of these agreements. (*See* CR 345 at 4 n.3 ("Neither party disputes the validity of [the JRA and JDA].").) However, the government in fact disputed the validity of these agreements to the extent Defendants suggested they could be read to apply retroactively to

communications that predated the agreements' existence. As the government pointed out, joint defense agreements provide *prospective* protection to confidences shared among the parties and their attorneys in furtherance of a joint defense. To be protected by the JDA, the disclosures in question must occur during and as a result of that joint defense. *Stepney*, 246 F. Supp. 2d at 1085. (CR 193 at 7; CR 269 at 9-10.) Nevertheless, the JDA appears to have been cited to justify *retroactive* application of that agreement to communications and documents that existed long before the JDA's creation. (*See* CR 345 at 3-4.) Here, the Order has the effect of sweeping into the universe of protected materials communications between Backpage and its attorneys dating to the company's inception in 2004 – 13 years before the JDA was executed. The government should be allowed to review an agreement that provides such broad privileges to its signatories.

In sum, the government contested the validity *and* existence of any purported joint representation or joint defense agreement that could have operated to prevent Ferrer from waiving Backpage.com's corporate attorney-client privilege over communications that predated these written agreements. (*See, e.g.*, CR 269 at 9-10 ("[I]t is highly unlikely that any of the documents currently segregated in the government's filter review contain material covered by the joint-defense privilege. Indeed, the filter team has confirmed that *none* of the segregated documents involves communications from December 2016 or later. This is relevant because Ferrer, Lacey, and Larkin didn't enter into a joint-defense agreement until late December 2016.").) The government should be permitted to review the JDA to assess whether the agreement sweeps so broadly as to include all Backpage.com privileged communications generated since the company's founding in 2004.

**III.   ANY PRIVILEGE HAS BEEN WAIVED.**

The Ninth Circuit addressed waiver of the attorney-client privilege in *Chevron Corp. v. Pennzoil Co.*, 974, F.2d 1156 (9th Cir. 1992), stating that the privilege "may not be used as both a sword and a shield….Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived." *Id.* at 1162. An implied privilege waiver occurs when: (1) the party asserts the

1  privilege as a result of an affirmative act, such as asserting a claim or defense; (2) through
2  the affirmative act, the asserting party puts the privileged information at issue; and (3)
3  allowing the privilege would deny the opposing party access to information needed to
4  litigate its rights effectively. *Home Indem. Co. v. Lane Powell Moss and Miller*, 43 F.3d
5  1322, 1326 (9th Cir. 1995). *See also In re Grand Jury Proceedings John Doe Co. v. United
6  States*, 350 F.3d 299, 303 (2d. Cir. 2003) ("The unfairness courts have found which
7  justified imposing [implied waiver] generally resulted from a party's advancing a claim to
8  a court or jury…while relying on its privilege to withhold from a litigation adversary
9  materials that the adversary might need to effectively contest or impeach the claim."). All
10 three requisites of implied waiver are satisfied here.

11       First, Lacey and Larkin asserted a claim or defense based on the three agreements.
12 In response to the disqualification motion, they affirmatively argued that Ferrer had waived
13 the conflicts described in the motion – and agreed not to seek disqualification – based on
14 the agreements. (*See, e.g.*, CR 180 at 6-8, 12-16.) Among other things, they represented
15 that the Engagement Letter and JRA "requested that DWT act as joint counsel"; "[a]s to
16 any claims – civil or criminal, whether then pending or that might arise in the future –
17 Ferrer agreed to waive any actual or potential conflicts of interest to allow for the joint
18 representation"; the parties agreed to share information "with the understanding that doing
19 so would not provide any basis to assert putative conflicts"; and "the agreements
20 contemplated that the parties interests could diverge…[and] allowed that a party could
21 withdraw from the joint representation but could not move to disqualify counsel from
22 continuing to represent other parties."  (CR 180 at 7.)  Lacey and Larkin also represented
23 that the JDA provided for information sharing and conflict waivers for the California
24 criminal case "or other proceedings," and that Ferrer agreed "not to seek disqualification
25 of counsel" should he later withdraw from the JDA.  (CR 180 at 7-8.)  They asserted "it
26 was acknowledged that DWT was encompassed within the joint defense undertakings and
27 protections."  (CR 180 at 8.)
28

Second, Lacey and Larkin put the contents of the three agreements at issue by extensively summarizing the agreements' terms in public court filings and at the October 5, 2018 motion hearing, and by arguing that those terms required denying the government's motions. (*See, e.g.*, CR 180 at 6-8, 12-16; 10/5/18 Hr'g Tr. at 32-34, 49-50, 83-84.)

Third, allowing the privilege to curtail the government's access to the agreements deprives the government of information it needs to litigate its interests effectively in this case. Lacey and Larkin asserted that the agreements "are privileged" and may only be provided to the Court *in camera*. (CR 180 at 6.) Without providing the government access to the agreements[2], the Court ruled that the agreements were "fatal" to the disqualification motion. (CR 338 at 7.) The Court also ruled that the JDA swept so broadly as to prohibit Ferrer from executing a valid waiver of Backpage.com's corporate attorney-client privilege regarding documents covered by *any* time period. (CR 345 at 4.)

Without access to the agreements, the government can neither meaningfully assess the recent rulings nor evaluate whether, *inter alia*: (1) the agreements described the present conflict sufficiently to allow Ferrer to have provided informed consent; (2) the agreements confirm that Ferrer was afforded meaningful opportunity to obtain independent advice[3]; (3) the conflict waivers apply retroactively to representations predating Ferrer's execution of the agreements; and (4) the agreements restrict Ferrer, in his capacity as Backpage.com's CEO and 100% owner, from waiving Backpage.com's corporate attorney-client privilege for communications generated at any time since the company's founding in 2004.

---

[2] The government previously sought disclosure of the December 31, 2016 JRA. The government noted that the JRA wasn't signed by any lawyers, and that Ferrer's description suggested it wasn't covered by the attorney-client privilege. "If the Court agrees," the government wrote, "it should order the defendants to provide a copy to the government." (CR 193 at 7.)

[3] The Disqualification Order contains no finding that Ferrer signed the JRA under advice of counsel. (*Cf.* CR 338 at 7-8).

Conclusion

For the foregoing reasons, the government respectfully requests that the Court order Defendants Lacey and Larkin to provide the government with the agreements attached as Exhibits A-C to the Grant Declaration (*see* CR 180 at 6-8).  In addition, the government requests that the Court continue the government's deadline for seeking reconsideration of the Disqualification and/or Privilege Orders until 14 days after service of the requested agreements on the government.  A proposed order is attached.

Respectfully submitted this 26th day of October, 2018.

        ELIZABETH A. STRANGE
        First Assistant United States Attorney
        District of Arizona

        *s/Peter Kozinets*
        KEVIN M. RAPP
        MARGARET PERLMETER
        PETER S. KOZINETS
        ANDREW C. STONE
        JOHN J. KUCERA
        Assistant U.S. Attorneys

        BRIAN BENCZKOWSKI
        Assistant Attorney General
        Criminal Division, U.S. Department of Justice

        REGINALD E. JONES
        Senior Trial Attorney
        U.S. Department of Justice, Criminal Division
        Child Exploitation and Obscenity Section

**Certificate of Service**

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: Anne Chapman, Erin McCampbell, Gregory Zamora, James Grant, Lee Stein, Paul Cambria, Robert Corn-Revere, Ronald London, Janey Henze Cook, John Littrell, Kenneth Miller, Thomas Bienart, Jr., Bruce Feder, Michael Kimerer, Rhonda Neff, KC Maxwell, David Wakukawa, Michael Piccarreta, Stephen Weiss, Gopi Panchapakesan, Ariel Neuman, Gary Lincenberg, Anthony Bisconti, Whitney Bernstein, Seetha Ramachandran.

*s/Sally Hawley*
U.S. Attorney's Office