ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>v.<br><br>Michael Lacey, et al.,<br><br>                Defendants. | CR-18-422-PHX-SPL (BSB)<br><br>**UNITED STATES' RESPONSE TO DEFENDANTS' JOINT STATUS REPORT (CR 443)**<br><br>**[Status Conference set for January 25, 2019, 9:30 a.m.]** |

**Preliminary Statement**

Asserting without any support that "[v]irtually all of the Defendants are without funds to pay for their defense"—and without first conferring with the government about the case schedule—Defendants filed a "Joint Status Report" on January 18, 2019 that seeks a four-month delay of their Scheduling Order deadlines. (CR 443 at 1.) In reality, the "Joint Status Report" is a mislabeled motion for a continuance. For several reasons, that motion should be denied.

First, Defendants' motion contains no showing that Defendants lack sufficient untainted funds to continue with their current counsel. As explained below, if they believe they are entitled to relief based on a claim of inability to pay counsel, Defendants' remedy is to seek a hearing pursuant to *United States v. Monsanto*, 491 U.S. 600 (1989), provided that they can first establish—with specific, particularized facts—they have no other funds for attorneys' fees. The government has even repeatedly offered to release funds for attorneys' fees without the need for a hearing if Defendants provide sufficient supporting evidence. Not a single Defendant has availed themselves of that invitation or otherwise sought a *Monsanto* hearing, and the requested delay should be denied for this threshold reason.

Second, Defendants' motion should be denied because the timeline for resolving their litigation in the Central District of California (CDCA) and the Ninth Circuit regarding the government's pretrial seizures of assets linked to Backpage.com, LLC (Backpage) is unknowable. Without engaging in detailed rebuttal of Defendants' account of the CDCA litigation, the government notes that a district court judge in the CDCA has stayed several of Defendants' challenges to the government's seizures. While Defendants have appealed the stay order, the Ninth Circuit has questioned whether it has jurisdiction over that appeal—and only recently permitted the appeal to proceed. (*See In re: Any and All Funds Held in Republic Bank of Arizona Accounts XXXX1889, XXXX2592, XXXX1938, XXXX2912, AND XXXX2500*, 9th Cir. No. 18-56455, DktEntries 2, 27.) Defendants have other asset-seizure objections pending before a magistrate judge in the CDCA. Simply put, the timeframe for resolving all of Defendants' various challenges in the CDCA is unknown (even after a Ninth Circuit appeal, there likely would be follow-on proceedings in the CDCA)—and Defendants should not be permitted to use the CDCA litigation as a mechanism for delaying their criminal trial in this District.

Third, the government vigorously disagrees with Defendants' "belie[f]" that they will be successful in the CDCA and/or Ninth Circuit. (CR 443 at 7.) As explained below, the cases Defendants cite are wholly inapposite. Moreover, despite the government's

invitation (*see* Ex. A), Defendants have failed to address numerous business practices (*e.g.*, moderation, the reciprocal-link program, aggregation/pre-boarding, financial relationships with "super pimps," concealment money laundering) engaged in by Backpage principals to increase Backpage's volume of prostitution ads and conceal its activities from law enforcement. Backpage was a criminal enterprise engaged in an array of practices designed to increase revenue from prostitution—activities in no way protected by the First Amendment.

For these and other reasons, the requested continuance should be denied.

## **Discussion**

### **I.  Defendants Have Failed to Show They Cannot Pay Their Attorneys.**

The requested continuance should be denied because the "Joint Status Report" is not supported by any definite, particularized showing that "[v]irtually all of the Defendants are without funds to pay for their defense." (CR 443 at 1.) Where a defendant produces sufficient evidence to show that seized assets are needed to pay for counsel of choice, the Fifth and Sixth Amendments require that the Court conduct a post-seizure, adversary "*Monsanto* hearing." *United States v. Westelaar*, 2013 WL 8206582, *19-20 (D. Nev. 2013). To obtain such a hearing, however, the defendant must make a preliminary showing that he is unable to retain his choice of counsel without the seized assets—in other words, that he has no other funds for attorney fees. *Id*.

Under the so-called "*Jones–Farmer* Rule," a pretrial hearing on a defendant's motion to release assets is required only if the defendant: (1) demonstrates to the court's satisfaction that he has no assets, other than those restrained, with which to retain private counsel; and (2) makes a *prima facie* showing that the restrained assets are not forfeitable. *United States v. All Funds on Deposit*, No. CV–05–3971(SJF), 2007 WL 3076952, at *7 (E.D.N.Y. Oct.17, 2007) (citing *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998)). As the court held in *Farmer*, "[t]he defendant has the burden of showing that he lacks other funds with which to retain counsel; a bare-bones allegation that he has limited cash on hand and no income is not sufficient." *United States v. Farmer*, 274 F.3d 800,

804–05 (4th Cir. 2001); *see also United States v. Marshall*, 2015 WL 4139368, at *5 (N.D.W. VA. July 9, 2015) ("The defendant must disclose his assets, liabilities, and sources of income and say how much he has already paid counsel and how much more he needs. He must also show that he does not have access to funds from third parties, such as friends or family members."); *United States v. Varner*, 2005 WL 2206083, at *2 (W.D.Va. Sept. 9, 2005 ("Varner's affidavit does not detail his assets and liabilities or provide a meaningful basis for the court to independently judge his assertion that he lacks the ability to retain counsel. Therefore, the court denies Varner's request for a hearing.").

The Ninth Circuit has neither explicitly embraced the *Jones-Farmer* Rule nor clearly stated what type of proof is required for this preliminary showing, but one case is illuminating. In *United States v. Unimex, Inc*., 991 F.2d 546, 551 (9th Cir. 1993), citing *Cohen v. United States*, 378 F.2d 751, 761 (9th Cir. 1967), the court found that to determine whether a hearing is required, "the court must decide whether the moving papers filed, including affidavits, are sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented. If the allegations are sufficient, and factual issues are raised, a hearing is required."

Here, Defendants have failed to support their request for a continuance with any such evidence. To the contrary, in response to a Defendant's claim of insufficient funds, the government offered to consider returning funds *without the need for a Monsanto hearing* to any Defendant who provided financial information that sufficiently established that he/she has no other assets with which to retain private counsel.[1] Defendant Larkin represented, through his counsel, that he would provide financial statements to establish his "need"; no such financial statements were ever provided to the government.

---

[1] *See, e.g*., Ex. K, Nov. 7, 2018 email from the government to M. Piccarreta, counsel for Defendant Padilla (explaining that, "[s]hould [your client] wish to make a *Monsanto* claim, we offer every defendant the opportunity to show that they are financially unable to pay for their defense without the funds we are seizing.…[I]f you can make a showing that your client has no other funds with which to pay for his defense, we are happy to review those materials and consider releasing some amount back to pay legal fees.").

- 4 -

Defendants Padilla and Vaught never responded to the government's offer. None of the Defendants requested a *Monsanto* hearing from this Court prior to filing the Joint Status Report. This is likely due to the fact that, as the government understands (upon information and belief), nearly all Defendants have more than sufficient untainted funds available for their defense. The motion should be denied for these threshold reasons.[2]

## II.     The CDCA/Ninth Circuit Proceedings Do Not Warrant a Continuance.

As described above, the parties have no way of knowing when Defendants' various CDCA challenges to the government's pretrial seizure of assets will be fully resolved. Particularly absent any showing by Defendants to support the assertion they are unable to pay their attorneys, Defendants cannot use the CDCA/Ninth Circuit litigation as a reason to delay this case until all such litigation concludes.

Moreover, the cases Defendants cite in their Joint Status Report are inapposite. Pointing to *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989), and *Adult Video Ass'n v. Barr*, 960 F.2d 781 (9th Cir. 1992) (readopted in *Adult Video Ass'n v. Reno*, 41 F.3d 503 (9th Cir. 1994)), Defendants assert the government's pretrial seizures of assets linked to Backpage violated the First Amendment. (CR 443 at 7-8.) Defendants nevertheless concede, as they must, that *Fort Wayne Books* and *Barr* dealt only with the pretrial seizure and removal from circulation of *expressive materials* (CR 443 at 8). Indeed, those cases only directly addressed the pretrial seizure of books, films and videos the government alleged were "obscene" under *Miller v. California*, 413 U.S. 15 (1973). They did not invalidate the pretrial seizure of *non-expressive assets* (*e.g.*, bank accounts, real estate, etc.).

In *Fort Wayne Books*, for example, the Supreme Court held that the pretrial seizure

---

[2] Defendants also assert "the government assured counsel for two defendants that the government was not seeking attorney trust funds." (CR 443 at 4.) Defendants never identify who made that representation, when and to whom it was made, and under what circumstances. Without more, it is difficult to respond. In any event, the government would have never agreed (and does not agree) to an attorney's use of tainted funds for legal fees, unless a defendant could demonstrate that he or she has no other source of legitimate funds.

of thousands of allegedly obscene books and films, based merely on a probable cause finding, constituted a prior restraint on speech prohibited by the First Amendment. Because the seizure "interrupt[ed] the flow of expressive materials" by removing them from sale or circulation, it triggered unique First Amendment concerns that otherwise do not generally apply to pretrial seizures. 489 U.S. at 63-57. The parties did not litigate, and the Court expressly did "not hold" "that the pretrial seizure of petitioner's *nonexpressive* property was invalid." *Id*. at 67 n.12.

Three years after *Fort Wayne Books*, in *Barr*, the Ninth Circuit invalidated a portion of the federal RICO statute (18 U.S.C. § 1963(d)) that permitted pretrial seizures of allegedly obscene films or videotapes without a hearing. The Ninth Circuit held that *Fort Wayne Books* required invalidation of pretrial seizures of obscene materials based merely on probable cause. *Barr*, 960 F.2d at 788. **However, the court "uph[e]ld § 1963(d)'s provision for the pre-trial preservation of assets."** *Id*. at 792. *See also id*. at 792 ("Only that part of section 1963(d) that authorizes pre-trial seizures of obscene materials on the basis of probable cause is unconstitutional."). Like *Fort Wayne Books*, *Barr* is inapposite.

Nor does *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Bd*., 502 U.S. 105 (1991), apply here. (*See* CR 443 at 8-10.) *Simon & Schuster* is not a pretrial seizure case; rather, it concerned New York's "Son of Sam" statute, which effectively authorized a tax on income from works that a "criminal" authored "on *any* subject, provided that they express the author's thoughts or recollections about his crime, however tangentially or incidentally." 502 U.S. at 121. The statute's definition of a "criminal" included "any person who has voluntarily and intelligently admitted the commission of a crime for which such person is not prosecuted." *Id*. at 110. As the Court observed, a person never accused of a crime, "but who admits in a book or other work to having committed a crime, is within the statute's coverage." *Id*. Had the statute been in effect at an earlier time and place, it would have applied to *The Autobiography of Malcom X*, Thoreau's *Civil Disobedience*, and the publications of Martin Luther King, Jr. *Id*. at 122. The Court invalidated the Son of Sam statute as impermissibly overbroad, and expressly confined its holding to that

statute. *Id*. at 122-23. The Ninth Circuit did not cite *Simon & Schuster* in its subsequent *Barr* decision, and it has no application here.

Defendants' remaining authorities (CR 443 at 9-10) are inapposite. The portion of *Citizens United v. FEC*, 558 U.S. 310, 336-337 (2010), cited by Defendants refers back to *Simon & Schuster*. *United States v. Natl. Treas. Employees Union*, 513 U.S. 454, 468-69 (1995), invalidated a 1989 law that prohibited federal employees from accepting compensation for speeches or articles regardless of any connection between such works and the employee's official duties. The statute erected a "wholesale deterrent to a broad category of expression by a massive number of potential speakers," 513 U.S. at 467; it had nothing to do with the seizure or forfeiture of assets involving criminal conduct. *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 812 (2000), concerned the Telecommunications Act's "signal bleed" provision that required cable operators to scramble sexually explicit channels in full or limit such programming to certain hours. It, too, had nothing to do with speech integral to illegal conduct, let alone civil seizure or criminal forfeiture issues. *Am. Lib. Ass'n v. Thornburgh*, 713 F. Supp. 469, 484 n.19 (D.D.C. 1989), *vacated sub nom. Am. Lib. Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992), invalidated the pretrial seizure of non-expressive assets—but only on the rationale that the seizure of those assets threatened the viability of an *ongoing* publishing business:

> Because the Court in the instant case concludes that the seizure of non-expressive assets—such as printing presses, bank accounts, etc.—of a business engaged in distributing expressive material **may determine whether the business is able to continue functioning or not,** the Court concludes that pre-trial seizure of non-expressive material *ex parte* from a business engaged in distributing expressive material…is unconstitutional.

713 F. Supp. at 484 n.19 (emphasis added). Defendants have not identified any ongoing publishing business that may be jeopardized if the accounts at issue (including IOLTA accounts) are subject to seizure.[3]

---

[3] In early April 2018, Backpage and its CEO pleaded guilty and admitted that Backpage was involved in knowingly facilitating prostitution. Backpage ceased its operations and agreed to forfeit the assets at issue. (*See, e.g*., *United States v. Backpage.com*, LLC, D.

As the Supreme Court has long recognized, speech facilitating criminal conduct—including adult and underage prostitution—is categorically excluded from First Amendment protection. *See, e.g., Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973) ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad…soliciting prostitutes."); *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) ("From 1791 to the present…the First Amendment has permitted restrictions upon the content of speech in a few limited areas" including "speech integral to criminal conduct…."); *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980) (the First Amendment is inapplicable to speech proposing an illegal transaction).

Nevertheless, citing three cases that involved Backpage, Defendants assert that "numerous courts have recognized that the publication of classified advertisements, even advertisements for adult services, are protected expression." (CR 443 at 10.) Yet Defendants' cited cases were all decided *before* Backpage and its CEO pleaded guilty and admitted that, during its 14 years of existence, Backpage "derived the great majority of its revenue from fees charged in return for publishing advertisements for 'adult' and 'escort' services," and "the great majority of these advertisements are, in fact, advertisements for prostitution services…." (*United States v. Ferrer*, D. Ariz. CR-18-464-PHX-SPL, Doc. 7-2 (Ferrer Plea Agreement at 12-13); *United States v. Backpage.com, LLC*, D. Ariz. CR-18-465-PHX-SPL, Doc. 8-2 (Backpage Plea Agreement at 11).)[4]

One of Defendants' cited cases, *Backpage v. Dart*, was dismissed as moot as a result of these guilty pleas; the only remaining issue in that case is whether Backpage's former lawyers (Davis Wright Tremaine) should be sanctioned for perpetuating a fraud on the court. (*See* Ex. B (Backpage.com, LLC v. Dart, Civil No. 1:15-cv-06340 (N.D. Ill.), CR

---

Ariz. CR-18-465-PHX-SPL, Dkt. 8-2 at 11-12; *United States v. Ferrer*, D. Ariz. CR-18-464-PHX-SPL, Dkt. 7-2 at 12-14).)

[4] On August 17, 2018, Backpage Sales and Marketing Director Dan Hyer pleaded guilty to an information charging him with a violation conspiracy, under 18 U.S.C. § 371, to commit one or more crimes in violation of § 1952 (Travel Act) and § 1956 (money laundering). (*United States v. Hyer*, D. Ariz. CR-18-422-5-SPL, Doc. 271 ("Hyer Plea Agreement").)

- 8 -

244 (Order Dismissing Case); Ex. C (CR 226, Sheriff Dart's Motion for Sanctions).) Moreover, Defendants' cases were decided long before the emergence of voluminous evidence, outlined in the Superseding Indictment and partially summarized below, demonstrating that Backpage was a criminal enterprise that knowingly hosted advertisements for adult and underage prostitution.

**III. Defendants Engaged in an Array of Business Practices Calculated to Increase Revenue by Increasing the Volume of Prostitution (Including Child Sex Trafficking) Ads on Backpage.**

In an exchange with Senior Judge David Campbell during the grand jury subpoena litigation that preceded this prosecution, then-counsel for Backpage and Ferrer (and current counsel for Defendants Lacey and Larkin) acknowledged that Defendants can be criminally liable for hosting third-party content they knew was illegal:

> THE COURT:  If a website operator republishes an advertisement knowing, completely knowing and understanding that the advertisement is for underage prostitution, meeting the scienter requirement that was addressed in the briefing, is it Backpage's position that that -- either that is not a crime or, if it could be characterized as a crime, it can't be prosecuted because it's committed in a First Amendment context?
>
> MR. GRANT:  To take the Court's question, I'm assuming they have knowledge not simply because somebody submitted an ad, but they know something?
>
> THE COURT:  Yeah, they know something more –
>
> MR. GRANT:  Actual mens rea, actual knowledge?
>
> THE COURT:  Right.  That's my hypothetical.
>
> MR. GRANT:  So the situation of the hypothetical is if there is actual knowledge, say through participation in a venture, you're conspiring with somebody, you know they posted an ad, you know the person involved is underaged, that's a prosecutable crime, Your Honor.

(Ex. D.) Against this backdrop, and the following are business practices committed with full knowledge by Defendants that Backpage was facilitating prostitution, including child sex trafficking:

    i.    <u>Moderation</u>

Defendants' cases discussing Backpage (CR 443 at 10) were all decided prior to the release of the U.S. Senate's Permanent Subcommittee on Investigations (PSI) Report in

2017. That 50-page report, entitled Backpage.com's Knowing Facilitation of Online Sex Trafficking, addressed a trove of internal Backpage documents not previously available.[5] The report was accompanied by an 840-page appendix largely consisting of incriminating Backpage documents.[6] As set forth in the report, and further outlined in the Indictment and Superseding Indictment in this case, Backpage engaged in a practice of content "moderation" that involved removing terms and pictures that were particularly indicative of prostitution, including child sex trafficking, and then publishing a revised version of the ad. (*See, e.g.*, CR 230, ¶¶ 11, 34, 68-152.)

Backpage CEO Carl Ferrer described the moderation process as follows in the factual basis of his guilty plea:

> I have long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). Acting with this knowledge, I conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., D.H., A.P, and J.V.) to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers. For example, I worked with my co-conspirators to create "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage. These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads.

(*United States v. Ferrer*, CR 18-464-PHX-SPL, CR 7-2, Ferrer Plea Agreement at 13.)

Backpage Sales and Marketing Director Daniel Hyer corroborated Ferrer's account and described the moderation process in the factual basis of his guilty plea as follows:

> Over time, I also became involved (along with Ferrer, Andrew Padilla, and Joye Vaught) in Backpage's efforts to "moderate" the content of the website's escort and adult ads. Once again, I knew that the great majority of the ads being "moderated" were actually offering illegal prostitution services—our removal of explicit words and pictures did nothing to change

---

[5] https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf

[6] https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf

> the underlying nature of the services being offered. In fact, Padilla insisted that I and other Backpage employees use the term "models" in intra-company emails when referring to persons in Backpage ads who appeared to be underage. This was a code word intended to avoid looking bad in a lawsuit.

(CR 271, Hyer Plea Agreement at 10.) In short, "moderation" involved the deliberate and knowing publication of prostitution ads.

ii.     Reciprocal Link: The Erotic Review

In addition to facilitating prostitution through the moderation process, in 2007 Backpage established a business relationship with a known prostitution website, The Erotic Review. The Erotic Review allowed "johns" to post reviews of prostitutes, including child sex trafficking victims, on their website. (*See* Ex. E; an example of a Backpage posting with a link to The Erotic Review.) Around 2007, Backpage recognized inserting links to The Erotic Review in Backpage postings would increase ad revenue. Backpage paid David Elms, The Erotic Review's owner, as much as $10,000 per month for this reciprocal link relationship. (*See, e.g.,* Ex. F; invoice to Elms). Backpage insisted that Elms disguise the name of The Erotic Review as Elms Website Technologies in an effort to conceal the nature of The Erotic Review and Backpage's financial relationship with The Erotic Review.

Hyer described Backpage's relationship with The Erotic Review in the factual basis of his guilty plea as follows:

> Among other things, the true nature of the ads was obvious and we sometimes used ads appearing on *The Erotic Review* (a website where customers would post "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts) as the source of the content for the new Backpage ads we were creating.

(CR 271, Hyer Plea Agreement at 9.)

As early as 2007, the subject of The Erotic Review was raised at management meetings attended by Defendants Larkin and Spear. Two years after the establishment of the business relationship between TER and Backpage, Elms was arrested in 2009. The arrest was reported on by the alternative weekly newspaper *The New Times* (then owned by Defendants Lacey and Larkin) which characterized The Erotic Review as "the Amazon.com of prostitution." (Ex. G.) Following Elms' arrest, Larkin notified Spear and Ferrer by email about the arrest with a subject line of "johns accused of favorably rating

1 escorts on Erotic Review in exchange for discounts." (Ex. H.) Backpage's relationship
2 with The Erotic Review continued after Elms' arrest until approximately February 2011.
3 (*See* Ex. I; email from Andrew Padilla.) By inserting The Erotic Review links in Backpage
4 postings, Backpage was knowingly facilitating prostitution.

5 On March 1, 2011, Larkin, Lacey, Ferrer, Spear and attorney Hemu Nigam met with
6 representatives of the National Center for Missing and Exploited Children ("NCMEC") in
7 Alexandria, Virginia. During that meeting, NCMEC staff provided a PowerPoint that
8 detailed how The Erotic Review links were inserted into Backpage ads that featured child
9 sex trafficking victims. (*See* Ex. E.) The Backpage participants remained silent about their
10 experience with The Erotic Review; at most, Larkin told NCMEC CEO Ernie Allen that
11 [Backpage] "has nothing to do with Erotic Review." (Ex. J; Mar. 1, 2011 email from Ernie
12 Allen.) Nevertheless, Backpage's approximately four-year reciprocal link business
13 relationship with The Erotic Review further demonstrates that Backpage knowingly
14 facilitated prostitution. (*See also* CR 230, ¶¶ 45-58.)

15       iii. <u>Aggregation/Pre-boarding</u>

16 Backpage also promoted illegal prostitution by engaging in a practice known within
17 Backpage corporate offices as "aggregation" or "pre-boarding." This was accomplished
18 by identifying prostitutes advertising on other websites. Backpage would then post a free
19 ad and contact the pimp or prostitute and solicit them to Backpage with the incentive of a
20 free ad for six weeks (or a similar financial incentive). (*See* CR 230, ¶¶ 35-44.)

21 Hyer explained the process in the factual basis of his guilty plea as follows:

22 In general, this process consisted of identifying so-called "escort" and
23 "adult" ads on other websites and creating ads on Backpage for the women depicted in those ads in the hope of securing their future business. These
24 aggregation efforts, which I discussed on multiple occasions with my bosses Carl Ferrer and Scott Spear, resulted in large revenue and traffic growth for
25 Backpage. As a result, Ferrer and Spear authorized the expansion of the aggregation team I was supervising and authorized me to repeat the
26 aggregation process (which was initially concentrated in Dallas) in other major U.S. markets.

27 (CR 271, Hyer Plea Agreement at 9.)

28 In short, by copying (or aggregating) the ad from a competing prostitution website

- 12 -

and imposing the Backpage banner on the ad, and in some cases, inserting The Erotic Review link, Backpage was knowingly facilitating prostitution.

### iv. Affiliate Program

Backpage also engaged in another business practice by entering into a financial arrangement with "affiliates" or "super affiliates" like "Dollar Bill," an individual who earned fees for knowingly arranging for prostitutes and pimps to post ads on Backpage. (*See* CR 230, ¶¶ 59-67.)

In sum, the business practices detailed above (moderation, reciprocal link, aggregation, and affiliate programs) clearly were ventures to facilitate prostitution.

### v. Concealment Money Laundering

By 2015, the major credit card companies stopped processing payments for Backpage and some banks closed Backpage's accounts out of concern they were being used for illegal purposes. (CR 230, ¶¶ 182-183.) In response, Defendants pursued an array of money laundering strategies. These included: (a) instructing customers to send checks and money orders to a particular Post Office box, depositing those payments in bank accounts held in the name of entities with no apparent connection to Backpage, and then giving customers a corresponding "credit" on Backpage to purchase new ads; (b) wiring the proceeds of Backpage's business to bank accounts held in foreign countries and then redistributing the funds to certain Defendants (as compensation) or redepositing the funds in bank accounts held in the United States (to conceal the nature of those funds and promote Backpage's ongoing operations); and (c) converting customer payments, and the proceeds of Backpage's business, into cryptocurrencies. (CR 230, ¶¶ 184-194.)

Ferrer described the actions Defendants took to conceal from conventional banks the fact that transactions were being processed for payment to Backpage as follows:

> In addition to conspiring to knowingly facilitate the state-law prostitution offenses being committed by Backpage's customers, I also conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., J.B., and D.H.) to engage in various money laundering offenses. Since 2004, Backpage has earned hundreds of millions of dollars in revenue from publishing "escort" and "adult" ads. Over time, many banks, credit card companies, and other financial institutions refused to do business with

> Backpage due to the illegal nature of its business. In response, I worked with my co-conspirators to find ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities (including but not limited to Posting Solutions, Website Technologies, and Cereus Properties), and to use cryptocurrency-processing companies (including but not limited to CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital) for similar purposes.

(*United States v. Ferrer*, CR 18-464-PHX-SPL, CR 7-2, Ferrer Plea Agreement at 13-14.)

The foregoing is not meant to provide a complete account of the evidence and legal theories that the government intends to present to the Court in any future proceedings, or at trial, in this case. Rather, the government offers the above summary to illustrate many of the reasons why Defendants' case citations in the "Joint Status Report" are inapposite, and why Defendants' request for a continuance lacks merit.

**IV.    The Public and the Victims Have a Statutory Right to "Proceedings Free From Unreasonable Delay."**

Defendants' requested continuance should be denied for a further reason: The public and the victims have a right conferred by statute to "proceedings free from unreasonable delay." 18 U.S.C. § 3771(a)(7) (the "Crime Victims' Rights Act" or "CVRA"); *see also* 18 U.S.C. § 3161(h)(7)(A). The Superseding Indictment contains 17 select victim summaries. (CR 230, ¶¶ 160-176.) Of these victims, at least five were juveniles when they were trafficked on Backpage. (CR 230, ¶¶ 163, 164, 167, 169, 172.) Four of the victims were murdered or killed as a result of being trafficked on Backpage, and their surviving family members or lawful representatives stand in their shoes for purposes of the CVRA. 18 U.S.C. § 3771(e)(2)(B). (CR 230, ¶¶ 165, 173, 174, 175.) The victims' statutory rights—and their need for an expeditious resolution of this prosecution—strongly militates against further delay.

### Conclusion

The government incorporates by reference its January 18, 2019 Status Report (CR 444), which summarizes early and extensive efforts to provide Defendants with discovery, including the production of more than seven million documents and detailed indices by May 2018, subsets of "hot documents" tailored to each Defendant, meetings with

prosecutors to review the government's evidence, and access to DOJ e-discovery personnel to assist with technical questions regarding the government's productions.

For all of the foregoing reasons, Defendants' request for a four-month continuance should be denied.

Respectfully submitted this 23rd day of January, 2019.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*s/ Kevin M. Rapp*
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
JOHN J. KUCERA
Assistant U.S. Attorneys

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

**Certificate of Service**

I hereby certify that on this date, January 23, 2019, I transmitted the foregoing under-seal document for filing to the Clerk of the United States District Court and sent a copy via electronic mail to: Paul J. Cambria Jr. Esq. and Erin e. McCambpell, Esq., Lipsitz Green Scime Cambria, LLC, 42 Deleware Ave, Suite 120, Buffalo, NY 14202, **pcambria@lglaw.com** and **emccampbell@lglaw.com**, Thomas H. Bienert, Jr., Esq., Anthony R. Bisconti, Esq., Kenneth M. Miller, Esq., and Whitney Bernstein, Esq., Bienart, Miller & Katzman, PLC, 903 Calle Amanecer, Suite 350, San Clemente, CA 92673, **tbienert@bmkattorneys.com, tbisconti@bmkattorneys.com, kmiller@bmkattorneys.com, wbernstein@bmkattorneys.com**; Mike Piccarreta, Esq., Piccarreta Davis Keenan Fidel, PC, 2 East Congress Street, Suite 1000, Tucson, AZ 85701, **mlp@pdlaw.com**; Jim Grant Esq., Davis Wright Termaine, LLP, 1201 Third Avenue, Suite 2200, Seattle, WA 98101, **jimgrant@dwt.com**; Michael D. Kimerer, Esq. and Rhonda Elaine Neff, Esq., 1313 E. Osborn Road, Suite 100, Phoenix, AZ 85014, **MDK@kimerer.com** and **rneff@kimerer.com**; Steve Weiss Esq., Karp & Weiss, PC, 3060 North Swan Rd., Tucson, AZ 85712, **sweiss@karpweiss.com;** Robert Corn-Revere Esq., Davis Wright Termaine, LLP, 1919 Pennsylvania Avenue N.W., Suite 800, Washington, D.C., 20006, **bobcornrevere@dwt.com**; Bruce Feder, Esq., 2930 East Camelback Road, Suite 160, Phoenix, AZ 85016, **bf@federlawpa.com**; Gary Linenberg, Esq., Ariel Neuman, Esq., Gopi K. Panchapakesan, Esq., Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C., 1875 Century Park East, 23rd Floor, Los Angeles, CA 90067, **glincenberg@birdmarella.com, aan@birdmarella.com, gkp@birdmarella.com.**

*s/ Angela Schuetta*
Angela Schuetta
U.S. Attorney's Office