ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>             Plaintiff,<br><br>     v.<br><br>Michael Lacey, et al.,<br><br>             Defendants. | No. CR-18-00422-PHX-SPL<br><br>**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTIONS TO DISMISS DUE TO GOVERNMENT INTERFERENCE WITH RIGHT TO COUNSEL AND REQUEST FOR DISCLOSURE OR, IN THE ALTERNATIVE, MOTION TO WITHDRAW**<br>**(Docs. 456, 463, 464, 465, 467)** |

## SUMMARY OF ARGUMENT

After unsuccessfully moving for a four-month continuance of the case management deadlines (Doc. 443), Defendants Padilla and Vaught (joined by Defendants Lacey, Larkin, Spear and Brunst) (collectively, "Defendants") recycle the exact same arguments in an attempt to seek the even more extreme remedy of dismissal of the Superseding Indictment. For several reasons, Defendants' motion should be denied.

*First*, Defendants do not have the right to use tainted funds for attorneys' fees. *Second*, Defendants have been given numerous opportunities to demonstrate that they do not have sufficient untainted funds for their legal defense to trigger a *Monsanto* hearing, and they still have not availed themselves of this opportunity. *Third*, Defendants have repeatedly refused to address the considerable evidence that Backpage was a criminal enterprise engaged in numerous illegal business practices (*e.g*., moderation, a financial relationship (to increase revenue) with *The Erotic Review*, aggregation (copying ads from other known prostitution websites), giving preference to ads posted by known "super" pimps, engaging in money laundering activities by concealing Backpage as the recipient of ad fees, etc.). None of these activities implicate First Amendment protections. *Last and importantly*, funds deposited in attorneys' trust accounts (before the original March 2018 indictment) were seized *after* the Backpage website was closed, the CEO pleaded guilty to operating an illegal business, and all related Backpage entities similarly pleaded guilty to being a criminal enterprise. In short, neither expressive materials nor revenue from an ongoing publishing business were ever seized. The motion should be denied.

## I.   PROCEDURAL BACKGROUND

### A.   Backpage Sends Millions in Proceeds to Attorney IOLTAs

Following a torrent of civil and criminal litigation[1] and a Senate Subcommittee Report,[2] Defendants directed Backpage CEO Carl Ferrer to wire millions of dollars in Backpage proceeds to a number of attorneys and law firms for "future litigation."

---

[1] *See* Doc. 230 at ¶¶ 140, 144.
[2] *See* Doc. 230 at ¶ 151.

Specifically, between approximately February 2017 and March 2018, in anticipation of "future legal services" and potential government seizure of Backpage-held bank accounts, Backpage directed more than $16 million in large and widespread retainer payments to lawyers and law firms around the country.[3]   For example, one law firm that previously represented Defendant Larkin received $5,279,173.07 in Backpage proceeds for prepayment of "future legal services."   Between May 2017 and January 2018, that law firm received more than $3.2 million in wires directly from one of Backpage's foreign bank accounts, and then $2 million directly from Backpage LLC's operating account.

On March 28, 2018, Defendants were indicted on charges of conspiracy, Travel Act violations to facilitate prostitution, conspiracy to commit money laundering, concealment money laundering, transactional money laundering, and international promotional money laundering.   (Doc. 3.)   In that Indictment, the Government included notice of the Government's intent to forfeit "[a]ll right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offenses" and "any and all property, real or personal, *involved in or traceable to*" any money laundering offenses.  (Doc. 3 at 57 (emphasis added).)  Those assets included certain assets identifiable at that time as well as funds placed in Interest on Lawyers Trust Accounts ("IOLTAs") around the country as criminal proceeds and/or property involved in money laundering offenses.

**B.      Backpage and CEO Carl Ferrer Plead Guilty and Forfeit All Assets**

On April 5, 2018, prior to arrests and the unsealing of the Indictment, and pursuant to plea agreements, Backpage.com, LLC ("Backpage") and its related entities[4], and Carl Ferrer, Backpage, LLC's CEO, (collectively, the "Backpage Defendants"), pleaded guilty to various charges including conspiracy to commit a violation of the Travel Act and conspiracy to launder funds.  (*See* CR18-00465 at Docs. 4, 8, 10; CR18-00464, at Doc. 4,

---

[3] These facts were not known during the investigation, but were provided by CEO Carl Ferrer *after* he entered a guilty plea and cooperated in the Government's case.

[4] The related entities are Website Technologies, LLC, Posting Solutions, LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC Tech Group BV.

7, 12, 20.)  As part of their plea, the Backpage Defendants admitted guilt and consented to the forfeiture of all corporate assets and other property owned or controlled by Backpage. Preliminary Orders of Forfeiture were issued in both cases.  (Docs. 22, 23, respectively.) The Preliminary Orders of Forfeiture incorporated the list of forfeitable assets set forth in the Backpage Defendants' Plea Agreements and expressly provided that the court would "retain jurisdiction to enforce this Order, and to amend it as necessary pursuant to Fed. R. Criminal. P. 32.2(e)."  (*See* CR18-00465, Doc. 22.)  In all, between seizure warrants issued by the Central District of California, and the assets specifically identified in the later-returned Superseding Indictment,[5] 26 locations in real property, 89 bank accounts, and 268 domain names were seized in total, all related to the conviction of the Backpage Defendants.

On June 29, 2018 and July 1, 2018, several, if not all of Defendants filed verified third-party claims, asserting their interests in property listed in the Preliminary Orders of Forfeiture and requesting hearings to determine the matter.  (*See* Docs. 28-40 in CR18-00465, and Docs. 29-41 in CR18-00464.)  Because the three criminal cases in this district were still ongoing, the Government sought claimants' position on the Government's impending motion to stay; all of them objected.

Shortly after, on August 1, 2018, Defendants filed a Motion to Vacate or Modify Seizure Warrants ("Motion to Vacate or Modify") in the CDCA.  (CV 18-06742-RGK-PJW, Doc. 6.)  Relying on previous assertions, the Motion to Vacate or Modify argued the seizures were void because the assets constituted proceeds of a publishing enterprise protected by the First Amendment, and sought an evidentiary hearing.  *Id*.  A hearing was originally scheduled for August 29, 2018, but was later taken off the calendar because the court ruled that it could decide on the pleadings.  (CV 18-06742-RGK-PJW, Doc. 55.)

C.    **The Government Executes Its First Seizure Warrant on an IOLTA**

On August 8, 2018, pursuant to seizure warrants issued out of the CDCA, the

---

[5] On July 25, 2018, a Grand Jury in the District of Arizona returned a Superseding Indictment that charged Defendants with largely the same offenses, but added additional assets for forfeiture. (Doc. 230.)

Government seized $6,292,201.67 of funds alleged to be involved in Backpage's money laundering scheme, which were held in an IOLTA maintained by the law firm of Davis Wright Tremaine ("DWT").[6]  The Government served the warrant on the bank, and then worked with DWT to accept a wire of the seized funds in an effort to minimize disruption to the firm's operations.

**D.     Defendant Brunst's Request to Sell Restrained House for Attorneys' Fees**

That same week, Defendant Brunst requested that the Government stipulate to the interlocutory sale of a parcel of real property upon which counsel for Defendant Brunst had recorded a lien in order to secure attorney's fees related to this matter.  The Government agreed to stipulate upon the condition that any proceeds in excess of the lien would be deposited into a Government account and held as substitute *res* pending the criminal forfeiture proceedings.[7]  Counsel for Defendant Brunst agreed but never submitted a proposed sale agreement. *See*, Correspondence between the Government and Counsel for Defendant Brunst, dated August 8, 2018, attached hereto as Exhibit 2.  Upon information and belief, Defendant Brunst still owns the property (through his personal trust, JMB Trust), and the mortgage/lien for attorneys' fees remains on the property.

**E.     Delaware Advancement Proceedings**

On notice that the Government intended to seize criminal proceeds alleged to be held in IOLTAs, on August 16, 2018, Defendants Lacey, Larkin, Spear, and Brunst (and several

---

[6] At the time of seizure, DWT already had earned $1,088,715.63, however, out of an "abundance of caution" and "to avoid any dispute," DWT never transferred its earned fees into its operating account. *See*, Email Correspondence from DWT to the Government, dated August 8, 2018, attached hereto as Exhibit 1.

[7] In correspondence with the Government, counsel for Defendant Brunst indicated they had recorded an attorneys' fee lien on the property.  However, a search of public records indicates that BIRD MARELLA BOXER WOLPERT NES PRIVATE INDIVIDUAL granted the owner of the property, JMB Trust (John and Mary Brunst Trust), a mortgage in the amount of $1,925,000 on June 21, 2018.

of their related entities[8], collectively, the "Delaware Plaintiffs"[9]) filed *under seal* an 84-page civil complaint in Delaware State Chancery Court against the Backpage Defendants and their related entities, attempting to collaterally and preemptively collect assets that they knew were subject to federal forfeiture—in direct contravention of 21 U.S.C. § 853(n). (*Camarillo Holdings, LLC vs. Amstel River Holdings, LLC*, Del. Ct. of Chancery, Case No. 2018-0606-SG, Aug. 16, 2018, Doc. 1.)

The same day, the Delaware Plaintiffs filed a Motion for Expedited Proceedings, requesting "trial be scheduled as soon as the Court's calendar permits in the 45-60 day time-frame [sic]." (*Id*. at Doc.15.)  The Delaware Plaintiffs sought two forms of relief from the Delaware Court: 1) advancement of attorneys' fees for the "defense costs and expenses that have been and [may] be incurred by [Delaware] Plaintiffs with respect to claims that have been asserted against them in numerous civil, criminal, administrative, and investigative matters;" and 2) permission to use certain funds held by [the Delaware Plaintiffs'] counsel".[10]

Despite their attempts to expedite the case and secure an order from the Delaware Chancery Court granting them attorneys' fees, the Delaware Plaintiffs were not able to get an immediate summary ruling, and the matter remains pending.  While a detailed summary of the proceedings is not necessary here, it is important to note that the Government filed a Motion to Intervene, which was granted on February 18, 2019, and joined in the Backpage Defendants' Motion for Stay of Proceedings on February 22, 2019.  (*Camarillo Holdings,*

---

[8] The related entities include Camarillo Holdings, LLC, Cereus Properties, LLC, Medalist Holdings, Inc., Leeward Holdings, LLC, Vermillion Holdings, LLC and Shearwater Investments, LLC.

[9] The Delaware Plaintiffs include Lacey, Larkin, Spear and Brunst, but *not* Padilla and Vaught.

[10] According to the Verified Complaint, "certain funds held by [Plaintiffs'] counsel" include advanced fee deposits at Davis Wright Tremaine, LLP (¶ 176), Perkins Coie LLP (¶ 183), Prince Lobel Tye LLP (¶ 189), Copeland, Franco, Screws & Gill, P.A. (¶ 194), Wayne B. Giampietro LLC (¶ 199), Walters Law Group (¶ 204), Akin Gump Strauss Hauer & Feld LLP  (¶ 209), Thompson Coburn LLP (¶ 213), and Rusing Lopez & Lizardi, PLLC Trust Funds (¶ 218).  *Camarillo Holdings, LLC vs. Amstel River Holdings, LLC*, Del. Ct. of Chancery, Case No. 2018-0606-SG, Doc. 49.

*LLC vs. Amstel River Holdings, LLC*, Del. Ct. of Chancery, Case No. 2018-0606-SG.)  Oral argument is scheduled for March 8, 2019.

### F.    The CDCA Civil Forfeiture Proceedings

Between October 5 and 11, 2018, in CDCA, the Government filed civil forfeiture complaints concerning almost the exact same Backpage-related assets identified in the District of Arizona criminal indictments.  On October 23, 2018, the CDCA district court granted the Government's motion to stay all of the civil forfeiture proceedings that were directly related to the criminal proceedings in the District of Arizona.  (CV 18-06742-RGK-PJW, Doc. 85.)  In so doing, the CDCA court expressed concern that the "[d]eterminations made by [the CDCA court, including the same First Amendment claims Defendants now reassert] on the pending motions could ultimately have preclusive effect on the criminal matter [pending in the District of Arizona]."  (CV 18-08420-RGK-PJW, Doc. 15.)  The CDCA court saw "no reason why [Defendants'] pending motions [and First Amendment claims] could not be brought in the criminal action."  *Id.*  Six days later, Defendants Larkin, Lacey, Spear and Brunst filed a notice of appeal to the Ninth Circuit from the CDCA order granting the stay.  (CV 18-06742-RGK-PJW, Doc. 86.)  That appeal is pending.

### G.    The Government Obtains Additional Seizure Warrants on IOLTAs

On October 31, 2018, the Honorable Rozella A. Oliver, United States Magistrate Judge for the CDCA, issued 12 additional seizure warrants for funds held in 17 different bank accounts, which were held in the names of 15 different law firms (collectively, the "IOLTA Seizure Warrants").  The IOLTA Seizure Warrants were issued upon the CDCA Court's probable cause finding that, pursuant to 18 U.S.C. § 981(a)(1)(A) and (C), the funds were property involved in or traceable to money laundering, or were proceeds of violations of 18 U.S.C. §§ 1952, 1956, and 1957 (interstate and foreign travel or transportation in aid of racketeering enterprises, and money laundering offenses).

The Government had intended to serve the seizure warrants on the banks to which they were issued, but because of what had occurred with DWT (where service of seizure warrants initially prompted the bank to freeze all of the firm's accounts), the Government

attempted to take a more collaborative approach to executing the warrants.  To prevent similar interruptions, the Government contacted the 15 law firms affected by the Seizure Warrants before executing the warrants at the respective banks.  Beginning on November 6, 2018, the Government began making courtesy calls to these law firms to offer a wire-in-lieu-of-execution of the seizure warrants.  (*See*, Doc. 360, Ex. C at 1.)  The Government explained to each law firm that while normally these warrants would be served on the bank, the Government was attempting to minimize interruption by allowing the firms to wire the funds to the Government instead.  Many of the law firms accepted the Government's offer and wired the funds without incident.

Two days after the Government notified the affected firms, on November 8, 2018, counsel for Defendants Padilla and Vaught challenged the warrants issued by the CDCA court, but filed their Emergency Motion to Stay Seizure of Attorneys' Fees and Request for Immediate Hearing in the District of Arizona.  (*See* Doc. 360.)  Shortly after, counsel for defendants Lacey, Larkin, Brunst, and Spear filed a motion to join (Doc. 366), despite the fact that the warrants were not directed to their counsel and they had no standing to contest them.  On November 16, 2018, this Court denied their motions.  (Doc. 393.)

However, challenges to the IOLTA Seizure Warrants were also filed in CDCA, where the warrants were issued.  On November 21, 2018, Defendants and other parties who were affected by the IOLTA Seizure Warrants renewed their efforts to stay execution of the IOLTA Seizure Warrants; they also sought a *Franks* hearing on the affidavits.[11]   On December 12, 2018, the Honorable Magistrate Judge Rozella A. Oliver heard argument regarding the pending motions to stay execution of the seizure warrants.  (CDCA 2:18-MJ-02875, Doc. 23.[12])  Judge Oliver has not yet ruled on the motions.

---

[11] The warrant matters in CDCA are MJ 18-2872; MJ 18-2873; MJ 18-2874; MJ 18-2875; MJ 18-2876; MJ 18-2878; MJ 18-2880; and MJ 18-2883.

[12] During the hearing, Judge Oliver noted that the parties should maintain the "status quo" while she was taking the matter under submission.  Because the Government interpreted this to mean that things should remain exactly as they were at that point, i.e., the Government would not obtain any new warrants, and those firms to whom the warrants were issued

**H.    Defendants File Motions to Stay the Ancillary Proceedings**

On November 7 and 9, 2018, Defendants filed motions to stay and postpone the ancillary proceedings in the Backpage Defendants' criminal cases. (*See* CR18-00465 at Docs. 51-57; CR18-00464, at Docs. 44-50.) Despite having previously objected to the Government's request for a stay, Defendants now asked this Court to stay the ancillary proceedings so that the Delaware Chancery Court could rule first on the request to advance attorneys' fees. (*See* CR18-00465, Doc. 51 at 3.) Acknowledging that in the ancillary proceeding this Court's "determination of who 'owns' or has an interest in property is governed by state law," Defendants argued that "it makes sense[13] to stay the Ancillary Hearing until [the Delaware Court] renders its decision." *Id.* The Court held a hearing on all of the pending motions, including Defendants' motion to continue the trial on January 25, 2019. (CR-18-00465-PHX-SPL, Doc. 75.) The Court denied Defendants' motion to continue the trial and declined to rule on the fee issue, noting that if the Ninth Circuit Court of Appeals issued an opinion, the Court would proceed accordingly. (Doc 459 at 67.) The Court reset the hearing on the motions to stay ancillary proceedings for June 21, 2019.

---

would not move any funds, the Government asked counsel to leave the funds in their IOLTAs until litigation over this matter was resolved by the court. *See* Doc. 456, Ex. 8. Counsel for Defendant Padilla, however, had already offered and agreed to this. *See*, Correspondence between the Government and Piccarreta, attached hereto as Exhibit 3.

[13] It is surprising that this "made sense" to Defendants given that nearly every court to hear the issue has held that neither a third party claiming an interest in property subject to federal forfeiture, nor a defendant in a criminal case, may file any action in another court to circumvent the forfeiture procedure. If such an action is filed, the court where that action is pending must find that it lacks subject matter jurisdiction over the matter. *See, United States ex rel. Chepurko v. E-Biofuels, LLC*, 2019 WL 162607, *9-10 (S.D. Ind. Jan. 10, 2019) (because § 853 gives the criminal court exclusive jurisdiction over questions of title to the forfeited property, court where qui tam action is pending lacks subject matter jurisdiction over relator's claim); *In re Guildmaster, Inc.*, 2013 WL 1331392, *6 (D. Maine Mar. 29, 2013) (bankruptcy court lacks jurisdiction under § 853(k) to decide ownership issues on which forfeiture in a pending criminal case will turn); *JP Morgan Chase Bank N.A. v. Khalil*, 2006 WL 87599 (N.D. Ill 2006) (granting Rule 12(b)(1) motion to dismiss a foreclosure action for lack of subject matter jurisdiction where § 853(k) bars a third party from attempting to litigate his interest in property, or the forfeitability of the property, in a foreclosure action in another forum).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.    ARGUMENT

### A.    Defendants are Not Entitled to Use Criminal Proceeds for Their Defense

Neither the Fifth nor the Sixth Amendment requires Congress to permit a defendant to use tainted assets adjudged to be forfeitable to pay legal fees. *See Caplin & Drysdale v. United States*, 491 U.S. 617, 633 (1989) (post-trial); *United States v. Monsanto*, 491 U.S. 600, 616 (1989) (pretrial). Congress' rationale for this was clear: "[p]ermitting a defendant to use assets for his private purposes that ... will become the property of the United States if a conviction occurs cannot be sanctioned." *Monsanto*, 491 U.S. at 613.

Defendants rely heavily on *United States v. Stein* for the proposition that, because they were former employees of Backpage, and they had an expectation to receive attorneys' fees as a benefit or prerequisite of employment, the Government's seizure of funds they intended to use for their defense constitutes "improper interference"[14] with their Sixth Amendment right to obtain counsel. *Stein*, 541 F.3d 130, 155 (2nd Cir. 2008). However, there was no allegation in *Stein* that the funds intended to be used as attorneys' fees were tainted—to the contrary, it was uncontested that the defendants were claiming clean, untainted funds from KPMG, and the government's interference with their use of *untainted funds* was a violation of their Sixth Amendment rights. *Id.* The Second Circuit specifically noted that "there is no Sixth Amendment right for a defendant to obtain counsel using tainted funds," and a defendant's Sixth Amendment right to hire the attorney of his choice only applies to the right "to use *wholly legitimate funds*". *Id.* (citing *United States v. Farmer*, 274 F.3d 800, 804 (4th Cir. 2001) (emphasis in original).

---

[14] Defendants, who have all joined in Sections I and II of Doc. 456, accuse the Government of "bad-faith wrongful prosecution," making threats, and claim that the Government's "'ends justify the means' approach is unseemly and unworthy of the United States government." Doc. 456, *passim*. These are thinly veiled accusations of government misconduct. Counsel for Defendant Padilla has already been warned by this Court that, should he wish to make allegations of government misconduct, he "should be prepared to have an affidavit signed by [him] and notarized to a state bar" because, unless he is seeking a remedy from the Court "for some form of misconduct … [he should] leave the name calling out of this litigation." Doc. 459 at 64-65 (excerpts attached hereto as Exhibit 4).

Defendants attempt to cloak their criminal conspiracy to facilitate prostitution and child sex trafficking, and their extensive laundering of those proceeds, as a "First Amendment right."  That is not the law.

1. **Defendants Do Not Have a "First Amendment Right" to Commit or Facilitate Criminal Activity**

The Supreme Court has long recognized that speech proposing an illegal transaction falls entirely outside of First Amendment protection.  *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980).  The First Amendment does not protect advertising adult or underage prostitution.  *See, e.g., Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973) ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad…soliciting prostitutes."); *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) ("From 1791 to the present…the First Amendment has permitted restrictions upon the content of speech in a few limited areas" including "speech integral to criminal conduct…the prevention and punishment of which have never been thought to raise any Constitutional problem.").

For these reasons - and as discussed in some of the earliest pleadings in this case - a website or website operator may be prosecuted under federal law for knowingly facilitating prostitution or other types of illegal conduct.  (Doc. 42 at 2-5, incorporated herein by this reference); *see also United States v. Omuro*, N.D. Cal. No. CR 14-CR-336 (18 U.S.C. § 1952 conviction of the founder of www.myRedBook.com; Omuro (like Ferrer) admitted that "[t]he website hosted advertisements, the vast majority of which were posted by prostitutes containing … the sexual services they offered, and their rates … As such, the website promoted and facilitated … prostitution..."); *United States v. Hurant*, E.D.N.Y No. CR 16-45 (18 U.S.C. § 1952 conviction for the founder of www.Rentboy.com, who admitted he "was well aware … that the escort ads he posted … were thinly-veiled proposals of sexual services in exchange for money."); *cf. United States v. Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014) (founder of "Silk Road" website prosecuted for allegedly creating and operating "an expansive [online] black market for selling and purchasing narcotics and malicious software," separating his alleged conduct "from the mass of others whose

websites may - without their planning or expectation - be used for unlawful purposes").

Ignoring these prosecutions, Defendants repeatedly assert that courts "[i]n numerous cases" have held that Backpage.com and ads posted on the website are subject to blanket First Amendment protection—and the website's operator and owners have broad immunity from civil or criminal liability. While some Defendants prevailed in cases seeking *civil* remedies or turning on whether Backpage could be prosecuted under *state* law, those cases are all distinguishable because Section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230 ("CDA"), provided a broad grant of immunity in such contexts. The charges against Defendants in this case, however, are brought under *federal* criminal law— a context in which the CDA has no application. 47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of . . . [any] Federal criminal statute.").

Moreover, nearly all of the cases Defendants cite regarding Backpage were decided long before the release of the U.S. Senate's Permanent Subcommittee on Investigations 50-page Report in 2017, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING,[15] which was accompanied by an 840-page appendix largely consisting of incriminating Backpage documents.[16] The Senate obtained these documents, in part, pursuant to a subpoena it issued in 2015 to Ferrer. After Ferrer declined to comply, the Senate held him in contempt and initiated a lawsuit against him in federal court. During this litigation, Ferrer advanced an array of First Amendment-based challenges to the subpoena, which the district court rejected, holding that the "First Amendment does not protect speech that is itself criminal because it is too intertwined with illegal activity.'" *Senate Perm. Subcommittee on Inv. v. Ferrer*, 199 F. Supp. 3d 125, 138, 140 (D.D.C. 2016), *vacated as moot*, 856 F.3d 1080 (D.C. Cir. 2017).[17]

---

[15] https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf.

[16] https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf

[17] Congress amended the CDA in April 2018, putting Defendants on further notice that the CDA: "was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution and … facilitate traffickers in advertising the sale of unlawful sex

The Senate's subpoena - which started the process of pulling back the curtain on Backpage's internal workings - was followed by other cases that highlighted Backpage's facilitation of prostitution and child sex trafficking.  *See, J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714, 715-16 (Wash. 2015) (denying Backpage's motion to dismiss in a lawsuit brought by three minor girls alleging they had been "bought and sold for sexual services online on Backpage.com"; after extensive discovery, Backpage lost a motion for summary judgment and entered a confidential settlement); *see also, e.g.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 2018 WL 1542056, at *1 (D. Mass. 2018) (denying, in part, motion to dismiss on First Amendment and CDA grounds, in a civil case brought by a different underage victim; because the plaintiff plausibly alleged Backpage had "redrafted [her] advertisement … to suggest she was an adult," the CDA did not apply).

As detailed in the Superseding Indictment, previous motions and correspondence, the United States has highlighted an array of Backpage business practices that facilitated prostitution.  (*See e.g.*, Doc. 230 at ¶¶ 35-152; Doc. 197; Doc. 446; Exhibit 5). These practices include a financial relationship (Backpage defendants paid a monthly fee of $10,000) with a known prostitution website called *The Erotic Review*. (*Id.*)  Moreover, Defendants engaged in a practice known as "moderation" that removed words indicative of prostitution (including child sex trafficking) and then posted the "sanitized" ad.  In addition, Defendants engaged in an activity known as "aggregation" where they trolled other prostitution websites, copied ads from those sites, posted the ads on Backpage for free, and then contacted the pimp or prostitute in an attempt to convert them to a paying client.  Finally, to conceal Backpage has the ultimate recipient of proceeds from prostitution, Defendants engaged in a variety of concealment money laundering activities.  Defendants, however, consistently avoid addressing these practices in any of their pleadings or correspondence to the United States.  (*See generally, e.g.*, Doc. 446 at 9-14, incorporated herein by this reference.)

---

acts with sex trafficking victims … and [that] clarification of [the CDA was] warranted to ensure that such section does not provide such protection to such websites."  Pub. L. 115–164, § 2, Apr. 11, 2018, 132 Stat. 1253.  *See also note 1, supra.*

## 2. Defendants Do Not Have a "First Amendment Right" to Proceeds of a Crime

Defendants' objections to the Government's seizures of property in this case, including funds held in IOLTAs, are based on several cases that have no persuasive value to this Court. Importantly, this is not a case that involves a prior restraint on speech or the seizure of any expressive materials.[18] Nor is this a case that involves the seizure of the funds or other assets of an ongoing publishing business.[19] As described herein, Backpage and its CEO have pleaded guilty and have agreed to forfeit and/or facilitate the forfeiture of the assets at issue. Backpage has effectively ceased operations and is no longer in the publishing business. The assets at issue all consist of funds that originated at Backpage, are proceeds of crime or are involved in the laundering of proceeds, and that are subject to forfeiture under the plea agreements.

Here, Defendants knew or had reason to know that the millions of dollars deposited into IOLTAs around the country constituted illicit proceeds subject to forfeiture because of their intimate knowledge of and access to Backpage's business operations, and the fact that they directed and/or retained significant operational control over Backpage's business activities. (*See, e.g.,* Doc. 230 at ¶ 31); *see also United States v. 141st Street Corp.*, 911 F.2d 870, 876-77 (2d Cir. 1990) (corporate officer's knowledge of drug trafficking at corporation's building could be imputed to the corporation to defeat innocent owner

---

[18] The law draws a critical distinction between pretrial seizures of expressive materials (e.g., books, films, videotapes) versus non-expressive assets (e.g., bank accounts). *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 62-67 (1989) (holding that while the pretrial seizure of allegedly obscene books and films, based merely on a probable cause finding, constituted a prior restraint on speech prohibited by the First Amendment, the pretrial seizure of petitioner's non-expressive property did not). (*See also* Doc. 446 at 5-9, incorporated herein by this reference.)

[19] In *Am. Lib. Ass'n v. Thornburgh*, 713 F. Supp. 469, 484 n.19 (D.D.C. 1989), *vacated sub nom. Am. Lib. Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992), the court invalidated the pretrial seizure of non-expressive material, but did so only on the rationale that pretrial seizure of assets of an *ongoing* publishing business may determine whether the business can continue to publish or not. Here, Backpage has already ceased operations and Defendants have not identified any case law that suggests it is improper to seize the proceeds of a business that constituted a criminal enterprise.

defense).  The Government's seizures in this case were all conducted pursuant to probable cause findings made by a Grand Jury, Magistrate Judge, or District Court Judge. Defendants will have an opportunity to contest the seizures or assert related claims in the Backpage and Ferrer ancillary proceedings pending in this District.  Moreover, Defendants Lacey, Larkin, Spear and Brunst are continuing to pursue litigation relating to these assets in the CDCA and Ninth Circuit (and even in the Delaware Chancery Court), as described above.  For these and other reasons, Defendants' instant motion to dismiss should be denied.

**B. Defendants Have Not, and Cannot, Meet the Threshold Showing Required to Make a *Monsanto* Claim**

A post-restraint, pretrial hearing to recover funds seized by the Government is available as an exception to the ancillary proceeding remedy, but only if (1) the Sixth Amendment is implicated, and (2) the defendant makes a prima facie showing that there is no probable cause for the forfeiture of the restrained property.  *Monsanto*, 491 U.S. 600, 616 (1989).  Neither the Fifth nor the Sixth Amendment requires Congress to permit a defendant to use tainted assets adjudged to be forfeitable to pay legal fees.  *See Caplin & Drysdale v. United States*, 491 U.S. 617, 633 (1989) (post-trial); *Monsanto*, 491 U.S. at 616 (pretrial). Congress' rationale for this was clear: "[p]ermitting a defendant to use assets for his private purposes that ... will become the property of the United States if a conviction occurs cannot be sanctioned."  *Monsanto*, 491 U.S. at 613.

To seek relief from seizure, a defendant must first make a showing that they do not possess sufficient assets to obtain counsel.  Only where <u>all</u> of a defendant's assets have been seized or restrained are the defendant's Fifth and Sixth Amendment rights violated.  *See United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993) ("Unimex's right to counsel under the Sixth Amendment and to Due Process under the Fifth Amendment were violated by taking away all of its assets, denying it an opportunity to show cause prior to its criminal trial that an amount it could have used for attorneys' fees was non-forfeitable.").  "To even be entitled to the hearing, defendants must first show a genuine need to use the assets to retain counsel of choice."  *See Kaley v. United States*, 571 U.S. 320, 353-54 (2014) (Roberts,

C.J., dissenting) (citing *United States v. Bonventre*, 720 F.3d 126, 133 (2d Cir. 2013) (holding that to qualify for a post-restraint *Monsanto* hearing, the defendant must disclose his net worth, provide a comprehensive list of his assets, and explain how he has been paying his significant living expenses; it is not enough to contrast his income stream and bank account balances with his living expenses and legal fees)).

Courts put the initial burden upon the defendant to show that he lacks sufficient funds. *See United States v. McCray*, 113 F. App'x. 770, 772 (9th Cir. 2004) (holding defendant has no Sixth Amendment right to a hearing unless he offers evidence as to the source of the restrained property, and "his inability to compensate counsel from other funds available to him") (citing *Unimex*, 991 F.2d at 551). After making a showing of financial necessity,[20] a defendant may make a *prima facie* showing that there is no probable cause for the forfeiture of the restrained property in order to be entitled to a *Monsanto* hearing. At the probable cause hearing, a defendant cannot challenge the grand jury's finding of probable cause with respect to the underlying crime, but he retains the right to challenge the probable cause regarding the nexus between the property and the offense. *Cf. Kaley v. United States*, 571 U.S. 320, 341 (2014). However, to be entitled to this remedy, the defendant must first have his assets seized or restrained, and prove that he otherwise has insufficient funds to mount a defense.

Defendants argue that the Government should have to litigate the merits of the forfeiture case now, and prove the Government's theory of forfeitability prior to restraint. But that is not the law and importantly, Defendants have made no threshold showing of

---

[20] "Perhaps recognizing that *Monsanto* hearings might be used only to gain a sneak peak of the Government's case and witnesses, thereby wasting prosecutorial resources, a majority of courts have held that such hearings are necessary, only where the criminal defendant makes at least an initial showing that he has no other assets with which to retain private counsel." *United States v. Kramer*, No. 1:06CR200-ENV-CLP, 2006 WL 3545026, at *4 (E.D.N.Y. Dec. 8, 2006) (citing *United States v. Jamieson*, 427 F.3d 394, 406 n. 3 (6th Cir.2005) (cataloguing other circuit's approaches)).

financial need that would entitle them to such a hearing at this point.[21]

The Government has made countless offers to Defendants that it would be willing to consider a request to release attorneys' fees, without the need for a formal *Monsanto* hearing, if Defendants provided evidence of financial need.[22]  But what Defendants actually want from this Court, and what they have sought in the Delaware Proceedings, is clear - an end-run around lawful forfeiture proceedings and a means to avoid the threshold showing requirements of *Monsanto.*  Evidence of this is the smokescreen they raise regarding Ferrer's fees[23] and the fact that Defendants *still* have not come to the Government - or this Court - and made any attempt to properly request a *Monsanto* hearing.

---

[21] Defendants Padilla and Vaught offered to "submit evidence of their indigency [*sic*] to the Court under seal".  Doc. 456 at 18, n. 18.  While that arguably may be in compliance with this Court's local rules, it is not sufficient as a matter of law.  *United States v. Bonventre*, 720 F.3d 126, 133 (2d Cir. 2013).  Furthermore, the Government does not address the request made by counsel for Defendants' Padilla and Vaught to withdraw if this Court does not order the release of attorneys' fees.  It is the Government's understanding that, should Defendants Padilla and Vaught sufficiently make the threshold showing of indigence to be entitled to a *Monsanto* hearing, but fail to make a prima facie showing that there is no probable cause, Defendants Padilla and Vaught could petition this Court for their counsel of choice to be paid by the CJA Panel of the District of Arizona.  Understanding that Messrs. Piccarreta and Weiss may wish to withdraw instead, the Government takes no position on whatever decision Defendants Padilla and Vaught reach with their counsel.

[22] *See, e.g.*, Ex. 3; *see, also* Doc. 360, Ex. C at 5.  None of Defendants have attempted to make such a showing.  Counsel for Defendant Larkin expressed interest in doing so, and said they would provide general financial information showing need.  However, to date, nothing has been provided. *See* Correspondence between the Government and Counsel for Larkin, attached hereto as Exhibit 6.

[23] Defendants argue that the Government's willingness to allow Ferrer, a cooperating defendant, to use allegedly tainted assets for attorneys' fees is "unseemly and undermines the workings of the adversary system."  Doc. 456, at 12.  Defendants are certainly entitled to argue at trial that *any* benefit the Government provides to a cooperating co-conspirator to secure his cooperation - whether it be attorneys' fees or anything else - affects the validity and potential bias of Ferrer's testimony.  *Giglio v. United States*, 405 U.S. 150 (1972) (the government must produce evidence to the defense that affects a government witness's credibility). But the Government's duty is *disclosure* that a benefit has been provided in exchange for cooperation, a common occurrence in the justice system, so that the defense can prepare adequately for trial. Here, that obligation has been met, and no constitutional violation has occurred.

Evidence gathered during the course of the Government's investigation suggests the reason for this is because Defendants *cannot* make a showing of financial need to this Court without, at a minimum, taking serious liberties with the truth of their actual financial situation.    Financial records obtained during the investigation of this case show that Defendants, particularly Lacey, Larkin, Spear, and Brunst[24], have been receiving hundreds of thousands of dollars - sometimes monthly - from business sources wholly unrelated to Backpage.  Specifically, since the April 6, 2018 closure of Backpage.com, the company that purchased Defendant Lacey and Larkin's alternative press newspapers (such as the Phoenix New Times, LA Weekly, and the Village Voice, hereafter, the "Company"), has continued to make monthly debt service payments to Cereus Properties (one of Defendants' related entities), and later, directly to an IOLTA.  In total, between August 2018 and early January 2019, the IOLTA held by Daniel J. Quigley PLC, received about $1,560,449.92 in allegedly untainted funds via wire transfers from the Company.  That same IOLTA paid out about $1,242,783 to Quigley and other law firms via wire transfers and checks.  The account also paid out about $392,666.62 to Lacey, Larkin's spouse, Brunst, and Spear's spouse.  *See* Versoza Declaration, attached hereto as Exhibit 7.  Defendants cannot make the required threshold showing, and the Sixth Amendment is not implicated.

## III.    CONCLUSION

Despite Defendants' contention that this case is somehow different from every other federal case that involves the seizure of proceeds and funds involved in money laundering, as the Grand Jury of the District of Arizona and the Honorable Judges of the CDCA determined in their probable cause findings - it is not.  Rather than any of Defendants attempting to make the requisite threshold showing of financial need to be entitled to a

---

[24] Because Defendants Padilla and Vaught are the only two Defendants who could make even a colorable claim of financial need, the Government - in a phone call with defense counsel Michael L. Piccarreta and Stephen M. Weiss - specifically invited them to submit financial records evidencing financial need, and the Government would consider releasing attorneys' fees, without requiring them to request a formal *Monsanto* hearing from this Court.  In response, Defendants Padilla and Vaught provided nothing, and filed this Motion to Dismiss, claiming "improper interference."

*Monsanto* hearing, they raise meritless arguments and request dismissal of the Superseding Indictment.  There is no valid legal basis for their claims and this Court should deny their continued attempts to end-run the proper federal forfeiture process.  Because Defendants have failed to state a legal basis for any of their requests for relief, the Motions to Dismiss Due to Government Interference with Right to Counsel and Request for Disclosure, or in the Alternative, Motion to Withdraw (Docs. 456, 463, 464, 465, 467) should be denied in its entirety.

Respectfully submitted this 25th of February, 2019.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

BRIAN BENCZKOWSKI
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

KEVIN RAPP
MARGARET PERLMETER
ANDREW STONE
PETER KOZINETS
Assistant United States Attorneys

REGINALD E. JONES
Senior Trial Attorney

*s/ John J. Kucera*
JOHN J. KUCERA
Special Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, February 25, 2019, I transmitted the foregoing under-seal document for filing to the Clerk of the United States District Court and sent a copy via electronic mail to: Paul J. Cambria Jr. Esq. and Erin e. McCambpell, Esq., Lipsitz Green Scime Cambria, LLC, 42 Deleware Ave, Suite 120, Buffalo, NY 14202, **pcambria@lglaw.com** and **emccampbell@lglaw.com**, Thomas H. Bienert, Jr., Esq., Anthony R. Bisconti, Esq., Kenneth M. Miller, Esq., and Whitney Bernstein, Esq., Bienert, Miller & Katzman, PLC, 903 Calle Amanecer, Suite 350, San Clemente, CA 92673, **tbienert@bmkattorneys.com, tbisconti@bmkattorneys.com, kmiller@bmkattorneys.com, wbernstein@bmkattorneys.com**; Mike Piccarreta, Esq., Piccarreta Davis Keenan Fidel, PC, 2 East Congress Street, Suite 1000, Tucson, AZ 85701, **mlp@pd-law.com**; Jim Grant Esq., Davis Wright Termaine, LLP, 1201 Third Avenue, Suite 2200, Seattle, WA 98101, **jimgrant@dwt.com**; Michael D. Kimerer, Esq. and Rhonda Elaine Neff, Esq., 1313 E. Osborn Road, Suite 100, Phoenix, AZ 85014, **MDK@kimerer.com** and **rneff@kimerer.com**; Steve Weiss Esq., Karp & Weiss, PC, 3060 North Swan Rd., Tucson, AZ 85712, **sweiss@karpweiss.com;** Robert Corn-Revere Esq., Davis Wright Termaine, LLP, 1919 Pennsylvania Avenue N.W., Suite 800, Washington, D.C., 20006, **bobcornrevere@dwt.com**; Bruce Feder, Esq., 2930 East Camelback Road, Suite 160, Phoenix, AZ 85016, **bf@federlawpa.com**; Gary Linenberg, Esq., Ariel Neuman, Esq., Gopi K. Panchapakesan, Esq., Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C., 1875 Century Park East, 23rd Floor, Los Angeles, CA 90067, **glincenberg@birdmarella.com, aan@birdmarella.com, gkp@birdmarella.com.**

*s/ Angela Schuetta*
Angela Schuetta
U.S. Attorney's Office