# EXHIBIT 1

1      UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3              _____

4   United States of America,      )
                                    )
5               Plaintiff,          )      CR-18-0422-PHX-SPL
                                    )
6          vs.                      )      Phoenix, Arizona
                                    )      January 25, 2019
7   Michael Lacey,                  )         9:35 a.m.
    James Larkin,                   )
8   Scott Spear,                    )
    John Brunst,                    )
9   Andrew Padilla,                 )
    Joye Vaught,                    )
10                                  )
                Defendants.         )
11                                  )
    _____)

12

13      BEFORE:  THE HONORABLE STEVEN P. LOGAN, JUDGE

14

15      REPORTER'S TRANSCRIPT OF PROCEEDINGS

16          STATUS CONFERENCE

17

18

19

20

21
    Official Court Reporter:
22  Elva Cruz-Lauer, RMR, CRR
    Sandra Day O'Connor U.S. Courthouse, Suite 312
23  401 West Washington Street, Spc. 33
    Phoenix, Arizona  85003-2151
24  (602) 322-7249

25  Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2      For the Government:

 3                   U.S. Attorney's Office
                     By: KEVIN M. RAPP, ESQ.
 4                       ANDREW C. STONE, ESQ.
                         MARGARET WU PERLMETER, ESQ.
 5                   40 North Central Avenue, Suite 1200
                     Phoenix, AZ  85004
 6
                     U.S. Attorney's Office
 7                   By: JOHN JACOB KUCERA, ESQ.
                     312 North Spring Street, Suite 1200
 8                   Los Angeles, CA  90012

 9                   U.S. Attorney's Office
                     By:  REGINALD E. JONES, ESQ.
10                   1400 New York Ave. NW, Ste. 600
                     Washington, DC  20530
11

12      For the Defendant Lacey:

13                   Lipsitz Green Scime Cambria
                     By: PAUL JOHN CAMBRIA, JR., ESQ.
14                   42 Delaware Avenue, Suite 120
                     Buffalo, NY  14202
15
        For the Defendants Lacey and Larkin:
16
                     Davis Wright Tremaine LLP
17                   By: ROBERT CORN-REVERE, ESQ.
                     1919 Pennsylvania Ave. NW, Ste. 800
18                   Washington, DC  20006

19      For the Defendant Larkin:

20                   Bienert Miller & Katzman
                     By: THOMAS HENRY BIENERT, JR., ESQ.
21                   903 Calle Amanecer, Suite 350
                     San Clemente, CA  92673
22

23      For the Defendant Spear:

24                   Feder Law Office
                     By: BRUCE S. FEDER, ESQ.
25                   2930 East Camelback Road, Suite 205
                     Phoenix, AZ  85016
```

```
 1    For the Defendant Brunst:

 2              Kimerer & Derrick
                By: MICHAEL D. KIMERER, ESQ.
 3              1313 East Osborn Road, Suite 100
                Phoenix, AZ  85014
 4
                Bird Marella Boxer Wolpert Nessim
 5               Drooks Lincenberg & Rhow
                By: GOPI K. PANCHAPAKESAN, ESQ.
 6              1875 Century Park E, Suite 2300
                Los Angeles, CA  90067
 7
      For the Defendant Padilla:
 8
                Piccarreta Davis Keenan Fidel
 9              By: MICHAEL L. PICCARRETA, ESQ.
                2 East Congress Street, Suite 1000
10              Tucson, AZ  85701

11    For the Defendant Vaught:

12              Karp & Weiss
                By: STEPHEN M. WEISS, ESQ.
13              3060 North Swan Road
                Tucson, AZ  85712
14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2          THE CLERK:  Criminal case 18-422, United States of

3     America versus Michael Lacey and others.

4          This is the time set for status conference.

5          MR. RAPP:  Good morning, Your Honor.  Kevin Rapp,

6     Reggie Jones, John Kucera, Andrew Stone and Peg Perlmeter on

7     behalf of the United States.

8          THE COURT:  Good morning to all of you.

9          MR. CAMBRIA:  Morning, Your Honor.  Paul Cambria on

10    behalf of Mr. Lacey, who is here.

11         THE COURT:  Good morning.

12         MR. CORN-REVERE:  Good morning, Your Honor.  Robert

13    Corn-Revere, Davis Wright Tremaine, for Mr. Larkin and Lacey.

14         THE COURT:  Good morning.

15         MR. BIENERT:  Good morning, Your Honor.  Thomas

16    Bienert on behalf of Mr. Larkin, who is present.

17         THE COURT:  Good morning, Your Honor.

18         MR. FEDER:  Morning, Your Honor.  Bruce Feder for

19    Scott Spear, who is also present.

20         THE COURT:  Good morning.

21         MR. WEISS:  Your Honor, good morning.  Steve Weiss on

22    behalf of Joye Vaught, and I waive her presence.

23         THE COURT:  Good morning.  Did you file a motion to

24    waive presence?

25         MR. WEISS:  I did not.

1          THE COURT:  Okay.  In this district, we generally do

2     this.  I will let you get away with it this time, but the next

3     time, you need to make sure you file the motion, okay?

4          MR. WEISS:  Thank you.

5          THE COURT:  Thank you.

6          MR. PICCARRETA:  Judge, Mike Piccarreta on behalf of

7     Andrew Padilla, and I similarly waived his presence, and we did

8     not file a motion.  I read the rule and saw it was not a

9     mandatory appearance.

10          THE COURT:  It's mandatory here.  You need to file a

11     motion, okay?

12          MR. PICCARRETA:  We will in the future.

13          THE COURT:  Perfect.

14          Good morning to everyone.  I have the status hearing.

15          MR. KIMERER:  Your Honor, excuse me.

16          THE COURT:  Oh, I am sorry.

17          MR. KIMERER:  Michael Kimerer appearing on behalf of

18     Jed Brunst.  Also --

19          THE COURT:  We need to speak in microphones.  If you

20     will step forward, please.

21          MR. KIMERER:  Yes.  Michael Kimerer, and Gopi -- I

22     always have difficulty with Gopi's last name.  We are appearing

23     on behalf of Jed Brunst, and Jed Brunst is present at this

24     time.

25          THE COURT:  Sir, how do you pronounce your last name?

1          MR. PANCHAPAKESAN:  Gopi Panchapakesan, Your Honor.

2          THE COURT:  Good morning to you two as well.

3          Is there anyone else?

4          This is time set for the status hearing.  This Court

5   is in receipt of Document Number 443, which is the defendants'

6   joint status report.  I have Document Number 444, which is the

7   status memorandum from the United States Government, and I have

8   Document Number 446, which is the United States' response to

9   the defendants' joint status report, which is Document Number

10  44 -- I'm sorry, which is document number 446.

11          Mr. Stone or Mr. Rapp or Mr. Kucera or Mr. Jones,

12  what's the status of discovery in this case?

13          MR. JONES:  Reggie Jones on behalf of the United

14  States, Your Honor.   If I may approach?

15          THE COURT:  Go ahead.

16          MR. JONES:  If it is okay with Your Honor, the

17  government would like to start off by addressing some of the

18  issues as it pertains to the scheduling order and the discovery

19  in the case historically, Your Honor.

20          The United States has complied fully with the

21  scheduling order as it pertains to discovery, Your Honor.  And

22  as it's the defendants' contention that we have just dumped ten

23  million documents on them, Your Honor, it's just not the case.

24          To start, Your Honor, the government produced more

25  than seven million documents to the defendants in an agreed

1    industry-wide standard format, Your Honor.  We were all here in

2    court in April 2018.  We all agreed upon, and the Court adopted

3    --

4            THE COURT:  You know what, Mr. Jones, everything that

5    you have to tell me this morning is incredibly important, and I

6    want to make sure I can take some notes, so if you could slow

7    down, it would be helpful.

8            MR. JONES:  Will do, Your Honor.  Thank you.

9            In an agreed-upon format, we were all here in April

10   2018, and the Court adopted its scheduling order.

11           The government, in May of 2018, produced to defendants

12   these seven million documents, Your Honor.  Not only did we

13   produce to the defendants these seven million documents more

14   than 20 months prior to trial, we also produced indexes, Your

15   Honor, consisting of more than 25 categories denoting the

16   source from which these materials were obtained, Your Honor.

17           THE COURT:  Okay.  One -- just one minute.  My

18   apologies for interrupting you, Mr. Jones.

19           I need -- Mr. Feder, has the index been helpful?

20           MR. FEDER:  No, Your Honor, because --

21           THE COURT:  Why not?

22           MR. FEDER:  Because it's in a program called

23   "Relativity," which the defense attorneys then need to buy.

24   Seven million documents, it is difficult to go through them.  I

25   can give the Court a great example, because it involves the

1    Brady obligations of the government, which the government I

2    think at our last hearing indicated that they didn't have any

3    Brady to produce.

4         My secretary was trying to go through the discovery

5    from the government last week and came across what we would

6    call attaboy -- 30 pages of attaboy emails from various law

7    enforcement agents all over the country sent to Backpage

8    congratulating them on their cooperation in helping to send

9    them ads of what were suspected to be child prostitution ads.

10   Those were not produced.

11        The government represented to this Court that they

12   didn't have any Brady to produce, and it was not under any

13   particular label in the government's production of discovery.

14   That's one example.

15        THE COURT:  Is there any defense counsel that is

16   currently here that has found the index that the United States

17   Government has provided to you to be helpful?  That's a

18   negative response from everyone.

19        Mr. Jones, my apologies for interrupting.  Go ahead.

20        MR. JONES:  Your Honor, in addition to the indexes,

21   Your Honor, we have offered to defendants a DOJ Relativity

22   support specialist to assist them in navigating these

23   documents, Your Honor.

24        And as a matter of fact, we have --

25        THE COURT:  Is this person still in -- is the person

| | |
|---|---|
| 1 | working?  I know none of the AUSAs -- none of you all are being |
| 2 | paid right now, so is that person working? |
| 3 | MR. JONES:  That's right, Your Honor. |
| 4 | And as a matter of fact, we were on a two-hour |
| 5 | conference call with the defense at the outset of this case, |
| 6 | Your Honor, with two DOJ support specialists, Your Honor, |
| 7 | walking them through facilitating their review of the documents |
| 8 | and offered to do this whenever it was needed, Your Honor. |
| 9 | In addition to this, Your Honor, approximately seven |
| 10 | months ago in July of 2018, we produced more than 1,000 pages |
| 11 | of hot documents, i.e., documents specifically related to the |
| 12 | allegations contained in the superceding indictment.  We gave |
| 13 | these to defense counsel, Your Honor. |
| 14 | We supplemented this hot document production in |
| 15 | September with an additional 400 pages of hot documents. |
| 16 | Documents, like I say, Your Honor, that the government feels is |
| 17 | most important to its case and/or related to the documents -- |
| 18 | the indictment. |
| 19 | We even took this a step further, Your Honor.  Based |
| 20 | on several of these defense counsel's requests, we segregated |
| 21 | these hot documents and tailored them to each respective |
| 22 | defendant, Your Honor, and have offered to and have on occasion |
| 23 | met with defense counsel and participated in conference calls |
| 24 | to discuss their clients' exposure and also the details of |
| 25 | these documents with the defendants and have offered to do this |

1    for all of them, Your Honor, as it pertains to these 1500

2    documents.

3           Another point, Your Honor, that I think is very

4    important to address today is that of these seven million

5    documents, more than two million pages of these documents, Your

6    Honor, are actually just reproductions.

7           These are documents that Backpage provided to the

8    Senate during its investigation of Backpage and to the

9    government as part of the Arizona Grand Jury investigation

10   where the Court required them to provide these documents to us,

11   Your Honor.

12          THE COURT:  So your argument is that the two million

13   pages they should be very, very familiar with, at this point.

14          MR. JONES:  That's correct, Your Honor.

15          One other point I wanted to address, Your Honor, is

16   that more than half of its discovery, more than five million

17   documents come from a source entitled "Costar materials," Your

18   Honor.

19          THE COURT:  Whoever has a phone going off, if you can

20   please silence your phone, that would be very helpful.

21          My apologies again, Mr. Jones.  You have been

22   interrupted several times, sir.  Go ahead.

23          MR. JONES:  That's okay.

24          They come from a source called the Costar materials,

25   about five million documents.  And we understood, Your Honor,

1    that's very voluminous; five million is a lot of documents.  So

2    we said, okay, we will agree to provide the defense counsel

3    with any documents from this source that we intend or might

4    utilize at trial, and we did so, Your Honor, in August of 2018.

5          So as you can see, Your Honor, the United States has

6    been very forthcoming, unusually forthcoming when it comes to

7    discovery in this case, so it is very surprising when we saw

8    the defendants' status conference memo that they -- let me make

9    sure I get this right -- that they are unable to make any

10    meaningful review of these documents, Your Honor.

11          That really surprised us, given the efforts that we

12    have come in trying to release these documents to the

13    defendants.

14          And just doing a bit of comparing and contrasting,

15    Your Honor, the Enron federal case, which is the case we all

16    know out of Texas, and that case was a lot more massive than

17    our case.  It contained hundreds of millions of documents in

18    that case.  Your Honor, the defendants were indicted in that

19    case in February 2004, the CEO of Enron and codefendants,

20    superceded in July of that year.

21          Your Honor, that trial -- trial commenced in that case

22    in January of 2006, approximately 23 months post indictment, a

23    case with hundreds of millions of documents, Your Honor.  A

24    case where the government --

25          THE COURT:  Were all the defendants' assets seized by

1    the government in that case?

2          MR. RAPP:  Yes.

3          MR. JONES:  Yes, that is correct, Your Honor.

4          And with that case, Your Honor, just in comparing and

5    contrasting discovery in that case, Your Honor, defense were

6    given servers in that case detailing email accounts of over 500

7    employees, they were given 1500 CDs in that case, 70 hard

8    drives, and 1500 boxes of paper documents in that case.  And

9    that case still proceeded to trial 23 months post indictment.

10          THE COURT:  Did they have prosecutions in different

11   jurisdictions?

12          MR. JONES:  Correct, Your Honor.  That's correct.

13          Defendants in this case have got no paper documents.

14   Everything that we have given them has been in the industry

15   standard format that they all agreed to -- we all agreed to in

16   April of 2018, that they would be provided in.

17          We have provided them indexes, Your Honor, and we're

18   still, Your Honor, 21 months post indictment.  So just

19   comparing and contrasting this case with theirs.

20          One other point I wanted to make, Your Honor, in

21   regards to the Enron case is, in regard to Jencks materials,

22   Your Honor.  As the scheduling order sets out, the government's

23   agreed to provide the defendants with Jencks material

24   approximately 11 months before trial.

25          As Your Honor is aware, in most federal cases

1    defendants aren't given Jencks materials until after a witness

2    has testified at trial.  We are giving it to them 11 months

3    before trial.

4           And in the Enron case, the judge didn't order Jencks

5    materials to be turned over until 30 days before trial, Your

6    Honor.  We are giving them to them 11 months.

7           One final point, Your Honor, is that witness

8    statements, as well as an exhibit list, we agreed to turn this

9    over, detailed witness statements and exhibit list,

10   approximately nine months before trial.

11          So, you know, the United States admits that we have

12   bent over backwards, Your Honor, to make this as seamless a

13   process as we can in complying with our discovery obligations

14   here.

15          THE COURT:  Well, Mr. Jones, I know on the scheduling

16   order that has been approved by this Court, Document Number

17   131, the initial compliance with Rule 16 discovery is set

18   for -- the expert disclosure requirements was due the 3rd of

19   December, 2018.  Percentage-wise, how much discovery has been

20   given to the defense?  How much was given by the 3rd of

21   December of 2018?

22          MR. JONES:  I think --

23          THE COURT:  You can confer with your colleagues if you

24   need to.  Percentage-wise.

25          MR. JONES:  I would like to address --

| | |
|---|---|
| 1 | THE COURT:  Mr. Rapp, if you need to move up to the |
| 2 | lectern, you can.  Come on up.  If you are the resident expert |
| 3 | on that question, answer it. |
| 4 | MR. JONES:  Your Honor, we were just conferring |
| 5 | about -- there are a couple of outstanding areas, but let me |
| 6 | answer -- to answer your question, first, other than these two |
| 7 | outstanding areas that I am about to address, more than 90 |
| 8 | percent of the discovery has been given to defendants to date. |
| 9 | THE COURT:  And that was by the 3rd of December, 2018? |
| 10 | MR. JONES:  That's correct, Your Honor.  I would like |
| 11 | to address the filter review and also the servers, Your Honor. |
| 12 | As Your Honor knows, you approved a filter protocol a |
| 13 | couple of days ago, and so we had ceased, you know -- |
| 14 | MR. RAPP:  -- review. |
| 15 | MR. JONES:  -- review of some of our documents, you |
| 16 | know, as per defendants' request in May of 2018. |
| 17 | Now that our filter protocol has been reviewed, we |
| 18 | have a few categories, documents, i.e., the defendants' tax |
| 19 | records, third-party IT firm, Your Honor, and also some of the |
| 20 | personal devices that need to go through that attorney filter |
| 21 | review.  But those documents should be disseminated to them as |
| 22 | well within the next couple of months or so since the filter |
| 23 | protocol is in place. |
| 24 | One other besides that filter review, Your Honor, we |
| 25 | also seized a large amount of servers in this case; to be |

1    specific, Your Honor, more than 70 servers were seized in this

2    case.

3            Five of these servers, Your Honor, were seized in

4    Dallas, and they contain, you know, paper processing data, as

5    well as, you know, some of the email data.  The email data

6    would be sent through our filter protocol and be given to them

7    shortly.

8            This paper processing data is currently in the

9    possession of FBI.  Defense has requested, you know, review of

10   this paper processing data, and FBI is currently imaging those

11   servers, and that should be available to them shortly as well,

12   Your Honor.

13           One other point regarding the servers is that we

14   seized also about 40 servers in Amsterdam, and because of, you

15   know, how slow sometimes the MLAT process can be -- but we have

16   obtained about nine of those servers, which we believe, to the

17   best of our knowledge, contain all the totality of the

18   marketplace data, Your Honor.  So all of the ads, both

19   internationally and domestically, are contained on those

20   servers.

21           And although we -- defense asked specifically for, you

22   know, to be able to access the ads, as well as the paper

23   processing data, Your Honor.  And so the ad data is at a FBI

24   facility here in Phoenix now and available for them.  Whenever

25   they would like to, we can work with the technical folks to set

1    up a time for them to review any of the server -- ad

2    information on the servers, Your Honor.

3          Although I would like to point out that this isn't new

4    information, Your Honor.  These are ads that were on, you know,

5    Backpage for the past 14 years.  They were classified ads on

6    their site, so these are just millions and millions of ads that

7    they have seen for the past 14 years, ads that they have turned

8    over to the Senate, ads that they have turned over to us as

9    part of the grand jury proceedings compliance.

10         THE COURT:  Mr. Jones, is that part of the 10 percent

11    that's currently outstanding?

12         MR. JONES:  No, not the -- well, not -- if you didn't

13    count the server information, Your Honor, we probably would say

14    that probably 95 or so percent of the discovery has been turned

15    over.  Because I didn't count that server with that discovery,

16    but, I mean, those are the only two outstanding categories as

17    it pertains to discovery.

18         But as far as the ads, Your Honor, like that ad

19    information, like we said, is not new.  This is information

20    that we detailed in the superceding indictment, emailed ads

21    that have been detailed in a lot of civil suits.

22         How they plan to use millions and millions of these

23    ads or what they would need with them, we don't know, Your

24    Honor, but they asked for them, and we said, hey, you can look

25    at them, you know.

1          Paper processing data, you know, same thing, Your

2     Honor.  We will have that available for them, their technical

3     folks to use as they would like.  And we are able to -- if they

4     would like for us to help facilitate any of that, you know, to

5     make it less of a burden off of them, we are happy to help them

6     if they are looking for specific stuff as well.  So if they

7     want to work with us on that, we are more than willing to work

8     with them as well, Your Honor.

9          THE COURT:  Mr. Jones, thank you for all of that.

10          Mr. Rapp, is there anything that you would like to add

11     to that, sir?

12          MR. RAPP:  Well, just on the servers.  We sent the

13     defense a letter on December 10th.  It's actually Exhibit J to

14     our Document 444, basically laying out the posture of those

15     servers.

16          To date we have not received a response from the

17     defense, but I just want to drive home the point on those

18     servers.  These are millions and millions of ad postings.  I

19     have a random sample of one.  It's nothing more than an

20     explicit ad with explicit pictures and explicit text that is

21     consistent with the postings on Backpage.  There's just

22     millions of those.

23          And so I don't -- I don't want the defense to say,

24     well, look, we want to go through every one of those servers

25     because somewhere buried in there is something that might be

1   helpful, when those servers contain nothing but international

2   postings.

3            As the Court knows from some of the filings, Backpage

4   had a presence in 94 countries in addition to the United

5   States, and the postings in all of those countries outside of

6   the United States, there was no moderation, so they are nothing

7   more than very explicit ads.  There's no pretext to

8   prostitution.  There's no removing certain terms and then

9   reposting the ad.

10            So I just want the Court to make clear, because when

11   you are presented with numerous servers, you might think, oh,

12   geez, we have to go through all of those.  Not really.  They

13   are just nothing more than postings.  That's the only point I

14   wanted to make.

15            Thank you.

16            THE COURT:  Thank you.  Thank you to both of you.

17            The defendants' joint status report, which is Document

18   Number 443, Mr. Piccarreta, it has your name at the top of it.

19   Is it fair to say that you are the author of this document and

20   everyone else joined in?

21            MR. PICCARRETA:  I am the co-author, but I will take

22   responsibility as the main author.

23            THE COURT:  Okay.  I have read through the document

24   obviously several times, and it's the defendants' request.  It

25   is a joint status report, but it appears to be a veiled motion

1    to continue.  Is that what you actually meant by this document?

2              MR. PICCARRETA:  Well, in part.  What I meant is --

3              THE COURT:  Is that the relief you are seeking?  You

4    are asking for four additional months, so --

5              MR. PICCARRETA:  Yes.

6              THE COURT:  That is usually granted by way of a

7    motion, once the motion is filed.

8              MR. PICCARRETA:  Well, I thought I had an obligation

9    to bring to the Court's attention now the problems that are

10   erupting in the case that may impact the scheduling process.

11             I wanted to A, make a complete record on that, but

12   two, I wanted to let the Court know the difficulties with the

13   scheduling process.

14             In the status report though, I did suggest that at

15   least for now to stay the defense obligations for 120 days as

16   we try and move through the financial issues so that we can

17   keep things somewhat in a status quo before we have to --

18   perhaps have to deal with Fifth and Sixth Amendment issues,

19   motions to dismiss, Stein inquiries by the Court, and perhaps

20   motions to withdraw by counsel.

21             So that was my and our suggestion that we would be in

22   a better position over 120 days if -- to be able to get some

23   answers as to financially what's going on with the case.  And

24   so, yes, it is a motion, but -- not formally, but I did want to

25   let the Court know of all of these difficulties.

1       THE COURT:  Well, it is actually not a motion, it is a

2  request for a status hearing.  If you were filing a motion for

3  relief, you should have filed it as a motion.

4       But what I will do to help out the defense, I will

5  accept it this one time as a motion requesting certain relief.

6  And I believe you are requesting a motion to stay the defense

7  obligations; is that correct?  That's what you just said?

8       MR. PICCARRETA:  Yes.

9       THE COURT:  Go ahead.

10       MR. PICCARRETA:  Now, Judge, I think you have to look

11  a little bit to the history that might help you understand why

12  we are very, very concerned about the process of this case and

13  the handling of the case.

14       As you know, the indictment occurred in March of 2018.

15  Counsel -- clients were arrested, counsel made appearances at

16  that time --

17       THE COURT:  Mr. Piccarreta, my apologies for

18  interrupting you, and of course I will allow you to finish your

19  thoughts and I appreciate all of your thoughts, but I have a

20  question before you finish.

21       I have Document Number 131, which is filed the 2nd of

22  May, 2018 and it is the scheduling order.  Isn't it true that

23  this was a document that was presented to the Court as a joint

24  defense prosecution document?

25       MR. PICCARRETA:  Yes, it was.

1      THE COURT:  So all of the relief that you are

2  requesting right now, what's changed since May that would lead

3  me to believe that the flow of the case has changed such that I

4  need to change the ultimate scheduling and the trial that is

5  scheduled for, I believe, the 15th of January, 2020 at 9:00 in

6  the morning?

7      MR. PICCARRETA:  Well, initially, first, the

8  disclosure issues, the volume of disclosure has been presented,

9  as they have indicated.

10      THE COURT:  But this is something the United States

11  Government had proffered to the defense as it relates to the

12  millions of documents that would be coming your way, right?

13      MR. PICCARRETA:  Yes.

14      THE COURT:  Go ahead.

15      MR. PICCARRETA:  And all of those documents, as they

16  indicated here, have not yet come our way.

17      THE COURT:  Just 95 percent.

18      MR. PICCARRETA:  Well, 95 percent, but if you include

19  the computers they just talked about, then that percentage

20  drops down to, they can estimate, 10 percent, 20 percent.

21      THE COURT:  But wouldn't you also be able to argue

22  that if you are requesting information from computers, and

23  Mr. Rapp and Mr. Jones placed on the record, that those issues

24  are dealing with ads that are born from the companies that you

25  represent, right?  So this is information that you at some

1    point already possessed over a decade-and-a-half period of

2    time, right?

3            MR. PICCARRETA:  Well, I don't represent the company.

4    I represent --

5            THE COURT:  Well, you are here talking for the defense

6    counsels.  Obviously I will let all of you talk to me, but just

7    globally, that's a question that I think you can answer.

8            MR. PICCARRETA:  Well, I am not familiar with those --

9    with those documents.

10           THE COURT:  Who is familiar with those documents that

11   Mr. Jones and Mr. Rapp just proffered on the record?  Is

12   anybody?  Has anybody heard of a Backpage ad?

13           Is anybody familiar with Backpage, with what they do

14   as it relates to ads?  Would anyone argue that if Backpage is

15   responsible for receiving compensation to post an ad, Backpage

16   should know about the ad?  Would everyone agree with that?

17           MR. PICCARRETA:  Well, I guess it depends on what we

18   are talking about "know."  Ads are posted.  Different people

19   know different things.  Different people have different roles.

20   Different people were involved in the case.

21           I speak on Mr. Padilla, but what's the big thing

22   that's changed, when we entered into this agreement, funds were

23   advanced to represent Mr. Padilla.  No mention was made that

24   the government intended to seize the IOLTA accounts of the

25   funds earmarked for Mr. Padilla when we entered into that

1    order.

2              After we entered the order and after the Court entered

3    the order, the government for the first time brought it up to

4    me.  We had a very open, pleasant discussion.  They wanted some

5    information.  I gave it to them.

6              They sent me a letter saying, we are concerned.  I

7    sent them a letter saying, your concerns are misguided, and

8    then radio silence.  So I assume that the issue is done.

9              In the interim though, I detected -- all of a sudden

10   there's a motion to disqualify our First Amendment counsel.

11   There's a seizure of the First Amendment counsel's trust

12   accounts, but nothing for us.

13             We have a hearing.  Their motion is denied to get rid

14   of our counsel.  Some rulings go each way.  I then follow up

15   with some specific Brady requests after the hearing, and I have

16   to admit, I was -- I had been active in the case.

17             Then all of a sudden, unbeknownst to us, on Halloween,

18   they go out and get a seizure warrant, albeit it for the wrong

19   accounts, in my case, I am only speaking for Mr. Padilla --

20             THE COURT:  You think they picked Halloween for a

21   reason?

22             MR. PICCARRETA:  No, I just thought it was ironic.  I

23   think it's interesting.  I am not saying they planned it for

24   Halloween.  They don't tell us for about another week, and then

25   we get a phone call in November.

1          Now, we find out on November 7th, which is, by the

2     way, months after initial appearance.  You look in cases where

3     there's other seizures, the landmark cases, things are dealt

4     with right up front before the lawyers get involved.  They know

5     what's going on.  Here, we are involved.  We have our plans.

6     We have cost limitations, but we are doing the best we can.

7          We, at the beginning of the case, we are dealing with

8     a wide variety of collateral non-motions on the merits.  Get

9     rid of counsel, technical things, joint defense agreements,

10    call-back motions, things like that, not really the heart of

11    the case.

12         We -- then  since November 7th, we have been mostly

13    full-time and trying to get our money back.  And we came here,

14    and the Court ordered denied here.  We went to L.A.  It is

15    filed before the magistrate.  That ruling is pending on that.

16         Prior to that, the original seizure warrants that

17    happened before the case began, which did not involve IOLTA

18    funds, is that we -- is up for those warrants pending before

19    the Ninth Circuit, and as of yesterday, the Ninth Circuit is

20    going to hear the case.

21         I am not in the business of predicting how they will

22    rule, but they -- the briefing schedule is accelerated.  They

23    put it on the accelerated oral argument calendar.  The briefing

24    ends in March, so that figures into within the 120-day window

25    that if we prevail and get some relief there, then we can get

1    our money back.

2         We have money, it's just that they have it.  And then

3    for my thing, we have been working with them on the issues of

4    IOLTA funds, virtually it has been the focus of the defense for

5    the last two months.  All this takes us away from being able to

6    do it.  That's assuming, which is an assumption --

7         THE COURT:  So you're making an argument that the bulk

8    of the time has been spent on making sure the lawyers can

9    secure money so that you can be properly compensated for doing

10   your job as it relates to getting through the discovery and

11   preparing your respective clients for trial.

12        MR. PICCARRETA:  Yes.  And I view it as we are

13   defending our clients' ability to have "counsel of choice" is

14   the term that the courts seem to use.  And in order to enforce

15   our clients' Fifth and Sixth Amendment rights, which then

16   spills over to here, and why I asked the Court to have a status

17   conference now as opposed to April, because I did not want to

18   show up in April and lay all this on the Court and the Court

19   could rightfully ask, where have you been for three months?

20   How come this is the first time I am hearing about it?

21        So they have taken our money.  There is a veiled

22   threat that the monies -- well, my money actually is still in

23   my IOLTA account with my agreement not to touch it pending

24   order of the court or agreement of the government.  They have

25   said --

1          THE COURT:  When you say, "your money," what are you

2     referring to?

3          MR. PICCARRETA:  My client's money, Mr. Padilla's

4     money, for the case.  I call it "my money" because eventually

5     it will be.

6          THE COURT:  Your money?

7          MR. PICCARRETA:  Our money, but it is Mr. Padilla's

8     money.

9          We have been told not to touch it up through November

10    30th, and they did agree we could get paid firm fees up through

11    November 30th.

12         So we -- just like -- we have a shutdown, and we have

13    a shutdown, and I am speaking for Mr. Padilla, and the same

14    thing for Joye Vaught, where we cannot access their money to

15    pay us at this time.  So we have no funds.

16         Then on top of that, if you talk about the cost of

17    putting this disclosure into the proper programs as we have

18    talked about, these are thousands and thousands, as put in the

19    motion, truckloads if they were paper, of documents.

20         We do not have the funds to do it on Relativity.  We

21    will have the funds if we prevail in the Ninth Circuit for the

22    first group of warrants and prevail in the court in California.

23    And by the way, it wasn't our decision to have two courts

24    running back and forth over the West Coast.

25         The government made their strategic decision to file

1    the forfeiture warrants in California, and we are here now, but

2    now we are dealing with two things.  So our money is

3    effectively frozen.

4          We have cases pending for some individual warrants

5    that, if we are successful, will be beneficial, and we are

6    stuck in a position that normally, if we didn't have those

7    pending things, I would have to ask the Court to hold a Stein

8    hearing to determine whether the government's tactics have

9    forced out counsel of choice, and if so, what would be the

10   remedy.  And if that was unsuccessful, we would properly have

11   to ask the Court to withdraw, which is not my client's desire.

12         The government has suggested, well, just get

13   appointed, and I really don't -- I have learned when I was a

14   lawyer after about a week, I don't take legal advice to solve a

15   problem that was caused by the person who is giving me the

16   legal advice.

17         So, you know, our clients are not interested in us

18   being appointed at a reduced rate, and we are from out of town,

19   so that doesn't solve the issue.  But rather than deal with

20   that now and go to the Court and file the motion to dismiss, or

21   alternatively motion to withdraw, I thought, let's put our role

22   on hiatus, come back to the Court at your status conference

23   currently set in April and let you know what's going on.

24         But it's a really serious Fifth and Sixth Amendment

25   issue.  We have no funds.  And the government says, well, tell

1    your client to pay you.  Well, there probably isn't a client in

2    the city -- very few clients could afford what's needed to do

3    this case.  And the Court has got a taste of the disclosure in

4    the millions of documents, but apart from that, there's the

5    serious First Amendment constitutional issues that we disagree

6    on.

7              On the seizure of the assets, we believe they have not

8    complied with the law on seizing it.  They believe they have.

9    We disagree.  Those are complex legal issues that we are having

10   to deal with at the same time trying to manage the case.

11             And once they take the funds, Mr. Padilla cannot

12   manage the case.  And we have remedies, you know, if things

13   fail and those other California things where we are now, we

14   can't come to the Court and request a Luis hearing, the Supreme

15   Court Luis, and have discussions there.

16             But I thought rather than have significant

17   constitutional issues here relating to the monies that have

18   been taken there, that we should at least try to resolve them.

19             If we are successful, a lot of these problems go away.

20   We still may need more time because we are sort of frozen now,

21   but -- and if they don't go away there, then we are going to

22   have to make decisions how do we address the Court and what

23   type of hearings have to be necessary and what type of

24   disclosure we are going to request from the government on the

25   issue of this.

1       But, you know, I -- we have all been involved in the

2  criminal justice system here for a long time.  On our side of

3  the table, the Court, and I have never had this happen in all

4  of my cases, and I have queried other people in the white

5  collar law, and they sort of haven't heard it either.

6       What makes this unique, and what makes this case have

7  issues that would be of interest to a lot of courts, is that

8  seizing IOLTA funds in the middle of the proceedings, and then

9  coming to court and saying, don't give them a continuance, I

10  mean, it benefits -- they are in a no-lose situation.

11       They cut off the money.  They -- defendants can't have

12  counsel of choice or are severely hampered, then push the Court

13  to go, keep that time limit going, keep that time limit going.

14  And that gains them, and whether it is intentional or not, I am

15  not throwing aspersions at anyone, but it gives them huge

16  tactical advantage, and that's the result.

17       And it's just like in a battle, if you cut off your

18  munitions, you get rid of the defense lawyers, you cut off the

19  money to pay them, that increases your likelihood of getting

20  the result you want.  It decreases the likelihood of a fair

21  trial for defendants and a fair decision on really serious

22  constitutional issues.

23       THE COURT:  So you are making an argument now that the

24  CJA panel and the Federal Public Defender is not capable of

25  taking on a defense of this magnitude?

1          MR. PICCARRETA:  No, no, I think they are capable of

2     it, but under the constitutional case law, Mr. Padilla has a

3     right to a counsel of choice.  And it is not an unlimited

4     right, I understand that.  But his counsel of choice, for

5     better or worse, is me.

6          If due to circumstances created by the government's

7     seizures, if he cannot have his counsel of choice, he

8     understands whatever the rules are and if we can get the

9     Federal Public Defender or adequate CJA counsel, that's what

10    you get, and then the issue bubbles up for, you know, for a

11    later day.

12         But I am saying, if we can keep sort of a status quo

13    until the next status conference, we may have information

14    before we have to delve off into litigating Fifth and Sixth

15    Amendment issues and issues of seizing the funds for capital

16    advantage.

17         THE COURT:  Now, when you say, "keep the status quo,"

18    is it fair to say that since you are making an argument that

19    all of the defense counsels are similarly situated as it

20    relates to the compensation, is it fair to say that they are

21    all in stand-by mode as it relates to preparing the case

22    because they are also waiting to see ultimately if they will

23    get paid?

24         MR. PICCARRETA:  Well, I can't speak for everyone, but

25    I think for the most part the Court is correct.  I know I am.

1          THE COURT:  So the discovery, the 95 percent, no one

2     is doing any work on it because you want to make sure that at

3     some point in time you are receiving pay?

4          MR. PICCARRETA:  Well, we're doing what we have to do.

5     Our attention has been totally on --

6          THE COURT:  Getting your money.

7          MR. PICCARRETA:  Yeah, getting the money to be able to

8     do the work, but we are not -- you know, until we are out of

9     the case, we are not going to be derelict, but there's only so

10    much time, in my case, a small firm can devote and especially

11    if you are not getting paid, then you have got to handle some

12    other matters so everyone gets food on the table.

13          But I am not crying the blues for me.  This is not

14    about me.  I am willing to ride this out to see whether our

15    money can be returned to us and continue on, because I do want

16    to stay.

17          But on the other hand, it is grossly unfair to

18    Mr. Padilla when the government seizes his money to then not

19    have a lawyer that can be compensated to handle his case.

20          And so I would urge the Court to just put this on

21    hold, at least our obligations on hold, set a status conference

22    in April, I think there's one set, and then we come to the

23    court and let the Court know where we are.

24          And in the interim, I can't guarantee when courts

25    rule, but the Ninth Circuit has set an accelerated schedule on

1    the issues for those warrants.  The magistrate has some

2    pleadings in front of her now.

3            So that's where -- that's my recommendation to the

4    Court.  That's why I asked for a status conference, and we are

5    just trying to enforce counsel of choice and to avoid having to

6    deal with a very -- a really serious constitutional issue.

7    Because this case is unlike some of the other cases that have

8    made it to the Supreme Court.

9            So I would urge the Court to do that.  And, look, we

10   didn't create the problem.  We were plugging away as best we

11   could, but once the IOLTA seizures arrived, that was, at least

12   seven months post indictment, to me sort of a bridge too far.

13   And it was nothing that I expected to occur, and I was very

14   surprised, especially in this type of case that it would occur.

15           So I would urge the Court to not -- I don't want to

16   use the word "punish," but it would put us, the defense, in a

17   very, very bad position as a result of actions taken by the

18   government that have hindered the defense, to then say, no,

19   your discovery is due then, your discovery is due now.

20           Because those circumstances all changed on Halloween

21   night and then Halloween day, and then a week later when we

22   received notice of it, at least from Mr. Padilla's and

23   Ms. Vaught's point of view.

24           THE COURT:  Well, sir, I certainly appreciate you

25   placing all of that on the record.  Which defense counsel is

1    next?  And I know all of you, but for the record, when you

2    approach the lectern, if you could place your name on the

3    record, please.

4         MR. WEISS:  Yes, Your Honor.  Steve Weiss on behalf of

5    Joye Vaught, and I am not going to spend a lot of time talking

6    about her situation other -- I agree with the remarks that

7    Mr. Piccarreta just made.  Because my client, Joye Vaught, is

8    in essentially in the same situation as Mr. Padilla.

9         But I just wanted to add a few things to sort of feel

10   out the situation.  My trust account -- I hold money in my

11   trust account for the benefit of defending Joye Vaught, but it

12   is effectively frozen.

13        And it is frozen because I was told in so many words

14   that even though the forfeiture warrant for my IOLTA account

15   expired, it was likely they were going to refile that.

16        And then on top of that, when we argued the case in

17   California, several weeks ago, because this Court declined to

18   rule on that matter and said we should be in California, we

19   said okay, that's what the Court said to do, and that's where

20   we went.

21        During the course of that hearing that took about

22   three hours, counsel for the government would not rule out a

23   criminal prosecution of attorneys who then sought to reach into

24   those trust funds to pay for work that was done.  So as a

25   result of that, I haven't touched those funds.

1           THE COURT:  You are certainly not saying that a

2   federal prosecutor threatened prosecution?

3           MR. WEISS:  I will tell you that Mr. Feder has the

4   actual transcript of the remarks and you can interpret that how

5   ever you wish.  I will tell you how I interpreted it, as if I

6   decided that notwithstanding the fact that a warrant had

7   expired --

8           THE COURT:  Well, tell me how you received it.

9           MR. WEISS:  Well, I received it as a threat, that

10  there could be a criminal prosecution.

11          THE COURT:  From which lawyer?

12          MR. WEISS:  It was Mr. Kucera.

13          So in any event -- so I am in the state of limbo in

14  that situation.  In the government's reply to our status memo,

15  they talked about having not shown that our clients can't

16  afford to pay for this defense.

17          And this is an enormous case.  I don't know who really

18  could, but Joye Vaught cannot.  And Joye Vaught has no money to

19  defend this case.

20          I offered, when we were here arguing the motion some

21  time ago, at that point I offered to provide to the Court under

22  seal her financial affidavit, but the Court declined to take

23  the case and sent us effectively to California.  But I still

24  have that, and I still will file it with the court, if the

25  Court permits it to be filed under seal.

1          And the government, in so many words, kind of knows

2     that she can't afford counsel of choice, which is her Sixth

3     Amendment right because they either have the Pretrial Services

4     Report or they have access to it.

5          And to just summarize it, it shows that she has a

6     negative net worth.  So -- and she has no other sources of

7     funds.  Her parents are deceased.  Her only so-called friend is

8     her boyfriend, who can't afford to pay for this.

9          And so the bottom line is that I just want the Court

10    to know that my client is in the position of being unable to

11    afford, and hopefully, will get some relief from the California

12    courts where this Court said we should properly be, and that's

13    where we are.

14         And it is in the Ninth Circuit.  We anticipate

15    hopefully a favorable ruling, but certainly a ruling that will

16    let us know where we are within the next several months.

17         So I don't think the request that you are considering

18    to be a request for a continuance is unreasonable.  I think

19    that it should be granted.  Thank you.

20         THE COURT:  Thank you very much.

21         Next.

22         MR. CAMBRIA:  Good morning, Your Honor.  Paul Cambria

23    on behalf of Mr. Lacey.

24         I wanted to address one issue that you brought up this

25    morning, and that was a situation of, well, the company

1    supplied the documents so there is the indication there that

2    now which of those documents would be charged to our side?

3          Rule 16 obviously has been enacted to educate the

4    lawyers as to the discovery.  We are not employees of that

5    company.  And we need to use Rule 16 to obtain the information

6    and allow ourselves to be educated.

7          There may be some people who are employed by that

8    company who have knowledge of those documents, but we don't

9    unless we are given the documents and we have enough time to

10    evaluate them and decide whether or not they are useful.

11          And, you know, the point that Mr. Rapp makes about,

12    well, they are all the same.  Well, they are all the same to

13    him.  They may not be to us.

14          In addition he says, well, some of them deal with

15    events overseas and there's no moderation at all, et cetera, or

16    there's no crime committed overseas, and a number of places the

17    laws are different and so the ads are different.

18          But the bottom line is that we still have to make

19    ourselves aware of the contents of these documents.  That's

20    what Rule 16 is all about.

21          As far as funding, I have no funds.  I haven't had any

22    funds in months and months and months.  I am not sitting there.

23    I am still working hard on behalf of my client.  That's just

24    the way I am, and I am sure these other lawyers are as well.

25          However, the situation is such, originally we had made

1    an application, as you know, to try to free up the funds.  The

2    government's side is fully funded, obviously.  They are all

3    being paid.  They have whatever funds they need for discovery.

4              THE COURT:  In theory they are fully funded, but they

5    are receiving nothing for the last month.

6              MR. CAMBRIA:  Well, what I am saying is, they are

7    being paid.  They have expense money and everything that they

8    need in order to do their side of the case clearly.

9              THE COURT:  But you are aware the federal government

10   is shut down and they are receiving no pay.

11             MR. CAMBRIA:  I am.  And I would venture to guess that

12   that will be a shorter period of time than it will be for the

13   defense to receive funds in this case.  And I --

14             THE COURT:  So you would agree that the federal

15   prosecutors somewhat feel your pain as well, because they

16   haven't been compensated.

17             MR. CAMBRIA:  To a very small degree compared to ours,

18   certainly, and neither side would be -- would like that.  I do

19   know one thing, that when the government does start back up in

20   business, they will be fully compensated.

21             We, on the other hand, have made an application, as

22   you know, and as has been repeated here several times this

23   morning to this Court, this Court indicated that we should go

24   to California.  We promptly did, and we promptly filed.

25             And several rulings were made.  Several things were

1    done by the government to once again freeze those funds.  They

2    were successful in freezing them.

3         We have taken an appeal.  The Ninth Circuit has

4    indicated at the first level of review that they are going to

5    permit us to brief all of the issues.  They are going to

6    schedule it for argument.

7         THE COURT:  Mr. Cambria, let me just stop you just for

8    one moment.  My apologies for interrupting your thoughts.  I

9    will allow you to finish.

10        All of you defense counsel, you have been doing this

11   for decades and decades.  I think the junior lawyer in the

12   room, obviously there's a law clerk, but might be

13   Ms. Perlmeter, who is probably an 8 to 10-year lawyer, or

14   Mr. Stone is probably a decade.

15        But on this side, you gentlemen and ladies have been

16   doing it for a long, long time.  Is this the type of case that

17   you believe can be done by way of appointment?

18        MR. CAMBRIA:  No.  One of the reasons would be this,

19   Your Honor, certainly the public defender's office could never

20   take it on, for a number of reasons.

21        Number one, they would have to start at ground zero,

22   and that would cause an even greater delay.

23        Number two, they couldn't survive a conflict analysis.

24   They are all in the same office representing multiple

25   defendants who may have different interests.

1          THE COURT:  Well, there would only be one defender;

2     the other ones would be CJA.  And in fact, one of your

3     colleagues, the Mitchell Stein Morrissey Carey law firm is, I

4     think they're -- I see Lee Stein's name all over my cover sheet

5     here, and they are obviously white-collar attorneys.  And they

6     handle other matters, but they are CJA appointed lawyers.

7          MR. CAMBRIA:  But there are a number of us that are

8     not from Arizona.  There would be traveling, lodging and all

9     sorts of other things.  And it's interesting because the one

10    case that I emphasized in the motion, that basically was denied

11    yesterday, was the Luis case.  And I say that for a reason.

12          Luis is a very interesting case because there the

13    Supreme Court said, when funds are available that are not

14    tainted, which we have here, that we should not pour on the

15    public, on the government, on the public defender's office, the

16    charge, when funds are available that are not tainted.

17          And in this case, we have money, and the money is not

18    tainted.  And -- however, the money is -- has been seized.  So

19    this is different than Monsanto.  And they keep talking about

20    Monsanto, Your Honor.  Monsanto dealt with the situation where

21    the funds were tainted, clearly.

22          And the difference was that when you have tainted

23    funds, the various statutes that applied in Monsanto gave the

24    government a preference to those funds.  Because once there was

25    a conviction, the title to the funds reverted to the government

1      at the time of the commission of the crime.

2              With funds that are not tainted, which we have here,

3      they do not have the same interest.  And basically, what I was

4      trying to get at, and I -- I guess I didn't convey the message.

5              When I made the motion with regard to Mr. Lacey, where

6      I said we have untainted funds, they have been mixed up in

7      these accounts as a result of a clerical error, I wasn't in any

8      way attacking the warrants, the seizure warrants.  That's why I

9      didn't think that it was inappropriate to be here, because I

10     wasn't attacking the seizure warrants.  It wasn't something

11     that the judges in California --

12             THE COURT:  Are we going back in time to an issue that

13     has already been litigated here --

14             MR. CAMBRIA:  No.

15             THE COURT:  -- and not focused on Document Number 443,

16     the status and the request for four additional months?

17             MR. CAMBRIA:  But here's the point I am trying to make

18     about that.  I think that you could conduct a Luis hearing.  In

19     fact, that case says that district courts regularly conduct

20     these taint hearings.  And it wouldn't have anything to do with

21     the validity of the warrants issued by Central California.  It

22     would simply have to do with a tracing of funds tainted, funds

23     not tainted.

24             Non-tainted funds would be able to finance this

25     defense.  So there would be two things going on here.  One is,

1    yes, we went to California, we are pursuing it, we are doing it

2    diligently.  And if the Ninth Circuit rules in our favor, we

3    will have all of the funds necessary to meet all of the

4    deadlines and have this case move along expeditiously.

5         On the other hand, there is another remedy for

6    non-tainted funds, and that is under Luis.  And I believe that

7    this Court could run that hearing.  It would have zero to do

8    with reviewing the validity of a warrant on the side of the

9    Central District of California.  It would only be a tracing,

10   and that's what that court says.  And I was trying to convey

11   that, and obviously I didn't do it effectively.

12        But you could simply go in and --

13        THE COURT:  Actually, I thought your arguments were

14   laid out really well, and I thought it was very clear what the

15   position was.

16        MR. CAMBRIA:  All right.  Well, anyways, so the bottom

17   line here is, Your Honor, that I think Luis stands for that

18   proposition.  But it also says, when funds are there and

19   available, that you shouldn't put that on to the public

20   defender's office, et cetera.

21        So we have two things going here.  We have a schedule,

22   clearly the Ninth Circuit is expediting this in their way, and

23   it would solve all of the problems.

24        On the other hand, you can try to appoint out-of-state

25   counsel not on your list, all of the rest of that, or the

1    public defenders would have all of the conflicts and so on, it

2    is going to take much more time.

3           The more efficient way is for us to have this brief,

4    and it is relatively brief, hiatus, let the Ninth Circuit rule,

5    and hopefully we will have all of the funds necessary.  If not,

6    then we have to deal with what's next.

7           And I think next would be the Luis hearing.  Because

8    there are many funds here that are not tainted.  Not every

9    dollar that came into Backpage had anything to do with the

10   adult stuff that they are talking about.

11          There were, you know, many millions of dollars

12   generated from other things that had zero to do with their

13   allegation of prostitution.

14          THE COURT:  Just one second.

15          Mr. Kucera, do you agree with that last thing that was

16   just placed on the record by Mr. Cambria?

17          MR. KUCERA:  The portion about --

18          THE COURT:  -- legitimate business outside of adult

19   site issues.

20          MR. KUCERA:  I think I can answer, but I will allow my

21   colleague to correct me if I misstate something.

22          THE COURT:  Go ahead.

23          MR. RAPP:  Go ahead.

24          MR. KUCERA:  Your Honor, the vast majority -- the

25   allegations are that the vast majority of the funds that

1   Backpage earned were derived from illicit activities.

2        THE COURT:  When you say, "the vast majority," can you

3   give me a percentage?

4        MR. KUCERA:  About over 90 is the percent that we have

5   been including, and that is sort of the back of the envelope.

6   We haven't gone through all of the full analysis of every

7   dollar, but that is an extrapolation of that portion that we

8   have analyzed, extrapolated into the whole.

9        But more importantly, the government does not need to

10  prove that every dollar is dirty.  The government needs to

11  prove, and the theory of forfeiture and seizure, that all of

12  the funds were involved in money laundering transactions.

13       The magic words in forfeiture hearing -- in money

14  laundering are "involved in."  And if we can show that the

15  financial transactions that relate to the Backpage assets that

16  have been seized were involved in money laundering

17  transactions, the government is rightly seeking to forfeit

18  those funds.

19       THE COURT:  Well, I'll tell you what, while you are

20  standing, tell me about this threat allegation.

21       Just one moment.

22       I'll tell you what, this is actually a good time to

23  take our morning recess because I want to hear from the other

24  defense counsels.

25       Court's in recess until 10:50.

1          (Recess taken at 10:34 a.m.; resumes at 10:54 a.m.)

2          THE COURT:  Good morning again, everyone.

3          This Court will come to order.  All parties present

4    when the Court last closed are present again.

5          Mr. Kucera.

6          MR. KUCERA:  Yes, Your Honor.  I think you asked me to

7    address the allegation of threats that the government is

8    supposed to have made at the hearing in the Central District of

9    California.

10          My suspicion is that that is the very same allegation

11    that was made the last time I was present before Your Honor,

12    where the government was invited to opine on whether it would

13    prosecute any future transaction involving these or any other

14    funds.

15          And I think I likened it to what would be an advisory

16    opinion by the Court, that the government is not in the

17    business of providing, or the public authority defense under

18    Rule 12, or something akin to that, we are saying giving some

19    sort of speculative answer on whether something would or would

20    not be criminal in some future conduct.

21          I can't remember my exact words, but I would be

22    surprised if I said anything stronger than that.  If that was

23    construed as a threat, I certainly didn't intend it to be.

24          THE COURT:  I appreciate that.

25          Counsel, did you have anything else to place on the

1    record, or were you finished?

2           MR. CAMBRIA:  Just briefly, Your Honor, if I can?

3           The statement by the government that they felt that 90

4    percent of the monies involved would be tainted, I can tell you

5    that the other 10 percent would fully fund the defense in this

6    case.  And we obviously have a disagreement as to what --

7    whether or not there's 90 percent involved, but that would be

8    the purpose of the taint hearing.

9           We would in that hearing decide what is and what is

10   not tainted, and the Supreme Court in Luis v. U.S. made it

11   quite clear -- it is kind of interesting, Justice Kagan even

12   kind of hinted to whether Monsanto is even good law anymore.

13          But anyway, the thrust of that case was that assets

14   that aren't tainted are reserved for defense and they should be

15   available.  And so I suggest, you know, this is a difficult

16   case.  It has lots -- it is difficult for the Court, for the

17   government, for the defense.

18          There are a lot of documents here, a lot of

19   complicated issues, a lot of new issues, things that have never

20   been raised before, prosecution that has never been instituted

21   and successful before, and so we put a lot of work into this

22   case.

23          And we think collectively, Your Honor, that the time

24   we are asking for is the most expeditious way and judicially

25   economic way.  Because number one, we are in a place where we

1    were asked to go or told to go.  We are pursuing it diligently,

2    and I think we will have a hearing there in fairly reasonable

3    time.

4           And should we be successful, then we will not have any

5    of these issues about visiting huge expenses onto the public

6    and so on.  And if we're not, then this Luis v. U.S. hearing,

7    the taint hearing, would be the next thing to happen, before we

8    could then decide counsel in, counsel out, et cetera.

9           I mean, those are really the two stages here, and I

10   think they are reasonable for the Court to go through them and

11   to give us the time necessary.

12          It isn't just a matter of paying the lawyers.  I mean,

13   part of our discovery response is, designate expert witnesses.

14   Well, we can't call an expert witness, we have no money to hire

15   them, and try to get them prepared and see if they are

16   interested and all the rest of it, when we are sitting here

17   with all of our money having been seized.

18          So I submit that's a reasonable way for the Court to

19   go to give us this time and to go through these next two

20   stages, the Ninth Circuit, and then after that, if we have to

21   have it after that, Luis.  And that's basically our position.

22          THE COURT:  I appreciate that.  Thank you.  And I also

23   appreciate the fact that you placed on the record that despite

24   the financial issues that you are confronted with, your law

25   firm continues to do their job as it relates to preparing for

1  the trial currently set for 15 January 2020.  I appreciate

2  that.

3          Who is next, if anyone?

4          MR. FEDER:  Bruce Feder for Scott Spear.

5          Judge, the hearing that we had in the Central District

6  before Magistrate Oliver was under seal.  My understanding is

7  the government, with permission from the defense, was going to

8  ask that the proceedings be unsealed.  I don't know the status

9  of that.

10         But I got the transcript of what Mr. Kucera told the

11 assorted lawyers, many of whom are in here.  I would like the

12 Court to read it.  Whether or not I need to place it --

13         THE COURT:  You talking about the threat issue?

14         MR. FEDER:  Yes.

15         THE COURT:  Oh, I've already moved past that.  I am

16 just prepared to deal with 443, at this point.

17         MR. FEDER:  Well, but it pertains to 443, Judge, in

18 this sense.  I have been a lawyer for 40 years.  I have

19 appeared before this Court.  I am going to appear before this

20 Court on Monday on another case.  Whatever my reputation is, it

21 is.

22         But I have never had fees threatened by the

23 government, to the credit of this office in Arizona.  This is

24 the first time, and I realize the Court knows I have

25 represented people charged with serious drug cases.

1          THE COURT:  Well, the reason I ask the question is in

2     almost 30 years, I have never heard of it, and I have

3     certainly, while sitting at that table over there, never even

4     occurred to me to do something like that.  That's why I

5     appreciate the fact that Mr. Kucera clarified his position.

6          But go ahead.

7          MR. FEDER:  Well, but to get the flavor of what

8     Mr. Kucera said in that courtroom, Judge, and I can tell you

9     every lawyer that was there and every lawyer that was on the

10    phone, took what he said to be a threat.

11         And as you mentioned, Judge, these are all lawyers

12    that have a few years under their belt.  All have been around

13    the block.  All -- some of them were former prosecutors, and we

14    all took it as a threat.

15         And to put it in a perspective of 443, in addition to

16    the lawyers not wanting to take any money out of the trust

17    account because they believe themselves, after all these years

18    of being lawyers, to be at risk of getting criminally

19    prosecuted, I am not going to call an expert or potential

20    expert and say, what's your fee?  And then they quote me a fee,

21    and then I say, I'm happy to give you this money, but I have to

22    warn you that there's a threat that this might be criminal --

23    these might be criminal proceeds, and I am going to spread that

24    risk that's already attributable to me, I am going to spread

25    that risk to you.  Will you take that money and will you take

1    this case?  The answer I am sure, as the Court knows, is going

2    to be no.  That goes for my assistants in my office.  Can I pay

3    you with criminal proceeds with threat of prosecution?  The

4    answer, of course, is going to be no.

5          Can I -- when I call up the vendors to take the

6    discovery that we have to put it into a database so we can try

7    to use it, they are not going to take the money.  If we want to

8    hire lawyers cheaper than our hourly rates to review those

9    documents, they are not going to take that money.

10         And I think ethically, all of the lawyers on this

11   case, would have an obligation, moral and ethical, to warn the

12   other parties that we are asking to help us to be aware of what

13   the government's position is.

14         And their position, as just articulated, is that every

15   dollar ever made by Backpage, no matter if it's for bicycle ads

16   or whatever, are tainted.

17         THE COURT:  I don't know if he said every dollar.

18         MR. FEDER:  He said, every dollar -- what I heard him

19   say is, every dollar, even if it's some other unrelated ad, not

20   just escort ads, but unrelated ads because it is all going into

21   the same bank accounts, that they are all tainted, 100 percent.

22         So we can't -- I can't, I will speak for myself and

23   Mr. Spear, I can't in good conscience bill hours.  I am here

24   not billing hours since November 30, to try to get us some

25   time.

1        THE COURT:  Since November 30 you have been working

2   basically pro bono on this case, that's fantastic.

3        MR. FEDER:  I try to do my fair share of pro bono work

4   every year.

5        THE COURT:  Does your client understand that?

6        MR. FEDER:  I didn't understand this was going to

7   be -- this is not a voluntary pro bono.  It is an involuntary

8   pro bono.

9        THE COURT:  Oh, it's the pro bono until the money

10  kicks in and you'll take your money that you have earned.

11       MR. FEDER:  Judge, I understand it seems a little

12  crass given the circumstances of the government shutdown.

13       THE COURT:  I understand lawyers don't work for free,

14  for the most part.

15       MR. FEDER:  But none of these lawyers, me included,

16  knew that they were going to seize fees when I signed on the

17  bottom line.  The Luis case that Mr. Cambria was just talking

18  about, there was a threat -- and I have talked to the lawyer

19  that did the Luis case in Florida.

20       There was a threat there, and the lawyers in that case

21  went to the Court and basically made provisional notices of

22  representation that they would not get into the case unless the

23  money issue was resolved.

24       The Court there stayed the proceedings for -- on a

25  monthly or bimonthly basis until the case wound its way to the

1    Court of Appeals and then ultimately to the Supreme Court.

2    That's how they resolved that.

3           But the lawyers in this case were not understanding

4    that these fees were going to be seized.  And at this point,

5    they now are, as of early November.

6           So if the Court doesn't want to look at it, I won't

7    give it to you, but I think to get a flavor, the Court might

8    want to look at how it was phrased and maybe understand how

9    defense lawyers who have been in this business for a long time

10   might have taken it.

11          THE COURT:  You may approach.

12          MR. FEDER:  Judge, unless the matters in the Central

13   District are unsealed, we should probably have this filed under

14   seal, if that's okay.

15          THE COURT:  That is.

16          Well, Mr. Feder, I will do you one better.  It is not

17   my intent to make this a part of the record.  I am certainly

18   not going to read this into the record.

19          MR. FEDER:  All right.

20          THE COURT:  You know, Mr. Feder, I appreciate you

21   providing the Court with this information.  To me, on page

22   number 12, it reiterates what Mr. Kucera just placed on the

23   record about, it's too speculative to know exactly what the

24   government may do at a future time.

25          But I appreciate that.  So the Court is clear on it,

1    and I don't find any misconduct in any way.  But I will tell

2    you this, that if I had a federal prosecutor, and I was the

3    defense counsel and heard a statement like that, I would

4    certainly seek some clarification.

5           But again, all of you have, for the most part, more

6    than 20, 30 years of experience, and I am sure with the

7    experienced lawyers on the government's side, these are some

8    things that you can meet and confer about just to make sure

9    that everyone is on the same sheet.

10          And Mr. Feder, between you and your colleagues that

11   have talked to me earlier, I am in a position now where I can

12   rule on 443.  But if there's anyone that feels that they need

13   to talk to me to place their respective positions on the

14   record, I would allow it, and I will let you finish as well,

15   Mr. Feder.

16          MR. FEDER:  I think I am finished.  Thank you, Judge.

17          THE COURT:  I appreciate that.  Who is next?  And my

18   apologies to all of you, but I have some time constraints now.

19   If you can limit your comments to 10 minutes, that would be

20   helpful.

21          MR. BIENERT:  Your Honor, Thomas Bienert for defendant

22   Larkin, who is present today.

23          You specifically asked, what has changed since May?

24   Two things have changed, Your Honor, why we need and we think

25   it makes sense to hold off until some of the money issues get

1    ferreted out.

2         When I appeared in front of Your Honor in May, my

3    client, who has been an extremely successful businessman, who

4    has made many multiples of tens of millions of dollars over his

5    lengthy career -- my client is here.  He is 69 years old, and

6    he is not a spring chicken like I am.

7         And he has made 15, 20 million dollars that have

8    nothing to do with Backpage through the businesses that he had,

9    like the Village Voice, Phoenix New Times, et cetera.

10        What has changed is since I appeared, the government

11   has seized over $50 million of his assets.  I do not have

12   funds.  I am continuing to work, as is my 13-lawyer law firm.

13   We have a huge arrearage in this case, but we are continuing to

14   work on it.

15        So number one, what changed is the money.  And what's

16   important, Your Honor, is this is not an indigent person.  He

17   has plenty of money.  It is just the government has and

18   continues to seize it, and we believe that they are doing it

19   illegally.

20        We understand that they say they're not, but what I

21   think -- this case has a few step-back-from-it moments.  The

22   one thing we have not been on the defense side is lazy about

23   seeking adjudication of this issue.

24        We have been trying to litigate.

25        THE COURT:  No, I have, I believe 36 or 39 pending

1      motions, so you have been far from lazy.  The forfeiture issue

2      is very well briefed.  There's only really three motions and

3      everybody joined in, but I know everyone has been working on

4      this case.

5              MR. BIENERT:  Well, what I think is also important to

6      know is you are only one of four judges, Your Honor, that we

7      have raised this issue with, and that doesn't count the Ninth

8      Circuit where it is pending.

9              So the point is, we have been trying since, I think --

10     I forgot if we filed in July or August, to get a substantive

11     ruling or addressment, a hearing, on whether they are right

12     that they can seize all this money when much of it is not

13     traced to illegal activity, or whether we are right that they

14     can't.

15             And finally, we have the Ninth Circuit wanting

16     briefing on that issue as it relates to the first batch of

17     seizures, and we are literally towards the tail end of what

18     looks like multiple filings in a lengthy hearing in front of

19     Judge Oliver on the more recent batch.  So everything is in

20     place.

21             I would also just say this.  To reiterate that it is

22     not our doing, and we are reacting to the government's actions

23     that they believe they can take, but we certainly didn't

24     anticipate these.

25             And just by broad stroke, I believe there's over $130

1    million of assets that have been seized by the government in

2    this case, as we stand here.

3            Even if we took the 90 percent is bad, which is way

4    off the mark, but let's assume that, there's $13 million, it's

5    ten percent of that.  We could start with the government

6    releasing $13 million to the defendants so we can prepare our

7    defense, and then we wouldn't be having this discussion right

8    now.

9            THE COURT:  Mr. Rapp, do you believe that the United

10   States Government would be willing to release millions at this

11   point?

12           MR. RAPP:  No, we are not releasing any tainted funds.

13           MR. BIENERT:  He says 10 percent are not tainted, so

14   that's what I am talking -- we can disagree about the 90

15   percent, and that should play out in litigation.  But if we

16   just get the 10 percent that isn't -- is the part that even

17   they acknowledge they can't show is illegal, that would get us

18   past this hurdle and at least allow us to start working in

19   earnest.

20           And then the last thing I will say and I will sit

21   down, is just to reiterate, this isn't just about lawyers

22   wanting to get our money.  Obviously, Your Honor, ironically,

23   we all know, in this courtroom, everybody working for Your

24   Honor and on this side of the table know all too well, that

25   sometimes people work without money.  I did it when I was a

1   federal prosecutor as well.

2            But even trying to do things, we can't hire the

3   vendors.  We have millions of dollars in needs to get document

4   hosting and document searching.  We can't do it.  And I think

5   the government's list that they submitted in December, they

6   gave us, I think December 16th, their preliminary list of

7   experts.  It is 10 experts.

8            Now, you will get a lot of motions down the line about

9   whether we believe those were appropriate or not.  I am sure

10   there will be motions in limine and that type of thing, but I

11   can't hire one expert, certainly not 10.  So that's the

12   problem.

13            And then finally, I will leave you with this.  In

14   terms of the volume of what we still don't have -- so first of

15   all, we can't get to the ten million documents because we need

16   document hosting and searching and we can't pay for that.

17            But the letter that was sent by the government on

18   December 10th, you were asking about percentages of what's

19   produced, they say, well, if you take out the servers, we think

20   95 percent.  But that's ignoring the elephant in the room.

21            According to the government's letter to us December

22   10th, just the servers that are being -- that have been seized

23   here in Arizona, the 32 servers, they say, we estimate the

24   capacity at approximately 500 terabytes.

25            Now, we have been given so far two terabytes.  So this

1    is literally exponentially more than that.  So we still don't

2    have all of that.  And here's why we need -- I am not saying we

3    have to go through every document, we don't, but we certainly

4    have to know what they are.

5            We need to be able to categorize for ourselves, and no

6    offense to the government, but we want to determine for

7    ourselves what's important and what's not.  And we want to

8    know -- I would want to know, what are the categories that are

9    on that?

10           They mention that these documents -- that Backpage has

11   ads in 94 countries.  Many of those countries, prostitution is

12   legal and so are ads for them.  And it's important for us as

13   defense counsel, for example, to be able to categorize what is

14   clearly from another country, what is not.

15           Is the government trying to use some examples in this

16   case, that frankly were for another country and therefore they

17   weren't illegal.  Things like that we have a right to know.

18           The other thing is I thought counsel said that the

19   servers contain emails.  I would think they contain emails.

20   Obviously, as Your Honor knows, emails are very important.  So

21   we need to get the servers, and if I am following their letter,

22   they still owe us -- they have only given us five or 10 percent

23   of the discovery.

24           And of course, we can't even begin to wrap our arms

25   around that if we don't have funds to be able to do this.  And

1    then finally, this isn't the kind of case -- first of all, I

2    couldn't do this case as a panel lawyer, because I am

3    responsible for 25 employees and 14 lawyers, and I can't do

4    my -- in my firm, it can't happen.

5          But more importantly, we are entitled to counsel of

6    choice.  My client has the money.  We just need to litigate or

7    resolve getting the appropriate money back that they can't show

8    is tainted, and we can litigate the case.

9          And it certainly would be inappropriate, I believe,

10   and I also think it is not what the law envisions, to somehow

11   try to saddle the taxpayer with paying CJA fees, when frankly

12   we don't need to.  We just need to have addressment of the

13   funds they have that we believe our client should have.

14         On that basis, Your Honor, I am done.

15         THE COURT:  Thank you, sir.

16         MR. CORN-REVERE:  Morning, Your Honor.  I am Robert

17   Corn-Revere for Mr. Larkin and Lacey.

18         THE COURT:  Good morning, again.

19         MR. CORN-REVERE:  I just wanted to place a couple of

20   things on the record as the issues have come up.  One is,

21   earlier Your Honor asked about what it means to maintain a

22   status quo, whether or not the lawyers on the team --

23         MR. RAPP:  Judge, I am going to object here for a

24   minute, if I may?  Mr. Lacey's attorney and Mr. Larkin's

25   attorney already addressed the Court.  Are we going to hear the

1    same from yet a second attorney for Mr. Lacey and Larkin?

2            THE COURT:  Mr. Rapp, thank you for that.

3            What do you have to offer me that is different than

4    what I have already heard?  If you can limit your comments to

5    that, that would be helpful.

6            MR. CORN-REVERE:  I am going to try and do that, Your

7    Honor.  And it's really just two brief things.  One is just to

8    confirm that Davis Wright Tremaine also has had its IOLTA funds

9    seized by the government, and we have been working diligently

10   on the case for months now, without prospect of being paid.

11           And it's not that people are treading water just

12   waiting for something to happen; people are working hard on the

13   case.  The second thing is, and that's just to point out as

14   First Amendment counsel in the case, that the issues that are

15   pending in the Ninth Circuit have an overarching effect both on

16   the positions being considered today, the motion being

17   considered today, and for the future conduct of the case.

18           So, for example, the government estimates that 90

19   percent of the funds from Backpage were tainted, or actually if

20   you take Mr. Rapp's latest comment, he believes that everything

21   is tainted.

22           That's based on the argument that is being made in the

23   Ninth Circuit, that adult ads are the same as illegal ads.  So

24   right off the bat, the government's estimate of what they are

25   entitled to seize is off for that reason.

1          And for that reason, the ruling by the Ninth Circuit

2   is going to clarify a lot about both the state of the seized

3   assets and also about the government's assumptions and bringing

4   the prosecution in the first place.  So it makes good sense as

5   a case management matter simply to see what the Ninth Circuit

6   has to say on these issues.

7          THE COURT:  I appreciate that.

8          Mr. Stone, do you or your colleagues have any final

9   remarks?

10          Mr. Rapp, you are standing.  Come on up.

11          MR. RAPP:  Well, let me just start with

12   Mr. Corn-Revere.  This is Davis Wright Tremaine's signature

13   move in this case.  Is they go into a civil case and claim

14   there ought to be a stay, things ought to stop because there's

15   a criminal case going on.

16          This is an interesting twist, coming into this

17   criminal case saying, you should stop everything because there

18   is a civil case going on in California.  It's sort of the tail

19   wagging the dog.  Everything should stop here because they are

20   litigating this issue with respect to the seizures of the IOLTA

21   accounts.

22          There is a history of delay with Backpage.  One, we

23   have to look no further than the California state case where

24   the judge issued sanctions for just this type of delay.

25          This is to the firm of Davis Wright Tremaine.  "I am

1    going to grant the motion for sanctions.  I believe an adequate

2    record has been made supporting sanctions in this case for a

3    number of reasons, all listed by the plaintiffs, but also the

4    Court looks at what constitutes a bad faith.

5            "And there are three ways the Court can look at it.

6    Pre-litigation misconduct.  I am finding that given the history

7    of the defendants in this case, in the multiple cases they have

8    had, not just before this Court, I have had two, not just in

9    this state but nationally, it is clear to this Court that their

10   conduct was to necessitate delay where there were what appears

11   to be clearly valid claims or rights being asserted by the

12   plaintiff, which months and years later" --

13           THE COURT:  Mr. Rapp, before you finish reading all of

14   that, which I have heard enough of that actually, what you're

15   placing on the record, did it deal with the fund issue that we

16   have been dealing with?

17           MR. RAPP:  You know what, I can talk about the fund

18   issue.

19           THE COURT:  That's a yes-or-no question.

20           MR. RAPP:  This transcript, no, just deals with --

21           THE COURT:  Generally delaying the case?

22           MR. RAPP:  Yes.

23           THE COURT:  But they didn't have the same argument

24   about, we don't have money to do our jobs?

25           MR. RAPP:  Well, Davis Wright Tremaine is not going to

1    argue they are not getting money from Backpage.  They are

2    getting money, clean money from Backpage.  Clean money.

3            They got 100,000 in August.  We are not taking that.

4    That's clean money.  So Spear, Brunst, Lacey, and Larkin, have

5    separate money from the sale of the alternative weeklies.  They

6    are getting money that we view as clean, legitimate money, and

7    they are funneling it through another lawyer's account and

8    disbursing it out.

9            THE COURT:  Why do you use the funneling through

10   analogy?  Because that just sounds unseemly.

11           MR. RAPP:  Well, it's a con move, however you want

12   to -- look, here's the point.  They are getting money, and

13   under Monsanto, come to us, show us your financials, we will

14   look at your financials, and if you have no legitimate money,

15   then maybe we can have a discussion.  But they won't do that.

16   They won't do that.

17           So you have to know the history of the case.  These --

18   many of the attorneys on this case who came to us shortly after

19   arrest, they knew that the tracing of illegitimate and

20   legitimate money was a problem.  And some of them said, look,

21   we have an account, we think this is legitimate money.  This

22   doesn't -- should not come as a surprise to them.

23           If by analogy, if this was a drug trafficking case,

24   and the kingpin of the cartel gave drug revenue out to various

25   attorneys before being arrested and indicted, and that same

1   kingpin was arrested and indicted and pled guilty and agreed

2   that he was running a criminal enterprise and that the revenue

3   from the criminal enterprise was dirty, and then he pled

4   guilty, the entire cartel, anybody looking at this would know

5   that there's a good chance that the money is all tainted.

6           That's the same case here.  It is no different.

7   Backpage was a criminal enterprise from its inception.

8           Now, they don't want to address the First Amendment

9   arguments that we responded to in 446, but if you look at the

10  business practices they were engaging in, and they have never

11  ever responded to those, in any of the letters I have sent

12  them, in any of the pleadings, they won't stand up here and try

13  to defend the financial relationship with the Erotic Review,

14  with the aggregation of ads from other prostitution websites,

15  because they can't.

16          Because they are running a criminal enterprise, and

17  every dollar that they make is dirty or it's commingled with

18  the very de minimis amount of money that is legitimate -- that

19  they say is legitimate, I guess, from selling bicycles and

20  couches, which was such an incredibly small fraction of

21  Backpage's business model that it is not even worth talking

22  about.

23          So they have a remedy, Monsanto.  Come to us, show us

24  your financials.  Maybe you can trigger a Monsanto hearing, and

25  we can look at your financials, or don't.  And then find money

1       from your legitimate source to fund your defense.

2               THE COURT:  Mr. Rapp, I appreciate that.

3               Mr. Piccarreta, since you are the one that basically

4       filed 443, I will give you the last word.  I will give you

5       three minutes.

6               MR. PICCARRETA:  Judge, we haven't had a factual

7       hearing yet to defend the allegations of the government, so for

8       them to assume we haven't defended yet, we haven't gotten to

9       that stage.  We have plenty of defenses.

10              Two, they know under United States versus Vera, the

11      Ninth Circuit is very clear that a guilty plea cannot -- facts

12      contained in it cannot be used against other defendants because

13      it's inherently unreliable.  I can give you the cite on Vera.

14              THE COURT:  I am familiar with it.

15              MR. PICCARRETA:  And finally, Judge, there's been a

16      lot of slander of Davis Wright Tremaine.  They seem to be the

17      target of these guys, but they are a very reputable --

18              THE COURT:  Another fire bomb legal term when you

19      start throwing away slander and -- bring out slander and

20      prosecutorial misconduct and threats and all of this.  You all

21      are senior enough that when you start launching these different

22      types of allegations and accusations, you should be prepared to

23      have an affidavit signed by you and notarized to a state bar

24      that this person is engaging in this conduct.

25              If you are not prepared to do that, in this case -- I

1    don't know if it is your practice some other place -- but save

2    that for when you leave the courtroom.  Because when you place

3    it on the record like this, it's very difficult to unring that

4    bell.

5           And I'm pretty confident that all of you are very

6    proud about what you have accomplished as lawyers, prosecutors,

7    defenders, whatever you have taken on as a lawyer.  And you

8    don't want to have your reputation sullied that way, so if you

9    could take this outside of the courtroom.

10          But if you are seeking a remedy from me for some form

11   of misconduct, please bring it up in this courtroom.  If you

12   are not, leave the name calling out of this litigation.

13          Go ahead.

14          MR. PICCARRETA:  I wasn't trying to call names, I was

15   just responding to what was --

16          THE COURT:  When you talk about slander, that's

17   exactly what you are doing.  Go ahead.

18          MR. PICCARRETA:  All right.  I did not believe it was

19   fair to make those accusations.  But put that all aside, we are

20   all here today as a result of the government's seizure of IOLTA

21   accounts in November of this year.

22          And that has wreaked havoc on my client, my defense,

23   and my ability to get funds.  And that's why we are here today

24   asking you to stay the proceeding, at least for the defense

25   obligations until the next status conference so we can

1    determine whether we have adequate funds to defend or whether

2    we have to file pleadings and go from there.  That's all we are

3    asking.

4              I am not involved in the other cases or whatever they

5    are referring to.  We are here with a legitimate gripe.  We

6    didn't serve the warrant on ourselves.  That wasn't discussed

7    with us.  It was dropped on our lap on November 7th, and that's

8    why we are here today, Judge.

9              THE COURT:  I really appreciate that.

10             First of all, I want to thank all of you for your well

11   thought out arguments that you've presented to the Court.  It

12   is all very, very helpful.

13             This Court is in receipt of Document Number 443, which

14   is the defendants' joint status report.  This Court, after

15   reading the 15-page document several times, I will consider it

16   as a motion requesting a continuance or as was described

17   earlier by Mr. Piccarreta, a request to stay the defendants'

18   obligations.

19             This Court is also in receipt of Document Number 444,

20   which is the United States Government's memorandum, and I also

21   have Document Number 446 that I have also considered, which is

22   the United States' response to defendants' joint status report.

23             After careful consideration of all of the arguments of

24   counsel, and I certainly understand the issues concerning both

25   sides and the litigation generally and some of the hardships

1    that the defense counsels may be going through to adequately

2    make sure that their clients are prepared for trial.

3            After carefully considering all of the issues, the

4    motion, which is Document Number 443, will be denied.

5            The current deadlines in the scheduling order that are

6    spelled out in Document Number 131, the government and defense,

7    I am ordering you both to continue to meet those deadlines.

8            In the event that the Ninth Circuit Court of Appeals

9    comes out with a decision, and that decision is one in which

10   this District Court needs to act on it based on if funds are

11   freed or whatever way that they decide the case and send it

12   back to the District Court, I look forward to weighing in on

13   those issues.

14           Mr. Feder, I appreciate you providing me with a copy

15   of this document that is currently under seal.  I don't want

16   it.  It's a sealed document.

17           Lisa, if you can return that to Mr. Feder.

18           And the hearing is adjourned.

19           (Proceedings conclude at 11:28 a.m.)

20

21

22

23

24

25

1                           **C E R T I F I C A T E**

2

3              I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 6th day of February,

12   2019.

13

14                                    s/Elva Cruz-Lauer
                                 Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25

                         **UNITED STATES DISTRICT COURT**