1   MICHAEL BAILEY
    United States Attorney
2   District of Arizona

3   KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
    MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
4   PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
    ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
5   JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
    Assistant U.S. Attorneys
6   40 N. Central Avenue, Suite 1800
    Phoenix, Arizona 85004-4408
7   Telephone (602) 514-7500

8   BRIAN BENCZKOWSKI
    Assistant Attorney General
9   Criminal Division, U.S. Department of Justice

10  REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
    Senior Trial Attorney, U.S. Department of Justice
11  Child Exploitation and Obscenity Section
    950 Pennsylvania Ave N.W., Room 2116
12  Washington, D.C. 20530
    Telephone (202) 616-2807
13  Attorneys for Plaintiff

14

15                  IN THE UNITED STATES DISTRICT COURT

16                       FOR THE DISTRICT OF ARIZONA

17  United States of America,                  No. CR-18-00422-PHX-SMB

18                 PLAINTIFF,            **GOVERNMENT'S RESPONSE TO**
                                         **(531) MOTION FOR IMMEDIATE**
19         V.                            **DISCOVERY REGARDING THE**
                                         **GOVERNMENT'S ABUSE OF**
20                                       **GRAND JURY AND TRIAL**
    Michael Lacey, et al.,               **SUBPOENAS TO OBTAIN DEFENSE**
21                                       **LAWYER BANK ACCOUNTS, AND**
                 DEFENDANTS.             **FOR POTENTIAL SANCTIONS**
22

23

24         Plaintiff United States of America (the "Government") hereby submits its response

25  to Defendant Scott Spear's Motion For Immediate Discovery Regarding The

26  Government's Abuse Of Grand Jury And Trial Subpoenas To Obtain Defense Lawyer

27  Bank Accounts, And For Potential Sanctions (the "Motion") (Doc. 531).[1]

28
    _____
    [1]   Defendant Andrew Padilla has joined the Motion.  (Doc. 544.)

## I.  PROCEDURAL BACKGROUND

### A.  March 2018 Indictment

On March 28, 2018, Defendants were indicted on charges of conspiracy to facilitate and facilitating prostitution in violation of the Travel Act, conspiracy to commit money laundering, concealment money laundering, transactional money laundering, and international promotional money laundering.  (Doc. 3.)  In that Indictment, the Government included notice of the Government's intent to forfeit "[a]ll right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offenses" and "any and all property, real or personal, *involved in or traceable to*" any money laundering offenses.  (Doc. 3 at 57 (emphasis added).)  Those assets included certain assets identifiable at that time as well as funds placed in IOLTAs around the country as criminal proceeds and/or property involved in money laundering offenses.

Prior to the indictment, Defendants directed Backpage CEO, Carl Ferrer to wire millions of dollars in Backpage proceeds to a number of attorneys and law firms for "future litigation."  These instructions stemmed from a series of civil and criminal suits (*see* Doc. 230 at ¶¶ 140, 144) and a Senate Subcommittee Report on Backpage's activities (*see* Doc. 230 at ¶ 151).  Specifically, between approximately February 2017 and March 2018, in anticipation of "future legal services" and potential government seizure of Backpage-held bank accounts, Backpage directed more than $16 million in large and widespread retainer payments to lawyers and law firms around the country.[2]  For example, one law firm that previously represented Defendant Larkin received $5,279,173.07 in Backpage proceeds for prepayment of "future legal services."  Between May 2017 and January 2018, that law firm received more than $3.2 million in wires directly from one of Backpage's foreign bank accounts, and then $2 million directly from Backpage LLC's operating account.

---

[2] These facts were not known during the investigation, but were provided by CEO Carl Ferrer *after* he entered a guilty plea and cooperated in the Government's case.

**B.     April 2018 Guilty Plea and Asset Forfeiture**

On April 5, 2018, prior to arrests and the unsealing of the Indictment, and pursuant to plea agreements, Backpage.com, LLC CEO Carl Ferrer and Backpage.com, LLC and its related entities[3] (collectively, the "Backpage Defendants") pleaded guilty to various charges including conspiracy to commit a violation of the Travel Act and conspiracy to launder funds.  (*See* CR18-00465 at Docs. 4, 8, 10; CR18-00464, at Docs. 4, 7, 12, 20.)  As part of their plea, the Backpage Defendants admitted guilt and consented to the forfeiture of all corporate assets and other property owned or controlled by Backpage.  Preliminary Orders of Forfeiture ("POOFs") were issued in both cases.  (Docs. 22, 23, respectively.)  The POOFs incorporated the list of forfeitable assets set forth in the Backpage Defendants' plea agreements and expressly provided that the Court would "retain jurisdiction to enforce this Order, and to amend it as necessary pursuant to Fed. R. Crim. P. 32.2(e)."  (*See* CR18-00465, Doc. 22.)  In all, between seizure warrants issued by the Central District of California ("CDCA"), and the assets specifically identified in the later-returned Superseding Indictment,[4] 26 locations in real property, 89 bank accounts, and 268 domain names were seized, all related to the conviction of the Backpage Defendants.

**C.     August 2018 Seizure Warrants for Defendant's Attorney's IOLTAs**

On August 8, 2018, pursuant to seizure warrants issued by the CDCA, the Government seized $6,292,201.67 alleged to be involved in Backpage's money laundering scheme, which were held in an IOLTA maintained by the law firm of Davis Wright Tremaine ("DWT").  The Government served the warrant on the bank, and then worked with DWT to accept a wire of the seized funds in an effort to minimize disruption to the firm's operations.

---

[3]   The related entities are Website Technologies, LLC, Posting Solutions, LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC Tech Group BV.

[4]   On July 25, 2018, a grand jury in the District of Arizona returned a Superseding Indictment that charged Defendants with substantially the same offenses, but added additional assets for forfeiture. (Doc. 230.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### D.    IOLTA Materials

On October 31, 2018, the Honorable Rozella A. Oliver, United States Magistrate Judge for the CDCA, issued 12 additional seizure warrants for funds held in 17 different bank accounts held in the names of 15 different law firms (collectively, the "IOLTA Seizure Warrants").  The IOLTA Seizure Warrants were issued upon the CDCA Court's probable cause finding that, pursuant to 18 U.S.C. § 981(a)(1)(A) and (C), the funds were property involved in or traceable to money laundering, or were proceeds of violations of 18 U.S.C. §§ 1952, 1956, and 1957 (interstate and foreign travel or transportation in aid of racketeering enterprises, and money laundering offenses).

The Government had intended to serve the seizure warrants on the banks to which they were issued, but because of what had occurred with DWT (where service of seizure warrants initially prompted the bank to freeze all of the firm's accounts), the Government attempted to take a more collaborative approach to executing the warrants.  To prevent similar interruptions, the Government contacted the 15 law firms affected by the Seizure Warrants before executing the warrants at the respective banks.  Beginning on November 6, 2018, the Government began making courtesy calls to these law firms to offer a wire-in-lieu-of-execution of the seizure warrants.  (*See*, Doc. 360, Ex. C at 1.)  The Government explained to each law firm that while normally these warrants would be served on the bank, the Government was attempting to minimize interruption by allowing the firms to wire the funds to the Government instead.  Many of the law firms accepted the Government's offer and wired the funds without incident.

Two days after the Government notified the affected firms, on November 8, 2018, counsel for Defendants Padilla and Vaught challenged the warrants issued by the CDCA court, but filed their Emergency Motion to Stay Seizure of Attorneys' Fees and Request for Immediate Hearing in the District of Arizona.  (*See* Doc. 360.)  Shortly after, counsel for Defendants Lacey, Larkin, Brunst, and Spear filed a motion to join (Doc. 366), despite the fact that the warrants were not directed to their counsel and they had no standing to contest them.  On November 16, 2018, this Court denied their motions.  (Doc. 393.)

- 4 -

1    Thereafter, on November 21, 2018, Defendants and other parties who were affected

2    by the IOLTA Seizure Warrants renewed their efforts to stay execution of the IOLTA

3    Seizure Warrants.  On December 12, 2018, Judge Oliver heard argument regarding the

4    pending motions to stay execution of the seizure warrants.  (CDCA 2:18-MJ-02875, Doc.

5    23.)  Judge Oliver has not yet ruled on the motions.

6        **E.     March 2019 Disclosure**[5]

7        In March 2019, the Government obtained bank documents related to the IOLTA held

8    in the name of Mr. Bruce Feder, Defendant Spear's attorney in this matter (the "IOLTA

9    Materials").  (*See* Declaration of AUSA John J. Kucera ("Kucera Decl.") at ¶ 2.)  As part of

10   its general protocols in this case, upon receiving the IOLTA Materials, the agents assigned

11   to this case placed the IOLTA Materials in a document review database.  (*Id*.)  Thereafter

12   (and also as part of the general protocols), the agents culled out any documents they deemed

13   relevant to the Backpage case and provided those documents to the AUSAs assigned to this

14   investigation, commonly referred to as "hot docs."  (*Id*.)  Here, the hot docs did not include

15   the IOLTA Materials, no AUSA assigned to this case has seen or reviewed the IOLTA

16   Materials, and only one of the investigating agents has reviewed the IOLTA Materials.  (*Id*.)

17   Notwithstanding that AUSAs had not reviewed these particular documents, pursuant Fed.

18   R. Crim. P. 16, the Government included the IOLTA Materials in its production of discovery

19   materials to Defendants' counsel.  (*Id*.)

20       Thereafter, in an email dated April 1, 2019, Defendants' counsel alerted the

21   Government to the nature of the IOLTA Materials.  (*Id*. at ¶ 3.)  The Government agreed

22   with counsel that the IOLTA Materials were not relevant to this prosecution, and in an email

23   dated April 4, 2019, the Government responded to Defendants' email to confirm that the

24   AUSAs assigned to this matter never reviewed the IOLTA Materials.  (*Id*. at ¶ 3.)  The

25   ─────────────────

26   [5]  In accordance with its obligations pursuant to Fed. R. Crim. P. 6, the Government does
     not concede that any grand jury materials were produced to Defendants.  This Response is
     argued in the hypothetical, and based on allegations made in the Motion.  The Government

27   notes that even if there had existed any grand jury materials, bank records (such as the
     IOLTA Materials) do not generally qualify as "grand jury materials."  *See generally,*

28   *United States v. Dynavac, Inc.*, 6 F.3d 1407, 1411-14 (9th Cir. 1993).

government requested that the recipients immediately destroy and not use the IOLTA Materials in any way.  (*Id*. at ¶ 3.)   The Government confirmed that it did not intend to use the IOLTA Materials involving client retainers unrelated to the Defendants.  (*Id*. at ¶ 3.)

## II.   ARGUMENT

### A.   By Law, Grand Jury Subpoenas and Proceedings Must be Kept Secret

Without any citation to authority, the Motion suggests that the Government should have contacted defense counsel to apprise them of the Government's intent to to obtain bank records. (*See* Motion, p. 3.)  Rule 6(e)(2)(B)(vi) of the Federal Rules of Criminal Procedure specifically prohibits any government attorney from disclosing a matter occurring before the grand jury.  Although a court can approve exceptions to this general prohibition, the Motion neither sets forth any basis for why an exception should have been sought in this case, nor what might have been accomplished had a court authorized such an exception.

### B.   A Depositor Has No Standing to Challenge A Subpoena Issued to a Bank

Generally, a depositor lacks the necessary Fourth Amendment interest to challenge a subpoena issued to a bank for its records of the depositor's transactions.  *United States v. Miller*, 425 U.S. 435 (1976).  "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area." *Id*. at 439 (quoting *Hoffa v. United States*, 385 U.S. 293, 301-02 (1966)).  The Supreme Court found that bank documents do not fall within this "protected zone of privacy."  *See id*.

On their face, bank documents do not constitute Defendant Spear's "private papers."  As the Supreme Court recognized, the bank records "are the business records of banks."  *Id*. at 440; *California Bankers Assn. v. Shultz*, 416 U.S. 21, 48-49 (1974) ("Banks are … not … neutrals in transactions involving negotiable instruments, but parties to the instruments with a substantial stake in the continued availability and acceptance.").   "The records of respondent's accounts, like 'all of the records (which are required to be kept pursuant to the Bank Secrecy Act), pertain to transactions to which the bank itself was a party."  Id. at 440-

41 (quoting *California Bankers*, 416 U.S. at 52).

When it comes to bank records, there is no legitimate expectation of privacy. *Id*. at 442. "The checks are not confidential communications but negotiable instruments to be used in commercial transactions." *Id*. Additionally, "[a]ll of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id*. "The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. *Id*. at 443 (citing *United States v. White*, 401 U.S. 745, 751-52 (1971)).

The Supreme Court has consistently held that "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities … ." *Id*. (citing multiple Supreme Court cases). It is no different here. Defendant's Spear simply has no standing and the Motion should be denied in its entirety.

### C.   The Motion Is An Unsupported Petition To Quash

Among other things, the Motion seeks the return of the IOLTA Materials and seeks to prevent the Government from using the IOLTA Materials in this proceeding. Essentially, The Motion amounts to a petition to quash the subpoenas resulting in the production of the IOLTA Materials. The issuance of grand jury subpoenas is governed by Fed. R. Crim. P. 17(c)(2), which states, "[o]n motion made promptly, the court may quash or modify the subpoena *if compliance would be unreasonable or oppressive*." *See United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991) (emphasis added).

 "[T]he law presumes, absent a strong showing to the contrary, … a grand jury acts within the legitimate scope of its authority." *Id*. at 300-01 (citing *United States v. Mechanik*, 475 U.S. 66, 75 (1986)); *see also Hamling v. United States*, 418 U.S. 87, 139, n.23 (1974); *United States v. Johnson*, 319 U.S. 503, 512-13 (1943). In the grand jury context, the Supreme Court held that a court considering a motion to quash must tailor Rule 17(c)(2)'s "unreasonable or oppressive" standard in light of the grand jury's "unique role in our

criminal justice system," which is to "inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred."  *R. Enterprises.,* 498 U.S. at 297; *Nixon,* at 698 (a grand jury subpoena "may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise"); *see Bowman Dairy Co. v. United States*, 341 U.S. 214 (1951).

"[W]hat is reasonable depends on the context."  *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985).  "Consequently, a grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance."  *R. Enterprises.,* 498 U.S. at 301.  The Supreme Court held that where "a subpoena is challenged on relevancy grounds, the motion to quash must be denied unless the district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation."  *Id.*

Backpage.com and its CEO, Carl Ferer, entered into plea agreements admitting their guilt and forfeiting all assets involved in or traceable to their illegal activities, including Backpage's money laundering crimes.  As part of the investigation into the money laundering activities and to identify the nature, extent, and location of those assets, any grand jury issued subpoenas would relate to assets suspected to be involved in the illegal activity. The purpose for these subpoenas was both legitimate and reasonable.  The Government would not have used the subpoenas as a "fishing expedition" to acquire evidence, and Defendant Spear has failed to meet his burden to demonstrate that any subpoenas would be unreasonable.

### D.    Attorney-Client Privilege Does Not Protect Client Trust Accounts

In general, bank records of an attorney client trust account are not the type of documents protected by the attorney-client privilege.  *See, e.g.*, *Reiserer v. United States*, 479 F.3d 1160, 1165 (9th Cir. 2007); *In re Grand Jury Proceedings (Goodman)*, 33 F.3d 1060, 1063 (9th Cir.), *cert. denied*, 513 U.S. 867 (1994); *Tornay v. United States*, 840 F.2d 1424, 1426 (9th Cir. 1988); *United States v. Bank of California*, 424 F.Supp. 220, 225 (N.D.

Cal. 1976). The party asserting the attorney-client privilege has the burden of establishing how the information sought falls within the privilege. *In Re Grand Jury Witness (Salas)*, 695 F.2d 359, 362 (9th Cir. 1982).

The attorney-client privilege does not ordinarily protect the disclosure of a client's identity or the fee arrangement between an attorney and client. *In Re Subpoena to Testify Before Grand Jury, Alexiou*, 39 F.3d 973, 976 (9th Cir. 1994). Defendant Spear argues that "the government's possession of these documents has allowed it access to confidential information, attorney work product and attorney-client privileged information … allowing it to review all expenditures from undersigned counsel's trust account, giving [the government] the improper opportunity to analyze contact with consulting experts, investigators and other service providers."[6] (Doc. 531 at 4.) Defendant Spear's claim is made without any factual assertions or citations to legal authority.

### 1. Subpoenas To Banks Do Not Implicate The Attorney-Client Privilege

Again without any citation to authority, Defendant Spear argues that the subpoenas for banking records from attorney-client trust accounts somehow violates the attorney client privilege because it will give the Government access to certain "privileged" information, such as expenditures to "consulting experts, investigators, and other service providers." The law, however, does not support this proposition.

A subpoena to a bank to produce records of an attorney's client trust account simply does not violate the attorney-client privilege. *See Harris v. United States*, 413 F.2d 316 (9th Cir. 1969) (holding that the attorney-client privilege was not violated by the production of bank records of an attorney's client trust account). The Ninth Circuit reasoned as follows:

---

[6] The work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3), protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *Admiral Ins. Co. v. United States District Court*, 881 F.2d 1486, 1494 (9th Cir. 1989). Bank statements, like the ones the Government sought, are not documents prepared by a party of his legal representative.

Furthermore, the Motion mentions the work product doctrine once—in passing—and without providing any explanation or legal authority as to how the doctrine is applicable here. In the absence of any facts presented in the Motion, the Government cannot respond in any fulsome way to the applicability of the work product doctrine here. However, should this Court request additional briefing, the Government will supplement its response.

1

2

3

4

5

6

> [T]he client, by writing the check which the attorney will later cash or deposit at the bank, has set the check afloat on a sea of strangers. The client knows when delivering the check, and the attorney knows when cashing or depositing it, that the check will be viewed by various employees at the bank where it is cashed or deposited, at the clearing house through which it must pass, and at his own bank to which it will eventually return. Thus, the check is not a confidential communication, as is the consultation between attorney and client.

7

8

9

*Id.* at 319-20; *see also United States v. Miller,* 425 U.S. 435, 442 (1976) (for Fourth Amendment purposes, there is no expectation of privacy concerning the information kept in bank records).

10

## 2.  Bank Records Are Not Privileged Communications

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

"It is well-settled that there is no privilege between a bank and a depositor."  *Reiserer v. United States*, 479 F.3d 1160, 1165 (9th Cir. 2007) (citing *Harris v. United States*, 413 F.2d 316, 319-20 (9th Cir. 1969)); *see also Rosingana v. United States*, No. Misc. S-07-88 LEW KJM, 2008 WL 183502, at *1 (E.D. Cal. Jan. 18, 2008) (not reported) (holding that there is no attorney-client privilege that bars disclosure of California State Bar trust account information); *Edwards v. IRS*, No. C 06-05331 WHA, 2006 WL 3499273, at *2 (N.D. Cal. Dec. 4, 2006) (not reported) (rejecting assertion of attorney-client privilege with respect to an attorney's trust account bank records because petitioner "presented no evidence supporting his asserting of privilege"); *United States v. Bank of California*, 424 F. Supp. 220, 225 (N.D. Cal. 1976) ("More importantly, Applicant is not called upon to reveal his clients' identities.  The clients' name appear on copies of checks which are in the hands of a third-party bank and, as noted, the summons is directed at the Bank."); *Matz v. United States*, No. CIV 96-0957-PHX-SMM, 1996 WL 628469, at *2 (D. Ariz. July 24, 1996) (not reported) (noting that even if the documents in question had at one time been privilege, the privileged had been waived by turning the documents over to a third-party bank).  More importantly, "there is no confidentiality where a third party such as a bank either receives or generates the documents sought by the [Government]."  *Id.*  The "attorney-client privilege applies only where the *communication between attorney and client* is confidential."  *Id.*

1

(emphasis added).

2

Defendant Spear asserts a general claim that the subpoenas targeted some

3

"confidential" documents that are protected by either the attorney work product doctrine or

4

the attorney-client privilege.  (Dkt. 531 at 4.) However, the Motion does not explain how

5

the production of bank documents amounts to the disclosure of privileged communications.

6

Case law is clear that there is no privilege protecting bank statements (excluding the *Baird*

7

exception—see below).  Even if Government attorneys had reviewed the IOLTA Materials,

8

the Motion contains no specific description of how the IOLTA Materials contain privileged

9

communications, how the IOLTA Materials reveal privileged information, or how any

10

potential payments to "consulting experts, investigators and other service providers" in

11

connection to this matter would constitute a "confidential communication."  Simply put: the

12

attorney-client trust account banking statements do not constitute the "usual privileged

13

communication between an attorney and client."  *Baird v. Koener*, 279 F.2d 623, 632 (9th

14

Cir. 1960).

15

3.   Arizona State Law Creates No Federal Privilege Preventing Disclosure

16

The Government takes no position on the Motion's assertion that Defendant Spear's

17

defense counsel may have an ethical obligation to notify his clients as a result of the

18

production of the IOLTA Materials (*see* Motion, p. 5), but, to the extent this assertion

19

suggests that state law creates a privilege exempting banks from complying with federal

20

subpoenas, the Government can find no such authority.   The Ninth Circuit has long

21

recognized that particular state laws that support the keeping of "confidences" or "secrets"

22

have no application in a federal grand jury.  *In re Grand Jury Proceedings, John Doe, M.D.*,

23

801 F.2d 1164, 1169 (9th Cir. 1986) ("state created privileges are not controlling on federal

24

law"); *In Re Grand Jury Appearance of Alvin S. Michaelson*, 511 F.2d 882, 892-93 (9th

25

Cir.), *cert. denied*, 421 U.S. 978 (1975) (holding that neither state law privileges nor rules

26

of professional conduct translate into a valid federal evidentiary privilege); *see also In re*

27

*Grand Jury Proceedings 88-9 (MIA)*, 899 F.2d 1039, 1044 (11th Cir. 1990) (rejecting

28

attorney's argument that "disclosure of information regarding client's identity and fees

would also breach California State Bar Rules of confidentiality"); *United States v. Bank of California*, 424 F. Supp. 220, 225 (N.D. Cal. 1976) (rejecting claim that a California statute affords a privilege not to produce documents adverse to a client's interest).

### 4.   The *Baird* Exception Is Inapplicable Here

Only in rare exceptions does the attorney-client privilege apply to bank records.  *See Baird v. Koerner*, 279 F.2d 623, 630 (9th Cir. 1960).   In *Baird,* the Ninth Circuit identified one exception where identification of the client conveys information that is itself privileged. *Baird* at 630 (9th Cir. 1960); *In re Subpoena to Testify Before Grand Jury*, 39 F.3d 973, 976-77 (9th Cir. 1994).  An attorney may protect the identity of a client only when such disclosure would convey information that would be part of the usual privileged communication between an attorney and client or where it would provide the last link of evidence needed to indict or prosecute the client with criminal wrongdoing.  For example, if the revelation of a client's identity would constitute an acknowledgement of guilt for the offense that led the client to seek legal assistance, the attorney-client privilege would prevent disclosure of the client's identity.  *In Re Horn*, 976 F.2d 1314, 1317 (9th Cir. 1992) (citing *Baird*, 279 F.2d at 632).

In *Baird*, an attorney was asked to identify the names of clients on whose behalf he had submitted a cashier's check, representing taxes due by the clients, to the Internal Revenue Service.  Under these circumstances, disclosing the identity of the clients would necessarily implicate them in the crime of failing to pay taxes—the very crime for which the clients sought legal representation.  Therefore, the disclosure of this information was prevented as the attorney-client privilege afforded protection.

The *Baird* exception is narrow and rare, and it is not absolute even in an instance where disclosure of the client's identity would incriminate or lead to indictment.  "In order to qualify for the protection afforded by the attorney-client privilege, information regarding client identity or legal fee must be 'in substance a disclosure of the confidential communications between the client and the attorney' … Neither the identities of [the attorney's] five clients nor the bare financial details of their fee arrangement with [the

1   attorney] satisfy that standard." *Horn*, 976 F.2d at 1317 (criminal defense attorney refused

2   to produce documents in response to subpoena, which called for production of all documents

3   relating to fee arrangements and trust accounts, claiming that these documents were

4   privileged pursuant to *Baird*; the Ninth Circuit rejected counsel's argument with respect to

5   disclosure of clients and fee arrangements, but upheld refusal to produce other information,

6   which was clearly privileged, such as letters of consultations) (quoting *In re Grand Jury*

7   *Subpoena (Osterhoudt)*, 722 F.2d 591, 593 (9th Cir. 1983)); *see also In re Grand Jury*

8   *Subpoena (DeGuerin)*, 926 F.2d 1423 (5th Cir. 1991) (identity of third party fee payer was

9   protected by the attorney-client privilege where attorney had ongoing attorney-client

10  relationship with third party whose identity, if revealed, would implicate third party in the

11  criminal conduct for which he sought legal advice); *United States v. Gray,* 876 F.2d 1411,

12  1416 (9th Cir. 1989) ("narrow exception of *Baird* and its progeny, however, only applies in

13  exceptional circumstances"); *In re Grand Jury Subpoenas,* 803 F.2d 493, 497 (9th Cir. 1986)

14  ("the exception to nonconfidentiality created by *Baird* has been narrowly applied by the

15  courts").

16          Consequently, the Ninth Circuit has limited the reach of *Baird* to its unique facts,

17  none of which are present here.  Indeed, the Motion makes no showing at all, much less the

18  required showing of facts necessary to establish that the IOLTA Materials fall within *Baird's*

19  narrow exception.  Further, the Government has already agreed not to use these materials in

20  its prosecution of this matter.  The *Barid* exception does not extend to the production of the

21  IOLTA Materials.  *See also United States v. Blackman*, 72 F.3d 1418, 1424 (9th Cir. 1995),

22  *cert. denied*, 117 S. Ct. 275 (1996) (rejecting attorney's claim that identity of clients who

23  had paid more than $10,000 in cash was privileged; holding the *Baird* exception did not

24  apply and identity of attorney's clients and fee arrangements were not privileged).

25      **E.**     **Defendant Spear Is Not Entitled to an Evidentiary Hearing**

26          The Motion requests "oral argument and an evidentiary hearing as soon as possible."

27  In support, the Motion cites to a single case, *United States v. Danielson*, 325 F.3d 1054

28  (9th Cir. 2003), which bears no factual resemblance to this matter.  In *Danielson*, the

- 13 -

defendant was convicted of illegally selling and transporting in interstate commerce a deer taken without a state-issued tag, in violation of the Lacey Act. *Id.* The Ninth Circuit found that the Government took deliberate and affirmative actions in obtaining the defense's trial strategy, violating the defendant's Sixth Amendment Right to Counsel. *Id.* at 1067. Specifically, a government informant "wrote and retained memoranda containing privileged trial strategy information, as well as recorded, listened to, transcribed, and retained the tapes and transcripts containing the privileged information." *Id.* at 1059. These materials were then made available to the Government in its prosecution of the defendant. *Id.*

In its analysis, the Ninth Circuit distinguished *Weatherford v. Bursey*, 429 U.S. 545 (1977), finding *Weatherford* to be "materially different" from the facts presented in *Danielson*. For example, unlike the agent in *Weatherford*, the informant in *Danielson* "purposefully intru[ded]" himself into the attorney-client relationship. *Danielson*, 325 F.3d at 1068; *Weatherford*, 429 U.S. at 558. Second, there was "'no communication of defense strategy to the prosecution.'" *Id.* (informant "reported regularly and extensively to the police working with [the AUSA] what he had learned about Danielson's trial strategy); *Weatherford*, 429 U.S. at 549, 558 (finding the agent kept information he learned in those meetings to himself and did not pass the information on to his superiors or to the prosecuting attorney).

The Ninth Circuit "construed Weatherford to mean that there is no Sixth Amendment violation *unless* there is prejudice." *Danielson*, 325 F.3d at 1069. (emphasis added). The Court found, "Under our precedents, improper interference by the government with the confidential relationship between a criminal defendant and his counsel violates the Sixth Amendment only if such interference 'substantially prejudices' the defendant." *Id.* (quoting *Williams v. Woodford*, 306 F.3d 665, 683 (9th Cir. 2002)). "'Substantial prejudice results from the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an

unfair advantage at trial.'"  *Id.* (quoting *Williams*, 306 F.3d at 682); *Irwin*, 612 F.2d at 1187.

The Ninth Circuit found that a defendant bears the initial burden of proof to make a "prima facie showing of prejudice." *Danielson*, 325 F.3d at 1071.  Only after a defendant establishes a prima facie case does "the burden shift[] to the government to show that there has been … no prejudice to the defendant[] as a result of these communications." *Id.*   The Court noted that one way the Government can insulate itself from privileged trial strategy information is to show that its actions were not purposeful and to take steps to shield itself from privileged communications protected by the attorney-client privilege.  *Id.* at 1072.

Even if the Ninth Circuit's holding in *Danielson* was applicable here (which it is not), the Motion (1) does not assert that any defendant's Sixth Amendment right to counsel was violated, (2) fails even to allege, much less make a prima facie showing, that the Government's conduct amounted to "substantial prejudice," and (3) even if there was "substantial prejudice," the Government's actions were not purposeful because it affirmatively took steps to insulate itself from obtaining any confidential communications protected by the attorney-client privilege.

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    CONCLUSION

For all of the foregoing reasons, Defendant Spear's Motion (Doc. 531) should be denied.

Respectfully submitted this 8th day of May, 2019.

MICHAEL BAILEY
United States Attorney
District of Arizona

BRIAN BENCZKOWSKI
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

KEVIN RAPP
MARGARET PERLMETER
ANDREW STONE
PETER KOZINETS
Assistant United States Attorneys

REGINALD E. JONES
Senior Trial Attorney

*S/John J. Kucera*

JOHN J. KUCERA
Special Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

1

## CERTIFICATE OF SERVICE

2

3     I hereby certify that on this date, May 8, 2019, I transmitted the foregoing under-seal
      document for filing to the Clerk of the United States District Court and sent a copy via
      electronic mail to: Paul J. Cambria Jr. Esq. and Erin e. McCambpell, Esq., Lipsitz Green
4     Scime Cambria, LLC, 42 Deleware Ave, Suite 120, Buffalo, NY 14202,
      **pcambria@lglaw.com** and **emccampbell@lglaw.com**, Thomas H. Bienert, Jr., Esq.,
5     Anthony R. Bisconti, Esq., Kenneth M. Miller, Esq., Whitney Bernstein, Esq. and John
      Littrell, Esq, Bienart, Miller & Katzman, PLC, 903 Calle Amanecer, Suite 350, San
6     Clemente, CA 92673, **tbienert@bmkattorneys.com,** tbisconti@bmkattorneys.com,
      kmiller@bmkattorneys.com, wbernstein@bmkattorneys.com, jlittrell@bmkattorneys.com;
7     Jim Grant Esq., Ronald London, Davis Wright Termaine, LLP, 1201 Third Avenue, Suite
      2200, Seattle, WA 98101, jimgrant@dwt.com, **ronnielondon@dwt.com**; Michael D.
8     Kimerer, Esq. and Rhonda Elaine Neff, Esq., 1313 E. Osborn Road, Suite 100, Phoenix,
      AZ 85014, **MDK@kimerer.com** and **rneff@kimerer.com**; Robert Corn-Revere Esq.,
9     Davis Wright Termaine, LLP, 1919 Pennsylvania Avenue N.W., Suite 800, Washington,
      D.C., 20006, **bobcornrevere@dwt.com**; Bruce Feder, Esq., 2930 East Camelback Road,
10    Suite 160, Phoenix, AZ 85016, **bf@federlawpa.com**; Gary Linenberg, Esq., Ariel
      Neuman, Esq., Gopi K. Panchapakesan, Esq., Bird, Marella, Boxer, Wolpert, Nessim,
11    Drooks, Lincenberg & Rhow, P.C., 1875 Century Park East, 23rd Floor, Los Angeles, CA
      90067, **glincenberg@birdmarella.com, aan@birdmarella.com**, gkp@birdmarella.com**.
12    Anne Chapman, Mitchell Stein Carey Chapman PC, 1 Renaissance Sq. 2 N Central Ave.,
      Ste. 1450, Phoenix, AZ 85004, anne@mscclaw.com, lee@mscclaw.com.  K C Maxwell,
13    Maxwell Law PC, 899 Ellis St., San Francisco, CA 9419, kcm@kcmaxlaw.com.  Janey
      Henze Cook, Henze Cook Murphy PLLC, 722 E Osborn Rd., Ste. 120, Phoenix, AZ
14    85014, janey@henzecookmurphy.com. Seetha Ramachandran, Schulte Roth & Zabel LLP,
      919 3rd Ave., Ste. 2013, New York, NY 10022, sramachandran@proskauer.com. David
15    Eisenberg, David Eisenberg PLC, 3550 N Central Ave., Ste. 1155, Phoenix, AZ,
      david@deisenbergplc.com.  Joy M. Bertrand, Joy Bertrand Esq LLC, P.O. Box 2734,
16    Scottsdale, AZ 85252, joyous@mailbag.com.

17

18     _s/S. Beckman_____
      U.S. Attorney's Office
19

20

21

22

23

24

25

26

27

28

- 17 -