**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CR-18-0422-PHX-SMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 13, 2019 |
| Michael Lacey, | ) | 11:02 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**MOTIONS HEARING**</u>

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2    FOR THE GOVERNMENT

3            U.S. ATTORNEY'S OFFICE
             By:  **Mr. Kevin M. Rapp**
4                 **Mr. Andrew C. Stone**
                  **Ms. Margaret Wu Perlmeter**
5                 **Mr. Peter Kozinets**
             40 North Central Avenue, Suite 1200
6            Phoenix, Arizona 85004

7            U.S. ATTORNEY'S OFFICE
             By:  **Mr. Reginald E. Jones**
8            1400 New York Avenue, NW, Suite 600
             Washington, D.C. 20530

9

10   FOR THE DEFENDANT LACEY:

11           LIPSITZ GREEN SCIME CAMBRIA
             By:  **Mr. Paul John Cambria, Jr.**
12           42 Delaware Avenue, Suite 120
             Buffalo, New York 14202

13
             HENZE COOK MURPHY, PLLC
14           By:  **Ms. Janey Henze-Cook**
                  **Mr. Tom Henze**
15           722 East Osborn Road - Suite 120
             Phoenix, Arizona 85014

16
     FOR THE DEFENDANT LARKIN:

17
             BIENERT MILLER & KATZMAN, PLC
18           By:  **Mr. Thomas Henry Bienert, Jr.**
                  **Ms. Whitney Z. Bernstein**
19           903 Calle Amanecer, Suite 350
             San Clemente, California 92673

20
     FOR THE DEFENDANT SPEAR:

21
             FEDER LAW OFFICE, PA
22           By:  **Mr. Bruce S. Feder**
             2930 East Camelback Road, Suite 160
23           Phoenix, Arizona 85016

24

25

```
1   FOR THE DEFENDANT BRUNST:

2           BIRD MARELLA BOXER WOLPERT NESSIM
            DROOKS LINCENBERG & RHOW, PC
3           By:  Mr. Ariel Neuman
            1875 Century Park E Suite 2300
4           Los Angeles, CA 90067

5   FOR THE DEFENDANT PADILLA:

6           DAVID EISENBERG, PLC
            By:  Mr. David S. Eisenberg
7           3550 North Central Avenue, Suite 1155
            Phoenix, Arizona 85012
8
    FOR THE DEFENDANT VAUGHT:
9
            DAVID EISENBERG, PLC
10          By:  Mr. David S. Eisenberg for Ms. Joy M. Bertrand
            3550 North Central Avenue, Suite 1155
11          Phoenix, Arizona 85012

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>**P R O C E E D I N G S**</u>

1

2          COURTROOM DEPUTY:  Criminal case 2018-422, United

3     States of America versus Michael Lacey and others, on for a

4     motion hearing.

5          Will the parties please announce.

6          MR. JONES:  Good morning, Your Honor.  Reggie Jones,

7     Kevin Rapp, Peggy Perlmeter, Peter Kozinets, and Andy Stone on

8     behalf of the United States.

9          THE COURT:  Okay.

10          MR. CAMBRIA:  Good morning, Your Honor.  Paul Cambria

11    on behalf of Michael Lacey.  And he is here, Your Honor.

12          THE COURT:  Okay.

13          MS. BERNSTEIN:  Good morning, Your Honor.  Whitney

14    Bernstein and Tom Bienert on behalf of James Larkin, who is

15    also here and present in court.

16          MR. FEDER:  Bruce Feder for Scott Spear, who is also

17    present.

18          MR. NEUMAN:  Good morning, Your Honor.  Ariel Neuman

19    for Mr. Brunst, who is present in court.

20          MR. EISENBERG:  Good morning, Your Honor.  David

21    Eisenberg on behalf of Andrew Padilla.  We would waive his

22    appearance, Your Honor.  And I'm standing in as well -- for my

23    telephone, which is unfortunately ringing -- for Joy Bertrand

24    who represents Joye Vaught.

25          THE COURT:  All right.  So we have four things to get

1   through, so we're going to try to do this as efficiently as

2   possible.

3          The first thing is this issue with supposed missing

4   documents or missing pleadings from the docket.  I received,

5   via e-mail, a list of 106 documents that the defense claims are

6   missing.  Both my courtroom deputy and I spent a significant

7   amount of time going through the list.

8          I can tell you that there is nothing missing or

9   secretive in the list.  About a third of the items are

10  documents that each individual defendant has because they

11  signed it and the other parties are not entitled to, things to

12  do with release conditions, bond postings, things like that.

13         About a third of the documents are the inadvertently

14  disclosed documents that the defense requested be filed under

15  seal for the record.

16         And the other third of the documents are motions to

17  seal or motions filed by one of defense counsel.

18         The only documents filed by the government are

19  documents I know you have because you responded to them.  One

20  was a motion for sanctions and there is a government response

21  to the motion to compel.  So, other than that, there is nothing

22  on that list.

23         The second thing is a recent e-mail that I believe we

24  got yesterday about some new discovery issue.  Who wants to

25  answer for the government on this?

1          MR. JONES:  I can.  I can probably short circuit this,

2    Your Honor.  Reggie Jones on behalf of the United States.

3          As to Mr. Neuman's first request from the Court, these

4    26 documents, the government -- the government was on

5    work-related international travel, and when we were able to see

6    this e-mail, we had less than a day to respond.  But when we

7    were made aware of these 26 documents, we immediately FedEx'd

8    overnight to defense all of -- defense counsel -- all of the

9    documents that Mr. Neuman is referring to in this first

10   request, Your Honor.  This wasn't any intentional withholding

11   of any Jencks material, it was just, you know, an oversight by

12   the government.  And once we became aware, we immediately

13   FedEx'd these documents, so they should have -- all of the

14   defense counsel should have them by close of business today.

15          THE COURT:  Okay.

16          MR. NEUMAN:  Your Honor, may I just briefly be heard

17   on that if we're going to take these issues one at a time?

18          THE COURT:  Not right now.  Let me just hear from him.

19          MR. JONES:  And as to Mr. Neuman's second and third

20   requests, Your Honor, as well as his last request in regards to

21   the Bates stamp copies, you know, some of these items, you

22   know, the government has provided to defendants as it pertains

23   to, you know, the proffer agreements, as well as some of the

24   other documents he's referring to here.  What we're doing now

25   internally since we've gotten this e-mail is for documents

1    pertaining to calls Ferrer, his Jencks, the government is going

2    through each of the memos we provided them and the supporting

3    documents that defendants are citing here that are not -- they

4    indicate weren't provided, we're going to have, you know,

5    within the next couple days we'll have one CD with all the

6    materials they're requesting to defense counsel, including

7    Mr. Neuman.

8          So, again, Your Honor, this was not an intentional

9    withholding of documents.  There may -- there are millions of

10   records in this case.  And we do believe a lot of what they're

11   asking for has been turned over, but we will, you know,

12   reproduce it to them on a CD with all the information they're

13   asking for.

14         THE COURT:  And that's -- the materials you're just

15   talking about, I'm assuming are in this paragraph that starts

16   third?

17         MR. JONES:  Third, yes.  Yes, Your Honor, third.  And

18   then he also refers to production of all documents represented

19   interview reports, referring to that as well.  As far as the

20   Bate stamp copies, it will take a few additional weeks to get

21   them Bate stamped copies of those documents, but we'll give

22   them a CD with all the materials in the next few days.  And

23   within the next couple weeks, we'll make sure all these

24   materials that he asked for as pertains to Jencks and Carl

25   Ferrer will be, you know, Bates produced with an accompanied

1    index indicating the same.

2         THE COURT:  Are these things that you think you have

3    not produced at all or you think you have but they just --

4         MR. JONES:  We have produced, Your Honor, as -- we

5    think a lot of this we have produced.  Um, as I said, starting

6    with the third -- the plea agreement, we have produced that to

7    one of defense -- one of defense counsel.  I'm not sure if it's

8    been circulated to all of them, but they are in a -- in a joint

9    defense agreement.  But we are in the process of obtaining the

10   transcript of the proceeding for Carl Ferrer's cooperation

11   agreement and we'll get that to them as soon as practicable as

12   well, Your Honor.  But, like I said, we aren't -- we know we

13   produced the plea agreement and the, I believe -- and I believe

14   the cooperation addendum as well to one of defense counsel.

15   And I know we have for Hyer as well.

16        But what we'll do, out of an abundance of caution, is

17   we'll, you know, everything that they have specified, we'll

18   either point them to those documents in what's been Bate

19   stamped, what we've already produced, and we'll reproduce it to

20   them as well on a CD, to all the defense counsels.

21        THE COURT:  Why would you disclose the plea agreement

22   to one defense counsel and not the rest?

23        MR. JONES:  Well, one of them requested it.  And

24   before your ruling on the Jencks material, we told them that we

25   would give -- send a Bate stamped copy to all of defense

1    counsel.  And so it takes a little longer to get documents

2    Bates stamped, and so immediately when defense counsel, I

3    believe it was Ms. Bernstein, requested it, we provided it.  I

4    responded to her e-mail with the attached document, Your Honor.

5            THE COURT:  Okay.  And then the last thing they're

6    asking about is in the third paragraph where it starts, second,

7    as reflected in the government's spreadsheet, they're, I guess,

8    asking for an agreement that this stuff is not -- the stuff

9    that is publically available or available through third

10   parties, that that be considered as exempt from the protective

11   order.

12           MR. JONES:  Your Honor, other than the documents -- my

13   counsel just told me some of these documents are from civil

14   discovery that are still subject to a protective order, but

15   other than those documents, you know, we don't have any issue

16   with defendant's request, second request.  And we could

17   highlight those documents to them, Your Honor.

18           THE COURT:  Okay.  Thank you.

19           MR. JONES:  Thank you.

20           THE COURT:  Mr. Neuman.

21           MR. NEUMAN:  Thank you, Your Honor.

22           So just -- good morning, Your Honor.

23           Walking through these one by one.  First, the 26

24   documents that were identified that haven't yet been produced

25   to us, I appreciate Mr. Jones saying they're going to produce

1   them.  There is a few issues with that.

2         One, I haven't done a careful review, but I don't

3   believe that the Bates numbers of the missing documents are

4   sequential, meaning that they're -- and I haven't checked this,

5   but I think that's right -- that, presumably, there is a whole

6   host of other documents with in between Bates numbers that they

7   haven't produced to us, so I think we need clarification on

8   that, first.

9         Second, there is a big issue, and that is, again, the

10  government missing a deadline that the Court imposed.  And

11  without explanation, suddenly we're told, oh, thanks for

12  telling us we missed this, even though they've designated it.

13  I think the Court should inquire as to what happened here, and,

14  again, determine whether sanctions are appropriate.  So those

15  are the two issues that I see with the first -- with the first

16  matter I raised in my first paragraph, given Mr. Jones'

17  response today.

18        Second, I appreciate that he has said that they agree

19  to the second item, that, basically, our request is that the

20  protective order only cover the Carl Ferrer interview

21  memoranda.  And I just want to be clear that that is the

22  request since the e-mail is not in the record.  I want to be

23  clear that that was the request.  And it appears he agrees,

24  other than the civil discovery documents that are subject to a

25  protective order.

1          It's interesting, those, apparently, were produced to

2     us without the -- without the Court's -- this Court's

3     protective order, without any designation that they're subject

4     to some other protective order, yet this is the first time

5     we're being told.  So there is just an issue, we didn't even

6     know that until, literally, today, as far as I know, but I'm

7     glad he agreed on that.

8          On the third issue, I, quite frankly, take issue with

9     what Mr. Jones said.  I think he skated over a number of issues

10    here.  First of all, I am troubled that only -- certain

11    documents are only being produced to one of my colleagues here.

12    Just because they get it, doesn't mean the rest of us get it.

13         Number two, if they did produce the plea agreement,

14    there is, as I understand the practice, a cooperation addendum,

15    which we don't have, a transcript, which we don't have, and all

16    of the proffer letters that are referenced in the -- in the

17    Carl Ferrer interview memoranda, that we don't have.  So there

18    is a number of things that Mr. Jones, apparently, thinks that

19    they've produced, which I can represent to the Court I don't

20    have.  Maybe somebody else does, we don't have them, and I'd

21    ask that they be produced forthwith.

22         Third, on the last issue, I think it's important for

23    the Court to understand what we're talking about when we refer

24    to documents that are referenced in the Carl Ferrer interview

25    memoranda.  These are the recently produced documents that the

1    Court ordered produced.  There are, I think it's two or three

2    of the memoranda, have, essentially, a list of documents with

3    some sort of identification.  Let's say it's -- just make

4    something up -- Brunst to Spear e-mail, February 20, 2011 --

5    just make that up -- and then there is a summary of what

6    Mr. Ferrer said about that document.

7           Now, the government in their initial disclosure says,

8    we're giving you all those documents on this disk.  We pointed

9    out to them they didn't.  They agreed to produce those, but the

10   problem is, with the way they're producing things, is there is

11   no way to match up the title of that document in the memo to

12   how it's being produced.  My paralegal spent hours on the ones

13   that they did give us, trying to match them up, because there

14   is no Bates number for most of them, the file names are

15   different, so it's a huge amount of effort on our part to do

16   it.  We've done it for the ones they've produced.  I would ask

17   that for whatever is forthcoming, whatever reason it wasn't

18   produced, that they be designated in the way that they are in

19   the memoranda so we can easily figure out, okay, he was asked

20   about this document, this is what he said.  This is the normal

21   way we do it.  So that is the last issue in the e-mail.

22          It seems to be an ongoing problem, Your Honor.  I just

23   yesterday realized that a number of the 302s have been produced

24   without attachments that are referenced in the 302s.  I haven't

25   raised this with the government yet, I'm going to have to raise

1   it via e-mail with them before we come to the Court, but it

2   seems like there is a discovery problem here with the most

3   basic documents, which are their interview memoranda.  So I

4   would ask that each of these issues we need to address, because

5   there is, apparently, missing Bates out there, missing

6   discovery out there, and a number of things related to

7   Mr. Ferrer's statements, which I can tell the Court after

8   reviewing them, I am thankful that the Court ordered them

9   disclosed when it did, because there is a lot of issues in

10  there that we'll raise in subsequent pleadings.

11          THE COURT:  Okay.

12          MR. NEUMAN:  Thank you.

13          THE COURT:  So with respect to these issues, with the

14  first issue, obviously, when you get your FedEx packages, if

15  something is missing, you should discuss it with the

16  government.

17          With respect to the second issue, the Court's order

18  with respect to limitations on Jencks Act material is clarified

19  that that order is limited to the government's interview

20  memoranda of Carl Ferrer, all civil discovery material that

21  remains under a protective order, but that only relates to the

22  Carl Ferrer, because there is other Jencks material, correct?

23          MR. JONES:  That's correct, Your Honor.  For Daniel

24  Hyer as well, Your Honor.  The government, just to reiterate,

25  you know, anything that's publically available, as Mr. Neuman

1    stated, we don't object to those documents not being a part of

2    the protective order.  But if they aren't publically available,

3    you know, the government believes that, you know, those

4    documents should fall under your current order.

5          THE COURT:  Yeah.  I think I should rephrase it the

6    other way.

7          MR. NEUMAN:  The only issue, Your Honor, is if it's

8    Mr. Ferrer's interview memoranda and Mr. Hyer's interview

9    memoranda, that's clear.  If it's some sort of vague whatever

10   is not publically available, this becomes much more

11   problematic, because, just as an example, among the documents

12   they've designated are e-mails.  Those e-mails may well have

13   been available to third parties, so any controls that the Court

14   puts in place on them limit us to say they are out there in the

15   ether somewhere, somebody comes back and says we violated the

16   court order, so that's number one.

17         Number two, they may have been filed in other cases, I

18   don't know.  I've been involved only in this criminal case.

19   And so to the extent that the government is saying only

20   publically available, I think we need a specific designation.

21   And I think they agreed earlier to what we requested, which was

22   Carl Ferrer's interview memoranda.  They want to add

23   Mr. Hyer's, I understand that, and it needs to be specific.

24   And that's been the issue here is they've given us this big

25   list, and it's very difficult to know what we're talking about

1    and where we have limits and where we don't have limits.

2         THE COURT:  Okay.  Well, I'm not willing to remove

3    from that order anything other than to say publically available

4    information.  So if you think there are -- I haven't seen the

5    list that you're talking about -- so if you think there is

6    something else that should be removed from the protective

7    order, then I guess you need to file something specific with

8    their designation so that I can make that determination.

9         MR. NEUMAN:  It would be helpful, Your Honor, if the

10   Court could order the government to tell us what do they think

11   is publically available so that they're designating what they

12   think falls under the protective order.

13        THE COURT:  They gave you a list, from what I'm

14   understanding.  They already gave you the list of what they

15   think is Jencks material.

16        Is that accurate, Mr. Jones?

17        MR. JONES:  Yes, Your Honor.  What we will do is we'll

18   review the list we gave them.  If there are additional

19   documents, we will make defendants aware that, you know, by

20   Monday, end of -- close of business Monday of next week just so

21   we're clear, but we believe all the documents on the list were

22   the documents that we believe should be subject to the

23   protective order.  But there are also some victim statements

24   that may not be a part of that list that we want to -- we would

25   like to clarify, and we'll do that by the close of business

1   next Monday with them.

2           MR. NEUMAN:   This is the problem, Your Honor.   He's

3   not actually agreeing to what -- he's saying, basically,

4   they're going to designate Jencks material.   What we need --

5   and what he's just said includes -- I'll just tell the Court --

6   a Netflix documentary transcript.   So it can't be that

7   everything on their list falls within the protective order.

8   The Court just somewhat clarified by saying not publically

9   available documents.   It would be very helpful -- the

10  government is in the best position to tell us what do they

11  think needs to be under the protective order.   If we need to

12  fight about it, we'll fight about it; if we don't, we don't.

13  But they're creating this list of what they think is Jencks.

14  They're the ones who know who is going to testify.   They know

15  what -- they think they know what qualifies as Jencks.   They

16  should tell us what needs to be protected.

17          THE COURT:   They just did.   You disagree with it.

18          MR. NEUMAN:   But so does the Court.

19          THE COURT:   That's their position.

20          MR. NEUMAN:   But the Court just ruled against --

21  sorry.

22          THE COURT:   I haven't seen the list.   So they said

23  this is what they want protected.   You're telling me there is

24  things that shouldn't be protected.   So what I just said is

25  this e-mail is not sufficient for me to rule on, if you want

1    anything more specific than things that are public are not

2    protected.  So all you need to do is send me the list with your

3    motion saying this is what I don't think should be protected

4    and here's why.

5            MR. NEUMAN:  Just so the Court knows, it is attached

6    to the e-mails, but if the Court -- I know the Court only got

7    it yesterday, so, understood, and we can do that.  We can

8    provide the specifics to the Court after we confer with the

9    government further.

10           It would be their -- their spreadsheet was attached.

11           THE COURT:  Oh, okay.  I do see an attachment, but

12   that's not going to tell me which specific things, unless you

13   think they're just -- unless you think your e-mail paragraph is

14   specific enough.

15           MR. NEUMAN:  It, essentially, covers everything on

16   their list, Your Honor, so.  Your Honor, if the Court prefers,

17   we can file something.  That's easy enough.

18           THE COURT:  Okay.

19           MR. NEUMAN:  Because there is declarations, there is

20   trial testimony, there is, as I said, a Netflix documentary

21   transcript.  If the government is going to stand on the

22   position that that's all subject to the protective order, we'll

23   have to deal with it specifically, I guess.  We'll confer with

24   Mr. Jones and see if he changes his position.

25           THE COURT:  With respect to the third issue which

1    Mr. Jones has indicated -- I'm not sure whether he's saying

2    it's all been disclosed but not in a grouping, so to speak, or

3    whether you're not sure if it's been disclosed, but, either

4    way, the government has said that they will go over this

5    information and produce it in a single CD.

6              MR. JONES:  Correct.  That's correct, Your Honor.

7              THE COURT:  And do you have any objection to

8    disclosing it in the manner that they requested, where you

9    identify the documents mentioned in the manner in which they

10   were referred to in his testimony?

11             MR. JONES:  No objection, Your Honor.  No objection.

12             THE COURT:  And how long do you think it will take you

13   to get that together?

14             MR. JONES:  Two weeks should be sufficient, Your

15   Honor.

16             THE COURT:  So it is ordered that the government

17   produce, let's see, the cooperation addendum, the plea

18   agreement for Carl Ferrer, the transcript of the proceedings

19   regarding his cooperation, and the proffer letters, all

20   documents referenced in the Ferrer interview report, and Bates

21   stamped copies of the Ferrer interview reports and related

22   documents.

23             In that disclosure, the documents referenced in the

24   Ferrer interview should be marked in the same manner as they

25   were referenced in the interview.

1          MR. JONES:  Your Honor, the only point the government

2    would like to make is as far as the Bates stamped copies,

3    that's being run out of D.C., so it may take a little bit

4    longer.  We'll get them all the documents, but as far as Bates

5    numbers that you mentioned for Ferrer, it may take a little bit

6    longer, but we'll try to make that two-week deadline, but if we

7    don't have all the Bates, we'll definitely have the documents

8    to them in two weeks.

9          THE COURT:  Mr. Neuman.

10         MR. NEUMAN:  Your Honor, getting these documents in

11   two different formats, which is what we're talking about, is

12   very difficult.  We got the Ferrer documents, I think they were

13   sent to us August 20th or 21st, we still don't have Bates

14   stamped copies of those reports.  It's -- we're trying to work,

15   prepare, and now we're suddenly going to get a new set, which I

16   appreciate.  We wanted it Bates stamped from the beginning.  We

17   need it.  Everything should be Bates stamped and I don't know

18   why it should take that much time.  You run it through -- we

19   produce documents in cases all the time -- you run it through

20   Relativity or whatever database you're using, you add a Bates

21   stamp and it goes out, so this is a simple process, as far as I

22   know.

23         MR. JONES:  Your Honor, the government will -- I'll

24   make sure this is expedited.  I get back to D.C. tonight and

25   I'll talk with litigation support and make sure the Bates copy

1      is expedited and it's to them within that 14-day time period.

2                THE COURT:  Okay.

3                MR. NEUMAN:  Thank you, Your Honor.

4                THE COURT:  Mr. Feder, we're set for argument on your

5      motion for discovery regarding the government's abuse of the

6      grand jury subpoena.  I've reviewed the motion, the response,

7      the reply.

8                Let me just ask you.  This, again, goes back to these

9      trust accounts by the attorneys and the government's seizing of

10     funds.  Hasn't this issue already been dealt with by Judge

11     Logan's order when he ruled on the motions to stay seizure of

12     attorney fees, and then my order regarding the motions to

13     dismiss the indictment because of seizure?

14               MR. FEDER:  Regrettably, Judge, I didn't bring the

15     motions, not knowing that we were going to talk about it today,

16     but my recollection is you -- the last order was you were going

17     to look at it and then issue either an order regarding the

18     motion and/or to set it for an evidentiary hearing.  But I can

19     tell you, at least off the top of my head, I don't believe that

20     those orders cover this.  This is trust account records of

21     lawyers, not only mine, but others in the criminal case and

22     others across the country in other cases.  It has really

23     nothing to do with the two orders that you've referred to.

24               THE COURT:  Okay.  Well, I can't find it.  I recall

25     sending something out that we'd talk about it today, but if

1    that's not the case, that's fine.  I don't need oral argument,

2    so we'll --

3          MR. FEDER:  I mean, I'm happy to have it.  I think the

4    motion asked for an evidentiary hearing, given the fact that

5    the government's response, as I recall it, was that it was just

6    sort of inadvertent and their agents got the trust account

7    records of all these lawyers, but the prosecutors really didn't

8    know anything about it, notwithstanding that Mr. Rapp, at

9    least, signed a subpoena for my trust account.

10          THE COURT:  Well, but the case law that I've looked at

11    indicates there is nothing inappropriate about getting

12    materials from an attorney's trust account.

13          MR. FEDER:  If it's relevant information, if there is

14    an investigation, for instance, but --

15          THE COURT:  And, in this case, the government was

16    tracking funds as part of a forfeiture case out of California

17    and as part of a money laundering case here.

18          MR. FEDER:  Doesn't that strike the Court as a little

19    unusual that they would pick out what appear to be random

20    lawyers across the country, most of whom have nothing to do

21    with the criminal case, and yet they didn't, for instance, go

22    after all of the trust accounts of all of the lawyers in the

23    criminal case if that were really the case?  That's a bit hard

24    to fathom.

25          THE COURT:  Actually, that doesn't surprise me.  And,

1   really, your motion, as far as I'm concerned, would only relate

2   to the seizure or subpoena of information sought on your

3   account, because I don't know that you would have standing to

4   challenge a subpoena to another attorney.

5            MR. FEDER:  Agreed.

6            THE COURT:  And you asked for an explanation of why

7   they subpoenaed -- or used a subpoena from the Central District

8   of California, although I think they did, by explaining that it

9   was part of the -- the search for funds from Backpage that they

10  believed were derived from illegal activities.

11           MR. FEDER:  Well, Judge, as to my account, there were

12  two subpoenas, one from the Central District, which was prior

13  to the seizure of attorney's fees, and then there was one from

14  this district, a criminal subpoena, if I recollect, in December

15  of 2018 after the indictment, still using a grand jury

16  subpoena, which is not appropriate unless there is some kind of

17  ongoing grand jury investigation, which the government does not

18  assert.

19           THE COURT:  Well, wouldn't they be able to assert it

20  if it were an ongoing investigation?

21           MR. FEDER:  Well, you can't, typically, under the law,

22  you can't use grand jury investigations to continue to get

23  information after there has been an indictment, and you have to

24  go to the 17(c) subpoenas, again, unless there is some

25  independent investigation that we are not aware of and on a

1    separate grand jury matter, which is, again, one of the

2    reasons --

3           THE COURT:  And what is it, though, what -- I mean,

4    other than the fact that -- well, I guess the grand jury

5    subpoena from Central District of California is on a separate

6    issue, a forfeiture case.  I can't see any -- anything

7    problematic about that.  So your real concern seems, to me, to

8    be the subpoena that was issued out of Arizona.

9           MR. FEDER:  No, there is more than that, Judge.

10          The concerns are, one, subpoenaing records of criminal

11   defense counsel in an attempt to intimidate.

12          Two, when you get a trust account -- you get trust

13   account checks, they show the expenditures of that lawyer, not

14   only on this case but on others, and disclose, potentially,

15   clients that are not supposed to be disclosed.  So it's an

16   intrusive kind of circumstance that I thought, and I believe

17   the law supports, needs to have an explanation and needs to

18   have an evidentiary hearing as to what the purpose was and why

19   they did that, whether there is other investigations going on

20   to justify the use of a trial subpoena where there is no trial.

21          THE COURT:  Okay.  Thank you.

22          Who wants to respond for the government?

23          MR. RAPP:  Well, these are bank records.  They're not

24   subject to a privilege.  There is five attorneys here and about

25   three agents, none of them have even seen these documents.  We

1    were alerted to it by, not Mr. Feder, by another attorney who

2    they gave it to the attorney.  We advised that attorney we have

3    destroyed it.  We advised the agent to contact the Relativity

4    person in D.C. and instructed them to destroy those documents.

5    That's it.  We've never even seen the documents, but they are

6    bank records that exist independent of the grand jury

7    investigation and they're not confidential or privileged.

8            THE COURT:  And then the other thing Mr. Feder is

9    concerned about is the use of the subpoena out of Arizona, that

10   that was somehow -- and I guess it was signed by you.

11           MR. RAPP:  If he's got the subpoena, I'd like to look

12   at it.  I'm not sure that's the case, but if he has it, I'll

13   take a look at it.  But if his argument is we're prevented from

14   conducting a grand jury investigation, he's wrong.  If the

15   Court would like to know in camera what our investigation is,

16   we'd be happy to inform the Court, but grand jury is secret.

17           THE COURT:  This -- I have it.

18           Traci, can you hand that to him.

19           COURTROOM DEPUTY:  Yes, ma'am.

20           THE COURT:  There is an attachment but I made notes on

21   it so...

22           MR. RAPP:  Right.  I mean, it's a subpoena that we're

23   looking for funds that we believe are tainted.

24           THE COURT:  And if that was already done out of

25   California, is there a reason it was being done again?

1      MR. RAPP:  This is -- may be a separate investigation.

2      THE COURT:  Okay.  Mr. Feder, anything you want to say

3  in reply?

4      MR. FEDER:  They've destroyed the documents.  We still

5  haven't heard what the basis was for issuing these subpoenas,

6  the grand jury subpoena out of the Central District of

7  California in August of 2018 and a trial subpoena here in

8  December of 2018 where there is no trial.

9      THE COURT:  I think he said the purpose was to look

10  for tainted funds.

11      MR. FEDER:  Via a trial subpoena for when there is no,

12  at least, arguably, no trial?  There was a trial date in

13  January of '19.

14      THE COURT:  Is that a trial subpoena?  I don't have it

15  in front of me.

16      MR. RAPP:  It's actually for a hearing or trial.

17      THE COURT:  So it was not a grand jury subpoena?

18      MR. RAPP:  No.

19      THE COURT:  And since it wasn't a grand jury subpoena,

20  what is the reason for issuing the trial subpoena?

21      MR. RAPP:  I think we were trying to determine where

22  certain funds were and we -- I don't know what hearing was

23  scheduled in December of 2018, but we -- that's -- that was the

24  basis of the subpoena.

25      THE COURT:  And was it -- I can look it up again, but

1    you have it -- was that under this case number?

2            MR. RAPP:  Yes.

3            THE COURT:  Because I know there is other cases here.

4            Okay.  I'm going to go back and look at the -- the

5    Court file with that date in mind and the subpoena, and I'll

6    issue a ruling as to whether or not I'm granting an evidentiary

7    hearing.

8            MR. FEDER:  Thank you, Judge.

9            THE COURT:  Okay.  We have the motion to compel

10   disclosure.  And, I'll tell you, depending on the answers I get

11   this morning, I may order an evidentiary hearing.

12           So, for the defense.  You only have about five

13   minutes.

14           MS. BERNSTEIN:  I'm sorry?

15           THE COURT:  You only have about five minutes because I

16   may have some questions.

17           MS. BERNSTEIN:  Oh, okay.  I can take this in whatever

18   the Court would like.

19           THE COURT:  You can start.

20           MS. BERNSTEIN:  Your Honor, the government is

21   prosecuting a 100-count indictment that is based on allegations

22   about a Web site, and that Web site ran on complex, dynamic,

23   interconnected system servers and databases, but the government

24   isn't giving us access -- reasonably usable access to the data

25   that was on those system servers and databases.

1          This prosecution requires the government to prove the

2     specific intent of the defendants in publishing that Web site.

3     Any analysis of their intent is going to turn on the history of

4     each ad, the administrative data and information about each ad,

5     and the general practices of the Web site as a whole.  We

6     cannot defend this case without access to the data that existed

7     at the time of the government's seizures that gets to the

8     bottom of these key issues, data that would show that

9     Backpage.com was a general use classified purpose Web site that

10    earned millions of dollars from tens of millions of non adult

11    ads.

12         We need access to data that would show that Backpage

13    blocked, removed tens of millions of ads, did not edit ads to

14    promote any illegality, partnered with law enforcement,

15    enforced the Web site's terms of use, and undertook screening

16    and removal practices that are customary among Web sites.  We

17    need access to data that would allow us to respond to the

18    government's accusations that all ads on Backpage were for

19    prostitution, that the Web site was designed to promote

20    prostitution, and that these defendants intended to promote

21    prostitution generally or in regards to the 50 specific Travel

22    Act counts.

23         Our due process rights to defend this case compel that

24    the Court order the government to provide access to the

25    Backpage systems with the same functionality and in the same

1   condition and configuration that they were in when they were

2   seized.

3           And I want to address three topics.  The first is the

4   materiality and the vital importance of access to these systems

5   so that they're searchable and viewable as they existed at the

6   time of the government's seizures.

7           The second area I want to discuss are the inadequacies

8   of the government's production to date, the lack of reasonable

9   usability of the limited data that has been produced, which is

10  contrary to ESI protocol and cases addressing ESI.

11          And then the third area I want to discuss is the order

12  that we're asking this Court to enter to allow us to defend the

13  case.

14          The first topic, Your Honor, the materiality and

15  critical importance of access to the functioning systems to

16  defend this case.  The government's prosecution is based

17  entirely on a Web site.  They allege that all ads posted by

18  third parties were for prostitution or sex trafficking, that

19  the operations and practices of the Web site through moderation

20  and aggregation were designed to facilitate and promote this

21  illegal conduct, and that the defendants supposedly

22  participated in this.  So the actual Web site, the ads as they

23  appeared, the actual actions that were taken to screen and

24  block and report ads, and the involvement, or lack thereof, of

25  the defendants is crucially important to the defense of this

1   case.

2          The functioning systems allowed searches of

3   administrative and back-end data.  And that showed a variety of

4   things.  It showed whether there was any editing of an ad by

5   staff or by technology, and, if so, who edited that ad; it

6   shows the e-mail addresses, phone numbers, and IP address of

7   the party who posted.  And the system would allow us to take

8   that contact information and search to see any other ads that

9   were posted by that user.

10         The cost, the text of an ad, whether an ad was

11  removed, how long it took for that ad to be removed, whether an

12  ad was reported to law enforcement, by whom, and when, and the

13  functioning systems also allowed us to run general searches,

14  how many ads were posted, by category, how many were removed or

15  suppressed, revenue by category.  And that's critically

16  important where here the government is alleging that the entire

17  Web site was largely, if not entirely, for prostitution, and

18  this is not true.  And the ability to search the metrics and

19  analytics would show that.

20         Most of the civil cases where Backpage responded to a

21  subpoena found exculpatory information and Backpage has been

22  able to refute allegations through access to this

23  administrative data.  There is three examples that are in our

24  motion on page 12, but very briefly, Your Honor, there was a

25  police detective who swore out an affidavit that Backpage ran

1    an ad after being told that the person in that ad was underage.

2    And by accessing this administrative data, Backpage was able to

3    show that it actually removed the ad, the initial ad, reported

4    it to it NCMEC, removed, blocked, and reported additional ads

5    concerning that individual, and blocked the e-mail address that

6    those ads were coming from.

7           Another example is that there was a sheriff

8    investigator who alleged that Backpage edited a sting ad.  And

9    it was only by reviewing the history of the ad that Backpage

10   was able to show that they did no such thing, that no Backpage

11   employee or staff or technology moderated that ad.

12          A third example is where a plaintiff alleged that

13   Backpage edited ads about her, and, again, using the

14   functioning database, Backpage was able to demonstrate that

15   none of those ads were edited.  Three were blocked by

16   moderators within minutes of being posted, and the fourth was

17   kept up in cooperation with law enforcement.  And this is all

18   information that was readily accessible in the databases and

19   systems as they existed when the government seized them.  Which

20   is why days after the indictment in this case defense counsel

21   sent a letter to the government, it's Exhibit F of our motion,

22   on May 1st of 2018, explaining that the systems contain

23   exculpatory information and how critical it is for us to gain

24   access to them in the same condition and configuration as when

25   they were seized.

1          The government also appreciates the capabilities of

2     these systems.  As it stated in its warrant application to this

3     court, quote, the servers contain current and historical

4     content of ads, all versions of an advertisement that a user

5     attempts to post on Backpage.  If an ad is stripped of certain

6     words or if a photograph is removed, the server will maintain

7     the original form of the ad.  That's in Exhibit C.

8          Your Honor, this information is clearly material to

9     preparing our defense under Rule 16 and controlling Ninth

10    Circuit case law.  The Ninth Circuit is clear that materiality

11    is a low threshold and is satisfied so long as the information

12    would help prepare a defense that information is material even

13    if it simply causes the defendant to completely abandon a

14    planned defense and take an entirely different path.  Access to

15    the systems is crucial for defendant's constitutional rights to

16    defend this 100-count indictment.

17          THE COURT:  Okay.  Let me interrupt you.

18          Because beyond materiality, the issue is whether the

19    government has what you're asking for, and whether they can

20    provide what you're asking for.  And that's where I have some

21    issue, because you say you want data in a functional,

22    operational format.  What does that mean to you?

23          MS. BERNSTEIN:  If I can show an example, I think it

24    really brings this into focus for the Court?

25          THE COURT:  Okay.

1          MS. BERNSTEIN:  So this is Exhibit -- this is Exhibit

2    K to our motion.  So this is Exhibit K to our motion, Your

3    Honor.  And this is the data as it appeared when Backpage was

4    able to get -- when the systems were functioning.  And this

5    contains a lot of information.  It's a concise three-page

6    report that tells us everything we would need to know about an

7    ad.  Anytime that someone edited an ad --

8          I'm not sure how to -- there.  Does that bring that

9    into focus?

10         THE COURT:  I actually have it in front of me.

11         MS. BERNSTEIN:  Okay.  So up top, Your Honor, it shows

12   every single time that someone edited an ad, anytime anyone

13   accessed an ad.  And this is crucial so we know who to talk to

14   about a given ad.  Farther down, it's the IP address of the

15   poster, the payment information of each ad, which is right

16   here, and any violations or reports to law enforcement.  And

17   that's in the violation section.  And this is all what used --

18   this is what was used in civil cases to debunk claims that

19   particular ads were involved in prostitution or the like.

20         In contrast, Your Honor, the government's given us

21   nothing that allows us to access the systems as they existed.

22   Exhibit J is an example of what the government has provided to

23   us.  And what's important to understand about Exhibit J is that

24   a lot of legwork was already done by the government to compile

25   that exhibit.  They gave us a sampling of the ads on the Web

1   site, so this is not -- we don't have access to this or

2   anything beyond what the government provided us a sample of.

3   And it's, obviously, going to be difficult to show up here, but

4   what it is initially is a 16-page spreadsheet with 91 different

5   columns.

6          This is how the text -- I believe this is how the text

7   of an ad appears.  And, Your Honor, I've spent hours with

8   Exhibit J trying to understand how Exhibit J contains the

9   information that's readily useable in Exhibit K, which is what

10  the systems would generate.

11         In addition to the text of an ad, or I suppose the

12  data of an ad that's contained across these 91 columns, the

13  government also, in producing the samples of the ads to us,

14  correlated the images and found the images that they claim

15  relate to this specific ad in J, and then they provided us

16  tables of that.  And, quite frankly, Your Honor, I don't know

17  what we're supposed to do with these tables.

18         There is 798 different pieces of information.  And I

19  think that they're just the file paths of the different images

20  but I have no -- I don't know how we're supposed to figure out

21  what images accompanied an ad.

22         Beyond that, the government provided us with JPEGs, in

23  addition to just these charts which are actually CSV files,

24  they provided us with JPEGs as well in an image folder.  This

25  is how they produced it to us for the sample ads.  And this

1    contains 371 different JPEGs.  This is not reasonably usable in

2    any capacity.  And this is what they pulled out to provide us

3    as samples, in direct contrast to what the systems had when we

4    were able to generate these reports.  This is not reasonably

5    usable.  And, Your Honor, as confusing as Exhibit J is, this is

6    the final product.  This is the finished product for it with

7    over 1,000 pieces of discrete information.

8           If the government issued a subpoena for administrative

9    data in an ad and received this, I think they'd probably pursue

10   contempt or obstruction charges, I mean, this is not --

11          THE COURT:  So let me interrupt you.  If I were to

12   order you -- them to give you access to the server, because I

13   know you guys were allowed to go look at them but not actually

14   touch them or manipulate them, is that what you're asking for?

15          MS. BERNSTEIN:  We're asking for -- well, what we're

16   asking for, Your Honor, is access to the systems and servers

17   with the same functionality and in the same condition and

18   configuration as existed when the government took it.  So I'm

19   not -- I don't know what the status of them in the various FBI

20   facilities are.  What we're asking for is access in the same

21   condition, configuration, and functionality as when the

22   government took it.  If that's what they have, access to that

23   is great.

24          THE COURT:  So you want them to recreate a Web site

25   that no longer exists?

1          MS. BERSTEIN:  We're not asking for a recreation of

2     any Web site.  We're asking to be able to use data that is

3     necessary for us to get to defend against the charges that our

4     due process rights dictate we have to defend against the

5     charges that existed when the government came to the servers.

6     Data that the government represented to this court whose

7     integrity it would maintain in pursuit of their search warrant,

8     data that the government has represented contained all of this

9     when they recognized how important it was to seize.

10          I mean, it's important to understand the scale here as

11     well, Your Honor.  Exhibit J references one sample ad.  That's

12     one ad that the government compiled for us because we asked for

13     what -- what this -- what they now look like in the system.

14          The government compiled Exhibit J.

15          THE COURT:  So I'm going to interrupt you again,

16     because I also read your expert's report which cites all sorts

17     of problems but doesn't give any suggestion about whether --

18     how she could get usable information.

19          MS. BERNSTEIN:  So what's been provided to us -- there

20     is a couple of responses to that, Your Honor.  First, what's

21     been provided to us thus far, as you recognize from the expert

22     affidavit, is just completely useless.  It's incomplete.  It's

23     broken.  There is nothing we can do with that.  The data -- the

24     integrity wasn't maintained and it doesn't meet industry

25     standards.

1          That, that has been provided to us, is also just bits

2     and pieces of a complicated integrated system.  So the

3     government is purporting to have given us five servers out of

4     hundreds.  And without all of it, my understanding is that we

5     are not able to access the data as it originally functioned,

6     because the way the Web site ran, the way the systems ran is

7     there is dozens, if not hundreds, of interconnected systems and

8     databases, and anything that appears, anything that is searched

9     is pulling from all those different hard drives and virtual

10    hard drives and servers and systems.  So I don't know how the

11    government has it maintained in their facility.

12          Presumably, and what has happened in some other cases,

13    in the Silk Road prosecution, for example, Your Honor, which

14    obviously was a case that involved a massive Web site, what's

15    clear from that prosecution -- and what I'm putting on the ELMO

16    is Docket 248 from that case, 14-CR-68, in the Southern

17    District of New York -- what's clear from that case is that

18    there was a copy, a searchable copy of the Web site that was

19    maintained.  And the Court, and, presumably, defendants, had

20    access to that Web site to run various searches.  Because when

21    the government bases the prosecution on a Web site, defendants'

22    due process rights require that they have access to that Web

23    site to defend against the charges.  So what we are asking this

24    Court for, and what we think case law allows and mandates is

25    that we get access to the functioning systems and databases and

1    servers.

2              Back to the scale for a moment, Your Honor.  It's that

3    -- I'm sorry.

4              THE COURT:  We're already at noon so I'm going to --

5    you've answered, I think, the questions that I had, which was

6    what you're asking for, and what you think it's going to show.

7    So I need to hear from the government on their perspective of

8    if that's possible.

9              MS. BERNSTEIN:  Thank you, Your Honor.

10             The final thing I would note is I think Federal Rule

11   of Civil Procedure 34 is incredibly instructive in this

12   capacity.  And though it is a civil procedure rule, there is

13   only one set of evidentiary rules, and so cases and statutes

14   that are applying to the preservation and introduction of

15   evidence are instructive even in the criminal context.  And

16   there is a variety of cases that import Federal Rule of Civil

17   Procedure 34 into criminal ESI cases.

18             Federal Rule of Procedure 34 does indicate that

19   reasonable usability is what's required of the Web site.  And

20   if the Court is interested, we can also supplement the record

21   with various civil cases -- excuse me, criminal and civil

22   cases, for example, United States v. O'Keefe --

23             THE COURT:  I'm aware that that's the standard.  My

24   question is what that means in this case, so that's what I'm

25   trying to get at.

1          MS. BERNSTEIN:  Okay.  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. JONES:  You'd like me just to start argument, Your

4   Honor, or you have the specific questions you would like for me

5   to --

6          THE COURT:  Well, I think you need to address the one

7   issue that I am trying to, I guess, decipher, which is what

8   they mean by functional operational format, which -- and

9   whether what you have given them is what you possess.

10          MR. JONES:  To start with that second question, Your

11   Honor, the government has produced the server data to

12   defendants in a functional, reasonable, usable format.  And the

13   bottom line, Your Honor, is we aren't trying to hide the ball

14   here.  We've given them all the server data in our possession

15   in the exact same format that we have it in, Your Honor.

16          And to Ms. Bernstein's point, and example K and J that

17   she gave, not only did we do that, six months ago, Your Honor,

18   they asked us -- we had a teleconference call -- and they asked

19   us to provide a sampling of all of the ads that are referenced

20   in the superseding indictment, how they appear in that server

21   data.  And we produced this data to them, Your Honor, which

22   included the ads, the underlying ad data, the underlying ad

23   data including information as to the user name, the user e-mail

24   address, poster ID, whether an ad was paid or not, and also

25   whether an ad was approved, Your Honor, among other things.

1           Ms. Bernstein cites to you Exhibit K, one example,

2    Your Honor, but just to be clear, there are hundreds of

3    thousands of ads posted to Backpage's adult services section a

4    day, Your Honor.  And so we're talking about tens of millions

5    of ads over a 14-year period.  And so this information that she

6    is referring to, this information isn't going to appear on

7    every single ad.  The bottom line is if that information was

8    available at the time the Web site was seized and shut down,

9    we've given that information to them the exact same format that

10   we have it, Your Honor.

11           THE COURT:  Is that Exhibit J, that format?

12           MR. JONES:  No, Your Honor.  We provided -- we

13   provided an Excel spreadsheet as it pertains to exhibit

14   referenced in the indictment.  That included some of what I

15   just referenced.  You know, we don't have -- that Exhibit K,

16   what she's referring to, Your Honor, that information is not --

17   if it was contained on the server data, we provided that to

18   them.

19           What I think is an important point to note, Your

20   Honor, is that what they're missing is that the Backpage

21   servers did not contain versioning, meaning, as we stated in

22   our motion response, is that if a user submitted an ad, if that

23   ad was moderated or changed a term or text was deleted or

24   moderated from that ad, that ad would no longer be in that

25   server data, only that changed ad would appear, Your Honor.  So

1    the information that they're seeking this operational Web site

2    for, or this live version of the site to obtain is not even

3    available, would not even be available, Your Honor.

4            One other point I'd like to make in regards to this

5    latest exhibit she put up in regards to the Silk Road Web site.

6    Important distinction here, Your Honor, is that the Backpage

7    servers were hosted in Amsterdam, the ads, the images, and also

8    the payment and processing data.  We -- the government

9    requested, as we stated in our response, we asked the Dutch

10   officials if they were able to keep the site live for a limited

11   period of time for law enforcement purposes.

12           Once they became aware of the indictment and the fact

13   that Backpage.com had pleaded guilty to illegality here in the

14   U.S., they demanded those servers be shut down, Your Honor.  So

15   we just -- we just want to be clear, you know, the government

16   doesn't have -- the U.S. doesn't have any legal authority to

17   tell the Dutch anything.  They say -- they say in their motion

18   that the government told the Dutch officials to keep the site

19   up.  You know, we don't have authority to tell them anything.

20   We requested they remain live for a limited period of time.

21   They demanded they immediately be shut down.

22           They have, through the mutual legal assistance

23   program, been cooperative in responding to our requests for the

24   server data.  And what we -- they have given us, we have in

25   turn provided to the defendants in a functional, reasonable,

1    usable format, the only format the government has it in this

2    case, Your Honor.

3         THE COURT:  What do you mean by functional, when you

4    say it was disclosed in a functional format?

5         MR. JONES:  When I say reasonably usable, as I stated

6    before, if underlying ad data was on those servers at the time

7    that we -- that they were shut down, that information has been

8    provided to the defendants.

9         Let's say, for example, count 1, if information

10   regarded the user name, a user poster ID, the e-mail address,

11   an IP address associated with an ad, the price of an ad, as

12   well as whether an ad was approved, you know, all that

13   information was turned over to the defendants, Your Honor.

14   They have all that information.

15        What we did do, we took an extra step, based on their

16   request, for the ads referenced in the -- you know, for the

17   indictment, and provided that specific information to them,

18   Your Honor.  But we aren't -- we aren't hiding the ball here.

19   We've given them everything that we have in the exact same

20   functional, reasonable, usable format they would have it.

21        And just to -- I cited a few case in my response, Your

22   Honor, in regards to the government being required to produce

23   discovery in the format that it doesn't have.  And there is a

24   few cases, you know, one being U.S. versus Budovsky, which is a

25   2016 case out of the Southern District of Illinois -- Southern

1    District of New York, a money laundering case involving

2    billions of dollars in proceeds.  The defendants in this case

3    asked the government to provide them the universe of the

4    discovery -- and I should note that it's, according to the

5    facts of this case, one of the largest discovery production in

6    SDNY -- they asked the government to provide the universe of

7    the discovery in one database, one format.  The government

8    responded that it did not have all of the materials to produce

9    the defendants, you know, in this format in their own case, and

10   thus couldn't provide them with something that they didn't have

11   themselves.

12           The Court concluded that, you know, one, that the

13   defendants provided no legal basis to -- to assert that the

14   Court -- that the government is required to do this, plus the

15   cost, the burden, the delay, and the waste of having the

16   government do this, Your Honor, is unreasonable.  Ultimately,

17   concluding that there is no obligation that the government be

18   required to produce discovery in a format that it does not

19   have.

20           THE COURT:  Okay.  All right.

21           MR. CAMBRIA:  Your Honor, can I be heard, please, Your

22   Honor?  May I speak on behalf of my client and add what I think

23   is important here on his behalf?

24           THE COURT:  Did you join the motion?

25           MR. CAMBRIA:  Yes.

1          THE COURT:  Well, I'm going to set an evidentiary

2     hearing, if that matters.

3          MR. CAMBRIA:  That is wonderful that you would, but I

4     have a couple of things that I think are important to focus

5     that.

6          THE COURT:  Okay.  Thank you.

7          MR. CAMBRIA:  I appreciate it.

8          Your Honor, the allegation is that the defendants

9     manipulated the ads.  The government admits in their pleadings

10    that you could, at the time they seized all the data and the

11    servers, that you could see who accessed an ad, what they did

12    with the ad and so on at that time.  When they applied for the

13    warrant with Magistrate Willett, they represented that the

14    original evidence would be preserved.  The original evidence is

15    such that you can access it and get this information.  Like for

16    my client, I would like to show whether he accessed an ad or

17    not, if he changed it or not, et cetera.  That's clearly

18    relevant.

19         What they've done to us here is this.  Assume this was

20    a tax case and they had a warrant for business records, and

21    after they looked at the records, they shredded the records and

22    then they handed us the shreddings and said, it's all there.

23    You can figure it out.  It's all there.  When they got this

24    warrant, they represented that they would not destroy the

25    original evidence.  The original evidence you could access all

1    this material.  You cannot now.  And that's what they did and

2    that's what we're complaining about.  And we're saying, we need

3    that or we can't defend.

4            THE COURT:  Okay.

5            MR. CAMBRIA:  Thank you.

6            MR. NEUMAN:  Your Honor, I don't know if the Court

7    needs to hear more, but two other points just -- I'll do it

8    from here very quickly, Your Honor, if I may.

9            One, as Mr. Cambria just said, these weren't servers

10   in Amsterdam that we're only talking about.  These were servers

11   in Tucson that they walked in after representing to the court

12   that they would maintain.  They ripped out, apparently, the

13   cords.  They could have kept it all together.  All they had to

14   do was turn off the internet connection to take this down.

15           Number two, the idea that they've given us everything

16   they have is belied by the declaration of FBI Special Agent

17   Richard Robinson, which they filed in Document 6264, where he

18   says, essentially, there is any number of servers required to

19   access this data, which we had, we've given them two -- or

20   we've given them two from Arizona and we've given them a couple

21   others.  And, you know what, that's -- he says in his

22   declaration -- not enough to access the ads.  So I think there

23   is some confusion, perhaps, on the government's side about what

24   they've given us and how functional it is.  And I appreciate

25   that the Court's going to set an evidentiary hearing.

1          THE COURT:  Okay.  So we need to do this sooner than

2     later, so I could do a hearing on October 3rd or October 4th,

3     that's a Thursday and a Friday.

4          MR. BIENERT:  May we have just a moment, Your Honor,

5     for us to kind of caucus?

6          THE COURT:  Yes.

7          (An off-the-record discussion was held between

8     counsel.)

9          MS. BERNSTEIN:  Your Honor, both October 3rd and

10    October 4th work for us.

11         THE COURT:  Okay.

12         MR. JONES:  They work for the government as well.

13         THE COURT:  So let's do October 3rd because

14    October 4th I would have to move a couple things, so if

15    October 3rd works, let's use that date.

16         How much time do you think you want?  Three hours?

17         MS. BERNSTEIN:  Your Honor, off the top of my head, I

18    can think -- I mean, do we need to subpoena the government

19    agents or will they have the agents available?  There is a

20    handful of other lay witnesses, as well as technical witnesses

21    that we would want to subpoena and have available, as well as,

22    presumably, if the Court would want our expert available for

23    that hearing as well.

24         THE COURT:  Yeah, I assumed you would bring her.

25         Does the government have a position?

1        I have the whole day, but I don't want to use a whole

2   day if it's just going to be repeating things.

3        MR. JONES:  We believe a couple hours will be

4   sufficient for a hearing, Your Honor.

5        MS. BERNSTEIN:  We think it would be prudent to block

6   out the whole day.  It will not be cumulative testimony, and to

7   the extent it is, the Court can cut it off.

8        THE COURT:  Okay.  October 3rd, we'll go nine to noon

9   and one to four.

10       MR. NEUMAN:  And, Your Honor, it would be helpful if

11  the government will make their agents voluntarily available.

12  The subpoena process for an agent is always difficult for the

13  defense, so I would just make that request.

14       THE COURT:  Do you have any objection to that?  Well,

15  I guess, who?

16       MR. JONES:  Depends on who.  Yeah.  Who?

17       MR. NEUMAN:  We'll identify them to them, but we'll

18  have to think about it and get back to you.

19       THE COURT:  Okay.  Then we're at recess.  Thank you.

20       (Proceedings concluded at 12:11 p.m.)

21                   *         *         *

22

23

24

25

C E R T I F I C A T E

I, CHRISTINE M. COALY, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 17th day of September, 2019.

/s/ Christine M. Coaly
Christine M. Coaly, RMR, CRR