1    **WO**

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE DISTRICT OF ARIZONA**

8

9    United States of America,              No. CR-18-00422-001-PHX-SMB

10                    Plaintiff,            **ORDER**

11   v.

12   Michael Lacey, et al.,

13                    Defendants.

14

15          The issue before the Court is Defendants Michael Lacey, James Larkin, Scott Spear,

16   and John Brunst's Motion to Dismiss Indictment.  (Doc. 561, "Mot.").  Codefendants

17   Andrew Padilla and Joye Vaught joined the Motion.  (Docs. 615, 617).  The Government

18   filed a Response.  (Doc. 649, "Resp.").  Lacey, Larkin, and Spear filed a reply.  (Doc. 697).

19   Brunst separately filed a reply.  (Doc. 700).  Various groups also motioned for leave to file

20   amici curiae briefs, which the Court granted.[1]

21   **I.    BACKGROUND**

22          On July 25, 2018, a federal grand jury returned a 100-count superseding indictment

23   against Defendants alleging they engaged in criminal acts while operating the website

24   Backpage.com ("Backpage").  The charges include conspiracy, violations of the Travel

25   ───────────────

26   [1] The DKT Liberty Project, Cato Institute, and Reason Foundation submitted a brief in
     support of the motion to dismiss the indictment. (Doc. 624). The ACLU of Arizona
     submitted an *Amicus Curiae* Brief Regarding First Amendment Considerations. (Doc.

27   625). Equality Now, Legal Momentum, Sanctuary for Families, United Abolitionists, Inc.,
     and National Coalition against Domestic Violence submitted a brief in support of the

28   Government. (Doc. 641).

Act, and money laundering.  (Doc. 230, the "SI").  This is one of multiple cases involving Backpage.  In another case before this Court, Backpage itself (the corporate entity) and related entities have pleaded guilty to Money Laundering Conspiracy, 18 U.S.C. § 1956(h).  (CR-18-465-PHX-SMB, Docs. 8, 10, 20).  In still another, the CEO of Backpage, Carl Ferrer has pleaded guilty to Conspiracy, 18 U.S.C. § 371.  (CR-18-464-PHX-SMB, Docs. 7, 12, 20).  Both of those cases are awaiting sentencing and forfeiture proceedings.

The first count in the SI is conspiracy, 18 U.S.C. § 371, to commit a violation of the Travel Act, 18 U.S.C. § 1952(a)(3)(A), against all defendants.  (SI ¶¶ 195–99).  Counts 2–51 are violations of the Travel Act, 18 U.S.C. § 1952(a)(3)(A), against all defendants.  (SI ¶¶ 200–01).  Count 52 is conspiracy to commit money laundering, 18 U.S.C. § 1956(h), against Lacey, Larkin, Spear, Brunst, and Hyer. (SI ¶¶ 202–03).  Counts 53–62 are charges for concealment money laundering, 18 U.S.C. § 1956(a)(1)(B)(i), against Lacey, Larkin, Spear, Brunst, and Hyer.  (SI ¶¶ 204–05).  Counts 63–68 are charges of international money laundering, 18 U.S.C. § 1956(a)(2)(A), against Lacey, Larkin, Spear, Brunst, and Hyer.  (SI ¶¶ 206–07).  Counts 69–99 are charges of transactional money laundering, 18 U.S.C. § 1957(a).[2]  (SI ¶¶ 208–09).  Finally, Count 100 is a charge of international concealment money laundering, 19 U.S.C. § 1956(a)(2)(B)(i), against Lacey.  (SI ¶¶ 210–11).  One defendant in this case, Dan Hyer, has pleaded guilty to Count 1 and awaits sentencing.  (Docs. 270, 284, 520).

1.  The Alleged Facts

At this stage of the proceedings, the Court must "accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).  The Court does "not consider evidence not appearing on the face of the indictment." *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) (quoting *United States v. Marra*, 481 F.2d 1196, 1199 (6th Cir. 1973)).  Further,

---

[2] The defendants for each count of transactional money laundering are designated by a table in the SI that includes the transaction at issue and which defendant or defendants are charged in connection to that transaction. Lacey, Larkin, Brunst, and Spear all appear as defendants in the table.

Defendants "may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence." *Id.* (quoting *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975)). The proper forum for challenging whether there is adequate evidence is at trial. *See id.* ("By basing its decision on evidence that should only have been presented at trial, the district court in effect granted summary judgment for the defendants. This it may not do."); *see also United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) ("Nor do the [criminal] rules provide for a pre-trial determination of sufficiency of the evidence."). Accordingly, the below summary of relevant facts is assumed as true for the purpose of this motion.

The SI contains a lengthy summary of the alleged facts. Lacey, Larkin, and a third individual known as "C.F" created Backpage in 2004. (SI ¶ 2). Spear and Brunst had executive positions at Backpage or related entities and held ownership interests. (SI ¶¶ 3–4). Padilla and Vaught were employees of Backpage, with Padilla serving as operations manager and Vaught as assistant operations manager. (SI ¶¶ 6–7). Lacey, Larkin, Spear, and Brunst "purportedly" sold their interests in Backpage in 2015, but retained "significant control" afterward. (SI ¶¶ 2, 29). They sold their interests in Backpage to Dutch entities controlled by C.F., who "borrowed" most of the purchase price from Lacey, Larkin, Spear, and Brunst. (SI ¶ 30). Even after the sale, Lacey, Larkin, Spear, and Brunst retained significant control over Backpage, including its finances, and required C.F. to provide them with an annual accounting of his personal assets. (SI ¶ 31).

Lacey and Larkin are the founders of the *Phoenix New Times* newspaper and owned several other newspapers, including the *Village Voice*. (SI ¶ 18). They created Backpage as an online classified ad site that competed with the likes of craigslist.com ("Craigslist"). (SI ¶¶ 20–21). When Craigslist shut down its "adult" section in 2010, Backpage began implementing strategies to capture Craigslist's share of the market. (SI ¶ 24). Larkin noted in one internal document that Craigslist folding could mean "a deluge of adult content ads for backpage.com." (*Id.*). Financially, Backpage was very successful. In its own words, it was experiencing "explosive growth" by "capitalizing on displaced Craigslist ad

volume." (SI ¶ 25).  Backpage profits grew annually: $26 million in 2010, over $52 million in 2011, over $78 million in 2012, over $112 million in 2013, and over $134 million in 2014.  (SI ¶¶ 25, 28).

The SI alleges that all defendants "were aware that the overwhelming majority of the website's 'adult' and 'escort' ads were actually ads for prostitution." (SI ¶ 34).  The SI points to three strategies Backpage used to attract more prostitution ads.  (*Id.*).  It refers to them as content aggregation, reciprocal link and affiliate programs, and moderating ads to "sanitiz[e]" them.  (SI ¶ 34).

The SI describes Defendants' aggregation efforts in paragraphs 35–44.  It alleges Spear encouraged Hyer and C.F. to create a plan to move prostitution ads onto Backpage.  The plan was to "identify prostitutes advertising other websites," contact the prostitutes, and create free trial ads for them if they were not already using Backpage.  First tested in Dallas, Texas, this strategy became known as the "Dallas aggregation" plan soon spread to other locations.  Spear, Hyer, Larkin, C.F., and Brunst are alleged to have been aware of this strategy through emails, email attachments, other documents, and meetings where the plan was on the agenda.

The SI describes the "reciprocal link and affiliate programs" strategy in paragraphs 45–67.   It alleges Defendants sought to create a business relationship with TheEroticReview.com ("TER"), a "prostitution website" where "johns" could rate escorts.  Backpage paid TER for banner ads, and Hyer and C.F. saw TER as essential to business growth.  Google Analytics reports provided to Defendants also showed TER was the number one source of outside referrals to Backpage.  The "affiliate programs" alleged in the SI involve partnerships with "organizations and individuals who were known to be involved in the prostitution industry." One such individual went by the name "Dollar Bill." Dollar Bill was described as a "super affiliate," and Backpage once deleted over 4,000 ads that he posted.  Padilla helped him restore those ads.  Emails show that Dollar Bill was aware of Backpage's moderation practices and C.F. coached him how to avoid deletion by Backpage moderators.

1    The SI describes Backpage's moderation practices in paragraphs 68–70, 72–73, 75,

2    77–96, 98–104, 108, 110, 112, 116–26, 128–30, 132–34, 136, 139, 143, 145, and 148.  C.F.

3    explained the strategy: "We do not intend to be a craig[slist] here, just get out the most

4    egregious stuff." Padilla emailed Hyer and C.F. that posters who repeatedly violated

5    Backpage's posting rule would have their ads deleted and banned, though the bans were

6    only temporary and aimed at the "worst apples." Another Padilla email cc'd Vaught and

7    threatened to fire any Backpage employee who acknowledged in writing that a customer

8    was a prostitute.  Attachments to an October 16, 2010 email from Padilla to a large group

9    of Backpage employees, including Hyer and Vaught, explained how to moderate ads.  The

10   instructions allowed nude and partially-nude photographs, some of which depicted graphic

11   sex acts.  The other attachment identified fifty terms that should be "stripped" from ads

12   before publication.  In another email, C.F. told Padilla to "lighten up on the images

13   moderation.  Spear tells me it's the text that is the problem." In January 2011, Lacey and

14   Larkin met with representatives from the National Center for Missing and Exploited

15   Children ("NCMEC") where Lacey told them "adult prostitution is none of your business."

16       According to the SI, these moderation efforts were made not to stop the underlying

17   illegal activity, but to create a "veneer of deniability" and evade detection.  (SI ¶ 13).

18   Defendants stripped coded terms they allegedly knew indicated prostitution or underage

19   prostitution—such as "GFE/Girlfriend Experience," "Lolita," and "New in Town"—from

20   ads but still posted them with their underlying message unchanged.  The moderation

21   practices also allowed identification numbers from TER to be used and permitted pictures

22   with "nude rear shots" and "transparent wet panties." A PowerPoint presentation created

23   by some defendants acknowledged the non-adult sections of Backpage existed to show

24   "plausible deniability" and make the website more palatable to "law enforcement."

25       A large portion of the SI is dedicated to showing Defendants knew their efforts to

26   market to prostitution advertisers were successful.  Spear received emails summarizing

27   these moderation practices.  (SI ¶¶ 70, 73, 81).  Larkin, Spear, Brunst, Hyer, and C.F.

28   received an email notifying them that Chase Bank would no longer process transactions

for Backpage because of Backpage's "involvement in human trafficking." (SI ¶ 135). C.F. testified in a number of criminal trials of pimps who had used to Backpage to post prostitution ads. (SI ¶¶ 71, 76, 92). C.F., Padilla, and Vaught helped one Backpage customer, P.R., restore her prostitution ads after they were taken down. (SI ¶ 132). P.R.'s ads included the phrase "50 Red Roses special." "Roses" is a commonly-used in prostitution to mean money. (SI ¶¶ 160–61). Lacey wrote a draft editorial claiming Backpage had provided "the oldest profession in the world . . . transparency, record keeping and safeguards" and acknowledging that Backpage used an automatic filter to remove certain phrases from ads that indicated prostitution but still published the ads after editing. (SI ¶ 107). Larkin forwarded the editorial to C.F. "cautioning against some of Lacey's statements 'being made public' because 'we need to stay away from the very idea of editing the posts.'" (SI ¶ 108).

The SI includes "victim summaries" of women who were sold for sex on Backpage. (SI ¶¶ 160–176). Ads depicting Victims 5, 8, 10, 12, 11, 15, 17, 13, and 16 are among the alleged ads in the indictment. (SI ¶ 201, Counts 2, 4–5, 12–17, 19–24). One ad by Victim 5 was rejected by Backpage because it listed her age as seventeen. It was accepted after it was "simply resubmitted with a new (false) age of 19." (SI ¶ 164). Victim 8 was fifteen years old when her uncle and his friends posted ads on Backpage using terms indicative of prostitution like "roses," and "150 for 1/2 hour, 200 for full hour." (SI ¶ 167). Victim 10 was seventeen years old when her pimp posted Backpage ads containing the phrase "NEW IN TOWN" and pictures of her provocatively posed. (SI ¶ 169). Backpage occasionally removed certain explicit photos from Victim 11's ads but published the remaining text and other provocative photos. (SI ¶ 170). Victim 12's advertisements contained phrases such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}." (SI ¶ 171). Victim 13 was a juvenile when she and her trafficker posted Backpage ads, which falsely represented she was nineteen years old. At least once, a Backpage representative contacted her with instructions on how to fix an ad so it could be published. (SI ¶ 172). Victim 15 was sold for sex using phrases such as "Thick Glass of Chocolate Milk Looking

for a GoodTime!!!" and "sexy certified freak." After her trafficker attempted to take her to Texas against her will, she jumped out of the vehicle and was killed after being hit by several vehicles on Interstate 10.  (SI ¶ 174).  Victim 16 was murdered by a customer after she posted Backpage ads containing the phrases "outcalls only," "Juicy Caramel Lady on Duty," and including provocative pictures.  (SI ¶ 175).  Victim 17 was sold for sex, averaged ten customers a day, and was forced to turn over all of her prostitution earnings to her pimp.  An associate of her pimp took pictures of her and drafted Backpage ads with the phrases "IN/CALLS ONLY," "I'm here to make your wildest fantasies come true," and "Sorry, but NO BLACK MEN."  The ads included pictures of Victim 17's buttocks and face.  (SI ¶176).

The SI's factual allegations regarding money laundering appear in paragraphs 177–194.  They detail that most of Backpages' earnings came from pimping and prostitution, and that banks, credit card companies, and other financial institutions refused to do business with Backpage because of its connection to prostitution.  (SI ¶ 177–78, 182).  C.F., Larkin, Spear, and Brunst discussed creating shell companies to fool credit card companies.  (SI ¶ 179).  They utilized entities such as Posting Solutions LLC, Website Technologies LLC, and Cereus Properties LLC.  (SI ¶¶ 184–85, 187–92).  They also used cryptocurrencies.  (SI ¶¶ 193–94).

The SI identifies fifty specific ads by date and description in paragraph 201.  Fifteen of the ads depict specific victims found in the victim summaries.  Ten of the ads were posted by P.R, the prostitute who had extensive communications with C.F.  (SI ¶ 201, Counts 3, 6–11, 18, 25–26).  In the remaining twenty-five examples, Backpage published ads containing "GFE."  (SI ¶ 201, Counts 27–51).

## II.   LEGAL STANDARD

The Fifth Amendment demands that "no person be held to answer for "a capital, or otherwise infamous crime" unless indicted by a Grand Jury.  U.S. Const., amend. V.  This indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  It is considered sufficient if it

"contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 116 (1974). An indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007) (quoting *United States v. King*, 200 F.3d 1207, 1217 (9th Cir. 1999). Language of a statute may be used to describe the accused defense, but it must be accompanied with enough "facts and circumstances" to "inform the accused of the specific offence . . . with which he is charged." *Hamling*, 418 U.S. at 117–18 (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)). "On a motion to dismiss an indictment for failure to state an offense, the court must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged." *Boren*, 278 F.3d at 914. An indictment cannot be challenged "on the ground that the allegations are not supported by adequate evidence." *Jensen*, 93 F.3d at 669 (quoting *United States v. Mann*, 517 F.2d at 267).

The First Amendment provides additional protections in prosecutions based on speech. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). But these protections are not unlimited. "Congress is allowed to restrict certain types of speech, including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *United States of America v. Sinneneng-Smith*, 910 F.3d 461, 480 (9th Cir. 2018) (citing *United States v. Stevens*, 559 U.S. 460, 468 (2010)). The government carries the burden to show that the speech is unprotected. *See Ashcroft*, 535 U.S. at 255.

## III.   DISCUSSION

Defendants repeatedly argue that the government is pursuing a theory of vicarious liability for merely hosting third party content. That argument is not supported by the SI, which goes through a long and fact-specific description of the Defendants participation in a conspiracy to facilitate and promote prostitution. The SI sufficiently explains why defendants in this case are not just merely hosting third party content. Defendants also

argue that the SI is based entirely on the assumption that the advertisements are for illegal activity.  Again, Defendants ignore the specific facts alleged in the SI.  While the SI does contain some language that could support that accusation, it is replete with specific facts that support finding that the conspirators knew the ads were for prostitution.

Defendants argue the SI should be dismissed for three reasons.  First, they argue the SI is deficient because it presumes the ads in the indictment are illegal, merely repeats others' accusations, attacks protected publisher functions, and attacks legal business practices.  Second, they argue SI fails to allege specific intent, which Defendants argue is the required *mens rea*.  Third, they argue the Travel Act is unconstitutional as applied in the SI because the allegations are based on "generalized crimes" and conflict with the First Amendment.  The Court is unpersuaded by these arguments and will deny Defendants' motion to dismiss the indictment.

1.  The SI is not deficient.

a.  *The SI does not presume ads are illegal nor does it merely repeat others' accusations.*

Defendants first argue that the SI impermissibly presumes the alleged offending ads are unlawful.  "The Government may not suppress lawful speech as the means to suppress unlawful speech."  *Ashcroft*, 535 U.S. at 255.  In their view, Backpage was "an avenue of expression of ideas and opinions" with First Amendment protections.  (Mot. at 17) (quoting *Backpage.com v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015)).  That is, because Backpage contained at least some ads that were not for prostitution, the Government's prosecution of these defendants necessarily attacks protected speech unless it shows the speech at issue was unlawful.  *See Dart*, 807 F.3d at 234.  The Government "bears the burden of proving the constitutionality of its actions" when it restricts speech. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000); *see Bd. of Trustees v. State Univ. of N.J.*, 492 U.S. 469, 480 (1989) ("[T]he State bears the burden of justifying its restrictions[.]").

Here, taking the allegations in the SI as true, as the Court must, the Government has met its burden of showing the fifty ads in the SI are for prostitution.  Counts 3, 6–11, 18,

and 25–26 concern ads posted by P.R. The SI lays out P.R.'s history of working with C.F. in detail.  (SI ¶ 132).  C.F. knew P.R.'s posts advertised prostitution, repeatedly allowed P.R. to post those ads, and advised P.R. on how to meet Backpage's publications standards. P.R.'s ads contained a phrase indicative of prostitution, "50 red roses special," and Backpage moderators sometimes deleted her nude pictures.   In emails to C.F., P.R. complained that other ads had more nudity than her own.  Vaught and Padilla also received emails from P.R.  They instructed another Backpage employee to "dig into" her difficulty posting such pictures.  P.R. posted ads through November 2015.  Construing the SI in its entirety according to common sense, the alleged facts sufficiently show that the ads posted by P.R. were for prostitution.

The ads in Counts 27–51 contain the phrase "GFE." The SI explains in multiple paragraphs that GFE, short for "girlfriend experience," is a "coded term for prostitution." At one point, GFE was temporarily banned from use in Backpage ads. Defendants Spear, Hyer, Padilla, C.F., and Vaught exchanged emails discussing its use as a "code word" or a "solid sex for money term[]."  (SI ¶ 149).  Dollar Bill once complained that Backpage refused one of his ads even though "IT NEVER SAID GFE" while other, more obvious prostitution ads had been published despite "saying GFE."  (SI ¶ 64).  Backpage's moderators were instructed to stop removing ads containing "GFE" in or around January 2016, a decision Padilla and a moderator discussed and communicated to Vaught.  (SI ¶ 148).  Again, taking the allegations in the SI as true, which the Court must, the SI's alleged facts sufficiently show the GFE ads were for prostitution.

Counts 2, 4–5, 12–17, and 19–24 depict ads of Victims 5, 8, 10, 11, 12, 13, 15, 16, and 17.  Victims 5, 8, 10 were "sold for sex, through the use of Backpage ads."  (SI ¶¶ 164, 167, 169–72, 174–76).  Each of these ads, construed according to common sense, and interpreted to include facts necessarily implied, and read in context of the entire SI, are ads for prostitution.  The ad in Count 2 depicted Victim 5 and was titled "Get freaky Tuesday. . . Come spend ur day with us–19" and had accompanying text saying "Doin incalls and outcalls."  Victim 8 was depicted in the ad for Count 4, titled "Puerto Rican mami in

Walpole area INCALLS—19."  A similar ad depicting her makes up Count 5.  The ads depicting Victims 10 and 12 (Counts 12–15) contained the phrase "New In Town," a "coded phrase used by pimps who shuttle children to locations where they do not know anyone and cannot get help."  (SI ¶ 13).  Victim 11 was featured in ads titled "Upscale Independent BRUNETTE BOMBSHELL 5-Star Fantasy—26" and "Alexis Foxx the HOTTEST in town!!!!!—26" (Counts 16–17).  Victim 15 and 17's ads, among other suggestive text, included a disclaimer that by contacting them, prospective customers agreed they were not affiliated with law enforcement (Counts 19–21).  Victim 17 offered in/calls only (Counts 21–22).  Victim 13's ad included prices for particular services: "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head" (Count 23).  Victim 16's ad offered "Outcalls Now Freaky Curvy Caramel Lady OUTCALLS NOW—23."

Again, at this point of the proceeding, the Court must take the SI at its face.  The Government may eventually fail to prove the facts alleged in the SI, but, at this stage of the proceeding, the Court cannot consider the adequacy of the evidence; that job is reserved for the fact finder.  The Court is convinced the factual allegations in the SI are sufficient to show the ads were for prostitution.

Additionally, Defendants argue the SI's use of government officials' and others' "accusations" against Backpage are improper.  (Mot. at 18–19); *see, e.g.*, (SI ¶ 74 (2010 letter from state AGs); SI ¶ 109 (letter from Seattle mayor); SI ¶ 111 (letter from National Association of Attorneys General); SI ¶ 140 (amicus brief filed by NCMEC); SI ¶ 131 (ASU publication)).  Defendants cite two previous cases Backpage was involved in for the proposition that Courts have "rejected such 'evidence'" in the past.  (Mot. at 19); *see Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012).  Neither case stands for such a proposition;[3] even if they did, the SI contains enough factual information outside of these

_____

[3] In the portions of *McKenna* cited by Defendants, the district court analyzed a state statute under vagueness and overbreadth doctrines. 881 F. Supp. 2d at 1280–83. The *Cooper* court

- 11 -

"condemnations" to be sufficient.

b. *The SI does not attack protected editorial functions or protected business advertising practices.*

Defendants argue the SI attacks Backpage's protected editorial judgment and business advertising practices.  The First Amendment protects "editorial control and judgment."  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  The First Amendment also protects speech on the Internet.  *Reno v. ACLU*, 521 U.S. 844, 870 (1997). Defendants, however, are unable to overcome the alleged facts in the SI.[4]

The SI alleges Defendants participated in moderation not merely to edit, but to "conceal the true nature of the ads being posted on its website."  (SI ¶ 11).  When a post advertised child prostitution, their "official policy" was to delete particular words in the ad that indicated the child's age and publish the revised version.  (SI ¶ 13).  This "only created a veneer of deniability and helped Backpage's customers (*i.e.*, pimps trafficking children) evade detection."  (SI ¶¶ 13, 78).  Backpage permitted users to include TER ID numbers, "just no live links."  (SI ¶ 85).  In February 2011, Padilla responded to a request for Backpage's list of banned adult terms. Padilla then provided an Excel spreadsheet that identified over "660 words or phrases that are indicative of prostitution, including an array of terms that are suggestive of child prostitution (*e.g.*, 'Lolita,' 'fresh,' 'high school,' 'tight,' 'young').  The spreadsheet explained that most such terms were simply to be 'filtered' from the ads in which they appeared."  (SI ¶ 95).  The SI also alleges the "non-adult sections" were simply intended to provide "plausible deniability" and to make the website "defensible" and more palatable to law enforcement.  (SI ¶ 112).  A Backpage

---

discusses the September 2010 letter from state AGs, but held a state statute similar to the one in *McKenna* was likely unconstitutional under the overbreadth doctrine. 939 F. Supp. 2d at 815–16, 831–32.  Neither considered the sufficiency or use of the contested statements.

[4] Defendants also argue the SI's allegations are not supported by underlying documents. Again, per *Boren* and *Jensen*, *supra*, the Court takes the allegations on their face and does not consider the adequacy of the evidence when reviewing whether an indictment is sufficient.

1    training document specifically instructed Backpage moderators not to remove photographs

2    of a person who looks like a minor, unless the ad also contained a banned term.  (SI ¶ 143).

3    The training manual instructed moderators to allow phrases like "99% CUM BACK FOR

4    MORE," "car service," and "lollipop special."  (SI ¶ 143).  Backpage also taught customers

5    how to word their ads to avoid moderator restrictions.  (SI ¶ 59–67).

6           The cases Defendants rely on do not persuade the Court that the above practices

7    alleged in the SI were merely traditional, editorial functions.   First, many of the cases were

8    decided under the Communications Decency Act ("CDA"), which grants immunity from

9    civil liability to "interactive computer service" providers when information on its service

10   originates from "another information content provider."  47 U.S.C. § 230(c); *see Barnes v.*

11   *Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009) ("To summarize, we hold that section

12   230(c)(1) bars Barnes' claim, under Oregon law, for negligent provision of services that

13   Yahoo undertook to provide"); *Green v. Am. Online (AOL)*, 318 F.3d 465, 469–71 (3d Cir.

14   2003); *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) ("By its plain

15   language, § 230 creates a federal immunity to any cause of action that would make service

16   providers liable for information originating with a third-party user of the service."); *Jones*

17   *v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014); *Batzel v. Smith*,

18   333 F.3d 1018, 1026–30 (9th Cir. 2003) *superseded by statute on other ground as*

19   *recognized in Breazeale v. Victim Serv., Inc.*, 878 F.3d 759 (9th Cir. 2017); *Doe v.*

20   *Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015); *M.A. ex rel P.K. v. Village*

21   *Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011).  This case, however,

22   does not concern civil liability, and the CDA has "no effect" on "any other Federal criminal

23   statute."  47 U.S.C. § 230(e)(1).

24          Second, the facts alleged in the SI are qualitatively different than the protected

25   activities in those cases.  In *Batzel*, for example, the Ninth Circuit held that an individual's

26   minor edits of another's email before forwarding the email to a listserv did not make that

27   individual responsible for the "development" of the content (and thus subject to civil

28   liability).  333 F.3d at 1031; *see also Jones*, 755 F.3d at 415–16 (holding defendant website

and operator were not liable under the CDA because they did not "materially contribute[] to the defamatory content").  In *Barnes*, 570 F.3d at 1098–99, and *Zeran*, 129 F.3d at 330, websites failed to remove information at the request of victims of hoaxes and harassment perpetrated by third parties, but the websites took no affirmative steps to conceal or facilitate its users' illegal conduct.  In *Green*, the Third Circuit held that § 230(c)(2) immunized AOL for its "good faith efforts to restrict effort to restrict access to material they consider to be objectionable."  318 F.3d at 472.

Defendants' argument that its efforts to promote its website was protected activity similarly fails.  Prostitution ads are ads for illegal transactions.  *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 285, 297 (2008) ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes."); *Erotic Serv. Provider Legal Ed. and Research Project v. Gascon*, 880 F.3d 450, 459–60 (9th Cir. 2018) ("[P]rostitution has not been a lawful activity in California since it was banned in 1872 . . . . On this basis alone, [the plaintiff's] claim fails because commercially motivated speech that involves unlawful activity is not protected speech under the First Amendment.").  The First Amendment does not protect "offers to engage in illegal transactions."  *United States v. Williams*, 553 U.S. 285, 297 (2008).

The SI does not allege Defendants are criminally liable because they unknowingly and unintentionally operated a website used by third parties to post prostitution ads.  Rather, it alleges Defendants purposely sought out opportunities to increase prostitution advertising on Backpage.  The SI alleges the Defendants intentionally identified prostitutes, created free Backpage ads for them, and used those ads to try to secure future business.  (SI ¶¶ 9, 36).  Hyer directed the project, and Spear, Hyer, C.F., and Larkin participated in meetings where the project was on the agenda.  (SI ¶¶ 36, 38, 40).  The plan was also described in a document C.F. gave to Larkin, Spear, and Brunst.  (SI ¶42).  Defendants also sought to expand their traffic through TER, a "prostitution website" where "johns" could rate and review escorts including the "prices charged for particular sex acts."  (SI ¶¶ 10, 54).  As alleged, Backpages' efforts to promote its website facilitated prostitution and were

1    not protected business practices.

2        2.   The SI alleges sufficient *mens rea*.

3        Defendants are charged with fifty counts of violating the Travel Act by promoting

4    or facilitating prostitution.  To obtain a conviction under the Travel Act, the Government

5    must show defendants had "specific intent to promote, manage, establish, carry on or

6    facilitate one of the prohibited activities."  *United States v. Gibson Specialty Co.*, 507 F.2d

7    446, 449 (9th Cir. 1974); *accord United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir.

8    1981) ("An indictment under the Travel Act requires allegations of each of the three

9    elements of the crime: (1) interstate commerce or use of an interstate facility (2) with intent

10   to promote an unlawful activity and (3) a subsequent overt act in furtherance of that

11   unlawful activity."); *United States v. Polizzi*, 500 F.2d 856, 876–77 (9th Cir. 1974)

12   (Required intent under the Travel Act is "specific intent to facilitate an activity which the

13   accused knew to be unlawful under state law.").  Defendants argue that to comply with the

14   First Amendment and satisfy the Travel Act's specific intent requirement, the SI must

15   allege each defendant "knew the *specific* speech that is the basis for criminal charges was

16   illegal." (Mot. at 28) (emphasis in original).   That is, Defendants argue the First

17   Amendment requires the Government to prove that each Defendant was aware of each ad

18   that make up the fifty Travel Act counts and knew that each ad proposed illegal

19   transactions.   The Court is not persuaded that the First Amendment demands such a

20   standard.

21       In their argument on this issue, Defendants largely rely on four cases—*Smith v.*

22   *California*, 361 U.S. 147 (1959), *Mishkin v. New York*, 383 U.S. 502, 511 (1966), *United*

23   *States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994), *United States v. Gibson Specialty*

24   *Co.*, 507 F.2d 446, 449 (9th Cir. 1974)—and previous statements made by the Government

25   or legislators in Congressional testimony and other cases.  The Court concludes none of

26   these cases mandate the *mens rea* requirement described by Defendants, and, instead,

27   agrees with the Government that intent to promote or facilitate prostitution is sufficient.

28       In *Smith*, an owner of a bookstore was convicted of violating a Los Angeles City

- 15 -

ordinance that made it illegal for a bookseller to possess "any obscene or indecent writing or book." 361 U.S. at 148.  The ordinance did not have a scienter element and "imposed a strict or absolute criminal responsibility on appellant."  *Id.* at 151.  The Supreme Court noted that obscene speech and writings are not protected by the First Amendment, but the "ordinance's strict liability feature" could "restrict the dissemination of books which are not obscene."  *Id.* at 153.  The Court struck down the ordinance, but in doing so did not consider "what sort of mental element is requisite to a constitutionally permissible prosecution of a bookseller for carrying an obscene book in stock" and explicitly left open the possibility of prosecution for something less than specific knowledge of the contents of a particular book.  *Id.* at 154–55.

Likewise, *Mishkin* upheld a scienter standard less demanding than the one proposed by defendants.  There, the defendant was convicted of violating a New York Penal Law prohibiting possession of obscene books with intent to sell and hiring others to prepare and publish obscene books.  *Mishkin*, 383 U.S. at 503.  The Court upheld the scienter standard used by the New York Court of Appeals, requiring the State show defendants were "in some manner aware of the character of the material they attempt to distribute."  *Id.* at 510.  The Court reasoned, "proof of scienter" is required "to avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity."  *Id.* at 511.  The scienter standard used in the prosecution "amply serve[d] those ends, and therefore fully [met] the demands of the Constitution."  *Id.*

*X-Citement* concerned a federal statute that prohibited "the interstate transportation, shipping, receipt, distribution, or reproduction of visual depictions of minors engaged in sexually explicit conduct."  513 U.S. at 65–66.  The statute had a scienter requirement of "knowingly" but was worded in such a way that it was not clear whether the knowingly requirement only applied to the verbs immediately following "knowingly"—transports, ships, receives, distributes, or reproduces—or also applied to the "elements of the minority of the performers, or the sexually explicit nature of the material."  *Id.* at 68.  The Court held the knowledge requirement also applied to the age of the performers and the sexually

explicit nature of the material, because, among other reasons, "the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct." *Id.* at 72. "[N]onobscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment. . . .Therefore, the age of the performers is the crucial element separating legal innocence from wrongful conduct." *Id.* at 72–73. Thus, "a statute completely bereft of a scienter requirement as to the age of the performers would raise serious constitutional doubts." *Id.* at 78. Nevertheless, *X-Citement*'s holding "was not a constitutional" one, but "one of statutory interpretation." *United States v. Smith*, 459 F.3d 1276, 1287 (11th Cir. 2006). Consequently, its application here is limited. The Government does not advance a theory of prosecution that is "completely bereft of a scienter requirement" such that innocent conduct is swept up in criminal liability, and the statute here contains an intent requirement.

*Gibson* described the Travel Act's specific intent requirement: "the prosecutor must show that the manufacturer in some significant manner associated himself with the purchaser's criminal venture for the purpose of its advancement." 507 F.2d at 449. There, manufacturers of gambling paraphernalia sold products to Montana distributors, where such products were illegal. *Id.* at 448. The Ninth Circuit held the manufactures failed to form a specific intent to violate the Travel act because "[t]here is no evidence in the record, direct or circumstantial from which one could infer the defendants associated with, participated in or sought to make succeed the Montana operations." *Id.* at 450. The manufacturers had merely "produced catalogues, filled orders for punchboards and pulltabs from Montanans, billed the buyers and received payments." *Id.*

Lastly, the previous statements made by the Government in other cases are not binding on the Court, not relevant to this prosecution, and, in any case, not inconsistent with the Government's current theory regarding the Travel Act. In 2010, the DOJ's National Coordinator for Child Exploitation, Prevention, and Interdiction testified in a congressional hearing that a website would only be liable for third-party postings if "there was evidence" that a website "was a participant . . . conspiring with those who were

misusing their site, that is knowingly conspiring to violate the laws." (Mot. at 29) (quoting *Domestic Minor Sex Trafficking: Hearing Before Subcomm. On Crime, Terrorism, & Homeland Security of the H. Comm. on the Judiciary*, 11th Cong. 215–16 (2010)). The SI alleges Defendants conspired with third parties, such as P.R. and Dollar Bill, to promote prostitution and edited other prostitution ads to "conceal their true nature." (SI ¶¶ 10–11, 59–67, 132). The remaining statements used in Defendants' motion concerned different statutes, the Fight Online Sex Trafficking Act and the SAVE Act 18 U.S.C. § 1591.

The Government's proposed *mens rea* standard, specific intent to promote or facilitate prostitution, is consistent with *Gibson*, *Tavelman*, and *Polizzi*—the Ninth Circuit cases discussing intent requirements of the Travel Act. The SI alleges the Defendants intentionally identified prostitutes, created free Backpage ads for them, and used those ads to try to secure future business. (SI ¶¶ 9, 36). They also helped known prostitution advertisers (Dollar Bill and P.R.) avoid their decency filters and attempted to "conceal the true nature of the ads being posted on" Backpage. (SI ¶¶ 11, 59–67, 132). Unlike the defendants in *Gibson*, where there was "no evidence . . . from which one could infer that the defendants associated with, participated in or sought to make succeed" the criminal venture, the SI meets *Gibson*'s test of requiring Defendants to in "some significant manner associate[]" themselves with the "criminal venture for the purpose of its advancement." 507 F.2d at 450.

Defendants argument that the First Amendment demands a scienter requirement more exacting than that offered by the Government is unpersuasive. Unlike in *Smith*, there is not a strict liability standard sweeping lawful acts in with unlawful acts because the activity here must be connected to a specific intent to promote or facilitate the crime of prostitution. As in *Mishkin*, where a defendant in an obscenity case only had to be "in some manner aware of the character of the material they attempt to distribute," specific intent to promote prostitution "avoid[s] the hazard of self-censorship of constitutionally protected material." Additionally, unlike in *Mishkin*, the intent standard does not have to compensate for the "ambiguities inherent in the definition of obscenity." *See Miller v.*

*California*, 413 U.S. 15, 24 (1973) ("obscenity" requires assessing whether the work (a) under "contemporary community standards...appeals to the prurient interest"; (b) depicts sexual conduct "in a patently offensive way"; and (c) "lacks serious literary, artistic, political, or scientific value").

The SI contains sufficient factual allegations to implicate all Defendants. Additionally, when there is a "continuous conspiracy," the "overt act[s] of one partner may be the act of all without any new agreement specifically directed to that act." *United States v. Pinkerton*, 328 U.S. 640, 646–47 (1946); *see United States v. Long*, 301 F.3d 1095, 1103 (9th Cir 2002) ("The *Pinkerton* doctrine is a judicially-created rule that makes a conspirator criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy."); *United States v. Fonseca-Caro*, 114 F.3d 906, (9th Cir. 1997) ("[A] co-conspirator is vicariously liable for reasonably foreseeable substantive crimes committed by a co-conspirator in furtherance of the conspiracy."). The pleadings and this order are replete with the relevant factual allegations against the defendants, so the Court will only briefly repeat them here. Taken as true, they show Defendants had a specific intent to promote prostitution.

Defendants Lacey and Larkin created Backpage with C.F. in 2004. (SI ¶ 2). They retained significant control throughout the time Backpage was operating. (SI ¶ 2). Their control over Backpage and their financial interest in it continued even after they purportedly sold Backpage. (SI ¶¶ 29–30). Spear was the Executive Vice President of one of Backpage's parent companies and owned approximately 4% of Backpage. Brunst was the Chief Financial Officer and owned approximately 6% of Backpage. Spear and Brunst also retained significant control over Backpage after the purported sale. (SI ¶ 31). Padilla was Backpage's Operations Manager and Vaught was the assistant Operations Manager. (SI ¶¶ 7–8).

Larkin regularly met with C.F. after the purported sale to discuss and direct the operation of Backpage. (SI ¶ 32). Larkin, Spear, Hyer, and C.F. attended meetings where the Dallas aggregation plan or the business relationship with TER was on the agenda. (SI

¶¶ 38–42, 47–48).  Lacey sent Larkin a draft editorial arguing Backpage brought "the oldest profession in the world . . . transparency."  (SI ¶ 137).  Larkin reviewed the editorial, forwarded it to C.F., and instructed him to remove any references to editing posts.  (SI ¶¶ 107–08).  Padilla helped supervise Backpage's moderators.  (SI ¶ 12).  Larkin, Spear, and C.F. met to discuss trade with TER.  (SI ¶ 47).  C.F. sent Larkin, Spear, and Brunst a "Backpage strategic plan" that included "expand relationship with TER."  (SI ¶ 49).  Padilla emailed (with Vaught cc'd or as a recipient) Backpage's India-based moderators to tell them to be "more lenient."  (SI. ¶¶ 93, 99).  Padilla and Vaught were sent an email informing them that their credit card processing company expressed concern about prostitution ads.  Vaught directed a moderator to not remove "sex for money" links from ads. (SI ¶ 139).  Vaught received an email from a moderator indicating that Padilla said to allow "GFE" in ads. (SI ¶ 148).  Larkin, Spear, Brunst, Hyer, and C.F. received an email in August 2013 notifying them that Chase Bank would no longer accept transactions from Backpage because of it "involvement in Human Trafficking."  (SI ¶ 135).  Larkin, Spear, C.F., and Brunst discussed strategies for fooling credit card companies into processing payments using shell companies.  (SI ¶¶ 178–80).

The alleged facts in the SI, taken as true, establish defendants had the specific intent to promote prostitution in violation of the Travel Act.  They conspired together to do so.  The conspiracy was successful and resulted in the fifty ads for prostitution that now make up fifty counts of violating the Travel Act.

   3.  The Travel Act is not unconstitutional as applied.

Defendants argue the Travel Act is unconstitutional as applied in the SI.  In their view, the SI merely alleges the defendants only had "general knowledge that Backpage.com was used by third parties to advertise prostitution."  (Mot. at 38).  Again, taking the SI's allegations as true, which the Court must, the SI tells a different story.  Nevertheless, the Court considers whether the Travel Act is unconstitutional as applied to the SI.

Defendants' argue the Travel Act is overbroad and vague as applied to the SI.  Conviction under the Travel Act requires: (1) interstate commerce or use of an interstate

facility; (2) with the intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity"; and (3) a subsequent overt act in furtherance of that unlawful activity. 18 U.S.C. § 1952(a); *Tavelman*, 650 F.2d at 1138.  The Ninth Circuit has interpreted the second prong quite broadly.  "Facilitate" is given its "ordinary meaning: to make easy or less difficult." *Gibson*, 507 F.2d at 446.

Defendants argue the Travel Act is overbroad as applied in the SI because without the specific intent standard they propose, "the statutory terms become boundless."  A law is overbroad under the First Amendment if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks omitted).  Given the standard the SI applies—specific intent to promote and facilitate prostitution (SI ¶ 10)—the Court does not agree.

Defendants do not provide any examples of how such a standard could criminalize protected speech.  The statute, as applied in the SI, requires Defendants to have intended to facilitate prostitution, which is a crime.  *See* A.R.S. § 13-3214.  This limits its purview to criminal activity and distinguishes it from cases relied on by Defendants.  For example, in *United States v. Sineneng-Smith*, the Ninth Circuit considered a statute that made it a felony when a person "'encourages or induces an alien to come to, enter, or reside in the United States' if the encourage knew or reckless disregarded 'the fact that such coming to, entry, or residence is or will be a in violation of law." 910 F.3d 461, 467 (9th Cir. 2018), *cert. granted*, No. 19-67, 2019 WL 4889927 at *1 (October 4, 2019) (quoting 8 U.S.C. § 1324(a)(1)(A)(iv)).  The Ninth Circuit, in disagreeing with a Fourth Circuit decision that compared the statute to aiding and abetting, struck it down.  They reasoned the statute criminalized speech that applied to both criminal and civil violations, speech that merely "encouraged" violating civil and criminal immigration laws (as opposed to the aiding and abetting requirement of "assisted or participated"), and did not require that a principal commit an underlying offense (as required in aiding and abetting).  *Id.* at 480–82; *see also*

*United States v. Freeman*, 761 F.2d 549 (9th Cir. 1985) (defendant was entitled to jury instruction concerning a First Amendment defense for 12 counts where he may have generally advocated for the filing of false tax returns, but not for the two counts where he "also assisted in the filing of false returns"). Such concerns are not relevant here. Defendants are accused of intending to promote or facilitate an activity they knew to be criminal under state law. They then assisted and participated in the violation of the state law, resulting in fifty prostitution ads cited by the SI. As applied in the SI, the Travel Act is not unconstitutionally overbroad.

Defendants argue the SI is unconstitutionally vague because the Travel Act's undefined terms do not sufficiently narrow criminal conduct to give people a fair warning of what conduct is prohibited and allows arbitrary and discriminatory enforcement. (Mot. at 40) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Where a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). As Defendants recognize, however, "strict *mens rea* requirements" can limit a statute's application. (Mot. at 41).

As applied in the SI, the Travel Act does limit its application to unprotected speech. The statute requires use of an interstate facility, with the intent to facilitate an unlawful activity, and a subsequent act in furtherance of that unlawful activity. Here, the SI alleges Defendants used a website with the intent to facilitate prostitution (a criminal activity) and executed strategies to further and increase that activity. The Court cannot conclude that such a standard or the allegations in the SI do not give fair warning that facilitating a criminal act is itself a crime. As applied in the SI, the Travel Act is not unconstitutionally vague.

## IV.  CONCLUSION

For the foregoing reasons, the SI is not constitutionally deficient. It contains the elements of the offense charged and fairly informs Defendants of the charges against which they must defend. It enables them to plead an acquittal or conviction in bar of future

prosecutions for the same offense.  Read in its entirety, construed according to common sense, and accepting the truth of the allegations, the SI gives Defendants enough facts and circumstances to inform the accused of the charged offenses.  Defendants arguments that the First Amendment demands a scienter requirement beyond specific intent to promote prostitution are unavailing, as the *mens rea* standard of specific intent to promote prostitution does not criminalize lawful activity.

Accordingly, Defendants' Motion to Dismiss the Indictment (Doc. 561) is **DENIED.**

Dated this 24th day of October, 2019.

Honorable Susan M. Brnovich
United States District Judge