MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-18-422-PHX-SMB |
| Plaintiff, | **UNITED STATES' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE EXPERT TESTIMONY [DOC. 928]** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

Defendants' motion *in limine* to preclude expert testimony should be denied for several of reasons. *First*, in compliance with the scheduling order, on December 18, 2018 the government provided notice to Defendants of ten witnesses it had identified whose testimony might be construed as expert testimony under Rule 702. (Docs. 422, 638). The government intends to designate Dr. Sharon Cooper as its primary expert in the area of sex trafficking.

*Second*, Defendants' complaint that Dr. Cooper or other witnesses should be precluded from referencing child sex trafficking is misplaced. The Travel Act prohibits the facilitation of prostitution whether it involves an adult or child prostitution offenses, and, as explained below, the Superseding Indictment ("SI") identifies several minor victims and other facts demonstrating that Defendants' business involved advertising both adult and underage prostitution. Defendants' motion should be denied.

*Third*, the remaining noticed experts are "hybrid" witnesses—persons who have gained expert or specialized knowledge through their experience, education and training, but who are also percipient fact witnesses based on their personal interactions with Defendants or other Backpage employees and agents, or based on their observations concerning Backpage's operations. In an abundance of caution, the government noticed the areas in which these witnesses could be considered experts. Defendants sought out many of these witnesses (*i.e.*, Dr. Dominique Roe-Sepowitz) *because of* their expertise in the area of adult prostitution and child sex trafficking. Courts have long recognized that witnesses may serve as hybrid expert and fact witnesses in similar circumstances. The jury is entitled to a full account of the facts concerning the prostitution-advertising enterprise that Defendants owned, operated and controlled, and Defendants' motion should be denied.

**ARGUMENT**

**I.     Dr. Cooper's Expert Testimony Is Admissible.**

The government's expert notice provides biographical information on Dr. Cooper, attaches her curriculum vitae, and indicates—among other things—that she is a physician with experience in pediatrics, has taught and written about child exploitation and sex trafficking, and that her work has been peer reviewed. Most notably, Dr. Cooper:

- is a developmental and forensic pediatrician who has practiced pediatric medicine since 1976;
- has treated patients, including children, who have been abused, neglected, and sexually exploited;
- has made presentations at numerous conferences on child sexual exploitation

- is an Instructor for the National Center for Missing and Exploited Children ("NCMEC"), where she trains investigators, prosecutors, judges, and others on sexual exploitation through prostitution;

- has testified before the United States Congress, the Russian Parliament, the Italian Senate and the European Commission on child exploitation; and

- has been qualified as an expert more than 300 times (to include testifying as an expert medical witness in federal court nearly 30 times).

### a. Dr. Cooper's Testimony Is Admissible Under Fed. R. Evid. 702.

Pursuant to Fed. R. Evid. 702, an expert may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The Ninth Circuit has articulated a two-prong analysis for admissibility of a qualified expert's testimony. First, the proffered testimony must be reliable, *i.e.,* the expert's testimony reflects scientific knowledge, the findings are derived by the scientific method, and the work product amounts to "good science." *Daubert v. Merrell Dow Pharm.,* 43 F.3d 1311, 1315 (9th Cir. 1995). Second, the testimony must meet the "fit" requirement of relevancy, *i.e.,* "it logically advances a material aspect of the proposing party's case." *Id.* A court's determination of relevancy "must be 'tied to the facts' of [the] particular case.'" *Cooper,* 510 F.3d at 942 (quoting *Kumho Tire,* 526 U.S. at 150).

### b. Dr. Cooper's Expert Witness Testimony Is Relevant.

Taking relevance first, it is "well established that the government in a conspiracy case may submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment." *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011). *See also, e.g., United States v. Lillard*, 354 F.3d 850, 854 (9th Cir. 2003); *United States v. Williams,* 989 F.2d 1061, 1070 (9th Cir. 1993) (finding no abuse of discretion where district court admitted evidence of "uncharged transactions" that were "closely linked to" events charged in drug conspiracy); *United States v. Bonanno,* 467 F.2d

14, 17 (9th Cir. 1972) (observing that in conspiracy prosecutions, the government has considerable leeway in offering evidence of other offenses not charged in the indictment).

Although the Ninth Circuit has concluded that the government is not limited to submitting proof on only overt acts charged in the superseding indictment, here, the SI alleges a substantial number of overt acts in furtherance of the conspiracy charge directly related to Defendants' knowledge about sex trafficking and prostitution on Backpage (SI¶¶ 95, 100, 104, 109, 120, 124, etc.).

The superseding indictment also contains detailed allegations of 17 adult and minor victims who were sex trafficked on Backpage. (SI¶¶ 160-173.) Five victims were minors when trafficked on Backpage. (SI¶¶ 163, 164, 167, 169, 172.) Many were raped and/or beaten repeatedly and three were murdered by Backpage customers. (SI¶¶ 164-165, 167-168, 170, 173-75.) Further, 15 charged counts in the superseding indictment involve victims who were trafficked on Backpage. (SI¶¶ Counts 2, 4-5, 12-17, and 19-24.)

As such, Defendants' argument that the government's proposed expert testimony on sex trafficking "is irrelevant because Defendants are not charged with human trafficking, sex trafficking, or child trafficking" disregards the actual allegations and charged counts in this case. For example, Victim-5—starting at the age of 14—was sold for sex through the use of Backpage ads, and "customers who responded to Victim 5's Backpage ads forced her to perform sexual acts at gun point, choked . . . and gang-raped her." (SI ¶164.) The SI alleges numerous other incidents of how traffickers used force and coercion to maintain control of their victims. (SI¶¶ 160, 162, 164, 165, 167, 168, 170.)

"By and large, the relationship between prostitutes and pimps is not the subject of common knowledge." *United States v. Taylor*, 239 F.3d 994, 998 (9th Cir. 2001) (citing Note, *Men Who Own Women: A Thirteenth Amendment Critique of Forced Prostitution*, 103 YALE L. J. 791, 793-796 (1993)). Because of their unfamiliarity with such topics, the average juror can be "unprepared to access the veracity of an alleged pimp, prostitute, or other witness testifying about prostitution." *Taylor*, 239 F.3d at 994. ("[P]eople puzzle over why a prostitute does not leave an abusive relationship with a pimp") (citing Ann M.

Coughlin, *Of White Slaves and Domestic Hostages*, BUFF CRIM. L. REV. 108, 120-21, 124-25 (1997)).  Dr. Cooper's testimony will address how pimps use force and coercion to maintain control over adolescent female and adult prostitutes and prevent them from leaving the relationship.  This testimony would aid the jury in understanding how victims in this case were not simply consenting and willing participants with free will to exit their situation.

Additionally, a trier of fact might not understand why an individual would respond to an online advertisement, travel to meet with a stranger, and engage in prostitution. (SI¶¶ 160-176.)  As a developmental and forensic pediatrician who evaluates and treats children who have been victims of sexual exploitation, Dr. Cooper's testimony about how pediatric development, family dysfunction, and the use of drugs and alcohol may make victims more susceptible to recruitment helps place in context the victims' actions and decisions in this case.  Moreover, the jury will also be required to access the credibility of the victims who will testify at trial—furthering their need to understand the pimp-prostitute relationship dynamics and subculture.

Dr. Cooper can also describe how the advent of the internet and online platforms like Backpage and Craigslist have transformed the commercial sex industry, and the roles these platforms played in the victimization of her patients—testimony that would be clearly and directly tied to the facts of this case and helpful to the determination of facts at issue.  Dr. Cooper could also explain certain terms unique to the vernacular of the prostitution and sex trafficking subculture.  Such terms include "new in town," "roses," "amber alert," "lollipop special," "GFE," "PSE," "DATY," "in-call," "out-call," "Lolita," and others.  These are terms the SI alleges Defendants knew were indicative of illegal services, and that they variously stripped from ads while still allowing the underlying ads to be published (offering the featured adults or children for sale for sex), or permitted ads with the terms to be published knowing that they indicated prostitution solicitations.

In sum, Dr. Cooper's testimony will address issues implicated by the charges and the particular incidents that the government expects will be discussed at trial. Accordingly, because the proffered expert testimony "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action," this testimony should be admitted. Fed. R. Evid. 401.

The government however, will not seek any opinion testimony from Dr. Cooper on the specifics of this case during her expert witness testimony.

Defendants' citation to two out-of-circuit cases is insufficient to exclude Dr. Cooper as an expert.[1] (Mot. at 12.). Dr. Cooper has been qualified as an expert on pimp-prostitute relationship dynamics in a number of district courts, including within the Ninth Circuit. Further, she has been qualified as an expert in other related areas more than 300 times, including nearly 30 times in federal court. *See United States v. King*, 703 F. Supp. 2d 1063, 1077-78 (D. Haw. 2010); Doc. 422-6.

**c.    Dr. Cooper's Testimony is Reliable.**

Fed. R. Evid. 702 requires an expert witness to be qualified "by knowledge, skill, experience, training, or education" in a particular area or field in order to testify as an expert in that area or field. Dr. Cooper's knowledge, skill, experience, training, and education qualifies her as an expert on the dynamics of the pimp-prostitute relationship. This point is undisputed—indeed, Defendants do not contest the reliability of any of the governments' noticed expert witnesses in their motion. (Doc. 928, *passim*.)

As her CV demonstrates, Dr. Cooper developed her expertise through extensive experience and training as a developmental and forensic pediatrician. (Doc. 422-7.) Dr. Cooper has practiced pediatrics since her residency in July 1976, served for 17 years as a

---

[1] The government notes that in *United States v. D'Ambrosio*, No. 1:15-CR-003, 2016 WL 1385281, at *1 (M.D. Pa. Apr. 7, 2016), the same court held that Dr. Cooper's testimony was relevant and would assist the trier of fact, noting "the background and information Dr. Cooper could provide would assist the jury to understand the dynamics of exploitation. . .") *see United States v. Williams*, No. 05 Cr. 443, 2007 WL 3118306, at *7 (M.D. Pa. Oct. 19, 2007).

physician in the Army, and joined the University of North Carolina, Chapel Hill, Department of Pediatrics. (*Id.*)  Dr. Cooper continues to treat patients, including children, who have been abused, neglected, and sexually exploited and to write and present extensively about the sexual exploitation of children. (Docs. 422, 422-7.)  She has interacted with hundreds of victims of sex trafficking and has worked with hundreds of law enforcement officers on the subject.  (*Id.*)

### d. Dr. Cooper's Testimony is More Probative Than Prejudicial.

Defendant next argues that expert witness testimony should be excluded under Rule 403 by way of Rule 404, asserting that Rule 404 prohibits such testimony because Defendants are not accused of "committing the bad acts of trafficking and pimping." (Mot. 8.)  However, Defendants ignore that Rule 404 is inapplicable here.  As explained above, Dr. Cooper's expert testimony is directly related to the crimes for which Defendants have been charged.  *United States v. Lillard,* 354 F.3d 850, 854 (9th Cir. 2003).

Further, Defendants' argument that ten expert witnesses testifying about the same subject matter—sex trafficking—is prejudicial and a waste of resources is moot.  The government has indicated it intends to seek expert testimony primarily from Dr. Cooper on the subject matter of trafficking.

Many of the governments' noticed experts have similar expertise to Dr. Cooper.  In the event Dr. Cooper is unavailable for trial the United States reserves the right to elicit the same testimony from one of the noticed experts or a combination thereof.

### e. Fact Testimony From Dr. Cooper Is Admissible.

Ninth Circuit authority permits the use of the same witness to provide lay and expert testimony provided the jurors are aware of the witness's dual roles. *United States v. Anchrum,* 590 F.3d 795 (9th Cir. 2009).  In *Anchrum*, the Court approved a procedure where the witness's testimony was separated into a first phase consisting of his percipient observations, and a second phase consisting of his credentials and expert testimony.  *See also United States v. Martinez,* 657 F.3d 811, 817 (9th Cir. 2011) (approving admission of

hybrid testimony when "the court instructed the jury three times on the difference between percipient and expert testimony").

Here, the government anticipates that Dr. Cooper will testify as a fact witness that in 2011 or 2012 she was contacted by legal counsel for Backpage regarding hiring her to review images depicted in Backpage ads to determine whether the individual depicted in the image was underage.[2] Dr. Cooper declined this offer—responding that it would be nearly impossible to do this, and told Backpage's legal counsel that the only way to know if an individual was underage would be to look at that individual's birth certificate.

As in *Anchrum*, the first phrase of Dr. Cooper's testimony will consist of the foregoing fact testimony by Dr. Cooper; the second phase will consist of her expert testimony. The government will clearly demarcate for the jury when Dr. Cooper's expert testimony begins. A limiting instruction clarifying the capacity in which Dr. Cooper testifies may also clarify the distinction between her expert and lay testimony. *Anchrum*, 590 F.3d at 803. Cross-examination of Dr. Cooper will provide additional opportunities to clarify that distinction. *United States v. Freeman,* 498 F.3d 893, 904 (9th Cir. 2007).

## II. The United States' Other Noticed Experts Will Provide a Combination of Fact and Expert Testimony.

As detailed below, many of the United States' noticed experts are largely fact witnesses who will invariably provide expert testimony. While these witnesses are anticipated to testify mainly as fact witnesses, in an abundance of caution the government noticed the areas in which they could be considered experts. (Doc. 422.) Many of the witnesses had personal interactions with Defendants or their agents (*e.g*., Don Bennet Moon ("Moon"), in-house counsel Elizabeth McDougall ("McDougall"), etc.), or others associated with the Defendants in furtherance of their criminal enterprise. The witnesses will testify about those meetings and communications.

---

[2] The government was recently informed of this conversation during a telephonic interview with Dr. Cooper. Thus, it will provide Defendants a written report of the interview shortly.

In addition, as both a fact and expert witness their testimony *may* include expert testimony. *Freeman,* 498 F.3d at 904 ("A law enforcement officer testifying as an expert in drug jargon may also testify as a lay witness if he was involved in the investigation."). To the extent there are concerns that the jury will be confused by a witness's dual roles (as both a fact and expert witness), the jury can be instructed accordingly. *Martinez,* 657 F.3d at 817 (approving admission of hybrid testimony when "the court instructed the jury three times on the difference between percipient and expert testimony"); *Anchrum,* 590 F.3d at 803–04 (holding that the district court "avoided blurring the distinction between [the case agent's] distinct role as a lay witness and his role as an expert witness" when it "clearly separated [the agent's] testimony into a first 'phase' consisting of his percipient observations, and a second 'phase' consisting of his credentials in the field of drug trafficking and expert testimony regarding the modus operandi of drug traffickers").

Direct and cross-examination provide additional opportunities "to clarify in the eyes of the jury the demarcation between lay and expert testimony offered by the same witness." *Freeman,* 498 F.3d at 904; *see also Martinez,* 657 F.3d at 817 (noting that "[t]he government was nearly always exact in specifying when it was asking for [the agent's] testimony as an expert" in affirming admission of the agent's hybrid testimony).

These experts' anticipated testimony is more fully described in the government's expert and rebuttal notices, and summarized below:

Detective Detective Decouflé

Phoenix Police Department Detective Christine Decouflé's expert testimony *may* include testimony about how human trafficking (particularly sex trafficking) occurs through online media, such as social networking websites, applications, and the internet in general. (*See* Doc. 422). In support of the Travel Act charges, she will also testify that prostitution is illegal in Arizona. Factually, she will testify to Backpage's connection to the Desert Diva investigation and The Erotic Review, and Backpage's symbiotic relationship with those organizations. Det. Decouflé is also expected to testify about how the advertising of prostitution transitioned from media sources to internet platforms,

1  primarily Backpage.  With the emergence of Backpage as the predominate prostitution
2  website in Arizona, Det. Decouflé (and other human trafficking task force members)
3  engaged in enforcement activities that included conducting stings by posting ads on
4  Backpage, among other things.

### Dominique E. Dr. Sepowitz-Sepowitz, M.S.W., Ph.D.

6  Dr. Dominique Roe-Sepowitz's testimony will include a combination of both fact
7  and expert testimony.  The expert notice contains her background and references her
8  various studies and articles that are relevant to her expertise in the area of human/sex
9  trafficking. (Doc. 422).  Defendants caused Dr. Sepowitz to be a fact witness at trial.  After
10 one of her studies of prostitution on Backpage.com was published in 2012, Backpage in-
11 house counsel Elizabeth McDougal requested to meet with her.  Dr. Sepowitz will testify
12 to the substance of that meeting.

### FBI Supervisory Special Agent James E. Hardie

14 Special Agent James Hardie's expert background is detailed in the government's
15 notice.  (Doc. 422).  SA Hardie has testified in numerous sex trafficking cases and been
16 found to be an expert.  *United States v. Bryant*, 654 F. App'x 807, 814 (6th Cir. 2016)
17 (finding no abuse of discretion in admitting SA Hardie as qualified to testify as expert
18 witness in sex trafficking case); *United States v. Jackson*, 2017 WL2362351, at *4 (D.S.
19 Car., May 31, 2017) (finding SA Hardie was qualified to testify as an expert in sex
20 trafficking, that his testimony would be relevant in giving the jury the context to evaluate
21 testimony); *United States v. Wiloughby*, 742 F.3d 229, 238 (6th Cir. 2014) (finding no
22 abuse of discretion in admitting SA Hardie as qualified to give expert testimony about the
23 methods pimps use to control their victims); *United States v. Jackson*, 299 F.R.D. 543, 547
24 (W.D. Mich. 2014) (finding no abuse of discretion in admitting SA Hardie as qualified to
25 give expert testimony about the means used to recruit and control child victims).

26 Here, SA Hardie's testimony will focus on his considerable contacts with and
27 knowledge of Backpage he obtained during his career investigating sex trafficking cases,
28 primarily in Ohio.  He is expected to testify that, in his over ten years of investigating adult

- 10 -

and child prostitution, there was no doubt that the adult section of Backpage was involved prostitution.  His investigations involving Backpage focused primarily on whether the individual in the ad was an adult or a child.  Related to the cases he was investigating, SA Hardie contacted Backpage records custodian, Nathan Yockey, who was required to authenticate Backpage ads at numerous sex trafficking trials involving postings on Backpage.[3]

Staca Shehan

Staca Shehan is the Executive Director Case Analysis Division, National Center for Missing & Exploited Children (NCMEC).  The Government's expert notice makes clear that she is both a fact and expert witness. (Doc. 422 at 9 ("In an abundance of caution, the government provides notice identifying Ms. Shehan as a potential "expert" in the area of human trafficking, sex trafficking, and  child exploitation.").)  Her factual testimony (similar to Drs. Sepowitz and Cooper) is the result of Backpage initiating contact with NCMEC. At Defendant's request, NCMEC representatives met with Lacey, Larkin, Spear and Ferrer on March 1, 2011.  Following that meeting, Defendants requested follow-up meetings with NCMEC.  Although Shehan was not present for the March 1 meeting, she was present at all subsequent meetings.  She will detail the dialogue she had with Ferrer and Moon, among other communications with Backpage representatives and agents.[4]  In sum, she will testify that Backpage failed to implement any of the recommendations that NCMEC made to curb child sex trafficking.

Lieutenant Detective Donna Gavin, Boston Police Department

As noted in the Government's Notice of Rebuttal Witnesses (Doc. 638 at 3-4), Lt. Detective Gavin has extensive experience in the area of human trafficking in the Boston area.  Her experience is relevant to her factual involvement in a Backpage-related investigation.  She is essentially a fact witness as she was involved in the search and rescue

---

[3] Yockey was routinely contacted to authenticate the postings of numerous  victims, including murdered Victim 15. *See* CR 920, Ex. W.

[4] *See* Doc. 929 Motion *in Limine* to Admit Evidence of Non-Hearsay.

of Victim 8. In addition, based on her years of working in supervising the human trafficking unit of the Boston Police Department, she is expected to testify about the predominate role that Backpage played in the prostitution marketplace in the Boston area, including testimony consistently with an affidavit that was served on Backpage in 2015. (SI ¶ 144.) This testimony is predominantly factual.

<u>Detective-Sergeant Thomas Adam Umporowicz Jr., Seattle Police Department</u>

Detective-Sergeant Thomas Adam Umporowicz Jr. is expected to testify as detailed in the government's notice. (Doc. 638 at 4-5.) His testimony is relevant to Backpage's facilitation and promotion of prostitution sex trafficking in the Seattle area. He is also expected to testify consistently with the affidavit that was served on Backpage in 2015. (SI ¶ 144.) This testimony is predominantly factual.

\* \* \*

The United States does not intend to call as witnesses Derek Stigerts and Dr. Shannon Wolf. The United States has addressed California Department of Justice Special Agent Brian Fichtner's anticipated testimony in its other filings. (*See*, e.g., *CR* 931 at 22-23). Lastly, Robert Spectre will testify as a rebuttal witness, if at all. (CR 638)

**CONCLUSION**

Defendants' motion to preclude expert testimony should be denied. The experts are expected to provide both factual and expert testimony in support of the charged offenses. Indeed, in many cases Defendants have made the noticed experts testimony relevant by initiating contact with them because of their backgrounds. In other cases, these witnesses spent years interacting with Backpage and its representatives through their work investigating adult and underage prostitution occurring via the Backpage website. Defendants' motion should be denied.

Respectfully submitted this 8th day of May, 2020.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Kevin M. Rapp*

KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

BRIAN BENCZKOWSKI
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/Zachry Stoebe*
U.S. Attorney's Office