# EXHIBIT C



U.S. Department of Justice

United States Attorney
District of Arizona

Two Renaissance Square             Main:       (602) 514-7500
40 N. Central Ave., Suite 1800     Main Fax:   (602) 514-7693
Phoenix, AZ  85004-4408            Direct Fax: (602) 514-7450

May 14, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ  85701

VIA EMAIL

    Re:    *Your Letter of May 1, 2018*

Dear Mike:

    I wish to respond to a letter you sent on May 1, 2018, requesting the production of certain categories of documents. As an initial matter, and as discussed during our May 4 meeting, the relevance of the materials you are requesting is unclear. The motion pending before the Court seeks to determine whether the DWT and HCM law firms have a conflict of interest. The materials you have requested do not, in many instances, have any apparent connection to that topic. We are happy to provide additional consideration to your request if you can articulate why they might be subject to discovery under the relevant rules of criminal discovery.

    I would further note that it appears, based on the nature of your requests, that you believe it was improper for the United States to enter into a cooperation-based plea agreement with Mr. Ferrer because he was a member of a joint defense agreement ("JDA") and/or you suspect the United States has improperly obtained JDA-protected information from Mr. Ferrer. Through this letter, I wish to explain why neither premise is valid.

    The courts have recognized that a JDA participant must retain the ability to plead guilty and cooperate and that the government has a strong, legitimate interest in considering such requests. For example, in *United States v. LeCroy*, 348 F. Supp. 2d 375 (E.D. Pa. 2005), the court recognized that "[a] JDA is not an escape-proof prison" and that "the right of the grand jury to get the facts, and the right of [a JDA participant] to decide to cooperate with the grand jury, are paramount." *Id.* at 382, 386. The courts have further recognized that a JDA participant is free to disclose liability-generating matters in which he personally participated, even if those matters are also the subject of JDA-related sharing and discussion. *See, e.g., In re Grand Jury Subpoena*, 274 F.3d 563, 572 (1st Cir. 2001) ("[W]hat the parties call a 'joint

May 14, 2018
Page 2 of 4

defense' privilege is more aptly termed the 'common interest' rule. Even when that rule applies, however, a party always remains free to disclose his own communication."); *United States v. Balsiger*, 2013 WL 3490873, *11 (E.D. Wisc. 2013) ("Balsiger and Currey cannot stop . . . another person . . . from waiving its privilege as to its own communications simply because the communication was shared with them or their counsel as part of the joint defense."); *United States v. Bekaert Steel Wire Corp.*, 1985 WL 25747, *3 (D. Md. 1985) (rejecting JDA-related claim where cooperator "Neri was not called before the grand jury to answer questions about what he may have learned through defense counsel; he was called to testify about events in which he had actively participated. . . . Neri participated in several meetings and had an ongoing relationship with the principals in the case for several years. It was that information that the government sought, not the substance of any communications between counsel.").

For these reasons, the courts have stated that, when engaging in cooperation-related discussions with a JDA participant, the government should simply take reasonable steps to prevent the receipt of any JDA-protected information. *See, e.g., United States v. Salvagno*, 306 F. Supp. 2d 258, 272-73 (N.D.N.Y. 2004). Here, the United States has taken extensive efforts to do so. The United States' first meeting with Mr. Ferrer did not take place until the morning of April 5, 2018. The proffer agreement (enclosed as Exhibit A) specifically stated that Mr. Ferrer should not discuss JDA-protected material, this instruction was reiterated on several occasions during the proffer, and Mr. Ferrer's attorneys have confirmed that no such material was discussed on April 5. The requirement not to disclose any JDA-protected material was also reiterated in the cooperation addendum to Mr. Ferrer's plea agreement (which is currently under seal but will be produced to you in the future), and Mr. Ferrer's counsel have confirmed that no JDA-protected material has been discussed during Mr. Ferrer's subsequent interviews by the government. Finally, the government also has not received a copy of the actual JDA or any other common interest agreement (we have avoided doing so, in an abundance of caution, precisely because we wish to avoid any grey areas).

Furthermore, even if (contrary to the government's best efforts) Mr. Ferrer had somehow disclosed JDA-protected information during his discussions with the government, the timing of his proffer undermines any claim of prejudice. As noted, the United States did not meet with Mr. Ferrer, or receive a proffer of information from Mr. Ferrer's counsel, until April 5, 2018. As a result, no information from Mr. Ferrer was used to obtain the March 28, 2018 indictment or obtain any of the search warrants in this case. Moreover, as you know from our extensive "reverse proffer" to you in December 2017, the theory underlying the indictment has long been transparent.

Courts have concluded that when (as here) the government establishes that it has taken steps to avoid the disclosure of JDA-protected information, the cooperator's counsel has averred that no such disclosure has occurred, and the defendant merely suspects (notwithstanding those avowals) that he was prejudiced by an improper disclosure, there is no entitlement to an evidentiary hearing. *See, e.g., United States v. Aulicino*, 44 F.3d 1102, 1117 (2d Cir. 1995) (affirming district court's denial of evidentiary hearing, where defendants

May 14, 2018
Page 3 of 4

alleged that government had obtained JDA-protected information from a cooperator, because the "government presented evidence of the steps it took to insulate the [prosecutors] from any knowledge gained by [the cooperating witness] from his contact with the codefendants after he agreed to cooperate" and the defendants "did not present any evidence to suggest that [the cooperating witness] revealed any privileged information to the government"); *Salvagno*, 306 F. Supp. 2d at 272 ("[T]he court denies defendants' motion requesting an order directing an evidentiary hearing. Defendants have failed to allege specific facts that indicate communication of privileged information to the Government and prejudice resulting therefrom. Moreover, the government avers that it neither sought nor accepted any [such] information."); *United States v. Anderson*, 288 F.3d 335, 338 (7th Cir. 2002) (affirming denial of evidentiary hearing, where defendant alleged that cooperators shared privileged information with the prosecution, because the defendant had "not alleged with sufficient detail, definitiveness, or specificity" the privileged matters that were allegedly disclosed).

Finally, to the extent your letter reflects a belief that the government's decision to file the disqualification motion was somehow improper, that belief is incorrect. The potential conflict-of-interest issues in this case did not even come to my attention until April 8, during a phone call with Mr. Larkin's former attorneys (who simply inquired if the government had any concerns about the anticipated representation arrangements in the case). We did not initially recognize the seriousness of those issues, as evidenced by the fact that the government did not object when the HCM firm represented Mr. Lacey during various hearings on the week of April 9-13 or when various DWT lawyers filed notices of appearance during the week of April 9-13.

Once the conflict-of-interest issues became more apparent to us, we conducted legal research. This research confirmed that the DWT and HCM firms were, in fact, laboring under deep conflicts of interest. Nevertheless, due to the sensitivity of the issues, we sought to engage in a meet-and-confer process before filing anything with the Court. Among other things, we mentioned our concerns to Mr. Cambria and Ms. Henze Cook during a phone call on April 23, sent an email to Mr. Cambria and Ms. Henze Cook on April 24 identifying the various cases and ethical rules supporting our concerns, and participated in a conference call with you and other members of the defense team on April 25. During this call, we specifically asked if there were any written agreements in which Mr. Ferrer had agreed to waive the DWT and HCM firms' conflicts of interests so they could represent Messrs. Lacey and Larkin. None were mentioned.

The case law makes clear that prosecutors should bring conflict-of-interest issues to the Court's attention as soon as they become apparent, and courts have faulted prosecutors (and reversed convictions) for failing to do so or waiting to do so until the eve of trial. *See, e.g., United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir. 1986) ("We add a final note. The reversal here is the direct result of the prosecution's using defense counsel's conflict of interest as a means of affecting the evidence going before the jury instead of moving for his disqualification before the trial. . . . We trust that this decision will ensure that a pretrial disposition of such issues will occur in the future."); *United States v. Henke*, 222 F.3d 633, 638 (9th Cir. 2000).

May 14, 2018
Page 4 of 4

That is simply what we have done here. Indeed, before filing the motion, the United States consulted with Mr. Ferrer's counsel, primarily to confirm that the factual representations contained in the motion were accurate. During these discussions, Mr. Ferrer's counsel stated that Mr. Ferrer did not wish to be a party to the motion. As a result, the United States filed the motion on its own behalf, in the interest of protecting the integrity of the trial. *See, e.g., United States v. Kight*, 2017 WL 4619024, *13 n.19 (N.D. Ga. 2017) ("[T]he Court rejects Kight's argument that the Government, without Lankford's permission, is precluded from seeking Armstrong's disqualification or that Lankford was required to join in the Government's Motion."); *United States v. Culp*, 934 F. Supp. 394, 399 (M.D. Fla. 1996) (granting government's disqualification motion and stating that defense counsel's "argument that the Government lacks standing to raise the issue of a potential conflict gives short shrift to the respective interests of the Government and the Court in ensuring that judgments remain intact on appeal. . . . [Counsel's] challenges to the Government's standing betray a conception of the interests at stake in this motion which is both unduly narrow and overly simplistic.").

Sincerely,

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

KMR/zs



U.S. Department of Justice

United States Attorney
District of Arizona

Two Renaissance Square  
40 N. Central Ave., Suite 1800  
Phoenix, AZ  85004-4408

Main:       (602) 514-7500  
Main Fax:   (602) 514-7693  
Direct Fax: (602) 514-7450

April 10, 2020

Bruce Feder, Esq.
Biltmore Lakes Corporate Center,
Suite 160
2930 E. Camelback Road
Phoenix. Arizona 85016

**VIA EMAIL ONLY**

Re:  *Your Letter of April 3, 2020*

Dear Bruce:

This letter responds to your letter dated April 3, 2020.

*First*, you request immediate disclosure of notes and reports of interviews regarding the government witnesses who have been withdrawn, including but not limited to Hemu Nigam, as you believe these reports will contain discoverable material. Your letter fails, however, to indicate why you believe they contain discoverable material. *United States v. Lucas*, 841 F.3d 796, 808 (9th Cir. 2016) ("[a defendant] must either make a showing of materiality under Rule 16 or otherwise demonstrate that the government improperly withheld favorable evidence").

In any event, if a report was prepared from an interview of any non-testifying witness, we would not be obligated to provide that report unless it contains *Brady* material. Nevertheless, we have already provided Defendants reports of interviews regardless of whether they were adopted pursuant to the Jencks Act. For example, we have disclosed an interview of Mr. Nigam that he has not adopted.[1] Any statement or Jencks Act material that contains *Brady* has also been disclosed.

*Second*, you request the government's position on producing Jencks Act and impeachment material. The government adheres to 18 U.S.C. § 3500 and the Ninth Circuit's definition of Jencks Act materials as "those 'statements' by a witness that are subject to disclosure." *United States v. Claiborne*, 765 F.2d 784, 801 (9th Cir. 1985). A statement means: (1) a written statement made by the witness that is signed or otherwise adopted or approved by the witness; (2) a substantially verbatim recital of an oral statement by the witness that is recorded contemporaneously with the making of the oral statement; or (3) a statement made by the witness to a grand jury. 18 U.S.C. § 3500(e)(1) - (3); *see also* Fed. R. Crim. P. 26.2(f).

---

[1] DOJ-BP-0005069167-70.

Your letter is concerning because it appears Defendants are suggesting: (1) the government is not disclosing reports of interviews unless and until the witness adopts the reports or statement; and (2) a written statement made by a witness is not being disclosed until after the witness "re-adopts" his/her own statement. Based on the discovery productions to date, you are well aware that is not the case. To date, the government has disclosed dozens of 302s and MOIs of victim and witness interview summaries. *See* Government's March 27, 2020 letter. In fact, on February 22, 2019 (more than 14 months ago), we disclosed nearly 80 reports of interviews. *See* Government's discovery transmittal letter seven dated February 22, 2019.

In your letter, you claim, "all *statements* of any witness should have been disclosed no later than the Court-ordered date in the relevant scheduling order (*See* Dkt. 731)." This is neither an accurate recitation of the Court's order nor the government's obligation. You are conflating statements (not adopted by a witness) with Jencks Act material. The Court's order clearly makes that distinction. (*See* Doc. 731.) Nevertheless, our position has always been consistent with 18 U.S.C. § 3500, that if a *testifying* witness has adopted a statement then the statement is disclosed. Here, the government has endeavored to have more critical witnesses (*e.g.*, Carl Ferrer, Dan Hyer, etc.) timely adopt their statements so that the government may comply with the scheduling order.

Additionally, as noted in our recent correspondence, there are a few instances where a testifying witness has not adopted their statements and, thus, no Jencks Act material exists. During our meetings with witnesses (primarily trafficking victims), in preparation for the August 17, 2020 trial, they will be asked to review their previous statements and make any necessary changes. Once that has occurred they will effectively adopt their statements consistent with the Jencks Act. This procedure was contemplated by the negotiated scheduling order. (Doc. 131, n.3) ("If the government obtains any additional written *Jencks* material after this date, this *Jencks* material shall be produced promptly to the defense as soon as practicable.")

*Third,* regarding your request for an agent's rough notes of interviews, your request does not accurately reflect the government's obligations. The Ninth Circuit has consistently recognized that where the agent's notes or report are not read to or otherwise approved by the witness, they cannot be "statements" of the witness under § 3500(e)(1) of the Jencks Act. *See United States v. Robertson,* 895 F.3d 1206, 1217 (9th Cir. 2018)(citing *United States v. Mincoff,* 574 F.3d 1186, 1200 (9th Cir. 2009) ("[A]n agent's rough notes will not be Jencks Act statements when they are not complete, are truncated in nature, or have become an unsiftable mix of witness testimony, investigator's selections, interpretations, and interpolations.")); *United States v. Spencer,* 618 F.2d 605, 606 (9th Cir. 1980). *See also United States v. Augenblick,* 393 U.S. 348, 355 (1969) (notes by agent not "substantially verbatim" statements where they did not cover entire interview); *United States v. Palermo,* 360 U.S. 343, 355 (1959) (agent's summary report of interview not "substantially verbatim" statement). The Ninth Circuit holds the same view on notes taken by Government lawyers during witness interviews. *Goldberg v. U. S.* 425 U.S. 949 (1976) ("Proper application of Jencks Act will not compel disclosure of a government lawyer's recordation of mental impressions, personal beliefs, trial strategy, legal conclusions or anything else that could not fairly be said to be the witness' own statement.")

*Fourth,* regarding your request for Jencks Act material for Brian Alstead, Brian Parterre, Michael Gage, Justin Dew, Tamara Barlow and Steve Vienneau, I refer you to our recent

April 10, 2020
Page 3 of 3

correspondence dated March 27, 2020 on the status of any Jencks Act material related to those witnesses.

*Fifth*, you request statements made to the government agents by Ferrer and Hyer *prior* to the March 28, 2018 indictment. In short, neither Ferrer nor Hyer met with or provided *any* information to the government prior to the first indictment. Indeed, the agents and prosecutors did not meet with Ferrer in person (or otherwise) until April 5, 2018. Hyer did not meet with agents until July 2018. Neither Ferrer nor Hyer have been directed to contact any other Defendants since they began cooperating with the government.

Other than a vague and confusing reference to "USA v. Lori Laughlin," the government is unclear what authority supports your request for Ferrer's and Hyer's personal notes, diaries, and communications made through counsel. The factual scenario in Operation Varsity Blues—where the government worked with a cooperator to contact targets through phone calls and emails—doesn't exist here.

As you know, the Court expressly "prohibit[ed] the parties from filing any further motions to compel or motions for discovery until the parties contact the Court to discuss." (Doc. 728 at 2.) We have now responded several times in the form of motions and correspondence to similar *Brady*, Jencks Act and Rule 16 requests. (*See* generally Doc. 810 with exhibits). Before filing any motion specific to your current request please provide us any counter authority you may have to our recent correspondence.

Sincerely,

MICHAEL BAILEY
United States Attorney
District of Arizona

/s Kevin Rapp
KEVIN M. RAPP
Assistant U.S. Attorney

KMR/zs