GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

KENNETH POLITE
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>  v.<br><br>Michael Lacey, et al.,<br><br>    Defendants. | No. CR-18-422-PHX-SMB<br><br>**UNITED STATES' RESPONSE TO DEFENDANTS' MOTION TO COMPEL *BRADY* (*CR* 1281)**<br><br>[*REDACTED FOR PUBLIC DISCLOSURE*] |

**Preliminary Statement**

In a thirteenth-hour attempt to relitigate issues squarely decided by Judge Logan years ago, Defendants have filed a Motion to Compel Brady (*CR* 1281) that asks the Court to conduct a second *in camera* review of two inadvertently-disclosed work-product memoranda. [REDACTED THROUGH LINE 12]]

In an effort to circumvent the Court's ruling, Defendants now assert that the government's case has "evolved." As explained below, that assertion lacks merit. The 92-page Superseding Indictment (Doc. 230, "SI") lays out the basis for the United States' case. The United States' recent opening statement and pleadings are based on exactly the same factual allegations and legal theories set forth in the SI, and there is no reason to reconsider Judge Logan's order, which remains law of the case.[1]

Defendants' motion more broadly seeks "all materials" or "all evidence" that "the government obtained in the WDWA proceeding" (Mot. at 1, 4), notwithstanding Judge Logan's finding that [REDACTED]. On

---

[1] Moreover, Defendants' characterization of the United States' case is fundamentally incorrect. (Mot. at 1.) As the United States has stated elsewhere, the jury is entitled to consider both the text and context of Backpage's ads in determining the nature of the services offered, including the use of coded prostitution terms (*e.g.*, "incall," "outcall," "quickie," "car service," "roses," "GFE," and references to being "new in town" or "in town" only briefly), prices tied to short time increments, nude or semi-nude images, references to well-known prostitution review websites like The Erotic Review, and other evidence. (*See, e.g.*, *CR* 1216-3 at 185-87.) The United States likewise does not advance a "strict liability" theory; rather, its legal theories are described in its proposed jury instructions, which are based on the allegations and charges contained in the SI, including the SI's conspiracy, Travel Act and Money Laundering counts. (*See generally CR* 1216-3; *CR* 230.)

July 22, 2021, Defendants asked the United States to produce those materials pursuant to *Brady* and *Giglio*, and the United States responded on August 2, 2021. (*See* Mot., Ex. I.) As explained by the United States, the WDWA Investigation materials are neither exculpatory nor material for numerous reasons—not the least because of significant evidentiary developments that have transpired in the nearly 10 years since that investigation concluded, and that form the basis of *this* case. (*See* Mot., Ex. I at 2-5.)

Notwithstanding Defendants' failure to establish the relevance and materiality of the WDWA Investigation, the United States previously provided Defendants with numerous factual materials from that investigation, including the documents identified in correspondence dated October 4, 2018 (Ex. A, filed herewith), and grand jury testimony (*see* Mot., Ex. I at 5 (referencing DOJ-BP-0004719710 - DOJ-BP-0004720536)). Moreover, after receiving Defendants' July 22, 2021 letter, the United States searched its files for any additional factual material related to the WDWA Investigation that had not previously been disclosed, and located memoranda of interviews ("MOIs") of witnesses, handwritten notes of moderator interviews, and additional reports or statements relating to that investigation. (*See* Mot., Ex. I at 4-5 and nn. 3-4; *see also* Ex. B, filed herewith.)[2] The United States does not believe that these materials reveal exculpatory or impeaching information in this criminal case. However, out of an abundance of caution, and in effort to exceed its discovery obligations, the United States provided all of these documents to the defense. For these and other reasons explained below, Defendants' third *Brady* motion should be denied.[3]

---

[2] Bates-numbered versions of these documents were produced on August 6, 2021, at USAO-BP-0033331 - USAO-BP-0033340 (reports and statements of FBI Special Agent Steven Vienneau from 2012); USAO-BP-0033341 - USAO-BP-0033362 (handwritten notes of agent interviews with former Backpage moderators Ezekiel Finley, Brian Alstadt, LaTamara Barlow, Justin Dew, Brian Paterge, and David Roberts); and USAO-BP-0033367 - USAO-BP-0033389 (MOIs of Ayesha Johnson, Bill Egan, David Schneiderman, and Scott Lebovitz).

[3] On January 28, 2019, Judge Logan issued an Order (*CR* 339) denying Defendants' attempt to compel the government to sift through voluminous, previously disclosed discovery, and furnish them with an itemized list of exculpatory documents pursuant to *Brady*. Further, on June 26, 2020, this Court issued an Order (*CR* 1028) denying

## Argument

**I. Defendants' Attempt to Re-Litigate Judge Logan's Order (*CR* 449-1) Should Be Denied**

On the afternoon of Wednesday, September 8, 2021, this Court asked Defendants if Judge Logan had already resolved the issue of whether any alleged underlying facts contained in the inadvertently-disclosed WDWA memos contained *Brady* material concerning *this* case. In response, Defendants stated that this issue had not been litigated and decided by Judge Logan. That statement was incorrect. In fact, Defendants argued that exact issue in their Response to the United States' Motion to Compel Destruction of Inadvertently Disclosed Documents. (*See CR* 407 at 2, Defendants' Response [REDACTED]

; *CR* 407 at 8 [REDACTED].)

What's more, after considering the parties' briefs, the attached exhibits, and relevant case law (*CR* 352, 407, 432), Judge Logan rejected Defendants' argument in his Order granting the United States' Motion to Compel Destruction of Inadvertently Disclosed Documents, finding:

[REDACTED THROUGH PAGE 5, LINE 3].

---

Defendants' attempt to compel the government to produce approximately forty-two separate categories of alleged *Brady* material.

- 4 -

(CR 449-1 at 2-3.)

Defendants now attempt to walk back their September 8, 2021 statement to the Court by asserting this Court should redetermine the issue because the United States' case has "evolved significantly" since Judge Logan issued *CR* 449-1. (Mot. at 1.) That's simply not true—the government's case today is based on exactly the same factual allegations and legal theories as its July 2018 Superseding Indictment.

The Superseding Indictment (*CR* 230, SI) alleged, *inter alia*, that Defendants "were aware that the vast majority of the 'adult' and 'escort' ads appearing on Backpage were actually ads for prostitution and took steps to intentionally facilitate that illegal activity." (SI¶9; *see also id* ¶34.) These steps consisted of several highly-successful prostitution-marketing strategies that Defendants deliberately authorized, oversaw and implemented, including:

> 9.  . . . . [D]uring Backpage's early years of operation, the company's employees were actually trained to—and paid bonuses for—identifying prostitutes who were posting ads on rival websites, creating free ads on Backpage for them, and using the resulting Backpage ads (which would only remain free for a trial period) in an attempt to secure the prostitutes' future business. These affirmative content-creation efforts, which were described internally as "content aggregation" or the "Dallas Plan," were vital to Backpage's early growth and success.
>
> 10.  Backpage also employed other business strategies that were specifically intended to promote and facilitate prostitution. For example, for several years, Backpage had a reciprocal link agreement with The Erotic Review ("TER"), a website that permitted customers to post explicit "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts. Backpage paid tens of thousands of dollars to TER in return for assistance in getting TER's customer base to start using Backpage.
>
> 11.  In addition to affirmatively creating prostitution-related content and intentionally soliciting prostitution-related business, Backpage also utilized a variety of strategies to conceal the true nature of the ads being

posted on its website. Most notably, Backpage periodically used computerized filters and human "moderators" to edit the wording of (or block) ads that explicitly offered sexual services in return for money. The BACKPAGE DEFENDANTS admitted—in internal company documents and during private meetings—that, despite these editing practices, they knew the overwhelming majority of the website's ads still involved prostitution.

(SI¶¶9-12; *see also* ¶¶34-176.) "Backpage also formed 'affiliate' partnerships with other organizations and individuals who were known to be involved in the prostitution industry. One such individual, known as 'Dollar Bill,' earned fees in return for arranging for prostitutes and pimps to post ads on Backpage." (SI¶59.)

The SI also identifies scores of blatant or thinly-veiled Backpage prostitution ads. Counts 2-51 identify 50 specific prostitution ads that fall into three categories. First, 10 of the 50 ads were posted by P.R. (SI Counts 3, 6-11, 18, 25-26; SI¶132.) Between September 2010 and October 2012, Ferrer became aware that P.R. was posting prostitution ads. (SI¶132.) Ferrer repeatedly restored her posting privileges and gave her advice on how to conform to Backpage's publication standards. (SI¶132.) Defendants Padilla and Vaught were also aware of P.R.'s ads. (SI¶132.) From October 2012 to November 2015, P.R. was allowed to post over a dozen new prostitution ads. (SI¶132.)

Second, 15 of the 50 ads depict specific victims who were repeatedly sold for sex via Backpage. (*See* SI Counts 2, 4-5, 12-17, 19-24.) The narratives associated with these victims are included in ¶¶160-176 of the SI. In many instances, Backpage representatives—who were implementing policies that Defendants authorized, oversaw or executed—coached users on how to fix their ads so they could be published, or otherwise edited the ads before publication. (*See, e.g.*, SI¶¶ 160, 163, 164, 166, 170, 172 and SI Counts 4-5, 12-13, 15-17, 19-20.) Third, the remaining 25 ads involve Backpage ads containing "GFE" (shorthand for "girlfriend experience"). (SI Counts 27-51.) Internal emails show that Defendants Spear, Padilla and Vaught, co-conspirators Ferrer and Hyer, and others at Backpage knew "GFE" is a "coded sex act for money" term or one of several "solid sex for money terms." (SI¶149.)

The ads highlighted in the SI include the following:

- Victim 15 ad, "GORGEOUS ebony PLAYMATE Perfect Curves…Skills to make ur TOES CURL – 19"; "you agree . . . you are not affiliated with any law enforcement agency" and "Incalls & Outcall!!!" (Count 19);

- Victim 13 ad, "Young SEXY PUERTO RICAN – 19"; "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head" (Count 23);

- P.R. ad, "50 Red R*O*S*E*S  S*P*E*C*I*A*L – DON'T MISS OUT!!!!!" (Count 26);

- "Sometimes It's All About The Journey, And The Destination…..Erectile Dysfunctional G F E Provider – 44"; "You can find a few current reviews at T3R [The Erotic Review] xxxxxx#" (Count 31);

- "OMG Sexy Sensual 36DD-24-36 Stacked College Coed With The Best Mouth Ever! BOOK NOW! -24"; "I do ALL the things YOU Wish Your Wife Did!!" and "(G).(F).(E) 30 min/$180" (Count 35);

- "WANNA HANG OUT NOW UpScale New In Town! Call ME now for an unforgettable visit – 20"; "100% GFE with 100% no Pimps" (Count 39).

(SI¶201.) The SI describes several other obvious prostitution ads featured on Backpage, including ads describing specific sex acts (*e.g.*, "blow jobs") with prices. (SI¶118.) Defendants were informed "New In Town" often indicates a trafficked victim shuttled to different locations; it appears in numerous ads in the SI. (SI¶¶13, 100, 169, 171, 201.) "Roses" is a common prostitution synonym for money. (SI¶¶132, 160-61, 164, 167, 201.) "Incalls" (customer goes to prostitution's location), "outcalls" (prostitute goes to customer), and "100% no pimps" are also common prostitution terms.

More fundamentally, the SI describes Backpage's entire "adult" section as a hub for prostitution ads. (*See, e.g.,* SI¶1 (Backpage was "notorious for being the internet's leading source of prostitution advertisements"), ¶11 (Defendants "admitted—in internal company documents and during private meetings—that, despite [moderation], they knew the overwhelming majority of the website's ads still involved prostitution"); ¶11 (Lacey even

"bragged about the company's contributions to the prostitution industry").) The SI alleges "Backpage derived the overwhelming majority of its revenue" from prostitution ads. (SI¶¶1, 15, 177.) The SI also alleges the rest of the website served as a falsely-legitimate cover for Backpage's "adult" ads. (SI¶112.)

The SI also contains a litany of allegations demonstrating that law enforcement, the national news media, anti-trafficking organizations, Senate investigators and others similarly concluded—and informed Defendants—that the vast majority of Backpage's "adult" ads were for prostitution. (*See* SI¶¶74, 86, 97, 105,109, 111, 127, 131, 134, 140, 141, 144, 146, 151.) Backpage and its principals were repeatedly notified that Backpage was the internet's leading place to shop for prostitutes. (*See, e.g.*, SI¶¶144). These notifications mirrored Backpage's internal admissions. (*See, e.g.,* SI¶¶11, 36, 54, 59, 68, 69, 75, 81, 82, 85, 92, 94-96, 98, 107-108, 112, 114, 116, 118-119, 128, 132, 138, 139, 143, 145, 148-149.) In short, the SI alleges Defendants intentionally operated (and aggressively expanded) a massive online marketplace for prostitution solicitations.

The United States' September 3, 2021 opening statement, and its other trial pleadings, are entirely consistent with the SI. As the United States recently pointed out:

> [The opening statement detailed] several significant pieces of evidence against Defendants—including Defendants' deliberate execution of several prostitution-marketing strategies purposefully designed to increase their website's revenues and facilitate their customers' prostitution businesses. These strategies . . . included content aggregation (publishing free prostitution ads in attempt to capture new business), reciprocal link agreements (including a longstanding relationship with the explicit prostitution review website The Erotic Review, which for years served as the number one source of outside referrals for Backpage), paying commissions or offering discounts to high-volume prostitution advertisers (super-posters or super-affiliates like Dollar Bill, New York Platinum, and Sean Kim), "moderation" (which sanitized overly-blatant prostitution ads without changing the true meaning of what they offered for sale), and money laundering schemes designed to conceal the true source of Backpage's revenues and fool financial institutions. (*See generally* Tr. at 13-55.)[4]

---

[4] "Tr." refers to the reporter's transcript of the afternoon portion of the proceedings on September 3, 2021.

(CR 1275 at 1; *see also id*. at 4-8.)  The opening statement further discussed Backpage's "moderation" practices, including that Backpage's moderators were "instructed by these defendants to conceal the fact that prostitution ads were rampant on Backpage." (Tr. at 20-21.)  It also explained that "the vast majority of these folks visiting Backpage.com weren't looking to buy themselves a sofa.  Backpage.com was the internet's leading hub, leading website for prostitution." (Tr. at 6.) The opening statement then discussed several of the specific ads that are also highlighted in the SI, including "Sometimes it's all about the journey and the destination," and "Stacked college co-ed with the best mouth ever" (Tr. at 27-28), and discussed ads including known prostitution terms like "incall," "outcall," "GFE," and "New in Town."  (Tr. at 8, 10, 30.)  The opening statement also canvassed much of the notice that Defendants received from NCMEC, law enforcement, media organizations, various non-governmental organizations, law enforcement, and internet safety experts.  (Tr. at 28-43.)  The opening statement underscored that Defendants' website generated the overwhelming majority of its revenue—some 94%—from selling prostitution solicitations.  (Tr. at 24.)

The United States' recent filings, including its proposed jury instructions and statement of the case (*CR* 1216-1, 1216-3), and its response to the mistrial motion regarding the opening statement (*CR* 1272), are likewise based on the same facts and legal theories contained in the SI.  Defendants' asserted defenses aren't new either (*see* Mot. at 1)—rather, Defendants have been asserting the same constitutional, statutory and *mens rea* arguments since this case began. (*See, e.g*., *CR* 23 at 2-4, 7, 11-12, and n.2; *CR* 26 at 10-11.)  Simply put, the United States' case has not "evolved"—and the Court should decline Defendants' request to relitigate Judge Logan's Order (*CR* 449-1).

**II.   Materials from the WDWA Investigation Do Not Reveal Exculpatory or Impeaching Information in This Case**

As the Ninth Circuit has recognized, to "challenge the government's representation that it lacks *Brady* information, [a defendant] must either make a showing of materiality under Rule 16 or otherwise demonstrate that the government improperly withheld

favorable evidence." *United States v. Lucas*, 841 F.3d 796, 808 (9th Cir. 2016). The test for materiality is whether the requested evidence might affect the outcome of the trial. *United States v. Alvarez*, 358 F.3d 1194, 1211-12 (9th Cir. 2004). Moreover, the Ninth Circuit has rejected the premise that a defendant may compel production of notes so that he could search through them for anything useful. *United States v. Mincoff*, 574 F.3d 1186, 1200 (9th Cir. 2009) ("Mere speculation about materials in the governments' files' [does] not require the district court to make those materials available, or mandate an in camera inspection."); *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995) ("[w]e never held that the Constitution demands an open file policy") (citing *United States v. Agurs*, 427 U.S. 97, 108 (1976)); *United States v. Michaels*, 796 F.2d 1112, 1116 (9th Cir. 1986) ("*Brady* does not "provide defense counsel with unlimited discovery of everything known by a prosecutor").

As the Supreme Court held in *Whitley*, 514 U.S. at 439, and the Court in this case noted in its Order Denying Defendants' Motion to Compel Production of *Brady* Material, "the prosecutor, not a defendant, 'make[s] judgment calls about what would count as favorable evidence' and that 'the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record.'" (*CR* 1028 at 20); *see also Lucas*, 841 F.3d at 807 ("It is the government, not the defendant or the trial court, that decides prospectively what information, if any, is material and must be disclosed under *Brady*.").

Here, context is key. As the government expressed in its reply in support of Motion to Compel Destruction of Inadvertently Disclosed Documents (*CR* 432) and in subsequent correspondence with Defendants (*see, e.g.*, Mot., Ex. I), materials from the WDWA Investigation are not *Brady* or *Giglio* for purposes of *this* case. In the years since the WDWA Investigation, a tidal wave of evidence has emerged regarding Defendants' knowledge and intent to facilitate business enterprises involved in prostitution. The government's Motion *in Limine* to Admit Certain Evidence (*CR* 931) highlights a great deal of this evidence, which shows that Defendants were well-aware that prostitution ads

were rampant on Backpage and took numerous steps to facilitate prostitution through their operation of the website. A non-exhaustive list of this evidence includes the following:

First, during the WDWA Investigation, Backpage was ostensibly working with the National Center for Missing and Exploited Children ("NCMEC") to combat prostitution on its website. However, in 2014 NCMEC publicly denounced Backpage and repudiated any suggestion that Backpage was somehow an ally. NCMEC joined several other non-profits and the Washington State Attorney General's Office by filing amicus briefs urging that state's Supreme Court to allow civil claims against Backpage to proceed. (*See* SI¶140.) The Washington State Supreme Court subsequently ruled against Backpage and in favor of three victims who had been "bought and sold for sexual services online on Backpage.com." *J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714,715 (Wash. 2015). The Court—in ruling that Backpage's motion to dismiss should be denied—found that discovery should be conducted "to ascertain whether in fact Backpage designed its posting rules to induce sex trafficking." *Id.* at 718.

Second, the WDWA Investigation occurred years before the United States Senate's Subcommittee on Permanent Investigations Report issued its January 2017 report, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING ("PSI Report").[5] The PSI Report found, among other things, that Backpage knowingly facilitated prostitution and sex trafficking. The PSI also released an 840-page Appendix.[6] Many of these documents did not come to light until after the Senate successfully pursued legal action to enforce its subpoena for internal Backpage records in 2016—long after the WDWA's 2012-13 Investigation. *See Senate Permanent Subcommittee on Investigations v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016). That litigation led to Backpage's compelled disclosure of more than 550,000 documents, comprising 1,112,826 pages—materials that

---

[5] https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf.
[6] https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf

Senate investigators analyzed in preparing the PSI Report. (PSI Report at 16.) The PSI also obtained testimony from current and former Backpage moderators who confirmed that Backpage was engaging in the facilitation of prostitution. One of the moderators testified that all of the Backpage employee-moderators knew that the ads they reviewed offered sex for money, and that moderators "'went through the motions of putting lipstick on a pig, because when it came down to it, it was what the business was about." (PSI Report at 36-37.) Another testified "everyone" knew that Backpage's adult advertisements were for prostitution, and "[a]nyone who says [they] w[ere]n't, that's bullshit." (PSI Report at 37.)

Third, the WDWA Investigation predated compliance with still more subpoenas (including District of Arizona Grand Jury Subpoenas 108 and 359) that produced additional evidence demonstrating Backpage's facilitation of prostitution on its website.

Lastly and importantly, the WDWA did not have the benefit of two cooperating witnesses—Backpage's CEO Carl Ferrer, and Backpage's Sales and Marketing Director Daniel Hyer. Years after the WDWA Investigation concluded, several corporate entities that operated Backpage.com, and Backpage's CEO, pleaded guilty in April 2018 in the District of Arizona and admitted that the "great majority" of Backpage's revenue-generating ads were "for prostitution services." (*See, e.g.*, 18-CR-464, CR 7-2 at 12-13; 18-CR-465, CR 8-2 at 11.) Subsequently, Backpage's Sales and Marketing Director pleaded guilty to Count 1 of the SI (conspiracy to violate the Travel Act/facilitate prostitution), and he admitted the majority of the "escort" ads he and others at Backpage had created as part of the "aggregation" process were actually offering illegal prostitution services. (*CR* 271 at 9.) As shown by these plea agreements and additional evidence, Backpage was facilitating prostitution and engaging in considerable content creation that included, among other things, domestically aggregating ads from competing websites, forming affiliated relationships with individuals who packaged thousands of prostitution ads for sale to Backpage, and forming a business relationship with the prostitution review site The Erotic Review.

Based on these and other developments (summarized in *CR* 649 at 23-26), the WDWA Investigation occurred in an evidentiary context far different from that of the current case. Materials from the Western District of Washington's 2012-2013 investigation of Backpage do not reveal exculpatory or impeaching information pertinent to this criminal case, which charges 100 counts of conspiracy, Travel Act and money laundering offenses. (*See generally* SI.)

### III. The Government Has Fully Complied with Its Discovery Obligations Pursuant to Brady, Rule 16, and 18 U.S.C. § 3500

While Defendants have neither shown materiality under Rule 16 nor demonstrated that the United States has withheld favorable or impeaching evidence, the United States previously produced grand jury testimony and numerous other materials from the WDWA Investigation to Defendants in this case. (*See* Ex. A, filed herewith; Mot., Ex. I at 5 (referencing DOJ-BP-0004719710 - DOJ-BP-0004720536).) Moreover, after receiving Defendants' July 22, 2021 letter, the United States searched its files for any additional factual material related to the WDWA Investigation that had not previously been disclosed, and located memoranda of interviews MOIs of witnesses, handwritten notes of moderator interviews, and additional reports or statements relating to that investigation. Those materials were promptly produced. (*See supra* at 3 and n.2; Mot., Ex. I at 4-5 and nn. 3-4; Ex. B, filed herewith.)

Defendants nevertheless assert that "the government conducted numerous interviews of Backpage personnel [in 2012-13] yet has produced no summaries or notes or any other records." (Mot. at 3-4.) More specifically, they claim that they "are aware of at least four Backpage moderators (La Tamara Barlow, Justin Dew, Brian Paterge, and Brian Alstadt) who were interviewed by the IRS" and speculate that the government is withholding *Brady* and *Giglio* concerning these employees. (Mot. at 5.) On August 6, 2021, the United States produced agents' notes of their interviews with these moderators. (*See* Ex. B.)[7]

---

[7] The government responded to Defendants' request for production of an attorney

In sum, the United States has provided Defendants transcripts from grand jury testimony, reports of interviews, and—although not the prosecutors' usual practice—out of an abundance of caution, even produced agents' interview notes from the Western District of Washington's nearly decade-old investigation into Backpage. (*See* supra at 3.) Defendants' motion should be denied.

## Conclusion

For the foregoing reasons, the Motion to Compel *Brady* (*CR* 1281) should be denied.

Respectfully submitted this 23rd day of September, 2021.

KENNETH POLITE
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

*s/ Reginald E. Jones*
REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

DAN G. BOYLE
Special Assistant U.S. Attorney

---

opinion that purported to advise a potential buyer of Backpage.com about possible criminal or civil exposure in an email attached to Defendants' Motion. (Mot., Ex. J ("In the final analysis, you are demanding an email that was based on a flawed legal analysis due to incomplete information for a non-testifying witness.").)

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/Marjorie Dieckman*
U.S. Attorney's Office