**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. CR-18-0422-PHX-SMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 13, 2021 |
| Michael Lacey, | ) | 1:35 p.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


BEFORE:   THE HONORABLE SUSAN M. BRNOVICH, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL - DAY 7 - P.M. SESSION


Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:


    U.S. ATTORNEY'S OFFICE
    By:  **Mr. Peter S. Kozinets**
         **Mr. Kevin M. Rapp**
         **Ms. Margaret Wu Perlmeter**
         **Mr. Andrew C. Stone**
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004


    U.S. DEPARTMENT OF JUSTICE
    By:  **Mr. Reginald E. Jones**
    1400 New York Avenue, NW, Suite 600
    Washington, DC 20530


For the Defendant Lacey:

    LIPSITZ GREEN SCIME CAMBRIA
    By:  **Mr. Paul J. Cambria, Jr.**
         **Ms. Erin E. McCampbell-Paris**
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202

For the Defendant Larkin:

    BIENERT KATZMAN
    By:  **Mr. Thomas H. Bienert, Jr.**
         **Ms. Whitney Z. Bernstein**
    903 Calle Amanecer, Suite 350
    San Clemente, CA 92673

UNITED  STATES  DISTRICT  COURT

```
 1   For the Defendant Spear:

 2       FEDER LAW OFFICE
         By:  Mr. Bruce S. Feder
 3       2930 East Camelback Road, Suite 160
         Phoenix, AZ 85016
 4

 5   For the Defendant Brunst:

 6       BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
         LINCENBERG & RHOW
 7       By:  Mr. Gopi K. Panchapakesan
              Mr. Gary S. Lincenberg
 8       1875 Century Park E, Suite 2300
         Los Angeles, CA 90067
 9

10   For the Defendant Padilla:

11       DAVID EISENBERG, PLC
         By:  Mr. David S. Eisenberg
12       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012
13

14   For the Defendant Vaught:

15       JOY BERTRAND, LLC
         By:  Ms. Joy M. Bertrand
16       P.O. Box 2734
         Scottsdale, AZ 85252
17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1                           **I N D E X**

2    WITNESS                                        PAGE

3    DR. SHARON COOPER
             Direct Examination by Mr. Jones          5
4            Cross-Examination by Ms. Bertrand        53

5

6                         **E X H I B I T S**

7
     Number              Description              Admitted
8
     6148         Screen Shot 489a at 20 Seconds    66
9
     6149         Screen Shot 489a at 33 Seconds    66
10
     6150         Screen Shot 489a at 37 Seconds    66
11
     6151         Screen Shot 489a at 1 Minute
12                14 Seconds Gorgeous Nubian         66

13   6152         Screen Shot 489a at 1 Minute
                  29 Seconds Hot Friday              66
14
     6153         Screen Shot 489a at 2 Minutes
15                1 Second Hot Latina                66

16   6154         Screen Shot 489a at 2 Minutes
                  10 Seconds Bootylicious            66
17
     6155         Screen Shot 489a at 2 Minutes
18                37 Seconds Running Special         66

19   6156         Screen Shot 489a at 33 Seconds
                  Want Out                           66
20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2              THE COURT:  We are back on the record with the jury

3      present.

4              The government's next witness.

5              MR. JONES:  The United States calls Dr. Sharon Cooper,

6      Your Honor.

7              MR. BIENERT:  This is Mr. Bienert.  While we're

8      waiting, your madam clerk was nice enough to square away those

9      exhibits with me.

10             Do you want me to recite the list now or do it later?

11             THE COURT:  We'll do it on a break.

12             MR. BIENERT:  Thank you, Your Honor.

13             THE COURT:  Thank you.

14                         DR. SHARON COOPER,

15     called as a witness herein, having been first duly sworn, was

16     examined and testified as follows:

17                         DIRECT EXAMINATION

18     BY MR. JONES:

19     Q.  Good afternoon, Dr. Cooper.

20     A.  Good afternoon.

21     Q.  Please introduce yourself to the jury.

22     A.  My name is Sharon W. Cooper and I'm a developmental and

23     forensic pediatrician.

24     Q.  Dr. Cooper, where do you live?

25     A.  I live in Fayetteville, North Carolina.

1  Q.  Is that where you serve as -- currently serve as a

2  developmental and forensic pediatrician?

3  A.  Yes, I do.

4  Q.  And how long have you held that position?

5  A.  I started my own corporation, Developmental and Forensic

6  Pediatrics, in 1997.

7  Q.  Dr. Cooper, could you just briefly describe for the jury,

8  just walk them through some of your formal education.

9  A.  I received my bachelor's of science degree from Fisk

10  University in Nashville, Tennessee, and then went on to medical

11  school at Meharry Medical College.

12        After I graduated from medical school, I volunteered

13  and joined the United States Army and did an internship and

14  residency at Tripler Army Medical Center in Honolulu, Hawaii.

15        I then spent the next total of 20 years -- 21 years

16  serving in the armed forces at various installations where I

17  was both a forensic pediatrician responsible for child abuse

18  cases of all different types, and involved in family violence

19  cases, as well as completing a fellowship in developmental at

20  Behavioral Pediatrics in El Paso, Texas.

21        My last assignment was at Fort Bragg in North

22  Carolina, which has the largest pediatric population in the

23  Army, more than 45,000 children under the age of 18.  And as

24  the chief of pediatrics there, I was responsible for

25  supervising other pediatricians who cared for inpatient

1    children, outpatient, and nursery and special care nursery

2    patients.

3            I retired from the Army in 1996 and started my own

4    corporation, Developmental and Forensic Pediatrics, and became

5    an adjunct professor of pediatrics at the University of North

6    Carolina at Chapel Hill, which is an appointment I continue to

7    have to the present date.

8            I also, at that point, became a forensic pediatrician

9    at the Southern Regional Area Health Education Center in

10   Fayetteville, which is one of ten counties in the 100-county

11   state of North Carolina that sees -- that has special clinics

12   to see child abuse cases.  And I continue to see patients

13   within that -- within those confines as well.

14   Q.  And, Dr. Cooper, what -- in or around what year did you

15   retire from the military?

16   A.  I retired in 1996.

17   Q.  And what was your rank upon retirement?

18   A.  I retired as a full colonel.

19   Q.  Did you receive any awards upon your retirement from the

20   military?

21   A.  I was very honored to be a recipient of the Legion of Merit

22   Award, which is an award that has to be approved by Congress in

23   order for you to receive that award as a military personnel.

24   Q.  Dr. Cooper, could you walk the jury through any of your

25   academic and community affiliations and appointments as they

1    relate to sex trafficking and how it occurs online.

2    A.  I had began working in the area of sexual exploitation and

3    sex trafficking around 1996 to 1997 after I retired from the

4    military.

5           I was asked initially to become a trainer for the

6    United States Postal Inspection Service, because in the late

7    1990s, just as we were coming to the change of the century, we

8    were beginning to see internet crimes against children, and we

9    were beginning to see digital crimes against children.  And the

10   U.S. Postal Inspection Service, which is the law enforcement

11   part of the post office, was finding themselves in a state of

12   delivering what turned out to be contraband in the mail, and so

13   they needed to be able to better assess the content of illegal

14   videotapes and things of that nature.  That started to become

15   more common.

16          Shortly after 2000 to 2001 when we started seeing

17   sexual exploitation exploding, both from the perspective of

18   online, what we called child pornography at that time, we now

19   call that child sexual abuse material --

20          MS. BERTRAND:  Objection.  Move for side bar, please.

21          THE COURT:  All right.

22          (The following proceedings were held at side bar.)

23          MS. BERTRAND:  This is Joy Bertrand, attorney for Joye

24   Vaught.

25          The defense objects to this line of prove up of this

1    witness for the following reasons:

2            First, this is not a pornography case; second, it's

3    not a child exploitation case.  We just talked about this

4    witness's limited scope of testimony at 8:30 this morning, and

5    they're already going beyond that in the prove up, talking

6    about child exploitation, talking about child pornography,

7    videos, and the explosion of all of this.  None of that has to

8    do with what this Court told the government it is allowed to do

9    with this witness.

10           I would ask, Judge, first of all, that this be

11   sustained, but also that I be allowed to voir dire this witness

12   before we get into substantive testimony, because I don't think

13   they're going to be able to prove up that she's linked to the

14   ability to talk about vernacular language, and that was what

15   the Court told the government this morning it could do, and

16   that's it.

17           THE COURT:  No, I thought there was a second area.

18           MS. BERTRAND:  Secondary area --

19           MR. JONES:  -- occurs online --

20           THE COURT:  Online.

21           MR. JONES:  -- which is what she --

22           THE COURT:  So, first of all, this is just foundation.

23   This is what she does.  She hasn't been asked anything

24   substantive, so the objection is overruled.

25           MR. LINCENBERG:  Your Honor, can I just --

1          THE COURT:  State your name.

2          MR. LINCENBERG:  Gary Lincenberg.

3          I thought the Court ruled that this witness can go

4     into one area -- vernacular and that was it.  And what the

5     government --

6          (Court reporter interrupts for clarification.)

7          THE COURT:  She can't hear you.

8          MR. LINCENBERG:  This is Gary Lincenberg.

9          And what the government is doing with this going into

10    the background is just all of the child and sex stuff that the

11    Court had permitted them to do and just kind of try to talk

12    about it by way of background.

13         I heard the Court rule -- there were two issues this

14    morning.  And the Court ruled that this witness can go into

15    vernacular, but then told the government if you do it with this

16    witness, you can't do it with Decoufle, and that the other area

17    they can't go into.

18         THE COURT:  Right.  No, no.  What I said is they can't

19    go into the relationship between traffickers and pimps and that

20    whole psychology, but I did not preclude how sex trafficking

21    occurs on the internet.

22         MR. LINCENBERG:  I heard it differently, but okay.

23         MS. BERTRAND:  Your Honor, I heard it differently too.

24         THE COURT:  Okay.

25         (The following proceedings were held in open court.)

1    BY MR. JONES:

2    Q.  Apologize, Dr. Cooper.  You can continue.

3    A.  So, therefore, right around 2000 we began, in the United

4    States and around the world, to recognize a new type of crime

5    against children, and that had to do with technology.

6         Around 2001, or thereabouts, I was asked to begin as a

7    trainer for the National Center for Missing and Exploited

8    Children, which is our national hotline, for individuals who

9    want to report a concern of either internet crimes against

10   children or sex trafficking of children.  That is our national

11   hotline.

12        Around 2002, I began to recognize that the field of

13   child maltreatment did not recognize child sexual exploitation

14   as a form of child abuse.  It just wasn't in our textbooks at

15   all.  So I began working, at that particular point, on writing

16   a textbook focused in this particular area.

17        At which time, I met Dr. Richard Estes, who became

18   very internationally renowned at recognizing sex trafficking in

19   children.  Dr. Estes is from the University of Pennsylvania,

20   and ultimately became one of the coauthors of the textbook that

21   we completed in 2005 focused on all aspects of child sexual

22   exploitation.  And it is Dr. Estes's term, the commercial

23   sexual exploitation of children, which is still used

24   internationally and nationally to reflect the issue of sex

25   trafficking involving minors, not just young children, but

1    adolescents as well.

2              I was continuing to provide training at the National

3    Center for Missing and Exploited Children for a specific course

4    entitled initially, Prostitution of Children, initially.  And

5    that name changed as our country changed in recognizing that

6    children were not prostitutes, children were being prostituted.

7    They were not prostitutes.

8              And it was in 2004 ECPAT International and ECPAT USA,

9    which is a nonprofit international organization that focuses on

10   sexual exploitation of children, wrote a document that caused

11   our Congress and state laws to change from any longer referring

12   to children as prostitutes.  They began to recognize that

13   children were, in fact, being prostituted.  They were not

14   prostituting themselves.

15             So in our earlier funds of knowledge, we always had

16   children who were sex trafficking victims as juvenile

17   delinquents.  And it was in the early 2000 part of this century

18   that we began to recognize that we had mis -- mislabeled, if

19   you will, a form of very serious victimization.  And we had

20   just assumed that children were selling themselves on street

21   corners, which was very, very erroneous in our thought process,

22   both from a criminal justice perspective, from a psychological

23   perspective, and from a medical perspective.

24             So in 2005 we wrote a textbook focused on all aspects

25   of child sexual exploitation.  I was the lead editor.

1   Dr. Estes was one of the editors, Dr. Angelo Giardino,

2   Dr. Nancy Kellogg, and attorney Victor Vieth were the five

3   editors of this particular two volume set of books that are

4   still seen in the United States, and in some foreign countries,

5   as the most comprehensive text on child sexual exploitation.

6           Because of our beginning to recognize, therefore, the

7   issue of the trafficking of children, we became much more

8   knowledgeable in our country, which already had passed the

9   Child Victim's Protection Act in 2000, that act already existed

10  as a federal law, but now we were beginning to look at the role

11  of subjugation and victimization of children as equally, if not

12  more so, problematic.

13          In 2004 --

14          MR. FEDER:  Judge, I'm going to object to this as

15  relevance.  It's a narrative of not her credentials, but her --

16  a speech.

17          THE COURT:  The objection is noted.

18          You need to ask a question.

19          MR. FEDER:  And move to strike and for a continuing

20  objection.

21          THE COURT:  The motion to strike is denied.

22  BY MR. JONES:

23  Q.  Dr. Cooper, could you talk with the jury a little bit about

24  any of your recent or past trainings as it pertains to adult

25  and child sex trafficking, and along with that, have you

```
1    reviewed any medical literature on -- on prostitution and child
2    sex trafficking as well, to talk with them briefly about that.
3              MS. BERTRAND:  Objection.  Relevance.
4              THE COURT:  The objection is sustained.
5    BY MR. JONES:
6    Q.  Dr. Cooper, have you testified as an expert in the area of
7    sex trafficking as pertains to adult and children and
8    prostitution in federal and state courts?
9    A.  Yes, I have.
10   Q.  Okay.  Just, approximately, the number of times your
11   testimony you have been qualified as an expert in this area?
12   A.  At least 25 times.
13   Q.  Okay.  As part of your medical practice, have you
14   interviewed victims who have been trafficked, both -- online,
15   both as adults and children?
16   A.  Yes, I have.
17   Q.  Okay.  Just, approximately, how many victims have you
18   interviewed?
19   A.  Well over a hundred.
20   Q.  Okay.  Could you briefly just describe, I guess, to the
21   jury, the nature of your -- of your work with victims and
22   interviewing them.
23   A.  Usually I have been called by law enforcement to evaluate
24   victims who have been rescued within the context of an
25   investigation involving a sex trafficker.
```

1          And so, generally speaking, I would be flown to

2    whatever part of the United States this would have occurred,

3    and I would stay and interview each one of the victims, and

4    write reports for the court regarding what had happened to them

5    in their life, how did they come to be exploited in the manner

6    that they were, what kinds of mental health problems were they

7    experiencing, were they also --

8          MS. BERTRAND:  Objection, Your Honor.  Relevance and

9    narrative.

10         THE COURT:  The objection to narrative is sustained.

11   BY MR. JONES:

12   Q.  And as part of your expert testimony in those more than 25

13   occasions, has that testimony included how victims, both adults

14   and children, were trafficked through online platforms?

15   A.  Yes, it has.

16   Q.  Okay.  Dr. Cooper, through your more than 40 years of

17   medical practice specialization in sex trafficking, have you

18   become familiar with terminology, in other words, the

19   vernacular used in the prostitution and sex trafficking

20   industry?

21   A.  Yes, I have.

22   Q.  Have you written books, read articles in any publications

23   regarding the vernacular involved in the prostitution and sex

24   trafficking industry?

25   A.  Yes, I have.

1  Q.  Briefly just talk --

2  A.  Yes.  The most recent chapter that I wrote was for the

3  third edition of child sexual abuse, it was on child sexual

4  exploitation, and in particular was focused on terminology that

5  is used with respect to children and adolescents who are being

6  sold in the online world.

7  Q.  Have you trained law enforcement on terminology used in the

8  prostitution and sex trafficking industry during your more than

9  40 years of experience?

10  A.  Yes.  I have not only trained law enforcement, I have also

11  trained medical providers, legal investigators, and I've spoken

12  at the National Judicial College.

13  Q.  Also through your work, have you, through your interviews

14  with victims, have you discussed the vernacular and terms used

15  in the prostitution and sex trafficking industry with them as

16  well?

17  A.  Yes, I have.  Specifically, within the context of

18  understanding if a victim has had quite a bit of trauma, it is

19  difficult for the victim to chronologically describe what has

20  happened to them, and so it really requires careful victim

21  interviews and repetitive interviews in order to get as many

22  details as possible.

23  Q.  Dr. Cooper, during your more than 100 occasions to have

24  testified in court throughout the country, has any of your

25  expert testimony involved or described the vernacular and

1    terminology used in the prostitution and sex trafficking

2    industry?

3    A.  Yes, it has.

4    Q.  Okay.

5           MR. JONES:  Your Honor, at this point the government

6    requests that Dr. Cooper be qualified as an expert in the area

7    of how trafficking occurs through online media platforms, and

8    also terminology and vernacular used in sex trafficking and

9    prostitution industry, her proposed expert testimony on these

10   topics deemed reliable and relevant to this case.

11          MS. BERTRAND:  Your Honor, I would ask to be able to

12   voir dire the witness before the Court makes that conclusion.

13          THE COURT:  That request is denied.

14          The government may proceed.

15          MR. JONES:  Thank you, Your Honor.

16   BY MR. JONES:

17   Q.  Dr. Cooper, could you just start off by explaining to the

18   jury, talking to them about, you know, what is sex trafficking

19   and what is prostitution, and really distinguishing the two for

20   them.

21   A.  Yes, I can do that.  The -- the difference between sex

22   trafficking and prostitution entails two components.

23   Prostitution can only occur with individuals who can give

24   consent.  Minors cannot give consent for any type of sexual

25   encounter, and so therefore prostitution is defined as the

1    exchange of sex for money, drugs, influence, et cetera, between

2    two consenting adults.  If these two individuals are exchanging

3    sex without consent, that is not considered prostitution,

4    that's considered sex trafficking between two adults.

5         If you, on the other hand, have third-party control,

6    that is, there is an exchange of sex between two adults or

7    between an adult and a child, and there is a third party that

8    is maintaining the power, control, and money that occurs for

9    that transaction, that is referred to as sex trafficking,

10   third-party control.

11   Q.  I want to talk -- ask you to explain just some of the

12   terminology just briefly.  We'll go into detail later.  But

13   just explain what a pimp and a trafficker is to the jury, and

14   also a John and trick, and also a madam and bottom.  Could you

15   just explain those terminologies to the jury so they have a

16   good understanding of what those terms mean?

17        MS. BERTRAND:  Objection.  Relevance.

18        THE COURT:  The objection is overruled.

19        THE WITNESS:  A pimp or a trafficker is that

20   third-party control of which I just spoke.  That's the

21   individual who is responsible for control, who has been the

22   individual to recruit, to entice, to harbor, or obtain, to

23   provide and/or transport a victim for the purpose of sexual

24   acts, typically commercial sex acts.

25        If a victim is a minor, no force, fraud, or coercion

1    is necessary for this to be a pimp or trafficker/victim

2    relationship.  If, on the other hand, the victim is an adult,

3    force, fraud, or coercion are necessary if, in fact, this is

4    going to be therefore considered a trafficking scenario, as

5    compared to a pimp.

6          A pimp individual often controls one or more

7    individuals --

8          MS. BERTRAND:  Your Honor, objection.  Relevance.

9    Move to strike.

10         THE COURT:  The objection is overruled.

11         THE WITNESS:  A pimp or trafficker uses, typically,

12   their power, control over one or more victims for the purpose

13   of sex trafficking, and makes those victims available for

14   individuals to purchase.  That dynamic, the making them

15   available for purchase, is the component that causes there to

16   be money, usually, made available.

17         What is also relevant is that typically in the

18   organization of a trafficker --

19         THE COURT:  Counsel, you asked for a definition.

20         MR. JONES:  Right.  Okay.

21   BY MR. JONES:

22   Q.  Could we move on to a John and a trick?  Could you give the

23   jury a definition of what a John and a trick means?

24   A.  Yes, I can.

25   Q.  And --

```
 1    A.  Yes, I can.  I was going to explain a bottom.  I'll explain
 2    a John.
 3    Q.  Or you can go whatever order, madam and bottom as well.
 4    A.  If that's okay?  Yeah.
 5            As I was saying, the -- the trafficker usually chooses
 6    a person among the women and/or men that they are controlling
 7    to be in charge of everyone, and that person's referred to as a
 8    bottom.  That was one of the questions that was posed.
 9            A bottom is often a person who was controlled by the
10    trafficker initially and who has worked their way up in the
11    organization to be in charge of everybody else.  And so they're
12    referred to as the bottom, but they actually are the victim who
13    is in charge of all the other victims in the organization.
14    Q.  What about a John?
15    A.  A John is a term often used for a buyer.  We try not to use
16    that terminology too much anymore.  We prefer the term buyer so
17    it's clear as to who is the trafficker and who is the market,
18    or who is the buyer.  And a John is an individual who usually
19    goes online in order to find any kind of evidence that would
20    allow him or her to be able to buy a person for sex.
21    Q.  What about the terminology hobby boards, review boards in
22    prostitution?
23            MS. BERTRAND:  Objection.  Relevance.
24            THE COURT:  Counsel, just yes or no, does this relate
25    to ads?
```

1          MR. JONES:  It does, Your Honor.

2          THE COURT:  The objection is overruled.

3          THE WITNESS:  Hobby boards, or review boards, are

4    often written information, typically in the online world, that

5    will score or gauge how successful a victim is likely to be

6    when an individual is considering buying that victim for sex.

7          MS. BERTRAND:  Same objection, relevance.  Move to

8    strike.

9          THE COURT:  The objection is overruled.  The motion is

10   denied.

11   BY MR. JONES:

12   Q.  Now, Dr. Cooper, I want to talk now about how sex

13   trafficking occurs on online platforms.  Before the advent of

14   the internet, you know, where did sex trafficking and

15   prostitution mostly occur?

16   A.  Most of the time, prior to the internet, sex trafficking

17   occurred on street corners or it occurred in brothels, in

18   hotels, or locations where individuals could go in and have sex

19   with men or women and then leave.  But the most common urban

20   form of sex trafficking was on street corners, with victims

21   walking up and down the street, often referred to as the track,

22   and with individuals who would drive by and decide which one

23   they wanted to buy for sex at that time.

24   Q.  You've interviewed approximately how many victims involved

25   in sex trafficking and prostitution over the past 15 or

1  20 years since the advent of the internet?

2  A.  How many have I seen?  I'm sorry.

3  Q.  Yes, just approximately.

4       MS. BERTRAND:  Wait.  Can we have the question again,

5  please?

6  BY MR. JONES:

7  Q.  Approximately, how many victims that have been trafficked

8  through online platforms have you seen or worked with in the

9  past 15 to 20 years?

10      MS. BERTRAND:  Objection.  Relevance.  Conflates

11  victims with prostitution.

12      THE COURT:  Okay.  The objection is overruled.

13      THE WITNESS:  Could you repeat the question?  I

14  apologize.

15  BY MR. JONES:

16  Q.  That's okay.  Approximately, how many victims, over the

17  past 15 or 20 years, have you worked with that have been

18  involved in the online sex trafficking or prostitution

19  industry?

20  A.  I have seen well over 200 victims, in part because some are

21  sold by traffickers who are not related to them.  Many have

22  been sold by traffickers who are family members.

23  Q.  Have those victims been both adult and children -- adults

24  and children?

25  A.  Yes, they have.

1   Q.  Okay.  And how many of those victims have been trafficked

2   online?

3   A.  The overwhelming majority.

4   Q.  Okay.  What about specific platforms over the past 15 or

5   20 years, the victims you have seen that have been trafficked

6   online?

7   A.  Initially, when we looked at online trafficking, Craigslist

8   was the first online site that we were aware of.  When I say we

9   are aware, this was within my relationship with the National

10  Center for Missing and Exploited Children as they were

11  monitoring where were children being found that were being

12  bought.

13          MS. BERTRAND:  Objection.  Move to strike.  Hearsay.

14          THE COURT:  The objection is overruled.

15          THE WITNESS:  I was working directly with the National

16  Center at that time.  In fact, I was an instructor for the

17  National Center for 16 years, and I taught specifically, with

18  respect to sex trafficking victimization, a 4-hour window, a

19  4-hour course of a 40-hour course, 10 percent of the course, on

20  victimization of children and adolescents in sex trafficking,

21  which is how I came to understand where and how it was that

22  victims were more commonly sold.

23          With respect to online marketing, Craigslist was our

24  first site that we began to see.  Then we began to see and

25  worry about social networks, because individuals were

1    interacting on MySpace at first, and then in Facebook and other

2    social networks, using that as a means.  And then we began to

3    hear about a different platform, and that was Backpage, which

4    became the most common, for at least ten years, site that we

5    saw victims sold for sex by sex traffickers.

6    BY MR. JONES:

7    Q.  Based on your experiences in this arena as well, did

8    Backpage itself and the online platforms, you know, have they

9    served as a means to also recruit victims into trafficking as

10   well?

11            MR. FEDER:  Objection.  Leading.

12            MS. BERTRAND:  Objection.  Relevance.  Leading.

13            THE COURT:  The objection to leading is overruled.

14   The other objection is sustained.

15   BY MR. JONES:

16   Q.  Could you talk to the jury briefly about how individuals,

17   basically, in your experience with law enforcement, experience

18   interviewing victims that have been trafficked, based on your

19   education and background as well, you know, how do you -- I

20   mean, how do traffickers come to know, you know, that online

21   platforms, in particular Backpage, was a site to go to?

22            MS. BERTRAND:  Objection.  Calls for hearsay.

23   Relevance.

24            THE COURT:  The objection to relevance is overruled,

25   but the objection to hearsay is sustained unless you have some

1   other foundation.

2         MR. JONES:  Okay.

3   BY MR. JONES:

4   Q.  You mentioned that Backpage was the platform, for at least

5   over ten years, where the majority of your victims are

6   trafficked, correct?

7   A.  Yes, that's correct.

8   Q.  How did you learn that to be the case?

9   A.  I usually -- usually glean that information from law

10   enforcement investigations.

11         MR. CAMBRIA:  Your Honor, I object.  It's hearsay.

12   That's not appropriate foundation.

13         THE COURT:  The objection is overruled.

14         THE WITNESS:  I would typically be working with law

15   enforcement when they were investigating a trafficking case,

16   and they would brief me with respect to the number of victims,

17   their ages, as best they could tell, and how did the case first

18   become known.  And there --

19         MS. BERTRAND:  Your Honor, hearsay.  Objection.

20         THE COURT:  The objection is overruled.

21         THE WITNESS:  And as I was briefed prior to evaluating

22   these victims by law enforcement, which is a standard

23   procedure, typically, when medical care providers are going to

24   interact with victims, usually we are briefed by law

25   enforcement and/or child protective services regarding the

1    specifics of the case, that this is how I discovered that these

2    victims were most commonly being sold from Backpage.

3              In keeping with that intel, when I would evaluate

4    victims, I would ask them did they have any idea of how it was

5    they were being sold and bought, and they told me directly that

6    how they had --

7              MS. BERTRAND:  Judge, hearsay.  Objection.

8              THE COURT:  Okay.  Counsel, side bar.

9              (The following proceedings were held at side bar.)

10             THE COURT:  Who is -- who am I talking to?  You made

11   the objection.  So Rule 702 gives the expert some leeway, so

12   you can have a continuing objection, but as long as it's

13   something she used in her experience, it's coming in under 702.

14             MS. BERTRAND:  Your Honor, there is also an objection

15   to relevance and 403, and that she keeps going back to child

16   trafficking, child trafficking, child abuse, medical

17   evaluations of children, and not talking in general terms about

18   sex trafficking.  That is improper.  It goes against prior

19   orders of this Court and we'd object.  It's going outside the

20   bounds of the limits this Court has placed on this prosecution.

21             MR. CAMBRIA:  Paul Cambria.

22             THE COURT:  Okay.  That limit was placed when we

23   talked about a different witness.

24             MR. CAMBRIA:  Paul Cambria on behalf of Mr. Lacey.

25             Your Honor, the entire direct was geared toward saying

1   children, children, children, children, children.  That's all

2   we heard about.  I did this with children, I did that, I this,

3   they can't consent, they can't this, that.  I move for a

4   mistrial.  I think that we are absolutely prejudiced at this

5   point.

6           These people think that this is a children case, and

7   in -- at the very minimum, this Court should instruct the jury

8   that there is no children charged in this case.  There is no

9   charge of trafficking children.  There is no charge of children

10  prostitution.  There are none of those crimes, if you will.

11  And these jurors are being led to believe that this is all

12  about children.  And that's all she is talking about.

13          And you can tell she's a professional witness.  She's

14  got all the, you know, the long narratives.  Any kind of

15  question she just goes on, and on, and on, and on, and I just

16  think you have to stop it, Your Honor, and I think we're

17  prejudiced irretrievably.

18          MR. FEDER:  Bruce Feder on behalf of Mr. Spear.

19          You mentioned to the opening statement, which was also

20  -- there was also a mistrial asked for, this is -- this is --

21  this appears to be the theme of the government is that they

22  open with child exploitation when this isn't about child

23  exploitation, and they have brought up -- they tried to gauge

24  it in.

25          THE COURT:  Mr. Jones.

1          MR. JONES:  As Your Honor has indicated in her order

2     to our motion in limine, criminal record 1156, the government

3     charged the defendants with intending to facilitate

4     prostitution through running Backpage for more than 14 years.

5          Sex trafficking is a subset of prostitution and

6     requires individuals to engage in sexual services in exchange

7     for money.  And so, you know, while the government does not

8     feel that Dr. Cooper's testimony has been overly focused on

9     children, but the fact of the matter is, you know, children are

10    trafficked through Backpage, and sex trafficking is a -- is a

11    subset of prostitution.

12         THE COURT:  Go ahead.

13         MR. JONES:  Moreover, Your Honor, we'd just like to

14    make the government aware, as Your Honor indicated, that the

15    fact that sex trafficking occurs on -- was facilitated through

16    Backpage and defendant knew it is highly relevant and highly

17    probative to defendants' intent to -- and their knowledge that

18    illegal activity was taking place on their website.

19         THE COURT:  Okay.  So you need to move on, because you

20    haven't even talked about how it's actually done, you've just

21    sort of --

22         MR. JONES:  And that's where we're leading up --

23    that's where we're headed to next.

24         THE COURT:  Well, you need to be careful, because

25    you're getting close to a 403 violation.

1          MR. JONES:  Okay.

2          THE COURT:  And I did, when discussing a different

3    expert, Ms. Perlmeter indicated she would phrase it in terms of

4    sex trafficking, stay away from the child sex trafficking.

5          MR. JONES:  All right.  Okay.

6          THE COURT:  You have not done the same, so you need to

7    be careful.

8          MR. JONES:  Will do.  Will do, Your Honor.

9          THE COURT:  And you need to direct your witness a

10   little bit, because she could very well go off on a tangent

11   into something.

12         MR. JONES:  Okay.  Will do.

13         THE COURT:  Which I had to stop her one time.

14         MR. EISENBERG:  I'm sorry.  May I be heard?  This is

15   Dave Eisenberg.

16         The real problem, as I see it, is that there is no

17   link between sex trafficking and anybody at Backpage who was

18   aware of it at all, child sex trafficking, I should say.  And I

19   think the jury is getting the impression that that's what this

20   case is really about.  I don't think the government can make

21   that link at all.  In fact, it's just the opposite, that's why

22   they were reporting what they thought were minors, not people

23   who were sex trafficked as minors, just minors, to NCMEC and

24   others.

25         MR. BIENERT:  For the record, I assume the motion --

1    all of us are deemed to have joined in the motion for mistrial.

2         THE COURT:  I will do that, although I think most of

3    you have spoken, but yes.

4         MR. BIENERT:  Well, Mr. Bienert joins.

5         THE COURT:  Okay.

6         (The following proceedings were held in open court.)

7    BY MR. JONES:

8    Q.  Apologies, Dr. Cooper.

9         I want to ask you, talk briefly now about your

10   knowledge of the Backpage.com website.

11        Have you had the occasion to -- have you seen ads that

12   have been posted in the adult services section of Backpage?

13   A.  Yes, I have.

14   Q.  Okay.  Have you had the occasion to notice certain

15   disclaimers within those advertisements?

16   A.  Yes.

17   Q.  Okay.  Are there any disclaimers as it pertains to

18   companionship?  Could you explain, talk with the jury about why

19   those disclaimers would be in a Backpage ad.

20   A.  My understanding of online marketing is to try to make it

21   as clear to the viewer that everything that is being marketed

22   online is legally marketed online.

23   Q.  Okay.  What about any disclaimers regarding law

24   enforcement?

25   A.  The goal is to make individuals who might be choosing to

1  make purchases online feel comfortable that they would not be

2  at risk for any type of law enforcement action.

3  Q.  Are you also familiar with how the Backpage website

4  operated, just generally?

5  A.  My knowledge of the operation of the Backpage process is

6  strictly through the -- my reading about Backpage, but also

7  from --

8          MS. BERTRAND:  Your Honor, objection.  Hearsay.

9          MR. FEDER:  It's a yes or no question.

10          THE COURT:  The objection is overruled because I'm

11  trying to figure out what her knowledge is.

12          Without telling us what you read, you can continue.

13          THE WITNESS:  Yes, ma'am.

14          My reading, in general, because I stay abreast of

15  victimization and the victimization literature, and also from

16  interviewing, doing medical interviews of patients whose images

17  were on Backpage.

18  BY MR. JONES:

19  Q.  Are you aware that there are posting rules that an

20  individual must agree to before posting in the adult service

21  section of Backpage?

22  A.  Yes, I am aware of that.

23  Q.  Okay.  Is it your -- based on your education and

24  experience, is it your expert opinion that those posting rules

25  are effective in preventing sex trafficking?

1          MS. BERTRAND:  Objection.  Relevance.

2          THE COURT:  The objection is sustained.

3     BY MR. JONES:

4     Q.  Based on your education and experience, what have you

5     learned about the posting rules that individuals must agree to

6     before posting in the adult services section of Backpage?

7     A.  My understanding of the posting rules are that they must be

8     voluntary and that no laws are going to be broken by their very

9     nature of having been posted.

10    Q.  Okay.  And based on your interviewing of victims, has this

11    been the case?

12    A.  No, it has not.

13    Q.  Okay.  Once an individual is recruited into trafficking,

14    you know, are there reasons why the victims are sold online, a

15    vast majority, versus elsewhere?

16         MR. CAMBRIA:  Object to the relevance, Your Honor.

17         THE COURT:  The objection is overruled.

18         THE WITNESS:  I apologize.  Could you repeat the

19    question?

20    BY MR. JONES:

21    Q.  Are there reasons why a victim may be trafficked online,

22    through online platforms like Backpage, versus elsewhere, like

23    on the street?

24         MS. BERTRAND:  Same objection.  Relevance.

25         THE COURT:  The objection is overruled.

1          THE WITNESS:  Yes.  The main reason that victims are

2     posted on online classifieds is because they will bring more

3     money because they are more readily available.  They can be

4     booked, if you will, very predictably ahead of time so that a

5     victim will know exactly how many sexual contacts they're going

6     to have in a given period of time because they've already been

7     booked.

8          MS. BERTRAND:  Your Honor, move to strike.  This calls

9     for speculation as to what the booker on the platform intends

10    and wants.

11         THE COURT:  The objection is overruled.

12         THE WITNESS:  Because the victims are told by the

13    trafficker exactly how many dates -- is what they're usually

14    referred to as -- they are going to have at a given time, it is

15    much more efficient than a victim standing on a street corner

16    waiting for a car to stop.

17    BY MR. JONES:

18    Q.  What about the -- the crafting of advertisements that are

19    posted online?  Do traffickers, are they able to control the

20    method by which the ads are posted with this process as well?

21         MS. BERTRAND:  Objection.  Foundation.

22         MR. FEDER:  Objection.  Beyond the scope of expertise,

23    and relevance.

24         Bruce Feder.

25         MS. BERTRAND:  Joy Bertrand.  Objection.  Lack of

1   foundation, and outside scope of expertise.

2           THE COURT:  The objection is sustained as to

3   foundation.

4   BY MR. JONES:

5   Q.  Are you familiar, Dr. Cooper, with how ads are posted to be

6   -- are posted on Backpage.com?

7   A.  I am.

8   Q.  Okay.  And what's involved in the posting of

9   advertisements?

10  A.  Yes.  A picture has to be made of a given victim, and then

11  the victim's image is going to be uploaded so that there will

12  be a description.  And specific words will be used for the

13  buyer to be able to ascertain how much money it's going to cost

14  in order to have a date with this particular victim.

15          MS. BERTRAND:  Objection.  Move to strike.  Conflating

16  all prostitution with traffickers.

17          THE COURT:  The objection is overruled.

18  BY MR. JONES:

19  Q.  What about the payment for advertisements?  Are you

20  familiar with how advertisements are paid to be posted on

21  websites like Backpage?

22  A.  Yes, I am familiar.

23  Q.  Okay.  Are there either benefits to a trafficker as it

24  pertains to the payments that -- or being able to pay for ads

25  on websites like Backpage?

1    A.  Yes, there are benefits.  Victims are usually sold by the

2    hour, and, generally speaking, they are -- generally speaking,

3    the amount of money that is going to be necessary for the hour

4    of a sexual encounter with a victim will be communicated in the

5    ad itself.

6    Q.  Based on your knowledge and experience of working with

7    hundreds of victims that have been trafficked online, do

8    websites like Backpage -- were you aware of any age

9    verification as it pertains to the posting of ads on Backpage?

10             MR. FEDER:  Objection.  Relevance.

11             THE COURT:  The objection is overruled.

12             THE WITNESS:  Based upon my experience from seeing

13   victims and evaluating victims, there has been no age

14   verification for minor victims who have been sold online.

15   BY MR. JONES:

16   Q.  Can you briefly describe for the jury the role -- you

17   explained what a buyer was, or what you -- of sex for money.

18   Just briefly describe the role a buyer plays in the online sex

19   trafficking industry.

20             MS. BERTRAND:  Objection.  Relevance.

21             THE COURT:  The objection is sustained.

22   BY MR. JONES:

23   Q.  You talk about -- you talked about review sites and these

24   hobby boards.  Have you found, based on your education and

25   experience in your more than 40 years of experience, have you

1    found that online sex trafficking occurs through these review

2    sites as well?

3              MS. BERTRAND:  Objection.  Relevance.

4              THE COURT:  The objection is sustained.

5    BY MR. JONES:

6    Q.  Dr. Cooper, have you found, with your expert experience,

7    that online platforms like Backpage have been helpful in

8    preventing sex trafficking --

9              MS. BERTRAND:  Objection.

10   BY MR. JONES:

11   Q.  -- online sex trafficking?

12             MS. BERTRAND:  Objection.  Leading.  Relevance.

13             THE COURT:  The objection is overruled.

14             THE WITNESS:  I have found just the opposite.  I have

15   found that the presence of online classified ads as are seen in

16   Backpage promote increased victimization, both in numbers and

17   in severity.

18   BY MR. JONES:

19   Q.  What about -- could you talk about other online platforms,

20   whether it be Google, Twitter, Facebook, is there a difference,

21   based on your expert opinion, in those online platforms versus

22   the online platform like Backpage?

23             MS. BERTRAND:  Objection.  Foundation.  Relevance.

24             THE COURT:  The objection is sustained as to

25   foundation.

```
1    BY MR. JONES:
2    Q.  Are you aware of other online -- online platforms?
3    A.  Yes, I am.
4    Q.  Okay.  That may host -- that may have adult content on
5    them?
6    A.  Yes, I am.
7    Q.  Okay.  Are you -- also you said you're familiar with
8    Backpage, correct?
9    A.  Yes, I am.
10   Q.  Have you found, based on your experience, a difference
11   between how the websites maintain the market as it pertains to
12   prostitution?
13           MS. BERTRAND:  Objection.
14   BY MR. JONES:
15   Q.  I'm sorry, as it pertains to adult advertisements?
16           MS. BERTRAND:  Objection.  Relevance.
17           THE COURT:  That objection is overruled.
18           MR. FEDER:  Foundation too.
19           THE COURT:  That objection is sustained.
20   BY MR. JONES:
21   Q.  You are aware of other online platforms that may host adult
22   content, correct?
23   A.  Yes, I am.
24   Q.  You are also aware that Backpage also hosted adult content
25   as well?
```

1  A.  Yes, it does.

2  Q.  Have you found, based on your experience in both of those

3  areas, have there been a difference in how adult ads were --

4  were -- were on -- were on Backpage versus other platforms that

5  may host adult content?

6              MS. BERTRAND:  Objection.

7              MR. FEDER:  Foundation.

8              MS. BERTRAND:  Relevance.  Beyond scope ordered by the

9  Court.

10             THE COURT:  That objection is overruled.

11             But can you rephrase the question?  I don't understand

12  the question.

13  BY MR. JONES:

14  Q.  Could you -- is there a difference between --

15             MR. JONES:  She's familiar with both adult content

16  that may be hosted on other platforms, whether it be Facebook,

17  Twitter, Google versus Backpage.

18  BY MR. JONES:

19  Q.  Have you found, based on your expert experience and

20  interviews of victims, have there been -- is there a difference

21  of how adult content is marketed on Backpage versus these other

22  platforms?

23             MS. BERTRAND:  Objection.  Foundation.  Relevance.

24  Beyond scope.

25             THE COURT:  The objection is overruled.

1          THE WITNESS:  Yes, I have found a difference.  There

2     are several differences.

3          The first difference is that the overwhelming majority

4     of victims that I have evaluated over the last 15 years, but

5     especially over the last 10 years, who have been sold online,

6     have been sold on Backpage, that's -- absolutely the lion's

7     share have been sold on Backpage.

8          The second point is that the majority of victims that

9     I have evaluated who have been sold on Backpage were underage

10    minors, so that is a second component.

11         And the third component is that reviewing the actual

12    Backpage postings, as I have as I prepared to testify in court

13    in many of these kinds of cases, the victims are promoted

14    within that particular venue as if they are selling themselves

15    not as if they are being sold.

16    BY MR. JONES:

17    Q.  Dr. Cooper, have you also found that recidivism, as it

18    relates to victims being trafficked on online platforms, in

19    particular Backpage, have you found that recidivism to be an

20    issue?

21         MS. BERTRAND:  Objection.  Vague as to recidivism and

22    relevance.

23         THE COURT:  The objection is sustained.

24    BY MR. JONES:

25    Q.  Dr. Cooper, are you familiar with recidivism as it relates

```
 1    to online sex -- in the online sex trafficking industry?
 2              MS. BERTRAND:  Objection.  Relevance.
 3              MR. LINCENBERG:  And 403.
 4              MS. BERTRAND:  403.
 5              MR. JONES:  I'm laying the foundation, Your Honor, for
 6    her to explain.
 7              THE COURT:  Well, that topic is not relevant.
 8              MR. JONES:  Okay.
 9    BY MR. JONES:
10    Q.  Dr. Cooper, based on your education and experience, you
11    said interviewing hundreds of victims who were trafficked via
12    online platforms, mostly Backpage, what percentage of them
13    have, to your knowledge, you know, actually engaged in sex for
14    money through those online platforms?
15              MS. BERTRAND:  Objection.  Foundation.  Relevance.
16    403.
17              THE COURT:  The objection is sustained.
18    BY MR. JONES:
19    Q.  You've interviewed victims -- trafficking victims --
20    victims who have been trafficked from Back -- on Backpage,
21    correct?
22    A.  Yes, I have.
23    Q.  I'll come back to that, Dr. Cooper.
24              I want to ask you now about -- I want to focus on some
25    of the terminology that's often used.  We've talked about
```

1    pimps, traffickers, you know, buyers, and the like.  You know,

2    why -- why is there a different vernacular used in the

3    prostitution and human trafficking industry?

4              MS. BERTRAND:  Objection.  Foundation.  Relevance.

5              THE COURT:  The objection is overruled.

6              THE WITNESS:  There is --

7              MS. BERTRAND:  Your Honor, objection.  Calls for

8    speculation as to what's in someone else's mind.

9              THE COURT:  The objection is overruled.

10             THE WITNESS:  There is a specific language involved in

11   sex trafficking victimization, and, generally speaking, the

12   general public is not really familiar to -- with that language.

13             For those of us who work in this particular field and

14   in this area, it's much easier for us to understand exactly

15   what's being communicated, and when we see it in writing, for

16   example, on an online classified ad, we know right away that

17   this is going to be the selling of a person for sex.

18             MS. BERTRAND:  Objection, Your Honor.  Comes to --

19   calls for ultimate conclusion.

20             THE COURT:  The objection is overruled for this

21   question.

22   BY MR. JONES:

23   Q.  Let's talk about, Dr. Cooper, you know, the -- some of the

24   terms used in the prostitution sex trafficking industry.

25             Could you explain to the jury the term -- terminology

1    in call and out call?

2    A.  Yes.

3              MS. BERTRAND:  Objection.  Foundation.

4              THE COURT:  The objection is overruled.

5              You can answer.

6              THE WITNESS:  Yes, ma'am.

7              My knowledge with respect to a lot of the language

8    associated with sex trafficking victimization has come from my

9    study of the literature, but also my having worked with

10   seasoned investigators at both the federal and state level for

11   many years.

12             In calls and out calls are particular terms used to

13   describe whether or not a victim is going to remain in one

14   location and a buyer is going to come to the victim.  This

15   would be referred to as an in call.  Typically, you would see

16   that in a motel type of setting where --

17             MS. BERTRAND:  Objection.  Lack of foundation.  Move

18   to strike.

19             THE COURT:  The objection is overruled.

20             THE WITNESS:  -- where the victim may, in fact, be

21   standing outside a door, and the buyer comes and sees the

22   victim and knows what room to come to in order to buy them and

23   have sex with them.

24             An out call, on the other hand, is when there is on

25   the -- on the platform that is marketing the victim, a request

1    for the victim to be brought to them.  Very often this means

2    that a trafficker will either personally drive a victim to a

3    hotel, for example, and take them specifically to a room where

4    the sexual acts are going to occur and where monies will be

5    exchanged, or if the trafficker has a more complete enterprise,

6    there will be other pieces to that transporting for an out

7    call.  There will be taxi cab drivers that are already paid.

8              MS. BERTRAND:  Your Honor, objection.  Goes beyond

9    scope.  403.  Relevance.

10             THE COURT:  Overruled.

11             THE WITNESS:  In that manner, the trafficker will

12   already have had working for him individuals who will transport

13   the victim from where the victim is staying, which is usually

14   with the trafficker, to the location of where the buyer is

15   going to be.  They will then wait.  They will often pay

16   individuals in a given hotel to allow that victim to just go

17   right past the front desk to the right room in order to have

18   sex with that particular buyer --

19             MS. BERTRAND:  Objection.

20             THE WITNESS:  -- and then leave the hotel.

21             MS. BERTRAND:  Your Honor, 403.  Beyond the scope.

22   Relevance.

23             THE COURT:  The objection is overruled.

24   BY MR. JONES:

25   Q.  What about the term 100 percent independent, or

1   independent, have you come across that term in ads on Backpage?

2   A.  Yes, I have.  When the term 100 percent independent is

3   cited on a classified ad, it is for the purpose of promoting

4   the buyer to believe that this is prostitution, that this is an

5   individual who is selling herself or himself hundred percent.

6   They're the person in charge of themselves.

7           MS. BERTRAND:  Your Honor, objection.  Testifying as

8   to the mindset of someone else.  Goes beyond the scope.  403.

9           THE COURT:  Counsel, the objection is overruled.  Rule

10   702 allows it.

11           Go ahead.

12   BY MR. JONES:

13   Q.  What about the term roses?

14   A.  Roses was a term that was first promoted in Craigslist and

15   usually would be the term to tell you how much money was going

16   to be necessary for the sex act.

17           An example -- I will give an example of what we would

18   see often in Craigslist, and subsequently have seen in other

19   online classified services, including Backpage.  A number of

20   roses, such as 100 or 150 roses, is the desired gift, if you

21   will, that is -- that is written, actually, in the online

22   classified.  That means that the sexual act is going to be 100

23   or $150.

24           In Backpage and some other sites, dollar signs are not

25   necessarily evident.  You may just see a symbol of a flower

1    that would be called a rose, but that really means how much

2    money the sexual act is going to cost.

3    Q.  What about the phrase GFE?  Are you familiar with that

4    term?

5    A.  Yes, I am.  The abbreviation GFE stands for girlfriend

6    experience, which means that the buyer wants to have a female

7    who will act like a girlfriend not like a stranger who is

8    coming in who is going to perform a sexual act and who is going

9    to leave, but who is going to be more personable and be more

10   like a girlfriend.

11          So GFE means that the victim is going to have to

12   behave in a certain manner, because they usually are not coming

13   to see someone they've ever met before, but they have to come

14   in and perform the sexual acts in a manner as if they were the

15   girlfriend of the individual who is buying them.

16   Q.  What about the terminology quick -- quickie, and also,

17   along with those, could you talk about, you know, pricing

18   increments in ads, generally?

19   A.  Yes, I can.  The -- often the sexual acts are sold in

20   increments of 15 to 30 minutes, and the more time, obviously,

21   the more expensive the date, as it is often referred to as on

22   classifieds, and also in terminology from the trafficker to the

23   victim.  The -- the amount of time will, of course, go up and

24   -- and more money will be necessary.

25          So a quickie is a very short sexual encounter, one of

1    the shortest sexual encounters.  And a quickie may very well

2    not entail a complete sexual act in the manner that we would

3    think, such as intercourse.  It may, in fact, entail a very

4    limited amount of contact, such as something referred to as a

5    blow job, which is oral sex, or a hand job, which is

6    masturbation of a penis to ejaculation.

7    Q.  What about the term Greek?

8    A.  The term Greek is another common term that you can see in

9    online classified ads.  It is another description of a

10   different type of sexual act.  It infers anal sex from the

11   Grecian times.

12   Q.  What about PIT?  Are you familiar with that term?

13   A.  I'm not so familiar.

14   Q.  PIT, or pimp in training?

15   A.  Yes, I am familiar with PIT.

16        PIT means that there are those younger pimps who are

17   learning how to be pimps.  And, in fact, I have evaluated

18   victims who spoke to me about PITs, which is how I first

19   learned about PITs.  A younger pimp is going to not protect a

20   victim as well as they might, or a younger pimp --

21        MS. BERTRAND:  Your Honor, objection.  Goes beyond the

22   scope.  403.  We --

23        THE COURT:  The objection is sustained.

24        MS. BERTRAND:  Move to strike.

25        THE COURT:  That last answer will be stricken.

1    BY MR. JONES:

2    Q.  What about DATY, D-A-T-Y, are you familiar with that term?

3            MS. BERTRAND:  D-A-T-Y?

4            MR. JONES:  Correct.

5            THE WITNESS:  Yes.  D-A-T-Y refers to oral sex, where

6    the Y is -- it's like dining at a meal, so to speak -- and the

7    Y is the Y of the vagina.  And so when the term D-A-T-Y is

8    present, it infers that the individual wants to have oral sex

9    with a female, and the female -- the Y is -- is the vaginal

10   area of the female.

11   BY MR. JONES:

12   Q.  What about bareback?

13   A.  Bareback is a very common term and it refers to having sex

14   without a condom.  It is the most dangerous type of sex, and

15   often is associated with transmission of sexually transmitted

16   infections.

17   Q.  What about donations?  Have you heard of the term donations

18   used?

19   A.  I can't recall donations.

20   Q.  Okay.  And I also wanted to ask you also about the -- what

21   about BBBJ, bareback blow job?

22   A.  That is -- what that means is that a blow job --

23           MS. BERTRAND:  Your Honor, beyond scope.  403.

24           THE COURT:  The objection is overruled.

25           THE WITNESS:  A blow job is oral sex.  And bareback

1  oral sex means that there is not going to be, again, use of a

2  condom, so it's not protected sex.  It, therefore, makes the

3  victim at higher risk for pharyngeal sexually transmitted

4  infection such as gonorrhea.

5         MS. BERTRAND:  Objection, Your Honor.  Beyond scope.

6  403.  Move to strike.

7         THE COURT:  The objection is overruled, but the motion

8  to strike is granted after everything after the definition.

9         MR. JONES:  Thank you, Your Honor.

10        One second, Your Honor.

11 BY MR. JONES:

12 Q.  Dr. Cooper, what about the term the wifey or a stable,

13 could you explain those terms to the jury?

14 A.  Yes, I can, very common terms in sex trafficking.  A wifey

15 is a female, usually many females, who are under the control of

16 a male trafficker, typically, who see themselves as all being

17 married to that one trafficker.  They're often referred to

18 as --

19        MS. BERTRAND:  Your Honor, objection.  403.  Goes

20 beyond scope.

21        THE COURT:  The objection is sustained.

22        MR. JONES:  Your Honor, this concludes the

23 government's expert -- expert witness portion of Dr. Cooper's

24 testimony.  We have a few we'd like to -- wanted to ask her a

25 few particular questions regarding the facts of this case as a

1    fact witness now, so we'd like to -- to move to that area of

2    her testimony, if the Court likes.

3              THE COURT:  Okay.

4              MS. BERTRAND:  We'd object and ask for a side bar.

5              THE COURT:  All right.

6              (The following proceedings were held at side bar.)

7              MS. BERTRAND:  Good afternoon.  This is Joy Bertrand.

8         Given the sweeping efforts the government has made to

9    bring in more in this case than the Court has deemed relevant,

10   I would ask that the government proffer as to what this witness

11   is going to testify to as now a fact witness so that we can

12   have the discussion outside the presence of the jury and

13   determine whether or not it is even relevant to any of the

14   elements the government must prove in this matter.

15             THE COURT:  Hold on.  Let me hear what the government

16   has to say.

17             MR. JONES:  Your Honor, the defense has been given

18   portions of the interview as it pertains to Dr. Cooper more

19   than a year-and-a-half ago, as it pertains to she was contacted

20   by a Backpage representative in around 2014 and was asked to --

21   I'm summarizing her testimony now -- if she would do consulting

22   work for Backpage in order to look at images and determine if

23   they were minors or children, and she declined to do so.  And

24   so that's the nature of her testimony and it's relevant in this

25   case.

1          MR. CAMBRIA:  Who asked her?

2          MR. JONES:  A Backpage representative, their then

3  general counsel.

4          MS. BERTRAND:  Well, we don't know that.  And, in

5  fact, the 302 says she doesn't know who called.  It was someone

6  from Backpage named Liz.  She did not know who it was.

7          MR. CAMBRIA:  And there is no foundation to show that

8  the person had the authority to make that request.  She can't

9  identify who it is.

10         MS. BERTRAND:  For all we know, it was a crank call.

11         THE COURT:  Can you stop?

12         Do you know who it is she spoke to?

13         MR. JONES:  Yes.  She -- based on -- she is aware that

14  it was Elizabeth McDougall that she spoke with, then general

15  counsel.  And she's aware that when -- the year she called and

16  what she -- the nature of the conversation, and that what she

17  -- that's simply all she'll testify to, Your Honor.

18         THE COURT:  But the conversation is that they asked

19  her to be an advisor --

20         MR. JONES:  Right.

21         THE COURT:  -- and she declined?

22         MR. JONES:  She told them that it was impossible,

23  without having the birth certificate, to determine whether an

24  individual depicted in a Backpage ad was a minor or over the

25  age of 18.

```
 1              THE COURT:  Mr. Cambria.

 2              MR. CAMBRIA:  Your Honor, she rendered an opinion

 3    on --

 4              (Reporter interrupts for clarification.)

 5              THE COURT:  Do you have anything else to say on the

 6    issue of whether or not she can testify as to factual?

 7              MR. CAMBRIA:  Not in that issue, no.

 8              THE COURT:  Any other motions we can talk about at the

 9    break.

10              MR. CAMBRIA:  Okay.

11              THE COURT:  Okay.  The objection is overruled.  I kind

12    of have an idea what she's going to say, so you can make any

13    other objections.

14              (The following proceedings were held in open court.)

15    BY MR. JONES:

16    Q.  Dr. Cooper, during the years that Backpage was in

17    operation, were you at one point contacted by a Backpage

18    representative?

19    A.  Yes, I was.

20    Q.  In or about when were you contacted?

21    A.  This was around 2013, 2014.

22    Q.  What was the nature of that contact?

23    A.  It was a brief telephone call to my office, basically

24    asking me would I consider working for Backpage.

25    Q.  And how did you respond?
```

1    A.  I declined.

2    Q.  What was the nature of why you were -- were asked to work

3    with --

4             MR. BIENERT:  Objection.  Speculative.  No foundation.

5             THE COURT:  The objection is sustained.

6    BY MR. JONES:

7    Q.  Who contacted you at Backpage, Dr. Cooper?

8    A.  I was contacted by an attorney at Backpage, Liz McDougall.

9    Q.  Okay.  And what was the reason Ms. McDougall contacted you?

10   A.  What she communicated to me was the desire --

11            MR. FEDER:  Objection.  Hearsay.

12            THE COURT:  The objection is overruled.

13            THE WITNESS:  What she communicated to me was the

14   desire to try to make sure that there were not underage minors

15   whose images might be on Backpage, and that's why she was

16   contacting me, because this is an area that I've worked in for

17   several years.

18   BY MR. JONES:

19   Q.  And what was your response in regards to her contact --

20   reaching out to you regarding this issue?

21   A.  I explained to her that I could not work for Backpage,

22   predominantly because you can --

23            MR. BIENERT:  Objection, Your Honor, as to whether

24   this is her behind-the-scenes reasons for not doing it, which I

25   would say is irrelevant and should not be stated, or whether

1    she's saying she told this to the Backpage representative.

2              THE COURT:  The objection is sustained.

3    BY MR. JONES:

4    Q.  What did you tell the Backpage representative?

5    A.  What I told Ms. McDougall was that I could not work for

6    Backpage, primarily because some children will be sexually

7    mature long before they are 18 years of age, in fact, most

8    children in the United States have reached sexual maturity

9    before they're 18 years of age.

10             MR. JONES:  Thank you, Your Honor.  No further

11   questions from the government.

12             THE COURT:  Okay.

13             Who is starting cross?

14             Ms. Bertrand.

15             MS. BERTRAND:  I am, Your Honor.  Thank you.

16                         CROSS-EXAMINATION

17   BY MS. BERTRAND:

18   Q.  Good afternoon, Doctor.

19             Doctor, you mentioned -- did I write this down --

20   you've testified in a federal trial as an expert 25 times?

21             And I'll take my mask off so you can --

22   A.  I have worked in federal trials.  Some went to a plea and

23   so they didn't actually go to a total -- in fact, several have

24   gone to a plea.

25   Q.  Sure.  How many times do you believe you have testified as

1    an expert in a federal trial?

2    A.  I would have to go back to my office and look at all of our

3    files.  I have been -- I've testified in federal trials every

4    year, usually on average of two to three or four per year, and

5    that's been going on since about 2000, but I'm not positive

6    exactly how many cases I have testified in federal trials.

7    Q.  Do you think it would be a fair estimate to say then in the

8    past 10 years you have testified in 20 to 40 federal trials?

9    A.  No.  I wouldn't say I have testified in 40 trials in the

10   last 10 years, no.

11   Q.  Okay.

12   A.  I testify in state courts, federal courts, court-martial

13   proceedings, family courts, many different types of courts.  So

14   I would have to defer to my office to give you the exact

15   number.

16   Q.  Would you say you testify in federal trials like this one

17   once or twice a year?

18   A.  Sometimes more often than that.

19   Q.  All right.  And you've been testifying in federal trials

20   since when?

21   A.  Probably since the 19 -- since the 1980s, because any case

22   that entails a civilian crime on a military installation will

23   be tried in federal court.

24   Q.  Gotcha.  So when you were with the Army, you also were

25   serving as an expert, but some of those cases, some of those

1    were court-martials and some of them were federal.  Is that

2    fair?

3    A.  That is correct.

4    Q.  And how many times have you been qualified in a federal

5    trial as an expert on the operations of Backpage?

6    A.  I've never been qualified as an expert on the operation of

7    Backpage.

8    Q.  How many times have you been qualified as an expert in

9    terminology used in advertising for sex work?

10   A.  I have testified on numerous occasions on terminology used

11   in sexual exploitation.  I don't refer to it as sex work.  I

12   refer to it as sexual exploitation.

13   Q.  All right.  Well, let's break that down.

14        So early in your testimony here you did make a

15   distinction between being trafficked, right, and being a free

16   agent, choosing to go out and do sex work by your own -- this

17   is what you decide you want to do for your job as an adult,

18   correct?

19   A.  What I testified to was the difference between sex

20   trafficking and prostitution.

21   Q.  And prostitution can involve adults who choose to make

22   money in that way, correct, having sex with others, correct?

23   A.  As long as the money remains with the person who is having

24   the sex.

25   Q.  Right.

1  A.  Yes, that's correct.

2  Q.  Right.  So -- right.  So as long as we're not talking about

3  anyone else managing it, that's why I said a free agent, that

4  also is considered sex work, correct?

5  A.  I don't use the term sex work.  I use the term

6  prostitution.

7  Q.  All right.  What's the difference to you between sex work

8  and prostitution?

9  A.  It's my choice.

10  Q.  Well, what's the -- what's that choice driven by for you?

11  A.  Because in the United States the term prostitution is more

12  commonly used when we speak of the exchange of sex between two

13  consenting adults.

14          Sex work is a term that I'm more familiar with in

15  European countries, as you see in the Netherlands and in

16  Amsterdam, where you have women or men who are in visible

17  single rooms and individuals will come in and have sometimes

18  visual sex so that others can watch.  That's what's referred to

19  as sex work, so this is why --

20  Q.  In your mind, right?

21  A.  I did say it was my choice, yes.

22  Q.  Okay.  So is it fair to say that there are people who

23  engage in erotic conduct that does not -- here in the United

24  States who are adults -- that does not entail having actual

25  penis to vagina sex, correct?

1    A.  Yes.  Yes.

2    Q.  That does not entail having the touching of anybody's

3    genitals by anybody else's anything, correct?

4    A.  I would have to say that there, in fact, is a form of

5    sexual exploitation where there is no contact.

6    Q.  Okay.  I'm not talking about exploitation.  I'm talking

7    about adults who choose to do this without anyone controlling

8    them.

9    A.  Oh, if you're talking about adults who choose to do -- I

10   heard you say erotic.

11   Q.  Right.  That can involve striptease, correct?

12   A.  Yes, it can.

13   Q.  It can involve talking dirty to someone, correct?

14   A.  Yes.

15   Q.  I'm thinking of the -- the sex lines in the '80s and '90s?

16   A.  Right, cyber sexing.

17   Q.  Uh-huh.  It can involve any element of nudity, as long as

18   somebody is not touching the other's genitals, correct?

19   A.  As long as these are adults.

20   Q.  Right, as long as these are adults?

21   A.  Correct.

22   Q.  It can involve kissing, no matter the state of undress,

23   mouth-to-mouth kissing, correct?

24   A.  Yes, it can.

25   Q.  It can involve fantasies that do not involve getting

1   undressed, correct?

2   A.  Well, I don't know how one observes a fantasy.  I can just

3   imagine a person speaking of a fantasy.

4   Q.  Or acting one out, right?

5   A.  I've not seen that, but I would imagine that if a person --

6   I'm sorry.  I have just not seen a person acting out a fantasy

7   without communicating what that fantasy is.

8   Q.  Oh, yeah, well, we'd all -- there would have to be an

9   agreement as to what the fantasy is that's going to be acted

10  out, but among consenting adults, that's a possibility,

11  correct?

12          Here's a common example, totally pedestrian example.

13  Dirty librarian, right?  You don't have to take off any clothes

14  to have someone work out that type of fantasy, correct?

15  A.  A dirty librarian?

16  Q.  Naughty librarian.  Maybe not?  Okay.

17          So let's go back to the number of times you've

18  testified in federal trials, testified.  How many times have

19  you been qualified as an expert under Rule 16 regarding

20  terminology used in ads for commercial sex?

21  A.  Not specifically regarding terminology only.

22  Q.  All right.  You mentioned that you teach, or you did teach

23  at the National Advocacy Center?

24  A.  The National Center for Missing and Exploited Children.

25  Q.  Oh, I thought you also said -- did you also not teach at

1    the NAC?

2    A.  I have spoken at -- yes, I have taught at the NAC in South

3    Carolina, yes, I have, but I didn't mention that in my

4    qualifications.

5    Q.  Maybe I saw it in your CV.  So National Advocacy Center is

6    prosecutor training, big facility in Columbia, South Carolina,

7    correct?

8    A.  Yes, it is.

9    Q.  And usually -- please correct me if I'm wrong -- the people

10   instructing at the NAC use PowerPoints or outlines as part of

11   their instruction, correct?

12   A.  As far as I know.  I know about me.  I wasn't there for all

13   of the other instructors, but as far as I did, I did.

14   Q.  You used a PowerPoint when you taught at the NAC?

15   A.  Yes, I did.

16   Q.  And the NAC is run by the United States Department of

17   Justice, correct?

18   A.  Yes, it is.

19   Q.  Did you share with the prosecutors in this case those

20   PowerPoints that you used at the NAC to teach?

21   A.  I haven't shared any PowerPoints with any prosecutors in

22   any case that I've ever testified in.

23   Q.  You have given the list to the prosecutors of the federal

24   trials that you have previously testified in, correct?

25   A.  I believe my office did if it was requested.

1   Q.  So if you testified in trials, much like this trial, is it

2   your recollection that there was a court reporter in the

3   courtroom taking down what you said?

4   A.  Yes, I'm sure there was a court reporter.

5   Q.  And you were sworn?

6   A.  I'm sure that that would be the case.

7           MS. BERTRAND:  Your Honor, I don't know what the Court

8   wants to do in terms of this afternoon's schedule, so I'll

9   pause here and say I'm about to change topics, or I can go

10  forward.

11          THE COURT:  Okay.  We'll take our afternoon recess.

12          So please remember the admonition.  We'll come get you

13  in about 20 minutes.

14          (The jury left the courtroom, 2:58 p.m.)

15          THE COURT:  We are outside the presence of the jury.

16          Ms. Bertrand.

17          MS. BERTRAND:  Your Honor, at this point -- I'm sure

18  some of my colleagues are going to join me in this -- I think

19  we have a Jencks Act issue here that is substantial.

20          We've been talking about Jencks Act violations in this

21  case for months.  I believe we've received from the government

22  in this case maybe one trial transcript of this witness's

23  testimony.  We have received none of her PowerPoint

24  presentations.  We have received no other recorded statements

25  of this witness.  The government can't say they weren't ones

1   she adopted, because they would have occurred in the context of

2   federal jury trials like this.

3           So, at this point, I'm going to move for a mistrial.

4   That is one of the sanctions under Jencks that is appropriate.

5   I welcome my colleagues jump in on this, but I don't see how

6   the government fixes this very serious discovery problem.

7           THE COURT:  You're done?

8           MS. BERTRAND:  Yeah.

9           THE COURT:  Mr. Cambria, anything to add?

10          MR. CAMBRIA:  Nothing to add, Your Honor, but I,

11  obviously, join in that.

12          THE COURT:  Mr. Bienert?

13          MR. BIENERT:  I join.

14          MR. EISENBERG:  And I, as well, Your Honor.

15          MR. FEDER:  Join.

16          MR. LINCENBERG:  Join.

17          THE COURT:  Okay.  From the government, Mr. Jones.

18          MR. JONES:  Judge, Your Honor, the government has

19  given defense a list of trials Dr. Cooper has participated in

20  and any transcripts that were in the custody and control of the

21  government, so we are not in violation of the Jencks Act in any

22  respect.  You know, anything that we have in our custody and

23  control, which is what the rule requires, we have turned over

24  to the defendants in this case, as it pertains to Dr. Cooper

25  and her transcripts.

1          MS. BERTRAND:  Custody and control, as the Ninth

2    Circuit addressed in the Bundy matter, goes well beyond this

3    prosecution team sitting here in Phoenix, Arizona.  This

4    witness has testified repeatedly for the United States

5    Department of Justice in criminal --

6          MR. JONES:  These are public -- oh, sorry.  Sorry,

7    Your Honor.  I apologize.

8          MS. BERTRAND:  That is not the point.

9          Much like the government this morning dodging the lack

10   of notice it gave under -- there is no notice under 16.1 or

11   Rule 16 that this witness would ever testify as to terminology.

12   When invited to amend their notice, they declined.  So we now

13   have a violation of Rule 16.

14         We also have a violation of Jencks, in that, as the

15   Ninth Circuit has been explicitly clear, material under Brady,

16   material under Jencks, goes well beyond what they have in their

17   file cabinets at the U.S. Attorney's Office.  And saying, it's

18   public record, is wholly unacceptable.

19         THE COURT:  Do you acknowledge that they gave you a

20   list of the trials?

21         MS. BERTRAND:  We do have a list of trials.  I do not

22   know if it is a comprehensive list.  We also did not get any of

23   her presentations at the National Advocacy Center for which she

24   has now stated she prepared PowerPoint presentations.  That

25   also would constitute Jencks material.

1          THE COURT:  Okay.  Mr. Jones, before we break, what

2     about the PowerPoint?  What's your position on the PowerPoint?

3          MR. JONES:  Like I said, we've given them everything

4     we have custody and control over.  And as Dr. Cooper stated in

5     her 30 trials that she has testified to, she has never turned

6     over -- has given any PowerPoint presentation that she ever

7     presented to any -- to any, I believe she said to any

8     prosecutor.

9          You know, we have given defense counsel everything

10    that is in the government's control as it pertains to

11    Dr. Cooper, given them the list of the trials, given any

12    transcripts that may be in our possession as well, Your Honor,

13    exclusive control.

14         THE COURT:  So, Ms. Bertrand, with respect to the

15    PowerPoint, if that is in the witness's control, do they have

16    an obligation to get it from her?

17         MS. BERTRAND:  Yes.  She's a paid witness for them.

18    She's working for them.  She's not a percipient witness who

19    just got roped into this.  She's working for them.  She's an

20    arm of their investigation.  And she is regularly an arm of

21    their investigation.  She trains them.  She trains law

22    enforcement and she testifies for the prosecution, for the

23    United States government, U.S. Department of Justice,

24    repeatedly.

25         They cannot say that it wasn't in their -- and the

1    exclusive control would have been something that, at least, the

2    government should have put the defense on notice it existed so

3    we could get it by other means.

4              THE COURT:  Okay.

5              MR. JONES:  Your Honor, just to be clear, Dr. Cooper

6    is not being paid by the government.  She's, in fact, an expert

7    and a fact witness, so she is not being paid for her testimony

8    here today.  So we just wanted to make that clear.

9              THE COURT:  All right.  We're at recess.  I'm going to

10   use the break to consider the motion.

11             MS. BERTRAND:  Okay.  Thank you.

12             MR. BIENERT:  You know, I'm chomping at the bit about

13   my exhibits, Your Honor.

14             THE COURT:  Yes, thank you.

15             So can you just read them off for me.

16             MR. BIENERT:  I assume you want me to do it, or madam

17   clerk?  I've got my sheet.

18             THE COURT:  Why don't you do it.

19             MR. BIENERT:  All right.  Thank you, Your Honor.

20             THE COURT:  Since you're moving to have them admitted.

21             MR. BIENERT:  Yes, I am.  And I have reviewed these

22   with Mr. Kozinets who is in the back here.

23             So at this time the government is moving into evidence

24   the following exhibits identified for us, which were then given

25   the exhibit numbers by madam clerk.  And it would be

1  defense's --

2         MR. KOZINETS:  You said the government is moving into

3  evidence.

4         MR. BIENERT:  Oh, sorry, the defense is moving into

5  evidence.  I spent too many years over there, do that

6  sometimes.

7         THE COURT:  Okay.

8         MR. BIENERT:  Exhibit IM 17, which is now

9  Exhibit 6148.

10         Exhibit IM 19, which is now Exhibit 6149.

11         Exhibit IM 20, which is actually now Exhibit 6150.

12         Exhibit IM 22, which is now Exhibit 6151.

13         Defense's IM 23, which is now Exhibit 6152.

14         Defense's IM 24, which is now Exhibit 6153.

15         Exhibit IM 25, which is now Exhibit 6154.

16         Exhibit IM 26, which is now Exhibit 6155.

17         And, finally, what was Exhibit IM 18, is now

18  Exhibit 6166, so I would ask to move into evidence Exhibit 6148

19  through 6166.

20         COURTROOM DEPUTY:  Correction, it would be 6156.

21         MR. BIENERT:  Yes, thank you so much.  I thought the

22  math didn't add up, so thank you.

23         So with that correction, it's actually 6148 through

24  6156.

25         THE COURT:  Mr. Kozinets, is there any objection?

1          MR. KOZINETS:  No objection, Your Honor.

2          THE COURT:  All right.  Those exhibits will be

3     admitted.

4          Okay.  We're at recess.

5          (Recess taken, 3:07 p.m. - 3:47 p.m.)

6          THE COURT:  With respect to the defense motion,

7     pursuant to the Ninth Circuit, prior testimony at a public

8     proceeding is public records not subject to the Jencks Act, so

9     that's not a Jencks Act violation.

10         With respect to the PowerPoint, I don't know what she,

11    this expert taught about, so I wouldn't be able to evaluate

12    whether her PowerPoint relates to any subject matter of her

13    testimony here.  And, secondly, I am not even sure that it

14    would be subject to disclosure if it did relate, so the motion

15    is denied.

16         One thing I did want to ask is, Mr. Cambria, you

17    started to make a motion at the bench conference but we were

18    talking about something else so I said you could make it later.

19         MR. CAMBRIA:  Yes, Your Honor.

20         THE COURT:  Do you want to make that now?

21         MR. CAMBRIA:  I can make it now or after the witness

22    has testified.

23         THE COURT:  Why don't you do it now.

24         MR. CAMBRIA:  All right.  Your Honor, you know, we

25    have made a number of complaints about the fact that this

1    witness was, obviously, prepared so -- whatever happened here

2    -- obviously, prepared so that she would inject the word

3    children, minors, and whatever into every sentence she should

4    possibly do it in.  And she did that in a case where there is

5    no charge of trafficking children.  There is no charge of child

6    prostitution.  And, in addition, she was allowed to give an

7    ultimate conclusion that Backpage was promoting.

8         And so, Your Honor, we renew our motion for a

9    mistrial.

10        THE COURT:  Does anybody else want to add anything

11   before I ask the prosecution?

12        Mr. Bienert?

13        MR. BIENERT:  Well, I -- I just second it.  And I saw

14   Your Honor react when he said the word promoting as though --

15   and I may have misread it -- but that you weren't sure of that.

16   I specifically remember it when he said that word as well.  I

17   want to look for it in my notes.  But she definitely used the

18   word promoting prostitution, which, of course, is what the

19   charge is here, so I think that is error.

20        And I agree with the sentiment that -- I think it was

21   Mr. Feder said at side bar -- the problem we're having here is,

22   obviously, we believe that just what was said in opening is

23   sufficient, but we understand your ruling, but these things are

24   snowballing.

25        Every single time the government continues to beat the

UNITED STATES DISTRICT COURT

1    drum of child trafficking, the prejudicial effect and the

2    difficulty that -- that jurors would have to objectively

3    evaluate the evidence gets tougher and tougher.

4           And what I am just, frankly, amazed at, and just think

5    this case has gotten dramatically off the rails, is here we are

6    and we still have heard no connection of anything to any

7    defendant or any ad in the indictment that is somehow tying the

8    knowledge of any defendant to the ad, the knowledge of any

9    defendant to any child who was peddled in an ad before the ad

10   was done, or even connecting any of the victims that -- we've

11   only had the one and her mom -- but now we've got people just

12   broadly saying -- the guy earlier today gave an improper

13   opinion -- Mr. Fichtner, Agent Fichtner -- that Backpage is

14   misleading, because almost all of this, or most of this is

15   prostitution, and they're misleading law enforcement when they

16   report a few things.  That was just a pure out opinion of

17   something that has never been proven, both on the prostitution

18   or trafficking front.

19          So we're in this mode where we've got all these

20   broad-based statements about prostitution and trafficking.  The

21   trafficking is, of course, inflammatory as all get-out.  And

22   none of it is ever being tied in to anything that shows

23   percipient knowledge of a defendant at the time that matters,

24   namely, when they're posting an ad and it's going to go public.

25          And I just don't understand how this jury is ever

1    going to evaluate whether these guys had specific intent on any

2    of the counts or things charged in the indictment, when they're

3    day, after day, after day just hearing Backpage had

4    prostitution, Backpage had child trafficking, from people who

5    don't identify the particulars and/or tie it to any defendant.

6           THE COURT:  Well, it's way too early to make that

7    argument, because I can envision from the evidence that I've

8    already seen where they're going to get to that.  It's way too

9    early.  We're barely, I don't know, ten percent in, so --

10          MR. BIENERT:  May I just --

11          THE COURT:  -- my -- the only real -- real argument

12   that I am considering is the argument about the prejudicial

13   value of the testimony that's been given so far, so you've

14   joined that.

15          MR. BIENERT:  And the only thing I would just add, I

16   just want to say on the record -- and, look, Your Honor runs

17   your court as you see fit -- but I think that's part of the

18   problem, that it is way too early.  In other words, in my

19   experience, and I do think that what the case law would back

20   up, while it is discretionary, this is, you know, ruling your

21   court, normally the courts require that they start proving that

22   defendants had particular knowledge of things that tie into the

23   actual counts before they start making the broad-based, this is

24   all prostitution, this is all children being trafficked.

25          And the problem is each time these jurors hear,

1     Backpage is the place where all children are trafficked,

2     Backpage is the place where it's just nothing but prostitution,

3     that's being cemented in their brains.  And we're on probably

4     four or five days of that, and yet they still haven't shown

5     them anything.  And that, in and of itself, is prejudicial.

6          The proof of the tie in to the defendants should be at

7     the beginning of the case, and then Your Honor can decide how

8     far they're able to go based on actual evidence.  But here it's

9     just a bunch of wave of the hand that it's all bad and none of

10    it is tying it to us, so I think that exacerbates things.

11         MR. LINCENBERG:  I wanted to just make one

12    supplemental point on that, Your Honor.

13         I thought it was a bit outrageous what happened in the

14    redirect of Agent Fichtner when he was asked questions and gave

15    testimony that all of these commendation letters are garbage

16    and that Backpage is really using all of that as a gloss over.

17    That was new on redirect.

18         Under the Court's rules, we didn't have an

19    opportunity, because the Court doesn't allow re-cross.  There

20    were strenuous objections by the defense that it was beyond the

21    scope and offering new opinions, and now on redirect we have

22    this broad-based wild opinion with no foundation and we didn't

23    even get to cross him on it.

24         THE COURT:  Anybody else?

25         MR. FEDER:  I don't know if it connects to this,

1  Judge.  It's Bruce Feder.

2          When we make motions to strike and the Court

3  occasionally grants the motion to strike, I would ask that the

4  Court instruct the jury about what that means and what they're

5  not to -- they're no longer to consider.

6          THE COURT:  I've already instructed them on that and I

7  will instruct them again.

8          Ms. Bertrand.

9          MS. BERTRAND:  Your Honor, the only thing I would add

10  to what Mr. Lincenberg and Mr. Bienert have noted is echoing

11  the Court's comment.  After the government's opening statement

12  and we were discussing a mistrial then, and the Court at that

13  time -- and I'm paraphrasing here -- said, I'd rather do a

14  mistrial now than weeks in.  And so I don't know that the --

15  that it is a wise or proper consideration to say, well, let's

16  see how this all plays out.

17          The government's conduct is the government's conduct.

18  It's not a one-off.  It's repeated.  It's repeated after this

19  Court admonishes the government not to do it and it still does

20  it.  And the impact of saying, let's just see how this plays

21  out, lets see how the rest of the evidence comes in, really

22  works against the whole purpose of denying mistrials early when

23  misconduct occurs.

24          And this -- this theme that the government has

25  embarked on in its opening, in its testimony through Dr. Cooper

1    today, through the testimony of the Svendgards last week, it is

2    clear they are going to run up to the line and step over that

3    line every time they can to get in children, children,

4    children.  This is not simply a, well, it's a subsection and we

5    might, like, you know, get into it and get out of it, this is

6    their focus.  They can't un-focus it now.  And they've been

7    told repeatedly by this Court to knock it off and they just

8    keep doing it.  Thank you.

9            THE COURT:  Mr. Eisenberg.

10           MR. EISENBERG:  Your Honor, I need not repeat

11   everybody else's statements to you.  I just think that what we

12   discussed at the side bar with respect to child endangerment

13   has now come in and this jury has heard it, even though there

14   is no way they could relate child endangerment to any single

15   defendant, much less a policy of Backpage.  Backpage was not in

16   the business of endangering children.

17           What is the relevance of that whole line of

18   questioning of Dr. Cooper?  I don't understand it, Your Honor,

19   and I think it's irretrievably caused a 403 issue with respect

20   to the defendants.  Thank you.

21           THE COURT:  And from the government.  Who wants to

22   respond?

23           MR. JONES:  Reggie Jones, Your Honor.

24           I guess to defendants' point regarding the ultimate

25   issue in the case, Dr. Cooper never commented on the six

1   defendants' mental state.  This is a specific-intent crime, and

2   so she -- she's never commented on the ultimate issue in the

3   case.  She gave her opinion, based on her expertise and her

4   qualifications, education, and experience, as it pertains to

5   prostitution and her belief that prostitution was facilitated

6   via Backpage, but that's not -- doesn't go to the ultimate

7   issue of these six defendants' mental state.

8          As it pertains to the sex trafficking, Your Honor,

9   this is an issue we addressed this morning, we've addressed it

10  in detail before trial started, and now during trial on several

11  occasions.  And as the Court has issued in 1156, you know, sex

12  trafficking is a subset of prostitution.  And the fact that

13  individuals were trafficked on Backpage is -- is highly

14  probative in this case.  As the Court did say, there are many

15  subparts to this, but that does not outweigh the high probative

16  value of evidence as it pertains to trafficking that took place

17  on Backpage.

18         And we are not -- the government does not believe that

19  it keeps beating a dead horse.  We are simply bringing in

20  relevant evidence, and that evidence pertains to categories the

21  Court in this case has deemed relevant under Dr. Cooper's

22  testimony, how sex trafficking occurred online, as well as the

23  terminology and the vernacular used in sex trafficking and the

24  prostitution industry.  And so we do not believe the 403 with

25  the defendants have been prejudiced in that regard, Your Honor.

1          THE COURT:  All right.  Well, I have concerns that the

2     government has crossed that line several times even after at

3     side bar I warned you not to do it.

4          I do want to take a look at the transcript to make

5     sure that my memory is what I think it is, and I do think there

6     is some validity to the argument of the cumulative effect.  I

7     had some concerns that the testimony elicited from the victim

8     went beyond what it should have, and that, coupled with the

9     testimony of Dr. Cooper, which went well beyond what we had

10     talked about prior to her testifying.

11          So why don't we bring her back.  We will continue with

12     cross until the end of the day.  I will talk to the court

13     reporter, both from this morning and this afternoon, about

14     getting a draft transcript to me, and I'll let you know in the

15     morning.

16          MR. LINCENBERG:  Your Honor, with regard to

17     transcripts, I'd like to make a plea that the Court permit the

18     entire defense team CJA funds for transcripts.  You know, every

19     one of us who are paid counsel are under water in this case, in

20     part, because of COVID and all of the additional time that

21     passed and expenses.  And I know the government's been getting

22     daily transcripts.  These issues are coming up daily.  We

23     haven't ordered transcripts because there are cost issues, and

24     we would make that request.

25          THE COURT:  So I don't want to cross the CJA lines,

1   the rules for that.  As far as getting a transcript from today,

2   if one of the CJA attorneys wants to order it, I'll approve it.

3   I think it has --

4           Does it have to come through me directly?

5           MR. EISENBERG:  I think it does, Your Honor.

6           MS. BERTRAND:  Yes, ma'am.

7           THE COURT:  I'll approve it.  Although, I don't know

8   that that will get done fast enough.

9           MR. LINCENBERG:  We do appreciate that.

10          If the Court can consider the broader topic, I have

11  had this come up before, I had it come up two years ago in a

12  trial before Judge Cooper -- not Judge Cooper -- Judge

13  Phillips --

14          THE COURT:  Well, I'll talk to the Ninth Circuit

15  person I've been working with on budgeting issues and I'll let

16  you know tomorrow.

17          MR. LINCENBERG:  Thank you.

18          MS. BERTRAND:  Your Honor, the CJA component of

19  transcripts does allow for daily or expedited transcripts, we

20  just have to be explicit about that.  I'll coordinate with

21  Mr. Eisenberg.  Particularly as to urgent matters like this, I

22  think we can quickly get something turned in to the Court.

23          THE COURT:  Okay.  All right.  I think someone started

24  to bring the witness in, but then took her out because we were

25  still talking.

1          Can you have her brought in.

2          And, Elaine, you can get the jury.

3          (4:06 p.m., the jury entered the courtroom.)

4          THE COURT:  All right.  Thank you.  Please be seated.

5          And we are back on the record with the jury present.

6          Ms. Bertrand.

7          MS. BERTRAND:  Thank you, Your Honor.

8     BY MS. BERTRAND:

9     Q.  Doctor, can you estimate for us, in the times you have

10    testified in a federal trial, how many times you have been

11    qualified as an expert in sex trafficking?

12    A.  Every time that I've been -- every time that I've testified

13    in a sex trafficking case, I've been qualified as an expert in

14    sex trafficking.

15    Q.  And that's in addition to being qualified as an expert on

16    any medical issues that you might be testifying in?

17    A.  I'm usually qual -- yes, that's correct.

18    Q.  And have you been qualified in any federal case as an

19    expert in online sex trafficking?

20    A.  I have been qualified as an expert in online victimization.

21    It was --

22    Q.  Ma'am, that is a different question than what I asked.

23          Have you been qualified as an expert in online sex

24    trafficking?

25    A.  I have been qualified as an expert in sex trafficking,

1    including online victimization.

2    Q.  So is the answer to my question a yes or a no?

3    A.  It would be yes.

4    Q.  What case was that in which you were qualified?

5    A.  In every case that I have testified in, and I'd have to go

6    back and give you specific names.  I would have to go and give

7    you.  There are several that I've testified in.

8    Q.  Is it fair to say that, sitting here today, you cannot --

9    and understanding your notes are someplace else -- sitting here

10   today, talking with us, you cannot think of a case where you

11   have been found to be an expert in online sex trafficking?

12   A.  I would like to explain.

13   Q.  All right.  Well, I'm going to look at -- check in with the

14   judge about that.  Mr. Jones will have an opportunity to follow

15   up with you as well, and that would be probably a more

16   appropriate time to talk about any elaboration.

17          You spoke before we broke, I believe in your direct

18   examination, about a conversation you may have had with someone

19   named Liz from Backpage, correct?

20   A.  After she identified that she was with Backpage, yes.  I

21   didn't know when I first started speaking with her that she was

22   with Backpage.

23   Q.  And that conversation occurred in 2011 or 2012?

24   A.  I think it was closer to 2014.

25   Q.  Would it surprise you to know that an FBI 302 said 2011,

1  2012?

2  A.  It could be, but I think that it was 2014 --

3  Q.  All right.

4  A.  -- from looking at my calendar.  I'll have to look again.

5  Q.  How long was that conversation, would you estimate?

6  A.  Probably about ten minutes.

7  Q.  Did you know, when you had that conversation, that you were

8  talking to Elizabeth McDougall?

9  A.  I thought I was talking to Liz, Liz Yore.

10  Q.  Okay.  Is that a different person?

11  A.  She is.  She's also an attorney.

12  Q.  So do you know if you spoke to Liz McDougall or Liz Yore?

13  A.  I now know that I spoke to Liz McDougall.  What I mean is

14  that when I first said, hello, how are you doing, I thought I

15  was speaking to Liz Yore, but it turned out that it was a

16  different attorney who referred to herself as Liz and her last

17  name.

18  Q.  McDougall.  All right.  And she asked you to help Backpage,

19  correct?

20  A.  She said -- I'm paraphrasing because I didn't record our

21  conversation or anything of that nature, and this is several

22  years later.  She said, we'd be interested if you would want to

23  provide some training for our staff regarding sexual

24  maturation, is what I recall she said.

25  Q.  Understanding that this now is --

1    A.   Several years ago.

2    Q.   -- somewhere between 7 and 10 years ago, and you don't have

3    any contemporary notes of that conversation.

4    A.   I wasn't -- no, I wasn't taking any notes at that time.

5    Q.   But Backpage reached out to you for help in identifying

6    underaged people in ads.   Is that -- is that a fair summary?

7    A.   I would say that Liz McDougall reached out to me.   It was

8    towards the middle of our conversation that she let me know she

9    was working with Backpage.   I don't know if you could say

10   Backpage reached out to me.   I would say that Liz McDougall

11   reached out to me.

12   Q.   Okay.   What distinction is -- is that, in your mind?

13   A.   I don't know that an employee of a large organization such

14   as Backpage can speak for the entire organization.

15   Q.   Did she indicate in that phone call, though, that she was

16   an attorney with Backpage, or for Backpage?

17   A.   I don't recall.

18   Q.   And you told them no?   You told this Liz no?

19   A.   Yes, I did.

20   Q.   And you told her no, because, as I understand it, so

21   correct me if I'm wrong, it is once -- once people reach

22   puberty and sexual maturation, it's difficult, if impossible,

23   to determine the exact age; is that correct?

24   A.   What I said was that the majority of children are sexually

25   mature before they reach 18 years of age.

1    Q.  And so because they are sexually mature, particularly

2    American children, and by -- well, let's back up.  And I hate

3    to be granular about it, but let's be real clear that we're all

4    using the same terminology.

5    A.  Right.

6    Q.  Okay.  So when I hear you say sexually mature, what I'm

7    hearing is that you're talking about physiologically mature,

8    correct?

9    A.  Correct.  Physically mature, right.

10   Q.  So young women have breasts --

11   A.  Yes, that's correct.

12   Q.  -- that have filled out?

13   A.  Right, that is correct.

14   Q.  Pubic hair, all the indications that you've gone from being

15   a child to early adulthood, correct?

16   A.  To sexual maturation, right.

17   Q.  And it's also fair to say, so we're clear, that simply

18   because your body has gotten rolling, it doesn't mean you're

19   capable of consent, correct?

20   A.  That's correct.

21   Q.  And this -- this type of sexual maturation we're talking

22   about is different from the emotional maturation that can come

23   much later than 18, correct?

24   A.  That's correct.

25   Q.  So when you spoke with Ms. Liz -- we believe McDougall --

1    A.   Yes.

2    Q.   -- what you related to Ms. McDougall is that the job

3    Ms. McDougall was asking you to do was not possible, is that --

4    it would not be practical or it would not be doable?

5    A.   I couldn't say that no one could do that.  I would just say

6    that I was not going to do that.

7    Q.   Because you didn't want to or because you didn't think it

8    was a doable thing?

9    A.   No, it wasn't because I didn't think it was a doable thing.

10   I chose not to do that because I had more work than I could do.

11   Q.   Did you suggest anyone to Ms. Liz of Backpage who could

12   help them?

13   A.   I did not.  She didn't ask me if I knew of anyone else who

14   would be willing to provide training, et cetera, for the staff.

15   Q.   And the idea was, when you talk about training for the

16   staff, did she say, or did you have an understanding of whom,

17   at a big organization like Backpage, she meant by the staff?

18   A.   I considered it to be similar to training at any

19   organization that is monitoring online content.  For example,

20   the National Center for Missing and Exploited Children, I

21   provided training for their staff and other hotlines around the

22   world, and they have different size staff, for the purpose of

23   trying to determine if images are consistent with those

24   children who are minors.

25   Q.   So it would have been, in your understanding, helping the

1   people trying to watch -- the people at Backpage trying to

2   watch out for children ending up on the site, correct?

3   A.  That is correct.

4   Q.  You're on the board of the National Center for Missing and

5   Exploited Children, correct?

6   A.  I have been for several years, but I just recently stepped

7   down from the board.

8   Q.  Okay.  And were you a member of the -- this is the board of

9   directors, right?

10  A.  That's correct.

11  Q.  Sometimes organizations have, like, fundraising boards, but

12  this is the board board, right?

13  A.  That is correct.

14  Q.  What years were you on the board of the National Center for

15  Missing and Exploited Children?

16  A.  I believe I was elected to the board in 2005, and -- yeah,

17  in 2005, to my recollection.

18  Q.  And you stepped down this year?

19  A.  2021, yes.

20  Q.  So you were on the board for 16 years?

21  A.  Yes, that's correct.

22  Q.  Were you aware, in your time at the board for NCMEC, as we

23  call it, about Backpage having a reporting system to NCMEC?

24  A.  I was aware of almost all social networking sites having a

25  mandated reporting to the National Center for Missing and

1   Exploited Children of potential illegal content.

2   Q.  Were you aware of Backpage's reporting system?

3   A.  Not specifically, aside from Facebook and other sites.

4   Q.  So is it your testimony today that you do not have

5   familiarity with how Backpage reported potential underage

6   people to NCMEC?

7   A.  I am aware of the requirement.  And I am aware that often

8   the reports -- it's not -- are, actually, the download content

9   that they feel is illegal.  And this content is then analyzed

10  digitally by the National Center to discern whether or not

11  they're consistent with children and are these children known

12  victims --

13  Q.  Right.

14  A.  -- already in the database.

15  Q.  So, basically, in general terms, this is what social

16  networking sites, whether Facebook, Instagram --

17  A.  Correct.

18  Q.  -- TikTok, have some system in place where if people, kind

19  of the backrooms of these social media platforms, observe

20  someone who looks like they may be under age, they can refer

21  that image, that post, to NCMEC, correct?

22  A.  Yes, they can.  That's one of the ways in which they can

23  refer images, right.

24  Q.  Right.  And then NCMEC can take the images and kind of

25  cross reference the missing and exploited children database.

1   Is that fair?

2   A.  Correct.

3   Q.  Are you familiar with the volume of reports that Backpage

4   sent to NCMEC, let's say, like, per year?

5   A.  I'm not specifically familiar with Backpage, but I do know

6   that the National Center receives millions of reports,

7   sometimes per week.

8   Q.  Right.  Did NCMEC, in your time on the board, publish any

9   studies or reports regarding the number of referrals -- I'll

10  call them referrals, if you have a better name, I welcome a

11  correction -- of these images on social media platforms sent to

12  NCMEC?

13  A.  NCMEC does -- does document the number of reports that --

14  that they receive from all of the different social networking

15  sites.  They are not necessarily available to the public, but

16  they do keep that data, yes.

17  Q.  And they break that down by the platform that sends it?

18  A.  That's correct.

19  Q.  So somewhere at NCMEC, or somewhere where NCMEC's servers

20  are is a statistical database, or some sort of storage of how

21  many referrals Facebook sends, correct?

22  A.  Yes, that's correct.

23  Q.  And how many TikTok sends?

24  A.  That's correct.

25  Q.  And how many Instagram sends?

1    A.   That's correct.

2    Q.   And when Backpage was in business, NCMEC maintained

3    statistics on how many referrals Backpage sent, correct?

4    A.   I would assume that.  I can't tell you that for sure, but I

5    would assume that.

6    Q.   Do you know when NCMEC began keeping those statistics?

7    A.   I do not know exactly the year that that began, but I do

8    know that it coincided with the ability to not have to look at

9    each image with the naked eye, but to look at hashtag values on

10   the images in order to have a better idea about whether or not

11   they were consistent with underage minors.

12   Q.   Do you know whether or not Backpage was, when it was in

13   business, responsible for the most referrals to NCMEC?

14   A.   I don't know the answer to that.

15   Q.   Do you know who was responsible at Backpage for making the

16   referrals to NCMEC?

17   A.   No, I don't know the name of the person, nor the department

18   of Backpage that was responsible for that.

19   Q.   You talked in your -- let's change topics here.

20        You talked in your direct examination about some

21   statistical conclusions you drew.  And other than your

22   one-on-one experience working with individual people, have you

23   participated in any statistical studies regarding online sex

24   trafficking?

25   A.   I have participated and was on the international working

1  group of the survivor survey, which was a study done by the

2  National Center for Missing and Exploited Children and the

3  Canadian Center for Child Protection.  I remain on that

4  international working group.

5  Q.  You do not have a background in statistics, correct?

6  A.  No.  My background is in medicine.

7  Q.  And I am in no way saying that you don't have to have a

8  strong proficiency in math to have a medical degree, but

9  statistics is different, would you say?

10 A.  Yes, it is.

11 Q.  Do you have any special training in statistics?

12 A.  No, I do not.

13 Q.  Do you have any special training in evaluating statistical

14 data?

15 A.  No, I do not.

16 Q.  Do you have, sitting here today, statistical data or

17 studies you can cite regarding some of your conclusions about

18 the volume of sex trafficking that you say occurred on

19 Backpage?

20      MR. JONES:  Your Honor, objection to vague.  Could she

21 ask a specific question?

22      THE COURT:  The objection is overruled.

23      MS. BERTRAND:  What?  I don't know what the objection

24 is.

25      MR. JONES:  Vague.

1              THE COURT:  His objection was vague.

2              The objection is overruled.

3              MS. BERTRAND:  Vague.  Okay.

4              Madam, please, go ahead.

5              THE WITNESS:  I'm sorry.  Can you repeat the question?

6    BY MS. BERTRAND:

7    Q.  No.  It's hot in here and we're tired.

8              MS. BERTRAND:  Madam court reporter, could you please

9    repeat the question for us.

10             (Requested portion of the record was read by the

11   reporter.)

12             THE WITNESS:  Today I have spoken of my own experience

13   in the cases that I have worked in where victims have been

14   victims of sex trafficking and the most common platform for

15   which they were exploited.  And the information that I gave to

16   the Court today reflects the fact that Backpage was the most

17   significant platform that we would see for the majority of the

18   patients that I've seen.

19   BY MS. BERTRAND:

20   Q.  That's your anecdotal experience.  Is that a fair

21   statement?  That's your experience in terms of who you spoke

22   to, correct?

23   A.  That's my experience in the histories that I have taken

24   from the victims, that's correct.  I wouldn't call it

25   anecdotal, but it's the history that the victims have shared

1    with me.

2    Q.  All right.  Is it also fair to say that before Backpage was

3    shut down in, I believe 2018, Backpage was the most responsive

4    to law enforcement subpoenas of the social media platforms that

5    we're referring to, in general terms?

6    A.  I don't have information to support that.  That may be

7    true, but I don't have that information to affirm that.

8    Q.  So it's possible?

9    A.  I just don't -- I wouldn't want to speculate on that.

10   Q.  Changing topics.

11          MS. BERTRAND:  And I'm -- Your Honor, I'm sensitive to

12   time, I don't have a clock up here, so I just --

13          THE COURT:  We have about ten more minutes.

14          MS. BERTRAND:  Okay.

15   BY MS. BERTRAND:

16   Q.  Change topics now to some of the terms we talked about in

17   your direct examination.

18          For example, let's -- let's talk about girlfriend

19   experience, GFE.

20   A.  Yes.

21   Q.  What we're calling consenting sex workers, people doing

22   this by choice, not manipulated by anybody --

23   A.  Yes.

24   Q.  -- also use the term GFE; isn't that true?

25   A.  I'm sure that that could be true.

1  Q.  And the same would be true that consenting sex workers also

2  use the term, I believe it was -- these aren't words we use in

3  my home so -- bareback blow job?

4  A.  Right, that would be true.  I would think that would be

5  true.

6  Q.  And with -- same with Greek?

7  A.  Yes, that would be true.

8  Q.  What that implies?

9  A.  Yes.

10  Q.  And what was DATY, D-A-T-Y?  I had a question mark next to

11  that.

12  A.  Dine at the Y.

13  Q.  Oh, got it.  Also something that consenting sex workers

14  would use, correct?

15  A.  Yes, that's correct.

16  Q.  And you made a distinction before our afternoon break, it

17  was an interesting one, about in Europe how there is places, I

18  think you said the Netherlands as an example, where there is

19  red light districts, correct?

20  A.  That's correct.

21  Q.  And people in windows putting on a show, correct?

22  A.  Yes, that's correct.

23  Q.  Or you can go into, like, an arcade, I don't mean like game

24  arcade, but like a -- more of an inside, same idea, correct?

25  A.  Yes.  The red light district has buildings along the

street, and each street -- each building has a glass in the

front like you would for a store.  And women or men will be

standing there inviting potential clients to come in to have

sex.

Q.  And here in the United States we don't have, necessarily,

sanctioned red light districts, correct?

A.  That's correct.

Q.  But we do have areas where, again, consenting adults can

engage in sexually explicit conduct, correct?

A.  Yes, that's correct.

Q.  So that could include topless dancing, correct?

A.  Yes, also known as strip clubs.

Q.  Right, strip clubs.  And there can be a difference between

the topless ones and then the full nude ones, correct?

A.  That's correct.

Q.  And Mr. Bienert mentioned earlier today, you know what, my

son had a bachelor party, and I thought about -- and it's kind

of dated now -- but like the lady jumping out of the cake at

the bachelor party?

A.  Yes.

Q.  Maybe in various states of undress?

A.  Yes, you can see that, and that is also a well reported

form of exploitation.

Q.  Okay.  But it may be -- it may also be people choosing to

do this for a living, correct?

1  A.  Yes, it could be.

2  Q.  It could include bondage and BDSM, correct?

3  A.  Yes.

4  Q.  Those are actually a little different?

5  A.  Yes.

6  Q.  But some of that involves being fully clothed, right?

7  A.  That's correct.

8  Q.  Do you think it's fair to say that the world of what sex

9  work is, as we're using it now, is actually pretty broad?

10  A.  The world of prostitution, which is illegal in the United

11  States in every state except for, I think, three counties in

12  Nevada, can have many different types of sexual proclivities

13  acted out.

14  Q.  And prostitution is one area of that kind of work, right,

15  selling actual --

16  A.  Yes.  Prostitution is illegal --

17  Q.  Illegal, correct.

18  A.  -- in the United States.

19  Q.  Are you familiar with what prostitution is defined as in

20  California?

21  A.  My definition, and the definition from research, helps us

22  to understand that prostitution is the exchange of sex for

23  money, drugs, influence, or some other desired outcome between

24  two consenting adults.

25  Q.  And how do you -- how are we defining sex in that context?

1   A.  Any type of sexual act.  It doesn't have to be penetration,
2   vaginal, anal, oral, or otherwise.
3   Q.  So you define prostitution as any sexual act even if the
4   parties -- the consenting parties involved do not touch each
5   other.  Am I understanding you correctly?
6   A.  It depends upon -- well, if we're talking about adults.
7   Q.  Yes, just talking about adults here.
8   A.  Right.
9   Q.  Are you defining prostitution as broader than the two or
10  more people involved touching each other?
11  A.  No, I'm not.
12  Q.  Okay.  So we can agree that prostitution is, with some
13  different definitions in the different jurisdictions, having
14  actual sexual contact, correct?
15  A.  Correct, that's the difference between prostitution and
16  stripping.
17  Q.  Yes.  Thank you.
18  A.  Stripping is different.
19          MS. BERTRAND:  Your Honor, this might be a good time
20  to pause, or I can change topics.
21          THE COURT:  All right.  We'll break.
22          So we'll recess for the evening.  Please remember the
23  admonition and we'll see you tomorrow morning.
24          (The jury left the courtroom, 4:34 p.m.)
25          THE COURT:  Is there something else?

1          MR. JONES:  Your Honor, I think it's too late now, but

2     Dr. Cooper is a medical physician, and she flew from the east

3     coast and she had patients to see tomorrow.  We were trying to

4     get her off today.  I know the jury has gone back now.  I

5     should have brought this up right before they left, but she'll

6     finish tomorrow morning, so that's fine.

7          THE COURT:  Okay.  You can step off, Doctor.  Thank

8     you.

9          THE WITNESS:  Thank you.

10         MS. BERTRAND:  Your Honor, we might be able to answer

11    the government's conundrum here, if I may just confer with my

12    colleagues for a minute.

13         THE COURT:  Okay.

14         (An off-the-record discussion was held between defense

15    counsel.)

16         MS. BERTRAND:  We are not done.  I tried.

17         THE COURT:  All right.

18         (Proceedings concluded at 4:37 p.m.)

19                    *          *          *

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 24th day of

13   September, 2021.

14

15

16

                    /s/ Christine M. Coaly_____
17                  Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25