Exhibit N

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,      )
                               )
                Plaintiff,     )        CR-18-0422-PHX-SMB
                               )
         vs.                   )        Phoenix, Arizona
                               )        December 4, 2020
Michael Lacey,                 )           10:02 a.m.
James Larkin,                  )
Scott Spear,                   )
John Brunst,                   )
Andrew Padilla,                )
Joye Vaught,                   )
                               )
                Defendants.    )
_____)

BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

TELEPHONIC MOTION HEARING


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    For the Government:

3                    U.S. Attorney's Office
                     By: PETER SHAWN KOZINETS, ESQ.
4                        KEVIN M. RAPP, ESQ.
                         MARGARET WU PERLMETER, ESQ.
5                        ANDREW C. STONE, ESQ.
                     40 North Central Avenue, Suite 1200
6                    Phoenix, AZ  85004

7                    U.S. Attorney's Office
                     By: DANIEL G. BOYLE, ESQ.
8                    312 North Spring Street
                     Los Angeles, CA  90012

9                    U.S. Department of Justice
10                   By: REGINALD E. JONES
                     1400 New York Avenue NW, Suite 600
11                   Washington, DC  20530

12   For the Defendant Lacey:

13                   Lipsitz Green Scime Cambria
                     By: PAUL JOHN CAMBRIA, JR., ESQ.
14                       ERIN E. MCCAMPBELL, ESQ.
                     42 Delaware Avenue, Suite 120
15                   Buffalo, NY  14202

16   For the Defendant Larkin:

17                   Bienert Katzman
                     By: THOMAS HENRY BIENERT, JR., ESQ.
18                   903 Calle Amanecer, Suite 350
                     San Clemente, CA  92673

19

20   For the Defendant Spear:

21                   Feder Law Office
                     By: BRUCE S. FEDER, ESQ.
22                   2930 East Camelback Road, Suite 160
                     Phoenix, AZ  85016

23

24

25

```
 1    For the Defendant Brunst:

 2              Bird Marella Boxer Wolpert Nessim Drooks
              Lincenberg & Rhow
 3            By: GOPI K. PANCHAPAKESAN, ESQ.
                  GARY S. LINCENBERG, ESQ.
 4            1875 Century Park E, Suite 2300
              Los Angeles, CA  90067
 5

 6    For the Defendant Padilla:

 7            DAVID EISENBERG, PLC
              By: DAVID S. EISENBERG, ESQ.
 8            3550 North Central Avenue, Suite 1155
              Phoenix, AZ  85012
 9

10    For the Defendant Vaught:

11            JOY BERTRAND ESQ, LLC
              By: JOY MALBY BERTRAND, ESQ.
12            P.O. Box 2734
              Scottsdale, AZ  85252
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      THE CLERK:  This is case number CR 18-422,

2  United States of America versus Michael Lacey, et al., on for a

3  telephonic motion hearing.  Counsel, please announce for the

4  record starting with the government.

5      MR. KOZINETS:  Good morning.  This is Peter Kozinets

6  for the United States.  With me on the phone is Kevin Rapp,

7  Reginald Jones, Margaret Perlmeter, Andrew Stone, and Daniel

8  Boyle.

9      THE COURT:  Okay.  And for the defense?

10      MR. CAMBRIA:  Good morning, Your Honor.  Paul Cambria

11  and Erin McCampbell on behalf of Michael Lacey.

12      MR. BIENERT:  Good morning, Your Honor.  Thomas

13  Bienert on behalf of defendant James Larkin.

14      MR. FEDER:  Bruce Feder on behalf of Scott Spear.

15      MR. PANCHAPAKESAN:  Good morning, Your Honor.  Gopi

16  Panchapakesan and Gary Lincenberg on behalf of defendant

17  Brunst.

18      MR. LINCENBERG:  Good morning, Your Honor.

19      MR. EISENBERG:  Good morning, Your Honor.  This is

20  David Eisenberg on behalf of Andrew Padilla.

21      MS. BERTRAND:  Good morning, Your Honor.  This is Joy

22  Bertrand appearing for Ms. Vaught.

23      THE COURT:  Okay.  Before we get started, who's going

24  to speak on behalf of the government?

25      MR. KOZINETS:  Your Honor, that's me, Peter Kozinets.

1      THE COURT:  Okay.  And for the defense?

2      MR. BIENERT:  Your Honor, this is Thomas Bienert.  It

3  will primarily be me, although I think other counsel may add

4  something at the end, but primarily me.

5      THE COURT:  Okay.  So I'll address those two counsel,

6  and then we'll go from there.  So it's the defense motion for a

7  stay.

8      Mr. Bienert, when you address the motion, there's two

9  questions I had.  One is in their response the government

10 asserts that when considering the first factor, the Court

11 should consider the factors used to assess whether mandamus

12 relief is appropriate from *Bauman*.  And so my first question is

13 do you agree that that analysis plays a role in this?

14     And then the second question is it does seem that the

15 normal course of things in cases is for this issue to be

16 decided by direct appeal.  So what makes this case different

17 and extraordinary from other cases?

18     MR. BIENERT:  Sure.  And, Your Honor, with the

19 stilting of being on the phone and not being able to see one

20 another, I'll address your questions.  And then I'll at least

21 tell you the topics I plan to hit.  And I will try take a pause

22 after each kind of chunk, so if Your Honor wants to stop me or

23 say something, I'm not cutting you off.

24     THE COURT:  Okay.

25     MR. BIENERT:  In terms of --

1          THE COURT:  I appreciate that.

2          MR. BIENERT:  In terms of the mandamus -- Is that

3   acceptable, I assume?

4          In terms of the mandamus standards, when you say do

5   they play a factor, I think they play a factor in your

6   determination of whether we meet the stay standards, which have

7   to do with whether or not we've established that we have a

8   likelihood of success on appeal or at least have met the

9   standard of a serious issue.

10          So I think it gets muddled, and you consider all of

11   those factors, and it becomes fact or circumstance dependent.

12          In terms of direct appeal, I agree with you that the

13   norm in most cases is things wait until direct appeal.  And I

14   also agree that there are cases that one can find that go on

15   either side of these recusal issues.  But, again, I would

16   submit it becomes a fact specific determination and whether or

17   not the party or the movant has met the standards.

18          In this case I think common sense and practicality

19   warrant that the issue should be decided now, but of course the

20   Ninth Circuit will decide whether they're going to do that or

21   not.  But the simple reality is because it is our view that

22   there are other judges -- not Your Honor -- who should preside

23   over this, then of course the damage is already done if Your

24   Honor rules on everything and if we have a trial in front of

25   Your Honor.

1          And because the case law on recusal, especially under

2    the sort of appearance of impartiality prong, whether a

3    reasonable man on the street might question impartiality,

4    independent of whether there truly is partiality, under that

5    prong and because sort of the system and the society is an

6    interested party in making sure that all things look

7    appropriate, this is a situation where it makes sense for it to

8    be decided before the rest of the motions are decided and of

9    course the time and effort of the trial.  And as Your Honor

10   notes, this is a very extensive trial, at least --

11          UNIDENTIFIED MALE SPEAKER:  Hello?  Hello?

12          MR. BIENERT:  Is Your Honor still hearing me?  This is

13   Bienert.

14          THE COURT:  I am.  Mr. Kozinets --

15          MR. BIENERT:  Okay.  So, anyway --

16          THE COURT:  -- are you still there?

17          MR. KOZINETS:  Yes, I'm on the phone, Your Honor.

18          THE COURT:  Okay.  All right.  Go ahead, Mr. Bienert.

19          MR. BIENERT:  Sure.  So the four areas I'm going to

20   try to address in order are sort of our concern, the standards

21   for the stay, why we believe we meet the standards for the

22   stay, and then a couple of particular issues that I think loom

23   large from Your Honor's standpoint and the government's -- and

24   mainly that's the timing of our filing -- and then just a

25   couple of the cases, the *Perry* case, the *Melendres* case, and

1    how they tie into, we believe, to the issue of whether we have

2    a serious issue that we've raised.

3              So obviously Your Honor does a good job of narrating

4    and putting in your order the issues that we uncovered

5    recently.  So I'll just hit what I think are the high points.

6    But the high points are the letter from Mark, namely, Attorney

7    Brnovich, from June of 2018 that we trial counsel and I will

8    just talk on my own behalf learned about on or about September

9    10th of this year, a couple months ago.  And that of course is

10   something that not only targets human trafficking but

11   specifically attributes that Backpage, according to this letter

12   or booklet, is where a large percentage of people and children

13   are trafficked.

14             Secondly, there are videos that are out by Attorney

15   General Brnovich when running for office and once in office

16   that touch upon the issue that we're presented with.

17             And more specifically we saw the videos -- I'm

18   sorry -- we saw the booklet.  We then learned of the many other

19   specific statements made about Backpage and its purported

20   involvement in human trafficking, which of course is really

21   what the case is about at trial.

22             And then there are two videos that really jumped out

23   at me that I saw since September 10th.  One was AG Brnovich's

24   video entitled "Trust in the AG's Office" in which he talks

25   about --

1          (Sound of phone disconnecting.)

2               THE COURT:  Mr. Bienert?  Mr. Bienert?

3               THE CLERK:  It sounds like he just disconnected, Your

4     Honor.  He's got to call that number back.

5               UNIDENTIFIED MALE SPEAKER:  I can't hear him either.

6               THE COURT:  Okay.  We're going to wait a minute to see

7     if he reconnects.

8               UNIDENTIFIED MALE SPEAKER:  Maybe somebody can send

9     him a quick e-mail just in case he's still talking, not knowing

10    he's not on.

11              THE COURT:  We are.

12              UNIDENTIFIED MALE SPEAKER:  I will.

13              UNIDENTIFIED MALE SPEAKER:  I'll text him.

14          MR. LINCENBERG:  Your Honor, this is Gary Lincenberg.

15    I just conferenced Mr. Bienert back in through my line.

16              Tom, are you on?

17          MR. BIENERT:  Yes, I'm here.

18          MR. LINCENBERG:  All right.  Go ahead.

19              THE COURT:  All right, Mr. Bienert.  So where I lost

20    you is you were talking about two videos that really jumped out

21    at you.  One was "Trust in the AG's Office."  And then we lost

22    you.

23          MR. BIENERT:  Okay.  Thank you, Your Honor.  And the

24    Trust in the AG's Office really is sort of a personal

25    explanation from AG Brnovich about why human trafficking and

1    sex trafficking are a significant issue for him.  It goes on to

2    talk about he believes that it should be aggressively

3    prosecuted.  It's his office's goal to educate kids and other

4    kids about it, including his own.  He notes that he is working

5    with federal officials to get the prosecutions done.  And he

6    goes on to say, quote, we're at the tip of the sword when it

7    comes to these types of cases.

8            The other video is one entitled "Live your Values.  Do

9    the Right Thing" in which Your Honor appears in what I'm

10   understanding is an ad along with AG Brnovich in his running

11   for Attorney General.

12           And basically it's an interview of the two of you

13   talking about your shared values and you talking about the many

14   ways you admire him and rightly so.

15           But I would submit that the video shows that unlike

16   some couples, where they go to great pains to separate

17   themselves in whatever they do professionally, you two as a

18   couple are more aligned than many.  At least I would submit

19   that's what most people would take away from these.

20           So I would highlight those.  But obviously all of the

21   things that we noted I would submit are things that would cause

22   a reasonable person to have cause or concern about whether this

23   Court is the right court for this case because it would have

24   concerns about whether it could be impartial.

25           So then going on to the standards for granting a stay,

1   we need to show a strong showing that we're likely to succeed

2   on the merits, whether it's irreparable injury absent a stay,

3   whether the stay will substantially injure other parties, and

4   where the public interests lies.

5          And if we don't have numbers one and three, according

6   to the *Leiva-Perez* case, 2011, Ninth Circuit, then we can show

7   serious questions raised and that the balance of hardships tip

8   to the movant.

9          I'd submit we meet those standards.

10          I'll set aside the strong showing for last, but in

11   terms of irreparable injury, obviously if there is concern both

12   from the defendants and the public as to whether this Court is

13   the right court to be on the case because of the relationship

14   with your husband, then that concern is not addressed if

15   everyone goes through the hearings and the trial because it

16   will have already happened.

17          Second, in terms of substantially injuring another

18   party, namely the government, I'd submit in this case there is

19   little or no injury to the government because we have a trial

20   that's set several months from now.  It is still far enough

21   away that witnesses and schedules are not locked in stone.

22          We frankly are all in limbo because unfortunately as

23   the COVID-19 information only gets worse and worse, it's quite

24   a dubious question as we sit here now as to whether or not we

25   can have a trial that by my count would probably involve 60

1       people per day in the courtroom in April.

2               But, regardless, I would submit that there's just not

3       a substantial injury to the party.

4               In terms of timing, I think we all realize this case

5       involves facts from long ago in a case that's been pending for

6       a while with a lot of motions and other issues.  But another

7       several months is not going to relatively make much of a

8       difference.

9               And then finally where does the public interest lie?

10      Well, in these cases involving recusal, and especially when it

11      involves Section 5A, namely, the public's perception of whether

12      or not there could be a concern about impartiality, the

13      public's interest's in getting that resolved before the trial.

14              So then, finally, it's just a matter of whether we

15      have a strong showing that likely to succeed on the merits.

16              And, Your Honor, there are, I think, three or four

17      things that we think were erroneous in Your Honor's findings in

18      your order.

19              One is that your spouse's interests are not sufficient

20      interests to warrant recusal because not financial or

21      commercial.

22              Two, whether or not separate and apart from that or in

23      conjunction with that AG Brnovich's public positions against

24      Backpage and his publicly supporting and relying on witnesses

25      the government says it wants to call in the case, whether they

1     warrant recusal.

2              And then the other one is just under Section 455(a),

3     whether facts and circumstances would cause a reasonable person

4     to question impartiality.

5              And for purposes of this motion for stay, Your Honor,

6     I'll focus on that third one.

7              And as Your Honor points out in your opinion, the

8     Court should ask how does this look to the average person on

9     the street?

10             And I would just submit that as a matter of just

11    practical reality, if an average person on the street is aware

12    of the relationship between you and AG Brnovich and his

13    specific positions about Backpage as he relates that it is a

14    site where 20 percent of the ads are underage girls being

15    trafficked and the relationship that at least is publicly seen

16    by you and Your Honor -- I'm sorry -- by Your Honor and the AG,

17    that that would cause someone to have concerns about

18    impartiality.

19             Second, in terms of your order, I think your order we

20    take issue with because it focuses on things that we don't

21    believe we were saying.  And if we said them poorly to begin

22    with, I could be more clear.

23             Your Honor points out things that we did know.  We

24    knew that you were married to the Attorney General.  I guess we

25    knew generally that, probably like most people, he is against

1   human trafficking.

2          But that's not the basis of our motion.  The basis of

3   our motion are the particular things that we learned about

4   recently that are specific and focused on Backpage.

5          And they are the very issues that are in our case.  We

6   don't agree that Backpage was a site that was doing, quote,

7   most, according to the AG's submissions, human trafficking and

8   underage sex.  We believe that's something that's an issue at

9   trial.

10          We don't agree that the government should even be able

11   to call many of these witnesses relied on by the Attorney

12   General's Office as accurate and giving the real facts.  But

13   regardless of whether you rule they can be called, we take

14   issue with those, and the government has to prove those points.

15          So it's these specific things that are the basis of

16   our motion, and we simply did not know them until September.

17          Your Honor makes a finding that it's unbelievable that

18   we did not know these things.  But, again, what Your Honor

19   points out is known is he's the Attorney General, and he

20   doesn't like human trafficking.

21          And the other thing that came out was that there was a

22   letter from 2017 that went to Congress with a whole bunch of

23   signatures on it, and your husband's was one.  As I said in my

24   declaration and as I believe all five other defense counsel

25   said, I was not aware of any of those.  We did not learn of

1    them until September of this year.

2          So then we get to the finding that you made, which

3    implies a couple of things.  One, it implies that you found

4    that our declarations were false.  I would submit there's just

5    no basis in the record to make that finding.  You didn't have

6    an evidentiary hearing.  There's nothing opposing what we said.

7    And the record doesn't say.  It demonstrates the falsity of us

8    telling you under oath that we were not aware that AG Brnovich

9    is taking positions specifically against Backpage.

10          And I'll point out in the facts there are AG Brnovich

11    webinars where the person speaking is not AG Brnovich but under

12    his name is specifically talking about Backpage as where most

13    human trafficking occurs.  And that webinar was in August of

14    this year, two, three months ago.  We just weren't aware of

15    those facts.

16          Second, your opinion suggests that we should have done

17    an investigation of your husband.  Well, I submit that we don't

18    have an obligation to investigate the family of the judge.  And

19    I would tell you I've never investigated the family of the

20    judge.  And I think the extension of such a finding that would

21    sort of put a burden on defendants to do that would, number

22    one, it's not the law, and, number two, I don't think it should

23    be the law.  I don't think defense counsel should have to

24    investigate the family of a judge.

25          Finally, the finding that we somehow knew about this

1    or should have is against the background that is a little

2    unclear to me as to how much Your Honor knew.  But Your Honor

3    does say in your opinion that when you were assigned the case,

4    you looked at the case for possible recusal and found no bases.

5            And you said in your opinion you were aware of your

6    husband's positions.  It's unclear to me what positions they

7    were.  But I would submit to Your Honor you didn't tell any of

8    us that.  We didn't have a hearing about any of this.  And had

9    Your Honor known or recognized back in I think it was 2000 --

10   late 2019 -- no, '18, when you were assigned, you should have

11   told us, and this would have been addressed then.

12           So I would submit under those circumstances, it's not

13   appropriate to say we were dilatory.  I can tell Your Honor, as

14   you may know, you're the third judge on this case.  We didn't

15   do a background investigation with Judge Logan and his family,

16   nor did we with Judge Rayes.  They self-recused without us even

17   knowing why.

18           And I am confident that had they thought maybe they

19   should recuse or at least raise the issue but decided not to,

20   they would let us know.

21           I was in a hearing this past Monday where the sole

22   hearing was because the judge told us on the record things that

23   he thought the parties might want to know to address whether he

24   should stay on the case.  And I've had that happen dozens of

25   times in my 34 years.

1          So I would say that to the degree there's a finding

2     somehow we should have known, I would say that is nullified by

3     the fact that we were never told.

4          So on balance I would submit that we are timely, there

5     is nothing in the record to demonstrate that we knew about this

6     and sat on it, and we simply didn't.  We filed within two weeks

7     of learning about the information.  And as Your Honor notes in

8     your order, the standard is not how long the case has been

9     around.  The standard is when did we file in relation to

10    learning about the issue.

11          Finally, just to touch on a couple of points, cases,

12    the *Perry* case is cited a lot by the government and Your Honor.

13    And I would submit the *Perry* case is the one with Judge

14    Reinhardt where he sat on an appellate bench reviewing a case

15    where at the appellate level counsel said he shouldn't have sat

16    because his wife had been the head of a southern California

17    ACLU, and the ACLU had taken positions on same-sex marriage,

18    which was one of the topics in that case.

19          I would submit that case does not render a decision in

20    this case.  It's just a different situation.

21          First of all, in reading the facts, it doesn't appear

22    there were any comments made specifically about the case he was

23    on.  It was more about and indeed the comments made were about

24    the ACLU, not his wife.

25          Number two, unlike Your Honor, one thing we share,

1    Your Honor, we have unusual last names.  I would think that if

2    someone in the Phoenix community heard your name and they were

3    aware that the Attorney General's name was Brnovich, they would

4    associate you two.

5         Judge Reinhardt's spouse's name is Ripston, wasn't

6    even the same as his.  No one without inside baseball knowledge

7    would even associate them.

8         Number three, appellate review is very different than

9    trial review.  Appellate review is more of an intellectual

10   exercise, looking at the four corners of a record.

11        There are no, of course, his dealing with fact

12   witnesses, with jurors, and doing all of this in front of

13   everyone.

14        And there are some real practical issues in our case.

15   How do we conduct voir dire when one of the issues that we have

16   to contend with is the degree to which potential jurors may be

17   familiar with your husband's publications -- after all, his

18   goal was to educate the public -- and realizing he's got the

19   same last name as you?

20        I haven't even figured out how to do that, Your Honor,

21   but it's a huge practical issue.

22        How do we deal with certain things that come up

23   depending on which witnesses you allow to testify.  If some of

24   these witnesses we believe have an angle that ties into a lot

25   of law enforcement, again, I haven't thought these things

1   through, but they are practical problems that don't exist at

2   the appellate level.

3            And, finally, in the Reinhardt situation, Judge

4   Reinhardt specifically found that there were not specific

5   comments by the ACLU about the case he was on.  It was just

6   about the topic of same-sex marriage.

7            Your opinion says pretty well the same thing.  The

8   topic of someone having an Attorney General, the topic of being

9   anti-human trafficking, that doesn't get you there.  And I

10  agree with you.  But that's not what our motion's based on.

11           It's based on the specific comments about Backpage,

12  specific comments that are at the heart of what this case is

13  about, which is going after the hierarchy of Backpage for

14  purportedly engaging in sex trafficking.

15           Now, we disagree with all of that, and, as you know,

16  we have a lot of motions pending saying because the cases are

17  of prostitution, the government shouldn't be able to get into

18  sex trafficking or peddling children.  Those are separate

19  statutes that aren't charged.  But all of that is pending in

20  front of you.

21           And if the government has its way, the case it puts on

22  is going to be about the very same thing that your husband's

23  positions have taken about Backpage, and we shouldn't be in a

24  tough position of having to have you decide that, given the

25  players.

1          And then, finally, you indicated that you found the

2     *Melendres I* case instructive.  I agree with you.  I think it is

3     instructive.  But I would submit that given the language of

4     *Melendres*, it's something that objectively should be in the why

5     the recusal should be granted column, because, as you know, the

6     Court said if it's a close call, the balance should tip towards

7     recusal.  And in that case Judge Melendres said it was a close

8     call and recused in an abundance of caution.

9          Where we disagree with your opinion is you say it's

10    not a close call.  But I would just submit that if we really

11    think about the man on the street hearing all of these facts

12    and the degree to which your husband is the tip of the spear

13    against human trafficking, which he says Backpage is the

14    biggest purveyor of in the country, Your Honor's close and

15    supportive, as it should be, and admiring relationship with

16    him, anyone who knows those facts would at least reasonably

17    question the impartiality.

18         And I believe that for those reasons we raise an issue

19    that should be decided by, frankly, a separate court at the

20    district level but where we are now would be the appellate

21    court and would certainly meet the standards that are set forth

22    for seeking a writ on this issue.

23         So with that, Your Honor, I would submit subject to

24    other persons' comments or any questions.

25              THE COURT:  Just on that last statement, you don't

1    believe that that motion should have been decided -- the motion

2    to recuse should have been decided by another judge, right?

3              MR. BIENERT:  Well, Your Honor, when I say I don't

4    believe, I frankly believe it should have been.  But I don't

5    believe that the law required that it had to be.  When I look

6    at the cases, there is no rule -- In some courts, like here in

7    California, it has to go to a different judge.  But I agree

8    with your implicit finding that you did not need to send it to

9    another judge.  That seems to be the law in your district, and

10   that's at the Ninth Circuit.  I had seen cases where it's gone

11   to other judges.  And I think it would have been the smart

12   thing to do.  But I don't believe you were required to do that.

13             THE COURT:  Okay.

14             All right.  Mr. Kozinets.

15             MR. KOZINETS:  Yes, Your Honor.

16             THE COURT:  My only area that I'd like you to, I

17   guess, go more into is this balance of equities, given -- Well,

18   actually before we do that, Mr. Bienert, let me ask you another

19   question, because had this been earlier in the case, had we not

20   been so close to trial and I had some idea of how long the

21   Ninth Circuit could potentially take, I think the balance of

22   equities would weigh more in your favor.

23             But as I understand it, we could be done with this

24   trial before the Ninth Circuit ever takes it up because we're

25   so close.  Do you agree with that?

1    MR. BIENERT:  Does Your Honor want me to comment on

2    that?

3         THE COURT:  Yes.

4    MR. BIENERT:  Well, I think you are potentially right,

5    but I also think you're potentially wrong.  I mean, my

6    experience, which may be not as vast as yours, is when we file

7    things like writs, they sometimes grant them and -- or I should

8    say agree to take them and, recognizing what they're about,

9    agree to take them on a shortened time.  And in my limited

10   experience, I think that's the norm.  But I also agree that if

11   they take the case, they could put it on a longer track.

12        But I will say my experience is that a writ of

13   mandamus track is a different, shorter track than a normal

14   appeal track.  I just can't tell you what that is.

15        THE COURT:  And as of today, because the government

16   mentions that the Ninth Circuit hasn't asked for a response; is

17   that correct?

18        MR. BIENERT:  To my knowledge, correct.  I've seen no

19   orders.

20        THE COURT:  Okay.  Thank you.  Mr. Kozinets.

21        MR. KOZINETS:  Thank you, Your Honor.  Yes.  Going to

22   the issue of irreparable injury and the balance of equities,

23   it's clear here that the defendants have not established a

24   likelihood of irreparable harm, and that's for two essential

25   reasons.

1          First, the law is clear that they can get relief in

2   the direct appeal.  And as we pointed out in our response, the

3   Ninth Circuit has recognized that accepting cases involving

4   truly extraordinary circumstances, the Ninth Circuit has held

5   that a judge's decision not to disqualify themself cannot be

6   appealed until a direct appeal is taken from a final adverse

7   decision.

8          That's discussed in the *Thompson* case, which provides

9   a very instructive discussion of the law in general in this

10  area.  The *Thompson* case also recognizes that a writ of

11  mandamus is not used as a substitute for the regular appeals

12  process.

13         What is interesting about some of the cases that the

14  defense has cited in their petition for mandamus is that those

15  cases get into some of the incredibly unique and extraordinary

16  circumstances that can justify mandamus relief as an

17  alternative to direct appeal.  But those circumstances don't

18  apply here.

19         So I'll just give you a couple of examples.  The *In re*

20  *United States* case that they've cited is a case where the

21  government sought mandamus review of a denial of a motion to

22  recuse, and the Ninth Circuit recognized that the government

23  really has no other avenue of obtaining appellate review.  If

24  there's an acquittal in the case, there is no right of appeal

25  that the government has.  So mandamus was truly the only avenue

1    that they had available.

2          In the *In re Sussex* case that they cite, that is an

3    incredibly interesting and instructive case because it's sort

4    of a reversal of what might be characterized as a grant of

5    mandamus.

6          In that case there was a commercial arbitration, and

7    early on in the arbitration, one of the parties moved to recuse

8    the arbitrator claiming that there was a financial interest

9    that required disqualification.  When the arbitrator declined

10   to recuse, they went to the district court and persuaded the

11   district court to remove the arbitrator mid-arbitration by

12   making some of the same arguments that we've heard from

13   Mr. Bienert today, that there's this need to intervene

14   mid-proceeding to effectuate a recusal if one party believes

15   that recusal is warranted.

16         The Ninth Circuit said, no, that actually was a

17   mistake.  That was wrong to remove the arbitrator

18   mid-arbitration.

19         Why?

20         Because these types of recusal issues are routinely

21   reviewed on direct appeal, and it really upends the

22   administration of justice to intervene before then and do what

23   the district court did in that case.

24         And so here too the defendants have that path of the

25   direct appeal.

1          The second reason why they haven't been able to show

2     irreparable harm is that in their motion papers and here today

3     as well, they talked about, you know, a bit about costs and

4     delays of proceeding if recusal might be determined to be

5     appropriate further down the line.

6          But the *In re Sussex* case and several cases that it in

7     turn cites say that that is never a ground for establishing

8     irreparable harm.  And they recognize that the Ninth Circuit

9     has repeatedly held that financial harm is insufficient to

10    justify that kind of collateral review.

11         The -- Mr. Bienert also made reference to concerns

12    about, you know, the perception of partiality and how that

13    plays into the irreparable harm analysis.  But that really is

14    part of the showing on the merits.  They have to be able to

15    establish on the merits a -- either a strong likelihood of

16    success or at least a reasonable probability of success that

17    recusal is warranted under Section 455(a).  And without going

18    into that point in detail now, it's clear that they don't come

19    anywhere close to meeting the standards, the very heavy burdens

20    that apply in this context to show that the Court erred,

21    plainly erred in its order on these issues.

22         So we would submit that their reference to that issue

23    in the irreparable harm analysis doesn't -- it's not addressed

24    there.  It's addressed on the likelihood of success.

25         With respect to the, really, the overwhelming balance

1     of equities, that also tips against the defendants.  And I just

2     want to mention here, Your Honor, that the test for getting a

3     stay as recognized in the Supreme Court's *Nken* decision and the

4     *Leiva-Perez* decision from the Ninth Circuit makes clear that if

5     the moving party cannot establish a strong likelihood of

6     success and they can only meet the reasonable probability of

7     success standard, which we don't think they can here, but even

8     assuming they could, if they're proceeding under that lesser

9     showing on the merits, they have to demonstrate that

10    irreparable harm and the balance of equities tips sharply in

11    their favor.  And they haven't done that here.

12          We've talked about irreparable harm, but now

13    looking at the equities as they relate to the government, the

14    victims, and the public, those factors all weigh against

15    granting a stay.

16          As Your Honor has noted, we're fairly close to trial.

17    This case has been pending for two and a half years.  The

18    defense has already obtained, I believe, five continuances.

19    This would be a sixth continuance of an indefinite duration

20    that would stop all judicial work on this case for some unknown

21    period of time.  It would create a backlog.

22          We know that there are, I think by our count, nine

23    pending fully briefed motions before the Court.  Those could

24    not be processed and resolved for some indefinite period.  And

25    of course as we get closer to April, the risk of further trial

1    delay becomes more and more, you know, immediate.

2         And then as the Supreme Court has recognized in the

3    *Flanagan* case, this sort of delay is just inherently

4    detrimental to the administration of justice and to the

5    government's ability to prove its case beyond a reasonable

6    doubt, because, as time goes by, witnesses and evidence can be

7    lost, testimony can be subject to impeachment on other issues,

8    and it just becomes more difficult to administer justice.

9         And I think even Mr. Bienert acknowledged this is a

10   complex case.  It involves events occurring over the course of

11   the last decade.  There are many witnesses, many proposed trial

12   exhibits.  And given that such a long period of time is

13   involved in this case, the risk of -- to the government and the

14   prejudice to the government of this sort of unknown delay cuts

15   against granting the stay now.

16        The victims also have a strong right to proceedings

17   free from unreasonable delay set forth in the Crime Victims'

18   Rights Act.  And when the defense asked for their prior

19   continuance, we consulted the victims and reported back to the

20   Court that they had made clear that they are eager for their

21   day in court and that they are very much interested in

22   obtaining the certainty and closure that trial will bring.

23        So they have an undeniable interest that equitably

24   cuts against granting stay at this point.

25        And then with respect to the public interest, there is

1       a strong -- and this is from the *Flanagan* United States Supreme

2       Court case -- a strong moral and collective interest in

3       upholding the law and administering justice and also in the

4       healing and closure that comes from timely pursuing criminal

5       proceedings to their final conclusion.

6               Now, what's particularly interesting about the public

7       interest in this case is that there is also a strong interest

8       in not allowing an untimely and very thinly supported motion

9       for recusal to upend the progress of these proceedings for some

10      undefined period.

11              And this really gets into the timeliness issue that

12      Mr. Bienert touched upon.  With respect to where this sits in

13      the kind of the procedural posture before the Court now, in

14      order to establish any sort of reasonable likelihood of success

15      on that issue, the defense would have to demonstrate that Your

16      Honor clearly erred as a matter of law in making your

17      determination that the motion was untimely.  And they simply do

18      not get anywhere close to meeting that very high standard.

19              The standards for timeliness are very well established

20      in the *Gallo* case, the *Preston* case, the *Rogers* case, and have

21      been even more fully developed in additional case law that

22      makes clear that recusal movants cannot sit on information that

23      could support a motion for recusal and use it only when the

24      court has started issuing adverse rulings against them, which

25      is exactly what happened here.

1              And as Your Honor lays out in your order on the

2      recusal motion, the defendants' motion is based on -- is

3      entirely based on very publicly available exhibits and

4      information that has been well known to the Internet-viewing

5      public, including, I think, Mr. Bienert highlighted a couple of

6      things including a handbook from -- published by the Arizona

7      Attorney General's Office in June, 2018.

8              And just very briefly, Your Honor, that public safety

9      handbook is 47 pages long.  One page in the middle, Page 22,

10     contains some discussion of Backpage, Facebook, chat rooms, and

11     other places where traffickers might recruit victims.  There's

12     some additional discussion of Backpage there.  But there is

13     nothing that talks about this federal case, that talks about

14     any of the defendants who are before the Court in this federal

15     case, or that talks about any of the charges that are pending

16     in this federal criminal prosecution.

17             And really the same goes for the videos that I believe

18     Mr. Bienert talked about.  The campaign video says nothing

19     about this case.  The other touches upon trafficking issues but

20     again doesn't identify any of the defendants before the Court,

21     any of the charges before the Court, or even this case, really,

22     at all.

23             And with respect to the -- Just one other factor with

24     respect to timeliness is another major piece of evidence that

25     the defense relies upon is this August 2017 letter from the

1  National Association of Attorneys General to Congress, which is

2  essentially a petition for change in federal legislation.

3         That letter was part of a series of letters that that

4  coalition of virtually all State Attorney Generals had

5  circulated, had sent, over the course of the last decade.  And

6  even defendants' counsel in their joint declaration

7  acknowledged that they were aware of these letters when this

8  case started but simply didn't focus on it.

9         And as we've discussed in our response, there's a

10 large body of case law that talks about how, when there is such

11 widely available public information and just even the barest

12 exercise of diligence would uncover any further facts that

13 might support some sort of recusal argument, the movant does

14 have an obligation to bring that information to the court's

15 attention in a timely fashion and cannot wait until adverse

16 rulings have been issued against them.

17        And the *Ernest & Julio Gallo* case from 1992 -- this is

18 Page 1295 -- makes clear that irrespective of any obligation of

19 the court to discuss these issues, that obligation to bring

20 these matters up exists with respect to the movants.  And the

21 Court says at Page 1295, quote, it does not necessarily follow

22 that a party having information that raises a possible ground

23 for disqualification can wait until after an unfavorable

24 judgment before bringing the information to the court's

25 attention.

1           And the court goes on to say that to hold otherwise

2    would encourage parties to withhold recusal motions pending a

3    resolution of their dispute on the merits and then if necessary

4    invoke Section 455 in order to get a second bite at the apple.

5           So in this context the public has an interest in

6    ensuring that litigants do not engage in these sorts of

7    untimely tactics in order to upend the administration of

8    justice against them.

9           Mr. -- Well, does Your Honor have any other questions

10   about the balance of equities?

11           THE COURT:  No.  Thank you.  All right.

12           Mr. Bienert, anything final?

13           MR. BIENERT:  I would just add -- I mean, when I

14   listen to what government counsel says all of these things

15   about his -- basically his views on what would be important,

16   what wouldn't, what would people know, not know, on the merits

17   of substance, I guess I should say, of AG Brnovich's positions,

18   the simple reality is we don't know the answers to them except

19   as a matter of kind of common sense and just practical reality

20   it's an eyebrow raiser.  I mean, if the day we walked into your

21   court any of us defense counsel -- and I'll certainly say on my

22   behalf -- I would have realized that your husband was making

23   these specific tip of the spear points about Backpage when this

24   case is about the hierarchy of Backpage and whether they were

25   or weren't involved in human trafficking -- we don't believe

1      that's what the case is about, but that's what the government

2      is telling you they're going to put on and you must decide -- I

3      would have been, like, holy moly, are you kidding me?  What are

4      the odds of that?  And it would have been addressed.

5              But even if somehow there is some issue where, gee,

6      maybe we can ferret this out, we need to question voir dire

7      members about this.  How do I do voir dire in front of Your

8      Honor when I'm trying to figure out if any of our potential

9      jurors have followed your husband's public disseminations and

10     are aware of your relationship?

11             And I'll turn this around.  Your commercial with your

12     husband was admirable.  I wish all couples were that close.

13     But I'll tell you what.  If I were in trial and somehow the

14     world turned in a way that the judge that we picked on a

15     commercial was saying what a laudable, admirable, respectable

16     guy I was and I wound up in trial with that judge, my adversary

17     wouldn't like it.  And any juror who realized that the judge in

18     my case had that high of an opinion of me, I would have an

19     extra boost with that juror, not whether it's deserved.  That's

20     just the reality.

21             THE COURT:  Okay, but my husband's not -- Mr. Bienert,

22     my husband's --

23             MR. BIENERT:  Yes, ma'am.

24             THE COURT:  My husband's not involved in this case.

25             MR. BIENERT:  But he's taken positions that are at the

UNITED STATES DISTRICT COURT

1    heart of the case.

2            THE COURT:  Well, the thought that somehow comments

3    made about -- Okay.  Well, I'll reserve my comments until

4    you're done.

5            MR. BIENERT:  And I guess I'll just leave it as I

6    understand Your Honor, and you made that clear in your opinion.

7    It's just an area that we just disagree.

8            We think an objective person is likely to view that

9    with more suspicion, not that you are in fact biased but that

10   the appearance is one that makes people go, wow, we don't know.

11           So, anyway, I would submit on that, Your Honor.

12           THE COURT:  Okay.  There's a couple things I just want

13   to clarify for the record.

14           In your -- Well, before I do that, Mr. Cambria, is

15   there anything you wanted to add?

16           MR. CAMBRIA:  No, Your Honor.  I feel that Mr. Bienert

17   has well covered it.  I was also interested in the practical

18   problem of voir dire.  I think we specifically have to raise

19   Attorney General Brnovich's name and focus in on the articles,

20   because it may very well be by the time we try this case that

21   people, you know, will have their memory triggered.  And I

22   wouldn't want it triggered when we're halfway through the

23   trial, and then one turns to the other and says:  Well, the

24   judge obviously isn't in favor of these guys.  I mean, look

25   what her husband said.

1          That is a real consideration here.

2          THE COURT:  Okay.  Mr. Feder.

3          MR. FEDER:  Judge, just one question.  I'm a little

4    concerned about the Court's statement in its order that

5    essentially defense counsel are unbelievable.  I mean, that to

6    me, without trying to be oversensitive, denotes that the Court

7    questions the -- not only the credibility but the honesty of

8    defense counsel, which in turn segues into whether or not there

9    is some kind of problem with ineffective assistance of counsel

10   that maybe needs to be addressed by the Court.

11         I don't know if that is based on facts that are in the

12   order or based on other facts, but it's something that counsel

13   ought to know and that our clients ought to know and under the

14   wrong circumstances the Ninth Circuit needs to know.

15         THE COURT:  Okay.  Thank you.

16         Let's see.  Mr. Eisenberg, anything to add?

17         MR. LINCENBERG:  Your Honor, you skipped defendant

18   Brunst.  This is Gary Lincenberg.  I would like to briefly add

19   something when the Court gets a chance.

20         THE COURT:  Okay.  I just had you further down the

21   list.  Sorry.  Go ahead.

22         MR. LINCENBERG:  Thank you, Your Honor.  Your Honor,

23   the one point that I would hope that the Court would consider

24   further on this issue is really focusing on this Court's

25   failure to disclose if this Court had any knowledge that your

1     husband had taken positions on Backpage.  And the Court never

2     really addressed whether the Court had that knowledge, whether

3     the Court considered it, whether the Court should have

4     disclosed it at a minimum.

5              And I think that it relates to the question of

6     positions in hindsight, particularly because there is no

7     allegation of personal bias.  It's dealing with the appearance

8     and the Court's opinion in which the Court criticized us for

9     not raising this earlier.

10             And I think that's a pretty critical point, and I

11    think the Court should take it into consideration with respect

12    to this motion.

13             THE COURT:  All right.  Mr. Eisenberg.

14             Are you there?  Mr. Eisenberg?  Who did we lose?

15    Mr. Bienert, are you still there?

16             MR. BIENERT:  Yes, Your Honor, I'm still here.

17             THE COURT:  Okay.  I think we lost Mr. Eisenberg.

18             Let's see if we can get him back on the line.

19             MR. EISENBERG:  Can you hear me now?

20             THE COURT:  Yes.

21             MR. EISENBERG:  Okay.  I'm sorry.  I was on mute.

22             THE COURT:  Okay.

23             MR. EISENBERG:  I would echo the comments that have

24    been made by all the defense counsel, including Mr. Bienert,

25    Mr. Feder, Mr. Cambria, and Mr. Lincenberg.  And particularly

1    I'm concerned about the sense that counsel has -- defense

2    counsel have put something over on the Court by not timely

3    revealing comments made or publications made by the Attorney

4    General.

5            I particularly want to echo on my behalf -- and I

6    think it's true of all of us -- none of us knew about what we

7    came up with in September of this year.  And I want to make

8    that abundantly clear to the Court, to the government.

9            So thank you, Your Honor.  That's my comment.

10           THE COURT:  Okay.  Ms. Bertrand.

11           MS. BERTRAND:  Thank you, Your Honor.  I echo my

12   colleague's comments and, as several of my colleagues, also

13   want to make a clear record that we filed our motions shortly

14   after learning about the more recent statements, and I filed

15   that motion in good faith.

16           The other thing I would note is that the government

17   has noted the continuances in this matter.  And the

18   continuances have happened, although I think it's somewhat

19   unfair to say that there's -- it's implied that it's as a

20   result of any gaming on the part of the defense.

21           One of the continuances was based on new counsel being

22   brought in very shortly before trial.  And we've had two

23   largely in part because of COVID and the practical safety

24   issues with such a large trial being held in the midst of a

25   health crisis.  So those would be the only other details I

1    would add unless the Court has any questions for me.

2            THE COURT:  All right.  As I started to say before I

3    circled back to other defense counsel, is there are a couple of

4    things I wanted to clarify on the record.

5            One is in my original order I didn't intend to imply

6    that any counsel was being -- was being untruthful in the

7    affidavit.  What I was intending to say is that it was -- that

8    I guess that there was no due diligence on the part of the

9    parties, especially in light of the fact that they had -- and

10   it's clearly been a part of the discovery in this case -- this

11   information about State Attorney Generals being involved with

12   letters to Congress.

13           So to the extent that the parties took it as the Court

14   thinking they were being untruthful, I apologize.  I did not

15   mean it to come across like that.

16           Next is if there's -- well, the parties seem to imply

17   that I withheld information from them regarding my husband's

18   activities, and that is just simply not true.  At the beginning

19   of this case when it was assigned to me, I made sure to check

20   if the AG had any involvement in this investigation, which he

21   did not, or if he had made any statements about this case,

22   which he has not.

23           The other issues raised by the defense are sort of

24   tangential and aren't directly related to this case, which is

25   why I made no disclosures.

1          And I think one of the key things in my reason for

2     denying the recusal is that this case is not about Backpage.

3     Backpage was prosecuted in a separate case, entered a plea in a

4     separate case.

5          This case is about these individual defendants and

6     whether they had specific knowledge of these ads as

7     facilitating illegal activity.  And that is why any reference

8     to the fact that this type of activity occurs on Backpage and

9     other social media doesn't have the strength it would had my

10    husband said something particular about these defendants, which

11    he has not.

12         He has also not -- I think the defense motion says

13    that he's made public statements about the people, which he has

14    not.  The entities, yes, he's commented that Backpage -- that

15    human trafficking has occurred on Backpage along with

16    Craigslist, Facebook, other social media.  And you also

17    mentioned issues in this case.  He has not commented on this

18    case or any of the issues in this case.

19         MR. LINCENBERG:  Your Honor, this is Gary Lincenberg.

20    I do not want to interrupt, but I would like to correct one

21    thing that the Court may have mistakenly just stated.

22         THE COURT:  What's that?

23         MR. LINCENBERG:  I believe I heard the Court state

24    that we had this key Attorney General letter in discovery, and

25    that's not correct, I believe, to the best of my knowledge.

1    The government did not produce that Attorney General letter to

2    us in discovery.  We did a search through the discovery.  There

3    may be others on the call who can specifically go into that.

4    But I believe the Court's statement in that regard is

5    incorrect.

6              THE COURT:  Okay.  I think -- I'd have to go back and

7    look, but I think I mentioned letters in general from Attorney

8    Generals to Congress.  I'm not sure that I know one way or the

9    other whether or not this specific letter was disclosed.

10             Mr. Kozinets, do you want to be heard on that?

11             MR. KOZINETS:  Thank you, Your Honor.  It's my

12   understanding that it was part of the discovery in this case.

13   I have reached out to my colleagues to confirm.  But I think,

14   you know, even separate and apart from that, what is abundantly

15   clear is that defense counsel admitted in their joint

16   declaration attached to their reply that they were aware of

17   this series of letters and -- after the start of this case, but

18   they just simply didn't focus on this particular letter.

19             So whether or not -- So even at the start of this

20   case, before any discovery had actually occurred, they already

21   knew about these letters.  I think that's clear beyond a doubt.

22             MR. BIENERT:  Your Honor, this is Tom Bienert.  I just

23   want to be clear.  I was not aware of the letters, did not know

24   about them at all, learned about them post-September 10th.

25             THE COURT:  You didn't know about any of the AG

1    investigations and their work with Congress?

2           MR. BIENERT:  When you say any AG investigations, yes,

3    I was aware there was some AG investigations.  I was not aware

4    that there was one by Attorney General Brnovich.  In fact, Your

5    Honor, you know, one thing I would say, as Your Honor knows --

6    and I understand there's a lot of fight over this among the

7    parties -- we just don't believe that what is charged in this

8    case, given that our clients were publishers and not the third

9    parties who posted the ads, et cetera, we don't believe that

10   that was illegal at the time of the matters charged.

11          So the fact that some AGs might make a case against

12   Backpage, all of which were dismissed, by the way, by courts as

13   not legal, but other AGs didn't, to me, could just as credibly

14   show, well, there is an Attorney General who gets, whether they

15   like the activity or not, it's not illegal activity.

16          So I was not aware that your husband, Attorney General

17   Brnovich, had taken any particular positions about Backpage.  I

18   became aware of that from September 10th on of this year.

19          MR. KOZINETS:  Your Honor, this is Peter Kozinets.

20   Again, I think, you know, the joint declaration -- it's doc

21   1071-2 in the record -- indicates some but not all of the

22   signing attorneys to that declaration were aware of this series

23   of letters to Backpage and Congress.  Those of them who were

24   aware simply just didn't focus, they claim, upon the August

25   2017 letter and didn't focus on the fact that the Arizona

1    Attorney General had signed the letter.

2           Also of note with respect to this declaration is it

3    is -- it's signed by 6 of the 17 attorneys of record for the

4    defendants in this case.  So it doesn't even cover everybody.

5    And of course it's not signed by the defendants themselves, who

6    were keenly attuned to criticism from this group of Attorneys

7    General that had been very publicly expressed over the course

8    of the last decade.  And that's established in several

9    paragraphs in the superseding indictment where there are

10   multiple references to letters from this coalition of Attorneys

11   General and to the discussion of these letters and these

12   concerns that occurred internally among defendants.

13          So there was clearly a keen awareness.  In all of the

14   case law that we cited on the timeliness issue, courts have

15   recognized that counsel need to check with their clients.  And

16   if their clients are in possession of information that could

17   support a recusal argument, that needs to be brought to light

18   and needs to be raised sooner rather than later.

19          So in this case we have a very high degree of

20   awareness by the clients themselves, and we also have at least

21   some of the signatories of this declaration recognizing that,

22   you know, they were aware of this series of letters that

23   were --

24          THE COURT:  Okay.

25          MR. KOZINETS:  Okay.

1          THE COURT:  I'm going to stop you because we're

2     getting sidetracked.  Obviously that's an issue they've raised

3     in their mandamus petition to the Ninth Circuit, so I'm not

4     going to relitigate it here.  I just wanted to focus in on

5     that.

6          Okay.  So I have considered the motion and the

7     response obviously prior to coming in here and reviewed the

8     relevant case law.

9          With respect to the four factors which the parties

10    agree on -- and I think the parties also agree that the party

11    seeking the stay bears the burden to show that the

12    circumstances justify the granting of the stay -- as to factor

13    one, given the arguments that I've heard here -- and obviously

14    I ruled on the motion for recusal, which covered all of the

15    issues raised in the mandamus petition -- I do not think that

16    the defense has made a showing that they will likely succeed on

17    the merits.

18         Given that a review of a decision on a motion for

19    recusal is for an abuse of discretion, which is a high

20    standard, as well as the *Bauman* factors for taking a writ of

21    mandamus, which is a high bar as well, because that is, as

22    described by the case law, a drastic and extraordinary remedy

23    reserved for really extraordinary cases, I don't believe that

24    this is an extraordinary case, and that it's likely to be heard

25    on direct appeal if that even happens.  The defendants could be

1    acquitted, and then it's all moot.  So that factor weighs in

2    favor of denying the stay.

3            Specifically, just a brief comment on the *Bauman*

4    factors, the first one is that the party seeking the writ has

5    no other adequate means such as direct appeal to obtain the

6    relief.  Obviously the defendants have the right to direct

7    appeal if they were convicted.

8            The petitioner will be damaged or prejudiced in a way

9    that is not correctable on appeal.  If the courts on appeal

10   decide I was in error, they would remand it for a new trial.

11           Number three, that the district court's order is

12   clearly erroneous.  I have, in the process of evaluating this

13   request for a stay, reconsidered or done an evaluation --

14       (Music playing over telephone connection.)

15           THE COURT:  Whoa.  Is everybody still there?  Is the

16   government still there?

17           MR. KOZINETS:  Yes, Your Honor.

18           MR. BIENERT:  Yes we're here, Your Honor.

19           UNIDENTIFIED MALE SPEAKER:  We're here.

20           THE COURT:  All right.  I've reevaluated the original

21   order.  I still think legally it's correct and that there was

22   no clear error.

23           The fourth is the district court's order is an

24   oft-repeated error.  I don't think that applies.

25           The district court order -- The fifth one is that the

1   district court's order raises new and important problems or

2   issues of law of first impression.

3            Well, recusal orders are nothing new.  The fact that

4   my husband's a public figure I don't believe is new.  That's an

5   issue that's come up before, and defense acknowledged that that

6   wouldn't be a basis for recusal just in and of itself.

7            They do argue -- The defense argues that it would be

8   an issue of first impression if the Ninth Circuit found that

9   these non-financial interests, as they've alleged that my

10  husband may have in this case, which I found do not exist, I

11  guess if they found that it was a basis for recusal, these

12  non-financial interests, then that would be an issue of first

13  impression.  But overall the five factors seem to me to say

14  that the defense does not have a likelihood of success.

15           As to factor two, calls for irreparable harm that is

16  likely to result, and that is hard to find in light of the fact

17  that the natural course of these recusal motions is that they

18  be dealt with through direct appeal.

19           Factors three and four, which sort of merge in this

20  situation, once the -- because the government is the opposing

21  party who represents the public, I agree that the defendants

22  have an interest in having this motion resolved by someone

23  other than me.

24           As for the public's interest, I looked a little bit to

25  the speedy trial case law, because this in essence would cause

1    another delay in the trial.  And the case law directs that a

2    district court must also give significant weight to the

3    public's interest in a speedy trial and that the public's

4    interest is generally served by strict adherence to the

5    requirements of the Speedy Trial Act and that under the Speedy

6    Trial Act, the district court must satisfy two requirements

7    when it grants what would be an ends of justice continuance.

8              The first one, which I think is significant, is that

9    it says the continuance must be specifically limited in time.

10   And in this case this is a request for a stay for an

11   indeterminate amount of time.  So this could be a four-month

12   stay, a year stay, an 18-month stay.  There's really no way to

13   tell.

14             And the second factor is that it must be justified

15   with reference to the facts as of the time the delay is

16   ordered.

17             And I think it's the first one that's a problem, is

18   that there is no time limit to this stay.

19             I've also mentioned that a continuance gets more

20   difficult to grant once we're this close to trial.

21             And I also did consider the victims' position, which

22   has been opposed to any continuances all along.

23             So for those reasons, I believe the defendants have

24   not met their burden to justify a stay, so the motion for a

25   stay is denied.

```
 1              I would say that if I knew the Ninth Circuit was

 2     having an interest in this, that may change the balance of the

 3     factors.  And so I'm going to set a status conference, another

 4     telephonic status conference, to see if there's any movement on

 5     it.

 6              Would counsel for the government be available on

 7     January 4th?

 8              MR. KOZINETS:  Yes, Your Honor.

 9              THE COURT:  And -- let's see -- Mr. Bienert, what

10     about you?

11              MR. BIENERT:  Yes, Your Honor, I'm available then.

12              THE COURT:  Mr. Cambria?

13              MR. CAMBRIA:  Yes, Your Honor.

14              THE COURT:  Mr. Feder?

15              MR. FEDER:  Judge, could you go to some other

16     defendants?  I'm going to get my calendar.  I'm not in my

17     office right now.

18              THE COURT:  Sure.  Mr. Lincenberg?

19              MR. LINCENBERG:  Yes, Your Honor.

20              THE COURT:  Okay.  Mr. Eisenberg?

21              MR. EISENBERG:  I'm available.  Thank you, Your Honor.

22              THE COURT:  Ms. Bertrand?

23              MS. BERTRAND:  Yes, ma'am, I'm available.  Thank you.

24              THE COURT:  Okay.

25              MR. BIENERT:  Your Honor, this is Thomas Bienert.  I'm
```

1    sorry to interrupt.  I do notice I have a hearing, which I'm

2    assuming will be telephonic, in another case at 8:30 in the

3    morning January 4th.  So I assume that's 9:30 your time.  That

4    hopefully Your Honor could set this, you know, maybe anywhere

5    from 10:30 on that day, but I might have a conflict at 8:30.

6        (Music playing over telephone connection.)

7            THE COURT:  Okay.  We had a little music, but I heard

8    you.

9            MR. BIENERT:  There's usually violence and trumpets

10   when I speak, Your Honor.  I got a little --

11           THE COURT:  Okay.  Mr. Feder, were you able to check?

12           MR. FEDER:  That's fine, Judge, yes.

13       (The Court and clerk confer off the record.)

14           THE COURT:  Give me just a minute to check on the

15   time.  I don't think I have any conflicts that day, but I want

16   to double check.

17           Okay.  My normal courtroom deputy and judicial

18   assistant are out, and I can't pull up the calendar from the

19   courtroom.  But from my memory, we're open, so I'm going to set

20   it at 11:00 a.m.  That should be plenty of time for Mr. Bienert

21   to finish.  And we'll e-mail the parties if we can't, if we

22   have to change that time.  Okay?

23           MR. BIENERT:  Thank you, Judge.

24           THE COURT:  Anything else from the government?

25           MR. KOZINETS:  Your Honor, I just want to note that --

1    I don't think it was clear at the beginning of this hearing

2    whether the defendants are present or there has been a waiver

3    of their appearance.

4            THE COURT:  Oh, you're right.  I have a note to do

5    that actually.

6            Mr. Bienert, is your client on the phone?

7            MR. BIENERT:  He -- I believe he is, Your Honor, but

8    he was going to call in on the public line, so there was no

9    inadvertent, you know, sound.  He is on the public line.

10           THE COURT:  Okay.  Mr. Cambria.

11           MR. CAMBRIA:  I do not believe my client is, Your

12   Honor.

13           THE COURT:  And do you waive his presence?

14           MR. CAMBRIA:  I do.

15           THE COURT:  Thank you.  Mr. Lincenberg?

16           MR. LINCENBERG:  Mr. Panchapakesan, can you answer

17   that question for the Court?

18           MR. PANCHAPAKESAN:  Yes, Your Honor.  Mr. Brunst's

19   appearance is waived.

20           THE COURT:  Okay.  Mr. Feder.

21           MR. FEDER:  I believe Mr. Spear is on the public line,

22   but if not, he waives his presence or I waive his presence.

23           THE COURT:  Okay.  Mr. Eisenberg.

24           MR. EISENBERG:  Mr. Padilla waives his presence, Your

25   Honor.

1          THE COURT:  Okay.  Thank you.  Ms. Bertrand.

2          MS. BERTRAND:  Ms. Vaught waives her presence.  Thank

3   you.

4          THE COURT:  Okay.  Anything else from the defense,

5   Mr. Bienert?

6          MR. BIENERT:  No, Your Honor.

7          THE COURT:  Okay.  We're at recess.  Thank you.

8       (Proceedings recessed at 11:25 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                          C E R T I F I C A T E

2

3          I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 4th day of December,

12   2020.

13

14

15                              s/Linda Schroeder
                            Linda Schroeder, RDR, CRR
16

17

18

19

20

21

22

23

24

25