# Exhibit 2

### Why Village Voice Media's Backpage.com Service
### Does Not Create Liability for Promoting Prostitution

#### Summary

**I. VILLAGE VOICE MEDIA LLC IS IMMUNE FROM LIABILITY FOR THE MESSAGES OF USERS OF ITS BACKPAGE.COM SERVICE**

    A.    Congress Created in Section 230 A National Policy To Encourage Internet Use and Growth.

    B.    Section 230 Immunizes Interactive Computer Service Providers From Liability For Third Party Content.

    C.    Section 230 Prohibits State Criminal Laws and Prosecutions That Would Impose Criminal Liability On An Interactive Computer Service Provider For Third Party Content.

    D.    Village Voice Satisfies All Requirements for Immunity Under Section 230.

        1.    Village Voice Is A "Provider" Of An "Interactive Computer Service," Namely The Backpage.com Website

        2.    The Ads In Question Are Posted By Users Of Backpage.com And Thus Are "Information Provided By Another Information Content Provider"

        3.    Village Voice Is The "Publisher" of User Ads on Backpage.com.

        4.    The Commercial Nature of Backpage.com Is Irrelevant.

    E.    State Officials Face Liability Under 42 U.S.C. § 1983 If They Violate Village Voice's Statutory Rights Under Section 230.

**II. EVEN IF SECTION 230 DID NOT APPLY, VILLAGE VOICE WOULD NOT BE LIABLE FOR BACKPAGE.COM CONTENT THAT ALLEGEDLY PROMOTES PROSTITUTION.**

    A.    Village Voice's Policies and Practices Prohibit, Monitor for, and Remove Advertisements for Illegal Services

    B.    Village Voice Cannot Be Liable Under Missouri Law For Promoting Prostitution.

        1.    Village Voice Has No Intent to Aid or Abet or Promote Prostitution, And Thus Has Not Committed These Crimes.

        2.    Scienter Is An Essential Element Of Criminal Statutes Which Target Even Unprotected Speech.

DEFENSE_015288

3. Criminal Laws Must Be Worded Or Construed So That They Do Not Cover Constitutionally Protected Speech.

4. Public Provision of a Communications Service Cannot Support Aiding And Abetting Liability, Because The Connection With The Crime Is Too Remote.

III. EVEN IF SECTION 230 AND THE SCIENTER AND REMOTENESS DOCTRINES OF CRIMINAL LAW DID NOT APPLY, THE FIRST AMENDMENT WOULD PREVENT IMPOSITION OF CRIMINAL LIABILITY ON VILLAGE VOICE IN THIS SITUATION.

A. Backpage.com Is Engaged In Protected Speech.

B. Normal Backpage Content is Classic Protected Expression, Even If it May be Offensive or "Indecent" To Some.

C. Internet Websites Are Like Bookstores, Which Cannot Be Expected To Pre-Screen All Their Content.

D. An Internet Provider Cannot Be Held Liable for Conducting a Communications Service That Has "Substantial Lawful Uses."

E. Forcing Village Voice to Eliminate the "Escorts" Category or to Block Ambiguous Ads Would Constitute An Unlawful "Prior Restraint."

## Conclusion

(1)  Section 230 of the Federal Communications Act, 47 U.S.C. § 230, specifically bars civil or criminal liability of Internet intermediaries based upon the content of their users' messages.

(2)  Missouri criminal law relating to promoting and aiding and abetting prostitution applies only to those who have specific criminal intent to promote or aid prostitution, and such intent is clearly lacking in the circumstances where a communications provider makes available a forum for posting communications, but also bans, screens for, and promptly deletes messages that offer prostitution.

(3)  The First Amendment limits prosecutions of information providers such as bookstore operators and communications providers to the rare situations where (a) the prosecution is confined to illegal content, (b) the publisher has knowledge and intent to provide illegal content, (c) the prosecution is conducted after-the-fact and does not chill or restrain ongoing protected speech.

DEFENSE_015289

**Why Village Voice Media's Backpage.com Service
Does Not Create Liability for Promoting Prostitution**

Mark Sableman
Anthony F. Blum
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, MO  63101
(314) 552-6000

I.     **VILLAGE VOICE MEDIA LLC IS IMMUNE FROM LIABILITY FOR THE MESSAGES OF USERS
       OF ITS BACKPAGE.COM SERVICE**

Village Voice Media LLC ("Village Voice") is exempt by virtue of a federal statute from

state civil or criminal liability for any illegal content posted on its Backpage.com service that was

contributed by third party users of the site.  The Section 230 of the Telecommunications Act of

1996, 47 U.S.C. § 230 ("Section 230"), sometimes referred to by the title of the chapter in which it

was contained, the Communications Decency Act ("CDA"), precludes liability for Internet

dissemination or publication of such third party content.

   A.     **Congress Created in Section 230 A National Policy To Encourage Internet
           Use and Growth.**

In 1996, Congress enacted legislation "(1) to promote the continued development of the

Internet and other interactive computer services and other interactive media [and] (2) to preserve

the vibrant and competitive free market that presently exists for the Internet and other interactive

computer services, unfettered by Federal or State regulation."  47 U.S.C. § 230(b).

Congress at the time made findings that the Internet "offer[s] a forum for a true diversity

of political discourse, unique opportunities for cultural development, and myriad avenues for

intellectual activity."  It further noted that "The Internet and other interactive computer services

have flourished, to the benefit of all Americans, with a *minimum of government regulation*."

47 U.S.C. § 230(a) (emphasis added).

DEFENSE_015290

Based on these findings and policies, Congress made the decision to not hold interactive computer service providers liable for user-generated content. This did not strip the government or wronged parties of redress for problems created by such content, because nothing in Congress' enactment prevents the original culpable party who posted any unlawful or harmful content from being held liable. *See Zeran*, 129 F.3d at 330. However, Congress realized that the "Internet is a unique and wholly new medium of worldwide human communication"; that internet service providers have hundreds of millions of users; and that it is impossible to screen the hundreds of millions of messages posted daily. *Reno v. ACLU*, 521 U.S. 844, 850 (1997); *Zeran*, 129 F.3d at 330.

For these reasons, Congress enacted Section 230, granting a broad immunity to Internet intermediaries from liability arising from user content. Congress found this measure essential to the growth and development of the Internet. If service providers were "[f]aced with potential liability for every message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted." *Zeran*, 129 F.3d at 331. It is impossible to merely weed out the objectionable or unlawful content. Without some law like Section 230, service providers would be forced to eliminate the user-generated content that makes the internet so vibrant, or face liability that would shut them down. *See Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003). Useful and constitutionally protected speech would be lost.

Section 230 has directly led to the vibrant and useful internet that Americans enjoy today.

**B.**     **Section 230 Immunizes Interactive Computer Service Providers From Liability For Third Party Content.**

Section 230 implements congressional policy by broadly immunizing Internet intermediaries from liability based on user content. Section 230 states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Furthermore, "No

2

cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

In *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997), the leading and most-cited case construing Section 230, America Online ("AOL") was sued in negligence for failing to remove defamatory messages posted on an AOL bulletin board. *Id.* at 329. The Court found that Section 230 by its plain language created "federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Id.* at 330. A service provider cannot be held liable as a publisher of the third party content, nor can it be held liable for exercising "traditional editorial functions," such as deciding whether to publish, withdraw, postpone or alter the content of a third party. *Id.* The Court, therefore, held that the claim was barred by Section 230. *Id.* at 327.

Since *Zeran*, "[t]he majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (internal cites omitted); *see also Doe v. Myspace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("Courts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content."); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) ("[W]e too find that Section 230 immunity should be broadly construed."); *Almeida v. Amazon, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (following the "consensus developing across other courts of appeals that § 230(c) provides broad immunity for publishing content provided primarily by third parties."); *Green v. America Online, Inc.*, 318 F.3d 465, 471 (3d Cir. 2003); *Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980, 984–85 (10th Cir. 2000).

DEFENSE_015292

Even defamatory, harmful and despicable content is covered by Section 230—with the effect that Internet intermediaries are not liable for that content, and only the originators of it are. In *Zeran*, the content at issue were a series of postings that falsely accused Mr. Zeran of delighting in the Oklahoma City federal building bombing. In *Carafano*, the content at issue was a false dating service posting, portraying Ms. Carafano as sexually promiscuous. In *Blumenthal v. Drudge*, 992 F.Supp. 44 (D.D.C. 1998), the content at issue (content that AOL could have previewed, did in fact edit, and did in fact profit from) allegedly constituted defamation of a top White House official. In all of these cases, courts applied section 230 by its terms, realizing that Congress made the determination that Internet intermediate can and must be immunized for liability for user content, even where that content was wrongful, illegal, and/or harmful.

Section 230 applies to any cause of action, not specifically exempted in the statute, that would hold a service provider liable for the content of another. This immunity defense has been applied to a number of different causes of action, including negligence, defamation, invasion of privacy, misappropriation of the right of publicity, state securities and cyberstalking acts, and violations of the Fair Housing Act. *See, e.g.*, *Carafano*, 339 F.3d 1119 (negligence, defamation, invasion of privacy and misappropriation of right of publicity); *Lycos, Inc.*, 478 F.3d 413 (state securities and cyberstalking acts); *Chicago Lawyers' Comm. For Civil Rights Under Law, Inc.*, 519 F.3d 666 (7th Cir. 2008) (Fair Housing Act). Section 230 is only limited by the specific exclusions in the statute, which do not apply here. *See* 47 U.S.C. § 230(e) (stating the section has no effect on intellectual property, the Electronic Communications Privacy Act, or *federal* criminal law).

While neither Missouri state courts nor the Eighth Circuit have yet addressed Section 230, all district courts within the Eighth Circuit that have confronted the issue have also found broad immunity for any cause of action that would hold a service provider liable for user-generated content. *See Gregerson v. Vilana Finan., Inc.*, No. 06-1164, 2008 WL 451060, at *8 (D. Minn. Feb.

4

DEFENSE_015293

15, 2008); *Faegre & Benson, LLP v. Purdy*, 367 F. Supp. 2d 1238, 1249 (D. Minn. 2005);

*PatentWizard, Inc. v. Kinko's, Inc.*, 163 F. Supp. 2d 1069, 1071–72 (D.S.D. 2001).

C.   **Section 230 Prohibits State Criminal Laws and Prosecutions That Would Impose Criminal Liability On An Interactive Computer Service Provider For Third Party Content.**

Section 230 provides immunity not only for civil liability but also for liability under state criminal statutes. 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").

In *Voicenet Commc'n, Inc. v. Corbett*, 2006 WL 2506318 (E.D. Pa. 2006), the court rejected arguments by the defendant, the attorney general of Pennsylvania, that Section 230 did not apply to certain state criminal statutes. 2006 WL 2506318, at *3–4. The court explained that Section 230(e)(3) made it clear that Section 230 applies to state criminal laws. *Id.* at *3. That subsection states that no "cause of action" may be brought and no "liability" may be imposed under any State or local law that is "inconsistent with" this section. The court found that the terms "liability" and "cause of action" in Section 230 encompass criminal as well as civil actions. *Id.* Also, subsection (e)(3) provides that no liability can be imposed under "any State or local law." By the express language, Section 230 provides immunity to all inconsistent state laws and not only civil ones.

Furthermore, Section 230 clearly sets forth what areas of the law are excluded from its coverage. Subsection (e)(1) "provides that nothing in the CDA shall be construed to impair enforcement of certain federal statutes governing obscenity and the sexual exploitation of children, 'or any other *Federal* criminal statute.'" *Voicenet*, 2006 WL 2506318, at *3. Congress could have exempted state criminal laws, but did not do so. *Id.* at *4. *Accord*, *People v. Gourlay*, 2009 WL 529216, at *2–3 (Mich. App. March 3, 2009) (finding that Section 230 applies to state criminal law).

D.   **Village Voice Satisfies All Requirements for Immunity Under Section 230.**

5

DEFENSE_015294

Village Voice falls squarely within the requirements of Section 230 and is immune from any state prosecution which would attempt to impose liability on it arising from the content of third party postings. Section 230 immunity exists if: (1) Village Voice is a "provider or user of an interactive computer service"; (2) the claim is based on "information provided by another information content provider"; and (3) the claim would treat Village Voice "as the publisher or speaker" of that information. *See* 47 U.S.C. § 230(c)(1); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007). All of these requirements are plainly met.

1. **Village Voice Is A "Provider" Of An "Interactive Computer Service," Namely The Backpage.com Website**

First, Village Voice is a "provider" of an "interactive computer service." *See* 47 U.S.C. § 230(c)(1). The term "interactive computer service" is defined in the statute as any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

Village Voice's Backpage.com meets the statutory definition of an "interactive computer service." Backpage.com provides an online service that allow people or companies to post classified ads or messages regarding items for sale; services, both commercial and noncommercial; and other information. Backpage.com is an "information service or system" which enables multiple users to access its "computer server," namely the server that hosts its website. *See Lycos, Inc.*, 478 F.3d at 419. Websites that allow users to post information have always been treated as "interactive computer services" under Section 230. *See, e.g., Lycos, Inc.*, 478 F.3d 413; *Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980, 985 (10th Cir. 2000). For example, craigslist.com, a provider of similar online classified ads, has been found to be an "interactive

6

DEFENSE_015295

computer service." *See Chicago Lawyers' Comm. For Civil Rights Under Law, Inc. v. craigslist, Inc.,*
519 F.3d 666 (7th Cir. 2008).

      **2.**    **The Ads In Question Are Posted By Users Of Backpage.com And Thus Are**
           **"Information Provided By Another Information Content Provider"**

      Second, the ads and other postings on Backpage.com are clearly "information provided by
another information content provider." These ads are not created by Village Voice. The
definition of "information content provider" is "any person or entity that is responsible, in whole
or in part, for the creation or development of information provided through the Internet or any
other interactive computer service." Users of backpage.com who post the ads, messages or
comments clearly are information content providers distinct from Village Voice. *See, e.g., Lycos,*
478 F.3d at 419.

      The fact that Backpage.com provides categories for posting does not change the analysis.
Such basic editorial and organizational structures are separate from the content contained within
them. Use of these categories does not make Village Voice "responsible, in whole or in part, for
the creation or development of [the] information . . . ." *See* 47 U.S.C. § 230(f)(3).

      In fact, many if not most "interactive computer services" provide some type of
organization or categories for user-generated content. Without such, Internet sites and service
using third party content would be chaotic and useless. For example, in *Chicago Lawyers' Comm.
For Civil Rights Under Law, Inc. v. craigslist, Inc.,* craigslist provided a category labeled as
"apartments," where FHA non-compliant ads were posted, but the mere creation of that category
did not, and could not, reasonably be construed as authorship in whole or part for the non-
compliant content posted within that category, and thus it could not support liability for
craigslist. Similarly, in *Whitney Info. Network, Inc. v. Xcentric Ventures, LLC,* 2008 WL 450095
(M.D. Fla. Feb. 15, 2008), where the website www.ripoffreport.com allowed users to submit
reports on companies under such categories as "con artists", "corrupt companies" and "false TV

7

**DEFENSE_015296**

advertisements," as well as other non-negative categories, the court held that establishment of

such categories did not make the defendant the "information content provider."  2008 WL

450095, at *10.  *See also Gentry v. eBay, Inc.,* 99 Cal. App. 4th 816, 832 (2002) (eBay's product

categories did not make it responsible for ads created by its users for sale of bootleg materials).

Only where a website publisher *mandates* use of certain content by its users does the

publisher become a co-author (or more specifically, in the statutory language, "responsible ... in

part, for the creation or development of [the] information"), and hence lose Section 230

immunity.  That is what occurred in *Fair Housing Council v. Roommates.com,* 521 F.3d 1157 (9th

Cir. 2008).  Roommates.com required users in creating postings to select from entries provided in

dropdown boxes, some of which required users to include unlawful ad content, such as racial

preferences for a roommate.  Because Roommates.com mandated use of certain illegal terms, it

was at least a co-author of the content of messages when its users used those mandated terms.

Thus, in that unusual situation, the allegedly unlawful statements did not originate solely from

"another information content provider."  *Id.* at 1165–66.  Roommates.com in that case was one of

the "information content provider[s]" since it was "responsible, in whole or in part, for the

creation or development of information."  *Id.*

Interestingly, Rommates.com also provided its users with an open-ended textbox, titled

"Additional Comments."  *Id.* at 1173.  Comments entered in this box by users of the

Roommates.com service, even when they used illegal terms, were covered by Section 230 such

that Roommates.com was immune under Section 230 for that content.  The decision likened this

textbox to *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. craigslist, Inc.,* 519 F.3d

666 (7th Cir. 2008), where an open-ended text prompt was provided that imparted no structure

and did not "induce[] anyone to post any particular listing or express a preference for

discrimination . . . ."  *Roommates.Com,* 521 F.3d at 1172.

8

Just as Section 230 applies to the "Additional Comments" box in Roommates.com and to ordinary ad text prompts as in *craigslist*, it applies to Backpage.com's user submissions. Backpage.com does not require users to enter inappropriate or illegal content. It does not provide users with illegal terms which they must select from, nor does it direct them in any way to enter illegal or inappropriate content. (In fact, it *prohibits* illegal or inappropriate content, stating directly on the page where ads are entered that users should not advertise illegal services or post obscene images, as explained further below.) Backpage.com only requires users to enter a title, age, description, location, and some other options, such as e-mail address. Any possible unlawful content submitted by users, in violation of Backpage.com's terms, would appear most likely in the title or description which are *developed solely from user entries in open-ended textboxes*. Thus, such content is fully protected by Section 230.

Notably, by structuring its service to isolate sexually related content from other content, Backpage is utilizing a procedure that Congress encouraged and protected in the CDA. Section 230(c)(2) specifically states:

> No provider or user of an interactive computer service shall be held liable on account of (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected.

This portion of Section 230 is known as the "Good Samaritan" provision, and was written specifically to encourage web publishers and intermediaries to use their discretion in taking editorial actions with respect to arguably indecent and inappropriate user content, without facing liability because of those actions. This subsection reversed the prior law, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct., May 24, 1995), which had treated a service provider as a "publisher" solely because it edited and deleted some offensive user material. *Id.* at *4. Congress reversed *Stratton Oakmont* in order to take away disincentives to self-regulation.

9

DEFENSE_015298

Village Voice takes efforts to isolate sexually related content, by using categories clearly

identifying such content, and by requiring users to go through warning and adult-screening entry

screens, before entering those categories.  It also uses sub-category labels such as "escorts, body

rubs, TS, ..." to zone off and separate adult material from family-friendly ads.  By these techniques,

users can stay clear of such categories they find offensive, and can also use filtering and blocking

software to prevent themselves or their children from viewing objectionable material, without

also blocking appropriate ads.  All of these actions of Village Voice fall within the protection of

the Good Samaritan provision of Section 230.

     3.     **Village Voice Is The "Publisher" of User Ads on Backpage.com.**

Since Village Voice is the provider of an "interactive computer service" and the ads and

postings on Backpage.com are "information provided by another information content provider,"

Section 230 provides that it cannot be held liable "as the publisher" under any state or local law

for the content of those ads or postings.  47 U.S.C. § 230(3)(1).

Because Village Voice could only be liable for user posted illegal content if it were treated

"as the publisher," imposition of any such liability is clearly prohibited by Section 230.  This is so

because Congress in enacting Section 230 realized that while brick and mortar publishers have a

duty to review and screen material, imposition of such requirements on the Internet would be

virtually impossible and would effectively shut down the medium, which Congress viewed as

essential to the country's growth and future.  *See e.g., Zeran*, 129 F.3d at 330, 333 ("the sheer

number of postings on interactive computer services would create an impossible burden in the

Internet context;" and so "lawsuits seeking to hold a service provider liable for its exercise of a

***publisher's traditional editorial functions***—such as deciding whether to publish, ***withdraw***,

postpone or ***alter content—are barred***.") (emphasis added).

DEFENSE_015299

No matter how a cause of action is labeled, or whether it is civil or criminal, Village Voice is immune from any liability for the content of third party information.  It cannot be held liable as a publisher, for not removing the material, or for failing to implement better protective measures.  *Zeran*, 129 F.3d at 330; *Doe v. Myspace, Inc.*, 528 F.3d 413, 419–20 (5th Cir. 2008).

 4. **The Commercial Nature of Backpage.com Is Irrelevant.**

 The fact that Village Voice and its Backpage.com service operate on a for-profit basis is completely irrelevant to the Section 230 analysis.  In just about every case involving Section 230, the interactive computer service provider was a for-profit company.  It also is irrelevant that Village Voice is potentially making money off of user ads, even if it ultimately develops that some of them contain illegal content.

 In *Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998), AOL entered into a contract for Drudge to create content that would be posted on AOL.  Drudge, after writing his Drudge report, would email it to AOL, which would then post it on its services.  *Id.* at 48.  AOL paid Drudge $3,000 a month.  *Id.* at 47.  One of the reports contained false and defamatory statements.  *Id.* at 47–48.  The Court found it irrelevant that Drudge was paid by AOL to create the content, or even that AOL actively and aggressively promoted and advertised it.  *Id.* at 51.  Section 230 is clear in its broad sweep, and AOL was immune from liability.  *Id.* at 53.

 By the same token, it is irrelevant that Backpage.com charges to post ads in some of its categories, and thus potentially receives money to post ads which could be illegal.  Village Voice is a provider of an "interactive computer service" and these ads are "information created by another information content provider."  Therefore, Village Voice cannot be treated as the publisher of the information.

 E. **State Officials Face Liability Under 42 U.S.C. § 1983 If They Violate Village Voice's Statutory Rights Under Section 230.**

11

DEFENSE_015300

State action directed against Village Voice based upon its publication of user-generated content on Backpage.com could result in liability to the involved state officials. The Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983"), states:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the *deprivation of any rights, privileges, or immunities secured by* the Constitution and *laws, shall be liable to the party injured* in an action at law, Suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (emphasis added).

In *Voicenet*, state officials executed a search warrant on the premises of plaintiff, a provider of usenet services, regarding a Pennsylvania state statute which criminalizes the knowing distribution and possession of child pornography. 2006 WL 2506318, at *1. Voicenet brought a variety of claims, including violation of Section 1983, against the Pennsylvania attorney general and other state officials.

The court denied a motion to dismiss the Section 1983 claim, holding that Section 230 was a right enforceable by Section 1983. Section 230 met the *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997), test in that (a) it was intended to benefit the plaintiff, (b) it is not too "vague and amorphous" for a court to enforce, and (c) it imposes a binding obligation on the state. *Voicenet*, 2006 WL 2506318, at *2–3.

In finding that Section 230 imposes a binding obligation on the state, the court in *Voicenet* cited to *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989), where the Supreme Court held "that a statute that 'denies [a] sovereign the authority to abridge a personal liberty' imposes a binding obligation on the State." *Voicenet*, 2006 WL 2506318, at *2–3 (*quoting Golden State*, 493 U.S. at 112). The National Labor Relations Act ("NLRA") gave parties to a collective-bargaining agreement the right to bargain with each other "free of governmental interference," thus creating a "free zone from which all regulation, whether federal or state, is

12

DEFENSE_015301

excluded." *Golden State Transit*, 493 U.S. at 110–11. Where, in *Golden State Transit*, the defendant

city refused to renew a taxicab company's franchise unless it settled a dispute with its union, the

Supreme Court held that the company could enforce this violation of the NLRA through the Civil

Rights Act. *Id.* at 104.

Similarly, Section 230 created a "free zone" that protects service providers from being held

liable by a state for information posted by others. *See Voicenet*, 2006 WL 2506318, at *3. Thus,

Section 230 imposes a ***binding obligation on the State***, which can be enforced through the Civil

Rights Act, to not treat an interactive computer service provider as the publisher or speaker of

information provided by others. *See id.* at *5. The Court in *Voicenet* therefore denied the motion

to dismiss. *Id.* at *1–5 (but holding that state officials had qualified immunity from money

damages since at that time the right was not clearly established).

## II.   EVEN IF SECTION 230 DID NOT APPLY, VILLAGE VOICE WOULD NOT BE LIABLE FOR BACKPAGE.COM CONTENT THAT ALLEGEDLY PROMOTES PROSTITUTION.

### A.   Village Voice's Policies and Practices Prohibit, Monitor for, and Remove Advertisements for Illegal Services

Any analysis of potential liability of Village Voice for the content of Backpage.com ads

must begin by looking at Village Voice's policies and practices for that service. Village Voice does

not encourage, promote, or even acquiesce in ads for illegal services. Village Voice expressly

prohibits illegal ads in its Terms of Use for Backpage.com, emphasizes prohibition to users,

solicits help of all users in reporting ads that violate the service terms or the law, and removes ads

that violate its policies whenever it learns of them. Furthermore, Village Voice works with

appropriate law enforcement officials when requested to do so.

Use of Backpage.com is governed by "Terms of Use" which users must affirmatively agree

to before they can utilize the service. The terms are also linked to from the main Backpage page,

so users can readily consult them. These terms prohibit posting such "material of any kind or

13

DEFENSE_015302

nature that encourages conduct that could constitute a criminal offense, give rise to civil liability or otherwise violate any applicable local, state, provincial, national, or international law or regulation, or encourage the use of controlled substances." Furthermore, the terms prohibit "adult content or explicit adult material" unless posted in "designated adult categories and permitted under applicable federal, state, and local law," and the user is not a minor. "Obscene or lewd and lascivious graphics or photographs, or graphics or photographs which depict or simulate sexual acts" are prohibited, as is "[p]osting any solicitation directly or in "coded" fashion for any illegal service exchanging sexual favors for money or other valuable consideration." The terms also again prohibit: "[p]osting any ad for products or services, use or sale of which is prohibited by any law or regulation."

Before any user can enter any category in the "personals" or "adult" section, the Backpage.com site requires the user to read and agree to entry terms. The entry terms for the "personals" section prohibit access to those under 18. They warn that the user "may encounter some sexual content, pictorial nudity or adult language," and request users report inappropriate content. They also link back to the "Terms of Use" and require users to read and agree to them.

Different entry terms are used for all categories in the "adult" section. These entry terms also warn that the "section contains sexual content, including pictorial nudity and adult language," and that the user should not access it unless he or she is over 18 (or of legal age in the user's jurisdiction). These entry terms also link back to the full Backpage.com "Terms of Use," which one is required to read and agree to before using the service. Additionally, the entry terms ask all users to "agree to report any illegal services or activities which violate the Terms of Use," and provide an e-mail address to which such reports should be directed.

When a user attempts to post an ad in the "Escorts," "Body Rubs" or "TS" categories, the following statements appear clearly and visibly at the top of the page in red type: "Do not suggest

14

an exchange of sexual favors for money," "Do not use code words such as 'greek', 'bbbj', 'blow', 'trips to greece', etc.," "Do not post obscene images," and "Do not post content which advertises an illegal service." A legend at the top of the page explains that ads not complying with the terms are subject to removal. When a user attempts to post in the "Phones & Websites" category, the following statements appear in red type: "Do NOT post escort, massage ads, or obscene pics here" and "Do NOT post content which advertises an illegal service."

In order to complete a post in any adult service or massage category, Backpage.com requires the use of a credit card. This deters users from posting ads for illegal services, since a record is kept that can be used by law enforcement officials. It also eliminates most prank postings and postings by under-age users.

When users report non-complying material, Backpage.com takes reasonable efforts to promptly remove offending advertisements. Each month, for example, Village Voice removes almost 150,000 ads from among more than one million posted in that time period on Backpage.com.

**B.    Village Voice Cannot Be Liable Under Missouri Law For Promoting Prostitution.**

Under a standard criminal law analysis, Village Voice cannot be held criminally liable merely because some of its users violate its terms and post advertisements for illegal services, such as prostitution. Statutes relating to promotion of prostitution were not meant to, and cannot, apply to publishers like Village Voice that merely provide an advertising medium for others, prohibit ads for illegal activities, actively screen for and encourage reporting of non-complying ads, and promptly remove any such ads.

**1.    Village Voice Has No Intent to Aid or Abet or Promote Prostitution, And Thus Has Not Committed These Crimes.**

DEFENSE_015304

Village Voice is not liable under Missouri law for promoting prostitution, or for aiding and abetting prostitution, since it has no intent for a crime to occur.[1]

To be found guilty of "promoting prostitution," one must "knowingly promote[] prostitution." Mo. Stat. Ann. § 567.070.  A person promotes prostitution if he "knowingly causes or aids a person to commit or engage in prostitution," or "knowingly engages in any conduct designed to institute, aid or facilitate an act or enterprise of prostitution." Mo. Stat. Ann. § 567.010.  Merely "assist[ing]" prostitution is not enough; one must act "with the purpose of promoting prostitution." *State v. Wilson*, 753 S.W.2d 102, 103 (Mo. App. S.D. 1988).

Village Voice cannot reasonably be accused of violating this statute.  It has no intent or purpose to promote any illegal activities.  Village Voice does not knowingly cause or aid a person to commit or engage in prostitution.  It takes great efforts to make sure its service is not used for prostitution.  Similarly, Village Voice does not "knowingly" engage in conduct "designed to institute, aid or facilitate" prostitution.  Its service is designed neutrally to allow the messages and advertisements to be posted on anything or any services.  It prohibits ads for illegal services, although it is impossible, given electronic posting methods, to prevent all such ads from being posted.

---

[1] Under Missouri law, accomplice liability for aiding and abetting prostitution is preempted by and subsumed into the "promoting prostitution" statute. *See* Mo. Ann. Stat. §§ 567.090, .010, .050–.070 (2009). For that reason, this memo will discuss the "promoting prostitution" statute.  However, even under traditional accomplice liability, to be found guilty of "aiding and abetting" a crime, one must "act[] with another with a common intent and purpose in the commission of a crime." *State v. Smith*, 108 S.W.3d 714, 719 (Mo. Ap. W.D. 2003); *see also* Mo. Stat. Ann. § 562.041 (to be held criminally responsible for aiding a crime, one must do so "with the purpose of promoting the commission of an offense").  Furthermore, "the evidence must show that the defendant associated himself or herself with the venture or participated in the crime in some manner."  Village Voice would not meet this standard even if "aiding and abetting" applied to prostitution, since it does not intend or have the purpose of promoting any crimes.  In fact, Village Voice prohibits its services for being used for illegal purposes and takes steps to prohibit and remove advertisements for illegal services.

DEFENSE_015305

For example, in *People v. Lauria*, 251 Cal. App. 2d 471, 475 (Cal. App. 1967), California attempted to prosecute the operator of an answering service, charging conspiracy to commit prostitution.  Lauria's answering service was provided for any business; however, he knew that it was used by prostitutes.  *Id.* at 475.  He even allowed them to pay the bills in person rather than to be billed by mail, for secrecy.  *Id.* at 474.  However, the court absolved him of liability.  *Id.* at 483.  While he provided a service to prostitutes and knew it, there was no proof that he actually "intended to further their criminal activities."  *Id.* at 483.  The court analogized the case to *U.S. v. Falcone*, 311 U.S. 205 (1940), where sellers of large quantities of sugar, yeast, and cans were absolved from participation in a moonshining conspiracy, since their knowledge that the supplies would be used for illicit purposes did not constitute criminal intent.

Knowledge that a business's service or liability will be used for criminal purposes is not enough to hold the business criminally responsible, where there is no intent or purpose to further or promote the illegal activities.  Such intent can sometimes be inferred, such as where the business has acquired a stake in the illegal venture, where no legal uses exist for the product or service, or where volume of sales for illegal purposes are grossly disproportionate to any legitimate demand.  *Lauria*, 251 Cal. App. 2d at 478–80.  These exceptions, however, clearly do not apply to Village Voice, which offers legal services and has taken extensive efforts to prevent and remove ads for illegal services.  Not only does Village Voice have no intent or purpose to further or promote illegal services; it actively acts to exclude or remove any ads for illegal services.  Village Voice no more knowingly promotes prostitution than Verizon aids and abets drug trafficking when dealers use Verizon's cell phones for drug deals.

### 2.    Scienter Is An Essential Element Of Criminal Statutes Which Target Even Unprotected Speech.

The scienter or criminal intent element of criminal offenses is essential where a statute may be applied to speech.  While speech promoting illegal conduct can be outlawed, a clear

17

scienter element is required by the First Amendment for any speech-directed criminal law.
Otherwise, people would over self-censor in fear of criminal liability, and protected speech would
be chilled, in violation of the First Amendment. In *Smith v. California*, 361 U.S. 147, 151–154 (1959),
for example, the Supreme Court held that a bookseller cannot be found criminally liable for
simply having an obscene book in his or her store; rather, criminal laws against sale of obscene
publications can only be applied to booksellers who know of the book's unlawful content. *Id.* The
Supreme Court required scienter in these circumstances to avoid damage to constitutionally
protected speech. The Court noted that unless knowledge of the obscenity of the targeted
publication is required for a prosecution of a bookseller, then booksellers would be required to
pre-read and screen every book. *Id.* Many books containing protected speech would be withheld
from sale as booksellers pro-actively removed borderline books from their shelves, to the harm of
the public and its right of free expression. *Id.*

The United States Supreme Court recently reaffirmed the need for a scienter requirement
in crimes that address speech, including unprotected speech, like child pornography. In *U.S. v.
Williams*, 128 S. Ct. 1830, (2008) the Supreme Court upheld a federal statute making it a crime to
advertise or promote child pornography. *Id.* at 1836–37. The Court in upholding this statute
noted that it included a "scienter requirement," because it required the acts to have been done
"knowingly," and it also required the defendant to actually have held the "belief" that the material
was child pornography, thereby showing that the defendant actually "intended" to promote child
pornography. *Id.* at 1839-40. These very clear scienter requirements prevented the statute from
coming too close to and chilling protected speech.

Accordingly, even apart from Missouri authorities' precedents requiring scienter, the First
Amendment would require proof of scienter before Village Voice or similar publishers could be

18

convicted of promoting prostitution.  Considering Village Voice's policies and procedures for prohibiting and removing ads for illegal services, this standard cannot be met.

> **3.**     **Criminal Laws Must Be Worded Or Construed So That They Do Not Cover Constitutionally Protected Speech.**

Criminal laws must clearly identify the conduct that is prohibited.  *See State v. Young*, 695 S.W.2d 882, 883–86 (Mo. 1985) (holding vague statute unconstitutional in violation of the 14th Amendment and Article I, Section 10, of the Missouri Constitution).  Particularly where an intermediary such as a store owner is involved, criminal laws cannot be so vague and unclear that they force the intermediary to steer clear of legal and permissible conduct.  Thus, while a state can ban the advertisement of unlawful services, it must use clear and narrowly tailored standards that do not bring protected speech within their coverage.  *See Pittsburgh Press Co. v. Pittsburgh Comm. On Human Relations*, 413 U.S. 376, 388 (1973); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 258 (U.S. 2002) (finding a statute unconstitutional as overbroad since it also covered protected speech).

For example, statutes banning the advertisement of drug paraphernalia have been upheld as constitutional under the First Amendment only when they have been narrowly tailored so that advertisements of legal products are not chilled.  *See, e.g.*, *Wash. Mercantile Assoc. v. Williams*, 733 F.2d 687 (9th Cir. 1984); *Camille Corp. v. Phares*, 705 F.2d 223 (7th Cir. 1983).  Products sometimes used as drug paraphernalia may also have other, legal purposes.  For example, a pipe can be used for illegal drugs or legal tobacco.  At least where advertising, a form of speech, is involved, laws must carefully distinguish between advertising for legal uses and advertising for illegal uses.  Specifically, in order to comply with the First Amendment, laws outlawing advertising of purported drug paraphernalia must be carefully worded so that they do not criminalize the advertising of legal products, which is of course constitutionally protected.

DEFENSE_015308

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 561–64 (1980).

*Washington Mercantile* and *Camille Corp.* both upheld laws that criminalized placing ads for drug paraphernalia. *Washington Mercantile*, 733 F.2d at 689; *Camille Corp. v. Phares*, 705 F.2d at 230. However, the statutes included a requirement of scienter—criminalizing a seller's placing ads only where the seller knew or had reason to know that it promoted the sale of drug paraphernalia. *Id.* Furthermore, the statutes, patterned after the Model Drug Paraphernalia Act, also clearly delineated what was drug paraphernalia and thus covered. These statues, therefore, withstood First Amendment challenges because: (1) they only banned advertisements for unlawful activities and not related lawful activities, (2) the statutes clearly identified what they covered, and (3) they required criminal intent on the part of the defendant.

Just like ads for pipes and cigarette papers, ads placed on Backpage.com may relate either to legal services or illegal ones. An escort's ad is legal if no sexual services are offered; it is illegal only if it offers sexual services for money. Often an illegal purpose cannot be discerned merely from the text of the ad. Protected and unprotected speech are "often separated . . . only by a dim and uncertain line." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963). In order to eliminate possible illegal ads, the State cannot sweep too broadly by threatening prosecution over all such ads, because such a prosecution would force publishers like Village Voice to take down legal (and constitutionally protected) ones as well.

This means that liability can never be imposed on the basis of ambiguous ads, because that would chill protected speech by forcing Village Voice and other publishers to "deter[] people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *United States v. Williams*, 128 S. Ct. 1830, 1838 (U.S. 2008). Laws that prohibit a substantial amount of protected speech are unconstitutional under the First Amendment and overbreadth doctrine. *See*

DEFENSE_015309

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 258 (U.S. 2002); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498–501 (1985) (obscenity law also reaching material appealing only to normal sexual appetites, which is protected speech, was overbroad).  The State cannot threaten civil or criminal suit against Village Voice for the content of ads on Backpage.com without appropriate guidelines.

Notably, when Village Voice is notified of advertisements which clearly advertise the exchange of sex for money, those ads are removed.  Village Voice hence not only bans clearly illegal ads but always takes them down immediately whenever they are found.  It properly treats differently ads that are not clearly illegal, which describe legal services, and any prosecution of it from allowing such ads would be improper for the reasons set forth above.

4.    **Public Provision of a Communications Service Cannot Support Aiding And Abetting Liability, Because The Connection With The Crime Is Too Remote.**

"Aiding and abetting" liability is a form of derivative liability—a situation where one party is held liable for another's conduct.  Derivative liability can be sensitive and troublesome particularly in the criminal law, and accordingly the law sets intent and remoteness limits on derivative liability.  The scienter (intent) requirement set forth in Section II.B.1. above is one such limit.  Additionally, prudential consideration of remoteness also limit derivative liability.  In a felony murder case, a getaway car driver may be convicted even though he did not pull the trigger, because of his intentional involvement in the crime team and the foreseeability of possible harm.  That is, his involvement is sufficiently close to the wrongful conduct that it is fair to make him liable.  But the person who sold the getaway car driver his car, or the store that sold the bank robber his ski mask, are not liable, because such involvement is too remote.

Judge Richard Posner explained that remoteness of an intermediary from another's wrongful conduct can protect the intermediary even if he or she knows or strongly suspects that a wrongful activity will occur:

DEFENSE_015310

> A retailer of slinky dresses is not guilty of aiding and abetting prostitution even if
> he knows that some of his customers are prostitutes—he may even know which
> ones are. See *United States v. Giovannetti, supra,* 919 F.2d at 1227; *People v. Lauria,*
> 251 Cal.App.2d 471, 59 Cal.Rptr. 628 (1967); Rollin M. Perkins & Ronald N. Boyce,
> *Criminal Law* 746-47 (3d ed.1982). The extent to which his activities and those of
> similar sellers actually promote prostitution is likely to be slight relative to the
> social costs of imposing a risk of prosecution on him. But the owner of a massage
> parlor who employs women who are capable of giving massages, but in fact as he
> knows sell only sex and never massages to their customers, is an aider and abettor
> of prostitution (as well as being guilty of pimping or operating a brothel). See
> *United States v. Sigalow,* 812 F.2d 783, 784, 785 (2d Cir.1987); *State v. Carpenter,* 122
> Ohio App.3d 16, 701 N.E.2d 10, 13, 18-19 (1997); cf. *United States v. Luciano-*
> *Mosquera,* 63 F.3d 1142, 1149-50 (1st Cir.1995).

*In re Aimster Copyright Litigation,* 334 F.3d 643, 651 (7th Cir. 2003).

Publishers of Internet services, telephone directories and newspapers can no more be
charged with aiding prostitution than "[a] retailer of slinky dresses . . . even if he knows that some
of his customers are prostitutes." Similarly, Hilton Hotels does not aid and abet prostitution
when a customer takes a prostitute to his hotel room, even if some of the hotel workers suspect or
recognize what is occurring. To take another example, it is common and appropriate for escort
and other adult services to advertise in telephone directories and newspapers. Just because some
of these might turn out to be offering prostitution does not create derivative liability for the
telephone directories or newspaper publishers; they merely provide neutral services. *See Doe v.*
*GTE Corp.,* 347 F.3d 655, 659 (7th Cir. 2003) (offering rhetorical question, "Does a newspaper that
carries an advertisement for "escort services" or "massage parlors" aid and abet the crime of
prostitution, if it turns out that some (or many) of the advertisers make money from that
activity?"); *People v. Lauria,* 59 Cal. Rptr. 628 (Cal. App. 1968) (absolving proprietor of telephone
answering service from liability for conspiracy to further prostitution where the defendant knew
prostitutes used his service, but there was no proof that he actually intended to further the
prostitution).

DEFENSE_015311

If the dress seller and hotel operator are not liable for promoting prostitution, then surely a neutral internet publisher is not. Unlike with the hotel operator and dress seller, any criminal liability for Village Voice would implicate serious First Amendment concerns. If Village Voice is held liable because some prostitutes use its service, it would have no choice but to severely self-censor its service to avoid criminal liability. This would have the adverse effect of chilling protected speech and possibly even eliminating a forum for protected speech. The First Amendment prohibits such derivative liability, especially here, where protected ads for legal adult services and unprotected ads for prostitution are "often separated . . . only by a dim and uncertain line." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963).

Furthermore, unlike the drug paraphernalia cases, there are absolutely no standards to determine whether the ads on Backpage.com are allowed or not. Without any standards "a person of ordinary intelligence" is not provided with "fair notice of what is prohibited." *Williams*, 128 S. Ct. 1845. Any attempt to force Village Voice to remove ads without providing such clear standards would be unconstitutional under the vagueness doctrine in violation of due process and the First Amendment. *See also Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676 (1968). Village Voice does not have the manpower, training or any guidance to know what ads the State objects to and those it does not.

III.   EVEN IF SECTION 230 AND THE SCIENTER AND REMOTENESS DOCTRINES OF CRIMINAL LAW DID NOT APPLY, THE FIRST AMENDMENT WOULD PREVENT IMPOSITION OF CRIMINAL LIABILITY ON VILLAGE VOICE IN THIS SITUATION.

   A.   **Backpage.com Is Engaged In Protected Speech.**

Village Voice's activities in publishing Backpage.com is protected speech under the First Amendment of the U.S. Constitution. Backpage.com is a classic forum designed for the exchange of information, both commercial and non-commercial. It provides a modern-day counterpart to

23

DEFENSE_015312

the personal and commercial ads that the Founders of our country found in the coffeehouse newspapers of their day.

Three different sets of persons have First Amendment interests with respect to Backpage. First, Village Voice as the publisher has a publisher's traditional interest in creating a publication that is useful to, and in demand by, readers and advertisers. Second, advertisers use Backpage as a forum for publication and distribution of their messages, which may be non-commercial (*e.g.* personal ads) or commercial (*e.g.*, ads for legal escort or massage services. Third, readers use Backpage to find and read items of interest. All three of these parties have recognized First Amendment interests. The readers' right to receive information is every bit as worthy of First Amendment protection as the right of publishers of advertisers to publish it. "Where a speaker exists, as is the case here, the protection afforded is to the communications, to its source and to its recipients both *** If there is a right to advertise, there is a reciprocal right to receive the advertising." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976). "Freedom to speak publicly and to publish has, as its inevitable and important correlative, the private right to hear, to read, and to think and to feel about what one hears and reads. The First Amendment protects those private rights of hearers and readers." *United States v. Roth*, 237 F.2d 796, 808 (2nd Cir. 1956) (Frank, J., concurring).

Accordingly, any attempt to prosecute Village Voice in connection with Backpage.com must contend with two key foundational facts about the expressive nature of the service: (1) Village Voice carries out a traditional publishing function on Backpage, and (2) Backpage users (both advertisers and readers) utilize the service for their own expressive activities. That is, Village Voice and its readers and advertisers all engage in constitutionally protected expressive activities.

    **B.**    **Normal Backpage Content is Classic Protected Expression, Even If it May be Offensive or "Indecent" To Some.**

24

The fact that many of the posts in the "sex" forum and ads posted in the "personals" section are not family-friendly does not remove their full protection under the First Amendment. No obscene material or child pornography is allowed on the site, and hence the content is presumptively covered by the First Amendment. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245–46 (U.S. 2002) ("[T]he First Amendment bars the government from dictating what we see or read or speak or hear." But it has limits, and "does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children."). "Indecent" material on the internet, including sexual expression, is fully protected. *See Sable Commc'n of Cal., Inc. v. Fed. Commc'n Comm.*, 492 U.S. 115, 126 (1989). While some parents may wish to shield this material from their children, this is easily done through the use of internet blocking and filtering software, widely available on the market, and through parental supervision. *See Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004).

The content contained within the ads in the "adult" section and "escorts" category which meet Village Voice's terms of service is also constitutionally protected. Many of the ads are non-commercial in nature and fully protected speech, even if some of them contain indecent content. *See Sable Commc'n of Cal., Inc. v. Fed. Commc'n Comm.*, 492 U.S. 115, 126 (1989). Others propose commercial transactions dealing with legal escort services, massages and other legal adult services. Advertisement of such services are best done on specialized sections of the internet where they can be screened away from minors. The First Amendment does not permit restricting or banning such advertisements, especially on the internet. *Cf., 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) (finding a complete ban on advertising the price of alcohol to be unconstitutional; also stating in a plurality portion of the opinion: "Most obviously, complete speech bans . . . are particularly dangerous because they all but foreclose alternative means of disseminating certain information.").

25

DEFENSE_015314

**C.      Internet Websites Are Like Bookstores, Which Cannot Be Expected To Pre-Screen All Their Content.**

The internet has allowed the distribution of free and protected speech on a scale unknown in the past.  Imposition of liability holding an internet website, such as Backpage.com, liable for the content of its users would disrupt the internet services that Americans enjoy today, and would violate the First Amendment.

In many ways, a website such as Backpage.com is the modern day virtual equivalent of a bookstore.  A bookstore cannot be held liable simply because it carries an illegal book.  The Supreme Court in *Smith v. California* struck down an ordinance holding a bookseller strictly liability for selling obscene books.  361 U.S. 147 (1959).  The Court stated that under such a law, "'Every bookseller would be placed under an obligation to make himself aware of the contents of every book in his shop.  It would be altogether unreasonable to demand so near an approach to omniscience."  *Id.* at 153.  Such a requirement would greatly impede the number of books with protected speech that would be available.  *Id.* at 154.  This concern is compounded a thousand-fold with the internet.  Currently, there are hundreds of millions of users logging onto the internet across the globe, and a large percentage of those are actively creating and posting content to sites such as Backpage.com, eBay, craigslist and Wikipedia.  If Village Voice and other internet service providers faced potential liability merely because their users posted illegal content, which was available for a short time before it was removed, such services could not exist, and would have to close down—just like booksellers would have, had not *Smith v. California* clarified the more limited nature of their potential responsibility.

In *Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997) the Supreme Court struck down a law that made it a crime to transmit certain material to a minor on the internet, since it would disrupt protected adult-to-adult communication.  *Id.* at 876.  The Court found that given the nature and size of the internet, one could almost always be charged with knowing a minor would

26

DEFENSE_015315

view material sent. *Id.* In fact, the law would have "confer[red] broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that his 17-year-old child . . . would be present." *Id.* at 880. The same analysis applies to the threatened prosecution in the instant case.

It is a core constitutional principle that the First Amendment requires "breathing space" for protected expression. *E.g.*, *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772 (1986). In *Hepps*, the Supreme Court held that plaintiff in a defamation case must prove falsity of the statements when they concern a public matter. *Id.* at 778. The Court recognized that this would necessarily insulate from liability some false statements of fact, which are not constitutionally protected. *Id.*; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974). However, the Court concluded that it was necessary in order to provide "breathing space" so that protected speech is not chilled.[2] *Hepps*, 475 U.S. at 772. Such a tipping of the scales in favor of speech and against regulation that would chill speech is the basis for the time-honored "chilling effect" derivative of First Amendment law, on which *Smith v. California* is based.

The origins of the "breathing space" doctrine trace back to *Speiser v. Randall*, 357 U.S. 513 (1958). A provision of the California constitution made nonadvocacy of overthrow of government by unlawful means a condition precedent to tax exemption. *Id.* at 1338–39. California law providing a tax exemption for World War II veterans enforced this provision by placing the burden of persuasion on claimants to show that they qualify, *i.e.*, that they did not engage in such unlawful speech. *Id.* at 521–22. The Court, while assuming the California constitutional provision was valid, struck down this enforcement procedure as unconstitutional based on due process and the First Amendment. *Id.* at 529. The Court explained:

---

[2] In the same manner, it is possible that some prostitutes advertise on Backpage.com in the guise of legal adult services, but it is impossible to eliminate those without eliminating protected speech.

27

DEFENSE_015316

> The vice of the present procedure is that, where particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding—inherent in all litigation—will create the danger that the legitimate utterance will be penalized. The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens. * * * [T]his procedural device must necessarily produce a result which the State could not command directly. It can only result in a deterrence of speech which the Constitution makes free.

*Id.* at 526. In short, the government in regulating unprotected speech must do so in a manner which does not deter or unconstitutionally chill protected expression. In order to defend speech on the edge of protected speech, the First Amendment requires that some speech on the other side go unpunished. *See also New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (holding that a public official must prove falsity and actual malice to win damages in defamation so as not to chill protected speech).

If Village Voice is not held responsible for content posted by its users, some ads promoting illegal services are likely to slip by. However, this is a necessary evil, and indeed it is part of the process by which free speech is protected. Otherwise, because it is virtually impossible for Village Voice to screen all user-posted content on Backpage.com, Village Voice would face uncertainty regarding the scope of the unlawful zone, resulting in it avoiding liability, either by shutting down, or by over self-regulating, thereby either cutting off or limiting protected speech.

### D.   An Internet Provider Cannot Be Held Liable for Conducting a Communications Service That Has "Substantial Lawful Uses."

The First Amendment and the nature of the internet require websites to be immune from any non-intentional and remote derivative liability based on postings of its users. Judge Easterbrook of the Seventh Circuit has stated:

> A web host, like a delivery service or phone company, is an intermediary and normally is indifferent to the content of what it transmits. Even entities that know the information's content do not become liable for the sponsor's deeds. Does a newspaper that carries an advertisement for "escort services" or "massage parlors" aid and abet the crime of prostitution, if it turns out that some (or many) of the

28

> advertisers make money from that activity? How about Verizon, which furnishes
> pagers and cell phones to drug dealers and thus facilitates their business? GTE
> does not want to encourage the surreptitious interception of oral communications,
> nor did it profit from the sale of the tapes. It does profit from the sale of server
> space and bandwidth, but these are lawful commodities whose uses
> overwhelmingly are socially productive. That web hosting services likewise may be
> used to carry out illegal activities does not justify condemning their provision
> whenever a given customer turns out to be crooked.

*Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003). Although made in the context of Section 230,

this opinion demonstrates why it would be improper under criminal law to construe offering of

services for legal purposes as conduct that could be prosecuted, merely because some users

misuse the services provided.

In copyright law, the Supreme Court held that copying equipment is not liable for

contributory copyright infringement if it is "capable of substantial noninfringing uses." *Sony*

*Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984); *see also* 35 U.S.C. § 271(c)

(statutorily providing the same for patent law). By the same token, a website that provides a

service allowing user-generated content should not be held liable for unlawful content of some

users if the service has "substantial lawful uses." Indeed, the danger of limiting speech protected

by the First Amendment is of a much greater concern than the policies at play in copyright law.

Backpage.com is a useful internet service that has many substantial legal uses. Almost all

of its categories contain ads and information regarding appropriate and non-objectionable

speech. Others, while objectionable to some, are still fully protected. It is only in a small number

of categories where some users post ads for illegal services and those ads generally have only a

short life, since Village Voice takes them down when it becomes aware of them.

In these circumstances, given the legality of the substantial uses of Village Voice's services,

derivative liability against Village Voice would be inappropriate

    E.    **Forcing Village Voice to Eliminate the "Escorts" Category or to Block
            Ambiguous Ads Would Constitute An Unlawful "Prior Restraint."**

DEFENSE_015318

Serious threats of civil or criminal suits by the State would present Village Voice with the choice of either eliminating much protected speech or facing serious liability. Such threats would essentially constitute the State using Village Voice as its censor to eliminate and prevent constitutionally protected speech. *Bantam Books*, 372 U.S. 58. This is a prior restraint of speech in violation of the First Amendment.

Requiring Backpage.com to block lawful speech or eliminate entire categories on its site that carry substantial amounts of protected speech is a prior restraint. This would shut down an entire forum of speech, and would essentially be giving "public officials the power to deny use of a forum in advance of actual expression," which is a classic example of prior restraint. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).

Prior restraints are "particularly disfavored" and bear a heavy burden against constitutional validity. *Id.* at 558 (internal citations omitted); *CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994). The "gagging of publication has been considered acceptable only in 'exceptional cases.'" *Id.* (citing *Near v. Minnesota*, 283 U.S. 697, 716 (1931)). Even where national security is concerned, see *New York Times Co. v. United States*, 403 U.S. 713 (1971), courts are reluctant to grant this "most extraordinary remed[y]" unless "the evil that would result . . . is both great and certain and cannot be mitigated by less intrusive measures." *CBS, Inc.*, 510 U.S. at 562 (internal citations omitted).

The State cannot justify a prior restraint under the "exceptional case" standard. The users posting ads can readily be punished after-the-fact, and the ads can readily be removed if reported to Village Voice and determined under appropriate standards to be for illegal services. In fact, removing escort ads would be counter-productive and would actually make law enforcement even more difficult, because prostitutes advertising their services would place their ads in other places,

30

where they are more difficult to identify, and where the operators do not retain credit card information which can be traced.

### Conclusion

As more fully explained above, prosecution of Village Voice for its Backpage.com service would be improper for three independent reasons:

      (1)    Section 230 of the Federal Communications Act, 47 U.S.C. § 230, specifically bars civil or criminal liability of Internet intermediaries based upon the content of their users' messages.

      (2)    Missouri criminal law relating to promoting and aiding and abetting prostitution applies only to those who have specific criminal intent to promote or aid prostitution, and such intent is clearly lacking in the circumstances where a communications provider makes available a forum for posting communications, but also bans, screens for, and promptly deletes messages that offer prostitution.

      (3)    The First Amendment limits prosecutions of information providers such as bookstore operators and communications providers to the rare situations where (a) the prosecution is confined to illegal content, (b) the publisher has knowledge and intent to provide illegal content, (c) the prosecution is conducted after-the-fact and does not chill or restrain ongoing protected speech.

4964961.10

DEFENSE_015320