UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-18-0422-PHX-DJH |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | December 13, 2021 |
| Michael Lacey, | ) | 1:31 p.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

ORAL ARGUMENT


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                     A P P E A R A N C E S

 2    For the Government:

 3                U.S. Attorney's Office
                  By: PETER SHAWN KOZINETS, ESQ.
 4                    KEVIN M. RAPP, ESQ.
                      MARGARET WU PERLMETER, ESQ.
 5                    ANDREW C. STONE, ESQ.
                  40 North Central Avenue, Suite 1200
 6                Phoenix, AZ  85004

 7                U.S. Department of Justice
                  By: REGINALD E. JONES
 8                1400 New York Avenue NW, Suite 600
                  Washington, DC  20530
 9
                  U.S. Department of Justice
10                By: DANIEL G. BOYLE, ESQ.
                  312 North Spring Street, 14th Floor
11                Los Angeles, CA  90012

12
      For the Defendant Lacey:
13
                  Lipsitz Green Scime Cambria
14                By: PAUL JOHN CAMBRIA, JR., ESQ.
                  42 Delaware Avenue, Suite 120
15                Buffalo, NY  14202

16    For the Defendant Larkin:

17                Bienert Katzman
                  By: WHITNEY Z. BERNSTEIN, ESQ.
18                903 Calle Amanecer, Suite 350
                  San Clemente, CA  92673
19
      For the Defendant Spear:
20
                  Feder Law Office
21                By: BRUCE S. FEDER, ESQ.
                  2930 East Camelback Road, Suite 160
22                Phoenix, AZ  85016

23

24

25
```

```
 1   For the Defendant Brunst:

 2              Bird Marella Boxer Wolpert Nessim Drooks
               Lincenberg & Rhow
 3             By: GOPI K. PANCHAPAKESAN, ESQ.
               1875 Century Park E, Suite 2300
 4             Los Angeles, CA  90067

 5   For the Defendant Padilla:

 6             DAVID EISENBERG, PLC
               By: DAVID S. EISENBERG, ESQ.
 7             3550 North Central Avenue, Suite 1155
               Phoenix, AZ  85012
 8
     For the Defendant Vaught:
 9
               JOY BERTRAND ESQ, LLC
10             By: JOY MALBY BERTRAND, ESQ.
               P.O. Box 2734
11             Scottsdale, AZ  85252

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  This is case number CR 18-422

2   United States of America versus Michael Lacey and others, on

3   for oral argument.

4          MR. JONES:  Good afternoon, Your Honor.  Reggie Jones,

5   Kevin Rapp, Margaret Perlmeter, Peter Kozinets, Andrew Stone

6   and Daniel Boyle on behalf of the United States.

7          THE COURT:  Good afternoon.

8          MR. CAMBRIA:  Good afternoon, Your Honor.  Paul

9   Cambria on behalf of Michael Lacey, and he is present today.

10          THE COURT:  Good afternoon.

11          MS. BERNSTEIN:  Good afternoon, Your Honor, Whitney

12   Bernstein on behalf of James Larkin who is present

13   telephonically as he's having a health issue.  Also with me is

14   Toni Thomas of our office.

15          THE COURT:  Good afternoon to you.

16          MR. FEDER:  Bruce Feder for Scott Spear, who is also

17   present.  Good morning -- or afternoon.

18          THE COURT:  Good afternoon.

19          MR. PANCHAPAKESAN:  Good afternoon, Your Honor.  Gopi

20   Panchapakesan on behalf of defendant John Brunst, who is

21   present in the courtroom.

22          THE COURT:  And good afternoon as well.

23          MS. BERTRAND:  Good afternoon, Your Honor.  Joy

24   Bertrand appears for Joye Vaught.  We ask to waive her

25   appearance.  She lives in the Dallas area.

1          THE COURT:  And good afternoon.

2          MR. EISENBERG:  Good afternoon, Your Honor.  David

3     Eisenberg for Andrew Padilla, who also resides in Texas.  And

4     we would waive his appearance today.

5          THE COURT:  Good afternoon to you as well.

6          All right.  The motion has been fully briefed with

7     regard to this particular matter, and I've given defendants and

8     the government 20 minutes apiece if you so choose to use that

9     time.  And I'll let whomever is going to proceed for the

10    defendants.

11         MS. BERNSTEIN:  Thank you, Your Honor.

12         THE COURT:  And let me just tell you how we're going

13    to proceed.  We will go through your oral argument, and then I

14    will take up the jury questionnaire at the latter part.  And so

15    just be prepared for that as well.

16         MS. BERNSTEIN:  Thank you, Your Honor.

17         Shall I approach the podium?

18         THE COURT:  All right, Ms. Bertrand.  Yes, please.

19         MS. BERNSTEIN:  And it's Ms. Bernstein, Your Honor.

20         THE COURT:  I'm sorry.  Ms. Bernstein, yes.

21         MS. BERNSTEIN:  And is it acceptable to the Court if I

22    argue for about 10, 15 minutes and save the remainder for

23    rebuttal?

24         THE COURT:  That's fine.  I gave you five minutes for

25    rebuttal in any event, so whatever time you wish.

1          MS. BERNSTEIN:  Okay.  Thank you.  And is it okay if I

2     have my cell phone up to keep track of the time?

3          THE COURT:  Yes, please.

4          MS. BERNSTEIN:  Thank you.

5          Thank you, Your Honor.  So I'm Whitney Bernstein.  I

6     represent James Larkin.

7          I think there's a couple of undisputed facts to begin.

8          First, it is a certainty that the government continues

9     to withhold significant Brady material.  There is no question

10    that the government continues to withhold a legal memo from

11    Arnold & Porter attorneys that this business, Backpage.com, how

12    it operated, what it published, how it was managed was legal.

13    And that undermines the government's theory of the case.

14         Second, there is no question that the government

15    interviewed and took grand jury testimony from many Backpage

16    moderators who made clear that they worked to keep illegal

17    content off of the website.  This is critical because the

18    government's theory is that these defendants intended to

19    promote prostitution.  But the moderators made very clear that

20    their job was to keep illegal content off the website, the very

21    opposite of what the government alleges.

22         The moderators also made clear that, contrary to the

23    government's allegations throughout the case, you cannot tell

24    that an ad is for illegal prostitution just by looking at the

25    ad.  And these interviews and these facts would destroy the

1    government's case.  This is the type of evidence that, if

2    believed by the jury, would result in an acquittal.  And the

3    government cannot withhold this evidence.

4         It demonstrates the misconduct that has been pervasive

5    in this entire case, in this prosecution by any means.

6         And everything I just said is beyond dispute, Your

7    Honor.

8         I'm going to spend a brief moment going through some

9    background information as we know that Your Honor is relatively

10   new to the case and didn't have the benefit of sitting through

11   the first trial.

12        Backpage.com was the second largest classified website

13   behind Craigslist, and it operated from 2004 until 2018.

14        The government here has charged a conspiracy for those

15   18 years, for that entire time frame from 2004 to 2018,

16   alleging that the defendants had the specific intent to promote

17   particular business enterprises, prostitution offenses,

18   through the publication of specific ads.  And there are 50

19   specific ads in the indictment that compose Counts 2 through

20   51.  And they've also charged money laundering related to these

21   alleged specific unlawful activities.

22        The government's purported evidence of the defendants'

23   specific intent to promote prostitution, as they've

24   demonstrated in millions upon millions of pages of discovery,

25   in its lengthy opening statement, and in the witnesses that it

1    called before the mistrial, includes the contention that lawful

2    escorts are actually illegal prostitution, that everyone can

3    tell an ad is prostitution just by looking at it.  And this

4    idea that people complained about ads on Backpage and that

5    Backpage aided law enforcement in the prosecution of pimps or

6    people who were misusing the website, and so that somehow puts

7    the defendants on notice that the website was being -- was used

8    for prostitution -- never mind that those three themes don't

9    really bear on specific intent -- that is the government's

10   evidence.

11            And in the middle of this alleged conspiracy from 2004

12   to 2018, in the middle of this, in 2012 and 2013, DOJ conducted

13   a years-long investigation into these exact defendants and this

14   exact company.

15       (Cell phone interruption.)

16            MS. BERNSTEIN:  They convened the grand jury.  They

17   took testimony of at least six people, including one of these

18   defendants.

19            THE COURT:  I'm going to stop you right here.  Just

20   please, everyone, take a moment to turn your cell phones off.

21   Off.

22            Thank you.  Go ahead.

23            MS. BERNSTEIN:  What's remarkable, Your Honor, is that

24   this is a conspiracy that spans 18 years.  And in the middle of

25   this conspiracy, the Department of Justice undertook this exact

UNITED STATES DISTRICT COURT

1    same investigation into these defendants, into this website.

2    It's not a company that had an office here and an office there

3    and a branch on the east coast and a branch on the west coast.

4    It's one company.  And in the middle of this, DOJ investigates.

5    They subpoena thousands of documents.  We have no idea how

6    much.  They take testimony of at least six people, including a

7    defendant, five moderators, and Charles Craig, a prospective

8    buyer.  And Mr. Craig is the one who had the advisory

9    letter from Arnold & Porter that was an exhibit in the grand

10   jury in the Western District of Washington that the government

11   steadfastly refuses to produce.

12          And the result of that investigation was that DOJ

13   concluded there was no criminality, no criminality.

14          THE COURT:  Let me -- I'm going to pause you for a

15   second, and let me ask you these couple of questions.

16          I know that in the motion to dismiss oral argument and

17   in the government's response, they essentially asked the Court

18   or tell the Court to look at these as two separate

19   investigations, the Washington investigation and this

20   investigation.

21          And I know from the prior order that Judge Logan

22   entered, he also found that the Washington investigation was

23   separate.  And he found that, therefore, in looking at the

24   memos that are at issue here, that that did not constitute in

25   his review Brady material.

1      And so let's put that aside for a second.  I know in

2  looking at your motion regarding the Arnold & Porter memo, this

3  is from 2011.

4      MS. BERNSTEIN:  Correct.

5      THE COURT:  And it's to a Charlie Craig, who at least

6  in my view of the government's witness list, he's not on the

7  witness list.  And I see in the attachments and the

8  government's response that Charlie Craig was a potential buyer.

9  And it seems like he then sought advice from Arnold & Porter.

10      And so I want to know if Charlie Craig is not one of

11  the named defendants and if he's not a government witness and

12  he solicited advice from Arnold & Porter, how is it relevant to

13  the case?

14      MS. BERNSTEIN:  I'll address your concerns in reverse

15  order beginning with your concerns about Mr. Craig.  Not being

16  a witness to this case absolves the government of their duty to

17  disclose everything related to him, related to this company, to

18  my client, whom he went out with a number of times and had a

19  number of conversations and correspondences with in his pursuit

20  of the company.  It absolves the government of their obligation

21  to provide that under Jencks.

22      But when what that information shows is that he was

23  looking to purchase the company and had a premier law firm that

24  the company's operations, the management of the company, the

25  content that the company published --

1      THE COURT:  How do you know that?  How do you know

2  what information he provided to Arnold & Porter in order to get

3  the memorandum?

4      MS. BERNSTEIN:  We don't know much, Your Honor, and

5  that's because a lot of it's been withheld.  But under Brady we

6  need to be showing that there's relevance and that this is

7  potentially exculpatory and potentially favorable.

8      The idea that a premier law firm vetted the company to

9  advise a potential buyer in the middle of this alleged

10  conspiracy that everything was copacetic, that there was no

11  criminal liability, that's unbelievably exculpatory and

12  undermines the government's arguments here that everything was

13  unlawful.

14      THE COURT:  But how does it go to the intent of your

15  client or the co-defendants?  Because I'm not sure -- There

16  seems to be a missing link here.  Because if Mr. Craig is the

17  person seeking the advice of Arnold & Porter, he's not an owner

18  of Backpage, so he's providing them whatever public information

19  I suspect that he provides.  Let's assume.

20      So how does that then -- How is that related then to

21  your clients and their acts or omissions or their state of

22  mind?  How do you make that link?

23      MS. BERNSTEIN:  I think first I just want to also

24  address that I believe -- My understanding, based on his

25  164-page grand jury testimony, is that he had provided his

1    attorneys with the CIM, the confidential information

2    memorandum, or the book that was prepared and presented to him

3    by Duff & Phelps in connection with the Bank of Montreal as

4    they were beginning this sale or to solicit buyers.

5           I think what Your Honor is asking is that you're

6    hoping or you're asking did our client -- did these defendants

7    read that memorandum such that it bears on their specific

8    intent and their good faith and potentially their advice of

9    counsel?  Is that the question?  Am I understanding that?

10          THE COURT:  That's one of the questions I have.  I

11   mean, how do we know if they did?

12          MS. BERNSTEIN:  I don't -- We don't, Your Honor.  And

13   I think that that's part of what's concerning here, is that we

14   don't know everything about that investigation.  We know

15   precious little about that investigation.

16          THE COURT:  Well, you certainly can talk to your

17   client and ask them whether or not they saw the memorandum and

18   when they saw the memorandum.  But I guess the question that I

19   have is if the -- if the information was sought from Mr. Craig,

20   who at the time wasn't an owner, I'm not sure how that is

21   relevant to the case.

22          MS. BERNSTEIN:  I guess, Your Honor, there's an

23   18-year conspiracy charged here, and a premier law firm vetted

24   the conduct of this company and the content that it published

25   and the way it was managed and what it was doing.  And that law

1  firm provided written advice in an advisory letter that

2  everything was legal, that a potential buyer would not have

3  criminal liability, would not have civil or criminal liability.

4          So for the government to turn around and instead

5  resume this prosecution and say actually everything that went

6  on during that time frame was in fact criminal, it doesn't

7  comport.  The idea of Brady is not what was specific

8  information that creates an advice of counsel defense or what

9  was specific information that my client or the other defendants

10  specifically read.

11          It's is there favorable evidence that the defense

12  might make use of that could undermine the government's case?

13          And the idea --

14          THE COURT:  It has to be material to one of the issues

15  in the case.

16          MS. BERNSTEIN:  Well, the issue in the case, Your

17  Honor, is that there was an 18-year conspiracy to violate the

18  law.  And the idea that in the middle of that 18-year

19  conspiracy a law firm investigates and issues a written

20  memorandum advising a potential buyer that there is no civil or

21  criminal liability, I don't see how that doesn't undermine the

22  government's contentions here.  The contention is that

23  everything was illegal.

24          THE COURT:  So let me finish with this question then.

25          So we're talking about 2011.  Arnold & Porter sends

1    out their memo to Mr. Craig.  My understanding from the oral

2    presentment on the motion to dismiss and looking at the papers

3    here, the government's position then is that something else

4    then happens after the U.S. Attorney's Office shuts down the

5    Washington case.  There's a senate investigation.  There are

6    congressional subpoenas that are submitted.  There's additional

7    information then that's developed.

8            And so how -- how then does that relate to the 2011

9    memo?  Isn't there sort of a new situation that arises here,

10   and isn't there new development of information?

11           MS. BERNSTEIN:  We, first of all, dispute the

12   government's contention that they later learned things that

13   they did not know that was going on during 2010, '11, '12, '13,

14   when they investigated.  It's our position and as --

15           THE COURT:  You simply don't believe the government in

16   that assertion?  Is that what you're saying?

17           MS. BERNSTEIN:  Not only that, Your Honor, but when

18   you read the grand jury testimony, the moderators make very

19   clear, for example, that the practice of removing words from an

20   ad, that that practice ceased, was only in existence for a

21   short period of time and ceased by 2012.

22           The government here alleges that that was a practice

23   that pervaded the history of Backpage.  And that's one of their

24   pieces of evidence to suggest that we are guilty, that we had a

25   specific intent to promote prosti -- the business enterprise

1    prostitution evinces.

2            It's not just that I don't believe the government,

3    that they didn't know this, and they later found it.  It's that

4    what we -- the little we have seen of the Western District

5    investigation does show that the theories they are advancing

6    now was known to them at the time.

7            Your Honor also asked how later information would go

8    to bear on the 2011 memo.  And I want to be clear that the 2011

9    memo, in our view, is the tip of the iceberg.  It's what we

10   know is out there.  We don't know what else is out there.  But

11   we do not believe that the 80 pages the government produced in

12   August of 2021, many of which actually are Jencks of a

13   government witness that remained on their witness list and was

14   put on their witness list in January, 2020, we do not believe

15   that those 80 pages comprise the world of information that was

16   out there.  We have those 80 pages as well as the grand jury

17   transcripts.

18           This investigation allegedly occurred from 2016 when

19   it was -- we have I believe it's Exhibit F of our motion.  It

20   is one of the FBI agent's affidavits seeking a search warrant.

21   And that affidavit relies on information, selectively relies on

22   information from the Western District of Washington.

23           It quotes certain things that they purport were said

24   in witness interviews in the Western of District Washington,

25   things that I would add that are not supported by the

UNITED STATES DISTRICT COURT

1    handwritten notes that we were provided in August of 2021 weeks

2    before trial three years after asking for this.

3           And so the idea that there was something later in

4    time, that more came to light, or it shifted the way the

5    government views the criminality in this case, we, A, don't

6    accept, and, B, that is for cross.  That is for cross.  That is

7    for rebuttal.  That is for closing.  The government doesn't get

8    to assume that our clients are guilty based on what -- the case

9    they've decided to present and then say that evidence that

10   doesn't comport with that assumption is immaterial to this

11   case.

12          The government has to go to trial and has to present

13   at trial, and a jury needs to find that our clients in fact did

14   everything the government contends they did.  And everything

15   they learned in the Western District of Washington undermines

16   what they stood up in court before Judge Brnovich in our last

17   jury and said.

18          Their superseding indictment, 65 percent of the

19   paragraphs relate to conduct before 2013.  The idea that

20   somehow this is all about later in time information, it's

21   just -- it's not supported, Your Honor, by what the

22   government's case is and by what they've argued at trial.

23          If the government wants to say, for example, if we

24   had --

25          THE COURT:  Well, let me -- When you say "argued at

1    trial", the only thing that I can really look at is their, my

2    understanding is and part of your motion, is that their opening

3    statement referred back in time to activities that occurred

4    back in 2004, some of which may or may not have come to light

5    in the Washington state investigation.

6           And I guess given the nature of opening argument and

7    looking at the opening argument that actually did occur, I

8    don't think Judge Brnovich sustained all but maybe two of the

9    objections.

10          And so I'm not clear what it is that you're trying to

11   tell me with regard to the opening statement, because, as you

12   know, opening statements are what the government purports

13   they're going to be able to show.  And certainly it's not

14   evidence.  So I'm not sure how that affects your argument here.

15          MS. BERNSTEIN:  Well, it's exactly that, Your Honor.

16   It's what the government was purporting to show over the course

17   of a four-month trial.

18          THE COURT:  But they can and they are permitted to

19   give a history of Backpage, how it began, who started it, how

20   much the company was worth, what was going on at that time.

21   They're allowed to do that, aren't they?

22          MS. BERNSTEIN:  Of course.  We have no issue with that

23   whatsoever.  The issue, Your Honor, is that the government's

24   case rests on evidence and on alleged practices and alleged

25   conduct of these defendants pre-2013.  And as of 2013, the

1    Western District of Washington had investigated that exact same

2    time frame, these exact same defendants, these exact same

3    contentions, and had concluded that they could not proceed with

4    their prosecution because there was no evidence of criminality.

5         The government resurrected that investigation and

6    prosecution three years later in 2016 and now is standing up

7    before everyone to say that in fact the Western District of

8    Washington actually got it wrong, nothing to see here, move

9    along, because we've decided what our case is, and we will not

10   even allow you an opportunity to cross or review evidence from

11   our years-long investigation that demonstrated the opposite

12   conclusion.

13        Your Honor said that Judge -- I would note that Judge

14   Brnovich, it was after the opening that we brought this issue

15   up again, because it was after the opening that we said:  Your

16   Honor, how in the world can they stand up here and say 2004,

17   '05, '06, '07, '08, '09, '10, '11, '12, '13 was illegal and not

18   give us evidence, not give us the factual investigation that

19   they did for years that this -- the FBI, the DOJ did for years

20   coming to the opposite conclusion?

21        And that was when she said -- they said, well, those

22   witnesses aren't on our list.  And we explained the

23   gamesmanship that they played with their witness list, that

24   every time we asked for Jencks of someone who we knew was

25   involved in the Western District of Washington, they took that

1   person off their witness list.  And we said that doesn't --

2   It's Brady, Your Honor.  It goes to favorable, exculpatory

3   material, impeaching information that we could make use of at

4   this trial that the jury would believe to acquit our clients.

5   That's what the government doesn't want to give us.

6           And she said government?

7           And then she said brief it.

8           So it's by no means that Judge Brnovich did not think

9   this was a live issue.  Based on the government's opening and

10  based on what the government had done pur -- what they claimed

11  they were going to show throughout the course of the trial that

12  relied on conduct pre-2013, Judge Brnovich said:  Why is that

13  not Brady?

14          Judge Logan did not address this, Your Honor.  It was

15  never before Judge Logan whether the facts of the underlying

16  investigation that underlied the government's conclusions,

17  whether those needed to be turned over.

18          This was not an issue that we raised with Judge Logan.

19  This was not an issue that Judge Logan found.  Judge Logan's

20  order was also in a vacuum.  Before the government's case

21  centered on the idea that anyone could tell an ad just by

22  looking at it, when they know that not just the Arnold & Porter

23  memo, Your Honor, but everything, all of the moderator

24  interviews -- We know they interviewed at least 12 moderators,

25  probably more, based on the scope and breadth of the subpoenas.

1  The facts of the underlying investigation were plainly

2  exculpatory, material, and impeaching.

3          It's the same investigation.  It's the same case.

4  It's the same contentions.  It's the same defendants.  The fact

5  that DOJ had an intervening investigation that came to an

6  opposite conclusion from what these prosecutors are now

7  advancing and thinks that they don't have to turn any of that

8  over because it doesn't comport with what they're arguing, it's

9  just plainly violative of Brady and Giglio and Rule 16.

10          THE COURT:  To be clear, though, they have turned over

11  quite a bit of documents.

12          MS. BERNSTEIN:  No, Your Honor, they have not turned

13  over quite a bit about this at all.  They have turned over six

14  grand jury transcripts, which are a couple of hundred pages in

15  length, and they have turned over, in August of 2021, 80 pages

16  of discovery that relate to the Western District of Washington.

17          This case, Your Honor, was investigated for about the

18  same time frame, this current prosecution.  And by October of

19  2018, the government had produced over 10 million pages of

20  discovery.

21          So it is incredible to believe that the Western

22  District of Washington yielded a grand total of 80 pages of

23  discovery when that was for years long, and this investigation

24  yielded ten million pages in the same amount of time.

25          Also, Your Honor, Agent Vienneau -- I'm sure I'm

1    mispronouncing his name -- but Agent Vienneau from the FBI has

2    been on the government's witness list in this trial since

3    January of 2020.  We have asked for Jencks.  There's an order

4    requiring them -- Judge Logan issued the order.  I believe

5    Judge Brnovich at docket 731 and 730 reaffirmed it.  There was

6    an order requiring them to provide Jencks by 2019.  I think it

7    was by August of 2019.

8            THE COURT:  Can you slow down just a bit.

9            MS. BERNSTEIN:  Yes.

10           THE COURT:  Thank you.

11           MS. BERNSTEIN:  There was an order requiring the

12   government to provide Jencks by 2019.  Agent Steven Vienneau

13   was the case agent on the Western District of Washington

14   investigation.  We never received a single page of discovery

15   from Agent Vienneau's investigation in Washington.

16           They provided eight pages of handwritten notes that

17   are impossible to decipher of moderator interviews by their IRS

18   agent.  And they also provided eight -- I'm sorry.  There were

19   twenty-ish pages of moderator handwritten note interviews.  And

20   there were about eight pages related to Agent Vienneau, his

21   reports from the Western District of Washington.

22           And the first page of that report makes very clear,

23   Your Honor, that that was going after the same stuff this was.

24   It was alleging that Backpage was known as the main online

25   venue for advertisements for prostitution for both adults and

1    juveniles.  This is one of the eight pages that we have

2    relating to his report.

3         The idea that that was never turned over to us ever

4    until August of 2021, despite repeated demands and despite --

5    never mind our demands -- there's an independent constitutional

6    obligation to provide that information.  And it was never

7    provided to us in any capacity.

8         So they have not turned a lot over.  I think that was

9    what Your Honor had suggested.  Not only are we obviously

10   missing information, but the government's never even pretended

11   to claim that they've given us everything that's out there.

12   They are noticeably never making that assertion.

13        Instead, it's all about, well, we think -- we think

14   that that wasn't right.  We think they got it wrong.

15        Your Honor, that is for cross.  That is for rebuttal.

16   That is for closing.  You do not get to withhold exculpatory

17   information because it doesn't sync with the case you're trying

18   to present.

19        And that's why we're asking this Court to order them

20   to give us all of the exculpatory facts, all of the information

21   that was revealed in the Western --

22        THE COURT:  Well, you're actually asking me to conduct

23   an in camera review of it, aren't you?

24        MS. BERNSTEIN:  At this point, Your Honor --

25        THE COURT:  Because it clearly relates to some of the

1   documents that Judge Logan found were protected.  You're asking

2   for the documents behind those memos.  Those memos themselves

3   are protected.  And I would have to, I think, based on his

4   finding that the memos and the impressions, the attorney

5   impressions, that, after having looked at those documents or

6   pieces of evidence, resulted in whatever their work product

7   was, I certainly would think that I would have to look at them.

8                MS. BERNSTEIN:  Your Honor, our request --

9                THE COURT:  If that's what you're asking for.

10               MS. BERNSTEIN:  I'm sorry.  Your Honor thinks that you

11   would have to look at the memos?  Is that --

12               THE COURT:  I would have to look at the -- what you're

13   asking for is the documents or evidence that the memos are

14   based upon.

15               MS. BERNSTEIN:  We're asking for the documents and

16   evidence that the declined prosecution of Backpage is based on.

17   The declined prosecution of Backpage is contained in the memos,

18   but it also was public knowledge.  It was known to the company

19   and to the clients that this DOJ investigation had begun, that

20   subpoenas were issued, that testimony was taken, and that a

21   non-prosecution was decided.  And there's also a government

22   witness, Ernie Allen, who's the former head of NCMEC, who

23   says -- and it's in the record for Your Honor -- says in an

24   e-mail, you know, DOJ told me that they can't prosecute, that

25   there's no -- they can't go forward with this case.  There's no

1    criminality.

2            So it's not just the memos, Your Honor.  It's the

3    existence of exculpatory information from the Western District

4    of Washington.  I don't believe that the Court would have to

5    review that in camera.  The government should certainly know

6    what their obligations are.  It's been made very clear the

7    information that we are after.  There's just never been an

8    order requiring them to turn it over.  And they're not doing it

9    volitionally.

10           We asked Your Honor to review the memos in camera

11   because we think that if --

12           THE COURT:  No.  I read your motion to say the

13   information that -- upon which the memos were written.  That's

14   what I read in your motion.

15           MS. BERNSTEIN:  That's what we're requesting be

16   ordered produced to us.  We had added that Your Honor could

17   review the memos in camera because at the time it was Judge

18   Brnovich, and we felt that if someone had, based on

19   recollection of the memos, that if someone read the memos, they

20   would see that there was probably a lot more that we just don't

21   remember to even ask for that undermine what the government

22   argued at trial.  So we're not asking --

23           THE COURT:  But I thought Judge Logan reviewed the

24   memos.

25           MS. BERNSTEIN:  Judge Logan did review the memos and

1      concluded that they were work product and protected and

2      concluded that the information -- that the memos, that the

3      conclusions of DOJ attorneys was protected work product.

4                THE COURT:  And he also found the material does not

5      rise to the level of Brady or Giglio material.

6                MS. BERNSTEIN:  Of the memos, Your Honor.  Not of the

7      underlying investigation.  Judge Logan never examined, was

8      never asked and had no ability to have examined the materials

9      underlying the government's non-prosecution decision.  Judge

10     Logan was saying that we can't make use of those memos, that we

11     can't bring a motion to dismiss, that we can't argue that

12     they're precluded based on an earlier decision, that we can't

13     put that before the jury.  That was what Judge Logan argued and

14     ordered us to do at 449-1.  Judge Logan never, ever addressed

15     the fact that there has to be witness interviews and statements

16     and reports and 302s that have never been produced.  That was

17     not before Judge Logan.

18               Judge Logan could never have issued an order that

19     said, government, you're absolved of Brady.  That was not what

20     Judge Logan's order said.  Judge Logan's order said we cannot

21     make use of the memos, which we have not done.

22               THE COURT:  And Judge Brnovich's later order basically

23     denied your motion to compel certain production of Brady

24     materials, but in that order it certainly seems to me that she

25     issues an admonishment to the government about its Brady

1    obligations and basically says -- which the law states and

2    supports -- that it's for the government to decide what is

3    Brady or Giglio or discoverable, depending on what their case

4    is that they're going to put forward.

5          And so I don't know why that isn't sufficient here.

6          MS. BERNSTEIN:  Well, as Your Honor knows,

7    unfortunately Brady violations do occur despite the

8    government's obligation to provide information that would

9    undermine its case.  And here what we know is that the

10   government has alleged an 18-year conspiracy about these

11   defendants and this website and how it operated and that it was

12   criminal.  And we know that the government investigated those

13   exact same contentions as of 2012 and 2013 in the Western

14   District of Washington and came to the opposite conclusion.

15         So it is unbelievable that the government does not

16   deem that information as undermining its current prosecution,

17   and that is why we are here before the Court.

18         THE COURT:  All right.  Let me hear from the

19   government.

20         MS. BERNSTEIN:  Thank you, Your Honor.

21         MR. JONES:  Good afternoon, Your Honor.  Reggie Jones

22   on behalf of the United States.

23         Your Honor, I want to address Mrs. Bernstein's

24   arguments, but I want to start by going back to the hearing

25   that took place on December 3rd, the morning of December 3rd,

1      when Your Honor asked the government if the Western District of

2      Washington's 2012-2013 investigation of Backpage, if it was

3      wholly separate, if there was any overlap between the District

4      of Arizona's grand jury investigation of Backpage.

5              And the government stood up and said that there was no

6      overlap, that they were wholly separate investigations.

7              Mrs. Bernstein, defense counsel, then stood up and

8      said that this was their first time hearing that, the

9      government making that statement that it was wholly separate,

10     and there was no overlap.

11             And so I just want to be clear, Your Honor, that the

12     government has stated on multiple occasions in the record in

13     letters as well as in court filings that the Western District

14     of Washington's nearly decade-old 2012-2013 investigation is

15     wholly separate from the case at hand.  I just want to point

16     these docket numbers out.

17             First, docket number 352 at 10, that's the

18     government's 2018 callback motion before Judge Logan:  "The

19     inadvertently disclosed work product documents prepared by

20     federal prosecutors in the Western District of Washington

21     pertain to that office's investigation of Backpage."

22             Docket 810-2, a November 2018 letter the government

23     sent to defense counsel:  "We do not share your view that the

24     materials from the Western District of Washington's 2012-2013

25     investigation of Backpage revealed exculpatory or impeachment

1    information in this criminal case."

2            Docket 432 at 3, our reply to their response to the

3    callback motion, December, 2018, three years ago:  "The

4    inadvertently disclosed memos are paid work product because

5    they set forth the USAO Western District of Washington's

6    prosecutors' and agents' mental processes, legal theories, and

7    recommendations on how to move forward with that office's

8    Backpage investigation."

9            In that file, that same reply:  "Defendants' attempt

10   to uncover USAO Western District of Washington's attorneys'

11   mental processes and other case-related recommendations from

12   that office's investigation into Backpage should be denied."

13           Then, as Your Honor pointed out to defense counsel

14   last week, Judge Logan, in January of 2018, after reviewing the

15   government's motion, the defendants' response, the government's

16   reply, as well as reviewing the inadvertently disclosed

17   memorandums in camera, ruled in docket 449-1 order at 3:  "It

18   is undisputed that the disclosed memos are attorney work

19   product related to a separate investigation into Backpage that

20   took place in the Western District of Washington.  The Court

21   finds that the defendants' argument is misguided.  It's clear

22   to the Court that the investigation that took place in the

23   Western District of Washington is wholly separate before --

24   from the criminal case before the Court."

25           And so those are more than six or seven occasions.  So

1   we just wanted to make clear for the record that that certainly

2   was not the defendants' first -- the government's first time

3   asserting that that decade-old investigation was wholly

4   separate from the case at hand.

5           Another point I'd like to address in Mrs. Bernstein's

6   argument, Your Honor, is she cites in docket 1332 at 12 in

7   their reply -- and she also argued this a few minutes ago --

8   that the government doesn't say that what we produced from the

9   Western District of Washington is the entire universe of

10  exculpatory or impeachment information when the Western

11  District of Washington concluded that there was no evidence of

12  criminal conduct.

13          First, just to be clear, the Western District of

14  Washington -- because they cite this throughout their

15  briefing -- the Western District of Washington investigation

16  did not conclude that there was not any criminal conduct.  An

17  indictment was not filed in that investigation.  But that

18  investigation did not conclude that there was not any criminal

19  conduct.  So I just want to make that clear.

20          But more importantly, Your Honor, neither the Court

21  nor the government had been silent on that issue.  As we stated

22  before, Judge Logan's order 449-1, "Defendants' argument is

23  misguided.  It is clear to the Court that the investigation is

24  wholly separate from the criminal case before the Court."

25          Secondly, we have told these defendants, have been up

1    front since the outset of this investigation, that materials

2    from the Western District of Washington's nearly decade-old

3    investigations are not exculpatory or impeachment information

4    in this criminal case.

5            And we go --

6            THE COURT:  Let me have you address what I think her

7    argument is.  Obviously the indictment spans back 2004.

8    There's certainly then an overlap in time with what -- with the

9    time period that the Washington investigation was going on.

10           So what she's saying is there's -- because you have

11   this conspiracy charge and the acts that you talked about

12   relating to Backpage and its operations and what its owners and

13   operators knew about it go back to when they became involved,

14   and so how is it that you can parse out what was being

15   investigated in Washington and this case?  And therefore how

16   can you say that there cannot be an overlap of evidence?

17           MR. JONES:  Well, I think, from our standpoint, Your

18   Honor, we charged a conspiracy from -- beginning in 2004 and

19   ending in 2018.  And the lion's share or the vast majority of

20   the evidence that was charged in the indictment come from the

21   tidal wave of evidence that has emerged that is in -- that the

22   government has again provided these defendants in this criminal

23   case, including the senate subcommittee 17-month investigation

24   where they issued a 52-page report that found the defendants

25   knowingly and intentionally facilitated prostitution and

1    included an 800-page index, which includes documents the

2    defendants have in this case.

3         We have also -- The Arizona grand jury obtained more

4    than a million pages of documents, the vast majority of which,

5    90 or so percent, are exhibits on the government's exhibit list

6    from this grand jury investigation that show -- talk about the

7    defendants' moderation practices, talk about their content

8    aggregation, talk about their reciprocal link agreements with

9    other prostitution review sites.

10        And so the government's case, the government's

11   indictment that we issued in July, 2018, in our opening

12   statement, and our theory of the case has not changed.

13        And so what is very clear, Your Honor, is that

14   information from the Western District of Washington's nearly

15   decade-old investigation, it's not exculpatory or impeachment

16   in this criminal case, Your Honor.

17        And we have -- And I think it's an important point

18   also to note is that defense counsel states that, you know,

19   Judge Logan just said the memos were not exculpatory.  She says

20   that Judge Logan never ruled that the government could withhold

21   the underlying factual investigation materials supporting WDA's

22   investigation.

23        That's not correct, Your Honor.  Judge Logan

24   absolutely addressed the so-called underlying factual materials

25   in his order 449-1.  In fact, a close look at the defendants'

1    motion -- response 407 and their motion 1281, they make -- they

2    advance the exact same arguments.  In 407 they state:  "The

3    memos contain Brady materials because the facts disclosed don't

4    support the superseding indictment."  That's 407 at 3.

5         407 at 8:  "The memos contain witness statements,

6    investigative leads favorable to the defense and evidence

7    relevant to the defendants' -- to support the defendants' grand

8    jury proceedings."

9         They then go on to cite, in 407 at Page 8, they state:

10   "Any factual or legal matters that contradicted the

11   prosecutor's theory of the case are Brady materials."

12        Then they cite a case:  "Brady violations for

13   withholding investigation reports or interviews undermine the

14   prosecution's theories of the case."

15        So Ms. Bernstein and the defense counsel's contention

16   that Judge Logan's order did not address any so-called

17   underlying facts is just not the case, Your Honor.

18        Judge Logan had the government's motion, the

19   defendants' response, 407, our reply, the inadvertently

20   disclosed memos which he looked at in camera, and, after

21   reviewing the relevant case law, issued his order 449 that the

22   materials in that totally separate investigation were separate.

23        He also indicated that the defendants should destroy

24   those memos and not make use of anything that they may have

25   derived from those memos at trial or any future proceeding in

1    this case.

2          Notwithstanding Judge Logan's order, the defense

3    counsel, in the middle of trial, get up, and they file a third

4    motion to compel Brady.  Their first two, as Your Honor is

5    aware, were denied.

6          And it is what defendants have failed to articulate

7    and Mrs. -- and Judge Brnovich highlights in her order 1028.

8    And she told the defendants at trial before they filed this

9    motion that the government is the gatekeeper.  The government

10   decides prospectively what is considered Brady, and that often

11   turns on the context of the existing record in this case, Your

12   Honor.  And so we just -- we just want to make that clear.

13         Also what Judge Brnovich noted in 1028 is that "A

14   comprehensive assessment of defendants' positions reveals a

15   view of Brady that contravenes settled precedent.  Taking their

16   positions together, it is clear defendants see Brady as a

17   discovery tool that creates an open file policy."

18         And that is what Mrs. Bernstein is contending.  Mere

19   speculation is not enough.  *Kyles versus Whitley*, *U.S. versus*

20   *Lucas*, the Ninth Circuit has made clear that we decide -- the

21   government is the gatekeeper -- we decide prospectively what is

22   considered Brady.

23         One other issue I wanted to just address that

24   Mrs. Bernstein argued, and it's in regards to this

25   Arnold & Porter legal memo that she claims is so-called Brady.

1          First of all, Your Honor, as the briefing indicates,

2     this -- the defendants have had the transcripts -- transcripts

3     since November of 2018, so more than three years ago.

4          On the eve of trial, in August of 2021, nearly three

5     years after they had this transcript, they request from the

6     government this so-called exculpatory legal memorandum, which

7     it's not, Your Honor.  The substance of the memo appears to be

8     in the grand jury transcript.  And it consisted of advice

9     obtained by a third party who ultimately decided not to

10    purchase Backpage because of prostitution advertising.

11         Your Honor, although, as Judge Logan indicated in

12    January of '19, as well as the government has indicated to

13    defendants since the outset of this case that no materials from

14    that separate investigation are Brady and Giglio in this

15    criminal case, after the December 3rd hearing, the government

16    went back to the Western District of Washington.

17         Just to take a step back, in 2016, the government

18    received materials from -- its understanding of materials

19    related to the Western District of Washington's

20    investigation -- it had been closed at -- five years at that

21    point in 2016 when we received it -- and turned materials over

22    to the defense counsel, including grand jury transcripts as

23    well as an October 4, 2018, 79 documents.  I don't think

24    Ms. Bernstein noted that, but we turned over documents from

25    that investigation October, 2018, as well as, you know, we

1    searched our files again and turned over a few other MOIs from

2    that separate investigation to the defendants.

3              And what we will do, Your Honor, we -- Just to be

4    clear, the government hasn't seen this Arnold & Porter memo,

5    but we will work with the Western District of Washington and,

6    you know, just -- although it's not Brady or Giglio, out of an

7    abundance of caution, in the coming weeks we will, if there are

8    any other materials from that investigation, we'll give them to

9    the defendants.

10             But we want to make clear before the Court that this

11   issue has been closed.  Judge Logan closed this issue in

12   January of '19.  And it was closed until they opened it back up

13   three years later, ignoring Judge Logan's order, and filing

14   their third motion to compel, Your Honor.

15             This is what the defendants do, not just with this

16   issue.  They continue to reurge --

17             THE COURT:  Mr. Jones, let me just stop you there.

18             MR. JONES:  Thank you, Your Honor.

19             THE COURT:  I think you can sense a bit of my

20   frustration if we're here on this matter, and the contention is

21   that especially with regard to this memo from

22   Arnold & Porter --

23             MR. JONES:  Yes, Your Honor.

24             THE COURT:  -- is somehow exculpatory.  And the

25   posture of the government up to this point has been that it is

1    not.  I'm not going to tell you what to turn over and what not

2    to turn over.  It is the law that you have the gatekeeping

3    function.  And the government -- excuse me -- the Court always

4    assumes the government lives up to its obligations.

5            But now if we're simply going to just turn over

6    matters, then why are we having this hearing?

7            MR. JONES:  Well --

8            THE COURT:  And I want to know then what the relevance

9    is of a 2011 memo from a third-party law firm to this

10   Mr. Charlie Craig has to do with this case?

11           MR. JONES:  It doesn't, Your Honor.

12           THE COURT:  And if it has nothing to do with the case,

13   then, I mean, certainly you can turn over what it is you're

14   going to turn over.  But why then am I here?  Is this a moot

15   issue then?

16           MR. JONES:  No.  What we're saying, Your Honor, is

17   that we aren't sure -- It was a wholly separate investigation.

18   The memo is not discovery in this case.  It's not Brady and

19   Giglio.  We aren't aware because it was totally separate.  So

20   we're not sure if the memo exists.  But what we're saying is

21   that we want to be clear that nothing from that investigation

22   is exculpatory or impeachment information in this criminal case

23   because they're separate criminal cases, Your Honor.

24           And so we don't even know if -- So we just want to

25   make that clear for the Court, because Mrs. Bernstein's

1   contending that the government's withholding an abundance of

2   Brady/Giglio, everything from that investigation is

3   Brady/Giglio, because it's one investigation.

4         And so we just want to make clear for the record, as

5   Judge Logan did three years ago, that there was no overlap, and

6   that investigation is wholly separate from the criminal case

7   before this Court.

8         THE COURT:  So I'd like you to, before you sit down, I

9   want you to respond to the defendants' reply that much of your

10  opening statement discusses the pre-2013 acts of Backpage and

11  the defendants and thus making all of that information somehow

12  relevant.

13        MR. JONES:  Your Honor, the government's opening

14  statement, we charged a conspiracy from 2004 into 2018.  And

15  our opening statement covers that time period.  Our opening

16  statement covers the superseding indictment.  It mirrors the

17  superseding indictment, Your Honor.  Our opening statement

18  discuss -- Excuse me.  Our opening statement discuss the

19  prostitution marketing strategies these defendants were

20  involved in beginning in 2004.

21        It discussed the content aggregation, taking ads from

22  Craigslist -- prostitution ads from Craigslist, recreating

23  those ads from Backpage to grow and expand the business in the

24  early years.

25        Our opening statement talked about the defendants'

1    relationship with prostitution review sites like the Erotic

2    Review, the reciprocal link agreements with those sites that

3    covered a certain time period.

4         Our opening statement talked about the defendants'

5    moderation practice, stripping words and images indicative of

6    prostitution and trafficking and posting those ads on the Web

7    site.

8         Our opening statement also talked about these --

9    talked about the defendants' money laundering strategies, how,

10   after banks and credit card companies closed their accounts out

11   of concerns of illegality, that they fooled the credit card

12   companies into believing that their charges weren't associated

13   with Backpage.

14        Our opening statement was comprehensive.  It mirrored

15   the superseding indictment and what we -- the allegations and

16   the charges in this case.  We have charged defendants with

17   conspiracy, violations of the Travel Act, as well as money

18   laundering offenses.  And that is what the government's opening

19   statement entailed, Your Honor.

20        Also our opening statement also talked about two

21   cooperating witnesses, former Backpage CEO Carl Ferrer as well

22   as sales and marketing director Dan Hyer, who will testify

23   about these prostitution marketing strategies, about how they

24   were fooling credit card companies.

25        So, Your Honor, the opening statement mirrored the

1    superseding indictment in this case.  And so this contention

2    that our opening statement was based on this wholly separate

3    investigation that took -- a decade ago is just not relevant.

4    It mirrored the superseding indictment that was issued in July

5    '18 which Judge Logan had when he issued his order in January

6    of 2019.

7              THE COURT:  All right.  You can make any final point.

8              MR. JONES:  And just to be clear, Your Honor, I want

9    to be clear the Western District of Washington -- and I believe

10   it's in the briefs -- but they did not have the cooperating

11   witnesses Carl Ferrer and Dan Hyer in that investigation.  They

12   didn't have that senate investigation that produced more than a

13   million pages of documents.  They didn't have the million pages

14   of documents that were obtained via the Arizona grand jury

15   investigation as well.  So we want to be clear, as our briefing

16   has, on that issue as well.

17             THE COURT:  So before you sit down, let me just see if

18   I understand what your statement to me was earlier.

19             You intend, if you can find that Arnold & Porter

20   memorandum, you will produce it?

21             MR. JONES:  We will, Your Honor.

22             THE COURT:  So that puts to bed at least one of the

23   defendants' arguments or requests.

24             Ms. Bernstein?

25             MS. BERNSTEIN:  Would you like a response to all of

1       that or just to that, Your Honor?

2              THE COURT:  No.  Just to that.

3              MS. BERNSTEIN:  Yes, that does put to bed that

4       request.  It also shows the government hasn't done that.  They

5       haven't even looked at it.  And they're getting up here telling

6       you what it does or doesn't say, and they've never even seen

7       it.

8              THE COURT:  Well, what I heard them say is they don't

9       have it.  They don't have it.  And if they don't have it, my --

10      my gut reaction is if they don't have it, how can they then

11      rely upon it in the prosecution?

12             MS. BERNSTEIN:  Your Honor, the government doesn't get

13      to bury its head in the sand and then say, oh, I didn't see all

14      that stuff.  We have been asking for this --

15             MR. JONES:  This --

16             MS. BERNSTEIN:  Excuse me.  We have been asking --

17             THE COURT:  No, no.  Wait.

18             Mr. Jones.

19             MR. JONES:  I just -- Okay.

20             THE COURT:  Are you finished?

21             MR. JONES:  I'm finished.  I just wanted to reiterate

22      the separate, wholly separate investigation as it pertains to

23      the Arnold & Porter memo, which I believe we covered with Your

24      Honor at the beginning.  But that does conclude my argument,

25      Your Honor.

1          THE COURT:  All right.  Thank you.

2          MR. JONES:  Thank you.

3          MS. BERNSTEIN:  Your Honor, the government has

4    admitted that they have not even sought the information that we

5    have been asking for ad nauseam for years.

6          If the government believes that it had absolutely no

7    bearing to this case, I don't know why the government ever

8    produced the grand jury testimony.  The government has

9    selectively produced information from the Western District of

10   Washington in response to our demands.  The government is not

11   complying with their obligations under Brady, Giglio, or

12   Rule 16.

13         Your Honor asked Mr. Jones to respond to our

14   contention that his -- much of his opening and much of the

15   government's case and 65 percent of the government's indictment

16   pertains to the time frame pre-2013.  And in response Mr. Jones

17   regurgitated the indictment, which is what the government also

18   did in their pleadings.

19         If these have nothing to do with one another and if

20   the government is not contending that there was criminality

21   pre-2013, why doesn't the conspiracy start in 2013?

22         The government keeps reiterating that the conspiracy

23   is 2004 to 2018.  The Western District of Washington

24   investigated 2010, '11, '12, '13, and found no evidence of

25   criminality.  So when the government says to you we're not

1    relying on those documents, of course they're not.

2            THE COURT:  I think there's a difference of opinion.

3    I think Mr. Jones stood up and said they decided not to seek an

4    indictment, which in the government's view is different from

5    not finding no criminality.

6            MS. BERNSTEIN:  Then I urge Your Honor to read the

7    memos, because that is not what the memos say.  They are lodged

8    in the record in response to Judge Logan's order at 537, and

9    that is not our memory of what those memos say.

10           I also find it very incredible that the government's

11   position is now in fact all this criminality was discovered,

12   but they didn't seek prosecution.

13           They're putting form over substance, Your Honor.  To

14   suggest that these are wholly separate, they want to cabin off

15   a three- to four-year investigation that found no -- that

16   found, I believe, no evidence of criminality, that certainly

17   found that you cannot tell an ad is for prostitution on its

18   face, that certainly found that moderators were employed to

19   strip the site of illegal content, to make sure illegal content

20   and people who abused the website never got to publish their

21   ads.

22           And then the government turns around and says, no,

23   actually now we have a cooperator that undermines everything

24   that we had concluded previously.

25           That is for cross.  That is for closing.  That is for

1      rebuttal.  The government doesn't get to not give us the

2      information because it doesn't comport with what they're trying

3      to prove here.  And that's what the government is saying.

4              THE COURT:  It also sort of, in my view, begs the

5      question as to why are you bringing this now?  If you have the

6      indictment and the indictment covers the time period, why are

7      you only raising this issue now?

8              You've raised it multiple times before Judge Logan.

9      You've raised it multiple times before Judge Brnovich.  I don't

10     know why this is any different.

11             MS. BERNSTEIN:  And I don't have the pleadings before

12     Judge Logan or Judge Brnovich, but I do -- Those were not

13     focused on the underlying factual material that the Western

14     District of Washington relied upon in deciding not to

15     prosecute.  That issue has not been litigated.  We have brought

16     Brady motions because we believe that there's a lot of Brady

17     that has not been turned over, including, for example,

18     everything from NCMEC, which is a government, state actor.

19             THE COURT:  And I think Judge Brnovich ruled on that.

20             MS. BERNSTEIN:  Did rule that we are not correct.  But

21     that was in response to the last motion.  It wasn't -- The

22     suggestion that we just keep getting up here -- And I think

23     Mr. Jones said I yelled in the middle of trial.  The suggestion

24     that we are getting up here trying to relitigate something

25     that's been foreclosed is not the case, Your Honor.  As Your

1       Honor knows, we're on strapped funds.  We are not trying to

2       waste anyone's time in this case, least of all our own.

3               We are here because after Mr. Jones' opening in which

4       it became abundantly clear that the government's case focused

5       on 2004 to 2013 and alleges content moderation and aggregation

6       and all of these perfectly legal policies that the government

7       claims were nefarious, after the government stood up and argued

8       that, we said how can you claim that we're not entitled to what

9       happened?

10              And it's notice, Your Honor.  The fact that

11      Arnold & Porter found that things were operating legally and

12      the fact that the government declined to prosecute, that all

13      went to our clients' state of mind.  That all showed our

14      clients and reassured them that what they were doing was legal,

15      that what they were doing was fine.

16              It was after the opening argument that focused on this

17      time frame, that focused on activities that the government was

18      well aware of when they declined to prosecute, that was when we

19      said you can't have it both ways.  You can't say 2004 to 2013

20      was actually illegal, but we're not going to show you

21      everything we found that contradicts our statement.

22              They want to claim that this conspiracy began in 2013.

23      That is a different situation, Your Honor.  That would be

24      different.

25              I would probably come up with some argument as to why

1    we were still entitled to the Brady, but I probably wouldn't

2    disagree if we were denied that.  That is different.  That is

3    not what the government is doing.  They are --

4            THE COURT:  Let me give you a foreboding, I think,

5    that's to come.

6            Mr. Jones says he's going to try to dig for this memo,

7    and let's assume that he finds this memo, and the memo is, as

8    we've discussed, directed to Charlie Craig.

9            How are you going to then develop any relevancy unless

10   you can tell me or someone can produce evidence of what was

11   told to Arnold & Porter, what information was provided them

12   such that they were able to issue this decision, and how it

13   relates to your clients' specific intent?

14           There's a number of missing hoops that I think are

15   going to be there, and I just simply don't want to get into a

16   situation where we're just rehashing this same thing over and

17   over and over again when I don't have even a prima facie case

18   of how all of this relates to your clients' specific intent or

19   knowledge.

20           MS. BERNSTEIN:  Your Honor, for all I know, the

21   Arnold & Porter memo might say we interviewed all six of these

22   defendants and asked them these thousands of questions, and our

23   memo is based on that.  I don't know.  I don't know because I

24   don't have it, and the government doesn't have it.  The idea

25   that hopefully they find it, Your Honor, it was a grand jury

1    exhibit in a related -- in the Western District of Washington's

2    investigation.  I sure hope they can find it.

3            It concerns me if they can't, and it concerns me that

4    they haven't yet looked for it.  How will we demonstrate to you

5    that that is relevant?

6            I don't know what it says.  And it might on its face

7    satisfy the Court's questions.  Moreover, the idea that

8    Arnold & Porter found that Backpage was operating legally as of

9    2011 directly undermines the government's contention that

10   Backpage was operating illegally as of 2011.

11           We do not think that the government at trial should be

12   able to produce all of this, quote-unquote, notice evidence,

13   that someone published a letter in the New York Times, and that

14   puts the defendants on notice that there was criminality on

15   their website, that someone said it was illegal, so they should

16   have taken that at face value and decided it was illegal.

17           But to the extent notice evidence is what the

18   government is relying upon, this is the exact same category of

19   evidence.  This is notice evidence that a site and our clients

20   were operating legally within the bounds of the law as

21   confirmed by Arnold & Porter.

22           I also just want to be clear that it's not -- our

23   request is not limited to that memo.  That memo is all I can

24   stand before you and specifically ask for because it's in a

25   grand jury exhibit, and I know it exists.  There's a whole

1    world of information that I don't know what it says.

2          The government had a number of moderators on its

3    witness list that had testified in the Western District of

4    Washington.  When we would ask them give us the materials from

5    the last time you asked these moderators the exact same

6    questions you're asking them now, they took them off their

7    witness list.

8          So I'm only able to stand before you and say there's a

9    2011 advisory opinion letter by Arnold & Porter because that's

10   in the transcript.

11         There's also interviews of other witnesses.  And I

12   have chicken scratch notes, much of which I would say, Your

13   Honor, there's a line in Ezekiel Finley, who was a moderator,

14   there's a line in the handwritten notes from him that say never

15   met or never saw -- it's hard to read -- Larkin and Lacey.

16   Larkin and Lacey, as you know, are the first defendants, one

17   and two, in this indictment.

18         The idea that a moderator who's giving the

19   government -- who's answering government questions about how

20   the website is a, quote-unquote, hub for illegal prostitution

21   never met or had anything to do with two of the defendants in

22   this case sure feels exculpatory.

23         And I don't know what else is out there.  So I just

24   want to be clear that it's not -- our request is not limited to

25   the memo that Mr. Jones will now seek for the first time.

1          THE COURT:  All right.  Thank you.

2          MS. BERNSTEIN:  Thank you.

3          THE COURT:  I will take the matter under advisement.

4          MR. CAMBRIA:  Your Honor, could I be heard?  May I

5    have some time to be heard on behalf of my client?

6          THE COURT:  Two minutes.

7          MR. CAMBRIA:  Thank you.

8          THE COURT:  You joined in the motion, so I'm assuming

9    the argument's the same.

10          MR. CAMBRIA:  I remember -- I read the memos.  We all

11    read the memos.  And those memos, to my recollection, had

12    conclusions that undermine the government's theory as far as

13    promoting prostitution.

14          We should be entitled to the information that those

15    conclusions were based upon.  That is Brady material.  That

16    isn't something Judge Logan could say we can't have because

17    he'd have to overrule Brady to do that.

18          So that information, that base information we should

19    be able to have.  I read those memos.  They arrived at

20    conclusions.

21          MR. JONES:  Your Honor, we just want to make

22    certain -- The memos are sealed, and so we just want to make

23    sure Mr. Cambria isn't trying to go into the substance of

24    what's contained in those memos that they were ordered to

25    destroy and not make use of at trial or any further proceeding

1    in this criminal case.

2            MR. CAMBRIA:  Judge Logan did not tell us that our

3    mind had to be erased, Your Honor.  I read the memos.  And what

4    I'm saying is those conclusions were obviously based on

5    something.  We should have the same advantage to look at what

6    it was based on, because they were favorable conclusions.  And

7    it doesn't matter how many witnesses that they have that are

8    new.  That doesn't matter.  Because if we have that

9    information, we may be able to blunt all their so-called new

10   information that they have.  That's up to us.  That's up to the

11   jury and the Court to see what that information would do if we

12   had that information.

13           And the other thing is as far as this letter from

14   Arnold & Porter, it's up to us to introduce that at the time.

15   And if we introduce it by showing that our lawyers were

16   familiar with that information and passed it on to our clients

17   and that helped our clients act in good faith, that would be

18   admissible.  So that's up to us.  That's a trial strategy.

19           But in the meantime, we should be able to have the raw

20   materials so we can make those judgments.  And that's how that

21   would go.

22           I know that a number of lawyers work for Backpage.

23   They would definitely have interfaced with anyone who was going

24   to purchase Backpage.  And there would have been information

25   exchanged both places.

1          That would be our duty at trial to get it admitted.

2     But in the meantime we need to look at it to evaluate it.

3          The other thing about saying that this is a separate

4     investigation is nonsense.  There's one company, one set of

5     employees, one set of operating protocols.  It doesn't matter

6     what venue the government finds Brady material in, whether it's

7     Florida or Washington or wherever.  It doesn't matter.  If it's

8     Brady material, we're entitled to it.

9          And the stakes are high here.  Brady is such that a

10    violation of it reverses a trial.  Are we going to go through

11    some exercise and then just to have it all dumped because it

12    turns out there's a Brady violation?

13         And if we're in a situation to show specifically that

14    we think there's a Brady category and, in the face of us

15    articulating that, they do not submit it, the Court looks at

16    that at a different level of review than if we said nothing and

17    simply left it up to the government to make those

18    determinations.

19         So all of those things are very important to us here,

20    and all we're asking for is whatever they used to develop those

21    conclusions that were favorable, we should be able to see; we

22    should be able to use at a trial.

23         Thank you for giving me the time.

24         THE COURT:  All right.  Thank you.

25         MS. BERTRAND:  Your Honor, may I address one matter as

1    it pertains distinctly to my client, Ms. Vaught?

2             THE COURT:  Narrow it to your client, specific to the

3    client.  I don't want to hear a reiteration of the argument.

4    Go ahead.

5             MS. BERTRAND:  I don't plan to reiterate.  May I

6    approach?

7             THE COURT:  Go ahead.

8             MS. BERTRAND:  As the Court may recall, Joye Vaught,

9    my client, was one of the direct supervisors on what I'll call

10   the floor of the moderators.  And the reason I bring this up as

11   a distinct issue for Ms. Vaught is several of the moderators

12   testified before the Western District of Washington grand jury,

13   including Justin Dew, Brian Patenge -- that's P-a-t-e-n-g-e --

14   and Latamar Barlow, L-a-t-a-m-a-r, Barlow, B-a-r-l-o-w.

15            When we were in the ramp-up to trial this summer and

16   the defense repeatedly was saying to the government where's our

17   Jencks, where's our Brady material, we know that some of these

18   moderators --

19            THE COURT:  I read they were on the list, and then

20   they were --

21            MS. BERTRAND:  And then they disappeared.  And the

22   last thing I would say is so if there's any doubt about whether

23   or not this information is useful, the *Bundy* case out of the

24   Ninth Circuit specifically says where there is doubt about the

25   usefulness of the evidence to the defense, the government

1    should resolve such doubts in favor of full disclosure.

2         And Ms. Vaught's in a very tenuous position here.  She

3    needs this information, maybe more than the owners do, so that

4    we know what these witnesses told the government before about

5    how she was supervising them.

6         That's all I have, Your Honor.

7         THE COURT:  Thank you.  All right.  As I stated, I

8    will take the matter under advisement.

9         And let's proceed now to the confidential juror

10   questionnaire.

11        I gave to all of the counsel a -- two documents.  One

12   was a track changes document that reflects all the strikeouts

13   and replacements, and the other was a document that

14   incorporated all of those.

15        And so let me start with the government.  Do you have

16   any further objections, clarifications or anything that you

17   wish to place on the record?

18        Let me just at the outset say this.  As I informed

19   everyone when I gave to you these drafts, I had been made fully

20   aware that our jury administrative office was bombarded with

21   complaints about the length of the questionnaire, the amount of

22   time it took for everyone to complete the questionnaire.  They

23   had to go back to it over and over again.  It was a cumbersome

24   exercise.  And I have knowledge that the actual voir dire

25   process took a couple of days.

1      And so what I attempted to do was find some way to

2  update the questionnaire and to remove information that would

3  be obvious during the voir dire process.

4      And I also removed those questions that I thought got

5  into legal argument.  It seemed to me that there were positions

6  that were in the questionnaire that amounted to educating the

7  jury about the law.  And that's not the purpose of voir dire.

8  That's certainly something that the Court will instruct them on

9  and that they will receive the benefit of both parties' case.

10     And so with that in mind, let me start with the

11 government.  I'm looking at the track change document.  Are

12 there any particular concerns, issues, or clarification that

13 you have with regard to the proposed revised questionnaire?

14     MS. PERLMETER:  Thank you, Your Honor.  Peggy

15 Perlmeter for the United States.  Would you like me to answer

16 here, or should I approach the podium?

17     THE COURT:  Please come to the podium.  And direct me,

18 if you would, to the question and what the concern is.

19     MS. PERLMETER:  Your Honor, we have two substantive

20 requests to the changes, and then there are a number of small

21 issues related to formatting, numbering, and some small typos.

22     But I'll start with the substantive issues.

23     So as I'll refer to document 1417-2, the non-tracked

24 version, Page 13 of 22.

25     THE COURT:  And you're going to have to direct me to

1  the number because I have the track change document that I'm

2  working off of.

3         MS. PERLMETER:  And it's -- Oh, I can go from the

4  track changes version.

5         So on 1417-1 it's page 14 of 25.  This is related to

6  question 36.  And it is related to -- So the United States has

7  no objection to the way that the Court has revised this

8  question.  In our proposed edits to the questionnaire, we had

9  suggested moving one of the questions towards the end, which

10 was the question about whether or not a juror will follow the

11 law as the Court instructs even if he or she may not agree with

12 it.

13        In the course of the editing, Your Honor, that

14 question has vanished from the questionnaire.  So we would --

15 Our substantive request is that the Court add it back in.  We

16 would suggest, after reviewing the Court's proposed changes,

17 that it be added in towards the end.

18        We note that the Court has this question whether or

19 not a jury will follow the law as instructed in standard

20 proposed question.  It's question number 17 on the District

21 Court's Web site.  We have no objection to the wording, wording

22 the question in that way or if the Court wishes to adopt the

23 version that the parties have proposed.

24        THE COURT:  And let me ask you what do we risk if it

25 is a question that is posed during the live voir dire?

1          MS. PERLMETER:  So previously the court -- Judge

2    Brnovich said that the voir dire between the parties would be

3    limited to only follow-up questions.  The court was not going

4    to permit the parties to ask additional new questions.

5          THE COURT:  Well, if the Court -- Let me rephrase

6    that.  What I intend to do is conduct the entire voir dire.  I

7    do not let counsel conduct voir dire.  I go through whatever

8    the supplemental questions are that I have that are live

9    questions that they will all answer in front of each other such

10   as do you know one another, if you look around the room, do you

11   know one another, that sort of thing.

12         So the question that I have for you is if I intend to

13   ask that question in the live voir dire, what do I risk, or is

14   there a risk in having someone answer these questions

15   differently -- obviously they might -- but if I ask them while

16   they're here in person whether they will follow the law as

17   given to them by the Court?

18         MS. PERLMETER:  So I think the risk would be that the

19   juror may, similar to not -- to any other question, we feel

20   that this is a pretty important question, whether or not a

21   proposed juror will follow the law as instructed by the Court.

22         Jury questionnaires have a tendency to elicit more

23   truthful, more comprehensive answers from prospective jurors.

24   In the old version, I think there was an area where they could

25   fill in, you know, yes, no, and why not.  Different jurors may

1    receive information differently.  So if they see it in written

2    form and they answer one way, and then they come to the

3    courtroom, and then the Court reiterates it in live voir dire,

4    sometimes we had jurors in the last trial they changed their

5    answers based on information that was provided in court by the

6    court as well as other jurors.

7              So we think there is a benefit to having that

8    particular question in written format.

9              THE COURT:  All right.  What's your second issue?

10             MS. BERTRAND:  Your Honor, may I step out to use the

11   restroom briefly?

12             THE COURT:  Oh, yes.

13             MS. BERTRAND:  Thank you.

14             MS. PERLMETER:  So our second request is on document

15   1417-1, question number 80, Page 23 of 25.

16             THE COURT:  What was the question?

17             MS. PERLMETER:  Question number 80, it was:  Part of

18   your role as a juror is to determine the facts of this case,

19   evaluate the credibility or believability of witnesses.  Do you

20   believe you can do that?  Yes or no.

21             And so the Court had removed that question from its

22   final version.  We ask that the Court reinsert it.  We think

23   that is important.  It serves as a precursor to the question

24   following it, which is whether or not someone would find a

25   witness more or less credible based on certain issues such as

1    alcohol or substance abuse, socioeconomic status, race, and

2    whatnot.

3              So we'd ask that that question be permitted.

4              THE COURT:  Okay.  And what were the other issues that

5    you had?

6              MS. PERLMETER:  The remainder, Your Honor, are

7    formatting, small typos, numbering.  Would you like me to go

8    through them?

9              THE COURT:  Yes.

10             MS. PERLMETER:  So may I do that from 1417-2 because

11   it's the cleaner version?

12             THE COURT:  Yes.  Go ahead.

13             MS. PERLMETER:  Okay.  So on 1417-2, Page 11 of 22,

14   question 32, the paragraph that begins with:  Have you, any

15   members of your family, or close friends ever applied or

16   volunteered for any position in law enforcement?

17             That's actually a new question, so we'd ask that it be

18   given its own number.

19             Question number 32 pertains to auditing by the IRS,

20   and then the paragraph after that is about law enforcement.

21             THE COURT:  All right.

22             MS. PERLMETER:  On the next page, 12 of 22, question

23   number 33, just some small formatting issues.  If yes, colon,

24   could be just on the next line.

25             On the next page, 13 of 22, question number 36, at the

1    end of the first paragraph where it says, "Never has to prove

2    innocence or present any evidence," there's an extra "I" on the

3    next line that can be removed.

4         "Given the above principles of law" can be indented.

5         THE COURT:  Okay.

6         MS. PERLMETER:  Page 17 of 22, question number 53.  So

7    between -- after question 53, it jumps to 61.  So we'd ask just

8    to correct the numbering system.

9         THE COURT:  Oh, the numbering is off?

10        MS. PERLMETER:  Yes.

11        THE COURT:  Okay.

12        MS. PERLMETER:  And then a couple of questions, same

13   page, question number 51, right now it says "F" selected for

14   jury service.  I think the Court intended "if".

15        THE COURT:  All right.

16        MS. PERLMETER:  Question number 76 on Page 20 of 22 on

17   document 1417-2, in the second paragraph it says, "is selected

18   as a juror," if that could be reflected as "if selected".

19        THE COURT:  Okay.

20        MS. PERLMETER:  And those are the corrections and

21   suggested changes that we had for typographical errors.

22        THE COURT:  All right.  Who wishes to go first for

23   defense?

24        MS. BERNSTEIN:  I can speak for the defendants, Your

25   Honor.

1          THE COURT:  Okay.

2          MS. BERNSTEIN:  We have no objections to Your Honor's

3    revised questionnaire and no objections to the nits that

4    Ms. Perlmeter put on the record.

5          THE COURT:  Nothing more then?

6          MS. BERNSTEIN:  We would like an opportunity to just

7    submit a brief to the Court about our ability to conduct

8    voir dire, understanding that it's this Court's practice

9    apparently to not allow attorneys to conduct it.  We would like

10   an opportunity to just brief that issue to preserve it.

11         THE COURT:  You can brief it.  You can present it.

12   But I'm not going to change my practice, especially in a case

13   this large, with a venire as expected to be as large.  And I

14   will tell you this with the caveat -- And you can certainly --

15   I think Mr. Eisenberg is the person that has most recently been

16   in trial in my court.

17         It's not that I prevent you from asking follow-up

18   questions that are in the questionnaire.  I will conduct all of

19   it, but you will take my direction as to when you can conduct

20   further follow-up.  Does that make sense?

21         MS. BERNSTEIN:  It does, and that clarifies it.  Thank

22   you, Your Honor.  We won't be submitting anything then.

23         THE COURT:  So I would suggest that Mr. Eisenberg just

24   give you a little bit of his experience in the voir dire

25   process in my court.

1        MS. BERNSTEIN:  Thank you.

2        THE COURT:  All right.

3        MR. EISENBERG:  Your Honor --

4        THE COURT:  Yes.

5        MR. EISENBERG:  -- excuse me.

6        Let me do that now and see if I've got it right.

7        The last trial that I had with Your Honor, like the

8   other ones, if a juror in the venire gave an answer to a

9   question that the Court asked, then Your Honor permitted us to

10  follow up with respect to that answer.

11       THE COURT:  Yes.

12       MR. EISENBERG:  And that may have led to a

13  clarification or confusion, but once that avenue was asked and

14  answered, then counsel either moved on to another answer by

15  that potential juror, or then we would go to a different juror

16  who also had a response to one of the Court's questions and

17  begin that same litany in order to get to the bottom of what

18  that juror was thinking.

19       THE COURT:  You have it right.

20       MR. EISENBERG:  And, Your Honor, the other thing

21  I would add in this case is these are really sensitive issues

22  for almost all of the people in the venire.  They don't like to

23  talk about it.  And that's why I thought the preliminary

24  questions with respect to the sensitivity of people with

25  respect to prostitution, et cetera, is a question that should

1    be asked so that people come prepared with the understanding

2    that these are the issues.

3              And so we had responses in those written -- The

4    written responses I thought were very helpful because it did

5    bring out what people thought.  And then when they got to

6    court, some of them became disabused, or some actually became

7    entrenched in their thinking.

8              But the preliminary questions I thought about the

9    sensitive nature of the prosecution were well taken.

10             Thank you, Your Honor.

11             THE COURT:  All right.  Thank you.

12             Let me ask one final, since I have all of you here,

13   let me ask you one final question.  If you look at the revised

14   jury questionnaire and you look at the trial calendar and look

15   at April, I have -- I want to make sure that this is correct.

16   I have no trial to be occurring on April the 7th.  Is that

17   correct?  Is that as a result of someone in counsel's --

18   someone -- counsel's calendar?  Thursday, April the 7th?

19             I will note for you as a result of that, there is

20   trial on Monday of that week, which is the 4th.  So trial on

21   that first full week of April would be on the 4th, 5th, and

22   6th.  And I have it blocked out on the 7th and then resuming on

23   the 8th.

24             I want to make sure or to verify whether or not that

25   was at someone's request, because if it is not, I'd be inclined

1    then to insert a trial date on the 7th and to remove the trial

2    date on Monday, the 4th.

3              MS. BERNSTEIN:  Your Honor, we don't believe that

4    April 7th was a date requested by any of the defense counsel.

5              THE COURT:  What about the government?

6              MR. RAPP:  It just happens to be my birthday on April

7    7th, but we can -- we're happy to have trial on that day.  It

8    wasn't a request by us.

9              THE COURT:  Okay.  Well, now you're making me rethink

10   it.

11             So here's what we will do.  We will not have trial on

12   Monday, April 4th.  We will have trial, therefore, on Tuesday,

13   the 5th; Wednesday the 6th; and Mr. Rapp's birthday, the 7th;

14   and the 8th.

15             And so we will revise that on the questionnaire.

16             MS. BERTRAND:  Your Honor, may I make a suggestion for

17   the jurors' interests?

18             Easter and Passover are relatively late this year.

19             It may be helpful to the jurors, given that the Easter

20   holiday is such a broad -- and Passover is such a broadly

21   observed holiday, to maybe go a half day on Friday, Good

22   Friday?

23             THE COURT:  When would that --

24             MS. BERTRAND:  That would be April 15.  Easter this

25   year is April 17.

1          THE COURT:  Well, let's -- We'll find out from the

2     sitting jury how they feel about that, and we can, maybe by

3     some miraculous act, we will not be in trial by then.

4          MS. BERTRAND:  Speaking of Easter, yeah.

5          THE COURT:  In any event, is there anything more from

6     defense counsel?

7          MS. BERNSTEIN:  No, Your Honor.  Thank you.

8          THE COURT:  All right.  Anything further from

9     government?

10          MR. JONES:  Nothing from the government, Your Honor.

11          THE COURT:  All right.  We will make the revisions to

12     the questionnaire.  I'm going to consider the government's two

13     substantive requests and determine whether or not to change it.

14          And with that, we should have that questionnaire out

15     by, I think, tomorrow, tomorrow or Wednesday.

16          All right.  There being nothing further, then we are

17     adjourned.

18     (Proceedings recessed at 3:00 p.m.)

19

20

21

22

23

24

25

1                        <u>C E R T I F I C A T E</u>

2

3              I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 7th day of January,

12   2022.

13

14

15                                    s/Linda Schroeder

16                              Linda Schroeder, RDR, CRR

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT