GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

KENNETH POLITE
Assistant Attorney General
Criminal Division, U.S. Department of Justice

AUSTIN M. BERRY (Texas Bar No. 24062615, austin.berry2@usdoj.gov)
U.S. Department of Justice
Child Exploitation and Obscenity Section
1301 New York Avenue, NW, 11th Floor
Washington, D.C. 20005
Telephone (202) 412-4136
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-18-422-PHX-DJH |
| Plaintiff, | **UNITED STATES' TRIAL BRIEF** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

In an effort to assist the Court and expedite the trial, the United States respectfully submits this trial brief to address procedural, legal, and evidentiary issues that the government anticipates will arise at trial, but that are not appropriate for a motion in limine.

I. **Photographs of Trial Witnesses for the Jury**

At the September 2021 trial, the United States asked that photos be taken of testifying witnesses (including Defendants' witnesses) and then be provided to the jurors in a notebook. Doc. 1432 at 92. The purpose is obvious: In a long trial, a juror can identify and recall each witness and make notes, if appropriate, regarding their testimony. Defendants objected to this process. Doc. 1432 at 99-101. The Court took the request under advisement, but never ruled on it. *See* Doc. 1432 at 101.

The Court should adopt this procedure here. Providing jurors photographs of witnesses has been routinely allowed in many complex trials in this District in the last 25 years.[1] This practice has been favored by courts to help jurors digest and recall evidence. *See Judicial Conference Second Judicial Circuit of the United States*, 178 F.R.D. 210, 229 (1997) (Hon. Jack B. Weinstein: "Anything that will help these good people who come into court, who want to do a good job, and who do their work effectively should be utilized. That includes . . . giving [jurors] photos of witnesses[.]"). Furthermore, psychological research shows that visual cues, such as photos of the witnesses, will substantially improve the jury's recall of that witness's testimony by the encoding-specificity principle that says that context cues enhance memory recall. *See* Rebecca L. Wheeler and Fiona Gabbert, "Using Self-Generated Cues to Facilitate Recall: A Narrative Review," Frontiers in Psychology, Oct. 27, 2017, at 6 ("The relationship between memory and context is a natural extension of the encoding-specificity principle of memory.").[2] This long-standing procedure should be used here.

---

[1] *E.g., United States v. Sinclair*, CR-01-486-PHX-MHM; *United States v. Slade, et al.,* 09-1492-PHX-ROS; *United States v. Maximov*, CR-10-00822-PHX-DCG; *United States v. Anderson*, CR-12-01606-PHX-SRB; *United States v. Hinkelday*, CR-15-1118-PHX-SPL; *United States v. Harbour*, CR-19-00898-PHX-DLR.

[2] Available at https://www.frontiersin.org/articles/10.3389/fpsyg.2017.01830/full (last visited July 17, 2023).

## II.   Protocol Regarding Witnesses and Exhibits

To expedite trial, the United States proposed a stipulation where the parties would identify witnesses and their corresponding exhibits one week before the witness's expected testimony, in exchange for handling any objections to the exhibits outside the jury's presence. Doc. 1625 at 3, n.1. Defendants rejected this. This Court should nevertheless impose this condition to avoid waste of time and expedite this jury trial. The Court has ample power to do so. Fed. R. Evid. 611(a) states that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."

The United States' suggested protocol is particularly warranted here. The parties' exhibit lists identify about 3,000 exhibits. The vast majority are emails that were authored or received by a Defendant, a co-conspirator, or an agent of a Defendant. Defendants have had access to nearly all these exhibits for years, so they cannot claim surprise if the United States indicates it intends to use any of these.

The parties have also disclosed about 100 trial witnesses, and the pace of trial could slow to a crawl if the parties wait until each exhibit is presented to a witness before they raise (and if permitted, litigate) their individual objections to each exhibit.

And, in similar cases, courts in this District have adopted the United States' proposed procedure. For example, in *United States v. Slade*, *et al.*, 09-1492-PHX-ROS—a six-week trial involving 3,500 exhibits and 40 witnesses—the court adopted the same protocol, which required the opposing party to state any objections to specific exhibits before the jury was seated. As the court summarized:

> THE COURT: . . . . You have had an opportunity to look at each other's exhibits for the most part. . . . [Y]ou are going to let me know ahead of time those exhibits to which you were going to have an objection. . . .
>
> . . . . If you have an objection to an exhibit that you believe is upcoming, give me a heads-up. We will take care of that objection outside the presence of the jury. Now, I understand sometimes you may not know if you're going to

object because you don't know what the witness is going to say, and I understand that. And for those limited situations, we will take care of that at sidebar. Admission of exhibits for the most part, will be done by counsel and Court personnel without me in the courtroom and without the jury in the courtroom because you're merely going to read into the record those exhibits to which there is no objection and you don't need me. If there are arguments on certain exhibits, please [inform the Court]. We will set aside time during the course of any day to handle those objections and admissions or exclusions outside the presence of the jury. I want to maximize the use of court time while the jury is here. I don't want them to be bogged down with our administrative issues.

CR 09-1492-PHX-ROS, RT, 1/3/13, at 177-179, transcript attached as Exhibit A.

To expedite this multi-week, multi-party trial, the Court should adopt the same approach here.

## III.   Prostitution Synonyms: Drawing Clear Boundaries for the Use of Terms Like "Sex Trafficking," "Child Sex Trafficking," and "Human Trafficking."

### A.   Relevant Procedural History

In its May 7, 2021 Order (Doc. 1156), the Court granted in part and denied in part Defendants' motion in limine to preclude the United States from presenting evidence of "sex trafficking or child-sex trafficking." Doc. 1156 at 2, 6. The Court "agree[d] with the Government's position" that "[s]ex trafficking and child sex trafficking are, by definition, both forms of prostitution. Both are simply a subset of the crime." Doc. 1156 at 3. Both "require victims to engage in sex in exchange for payment, and the Government must prove that Defendants intended to facilitate prostitution through Backpage.com." Doc. 1156 at 3. The Court ruled: "Evidence that tends to prove that Defendants were aware that Backpage.com was being used to facilitate sex trafficking and child sex trafficking are extremely probative to show notice to Defendants that the website was being used for illegal purposes." Doc. 1156 at 3. While the prejudicial value of that evidence to Defendants "is high, it does not substantially outweigh the probative value of the evidence which is also very high." Doc. 1156 at 3-4.

The Court was careful to rule, however, that it would "not allow the Government to linger on the details of the abuse sex trafficking victims suffered as a result of being

- 4 -

trafficked." Doc. 1156 at 4. However, "the Court will allow evidence of the fact that people were trafficked using Backpage.com at trial subject to specific objections from Defendants." Doc. 1156 at 4. The Court also stated that it would "not allow the Government to introduce lengthy testimony from witnesses who were engaged in prostitution about their lives, lifestyles, or other details of their time working as prostitutes. Testimony from people involved in prostitution is only relevant as it relates to their use of Backpage.com and notice to Defendants that prostitutes were using their website. Testimony concerning the lifestyle and impact that prostitution had on witnesses' lives is irrelevant to the crimes charged and may unduly prejudice Defendants." Doc. 1156 at 5. But the United States could explore "how ads were created, drafted, edited, and paid for." Doc. 1156 at 5.

In its Order, the Court specifically ruled:

> Defendants' Motion in Limine to Preclude Presentation of Certain Evidence is granted in part and denied in part. (Doc. 908.) The motion is granted to preclude testimony from people engaged in prostitution regarding the details of their lifestyle except as it relates to their use of Backpage.com. The motion is also granted to preclude evidence related to details of crimes committed by third parties . . . The rest of Defendants' motion is denied.

Doc. 1156 at 6.

After the government presented testimony from only four of its 76 anticipated witnesses, the Court declared a mistrial based on what it determined was "abuse[ ]" of the "leeway" that Doc. 1156 afforded to introduce evidence about child sex trafficking and sex trafficking. Doc. 1347 at 4. The Court found that one of the witnesses, Dr. Cooper, had "emphasiz[ed] child sex trafficking," and that another, J.S., had talked about her experience as a trafficking victim. Doc. 1347 at 4-5. While the Court found "I don't see any of these as intentional misconduct," it concluded that a mistrial was warranted based on their "cumulative effect." Doc. 1347 at 5.[3]

---

[3] After the case was reassigned, this Court denied Defendants' motion to dismiss under the double jeopardy clause, based in part on the trial court's finding of no intentional misconduct. Doc. 1444 at 1-17. The Ninth Circuit affirmed, finding that "the government generally had good-faith reasons to believe its questions were within the contours of the

The United States has no desire to see the next trial end the same way. It respectfully submits this memorandum to preview related issues and suggest safeguards that would permit introduction of relevant evidence about Backpage's operations and Defendants' knowledge and intent—without creating a risk of unfair prejudice that substantially outweighs the evidence's probative value. *See* Fed. R. Evid. 403.

The core of the Court's May 7, 2021 Order remains valid—namely, that the terms "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator: the exchange of sex for money. While they may indicate the different labels for persons whose sexual services were offered for sale, they all describe conduct that comes under the general umbrella of prostitution.

### B.    Prevalence of Prostitution Synonyms

As before, the United States anticipates that a primary issue will involve the terms that attorneys and witnesses use when discussing the subject matter of prostitution. Many exhibits contain the terms "sex trafficking," "human trafficking," or "child sex trafficking." Each term, as used in the evidence, signifies a form of prostitution. "Sex trafficking" is sometimes used to describe instances where a pimp is selling one of his prostitutes for sex; "child sex trafficking" is a subset of sex trafficking that involves minor victims. But these terms all involve prostitution—the statutory term used in the Travel Act, 18 U.S.C. § 1952.

The United States anticipates that Defendants will object—or even seek a mistrial—whenever any of these terms are used instead of "prostitution." Or, they may demand that "sex trafficking," "child sex trafficking," or "human trafficking" be redacted wherever they appear in the more than 3,000 trial exhibits. In many instances, the United States will not be able to avoid these terms because they are contained in exhibits created by other people before the indictment and are essential to understanding the exhibit and the witness's

---

trial judge's rulings" or had "cogent reason[s]" for its questions. *United States v. Lacey*, 2022 WL 4363818, at *2 (9th Cir. Sept. 21, 2022).

testimony about why they were communicating with Backpage representatives. In other instances, these terms will be integral to evidence and testimony about Defendants' notice, knowledge, or intent regarding prostitution conducted via their website.

Examples abound. On April 28, 2010, Defendant Lacey emailed Defendant Spear asking, "is there any evidence of child trafficing [sic] anywhere?", to which Spear replied, "We have had subpoenas that deal with this exact issue. . . We get a ton of subpoenas that we comply with on a daily basis." Exh. 804.[4] In other words, Lacey asked about a subset of prostitution involving children, and was informed by a co-defendant that, yes, there is lots of evidence of that type of prostitution being linked to Backpage, namely "a ton of subpoenas" notifying Backpage "daily" of such activity.

In another example, a minor sued "Village Voice Media Holdings, d/b/a backpage.com," alleging, and placing Defendants on notice, that she was "sexually trafficked as a paid escort for sex" by another person who ultimately pleaded guilty to certain crimes. Exh. 906a. That person, in turn, admitted in the guilty plea that she had "post[ed] this child pornography on defendant's website, backpage.com in advertisements seeking sex from paying customers; pa[id] backpage.com for these postings; transport[ed] minor M.A. for the purpose of sexual liaisons for money with adult male customers obtained through defendant's website; collect[ed] money for minor M.A.'s sexual services from these customers; and purchas[ed] goods to facilitate these sexual services." Exh. 906a.

Defendants understood the interchangeability of terms regarding commercial sex in M.A.'s suit. This is shown by an email from co-conspirator Carl Ferrer, which Defendant Larkin forwarded to Defendant Lacey, and which stated, in part, "there is NO sex act for money language in the [M.A.] posting." Exh. 906. In other words, the conspirators read the M.A. pleadings, which used the terms "sexually trafficked as a paid escort for sex," and understood that language was synonymous with "sex act for money," *i.e.*, prostitution.

---

[4] "Exh." refers to the trial exhibits that the United States has disclosed to Defendants on its list of exhibits. The United States is not attaching the cited exhibits here, but it stands ready to provide the Court with copies if requested.

1          Another example involves a March 2011 meeting between the National Center for
2   Missing and Exploited Children (NCMEC) and Defendants Lacey, Larkin, and Spear, and
3   Carl Ferrer. This meeting, along with the participants' preparation for it, will be the subject
4   of testimony for several witnesses, including Ferrer, John Shehan, and Staca Shehan. At
5   the meeting on March 1, 2011, NCMEC showed Defendants Lacey, Larkin, and Spear a
6   PowerPoint presentation that detailed case studies of trafficked children on Backpage. Exh.
7   652. These studies highlighted the reciprocal link relationship between Backpage and The
8   Erotic Review (TER). Unbeknownst to NCMEC at the time, Backpage had a robust
9   relationship with TER. Lacey, Larkin, and Spear remained silent at the meeting about that
10  relationship.

11         Ferrer is expected to testify that Lacey, Larkin, and Spear, and others, held several
12  internal meetings to prepare for the March 2011 meeting with NCMEC. Their primary goal
13  was to persuade NCMEC that Backpage was part of the solution for child sex trafficking,
14  rather than the problem. At the meeting, however, NCMEC confronted these Defendants
15  with presentations showing how Backpage advertised minor prostitutes.

16         This is critical evidence. It will not be offered for the truth of whether children were
17  actually trafficked on Backpage, but to demonstrate what these individual Defendants were
18  told about their website's content. It will help refute Defendants' argument that they knew
19  nothing about prostitution advertisements being posted on their website. Doc. 1212 at 10
20  ("The fact numerous third parties informed the Defendants of the prostitution ads present
21  on Defendants' website may be validly used to prove that the Defendants had knowledge
22  of the ads' existence.").

23         In another example, on January 26, 2012, Defendant Larkin forwarded to co-
24  conspirator Carl Ferrer a link to a column in the New York Times by Nicholas Kristof titled
25  "How Pimps Use the Web to Sell Girls." Exh. 1032. The column focused on Backpage as
26  a marketplace for commercial sex. Exh. 1032a. Kristof quoted a prosecutor in Brooklyn,
27  who headed the "sex trafficking unit," saying that most of her cases that year involved girls
28  who were marketed on Backpage. Kristof further wrote that Attorneys General from 48

states wrote to Backpage and called it a hub for "sex trafficking." Kristof then quoted the Brooklyn prosecutor discussing the average age in which girls are "forced into prostitution." In the next paragraph, Kristof acknowledged that statistics on "human trafficking" are hard to come by. Kristof finished with a rhetorical flourish saying that the minor who ran away from her pimp and pounded on the door of a Brooklyn resident "was also in effect pounding on the executive suite of Backpage and Village Voice Media."

Thus, in one exhibit, the terms "sex trafficking," "prostitution," and "human trafficking" were used interchangeably to discuss Backpage's core issue: It teemed with prostitution ads. Sometimes the prostitution involved minors, sometimes adults; sometimes it involved prostitution offered by an individual posting her own ad voluntarily, sometimes by a pimp who forced a person to engage in prostitution.

These are but a few examples from the many others that exist in the United States' evidence that it plans to introduce in its case-in-chief.[5]

As noted above, the Court has already held that evidence showing Defendants' knowledge of sex trafficking and child sex trafficking is admissible and not unfairly prejudicial. Doc. 1156 at 3-4. Nevertheless, the United States proposes several safeguards to further address any potential risk of unfair prejudice to Defendants from the use of exhibits and testimony that reference terms like "sex trafficking," "child sex trafficking," or "human trafficking" when discussing Defendants' notice, knowledge, or intent

---

[5] Another example is the United States Senate Permanent Subcommittee on Investigation's January 2017 report, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING. Exh. 1587. The report—which contains "sex trafficking" in its title—is discussed in ¶¶ 151-152 of the Superseding Indictment (Doc. 230), and represents a critical piece of notice evidence that caused Backpage to alter its websites. Still another example is a June 29, 2015 letter from Cook County (Illinois) Sheriff Dart to the CEO of VISA regarding Backpage, which discusses prostitution and sex trafficking together in several paragraphs. Ex. 459. The United States anticipates introducing testimony showing that the letter caused Visa to scrutinize Defendants' website—and ultimately terminate Backpage from its network. Scores of other exhibits contain similar discussions of prostitution and sex trafficking. For a non-exhaustive list, *see, e.g.,* Exhs. 73, 104, 104a, 111, 112, 112a, 116, 119, 124a, 593, 593b, 594, 619, 628, 628a, 628b, 631, 633, 634, 635, 637, 638, 643, 644, 644a, 651, 652, 653, 658, 660, 661, 662, 670, 670a, 670b, 670c, 681, 683, 683a, 689, 692b, 694, 699, 720, 722, 804, 805, 814, 826, 827a, 842, 843, 844, 846, 846a, 864, 864a , 901, 906, 906a, 906b, 912, 926, 929, 937, 1021, 1032, 1043, 1051, 1161, 1162, 1163, 1032a.

concerning prostitution.

### C.   Limiting Jury Instruction

The Court could provide the jury with a limiting instruction that makes clear that Defendants are *not* charged with the crimes of sex trafficking, child sex trafficking, or human trafficking. Such an instruction could read as follows:

> Jurors: The evidence and testimony that you will receive at trial will occasionally involve terms such as "sex trafficking," "child sex trafficking," or "human trafficking." As used in this case, those terms should be understood as referring to the exchange of sex for money—what is commonly known as "prostitution." Any use of those terms is not meant to imply that any Defendant has been charged with, or may be guilty of, any other crimes. Instead, Defendants are charged only with the crimes of conspiracy to violate the Travel Act; individual Travel Act crimes; and money laundering.

This instruction could be given at the outset of the case; it could be repeated the first time that a Defendant objects to the use of one of these terms; and it could be repeated with the final jury instructions.

### D.   Limiting "Day in the Life" and Child Sex Trafficking Testimony

The United States will focus its questioning of victims in a way that avoids a detailed discussion about the daily life of a prostitute. Although the Court has not explicitly defined what "day in the life of a prostitute" means, the United States understands the Court does not want the United States to "linger on the details of the abuse sex trafficking victims suffered as a result of being trafficked." Doc. 1156 at 4. Thus, the United States will not ask the victims about any physical, emotional, and mental abuse they suffered from their pimps and Johns.[6] But the United States does need to establish that prostitution business

---

[6] The United States reserves the right to discuss the abuse a victim suffered because of being advertised on Backpage if Defendants raise any issues with respect to the victims' credibility. *See* Doc. 1345 at 6-7, 10-11. For example, some of the victims were directed or controlled by their pimps through physical, verbal, or emotional abuse or provided

enterprises existed and how the enterprise operated. To do so, the United States will ask the victims questions about the prostitution business.

The United States will begin by asking the victim if they were advertised on Backpage. The United States will not ask questions about the victim's life circumstances before they were marketed on Backpage. The United States will ask the victim how she was posted on Backpage and go over the details of her ads, including how the ads were created and the language used, and the number or frequency of their ads. Regarding the photos in the ads, the victims will testify about where the photos were taken, what they were to be used for, who told them how to pose, or what to wear for the photos. During the course of this testimony, some victims will testify that they were directed to do this by a pimp or trafficker. Nevertheless, the United States will not elicit from such victims any details about *how* they may have been forced, e.g, threats of violence, actual violence.

The victims are expected to testify about how the ads were paid for and that the phone would start ringing almost immediately after the ad was posted. It is anticipated the victims will testify that they engaged in acts of commercial sex, a.k.a. "dates" with Johns (the sex customers who responded to Backpage ads featuring them). To establish the nature of the prostitution business enterprise, the victims are expected to testify that they seldom kept the money earned during "dates" and that the money almost always went to their pimp or trafficker, who would, in turn, pay certain expenses for the victims. The victims are also expected to testify about how long they worked for their pimps or traffickers, and the number of "dates" they conducted as part of their participation in the prostitution enterprise.[7]

---

drugs, while engaging in acts of prostitution for their pimps. If Defendants challenge the victims' credibility, memory, or ability to recall or perceive an event, the United States reserves the right to ask more specific questions.

[7] The United States acknowledges the Court's concern, at the end of the September 2021 trial, about testimony on the length of time that victim J.S. worked for a pimp who advertised her on Backpage. Doc. 1347 at 5. The duration or frequency of the trafficking is relevant to establishing the prostitution business enterprise. *See* Doc. 946 at 10 ("[W]hat must be alleged for the 'unlawful activity' element under section 1952(b)(i) are allegations showing 'a continuous course of criminal conduct.'"); *United States v. Kaiser*, 660 F.2d.

In addition, some victims are expected to testify that the final version of their Backpage ads were sometimes different from the ad that was submitted, for example, certain photos would be removed from the ads. Finally, the victims will testify about how their pimp or trafficker's prostitution business enterprise was disrupted by law enforcement, including prosecutions and convictions.

Similar to avoiding "day in the life" type testimony with victims, the United States will avoid excessive and unnecessary testimony related to child sex trafficking. For law enforcement officers, the United States will not mention child sex trafficking during their testimony. When a law enforcement officer's work experience involves child sex trafficking, the United States will instead refer to "prostitution crimes."[8]

## IV.   Admissibility of Non-Testifying Witness Statements

This Court has already ruled that evidence of third party statements may be admitted as non-hearsay to show that Defendants had knowledge or notice of those statements, and not as proof of truth of the matters asserted. In its June 2, 2021 Order (Doc. 1165), the Court denied Defendants' motion to preclude evidence, testimony, and argument of Backpage's alleged reputation as a leading source of illegal sexual services. While the Court found such evidence not admissible under Fed. R. Evid. 803(3)'s state-of-mind exception to the hearsay rule, the Court ruled the evidence admissible as non-hearsay:

[T]he Court finds that the evidence the government intends to offer to trial is

---

724, 731 (9th Cir. 1981) ("The words 'business enterprise' refer to a continuous course of criminal conduct rather than the sporadic or casual involvement in a proscribed activity."). In the case of J.S., it also established the fact that J.S. was trafficked by two separate pimps, Baruti Hopson and a person who responded to J.S.'s Backpage ad posing as a John. Doc. 1334 at 85. In the retrial, the United States simply plans to establish the time factor and will move on, unless necessary to clarify or connect a fact or event.

[8] The United States reserves the right to discuss a witness's experience and qualifications in more detail if Defendants raise any issues with respect to the witness's qualifications. For example, retired Detective Christi Decoufle has been noticed as an expert for the United States and will testify about the three areas outlined in the amended notice. (Doc. 1627.) If Defendants raise any issues related to Detective Decoufle's qualifications and experience, the United States reserves the right to ask more specific questions about, for example, her work on the FBI Human Trafficking Task Force and the scores of forensic interviews of child sex trafficking victims, among others.

admissible as non-hearsay. If statements which would otherwise constitute hearsay are offered to show notice, not for their truth, they may be admitted as non-hearsay. *See MacDonald v. Ford Motor Co.*, 142 F. Supp. 3d 884, 898 (N.D. Cal. 2015) (allowing statements to be admitted to show "Ford had knowledge of the events, not that the events were true."). Here, the evidence the government desires to offer may be admitted to show that Defendants had knowledge of Backpage's reputation with third parties, which is relevant to Defendants' intent to facilitate an unlawful activity under the Travel Act.

Doc. 1165 at 5. The Court reiterated and expanded on this ruling in its August 11, 2021 Order, applying this reasoning to letters from third parties informing Backpage of allegedly unlawful activity being conducted via Defendants' website. Doc. 1212 at 10-11 (sealed).

Consistent with these rulings, which are the law of the case, the United States plans to introduce many exhibits containing statements by witnesses who will not be testifying at trial. The statements contained within those exhibits typically involve a person condemning Backpage and its principals for permitting prostitution ads to be published. Sometimes the condemnation is in a public forum, such as a documentary (e.g., CNN) or newspaper column (e.g., New York Times); sometimes it is in a private email or letter. In a related example, Backpage hired public relations firms to help combat the negative press the website was receiving, which resulted in presentations that also placed many of the individual Defendants on notice about their website's content.

In each instance, the United States submits that the exhibit is admissible as non-hearsay, because each will be offered to show the effect on the listener—and not for the truth of the matter asserted. Fed. R. Evid. 801, advisory notes ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.").

### A. New York Times Column

For example, as mentioned above, The New York Times published Mr. Kristof's column that focused on Backpage as a known marketplace for prostitution. Exh. 1032a. The United States does not intend to call Mr. Kristof to testify about his column, but the content of his column is offered, and therefore admissible, regardless of the truth of

anything he, or anyone else quoted within, said about Backpage. Instead, it is offered because it was published in one of the most prominent newspapers in the United States by a well-known columnist, and thus the mere publication of it, regardless of its truth, would have put Defendants on notice, in a very public way, that they were potentially promoting, or facilitating the promotion of, business enterprises involving prostitution by continuing to operate Backpage as they had done before that publication. Indeed, a number of email exchanges between Defendants Larkin and Lacey will be admitted showing them strategizing a response to Mr. Kristof's various articles criticizing Backpage as a hub for child sex trafficking. *See, e.g.*, Exhs. 1004, 1005.

### B.    CNN Documentary

Similarly, on January 23, 2011, CNN aired a documentary titled "Selling the Girl Next Door" that focused on Backpage as the leading website for prostitution. Exh. 1052a, 1052b, 1052c. Both before and after the initial airing of the documentary, Backpage representatives engaged in internal communications and communications with CNN representatives. Such communications show that Defendants were actually aware of the documentary and its criticisms of Backpage as a hub for prostitution advertisements. *See, e.g.,* Exhs. 84, 85, 86, 87, 89a, 630, 937, 1185. As with the New York Times column, the CNN documentary is offered not for the truth of the allegations, but to show Defendants' intent and actions in maintaining the website in the face of a nationally televised one-hour documentary on a major news network.

### C.    Anderson Cooper 360°

On December 28, 2011, CNN's Anderson Cooper focused a large portion of his program on how often Backpage was used to promote prostitution in different parts of the country. Exhs. 1053a, 1053b.[9] Again, this type of focused treatment on Backpage and its

---

[9] The United States intends to offer only the portion of the program where Anderson Cooper is interviewing Backpage's representative Ed McNally and a subsequent program where Cooper interviews Backpage's attorney Elizabeth McDougall. Exhs. 1054 & 1055.

promotion of prostitution on a national news network during primetime on a well-known anchor's program did not go unnoticed by Defendants.[10] Indeed, the United States will offer multiple exhibits showing some Defendants knew about the program, as evidenced by their email discussions. *See*, *e.g.*, Exhs. 945, 946, 949, 953, 982, 997. Thus, the statements made within the program are not offered for their truth, but to illustrate to the jury that Defendants were consistently aware of public criticism that Backpage was a prostitution marketplace, and that their actions when confronted with these allegations were to deflect blame (Exh. 949, Lacey to Larkin: "we know victim posted on numerous websites"), threaten legal action (Exh. 946, co-conspirator to Lacey and Larkin: "we have a history with CNN legal" and "we could send a brush-back pitch, reminding them they'd better be awfully certain of any statements they publish about us"), and then continue with business as usual.

### D. Public Relations and Brand Analysis

In 2011, Backpage hired Washington D.C. public relations firm Goddard Gunster (Goddard) to address the negative press Backpage was receiving. Goddard in turn hired a brand analysis firm known has Greenberg Quinlan Rosner (GQR) to prepare research reports to augment the public relations strategy. At trial, both Robert Leggat from Goddard and Anna Greenberg from GQR are expected to testify. Leggat will testify to conversations with Backpage representatives (*e.g.*, Ferrer, Larkin, and Lacey) about formulating a public relations strategy to combat negative press and pressure from the National Association of Attorneys General. This evidence is admissible as non-hearsay because it is offered to show the effect on the listener, and not for the truth of the matter asserted.

#### 1. Goddard

Leggat prepared a PowerPoint deck that was presented to Backpage in October 2011. The deck included many slides identifying Backpage's reputational issues as

---

[10] Viewership for Anderson Cooper 360 in 2011 exceeded 600,000 nightly. https://cnnpressroom.blogs.cnn.com/2011/12/15/cnn-has-significant-ratings-gains-in-2011-up-30-in-primetime/. (last visited July 17, 2023).

including child sex trafficking. One slide summarizes the issue as follows:



Exh. 126a at 20.

Goddard recommended banner ads that Backpage should consider publishing on the site, including:



Exh. 126a at 27.



Exh. 126a at 28.

Backpage did not accept Goddard's recommendations, and the relationship ended.

2.   GQR

After Dr. Greenberg signed a contract with Defendant Larkin, GQR prepared three research papers on Backpage's behalf. Exh. 860, 860A. The first proposal was titled "Backpage.com Potentially Vulnerable to DOJ Investigation." Exh. 803. The January 19, 2012 memo from GQR summarizes the results of interviews with five former United States Department of Justice staff members. The introduction summarizes the results:

> We set out on this project to determine if Backpage.com has a potential problem with Department of Justice (DOJ) staff. The answer to that question is a qualified yes. The former DOJ staffers we spoke with believe the department needs to do more to prosecute Internet crime and child protection issues. When given a basic explanation of the role that websites, Backpage.com in particular, play in fostering child trafficking, they think prosecuting Backpage makes sense.

Exh. 803 at 1. This report is again not offered for the truth, but to show that Backpage principals had notice about potential exposure to criminal liability.

GQR prepared a second report for Backpage and provided it to Backpage attorneys and Ferrer by email on July 10, 2012. Ex. 823a. The report was titled "Backpage.com Media and Digital Brand Analysis." The introduction states:

> Over the past several years Backpage.com has become nearly synonymous with prostitution and illegal activity. This brand image is, in large part, the result of press coverage driven by anti-Craigslist and anti-Backpage.com advocates. However, this advocate-driven negative coverage is not the whole

> story. For years, there has been a near constant stream of stories about prostitution busts that mention Backpage.com.

Ex. 823a. The report details several damaging articles implicating Backpage in prostitution busts, law enforcement stings, child sex trafficking and murders. At trial, both Greenberg's testimony and the GQR reports will be sanitized to remove any references to murders—as is true for all exhibits the United States will introduce as evidence. Similar to her first report, however, the rest of the reports' contents are highly relevant for notice to Defendants that prostitution proliferated on their website.

### E.    These Statements Are Not Offered for the Truth

The United States expects that Defendants will argue that they did not have knowledge that the users of their site were engaging in prostitution offenses, and thus they could not have had the requisite intent to promote, or facilitate the promotion of, any business enterprises involving prostitution. Similarly, Defendants are expected to argue that they did not do any act that did promote, or facilitate the promotion of, any business enterprises involving prostitution. Thus, these statements are offered to show that Defendants had ample knowledge that there were many individuals who had reviewed their site and believed that users of their site were engaging in prostitution offenses. That is, whether the ads actually were for prostitution, as all these third parties told Defendants, is not why the statements are being offered. Instead, they are being offered to show that Defendants were hearing a steady drumbeat from many public and private sources that their site was engaged in promoting, or facilitating the promotion of, prostitution activities. Likewise, these third-party statements about the prostitution ads posted on Backpage are offered to help better understand the acts that Defendants took after hearing the information: They took affirmative steps to try to mollify critics, while not actually altering the business model of continuing to promote, or facilitating the promotion of, business enterprises involving prostitution.

If these third-party statements are excluded, Defendants may argue to the jury that they lacked any notice or knowledge of prostitution via their website. The Court should

admit such third-party statements not as statements offered for the truth of the matter asserted, but as notice or knowledge evidence so that the jury understands what Defendants knew, when they knew it, and how they responded. This evidence will help the jury determine each Defendant's intent. It will also help the jury decide whether Defendants, with that intent, thereafter did an act to promote, or facilitate the promotion of, business enterprises involving prostitution.

**V.**   **Recordings of Phone Calls of Backpage Users Responding to a California Department of Justice Undercover "Escort" Ad Posted in March 2015**

In early 2015, California Department of Justice Special Agents Brian Fichtner and Tera Mackey began investigating Backpage. Doc. 1343 at 50, 55, 57. In March 2015, the agents created two undercover Backpage ads to investigate how the webpage worked, see what responses to the ads would be like, and explore how Backpage might respond to a call for assistance. Doc. 1343 at 57, 60. One of the undercover ads was an adult ad in the adult escort section; the other was of a couch for sale. Doc. 1343 at 58. The agents began receiving calls and text messages about the escort ad almost immediately after the ad went live. Doc. 1343 at 43. Special Agent Mackey, working in an undercover capacity posing as a prostitute, took phone calls from the undercover phone number in the escort ad and recorded her conversations. The responses she received were solicitations of sex for money. Doc. 1343 at 43.

The United States intends to move into evidence a sampling of four of Special Agent Mackey's phone conversations with the callers, that range between one and four minutes each, in response to the escort ad. *See* Exhs. 1550-1557. During the calls, callers ask Special Agent Mackey if she is available for 30 minutes or something quick. Exhs. 1553, 1555. One caller asks Special Agent Mackey if she will do deep throat, has a gag reflex, and if it's okay if [he's] about ten inches. Exh. 1551. Another quickly ends his call, after stating he was calling in response to an ad on Backpage, because he was suspicious that Special Agent Mackey was a law enforcement officer. Exh. 1557.

The recorded phone calls are relevant because the calls will help the jury understand

how escort ads posted on Backpage were seen and responded to by users of Backpage's escort section in March 2015. Admission would not be unduly prejudicial under Rule 403 because the United States only intends to admit four calls out of hundreds of calls and text messages Special Agent Mackey received. The recordings are short and provide the jury with a general understanding of how users responded to escort ads posted on Backpage. The calls are admissible as non-hearsay as they are not being introduced for the truth of the matter asserted. *United States v. Sledge*, 762 F. App'x 433 (9th Cir. Mar. 11, 2019) (admission of a spreadsheet properly admitted to show effect on the listener, and not for the truth of any statement made by the spreadsheet's preparer); *see also United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir. 1991); *United States v. Issa*, 265 F. App'x 801, 806 (11th Cir. 2008) (affirming admission agent's statement that he received information from a non-testifying informant that the defendant was involved in narcotics trafficking as non-hearsay evidence offered "to show the effect the information had on the witness in beginning his investigation"); *United States v. Standley*, 121 Fed. Appx, 728, 729 (9th Cir. 2005) ; *see also United States v. Louis*, 233 Fed. Appx. 933, 935 (11th Cir. 2007) (affirming that statements offered to give context to the Defendant's statements were not offered for the truth and therefore did not fall within the ambit of the Confrontation Clause); *United States v. Bermea-Boone*, 563 F.3d 621, 626 (7th Cir. 2009) (affirming that it is "well-settled" that statements that are offered for context, and not for the truth of the matter asserted, are not hearsay and do not present a Crawford issue); *United States v. Detelich*, 351 Fed. Appx. 616, 623 (3rd Cir. 2009). The United States is not trying to prove the truth of the callers' statements. The statements are being introduced to show the effect on the listener, Special Agent Mackey. The responses she and Special Agent Fichtner received from the posting of their undercover ads caused the California Department of Justice to continue forward with its investigation into Backpage.[11]

---

[11] Alternatively, Fed. R. Evid. 801(d)(1)(B) will apply if Defendants question Special Agent Mackey's motives, memory, or credibility.

## VI.    Ernie Allen's Past Recollection Recorded – FRE 803(5)

The United States anticipates that at least one witness, who took contemporaneous notes of meetings with some Defendants, might be unable to recall the details of the meetings that occurred in 2010 and 2011. Consequently, the United States expects to offer the witness's notes under Fed. R. Evid. 803(5), the past recollection recorded hearsay exception.

On March 1, 2011, Ernie Allen, the then-CEO of NCMEC, took contemporaneous notes of his in-person meeting with Defendants Larkin, Spear, Lacey, and co-conspirator Carl Ferrer; a meeting that took place at NCMEC in Virginia. The three-page, single-spaced, notes provide details about the meeting, including that Defendants showed Allen a presentation of what steps Backpage was taking at that time regarding moderation. In the notes, Allen then explained that he responded to the presentation with several points, including the links in Backpage ads to The Erotic Review, where "all they have to do is look at the Erotic Review site to determine that the ads they are running are clearly prostitution ads." Allen's notes also detail that he asked Defendants "whether it was appropriate for newspapers to run ads that are obviously for illegal prostitution and are easily ascertained as illegal prostitution ads." Allen further informed Defendants, "you are supporting a criminal enterprise."

Allen's notes also detail a moment in the meeting in which Defendant Lacey "lit into [Allen] with a vengeance," telling Allen that "adult prostitution is none of [Allen's] business and that what people were doing under the banner of 'child trafficking' was a joke." In response to Defendant Lacey's tirade, Allen's notes make clear that Allen responded with a question: "so what you are telling me is that your company is going to continue to operate a criminal enterprise, and that you are OK with it as long as the people being prostituted and trafficked aren't underage?" Allen further declared in his notes that he told Defendants, "Prostitution is a crime in every state, and what you are saying is that you are going to allow it and facilitate it on your site, as long as it doesn't involve kids." Allen's notes also quote Defendant Lacey as saying, "we are not going to roll over. We are

not Craigslist, and we aren't going to succumb to pressure and run for cover."

Allen further memorialized that Defendants asked Allen if he thought they were vulnerable to criminal prosecution. Allen told Defendants, "I thought companies could be held criminally liable if they knowingly and intentionally facilitate criminal enterprises."

On June 6, 2017, the FBI interviewed Allen regarding these notes. In that interview, Allen said he had reviewed the notes that, at that time, had taken place more than six years before. At that time, Allen said his notes would be the best reference as to the Backpage.com meetings, and that he would stipulate that what was in his notes was his recollection of the meetings.

The United States understands that Allen's memory about the meetings in 2010 and 2011 has not improved in the six years since being interviewed by the FBI about the notes in June 2017. Consequently, the United States expects that Allen will be able to attest to the following facts that will satisfy Rule 803(5):

(1) Allen is the founder of the National Center for Missing and Exploited Children (NCMEC), and also the founder of the International Center for Missing and Exploited Children (ICMEC).

(2) Allen was the President and CEO of NCMEC until 2012, and the President and CEO of ICMEC until 2014.

(3) In his capacity as President and CEO of NCMEC, Allen had meetings with many individuals.

(4) It was his practice to record his memories of the meetings close in time to the meetings.

(5) Allen has such notes from three meetings with representatives from Backpage.

(6) On November 30, 2010, Allen had a conference call with the following Backpage representatives: James Larkin, Scott Spear, Carl Ferrer, Steve Suskin, and Hemu Nigam.

(7) On March 1, 2011, Allen had an in-person meeting with the following

Backpage representatives: James Larkin, Scott Spear, Michael Lacey, Carl Ferrer, and Hemu Nigam.

(8)     On March 31, 2011, Allen met with Backpage representative Don Moon.

(9)     Allen created typed notes from all three meetings, each created on the same day as the meeting.

(10)    At the time Allen created the notes, he vividly recalled the details of those meetings, but he can no longer recall the details well enough to testify fully and accurately.

(11)    At the time Allen created the notes, the contents were fresh in his memory.

(12)    The notes accurately reflect Allen's knowledge at the time they were created.

Federal Rule of Evidence 803(5) provides that a record is not excluded as hearsay if that record:

(A)     is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;

(B)     was made or adopted by the witness when the matter was fresh in the witness's memory; and

(C)     accurately reflects the witness's knowledge.

Fed. R. Evid. 803(5); *United States v. Patterson*, 678 F.2d 774, 778 (9th Cir. 1982).

Importantly, it need not be shown that a witness has zero recollection of a subject; it is sufficient if he only has a partial or incomplete recollection when asked to testify at trial. Fed. R. Evid. 803(5)(A) (requiring only that a witness "now cannot recall well enough to testify fully") (emphasis added); 30B C. Wright & K. Graham, Federal Practice and Procedure: Federal Rules of Evidence § 6854 (2018) ("The witness's memory failure need only be partial[.] As long as the witness is shown to be unable to testify fully about some point, . . . a . . . recorded recollection that does fully address that point will be permitted.") (citing *United States v. Cash*, 394 F.3d 560, 564 (7th Cir. 2005); *United States v. Williams*, 571 F.2d 344, 349 (6th Cir. 1978)).

Furthermore, this Court will not have to permit additional cross-examination once it admits the witness's prior written statement per Rule 803(5). Not only does the text of

that rule not require as much, the whole point of a past recollection recorded is that a declarant can no longer recall the subject matter addressed by the statement. Thus, cross-examination can be (and often is) properly denied on that basis alone—a circumstance that has also been held to go to the weight of the evidence, not its admissibility:

> Since the exception for past recollection recorded comes into play only when the declarant cannot be effectively cross-examined upon matters as to which he or she asserts a lack of memory, the question has arisen as to whether the reading into the record of [a past recollection recorded] in a criminal case violates the Confrontation Clause. It has been held that the . . . denial of cross-examination must go to the weight rather than the admissibility of a memorandum, since otherwise the objection would always preclude the reading of past recollections which have been recorded.

12A J. Bourdeau & P. Coltoff, Federal Procedure: Evidence § 33:439 (2019).

The United States is unaware of any authority finding a Sixth Amendment violation from the admission of a past recollection recorded without concomitant cross-examination on that statement. Instead, courts have long found the admission of past recollections recorded not to violate the Confrontation Clause. *See, e.g.*, *United States v. Brown*, 800 F. App'x 455, 459 (9th Cir. 2020) (affirming admission of minor's statement from 2001 under FRE 803(5) and holding no Confrontation Clause violation); *see also United States v. Marshall*, 532 F.2d 1279, 1285 (9th Cir. 1976); *cf. United States v. Owens*, 484 U.S. 554, 559 (1988) (that the witness could not be cross-examined on a subject because he was "unable to recollect the reason for [a] past belief" did not violate Confrontation Clause; finding it sufficient that defendant could bring out "the very fact that [the witness] has a bad memory").

## VII.   <u>Frye/Cooper Notices</u>

The United States made plea offers to all six Defendants. To date, no Defendant has accepted. Accordingly, the United States requests that the Court inquire of Defendants that they understood the plea, its deadline, and knowingly rejected the plea. *See Lafler v. Cooper*, 132 S. Ct. 1376 (2012); *Missouri v. Frye*, 132 S. Ct. 1399 (2012).

Respectfully submitted this 21st day of July, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

KENNETH POLITE
Assistant Attorney General
Criminal Division, U.S. Department of Justice

*s/ Andrew C. Stone*
KEVIN M. RAPP
MARGARET PERLMETER
PETER KOZINETS
ANDREW STONE
DANIEL BOYLE
Assistant U.S. Attorneys

AUSTIN M. BERRY
Trial Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Gaynell Smith*
U.S. Attorney's Office