1

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | August 31, 2023 |
| Michael Lacey, et al. | ) | 8:47 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 3 - A.M. SESSION**


Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2

For the Government:
3      UNITED STATES ATTORNEY'S OFFICE
       By:  **Mr. Kevin M. Rapp, Esq.**
4            **Mr. Peter S. Kozinets, Esq.**
             **Mr. Andrew C. Stone, Esq.**
5            **Ms. Margaret Wu Perlmeter, Esq.**
       40 North Central Avenue, Suite 1200
6      Phoenix, Arizona 85004
       kevin.rapp@usdoj.gov
7      peter.kozinets@usdoj.gov
       andrew.stone@usdoj.gov
8      margaret.perlmeter@usdoj.gov

9  For the Government:
       UNITED STATES DEPARTMENT OF JUSTICE
10     By:  **Mr. Austin Berry, Esq.**
       1301 New York Avenue, NW, 11th Floor
11     Washington, DC 20005
       austin.berry2@usdoj.gov

12

For the Defendant Michael Lacey:
13     LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
       By:  **Mr. Paul J. Cambria, Jr., Esq.**
14     42 Delaware Avenue, Suite 120
       Buffalo, NY 14202
15     pcambria@lglaw.com

16

For the Defendant Scott Spear:
17     FEDER LAW OFFICE, P.A.
       By:  **Mr. Bruce S. Feder, Esq.**
18     2930 East Camelback Road, Suite 160
       Phoenix, AZ 85016
19     bf@federlawpa.com
       - and -
20     KESSLER LAW OFFICE
       By:  **Mr. Eric Walter Kessler, Esq.**
21     6720 N. Scottsdale Road, Suite 210
       Scottsdale, AZ 85253
22     eric.kesslerlaw@gmail.com

23

24

25

1   For the Defendant John Brunst:
        BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
2       LINCENBERG & RHOW, P.C.
        By:  **Mr. Gopi K. Panchapakesan, Esq.**
3            **Mr. Gary S. Lincenberg, Esq.**
        1875 Century Park E, Suite 2300
4       Los Angeles, CA 90067
        gpanchapakesan@birdmarella.com
5       glincenberg@birdmarella.com

6
    For the Defendant Andrew Padilla:
7       DAVID EISENBERG, P.L.C.
        By:  **Mr. David S. Eisenberg, Esq.**
8       3550 North Central Avenue, Suite 1155
        Phoenix, AZ 85012
9       david@deisenbergplc.com

10
    For the Defendant Joye Vaught:
11      JOY BERTRAND, ESQ., L.L.C.
        By:  **Ms. Joy M. Bertrand, Esq.**
12      P.O. Box 2734
        Scottsdale, AZ 85252
13      joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2

3      (Proceedings commence at 8:47 a.m.)

4          THE COURT:  All right.  The record will reflect the

5  presence of government counsel, the presence of all defense        08:47AM

6  counsel and clients.  No jury panel member is present.

7          Let me tell you, just in looking at the PowerPoint on

8  the government's perspective, and looking at the law, in the

9  Ninth Circuit the rule is that if it is admissible and you

10  intend to admit it, and if it is stipulated to at this point,     08:47AM

11  you can put it in your PowerPoint.  If it is not, and I will

12  tell you that if there is no agreement with regard to e-mail

13  statements yet, remove it.  You can talk about it, but remove

14  it.

15          To the extent that any of those photographs are          08:48AM

16  booking photographs, remove them.  You have the parties here.

17  You can refer to the parties, point to the parties.  Remove

18  those photographs.

19          The same goes for defense.  I haven't seen anything

20  yet, but I will tell you if it is not intended to be admitted,    08:48AM

21  if there's no foundation to be laid, it is not going to come

22  in.  Don't risk the potential 'cause I'll stop you midsentence

23  and tell you to shut down your PowerPoint.  So scrub those

24  PowerPoints with those directives in mind.  If you do not

25  intend to admit it, if it is inadmissible, not agreed to at the   08:49AM

```
1    moment, do not use it.  That is my ruling.

2            Yes.

3            MR. STONE:  May I ask just one clarifying question,

4    Your Honor?

5            THE COURT:  Yes.                                    08:49AM

6            MR. STONE:  You're saying there are exhibits that the

7    government intends to admit.  There's been zero stipulation

8    about any exhibits coming in at all from either side.

9            THE COURT:  That's fine.

10           MR. STONE:  So is it -- is your ruling that if we     08:49AM

11   intend to admit and we have a good faith basis, then we can use

12   it, or does it need to be stipulated to come in?

13           THE COURT:  It should be stipulated to.  You are

14   certain it's going to be admitted.

15           And what I'm saying is, I noted that there are        08:49AM

16   PowerPoints with quotes from e-mails or whatever they may be,

17   directed to a particular -- attached to a particular defendant,

18   and that is not yet admitted, so that will not come in in the

19   form of a PowerPoint slide.  You can talk about the e-mail

20   content, but don't display it for the jury, please.          08:50AM

21           MR. STONE:  What about demonstrative slides, Your

22   Honor, that are just intended to help the jury understand what

23   the evidence will be when it comes in?

24           THE COURT:  That may be permitted.  The same goes for

25   the defense.  However, it need not be over the top or         08:50AM
```

UNITED STATES DISTRICT COURT

```
 1    excessive.  And if I find it to be excessive, like I said,
 2    don't run the risk in front of this jury that I will shut you
 3    down.
 4            I don't necessarily -- so yesterday there was an
 5    example of some lyrics or something like that.  This case is      08:50AM
 6    not about lyrics or a song.  So to the extent that anyone has
 7    that in their PowerPoint, remove it.
 8            No mugshots --
 9            MR. STONE:  I take it, Your Honor, again, another
10    point of clarification, if an exhibit is not stipulated to it     08:51AM
11    should not be shown to the jury?
12            THE COURT:  That's right.  Gone are the days
13    apparently where this didn't have to occur.  You could just
14    speak because all of you are great lawyers, and we wouldn't
15    have this problem.  You create the problem if you want to         08:51AM
16    pursue this avenue of drama, and this is not the time or the
17    place.
18            Yes, Mr. Eisenberg?
19            MR. EISENBERG:  Your Honor, I have the actual e-mails
20    that are noted as exhibits for the defense.  The government has   08:51AM
21    just informed me that it will not stipulate to the admission of
22    those e-mails, and I assume what they are saying they won't
23    stipulate to that at trial, and they are not stipulating to it
24    now.  Does that mean that e-mail still cannot be used?
25            THE COURT:  That's right.  You can talk about it.  You    08:52AM
```

1    can say:  The evidence will show.  The evidence will show --

2              MR. EISENBERG:  It just can't --

3              THE COURT:  -- we are going to put forth the evidence

4    of X, Y and Z.

5              MR. EISENBERG:  It just can't be displayed?          08:52AM

6              THE COURT:  Yes.  Do not display it.

7              MR. STONE:  One further point of clarification, Your

8    Honor.  We don't have any mugshots as photos in the PowerPoint.

9              THE COURT:  Well, they look like mugshots to me.  I

10   mean, the problem, Mr. Stone, is we've been inundated in the    08:52AM

11   media with what appeared to be mugshots, and I think we all

12   know what I'm talking about.  And so those photographs, I don't

13   think they are necessary.  You have the defendants all present

14   here.  You can refer to them.  This jury will be here for two

15   months plus.  They will know who's who.  I understand that you  08:52AM

16   want to provide a roadmap, but I don't think the photographs

17   are necessary at this point.

18             MR. STONE:  The only --

19             THE COURT:  Frankly, some of the photographs don't

20   look like the same individual.                                 08:53AM

21             MR. STONE:  Understood, Your Honor.  The only

22   follow-up is the defense made the same argument for the first

23   trial and Judge Brnovich ruled that she thought the photographs

24   would be helpful and could be used in the PowerPoint, so we

25   were taking that as law of the case.                           08:53AM

1          THE COURT:  Well, at this juncture, that is my ruling.

2          MR. STONE:  Understood, Your Honor.

3          THE COURT:  Thank you.  Be prepared to go.  Let's have

4  our -- I'm sorry, Mr. Eisenberg.

5          MR. EISENBERG:  Yes.  Thank you, Your Honor.  So that          08:53AM

6  if I refer to the e-mail and don't display it and the

7  government objects during my opening, do I have to face that?

8          THE COURT:  I don't know.  We'll see.

9          MR. EISENBERG:  Oh.  Well, okay.

10          THE COURT:  I can't predict what the government is          08:53AM

11  going to do, and I can't predict what I'm going to do.  I am

12  giving you the same directive as I gave the government.

13          MR. EISENBERG:  I understand.

14          THE COURT:  If you intend to prove it, if you intend

15  to admit it during your case in chief or through a witness, you          08:54AM

16  may refer to it orally.  But if it's a part of an exhibit that

17  you intend to admit and it hasn't been stipulated to, there is

18  no foundation yet to be laid, then don't show it.

19          MR. EISENBERG:  I got it.

20          THE COURT:  Okay.  Thank you.  All right.  Let's have          08:54AM

21  the individual last panel in.

22      (Prospective jury panel members 98 through 110 are present

23  at 8:56 a.m.)

24          THE COURT:  Come to order.  Do we have our microphones

25  there?  Thank you.                                                    08:56AM

1          All right.  We have Jurors 97 -- I'm sorry -- 98

2    through 110 present.  Please be seated.  And welcome back to

3    the jury panel members.  Again, I do thank you for your

4    patience.  And I do want to remind you that you remain under

5    oath for the duration of the proceeding, and so all of the          08:57AM

6    information that you provide to us must be completely truthful

7    and accurate.  Certainly, if during this process you'd rather

8    answer something in a private way, I'll permit you to do that.

9          As I asked you yesterday, I asked you to report if you

10   had seen, read, heard, listened to anything having to do with       08:57AM

11   the case, so I ask you to keep that in the back of your mind

12   and I will finalize my questioning of you with that question

13   again.

14         And so with that, I want to remind you about a couple

15   of the questions that were in the questionnaire that you            08:58AM

16   probably haven't thought about since you completed it, and I

17   wanted to make sure that you didn't have additional information

18   that you wanted to share, if you had feelings that were

19   generated recently about these areas.

20         There were a series of questions about your attitudes         08:58AM

21   or feelings regarding prostitution and adult-oriented

22   entertainment.  And the question, to refresh your recollection

23   was, whether you had strong feelings about pornography on the

24   Internet, or have you or someone close to you ever been

25   affected by pornography, whether you had strong feelings about      08:58AM

1    the adult entertainment industry or people working in the adult

2    entertainment industry, or have you or someone close to you

3    ever been affected by this type of service?

4         And similarly, if you had strong feelings about

5    prostitution or whether you or someone close to you has been          08:59AM

6    affected by prostitution or the purchase or sale of a sex act

7    for money, otherwise known as commercial sex?

8         Many of you had a variety of different answers to

9    those questions.  Some of you answered no to all of them and,

10   therefore, you basically moved on.  Some of you said that you         08:59AM

11   have had some feeling about it.  Others of you believed

12   strongly about it, had strong feelings about it, and,

13   therefore, followed up about what those feelings were.

14        As you can recall filling out the answers to those

15   questions, have any of your feelings changed?                         08:59AM

16        And there were a number of questions related to

17   whether or not you thought law enforcement, local, state or

18   federal and the government should expend resources

19   investigating and prosecuting individuals who are purchasers of

20   commercial sex.  Again, here too, some of you expressed no            09:00AM

21   feeling whatsoever.  Some of you in fact said:  I've never

22   thought of it.  Others of you expressed strong feelings.  Some

23   of you qualified those feelings only if it related to people

24   who were forced into certain activity or if it affected

25   children.                                                             09:00AM

1           Have any of your feelings regarding that question

2     changed, or have you developed new thoughts about that?

3           There was another question about whether or not you

4     had strong feelings about whether or not prostitution should be

5     legalized.  Again, here too, some of you either said you had          09:01AM

6     never thought about it before, some of you said no, and some of

7     you basically said, yes, you had strong feelings.

8           And the qualification to the answers went something

9     like this:  Yes, it should be legalized, therefore, we can

10    regulate it better.                                                   09:01AM

11          Some of you said:  No, it should not be legalized.  It

12    creates all sorts of social ills, and there's other things that

13    go along with that.

14          And like I said, some of you expressed no feeling

15    about it.  Perhaps you had not given it much thought.                 09:01AM

16          Have any of your thoughts or attitudes since you

17    completed this questionnaire changed?  Okay.  No.

18          Now, there was another question about whether you

19    thought resources, law enforcement or government resources

20    should be used to investigate and prosecute businesses or            09:02AM

21    individuals who provide a platform that sell goods or services

22    that promote or facilitate prostitution.  And here too there

23    were a variety of answers.  Some of you said no.  Some of you

24    said I have not thought about that.  Some of you said it's a

25    complex issue.  Some of you, in fact, believed that resources        09:02AM

1    should be used.

2            Have any of your thoughts, opinions or feelings

3    changed one way or the other?

4            All right.  Let me -- with regard to those series of

5    questions, I do have a couple of follow-up questions.  Let me          09:03AM

6    go to Juror 100.  Juror 100, with regard to strong feelings

7    about pornography on the Internet or whether or not someone

8    close to you has ever been affected by pornography, you had

9    strong feelings, yes.  And when I ask you a question, if you

10   would bring the mic -- pass the mic to the juror, and speak          09:03AM

11   very closely into the microphone.  They are a bit sensitive.

12   If you would just stand so that all counsel can see you.  Thank

13   you.

14           Your explanation was that you thought it had a very

15   negative effect on families.  Is there anything more about that     09:04AM

16   that you would like to expound upon?

17           PROSPECTIVE JUROR:  No, Your Honor.

18           THE COURT:  Now, having developed that feelings and

19   its effects on families, would you be able to set aside those

20   opinions and view the evidence and hear the testimony in this        09:04AM

21   case with an open mind?

22           PROSPECTIVE JUROR:  I believe I can do that.

23           THE COURT:  Okay.  So when you say you believe you

24   can, would these thoughts and feelings about the effect on

25   families, would those creep into your head from time to time?        09:04AM

1          PROSPECTIVE JUROR:  Well, being a human being I have

2     to say of course they would, but I also believe everybody is

3     entitled to a fair trial.

4          THE COURT:  Okay.  Thank you.  And you similarly

5     answered the question about having strong feelings about people      09:04AM

6     working in the adult entertainment industry and people who

7     purchase commercial sex, and with those topics, do you have

8     anything more to expound upon?

9          PROSPECTIVE JUROR:  No.  My feelings would reflect

10    what I said initially about pornography in that I think it's      09:05AM

11    harmful to all of us and all the individuals involved in that.

12         THE COURT:  And then with regard to questions about

13    using resources to investigate and prosecute people who

14    purchase commercial sex, your answer was, like others, that the

15    government should investigate all crimes.      09:05AM

16          And then you followed up with the other question about

17    prostitution, and you said you had strong feelings about that,

18    whether it should be legalized, and you said yes.  And it's a

19    little bit contradictory because the question is a little

20    bit -- I guess it could be read either way.  It says:  Do you      09:06AM

21    have strong feelings about whether or not prostitution should

22    be legalized?  And you said:  Yes.  So when you said yes, is

23    that that you believe it should be legalized?

24         PROSPECTIVE JUROR:  No.  Yes, I have strong feelings

25    about it.      09:06AM

1        THE COURT:  And then you write:  I do not believe it

2   is good for workers or society.

3        Is there anything more that you can say about that?

4        PROSPECTIVE JUROR:  Your Honor, in truth, I could

5   probably speak for an hour about my personal opinions on this          09:06AM

6   topic, but what is germane to your court is that I think I have

7   clarified that.  I just see it as a harmful thing to the people

8   working in the industry and to our society at large.

9        THE COURT:  Okay.  And then once again, I don't want

10  to badger the point, but knowing how you feel and the fact that        09:06AM

11  you have a lot of opinions, it sounds like, about this topic,

12  would you be able to set those personal views and opinions

13  aside and come to this case, the evidence and the testimony,

14  with an open mind?

15       PROSPECTIVE JUROR:  I feel that, again, people are               09:07AM

16  entitled to a fair trial, and that's what this is all about.

17  To me that's the bottom line.  It doesn't matter what the

18  particular crime is.  It depends on whether or not the guilt or

19  innocence is proven to me.

20       THE COURT:  All right.  Thank you.                              09:07AM

21       And let me inquire of Juror 101, 101.  Generally with

22  regard to using resources to investigate and prosecute

23  purchasers of commercial sex, you said you had no opinion, and

24  then you followed up by saying:  I would say no if we are

25  talking about consenting adults and no one has been injured or         09:08AM

1    victimized.

2            Is there anything that you wish to say more about

3    that?

4            PROSPECTIVE JUROR:  Well, I saw that -- can you hear

5    me?                                                            09:08AM

6            THE COURT:  Yes.

7            PROSPECTIVE JUROR:  I saw that movie, Sound of

8    Freedom, and so it kind of, you know, when I saw that I go,

9    okay, consenting adults, okay.  It's always been like that.

10   Adults -- I'm kind of a Libertarian.  Adults should be able to  09:08AM

11   do, as long as they are not doing any harm to anybody else,

12   that's the way I look at it.  Children is a whole different

13   story.

14           THE COURT:  Okay.  Now, let me ask you another

15   question in another series.  This question was about whether  09:09AM

16   you had strong feelings about whether websites like YouTube,

17   Facebook, Twitter and so on, should be responsible for the

18   content posted by users of the website, and you said yes.  And

19   you stated that you have strong feelings that they should not

20   be responsible unless it violates community standards or is a  09:09AM

21   provable lie, such as not suitable for children or threatening

22   or causing damage to someone.

23           Is there anything more that you wish to add to that,

24   or do you have further opinions on that?

25           PROSPECTIVE JUROR:  No.  I agree with that.           09:09AM

1          THE COURT:  Okay.  And so having that opinion, would

2     you be able to set that aside and come to the evidence and the

3     testimony in this case with an open mind?

4          PROSPECTIVE JUROR:  Yes.  I believe so.

5          THE COURT:  Okay.  Now, finally, there was a series of      09:10AM

6     questions that asked about how you would view witness and

7     victim testimony, and I do want some clarification from you on

8     this.  The question was:  Some of the witnesses in the case

9     are, one, ethnic minorities; two, of a low socioeconomic

10    status; or three, have experienced challenges with alcohol      09:10AM

11    and/or substance abuse.  Would you find a witness' testimony to

12    be more or less credible simply based on their, and then it

13    asks you to answer each, and for each of those categories you

14    answered no.

15         And then you explained:  I generally take what anyone       09:10AM

16    tells me with a grain of salt, meaning it doesn't matter who it

17    is.  They usually won't be telling me both sides of the story

18    factually.

19         And so it sounds like you come to people's statements

20    with a high level of skepticism, is that fair to say?           09:11AM

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Now, having developed that view, there are

23    going to be many, many, as you heard, witnesses who will come

24    and take the witness stand and they would have to take the oath

25    just as you did to tell the truth.  Would you be able to set     09:11AM

1    aside this high skepticism in the first place and listen

2    intently to what each witness says and base your opinion upon

3    their testimony with a number of factors about what they --

4    what their capacity was to hear and see and know the things

5    testified to?                                                    09:11AM

6          PROSPECTIVE JUROR:  Yeah.  Well, since they are under

7    oath and they face a lot of penalties if they lie, I would -- I

8    would -- I would lean towards that they are telling the truth.

9          THE COURT:  All right.  All right.  And that is -- let

10   me just see if I can clarify, that would be as to any witness   09:12AM

11   who would take the stand, regardless of their background, if

12   they had addictions or anything of that kind, is that fair to

13   say?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Okay.  Thank you.  Oh, let me ask all of       09:12AM

16   you this, because I know there are a couple of folks, and I do

17   want to follow up on this.  Having sat through the process on

18   Tuesday and this morning, you understand, and in the

19   questionnaire it pointed out that there are going to be sexual

20   terms, there are going to be witnesses who talk about            09:12AM

21   prostitution, use sexual terms, there might be evidence of

22   that, and there was a question about whether or not you would

23   be able to listen to that type of testimony, and if selected as

24   a juror be able to talk about and deliberate with your fellow

25   jurors, even if it relates to those topics.                      09:13AM

1          Again, here too, some of you said you would be able to

2    do so, that it's a part of, you know, some of the society that

3    we live in today.  Others of you said, absolutely not.  Some of

4    you said, yes, but it would be difficult.  Some of you said you

5    weren't sure.                                                    09:13AM

6          At this point, let me ask, is there anyone among you

7    who have, know for certain that you would not be able to hear

8    or discuss that type of content if you were selected as a

9    juror?

10         Juror 103, let me just ask you a question, because in    09:14AM

11   the series of questions about whether or not you thought

12   resources should be expended to investigate and prosecute

13   individuals who purchase commercial sex, in my reading your

14   answer it seemed like you really tried to think about this a

15   lot and put down what your thoughts were, so I wanted to get    09:14AM

16   some clarification from you.

17         You start out by saying:  This is a hard question to

18   answer.  I generally feel that law should be followed and that

19   individuals who break laws should be prosecuted accordingly.

20   That said, I also believe that there are far worse crimes than  09:15AM

21   paid sex between consenting individuals, and that resources

22   could potentially be better spent.

23         Is there anything more that you can think of or

24   further explain in that answer?

25         PROSPECTIVE JUROR:  I don't think so.  I think that       09:15AM

1    summarizes it fairly well.

2           THE COURT:  Okay.  And then with regard to whether or

3    not prostitution should be legalized, you said:  No.  And then

4    you said:  I think legalization generally makes sense, but I

5    don't feel strongly about it.  I understand that this is a very          09:15AM

6    difficult and complicated subject.

7           Have you had anymore time to think on that topic or

8    whether or not your opinions have formed?

9           PROSPECTIVE JUROR:  I intentionally did not.  I

10   really, really try to avoid making judgments about issues when          09:15AM

11   I don't have enough information, and I intentionally did not

12   seek help for further information during the time I filled the

13   questionnaire out.

14          THE COURT:  All right.  Thank you.  And then as to the

15   question about resources being used to investigate and                  09:16AM

16   prosecute businesses or individuals who provide a platform that

17   sell goods or services that promote or facilitate prostitution,

18   you said no.  And then you basically said:  I feel the same way

19   here as I do about prostitution itself.  I generally feel that

20   laws should be followed, and that individuals who break laws            09:16AM

21   should be prosecuted accordingly.  That said, I also believe

22   that there are far worse crimes than paid sex between

23   consenting individuals, and that resources could potentially be

24   better spent.

25          Are those your same feelings today?                              09:16AM

1          PROSPECTIVE JUROR:  The same, yes.

2          THE COURT:  There's nothing more that you want to

3     expound upon with regard to that?

4          PROSPECTIVE JUROR:  I don't think so.

5          THE COURT:  Okay.  Thank you.                         09:16AM

6          Juror 104, I wanted to follow up on something that you

7     said previously.  You mentioned that you had migraines.

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  And how frequently does that occur?

10         PROSPECTIVE JUROR:  They are sporadic.  They are worse   09:17AM

11    in the summer.  I do work outside.

12         THE COURT:  When you have one of these episodes, how

13    long does the migraine usually last?

14         PROSPECTIVE JUROR:  It could be an hour; it could be

15    all day.  I've had them since I was a child.  I deal with them. 09:17AM

16         THE COURT:  And so I guess when you say you deal with

17    them, in your line of work, if you came upon a migraine, do you

18    just power through?

19         PROSPECTIVE JUROR:  I do.  As a matter of fact, I have

20    a headache today, but it's -- most of the time I do power       09:18AM

21    through it.

22         THE COURT:  Do you feel that at times that when you

23    have the onset of the migraine you're not concentrating or

24    working as you normally would?

25         PROSPECTIVE JUROR:  Sometimes.  If it's bad enough in    09:18AM

1    the morning, I do stay home, but again, it's -- it just depends

2    on the severity.  If it comes on during the day, I stay at

3    work.  I have never gone home in the middle of a shift.  I

4    power through it and stay at work.

5            THE COURT:  Now, if you were selected as a juror in      09:18AM

6    this case, do you feel that you would be able to I guess not

7    have a situation where the migraine would interfere with your

8    concentration, or do you worry about that at all?

9            PROSPECTIVE JUROR:  I think most of the time it should

10   be okay.  It's -- I have had them, like I said, my whole life    09:19AM

11   for the most part, so...

12           THE COURT:  Okay.  Well, I'm sorry to hear that, but

13   thank you.

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  Now, there was a question that I wanted to    09:19AM

16   follow up with you on, and it is that series of questions about

17   whether or not you had strong feelings about whether or not

18   prostitution should be legalized, and you said no.  And then

19   you answered:  I had never really thought about legalizing it.

20           Having an opportunity to revisit that question, have     09:19AM

21   you formed an opinion one way or the other?

22           PROSPECTIVE JUROR:  No.  I think I kind of got

23   confused on the questions as well.  Same thing, you know, I

24   agree as well.  I agree that there are more crimes that are

25   more fitting to be -- I don't really think about it either.      09:20AM

1    Consenting adults, in my opinion, can do what they want.  As

2    far as children, it's a different situation in my opinion.  But

3    consenting adults, if that's what they want to do, it doesn't

4    affect me.  As far as legalizing it, I have never really formed

5    an opinion on that.  So...                                    09:20AM

6         THE COURT:  Okay.  It's not something that you think

7    about it everyday?

8         PROSPECTIVE JUROR:  No, I do not.

9         THE COURT:  Okay.  Thank you.  Now, there was a series

10   of questions about victim and witness testimony and the types   09:20AM

11   of witnesses that may appear and provide testimony.  And again,

12   the categories were:  One, ethnic minorities; two, persons of a

13   low socioeconomic status; or three, those who have experienced

14   challenges with alcohol and substance abuse.  And the question

15   is:  Would you find a witness' testimony to be more or less      09:21AM

16   credible simply based on their, and then based on their status,

17   one, two or three.  And when it came to substance abuse,

18   alcohol and/or drugs, you said yes.

19        And then you explained:  I feel that drugs and alcohol

20   affect a person's actions, et cetera, but that they are still    09:21AM

21   responsible for the themselves and their actions.  And if

22   currently on drugs and alcohol, they might not be a reliable

23   witness.  And so can you explain that just a little bit

24   further?

25        PROSPECTIVE JUROR:  I just feel if they are currently       09:21AM

UNITED STATES DISTRICT COURT

```
 1   on, it could affect how -- how they might, you know, respond or
 2   be in that moment, if they are currently on them, how they
 3   could be -- I'm probably not explaining this very well.  If
 4   they are currently doing drugs, how they could be affected by
 5   those drugs.  Not saying that they purposely are doing anything
 6   wrong, but you're responsible for your actions if you are on
 7   drugs, and it could affect how you -- how you are at the
 8   moment.
 9                THE COURT:  Okay.
10                PROSPECTIVE JUROR:  Not saying that they are a bad
11   person.  Just saying that they could possibly be doing
12   something that they are not meaning to do.  If they are on a
13   drug -- I'm having -- sorry.  I'm a little nervous.
14                THE COURT:  That's okay.  Let me see if I could maybe
15   ask you a different way.  If an individual came and took the
16   witness stand and is testifying about something they saw, heard
17   or knew, the fact that they also have an alcohol or substance
18   abuse problem, would that affect the way that you view their
19   testimony?
20                PROSPECTIVE JUROR:  No, ma'am.
21                THE COURT:  Okay.  And so is it fair to say it's
22   whether or not they were on the illegal substance at the time
23   they saw, heard or knew or came to know?
24                PROSPECTIVE JUROR:  No, not necessarily.  And I am not
25   saying that I am judging them if they are a bad person because
```

1    of that, because we all have our vices.  Nobody is perfect.

2    Not judging them for that.  That's not what I meant by that.

3            THE COURT:  Okay.  Thank you.

4            PROSPECTIVE JUROR:  Yes.

5            THE COURT:  I wanted to just follow up because I asked    09:23AM

6    you about some of the sexually explicit topics that were going

7    to be presented in the case, and you were one of the jurors

8    that said you weren't sure.  And in response you also said:  It

9    would be difficult, especially if it involved children or

10   molestation.                                                     09:24AM

11           As I had indicated before, this is not a case where

12   anyone has been charged with a child sex trafficking or child

13   molestation charge.  And so understanding that, would you still

14   continue to have difficulty listening and potentially

15   discussing some of these topics if you were selected as a        09:24AM

16   juror?

17           PROSPECTIVE JUROR:  No problem at all.  Only if it

18   involved children.  That just -- yeah, no problem if there is

19   no children involved.

20           THE COURT:  Okay.  Thank you.                            09:24AM

21           Juror 106, 1-0-6, good morning.

22           PROSPECTIVE JUROR:  Good morning.

23           THE COURT:  There we are.  Okay.  So I wanted to ask

24   you a question relating to the potential hardship of serving as

25   a juror.  Although you said the length of the jury schedule      09:25AM

1    would not be a hardship, you went on to say that you are a sole

2    provider of income for your household, has that changed?

3            PROSPECTIVE JUROR:  No, I am still the sole provider.

4            THE COURT:  And so if you are sitting here in jury

5    service for the better part of two months, how would that                09:25AM

6    affect your finances, or would it?

7            PROSPECTIVE JUROR:  It wouldn't affect the finances.

8    The hardship comes is that I have -- I provide transportation

9    for medical and schooling and so I would have to find coverage

10   for that.                                                                 09:25AM

11           THE COURT:  And in finding coverage, is that often

12   difficult for your employer?

13           PROSPECTIVE JUROR:  No.  I would find -- it's for my

14   family --

15           THE COURT:  Oh, for your family.                                  09:26AM

16           PROSPECTIVE JUROR:  -- to get where they need to go.

17   I am the only driver in that household, so I take them to

18   school, I take them to appointments, so I would need to find

19   other people to do that.

20           THE COURT:  And so Tuesday and yesterday, how were the            09:26AM

21   accommodations made for that transportation?

22           PROSPECTIVE JUROR:  School -- they didn't have school

23   on Tuesday.  I didn't have to worry about it.  The day before I

24   had to find someone else to, and I found my sister to do that.

25           THE COURT:  And is that something that you would be               09:26AM

1   able to do if you were selected as a juror to find alternative

2   sources of transportation?

3          PROSPECTIVE JUROR:  If I know the schedule like the

4   calendar, I can schedule it ahead of time.

5          THE COURT:  All right.  Thank you for providing that.    09:26AM

6          Juror 107, as well, you answered that you were also

7   the sole provider of income for your household, and has that

8   changed?

9          PROSPECTIVE JUROR:  No.  I am still the sole provider.

10         THE COURT:  And so if you were selected to serve as a    09:27AM

11  juror in this case, understanding the length of time that

12  service would require, would that affect your income or your

13  ability to serve?

14         PROSPECTIVE JUROR:  Not -- no, not in the slightest.

15         THE COURT:  You have other means of help?               09:27AM

16         PROSPECTIVE JUROR:  My company is very generous with

17  jury duty time.

18         THE COURT:  Well, we thank that company.  We

19  appreciate that.

20         I wanted to follow up with you as well that there was    09:27AM

21  that question regarding victims and witnesses and the

22  categories, again, the three categories, ethnic minorities,

23  people of a low socioeconomic status, or people who have

24  experienced challenges with alcohol and/or substance abuse, and

25  whether or not you would find those categories of witnesses to   09:28AM

1    be more or less credible based on those categories.  With

2    regard to the substance abuse, alcohol or drugs, persons who

3    are using those substances, you answered yes.  And then you

4    went on to explain:  Substance abusers often will say anything

5    to shape a narrative, and I would be suspicious of their      09:28AM

6    testimony, though I would try to be open to what they are

7    saying.

8            Is there anything more about that that you wish to

9    expound upon?

10           PROSPECTIVE JUROR:  Yeah, if -- it depends on their   09:28AM

11   state of mind or their frame while the acts are being

12   committed.  So if they are high on narcotics or something like

13   that, I don't believe that they could be trusted to tell an

14   accurate account of what was going on, let alone report on

15   somebody else if they are doing something.  But if they are not 09:29AM

16   high doing it and they are just an alcoholic or if they have a

17   drug problem but their story seems accurate based on the

18   evidence that's being presented at the same time, then, yeah, I

19   wouldn't have any trouble believing it.

20           THE COURT:  Thank you.  Now, in response to a         09:29AM

21   different set of questions, there was a question that asked

22   you:  Do you have strong feelings about the laws and

23   regulations affecting the Internet, including the publishing of

24   content posted by users of the websites?  And your answer was

25   yes.  And you stated:  I believe strongly that the Internet is 09:29AM

1    protected speech and that people should be free to say what

2    they want under the First Amendment of the constitution.

3           Is there anything more that you wish to expound upon

4    with regard to that?

5           PROSPECTIVE JUROR:  Not really.  I mean, I just think    09:29AM

6    that speech is protected.  You can say what you want.  There's

7    repercussions for what you say.  I have no problem with that,

8    but lately society, we have become a lot of pearl clutchers,

9    and everything that comes out everybody is screaming about, and

10   I think people should be allowed to say what's on their mind.   09:30AM

11          THE COURT:  And then the next question was whether you

12   had strong feelings about whether websites like YouTube,

13   Facebook, Twitter and so on should be responsible for the

14   content posted by users of the website?  And you said yes.  And

15   then you explained:  While an individual can say what they want  09:30AM

16   as protected speech, a platform can inadvertently boost hate

17   speech simply by hosting it.  Media companies have a

18   responsibility to not boost such content.  It's a fine line,

19   but I know it exists.

20          Can you expound upon that?                                09:30AM

21          PROSPECTIVE JUROR:  These are private companies.  They

22   have user agreements that everybody scrolls through and never

23   reads, but they exist.  These private companies have rules, and

24   if you go on these platforms and start saying things that are

25   against what the platforms stand for, then you should be        09:31AM

1    censored by the platform.  I have no problem with that at all.

2         THE COURT:  Okay.  And having come to jury service

3    with this strong belief and that you expressed earlier, would

4    you be able to sort of set those beliefs aside and view the

5    testimony and evidence, come to it with an open mind?                    09:31AM

6         PROSPECTIVE JUROR:  I don't see a problem with that at

7    all.  I mean, everything is framed in your experience, but I

8    really don't know what this case is about.  To be honest with

9    you, I have no idea.  I'd like to think that I can be fair

10   based on, you know, my experience and what I believe.  I am not          09:31AM

11   a legislature, so I don't know the statute either.  So if the

12   law -- if there is evidence presented that the laws are broken,

13   then the laws are broken.

14        THE COURT:  And then you would be able to follow the

15   Court's directive in terms of how to apply the law to the                09:32AM

16   facts, is that fair to say?

17        PROSPECTIVE JUROR:  Yeah, absolutely.

18        THE COURT:  Thank you.

19        Juror No. 110, in answer to the question whether or

20   not you thought law enforcement and the government should               09:32AM

21   expend resources investigating, prosecuting people who are

22   purchasers of commercial sex, you said no.  And then you went

23   on to explain:  I think that the facilitators, producers and

24   persons providing the service should be addressed before the

25   person who may be tempted by the product.  The purchaser may            09:33AM

1    need help, help them to not do harm to themselves and

2    inadvertently intentionally to others labeling, registering and

3    publicly shaming must be used with extreme care to the

4    individuals and circumstances.

5           And so is there something -- can you expound a little         09:33AM

6    bit more on that?

7           PROSPECTIVE JUROR:  Sure.  So my center of thinking

8    answering those questions was who is being, where is the harm

9    being done?  And that's where answering it was easy to have

10   feelings on the idea of a stereotypical interaction.  That's        09:33AM

11   probably changed through thinking about this.  It's an

12   introspective survey.  I would say that initially I was

13   thinking that there are some people that might be victims or

14   they might be perpetrating or causing harm to others, and the

15   more I think about it, it could be the person buying, it could    09:34AM

16   be the person selling, and it could be a mixture of any of

17   those.  Any of those people could be harmed or be the person

18   causing harm.  So it became complex.  I know I used that word.

19          THE COURT:  Okay.  Well, I appreciate you explaining

20   that a little bit further.                                          09:34AM

21          I also wanted to follow up with your answer about

22   strong feelings about whether or not prostitution should be

23   legalized, and you said, yes, you do have strong feelings.  And

24   then you said:  I think that the facilitators, producers and

25   persons providing this service should follow normal democratic     09:35AM

1    means to make their case how this would be acceptable.

2            Is that your feeling today?

3            PROSPECTIVE JUROR:  Yeah, I think that that's fairly

4    accurate.  It comes to where it's not legal, if that -- there

5    are other instances of things becoming legalized, and that          09:35AM

6    would probably be an appropriate way to approach if -- sorry.

7    That would be an appropriate way to approach it.  If that is

8    something that society agrees is acceptable and it can be

9    handled within what's acceptable to society, then that would be

10   the direction it should go.                                         09:35AM

11           THE COURT:  And then you also indicated that you

12   thought resources should be spent investigating and prosecuting

13   businesses or individuals who provide a platform that sell

14   goods or services that promote or facilitate prostitution, and

15   you said yes.  And then again here you said:  I think that the      09:36AM

16   facilitators, producers and persons providing the service

17   should be addressed if they are doing things in an illegal

18   context.  If there were not a marketplace, then potential

19   victims and seekers would not easily have temptation,

20   opportunity to engage in illegal activities.                        09:36AM

21           Is that your feeling today?

22           PROSPECTIVE JUROR:  I think it's still mostly captures

23   what I think about that, but I would say that I would expect a

24   company, a business or the facilitators to act within the law,

25   and I am not an expert on that, so I would -- I would interpret     09:36AM

1     that through like proceedings like this, having the law

2     explained, having actual facts instead of supposing what

3     happened and applying it that way.

4           THE COURT:  All right.  Thank you.  Then with regard

5     to another question about strong feelings about whether          09:37AM

6     websites should be responsible for content posted by users of

7     the websites, and you said yes.  And you say:  The main point

8     is that websites post their community rules, they should refer

9     to them and apply them fairly.  Generally I feel that they do

10    this, but it is not always perfect.  Surprises to users who get  09:37AM

11    flagged for violating the community rules are the -- are the

12    onus -- onus of the users, and should have an appropriate

13    appeal process in the case of a mistake or misunderstanding,

14    but in many cases the rules are provided and clear.  Not

15    reading them does not excuse the users.                          09:37AM

16          It seems like you thought pretty hard about that

17    question.

18          PROSPECTIVE JUROR:  Yeah, and I -- I heard -- I kind

19    of heard similar, similar what I was getting that somebody said

20    better, that joining a community it's on me to read through the  09:38AM

21    community guidelines.  And I think surprises come up.  Might be

22    surprises to a person in the community.  It could also be

23    people who administer the platform.  Once someone becomes

24    aware, then I have a choice of not being -- deleting my

25    profile, leaving the community, and also if the platform finds   09:38AM

```
 1    a surprise.  Our platform has this going on, and it's against
 2    our community rules, then it should adhere -- they should
 3    adhere to the rules that they agreed in.
 4           THE COURT:  So the onus is on the user, in your view?
 5           PROSPECTIVE JUROR:  It's on both.  The user can choose    09:39AM
 6    whether or not they want to be part of that community and the
 7    community leaders should -- should manage their community to
 8    the rules that they set out.
 9           THE COURT:  All right.  Thank you.
10           Are there any follow-up questions from the government    09:39AM
11    on these series of questions?
12           MS. PERLMETER:  No, Your Honor.
13           THE COURT:  Mr. Eisenberg.
14           MR. EISENBERG:  No.
15           MR. FEDER:  No.  Thanks.                                 09:39AM
16           THE COURT:  Mr. Lincenberg.
17           MR. LINCENBERG:  Yes, Your Honor.
18           Good morning, ladies and gentlemen.  My name is
19    Gary Lincenberg.  I am one of the defense attorneys in this
20    case.  I have just a few questions.                             09:39AM
21           First for Juror 99, sir, in the questionnaire you
22    indicated that the length of the trial would create an undue
23    hardship because you're caring for a two-year-old grandson.
24           PROSPECTIVE JUROR:  That's not me.
25           MR. LINCENBERG:  That's not you.  Was that one of the    09:40AM
```

```
 1    others in this group?  Okay.  I apologize.

 2              PROSPECTIVE JUROR:  That's all right.

 3              MR. LINCENBERG:  Juror No. 100, if I recall yesterday,

 4    did you make mention of having digestive flare-ups, is that

 5    you?                                                         09:40AM

 6              PROSPECTIVE JUROR:  It was on Tuesday.  Yes, I did.

 7              MR. LINCENBERG:  And as I recall, my note is that you

 8    said that you can't guarantee that you can leave the house at

 9    any day, is that accurate?

10              PROSPECTIVE JUROR:  That's correct because when this  09:40AM

11    happens, it's always in the morning for some reason.  Don't

12    know the source of it.

13              MR. LINCENBERG:  So there's days just throughout the

14    year when you'll have this flare-up and just can't leave the

15    house?                                                       09:41AM

16              PROSPECTIVE JUROR:  Being retired it isn't a problem

17    for me.

18              MR. LINCENBERG:  If you're going to work; right?

19    Okay.  Would that potentially interfere with your ability to

20    get to court if you had a flare-up?                          09:41AM

21              PROSPECTIVE JUROR:  Yes, it would, honestly.

22              MR. LINCENBERG:  How often do you have the flare-ups?

23              PROSPECTIVE JUROR:  I would say every six weeks or so.

24    Just had a flare-up last week, so...

25              MR. LINCENBERG:  So you don't know when the next      09:41AM
```

1    one --

2              PROSPECTIVE JUROR:  I have no idea.

3              MR. LINCENBERG:  Okay.  Thank you, ma'am.

4              PROSPECTIVE JUROR:  Sorry.

5              MR. LINCENBERG:  Juror No. 105, I'm sorry, I think we    09:41AM

6    covered it.  Thank you, ma'am.  I'm sorry.

7              Jury No. 106, ma'am, in response to one of the

8    questions about sexually explicit topics, because there are

9    going to be sexually explicit topics in this case, the

10   questionnaire asked whether or not you can listen and discuss    09:42AM

11   this with others.  And my note indicates that your answer was

12   you were not sure; that if it's very graphic, you may be

13   shocked.  And you said:  But can manage.  If it involves

14   children, then certainly no.

15             Is that accurate?                                      09:42AM

16             PROSPECTIVE JUROR:  That's correct.

17             MR. LINCENBERG:  Now, this is a case in which there

18   may be images everyday of the trial that are sexually explicit.

19   Would that be shocking to you?  Would that be difficult?

20             MS. PERLMETER:  Objection.                             09:42AM

21             THE COURT:  I don't think she can answer that.  I

22   think she can -- she can --

23             MR. LINCENBERG:  Would that potentially be the type of

24   thing that might be shocking to you?

25             PROSPECTIVE JUROR:  It could be.  I don't know.  I see  09:43AM

1    movies all the time that have things in it that I'm shocked by,

2    but, yeah.

3              MR. LINCENBERG:  So you can't tell the Court today not

4    knowing what type of shocking material may come up whether or

5    not you could manage with regard to discussing the topics, is          09:43AM

6    that fair?

7              PROSPECTIVE JUROR:  I couldn't talk about it.  I just

8    don't know how shocking it's going to be.

9              MR. LINCENBERG:  Okay.  Your answer was you weren't

10   sure whether or not you could listen or discuss that.  Is that         09:43AM

11   fair that you just aren't sure, but that things shock you and

12   sometimes you can't listen or discuss it?

13             PROSPECTIVE JUROR:  I would think it would be more

14   with children if that came up, then that I shouldn't.  But with

15   adults nowadays, I mean everything is open right now.                  09:43AM

16             MR. LINCENBERG:  Okay.  Thank you, ma'am.  Appreciate

17   it.

18             Thank you, Your Honor.

19             THE COURT:  Ms. Bertrand.

20             MS. BERTRAND:  Mr. Lincenberg covered my questions.  I        09:44AM

21   am good.  Thank you.

22             THE COURT:  Mr. Cambria.

23             MR. CAMBRIA:  None, Your Honor.

24             THE COURT:  All right.  Members of the jury panel, as

25   I mentioned before, I was going to ask each of you if you had          09:44AM

1    contemplated or thought about something you may have heard,

2    seen, listened to, inadvertently or otherwise, since filling

3    out your questionnaire and through your time of jury service

4    about this case or any of the parties in it, any of the named

5    defendants, any of the government lawyers or any of the subject      09:44AM

6    matter.  If you have, please raise your hand.

7            All right.  Thank you very much for coming in early

8    this morning.  We're going to excuse all of you now.  You may

9    exit through the double doors of the courtroom.  Return to the

10   jury assembly room for further direction.  We'll probably --        09:45AM

11           There's a hand about to be raised.  I see.  Okay.

12   Juror number -- your hair is covering your badge number.  State

13   your number.

14           PROSPECTIVE JUROR:  Juror No. 98.

15           THE COURT:  Juror No. 98.                                    09:45AM

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  And the answer that, or the statement

18   you're going to give relates to something about hearing or

19   listening to any of the matters?

20           PROSPECTIVE JUROR:  No.  It was about the questions we       09:45AM

21   had gone over earlier in the questionnaire.

22           THE COURT:  Is this something that you wish to discuss

23   privately?

24           PROSPECTIVE JUROR:  It doesn't need to be privately.

25   Just one of my answers has changed and it was not covered just       09:45AM

UNITED STATES DISTRICT COURT

1    now.

2            THE COURT:  Okay.  And what was the -- do you recall

3    what the question was?

4            PROSPECTIVE JUROR:  Yes.  It was about the hardship.

5            THE COURT:  Oh, the hardship.  Okay.  So can you                09:45AM

6    describe generally what the hardship would be?

7            PROSPECTIVE JUROR:  Yes.  After the initial

8    questionnaire I was notified by my company that I would only

9    receive pay for two weeks of jury service.

10           THE COURT:  And if that is the case, even though you             09:46AM

11   will get a stipend for service here, would that create a

12   financial hardship for you?

13           PROSPECTIVE JUROR:  I'm not quite -- is that -- is the

14   stipend what we're paid daily?

15           THE COURT:  Yes.                                                 09:46AM

16           PROSPECTIVE JUROR:  Yes, it would create a hardship.

17           THE COURT:  Thank you.  I appreciate you providing

18   that information to us.  All right.  And so is there a

19   follow-up?

20           MS. PERLMETER:  No, Your Honor, but in the                      09:46AM

21   questionnaire Juror No. 104 had indicated that they wished

22   to --

23           THE COURT:  I can't hear you, Ms. Perlmeter.

24           MS. PERLMETER:  Juror No. 104 had indicated in their

25   questionnaire that they wished to talk to the Court privately.          09:47AM

1    It was in question 74 referencing question 64.

2           THE COURT:  Certainly Juror 104, do you wish to speak

3    with the Court privately about one of your answers?

4           PROSPECTIVE JUROR:  Was that just about if it was

5    about --                                                    09:47AM

6           THE COURT:  Yes.

7           PROSPECTIVE JUROR:  If it does not involve children,

8    then there is no reason to.

9           THE COURT:  Okay.  Thank you.

10          All right.  Members of the jury panel, I will ask now  09:47AM

11   that you exit through the double doors in front of the

12   courthouse or courtroom, excuse me, return to the jury assembly

13   area.  You'll probably be on a break for the better part of an

14   hour, but we will have the Jury Administrator keep you

15   apprised.  We have some business to attend to.                09:48AM

16          As I mentioned yesterday to all of you, we hope to be

17   able to select and seat a jury before lunchtime, so do -- do

18   not go far.

19          All right.  With that, please all rise for the jury

20   panel members.                                                09:48AM

21          (Prospective jury panel leaves courtroom at 9:48 a.m.)

22          THE COURT:  All right.  Please be seated.  Now, I

23   think just given the answer from Juror No. 100, she should be

24   released for hardship.  She's got physical difficulties, and I

25   don't think we can depend on her if selected.  Is there any   09:49AM

```
 1   objection?
 2            MS. PERLMETER:  To 100, no objection.
 3            MS. BERTRAND:  No objection.
 4            THE COURT:  Mr. Cambria.
 5            MR. CAMBRIA:  I'm sorry, no objection.        09:49AM
 6            MR. EISENBERG:  No objection.
 7            THE COURT:  100 is removed.  All right.  With that, I
 8   ask that you --
 9            MR. EISENBERG:  What about 98?
10            THE COURT:  I'm sorry?                        09:49AM
11            MR. EISENBERG:  What about 98?
12            MR. FEDER:  98.
13            THE COURT:  Oh, 98, she is the person that would only
14   receive two weeks pay.
15            MS. PERLMETER:  No objection.                 09:49AM
16            THE COURT:  Any objection to removal for financial?
17            MR. FEDER:  No objection.
18            MS. BERTRAND:  No objection.
19            THE COURT:  Any other juror in that batch for a
20   hardship?  I don't identify any myself, but if you do, you can  09:50AM
21   let me know.
22            MR. LINCENBERG:  The only question would be what the
23   Court views in terms of 104 with the migraines.
24            THE REPORTER:  I'm sorry.  Who spoke?
25            MR. LINCENBERG:  Gary Lincenberg.  The cause argument,  09:50AM
```

1    I guess, would be, or hardship as well.  She said:  I

2    concentrate most of the time.

3          I'm not sure that's sufficient.  That would be --

4          THE COURT:  Well, it sounds like she's lived with the

5    issue.  You know, I fortunately -- I do know what a migraine is      09:50AM

6    like, but I fortunately am not one of these that has to live

7    with that.  It seemed like in her answer she worked through it.

8          MR. LINCENBERG:  I think she said when she's at work

9    she stays, but otherwise she stays home in the morning.

10          MS. PERLMETER:  Yes.  The juror indicated that she's      09:51AM

11    had this issue since childhood.  She manages, she powers

12    through.  She did indicate she's never left a shift because of

13    it.  So it appears that -- I don't think it's sufficient for

14    cause or hardship.

15          THE COURT:  I think given her explanation and her      09:51AM

16    willingness to continue on, that sort of to me demonstrates an

17    ability to power through, and she's lived with it, so I'm going

18    to keep her in.

19          All right.  Now, before you concentrate on your

20    strikes, I told you that we would take up the preliminary      09:52AM

21    instructions or there any objections thereto.  My staff sent to

22    you by e-mail last evening the revision.  Is there any change

23    from the government?

24          MR. STONE:  Yes, Your Honor.  We filed the document

25    last night, Doc 1743.  I have it right here.      09:52AM

1          THE COURT:  Yes.  What is -- just tell me orally what

2    is the nature of your objection?

3          MR. STONE:  I will take the role.  There are just four

4    minor issues with the preliminary jury instruction 1.2.

5          THE COURT:  Hold on.  Let me get there.  What is that?   09:52AM

6          MR. STONE:  The first line under Count 1, the

7    conspiracy count describes the charges conspiring to facilitate

8    prostitution.  This is on page 3 of the preliminary jury

9    instructions, Your Honor.  And that's just an incomplete

10   description of the Travel Act crime.  As the Court instructs in   09:53AM

11   the first paragraph of the substantive violations, which is the

12   next page, the statutory language reads:  To promote, manage,

13   establish, carry on or facilitate the promotion, management,

14   establishment or carrying on of a business enterprise involving

15   prostitution offenses.                                            09:53AM

16         And so the government believes just a more accurate

17   way to shorthand that would be to state:  Count 1 of the

18   indictment is for conspiring to promote or facilitate the

19   promotion of prostitution.

20         So just changing the shorthand to be more accurate       09:54AM

21   with the statutory language, Your Honor.

22         THE COURT:  Say that again.  Count 1 of the indictment

23   is for conspiracy to?

24         MR. STONE:  For conspiring to promote or facilitate

25   the promotion of prostitution.                                    09:54AM

1          THE COURT:  Any objection?  Any objection --

2          MR. PANCHAPAKESAN:  I need to approach, Your Honor.

3          THE COURT:  -- to that change?

4          MR. PANCHAPAKESAN:  We have no objection -- we have no

5   objection to that change.                                    09:55AM

6          THE COURT:  Okay.  Then let me have him go to the next

7   matter.

8          MR. STONE:  Are you ready for the next one?

9          THE COURT:  Yes.

10         MR. STONE:  Second, the second element in Count 1       09:55AM

11  contains the word "illegal" before "objects."

12         THE COURT:  I think we covered this in the discussion

13  of the final instructions at the Final Pretrial Conference.

14         MR. STONE:  I think so, but if I can just make a

15  record, Your Honor.                                           09:55AM

16         THE COURT:  You can.

17         MR. STONE:  In the full jury instruction, the full

18  draft instructions that the court prepared, sometimes the

19  "illegal" was not listed before, so it was a little bit

20  inconsistent, and I just want to make the record that I think  09:55AM

21  it's right not to have it and it's for three reasons.

22         First, the word "illegal" isn't used in the Model

23  Criminal Jury Instructions.  That's 11.1.  It's not there.  It

24  wasn't in the preliminary jury instructions for the first

25  trial, so it's contrary to law of the case.  That's           09:55AM

1    Document 1311 at three.

2          And third, it's contrary to Ninth Circuit law, *United*

3    *States vs. Kaplan* 633 F.2d 534 states --

4          THE COURT:  Give me the citation because I have

5    contrary circuit law.                                    09:56AM

6          MR. STONE:  633 F.2d 534.

7          THE COURT:  I think my case is an F.3d.

8          MR. STONE:  I know there is case law that

9    Mr. Panchapakesan has provided, but I don't think those cases

10   is our intention, Your Honor.  I think they both stand, they  09:56AM

11   can both stand for this proposition because this case states a

12   conspiracy is defined as a combination of two or more persons

13   to accomplish some unlawful purpose, or some lawful purpose by

14   unlawful means.

15         Here in the Superseding Indictment, Doc 230, the       09:56AM

16   purpose or the object of the conspiracy is listed as to obtain

17   money.  That's not unlawful in itself.  Any business' object

18   would be to obtain money.  But if they have an unlawful means

19   to do so, in this case violating the Travel Act, promotion,

20   promoting or facilitating the promotion of prostitution       09:57AM

21   offenses, then that's a criminal conspiracy.  And so the cases

22   that have been cited that you may have on F.3d talk about the

23   one that where you need to have the illegal object, but you

24   don't need it, and that's why 11.1 under the Model Jury

25   Instructions doesn't contain that word.                     09:57AM

```
 1              THE COURT:  All right.  Thank you.  Next.

 2              MR. STONE:  Third issue is the Pinkerton instruction,

 3    and this is the middle of page 4.  That's inaccurate here,

 4    although it is accurate on the Court's draft jury instructions,

 5    which is Doc 1656 at 37.  So I think we just need to modify it    09:57AM

 6    to make --

 7              THE COURT:  Which paragraph are you --

 8              MR. STONE:  It's the elements under Pinkerton.

 9              THE COURT:  Which paragraph?  Page 4, which paragraph?

10              MR. STONE:  It starts with:  First the defendant        09:58AM

11    committed the Travel Act offense.

12              THE COURT:  Okay.

13              MR. STONE:  So our issue is with the first three

14    elements here.  Under Pinkerton, it doesn't need to be a

15    defendant who is sitting over here to commit the offense for a    09:58AM

16    defendant to be found guilty under that theory.  It could be

17    any member of the conspiracy.  And that's what the Court

18    properly instructed at Doc 1656 at 37.  So it should read:

19    First a member of the conspiracy committed the Travel Act

20    offense alleged in that count.  Second, the person was a member  09:59AM

21    of the conspiracy charged in Count 1 of the indictment, and

22    third --

23              THE COURT:  Wait, wait, wait, wait.

24              MR. STONE:  Sorry.

25              THE COURT:  First, a member of the conspiracy           09:59AM
```

```
1     committed the Travel Act offense?

2              MR. STONE:  Yes.

3              THE COURT:  And then next.

4              MR. STONE:  Second, the person was a member of the

5     conspiracy charged in Count 1 of the indictment.                    09:59AM

6              And third --

7              THE COURT:  Second, the defendant who committed the

8     charged Travel Act offense was a member of the conspiracy.

9              MR. STONE:  Second, the person was a member of the

10    conspiracy because it doesn't need to be a defendant who            10:00AM

11    committed the crime.

12             And then there's a modification to the third element

13    as well.

14             THE COURT:  What is that modification?

15             MR. STONE:  It would read:  Third, the person            10:00AM

16    committed the Travel Act offense in furtherance of the

17    conspiracy.

18             Again, I've just taken the language that the Court

19    instructed in Document 1656.  That's the larger draft jury

20    instructions, page 37.                                              10:00AM

21             THE COURT:  And what else?

22             MR. STONE:  This is consistent with how the Court in

23    the first trial instructed, and that's Doc 1311 at four.  Okay.

24    That's it for the corrections to 1.2.

25             Then we just have one --                                   10:01AM
```

1          THE COURT:  Let me have defense counsel address 1.2

2     then.  What is --

3          MR. PANCHAPAKESAN:  So Your Honor, a couple things in

4     response to Mr. Stone on this issue on Count 1 in terms of the

5     word "illegal modifying objects."  Our view is that under Ninth         10:01AM

6     Circuit precedent, the object itself has to be unlawful, and

7     there is two cases on that.  There is *U.S. vs. Manarite* 44 F.3d

8     1407.  Another one is *U.S. vs. Johnson* 44 F.APPX 752.  The

9     indictment itself only says that the object is, quote, to

10    obtain money.  It does not follow it up by saying there were        10:01AM

11    unlawful means to obtain money.  And so a couple things on

12    this.

13         One, given the government's position on this, it's our

14    view that that count should be dismissed because it's defective

15    under Ninth Circuit precedent, and we're making an oral motion        10:02AM

16    in that respect.

17         THE COURT:  I think I heard that before.

18         MR. PANCHAPAKESAN:  But as to the jury instructions,

19    our view is that the word "illegal" should be in there.

20         As to when Mr. Stone referred to as the *Pinkerton*        10:02AM

21    section of the Travel Act counts, I think we're in agreement.

22    Our modification would be as to the first line it should say:

23    A member of the conspiracy charged in Count 1.  We just don't

24    want the implication that --

25         THE COURT:  Sorry, what is the modification?  I want        10:02AM

```
 1    to know now what is the modification that you're proposing

 2    then?

 3              MR. PANCHAPAKESAN:  We're okay with Mr. Stone's

 4    proposed changes to the three sections of the Pinkerton portion

 5    of Counts 2 through 51.  I believe his language was a member of    10:03AM

 6    the conspiracy.

 7              THE COURT:  Yes.

 8              MR. PANCHAPAKESAN:  We are proposing after that is to

 9    say:  Charged in Count 1.  To avoid the implication that there

10    is in fact a conspiracy.                                           10:03AM

11              THE COURT:  Okay.  So let -- this is a little bit

12    unwieldy, but the first modification is:  First, a member of

13    the conspiracy committed the Travel Act offense as charged in

14    Counts 2 through 51 of the indictment.

15              MR. PANCHAPAKESAN:  Right.                               10:03AM

16              THE COURT:  Is there a modification to that?  You

17    wanted to say --

18              MR. PANCHAPAKESAN:  "A member of the conspiracy

19    charged in Count 1."  If it just says "a member of the

20    conspiracy" the implication is there is in fact a conspiracy.     10:03AM

21              MR. STONE:  May I be heard?

22              THE COURT:  And I think that's what the indictment

23    alleges, isn't it?

24              MR. PANCHAPAKESAN:  The indictment does allege a

25    conspiracy, but I think that language implies the existence of    10:04AM
```

```
1    one.
2           THE COURT:  Well, they still have to prove it up.
3    These are just preliminary instructions.
4           All right.  What is your second modification?
5           MR. PANCHAPAKESAN:  That's the only modification.  I    10:04AM
6    have some further comments, but I will let Mr. Stone go through
7    his other -- do you have further ones?
8           MR. STONE:  I have an --
9           THE COURT:  I guess let me just, Mr. Panchapakesan,
10   let me just ask you then if, because I do see, and I have noted   10:04AM
11   that it is the defense's position that the object of the
12   conspiracy was to make money.  I know that's -- I have seen
13   that over and over again, and I do say.  I do agree that the
14   making money in and of itself is not anything illegal.  And so
15   I think I am curious as to whether or not you've had an          10:05AM
16   opportunity to distinguish the case that you cite, is it the
17   *Kaplan* case, to what the government cited?
18          MR. PANCHAPAKESAN:  We cite the *Manarite* case and the
19   *Johnson* case.  I think the case that Mr. Stone cites says that
20   you can obtain money in an unlawful way, right, and what they    10:05AM
21   are saying is that it was done in an unlawful way here.  But
22   the defect is in the indictment says it does not actually
23   specify what those unlawful means are in terms of the object.
24          THE COURT:  Well, it does in toto, and I think Judge
25   Brnovich had already ad nauseam discussed that, that the         10:05AM
```

1    totality of the indictment was sufficient in terms of its

2    description of the illegal means.  So I guess -- and I will

3    say, Mr. Stone, the case law basically that I look at, for

4    example, *United States vs. Hubbard*, this is a 96 F.3d, 1223:

5    To prove a conspiracy, the government must show an agreement      10:06AM

6    between two or more persons to accomplish an illegal objective

7    coupled with one or more overt acts in further of the illegal

8    purpose.

9          And I also -- I think that that is still good circuit

10   law.  And so I'll look at the case that you cited see if I       10:06AM

11   change my mind in regard to the preliminary instructions

12   keeping in mind there are going to be final instructions that

13   will be perfected based upon the evidence and testimony that is

14   received.

15         Were there any other records to be made with regard to     10:07AM

16   anything else that the government objects to in a preliminary

17   instruction?

18         MR. PANCHAPAKESAN:  The only addition I had, or

19   request that there be a specific intent instruction, which I

20   can address now briefly.                                         10:07AM

21         THE COURT:  As a preliminary instruction?

22         MR. PANCHAPAKESAN:  That's right, Your Honor.  In

23   connection with the initial trial there was a preliminary

24   instruction on specific intent.  That's Docket 1311.  And the

25   reason we're making that request is the -- but there is no       10:07AM

1    dispute that the Travel Act is a specific intent crime.  I

2    think as the Court is going to see, much of the government's

3    evidence is going to go to knowledge.

4         For example, a third party sending a letter to a

5    defendant that there may be illegal activity on the site.  I    10:08AM

6    think that is the bulk of the government's evidence.  It does

7    not go to a specific ad or a specific business enterprise.  And

8    so the concern is, we may go through two or three months of

9    trial and the jury may be under the misimpression that

10   knowledge that a site is being used in a certain way is enough,   10:08AM

11   when it's not.  There has to be intent as to an ad, as to a

12   business enterprise.  So including that instruction now would

13   mitigate against that risk.

14        THE COURT:  Is there an objection?  I do note it was

15   in the preliminary instructions that were given last time.    10:08AM

16   Mr. Stone.

17        MR. STONE:  No objection to the instruction that was

18   given the first time around.  I don't think -- we don't think

19   it's necessary, Your Honor, but it was given before, and that's

20   fine.                                                         10:08AM

21        THE COURT:  All right.  Anything further?

22        MR. STONE:  Just to clarify, I think the modification

23   that Mr. Panchapakesan offered makes that first element

24   confusing.  The whole point of *Pinkerton* is they don't need to

25   be sitting at defense table.  If the jury finds that          10:09AM

1    Carl Ferrer committed the crime and he was in a conspiracy with

2    the defendant sitting here and the other elements of *Pinkerton*

3    are met, then they can find -- it's an alternative way to find

4    a defendant guilty.  So I just want it to be clear that it is a

5    member of the conspiracy; not a current defendant.                    10:09AM

6           THE COURT:  All right.  Thank you.

7           MR. STONE:  The argument I have -- I have one argument

8    on the limiting instruction, Your Honor, and one and a half, I

9    will say.  The big one is, the first sentence identifies

10   misdemeanor state law prostitution offenses.  And the            10:09AM

11   government's position is there's no reason to say

12   "misdemeanor."  That doesn't provide the jury with any

13   information that's helpful.  We -- it serves no legitimate

14   purpose except for perhaps defendants to make some

15   nullification argument about, what is the big deal?  These were   10:10AM

16   just misdemeanor offenses at the state level, even though they

17   are federal felony charges that the jury has to find in this

18   case.

19          We don't instruct that the Travel Act has a five-year

20   statutory maximum, or that concealment money laundering is       10:10AM

21   20 years.  We can get to everything that the Court wants to

22   instruct here by just excising "misdemeanor, facilitating state

23   law prostitution offenses."  That's the way it should read.

24   And then the half argument I have is similarly that this says

25   "facilitating."  We think it should be "promoting or             10:10AM

1   facilitating the promotion of," just to be more accurate to the

2   Travel Act language.

3          THE COURT:  All right.

4          MR. PANCHAPAKESAN:  Your Honor, on Mr. Stone's second

5   point, we have no objection to adding the promotion language.       10:10AM

6          In terms of the reference of the misdemeanor, look,

7   our understanding is that the state statutes on what the Court

8   will eventually instruct the jury are in fact misdemeanor

9   statutes, so this is not a nullification issue.  We are not

10  misstating the law.  And the conclusion of that makes an           10:11AM

11  important distinction between a trafficking offense, which is a

12  felony, and a state prostitution offense, which as I understand

13  it are all misdemeanors here.  That's why we included it.

14         THE COURT:  And you'll have an opportunity to argue

15  that, but I think sometimes we lose focus about who our public     10:11AM

16  jury is, and often times these individuals they have no concept

17  or have never thought of the distinction between a misdemeanor

18  and a felony, a petty offense and so on, and so I think

19  removing it at this juncture is not problematic.  I will add

20  the promotion language in there.                                    10:11AM

21         And again, you will let me know when it is appropriate

22  to give the limiting instruction.  I purposely did not include

23  what the defendants suggested was to describe what the intended

24  meaning of it was, not for the truth of the matter and so on,

25  but it's for the counsel to lay that foundation and extract         10:12AM

```
1    that information from the witness.  It's not my responsibility

2    to project and predict what that would be.

3              So in any event, anything more on that limiting

4    instruction?

5              MR. CAMBRIA:  Yes.  Yes, Your Honor.  I think that      10:12AM

6    it's necessary that you included the First Amendment

7    instruction.  You've agreed, and I think rightly so --

8              THE COURT:  As a preliminary instruction?

9              MR. CAMBRIA:  No.  That there is a First Amendment

10   instruction appropriate in this case.                             10:12AM

11             THE COURT:  Mr. Cambria, let me back up.  We're

12   talking about preliminary instructions.

13             MR. CAMBRIA:  I know we are.

14             THE COURT:  You can save that argument for later.

15             MR. CAMBRIA:  No.  All I am saying is that it's clear    10:13AM

16   the Court has recognized First Amendment applies to this case,

17   and what I'm saying is that it should be given as a preliminary

18   instruction.

19             THE COURT:  That's just what I asked you.  I just

20   asked you, do you mean a preliminary instruction --              10:13AM

21             MR. CAMBRIA:  Yes.

22             THE COURT:  -- and you said no.

23             MR. CAMBRIA:  No.  No.  No.  Yes, what I was saying is

24   since you've already recognized in the final instructions that

25   First Amendment applies, that it should be given to the jurors   10:13AM
```

1    in the beginning as part of a preliminary instruction because

2    it permeates this entire case, and they should have that

3    guidance as we -- as they hear the evidence.

4          THE COURT:  Was that given in the first trial?

5          MR. CAMBRIA:  In the first trial, no, it was not.          10:13AM

6          THE COURT:  Okay.  Let me hear from --

7          MR. CAMBRIA:  I understand that, but it should be

8    given in this trial because it's appropriate.  There is no way

9    that this case is not governed by the First Amendment.  These

10   are publications.  It's classic First Amendment.  And the      10:14AM

11   jurors need to know just exactly what your instructions said

12   for the most part.  We did object to the part about "related

13   to" 'cause it's not consistent with Ninth Circuit law, but at

14   least tell them that it is governed by the First Amendment,

15   presumptively protected.  That clearly should be said to them.  10:14AM

16   This case is about that.

17         THE COURT:  Who from the government wishes to respond?

18         MR. KOZINETS:  I do, Your Honor.  Peter Kozinets for

19   the United States.  This issue came up in identical form at the

20   first trial and it is was extensively briefed by the parties   10:14AM

21   whether there should be a preliminary First Amendment

22   instruction, and whether there should be any such instruction

23   at all.  This is set forth at Doc 1216 at three and 164 Doc

24   1236 and Doc 1242.  We argued it at length before Judge

25   Brnovich as reflected at Doc 1432.  This was an August 20th     10:15AM

1    status conference two years ago.  At pages 36 to 66 of that

2    transcript, we discussed all of these issues specifically

3    including whether there should be a preliminary instruction on

4    this issue.

5             On September 3rd, 2021, just before opening                    10:15AM

6    statements, the Court ruled that she had e-mailed preliminary

7    jury instructions that, quote, on purpose doesn't include a

8    First Amendment instruction.  That's at Document 1340, page 25.

9    She said:  I have done the research, considered the arguments

10   that were previously presented, the new information presented     10:15AM

11   and have declined to include that in the preliminary

12   instructions.  That's at Doc 1340 at page 25.

13            That ruling remains correct today.  It is well

14   grounded in Ninth Circuit law and the law of the Second Circuit

15   and the Seventh Circuit as we briefed in Doc 1242.  We're -- we    10:16AM

16   told the Court, the defendants had cited no case requiring a

17   preliminary jury instruction on any defense theory involving

18   First Amendment and the U.S. located none.  That remains true

19   today.

20            We cited the *Freeman* case from the Ninth Circuit,         10:16AM

21   *United States vs. Freeman*, the *Rowlee* case from the Second

22   Circuit, and the *White* case from the Seventh Circuit.  And

23   basically what all of these cases stand for, and the full case

24   citations are set forth in our brief at Doc 1242, what these

25   all essentially stand for is the proposition that you can't        10:16AM

1    tell until all of the evidence has come in whether such an

2    instruction is warranted, and giving it in advance has great

3    potential to confuse the issues and to invite potential

4    nullification where in a manner that's just not appropriate.

5            So for all of those reasons, and for the reasons that      10:17AM

6    we've previously set forth to the Court, we object to that

7    instruction.

8            Does Your Honor have any questions about this?

9            THE COURT:  No, I don't.  And I do note, and I have

10   reviewed some of the prior Court's orders, and I do note         10:17AM

11   specifically a note from the prior Court that indeed there is

12   no First Amendment instruction to be given in the preliminary

13   instructions, and I did note the order stating the reasons why

14   I.  I don't have a -- I don't find the necessity to change that

15   prior decision at least in the preliminary instructions, and     10:18AM

16   that is going to continue to be my ruling.

17           All right.  Now --

18           MR. PANCHAPAKESAN:  Your Honor, I'm sorry, I just have

19   one quick comment.

20           THE COURT:  One quick comment, yes.  Thank you.          10:18AM

21           MR. PANCHAPAKESAN:  Given that on Count 1, the

22   conspiracy, we are now tracking the statute in terms of the

23   promotion language.  We would ask that after that there be a

24   reference to a business enterprise involving prostitution

25   offenses, just to be consistent the with the statute, and that   10:18AM

1    would also be consistent with the substantive count.  And I

2    believe that language is in Counts 2 through 51.

3            THE COURT:  What lines?

4            MR. PANCHAPAKESAN:  One second.

5            THE COURT:  Is it in the prior preliminary                    10:19AM

6    instructions given by Judge Brnovich?

7            MR. PANCHAPAKESAN:  That I am not sure of, Your Honor,

8    but it is in Counts 2 through 51 in the current preliminary

9    instructions.  So this would be the first paragraph of Count 1

10   under 1.2.  And so it would read:  Count 1, the indictment, is    10:19AM

11   for conspiring to facilitate or promote the facilitation of a

12   business enterprise involving prostitution offenses, et cetera.

13   That would track what's in the substantive counts.

14           THE COURT:  All right.  Now, we are at 20 after the

15   hour.  I ask that you use the next hour to exercise your          10:20AM

16   strikes.  I will be back to gather those strikes and review it,

17   take up any argument with respect to those strikes.  I will

18   then expect that process hopefully won't go on beyond

19   20 minutes or so.  My idea then is to have all of the jury

20   panel come in, filter through the back, take up the gallery       10:20AM

21   seating, and then we will select the jurors who will hear the

22   case.

23           Now, at that juncture I will then give them the

24   preliminary instructions.  And if we are at around then, if

25   that puts us close to about quarter to 12:00 or so, then I        10:20AM

1    would break for lunch, give them the admonishment and then we

2    would begin opening statements from the government.  If we are

3    around 11:30, which I highly doubt we will be, then I will

4    expect the government to be ready to be prepared to begin their

5    opening arguments, and then we can do that for about an hour          10:21AM

6    taking a break for lunch.  That's how I intend to proceed.

7            Ms. Bertrand, looks like you want to say something.

8            MS. BERTRAND:  If I may, please.  Two things we

9    skipped and I was trying to stand up.  With regard to the

10   *Pinkerton* instruction, for Counts 2 through 51, I just want to      10:21AM

11   make sure that that instruction specifically references Count 1

12   of the indictment because there are two defendants here who are

13   not implicated in the additional conspiracies that are charged,

14   and I don't want the jury to be confused about which conspiracy

15   applies to that *Pinkerton* instruction.  That's issue one.          10:21AM

16           And then I have a question about jury selection.  My

17   question about jury selection, I just want to make sure I

18   understand, I note that the defense has request to strike for

19   cause on hardship remaining, so I want to make sure that we're

20   spending our time correctly.  Is the Court going to allow us to       10:22AM

21   make cause and hardship challenges in addition to what's

22   already been done?

23           THE COURT:  No.  We've gone through hardship

24   challenges, so those are done.  As far as I am concerned, they

25   are done.  I've identified some, you've identified some.  The         10:22AM

UNITED STATES DISTRICT COURT

```
1    remaining pool is the remaining pool.

2             MS. BERTRAND:  What about challenge for cause, Your

3    Honor?

4             THE COURT:  If you wish to make a challenge for cause,

5    here's what I'm going to tell you.  Remember that the          10:22AM

6    government has nine strikes.  You have 15 strikes.  If you wish

7    to have a challenge for cause, you can bring those to my

8    attention.  If you want to do that now, we can do that now.

9    Are there challenge for cause that you've identified?

10            MR. LINCENBERG:  Yes, there are, Your Honor.           10:23AM

11            THE COURT:  Has the government identified those?

12            MS. PERLMETER:  We identified jurors for cause as well

13   as hardship, and these were individuals that we consulted with

14   the defense on yesterday where we were unable to reach an

15   agreement.  There were some jurors that the government proposed 10:23AM

16   that the defense did not agree with, and the defense has some

17   individuals for both reasons, cause and hardship, that they

18   propose that the government did not agree with.

19            THE COURT:  Let's take a 15-minute break and we will

20   come back and I will hear those challenges for cause.          10:23AM

21            MS. BERTRAND:  Thank you, Your Honor.

22            (Recess was taken at 10:23 a.m.)

23        (Proceedings reconvened at 10:41 a.m.)

24            THE COURT:  All right.  The record will reflect the

25   presence of counsel.                                           10:42AM
```

1          I'm going to take up your argument for cause strikes

2     now.  Ms. Perlmeter.

3          MS. PERLMETER:  Thank you.  The government moves to

4     excuse Juror No. 3.  Juror No. 3 is the individual --

5          MR. LINCENBERG:  Can you speak into the microphone?                10:42AM

6     I'm having trouble hearing you.  I apologize.

7          MS. PERLMETER:  Juror No. 3 is the male who indicated

8     that he would have difficulty wearing a mask.  He is the

9     individual who has emphysema and he stated in questioning that

10    he has experienced difficulty masking while at the airports.           10:43AM

11    The government's concern is that if our county or our city or

12    this District Court requires masking at some point in the

13    future, that he would be, although willing, but he, given his

14    respiratory issues and his medical diagnosis, would be fumbling

15    with the mask, he would be uncomfortable and that would be             10:43AM

16    distracting and would prevent him from listening to the case.

17         MR. LINCENBERG:  Your Honor, I will be handling the

18    arguments on the cause.

19         THE COURT:  As to 3?

20         MR. LINCENBERG:  As to all of them.                               10:43AM

21         THE COURT:  Well, as to 3?

22         MR. LINCENBERG:  As to 3 we disagree.  Juror No. 3,

23    part of the answer was:  It's not too bad.  If I have to do it,

24    I'll get by.

25         Now, Ms. Perlmeter asked a question in I thought a                10:43AM

1    fairly aggressive manner in a sense, if you had to sit here

2    from 9:00 to 5:00 and couldn't take off the mask for one minute

3    the entire day, he said that would be a problem.  A lot of

4    people indicated that would be a problem.  I'm not sure where

5    the Court is at as to how the Court is going to deal with the          10:44AM

6    different mask answers, but with this juror, this juror said he

7    would get by if he had to.

8           THE COURT:  I agree.  And quite frankly, I think that,

9    you know, we're sort of speculating about resurgence of COVID

10   in any event, and whether or not we would then be falling under        10:44AM

11   those restrictions.  What the CDC is going to do is highly

12   speculative in the first place.  I think he gave a sufficient

13   answer, and I think everyone agreed it would be uncomfortable

14   but would get through it.  So the cause removal for three is

15   denied.                                                                10:44AM

16          MS. PERLMETER:  Juror No. 5 is next.  Your Honor, this

17   is the individual who has recently purchased the home.  He

18   indicated that he also does not get paid for jury duty past

19   80 hours.  It would have to go into his PTO.  He stated that

20   while he and his partner would be able to make payments and            10:45AM

21   they wouldn't become destitute, it would be a -- it would be a

22   struggle for them.

23          He is the one the Court asked the parties to consider

24   after he left.  The Court grouped him in the same category as

25   Juror No. 1.  Juror No. 1 we did stipulate to yesterday and the        10:45AM

1    Court has excused her, and we would ask the Court to be

2    consistent and excuse Juror No. 5 for those same reasons.

3              THE COURT:  Mr. Lincenberg.

4              MR. LINCENBERG:  Your Honor, we disagree.  I think the

5    Court is going to have to make the call on the Court's feel on          10:45AM

6    income loss and so forth.  Everybody is losing income with this

7    jury.  We don't stipulate because he indicated:  There's a

8    potential loss; I need to check with the employer.  I don't

9    know we got a final answer, so we don't stipulate to that one.

10             THE COURT:  I am going to remove him for hardship,          10:46AM

11   financial hardship.  It dawned on me when you raised his number

12   that he was the individual who just recently purchased the

13   home, and it seemed to me that he indicated a financial

14   struggle, although I am sure in the public setting he wasn't

15   going to go into too much detail but it sounded like it would          10:46AM

16   be a difficulty, so 5 is removed for hardship.

17             MS. PERLMETER:  Oh, and Your Honor, we agree to

18   stipulate to the removal of Juror No. 4.  We came to that

19   agreement over the break.

20             MR. LINCENBERG:  That's correct.          10:46AM

21             THE COURT:  Juror No. 4, for what reason?

22             MR. LINCENBERG:  We had both cause and hardship.

23             THE COURT:  What is the cause, your agreement on

24   cause?

25             MR. LINCENBERG:  Yes.  Cause related to the nephew          10:46AM

```
 1    committing sex crimes against the sister when a minor, and the
 2    effect and so forth, uncomfortable discussing sexually explicit
 3    subject matter with fellow jurors.
 4          THE COURT:  All right.
 5          MS. PERLMETER:  Yes, he really wavered on -- I think    10:47AM
 6    he tried, but he wavered on his ability to be fair and
 7    deliberate.
 8          THE COURT:  Juror No. 4 is removed for cause.
 9          MS. PERLMETER:  Next, Your Honor, Juror No. 8.  We ask
10    for him to be removed for cause as well similar to Juror No. 4. 10:47AM
11          THE COURT:  Is this a stipulation?
12          MS. PERLMETER:  No.  This is a motion by the United
13    States.  He is the individual who talked about morality laws.
14    He has strong views against prostitution laws; he has strong
15    views against drug laws.  His position is that because no one   10:47AM
16    is harmed, basically it's not a big deal.
17          He says that, when the Court asked him, he says:
18    Well, I suppose I can set aside my opinions.  I've never seen
19    or dealt with something like this before, so I don't know.  He
20    reiterated his strong opinions.  He said:  I think I can be     10:47AM
21    fair, but this is my opinion.
22          So the concern is that he won't, although he will
23    certainly try based on his answers, and I think we wants to
24    try, based on how strong his views are and how they are so
25    embedded in his core, we think he should be removed for cause   10:48AM
```

1    because he is just unable to be fair even though he is

2    certainly trying, or willing to try.

3                THE COURT:  Mr. Lincenberg.

4                MR. LINCENBERG:  Your Honor, this juror twice said

5    that he could set it aside and he said he would definitely          10:48AM

6    follow the law.

7                MS. PERLMETER:  He also said:  I don't know.  I never

8    seen this before.  I don't know if I could set aside my

9    opinions.

10               THE COURT:  And I think that was consistent with other  10:48AM

11   jurors, so the cause removal is denied.

12               MS. PERLMETER:  Juror No. 24, Your Honor.  Juror No.

13   24 is a taxi cab driver or at one point was a cab driver who

14   took people from one county and Nevada to the next.  He had a

15   number of statements about his experiences and videos that he's    10:49AM

16   seen about brothels, about the federal, about the Feds taking

17   over the brothel, watching YouTube videos about it.

18               The government -- he also had the potential bias

19   towards law enforcement because the cops violated his Fourth

20   Amendment back in the '90s because everything was caught on the    10:49AM

21   dash cam.  He -- but foremost, he is too close to the issues of

22   this case.  We ask that he be removed for cause.

23               MR. LINCENBERG:  Your Honor, this juror -- this juror

24   said:  I would not come to this case with any preconceived

25   ideas.                                                             10:49AM

1          THE COURT:  And he did say that, but I was concerned

2     because I took down notes about his back issues.  He looked

3     very uncomfortable on the first day, although he came back and

4     he said they weren't bothering him too much.  I think he has a

5     physical --                                                          10:50AM

6          MR. LINCENBERG:  On that point, Your Honor, with

7     regard to hardship, what he said was:  I would need to stand up

8     and stretch, and I am not distracted by this now.

9          THE COURT:  And we'll keep him in, 24, denied.

10          MS. PERLMETER:  Next is Juror No. 86.  Juror No. 86       10:50AM

11     has a work hardship, not a financial hardship, she indicated.

12     She is the one who was seated in the front row yesterday

13     talking about how she works for a small office and it's a

14     strain on her ability to do her job.  She had -- she explained

15     she had been doing work on her phone during the break           10:50AM

16     yesterday.  She is the only one that does her job.  When asked

17     how she would manage her work responsibilities if selected as a

18     juror, she said that she would just have to try to do both;

19     that it would be inconvenient and she would have to try to make

20     it up on the weekends.                                          10:51AM

21          So we think that is a hardship.  That would prevent

22     her from doing her responsibilities at work and maintaining her

23     responsibilities as a juror if she's selected.

24          THE COURT:  Mr. Lincenberg.

25          MR. LINCENBERG:  Your Honor, if I recall 86, I believe    10:51AM

1    86 is the one who said, yeah, I may have to do my work on

2    Monday and Fridays and the like, and deal with e-mails during

3    the breaks and so forth but --

4            MS. PERLMETER:  No.  The one who spoke specifically

5    about Mondays and Friday is somebody else.  This juror said          10:51AM

6    that she would just do it on the phone, breaks and on the

7    weekends.

8            MR. LINCENBERG:  Are you on 86, did you say?

9            MS. PERLMETER:  86.

10           THE COURT:  I did probe in that area and it seemed to         10:51AM

11   me that she would be capable of making it work, so I'm going to

12   deny.

13           MS. PERLMETER:  And then Juror No. 87, he is the

14   individual who said he worked last night and that he worked

15   during the breaks when he was questioned.  He was not --          10:52AM

16           THE COURT:  Wait, wait, wait.  Let me get there.  What

17   number?

18           MS. PERLMETER:  Juror No. 87.

19           THE COURT:  87.

20           MR. LINCENBERG:  Counsel, was this the one who said          10:52AM

21   would have to make it up on Mondays and Fridays and so forth?

22   I think my note was for 87; not 86.

23           THE COURT:  All right.  Go forward.

24           MS. PERLMETER:  Juror No. 87 is the individual who

25   said he had worked last night and he was working during the          10:52AM

1    breaks yesterday, and that he doesn't have a hundred percent

2    backup if he, as to his work responsibilities if he were to be

3    selected, so we ask that he be removed for hardship.

4            THE COURT:  I actually think that this is an

5    individual who would have a difficult time because he didn't                    10:53AM

6    want to be away from his job for that long.  He was the primary

7    person for the responsibilities in his office, and he was

8    unsure whether or not it would affect his standing in work at

9    this point, and so I think 87 should be removed for hardship.

10           MS. PERLMETER:  And that's --                                           10:53AM

11           THE COURT:  I'm sorry, did you wish to make a record,

12   Mr. Lincenberg?

13           MR. LINCENBERG:  That's okay.  That's fine.

14           MS. PERLMETER:  And that's it from the government?

15           THE COURT:  That was 87.                                                10:53AM

16           MS. PERLMETER:  Yes, Your Honor.  No more motions.

17           THE COURT:  All right.  The defense then,

18   Mr. Lincenberg.

19           MR. LINCENBERG:  Your Honor, Juror No. 7 was a woman

20   who had, first of all, had indicated that she did not want                      10:54AM

21   graphic pornographic images in her head, preferred not to think

22   about.  Our second argument for cause, Your Honor, has to do

23   with question 32.  What I'd like to do is just make a general

24   statement hoping to persuade the Court, but at least for the

25   record, and I will make it at a little bit of length now and                    10:54AM

1   not repeat the argument with the other jurors where we want to

2   make the argument.

3          Your Honor, we had questionnaires which were submitted

4   where people stated under oath that they expected the defendant

5   to testify; they expected the defendant to prove the case and     10:54AM

6   so forth.  Those are under oath statements which, not with

7   regard to number 7, I will talk about 7 in a moment, where we

8   believe it's a hardship, and it's a hardship for a couple of

9   reasons.  First of all, we don't believe that the Court's

10  general question to the venire --                                 10:55AM

11         THE COURT:  You mean the several questions I asked

12  under oath?

13         MR. LINCENBERG:  I think there's three.  Several

14  questions, the questions that the Court asked --

15         THE COURT:  Jury panel members who were under oath?        10:55AM

16         MR. LINCENBERG:  Yes.  Yes.  That where the Court

17  threw out those general questions and nobody raised their hand,

18  which we believe is a situation which would be much more

19  intimidating for the jurors to do, but that negates the under

20  oath statements they made in their questionnaire.                 10:55AM

21         Your Honor, even if the Court were of the view that it

22  did not, what we would then have would be contradictory answers

23  under oath on the most fundamental point to our clients, and

24  the defendants.  And the -- and the Court denied us the

25  opportunity to explore further with the jurors during our voir   10:56AM

1    dire or any follow-up on question 32.

2            THE COURT:  Mr. Lincenberg, I'm going to cut you off

3    because I'm watching the time here and I want to get this.

4            MR. LINCENBERG:  That's why I wanted to make the

5    argument once, and then I'll just note that the objection on        10:56AM

6    various jurors on question 32 is for cause and I won't repeat

7    the argument.

8            THE COURT:  All right.

9            MR. LINCENBERG:  With regard to 7, 7 there was no

10   questionnaire.  The Court did not ask question 32, so we           10:56AM

11   believe --

12           THE COURT:  In the questionnaire?

13           MR. LINCENBERG:  Yes.  So we believe that that raises

14   similar concerns.  So the second objection on 32 was the, on

15   number 7, was that this juror indicated that she does not want     10:56AM

16   graphic pornographic images in her head for her not to think

17   about.  And that's what this case is going to be about.  There

18   is going to be images everyday.

19           THE COURT:  And I think the Court sufficiently

20   followed up with all of the jurors who sat in the jury box         10:57AM

21   about whether or not they could set aside those opinions

22   understanding now the testimony and evidence that is involved

23   in the case, and I don't believe any of them vehemently said

24   that they could not.  There were a couple of them, I did note

25   that, there were a couple of them that said it would be            10:57AM

1    difficult.  They continued to say that.

2             Again, there was qualifiers regarding the fact that

3    this doesn't involve child molestation or child pornographic

4    images so to speak, and that, I think, calmed some of their

5    fears.                                                        10:57AM

6             So with regard to that objection to 7, that is, I am

7    going to overrule or deny the request for cause challenge to 7.

8             MR. LINCENBERG:  There was the second element of that

9    challenge.  Did the Court address that, that this juror not

10   wanting pornographic images?                                 10:58AM

11            THE COURT:  As I said, yes.

12            MR. LINCENBERG:  Next challenge, Your Honor, would be

13   to Juror No. 17.  This gentleman, the most striking answer was:

14   I'm not the judge.  God is the judge.

15            I could go on with his other answers throughout the  10:58AM

16   questionnaire, but I think that's pretty troubling.

17            THE COURT:  Ms. Perlmeter.

18            MS. PERLMETER:  Your Honor, this individual did

19   express some strong views based on his religious beliefs,

20   however, he was questioned extensively and he talked about on  10:58AM

21   numerous occasions how he can be impartial.  Although he said,

22   although he may believe it is wrong, it is the law.  He would

23   not let his personal beliefs get in the way of him following

24   the law.  It would not affect his decision.  He would follow

25   the law.  While he would prefer not to look at graphic images,  10:58AM

1    it would not be an issue because he understands his duty as a

2    juror.  He then went to talk about how there are many different

3    types of sins in the world and how he himself has committed

4    one.  He then, again, reaffirmed his ability to follow the law

5    and to set aside his personal beliefs, and he finished up with          10:59AM

6    stating that individuals are innocent until they are proven

7    guilty.

8            THE COURT:  Yes.  I recall that as well.  I

9    specifically questioned him because he did state having strong

10   biblical views, but then I think he started out his statement           10:59AM

11   by saying, you know, prostitution is has been around forever.

12   And I think I was sufficiently satisfied that he would be able

13   to set aside those views and be fair and impartial.  So 17

14   is --

15           MR. LINCENBERG:  Your Honor, if I may make a further             10:59AM

16   record.  I thought this one so straightforward I was trying to

17   keep it brief, but this is a person who indicates this industry

18   is evil; that these people are committing major sins; that it's

19   leading to moral decay.  These are answers he's given under

20   oath.  Then he is basically saying:  I am not the judge.                11:00AM

21           As a juror, he is going to have to be judging certain

22   things.  He is saying God is the judge, and he believes that

23   everything about this case is involving evil and moral decay.

24   I think this is as strong of a case for a cause as there is.

25           THE COURT:  I think he rehabilitated himself in the             11:00AM

1     jury box by answering the Court's direct questions and probing

2     it further, as did all parties have an opportunity to do so,

3     and so I'm going to keep him in.

4          All right.  Which one is next?

5          MR. LINCENBERG:  Number 18, which for cause this          11:00AM

6     person indicated that has very strong feelings that could

7     impact that person, tied it in a little bit to watching Sound

8     of Freedom, and said, quote:  I have very strong feelings and

9     it could affect me.

10         18.  Yes.  We also have a question to 32, objection.      11:01AM

11         THE COURT:  Sorry, what was that last statement?

12         MR. LINCENBERG:  The questionnaire 32.  I am going to

13    repeat that briefly for the record.

14         THE COURT:  All right.  And Juror 18, as with all

15    panel members, answered the Court's oral questions relating to  11:01AM

16    32 while under oath, and so for that reason that's denied, but

17    Ms. Perlmeter, as to the other.

18         MS. PERLMETER:  Your Honor, this individual did

19    indicate that while he has strong opinions, he can be fair and

20    impartial.  He was reminded by this court that this is not a   11:01AM

21    case about human trafficking.  He indicated that he could be

22    professional, do his duty, and that his beliefs would not

23    impact the case.

24         When asked by the defense if the defendants would be a

25    step behind based on his views, he said no, and he would not be  11:01AM

1    affected.  So he has indicated an ability to be fair and

2    impartial in this case.

3         THE COURT:  And I do recall, I think it was Ms.

4    Bertrand, that questioned him about the ultimate statement

5    relating to invoking emotions of anger and stress, and I think    11:02AM

6    that he indicated that he would be able to set that aside and

7    that had to do with a different subject matter.  Now

8    understanding what the case is about, he could be fair and

9    impartial.  So I'm going to deny the request for 18.

10        MR. LINCENBERG:  Juror No. 20, in addition to our          11:02AM

11   challenges based on question 32, this juror indicated answers

12   that were inconsistent with the law.  For example, said nothing

13   should be posted that is illegal.  It's not the law.  And

14   further, Your Honor, we want to follow up on that and we were

15   not permitted to do so.                                          11:03AM

16        MS. PERLMETER:  Your Honor, the Court will ultimately

17   instruct the jurors on the law in this case.  The Court

18   explained that concept to the jurors as a group on several

19   occasions throughout the past several days.  This juror did

20   not -- this juror indicated they would be willing to follow the  11:03AM

21   law.  And when questioned by the defense if that given the

22   juror's particular views and opinions, whether they -- they

23   would perceive that the defendants were already a step behind,

24   and the juror indicated no.  So this juror has also indicated

25   an ability to sit on this case fairly and impartially.           11:03AM

UNITED STATES DISTRICT COURT

1          THE COURT:  That was my recollection as well having

2     further probed those views, and so as to 20 that is denied.

3          MR. LINCENBERG:  Our next challenge is as to Juror 25.

4     It's a cause challenge.  This is a juror who under oath said

5     that the defendant should be required to prove his innocence.      11:03AM

6          THE COURT:  25?

7          MR. LINCENBERG:  Yes.

8          THE COURT:  All right.  Ms. Perlmeter.

9          MS. PERLMETER:  We don't have that indication at all

10    between me and co-counsel at the table here, so if                 11:04AM

11    Mr. Lincenberg can direct us to when he made that statement

12    because we don't believe that statement was made.

13         MR. LINCENBERG:  Well, first of all, the person made

14    that statement in the questionnaire in response to question

15    32 A.  Also, with regard to 25, this is a sole provider of        11:04AM

16    income for the household, spoke about needing to book a

17    colonoscopy, working through some fascial pain syndrome, and

18    upper cross syndrome, and so forth, so there is also a hardship

19    challenge.

20         MS. PERLMETER:  So if the concern of the defense is          11:05AM

21    that they indicated as such on the questionnaire, we stand on

22    our prior arguments and the Court's position we concur with

23    that the Court has sufficiently re-raised the issue, re-voir

24    dired the jurors on this issue, given everyone an opportunity

25    to change their answers or to raise their hand, and there's       11:05AM

1    been no indication that as to the fundamental principles of

2    criminal law, presumption of innocence, need not testify, that

3    the jurors did not understand the question, did not hear the

4    question or did not have an ability to answer the question if

5    they so wanted to.                                              11:05AM

6           This juror also -- we have several individuals on this

7    panel who are sole providers, and some indicated financial

8    hardship, others did not.  This one did not, and there was no

9    indication that he wouldn't be able to sit fairly.

10          THE COURT:  I recall probing as to the financial        11:05AM

11   hardship, and I don't recall there being a strong statement

12   that it would be.  I do recall that there was a desire to

13   schedule a physical examination sometime in September and

14   October, and I thought -- and I may be mistaken by another

15   gentleman who basically said I wanted to figure out what the   11:06AM

16   trial schedule was before doing so, and so I think those are

17   sufficient answers to overcome the hardship removal for 25.

18          All right.  Next.

19          MR. LINCENBERG:  Next is 32.  Your Honor, this is a

20   questionnaire 32 A and C objection.  Person stated under oath  11:06AM

21   that the defendant should be required to prove their innocence

22   and should be expected to testify.

23          MS. PERLMETER:  Same response from the government;

24   that the Court has adequately and sufficiently probed this

25   issue.  First in the questionnaire and then in open court on   11:07AM

1    several occasions over the past few days.

2            THE COURT:  The Court also agrees it probed that

3    question.  There was no negative response, and so denied as to

4    32.

5            MR. LINCENBERG:  Your Honor, as to 33, same objection        11:07AM

6    as 32.

7            MS. PERLMETER:  Same response.

8            THE COURT:  And the Court will deny the objection

9    because it sufficiently questioned the juror on those

10   principles and the there was no indication that the juror        11:07AM

11   disagreed.  Next.

12           MR. LINCENBERG:  39 is a hardship and cause challenge.

13   Hardship, this juror just began on a new team at work.  Will

14   have to miss a lot of training and assimilating.  It would be

15   tough and would not be able to participate in team activities,        11:07AM

16   might affect his standing at work, set him back.

17           Also said with regard to cause, that his wife

18   volunteers at CASA, watches trafficking training films all the

19   time.  He's seen negative impact on pornography on friends.  He

20   had the close friend of the daughter situation where the person        11:08AM

21   was missing, suspected the person had been taken.

22           I think that with this juror it goes beyond

23   simply that -- whether he said at the end that I would try to

24   put this aside and be impartial, there's so much baggage and

25   history that comes to the table in connection with this case        11:08AM

1    that I think there is a basis for a cause challenge.

2            MS. PERLMETER:  Your Honor, as to the numerous

3    sub-issues that the defense has raised, the juror was asked and

4    he addressed each one, and he did not indicate.  He said he

5    could be fair and impartial.                                    11:09AM

6            As to his wife being a CASA volunteer, he just was

7    being forthcoming with the Court.  He did not indicate that her

8    watching human trafficking video as part of her volunteer

9    training would affect his ability to sit fairly and

10   impartially.  Specifically as to question 64 about the          11:09AM

11   experience that his daughter's friend had, he said that he

12   could be fair.  He did not think that it would bring back

13   feelings of what happened if he were chosen to sit at this

14   trial.

15           In the small group, Your Honor, when asked about work,  11:09AM

16   he said:  I am not sure if there would be a negative impact on

17   me, but I don't think so.

18           He didn't think there would be an impact on him.  And

19   then he stated that he would not be distracted by his work

20   responsibilities if he were selected as a member of this jury.  11:09AM

21   And then in follow-up when he was in private, he stated that he

22   could be fair.

23           So given the totality of the statements and the number

24   of statements he made before this Court, and the Court's

25   ability to observe him the past several days, we think he is    11:10AM

1    able to sit as a fair and impartial juror.

2          THE COURT:  I think this juror caused me pause because

3    there were multiple instances, although the CASA volunteer work

4    that his wife did really didn't have to do with anything of the

5    subject matter of this case.  It was more along the lines of a          11:10AM

6    maternity-paternity sort of issue.  The family was involved in

7    posting or reposting items on trafficking.  He had the instance

8    of concern with the very close friend of the daughter and the

9    daughter may have had some residual effects about the potential

10   that she may have been trafficked, and I think there were          11:10AM

11   multiple other areas that this individual presented with having

12   preconceived ideas.  And so I'm going to grant the cause.

13         Well, I guess it's a combined cause and hardship.  He

14   was not sure about the impact of leaving work or missing work

15   given this new team that started.  He was unsure if he would be          11:11AM

16   behind the eight ball and would have any negative consequence,

17   and so I'm going to remove 39 for hardship.

18         MR. LINCENBERG:  Next, Your Honor, is 54.  This was

19   this 81-year-old gentleman from, with the long drive in, who

20   had, first of all, for hardship.  He discussed having a number          11:11AM

21   of appointments.  The urologist appointments didn't seem as

22   important as the cardiology appointments.  And on the cause

23   front, we also would challenge him twice in the questionnaire

24   in response to 51 and 65.  He said his impartiality would be

25   affected, and as well there was no question 32 questionnaire.          11:12AM

1          MS. PERLMETER:  Your Honor, this individual said that

2    he, regarding deliberation, that he didn't think it would be a

3    problem so long as kids weren't involved.  He explained that he

4    has no problem with prostitution generally; that it's been

5    around forever, but he just had general concerns over kids, and   11:12AM

6    the jurors have an instruction that this is not a case about

7    child molestation or child pornography.

8          Regarding the doctor's appointments, Your Honor, there

9    are days that he can schedule them when the Court is not in

10   trial.  The Court mentioned to him that they could also be         11:12AM

11   possibly scheduled during the October break given the time

12   frame he had provided about when appointments could be

13   scheduled.

14         THE COURT:  I actually noted a concern about 54.  It

15   was more or less, I think -- I think he has a desire to serve      11:12AM

16   such that he would overlook his own health issues, but when he

17   raised issues of having to go to the doctor for heart-related

18   matters and putting off those appointments and, in fact,

19   rescheduling appointment to be here, I thought that was a

20   concern.  It didn't appear to me that he should have reschedule    11:13AM

21   those appointments especially if they are heart related, and so

22   I will remove 54 for hardship.  One moment.

23         Mr. Lincenberg.

24         MR. LINCENBERG:  Next is 57.  57, this woman indicated

25   that she would have a hard time watching explicit -- seeing        11:13AM

UNITED STATES DISTRICT COURT

1    explicit materials, and we challenge her for cause because

2    that's what we're going to see everyday for the next ten weeks.

3            THE COURT:  Ms. Perlmeter.

4            MS. PERLMETER:  Your Honor, this juror spoke quite

5    extensively yesterday and ultimately concluded on several          11:14AM

6    occasions that she would be able to keep an open mind.  She

7    said she would be able to be fair and impartial.  She talked

8    about how -- how she would consider the case, that there would

9    be goods or positives or negatives and why someone would do

10   something.  Again, reiterating that she would be able to come     11:14AM

11   to the case with an open mind and consider all of the evidence

12   that she receives if selected as a juror.

13           MR. LINCENBERG:  I think the statement she made was:

14   I would do my best to be neutral.

15           I think when I see answers about difficulty watching      11:14AM

16   things, we heard one juror today say, "Well, I really don't

17   know what the case is about," the Court gave a description that

18   these are the charges.  But I think when some of these jurors

19   get into it and see what is going to be on the screen all day

20   everyday, and we have somebody who under oath is saying, "I am    11:15AM

21   going to have a hard time looking at this," and then just says

22   to, you know, "Well, sure, I will do my best to be neutral," I

23   think there's a difficulty there that is subject to a cause

24   challenge.

25           MS. PERLMETER:  And given the extensiveness of            11:15AM

1    question 64 and the amount of detail provided regarding the

2    potential of sexually explicit materials or what those could

3    contain or hear or view, this juror still indicated she could

4    keep an open mind.

5         THE COURT:  And I do recall there being qualifiers      11:15AM

6    with regard to if there are children involved.  That was going

7    to be the explicit, you know, difficulty, and but the other

8    explanation was this person is a health care professional and

9    she could maintain the professionalism in order to go forward,

10   and so I'm going to deny as to 57.                           11:16AM

11        MR. LINCENBERG:  Your Honor, there is three more

12   jurors who we have challenges, but they are in the 70s.  I am

13   not sure if the Court is keeping a count.

14        THE COURT:  I am not keeping a count right now.  I am

15   listening to you.                                            11:16AM

16        MR. LINCENBERG:  Your Honor, with regard to Juror 75,

17   I will keep this brief, we have a challenge for cause because

18   this juror stated under oath that a defendant should be

19   required to prove his innocence.

20        THE COURT:  All right.  For the same reasons, I am      11:16AM

21   going to deny.  Next.

22        MR. LINCENBERG:  Two more.  With regard to Juror 70 --

23        THE COURT:  Juror 70?

24        MR. LINCENBERG:  78.  With regard to 78, this is a

25   challenge for cause.  This is a juror who indicated that the  11:16AM

1   juror believes -- this woman indicated that she believes that

2   the platforms use their businesses to do illegal stuff.

3        MS. PERLMETER:  This juror also indicated that she

4   would keep an open mind and that she would listen to the

5   evidence and that she would be able to be fair and impartial.        11:17AM

6        THE COURT:  I actually think there were a couple of

7   other concerning comments that I noted.  On the first day she

8   had a negative response to law enforcement and the judicial

9   system it seemed because one of her family members was a

10  juvenile and then charged as an adult, and that left an             11:17AM

11  impression, a negative impression on her.

12       MS. PERLMETER:  But Your Honor, she also indicated in

13  response to that event that she would be able to be fair in

14  this case.

15       Further down the questionnaire, Your Honor, she also         11:18AM

16  indicated that her mom, this was not discussed in open court,

17  but in her questionnaire she indicated that her mom and her

18  sister had been victims of robbery about six years ago, and

19  that she had a positive experience with law enforcement.  And

20  that case, felt safe, and so these are just experiences that       11:18AM

21  this juror happens to have had.  She didn't indicate that they

22  would affect her ability to sit in this case understanding that

23  they are different.

24       MR. LINCENBERG:  Our note is that this juror said:  I

25  can't be sure that I can keep an open mind.                         11:18AM

1          THE COURT:  I don't recall that in the -- was that in

2     the follow-up question?

3          MS. BERTRAND:  I have it in my notes directly as she

4     was speaking.  She said:  I can't be certain that I can keep an

5     open mind.  She also made a comment about poor people, lower          11:19AM

6     socioeconomic status people will do illegal things for money.

7          THE COURT:  Yes, I think on total, 78 should be

8     removed for cause, and so I will grant that.  The last one,

9     Mr. Lincenberg.

10          MR. LINCENBERG:  The last one is 79.  Juror 79 was a          11:19AM

11     gentleman who had discussed having personally viewed

12     pornography and it affected him negatively.  I don't think this

13     is the right case for him.

14          MS. PERLMETER:  Your Honor, this individual indicated

15     that he understands pornography is harmful.  He indicated he          11:19AM

16     had seen it himself, but that it does not change his opinion on

17     policies, and that he -- it would not negatively impact him

18     from sitting on this case, and that he will be able to do so in

19     a fair and impartial way.  This is the individual that works in

20     the ministry helping underserved populations and urban          11:20AM

21     entrepreneurs.

22          THE COURT:  79?

23          MS. PERLMETER:  Yes.

24          MR. LINCENBERG:  Yes.

25          MS. PERLMETER:  He didn't have strong feelings about          11:20AM

1    things, and the Court observed him as he spoke yesterday.  He

2    spoke clearly, confidently.  He indicated without hesitation an

3    ability to sit fairly.

4           THE COURT:  I recall that as well.  I was just looking

5    at the notation about ministry work and I thought you said he    11:20AM

6    worked in the ministry, and that's not what it indicates here.

7    But if I missed something, it's entirely possible I did.  But

8    in any event, I don't think there is sufficient cause to remove

9    him for cause.

10          Okay.  Now, I have asked the jury administration to       11:21AM

11   let the jury panel members go for lunch until 12:30.  I am

12   going to give you at least a period of time for lunch.  I would

13   suggest that you return back here at a quarter after 12:00, and

14   you can let me know who you your strikes are at that time.  And

15   then at that time we will see where we are on the clock and I    11:21AM

16   will have the jury panel members come in.

17          Now, while I did not specifically tell you what slides

18   that I would permit or not permit, I gave you parameters.  I

19   will tell you, I am not going to let the government show these

20   types of photos.  These should all be out of your opening       11:22AM

21   PowerPoint.

22          MR. STONE:  Understood, Your Honor.

23          THE COURT:  And the PowerPoints that have in

24   quotations different statements that have not yet been

25   admitted.  You can talk about them, the kind of conversations   11:22AM

1    that occurred, but to the extent that they are not admitted yet

2    or stipulated to be admitted.

3             MR. STONE:  All e-mails are out, Your Honor.  I did

4    have a couple other questions if now is the good time.

5             THE COURT:  Well, if now is not the good time, then          11:23AM

6    when?  So Mr. Stone, yes.

7             MR. STONE:  Agreed, Your Honor.  We are showing some

8    of the ads that are counts that make up, I think we are showing

9    four counts, which should be four ads.  Are we -- they are not

10   stipulated to, but are we permitted to show that to the jury?          11:23AM

11            THE COURT:  To support the counts in the charge?

12            MR. STONE:  Yes, Your Honor.

13            THE COURT:  Yes, they may be shown.

14            MR. STONE:  Also Your Honor, we have a few slides that

15   are pages from the Backpage website that just show escort ads          11:23AM

16   for 2015.  It's the -- it was the defendant's website.  That's

17   not stipulated to, but we think we should be able to show that

18   as well in opening.

19            THE COURT:  Is it demonstrative of an advertising page

20   for Backpage?                                                          11:23AM

21            MR. STONE:  It's not a demonstrative.  It's an actual

22   screen shot from what would have been on the screen if you were

23   searching for escorts in Sacramento in 2015 on a certain date

24   in March.

25            THE COURT:  I will permit it.                                 11:24AM

UNITED STATES DISTRICT COURT

1          MR. STONE:  Your Honor, we have a few slides that show

2     just Backpage revenue for certain years.  Not nothing else.  I

3     mean, that's certainly an issue that is relevant.  It's part of

4     the conspiracy.  As we talked about earlier, the object was to

5     make money.  There is motive there.                          11:24AM

6          THE COURT:  What is the point of the slide?  How are

7     you going to use it?

8          MR. STONE:  Just to indicate what Backpage was earning

9     during these years, and the argument that the vast bulk of

10    those earning were from prostitution ads.                    11:24AM

11         THE COURT:  I will permit it.

12         MR. STONE:  Similarly, we have three slides for the

13    owner defendants, Defendants Lacey, Spear and Brunst, that just

14    take a snapshot for 2013 and 2014 for what they earned only

15    from Backpage.                                               11:24AM

16         THE COURT:  I will permit it.

17         MR. LINCENBERG:  Your Honor, we did want to respond on

18    at least one of the points that Mr. Stone is raising.  Are we

19    allowed to?

20         THE COURT:  Well, let him finish.                       11:25AM

21         MR. STONE:  We have photos that we are using for our

22    two cooperating witnesses.  They are not sitting over there.  I

23    can't point to them, Carl Ferrer and Dan Hyer.  Are we allowed

24    to use photos for them to help the jury understand for what at

25    least they are going to look like?                           11:25AM

1          MR. CAMBRIA:  They will see them.

2          THE COURT:  No.

3          MR. STONE:  Okay.  We have slides that show reviews on

4    the The Erotic Review, which, Your Honor, in the order on

5    Motions in Limine found was relevant to this case.  And there          11:25AM

6    is a relationship that Backpage had with The Erotic Review for

7    three years within the conspiracy period.  Are we permitted to

8    show the reviews from the The Erotic Review?

9          THE COURT:  I'm assuming you're going to explain what

10   the The Erotic Review is and what the alleged relationship is,       11:26AM

11   and then use that one slide to support that statement.

12         MR. STONE:  Yes, Your Honor.  I actually have three or

13   four slides from the The Erotic Review.  Several of them are

14   tied to counts, so it's a review of the -- what who the

15   government believes would be a prostitute who also posted on          11:26AM

16   Backpage.

17         THE COURT:  Pick your one demonstrative or best slide

18   per count.  Don't inundate the PowerPoint with multiple slides

19   for multiple counts.  Use it as an example, a roadmap, if you

20   would.                                                                 11:26AM

21         MR. STONE:  Okay.  Just to be clear, this is actually,

22   if you went on the The Erotic Review, it would show what a

23   review looks like.  That's the demonstrative.

24         THE COURT:  Understood.

25         MR. STONE:  Thank you, Your Honor.  I think that                 11:27AM

1    answers all my questions.

2             THE COURT:  Mr. Lincenberg, you had a particular --

3             MR. LINCENBERG:  That's all right, Your Honor.

4             THE COURT:  No.

5             MS. BERTRAND:  Your Honor --                        11:27AM

6             MR. CAMBRIA:  I do.

7             MS. BERTRAND:  I would like to note an objection to

8    any TER, the The Erotic Review site slides.  These are not

9    going to be demonstrative.  This is being offered as

10   substantive evidence that they are trying to slide in as a    11:27AM

11   demonstrative.  These are objectionable under hearsay, 801.

12   There is also -- there's a lack of foundation here.  So we are

13   not stipulating to the admissibility of these, and they are

14   going to be used as substantive evidence.  I know they are

15   trying to say it's demonstrative, but it's not.              11:27AM

16            THE COURT:  Well, no, I think in my order in the

17   motions in limine made my position fairly clear that it was

18   relevant; that the The Erotic Review and the TER, I can't

19   recall specifically, that that information was relevant to the

20   case, and so I don't understand what it is that you're        11:28AM

21   objecting to in terms of their ability to use that information

22   to show the relationship.

23            MS. BERTRAND:  Your Honor, it's a hearsay objection;

24   not a relevance objection.  They are using it --

25            THE COURT:  Do you know what the slide is?  Are you   11:28AM

1    saying that there is not going to be foundation laid for that?

2          MS. BERTRAND:  Correct.  That's my assertion, and this

3    is what I put the government on notice about when I sent them

4    my objections and said I object to these slides.

5          THE COURT:  What is the foundation to be laid for that    11:28AM

6    line of evidence, Mr. Stone?

7          MR. STONE:  With respect to hearsay, it's not a

8    statement, so that's my initial response on hearsay.  The

9    foundation is, we will have a detective who went on The Erotic

10   Review and used the indicators from the prostitute who posted   11:29AM

11   on Backpage, and this is one of our substantive counts, either

12   a phone number or an e-mail, looked up the The Erotic Review

13   profile, and matched it to the same individual who posted an ad

14   that is a substantive count.

15         So if this count was from 2016, someone who was on        11:29AM

16   Backpage's website in 2016, if they looked up that prostitute

17   on the The Erotic Review, they would see this profile.  That's

18   what we're matching up and that's what we will marry up in the

19   opening, Your Honor, and throughout trial.

20         THE COURT:  And at this point I'm going to overrule        11:29AM

21   the objection.  You can renew it at the time.

22         MR. CAMBRIA:  May I be heard, Your Honor?

23         THE COURT:  Ms. Bertrand is not finished.

24         MR. CAMBRIA:  I'm sorry.

25         MS. BERTRAND:  Thank you, Your Honor.  I would just        11:29AM

```
 1   note, I don't know how they can say it's not a statement.  It's
 2   words asserting something, whether it's this is the phone
 3   number that you can call me at, this is what I do for a living.
 4   Those are, by definition, statements, and they were made out of
 5   court and they are going to be offered for the truth of the          11:30AM
 6   matter asserted.
 7         So that phone number, this person on TER is related to
 8   this ad over here.  That is being offered for the truth of the
 9   matter asserted.  So I am noting my objection now.  I don't
10   like to interrupt people during their openings, so I want to        11:30AM
11   make sure my objection is clear.
12         THE COURT:  I have ruled.  Yes.  Thank you.
13         Next.
14         MS. BERTRAND:  That is my statement, Your Honor.
15         THE COURT:  Mr. Cambria.                                      11:30AM
16         MR. CAMBRIA:  Thank you, Your Honor.  First of all,
17   the company is not a defendant.  Individuals are defendants.
18   Under 401, this -- an offer has to be relevant.  Unless there
19   is a good faith representation that one of the charged people
20   here saw those ads, then they are not relevant to the case.        11:31AM
21         THE COURT:  Are you talking about -- I want to focus
22   this, Mr. Cambria.  There is enough time to make an argument
23   relating to whether something is admissible or whether there's
24   lack foundation or whether it's relevant.  I want to focus on
25   the opening statements.                                            11:31AM
```

1          MR. CAMBRIA:  Right.

2          THE COURT:  Tell me what the objection is and to what.

3          MR. CAMBRIA:  The objection is that the only reason

4    they would put in anything about the The Erotic Review is to

5    show knowledge or intent.  The only reason they would put an ad          11:31AM

6    in is to show knowledge and intent.  Those are 404(b) subjects.

7    So they have to be -- they have to comply with 404 (b), but

8    they have to be relevant.  The only way they are relevant in

9    this case is if they have a good faith basis to say one of

10   these defendants actually saw those, because they cannot serve          11:31AM

11   as knowledge or intent proved unless someone actually has seen

12   those out of millions of ads.

13          So just to put them in and to inflame the jury with

14   pictures and words and so on and not connect it to any of the

15   defendants, that's not fair.  That is not relevant under 401.          11:32AM

16   The only way that evidence could be competent is if they can

17   show that one of these individuals was exposed to it.

18          THE COURT:  Mr. Cambria, in the first instance, in my

19   rulings is in the Motion in Limine I found them to be relevant,

20   so that's a nonstarter.          11:32AM

21          MR. CAMBRIA:  Well, how could they be relevant if they

22   haven't seen them and if there is no proof that they saw them

23   out of millions of ads?

24          THE COURT:  Well, you're asking me a specifically

25   different question with regard to a specific ad, and I don't          11:32AM

 1    know the answer to that.  We're waiting to see how that

 2    unfolds.

 3            MR. CAMBRIA:  What I'm saying is that I think they

 4    need to make an offer of proof as to stating that they can

 5    prove that one of these defendants saw these, otherwise they        11:32AM

 6    are not competent for what they are doing.  All they are going

 7    to do is inflame the jury.  All they are going to do is be

 8    explicit things, which they can't connect to an individual

 9    defendant, and there is no corporate defendant.

10            So the only way they could be relevant is if they           11:33AM

11    could show one of these defendants saw that so they can make an

12    argument.  They saw them, that gave them knowledge, that gave

13    them intent.  The first part has to happen.

14            THE COURT:  Well, I think there are multiple layers to

15    the conspiracy charge, and we discussed the *Pinkerton* charge       11:33AM

16    for that reason, and so I think the government understands the

17    parameters that the Court gave this morning shortly a few

18    minutes ago as well as my ruling on the Motions in Limine, and

19    you had multiple opportunities to brief the Court on these

20    issues, and so my ruling stands.                                    11:33AM

21            Anything further?

22            MR. CAMBRIA:  Yes.  The further is that -- that you

23    say we have had opportunity to brief these, we just got these a

24    day ago as to what they plan to use in their opening.

25            THE COURT:  Are these different slides than from prior      11:34AM

1   proceedings?

2            MR. CAMBRIA:  Hard to say.  There are millions of ads.

3   All I'm saying is they want to use this in an opening.  My

4   position is they can't do it in good faith without connecting

5   it to a defendant.                                           11:34AM

6            THE COURT:  Anything further, Mr. Cambria?

7            MR. CAMBRIA:  No, Your Honor.

8            THE COURT:  Mr. Eisenberg, you look like you want to

9   say something.

10            MR. EISENBERG:  Yes, Your Honor.  Thank you.  Earlier   11:34AM

11   the Court ruled that under certain circumstances, including

12   e-mails --

13            THE COURT:  Can you speak -- get closer to the

14   microphone.  I am sorry.  We just need to make sure that

15   everyone can hear you.  You can come to the podium, yes.      11:34AM

16            MR. EISENBERG:  I understood Your Honor's rulings with

17   respect to the e-mails that you made earlier today, and of

18   course, prepared to abide by that.  Now I hear counsel for the

19   government talk about many documents which are contained within

20   their business records or whether Backpage's business records.  11:35AM

21            THE COURT:  Many documents meaning what?

22            MR. EISENBERG:  That they intend to use for slide

23   purposes.

24            THE COURT:  I saw Mr. Stone show a slide graph with

25   figures on them, one slide.  Are there multiple documents that  11:35AM

UNITED STATES DISTRICT COURT

```
 1   are going to be shown on that slide?
 2           MR. STONE:  No, Your Honor.
 3           MR. EISENBERG:  Well, he is talking about things
 4   connected with the The Erotic Review, and we've already had an
 5   objection as to whether that should actually be coming in.        11:35AM
 6   Here's my concern about these e-mails.  These e-mails are part
 7   of Backpage's own repository of records.
 8           THE COURT:  Let me stop you there.  I think I said no
 9   e-mails.
10           MR. STONE:  We've removed all e-mails from our           11:36AM
11   PowerPoint.
12           THE COURT:  He was talking about an ad on the The
13   Erotic Review, not an e-mail.
14           MR. EISENBERG:  Let me be heard on the e-mail.
15           THE COURT:  Thank you.                                    11:36AM
16           MR. EISENBERG:  These come from Backpage's repository
17   of documents.  There's been no Motion in Limine that has come
18   in from the government saying that they are not relevant or
19   that they can't be admitted because there is no foundation for
20   them, and the government has had these -- what they consist of,  11:36AM
21   Your Honor, are notices to my client, among others, that:
22   Thank you for doing a good job on behalf of law enforcement.
23           It's notice to him from a law enforcement agent that
24   he has done a good job in helping to indicate where evidence
25   may lie in the commission of an offense, something that          11:36AM
```

1   Backpage gave up, sometimes voluntarily, sometimes by subpoena.

2   So it's notice to him and others at Backpage never to have

3   gotten anything indicating that this was illegal activity.  So

4   it is relevant.  I can read from them, Your Honor.

5          THE COURT:  And that's fine.  I mean, I am quizzical          11:37AM

6   here, Mr. Eisenberg, because I am wondering why it is you can't

7   just say that?

8          MR. EISENBERG:  Because I am prepared to admit it into

9   evidence, and I don't understand what the government's problem

10  is with it.                                                        11:37AM

11         THE COURT:  Is there going to be an objection to the

12  admission of that?

13         MR. STONE:  Well, it's going to depend on the

14  particular exhibit.  Some of these seem to be e-mails from

15  detectives or law enforcement from all across the country to     11:37AM

16  individuals who likely aren't going to take the witness stand,

17  and so those are hearsay statements and it's unclear how there

18  is going to be foundation laid for them.

19         There's others where there is e-mails to Carl Ferrer,

20  and I suppose they are going to attempt to admit those exhibits   11:37AM

21  through Mr. Ferrer, and we'll have to see on those.  But I

22  think at this point it's Your Honor's ruling that e-mails are

23  not to be shown to the jury in opening.  I think that's all

24  we're talking about.

25         THE COURT:  If they are not going to be admitted, if       11:38AM

1    there is not at this point an agreement that it is going to be

2    admitted, and I don't know how it could not be admitted,

3    Mr. Eisenberg, you have like a hundred people listed on your

4    witness list, so somebody has got to be able to testify to

5    something.                                                    11:38AM

6           MR. EISENBERG:  Sorry, I didn't mean to interrupt.

7           THE COURT:  In any event, that is my ruling.  I am

8    going to adhere to it.  You can refer to that e-mail.  My

9    client received these notes from law enforcement.  And you

10   can -- if you have it there, I will permit you to refer to it   11:38AM

11   and read from it.

12          MR. EISENBERG:  I will.

13          THE COURT:  But at this point, just don't make it an

14   issue with regard to putting it in front of the jury something

15   that is not admitted, okay?                                   11:38AM

16          MR. EISENBERG:  Okay.

17          THE COURT:  Thank you, Mr. Eisenberg.  Anyone else?

18   All right.  So you have your charge.  Be back here, I think I

19   said at a quarter after 12:00, and my law clerk will hand to

20   you the revised preliminary instructions.                     11:39AM

21          I have looked at the case law.  I will remove the term

22   "illegal."  I will make the additional modifications, including

23   the terms "business enterprise." I will include the specific

24   intent preliminary instruction.

25          When we return then you will provide to me, possibly    11:39AM

UNITED STATES DISTRICT COURT

1    even before that time, your proposed preliminary strikes and

2    then at that time I think what we will do is I need to give you

3    guys a lunch break, and if you pardon me, it will be along the

4    lines of a 45-minute lunch break, not an hour, so that we can

5    bring this jury in, release the rest of them and then continue          11:40AM

6    on.

7            MR. BERRY:  Your Honor, I apologize, you went through

8    in some detail about what the government can do in their

9    opening, and I understand you made general rulings that the

10   defense should take and heed, but I did hand out some of the            11:40AM

11   defense exhibits that the United States objected to, and I am

12   concerned that we haven't addressed any of the specificity of

13   that, and I am concerned that they are going to maybe still

14   show some of that, so I would like the Court to, if it's so

15   inclined, to --                                                         11:40AM

16           THE COURT:  Which one are they, are they these?

17           MR. BERRY:  Correct.  So that's one of them.  I think

18   you have another stack.  That's Lacey's.

19           THE COURT:  I have Defendant Lacey one, two, six, what

20   does that mean?                                                         11:40AM

21           MR. BERRY:  Those are the slide or page numbers.

22   Those are the three things that you have up there.  Page 6 is a

23   multipage document.  It's the Court filing from the Backpage

24   vs. Dart case.  It's a violation of this Court's Document 1643

25   at 11.                                                                  11:41AM

1           THE COURT:  I would agree.  This needs to be removed.

2           MR. CAMBRIA:  Your Honor, I only planned on verbally

3    discussing those; not showing that on the Elmo.

4           MR. BERRY:  Your Honor, that would also be a violation

5    of this Court's order.                                    11:41AM

6           THE COURT:  It would be.

7           MR. CAMBRIA:  Wait, just one second.

8           THE COURT:  Read my -- no, read my order.

9           MR. CAMBRIA:  I understand your order, but all I'm

10   saying is that certain statements were made under oath by one  11:41AM

11   of their witnesses.  I don't -- it's all I'm saying.  These

12   statements were made under oath by this witness, not

13   identifying a case or anything else.

14          THE COURT:  Was the statement made under oath in a

15   civil matter?                                             11:41AM

16          MR. CAMBRIA:  Yes.

17          THE COURT:  Okay.  Then it's irrelevant.

18          MR. CAMBRIA:  How can it be irrelevant if it's a sworn

19   statement?

20          THE COURT:  Was it a Travel Act case?              11:41AM

21          MR. CAMBRIA:  Your Honor, I am not introducing it for

22   that reason.  I'm introducing it as this witness made these

23   representations under oath, and it doesn't matter what -- what

24   the situation was, what kind of case it was.

25          THE COURT:  Mr. Cambria, it does matter.  I went    11:42AM

1    through the analysis.  It matters to the Court.  I said

2    specifically that no one is to mention any other case.

3              MR. CAMBRIA:  I am not going to mention the case.

4              THE COURT:  Let me speak.  Don't interrupt me.

5              MR. CAMBRIA:  All right.                              11:42AM

6              THE COURT:  It does not matter whether or not you

7    mention the case, but if the testimony was given in an

8    unrelated irrelevant proceeding to this case, if the testimony

9    was given upon a series of questions that don't relate to any

10   Travel Act violation, it's not coming in.                      11:42AM

11             MR. CAMBRIA:  It's not anything in relation to

12   questioning.  It is a declaration made by a witness under oath

13   where he stated certain things under oath.

14             THE COURT:  Tell me what the certain things are that

15   he stated.                                                     11:43AM

16             MR. CAMBRIA:  That they followed certain procedures to

17   keep things off the website that were illegal; that they had

18   terms of use; that they did everything they could to keep

19   children off the website, things like that.

20             THE COURT:  Are you going to bring in in your case in  11:43AM

21   chief evidence of that?

22             MR. CAMBRIA:  I will ask that witness those questions,

23   if he made those statements under oath.

24             THE COURT:  Who is that witness?

25             MR. CAMBRIA:  Mr. Ferrer.                            11:43AM

1      MR. BERRY:  Your Honor, what I think Your Honor's

2    ruling was also in regards to this is to the extent that there

3    was any testimony in a prior hearing, I think is the way Your

4    Honor referred to that, maybe more in reference to the first

5    trial to the extent they wanted to impeach, I think it would be        11:43AM

6    okay for the defense to ask Mr. Ferrer:  Did you say under oath

7    at some point in time X?  And if he says yes, then that's the

8    end of the inquiry.  If he says no, then he could be impeached

9    with that document, but there is no reason for Mr. Cambria to

10   actually bring this in front of the jury at this opening               11:44AM

11   statement stage.

12       MR. CAMBRIA:  Your Honor, that's preposterous.

13       THE COURT:  I think, Mr. Cambria, you can, and I am

14   not going to give you your opening statement for you, but I

15   think you're on safer ground if you say:  They had an                  11:44AM

16   understanding.  They were informed that they were doing

17   everything right.

18       You can say that.

19       MR. CAMBRIA:  What I want to say is:  Mr. Ferrer said

20   under oath that we did X, Y and Z legally.                             11:44AM

21       THE COURT:  The problem is, when you refer to the

22   under oath, you're referring to some other proceeding that I

23   don't know about.  I don't know whether it's a civil

24   proceeding, I don't know if it's a prior criminal proceeding,

25   whether it was a different statute that was being alleged, and         11:44AM

1   so that's the problem.  And if it is in violation of this

2   Court's order, I am not going to have it.

3           MR. CAMBRIA:  But it's not any of those things.  It's

4   a declaration by him, an affidavit, where he says:  We followed

5   this the following protocols in operating Backpage.                    11:45AM

6           THE COURT:  You can talk about it.  I am not going to

7   let you bring in any sort of court document.

8           MR. CAMBRIA:  That's what I plan to do.  Thank you.

9           THE COURT:  Let's move forward.

10          MR. BERRY:  With that same first Doc that Mr. Cambria      11:45AM

11  handed to us, the first one is the front page of the New Times

12  from March of 1991, which predates the conspiracy by 13 years,

13  and I don't see any relevance to the front page of the New

14  Times in a case about Backpage.com.  This Court has ruled that

15  we are not permitted to talk about certain other websites and       11:45AM

16  things like that.  We think that should not be permitted in the

17  opening statement.  It's not relevant.

18          THE COURT:  What is the relevance of that?

19          MR. CAMBRIA:  Just an example of the newspapers that

20  they were operating in the early days.                              11:46AM

21          THE COURT:  And if that's all you say, then it's fine.

22          MR. CAMBRIA:  That's it.

23          MR. BERRY:  Next, Your Honor, is the slide showing

24  past professional awards.  We don't believe those are relevant.

25          THE COURT:  What page is that?                              11:46AM

```
 1          MR. BERRY:  It's the one that says two, one, two and
 2     six.  It would be number two.  It's a slide that just shows
 3     like the Pulitzer and --
 4          THE COURT:  And as I mentioned in my order on the
 5     motions in limine, counsel can refer to prior practices of        11:46AM
 6     their clients, and if that includes receiving awards, they may
 7     touch upon it, but this is not going to be something where
 8     we're going to describe each award and go into detail --
 9          MR. CAMBRIA:  Don't plan to.
10          THE COURT:  -- about the way it was received and what        11:46AM
11     was done and who provided it and so on and so forth.  That's
12     not going to occur.
13          MR. CAMBRIA:  Not the plan.
14          MR. BERRY:  The next one would be the larger stack of
15     Mr. Spear's opening slides, and there is quite a few on that      11:47AM
16     one that were problematic.  No, yeah.
17          THE COURT:  I don't have that.  Let's see.
18          MR. BERRY:  It was the other stack you had in your
19     hand a moment ago.
20          MS. BERTRAND:  May Ms. Vaught step out to use the            11:47AM
21     ladies' room?
22          MR. BERRY:  No.
23          THE COURT:  This one.
24          MR. BERRY:  That was part of it.
25          THE COURT:  I have one -- Mr. -- this is Mr. Lacey's         11:47AM
```

1   objections to the government.  I have Ms. Vaught's objections.

2   That's all I have.

3          MR. BERRY:  I'm sorry, I handed them to Liliana

4   earlier.  I can show them to you on the computer.

5          THE COURT:  You're eating into your time.  I hope the          11:48AM

6   rest of the counsel are looking at these remaining jurors.  I

7   am not going to extend your time.

8          MR. BERRY:  This is obviously important regarding some

9   of the slides.  They have a slide of Megan Thee Stallion and

10  Cardi B that they want to show to this jury.          11:48AM

11         MR. FEDER:  Maybe I can save some time.  We are not

12  going to show the ads, external ads.

13         MR. BERRY:  I am plugged in.  Did the Court want to

14  look at it?  Slide one.

15         MR. FEDER:  Taken out.          11:48AM

16         MR. BERRY:  The next one would be slide three.  Your

17  Honor's order at Document 1643, pages 8 to 9, we don't believe

18  that the defense can just argue that the First Amendment

19  protects everything.  We think the injection of the First

20  Amendment into opening statement would be inappropriate here          11:49AM

21  because what is -- the way the First Amendment protects them is

22  by the jury finding them not guilty saying that they did not

23  find that these ads were prostitution ads, therefore, then

24  those ads are protected.  But to say:  Ladies and gentlemen of

25  the jury, the First Amendment protects us here from doing this          11:49AM

```
 1    activity, would, I believe, violate this Court's order as 1643.

 2    It invites the jury to acquit on a notion of constitutional law

 3    and suggests that that's something that's going to be

 4    instructed or part of this Court's instruction.

 5         THE COURT:  How are you going to use the exhibit?        11:49AM

 6         MR. FEDER:  Judge, I think the Court -- I don't have

 7    the Court's order in front of me.  We can certainly say that we

 8    tried to follow it and goes to intent, and that's how they

 9    would be used.

10         THE COURT:  This particular slide.                       11:49AM

11         MR. FEDER:  Everybody hasn't memorized the First

12    Amendment, and I think the jury can at least see what it says.

13         THE COURT:  It's fine.  Let's move forward.

14         MR. BERRY:  The next one would be number six

15    showing --                                                    11:50AM

16         MR. FEDER:  Out.

17         MR. BERRY:  Okay.  Seven, we don't know where this one

18    comes from.  It's some sort of terms of use, but we don't know

19    where it comes from.

20         MR. FEDER:  These are going to be -- there is about      11:50AM

21    ten exhibits from the government and the defense on this.

22         MR. BERRY:  If this is one of the exhibits that the

23    defense intends to admit, then I think Your Honor has already

24    just ordered just that we can't do that.

25         THE COURT:  That's correct.                              11:50AM
```

UNITED STATES DISTRICT COURT

```
1              MR. FEDER:  Fine.

2              MR. BERRY:  The next one is a slide of Liz McDougal.

3              MR. FEDER:  Out.

4              MR. BERRY:  If we are keeping the slides, the picture

5    is out.                                                          11:50AM

6         In addition to this one, Your Honor, the reference to

7    her as a legal consultant, we believe they should not be

8    allowed to refer to any of these individuals that may have been

9    advising them as legal consultants or that sort of thing

10   because that would violate this Court's order regarding the      11:50AM

11   advice of counsel.

12             THE COURT:  If that is their position, I am going to

13   allow it.

14             MR. BERRY:  And then --

15             MR. FEDER:  Out.                                       11:51AM

16             MR. BERRY:  Okay.  Is that the same for 12?

17             MR. FEDER:  Yes.

18             MR. BERRY:  Is that the same for 17?

19             MR. FEDER:  I like that one.  Yup, she is out.

20             MR. BERRY:  Wow.  What about 19?                       11:51AM

21             MR. FEDER:  Out.

22             MR. BERRY:  This aggregation quote, we don't know

23   where this comes from.

24             THE COURT:  Mr. Feder, can you just talk about

25   aggregation?                                                     11:51AM
```

```
 1            MR. FEDER:  It will take longer.

 2            THE COURT:  Are you going to read this?

 3            MR. FEDER:  I will show it and try to read through it

 4   to explain it very quickly.

 5            MR. BERRY:  Your Honor, this violates 1643, 9 to 10,    11:51AM

 6   because it references the CDA at the end.

 7            THE COURT:  Yes, remove the CDA.

 8            MR. BERRY:  22.

 9            MR. FEDER:  Out.

10            MR. BERRY:  Did you say "out"?                          11:52AM

11            MR. FEDER:  Out.

12            MR. BERRY:  24.

13            MR. FEDER:  Out.

14            MR. BERRY:  26.

15            MR. FEDER:  Out.                                        11:52AM

16            MR. BERRY:  28.

17            MR. FEDER:  Out.

18            MR. BERRY:  30.

19            MR. FEDER:  Same thing as the First Amendment.

20            MR. BERRY:  This is --                                 11:52AM

21            THE COURT:  No.  This is in violation of the Court's

22   order on the motions in limine, so remove that.

23            MR. BERRY:  31, lyrics to a song.

24            MR. FEDER:  Out.

25            MR. BERRY:  Next is -- that's all for Mr. Spear, Your  11:52AM
```

1    Honor.

2           The last one, just a couple more.  Mr. Brunst has one

3    slide that references good faith.  And while good faith can be

4    argued, it cannot be argued in the sense of advice of counsel

5    defense because this Court has ordered at 1643, pages 9 and 13,     11:52AM

6    that unless they make the four-part showing, they cannot do

7    that.

8           THE COURT:  In the context of that, I agree.

9           MR. BERRY:  Okay.  And then the final one --

10          MR. LINCENBERG:  I do think it would be helpful to be        11:53AM

11   heard.  I know you agree.

12          THE COURT:  I can't hear you.  We can't hear you.

13   Move to the microphone.

14          MR. LINCENBERG:  Thank you, Your Honor.  Your Honor, I

15   appreciate the Court's ruling on that point.  But I also want      11:53AM

16   to make a point that's broader because the government has

17   slides, for example, that are dealing with the credit card

18   companies canceled Backpage, and their intent is to suggest

19   that that provides notice to my client that there was something

20   illegal because credit card companies were canceling, and I       11:53AM

21   wouldn't expect the Court to be familiar with all of the

22   correspondence, but that entire dialogue involving the credit

23   card cancellations discusses Dart.  Dart is related to the

24   Seventh Circuit opinion, Dart.

25          This is credit card companies being threatened by          11:54AM

1    Sheriff Dart and taking certain actions.  It is communications

2    between Ferrer and people involved in payment processing.  On

3    some of the communications Mr. Brunst is involved,

4    communications with the credit card companies.  The discussion

5    of Dart is all over the conduct.  It's impossible to discuss          11:54AM

6    and respond to what they want to talk about.

7            THE COURT:  What is the good faith slide related to?

8            MR. LINCENBERG:  The good faith is the summary slide,

9    and the good faith is the conclusion at the end that Mr. Brunst

10   acted in good faith because of all of the information that he        11:54AM

11   received.  And a part of the underlying part of my opening,

12   because I am going to be dealing with a lot with the monetary

13   transactions, is one of the slides that Mr. Stone had, one of

14   them that I did not object to, is this whole discussion of that

15   my client was put on notice by credit card cancellations.  And      11:55AM

16   so if they are opening the door to talk about getting into

17   Mr. Brunst's state of mind, I need to be able to complete the

18   communications.  And Mr. Ferrer will testify about all of this.

19           THE COURT:  So long as it does not get into the

20   avenues of reliance on attorney advice because, as you even         11:55AM

21   acknowledged at the Final Pretrial Conference, you've waived

22   that, and you've not asserted it.  And so with those parameters

23   I will permit the slide.  Touch upon it, and move on.

24           MR. LINCENBERG:  To be clear, what we asserted is I've

25   indicated my client is not having an advice of counsel defense      11:55AM

1    because of prior rulings in this case suggested that regard to

2    the 50 ads he would have to have disclosures and so forth.

3    Okay.

4           MR. BERRY:  The last one, Your Honor, very briefly,

5    Ms. Vaught has burdens of proof slide that are 14 burdens of          11:55AM

6    proof that don't exist in the law.  There's a case from *United*

7    *States vs. McDade*, 1996 Westlaw 432 490 from the Eastern

8    District of Pennsylvania that basically goes through almost an

9    identical version of this chart, and says that that would be

10   misleading to the jury and misstates the law, and it needs to       11:56AM

11   be reasonably informative, and it is not a correct statement of

12   the law.

13          THE COURT:  And looking at the slide myself, I agree.

14   I don't know any terminology in the law of highly possible or

15   possible, and so these are incorrect statements or                  11:56AM

16   misstatements.  They may be misleading and confusing, so it's

17   not going to be used.  You can describe what you think that the

18   burden of proof is, but do not use the slide.

19          MS. BERTRAND:  Your Honor, I would like to make a

20   quick record.  It will not take more than two minutes.  First,      11:56AM

21   I used this slide in the first trial in my opening statement.

22   Drew no objection from the government.  The Court has asked

23   counsel regarding another exhibit if this was used in the first

24   trial or another proceeding.  It was here.  Government never

25   had a problem with it.  It isn't until that they stood there        11:57AM

1    that they even gave me a bases for their objection.

2             I don't believe that I am representing to anyone in

3    that slide or exhibit that this is the law.  I am giving them

4    examples in common life of different levels of belief that

5    people have.  I am not representing that it is a legal matter.   11:57AM

6             That's my argument.  I do believe it is totally

7    appropriate as a demonstrative, and the Court can certainly

8    address any concern that the government has about it through --

9             THE COURT:  Well, it's --

10            MS. BERTRAND:  -- instructions about reasonable doubt.   11:57AM

11            THE COURT:  Looking at it myself, I have concerns

12   about it.  It's misstatements.  It's incorrect to tell this

13   jury, to have them look at a slide that introduces concepts

14   that are not the law, and so it's confusing.  And so,

15   therefore, I am not going to permit it.                          11:58AM

16            All right.  Thank you.  You have 15 minutes.

17            (Proceedings concluded at 12:59 p.m.)

18

19

20

21

22

23

24

25

1

2

3                        **C E R T I F I C A T E**

4

5              I, HILDA E. LOPEZ, do hereby certify that I am duly

6    appointed and qualified to act as Official Court Reporter for

7    the United States District Court for the District of Arizona.

8              I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13             DATED at Phoenix, Arizona, this 6th day of September,

14   2023.

15

16

17
                            s/Hilda E. Lopez_____
18                          HILDA E. LOPEZ, RMR, FCRR

19

20

21

22

23

24

25