**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 13, 2023 |
| Michael Lacey, et al. | ) | 9:07 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TRIAL - DAY 5 - A.M. SESSION**

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

<pre>
1                        A P P E A R A N C E S

2

3    For the Government:
         UNITED STATES ATTORNEY'S OFFICE
         By:  Mr. Kevin M. Rapp, Esq.
4             Mr. Peter S. Kozinets, Esq.
              Mr. Andrew C. Stone, Esq.
5             Ms. Margaret Wu Perlmeter, Esq.
         40 North Central Avenue, Suite 1200
6        Phoenix, Arizona 85004
         kevin.rapp@usdoj.gov
7        peter.kozinets@usdoj.gov
         andrew.stone@usdoj.gov
8        margaret.perlmeter@usdoj.gov

9    For the Government:
         UNITED STATES DEPARTMENT OF JUSTICE
10       By:  Mr. Austin Berry, Esq.
         1301 New York Avenue, NW, 11th Floor
11       Washington, DC 20005
         austin.berry2@usdoj.gov

12

13   For the Defendant Michael Lacey:
         LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
         By:  Mr. Paul J. Cambria, Jr., Esq.
14       42 Delaware Avenue, Suite 120
         Buffalo, NY 14202
15       pcambria@lglaw.com

16

17   For the Defendant Scott Spear:
         FEDER LAW OFFICE, P.A.
         By:  Mr. Bruce S. Feder, Esq.
18       2930 East Camelback Road, Suite 160
         Phoenix, AZ 85016
19       bf@federlawpa.com
         - and -
20       KESSLER LAW OFFICE
         By:  Mr. Eric Walter Kessler, Esq.
21       6720 N. Scottsdale Road, Suite 210
         Scottsdale, AZ 85253
22       eric.kesslerlaw@gmail.com

23

24

25
</pre>

```
 1   For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 2       LINCENBERG & RHOW, P.C.
         By:  Mr. Gopi K. Panchapakesan, Esq.
 3            Mr. Gary S. Lincenberg, Esq.
         1875 Century Park E, Suite 2300
 4       Los Angeles, CA 90067
         gpanchapakesan@birdmarella.com
 5       glincenberg@birdmarella.com

 6
     For the Defendant Andrew Padilla:
 7       DAVID EISENBERG, P.L.C.
         By:  Mr. David S. Eisenberg, Esq.
 8       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012
 9       david@deisenbergplc.com

10
     For the Defendant Joye Vaught:
11       JOY BERTRAND, ESQ., L.L.C.
         By:  Ms. Joy M. Bertrand, Esq.
12       P.O. Box 2734
         Scottsdale, AZ 85252
13       joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

<u>**I N D E X**</u>

| | | | |
|---|---|---|---|
| <u>**PLAINTIFF WITNESS:**</u> | <u>**DIRECT**</u> | <u>**CROSS**</u> | <u>**REDIRECT**</u>  <u>**RECROSS**</u> |
| **CARL FERRER  (cont.)** | **12** | | |

<u>**E X H I B I T S**</u>

**Exhibit No.**                                                        **Admitted:**

| | | |
|---|---|---|
| 10 | Email from Spear to Hyer and Ferrer (With attachments), 04/10/2007 DOJ-BP-0004602204 | 16 |
| 10a | Attachment. Dallas success in other markets. DOJ-BP-0004602206- DOJ-BP-0004602207 | 16 |
| 19 | Email from Ferrer to Spear, 07/02/2007 DOJ-BP-0002134224 | 22 |
| 20 | Email from Hyer to Spear and Ferrer, 07/16/2007 DOJ-BP-0004602609- DOJ-BP-0004602611 | 27 |
| 1155 | Email to Ferrer, "RE: Attn: Dave…July25-LA confirmation" 07/24/2007, DOJ-BP-0002134131 | 36 |
| 1156 | Email to Ferrer, "RE: Attn: Dave (second batch of urls to change on reviews.", 08/01/2007DOJ-BP-0002134109  DOJ-BP-0002134110 | 41 |
| 1835 | Email from Staff @ TER to Ferrer, "Here is our stuff", 09/25/2007, DOJ-BP-0002135170 - DOJ-BP-0002135171 | 46 |
| 1835a | Attachment: Ter1 (TER Profile Showing Backpage banner) DOJ-BP-0002135172 | 51 |
| 1835b | Attachment: Ter2 (TER Review Showing Backpage banner) DOJ-BP-0002135173 | 51 |
| 1835c | DOJ-BP-0002135174 Attachment: Ter3 (New Reviews-Phoenix) | 51 |

| | **Exhibit No. Continued** | | **Admitted:** |
|---|---|---|---|
| 1162 | Emails from Ferrer and Adams, "Subpoena filled take down ad"?, 11/06/2007, DOJ-BP-0002133820 | | 66 |
| 23 | 2008 Budget and Business Plan for Backpage.com, 12/20/2007  DOJ-BP-0004602308-DOJ-BP-0004602331 | | 71 |
| 547 | 0024582 Capture of Popular Adult Searches for Phoenix as of 01/18/2008, USAO-BP | | 78 |
| 549 | Report on Referrals to Backpage from TER, 01/2008 and 01/2011 DOJ-BP-0004900291-DOJ-BP-0004900292 | | 81 |
| 1164 | Email to Padilla and Ferrer, "Fwd: Ter/Backpage links 1/4/07", 01/31/2008, DOJ-BP-0002133607  DOJ-BP-0002133608 | | 83 |
| 551 | Emails from Ferrer and Spear, "Terms of Use changes", 02/22/2008, DOJ-BP-0002127277 - DOJ-BP-0002127278 | | 86 |

**P R O C E E D I N G S**

(Proceedings commence at 9:07 a.m.)

THE COURT:  Please be seated.  All right.  I had a
request from our court reporters, when any counsel objects, if
you would just stand so that they can identify who is making
the objection so that you don't have to necessarily all the
time state your name.  That will help immensely.

Mr. Rapp, you wanted to inquire of the Court about
something?

MR. RAPP:  I think Ms. Perlmeter has a --

MS. PERLMETER:  Your Honor, yesterday evening we were
informed that a staff member with our victim services
department had some contact with a juror in this case.  The
contact occurred during the lunch hour outside of the
courthouse.  It lasted less than a minute.  Our victim witness
coordinator recognized a woman.  They said hello to each other.
They then departed.  They did not discuss this case.  Through
conversations with victim services we think that the juror --
she is referencing is Juror No. 8 who is sitting in the second
row in the last seat.

THE COURT:  And so the communication was essentially
just saying hello or something of that nature?

MS. PERLMETER:  Correct, Your Honor.  My understanding
is that they did not expect to run into each other.  It was

09:07:27

09:07:47

09:08:01

09:08:24

09:08:39

1    just saying hello.  The juror said:  I'm a juror.  And then

2    they departed.

3            THE COURT:  Is there any necessity for an inquiry from

4    any counsel?

5            MR. CAMBRIA:  Your Honor, do they know each other?        09:08:53

6            THE COURT:  Well, I think the question Mr. Cambria

7    posed is whether or not they knew each other, and I think

8    during the voir dire process I did ask all of the jurors if

9    they were familiar with anyone in the U.S. Attorney's Office

10   and there was no "yes" response, so I'm assuming no.           09:09:16

11           Was there any indication that that juror may was

12   familiar with Juror No. 8?

13           MS. PERLMETER:  I didn't hear Cambria's question.  In

14   response to the Court's question, the two women recognized each

15   other because they used to work together previously.          09:09:35

16           THE COURT:  Oh, they were prior colleagues?

17           MS. PERLMETER:  Yes.

18           THE COURT:  How long ago was that?

19           MS. PERLMETER:  I don't know.

20           THE COURT:  Any further inquiry?                        09:09:45

21           MR. LINCENBERG:  Perhaps, Your Honor, I don't

22   recall -- this is Mr. Lincenberg -- I don't recall what the

23   juror said about in response to people she may have known in

24   the U.S. Attorney's Office or not as to whether there would be

25   a need for further inquiry.  Maybe we need to look back at the   09:10:07

1    questionnaire.

2            THE COURT:  No.  I asked in voir dire.  I introduced

3    counsel of the U.S. Attorney's Office.  I introduced Mr.

4    Restaino as the U.S. Attorney.  I asked the entire venire

5    whether they were familiar with the counsel or anyone in the          09:10:25

6    U.S. Attorney's Office and there was no positive response.

7            MR. LINCENBERG:  Well, then I would suggest we may

8    need further inquiry.

9            THE COURT:  What would the inquiry be?

10           MR. LINCENBERG:  I think the inquiry would be, again,          09:10:40

11   I don't know if there was something on this juror's

12   questionnaire that might have suggested as much, but if there

13   is an inconsistent answer, if this juror actually knew somebody

14   in the U.S. Attorney's Office and responded to the Court

15   essentially saying, no, I don't know anybody in the U.S.              09:10:56

16   Attorney's Office, maybe we would need to explore then.

17           THE COURT:  Well, let's have Juror No. 8 in and I will

18   make the inquiry.  And welcome back, Mr. Lincenberg.

19           MR. LINCENBERG:  Thank you, Your Honor.

20           THE COURT:  Mr. Feder, did you want to say something          09:11:17

21   or are you just standing?  Okay.  We'll have Juror No. 8 in.

22           MS. BERTRAND:  Your Honor, on that topic --

23           THE COURT:  Well, let's make sure the juror doesn't

24   come in while you're speaking.  Yes, on that topic.

25           MS. BERTRAND:  Related topic, Your Honor, perhaps when        09:11:35

```
 1    we're done talking with Juror 8 and the rest of the jurors come
 2    in we could also advise them that the parties can't speak to
 3    them.  I know that Mr. -- I think Mr. Eisenberg raised with
 4    Liliana yesterday that we do pass them in the hallway and
 5    stuff, but I don't recall hearing the jury being told:  The           09:11:56
 6    lawyers aren't allowed to speak with you.  They are not being
 7    rude.  They are instructed by the Court not to communicate with
 8    you.  Something to that effect.
 9          THE COURT:  I do believe Liliana told them that after
10    that exchange, but I can do that on the public record.               09:12:11
11          MR. RAPP:  It was part of the preliminary
12    instructions.
13          THE COURT:  It always is, but we'll go ahead and
14    instruct them nevertheless.  Let's bring Juror No. 8 in.
15          Juror No. 8 present.                                           09:13:03
16          JUROR 8:  Good morning.
17          THE COURT:  I understand that there was a brief
18    exchange between you and apparently a staff person at the
19    United States Attorney's Office yesterday, do you recall having
20    an interaction with anyone?                                          09:13:18
21          JUROR 8:  Yes.
22          THE COURT:  And can you tell us just in your own words
23    what that interaction was?
24          JUROR 8:  So she used to work with me and she got a
25    job here.                                                            09:13:30
```

```
 1              THE COURT:  Who is the person that used to work with
 2    you?
 3              JUROR 8:  Jenny, Jenny Doe (phonetic).
 4              THE COURT:  And how long ago did she work with you?
 5              JUROR 8:  I want to say like a year ago.        09:13:40
 6              THE COURT:  A year ago?
 7              JUROR 8:  Yeah.
 8              THE COURT:  Have you been familiar that this Jenny was
 9    working in the U.S. Attorney's Office?
10              JUROR 8:  No, ma'am, no.  I just know that she got a  09:13:54
11    job.  Like she left the department, but I didn't know where.
12              THE COURT:  Okay.  And so yesterday when you saw her,
13    obviously you recognized one another?
14              JUROR 8:  Yes.
15              THE COURT:  What happened then?                 09:14:08
16              JUROR 8:  So -- how did the conversation go?  I just
17    told her that I got promoted in my new job, and then I asked
18    her what she was doing here, and then she said she works here.
19    I said:  Okay, cool.  She asked me what I was doing here, and I
20    just said:  I'm on jury duty.                            09:14:23
21              THE COURT:  Any other communication?
22              JUROR 8:  No, ma'am, and then I just left.
23              THE COURT:  Did this occur during the lunch hour?
24              JUROR 8:  I believe so, right when lunch started, yes.
25              THE COURT:  Mr. Rapp, any further inquiry?       09:14:37
```

1          MR. RAPP:  No, Your Honor.

2          THE COURT:  Mr. Eisenberg?

3          MR. EISENBERG:  No.

4          THE COURT:  Mr. Feder?

5          MR. FEDER:  No.                                    09:14:44

6          THE COURT:  Mr. Panchapakesan?

7          MR. PANCHAPAKESAN:  No, Your Honor.

8          THE COURT:  Ms. Bertrand?

9          MS. BERTRAND:  No.  Thank you.

10          THE COURT:  Mr. Cambria?                          09:14:51

11          MR. CAMBRIA:  No, Your Honor.

12          THE COURT:  Thank you.  You may return, or actually

13   we're going to bring the jurors in just a few minutes.  Just

14   stand behind the door.  Liliana can take you behind the door.

15          MR. RAPP:  Your Honor, may I re-seat the witness?   09:15:11

16          THE COURT:  One moment.  Well, at least in my view

17   Juror No. 8 was forthright in answering the question that she

18   did not know anyone who worked at the U.S. Attorney's Office.

19   Obviously she had no idea that she was working here having just

20   left the position a year ago, and so I think there was a        09:15:32

21   sufficient inquiry made and so I will admonish all of the

22   jurors when they come in that they are to avoid people just in

23   general, and that counsel have been admonished not to approach

24   them, and that when counsel is in there, in their presence,

25   that they are not to, you know, take anything, be offended by   09:16:03

1    counsel ignoring them or one way or the other.  It's simply to

2    preserve the process.  We'll go forward in that way.

3           Anything further, Mr. Rapp?

4           MR. RAPP:  No, Your Honor.  Thank you.

5           THE COURT:  Anything further that needs to be brought          09:16:21

6    up?  Okay.  Let's have our jury in.  Oh, yes, please bring the

7    witness in.

8                      (Jury is present)

9           THE COURT:  All right.  Please be seated.  The record

10   will reflect the presence of the parties.  Mr. Ferrer is on the      09:17:59

11   witness stand, and the return of our jury.

12           Members of the jury, I hope all of you weathered the

13   storm last night.  I just wanted to remind you of a pretty

14   important admonishment.  This is a fairly large building, as

15   you can see, and there are people coming and going from this         09:18:22

16   public building, and the -- we have your juror badge numbers on

17   you at all times so that people can identify you as being a

18   seated juror, and so from time to time you may run into counsel

19   or perhaps a witness or a member of the counsel staff and it's

20   important not to engage in any kind of communications.  I know       09:18:46

21   it's very difficult.  From time to time we all want to, you

22   know, say our pleasant good mornings and so on and so forth,

23   and counsel are advised to not approach you and not to make any

24   contact with you, so don't be offended or feel badly if they

25   simply ignore you or turn and walk the other way.  It's just         09:19:05

```
 1    part of the process to ensure that we are completely all in our
 2    respected areas.
 3              And so with that, let's continue, Mr. Rapp.
 4              MR. RAPP:  Thank you, Your Honor.
 5    CARL FERRER                                              09:19:18
 6    (Witness previously sworn.)
 7                    CONTINUED DIRECT EXAMINATION
 8    BY MR. RAPP:
 9    Q.  Good morning, Mr. Ferrer.  When we left yesterday afternoon
10    we were talking about Exhibit 1057, do you recall that exhibit? 09:19:26
11    A.  Yes, I do.
12    Q.  And I just have a couple more questions regarding it.  So
13    just to orientate the jury, is this a -- is the top part an
14    e-mail from you to Mr. Spear?
15    A.  Yes, it is.                                          09:19:47
16    Q.  And then is Mr. Spear giving you an e-mail in the bottom
17    part of 1057?
18    A.  Yes.
19    Q.  And we talked about this paragraph regarding the personal
20    services category.  I want to ask you about this, this sentence 09:20:07
21    here.  Could you read that for the jury, and I will ask you
22    questions?
23    A.  Scott writes:  "I know everyone dreads this, but I would
24    like to get this done in the next 14 days and get notice out to
25    all the partners."                                       09:20:31
```

Q.  What did you take that to mean from Mr. Spear?

A.  That he's going to notify the partners that -- that --
that -- that we're going to be making some changes in terms of
the content.

Q.  And can you explain to the jury who the partners are?          09:20:55

A.  The partners are different licensees that Scott and I sold.
They are alternative weeklies in different cities, and they had
licensed Backpage to where they could share the revenue.
Scott Spear and I both sold those licenses because he had a lot
of relationships in the alternative newspaper industry.          09:21:20

Q.  And then the last sentence he says down here, what does he
say there?

A.  Scott writes:  "I am on to the privacy policy now."

Q.  What did you take that to mean?

A.  Scott Spear modified the terms of use and the privacy          09:21:41
policy.  He did it multiple times, and the reason why we
dreaded it is that it was continually changing and he had
modifications that he would make, and it was a lot of work to
get that into the database.

Q.  And who was ultimately responsible for that policy?          09:22:04

A.  Scott Spear.

Q.  And I believe your testimony yesterday was that you had
worked with Mr. Spear for sometime?

A.  Yes.

Q.  Can you describe for the jury Mr. Spear's, and I believe          09:22:20

1  you identified him sitting up here in the front row with the

2  mask, could you describe his management, how -- can you

3  describe how he was as a manager?

4  A.  Scott Spear was very detailed.  His budgets accounted for

5  every penny, the raises, when they were due, the revenue          09:22:44

6  strategies, and he required a lot of -- he required a lot of

7  feedback from me on the progress of the task that I was working

8  on.  I would describe him as micromanager.  Like we had to have

9  a lot of meetings, a lot of discussions.  He's very involved in

10  the meetings with the licensees and with the developers.          09:23:14

11  Q.  All right.  During this same time period 2006 to 2007, were

12  you continuing to implement the strategy of aggregation that we

13  discussed yesterday?

14  A.  Yes, very much so.

15  Q.  I'm now showing you United States Exhibit 10 for the          09:23:35

16  witness' eyes only.  Do you recognize this exhibit?

17  A.  Yes, I do.

18  Q.  And is this -- is it fair to say that this is an e-mail

19  exchange between you and Mr. Spear?

20  A.  Yes.                                                           09:24:01

21  Q.  And did this e-mail exchange take place in April of 2007?

22  A.  It did.

23          MR. RAPP:  Move to admit --

24  BY MR. RAPP:

25  Q.  And, sir, is there -- is there an attachment to this e-mail   09:24:16

1    identified 10a that's a two-page document?

2    A.  Yes, there is.

3    Q.  And is the e-mail that you looked at as 10, for the record,

4    is that what we call this sort of the transmission e-mail with

5    these attachments?                                                    09:24:33

6    A.  Yes.

7             MR. RAPP:  Move to admit United States 10 and 10a.

8             MR. FEDER:  Objection.

9             THE COURT:  Overruled.  It may be admitted.

10            (Exhibit Nos. 10 and 10a were admitted)                      09:24:46

11            MR. FEDER:  Could I state my objection, Judge?

12            THE COURT:  Yes.

13            MR. FEDER:  401, 403, 803 and also 106.  This talks

14   about three documents; not one.

15            THE COURT:  Overruled as to each.                            09:24:59

16            MR. RAPP:  Thank you.

17   BY MR. RAPP:

18   Q.  Now, just starting below, can you read the first paragraph,

19   is this something that Mr. Spear is telling you and

20   Mr. Dan Hyer?                                                          09:25:26

21   A.  Yes, he e-mails myself and Dan Hyer.

22   Q.  Can you read the first paragraph, and I will ask you some

23   questions on the other side?

24   A.  Yes.  "Attached are the three documents that have been

25   presented in the last couple of weeks dealing with growing           09:25:44

Backpage in Dallas and moving that process to other cities.  We

need to combine this into one document as a blueprint for this

process for all cities.  The three-at-a-time concept is pretty

well agreed upon as is the schedule and in the Dallas

replication documents.  Personals program would also be done on

the same schedule, same three at a time, so that we can better

work with just a few publishers and class directors more

intensely.  The final document is what we will go over on

Thursday."

Q.  With respect to growing, what he says up here, "growing

Backpage in Dallas and moving that process to other cities,"

what did you take that to mean?

A.  We were very successful in our prostitution marketing

activities in terms of securing content from Craigslist erotic

services, and we're going to send that process across other

cities.

Q.  All right.  And in so doing, did you develop some type of a

script that staff would use to reach out to potential customers

to solicit them to Backpage?

A.  Yes, we did.

Q.  Let me move on to the first page of 10a and direct your

attention to the bottom here, 9.  Do you see that on your

screen?

A.  I do.

Q.  And can you -- can you read just 9c?

A.  9c states:  "Script:  Hi, I saw your ad on the Internet.

Have you ever tried posting it on Backpage.com?  I can post

your ad today so that you can try out the site.  It costs you

nothing.  I do all the work here.  Can I have your e-mail

address please?"

Q.  Is that the script that you were referring to which what

was being referred to in the original e-mail that was going to

be implemented in other cities?

A.  Correct.  We were going to have sales staff use that script

to contact people running prostitution ads on Craigslist and --

        MR. FEDER:  I am going to object to --

        THE WITNESS:  -- secure them.

        MR. FEDER:  -- object to the use of prostitution as

speculation, unless he knows.

        THE COURT:  Well, you can ask him if he knows.  I will

sustain the objection.

BY MR. RAPP:

Q.  Let me see if I can address those concerns.  How is it,

Mr. Ferrer, that you knew that these ads that you were

aggregating from other sites involve prostitution services?

A.  During this time line of 2007?

Q.  Yes.

A.  There is little or no moderation going on on Craigslist or

Backpage, so the ads are -- they have sex act pics, they have

sex acts language, or they have coded sex act terms, and with a

1   price per hour, 15 minutes, 30 minutes, 60 minutes usually.

2   Q.  And from that did you -- was that what made you determine

3   that these were prostitution ads they were aggregating to

4   Backpage?

5   A.  Yes.                                                        09:29:45

6   Q.  And in fact, just to be clear here, were you implementing

7   this strategy in any other category on Backpage?

8   A.  We had made some half-hearted attempts to get content in

9   rental and employment ads, but it just didn't work.  First, you

10  couldn't find phone numbers to call on employment ads, so that   09:30:14

11  made a script impossible, and the rental ads it just wasn't

12  very successful.  What did work and what we put all of our

13  resources was using Craigslist erotic services as a lead source

14  because those ads, they needed their phone to ring and they

15  wanted their phone to ring week after week, day after day, so    09:30:41

16  it was a business necessity for them to run ads with us, and

17  limited options for them to advertise few other sites.

18  Q.  And in expanding this aggregation strategy to -- is that

19  me?

20          THE COURT:  It's the room.                               09:31:07

21          MR. RAPP:  It's the room.  I don't take it personally.

22          THE COURT:  I don't blame it on anyone.  We have had

23  so many technical issues here.  Be patient with us.

24  BY MR. RAPP:

25  Q.  In expanding this strategy to other markets, we looked at    09:31:18

1    the original e-mail 10, did there -- did you have to hire

2    additional staff to work in these other cities doing

3    aggregation?

4    A.  Yes.  We had to hire additional staff and purchase

5    equipment for that staff.                                    09:31:54

6    Q.  And who made those decisions in terms of budgeting the

7    monies to hire those additional staff?

8    A.  The approval to hire staff and purchase equipment came from

9    Scott Spear and Jed Brunst.

10   Q.  And just to be clear, is Mr. Brunst the individual that you   09:32:18

11   identified at the end of the table earlier in your testimony

12   yesterday?

13   A.  Yes.

14   Q.  All right.  The other question I want to ask you regarding

15   10 is, quickly, is this statement down here by Mr. Spear where   09:32:42

16   he says:  "I'm reviewing Indy right now."

17          Do you see that?

18   A.  Yes, I do.

19   Q.  What was that a reference to?

20   A.  Scott Spear is letting me know that he is reviewing the   09:32:58

21   contract for an alternative weekly in Indianapolis for a

22   license, and this is because I didn't have the authority to

23   sign any contracts.  Contracts had to be signed by one of the

24   owners.

25   Q.  All right.  And that was just in 2007 you didn't have the   09:33:19

authority to sign the contract?

A.  I didn't have the authority to sign contracts up until the purchase of the site, and even then I had to get approval before I would enter into a contract.

Q.  Well, let me make sure I understand what you're talking about because you're jumping way ahead to 2015.  Based on your testimony yesterday, you actually purchased the site in 2015?

A.  I purchased it, but they were all the same, what they called covenants that I had to follow, that meant I was really an employee.  I couldn't sign contracts, I couldn't open bank accounts, I couldn't fire key employees.  It all required approvals from the owners, former owners.

Q.  And the owners being Mr. Spear, Mr. Brunst and Mr. Lacey?

A.  Mr. Spear, Mr. Brunst, Mr. Lacey and Jim Larkin.

Q.  Okay.  Meanwhile, during 2007, are you still -- are you still working on this relationship with The Erotic Review?

A.  Yes.

Q.  So let's look at Exhibit 19.

        MR. RAPP:  For the witness' eyes only.

BY MR. RAPP:

Q.  Is this an e-mail that you sent to Mr. Spear?

A.  Yes, I did.

Q.  In fact, you remember sending this e-mail to Mr. Spear?

A.  Yes, I do.

Q.  Now, was this in July 2nd of 2007?

09:33:39

09:34:06

09:34:29

09:34:50

09:35:12

1    A.  Yes.

2            MR. RAPP:  Move to admit.

3            MR. FEDER:  401, 403, 801.

4            THE COURT:  Overruled.  It may be admitted.

5            MR. RAPP:  Request permission to publish.                    09:35:28

6            THE COURT:  It may be published.

7            MR. FEDER:  Judge, to save time, if I just said,

8    "same," is that going to save some time?

9            THE COURT:  Yes.

10       (Exhibit No. 19 was admitted.)                                   09:35:42

11   BY MR. RAPP:

12   Q.  Let's start with the first paragraph, or the first

13   sentence, rather, what do you tell, in the first couple

14   sentences, what are you -- can you read this, and I will ask

15   you some questions about it.                                         09:35:52

16   A.  I write:  "We get 2 million page views, 150,000 visits from

17   The Erotic Review per month.  They bring in more referrals than

18   the Village Voice."

19   Q.  What are you communicating to Mr. Spear there regarding The

20   Erotic Review?                                                       09:36:12

21   A.  I'm communicating how valuable The Erotic Review is in

22   terms of sending traffic to Backpage.  It's more traffic than

23   our own paper that we own in the Village Voice, the Village

24   Voice, the company owns.  We had a link there for Backpage and

25   Backpage ads were on the Village Voice.  We actually got more     09:36:33

traffic coming from The Erotic Review than our own online

newspaper.

Q.  All right.  Let me make sure the jury understands this,

when you say -- do you mean just The Erotic Review gives more

traffic than the single newspaper the New Times that's based

here in Phoenix?

A.  Yes.

Q.  And then down here in the next paragraph, is there some

type of a reference to the principal of The Erotic Review?

A.  Yes, there is.

Q.  And what is -- what are you communicating to Mr. Spear in

that sentence?

A.  I write:  "For a couple of months we have been trying to

connect with the principals of the site so I could buy a banner

ad.  Mike Beletz found the owner that he suggested a trade with

us."

Q.  All right.  Can you explain to the jury what a banner ad

is?

A.  A banner ad is more of a graphic ad, kind of like -- it's

not text.  It's more images.  Typically runs on the top or the

side of pages, web pages.

Q.  All right.  And I highlighted another sentence here,

what -- what does this refer to?  Can you read that and explain

that to the jury?

A.  I write:  "The Erotic Review makes money from users

1  upgrading to premium packages.  They do not make money from

2  advertising or postings."

3  Q.  All right.  And so at this point, did you have sort of a

4  formalized relationship with The Erotic Review at this point

5  right now?                                                    09:38:37

6  A.  At this point we don't, and but we want to.

7  Q.  All right.  And did you come to learn after this what --

8  what really this premium package is and how somebody -- how The

9  Erotic Review would actually make money with reviews?

10  A.  Yes.  It's --                                             09:39:00

11         MR. FEDER:  Your Honor, I am going to object to the

12  constant -- he asked him a question that calls for a yes or no

13  answer, and then Mr. Ferrer goes on and makes an explanation

14  that's not in response to the question.  So I know it's a

15  formality, but needs to be done.                              09:39:18

16         THE COURT:  I would sustain that objection.  I'd

17  agree.

18         Mr. Ferrer I think we discussed yesterday, just listen

19  to the question that Mr. Rapp asks you and just specifically

20  answer that question.  Sometimes it calls for a yes or no, and 09:39:34

21  if you need to explain it, I am sure Mr. Rapp will find a way

22  to have you do that, so --

23         THE WITNESS:  Yes, Your Honor.

24         THE COURT:  -- if you proceed in that way we will get

25  far less objections.                                          09:39:48

```
 1   BY MR. RAPP:
 2   Q.  Mr. Ferrer, can you explain how The Erotic Review makes
 3   money?
 4   A.  It makes money by Johns paying for a premium membership.
 5            MR. CAMBRIA:  Your Honor, object to the foundation          09:39:59
 6   here for this, for The Erotic Review.
 7            THE COURT:  Sustained.
 8   BY MR. RAPP:
 9   Q.  Did you come to learn how -- well, let me just ask you, did
10   you have meetings with the principal of The Erotic Review?        09:40:11
11   A.  I did, yes.
12   Q.  And did you exchange e-mails with the principal?
13   A.  Yes.
14   Q.  And what was the name of the principal?
15   A.  David Elms.                                                    09:40:25
16   Q.  And during those meetings, was there an explanation of how
17   The Erotic Review generated revenue?
18   A.  Yes, there was.
19   Q.  And did you yourself go to the website and review it, and
20   from looking at the website, did you yourself determine --        09:40:44
21            MR. EISENBERG:  Objection, Your Honor, leading.
22            THE COURT:  Overruled.
23   BY MR. RAPP:
24   Q.  Did you yourself determine how they generated revenue?
25   A.  Yes, I did.                                                    09:40:56
```

1    Q.  Can you explain that to the jury?

2            MR. CAMBRIA:  I object.  Foundation; hearsay.

3            THE COURT:  Overruled.

4            THE WITNESS:  Yes, they made their revenue from

5    selling subscriptions to see premium content.                    09:41:07

6    BY MR. RAPP:

7    Q.  And who -- who did -- who did they make -- who were their

8    customers that would pay for these premium packages?

9    A.  Johns, people who frequented prostitutes.

10   Q.  And then above that there's a reference to a sponsor ad, do  09:41:33

11   you see that?

12   A.  Yes.

13   Q.  All right.  And what -- what is that a reference to?

14   A.  We would -- Backpage would get a banner ad that would

15   appear on The Erotic Review.                                     09:42:03

16   Q.  All right.  And how would that generate revenue?

17   A.  Johns that used The Erotic Review would see the Backpage

18   ad, click it, and then arrive in the female escort section of

19   Backpage.

20   Q.  All right.  And just to be clear, was there any other       09:42:27

21   category on -- on Backpage that you did a sponsor ad from

22   The Erotic Review?

23   A.  No, just female escorts.

24   Q.  All right.  And so from 2007, this time period in 2007, did

25   you, similar to aggregation, did you try to expand this          09:42:53

```
 1   relationship with The Erotic Review into other markets where

 2   Backpage had a presence?

 3           MS. BERTRAND:  Objection; leading.

 4           THE COURT:  Overruled.

 5           THE WITNESS:  Yes.                                    09:43:11

 6   BY MR. RAPP:

 7   Q.  All right.  Let me show you Exhibit 20.

 8           MR. RAPP:  For the witness' eyes only.

 9   BY MR. RAPP:

10   Q.  Do you see that on your screen there?                    09:43:19

11   A.  I do.

12   Q.  Is this an e-mail in July of 2007 between you and Mr. Hyer,

13   and is Mr. Spear also copied on this?

14   A.  Yes.

15   Q.  And --                                                   09:43:38

16           MR. RAPP:  Move to admit United States 20.

17           MS. BERTRAND:  Objection; hearsay; lack of foundation.

18           THE COURT:  Overruled.  Overruled.  It may be

19   admitted.

20           MR. RAPP:  Permission to publish.                    09:43:55

21           THE COURT:  It may be published.

22      (Exhibit No. 20 was admitted.)

23   BY MR. RAPP:

24   Q.  Just to orientate the jury to this e-mail, is this an

25   e-mail that you're sending down here with your name here?    09:44:09
```

1    A.   Yes.

2    Q.   And in fact, do you reference on here that you are copying

3    Mr. Spear?

4    A.   Yes.   I state:  "I'll copy Spear so he knows I'm being

5    nice."                                                            09:44:33

6    Q.   And in the context of this e-mail, what did you mean by

7    that?

8    A.   We had a problem in Minneapolis that I needed to bring to

9    his attention.

10   Q.   What was the problem that you were having in the           09:44:45

11   Minneapolis market that you needed to bring to Mr. Spear's

12   attention?

13   A.   One of the paper's managers that had access was expiring

14   the ads in one week, but they were meant to stay online for a

15   lengthy period of time.                                         09:45:01

16   Q.   Why was it important that they needed to stay online for a

17   lengthy period of time?

18   A.   Because we had a relationship we were building with

19   The Erotic Review, and links on The Erotic Review that pointed

20   to Backpage ads, the ads needed to stay live.   That way traffic 09:45:17

21   from The Erotic Review would land on content on Backpage.

22   Q.   All right.   And do you actually give -- so just so we're

23   clear here, this lower e-mail, is this being sent to somebody

24   else, another colleague within Backpage?

25   A.   I believe Dan Hyer.                                         09:45:42

UNITED STATES DISTRICT COURT

1   Q.  And then is it fair to say that this e-mail is then

2   forwarded and copied to Mr. Spear?

3   A.  Yes.

4   Q.  And do you give an example of an ad that had been deleted?

5   A.  Yes, I do.                                                    09:46:08

6   Q.  And could you read the substance of the ad that was

7   deleted?

8          MS. BERTRAND:  Objection; hearsay.

9          THE COURT:  Overruled.

10         THE WITNESS:  You want me to read the ad text?           09:46:21

11  BY MR. RAPP:

12  Q.  Yes, if you would.

13  A.  "Hi there.  I am Julie and I am like no one" -- going to

14  start over.  "Hi there.  I am Julie and like no one you have

15  seen before.  I am one of the few how have the experience to   09:46:37

16  appreciate my encounters and truely enjoy myself with my

17  clients.  I am very discreet.  Just a call away for enjoyable

18  relaxing session.  I am offering both in and outcall right now.

19  Brooklyn center ios where I am located.  Call now for an

20  appointment before there booked.  A perfect GFE experience.    09:47:04

21  Julie, (703) 473-6388."

22  Q.  And just a couple questions on some of the terminology

23  here.  This in and outcall right now, what did you come to

24  learn that reference meant?

25         MS. BERTRAND:  Objection; lacks foundation.              09:47:25

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Sustained.
 2   BY MR. RAPP:
 3   Q.  Well, let me see if I can address the concern here.
 4   Mr. Ferrer, how many postings from 2004 to 2018 have you
 5   reviewed that were posted on any female escort section of        09:47:40
 6   Backpage?
 7   A.  Over my career?
 8   Q.  Yes, sir.
 9   A.  Thousands and thousands, tens of thousands or more.
10   Q.  Did you -- did you often encounter this reference to in      09:47:56
11   call and outcall?
12   A.  Yes, I did.
13   Q.  And in that process, did you come to learn what that
14   reference meant?
15   A.  Yes, I did.                                                   09:48:11
16   Q.  And did you often have occasions to meet with law
17   enforcement during your time at Backpage.com?
18   A.  Yes.
19   Q.  Did you have occasions to meet with other organizations
20   like NCMEC and Polaris?                                          09:48:31
21   A.  Yes.
22   Q.  And in meeting with those people and reviewing the postings
23   on the site, did you come to learn what in call and outcall
24   mean?
25   A.  Yes.                                                         09:48:47
```

```
 1              MR. FEDER:  Can we get a time on that?
 2              THE WITNESS:  Yes.
 3    BY MR. RAPP:
 4    Q.  From 2004 to 2018?
 5    A.  Yes.                                              09:48:53
 6              MR. FEDER:  Same objection.
 7              THE COURT:  Overruled.
 8    BY MR. RAPP:
 9    Q.  What did it mean?
10              MR. CAMBRIA:  Object to the hearsay, Your Honor.  09:48:59
11              THE COURT:  Overruled.
12              THE WITNESS:  Yes.  I came to understand what in call
13    and outcall meant.
14              MS. BERTRAND:  Your Honor, I am going to object under
15    Rule 16, lack of notice.                             09:49:11
16              THE COURT:  Overruled.
17    BY MR. RAPP:
18    Q.  What did that mean?
19    A.  In call means the prostitute comes out.  Let me back up.
20    In call means you go to the prostitute.  Outcall means the  09:49:25
21    prostitute comes to you.
22    Q.  All right.  And there's another term in the ad that had
23    been deleted in the Minneapolis market.  Do you see that there?
24    A.  Yes.
25    Q.  The same questions with respect to this term that says "GFE  09:49:42
```

```
 1    experience," did you have meetings with law enforcement, well,
 2    just in the interest of time, did you have the same type of
 3    meetings and did you, from those meetings did you come to learn
 4    what the GFE experience meant?
 5              MS. BERTRAND:  Objection; compound question.          09:50:04
 6              MR. FEDER:  Same objection.
 7              MS. BERTRAND:  Lack of foundation.
 8              THE COURT:  Overruled.  Ms. Bertrand --
 9              MR. FEDER:  Foundation, 401, 403, 801, speculation.
10              THE COURT:  Overruled, Mr. Feder.                     09:50:18
11    BY MR. RAPP:
12    Q.  What did it mean?
13    A.  Yes.  GFE means Girlfriend Experience.
14    Q.  And what did you come to learn that the Girlfriend
15    Experience was a reference to?                                 09:50:30
16    A.  It means that the prostitute will have sex with you and
17    pretend to be a girlfriend.
18    Q.  All right.  And so down below you give a message to
19    Mr. Hyer that is forwarded up to Mr. Spear.  Do you see that
20    down there?                                                    09:51:01
21    A.  Yes, I do.
22    Q.  What are you trying to communicate to Mr. Hyer then
23    ultimately to Mr. Spear in this portion of the e-mail?
24    A.  "Alan schedules ads for a week and then the ad expires.
25    Dallas does not do this.  This is why Minneapolis flounders.   09:51:22
```

1    It kills the sites seo as in no traffic from

2    TheEroticReview.com.  Links back to Minneapolis are bad when

3    users write reviews.  The links are bad because the ad was

4    deleted or expired in seven days by Alan.  Why care?  Without

5    The Erotic Review traffic you might as well kiss any growth in   09:51:46

6    Minneapolis good bye."

7    Q.  MPLS is Minneapolis?

8    A.  Yes.

9    Q.  And SEO, can you just explain that acronym to the jury?

10   A.  Search engine optimization.  It's trying to get the ads to   09:52:02

11   appear near the top of Google searches.

12   Q.  When you say:  "Without The Erotic Review traffic you might

13   as well kiss any growth in Minneapolis good bye," what are you

14   trying to convey here, what message are you trying to convey?

15   A.  That the Johns that come from The Erotic Review will make   09:52:21

16   the phone number ring for the ads that are posted on Backpage,

17   and if we make the phone numbers ring we're going to sell a lot

18   more ads and get a lot more growth.

19   Q.  And then you're giving a recommendation that ultimately is

20   forwarded up to Mr. Spear down here.  What's the recommendation   09:52:41

21   that you are giving in this e-mail?

22        MS. BERTRAND:  Your Honor, objection.  I would ask

23   that the government not describe what is going on in the

24   document for the witness.

25        THE COURT:  I'll sustain the objection.   09:52:57

1   BY MR. RAPP:

2   Q.  Do you see this part down here under recommendation?

3   A.  Yes.

4   Q.  Can you explain what message you're trying to give?

5   A.  Yes.                                          09:53:10

6   Q.  What is the message that you're trying to give?

7   A.  I write to Mr. Spear:  "Tell papers to not delete good ads.

8   Tell papers to not post" --

9           MR. FEDER:  Object.  This is an e-mail to Mr. Hyer,

10  not to Spear, so it misrepresents what is in the e-mail.   09:53:30

11          THE COURT:  I'll sustain.  Mr. Rapp, why don't you

12  clear it up.

13  BY MR. RAPP:

14  Q.  Does this e-mail with the lengthy e-mail below, does it get

15  forwarded to Mr. Spear?                          09:53:51

16          MS. BERTRAND:  Objection; leading.

17          THE COURT:  Overruled.

18          THE WITNESS:  Yes, it's copied to Mr. Spear because he

19  has to settle this disagreement.  He's ultimately the boss.

20  BY MR. RAPP:                                     09:54:08

21  Q.  And why is Mr. Spear the boss, why are you giving him this

22  information?

23  A.  Because I can't pick a fight with Kenny Stocker or pick a

24  fight with Minneapolis paper.  I have to go through Mr. Spear,

25  Mr. Scott Spear.                                 09:54:24

1    Q.  And why is that?

2    A.  Because he's one of the owners that can resolve this

3    conflict.  It's over my pay grade.

4    Q.  All right.  There's a reference here that says:  Links back

5    to Minneapolis when users write reviews --                          09:54:50

6         MS. BERTRAND:  Your Honor, same objection.  I would

7    ask that the government -- that the Court instruct the

8    government not to read in the document and allow the witness to

9    describe it.

10        THE COURT:  Sustained.  Just direct him to what            09:55:02

11   portion of the e-mail you're going to ask him questions about,

12   Mr. Rapp.

13   BY MR. RAPP:

14   Q.  Okay.  Do you see this part here where I've got circled in

15   red?                                                                09:55:21

16   A.  Yes.

17   Q.  All right.  Can you read that?

18   A.  "Links back to Minneapolis are bad when users write

19   reviews.  The links are bad because the ad was deleted or

20   expired in seven days by Alan."                                     09:55:38

21        I feel I need to explain what those links are.

22   Q.  Why don't you explain that to the jury?

23   A.  So those are the links that would be on The Erotic Review

24   so that if a John clicks that link, it arrives on a -- on a

25   page that's not found that somebody in Minneapolis deleted that     09:55:59

1    ad.  Well, then that would be bad.  That would defeat the

2    purpose of The Erotic Review.  So that's why we need those ads

3    to stay online.

4    Q.  Let's go to 1155.  Do you see that on your screen?

5    A.  Yes, I see 1155.                                          09:56:28

6    Q.  Is this an e-mail exchange between you and somebody?

7    A.  Yes, an e-mail exchange between David Elms and myself.

8    Q.  And how do you know that?

9    A.  Well, David Elms used the Staff@TheEroticReview.com e-mail

10   address and he uses the name David in the e-mail.             09:56:50

11   Q.  Just so we're clear here, did you come to learn that

12   Mr. Elms was the person running The Erotic Review?

13   A.  Yes.  Mr. Elms was the CEO of The Erotic Review.

14   Q.  And the -- what type of website was the The Erotic Review?

15   A.  The Erotic Review was a prostitution review.              09:57:13

16          MR. EISENBERG:  Objection; it's been asked and

17   answered.

18          THE COURT:  Sustained.

19          MR. RAPP:  Just laying the foundation for this e-mail.

20   Well, then I move to admit the e-mail, United States 1155.    09:57:23

21          MR. FEDER:  Same.

22          MS. BERTRAND:  401, 801.

23          THE COURT:  Overruled.  It may be admitted and

24   published.

25          (Exhibit No. 1155 was admitted.)                       09:57:36

BY MR. RAPP:

Q.  Just quickly, Mr. Ferrer, what is this e-mail exchange all about?

A.  So I got approval to go see Mr. Elms, to have a meeting with him.

Q.  Let me stop you for a minute.  Who did you get approval from to go meet with Mr. Elms?

A.  Yes, from Scott Spear.

Q.  All right.  And why did you need to get approval?  Did you have to travel?  I mean, were you just driving across the street or did you have to travel somewhere?

A.  I had to fly to L.A.

Q.  Fly to L.A. from Phoenix or Dallas?

A.  I think at this time from Phoenix.

Q.  And when you traveled in your capacity as the project manager, did you have to get approval from anybody above you?

A.  Yes.  My expenses had to be approved in advance.

Q.  And does this -- is this e-mail exchange between you and Mr. Elms, is this just confirming your meeting with him?

A.  Yes.

Q.  All right.  And I think you were talking, you were mentioning earlier the fact about Mr. Elms' e-mail address, can you explain the e-mail address you had exchanges with him?

A.  David Elms is using the e-mail address Staff@TheEroticReview.com.

09:57:57

09:58:10

09:58:22

09:58:48

09:59:10

Q.  And did you -- going forward, did you have e-mail exchange

with this e-mail address where you were having exchanges with

Mr. Elms?

A.  Yes.

Q.  All right.  And then so did you actually meet with him in        09:59:27

person?

A.  I did meet with him at the Big Wok Mongolian Barbecue.

Q.  Did you have occasion to actually visit where -- where he

was running, if he was, The Erotic Review?

A.  I did go to his office, which was his home.                      09:59:47

Q.  And did you observe the operation?

A.  I did.  It was a bunch of computer monitors on the wall and

high security.

Q.  All right.  And when you returned from the meeting with

Mr. Elms, did you report back that meeting to anybody?               10:00:08

A.  I did.  I reported back to Mr. Spear some of the -- some of

the conversations with David Elms and some of the crazy things

that happened with Mr. Elms.

Q.  But going forward, did you have -- did you establish a

relationship, a business relationship with Mr. Elms with --         10:00:33

with respect to The Erotic Review?

A.  We did.  We set up a partnership.

Q.  All right.  Let's look at 1156.

        MR. RAPP:  Witness' eyes only.

BY MR. RAPP:                                                         10:00:50

1    Q.  Do you see that on your screen, sir?

2    A.  I do.

3    Q.  And would you agree that this is a, a two page e-mail?

4    A.  Yes.

5    Q.  And is the -- so on the second page, is it -- is it -- is          10:01:10

6    there a signature line from some -- from some staff member at

7    Backpage?

8            MS. BERTRAND:  Same objection.  I would ask the Court

9    to instruct the government not to describe the document.

10           THE COURT:  I think he's only asking if there's a              10:01:32

11   signature at the bottom of the page, and so overruled.

12   BY MR. RAPP:

13   Q.  Is there a signature?

14   A.  Yes.  Mike Beletz, the adult marketing manager.

15   Q.  Was Mike Beletz in some fashion involved in from Backpage's        10:01:46

16   standpoint involved in this relationship with The Erotic

17   Review?

18   A.  Yes, he was -- he was the first adult marketing manager to

19   start the relationship with The Erotic Review.

20   Q.  And when you say he was the adult manager with the                 10:02:05

21   relationship with The Erotic Review, in that capacity, what did

22   he have to do?

23   A.  So he would create ads on Backpage and then submit a

24   request to The Erotic Review to go ahead and put the Backpage

25   link on the prostitution review page.  And in exchange, he            10:02:28

1   would make sure that The Erotic Review link to their, to that

2   prostitution review page would appear in the Backpage ad.  It's

3   a reciprocal link strategy.

4   Q.  And in doing that, that process, did Mr. Beletz have to

5   actually look at The Erotic Review website?                          10:02:53

6   A.  Yes.

7   Q.  Did he have to look at the postings on The Erotic Review

8   that were reviews of prostitutes?

9           MR. EISENBERG:  Objection, Your Honor, foundation.

10          THE COURT:  Sustained.                                       10:03:15

11  BY MR. RAPP:

12  Q.  Do you know if you had to look at The Erotic Review website

13  to make sure that this link relationship was in place?

14  A.  Yes, he had to look at the --

15          MR. EISENBERG:  Objection.                                   10:03:28

16          THE WITNESS:  -- the actual review.

17          MR. EISENBERG:  Excuse me, still same thing,

18  foundation.

19          THE COURT:  Sustained.

20  BY MR. RAPP:                                                         10:03:33

21  Q.  Well, how do you know that?

22  A.  We -- that was his job description that we gave him.

23  That's what his job was as the adult marketing manager to look

24  at The Erotic Review pages and then to create Backpage ads from

25  Craigslist and then to set up and let The Erotic Review know,       10:03:51

1    put the Backpage link on the prostitution review page.

2    Q.  And do you -- did you receive e-mails from him where he was

3    detailing this job that he was doing that you just described?

4          MR. EISENBERG:  Objection; leading.

5          THE COURT:  Overruled.                                    10:04:13

6          THE WITNESS:  Yes, that was part of his job

7    description to send us regular reports on what he was doing.

8    BY MR. RAPP:

9    Q.  All right.  And is this -- is this e-mail at United States

10   1156, is that an example of that?                               10:04:27

11   A.  Yes.

12   Q.  And does he send you this -- does he send you a -- an

13   e-mail with these, with these links?

14   A.  Yes, he does.

15   Q.  And then do you in turn send an e-mail to                   10:04:44

16   Staff@TheEroticReview?

17   A.  Yes, I do.

18         MR. RAPP:  Move to admit 1156.

19         MS. BERTRAND:  Objection, lack of foundation, hearsay,

20   and 801(d)(2)(E) as to the foundation problem.                 10:05:01

21         MR. FEDER:  Same.

22         THE COURT:  Overruled.  It may be admitted.

23      (Exhibit No. 1156 was admitted.)

24   BY MR. RAPP:

25   Q.  Let's just go quickly to the second page, do you see that  10:05:13

UNITED STATES DISTRICT COURT

1    there on your screen, sir?

2              MR. RAPP:  Request permission to publish.

3              THE COURT:  Yes, it may be published.

4    BY MR. RAPP:

5    Q.  Can you explain to the jury what we're looking at?  We will          10:05:34

6    just use one example in the interest of time here.  What is

7    this?  What are we seeing here?

8    A.  What we're seeing are instructions to The Erotic Review to

9    go to their -- we see TER URL, but that would be the

10   prostitution review page, and to insert the Backpage web               10:05:55

11   address, which we call New BP URL.  That way Backpage is on the

12   prostitution review page, which is a huge win for us.

13   Q.  Why do you say it's a huge win for you?

14   A.  Because The Erotic Review is the main driver of traffic to

15   Backpage in terms of referring sites, so we want to build that        10:06:20

16   traffic more.

17   Q.  And then going to the first page, this gets sent to you and

18   then what are you telling to the staff at The Erotic Review?

19   A.  I write:  "TER staff, thank you very much for doing this."

20   Q.  All right.  And the subject line is?                              10:06:53

21   A.  Subject line is:  "Attention:  Dave (second batch of URLs

22   to change on reviews."

23   Q.  And then up above, do they respond to you in some respect?

24   A.  They do.  The Erotic Review responds indicating that there

25   are two ads on Backpage that do not have The Erotic Review           10:07:16

1    reciprocal link, and we need to correct that.

2    Q.  Why -- what do you take from that that they are telling you

3    this, why is that the case?

4    A.  They will not put the Backpage link on the prostitution

5    review page unless we have The Erotic Review link on the          10:07:35

6    prostitute's ad on Backpage.

7    Q.  All right.  Did there come a time where on -- let me just

8    look at another exhibit here.  Did there come a time, sir, when

9    you actually did -- you had an exchange of ads between Backpage

10   and The Erotic Review?                                            10:08:18

11   A.  Yes.

12   Q.  All right.  Why was that the case?  Is this in

13   approximately September of 2007?

14   A.  Yes.  Is this the banner ads?

15   Q.  Yes.  Let me orientate you to this.                           10:08:40

16          MR. RAPP:  So let's put on 1835 for the witness' eyes

17   only.

18   BY MR. RAPP:

19   Q.  Do you recognize that, that exhibit on the screen United

20   States 1835?                                                      10:08:57

21   A.  Yes, I do.

22   Q.  And who is this an exchange with?

23   A.  It's from staff at TER and they are e-mailing me the ad for

24   them to post that I'm going to post on Backpage for them.

25   Q.  And is this an, an ad that has some attachments as well?      10:09:14

1    A.  Yes, four attachments.

2    Q.  And do are those attachments represent?

3    A.  Those are screenshots of The Erotic Review's various pages.

4    Q.  And in terms of being an ad, were the screenshots also

5    intended to be an advertisement for The Erotic Review on          10:09:40

6    Backpage?

7    A.  Yes.  They are getting a sponsor ad in the female escorts

8    category of Backpage.

9            MR. RAPP:  Move to admit United States 1835.

10           MS. BERTRAND:  Objection; hearsay; hearsay within        10:09:56

11   hearsay; lack of foundation under 801(d)(2)(E).

12           MR. FEDER:  Same.

13           THE COURT:  I'll sustain the foundation objection,

14   Mr. Rapp.  Just lay some for foundation.

15   BY MR. RAPP:                                                      10:10:13

16   Q.  All right.  Is this an e-mail that you received from The

17   Erotic Review?

18   A.  Yes.

19   Q.  And was the -- what was the -- what was the import of this

20   e-mail?                                                           10:10:26

21   A.  So this is the responsibility that I have in the reciprocal

22   link relationship to post an ad for The Erotic Review in the

23   female escorts pages.

24   Q.  And why would posting an ad for The Erotic Review in the

25   Backpage escort section be important?                            10:10:44

A.  Because we are getting an ad on The Erotic Review.  We're

sponsoring.  We have a sponsor banner ad on their site.  So if

they are going to give me an ad, I have to give them an ad, and

so what they are sending me is the actual ad text for their ad

that I am going to create and I am going to post online.

Q.  And did you review this particular ad that The Erotic

Review was going to be -- that was going to be placed on

Backpage, did you review that with anybody in upper management?

A.  Yes.

Q.  Who?

A.  Scott Spear.

Q.  All right.  And just so we're clear, how would this in any

respect further the relationship between The Erotic Review and

Backpage?

A.  We expect to get a lot more traffic from The Erotic Review,

a lot more referrals, which is really the key to Backpage's

success.

        MR. RAPP:  Move to admit 1835.  Request permission to

publish.

        MS. BERTRAND:  Same objection.  Lack of foundation

under 801(d)(2)(E).

        MR. FEDER:  Same.

        MS. BERTRAND:  And hearsay within hearsay.

        THE COURT:  Overruled as to 801(d)(2)(E), and

801(d)(2), and it may be admitted.  You may publish.

```
1          (Exhibit No. 1835 was admitted.)
2     BY MR. RAPP:
3     Q.  Okay.  So let's start just at the top here just so we're
4     clear.  This comes from The Erotic Review to you?
5     A.  Yes.                                              10:12:31
6     Q.  And then the first part of this is, is this an ad that is
7     going to be placed on Backpage.com?
8          MS. BERTRAND:  Objection; leading.
9          THE COURT:  Overruled.  Re-ask the question, Mr. Rapp.
10    BY MR. RAPP:                                          10:12:58
11    Q.  What are you going to do with this ad?
12    A.  This is the text that I'm going to put for an ad to appear.
13    It's a sponsor ad in the female escorts category of Backpage in
14    many cities.
15    Q.  All right.  So can you read this for the jury, please?  10:13:17
16    A.  "The Erotic Review-Don't get ripped off again.  Before you
17    pick up that phone, read her reviews on the
18    TheEroticReview.com.  What are people saying about
19    TheEroticReview.com?
20         The TheEroticReview.com, the Consumer Reports of the  10:13:35
21    escort industry-New York magazine, July 18th, 2005.
22         Nothing is kept in the dark.  It's information, and
23    the brings a characteristically very secretive hobby into the
24    light."
25    Q.  Let me stop you there.  When they reference a secretive  10:13:53
```

1    hobby into the light, what did you take that to mean?

2         MR. CAMBRIA:  Well --

3         MS. BERTRAND:  Objection, calls for speculation as to

4    what someone else intended when they wrote something.

5         THE COURT:  Sustained.                              10:14:06

6    BY MR. RAPP:

7    Q.  All right.  Why don't you go on to the second bullet point?

8    A.  Would that be the third bullet point?

9    Q.  You're right.  This is third.

10   A.  "The Erotic Review, the largest of the escort-rating      10:14:19

11   websites-MSNBC.com, January 20th, 2006."

12   Q.  And then the next one?

13   A.  "TheEroticReview.com, the Zagat's of the escort-for-hire

14   industry-New York Magazine, July 18th, 2005."

15   Q.  Do you know what Zagat's is?                          10:14:42

16   A.  It's kind of like the Yelp, but I think it's a little more

17   upscale.

18   Q.  And then the last bullet point?

19   A.  "TheEroticReview.com, or TER, the world's largest Internet

20   site devoted to review the various attributes and abilities of  10:15:03

21   independent providers-Playboy Magazine, July 2007."

22   Q.  And what did you take "independent providers" to mean?

23        MS. BERTRAND:  Objection, calls for speculation.

24        THE COURT:  Overruled.  He can answer as to what he

25   thought it meant.                                        10:15:26

1          THE WITNESS:  Prostitutes.

2    BY MR. RAPP:

3    Q.  Did you see that reference, aside from this ad, did you

4    ever see that reference on The Erotic Review when you were

5    reviewing it?                                                    10:15:40

6    A.  Independent escorts?

7    Q.  No, independent providers.

8    A.  Yes, they use the word "providers."

9    Q.  And then this next part of the e-mail, is this portion also

10   part of the ad that was to be placed on Backpage.com?            10:15:56

11   A.  Yes.  It's a very long ad.

12   Q.  Can you read it?

13   A.  "With almost 1 million members and over 100,000 escorts in

14   our database, TheEroticReview.com is simply the largest escort

15   review site in the world.                                        10:16:16

16          Before you spend your money on an escort, no one likes

17   to get ripped off.  Before you spend your hard earned cash on

18   an escort, read her reviews.  It only takes a minute to see

19   what guys, just like you, are saying about her.  You can find

20   out if she is a rip-off, just average, or a great experience     10:16:35

21   completely free.  Come on, try us.  Click here to search our

22   database of over 100,000 escorts.

23          Did you get ripped off again?  Didn't read her

24   reviews, did you?  Don't let them get away with it.  The reason

25   why these rip-offs exist is because up until now there was       10:16:55

1    nothing you could do about it.  By submitting a review you are

2    not only warning thousands of guys in your area, you hitting

3    them where it hurts.  Your choice, be another victim or click

4    here to submit a review.

5           Want to brag?  Did you have a great time last night?     10:17:14

6    Can't tell anyone about it?  Sucks, huh?  Did you know there

7    are thousands of guys just like you in your area waiting to

8    hear your juicy details?  You can share your experiences or

9    read about theirs, knowing that your identity is completely

10   secure.  Click here to submit a review.  Click here to see what   10:17:38

11   happened last night to someone else.

12          Bored and horny?  If you just want to see the latest

13   escort reviews for your area, click here.  See who the other

14   guys are doing.

15          So, how much is this going to cost me?  Becoming a       10:17:56

16   Basic Member is free.  Just click here and fill out the form.

17   Over 80 percent of the information of TheEroticReview.com is

18   given away for free.  You can find out if she is a rip-off,

19   just average, or a great experience completely free.  Of

20   course, there is an upgrade option that will allow you to see   10:18:21

21   the other 20 percent for $20 a month or $50 for" --

22   Q.  Let's go on to the next page.  And so this last part the

23   $20 a month, what did you come to learn, and the $50, what did

24   you come to learn that was payment for in your review of The

25   Erotic Review website?                                          10:18:49

1    A.   That's the premium subscription.

2    Q.   All right.  And then starting here, what else does this ad

3    on Backpage.com say about The Erotic Review?

4    A.   It says:  "If you do not want to pay, we give free VIP days

5    for helping us out by submitting reviews.  Click here to read          10:19:09

6    more about VIP."

7    Q.   All right.  And then the next, the last part?

8    A.   "Join almost 1 million guys.  Dozens of magazines and

9    newspapers, and almost 1 million guys can't all be wrong.  This

10   is not a scam.  This is not a porn site.  We are the real deal.        10:19:28

11   It only takes one click to see for yourself.

12          The Erotic Review-we have the information you need to

13   know."

14   Q.   All right.  And then attached to this e-mail sent to you

15   they also had these attachments that are contained in 1835a.           10:19:44

16          MR. RAPP:  So just so the record is clear, I move to

17   admit 1835, plus the attachments that were included.

18   BY MR. RAPP:

19   Q.   So on your screen, sir, is 1835a, and this was -- so first,

20   was this -- was this on your screen, was this also part of the         10:20:07

21   advertisement that you were placing on Backpage.com?

22   A.   Yes.  These are the images that will appear in their ad.

23   Q.   All right.  And on this image that was placed on the ad, is

24   there a reference to Backpage.com?

25   A.   Yes.  Our logo, the Backpage logo appears as a sponsored          10:20:32

1    by.

2              MR. RAPP:  Move to admit 1835a and b and c.

3              MS. BERTRAND:  Objection; hearsay within hearsay, and

4    hearsay.

5              MR. FEDER:  Same.                                    10:20:49

6              THE COURT:  Overruled.

7    BY MR. RAPP:

8    Q.  Request permission to publish both a, b and c?

9              THE COURT:  It may be published.  Yes.

10             (Exhibit No. 1835a, b, and c were admitted.)        10:21:02

11   BY MR. RAPP:

12   Q.  All right.  So I have highlighted up here, just so we're

13   clear, is this what you were referring to when you said

14   sponsored by Backpage.com?

15   A.  Yes.  This is the banner ad for Backpage that will appear  10:21:20

16   on The Erotic Review.

17   Q.  And is this an example of a profile that you would find on

18   The Erotic Review?

19             MR. EISENBERG:  Objection; leading.

20             THE COURT:  Well, I guess, Mr. Rapp, don't lead.     10:21:38

21   BY MR. RAPP:

22   Q.  What is this?

23   A.  This is a screenshot of a prostitution review called

24   Ashley's that will appear in The Erotic Review ad on Backpage.

25             MS. BERTRAND:  Objection, Motion to Strike as to      10:22:02

1    speculation regarding whether or not this is for prostitution.

2            MR. RAPP:  Maybe I can address that.

3            THE COURT:  Well, let me sustain the objection and

4    then you can address it.

5    BY MR. RAPP:                                                    10:22:18

6    Q.  Okay.  Let's just start in addressing that concern.  Let's

7    start with the top part of this what you've described as a

8    review that was an ad on Backpage, can you go through some of

9    the information under general information?

10   A.  Yes.  The ad website, it's kind of hard to read here, but  10:22:41

11   it's Tucson Backpage, so if you click that link you will go to

12   a female escort page in Tucson.

13   Q.  All right.  And then did it have some type of a contact

14   information here?

15   A.  It does.  It has e-mail only.                              10:23:05

16   Q.  All right.  And then we discussed earlier in your testimony

17   this morning the reference to this term in and out, the

18   outcall, is that information that was found a profile?

19   A.  Yes, it says "outcall."

20   Q.  And then going over to the service that's offered, what    10:23:28

21   service is offered?

22   A.  Escort.

23   Q.  And then from that, just from that information alone,

24   Mr. Ferrer, how do you come to the conclusion that this is a

25   profile that is for prostitution services?                    10:23:56

1   A.  Because it appears on The Erotic Review.  It's really that

2   simple.

3   Q.  Okay.  Well, then the next section here is -- has -- is

4   entitled "appearance."  What type of information was provided

5   on a review for appearance?                                   10:24:22

6   A.  So under "appearance" they got real photo, the build,

7   ethnicity, hair color, hair type, hair length, piercings.  It

8   says:  Pussy, shaved.  Photo accurate, height, transsexual,

9   breast size, breast cup, breast implants, breast appearance,

10  tattoos.                                                      10:24:52

11  Q.  And then going to the bottom portion where it says

12  "services offered," what type of services are referenced here

13  that suggest that this might be for prostitution services?

14  A.  Under "services offered" we have massage, sex, blow job,

15  touch pussy, kiss, two girl action, more than one guy, multiple  10:25:24

16  pops, massage quality, s & m, cum in mouth, lick pussy, anal,

17  will bring second provider, no rush session, rimming.

18  Q.  And then under the next portion of this profile, what do

19  you find?

20  A.  Escort is the service, the length of time is 60 minutes and  10:26:04

21  the price, $200.

22  Q.  So this the length where it says 60 minutes and the prices,

23  do you see that there?

24  A.  Yes.  Yes.

25  Q.  Did you also find this type of information on postings on  10:26:26

```
 1   Backpage.com?
 2   A.  Yes.
 3          MS. BERTRAND:  Objection, vague as to what information
 4   on Backpage.com.
 5          THE COURT:  Well, I guess, Mr. Rapp, just go ahead and     10:26:47
 6   clarify.  I will sustain the objection.  Just clarify what you
 7   meant in the question.
 8   BY MR. RAPP:
 9   Q.  All right.  Did you review a number of postings in your
10   career from 2004 to 2018 in the female escort section of          10:27:02
11   Backpage.com?
12   A.  Yes, a lot.
13   Q.  When you say "a lot," can you give a ballpark for us?
14   A.  Certainly more than tens of thousands.
15   Q.  Did you often find in those postings some reference to        10:27:21
16   length of time and cost either explicitly or coded?
17   A.  Yes.  The length of time was often 15 minutes, 30 minutes,
18   60 minutes.  Those are the most common times.
19   Q.  And was there a reference, either explicit or coded, to the
20   costs for that time period?                                        10:27:53
21          MS. BERTRAND:  Objection; foundation.
22          THE COURT:  Overruled.
23          THE WITNESS:  Yes, there was a price and it was almost
24   always explicit.
25   BY MR. RAPP:                                                       10:28:05
```

1   Q.  All right.  So the bottom part of United States 1835a is

2   entitled "reviews," can you explain to the jury this portion?

3   A.  So this is individual reviews of this of Ashley by

4   different Johns.

5          MS. BERTRAND:  Objection; hearsay; hearsay within          10:28:39

6   hearsay; lack of foundation; speculation.

7          THE COURT:  Overruled.  He's describing what this

8   means to him.

9   BY MR. RAPP:

10  Q.  In describing what this means to you, did you have occasion   10:28:55

11  in this business relationship with The Erotic Review to look at

12  postings on the site?

13  A.  Yes.

14  Q.  Did you see similar type of sections on the posting that

15  was entitled "reviews"?                                          10:29:13

16  A.  Yes.

17  Q.  Did you come to learn -- did you do any research on these

18  reviews on the website?

19  A.  Yes.

20  Q.  And why, sir, did you do that?                               10:29:27

21  A.  Well, later I would even get a VIP access from The Erotic

22  Review.

23  Q.  Do you know why they provided you that, you as a point of

24  contact at Backpage.com the VIP package for The Erotic Review?

25  A.  Market research.  I mean, I am in charge of trying to grow   10:29:50

1    revenue for the company, so I'm tasked with understanding

2    The Erotic Review.

3    Q.  And in doing that, did you look at the section similar to

4    this on reviews on The Erotic Review that had reviewer,

5    appearance, performance?                                          10:30:14

6    A.  Yes.

7    Q.  And what, sir, did that mean to you?

8    A.  There would be -- the reviews are from The Erotic Review

9    users are sorted by date with the newest review on top, and

10   then it has the reviewer's handle name, and then it breaks the    10:30:34

11   appearance I believe on a scale of one to ten with a couple of

12   words like "really hot," and then it rates the performance once

13   again on a scale of one to ten with the top review saying -- I

14   think it's an eight, "Went the extra mile."

15   Q.  All right.  But just looking at this, how would you know     10:31:00

16   that the person posting, or the review of the person, the

17   person's name would actually be for a prostitution service?

18           MS. BERTRAND:  Objection; calls for speculation.

19           THE COURT:  Well, I think he asks how would you know,

20   so I think rephrase.                                             10:31:24

21   BY MR. RAPP:

22   Q.  How would you know?

23   A.  You could click the view button and then you go into the

24   juicy details, and that's how they described it.

25   Q.  All right.  And then let's look at 18 --                     10:31:36

1          THE COURT:  I'm going to say, Mr. Rapp, let's go ahead

2     and break for our morning recess.

3          MR. RAPP:  Sure.

4          THE COURT:  And so members of the jury, we'll be on a

5     20-minute stretch break.  Again, in that time period, I ask you          10:31:52

6     not to come to any conclusions and not to discuss the case

7     amongst yourselves or with anyone else.  Just simply try to

8     enjoy the 20-minute break.  Be ready in the jury room to come

9     in at about ten to the hour.  Please all rise for the jury.

10                    (Jury is not present.)                                   10:32:38

11          THE COURT:  All right.  Then again, I would ask those

12     who are in the public viewing area of the courtroom, if you

13     would remain in the courtroom a few minutes in case the jurors

14     want to step out and take a break.

15          MR. EISENBERG:  Your Honor, may I address the Court          10:32:54

16     just briefly, Your Honor?  I want the record to reflect that

17     the objections that have been made, I join in those objections.

18          THE COURT:  Yes, and I think Mr. Feder clarified that

19     this morning and we discussed it yesterday, so yes, it's

20     understood.                                                           10:33:11

21          MR. EISENBERG:  Your Honor, the other is the insertion

22     of the government into this process as if they are vouching for

23     the witness.  For example, at some point, more than once,

24     prosecutor has said, "Just so we're clear" as an indication of

25     we are clear.  That's the government and the witness.  At          10:33:38

UNITED STATES DISTRICT COURT

1    another point he said, "As we discussed earlier in your

2    testimony."

3            The government doesn't discuss anything; the witness

4    does, but the government is apparently seeking to join itself

5    with the witness.  So I would ask that Mr. -- the Court direct          10:33:54

6    Mr. Rapp not to insert himself in this process.

7            THE COURT:  I don't find it to be vouching, but it's a

8    fair point, Mr. Rapp.  Maybe rephrase the way that you ask the

9    question.

10           MR. RAPP:  Sure.                                                10:34:10

11           THE COURT:  We will stand in recess.

12           (Recess was taken at 10:34 a.m. )

13           THE COURT:  Please be seated.  Let's have the jury in.

14       (Proceedings reconvened at 10:55 a.m.)

15           THE COURT:  Please be seated.  The record will reflect         10:55:33

16   the presence of our jurors and counsel and the witness.

17           Mr. Rapp, you may continue.

18           MR. RAPP:  Thank you, Your Honor.  Madam clerk, if we

19   could put 1835a back on the -- to publish.  Thank you.

20   BY MR. RAPP:                                                           10:55:52

21   Q.  Just a couple more questions.  Drawing your attention to

22   this portion, can you explain what this is?

23   A.  So under "general information" of this review page, there

24   is a field called "ad website," and that's the field where we

25   want to have the Backpage link displayed.  If you click this          10:56:20

1   link, you would go to Ashley's profile.  Excuse me, I said that

2   wrong.  If you click this link, you will go to Ashley's ad on

3   Backpage.

4   Q.  Is this an example of the reciprocal link relationship?

5   A.  Yes.                                              10:56:49

6   Q.  Looking at 1835b, which has been admitted and request

7   permission to publish it as well.  First, can you explain this

8   portion on the right side of this document?

9   A.  Under "Sponsored by" there's a banner ad that says:

10  "Backpage.com, find escorts here."  When you click that banner   10:57:28

11  ad, it would take you to the escort category for the specific

12  city.

13  Q.  All right.  And then on this document entitled "DATYGMAN'S

14  review of Felicia," what would you find under "general

15  details"?                                            10:57:59

16          MS. BERTRAND:  Objection; hearsay; hearsay within

17  hearsay; lack of foundation.

18          THE COURT:  Overruled.

19          MR. FEDER:  Same objection.

20          THE COURT:  Overruled.                       10:58:09

21          THE WITNESS:  DATYGMAN'S review under "general

22  details" says:  "Seen Felicia a few times.  She is a lot like

23  the hot girl next door with a wild side.  If you get her in the

24  mood, get ready for a great time.  Set up a session day time at

25  her friend's place for a couple of hours of lusty fun.  Asked   10:58:37

her to wear a special outfit.  I waited for her to arrive and

watched her fine ass walk up the door from my car.  I waited a

few minutes and off I was for a great time."

BY MR. RAPP:

Q.  All right.  And then under "general details," was there

another section?

A.  Yes, it's called, "the juicy details."

Q.  And what information was this advertising for this posting

for this review?

           MS. BERTRAND:  Objection.

BY MR. RAPP:

Q.  Details --

           MS. BERTRAND:  Hearsay; hearsay within hearsay; lack

of foundation.

           THE COURT:  Overruled.

           THE WITNESS:  So the review states under "juicy

details":  "I brought the wine and while I was pouring could

not take my eyes off of Felicia's legs and heels.  She

approached me and DFK'd me, and raised her leg to feel my hard

cock.  Poured the wine and retreated to the bedroom where I

proceeded to kiss and lick her tasty shaved pussy.  Told her to

take time cumming since I was not in a rush.  20 minutes of

DATY and she came all over my face.  I am sure the neighbors

heard us.

           Recovered and it was my turn.  What a great BBBJ with

1  lots of ball tongue action and eye contact.  Covered up and

2  Felicia got on me to ride me.  I had to stop or at least slow

3  her down a few times.  Flipped her around for some deep doggy

4  with those long legs.  Wow.  Popped a big load and more wine

5  while we both recovered.  Action was non-stop for two hours and    11:00:41

6  it was just awesome.  She plans to be shortly do a career

7  change, so I recommend you hurry before that happens.  A

8  wonderful fun, hot lady."

9  BY MR. RAPP:

10  Q.  There were some acronyms contained in this review, did you    11:01:02

11  see these same terms at any point on postings on Backpage.com?

12  A.  Yes.

13  Q.  And were they terms in any way suggestive of a sexual act?

14          MS. BERTRAND:  Objection; leading; speculation.

15          MR. FEDER:  Foundation.                                    11:01:37

16          THE COURT:  Let me rule on her objections.

17          MR. FEDER:  Thank you.

18          THE COURT:  Sustained.  What is your objection?

19          MR. FEDER:  Foundation too.

20          THE COURT:  Overruled.  Rephrase, Mr. Rapp, if you         11:01:47

21  can.

22  BY MR. RAPP:

23  Q.  Did you see these terms on Backpage.com?

24  A.  Yes.  I saw "DATY" and "BBBJ" on Backpage.

25  Q.  Were there terms that at some point were stripped out of       11:01:59

1   postings on Backpage.com?

2   A.  Yes, we stripped out those terms 'cause they were

3   indicative of a sex act.

4   Q.  All right.  Going to 1835c, can you explain to the jury

5   what this advertisement demonstrates?                        11:02:27

6   A.  So this is a screenshot of the new reviews that were

7   appearing in The Erotic Review for the city of Phoenix.

8   Q.  All right.  And then what -- what do all of these, looks

9   like buttons, what do they represent, if you know?

10  A.  I do know.  The view is the actual prostitution review of  11:03:03

11  the provider that's directly to the right.

12  Q.  All right.  Now, in terms of putting these ads for The

13  Erotic Review on Backpage.com, did you review these potential

14  ads with anybody in upper management?

15  A.  Yes, with Scott Spear.                                    11:03:34

16  Q.  All right.  Now, moving on to another area, did there come

17  a time in 2007 and going forward where Backpage would receive

18  subpoenas?

19  A.  Yes.

20  Q.  And who would Backpage receive subpoenas from?           11:03:57

21  A.  From law enforcement involved in prostitution

22  investigations.

23  Q.  And how would Backpage receive those subpoenas?

24  A.  Initially they were faxed over to the Building B office

25  where Jed Brunst, Scott Spear and Jim Larkin officed.        11:04:19

1   Q.  All right.  And then were you in any way alerted to the

2   receipt of these subpoenas?

3   A.  Yes.

4   Q.  And were you involved in responding in any way to the

5   subpoena request?                                          11:04:40

6   A.  Yes, I was.  I even had to testify at times as a custodian

7   of records.

8   Q.  Okay.  So can you explain to the jury what a subpoena is?

9   A.  A subpoena is a request from law enforcement to provide

10  records on a particular posting or user.                   11:04:58

11  Q.  All right.  And as time went on between 2004 and 2018, did

12  subpoena requests increase or decrease?

13  A.  Subpoena requests continually increased.  We ended up

14  having a total of 20,000 subpoenas involving prostitution

15  investigations in that time frame.                         11:05:27

16  Q.  And did there come a time where in order to handle this

17  volume of subpoenas, did you have to -- did Backpage have to

18  hire any staff?

19  A.  Yes, we had to hire additional staff, and it was something

20  that we had to put into the budget and have Jed Brunst, Scott  11:05:52

21  Spear approve the budget.

22  Q.  All right.  Now, I think you just mentioned that you were

23  subpoenaed to testify at trials?

24  A.  Yes.

25  Q.  What was the purpose -- what were you asked to testify     11:06:11

1    about at these trials?

2    A.  I was authenticating the records for prostitution

3    investigations.

4    Q.  And when you say you were authenticating the records, can

5    you be more specific as to what type of record?                    11:06:29

6    A.  These records would be the posting with the ad text and

7    then the admin data that we capture, which would be the e-mail

8    address, phone number, type of payment they used, whatever

9    address they used on the payment form, and I was to

10   authenticate that, this data that was collected was from         11:06:52

11   Backpage services.

12   Q.  Sir, how was it that you were qualified to provide that

13   testimony?

14   A.  I am the main manager of the site, so I'm very familiar

15   with how the data should look and appear.                          11:07:13

16   Q.  All right.  And was there some -- something that was unique

17   about Backpage postings and you were able to identify them as

18   postings on Backpage?

19   A.  Yes, there's a number of things, from the logo to the

20   copyright information on the bottom of the ad, the type of data  11:07:38

21   we collected, the bread crumb trails, look and feel, how things

22   are organized.  And the type of data, like the admin data is

23   very unique to our servers, and that's the data that we collect

24   on the user, like the IP address.

25   Q.  Did there come a point you no longer were involved in         11:07:57

1   responding to subpoenas?

2   A.  Yes.  It became apparent that I was not a good choice to be

3   on the stand providing the information about records.

4   Q.  And why was that the case?

5   A.  Spear had determined that really we needed to get someone          11:08:18

6   that was just handling subpoenas because obviously I knew so

7   much about marketing that if I was questioned on the stand

8   about some of our marketing activities, that that would just

9   open up a can of worms.

10  Q.  Did you -- when you were asked to testify in these cases,          11:08:45

11  did you ever disclose to anybody these marketing strategies

12  that you've testified to the last couple of days, the

13  aggregation, the super poster and the relationship with The

14  Erotic Review?

15  A.  I did not disclose that, nor was I asked.                          11:09:06

16  Q.  Did you also come to learn as of 2007 that law enforcement

17  was using the website Backpage for what is often known as

18  stings?

19  A.  Yes, that was quite a frequent occurrence.

20  Q.  All right.  Can you explain to the jury your understanding         11:09:34

21  of a string?

22  A.  So law enforcement would post ads in the female escorts

23  category of Backpage and they would usually rent a hotel room

24  or motel room, and when Johns showed up to engage with a

25  prostitute, they would be arrested, and then there would be a          11:09:59

1    news story within a couple of days about the number of arrests.

2    Q.  All right.  And when that occurred, was there any

3    discussion among upper management about that occurrence?

4    A.  We were very aware of the sting ads because there were

5    numerous Google news alerts with Backpage in the news story.        11:10:26

6    Q.  I'm showing you 1162.

7           MR. RAPP:  For the witness' eyes only.

8    BY MR. RAPP:

9    Q.  And is this is this an e-mail exchange?

10   A.  Yes.                                                           11:10:50

11   Q.  And is this an e-mail exchange regarding the receipt of a

12   subpoena?

13   A.  Yes, it is between Jess Adams and myself.

14   Q.  And as a result of receiving this request from Mr. Adams,

15   does it cause you to do something?                                 11:11:09

16   A.  Yes.  I took the ad down, I believe.  It says:  "Done."

17   That's what I wrote.

18           MR. RAPP:  Move to admit 1162.

19           THE COURT:  11 -- overruled.  1162 is admitted.

20      (Exhibit No. 1162 was admitted.)                               11:11:34

21   BY MR. RAPP:

22   Q.  All right.  Is this -- first of all, is this an example of

23   a request that you would receive from law enforcement regarding

24   providing postings?

25   A.  Yes, we would get requests from law enforcement.              11:11:58

1   Q.  And is this an example of a request in involving a

2   prostitution case?

3   A.  Yes.

4   Q.  And as a result of this, I believe your testimony is you

5   removed the posting, can you explain to the jury why you would        11:12:20

6   do that?

7   A.  So Jess Adams had -- was letting us know that the detective

8   had advised him that we should take the ad down now.  So he

9   e-mailed me and Tamara Nickel and then I replied back that I

10  went ahead and removed the ad.                                       11:12:48

11  Q.  And were there occasions where law enforcement, after you

12  provided them postings, were there occasions where law

13  enforcement would thank you for responding to the subpoena?

14  A.  Yes, they were professional.

15  Q.  All right.  But you have testified that when you appeared        11:13:11

16  to testify in court, and I think your testimony was you were

17  appearing in court to authenticate the postings, when law

18  enforcement requested this by e-mail, did you ever disclose the

19  strategies that we've been discussing the last day or so, did

20  you ever disclose those in the form of an e-mail to law              11:13:39

21  enforcement?

22  A.  We didn't disclose our aggregation activities or our

23  relationship with The Erotic Review or our VIP treatment of the

24  super posters in New York City.

25  Q.  All right.  Did there come a point where, well, let me ask       11:14:00

UNITED STATES DISTRICT COURT

```
 1   you, in responding to these subpoenas, did you -- did you
 2   charge law enforcement for the cost of you having to put
 3   together these records to provide them, did you charge for
 4   that?
 5   A.  We did.  There was -- after the volume picked up on the        11:14:24
 6   subpoenas, like hundreds coming in per month, that we decided
 7   to charge per page for records.  It wasn't a very successful
 8   effort.
 9   Q.  Why not?
10   A.  Because the Federal government, which was the bulk of the       11:14:43
11   subpoenas, just refused to pay, and we still had to comply, so
12   we complied.  There were a few states that did send us some
13   payments, but it was really insignificant.
14   Q.  All right.  So when you -- just so the jury is clear, when
15   you receive these subpoenas, did you have any choice not to        11:15:07
16   comply?
17   A.  There was no realistic choice.  I mean, you could you try
18   to quash it and go to court.  We just did not do that.  We just
19   had to comply, and we complied.
20   Q.  All right.  And still in 2007, was there any effort to         11:15:26
21   develop some type of a policy for the people, the users that
22   were posting on the website, did you do anything to develop
23   some type of a policy for the postings?
24   A.  Yes, very much so.
25   Q.  All right.  Can you explain what your role, if any, was in     11:15:52
```

```
1   that developing that policy?
2   A.  In terms of we would negotiate on the posting rules that
3   would, you know, determine -- to alert users about what the
4   standards are for content.  What words are not allowed was
5   probably the most important, and what kind of pics are allowed      11:16:17
6   or not allowed.
7   Q.  Did that become more of a concern in going forward from
8   2007 to 2008?
9   A.  It did.  As we started to get more pressure and we were
10  watching Craigslist come under pressure from the Attorneys          11:16:35
11  General of various states, we -- we were -- we knew we were
12  next and so we wanted to sanitize the content, make it less
13  obvious prostitution.
14  Q.  But did you still maintain this reciprocal link
15  relationship with The Erotic Review during this time period in      11:16:59
16  the latter part of 2007?
17  A.  Absolutely.
18  Q.  All right.  Now, at the end of 2007, do you do anything to
19  create or plan, a budget for Backpage.com for 2008?
20  A.  Yes.  There's an annual budgeting process that's quite the      11:17:26
21  ordeal.  It starts November and we start gathering the data and
22  preparing the budget which will be presented usually in
23  December.
24  Q.  All right.  And who is involved in that budget process for
25  the coming year?                                                    11:17:47
```

1   A.   Myself.   I normally gather data to from Andrew Padilla and

2   Dan Hyer, and then Scott Spear, the Backpage accountant at this

3   time Jess Adams, and then we were going to make the

4   presentation to Jim Larkin and Jed Brunst for their approval.

5   Q.   All right.   And what, if any, was Mr. Brunst's role in the          11:18:15

6   budget process?

7   A.   His role is to make sure that it's a sound strategy and

8   also that it's profitable; that we're not spending money

9   needlessly.

10  Q.   All right.   Let me show you Exhibit 23.                             11:18:38

11          MR. RAPP:   For the witness' eyes only.

12  BY MR. RAPP:

13  Q.   Do you -- do you see that on the screen there?

14  A.   Yes.

15  Q.   Can you identify this document?                                      11:18:52

16  A.   This is the 2008 Budget and Business Plan for Backpage.com

17  overview.

18  Q.   And do you know approximately how many pages this Budget

19  and Business Plan is?

20  A.   It's around 24 pages approximately.                                  11:19:11

21  Q.   And what type of information would you expect to find in

22  this 2008 Budget and Business Plan for Backpage.com?

23  A.   This is a detailed blueprint on the steps that the company

24  will be taking to grow the business.

25  Q.   And who is the author of this 24-page document?                     11:19:36

1    A.  I would say Scott Spear is the main author, although I

2    contributed, Jess Adams contributes, and I get some data from

3    Dan Hyer and Andrew Padilla, but Scott Spear is a very detailed

4    person and so that's why this overview is so long.

5              MR. RAPP:  Move to admit Exhibit 23.                      11:20:09

6              MR. FEDER:  Same.  Same.

7              THE COURT:  It may be admitted.

8         (Exhibit No. 23 was admitted.)

9    BY MR. RAPP:

10   Q.  Just so the jury understands what we're talking about, is    11:20:22

11   this the document you've been referring to?

12             THE COURT:  It may be published.

13             MR. RAPP:  Published.  Thank you.

14   BY MR. RAPP:

15   Q.  Do you see there on your screen, sir?                        11:20:35

16   A.  Yes, that is the document.

17   Q.  I'm not going to go through all 24 pages, but a few pages

18   when you are presenting this and going over this, who is the

19   audience that this is being presented to?

20   A.  The owners, Jim Larkin and Jed Brunst.                       11:21:00

21   Q.  All right.  And let me just draw your attention to the

22   middle of the first page.  Do you see that there?

23   A.  Yes, I do.

24   Q.  Can you explain the data that's highlighted on your screen

25   there?                                                           11:21:32

A.  I can.  We've got the time frame of 2004 and then you see

the visits and the revenue generated, the number of ads and the

page views.  And if you just go down to 2007, October of 2007,

you can see that the visits have greatly increased from 342,852

to 8,993,456, and a visit is when someone arrives on Backpage        11:22:00

and they land on Backpage site.

        And then the revenue in July of 2004 it was 29,729.

In October 2007 it's 454,317.

Q.  Let me stop you there.  Based upon your role at Backpage,

do you have any opinion as to what accounted for that increase     11:22:35

in revenue?

A.  This is entirely, well, I shouldn't say the word

"entirely," it's mostly prostitution revenue.  It's coming from

female escorts.

Q.  Female escort category.  Okay.  All right.  Let me draw       11:22:51

your attention to page 3 of this document and highlight the

top.  Can you read the top of page 3 of U.S., United States 23?

A.  Yes.  "In terms of marketing, we struck a deal with

TheEroticReview.com, TER, with reciprocal links it created huge

brand awareness in this niche industry and increased page views   11:23:31

from TER by 120,000 per day."

Q.  All right.  And when you presented this information to the

Chief Financial Officer, Mr. Brunst, which you've identified

yesterday as sitting at the end of the table, how did he and

the ownership view the relationship that you had established      11:23:56

1   with The Erotic Review?

2           MR. PANCHAPAKESAN:  Objection; foundation.

3           THE COURT:  You can lay some foundation, Mr. Rapp.

4   BY MR. RAPP:

5   Q.  Did you present this information to Mr. Brunst in his          11:24:15

6   capacity as the CFO?

7   A.  Yes, I did.

8   Q.  And how did he view this relationship with The Erotic

9   Review as part of the 2008 budget, if you know?

10          MR. PANCHAPAKESAN:  Objection; foundation;               11:24:32

11  speculation.

12          THE COURT:  Overruled.

13          THE WITNESS:  We were all excited about this

14  opportunity because we could see that it was working.

15  BY MR. RAPP:                                                      11:24:48

16  Q.  When you say "working," can you explain to the jury what

17  you mean by that?

18  A.  Revenues increasing, ad counts increasing, page views are

19  increasing.  Backpage is so much more successful than any of

20  the other companies' web ventures.                                11:25:05

21  Q.  And as a matter of fact, how is the -- how is the

22  alternative newspapers doing at this point in the latter part

23  of 2007?

24  A.  It was my opinion they were --

25          MR. PANCHAPAKESAN:  Objection; foundation.               11:25:32

1          THE COURT:  Sustained.

2     BY MR. RAPP:

3     Q.  To address the concerns, how would you know this -- how

4     would you know how alternative newspapers were doing in terms

5     of revenue during the latter part of 2007?                          11:25:44

6          MS. BERTRAND:  Objection as to this line of

7     questioning; lack of notice under Rule 16 as to expert

8     testimony.

9          THE COURT:  Overruled.

10         MR. PANCHAPAKESAN:  Objection; foundation.                      11:25:59

11         THE COURT:  Overruled.  Well, let me just say with

12    regard to foundation, Mr. Rapp, I think the question is broad

13    and so maybe you want to break it down in terms of, 'cause

14    you're talking about alternative newspapers.  I don't know

15    which newspaper you're talking about.                               11:26:18

16    BY MR. RAPP:

17    Q.  Okay.  Yeah.  So how many alternative newspapers did

18    Mr. Larkin, Mr. Lacey, Mr. Spear, Mr. Brunst own, if you know,

19    at the end of 2007?

20    A.  It was over 11 papers.                                          11:26:35

21    Q.  All right.  And did you come to learn through this budget

22    process or any other information you received how they were

23    doing in terms of revenue?

24    A.  I worked in the office with the papers.  I saw the staff

25    being reduced.  I saw the number of pages printed in the            11:26:57

1  newspaper becoming fewer.  It was getting more and more

2  difficult for the papers to generate revenue.  The Internet was

3  having an impact.  It wasn't -- you know, it would become more

4  and more severe each year, that impact.

5  Q.  All right.  And did you come to learn that the revenue from  11:27:17

6  Backpage.com was being used in any way to support the

7  alternative newspapers?

8  A.  We were giving a big chunk of the revenue that came from

9  Backpage to the newspapers to help support them.  They really

10  weren't doing much in terms of referrals, but the revenue went  11:27:47

11  to them to help support them and that became very evident as

12  time went on and Backpage revenue increased.

13  Q.  All right.  Moving on to another exhibit, which is for the

14  witness' eyes only.  This is Exhibit 547, what is this

15  document?  11:28:21

16  A.  This is a document that shows the search terms that users

17  on Backpage would enter into the Backpage search bar.

18  Q.  What was the source of the date on this document?  Did you

19  have anything to do with having this document generated?

20  A.  Yes.  I managed the development of the popular searches on  11:28:46

21  Backpage once I had approval to go forward with this

22  development.

23  Q.  All right.  And who did you need to have approval to go

24  forward with the development?

25  A.  This was from Scott Spear, my supervisor.  We had to  11:29:00

1    prioritize which developments we would be working on.

2    Q.  And why were the search terms -- why would that be

3    important to Backpage.com, why would it be important that you

4    know that information?

5    A.  For search engine optimization reasons we wanted to create          11:29:21

6    landing pages for popular search terms on the site.  So if you

7    were looking for something specifically, Google would have a

8    page that's indexed for those popular items.

9    Q.  All right.  And who did you coordinate this with to

10   generate the number of search terms for a particular term, who       11:29:45

11   did you coordinate that with?

12   A.  So Scott Spear had a contract with a company called Desert

13   Net.  They were our main developers and --

14   Q.  Let me stop you.  Where were they based?

15   A.  Tucson, Arizona.                                                   11:30:05

16   Q.  When you say that they were your main developers, what do

17   you mean by that?

18   A.  Well, they did the development for Backpage.  We did

19   have -- Backpage had developers, but they were focused more on

20   the payment gateway for handling credit cards, but for               11:30:18

21   developments involving Backpage, that was through a company

22   called Desert Net in Tucson, Arizona.  It was an annual

23   contract that was negotiated with Scott Spear and Desert Net.

24   Q.  All right.  And did you have Desert Net do something where

25   they would provide you what the most search terms you would          11:30:44

1  find on Backpage.com?

2  A.  Yes, I scheduled the development for them, gave them the

3  idea of let's build this, and then they build it and then they

4  are able to track the words that people are using in the

5  Backpage search bar, and then load them up on to a page that        11:31:07

6  shows their frequency of use by category.

7  Q.  All right.  Did you do this in the other categories on

8  Backpage.com, for example, like home furnishings, furniture,

9  real estate, jobs?

10  A.  I think we did, but it just wasn't very revealing because     11:31:30

11  we didn't have that much searches in those categories.  They

12  weren't very popular.

13  Q.  All right.  Then once you received this document, what, if

14  anything, did you do once you received the information from

15  Desert Net?                                                        11:31:49

16  A.  We put a link on the footer that showed the popular

17  searches so that Google would index it and users could then use

18  it too to see what people are searching for in a particular

19  city in a particular category.  And then I found the

20  information so revealing that I printed out copy and would        11:32:09

21  share it in management meetings with Spear and others.

22  Q.  Okay.

23           MR. RAPP:  Move to admit United States 547.

24           MR. FEDER:  Same.

25           THE COURT:  It is admitted.                              11:32:29

```
 1    BY MR. RAPP:
 2    Q.  All right.  Just so looking over here --
 3              MR. RAPP:  Request permission to publish.
 4              THE COURT:  Yes, it may be published.
 5         (Exhibit No. 547 was admitted.)                      11:32:42
 6    BY MR. RAPP:
 7    Q.  And so just, can you tell us how many terms you found in
 8    the escort section that -- how many terms did they provide you?
 9    A.  There were 50 terms that we were displaying that were
10    searched on Backpage.                                      11:33:05
11    Q.  All right.  Well, we're not going to go through all 50
12    terms, but were some of these terms indicative of sexual acts?
13    A.  Yes.
14              MS. BERTRAND:  Objection; vague as to sexual acts.
15    That is not what is defined in the Arizona rules or Arizona  11:33:22
16    Revised Statutes.
17              MR. FEDER:  Speculation, too.
18              THE COURT:  Overruled as to both.  I think he can
19    explain what he thinks sexual acts are that are described in
20    the exhibit.  So he can answer in that way.                11:33:36
21    BY MR. RAPP:
22    Q.  Well, let's just pick up.  Let's just look at number eight,
23    was that one of the terms that you found was a frequent search
24    term?
25    A.  Yes.  BBBJ, which means Bareback Blow Job.             11:33:55
```

1   Q.  Let's look at number six, what was that?

2   A.  GFE, Girlfriend Experience.

3   Q.  All right.  And just to be clear, what would, I think you

4   were explaining that this would give a link on the postings, so

5   what would -- what would a user of the website do, if you know,      11:34:23

6   with that term as being a link on the posting?

7   A.  You know, this page was actually built more for Google to

8   index so that if somebody was doing a search on Google for

9   Phoenix escorts, BBBJ, they would arrive to a page that would

10  have nothing but Phoenix ads featuring BBBJ in female escorts       11:34:55

11  category, so it's really a search engine play, but it's very

12  descriptive of how actual Johns are using Backpage.  They were

13  the ones putting in a term BBBJ.

14  Q.  All right.  And then at 30, was there another term that was

15  frequently searched?                                                11:35:22

16  A.  Yes, TER, The Erotic Review.

17  Q.  And so did you continue to have Desert Net provide you this

18  data going forward from 2007?

19  A.  Yes, from 2007 to 2012 we continued to capture the popular

20  adult term searches and then displayed it as a footer on the        11:35:54

21  back page of all pages of adult.

22  Q.  Did there come a time after 2007 when you ceased to collect

23  this data and include it as a link in the postings?

24  A.  Yes.  In 2012 we completely eliminated this development.

25  We just thought it was too damming.                                 11:36:25

1   Q.  All right.  When you say "we," who do you mean?

2   A.  2012, Scott Spear, Jim Larkin.  We just -- there was a

3   process of wanting to clean up content that appeared very

4   indicative of prostitution.

5   Q.  And in 2012, if you know, were you experiencing any                11:36:52

6   pressure regarding the website?

7   A.  Yes, there was another prostitution investigation of the

8   site.

9   Q.  Let's look at -- so going into 2008, did you continue on

10  with the relationship with The Erotic Review?                          11:37:17

11  A.  Yes.

12          MR. RAPP:  And just looking at Exhibit 549, for the

13  witness' eyes only.

14  BY MR. RAPP:

15  Q.  Do you see this document on your screen?                           11:37:28

16  A.  Yes.

17  Q.  And can you tell us what that is?

18  A.  It is a report on referral traffic.

19  Q.  All right.  And is this something that you -- you obtained

20  for some purpose in your position with Backpage?                       11:37:50

21  A.  Yes.  We generated this report using Google Analytics,

22  which is a service that Google provides to track traffic.

23  Q.  And why -- why would you do this?

24  A.  When you're running a website, you need to know how much

25  traffic you're getting from Google searches or from referral          11:38:17

```
1    sites like The Erotic Review, and you can identify those sites

2    and then try to expand your relationship with them to grow the

3    site.  You also want to know the number of page views and where

4    the page views are by category so you understand what your

5    users are using on the site.                                         11:38:39

6            For example, are they looking in furniture or are they

7    looking in female escorts.

8    Q.  And is this one of the Google Analytics reports that you

9    obtained to track that referral traffic?

10   A.  Yes.  This Google Analytics referral report is specifically     11:38:57

11   on the number of referrals coming from The Erotic Review.

12           MR. RAPP:  Move to admit United States 549.

13           MR. FEDER:  Same.

14           THE COURT:  It may be admitted.

15       (Exhibit No. 549 was admitted.)                                  11:39:13

16           THE COURT:  And published.

17           MR. RAPP:  Thank you.

18   BY MR. RAPP:

19   Q.  Drawing your attention to the top here where -- what is the

20   source of the information?                                           11:39:24

21   A.  So "source" is a term that you would use in the report

22   saying, well, where is the source for the referral traffic.

23   And in this I am saying, tell me TheEroticReview.com as a

24   source, how much traffic are we getting from them?

25   Q.  So right now we are in 2008, but does this compare years?       11:39:46
```

A.  So this report is going to compare January in 2008 to
January in 2011 to see if our relationship with The Erotic
Review is paying off, is it working.

Q.  All right.  And from the information that you received,
were you able to draw any conclusions about whether or not the
referral traffic from The Erotic Review was increasing?

A.  Yes.  In this time frame, January 2008 to January,
comparing to January 2011, the referral traffic increased from
294,545 to 682,716.  It more than doubled, and that this
traffic that I'm talking about is specifically coming from the
Backpage links that are on the reviews that we aggregated or
that we asked the TR to put on the site, their site.  So that
really shows that the reciprocal link program is very
successful.

Q.  Okay.  All right.  And so let me show you 1164, for your
eyes only, and we had talked previously on a previous exhibit
about this individual by the name of Roger Williams.  Do you
remember that?

A.  Yes.

Q.  Did he continue on in his capacity as the person in charge
of this relationship?

A.  He did.  He worked out of the Phoenix office and Andrew
Padilla was supervising him.

Q.  And is he sending you some information in this e-mail
that's contained in 1164?

11:40:14

11:40:51

11:41:15

11:41:49

11:42:08

1  A.  Yes, he is.

2          MR. RAPP:  Move to admit 1164 and request permission

3  to publish.

4          MS. BERTRAND:  Objection; hearsay, lack of foundation

5  under 801(d)(2)(E).                                            11:42:22

6          THE COURT:  Overruled.

7          MR. FEDER:  Also same.

8          THE COURT:  It may be admitted.

9          MR. RAPP:  Request permission to publish as well.

10         THE COURT:  It may be published.                       11:42:39

11         (Exhibit No. 1164 was admitted.)

12  BY MR. RAPP:

13  Q.  All right.  So I think you had just mentioned that Andrew

14  Padilla was involved in this e-mail, so why was he copied on

15  this e-mail?                                                  11:42:56

16  A.  I'm working in between Dallas and the Phoenix office, so

17  I'm flying back and forth.  Roger is working from the Phoenix

18  office, so Andrew is his immediate supervisor, and that's why

19  he's copied.

20  Q.  All right.  What is Roger Williams, what does he say here  11:43:17

21  in his e-mail to you and Mr. Padilla?

22  A.  Roger writes:  "I just double-checked these links and I

23  noticed that none of these were updated to TER.  I'm going to

24  look over some of the older e-mails to see how long we've been

25  having this problem with our links being put on your site.    11:43:43

UNITED STATES DISTRICT COURT

1   Please get back to me ASAP with a solution."

2   Q.  All right.  Can you explain that what he's communicating to

3   you, what is the issue here, if any?

4   A.  Yes.  He's -- hold on.  Yeah.  So he -- if you look at the

5   two e-mail address, it's going to admin at TER.com, so he's          11:44:08

6   copied me and Andrew and he's e-mailing the admin at TER.com

7   people saying:  You're not doing your job.  We sent you

8   Backpage links.  You're supposed to add them to your

9   prostitution reviews, and it's not getting done.

10  Q.  All right.  And then what are these down here, what are          11:44:32

11  these links?

12  A.  So that's the standard task there of it's telling TER to go

13  to this specific review, and if we just do the first one, the

14  prostitution review numbers 103293, go to that review and then

15  add the Backpage URL, add that Backpage link, and you can look      11:45:00

16  at the Backpage ad and you can see that we've added The Erotic

17  Review link, so we have done our part of this reciprocal link

18  relationship, now do your part.  So this is essentially a to-do

19  list for The Erotic Review.

20  Q.  Is that the case with all the other links below that first      11:45:21

21  one?

22  A.  Yes.

23  Q.  And going on to the second page, is that also the case?

24  A.  Yes.

25  Q.  Now, we've talked about coming up with terms, terms of use      11:45:39

1    that are communicated to the people posting on Backpage.com,

2    did you have exchanges with Mr. Spear in 2008 about a legal

3    term or terms that are indicative of sex for money on the

4    postings, did you have exchanges with Mr. Spear regarding that

5    illegal?                                                    11:46:26

6    A.  Yes.

7    Q.  All right.  Showing you Exhibit 551, do you see that on

8    your screen?

9    A.  Yes, I do.

10   Q.  Is this an e-mail from you to Mr. Spear?                11:46:53

11   A.  Yes.

12   Q.  And what is the -- what's the point of this e-mail?

13   A.  So this e-mail summarizes the task that Scott Spear has

14   asked me to do on the site, and I wanted to nail him down to

15   this being exactly what we're going to do because it's a lot of 11:47:23

16   work.  You have to go to each individual city and then add the

17   posting rules page and change the terms of use page, so I don't

18   want Scott to be coming back and forth to me with little tiny

19   changes.  I want the final version here.

20   Q.  All right.  So let's take a look at 551.                11:47:42

21          MR. RAPP:  Move to admit.  Move to admit 551 and

22   request permission to publish.

23          MR. FEDER:  Same.

24          THE COURT:  Yes, it may be admitted and it may be

25   published.                                                  11:48:04

1          (Exhibit No. 551 is admitted)

2    BY MR. RAPP:

3    Q.  And so this is the -- is this the e-mail we've been

4    discussing?

5    A.  Yes.                                                    11:48:14

6    Q.  And is this talk about the posting rules?

7    A.  Yes.  This is what will be inserted on top of the form that

8    users use to create their ad.

9    Q.  All right.  And in terms -- can you read from starting with

10   "You must" down?                                            11:48:40

11   A.  "You must observe the following posting rules:  Do not

12   suggest or imply an exchange of sexual favors for money.

13          Do not use code words such as Greek, BBBJ, blow, trips

14   to Greece, et cetera.

15          Do not include obscene images.                        11:48:58

16          Do not post content which advertises an illegal

17   service.

18          Postings not complying with the terms of use are

19   subject to removal."

20   Q.  And up to this point in 2008 those terms that you         11:49:14

21   referenced, were they found in the -- in postings?

22   A.  Yes.

23   Q.  And as going forward after these posting rules, were these

24   types of terms stripped out of or removed in some fashion from

25   the postings?                                                11:49:41

1  A.  Yes, these terms had to be stripped out.  We needed some

2  technology.  It's only because they were so frequent that they

3  showed up in popular search terms like BBBJ and Greek, so it's

4  on a lot of ads.  We can't manually go through each ad to try

5  to remove them, even though we did do for many, so we would end      11:50:05

6  up putting them into strip out.

7  Q.  All right.  And so -- and you've -- you give an example

8  here to the posters, so can you explain -- so are all these

9  terms based upon your experience working at Backpage.com, are

10 each one of these terms indicative of some type of sexual act?       11:50:37

11 A.  Yes.

12 Q.  All right.  And we've talked about this one, BBBJ, what

13 about Greek, trips to Greece, how are those indicative of some

14 type of sexual act?

15 A.  So trips to Greece and Greek are indicative of anal sex;         11:50:59

16 and Greek, I think, was the second most popular search term on

17 the site, so it's on a lot of ads.

18 Q.  We just saw that on the exhibit we just looked at where you

19 got Desert Net to list --

20       MS. BERTRAND:  Objection.  Objection, Your Honor, I            11:51:20

21 would ask the Court to instruct the government not to testify

22 about the evidence.

23       THE COURT:  Sustained.

24 BY MR. RAPP:

25 Q.  Have you seen this before?                                       11:51:31

1    A.  Yes.

2    Q.  Where?

3    A.  The posting rules?  No, I have seen the term "Greek."  It

4    showed up on the -- it was the second most popular search term

5    on the site under adult female escorts.                          11:51:43

6    Q.  In the time that you were at working from 2004 to 2018, did

7    you come to learn that posters would do anything to try to

8    circumvent the these rules which would be including these terms

9    in their postings?

10           MS. BERTRAND:  Objection; calls for speculation, and    11:52:07

11   the government is giving the detail.

12           THE COURT:  Sustained.

13   BY MR. RAPP:

14   Q.  What did you come to learn about these terms going forward

15   in the postings?                                                 11:52:23

16   A.  Well, we would post these posting rules on the site and

17   users, especially in the female escorts category, are very

18   creative and they will misspell, they will add spacings, they

19   will use 3s instead of E when they want to write Greek, so it's

20   a big whack-a-mole.                                              11:52:43

21   Q.  When you say "whack-a-mole," what do you mean?

22   A.  When you block a term or you strip out a term, they just

23   come up with a new term.  Instead of trips to Greece they might

24   say trips to the Mediterranean.

25           MS. BERTRAND:  Objection; move to strike; calls for     11:53:00

1    speculation.

2            THE COURT:  Overruled.

3    BY MR. RAPP:

4    Q.  What about this next start of the posting rules, not to

5    include obscene images, what did that mean?                    11:53:08

6    A.  That means we're done with the sex act pics and we don't

7    want them to post anymore extreme close-ups of genitalia.

8    Q.  All right.  And when you would find a posting with, let's

9    just start with the terms, with terms like that, would you

10   block the posting?                                             11:53:39

11           MS. BERTRAND:  Objection; leading.

12           THE COURT:  Sustained.

13   BY MR. RAPP:

14   Q.  What would you do when you find a posting with one of these

15   terms in it?                                                   11:53:48

16   A.  We would just remove the term.

17   Q.  All right.  And with respect to the images, what would you

18   do with respect to the images if you found images that were

19   indicative in your words, a sex act pic, what would you do with

20   the image?                                                     11:54:16

21           MS. BERTRAND:  Objection; vague as to time.

22           THE COURT:  I think the exhibit has a time on it.  Are

23   you talking about the year or the date, or what is the

24   objection specifically?

25           MS. BERTRAND:  Right.  At what point is the government  11:54:33

1   asking about when they would strip, when they would pull ads,

2   ban people, et cetera.

3          THE COURT:  Yes, let's clarify, Mr. Rapp.

4   BY MR. RAPP:

5   Q.  All right.  We are in 2008, when did you implement the                    11:54:46

6   stripping of terms that you've described?

7   A.  So in 2008 we started to implement the stripping of terms

8   and the editing of ads, removing those terms and the removal of

9   obscene images, but we did not delete the ad or block the user

10  from future postings.                                                         11:55:15

11  Q.  All right.  And in terms of, for example, these other rules

12  down here, did you ban them from obscene or lewd or lascivious

13  graphics or photographs, did you ban the ads when those

14  appeared?

15  A.  No, we didn't remove the ads or ban the user from future                  11:55:47

16  postings when they violated these terms.

17  Q.  And you actually have an age requirement here, how did you

18  implement that?

19  A.  The age requirement is really just, well, they put in their

20  age on the posting form.  They are not allowed to put anything               11:56:13

21  under 18.

22  Q.  All right.  And what at this time in 2008, what, if

23  anything, was done to verify that?

24  A.  Nothing.

25  Q.  And then so this down here, what are you saying to                        11:56:29

1   Mr. Spear?

2   A.  I'm saying to Mr. Spear:  Have I missed anything?  And that

3   means -- 'cause this is a lot of changes and I want to make

4   sure that he's communicated to me everything that he wants

5   done.                                                    11:56:51

6   Q.  Did -- what was the -- what was the moderation staff at

7   this point in February of 2008 within Backpage.com, how many

8   staff members did you have to review the postings in any given

9   market?

10  A.  In 2008 I'm thinking not more than a dozen.  Maybe -- we're   11:57:13

11  going to be expanding it significantly, but this is pretty

12  early on, so maybe 20 maximum.

13  Q.  Let look at page 2 of 551.

14          THE COURT:  Is this a new exhibit, Mr. Rapp?

15          MR. RAPP:  No, ma'am.                            11:57:41

16          THE COURT:  Same one.  How long are you going to have

17  with this exhibit?

18          MR. RAPP:  Maybe a minute or so.

19          THE COURT:  Okay.

20  BY MR. RAPP:                                             11:57:51

21  Q.  And so this is actually the start, what does -- what does

22  Scott Spear tell you on February 15th of 2008 in, and then you

23  give them these changes that was in the previous one, what is

24  he telling you here?

25  A.  So this is the -- he's attached a Word document with all of   11:58:15

1    the changes that he wants done, and I have pulled that

2    information and put it in an e-mail to him.  That's just

3    simpler for me to communicate with the developers.  Essentially

4    I had to take Scott Spear, what he wants done, and then I got

5    to make it more simply and organized for the developers to do          11:58:44

6    it.

7    Q.  In going forward with respect to both terms and images,

8    who, if anyone, did you have to get approval to make any

9    changes?

10   A.  Scott Spear.                                                        11:59:00

11   Q.  All right.  Let's look at Exhibit 1841 --

12          THE COURT:  I think before we do that, Mr. Rapp, it's

13   at the noon hour and I think we should take our lunch break

14   now.

15          And so members of the jury, just remember the              11:59:17

16   admonition not to come to any conclusions or discuss any of the

17   matters or do any research or anything of the sort.  Enjoy your

18   lunch.  Stand in recess for one hour for lunch.

19          Please all rise for the jury.

20          I will ask those in the courtroom to give the jurors     12:00:06

21   some time to make their way to get lunch uninterrupted, and we

22   will stand in recess.

23       (Proceedings concluded at 12:03 p.m.)

24

25

1

2

3

4                         **C E R T I F I C A T E**

5

6              I, HILDA E. LOPEZ, do hereby certify that I am duly

7     appointed and qualified to act as Official Court Reporter for

8     the United States District Court for the District of Arizona.

9              I FURTHER CERTIFY that the foregoing pages constitute

10    a full, true, and accurate transcript of all of that portion of

11    the proceedings contained herein, had in the above-entitled

12    cause on the date specified therein, and that said transcript

13    was prepared under my direction and control.

14             DATED at Phoenix, Arizona, this 14th day of

15    September, 2023.

16

17

18                              s/Hilda E. Lopez_____
19                              HILDA E. LOPEZ, RMR, FCRR

20

21

22

23

24

25