UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,      )
                               )
            Plaintiff,         )  NO. 2:18-cr-00422-DJH
v.                             )
                               )  Phoenix, Arizona
Michael Lacey, et al.,         )  September 13, 2023
                               )  1:03 p.m.
            Defendants.        )
_____)


**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**EXCERPTED TESTIMONY OF CARL FERRER**

**JURY TRIAL DAY 5**
**P.M. SESSION**


Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

```
 1                    A P P E A R A N C E S

 2   For the Plaintiff:
          UNITED STATES ATTORNEY'S OFFICE
 3        By:  Kevin M. Rapp, Esq.
               Andrew C. Stone, Esq.
 4             Peter Shawn Kozinets, Esq.
               Margaret Wu Perlmeter, Esq.
 5        40 North Central Avenue, Suite 1800
          Phoenix, Arizona 85004-4408
 6

 7   For the Defendant Michael Lacey:
          LIPTSUTZ GREEN SCIME CAMBRIA, LLP
 8        By:  Paul J. Cambria, Jr. Esq.
          42 Delaware Avenue, Suite 120
 9        Buffalo, New York  14202

10   For the Defendant Andrew Padilla:
          DAVID EISENBERG, PLC
11        By:  David S. Eisenberg, Esq.
          3550 North Central Avenue, Suite 1155
12        Phoenix, Arizona 85012

13   For the Defendant Scott Spear:
          KESSLER LAW OFFICE
14        By:  Eric Walter Kessler, Esq.
          6720 North Scottsdale Road, Suite 210
15        Scottsdale, Arizona 85253
          - and -
16        FEDER LAW OFFICE, PA
          By:  Bruce S. Feder, Esq.
17        2930 East Camelback Road, Suite 160
          Phoenix, Arizona 85016
18

19   For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20        By: Gary S. Lincenberg, Esq.
               Gopi K. Panchapakesan, Esq.
21        1875 Century Park E, Suite 2300
          Los Angeles, California 90067
22

23   For the Defendant Joye Vaught:
          JOY BERTRAND, ESQ, LLC
24        By:  Joy Malby Bertrand, Esq.
          P.O. Box 2734
25        Scottsdale, Arizona 85252-2734
```

UNITED STATES DISTRICT COURT

```
1                          I N D E X

2

3    GOVERNMENT WITNESS:                              PAGE

4    CARL FERRER
     Continued Direct Examination by Mr. Rapp...................7
5

6    Side bar discussion.......................................89

7

8                     INDEX OF EXHIBITS

9    EXHIBIT                                       RECEIVED

10   NO.    DESCRIPTION

11   1841   Email from Spear to Ferrer,                   8
            "URLs", 04/01/2008, DOJ-BP-0002133475
12
     1949   Email to Ferrer, "Re: Fwd: ter username"     13
13          05/15/2009, DOJ-BP-0002132458

14   1849a  Attachment.  Spreadsheet "TER-Backpage        16
            Links.xls", DOJ-BP-0002135192
15
     1851   Email from Ferrer, copying Hyer,             19
16          "Re: Willamette Week's Marketing
            Efforts (summary)", 06/17/2008,
17          DOJ-BP-0002136271 - DOJ-BP-0002136272

18   1857   Email from Ferrer to "Fwd: bp/ter links      22
            (hey dave)", 12/17/2018, DOJ-BP-0002133012
19
     1857a  Attachment.  Email to Ferrer from           23
20          "bp/ ter links", 12/17/2008,
            DOJ-BP-0002133013
21
     1857b  Email from to admin@theeroticreview,         24
22          "bp/ ter links 3", 12/02/2008,
            DOJ-BP-0002133016
23
     567    Email from Ferrer, "January Invoice for      25
24          Banner Ad", 01/12/2009, USAO-BP-0001006

25
```

1                    *INDEX OF EXHIBITS CONT'D*

2      __EXHIBITS__                                          __RECEIVED__

3      __NO.__      __DESCRIPTION__

4      567a     Attachment, Elms Web Services dated              25
                01/01/2009, USAO-BP-0000975
5
       899      Email to Spear, "Docs you requested for          28
6               Budget", 12/05/2008, DOJ-BP-0000195525

7      899e     Attachment, Manager Job Description,             28
                DOJ-BP-0000195531 - DOJ-BP-0000195532
8
       837      Email from Elms to Ferrer "TER Inbound           30
9               referral report", 11/07/2008,
                USAO-BP-0000983 - USAO-BP-0000991
10
       1941     Email to Ferrer, "new template for la",          33
11              11/08/2008, DOJ-BP-0002133132

12     1941a    Attachment: TER Promo template                   33
                DOJ-BP-0002133133
13
       1172     Email from Ferrer to Elms, "(invoice)",          34
14              12/03/2008, DOJ-BP-0002134640 -
                DOJ-BP-0002134641
15
       1172a    Attachment, Invoice, web_services_dec,           34
16              DOJ-BP-0002134642

17     1174     Email from Ferrer to Adams, "Payment plan        37
                (draft)", 01/20/2009, DOJ-BP-0002132885
18
       1935     Email from Ferrer to Spear, "Re: Fwd: BP.com     39
19              Budget and Presentation Summary", 12/14/2008,
                DOJ-BP-0000193698 - DOJ-BP-0000193699
20
       24       Email from Ferrer,  "How we are going to get     42
21              there", 12/15/2008 DOJ-BP-0002134399

22     24a      Attachment. Document discussing BP's Budget      42
                DOJ-BP-0002134400-DOJ-BP-0002134402
23
       570      Email from Ferrer to Elms, Agenda for Tues.      45
24              Feb 10th, 02/03/2009, DOJ-BP-0002132844 -
                DOJ-BP-0002132845
25

*INDEX OF EXHIBITS CONT'D*

EXHIBITS                                                              RECEIVED

NO.      DESCRIPTION

1151     Email to Ferrer, "Re: Hey Jess",                                  47
         02/02/2009, DOJ-BP-0002132854

1151a    Attachment, Google Analytics January 2009                         47
         Referring sites, DOJ-BP-0002132855 -
         DOJ-BP-0002132858

1944     Email from Ferrer to Padilla, "Dave at TER                        50
         has some more legal problems this weekend",
         02/16/2009, DOJ-BP-0002132791

573      Capture of News Article, "TheEroticReview.com
         Founder David Elms Arrested in Phoenix",
         02/17/2009, USAO-BP-015360

573a     Redacted version of Exh 573 USAO-BP-015360                        56

1862     Email from to admin@theeroticreview                               58
         (copying Ferrer), "Fwd: ter/bp links 18",
         02/18/2009,DOJ-BP-0002132785

574      Emails (with attachment) between Ferrer                           59
         and TER Staff, "Banner ad change", 02/19/2009,
         USAO-BP-015361 - USAO-BP-015365

1946     Email from Spear to Ferrer and Hyer,
         "Fwd: Re: Revised TER Animated Gifs",
         02/19/2009, DOJ-BP-0002132765

575      Email to Ferrer, "ELMS analysis (for Scott)",                     67
         02/26/2009, DOJ-BP-0002132711

28       Email from Larkin to Spear and Ferrer,                            70
         05/11/2009 DOJ-BP-0004602735- DOJ-BP-0004602736

575b     PDF of Exhibit 575-a; Attachment, ELMS                            68
         analysis Excel spreadsheet, 02/26/2009,
         DOJ-BP-0002132712

579      Emails between Ferrer and Padilla, "Craigslist                    73
         throws backpage under the bus", 05/17/2009,
         DOJ-BP-0002125289 - DOJ-BP-0002125290

*INDEX OF EXHIBITS CONT'D*

EXHIBITS                                                    RECEIVED

NO.      DESCRIPTION

902      Letter from Eight State Attorneys General,              77
         10/02/2009 DOJ-BP-0000196538 –
         DOJ-BP-0000196540

585      Email from Spear to Ferrer, "list", 11/19/2009,        85
         DOJ-BP-0002131723

585a     Attachment, Common terms and code words               85
         resulting in a post being removed 8-15-09.doc,
         DOJ-BP-0002131724

1895     Email from Adams to Ferrer, Spear,
         "2010 Backpage.com Budget / Powerpoint -
         Finals", 12/10/2009 DOJ-BP-0002127432

1895c    Sub exhibit to 1895-b; 4 pages of Backpage
         2010 Budget Presentation

588      PowerPoint presentation, 2010 Budget                  106
         Presentation, 12/10/2009, DOJ-BP-0004602403

34       Emails to and from Padilla re Dollar Bill,             95
         03/05/2010 DOJ-BP-0004602785

35       Email from Padilla to Backpage's programmers,          98
         03/18/2010 DOJ-BP-0004602786- DOJ-BP-0004602787

311      Daily Google Analytics Report, 03/22/10              110
         DOJ-BP-0004602753-DOJ-BP-0004602760

|   |   |
|---|---|
| 1 | ***P R O C E E D I N G S*** |
| 2 | *(Whereupon proceedings began at 1:03 p.m.)* |
| 3 | COURTROOM DEPUTY:  All rise, court is now in |
| 4 | session. |

01:03p 5    THE COURT:  Please be seated and let's have our jury

6    in.

7    (Jury in at 1:04 p.m.)

8    THE COURT:  All rise for the jury.

9    Please be seated.  The record will reflect the

01:05p 10    presence of our jury, the parties are present and, Mr. Rapp,

11    you may continue.

12    MR. RAPP:  Thank you, your Honor.

13    Madam clerk, if you could put the screen on for the

14    witness' eyes only.

01:05p 15    CONTINUED DIRECT EXAMINATION

16    BY MR. RAPP:

17    Q.   Mr. Ferrer, in 2008, April of 2008 did you come to learn

18    that Mr. Spear was reviewing the female escort category of

19    Backpage.com?

01:05p 20    A.   Yes, he was.

21    Q.   I'm showing you on your screen United States 1841.

22    Do you see that exhibit there on your screen?

23    A.   I do.

24    Q.   What is -- is this an e-mail?

01:06p 25    A.   It's an e-mail from Scott Spear, and it's sent to me with

1    the different URLs that had problem content.

2    Q.   All right.

3              MR. RAPP:  Move to admit 1841.

4              MR. FEDER:  Same.

01:06p  5              MR. RAPP:  And request permission to publish.

6              THE COURT:  Wait, wait, wait.  Mr. Rapp, what

7    exhibit is this?

8              MR. FEDER:  Same.

9              THE COURT:  Is it 1841 or 1849?

01:06p 10              MR. RAPP:  1841.

11              THE COURT:  1-8-4-1?

12              MR. RAPP:  1-8-4-1.

13              COURTROOM DEPUTY:  Counsel, it states 1849 at the

14    bottom in the PDF.  Is that accurate?

01:06p 15              MR. RAPP:  No.  If you look at the very top left

16    corner of the --

17              COURTROOM DEPUTY:  Okay.

18              THE COURT:  Okay, so 1841.

19              I'm sorry, Mr. Feder.

01:07p 20              MR. FEDER:  Same.

21              THE COURT:  And overruled.  1841 may be admitted.

22              (Exhibit No. 1841 admitted in to Evidence.)

23    BY MR. RAPP:

24    Q.   All right.  What is Mr. --

01:07p 25              MR. RAPP:  And request permission to publish.

1           THE COURT:  Yes, it may be published.

2           MR. RAPP:  Thank you.

3   BY MR. RAPP:

4   Q.   What is Mr. Spear telling you in this e-mail?

01:07p  5           MR. FEDER:  Speculation.

6           MR. RAPP:  Well --

7           THE COURT:  Sustained.

8           MR. FEDER:  And the document speaks for itself.

9           THE COURT:  Well, sustained.

01:07p 10           Go ahead, Mr. Rapp.

11   BY MR. RAPP:

12   Q.   Well, how about can you read what Mr. Spear tells you in

13   the bottom of this e-mail?

14   A.   Yes, he -- he sent me eight URLs of different ads on the

01:07p 15   Phoenix Backpage.

16           MR. FEDER:  Objection, the question was what does it

17   say, not what Mr. Ferrer wants to say.

18           That's what the question was, non-responsive.

19           THE COURT:  I'm sorry, is the objection you're

01:08p 20   asking him to read the e-mail?

21           MR. FEDER:  That's what Mr. Rapp asked him to do,

22   and he's going off on his own tangent.

23           THE COURT:  Go ahead and reask the question,

24   Mr. Rapp.

01:08p 25           MR. RAPP:  Sure, sure.

1    BY MR. RAPP:

2    Q.   Can you read in the highlighted portion down there?

3    A.   Yes.   "The first seven are just from today.  the last one

4    keeps popping up (from Friday) and does not pass muster.

01:08p  5    Phoenix needs a daily clean up.  Every day."  Scott or S.

6    Q.   What did you take that to mean?

7    A.   He is sending me these URLs that need to be cleaned up,

8    edited.

9    Q.   All right.  What do you mean by cleaned up?

01:09p  10   A.   Edited, remove the sex acts pics or the sex act language.

11   Q.   Okay.  Why is this -- why is he reviewing the Phoenix

12   Backpage market as opposed to any other Backpage market, if

13   you know?

14            MR. FEDER:  Speculation.

01:09p  15            THE COURT:  Overruled.

16            THE WITNESS:  The home office is in Phoenix, and so

17   the focus would be cleaning up Phoenix.

18   BY MR. RAPP:

19   Q.   All right.  And when he references the last one, the last

01:09p  20   link and said it does not pass muster, what does -- what did

21   you take that to mean?

22   A.   The last link, he wants me to remove the ad that says the

23   title "very tiny squirty nympho girl you gonna pull my

24   piggytails incall only 23."

01:10p  25   Q.   All right.

1  A.   He either wants me to remove it or edit it, but more

2  likely probably edit the pics and edit the language.

3  Q.   And did some of these --

4           MR. FEDER:  Move to strike the last part as being

5  speculation, where he says "more likely."

6           THE COURT:  Overruled.

7  BY MR. RAPP:

8  Q.   All right.  And then just to look at some of these -- the

9  links, can you read this link that Mr. Spear has identified

10 for you?

11 A.   Yes.  The title of the ad, "upscale oral expert let me

12 put my money where my mouth is 33."

13 Q.   So what did you do with these postings after you received

14 Mr. Spears' e-mail, if you recall?

15 A.   I believe I sent it -- sent this e-mail to Andrew

16 Padilla.

17 Q.   All right.  And why did you spend it to Andrew Padilla?

18 A.   He's the supervisor of moderation.

19 Q.   All right.  And during April of 2008 did you continue to

20 have -- did you continue to have this relationship with The

21 Erotic Review?

22 A.   Yes.

23 Q.   All right.  I'm showing you for the witness' eyes only

24 United States 1849, and did you have an employee that worked

25 for Backpage during this time frame by the name of Andrea

1  Sennet?

2  A.   Yes, we did.

3  Q.   And what was her role, if any, at Backpage.com?

4  A.   She was an administrative assistant for Dan Hyer where a

01:12p  5  lot of Backpage marketing activities occurred.

6  Q.   Did she have anything to do with the relationship between

7  Backpage and The Erotic Review?

8  A.   Yes, she was assigned to track the reciprocal link work

9  being done for The Erotic Review.

01:12p  10  Q.   Would that work require her to go on The Erotic Review?

11  A.   Yes, she needed to verify that there was a reciprocating

12  link.

13  Q.   And would -- by verifying a reciprocating link, by

14  definition would that require her to view the postings on The

01:12p  15  Erotic Review?

16  A.   Yes, she would have to go to the specific Erotic Review

17  posting or their review and look for the Backpage URL.

18  Q.   All right.

19          MR. RAPP:  Move to admit United States 1849.

01:13p  20          MR. FEDER:  Same.

21          MS. BERTRAND:  Objection, 801.  Lack of foundation

22  under 801(d)(2)(E).

23          THE COURT:  Sustained.

24  BY MR. RAPP:

01:13p  25  Q.   Would she have to look at the reviews of -- the

1  prostitution reviews on The Erotic Review in establishing

2  these links?

3           MR. FEDER:  Speculation and 401, 403, 801.

4           THE COURT:  Sustained as to foundation.

01:13p  5  BY MR. RAPP:

6  Q.   Do you know if she would have to look at the prostitution

7  reviews on The Erotic Review?

8  A.   Yes.

9  Q.   How do you know that?

01:14p  10  A.   Because that's what she was assigned to do this task.

11  That would require her to look at the links on The Erotic

12  Review and then track them in an Excel spreadsheet.

13  Q.   And why would she be tracking them in an Excel

14  spreadsheet?

01:14p  15  A.   So that we could measure the results of the prostitution

16  marketing activity with The Erotic Review.

17           MR. RAPP:  Move to admit 1849.

18           MS. BERTRAND:  Same objections, 801, 801(d)(2)(E),

19  lack of foundation.

01:14p  20           THE COURT:  Overruled, it may be admitted.

21           MR. RAPP:  Request permission to publish.

22           THE COURT:  Yes.

23           (Exhibit No. 1949 admitted in to Evidence.)

24  BY MR. RAPP:

01:14p  25  Q.   So what is Andrea Sennet telling Roger Williams where

1  you're copied?

2  A.   Andrea Sennet writes "Roger, Attached are the TER

3  links...a whopping 469 links!!!  CRAZINESS!!!  Thanks,

4  Andrea."

01:15p 5  Q.   All right.  And have you reviewed -- and I'll just take

6  this off the screen for a minute here.

7       Have you reviewed the attached Excel spreadsheet that

8  Andrea Sennet attached for Roger Williams and that was copied

9  -- that you were copied on?

01:15p 10  A.   Yes, I have.

11  Q.   All right.  And can you just describe what the Excel

12  spreadsheet is?

13  A.   The Excel spreadsheet has two columns.  One is the

14  Backpage URL and the other one is the -- the other column is

01:16p 15  The Erotic Review URL.  So it's a long spreadsheet of URLs.

16  Q.   All right.

17          MR. RAPP:  Move to had admit 1849a.

18          MS. BERTRAND:  Objection, lack of foundation

19  regarding the underlying data.

01:16p 20          MR. FEDER:  401, 403, 801.

21          THE COURT:  I'll sustain as to Ms. Bertrand's.

22          Maybe you can lay some more foundation, Mr. Rapp.

23          MR. RAPP:  All right.

24  BY MR. RAPP:

01:16p 25  Q.   How is this Excel spreadsheet created?

1      MS. BERTRAND:  Objection, calls for speculation.  He

2   didn't create it.

3      THE COURT:  Well, if he knows.

4      MR. RAPP:  Do you know?

01:16p  5      THE COURT:  He can ask.

6      THE WITNESS:  I requested her to make this

7   spreadsheet.  That's why I'm receiving it -- or why I'm copied

8   on it and it's -- we need it to see just how many reciprocal

9   links that we're sending to The Erotic Review.  So we needed

01:17p  10  to grow traffic.  Our budgets call for more and more growth,

11  more ad count, more revenue.  The best way to do it is with

12  The Erotic Review.  So I want to report -- I want to see the

13  report that shows that -- the link work that the staff is

14  doing with Erotic Review.

01:17p  15  BY MR. RAPP:

16  Q.   And how do they capture this data that's set forth in the

17  Excel spreadsheet?

18  A.   It's being submitted to Andrea.  Then she's verifying it

19  because we want to verify that the links are actually being

01:17p  20  done by The Erotic Review.  You might remember in that earlier

21  e-mail we need to double-check on them.  Did they do what

22  they're supposed to do?

23  Q.   All right.

24      MR. RAPP:  Move to admit 1849a.

01:17p  25      Request permission to publish.

1          MS. BERTRAND:  Objection.  Same objection regarding

2   lack of foundation as to the accuracy of the underlying data.

3          THE COURT:  Overruled.

4          MR. FEDER:  Same, also.

01:18p   5          THE COURT:  Overruled.  It's also 803(6), and so it

6   is admitted and it may be published.

7          (Exhibit No. 1849a admitted in to Evidence.)

8   BY MR. RAPP:

9   Q.   Can you -- I can't magnify this, but can you explain to

01:18p  10   the jury what they're looking at here?

11   A.   It's a pretty painful spreadsheet, but the column -- the

12   first column on this page is the Backpage link; and if you

13   click that link, you will go to a live Backpage ad, and that

14   Backpage ad will have the TER link in it, which is on the next

01:18p  15   column to the right.  So those are the TER links.

16       So those TER links will appear in the Backpage ad, and

17   then we need to go to the TER link and verify that The Erotic

18   Review has inserted the Backpage ad and the Backpage link into

19   the prostitution review page.

01:19p  20   Q.   All right.  And we looked at this previous -- we looked

21   at this previous e-mail from Mr. Spear where he was alerting

22   you to some links in Phoenix market, but do these links -- do

23   they have -- are they linking to the TER in different cities?

24   A.   Yes, they are.

01:19p  25   Q.   And -- and what cities are they linked to?

1    A.   Well, starting from the top, Miami, Washington, D.C., New

2    York, Detroit, Seattle, Raleigh.

3    Q.   So by -- by April of 2008 had Backpage expanded into even

4    more cities?

01:20p 5    A.   Yes, we were continually adding cities.

6    Q.   Okay.  And when we looked at -- does any of the

7    spreadsheet, does it have anything to do with the Google

8    Analytics report that we previously looked at that told you

9    what the referral traffic was from The Erotic Review?

01:20p 10   A.   Yes, it has very much everything to do with it.  This

11   shows the links that are driving the traffic for the referral

12   reports.

13   Q.   All right.

14        MR. RAPP:  Madam clerk, could you take this off the

01:20p 15   screen.  Thank you.

16   BY MR. RAPP:

17   Q.   Okay.  And so did you continue to have the link --

18   exchange link -- or exchange e-mails, rather, with the staff

19   at The Erotic Review to -- for this relationship to continue?

01:21p 20   A.   Yes, we did.

21   Q.   All right.

22        Looking at -- let's see, let's look at 557 for the

23   witness' eyes only, please, and 557a -- you know what, let me

24   ask you about another area here.

01:22p 25        We've talked about the super poster.  Remember we talked

1    -- you testified about that yesterday?

2    A.   Yes.

3    Q.   Did you ever have a program within Backpage that was the

4    affiliate program?

01:22p 5    A.   Yes, we did.

6    Q.   Can you explain that to the jury?

7    A.   An affiliate program is a way to have the users of

8    Backpage actually drive traffic and get paid.  So if they'll

9    create links and they'll promote Backpage, they'll get paid 10

01:22p 10   percent commission on any revenue generated from users that

11   they refer; and in the end it turned out to be more of a cash

12   back award program to where users were getting 10 percent back

13   for their postings -- for their paid postings.

14   Q.   All right.  And was that implemented in every category on

01:23p 15   Backpage.com?

16   A.   It was but only successful in the paid categories of

17   adult.

18   Q.   And as you went into -- as you went into April of -- or

19   into June of 2008, did you continue to have this aggregation

01:23p 20   program continuing?

21   A.   Yes, we did.

22   Q.   All right.  And I'm showing you on your screen there,

23   sir, United States 1851.  Do you see that there?

24   A.   Yes, I do.

01:23p 25   Q.   And is this an e-mail from you to somebody else?

1    A.    It's an e-mail from me to Michael Donhowe.

2    Q.    All right.  And is somebody else copied on it?

3    A.    Yes, Dan Hyer is copied on it.

4    Q.    And have you -- do you recall this e-mail?

01:24p  5    A.    Yes, I do.  I wrote this e-mail.

6    Q.    What is -- what is the subject matter of this e-mail?

7    A.    We -- the subject matter is a marketing strategy that

8    Michael Donhowe can use in Portland and the strategy is --

9    it's the Dallas replication strategy.  The way that we're

01:24p 10   growing prostitution content in other sites, I'm sharing that

11   strategy with Michael.

12   Q.    All right.  And so --

13             MR. RAPP:  Move to admit 1851.

14             MR. FEDER:  Same.

01:25p 15             THE COURT:  1851 is admitted and it may be

16   published.

17             (Exhibit No. 1851 admitted in to Evidence.)

18   BY MR. RAPP:

19   Q.    All right.  And so starting on the second page, is

01:25p 20   Michael Donhowe -- is he -- is he asking you something here

21   that requires you to respond in a lengthy e-mail?

22   A.    Yes, he's indicating that Portland's underperforming and

23   he wants to know why and what we can -- what he can do about

24   it.

01:25p 25   Q.    And what does that cause you to do?

1    A.   I wrote him a very long e-mail which was a to-do list

2    listing all of the activities that we were using to grow

3    content and revenue in our own newspaper sites.

4    Q.   And looking at No. 1, what do you tell him in No. 1?

01:26p   5    A.   In No. 1 I write "Goal is to add 200 new escort users in

6    the next 90 days.

7         - post in the users e-mail address with their permission.

8         - set at" -- I believe I mean "ad."

9         - "set" ad "to repost every 7 days 8 times.

01:26p  10        - When ad expires, client will get renewal e-mail and

11   will buy ad of they had good results."

12        I believe I meant "if" they had good results.

13        "- Do not add ads that are an overt sex act for

14   money...example:  '$100 for a blow job.'"

01:26p  15   Q.   All right.  And what did you mean -- what did you mean

16   when you were telling Mr. Donhowe that they will buy the ad if

17   they have good results?  What did you mean by that?

18   A.   If their phone rings.  If they have johns calling them

19   booking appointments, they will find out that the ad is on

01:27p  20   Backpage and they will renew the ad.

21   Q.   All right.  And then going to No. 2, in terms of what

22   were you telling, if anything, to Mr. Donhowe about where they

23   would seek -- what would be the sources that they would find

24   these -- these ads to bring to Backpage.com?

01:27p  25   A.   So I list -- I list four sources and Source A is

1  theeroticreview.com.  B is myredbook.com.

2  Q.   And I don't know that we've had a reference to myredbook;

3  but what, if anything, do you know about this website

4  myredbook.com?

01:28p  5  A.   myredbook.com is a -- it's a prostitution ad and review

6  site that's very strong on the West Coast.

7  Q.   All right.  And how do you know that?

8  A.   There -- we use them as a lead source.

9  Q.   Okay.  And so just so we understand what you're talking

01:28p 10  about -- just so the jury understands what you're talking

11  about, you say they are a ad site and a review site.

12      Can you explain that a little bit?

13  A.   The Erotic Review just had reviews.  Sites like myredbook

14  had ads and reviews mixed together.

01:28p 15  Q.   All right.  And so is -- is there a reason that Backpage

16  didn't have the same type of business model, if you know?

17  A.   Yes.  If we added reviews, it would just be too obvious

18  that we were in the prostitution business.  Better to be -- to

19  just have ads.

01:29p 20  Q.   All right.  And then going to just -- to three, can you

21  just -- without reading this just in the interest of time,

22  what is -- what are you telling Mr. Donhowe?  What are you

23  giving him an example of here?

24  A.   I give him the same script that I had read earlier on how

01:29p 25  to contact people and create ads in the female escorts

1    category.

2    Q.   All right.  So as you went into -- so that's aggregation.

3    As you continued on into September through the end of the year

4    of 2008, did you continue on having a relationship with The

01:30p  5    Erotic Review?

6    A.   Yes.

7    Q.   So I'm showing you for the witness' eyes only 1857.

8         Do you recognize this?

9    A.   Yes, I do.

01:30p 10    Q.   Is this an e-mail from you to The Erotic Review?

11    A.   Yes, it's an e-mail from me to The Erotic Review.

12    Q.   All right.

13         MR. RAPP:  Move to admit 1857.

14         MR. FEDER:  Same.

01:30p 15         THE COURT:  Overruled.

16         MR. RAPP:  Request permission to publish.

17         THE COURT:  It is admitted and it may be published.

18         MR. RAPP:  Thank you.

19         (Exhibit No. 1857 admitted in to Evidence.)

01:30p 20    BY MR. RAPP:

21    Q.   So who are you sending this e-mail to?

22    A.   I'm intending it to go to David Elms and I'm sending it

23    to admin@theeroticreview.com, one of his e-mail addresses.

24    Q.   All right.  And what are you telling him in this e-mail?

01:31p 25    What do you tell him in this first line?

1    A.   I'm telling him, "The check is in the mail to you today,"

2    because he was always asking for money.  We had set up a deal

3    where we would send him $4,000 a month if he would maximize

4    the reciprocal links.  We wanted more referral traffic.

01:31p  5    Q.   All right.  I'm now showing you 1857a.  This is for the

6    witness' eyes only.

7         What does 1857 -- what is attached to 1857 as "a"?

8    A.   This exhibit is from -- hold on.  I need some time to

9    read this.

01:32p  10        Roger Williams is sending me an e-mail that's telling me

11   that The Erotic Review has not sent any confirmation e-mails

12   back from our request to have them add the Backpage links to

13   the different prostitution review pages.

14   Q.   All right.

01:32p  15            MR. RAPP:  Move to admit 1857a.

16            MS. BERTRAND:  Objection, hearsay, lack of

17   foundation under 801(d)(2)(E).

18            MR. FEDER:  Same.

19            THE COURT:  Overruled, it may be admitted.

01:32p  20        *(Exhibit No. 1857a admitted in to Evidence.)*

21            MR. RAPP:  Request permission to publish.

22            THE COURT:  Yes, it may be published.

23            MR. RAPP:  Okay.

24   BY MR. RAPP:

01:32p  25   Q.   Just so the jury knows what we're talking about, what is

1    -- again, what is he telling you about the links with The

2    Erotic Review?

3    A.   He states, "Batches 4 and 5 where sent out too and no

4    confirmation came back.  I can not find them in my sent file,

01:33p  5    I must've erased them by accident as I'm always cleaning" out

6    -- "I'm always cleaning old sent emails.  I can assure you

7    that they were sent out and I made sure all bp/ter links are

8    CCed to you."

9    Q.   Why is he alerting you to this?  Why do you care about

01:33p 10    this?

11   A.   Because I want referral traffic to grow.  I'm tasked with

12   growing the site.

13   Q.   All right.  And now going to 1857b, the witness' eyes

14   only.

01:33p 15        And is this a follow-up?  Is this related to that e-mail

16   that he just sent you?

17   A.   Yes, it's a -- it's another e-mail requesting The Erotic

18   Review to add Backpage links to their pages.

19             MR. RAPP:  Move to admit 1857b and request

01:34p 20    permission to publish.

21             MS. BERTRAND:  Objection, hearsay.

22             THE COURT:  Overruled, it may be admitted and it may

23   be published.

24             (Exhibit No. 1857b admitted in to Evidence.)

01:34p 25    BY MR. RAPP:

1  Q.   And so this is -- is this similar to some other e-mails

2  with links in them -- with Erotic Review links and Backpage

3  links?

4  A.   Yes.

01:34p  5  Q.   All right.  Moving on for the witness' eyes only 567 and

6  567a for the witness' eyes only.

7       Do you recognize 557 (sic) and 557a (sic)?

8  A.   Yes, I do.

9  Q.   And is this a e-mail -- who is this an e-mail from to

01:35p  10  you?

11  A.   It's an e-mail to Jess Adams from myself and I'm asking

12  -- you know, I'm sending Jess the invoice for The Erotic

13  Review for their $4,000 in payment, and I'm asking him when

14  can we have the payment.

01:35p  15       MR. RAPP:  Move to admit 567 and 567a and request

16  permission to publish.

17       MR. FEDER:  Same.

18       THE COURT:  Overruled, it may be admitted and

19  published.

01:35p  20       MR. RAPP:  Thank you.

21       *(Exhibit Nos. 567 and 567a admitted in to Evidence.)*

22  BY MR. RAPP:

23  Q.   And so down here what is -- who is e-mailing you down

24  here?

01:35p  25  A.   It's David Elms again and he's indicating -- he's asking

 1  me, "When do you think you can send the next payment."

 2  Q.   And then --

 3          THE COURT:  Can -- can I interrupt one -- one

 4  second.

01:36p 5          MR. RAPP:  Yes, ma'am.

 6          THE COURT:  Can you clarify is it 557 or 567?

 7          MR. RAPP:  I believe I said 567, but if I said 557

 8  that's in error.

 9          THE COURT:  Yeah, I have both citations.  Can you

01:36p 10  just look at the exhibit and clarify.

11          MR. RAPP:  Sure.  Yes, this is 567 up at the top.

12          THE COURT:  5-6-7?

13          MR. RAPP:  5-6-7, yes.

14          THE COURT:  Thank you.

01:36p 15  BY MR. RAPP:

16  Q.   And then so at the top here -- who are you e-mailing

17  about Mr. Elms' request to be paid?

18  A.   I'm e-mailing Jess Adams, who is the accountant at -- for

19  Backpage.  He works in the same building as Scott Spear.

01:36p 20  Q.   And who is -- who is Jess Adams?  What is his role in

21  Backpage?

22  A.   He's the Backpage accountant.  He's responsible for

23  putting together the numbers and the budget for Scott Spear.

24  Q.   And who is his direct supervisor?

01:37p 25  A.   So his direct supervisor is Jess -- or is Scott Spear,

 1    but I think he's also talking a lot with Jed Brunst, whose

 2    office is right next to Jess Adams' cubicle.

 3    Q.   All right.  Why would he be talking to Jed Brunst?

 4           MR. PANCHAPAKESAN:  Objection, foundation,

01:37p  5    speculation.

 6           THE COURT:  Sustained.

 7    BY MR. RAPP:

 8    Q.   Why in his capacity as a bookkeeper would he have any

 9    contact with Jed Brunst?

01:37p 10           MR. PANCHAPAKESAN:  Same objection.

11           THE COURT:  If you know.

12           MR. RAPP:  If you know.

13           THE WITNESS:  Answer?  Because Jess Adams is

14    responsible for the money and the accounting, and it has

01:37p 15    everything to do with the CFO's responsibilities.

16    BY MR. RAPP:

17    Q.   All right.  Now, looking at 567a, what is this?

18    A.   So this is an invoice that was -- that I created for

19    David Elms so he could get paid.

01:38p 20    Q.   All right.  And is there a reason why there's no

21    reference to Mr. Elms' company, The Erotic Review, on this

22    invoice, if you know?

23    A.   Yeah, the reference is to Elms Web Services, Inc.  So

24    that's -- the check will be cut to Elms Web Services, Inc.  I

01:38p 25    have to have this invoice and then do a request for payment

1    for Scott Spear and Jed Brunst to approve.

2    Q.   All right.  And -- but why didn't you put The Erotic

3    Review anywhere on this so they would know where it was being

4    paid?

01:39p  5    A.   David Elms requested that I make it payable to this

6    company, and I didn't question it.

7    Q.   All right.  I'm now showing you 899 for the witness' eyes

8    only.  Is this an e-mail from you to Scott Spear?

9    A.   Yes.

01:39p 10    Q.   And what is it that -- what is it that you're attaching

11    to this e-mail?  Let me just show you 899e.

12        Do you see that there --

13    A.   Yes.

14    Q.   -- second page?

01:40p 15    A.   Yes.

16    Q.   All right.

17            MR. RAPP:  Move to admit Exhibit 899 and 899e.

18            MR. FEDER:  Same objection, plus Rule 106.  There's

19    more than one attachment, and he's only using one.

01:40p 20            THE COURT:  Overruled.  It may be admitted and

21    published.

22            MR. RAPP:  Thank you.

23            (Exhibit No. 899 and 899e admitted in to Evidence.)

24    BY MR. RAPP:

01:40p 25    Q.   So in point No. 1 what are you giving Mr. Spear?  What

1   are you telling Mr. Spear is attached to this?

2   A.   Mr. Spear requested that I create the job descriptions

3   for all the managers.

4   Q.   All right.

5   A.   Which I did.

6   Q.   And then going to 899e and drawing your attention down to

7   Mr. Padilla down at the bottom, do you see that there?

8   A.   Yes.

9   Q.   And then going to the second page of 899e, what was part

10  of Mr. Padilla's job description while he was at backpage.com?

11  A.   He managed the moderation department and then I told him,

12  "You also manage staff for reciprocal link relationships with

13  select sites."

14  Q.   All right.  And does that include The Erotic Review?

15  A.   It only includes The Erotic Review.  I was just using

16  kind of vague language intentionally.

17  Q.   All right.  Now, going to Exhibit 837 for the witness'

18  eyes only.  Do you see that on your screen, sir?

19  A.   Yes, I do.

20  Q.   Is this a e-mail from Mr. Elms to you?

21  A.   Yes, it is.

22  Q.   And what is the subject of this e-mail?

23  A.   "TER INBOUND REFERRAL REPORT."

24          MR. RAPP:  Move to admit Exhibit 837.

25          MS. BERTRAND:  Objection, hearsay.  Objection, lack

1   of foundation as to the underlying data.

2         THE COURT:  Why don't you lay some foundation,

3   Mr. Rapp.

4         MR. RAPP:  Sure.

01:42p 5   BY MR. RAPP:

6   Q.   What -- do you -- is Mr. Elms giving you a series of

7   links in this -- this e-mail?

8   A.   He's sending me a report that shows the traffic that's

9   coming to The Erotic Review and which Backpage ads are sending

01:43p 10  The Erotic Review traffic.  Users from Backpage clicking links

11  to The Erotic Review and going to The Erotic Review, that's

12  what this report counts.

13  Q.   And why would this be anything that you would want to

14  know?

01:43p 15  A.   I want to see how valuable our traffic is to The Erotic

16  Review.

17         MR. RAPP:  Move to admit 837.

18         THE COURT:  It may be admitted.

19         MR. RAPP:  And request permission to publish.

01:43p 20         THE COURT:  Yes, it may be published.

21         (Exhibit No. 837 admitted in to Evidence.)

22  BY MR. RAPP:

23  Q.   And so if you could just explain for the jury what --

24  what these links are and if you could explain what this

01:43p 25  particular number, if you know, is on the side.

```
 1   A.   So that's a count on the left.  So starting with, like,

 2   the first one, 106 visits came from Cleveland Backpage and

 3   then -- and this is just for one day.  And then 61 came from

 4   this ad in Phoenix, the milf next door ad.
```

01:44p  5   Q.   All right.  And would that be the same case with each of

```
 6   the numbers with the corresponding city --

 7   A.   Yes.

 8   Q.   -- in the link?

 9        All right.  And why was this important, if it was, to
```

01:44p 10   you?

```
11   A.   This shows the Backpage users looking at female escort

12   ads.  It shows how many times they're going to The Erotic

13   Review.

14   Q.   All right.  And is this the second page same -- same with
```

01:44p 15   the number on the left and the corresponding city, for

```
16   example?

17   A.   Yes, and it shows the count and it just shows so many

18   cities that The Erotic Review is really important to us to

19   market in the US in all cities.
```

01:45p 20   Q.   And then going to Page 3, is this the same?

```
21   A.   The same.

22   Q.   Page 4?

23   A.   More cities, yes, more ads.

24   Q.   Page 5?
```

01:45p 25   A.   Yes.

 1  Q.   Page 6?

 2  A.   Yes.

 3  Q.   Page 7?

 4  A.   Yes.

 5  Q.   Page 8?

 6  A.   Yes, it's a long report.

 7  Q.   Page 9?

 8  A.   Page 9 has a summary at the bottom.

 9  Q.   And what is -- what is the significance, if any, of this

10  summary?

11  A.   That summary is 1,128 times someone on Backpage went to

12  The Erotic Review reviews for that particular day and it

13  happened on 232 separate ads.

14  Q.   All right.  Moving on to Exhibit 1941 for the witness'

15  eyes only, is this an e-mail from Mr. Williams to you?

16  A.   Yes.

17  Q.   And -- and what is -- what is he telling you in this

18  e-mail?

19  A.   He's giving me a report on Los Angeles.  I've asked him

20  to work hard on getting content and reciprocating links in the

21  Los Angeles market.

22  Q.   All right.

23            MR. RAPP:  Move to admit Exhibit 1941 --

24            MR. FEDER:  Same.

25            MR. RAPP:  -- and also 1941a.

1        MR. FEDER:  Same.

2        THE COURT:  Overruled.  1941 and 41a may be admitted

3   and published.

4            (Exhibit Nos. 1941 and 1941a admitted in to

01:47p  5   Evidence.)

6   BY MR. RAPP:

7   Q.   All right.  Looking at 1941, is this what you were

8   referring to about the Los Angeles market?

9   A.   Yes.

01:47p 10   Q.   And why was the Los Angeles market important, if it was?

11   A.   It wasn't doing as well.  We were competing against

12   myredbook and not doing as well as, let's say, New York City.

13   Q.   All right.  And then 1941a, can you explain this to the

14   jury?

01:48p 15   A.   Yes, this is Roger Williams' e-mail campaign that he's

16   going to send to e-mail addresses of prostitution advertisers

17   in the LA market.

18   Q.   All right.  Can you just read this for the -- for the

19   jury?

01:48p 20   A.   "We are offering a free 6 week ad on backpage.com to

21   providers with 'only' good TER reviews.  The Erotic Review and

22   Backpage.com are working together to provide better service to

23   its viewers and providers such as yourself.  Included in the

24   free post will be a link to your TER reviews at."

01:48p 25   Q.   And what did you take only -- quote/unquote "only good

1   TER reviews" to mean?

2   A.   Well, let me make sure I -- it's going to be escorts that

3   do have sex for money.

4   Q.   All right.  All right.  Let's look at 1172 for the

01:49p   5   witness' eyes only, and is this an e-mail between you and

6   Mr. Elms?

7   A.   Yes, it is.

8          MR. RAPP:  Move to admit 1172.

9          MR. FEDER:  Same.

01:49p  10          THE COURT:  Overruled, it may be admitted.

11          MR. RAPP:  And just for a moment before you publish

12   just so we could do this all in one.

13   BY MR. RAPP:

14   Q.   Is there a -- also attached to this is 1172a.  Do you see

01:50p  15   that there, sir?

16   A.   Yes, I do.

17   Q.   And is that attached to 1172?

18   A.   It is.  It's the invoice for another month.

19   Q.   All right.

01:50p  20          MR. RAPP:  For the record, move 1172 and 1172a in to

21   evidence and request permission to publish, Your Honor.

22          THE COURT:  Yes, 1172 and 72a are admitted and may

23   be published.

24          MR. RAPP:  Thank you.

01:50p  25          *(Exhibit No. 1172 and 1172a admitted in to*

 1    *Evidence.)*

 2    BY MR. RAPP:

 3    Q.   And so what are you telling Mr. Elms at the top of this

 4    e-mail?

01:50p 5  A.   I write, "David, we are adding you to our budget each

 6    month.  The attached invoice I will send to accounting to get

 7    paid this month."

 8    Q.   Let me just stop you there.  When you are adding David

 9    Elms to the budget each month, who has to be aware of that

01:51p 10 within backpage.com?

11    A.   I have to get Scott Spear's permission to spend this kind

12    of money because it's not in the budget.

13    Q.   All right.  And then underneath what do -- do you discuss

14    with him referrals and links?

01:51p 15 A.   Yes.  I write, "How do we go from 20k to 50k in referrals

16    again?  My staff sends good links.  Your staff finds links."

17    Q.   What did you mean by that?

18    A.   I'm hoping that The Erotic Review staff will start

19    posting Backpage links on their own to the reviews on their

01:51p 20 site.

21    Q.   All right.  And then just going down here, is this yet

22    another e-mail from The Erotic Review with links?  Can you

23    explain this to the -- the jury?

24    A.   I believe this is an e-mail from Backpage staff to The

01:52p 25 Erotic Review because I'm pointing out that here's the four

```
      1   URLs that you did and it's not very much for production.  Four
      2   is not enough.
      3   Q.   All right.  Why isn't four enough?
      4   A.   Because we need 400 done.  We -- we have significant --
01:52p 5  we have, like, double digit revenue goals in the budget, and
      6   The Erotic Review is the most successful way for the company
      7   to hit those numbers, and it's something that was communicated
      8   in the budget in management meetings.
      9       So David Elms is letting me down here despite sending him
01:52p 10 $4,000.
      11  Q.   All right.  And let's look at 1172a.  What is this?
      12  A.   This is another invoice for Elms Web Services to
      13  Backpage.
      14  Q.   All right.  And just to be clear, did you ever write the
01:53p 15 check to Elms Web Services?
      16  A.   I can't sign checks.
      17  Q.   All right.
      18  A.   I can't write checks.
      19  Q.   All right.  Let's look at 1857 for the witness' eyes
01:53p 20 only.  All right.  And what are you telling Mr. Elms here?
      21  A.   I'm telling him once again "the check is in the mail."
      22          MR. RAPP:  Move to admit Exhibit 1857.
      23          THE COURT:  I think it's already admitted.
      24          MR. RAPP:  Oh, I see.
01:54p 25          All right, let's go to 1174 for the witness' eyes
```

1  only.

2         THE COURT:  Let me double check with my courtroom

3  deputy.

4         COURTROOM DEPUTY:  Yes.

01:54p  5         THE COURT:  It has been previously admitted.

6         MR. RAPP:  Got it.  Let's go to 1174.

7  BY MR. RAPP:

8  Q.   Is 1174 an e-mail from you?

9  A.   Yes, I'm asking Jess to find that check to TER.

01:54p 10  Q.   All right.  And as part of this e-mail string, is there

11  an e-mail exchange between you and Mr. Elms?

12  A.   Yes, Mr. Elms wants to know where his money is yet again.

13  Q.   All right.

14         MR. RAPP:  Move to admit 1174.

01:54p 15         MR. FEDER:  Same.

16         THE COURT:  Yes, it may be admitted.

17         MR. RAPP:  And request permission to publish.

18         THE COURT:  Yes.

19         (Exhibit No. 1174 admitted in to Evidence.)

01:54p 20  BY MR. RAPP:

21  Q.   Just starting down here, can you explain what you're

22  telling Mr. Elms?

23  A.   Letting David Elms know that this -- we've paid January.

24  February's paid.  The payment's on its way.  I will submit

01:55p 25  March's payment on February 1st and he should be expect it

```
 1   February 15th.  So I'm giving him a schedule so he knows when

 2   his check's coming in.

 3   Q.   And then do you forward that e-mail exchange up to

 4   somebody else in Backpage?
```
01:55p 5   A.   I send this e-mail exchange to Jess Adams.  I know it

```
 6   takes two weeks to cut a check out of Building B.  So, you

 7   know, I want him to track the check and see if it's been

 8   created and sent to the client.

 9   Q.   All right.  Now, going to United States 1935 for the
```
01:56p 10   witness' eyes only.

```
11       Now, who is this an e-mail exchange with?

12   A.   This is an e-mail from myself to my supervisor, Scott

13   Spear.

14   Q.   All right.  And what is the subject matter of this
```
01:56p 15   e-mail?

```
16   A.   Yeah, that helps.  Could you go back a page?

17   Q.   Yes.  Yes, sir.

18   A.   This is -- we're going over the material for the budget

19   presentation, which is in December of 2008, and, you know,
```
01:57p 20   there's a -- we're outlining how we're gonna grow the site in

```
21   2009.

22   Q.   All right.  And we had this same discussion in 2007.  Is

23   this something that happens every December?  Is there

24   discussions about the budget for the following year?
```
01:57p 25                MS. BERTRAND:  Objection, leading.

1          THE COURT:  Overruled.

2          THE WITNESS:  Yes, it's just baked into the company.

3    It's part of the routine.  Start working on the budget in

4    November, present the budget in December.  Account for all

01:57p  5    wages, salaries, increases, and provide a marketing strategy.

6          MR. RAPP:  Move to admit United States 1935 and

7    request permission to publish.

8          MR. FEDER:  Same.

9          THE COURT:  It may be admitted and it may be

01:58p 10    published, overruled.

11          (Exhibit No. 1935 admitted in to Evidence.)

12    BY MR. RAPP:

13    Q.   So this is a two-page document.  Starting on the last

14    here, the second page, is this -- who is this e-mail here on

01:58p 15    the second page coming from?

16    A.   It's coming from Scott Spear.

17    Q.   And what is he referencing here related to the budget?

18    A.   What he says is, "Also I would like to have the 14 day

19    Google page reviews and visits numbers for December 1 - 14

01:58p 20    ready to discuss as a baseline for where we are at now," and

21    this used to really frustrate me with Scott Spear.

22    Q.   Why is that?

23    A.   Because a base --

24          MR. FEDER:  Speculation.

01:58p 25          THE COURT:  One moment.

```
 1              THE WITNESS:  I can answer.

 2              THE COURT:  Wait, wait.

 3          I'm going to sustain the objection, Mr. Rapp.

 4              MR. RAPP:   All right.

01:59p  5  BY MR. RAPP:

 6  Q.   But you say -- what do you say in response to him up here

 7  in response?  What do you say to him?

 8  A.   I state, I attached an example of the google referral

 9  report (compares the first 13 days in November to the first 13

01:59p 10  days in December.  Is this what you are looking for?

11  Q.   All right.  And if you know, why is this important?

12  A.   Because that's the baseline, and when Scott Spears says

13  baseline --

14              MR. FEDER:  Objection.  Hearsay, speculation.

01:59p 15              THE COURT:  Overruled.

16              THE WITNESS:  He said he was going to use it as a

17  baseline.  That means he's gonna sort of take the best

18  possible traffic that we were ever at, and that's where we're

19  going to start for the month of January 2009.  It's very

02:00p 20  aggressive.  It's growth on top of growth.

21  BY MR. RAPP:

22  Q.   All right.  And I just want to draw your attention just

23  so we understand where we are in this e-mail.  Do you see this

24  portion of this e-mail chain from Scott Spear?

02:00p 25  A.   Yes.
```

 1   Q.   And could you go down to under "it includes."

 2        You see that?

 3   A.   Yes.

 4   Q.   All right.  And can you read this portion of the e-mail

**02:00p**  5   starting here?  Maybe -- let me make that better.  Right --

 6   right there, "Additional."

 7   A.   "...Additional marketing (TER, PR) Automated Spam program

 8   (Basian filter?) Other big development chores (you list) Other

 9   stuff you can identify."

**02:01p** 10   Q.   What did you take that to mean from Mr. Spear?

11        MR. FEDER:  Objection.  Hearsay, speculation.

12        THE COURT:  Sustained.

13   BY MR. RAPP:

14   Q.   What direction did you take from Mr. Spear's e-mail to

**02:01p** 15   you regarding the marketing strategy?

16   A.   This is gonna include the budget for paying The Erotic

17   Review the $4,000 per month.

18   Q.   All right.  Now, let's look at Exhibit 24.

19        All right, is this an e-mail from you?

**02:02p** 20   A.   Yes, it is.

21   Q.   All right.  Who are you sending it to?

22   A.   I'm sending it to Jess Adams, the Backpage accountant.

23   Q.   All right.  And let's look at 24a and what is 24a?

24   A.   24a is a very detailed list of all of the marketing tasks

**02:02p** 25   that Backpage is gonna engage in to grow the site in 2009.

1   Q.   All right.

2            MR. RAPP:  Move to admit 24 and 24a.

3            MR. FEDER:  Same.

4            THE COURT:  Overruled.  24 and 24a are admitted and

02:03p  5   they may be published.

6            MR. RAPP:  Thank you.

7            *(Exhibit No. 24 and 24a admitted in to Evidence.)*

8   BY MR. RAPP:

9   Q.   Just so we go back to the transmission e-mail, what is

02:03p  10  Mr. Adams telling you?

11  A.   He's requesting a copy of how to get their document that

12  we've put together, the final doc.

13  Q.   All right.  And what is the reference here to?

14  A.   I believe he -- well, he writes "Wasn't attached to

02:03p  15  Scott's."  I'm thinking Scott's e-mail perhaps, guessing.

16  Q.   And then going to 24a, can you explain what is meant by

17  "HOW WE ARE GOING TO GET THERE IN 2009."

18  A.   So this document lists the task on how we're going to get

19  there in 2009 and Scott Spear, Jess Adams and myself are

02:04p  20  presenting this to Jim Larkin and Jed Brunst.

21  Q.   All right.  And just drawing your attention -- I know

22  there's a number of them, but I'm just gonna focus on a couple

23  here.  Focusing you on 3 and 4, can you read that?

24  A.   Yes.  Under 3 we're gonna increase the Dallas staff.

02:04p  25  We're gonna add six people, use an internal affiliate program

 1   to re-create the Dallas success in other markets.  The type of

 2   commission program.  "Example:  Two people secure 40 new users

 3   per day with a free post.  Then, 50% convert to paid 60 days

 4   later at $5 a post."

02:05p 5   Q.   All right.  What is this referring to when it says

 6   "re-create Dallas's success"?  What category are we talking

 7   about here when it says "increase Dallas staff"?

 8   A.   These six people will be working in other cities, not

 9   Dallas, to re-create the success Dallas is having in the

02:05p 10   female escorts category and paying them commission using an

 11   affiliate program.

 12   Q.   All right.  Let's jump to No. 7, and what are you telling

 13   Mr. Spear and Mr. Brunst and Mr. Larkin about the marketing

 14   efforts?

02:06p 15         MR. PANCHAPAKESAN:  Objection, assumes facts.

 16         THE COURT:  What was the objection?

 17         MR. PANCHAPAKESAN:  Assumes facts, lacks foundation.

 18         THE COURT:  Overruled.

 19         THE WITNESS:  Item 7, "Marketing.  TER - high page

02:06p 20   view per referral.  Identify new referral partners.  PR -

 21   Articles, Wikipedia and DMOZ entry and press releases."

 22         So those are the three tasks in marketing.

 23   BY MR. RAPP:

 24   Q.   All right.  And can you explain what the "TER - high page

02:06p 25   view per referral" means?

```
 1   A.   That's an abbreviation of the reciprocal link program.
 2   Q.   All right.  And when B -- what is it meant by "Identify
 3   new referral partners"?
 4   A.   To see if we can find any other partners like The Erotic
 5   Review.  It's been a successful program.  Are there any other
 6   type of sites that could send us referrals?
 7   Q.   All right.  And No. C, "PR - Articles, Wikipedia and DMOZ
 8   entry and press releases," what did that refer to?
 9   A.   That's the sort of boring SCO task that you need to do.
10   You're trying to get Backpage links on different places.
11   Q.   All right.  Now, going into 2009, how was the alternative
12   newspapers doing for Mr. Lacey, Mr. Spear, Mr. Brunst and
13   Mr. Larkin?
14   A.   They're not growing like backpage.com is growing.
15   Q.   All right.
16   A.   Backpage has got double digit growth every month,
17   certainly every year, sometimes monthly.
18   Q.   Now, showing you 570, do you continue on into 2009 with
19   your relationship with The Erotic Review?
20   A.   Yes, I do.
21   Q.   All right.  Showing you an exhibit -- or Government's
22   Exhibit 570, is this an e-mail exchange between you and
23   Mr. Elms?
24   A.   Yes, it is.
25   Q.   All right.
```

02:07p (line 5)
02:07p (line 10)
02:08p (line 15)
02:08p (line 20)
02:08p (line 25)

1              MR. RAPP:  Move to admit 570.

2              MR. FEDER:  Same.

3              THE COURT:  Overruled.  It may be admitted and

4    published.

02:08p  5      MR. RAPP:  Thank you.

6              (Exhibit No. 570 admitted in to Evidence.)

7    BY MR. RAPP:

8    Q.   Can you just tell us what this e-mail -- what the subject

9    matter of this e-mail is?

02:09p 10   A.   I'm arranging travel and a meeting at David Elms'

11   location once again because we want more referrals from him,

12   and the plan is to have him hire employees to do this work.

13   Q.   All right.  And does this e-mail -- does this e-mail have

14   something to do with arranging for you to meet at The Erotic

02:09p 15   Review offices to do training?

16   A.   Yes.  Yes, it does.

17   Q.   All right.  I'm now showing you 1151, the witness' eyes

18   only, and 1151a.

19        Do you recognize 1151 and 1151a?

02:10p 20   A.   Yes, I do.  It's a referral report.  Shows where the

21   traffic's coming from to -- that's landing on Backpage, a

22   referral report.

23   Q.   And is this an e-mail exchange between you and Mr. Adams

24   with that referral report attached?

02:10p 25   A.   Yes, it is.

1    Q.   All right.

2              MR. RAPP:  Move to admit 1151 and 1151a.

3              MS. BERTRAND:  Objection, 801 and lack of foundation

4    as to the underlying data in the report.

02:10p  5              MR. FEDER:  Also same.

6              THE COURT:  And, Mr. Rapp, I'll sustain the

7    foundation objection, but otherwise overruled.

8              MR. RAPP:  All right.

9              THE COURT:  If you lay some foundation.

02:11p  10              MR. RAPP:  Yeah.

11   BY MR. RAPP:

12   Q.   So the e-mail exchanges, did you frequently have e-mail

13   exchanges with Mr. Adams?

14   A.   Yes, I did.  He was the Backpage accountant and he's like

02:11p  15   -- he helps me run reports and provide data.

16   Q.   And then this referral report that's attached to this

17   e-mail, is this something that you would get periodically?

18   A.   Yes, it was really important to the company.  The

19   referral report was shared with my bosses and supervisor,

02:11p  20   Scott Spear, Jim Larkin.

21   Q.   And where did you obtain the referral report?

22   A.   We used Google Analytics, a vendor, to run those reports.

23   Q.   And did you have to pay to get those reports?

24   A.   Eventually we would.  When our traffic started to become

02:11p  25   billions of page use per month, then Google wanted money from

 1   us; but when we stayed under like a billion, the service was

 2   still free.

 3   Q.   And how frequently did you receive these reports?

 4   A.   We had to run those reports -- well, I paid attention to

02:12p   5   them daily, weekly; but we had to run those reports in the

 6   company monthly so we could provide this monthly report to

 7   Spear and others in the company that showed the page use and

 8   we can only track that through Google Analytics.

 9   Q.   All right.

02:12p  10        MR. RAPP:  Move to admit 1151 and 1151a.

11        MS. BERTRAND:  Same objection.

12        THE COURT:  Overruled.

13        MR. FEDER:  Same.

14        THE COURT:  Overruled.

02:12p  15        MS. BERTRAND:  Same objection under Rule 16, lack of

16   disclosure regarding the underlying data.

17        THE COURT:  Overruled.

18        MR. RAPP:  Request permission to publish, Your

19   Honor.

02:12p  20        THE COURT:  Yes, they are admitted and may be

21   published.

22        (Exhibit No. 1151 and 1151a admitted in to

23   Evidence.)

24   BY MR. RAPP:

02:12p  25   Q.   All right.  1151, starting down here, what are you --

 1  what are you telling Mr. Adams?

 2  A.   So I have permission to book a flight to go to LA to meet

 3  with David Elms, but I want to take the invoice with me so I

 4  need the check.  I want it by February 15th -- or Dave needs

02:13p  5  the check on or before February 15th.  So I'm flying out

 6  Tuesday, February 10th.  I'd like to give him the check in

 7  person.

 8  Q.   All right.  And then Mr. Adams, what does he tell you

 9  regarding -- what does he tell you?

02:13p 10  A.   Mr. Adams writes, "Turned this in to A/P - thought I'd

11  double check his referrals, interesting stuff on GA for

12  referring sites!  Indeed seems stronger than I would have

13  thought.  Looks like TER is sending over what we are paying

14  for."

02:14p 15  Q.   And what did you take that to mean?

16  A.   That we -- that it's worth the money, that it's worth the

17  $4,000 check that we're sending to David Elms.

18  Q.   Okay.  And there's one little entry here.  Do you see

19  that there?

02:14p 20  A.   Yes, "Turned this in to A/P."

21  Q.   What did that -- what's that mean?

22  A.   In order for a check to be cut, it has to go to accounts

23  payable, and then the check needs to be signed by at least

24  one, sometimes two, of the principles that can sign checks.  I

02:14p 25  believe that's Jed Brunst, Scott Spear, two signers.

 1   Q.   All right.  And then looking at 151a, fair to say this is

 2   a multiple-page document?

 3   A.   Yes.

 4   Q.   All right.  And just starting at the top here, what does

02:15p  5   this refer to?

 6   A.   So this is "Referring Sites."  It's where users are on

 7   some other site and then they click a Backpage link and arrive

 8   on Backpage.

 9   Q.   And does it tell you for what time frame it is giving you

02:15p 10   reports on referral traffic?

11   A.   Yes, the month of January.

12   Q.   And then going down here, can you explain to the jury

13   what these -- this data means here?

14   A.   The most important number is visits.  8,335,110 users

02:16p 15   visited Backpage after clicking a link to Backpage.

16   Q.   All right.  And then going down here, what type of

17   information do you find here?

18   A.   Well, after you exclude the home page of backpage.com --

19   www.backpage.com, the referral that isn't backpage.com, the

02:16p 20   number one referral is The Erotic Review with 521,567 visits.

21   It just overwhelms.  It's larger than any other referring

22   site, significantly larger.

23   Q.   All right.  And is there any other figure in that row

24   that is important to you in evaluating the referral traffic?

02:17p 25   A.   There is.  The next figure that's important is this one.

```
 1   That would be the page -- page views when someone lands on

 2   backpage.com because when they come from The Erotic Review,

 3   they land on a page one time and then they look at 11 more

 4   pages on Backpage, which shows that the content on Backpage is

 5   very relevant to The Erotic Review user.

 6   Q.   All right.  And who reviewed this Google Analytics report

 7   within Backpage, if you know?

 8   A.   Myself, Dan Hyer, Scott Spear.  It's presented in

 9   management meetings with Jed Brunst and Jim Larkin.

10   Q.   All right.  Let's look at United States 1944 for the

11   witness' eyes only, and is this an e-mail from you to someone?

12   A.   It's an e-mail to Roger Williams doing the adult

13   marketing activity in Phoenix.

14   Q.   And anybody else?

15   A.   It's from me but it's copied to Andrew Padilla.

16   Q.   All right.

17            MR. RAPP:  Move to admit 1944 and request permission

18   to publish.

19            MR. FEDER:  Same.

20            THE COURT:  It may be admitted and published.

21            (Exhibit No. 1944 admitted in to Evidence.)

22   BY MR. RAPP:

23   Q.   Are you telling Mr. Padilla and Mr. Williams in this

24   e-mail?

25   A.   Well, the subject line sort of states it all.  "Dave at
```

02:17p  5
02:18p 10
02:18p 15
02:18p 20
02:19p 25

1    TER has some more legal problems this weekend."

2    Q.   Okay.  And at this time did Mr. Elms no longer become

3    your point of contact at The Erotic Review?

4    A.   That's correct.

02:19p 5    Q.   And then what are you telling Mr. Padilla and Roger

6    Williams about The Erotic Review links?

7    A.   I state to Roger, "I need you to continue doing TER

8    links.  Attack the craig links before city vibe gets to them.

9    Be sure to cc me email that you send to TER.  Traffic is down

02:20p 10   in escorts and TER is a way to reverse this."

11   Q.   And what did you mean by that?

12   A.   That TER is the way to increase traffic in the female

13   escorts category and that if we don't attack it, our

14   competitor, which is another escort website, will get those

02:20p 15   links before we do.

16   Q.   All right.  Now, I'm showing you -- this is for the

17   witness' eyes only.  This is 573.  Did the Phoenix New Times

18   do an article on The Erotic Review?

19        This is a "yes" or "no" question.

02:21p 20   A.   Yes.

21   Q.   Now, let's talk about the Phoenix New Times.  Who is the

22   editor of the Phoenix New Times?

23             MS. BERTRAND:  Objection, as to what time.

24             THE COURT:  Yes, lay some foundation.

02:21p 25             MR. RAPP:  This time, in February of 2009.

1          THE WITNESS:  The editor for all the papers, Michael

2   Lacey.

3   BY MR. RAPP:

4   Q.   All right.  Where was Mr. Lacey's office?

02:21p  5   A.   In Building B right in the center of the editorial

6   department for Phoenix New Times.

7   Q.   All right.  And the article in the New Times about The

8   Erotic Review, do you know who it was written by?

9   A.   Yes, it was written by Ray Stern.

02:22p 10   Q.   And did you have occasion to observe what relationship,

11   if any, Mr. Stern had with Mr. Lacey?

12   A.   I just knew he was an employee of Mr. Lacey.

13          MR. CAMBRIA:  Object, non-responsive.

14          THE REPORTER:  I don't know who said that, Judge.

02:22p 15          THE COURT:  That was Mr. Cambria.

16          I think it was a "yes" or "no" question.

17          THE WITNESS:  I apologize, Your Honor.

18          MS. BERTRAND:  Move to strike the answer.

19          THE WITNESS:  I understand.

02:22p 20          THE COURT:  Reask the question.  Let him --

21   BY MR. RAPP:

22   Q.   Did you have occasion to observe what relationship

23   Mr. Stern had with Mr. Lacey?

24   A.   Yes.

02:23p 25   Q.   Okay.  What did you observe that relationship to be?

```
 1   A.   I understood he was an employee of Michael Lacey.

 2   Q.   And did he write for the Phoenix New Times?

 3   A.   Yes.

 4   Q.   All right.  And where is the Phoenix New Times published?

02:23p  5   A.   1201 East Jefferson Street, Phoenix.

 6   Q.   And is this where Mr. Lacey had an office?

 7   A.   Yes.

 8   Q.   And was Mr. Lacey one of the owners of the Phoenix New

 9   Times?

02:23p 10   A.   Yes, a majority owner.

11   Q.   All right.  And was Mr. Lacey -- was he on the -- if you

12   know, was he on the business side or was he on the editorial

13   side of the newspaper?

14         MS. BERTRAND:  Objection, leading question.

02:24p 15         THE COURT:  Overruled.

16         THE WITNESS:  Very much on the editorial side.

17         MR. RAPP:   All right.

18   BY MR. RAPP:

19   Q.   And did you come to learn in your time working at the

02:24p 20   Phoenix -- for the alternative newspapers and Backpage started

21   in 1996, did you come to learn what involvement, if any,

22   Mr. Lacey had in the publishing of the alternative newspapers?

23   A.   I was aware that he was a very hands-on editor.

24   Q.   All right.  And then down the road from approximately

02:24p 25   2011 to 2018 did you interact with Mr. Lacey on various
```

         1   articles that he was the author of?

         2   A.   Yes.

         3   Q.   All right.  Now, with respect to Exhibit 573, did this

         4   article feature information -- this article published in the

02:25p   5   Phoenix New Times, did it feature information about The Erotic

         6   Review?

         7             MS. BERTRAND:  Objection, leading.

         8             THE COURT:  Sustained.

         9   BY MR. RAPP:

02:25p  10   Q.   What type of information did it feature?

        11             MS. BERTRAND:  Objection, hearsay.

        12             THE COURT:  Overruled.

        13             MR. FEDER:  401, 403 also.

        14             MS. BERTRAND:  Join.

02:25p  15             THE COURT:  Overruled.

        16             THE WITNESS:  It was coverage about David Elms --

        17   BY MR. RAPP:

        18   Q.   Let me stop you there.  I'm just talking about The Erotic

        19   Review.  Let's forget about Mr. Elms for a minute.

02:25p  20        What information did it have about The Erotic Review?

        21             MS. BERTRAND:  Objection, hearsay.

        22             MR. FEDER:  401, 403 also.

        23             THE COURT:  Overruled.

        24             THE WITNESS:  It had a descript --

02:26p  25             THE COURT:  Let me --

1              THE WITNESS:  Sorry.

2              THE COURT:  I think I previously ruled on this

3     particular exhibit, this page of the exhibit; and so I'm not

4     going to permit this particular exhibit at this time,

02:26p  5     Mr. Rapp.

6              MR. RAPP:  Here is what we intended to seek to

7     admit, Your Honor.

8              THE COURT:  And as I understand it, that's embedded

9     in the New Times article?

02:26p 10              MR. RAPP:  Yes, ma'am.

11              THE COURT:  Okay, you can probe with regard to that.

12              MR. RAPP:   All right.

13     BY MR. RAPP:

14     Q.   So now I'm showing you on your screen for the record 573a

02:26p 15     and what does 57 -- is 573a a part of the article featured in

16     the Phoenix New Times that was contained in 573?

17              MS. BERTRAND:  Objection, leading and seeks hearsay.

18              MR. FEDER:  And 401, 403 -- I'm sorry, 401 and 403.

19              THE COURT:  Well, I think the question is:  Is 573a

02:27p 20     a part of the article featured in the Phoenix New Times?

21              He testified that he saw the article, is my

22     recollection.  So he can answer the question.

23              It's a "yes" or "no" answer.

24              THE WITNESS:  Yes.

02:27p 25     BY MR. RAPP:

1   Q.   And does it feature a -- an example of a review from The

2   Erotic Review in the article?

3   A.   Yes, it's a screen shot of The Erotic Review with the new

4   reviews and details below of a -- of a review, prostitution

02:28p  5   review.

6          MR. RAPP:  And move to admit 573a.

7          MS. BERTRAND:  Same objection as to hearsay.

8          MR. FEDER:  401, 403 too.

9          THE COURT:  Overruled as to all.

02:28p 10          573a may be admitted and published.

11          (Exhibit No. 573a admitted in to Evidence.)

12   BY MR. RAPP:

13   Q.   And so just so the jury understands what we're talking

14   about, is this the -- is this -- what is this?

02:28p 15   A.   That's the header of a web page that was published on

16   phoenixnewtimes.com.

17   Q.   And what was the subject of the article?

18   A.   Theeroticreview.com.

19   Q.   And who was it written by?

02:28p 20   A.   By Ray Stern.

21   Q.   And contained within the article what did it have?

22   A.   It has two screenshots.

23   Q.   And explain what they are.

24   A.   The first screenshot is the new reviews that are being

02:29p 25   posted in Phoenix with the exception of one market listed

            1    below is Los Angeles, and then the screenshot below is an

            2    example -- it's a screenshot of a review that has the

            3    appearance and the -- appearance and the services offered.

            4    Q.   All right.  And do you have any idea having worked at the

02:29p      5    Phoenix New Times during this particular time period what the

            6    distribution of the paper was?

            7    A.   I did work for the Phoenix New Times paper but -- I

            8    believe it was over 50,000, but I'm not sure this article

            9    appeared in the paper.  It might have just been on-line.

02:30p     10    Q.   All right, okay.  All right.  So I believe we were

           11    talking about the fact that Mr. -- Mr. Elms was no longer your

           12    point of contact at The Erotic Review?

           13    A.   Yes.

           14    Q.   Did you start to deal with somebody else who just stepped

02:30p     15    into his shoes?

           16    A.   Yes, fairly quickly.

           17    Q.   All right.  Let me show you 1862 for your eyes only.  And

           18    do you recognize this?

           19    A.   Yes.

02:31p     20    Q.   And -- and what is it?

           21    A.   It is another to-do list for The Erotic Review of

           22    Backpage URLs they should be adding to their prostitution

           23    review pages.

           24    Q.   And did you receive 1862 -- and it's a two-page document

02:31p     25    with an attachment.  Let's look at 1862a -- no it's the same,

```
 1   all right.  Let's just stick with 1862.

 2        So, as I think you've testified, that it's one of these

 3   e-mails with links.  Move to admit 1862.

 4             MS. BERTRAND:  Objection, hearsay.

 5             MR. FEDER:  401, 403.

 6             THE COURT:  Overruled, it may be admitted.

 7             (Exhibit No. 1862 admitted in to Evidence.)

 8   BY MR. RAPP:

 9   Q.   Did you receive this e-mail --

10             MR. RAPP:  Request permission to publish.

11             THE COURT:  Yes, it may be published.

12   BY MR. RAPP:

13   Q.   Did you receive this e-mail after Mr. Elms no longer

14   became your contact at The Erotic Review?

15   A.   Did I receive this e-mail?

16   Q.   Did somebody at backpage.com -- did somebody from

17   backpage.com send this to The Erotic Review?

18   A.   Yes.

19   Q.   All right.

20   A.   Roger Williams had sent it.

21   Q.   Right, okay.  And his signature line is where?

22   A.   At the bottom of the page.

23   Q.   All right.  So did this relationship continue on?

24   A.   Yes, there was no change in the relationship except we

25   didn't have to pay the $4,000 per month anymore.
```

02:31p 5
02:32p 10
02:32p 15
02:32p 20
02:32p 25

```
 1   Q.    Okay.  Looking at Exhibit 574, do you see this e-mail?

 2   A.    I do.

 3   Q.    And can you explain what this is?

 4   A.    This is a e-mail that -- from me and it's going to my

 5   archive e-mail address that I had on gmail.

 6   Q.    All right.  And let me look at the second page of this

 7   e-mail.  Do you recognize this e-mail that's -- that you were

 8   forwarding to your -- to your -- I think you testified to your

 9   archive e-mail?

10   A.    Yes.

11   Q.    And do you recognize this e-mail as well?

12   A.    Yes, I do.

13   Q.    Okay.  And -- and who is this e-mail between?

14   A.    It's between myself and Fred Magid, who is a CTO at The

15   Erotic Review, and I'm asking him to making some changes with

16   the banner ads.

17   Q.    All right.

18         MR. RAPP:  Move to admit 574 and request permission

19   to publish.

20         MR. FEDER:  Relevance.  I'm sorry, 401, 403 too.

21         THE COURT:  Overruled.  It may be admitted and it

22   may be published.

23         (Exhibit No. 574 admitted in to Evidence.)

24   BY MR. RAPP:

25   Q.    So starting -- yeah, let's just focus on the top.
```

02:33p — line 5
02:33p — line 10
02:34p — line 15
02:34p — line 20
02:34p — line 25

1          Again, just so the jury understands, this is the person
2     you're sending it to you?
3     A.   Fred Magid is the CTO of theeroticreview.com, and now
4     that David Elms is gone I'm sort of talking directly to their
02:35p  5     developers.
6     Q.   All right.  And what are you telling Mr. Magid in the top
7     of this e-mail?
8     A.   I write, "Hey Fred, My bosses want me to be less
9     escort-ish with the banner ad on theeroticreview.com.  I think
02:35p 10     they're crazy but it is not worth arguing with them.  Can you
11     switch out banner ads and use the one that is attached.
12     Thanks Carl."
13     Q.   All right.  What is it that you meant -- well, first,
14     when you refer to "my bosses," who are you referring to?
02:35p 15     A.   Scott Spear.
16     Q.   All right.  And when you say they want it to be "less
17     escort-ish," what do you mean by that?
18     A.   At this time in 2009 we don't want the site to be so
19     obvious that we're just marketing prostitution only.  So we're
02:36p 20     gonna modify the banner ads and have it promote other
21     categories in addition to escorts.
22     Q.   Okay.  And why did you not want it to be so obviously
23     prostitution?
24     A.   Because it looks bad.  Just makes us look bad to be a
02:36p 25     prostitution site.  We want to keep that veneer of credibility

1  of being like a Craigslist even though we were entirely --

2  almost entirely prostitution head-based revenue.

3  Q.   Okay.  And then moving on to 1946 for your eyes only --

4         THE COURT:  Well, I think before you go into this

02:37p  5  exhibit, Mr. Rapp, we should take our afternoon break.

6         MR. RAPP:  Very well.

7         THE COURT:  And so, Members of the Jury, again, just

8  remember the admonition and we will stand in recess until just

9  around 3:00 o'clock.  I'll have Liliana come and get you, and

02:37p 10  so please all rise for the jury.

11         (Jury out at 2:37 p.m.)

12         THE COURT:  All right, we'll stand in recess.

13         (Recess taken at 2:37 p.m.)

14         (Back on the record at 3:00 p.m.)

03:00p 15         COURTROOM DEPUTY:  All rise, court is now in

16  session.

17         THE COURT:  Please be seated.  Let's go ahead and

18  bring the jurors in.  All rise for the jury.

19         (Jury back in at 3:01 p.m.)

03:01p 20         THE COURT:  All right, please be seated.

21         And, Mr. Rapp, you can continue.

22         MR. RAPP:  Thank you, your Honor.

23  BY MR. RAPP:

24  Q.   Mr. Ferrer, when we last broke for the break we were

03:01p 25  looking at United States 574.  Do you see that on your screen?

```
 1   A.   Yes, I do.

 2   Q.   And so in this same e-mail is there a -- an example of

 3   what the change to the banner ad is?

 4        And let me take you to 574, Page 4.  Do you see that

03:02p  5   there?

 6   A.   Yes.

 7   Q.   All right.  And then 574, Page 5?

 8   A.   Yes.

 9   Q.   Do you see that?

03:02p 10   A.   I do see it.

11   Q.   Can you explain to the jury what the change his here?

12   A.   So the banner ad used to say "Backpage find escorts

13   here."  We're now changing it to "Backpage" and then it will

14   flash "APTS-JOBS-ESCORTS."

03:02p 15   Q.   Let me just show you once again 1835b.

16             MR. RAPP:  Madam clerk, this has already been

17   admitted, 1835b.

18   BY MR. RAPP:

19   Q.   So I'm showing you now 1835b, and do you see over here --

03:03p 20   it's hard to see.  Do you see that?

21   A.   Yes, that's the backpage.com banner ad with "find escorts

22   here" that's under the sponsor by section on The Erotic

23   Review.

24   Q.   And here is -- and so is this what the change is that's

03:03p 25   proposed?
```

1   A.   Yes, we don't want it to be just escorts.  We're trying

2   to be a little more mainstream.

3   Q.   Well, with respect to that, what about apartments and

4   jobs on the website?  How much were those two categories in

03:04p  5   2009 generating in terms of revenue, if you know, for

6   Backpage?

7   A.   It was insignificant revenue compared to the revenue from

8   categories like female escorts.

9   Q.   All right.  And then did you -- did you seek approval of

03:04p  10   this change from your -- from upper management?

11   A.   Yes, this -- I was told to do this by Scott Spear and I

12   created banner ads for him to approve before sending it to The

13   Erotic Review.

14   Q.   All right.  I'm showing you for your eyes only 1946, and

03:05p  15   do you see that on your screen?

16   A.   Yes.

17   Q.   And I'll show you 1946a.

18   A.   Yes.

19   Q.   And then 1946b, do you see that?

03:05p  20   A.   Yes.

21   Q.   All right.  And are these exchanges between you and

22   Mr. Spear and other employees of Backpage regarding the change

23   in the ad?

24   A.   Yes.  Micah Killough, who works for backpage.com, is

03:05p  25   creating that ad for Scott's approval.

1  Q.   All right.

2          MR. RAPP:  Move to admit 1946a and b.

3          MR. FEDER:  Same.

4          MS. BERTRAND:  Objection, hearsay.  Lack of

03:05p  5  foundation under 802(d) -- 801(d)(2), excuse me.

6          THE COURT:  Sustained.

7          MR. RAPP:  Well, why don't I just start with 1946.

8          Move to admit 1946.

9          MS. BERTRAND:  Objection, same objection.

03:06p 10          THE COURT:  Overruled.

11          MR. RAPP:  And request permission to publish, Your

12  Honor.

13          THE COURT:  Just 46, yes.

14  BY MR. RAPP:

03:06p 15  Q.   Can you explain this e-mail from Scott Spear to you and

16  Dan Hyer?

17  A.   Scott is telling Micah Killough, who made the banner ads,

18  "This works for me.  Carl and Dan you good with this?"

19  Q.   All right.  And just so the jury understands what we're

03:07p 20  talking about here, is this the change in the banner ad on The

21  Erotic Review?

22  A.   Yes, this is the change in the banner ad and the banner

23  ad's attached and it's called the "Revised TER Animated Gifs."

24  Q.   And what's a "TER Animated Gif"?  Do you know what a

03:07p 25  TER --

1    A.    Oh, I'm sorry.  Was that a question?

2    Q.    Yes, I'm sorry, that is a question.  What is a "TER

3    Animated Gif"?

4    A.    It's another way to just say "banner ad."

03:07p  5    Q.    All right.  I'm now showing you United States 575 for the

6    witness' eyes only.

7          So is this a -- what is this?

8    A.    This is an e-mail from Jess Adams to myself giving me the

9    heads up that Scott Spear has asked for an analysis of the

03:08p 10    Elms' ads.

11    Q.    All right.  And why does -- why does Scott Spear want an

12    analysis of the Elms -- an Elms analysis?

13          What is Elms, the acronym?

14                MR. FEDER:  Hearsay, speculation, 401, 403.

03:08p 15                MS. BERTRAND:  Compound question.

16                THE COURT:  If he -- well, yes, break up the

17    questions and then let him answer if he knows.

18    BY MR. RAPP:

19    Q.    Do you know what "Elms analysis" is?

03:08p 20    A.    Yes, I do.

21    Q.    What is that?

22    A.    It's gonna show whether the referral traffic is

23    worthwhile.  Are we getting our money's worth from David Elms,

24    'cuz we're sending him checks for 4k at a time here.

03:09p 25    Q.    All right.  And was it -- in 2009 was it profitable, this

     1  relationship?

     2  A.   Very much so.

     3             MS. BERTRAND:  Objection, lack of foundation.  Lack

     4  of notice under Rule 16, opinion.

03:09p  5             THE COURT:  I guess -- let me -- I might be a little

     6  bit confused.  Are we still talking about the TER, the

     7  relationship between Backpage?

     8             MR. RAPP:  Yes.

     9             THE COURT:  Overruled.

03:09p 10  BY MR. RAPP:

    11  Q.   As it in -- let me just start over again.

    12       In 2009 after David Elms was no longer your point of

    13  contact, was this analysis for The Erotic Review -- did it

    14  demonstrate that it continued to be profitable?

03:09p 15  A.   Yes, the referral traffic showed that it was continuing

    16  to grow significantly in that period, that's it.

    17  Q.   All right.  I'm now showing you United States 28.

    18             THE COURT:  Can I just go back.

    19             Was that 1946, Mr. Rapp?

03:10p 20             MR. RAPP:  575.

    21             THE COURT:  575, okay.

    22             MR. RAPP:  All right, let's go back to 575.

    23             Move to admit 575, request permission to publish.

    24             MR. FEDER:  Same.

03:10p 25             THE COURT:  I'm -- I'm sorry, let me confer with my

```
  1 | courtroom deputy.  I thought 575 was admitted.
  2 |           COURTROOM DEPUTY:  No.
  3 |           THE COURT:  Apparently, it was not.
  4 |           MR. RAPP:  Okay.
03:11p  5 |           THE COURT:  Okay, 575 was that e-mail that was just
  6 | up?
  7 |           MR. RAPP:  Yes, ma'am.
  8 |           THE COURT:  It's the current e-mail right now?
  9 |           MR. RAPP:  Yes.
03:11p 10 |           THE COURT:  What was the objection?
 11 |           MR. FEDER:  Same.
 12 |           THE COURT:  Oh, overruled.  It may be admitted.
 13 |           COURTROOM DEPUTY:  And published?
 14 |           THE COURT:  And published.
03:11p 15 |           MR. RAPP:  Thank you.
 16 |           (Exhibit No. 575 admitted in to Evidence.)
 17 | BY MR. RAPP:
 18 | Q.    All right.  Now, the questions I was asking you about
 19 | The Erotic Review still being profitable, was that the subject
03:11p 20 | of this analysis that was done?
 21 | A.   Yes, Jess Adams writes, "SS asked for this - here's what
 22 | I see - any comments/corrections before I sent it over?"
 23 | Q.    All right.  At this point was The Erotic Review
 24 | continuing to be a profitable referral site for Backpage?
03:12p 25 | A.   This Elms analysis showed that it was very profitable.
```

1    Q.   All right.

2            MR. FEDER:  106, please.

3            THE COURT:  Overruled.

4            MR. RAPP:  Well, I can take care of that.  I'll

03:12p  5   show -- this is for the witness' eyes only, 575b.

6    BY MR. RAPP:

7    Q.   You see that on your screen, sir?

8    A.   Yes, I do.

9    Q.   And is this the attachment to the e-mail that you just

03:12p 10   exchanged with Mr. Adams?

11   A.    Yes.

12   Q.   And who is the author of this document?

13   A.    It's authored by Jess Adams for Scott Spear.

14   Q.   All right.

03:12p 15           MR. RAPP:  Move to admit 575b.

16           MR. FEDER:  Same.

17           THE COURT:  Overruled.

18           MR. RAPP:  Request permission to publish, move to

19   admit.

03:12p 20           THE COURT:  You may publish.

21           (Exhibit No. 575b admitted in to Evidence.)

22   BY MR. RAPP:

23   Q.   All right.  And what does this show?

24   A.    It shows Line 6 through 10 that we had paid The Erotic

03:13p 25   Review $4,000 a month December, January, February for a total

1    of $12,000.

2    Q.   And at this time were you familiar with the revenue that

3    Backpage was generating?

4    A.   Very much so.

03:13p 5   Q.   And how were you?

6    A.   I watched the revenue reports daily, weekly, monthly.   I

7    knew the revenue by market, by category.

8    Q.   Was $12,000 -- was that a significant sum given the

9    revenue that Backpage was generating?

03:13p 10  A.   It was very, very little.   Insignificant expense.

11   Q.   All right.   And then down here, can you explain to the

12   jury what this shows in 2009?

13   A.   It shows in 2009 that referrals in 2000 -- I should say

14   -- let me do this by line.

03:14p 15       Line 17 is in 2008, November.   There were 440,797

16   referrals, and then just skip down to 2009 January under

17   Line 19.   There are 521,567 referrals.   So that's after the

18   paid banner ads.   So it did increase significantly.

19   Q.   All right.   Now, moving to -- and this is for the

03:14p 20  witness' eyes only -- United States 28.

21       Did you receive, along with Mr. Spear, a e-mail from

22   Mr. Larkin?

23   A.   Yes, I did.

24   Q.   All right.   And is -- what was the -- without going into

03:15p 25  the substance of it, what was -- basically, what was he

1  forwarding to you and Mr. Spear?

2  A.   He was forwarding a news story.

3  Q.   All right.  And did that news story in some way involve

4  The Erotic Review?

03:16p 5  A.   Yes.

6  Q.   All right.  But does Mr. Larkin -- except for the subject

7  line, is there any -- does he say anything in this -- in this

8  e-mail?

9  A.   He does not.

03:16p 10  Q.   All right.

11           MR. RAPP:  Move to admit Exhibit 28.

12           MR. FEDER:  Same.

13           MS. BERTRAND:  Objection 801, 404, 403.

14           THE COURT:  Overruled, it may be admitted.

03:16p 15           MR. RAPP:  All right.

16           THE COURT:  And published.

17           MR. RAPP:  Thank you.

18           *(Exhibit No. 28 admitted in to Evidence.)*

19  BY MR. RAPP:

03:16p 20  Q.   So first, what is the headline of the news story that is

21  provided?

22  A.   "Authorities:  43 more indicted in Desert Divas

23  prostitution bust."

24  Q.   And what is the subject line that -- of the e-mail that

03:17p 25  he sends to Mr. Spear and to you?

1   A.    "Johns accused of favorably rating escorts on Erotic

2   Review in exchange for discounts."

3   Q.    So as we get into 2009, in September of 2009, do you come

4   to learn that Craigslist is receiving pressure regarding its

03:17p  5   erotic services category?

6           MS. BERTRAND:  Objection, leading.

7           THE COURT:  Sustained.

8   BY MR. RAPP:

9   Q.    Is Craigslist receiving any pressure during this time

03:17p 10   period?

11           MS. BERTRAND:  Same objection.

12           THE COURT:  Sustained.

13   BY MR. RAPP:

14   Q.    Do you know if Craigslist is receiving any pressure?

03:18p 15           MS. BERTRAND:  Seek speculation.

16           THE COURT:  Overruled, "yes" or "no."

17           THE WITNESS:  Yes.

18   BY MR. RAPP:

19   Q.    How do you know that?

03:18p 20   A.    We follow Craigslist and the news closely, and he's under

21   frequent attacks from the Attorneys General.

22           MS. BERTRAND:  Objection.  Motion to strike,

23   hearsay.

24           THE COURT:  Overruled.

03:18p 25   BY MR. RAPP:

 1  Q.   Do you come to learn that Craigslist shuts down its

 2  erotic services category in September of 2009?

 3           MS. BERTRAND:  Objection, leading.

 4           THE COURT:  Sustained.

03:18p 5           MS. BERTRAND:  Move to strike the question.

 6           THE COURT:  Sustained.  We'll strike the answer, and

 7  the jury will disregard the question, Mr. Rapp.

 8  BY MR. RAPP:

 9  Q.   Let me show you Exhibit 579 for the witness' eyes only.

03:19p 10       Do you see that -- do you see this exhibit on the -- on

11  your screen, 579?

12  A.   Yes, I do.

13  Q.   Do you see it?

14  A.   Oh, I'm sorry, yes.

03:19p 15  Q.   Do you recognize this exhibit?

16  A.   Yes.  Yes, I do recognize this e-mail.

17  Q.   Let me go to the second page.  So fair to say is this a

18  two-page e-mail, very little on the second page?

19  A.   Yes.

03:19p 20  Q.   And then at the bottom of the page you have talked in

21  your testimony about a Google alert.

22       Are you receiving a Google alert as part of this e-mail?

23  A.   Yes, I am.

24  Q.   And do you forward that e-mail to anybody else?

03:20p 25  A.   Yes, I forward it to Andrew Padilla.

 1   Q.   All right.  And anybody else?

 2   A.   And Dan Hyer in Dallas.

 3   Q.   And without going into the substance of it, what is --

 4   what is the subject matter of this?

**03:20p** 5   A.   The news alert is causing me to want to give a task to

 6   Andrew Padilla.

 7   Q.   All right.

 8            MR. RAPP:  Move to admit 579.

 9            MS. BERTRAND:  Objection, hearsay.  Hearsay within

**03:21p** 10  hearsay, 403.

11            THE COURT:  Overruled.

12            MR. RAPP:  And request permission to publish, Your

13  Honor.

14            THE COURT:  It may be published.

**03:21p** 15           MR. RAPP:  Thank you.

16            COURTROOM DEPUTY:  And it's admitted?

17            THE COURT:  It is admitted and it may be published.

18            (Exhibit No. 579 admitted in to Evidence.)

19  BY MR. RAPP:

**03:21p** 20  Q.   So starting down here, does this give you any type of

21  notice, this Google alert?

22  A.   Yes, it does and. . .

23  Q.   What does it tell you?

24  A.   It states, So. Carolina eyes 'criminal investigation' of

**03:21p** 25  Craigslist CNET news - San Francisco, California, USA.

 1   Meanwhile, the 'adult entertainment' section of

 2   greenville.backpage.com (careful with link, NSFW), owned by

 3   Village Voice Media, has over 60 adds for the..."

 4   Q.   All right.  And then what do you forward up to Mr. Hyer

03:22p  5   and Mr. Padilla?

 6   A.   I send them an e-mail that states, "We are probably need

 7   to start the process of cleaning up adult Monday AM.  South

 8   Carolina markets are our first priority.  Sex act pics remove.

 9   In South Carolina, we need to remove any sex for money

03:22p 10   language also.  Obviously, we do not have the man power to

11   read texts in other markets."

12   Q.   Okay.  What did you mean by that when you were alerting

13   Mr. Padilla and Mr. Hyer to this?

14   A.   Well, I'm telling them that Craigslist threw Backpage

03:23p 15   under the bus with a link in their blog that shows that we

16   have a link in South Carolina with sex act pics.  So we're

17   under scrutiny.  We need to clean up South Carolina as quickly

18   as possible.

19   Q.   All right.  And why do you believe that you're under

03:23p 20   scrutiny?

21   A.   Because Craigslist threw us under the bus.  It's gonna be

22   picked up in the media.

23   Q.   All right.  And then what does Mr. Padilla tell you he's

24   going to do as a result of this e-mail that you send to him?

03:23p 25   A.   Andrew Padilla states, "I've started Martina and Amanda

1   on Adult picture cleanup in all markets Friday.  We'll

2   continue this Monday.  Zeke, Michael and Amanda will be

3   working on Adult for as long as we need to.

4       We'll implement the text and pic cleanup in South

03:23p  5   Carolina only, on Monday as well.

6       We're setting ads as offline and saving the email

7   addresses of the posters.  I'll compile everyone's lists and

8   send them to Dan once a day."

9   Q.   Okay.  Do you know why Mr. Padilla's telling that you

03:24p 10   he's saving the e-mail addresses of the posters?

11           MR. EISENBERG:  Objection, foundation.

12           THE COURT:  Well, he can answer "yes" or "no" and

13   then, Mr. Rapp, you can follow up, so sustained.

14   BY MR. RAPP:

03:24p 15   Q.   Do you know why?

16   A.   Yes.

17   Q.   All right.  Why is it that he's saving the e-mail

18   addresses of the posters?

19   A.   We're gonna contact them if they're upset.

03:24p 20   Q.   All right.  Contact them for what purpose?

21   A.   Give them a free promo code if necessary.

22   Q.   All right.  Can you explain to the jury what a "free

23   promo code" is?

24   A.   It's the ability to post for free by putting in a promo

03:25p 25   code.

1  Q.   So are you implementing this -- this strategy of cleaning

2  up in any other market that Backpage has a presence?

3  A.   At this time --

4  Q.   Yes.

03:25p  5  A.   -- its focus is on South Carolina.

6  Q.   All right.  Now, did you come to learn that -- that

7  Craigslist was receiving pressure from Attorneys Generals?

8  A.   Yes.

9  Q.   I want to show you Exhibit 902 for your eyes only.

03:25p 10       Do you see that on your screen?

11  A.   Yes, I do.

12  Q.   Do you recognize this document?

13  A.   Yes, I remember reading this document.

14  Q.   How is it, sir, that you received this document?

03:26p 15  A.   It was a document that went to Sam Fifer that was

16  eventually sent to us indicating problems that Backpage had

17  that they wanted to address.

18  Q.   Okay.  When you say us," who are you referring to?

19  A.   Myself, Scott Spear, the owners, Jed Brunst.

03:26p 20  Q.   All right.  And this letter is -- how many pages is this

21  letter?

22  A.   Three pages.

23  Q.   All right.  And you identify the individual went to -- I

24  believe you said his name was Sam Fifer.  Who is Sam Fifer?

03:27p 25  A.   Sam Fifer was a lawyer that Scott Spear engaged.

1  Q.   All right.  And did you discuss this letter internally?

2       I know you've just testified that you received it, but

3  did you discuss it?

4  A.   Absolutely.  It had a lot of changes that they were

03:27p  5  suggesting we would make on the site.

6  Q.   All right.

7            MR. RAPP:  Move to admit 902.

8            THE COURT:  Yes, 902 may be admitted.

9            MR. RAPP:  And published.

03:27p 10            THE COURT:  And published.

11            *(Exhibit No. 902 admitted in to Evidence.)*

12  *BY MR. RAPP:*

13  Q.   And so is this the letter we've been discussing?

14  A.   Yes, it is.

03:28p 15  Q.   Can you read the first paragraph?

16  A.   "We appreciated meeting with you recently in New York

17  regarding our concerns with prostitution ads and other

18  sexually explicit images posted in the adult services and

19  personals sections on backpage.com.  Although we understand

03:28p 20  many online classified postings on the backpage site are for

21  legitimate purposes, we remain deeply concerned regarding the

22  presence of ads that are illegal and in blatant violation of

23  backpage's terms of service.  Indeed, we are told that since

24  craigslist has taken steps to reduce illegal prostitution ads

03:28p 25  on its site, the number of postings has risen dramatically on

1  sites such as backpage."

2  Q.   In the first sentence it with references a meeting in New

3  York.  What, if anything, do you know about that?

4  A.   I helped prepare a PowerPoint, along with Scott Spear,

03:29p  5  that we would have a representative go to New York to meet

6  with the Attorneys General.

7  Q.   All right.  And in preparing that power -- and what was

8  the purpose of the PowerPoint?

9  A.   To show them, you know, terms of use, the posting rules,

03:29p 10  some of the moderation standards that we were putting in

11  place.

12  Q.   Did you disclose to the Attorneys Generals, did you

13  disclose the relationship that you've been testifying about

14  regarding The Erotic Review?

03:29p 15  A.   We did not.

16  Q.   Did you disclose to them the strategy that you've

17  referred to as aggregation?

18  A.   We did not.

19  Q.   Same question as to the relationship with the super

03:30p 20  posters.  Did you disclose that to the Attorney General?

21  A.   We did not disclose the relationship with the super

22  posters.

23  Q.   This second -- this second sentence here where it talks

24  about many on-line classified postings on the Backpage site

03:30p 25  are for legitimate purposes, was that a true statement?

1    A.   I felt it was very kind of them.  They were trying to get

2    our cooperation.  I knew that we had not very many postings

3    for legitimate purposes.

4              MR. FEDER:  Objection, going beyond the scope of the

03:30p  5    question.

6              MS. BERTRAND:  And speculative.

7              THE COURT:  Overruled.

8              THE WITNESS:  We had a lot of spam.  There were a

9    few legitimate jobs, but not many.  We were having to

03:31p 10    constantly bulk up non-adult content to create that veneer of

11    a general classified site --

12              MR. RAPP:  Let me just stop --

13              THE WITNESS:  -- but it wasn't very successful.

14    BY MR. RAPP:

03:31p 15    Q.   Let me just stop you there.  I think what you said is you

16    had to bulk up.  Can you explain that to the jury, what you're

17    referring to, bulk up the legitimate sections on Backpage?

18    A.   Yes, we -- we'd have staff just steal ads from other

19    sites on occasion but eventually --

03:31p 20              MR. FEDER:  Objection to the term of "steal."

21    Inappropriate, it's untrue, and it's 401 and 403.

22              THE COURT:  Well, I guess -- sustained and,

23    Mr. Rapp, maybe he can -- you can reask the question.  He can

24    describe what it is that they did.

03:31p 25    BY MR. RAPP:

1  Q.   Were you stealing ads from other sites for the non-adult

2  section?

3  A.   Yes.

4          MR. FEDER:  Same objection.

03:32p  5          MS. BERTRAND:  Objection, 404, without notice.

6          THE COURT:  Overruled.

7  BY MR. RAPP:

8  Q.   Can you explain what you were doing?

9  A.   We would take ads from other sites and just put them on

03:32p 10  Backpage, and we would receive cease and desist letters on a

11  regular basis.

12  Q.   All right.  When you say you would receive -- you would

13  take other ads, what type of ads would you -- would you put on

14  the site?

03:32p 15  A.   Just trying to add a few employment ads, a few rental

16  ads; but in the end we found that taking feeds was a much

17  better way to bulk up the content.

18  Q.   "Taking feeds," can you explain that to the jury?

19  A.   There were feed providers out there, other websites

03:32p 20  willing to send their content.  As long as it had a link in it

21  we would import it.  So it created the impression that we had

22  a lot of general classified adds, but they really were bulk

23  ads.  They were imported by the thousands.  They weren't real

24  user-generated classified adds.

03:33p 25  Q.   Would you -- would that -- by putting the feeds on the

1    site, would that generate any revenue for Backpage?

2    A.   The purpose isn't revenue.   The purpose is to create the

3    veneer of a general classified site.

4    Q.   Okay.

03:33p  5         MR. RAPP:  Madam clerk, can I ask you to publish

6    again 902.

7    BY MR. RAPP:

8    Q.   Going down to this sentence that you read where it said,

9    "...the number of such postings has risen dramatically on

03:33p 10    sites such as Backpage," is that an accurate statement?

11   A.   Yes, and we're excited about it.

12   Q.   All right.   Why are you excited about it?

13   A.   Revenue and ad count are increasing in the female escorts

14   category.

03:34p 15   Q.   Okay.  All right.  And do they make -- in this letter, do

16   they make any suggestions to the owners of backpage.com that

17   they should implement?

18         MS. BERTRAND:  Objection, the document speaks for

19   itself.

03:34p 20         THE COURT:  Sustained.

21   BY MR. RAPP:

22   Q.   All right, let's go back to Page 1.  Can you read -- can

23   you read this?

24   A.   "Backpage should eliminate allowing users to provide

03:35p 25   direct links to their accounts on either The Erotic Review or

 1  Cityvibe websites or..."

 2  Q.   And then it finishes on.

 3  A.   "...any other site whose sole purpose is to provide a

 4  forum for prostitution profiles."

03:35p  5  Q.   When you got this -- so let's just -- who was this -- who

 6  is this letter sent by?  We've been talking about the Attorney

 7  Generals, but are there a number of Attorney Generals from

 8  states that send you this letter?

 9          MS. BERTRAND:  Objection, leading.  Document speaks

03:35p 10  for itself with the listing of the Attorneys General.

11          THE COURT:  Well, I guess what we could do is give

12  the jurors a moment to read through the entire letter if that

13  would be your preference, Ms. Brunst (sic), but I think it's

14  fair to ask who the letter was sent by.  So I'm going to

03:36p 15  overrule the objection.

16          MR. FEDER:  I would also ask under Rule 106 for the

17  other letters responsive to this to be shown to the jury.

18          THE COURT:  You can do that when it's your turn, so

19  overruled.  Mr. Rapp.

03:36p 20          MR. RAPP:  Thank you.

21  BY MR. RAPP:

22  Q.   So -- I kinda lost track.  When they recommended this --

23  when they recommended that you -- that this -- in the bullet

24  point here that you just read about The Erotic Review, did you

03:36p 25  -- did you make any changes in regard to that at this time, in

1   2009?

2   A.   No, we did not.  We -- there's no way we're gonna remove

3   it from the site.

4   Q.   Well, in terms of the users where it says, "backpage

03:37p  5   should eliminate allowing users to provide direct links to

6   their accounts..." was that -- is that an accurate statement?

7   A.   They don't know that Backpage is actually adding links --

8            MR. FEDER:  Objection, hearsay, speculation what

9   they know or don't know.

03:37p 10            THE COURT:  Sustained.

11   BY MR. RAPP:

12   Q.   Well, so, Mr. Ferrer, have we looked at any exhibits

13   yesterday and today that had e-mail exchanges with TER links

14   and Backpage links?

03:38p 15   A.   Yes, we have.

16   Q.   Can you distinguish between this reference to users and

17   to what your -- the strategy for Backpage was in this

18   relationship with The Erotic Review?

19       Can you explain that to the jury, the distinction, if

03:38p 20   there is one?

21   A.   The e-mails that we have with The Erotic Review is that

22   we're actually adding The Erotic Review links to Backpage ads.

23   Q.   All right.  And how is that different than what the

24   Attorney Generals are suggesting here?

03:38p 25   A.   The Attorneys Generals thinks that the users are adding

```
 1   the direct links.  While some may be adding direct links, a

 2   lot of the direct links are being posted by Backpage staff.

 3   Q.   All right.  Now, did you give a response to this -- you

 4   talked earlier in testimony about meeting with the Attorney
```
03:39p 5   Generals in New York and presenting a PowerPoint?
```
 6   A.   Yes.

 7   Q.   Right?

 8   A.   Yes.

 9   Q.   This is a different question.  Did the owners of Backpage
```
03:39p 10  give the Attorney Generals a response to this letter?
```
11              MS. BERTRAND:  Objection, speculation, lack of

12   foundation.

13              THE COURT:  Sustained.

14   BY MR. RAPP:
```
03:39p 15  Q.   Do you know if the owners gave the Attorney Generals a
```
16   response to this letter?

17   A.   Yes, I helped work on that response.

18   Q.   All right.  Was that response accurate?

19   A.   No, it was deceptive, highly misleading.
```
03:40p 20  Q.   In what respect?
```
21   A.   They asked us to get rid of the TER links, and we said we

22   would get rid of clerotic.org's links.  We just gave them some

23   website that brought little or no traffic to Backpage.

24   Q.   Why didn't you -- why didn't you -- when you were given
```
03:40p 25  this letter, why didn't you remove The Erotic Review links

1  from the postings on Backpage, why?

2  A.   Scott Spear, Jim Larkin and myself felt the traffic from

3  The Erotic Review was very, very important for Backpage's

4  success.

03:40p  5  Q.   All right.  Let's move on to Exhibit 585.

6       Do you see that on your screen for your eyes only?

7  A.   Yes, I do.

8  Q.   And is -- who is this a -- who is this a e-mail from?

9  A.   This is an e-mail from Scott Spear to myself.

03:41p 10  Q.   All right.  And what is the subject of it?

11  A.   He's sending me the common terms and code words resulting

12  in a post being removed, 8-15-09 document.

13  Q.   All right.  I'm now showing you 585.  Is that the

14  attachment to this e-mail that Mr. Spear is sending you?

03:41p 15  A.   It's a list of terms and code words, yes.

16  Q.   Okay.  So that -- just for the record, that's 585a?

17  A.   Yes.

18  Q.   All right.

19           MR. RAPP:  Move to admit 585 and 585a.

03:41p 20           MR. FEDER:  Same.

21           THE COURT:  Overruled, it may be admitted as to 85

22  (sic) and 85a (sic).

23           *(Exhibit Nos. 585 and 585a admitted in to Evidence.)*

24  BY MR. RAPP:

03:42p 25  A.   All right.  So this is what we're talking about -- he

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP          86

1    sends you what is the subject of the e-mail on -- in November

2    of 2009?

3    A.   The subject is "Common terms and code words resulting in

4    a post being removed 8-15-09."

03:42p  5    Q.   All right.  And then going to 585a, what is this?

6    A.   So this is the list of terms and code words that are no

7    longer gonna be allowed in ads on Backpage.

8    Q.   All right.  And we're not gonna go through all these, but

9    is it fair -- have you reviewed this at the time and then in

03:42p 10    preparation for your testimony?

11    A.   Yes, I've reviewed the list and I'm aware of how the

12    terms were used by the moderation department.

13    Q.   All right.  And can you explain that to the jury?

14    A.   At this time we're going to start removing ads, but we're

03:43p 15    not going to block users for posting ads with prostitution

16    terms.  That's the big difference.  Users are gonna be able to

17    post again.  They're just going to have to self sensor and

18    modify.

19        So these terms, there's so many of them that we're gonna

03:43p 20    go ahead and ad them to the global filter, and they'll get a

21    message that says these terms are forbidden.

22    Q.   And then what did you come to learn when the poster would

23    receive a message that these terms are -- were forbidden?

24    What would you come to learn would happen?

03:43p 25    A.   They'll take out the term and put in a similar term or a,

1   you know, misspelled term so they can get past the filter.

2   Q.   All right.  And so can you just give us an example of --

3   of what you would -- would learn a poster would do to avoid

4   the filter?

03:44p  5   A.   So, for example, "Greek," they might take G-r-3-3-k.  So

6   that would be a misspelling of Greek, but a john reading the

7   ad would understand that means Greek.

8   Q.   All right, okay.  When it says here -- when Mr. Spear

9   says here these were resulting in a post being removed, what

03:44p 10   did you take that to mean?

11   A.   We're going to remove the post, but we are not going to

12   block the user.  Moderation is not going to be about removing

13   prostitution ads.  It's gonna -- it's not gonna be about

14   removing prostitutes from posting.  It's gonna be just taking

03:45p 15   down ads if they have those terms in the ad.  The user can

16   post again, in other words.

17   Q.   All right.  Why wasn't moderation about removing the

18   illegal prostitution ads?  Why wasn't it about that?

19   A.   The priority of the company was revenue growth, and we

03:45p 20   were making incremental slow changes in moderation giving the

21   posters a chance in the female escorts category to self

22   sensor.  They need to learn the rules.

23   Q.   All right.  And when you say "self sensor," what do you

24   mean by that?

03:45p 25   A.   It means when they see a post get removed and they can

1   post again, they've -- they know that the terms -- they take

2   out the terms that are the most indicative of sex for money.

3   Q.   All right.  Let's move on to Exhibit 1895, for your eyes

4   only.  We are now in December of 2009 and what, based on your

03:46p  5   experience, happens at Backpage.com typically in December of

6   any given year regarding the coming year?

7   A.   It's another year of budget hearings and this will be for

8   budget hearings in 2010 involving Brunst, Larkin, Spear, the

9   accountant and myself.

03:46p  10   Q.   All right.  And in this e-mail -- who is this e-mail from

11   and to whom?

12   A.   It's from Jess Adams.  It's to myself and Scott Spear.

13   Q.   All right.  And what is the attachment to this e-mail?

14   A.   The attachments are the 2010 budget, the final, a 2019

03:47p  15   budget presentation detail with notes.

16   Q.   All right.  I'm showing you 1895c and can -- this is a

17   handful of pages.  Do you see that there, the pages I just

18   showed you?

19   A.   I do, this is the PowerPoint attachment with the notes.

03:47p  20   Q.   All right.  And who is responsible, if you know, for

21   preparing this PowerPoint attachment with the notes?

22   A.   Could you say that again, sorry.

23   Q.   Who's responsible for preparing the PowerPoint attachment

24   to this e-mail with the notes?

03:48p  25   A.   I believe Scott Spear, but Jess Adams and myself also

1  worked on this PowerPoint; but I believe the notes are written

2  by Scott Spear on who's gonna cover what topics.

3  Q.   All right.  And then who is the PowerPoint -- if you

4  know, who is it presented to?

03:48p  5  A.   The budget PowerPoint is presented to Jed Brunst and Jim

6  Larkin for their approval.

7  Q.   All right.

8         MR. RAPP:  Move to admit 1895 and 1895c.

9         MR. PANCHAPAKESAN:  Objection, Your Honor, as to

03:48p 10  1895c giving the missing or redacted slides.  I believe the

11  Court's ruled on this.

12         THE COURT:  Yes, I was going to make that

13  observation, Mr. Rapp.  I think we had a prior conversation

14  about the redacted versions being replaced.

03:49p 15         MR. RAPP:  I'm sorry, being what?

16         THE COURT:  The -- there's a slide on there that

17  says "redacted," and we had a conversation about that exhibit

18  based on an objection.

19         MR. RAPP:  So I know we had a conversation, but I

03:49p 20  don't recall what the ruling from the Court was on that.

21         THE COURT:  There -- there apparently were -- let's

22  have sidebar.

23         (The following discussion held at sidebar.)

24         THE COURT:  There was a moment when

03:50p 25  Mr. Panchapakesan made an objection to this PowerPoint because

1   he objected regarding the redacted -- I think it said redacted

2   for privilege and we had a conversation in which he said that

3   you -- this was the PowerPoint that you were provided by --

4   you were provided by subpoena.

03:50p  5           MR. RAPP:  Uh-huh.

6           THE COURT:  But the Court told you to replace it

7   with the unredacted version, and you said you would.

8           MR. RAPP:  I think this is the unredacted version.

9           THE COURT:  No, I saw a slide there that said

03:51p 10   "redacted."  Is that --

11          MR. PANCHAPAKESAN:  It's Exhibit 588.  It's

12   unredacted.  It has all the slides so it's the --

13          THE COURT:  So use the unredacted version, in other

14   words.

03:51p 15          MR. RAPP:  Okay.

16          THE COURT:  I mean, I don't -- do you have that?

17          MR. RAPP:  It's a government exhibit.

18          THE COURT:  Okay, so you have to -- just make sure

19   that you're using the appropriate exhibit, the unredacted

03:51p 20   version.

21          MR. RAPP:  Okay.

22          THE COURT:  Do you recall this conversation we had?

23          MR. RAPP:  Yeah, I totally recall.

24          THE COURT:  Okay.

03:51p 25          MR. RAPP:  I might -- just in the interest of time,

1   I might come back to this --

2          THE COURT:  Okay.

3          MR. RAPP:  -- because it involves a little computer

4   magic.

03:51p  5          THE COURT:  Okay.

6          (End of discussion at sidebar.)

7          THE COURT:  I forgot to mention to the jurors that

8   if there is an occasion where we have a sidebar like that or

9   someone's coming off or on the stand, might be a good time to

03:52p 10   stretch.

11          And from time to time -- I know there's a little bit

12   of room against that back wall, and if somebody has to go up

13   and stand against it I suggest you do so, because we do a lot

14   of sitting, as you can tell.

03:52p 15          All right.  Mr. Rapp, let's continue.

16          MR. RAPP:  Thank you.

17   BY MR. RAPP:

18   Q.   All right, I'm showing you Exhibit 588.  Do you see that

19   on your screen there, sir?

03:52p 20   A.   Yes, I do.

21   Q.   And as you look at this, do you see what this -- what

22   this is?  Do you recognize it?

23   A.   Yes, it's the budget presentation.

24   Q.   All right.  I'm showing you Slide 23 of this slide show

03:53p 25   and I'm moving to admit Slide 23.  Do you see that there?

1   A.   I do see it.

2               MR. PANCHAPAKESAN:  Your Honor, we --

3               THE COURT:  Mr. Rapp --

4               MR. RAPP:  Yes?

03:53p 5        THE COURT:  -- what exhibit number again was this?

6               MR. RAPP:  This is 588.

7               THE COURT:  588?

8               MR. RAPP:  Yes.

9               MR. PANCHAPAKESAN:  Your Honor, we object to the

03:53p 10  admission of just one slide of the exhibit.

11              THE COURT:  I'm sorry?

12              MR. PANCHAPAKESAN:  We object to just the admission

13  of only one slide of the exhibit.

14              THE COURT:  Yes, I would sustain -- if you're going

03:53p 15  to admit the exhibit, you should admit the entirety of the

16  exhibit.

17              MR. RAPP:  Okay.  All right, we'll come back to

18  this.

19  BY MR. RAPP:

03:54p 20  Q.   Well, in response to the Attorney Generals' response,

21  were there discussions that you had with Mr. Spear about how

22  you were going to respond to the Attorney Generals'

23  recommendations that they made in the letter that we saw in

24  902?

03:54p 25  A.   Yes, we were going to slow dance the Attorney Generals.

 1              MR. FEDER:  Objection, again going beyond what the

 2      question is.

 3              THE COURT:  Sustained.

 4              Again, Mr. Ferrer, just try to contain your answers

03:54p  5      specifically to the question.  I think that was a -- that

 6      called for a "yes" or "no."

 7              THE WITNESS:  Yes, your Honor.

 8      BY MR. RAPP:

 9      Q.   And what strategy did you discuss with Mr. Spear during

03:55p 10      this time period following the letter that you received from

11      the Attorney Generals in terms of the budget for the following

12      year, for 2010?  What was the strategy you were going to take

13      with the Attorney General?

14              MR. FEDER:  401, 403, hearsay, speculation.

03:55p 15              THE COURT:  Overruled.

16              MR. FEDER:  And foundation.

17              THE COURT:  Overruled.

18              MR. FEDER:  Thanks.

19              THE COURT:  I think the question was, what did you

03:55p 20      discuss?  So he can answer the question.

21              THE WITNESS:  We discussed the slow dance strategy

22      with the Attorney Generals.

23      BY MR. RAPP:

24      Q.   And what did you take that to mean?  What did you take

03:55p 25      that to mean, the slow dance?

```
 1   A.   We're going to give them very, very little but create the
 2   impression that we're doing something.  Like we're going to
 3   clean up some content, but we're not going to do everything
 4   that they want 'cuz that would impact revenue negatively.
```
03:56p 5   Q.   All right.  Now, as you went in to 2010, how was the
```
 6   revenue doing for the alternative newspapers, if you know?
 7   A.   Poorly.
 8   Q.   All right.  How do you know that?
 9   A.   Number of pages in each papers going down in size, staff
```
03:56p 10  is being reduced.
```
11   Q.   All right.  Did you continue to -- we're going to talk
12   about the strategy in a moment, but did you continue into 2010
13   to have this super poster relationship?
14   A.   Yes, we did.
```
03:56p 15  Q.   All right.  And can you remind the jury who it is that
```
16   you identified as a super poster?
17   A.   There were three in New York:  Dollar Bill, Somad and
18   Sean Kim.
19   Q.   All right.  I'm showing you Exhibit 34.  Do you see that
```
03:57p 20  on your screen there?
```
21   A.   Yes, I do.
22   Q.   And is this an e-mail exchange between some Backpage
23   employees?
24   A.   Yes, it is.
```
03:57p 25  Q.   And is it -- is it being sent to Andrew Padilla?

1    A.    Yes, it is from Thomas Pearl to Andrew Padilla.

2    Q.    And in response to Thomas Pearl's e-mail, is Mr. Padilla

3    -- does he do anything?  Let me just -- it's a "yes" or "no"

4    question.

03:58p  5        Does he take any action in response to Thomas Pearl's

6    e-mail?

7    A.    Yes, he did.  He restored an ad that was removed.

8              MR. RAPP:  All right, move to admit 34.

9              THE COURT:  I'm sorry, Mr. Rapp, did you say it was

03:58p 10   to Mr. Padilla?

11             I might be missing something.  I think it says to

12   Carl Ferrer -- oh, I see.  You're talking about the bottom

13   part?

14             MR. RAPP:  Yes.

03:58p 15             THE COURT:  All right.  You moved to admit?

16             MR. RAPP:  Yes.  Yes, ma'am.

17             MR. EISENBERG:  No objection, Your Honor.

18             THE COURT:  It may be admitted.

19             *(Exhibit No. 34 admitted in to Evidence.)*

03:58p 20             MR. RAPP:  All right.  And request permission to

21   publish.

22             THE COURT:  It may be published.

23   BY MR. RAPP:

24   Q.    All right.  Can you read this -- this e-mail from Thomas

03:59p 25   Pearl that he's sending to Andrew Padilla?

1  A.   "Hey Andrew, Wanted to reach out to you in reference to 2

2  ads that were community removed from my super affiliate

3  William Mersey."

4  Q.   Let me just stop you there.  This term "community

03:59p  5  removed," what does that mean?

6  A.   "Community removed" actually means a Backpage moderator

7  removed it.

8  Q.   All right.  And then what else -- what else is in this

9  e-mail?  What's the link in the ad's headline?

03:59p 10  A.   So he's sending a link to Dollar Bill's user account, and

11  then he's got the ads headline -- the two ads and the

12  headlines read, "KOREA'S ABSOLUTE BEST - It's PINKY - Start

13  your tour right here!  Real photos of a really hot girl!"

14       The next ad is, "The one and only PINKY!  KOREA'S BEST!

04:00p 15  Their loss is The Big Apple's gain!"

16       "Both were marked as spam; I've made them live again, but

17  I wanted to check with you to see why they were pulled.

18  Thanks for looking into it, Thomas."

19  Q.   And then what does Mr. Padilla tell him?

04:00p 20  A.   Mr. Padilla writes, "It's hard to tell what happened

21  after the ad has been restored.  It might be related to a

22  problem with the bayesian filter.  I'm working with desertnet

23  on it now.  it might be worth whitelisting dollarbill

24  temporarily until this resolved."

04:00p 25  Q.   All right.  Can you explain to the jury what

1   "whitelisting" means?

2   A.   So whitelisting would have an ad bypass, some of the

3   automated filters.  So you'd be getting an extra special VIP

4   treatment.

04:01p  5   Q.   All right.  And then the subject, that goes from Thomas

6   Pearl to you?

7   A.   Yes, Thomas Pearl forwards it to me because he expects

8   Dollar Bill's gonna try to e-mail me directly, as he often

9   did.

04:01p  10   Q.   All right.  And let's go to Exhibit 35 for the witness'

11   eyes only.  Can you identify this document?

12   A.   Yes, I can.

13   Q.   What is this document?

14   A.   This document is an e-mail and it's describing a task

04:01p  15   that comes out of our development database we call Mantis.

16   Q.   All right.  Can you explain to the jury what Mantis is?

17   A.   Mantis is just a website tool that we use to schedule

18   problems for the developers to fix.  So -- and then there's an

19   e-mail that's generated after the task is submitted to the

04:02p  20   developers, and that's what you see in this e-mail.

21   Q.   All right.  And is this between -- is this from Andrew --

22   this Mantis e-mail, is this from Andrew Padilla to you and Dan

23   Hyer?

24   A.   Yes, Andrew Padilla forwards this to -- or sends this to

04:02p  25   myself and Dan Hyer.

         1              MR. RAPP:  Move to admit Exhibit 35.

         2              THE COURT:  It may be admitted.

         3              MR. RAPP:  And so drawing your attention --

         4              THE COURT:  And published.

04:02p   5              MR. RAPP:  And published, thank you.

         6              *(Exhibit No. 35 admitted in to Evidence.)*

         7  BY MR. RAPP:

         8  Q.   Just drawing your attention to the bottom here, is this

         9  statement here, is this coming from Mr. Padilla?

04:02p  10  A.   Yes.  He writes, "Carl and Dan are still getting

        11  bombarded with calls from this client so I'm raising the task

        12  priority to immediate," like it needs to be worked on now.

        13  Q.   Okay.  And then up here what message is being given to

        14  the developers regarding the status of Dollar Bill's postings?

04:03p  15  A.   So the summary of the task is 4,200 ads need to be

        16  restored to live status and under description, "This account

        17  looks like it was accidentally hit with a global delete by one

        18  of our staffers."

        19       "Carl's gone ahead and whitelisted the account for future

04:03p  20  postings but we still need anything Community Removed set to

        21  Live and the expiration dates changed accordingly."

        22  Q.   All right.  And do you know if that was done?

        23  A.   Yes, it was -- it was done.  It was quite upsetting for

        24  Dollar Bill to have all 4200 of his ads suddenly deleted and

04:04p  25  we restored them.

1    Q.   Of those 4,200 ads that are the subject of Exhibit 34 and

2    now this Mantis report in 35, do you know whether or not those

3    4,200 ads were prostitution postings?

4              MS. BERTRAND:  Objection, speculation, unless he's

04:04p 5    looked at all 4,200 of them.

6              THE COURT:  Sustained.

7    BY MR. RAPP:

8    Q.   Well, do you have -- have you had conversations with

9    Dollar Bill about his postings?

04:04p 10   A.   Yes, I have and I've read his blog.

11   Q.   All right.  And in -- so to be clear, have you actually

12   had a in-person or phone conversation with Dollar Bill?

13   A.   Yes.

14   Q.   And during those conversations did Dollar Bill explain to

04:05p 15   you in some fashion who he was representing in bringing these

16   postings to Backpage?

17             MS. BERTRAND:  Objection, hearsay.

18             THE COURT:  Overruled.

19             THE WITNESS:  Yes.

04:05p 20            MR. RAPP:   All right.

21   BY MR. RAPP:

22   Q.   And who was he representing in these postings that he was

23   bringing to Backpage?

24   A.   He's representing Asian massage parlors in New York City,

04:05p 25   many of which he also puts on his blog with reviews.

 1  Q.   Okay.  And when you say "his blog with reviews," can you

 2  explain that.  Because we've been talking about The Erotic

 3  Review in reviews, but can you explain to the jury this blog

 4  and the reviews Dollar Bill has?

04:06p  5  A.   Dollar Bill's blog --

 6               MS. BERTRAND:  Objection, hearsay.

 7               MR. FEDER:  401, 403 too.

 8               MR. EISENBERG:  And foundation.

 9               THE COURT:  Well, I think foundation; but the other

04:06p 10  objections are overruled.

11               MR. RAPP:  Let me step back on the blog.

12  BY MR. RAPP:

13  Q.   How is it that you came to review Dollar Bill's blog?

14  A.   It was run as an ad on backpage.com in New York City

04:06p 15  female escort section.

16  Q.   All right.  And what was the reason for that?

17  A.   We gave him an ad because we wanted a good relationship

18  with Dollar Bill 'cuz he brought a lot of content.

19  Q.   All right.  And in addition to that, did you have e-mail

04:06p 20  exchanges with Dollar Bill about his postings on backpage.com?

21  A.   Yes, I did.

22  Q.   And during those e-mail exchanges was there anything he

23  said that led you to believe that the postings that he was

24  putting on the website involved prostitution ads?

04:07p 25               MS. BERTRAND:  Objection --

1          MR. EISENBERG:  Calls for a conclusion.

2          MS. BERTRAND:  -- and speculation.

3          THE COURT:  Sustained.

4          MR. RAPP:  As to?

04:07p  5          THE COURT:  As to hearsay.

6     BY MR. RAPP:

7     Q.   Well, was it important -- was Dollar Bill -- we just

8     looked at Exhibit 34 and 35.  Was Dollar Bill an important

9     customer to Backpage?

04:07p 10          MR. EISENBERG:  Objection, it's been asked and

11    answered.

12          THE COURT:  Well, overruled.

13          THE WITNESS:  Extremely important and we wanted to

14    promote his blog.

04:07p 15    BY MR. RAPP:

16    Q.   Why did you want to promote his blog?

17    A.   Because it made him happy and he would run more ads,

18    although later I decided the blog was just way too toxic for

19    us.

04:08p 20    Q.   When you say "too toxic" for you, what do you mean by

21    that?

22          MR. CAMBRIA:  Objection, calls for a conclusion.

23          THE COURT:  Overruled.

24          THE WITNESS:  He did very graphic reviews of his

04:08p 25    clients.

BY MR. RAPP:

Q.   All right.  And when you say "graphic reviews," what do you mean by that?

A.   I mean they were sex -- they were descriptions of sexual services.

04:08p          MS. BERTRAND:  Same objections, hearsay, lack of foundation.

          MR. EISENBERG:  Your Honor, it's irrelevant with respect to what's in Exhibit 35.  Those are ads, not reviews.

04:08p          THE COURT:  Well, I think we've moved on from those exhibits, so overruled.  And as to hearsay, it's overruled.

          MR. RAPP:  So --

          THE COURT:  I guess, Ms. Bertrand, I'm confused by your objection because the answer was they were descriptions

04:09p of sexual services and you said "hearsay."

          MS. BERTRAND:  Yeah.

          THE COURT:  So I think I don't know if we want to have this witness, as he's done previously, describes what he means by "sexual services" so --

04:09p          MS. BERTRAND:  That's not the hearsay concern.  I'll respond to the Court.  I just want to make sure I'm following the Court's rules.

          The hearsay concern is the discussion of what's gone on on a third-party blog and implicating that blog that

04:09p they've not tied to any of these 4,200 ads to conclude that,

 1   thus, these 4,200 ads must have been for prostitution.

 2   That's the leap.  That's a hearsay leap, a speculation leap

 3   and a relevance leap.

 4          THE COURT:  Well, I'll sustain it as to the entirety

04:10p  5   of the 4,200 ads and so -- but I guess to the extent you can

 6   lay the foundation beyond what you already laid with regard to

 7   the relationship between Backpage, Mr. Ferrer, and Dollar

 8   Bill; but I think there's sufficient foundation for that

 9   relationship, in any event, and so let's move forward,

04:10p 10   Mr. Rapp.

11          MR. RAPP:  Okay.

12   BY MR. RAPP:

13   Q.   All right.  The ad that -- based upon your discussions

14   with Dollar Bill, did you have an opinion as to the type of

04:10p 15   ads he was posting on Backpage --

16          THE COURT:  Can you move to the microphone, please.

17          MR. RAPP:  Yes, ma'am.

18   BY MR. RAPP:

19   Q.   Based on your discussions with him, both in person, over

04:11p 20   the phone and your e-mail exchanges, did you have an opinion

21   as to what type of ads Dollar Bill would be posting on

22   Backpage?

23          MS. BERTRAND:  Objection.  Relevance, foundation.

24          THE COURT:  Overruled.

04:11p 25          THE WITNESS:  Yes, I did.

1    BY MR. RAPP:

2    Q.   And -- and what was that -- let's also throw in there the

3    fact that you had this blog on -- that you were promoting on

4    backpage.com.  Did that also help you form an opinion?

04:11p  5    A.   It does.  I knew he posted prostitution ads because it

6    was in his blog.  I have conversations with him in person and

7    over the phone, and it was just always too revealing.  I

8    didn't want him to talk about it, and he liked to talk about

9    this stuff.  He was very -- too overt and the staff didn't

04:12p 10    really want to talk to him.  In fact, eventually the

11    relationship went to e-mail only.

12    Q.   All right.  Okay, thank you.

13         So with regard to the ads that Dollar Bill put on --

14    we've been talking about this blog, but were there ever -- was

04:12p 15    there ever the occasion where his ads would have links to

16    reviews?

17    A.   His ads would have occasionally links to the Dollar Bill

18    Psycho Roundup blog, and there you could find reviews.

19    Q.   All right.  And, again, just to be clear, what -- what

04:12p 20    were the reviews that they linked to?

21              MS. BERTRAND:  Objection.  Hearsay, foundation.

22              It's being offered for the truth of the matter

23    asserted, and it is clearly the statement of a person not in

24    this room making a statement.

04:13p 25              THE COURT:  Well, I think originally the question

```
        1   was:  Was there an occasion where his ads would have links to

        2   reviews?  The witness has testified he saw the blog.  So he

        3   can answer the question.  Go forward, Mr. Rapp.

        4   BY MR. RAPP:

04:13p  5   Q.   All right.  Well -- were these -- were these reviews that

        6   -- that were linked to Dollar Bill's blogs, were they reviews

        7   similar to what you would find on The Erotic Review?

        8            MS. BERTRAND:  Objection, leading.

        9            THE COURT:  Sustained.

04:13p 10   BY MR. RAPP:

       11   Q.   What type of reviews were they?

       12   A.   Descriptions of sexual services at massage parlors.

       13            MS. BERTRAND:  Objection, hearsay.  Move to strike.

       14            THE COURT:  Overruled.

04:14p 15   BY MR. RAPP:

       16   Q.   Okay.  Now, looping back to Exhibit 588 -- and if you

       17   could just look at that on your screen, sir.  Do you see that?

       18   A.   Yes, I do.  It's a PowerPoint.

       19   Q.   Okay.  And do you recognize this PowerPoint?

04:14p 20   A.   Yes, I do.  It's part of the budget hearings.

       21   Q.   All right.  And is this -- is this the PowerPoint that we

       22   were talking about earlier with this e-mail from Jess Adams

       23   and it was attached?

       24        Does that refresh your recollection, that e-mail that we

04:14p 25   were talking about a few moments ago?
```

1   A.   Yes, it does.  Yes, this is -- this is the attachments in

2   that e-mail.

3   Q.   All right.

4        MR. RAPP:  I would move to admit the entirety of

04:15p  5   588.

6        THE COURT:  5-8-8?

7        MR. RAPP:  Yes, ma'am.

8        THE COURT:  Yes, it may be admitted.

9        *(Exhibit No. 588 admitted in to Evidence.)*

04:15p  10       MR. RAPP:  So just -- and I would request permission

11   to publish.

12       THE COURT:  It may be published.

13   BY MR. RAPP:

14   Q.   And just so we're clear, is this the PowerPoint deck that

04:15p  15   we were talking about earlier for the 2010 budget?

16   A.   Yes.

17   Q.   And I want to just have you look at a couple of these

18   slides.  In looking at Slide 18, can you explain to the jury

19   -- can you read this and explain to the jury what this slide

04:16p  20   is all about?

21   A.   So in Slide 18 we have specific initiatives for 2010 plan

22   and to "add personnel."  We're increasing the monitoring staff

23   to a full 24/7 operation.  "(see moderation section)."  We're

24   increasing the marketing staff and efforts --

04:16p  25   Q.   Let me just stop you there.  When you increase the

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP          107

```
  1  marketing staff and efforts, who has to approve that?

  2  A.   Scott Spear, Jim Larkin, Jed Brunst.

  3  Q.   All right.  And if -- if you could go on.

  4  A.   "Dan Hyer:  Sales and marketing Director."  Then you'll

  5  see "Carl."  That means I'm to talk about this topic.

  6  Q.   All right.  And what are the bullet points under that?

  7  A.   Under -- the bullet points are "User acquisition and

  8  retention."

  9       "Fraud recovery:  phone verifications over $100."

 10       "Traffic retention:  Manage back links/ban bad URLs."

 11       "Affiliate (loyalty) operations manager."

 12       "National accounts manager."

 13       Increase marketing staff from 14 to 18 in Q1 -- I think

 14  it's -- well, it says 21 in Q3.

 15  Q.   All right.  Let me just ask you a quick question about

 16  this third bullet point there.

 17       "Manage bad links," what did that refer to?

 18  A.   That refers to The Erotic Review.

 19  Q.   And in what respect?

 20  A.   That's -- that's increasing the referrals, keeping the

 21  referrals coming from The Erotic Review.

 22  Q.   And I think I got ahead of myself.  And "user acquisition

 23  and retention," what did that refer to?

 24  A.   That's the -- that's the offering users free ads in

 25  female escorts and then if -- and this is -- this is what's
```

04:16p (line 5)
04:17p (line 10)
04:17p (line 15)
04:17p (line 20)
04:18p (line 25)

1    different is that if we find out that a paying client in

2    female escorts, in particular, is now no longer running paid

3    ads, we have a retention effort, meaning we're gonna contact

4    them and give them e-mail offers, call them on the phone if we

04:18p  5    have to to get them to become live customers again.

6    Q.   And then going to Slide 23 where it says, "Continue to

7    engage Attorney Generals.  Move slowly but deliberately," what

8    did that mean?

9    A.   So this slide is going to be explained by Scott Spear.

04:19p 10    "Legal strategy for 2010.  Continue to engage Attorney

11    Generals.  Move slowly but deliberately."

12    Q.   All right.  And then down -- this last bullet point that

13    says "Budget appropriately" and in parens what does that say?

14    A.   Scott Spears saying in the budget hearing we're gonna

04:19p 15    need to budget appropriately.  The slow dance $360,000, that's

16    the legal budget.

17    Q.   And, again, you've discussed what the slow dance means

18    with regard to the Attorney Generals.

19         Let's look at Exhibit 31 -- Slide 31, rather -- and this

04:20p 20    is -- the entirety of 588 is in evidence, thank you -- and 31

21    under -- under the bullet point marked "Legal," what does it

22    say?

23    A.   That bullet point states, Legal ($250k slow dance

24    w/AGs, $110k remainder for licenses and miscellaneous.)

04:20p 25    Q.   All right.  And I believe your testimony is you weren't

1    the only one to work on this PowerPoint?

2    A.   Yes, this PowerPoint is mainly Scott Spear.  Jess Adams

3    is building it, and I'm contributing content to it.

4    Q.   And do you have a recollection in December of 2009

04:21p  5    presenting this PowerPoint?

6    A.   Yes, I do.

7    Q.   And where did that happen?

8    A.   It happened at the Phoenix New Times' offices.

9    Q.   All right.  And were you present?

04:21p 10    A.   Yes, I have to be present.

11    Q.   All right.  Was Mr. Spear present?

12    A.   Yes, he was.

13    Q.   And was Mr. Brunst in his capacity as the chief financial

14    officer, was he present?

04:21p 15    A.   Yes.

16    Q.   All right.  Moving on, as you got into -- as you went in

17    to 2010 we talked about the super poster relationship with

18    Dollar Bill, but did the relationship with The Erotic Review

19    continue?

04:22p 20    A.   I believe so, yes.

21    Q.   All right.  Let's look at Exhibit 311 for your eyes only.

22         Okay.  So do you see that on your screen there?

23    A.   Yes, I do.

24    Q.   And what is it?

04:22p 25    A.   It's a Google Analytics report that shows the traffic on

```
 1    Backpage for March 22nd, 2010.

 2    Q.   All right.  And how is it that you received -- did you

 3    receive this Google Analytic report?

 4    A.   Yes.

 5    Q.   And was this -- do you know if this Google Analytic

 6    report for this single day was provided to anybody in upper

 7    management?

 8    A.   I believe so, yes.

 9    Q.   And who in upper management was this -- was reviewing

10    this?

11            MR. PANCHAPAKESAN:  Object to foundation and vague

12    as to "upper management."

13            THE COURT:  Sustained.

14            MR. RAPP:  All right.

15    BY MR. RAPP:

16    Q.   Let's just take -- do you know if Scott Spear would

17    review a Google Analytic report such as this?

18    A.   Yes, I ran these reports to show them to Scott Spear in

19    our discussions about the business and how it was doing.

20            MR. RAPP:  Move to admit United States 311.

21            MR. FEDER:  401, 403, 801.

22            THE COURT:  Overruled.  311 is admitted, may be

23    published.

24            (Exhibit No. 311 admitted in to Evidence.)

25    BY MR. RAPP:
```

04:23p (line 5)
04:23p (line 10)
04:23p (line 15)
04:23p (line 20)
04:24p (line 25)

 1    Q.   All right, let's just look at a couple things.  Just so

 2    we're clear, for what time period is this Google Analytics

 3    report?

 4    A.   March 22nd, 2010.

04:24p    5    Q.   And then this section under "referring sites," can you

 6    interpret this section for the jury?

 7    A.   Yes, so this shows users coming from other sites to

 8    Backpage with theeroticreview.com bringing 43,328 visits on a

 9    single day and below it eccie.net 7,000 visits and

04:24p   10    usasexguide.info 6,498 visits.

11         Those last two sites are escort sites that have also

12    escort review.

13    Q.   All right.  And then going to this section that is

14    entitled "content drilldown," can you interpret these figures

04:25p   15    for the jury?

16    A.   So this shows what are people consuming on backpage.com,

17    where they going; and 55.19 percent of the traffic is in

18    female escorts and then -- well, nearly another seven percent

19    is in body rubs and then transsexual escorts another near six

04:25p   20    percent.

21         So if you ranked it in terms of priority of traffic,

22    female escorts is the number one category followed by body

23    rubs and transsexual escorts.

24    Q.   All right, let's go on to another area.

04:26p   25         As you got into 2010, did you continue to have any

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP

```
 1   competition as a classified website with Craigslist?

 2   A.   Did we continue to have competition with Craigslist?

 3   Q.   Yes.

 4   A.   Oh, yes, very much so.

 5   Q.   Did you come to learn what Craigslist was doing with its

 6   adult section?

 7   A.   Yes, they were making changes.

 8   Q.   All right.  And what changes did you understand

 9   Craigslist was making with its adult section?

10   A.   Well, he had two sets of changes.  One was erotic

11   services cancelled, and then it all moved to adult services;

12   and then later he terminated adult services.

13   Q.   All right.  And did you -- did it come to your attention

14   that Craigslist -- did Craigslist have a blog?

15   A.   Yes, he had a blog.

16   Q.   When you keep saying "he," who are you --

17   A.   Craigslist, Craig Newmark and Jim Buckmaster often posted

18   in the blog, the Craigslist blog.

19   Q.   All right.  And is -- Craig Newmark, is he the person

20   Craigslist is named after?

21   A.   Yes, he's the CEO of Craigslist.  Jim Buckmaster is the

22   CTO.

23   Q.   All right.  And at some point in the time you were at

24   Backpage you'd have occasion to meet with Mr. Newmark?

25   A.   Did I have -- yes, I did have a couple of times I met
```

Timestamps: 04:26p (line 5), 04:26p (line 10), 04:27p (line 15), 04:27p (line 20), 04:27p (line 25)

 1  with Craig Newmark.

 2  Q.   And were you following the changes that Craigslist was

 3  making to its erotic and adult section?

 4  A.   We were following it very, very closely.

04:28p 5  Q.   Did you learn at some point that Mr. Newmark was

 6  confronted by a journalist regarding his adult section?

 7  A.   Yes, we learned that he was confronted by Amber Lyon of

 8  CNN.

 9  Q.   All right.  And how did you learn that?

04:28p 10  A.   It -- the story broke on CNN.

11  Q.   All right.  And can you describe how Mr. Newmark was

12  confronted by Amber Lyon?

13           MS. BERTRAND:  Objection, hearsay.

14           MR. EISENBERG:  Objection, hearsay.

04:29p 15           THE COURT:  Sustained.

16  BY MR. RAPP:

17  Q.   Well, were you aware of it?  That's a "yes" or "no."

18  A.   Yes, very aware of it and concerned.

19           MR. RAPP:  All right.

04:29p 20           MS. BERTRAND:  Objection, motion to strike,

21  non-responsive.  The question was:  Are you aware of it?

22           THE COURT:  He said "yes."

23           MR. RAPP:  All right.

24  BY MR. RAPP:

04:29p 25  Q.   Did you come to learn that anybody in upper management

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP

1    and in ownership also viewed the confrontation between Amber

2    Lyon and Craig Newmark?

3              MS. BERTRAND:  Objection, leading.

4              MR. PANCHAPAKESAN:  It's foundation, speculation,

04:29p   5    vague as to "upper management."

6              MS. BERTRAND:  And seeks hearsay.

7              THE COURT:  Sustained as to leading and hearsay, and

8    so why don't we take our afternoon recess.  It is 4:30.

9              Members of the Jury, so it seems to me that since

04:30p  10    Mr. Rapp is moving into a different area, this should be the

11    appropriate time that we take our evening recess; and so,

12    again, I give you the admonishment just to not come to any

13    conclusions, just to continue to keep an open mind, not to

14    discuss the matters that you've heard today amongst yourself

04:30p  15    or anyone else.

16              Just have a pleasant evening and please be ready to

17    come into the courtroom promptly at 9:00.  With that, please

18    all rise for the jury.

19              (Jury out at 4:30 p.m.)

04:31p  20              THE COURT:  All right, please be seated.

21              And as previously, those who are in the courtroom

22    please remain for a few minutes so that the jurors can leave

23    uninterrupted.

24    *(Whereupon the proceedings adjourned at 4:31 p.m.)*

0:0:0   25

1          ***REPORTER'S CERTIFICATION***

2

3                    I, TERI VERES, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6                    I FURTHER CERTIFY that the foregoing pages

7     constitute a full, true, and accurate transcript of all of

8     that portion of the proceedings contained herein, had in the

9     above-entitled cause on the date specified therein, and that

10    said transcript was prepared under my direction and control.

11                   DATED at Phoenix, Arizona, this 14th of

12    September, 2023.

13

                                    _____s/Teri Veres_____
14                                   TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25