UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

|  |  |  |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Phoenix, Arizona |
| Michael Lacey, et al., | ) | October 10, 2023 |
| | ) | 12:59 p.m. |
| Defendants. | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**JURY TRIAL - DAY 15**</u>

<u>**(P.M. SESSION)**</u>

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2     For the Government:
          UNITED STATES ATTORNEY'S OFFICE
3         By:  **Mr. Kevin M. Rapp, Esq.**
               **Mr. Andrew C. Stone, Esq.**
4              **Mr. Peter Shawn Kozinets, Esq.**
               **Ms. Margaret Wu Perlmeter, Esq.**
5              **Mr. Daniel G. Boyle, Esq.**
          40 North Central Avenue, Suite 1800
6         Phoenix, Arizona  85004-4408
          kevin.rapp@usdoj.gov
7         peter.kozinets@usdoj.gov
          andrew.stone@usdoj.gov
8         margaret.perlmeter@usdoj.gov
          - and -
9         UNITED STATES DEPARTMENT OF JUSTICE
          By:  **Mr. Austin Berry, Esq.**
10        1301 New York Avenue NW, 11th Floor
          Washington, DC  20005
11        austin.berry2@usdoj.gov

12    For the Defendant Michael Lacey:
          LIPTSITZ GREEN SCIME CAMBRIA, LLP
13        By:  **Mr. Paul J. Cambria, Esq.**
          42 Delaware Avenue, Suite 120
14        Buffalo, New York  14202
          pcambria@lglaw.com

15    For the Defendant Scott Spear:
16        KESSLER LAW OFFICE
          By: **Mr. Eric Walter Kessler, Esq.**
17        6720 North Scottsdale Road, Suite 210
          Scottsdale, Arizona  85253
18        eric.kesslerlaw@gmail.com
          - and -
19        FEDER LAW OFFICE, PA
          By:  **Mr. Bruce S. Feder, Esq.**
20        2930 East Camelback Road, Suite 160
          Phoenix, Arizona  85016
21        bf@federlawpa.com

22

23

24

25

                     UNITED STATES DISTRICT COURT

<pre>
 1                    A P P E A R A N C E S (Cont'd)

 2   For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 3        By:   Mr. Gopi K. Panchapakesan, Esq.
                Mr. Gary S. Lincenberg, Esq.
 4                Mr. Ariel A. Neuman, Esq.
          1875 Century Park E, Suite 2300
 5        Los Angeles, California  90067
          gpanchapakesan@birdmarella.com
 6        glincenberg@birdmarella.com
          aneuman@birdmarella.com
 7
     For the Defendant Andrew Padilla:
 8        DAVID EISENBERG, PLC
          By:   Mr. David S. Eisenberg, Esq.
 9        3550 North Central Avenue, Suite 1155
          Phoenix, Arizona  85012
10        david@deisenbergplc.com

11   For the Defendant Joye Vaught:
          JOY BERTRAND, ESQ, LLC
12        By:   Ms. Joy Malby Bertrand, Esq
          P.O. Box 2734
13        Scottsdale, Arizona  85252-2734
          Joy@joybertrandlaw.com
14

15

16

17

18

19

20

21

22

23

24

25
</pre>

1

<u>I N D E X</u>

2

<u>WITNESSES FOR THE GOVERNMENT:</u>                                    <u>PAGE</u>

3

Carl Ferrer
         Cross-Examination by Ms. Bertrand                    17
4        Redirect Examination by Mr. Rapp                     59
Jess Adams
5        Direct Examination by Mr. Stone                      120

6

7

<u>EXHIBITS</u>

8

<u>NO.</u>        <u>DESCRIPTION</u>                                   <u>REC'D</u>

9

5, page    PowerPoint Presentation, January 2006          68
1 and      DOJ-BP-0004602110
10
page 17

11

5174       Spreadsheet of Law Enforcement Accolades        17
           DEFENSE 001962-001977
12

5175       02.16.11 Email from M. Barker to C. Ferrer       17
13         re: "Police Posting"

14

5220       05.15.13 Email from Det. John Mazure,            17
           Lyndhurst PD, NJ to help@backpage.com
15         DEFENSE 002107-002109

16

5221       EXHIBIT REMOVED - DUPLICATE OF 5220              17

17

5222       06.11.13 Email from Det. Rich Petrie             17
           Toronto PD, Ontario, CAN to
18         help@backpage.com DEFENSE 002113-002114

19

5223       08.09.13 Email from M. Dollear re: Cook          17
           County, IL Subpoena to help@backpage.com
20         DEFENSE 002116

21

5224       08.27.13 Email from Tracy Zeller, Tulsa          17
           PD, OK to help@backpage.com
22         DEFENSE 002118-002119

23

5225       09.18.13 Email from Jodie Donaghy, SA,           17
           DHS, RI to help@backpage.com
24         DEFENSE 002121-002122

25

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 5226 | 11.12.13 Email from Det. John Purlee, Grand Rapids PD, MI to help@backpage.com DEFENSE 002124-002125 | 17 |
| 5227 | 10.29.15 Email from Det. Joe Adock, Flower Mound PD, TX to help@backpage.com DEFENSE 002128-002129 | 17 |
| 5228 | 01.24.14 Email from Ronald Bercovici, Constable, Windsor PD, Ontario, CAN to support@backpage.com DEFENSE 002131-002134 | 17 |
| 5229 | 02.03.14 Email from Paul Osborn, Inv., Tallahassee PD, FL to records@backpage.com DEFENSE 002136-002138 | 17 |
| 5230 | 02.05.14 Email from Det. Donna Ring, Charlotte PD, NC to help@backpage.com DEFENSE 002140-002141 | 17 |
| 5231 | 03.13.14 Email from Det. Jonathan Weiss, Burlington PD, WA to records@backpage.com DEFENSE 002143-002144 | 17 |
| 5232 | 02.04.14 Email from Heather Gordon, SA, FBI to help@backpage.com DEFENSE 002146 | 17 |
| 5233 | 05.13.14 Email from James Stapleton, Springfield, IL to records@backpage.com DEFENSE 002148 | 17 |
| 5234 | 05.20.14 Email from Kateri Gasper, DA, Queens, NY to records@backpage.com DEFENSE 002150-002151 | 17 |
| 5235 | 05.22.14 Email from Douglas Wood, SA, FBI Northern VA to help@backpage.com DEFENSE 002153-002154 | 17 |
| 5236 | 05.27.14 Email from D. Dorsey, City of Pearl, TX to help@backpage.com DEFENSE 002156 | 17 |

UNITED STATES DISTRICT COURT

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 5237 | 06.03.14 Email from Det. Andrew Thompson, Dunwoody PD, GA to records@backpage.com DEFENSE 002158-002159 | 17 |
| 5238 | 06.09.14 Email from  Det. Isaac Wall, Denver PD, CO to records@backpage.com DEFENSE 002161 | 17 |
| 5239 | 06.14.12 Email from Kathleen Trask, DA, Essex County, MA to help@backpage.com DEFENSE 002163 | 17 |
| 5240 | 06.17.14 Email from Shawn Allen, Fayetteville, AR to records@backpage.com DEFENSE 002165 | 17 |
| 5241 | 06.23.14 Email from Tammy Lobb, CST, Halifax Nova Scotia, CAN to records@backpage.com DEFENSE 002167-002168 | 17 |
| 5242 | 06.26.14 Email from Det. Greg Engstler, Atlantic County Sheriff's Office, NJ to records@backpage.com DEFENSE 002170-002171 | 17 |
| 5243 | 07.01.14 Email from Douglas Wood, SA, FBI Northern VA to records@backpage.com DEFENSE 002173 | 17 |
| 5244 | 07.29.14 Email from Louis Longhitano, DA, Cook County, IL to Andrew Padilla re: Ad reported to NCMEC on 07.08.14 DEFENSE 002175-002178 | 17 |
| 5245 | 08.01.14 Email from Andrew Knutson, SA, FBI to records@backpage.com DEFENSE 002180-002181 | 17 |

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|---|---|---|
| 5246 | 08.13.14 Email from Kenneth Penrod, Montgomery County PD, MD, to Andrew Padilla re: Placing ads in the community/general section and Escort section<br>DEFENSE 002183 | 17 |
| 5247 | 09.03.14 Email from Det. Paul Martin, Yarmouth PD, ME to records@backpage.com<br>DEFENSE 002185-002186 | 17 |
| 5248 | 09.15.14 Email from and Eric Landamia, DA, Bucks County, PA to records@backpage.com<br>DEFENSE 002188-002189 | 17 |
| 5249 | 09.17.14 Email from Michael Panico, Chicago PD, IL to records@backpage.com<br>DEFENSE 002191 | 17 |
| 5250 | 10.10.14 Email from Lacy Lansdown, Tulsa PD, OK to help@backpage.com<br>DEFENSE 002193-002194 | 17 |
| 5251 | 10.27.14 Email from Daniel Steele, Denver PD to L. McDougal re: Online prostitution ads<br>DEFENSE 002196 | 17 |
| 5252 | 10.28.14 Email from David Nieto, Houston PD, TX to records@backpage.com<br>DEFENSE 002198 | 17 |
| 5253 | 10.28.14 Email from Terrence Burks, Houston County Sheriff's Office, TX to records@backpage.com<br>DEFENSE 002200 | 17 |
| 5254 | 11.04.14 Email from Heather Gordon, SA, FBI to records@backpage.com<br>DEFENSE 002202 | 17 |
| 5255 | 11.19.14 Email from Brian Pereira, Fairfield PD, CA to records@backpage.com<br>DEFENSE 002204-002205 | 17 |

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 5256 | 12.06.14 Email from Michael Panico, Chicago, PD, IL, to records@backpage.com DEFENSE 002207 | 17 |
| 5257 | 12.18.14 Email from Roy VanBrunt, SA, FBI to help@backpage.com DEFENSE 002209-002210 | 17 |
| 5258 | 01.28.15 Email from Mike Schantzen, Anoka County Sheriff's Office, MN to records@backpage.com DEFENSE 002222-002223 | 17 |
| 5260 | 01.28.15 Email from Mike Schantzen, Anoka County Sheriff's Office, MN to records@backpage.com DEFENSE 002222-002223 | 17 |
| 5261 | 01.30.15 Email from Steve Wrathall, SA, FBI, Orange County, CA to records@backpage.com DEFENSE 002225-002226 | 17 |
| 5262 | 02.11.15 Email from Michael Panico, Chicago, PD to records@backpage.com DEFENSE 002228 | 17 |
| 5263 | 5263   02.18.15 Email from William Williger, SA, DHS, FL to help@backpage.com DEFENSE 002230-002231 | 17 |
| 5264 | 02.27.15 Email from Louis Longhitano, DA, Cook County, IL to records@backpage.com DEFENSE 002233-002234 | 17 |
| 5265 | 02.27.15 Email from Louis Longhitano, DA, Cook County to records@backpage.com re: Additional records request DEFENSE 002236-002237 | 17 |
| 5266 | 03.05.15 Email from Beth Crano, Inv., Cuyahoga County, OH to help@backpage.com DEFENSE 002239-002240 | 17 |

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 5267 | 03.16.15 Email from Anthony Kozlar, Cook County Sheriff's PD to records@backpage.com  DEFENSE 002242-002243 | 17 |
| 5268 | 03.17.15 Email from Jeff Carson, Franklin PD, TN to records@backpage.com DEFENSE 002245 | 17 |
| 5269 | 03.17.15 Email from Michael Barker, SA, FBI to records@backpage.com DEFENSE 002247-002248 | 17 |
| 5270 | 03.31.15 Email from Brigid Brown, DCA, Cook County, IL to records@backpage.com DEFENSE 002250 | 17 |
| 5271 | 04.17.15 Email from Adam Granit, Davie, FL to help@backpage.com DEFENSE 002252-002253 | 17 |
| 5272 | 04.22.15 Email from Henrik Impola, DE, FBI, Detroit, MI to records@backpage.com DEFENSE 002255-002256 | 17 |
| 5273 | EXHIBIT REMOVED - DUPLICATE OF 5272 | 17 |
| 5274 | 04.30.15 Email from Joseph Haungs, SA, FBI to records@backpage.com DEFENSE 002261-002262 | 17 |
| 5275 | 05.04.15 Email from Rebecca Hart, SA, FBI to help@backpage.com DEFENSE 002264 | 17 |
| 5276 | 05.06.15 Email from Carrie Sidoti, Akron, OH PD to records@backpage.com DEFENSE 002266 | 17 |
| 5277 | 04.13.15 Email from Michael Melendez, Charlotte-Melkenberg PD, NC to records@backpage.com DEFENSE 002268 | 17 |

<b><u>EXHIBITS (Cont'd)</u></b>

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 5278 | 05.27.15 Email from Alyssa Ryder, Duluth PD, MN to ords@backpage.com<br>DEFENSE 002270-002271 | 17 |
| 5279 | 05.28.15 Email from Joseph Haungs, SA, FBI to help@backpage.com re: Subpoena 141343<br>DEFENSE 002273-002274 | 17 |
| 5280 | 05.28.15 Email from Joseph Haungs, SA, FBI to help@backpage.com re: Subpoena 141253<br>DEFENSE 002276-002277 | 17 |
| 5281 | 07.09.15 Email from Sean McDermott, FBI, to records@backpage.com<br>DEFENSE 002279-002281 | 17 |
| 5282 | 06.12.15 Email from Michael Panico, Chicago PD, IL to records@backpage.com<br>DEFENSE 002283 | 17 |
| 5283 | 06.23.15 Email from Cole Masutani, DHS, Honolulu HI to records@backpage.com<br>DEFENSE 002285-002286 | 17 |
| 5284 | 08.07.15 Email from Lauren Gebo, Paralegal, USAO, Burlington, VT to records@backpage.com<br>DEFENSE 002288 | 17 |
| 5285 | 08.07.15 Email from Douglas Wood, SA, FBI Northern VA to records@backpage.com<br>DEFENSE 002290-002292 | 17 |
| 5286 | 08.10.15 Email from Matthew Jacobs, AUSA, EDNY to records@backpage.com<br>DEFENSE 002294 | 17 |
| 5287 | 08.17.15 Email from Taylor Dervish, SA, FBI to records@backpage.com<br>DEFENSE 002296-002297 | 17 |

UNITED STATES DISTRICT COURT

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 5288 | 08.19.15 Email from Jacob Jansky, FBI, Milwaukee, WI to records@backpage.com DEFENSE 002299 | 17 |
| 5289 | 08.20.15 Email from Det. Gary Frascone Jackson Township PD, OH to records@backpage.com DEFENSE 002301-002302 | 17 |
| 5290 | 08.31.15 Email from Daniel Townsend, Portland PD, ME to records@backpage.com DEFENSE 002304 | 17 |
| 5291 | 09.13.15 Email from Carlos Delgado, ICE/DHS to records@backpage.com DEFENSE 002306-002307 | 17 |
| 5292 | 09.14.15 Email from Heather Gordon, SA, FBI to records@backpage.com re: Subpoena 159883 DEFENSE 002309 | 17 |
| 5293 | 09.14.15 Email from Heather Gordon, SA, FBI to records@backpage.com re: Subpoena 159899 DEFENSE 002311 | 17 |
| 5294 | 09.15.15 Email from Amanda Herman, Phoenix PD, AZ to records@backpage.com DEFENSE 002313-002314 | 17 |
| 5295 | 09.15.15 Email from Det. Nicholas Bollas, New Franklin PD, OH records@backpage.com DEFENSE 002316 | 17 |
| 5296 | EXHIBIT REMOVED - DUPLICATE OF 5887 | 17 |
| 5297 | 09.18.15 Email from Matthew Jacobs, AUSA, EDNY to records@backpage.com DEFENSE 002320 | 17 |
| 5298 | 09.25.15 Email from Patick Dugan, SA, FBI, Baltimore, MD to records@backpage.com DEFENSE 002322-002323 | 17 |

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 5299 | 08.25.15 Email from Det. Aaron Dennis, Columbus PD, OH to N. Kopecky re: Guilty Verdict in trial DEFENSE 002325-002327 | 17 |
| 5300 | 09.28.15 Email from Mark Kirby, SA, FBI to help@backpage.com DEFENSE 002329-002331 | 17 |
| 5301 | 10.08.15 Email from Melissa Rodriguez, Deputy DA, San Bernardino County, CA to N. Kopecky re: Guilty Verdict in trial DEFENSE 002333-002334 | 17 |
| 5302 | 10.16.15 Email from Heather Gordon, SA, FBI to records@backpage.com re: Subpoena 165793 DEFENSE 002336 | 17 |
| 5303 | 10.16.15 Email from Heather Gordon, SA, FBI to records@backpage.com re: Subpoena 165796 DEFENSE 002338-002339 | 17 |
| 5304 | 10.30.15 Email from Kimberly Anderson, FBI, LA, CA to records@backpage.com DEFENSE 002341-002342 | 17 |
| 5305 | 10.30.15 Email from Christopher Kindell, DPS, TX to records@backpage.com DEFENSE 002344-002346 | 17 |
| 5306 | 11.12.15 Email from Joseph Haungs, FBI, PA to records@backpage.com DEFENSE 002348-002349 | 17 |
| 5307 | 11.24.15 Email from Stanley Kaluza, Special Duty US Marshall, Philadelphia, PA to records@backpage.com DEFENSE 002351-002352 | 17 |
| 5308 | 12.09.15 Email from Det. Erin Gibbs, Dekalb County PD, GA to records@backpage.com DEFENSE 002354-002355 | 17 |

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 5309 | 12.14.15 Email from Joseph Scaramucci, McLennan County, TX to records@backpage.com DEFENSE 002357 | 17 |
| 5310 | 01.25.16 Email from Carlos Delgado, SA, DHS, San Diego, CA to records@backpage.com DEFENSE 002360-002361 | 17 |
| 5311 | 02.10.16 Email from Matthew Goeckel, Gainesville PD, FL to records@backpage.com DEFENSE 002363-002364 | 17 |
| 5312 | 03.01.16 Email from Kimberlie Laff, FBI, Savannah GA to records@backpage.com DEFENSE 002366-002367 | 17 |
| 5313 | 03.01.16 Email from Joseph Wechsler, Henrico, VA to records@backpage.com DEFENSE 002369-002370 | 17 |
| 5314 | 04.13.16 Letter from Gloucester County Prosecutor Sean Dalton and Victim Witness Coordinator Kris Gallagher to I. Martin re: Her assistance DEFENSE 002372-002373 | 17 |
| 5315 | 04.21.16 Email from Kelly Harrison, SA, DHS, Charlotte, NC to N. Kopecky re: His assistance DEFENSE 002375-002377 | 17 |
| 5316 | 04.26.16 Email from Michael McKeen, SA, DHS, MI to records@backpage.com with article of conviction attached to email DEFENSE 002379-002380 | 17 |
| 5317 | 05.06.16 Email from Amy Storer, DHS, Savannah, GA to records@backpage.com DEFENSE 002382-002383 | 17 |
| 5318 | 05.09.16 Email from David Weiss, Prosecutor Brooklyn, NY to issa@backpage.com DEFENSE 002385-002386 | 17 |

**<u>EXHIBITS  (Cont'd)</u>**

| <u>NO.</u> | <u>DESCRIPTION</u> | <u>REC'D</u> |
|---|---|---|
| 5319 | 05.10.16 Email from Amy Storer, DHS, Savannah, GA to records@backpage.com<br>DEFENSE 002388-002390 | 17 |
| 5320 | 05.12.16 Email Det. Dan Gaughan, Tempe PD, AZ to records@backpage.com<br>DEFENSE 002392-002394 | 17 |
| 5321 | 05.17.16 Email from Elizabeth Noonan, Oxford, MA to records@backpage.com<br>DEFENSE 002396-002398 | 17 |
| 6257 | 04.03.14 Email from J. Vaught to Colleen, A. Padilla and Sara re: "Performance Warning 4.3.14"<br>(Govt Exh. 1644)<br>DOJ-BP-0003715769 | 36 |
| 6258 | 02.27.14 Email from J. Vaught to Colleen, A. Padilla and Sara re: "Moderation Review 2.27.14"<br>(Govt Exh. 1645)<br>DOJ-BP-0003715685 | 40 |

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (Proceedings resume at 12:59 p.m.) |
| 3 | (Jury not present at 12:59 p.m.) |
| 4 | THE COURT:  All right.  Please be seated. |
| 5 | MR. RAPP:  Judge, I just have one brief matter. |
| 6 | With respect to the exhibits that counsel wanted to |
| 7 | admit en mass and go through, we don't have an objection to |
| 8 | that, and she can proceed accordingly. |
| 9 | THE COURT:  The -- well, let's see.  One moment. |
| 10 | (The Court and the courtroom deputy confer.) |
| 11 | MS. BERTRAND:  Does the Court need an extra set of |
| 12 | readers?  I'm sure among the lawyers we can find one. |
| 13 | (Discussion held off the record.) |
| 14 | MS. BERTRAND:  I suggested to the Court that between |
| 15 | all the lawyers, we might have an extra pair of reading |
| 16 | glasses. |
| 17 | THE COURT:  You know, it dawns on me that -- oh, here |
| 18 | we go. |
| 19 | MS. BERTRAND:  Oh, all right. |
| 20 | THE COURT:  Always an emergency pair. |
| 21 | MS. BERTRAND:  My house buys them by the pack. |
| 22 | THE COURT:  These are Costco, so multipack. |
| 23 | In any event, I have the stipulations in document |
| 24 | 1801, and there were stipulations as well as contested matters. |
| 25 | I take it, and I assume what you were referring to, |

The timestamps in the right margin:
12:59:05
13:00:21
13:00:57
13:01:05
13:01:29

1    Ms. Bertrand, was Attachment A, Document 1801, which lists the

2    stipulated defense exhibits, these --

3             MS. BERTRAND:  Yes.

4             THE COURT:  -- were the exhibits that you wanted to

5    move to admit en mass.                                    13:01:49

6             MS. BERTRAND:  Correct.  Yes.  Thank you.

7             THE COURT:  And these are the exhibits that the

8    government has no objection to moving forward in that fashion?

9             MR. RAPP:  That's correct.

10            THE COURT:  All right.  So we can do that, and you may  13:02:03

11   proceed in that way.

12            MS. BERTRAND:  Thank you.

13            Would the Court like me to, when the jury comes out,

14   put on the record those exhibit numbers?  How would you like me

15   to proceed?                                               13:02:17

16            THE COURT:  Yes, you should --

17            MS. BERTRAND:  Okay.

18            THE COURT:  -- just so -- and it is always somewhat

19   procedurally problematic that if you move to admit all of these

20   exhibits, we presume they go back to the jury.  And so they're  13:02:32

21   going to have to have some context in any event.  It's just the

22   process of moving and publishing.

23            So go ahead and make the motion.  Government will not

24   object.  And then you can just move forward in that way.

25            MS. BERTRAND:  Okay.  Thank you.                 13:02:52

CARL FERRER - CROSS-EXAMINATION (Cont'd)

THE COURT:  All right.  Let's go ahead and have the jury in.

All rise for the jury.

(Jury present at 1:03 p.m.)

THE COURT:  All right.  Please be seated.

And the record will reflect the presence of our jury.  Mr. Ferrer's on the stand.

Ms. Bertrand, you may proceed.

MS. BERTRAND:  Thank you, Your Honor.

Before we go further, I would ask the Court to admit the following documents: Defense 5174, 5175, 5220 through 5258, 5260 through 5321.

THE COURT:  And is there an objection?

MR. RAPP:  No objection, Your Honor.  Thank you.

THE COURT:  Those exhibits may be admitted, and you may publish them when you're ready.

(Exhibits 5174, 5175, 5220 - 5258, 5260 - 5321 admitted into evidence.)

MS. BERTRAND:  Okay.  Thank you.

CROSS-EXAMINATION

BY MS. BERTRAND:

Q.  I'm going to go back to what we were discussing before the break, and we may get to those others exhibits.  But let's go back to where we were before the break.

MS. BERTRAND:  Ms. Ellig, please show Mr. Ferrer

CARL FERRER - CROSS-EXAMINATION (Cont'd)

Exhibit 523.  I believe it's already been admitted into
evidence.

     (The Court and the courtroom deputy confer.)

          THE COURT:  Is this -- wait.  One moment.  Is this
government's?

          MS. BERTRAND:  This was Exhibit 523, one of the --

          THE COURT:  Oh, okay.

          MS. BERTRAND:  I want to make sure we have the right
number here.

          THE COURT:  Well, the defense exhibits are in the
5,000s.

          MS. BERTRAND:  No.  This is one of the government's
exhibits.  It's been admitted.

          THE COURT:  Okay.

MS. BERTRAND:

Q.  Mr. Ferrer, can you see it on the screen?  It's really
small.

          THE COURT:  I'm going to ask you to pause for one
moment.

          MS. BERTRAND:  Okay.

     (The Court and the court reporter confer.)

          THE COURT:  All right.  You may proceed.

          MS. BERTRAND:  Thank you, Your Honor.

          We don't know what's going on with the 523 numbering,
so I'm going to move on rather than spend time addressing it in

front of the jury.

BY MS. BERTRAND:

Q. Mr. Ferrer, is it fair to say that Backpage also had a -- a
section for people to post in the Reno, Nevada, area; correct?

A. Yes, it did.

Q. And it doesn't limit the poster to only doing whatever
they're going to do in that specific city; right?

A. Generally, yes.

Q. So with Reno, do you know whether -- do you know whether or
not there are any counties near Reno, Nevada, that allow
prostitution?

A. I do not.

Q. I'm going to change topics.

        You talked a little bit with one of my colleagues
about your income for 2011 and 2012.

        Quickly, and understanding these may be estimates and
not exactly what you put on a W-2, do you recall what you
earned from your work at Backpage in 2013?

A. I do not.

Q. What's your best estimate?

A. 400,000, 500,000.

Q. 4- to 500,000.  Set -- that's salary?

A. Salary and bonus.

Q. Did you claim any other income like you did in 2011 and
2012?

A.  What -- what year are you focusing on?

Q.  I was talking about 2013.

A.  2013?  Yes.

Q.  What other types of income did you claim for 2013?

A.  I had income from my brother's business.

Q.  The same business we talked about before regarding the 2011 and 2012 taxes?

A.  Yes.

Q.  How much do you estimate you made from your brother's business in 2013?

A.  I don't have those numbers in front of me.

Q.  What's your best estimate?

A.  It was probably equal to the salary.

Q.  So another 4- or $500,000?

A.  Probably.

Q.  Give or take; right?

        Same thing with 2014.  What was your salary at Backpage?

A.  What was my salary at Backpage or my entire compensation?

Q.  I'm fine with either answer, if there's one you know and one that's more difficult to answer.

A.  I -- I guess I'm not comfortable guessing, you know.

Q.  Okay.

A.  I don't believe --

Q.  What do you estimate you worked from your work at Backpage

CARL FERRER - CROSS-EXAMINATION (Cont'd)

in 2014?

A.  I think -- I don't -- don't know.

Q.  Same as 2013, or thereabouts?

A.  It would be over 500,000.

Q.  So more than 500,000 in 2014?

A.  That's a guess.

Q.  All right.  And did you report other income that year as
well, like from your brother's business?

A.  Yes.

Q.  And can you give an estimate as to what income you had also
reported that didn't come from Backpage that year?

A.  It's -- it's equal to the salary or more.

Q.  So more -- $500,000 or more in 2000 --

A.  What year?

Q.  I think '15 is what we're on.

A.  In '15?  Oh.  No.  If -- I thought we were talking about
2014.

Q.  You might be right.  It's after lunch.

A.  Yeah.

Q.  Let's talk about '14.

A.  Yeah.

Q.  So 500,000 from Backpage.  And then another 500,000 from
your brother's business?

A.  I just want to say that the -- the business I recall would
equal roughly the salary.

Q.  Okay.  So likewise in 2015?

A.  No.

Q.  All right.  What was your income from working for Backpage in 2015?

A.  Once again, over 500,000.

Q.  Did you have income otherwise that you reported that year?

A.  About 5,000, because I had to shut down the other businesses.

Q.  And then in 2016, how much income did you receive from your work at Backpage?

A.  I -- probably a million.

Q.  What about 2017?

A.  I don't know.  Probably the same.

Q.  And then understanding that Backpage closed in 2018 --

A.  Uh-huh.

Q.  -- what income did you have from your work at Backpage in 2018?

A.  I don't recall.

Q.  Did you continue to receive income from Backpage after the website was shut down?

A.  I did not.

Q.  We've talked a lot about, so far, your interactions with Andrew Padilla.  And I think you mentioned a couple times in talking to the government that Ms. Vaught was your -- or was the -- the second in command at moderation.

Do you remember that?

A.  Yes.

Q.  Were you in her chain of command?

A.  Yes, I was.

Q.  So was Mr. Padilla right above her?

A.  Yes.

Q.  And then were you above Mr. Padilla?

A.  Yes.

Q.  Are you familiar with what Ms. Vaught's compensation would have been over the same time period, 2011 to 2018?

A.  2011 to 2018?

Q.  Yeah.

A.  It's probably much lower in 2011.  And in 2018 --

Q.  Let's stop there.

A.  I can give you a range, I guess.

Q.  Sure.  Let's stop with 2011.  You made a qualification there.  It would been much lower in 2011.

Why is that?

A.  Well, we had to relocate to Dallas, and so that came with a salary increase.

Q.  So there was an insensitive for people to follow you to Dallas?

A.  Well, we had shut down the Phoenix office, so obviously we wanted to pay her more --

Q.  All right.

CARL FERRER - CROSS-EXAMINATION (Cont'd)

A.  -- because she had a lot of experience.

Q.  She had a lot of experience as a moderator at that point?

A.  As an -- as a moderator and working with Andrew.

Q.  Kind of as his --

A.  Managing the moderators.

Q.  2012, what do you believe the range of her salary to be, understanding it's an estimate?

A.  Yeah.  So I -- I'm only guessing, so I could be wrong.  But I'm -- I'm thinking 70- to 80,000.

Q.  What about 2013?

A.  I -- you know, I think, if I'm going to give a range by year, maybe it went 65, 70, 75, 80, 85.

Q.  All right.  So by 2017, it would have been about 85 a year?

A.  Geez, I -- that's really a guess.

Q.  Okay.  Do you know whether or not she received bonuses?

A.  I think there might have been some bonuses for her.  I'm not sure.  I know there were bonuses for Andrew.  I really don't -- I can't recall a bonus for Joye.

Q.  Why would Andrew get bonuses?

A.  Why did Andrew get bonuses?

Q.  Yes.

A.  Well, moderation's combat.  I mean, it's a lot of work, and it's working long hours.

Q.  Let's talk about moderation as combat.

        From what I gleaned from your testimony, and I --

please correct me if I'm wrong, but that -- there was a
substantial -- a big wave of hires of moderators in late
2009-2010.  Is that accurate?

A.  Yes.

Q.  And that wave was because of the migration from Craigslist;
is that correct?

A.  Yes.

Q.  And were you involved in the hiring of Ms. Vaught as a
moderator?

A.  I was not.

Q.  What were the requirements for a moderator to be hired by
Backpage?

A.  Well, you needed some computer skills, some Internet
skills.  You needed a work ethic that could handle volume,
because you're going to be busy all day.

Q.  Did you require a college degree, then, for your
moderators?

A.  I don't recall requiring a college degree.

Q.  And the starting wage for a moderator in 2019 was what, $13
an hour?

A.  In what year?

Q.  2009?

A.  2009?  Probably.

Q.  Do you know when Ms. Vaught was promoted?

A.  I don't.

Q.  Do you -- do you participate in the decision to promote her?

A.  It's likely that Andrew Padilla communicated to me his intention to have Joye be second in charge, but I just don't recall receiving an email to that effect.

Q.  When -- you learned at some point Ms. Vaught was going to be promoted; correct?

A.  Say that again.

Q.  At some point you must have learned that Ms. Vaught was being promoted.

A.  Yes.  It just seemed like she stepped in and was doing a lot of the emails and communication.

Q.  Did you have any requirements for the people working under you in terms of eligibility for promotion?

A.  Did I have any requirements for eligibility for promotion?
That reported direct to me?

Q.  Or subordinates below you.

A.  Well, I would like -- for example, Andrew Padilla could promote whoever he wanted to promote.

Q.  Oh, he didn't have to check with you?

A.  I don't think that would have been necessary.  He probably did check with me, but, you know, I would have allowed the department heads to hire/promote whoever they felt was necessary to do their job.

Q.  You mentioned that Ms. Work -- Ms. Vaught was doing a lot

of work, a lot of hard work as a moderator.  Is that fair?

A.  Yes.

Q.  And did Backpage have at any time a metric to evaluate if a moderator was doing their job?

A.  We did.

Q.  What was that metric?

A.  I think we -- we had a report that you could see in admin that would display the number of clicks or the amount of activity being done by a moderator.  And you could also look at the number of ads removed; the number of ads approved.  So there were some tools, some reporting tools.

Q.  And of those tools, what was important to you as the, you know, front-line supervisor above Mr. Padilla?

A.  What was important to me was that -- well, there were multiple things --

Q.  Uh-huh.

A.  -- that are important.

Q.  Start with the first.

A.  All right.  The first is to ensure that the content meets the posting rules.  That's the content that's displayed.

        The second is if the ad's pending, that we need to have that ad moderated quickly.  Because when people post, they expect their phone to be ringing right away, so we can't have the ad stuck in a moderation queue.

        And, third, I mean, do enough NCMEC reports.  Make

sure that the NCMEC reports are sent promptly.

Q.  I would think that would be very important, the NCMEC reports.

A.  Yes.

Q.  I think I saw in one of the emails that was discussed with Mr. Eisenberg that at one point you tried to go from a 15-minute waiting time to a five-minute waiting time in the queue; is that correct?

        Maybe I misunderstood it.

A.  Yeah.  I don't recall that.

Q.  What was the average time the moderators had to look at an ad when it posted?

A.  I don't think there was a fixed time.  They could spend whatever time they needed to.  But there were reports that would, you know, hold them accountable if they've only moderated five ads in a day.

        And the reason why we needed those reports is many people worked from home.

Q.  We'll get to that, too.

        So this -- these metrics applied to the people that worked on the -- what I'll call the moderation floor?

A.  Uh-huh.

Q.  And then they also applied to the people who worked at home; correct?

A.  That's -- that's correct.

Q.  The people who worked from home started a little bit later, though, than this first wave of hiring; right?

A.  The people who worked from home started when we went to a 24/7 operation.  But that was probably 2010.

Q.  Before you went to a 24/7 operation, how many moderators did you have?

A.  How many moderators?

Q.  Yeah.

A.  Before?

Q.  Yes.

A.  I don't have the exact number, but, you know, somewhere above a 12 and below 18.

Q.  And they just had regular work hours that they would come in and go through ads?

A.  Yes.

Q.  Were they all working one shift?

A.  When -- when moderation first got started?

Q.  Yes.

A.  Yes.

Q.  And then it shifted -- it changed to a 24/7 review; correct?

A.  It did.

Q.  And that was to keep the pipeline moving; right?

A.  That was because we were receiving a fire hose of content from the Craigslist site shutting down its adult section.

Q.  You mentioned that the meet -- the moderators were tasked, and one of the things you looked for was ensuring that the ads complied with the terms of use; is that correct?  The posting rules.

A.  Yes.

Q.  And that was important because?

A.  It was important because we wanted to maintain that veneer of a general classified site, and we didn't want ads to be obvious prostitution.

Q.  So it was what was important to you; right?

A.  It was important to the owners and myself.

Q.  And the moderators were told this was important.  Were they given a reason why it was important?

        MR. RAPP:  Objection.  Foundation.

        THE COURT:  He can answer if he can.

        THE WITNESS:  Yeah.  I didn't communicate with the moderators direct.

BY MS. BERTRAND:

Q.  Did the moderators face any type of discipline or termination if they pulled too many ads?

A.  I don't know.

Q.  Do you know whether or not the moderators' pay was based on how many ads posted?

A.  How many they reviewed?

Q.  How many they allowed to post.

A.   No.  I don't know.

Q.   Do you know of any incentive that Backpage created for the moderators to allow ads that violated the terms of use to be published?

A.   Do I know of any incentives given to the moderators to allow ads to be published that violated the terms of use?

Q.   Yes.

A.   I believe they were all paid an hourly rate.

Q.   I think you mentioned when you were talking with the government about these, I -- super posters, or they're -- that sounds like a VIP to me.

          Is that similar idea?

A.   That is a similar idea, yes.

Q.   And with being a super poster, did you have to pay a -- like a, I don't know, subscription fee or something?

A.   No.  You -- a super poster was just based on the number of postings that they would generate.

Q.   What benefit did a super poster get?  I mean, I'm picturing like a sandwich punch card but probably more complex.

A.   I'm sorry?

Q.   What benefits did a super poster get?

A.   Well, there are a number of them.

Q.   Okay.

A.   In the case of Dollar Bill and Somad, they were able to post for free whenever anyone else had to pay.

Q.  Uh-huh.

A.  They had VIP support.  They could just call.

Q.  Just call who?  You?

A.  It would -- they would try to call me, but then I would try
to pass that on to somebody in Dallas.

        They also would receive like a discount, where they'd
buy credits in advance to do their postings.

Q.  Is it fair to say that being a super poster in some ways
allowed them to bypass moderation?

A.  I don't think so, because there's two tiers of moderation:

        There's Tier 1 going into the queue.  And I think
super posters after a while, if they had a good track record,
those ads would not appear in the queue.  But still there was a
Tier 2, where moderators were just browsing the site realtime.

        So, you know, there were ads flagged by moderators for
Dollar Bill, for example.

Q.  And those were ones that slipped in through the -- like the
filter, the computer filter, is that --

A.  These are -- these are ads that were posted, but the --
then the rules would continually change.  And so these posters
would have to sort of get caught up with the new rules.

Q.  Did I understand you to say that there were some times when
one of these super posters or VIPs would talk to you and say,
hey, you need to put that ad back up?

A.  They would talk to me.  In one case, Dollar Bill would say:

You need to put all thousands of my ads back up because the
moderators removed them.

Q.  And those ads were put back up?

A.  They were.

Q.  Were the moderators told that those ads were put back up?

A.  The moderators were told to not use the global delete
button, which they had used on this particular client,
Dollar Bill.

Q.  Were your moderators ever told to ignore posts by this
Dollar Bill person?

A.  Were they -- could you ask again?

Q.  Sure.  And if I forget, we'll have the court reporter fix
it.

        Do you know whether or not the moderators were ever
told to ignore, just let through whatever Dollar Bill posts?

A.  I don't think so.

Q.  Now, at one point Ms. Vaught becomes a -- a moderation's
supervisor.

        Do you know when that was?

A.  It might have been sooner, but certainly when she was in
Dallas in 2012 she was a supervisor.

Q.  And her job was to monitor the people enforcing the site's
terms of use in the adult section; right?

A.  That and also handling the NCMEC reports.

Q.  So that was a -- a -- in government service we say it's a

collateral duty, that she had a -- an extra duty.  In addition to keeping track of everybody, she also had to do the NCMEC reports.  Is that fair?

A.  Yes.

Q.  Did you ever have any concerns about her accuracy when it came to sending NCMEC reports?

A.  No.

Q.  Anyone ever complain to you about Ms. Vaught letting stuff slip through?

A.  No.

Q.  Anyone ever complain to you about Ms. Vaught looking the other way when ads were in violation of the terms of use?

A.  Not involving Ms. Vaught.

Q.  Ms. Vaught's job was to watch those same metrics that you described; the -- the number of ads reviewed, the number of ads processed, sent to NCMEC.

        That was her job, to make sure this now army of moderators is meeting those metrics.  Fair?

A.  Yes.

        MS. BERTRAND:  I would like to have shown to the witness Exhibit 6257.  It has not been admitted yet, so just for the witness.

BY MS. BERTRAND:

Q.  Mr. Ferrer, do you remember a moderator named Colleen?

A.  I think so.

Q.  Moderator --

A.  I'm not absolutely certain, though.  The name is familiar.

Q.  Name sounds familiar, you said?

A.  Yes.

Q.  How about Sara?

A.  Sara, yes.

Q.  Who's Sara?

A.  She was a moderator.

Q.  Could you please describe in general terms what you're looking at on this screen.

A.  We're looking at an email from Joye with a subject line performance warnings:  4/13/14.

Q.  And --

A.  It's --

Q.  That's from the joye -- J-O-Y-E -- @backpage.com email address?

A.  Yes, it is.

Q.  And cc'ed on that is andrew@backpage.com; correct?

A.  Correct.

Q.  And sara@backpage.com; correct?

A.  Yes.

Q.  To colleen@backpage.com; right?

A.  Yes.

Q.  Are these emails you recognize as those used for Backpage employees to communicate with their supervisors?

```
 1    A.  I do.

 2    Q.  And this is actually a performance warning, I believe you

 3    said; correct?

 4    A.  It is.

 5    Q.  So this would actually be kept in this business as -- in      13:34:54

 6    its course of business as a -- a personnel type of document;

 7    correct?

 8    A.  Yes.

 9            MS. BERTRAND:  Move to admit, please, 6257.

10            MR. RAPP:  No objection.                                  13:35:10

11            THE COURT:  Yes, 6257 may be admitted.

12        (Exhibit 6257 admitted into evidence.)

13            MS. BERTRAND:  Thank you.

14            Could we please publish?

15            THE COURT:  Yes.                                          13:35:18

16    BY MS. BERTRAND:

17    Q.  Mr. Ferrer, you said you thought you might recognize

18    Colleen.  Was she someone who worked at night from home?

19    A.  Yeah.  I don't know.

20    Q.  Okay.  Had -- are you familiar with any performance          13:35:30

21    warnings that Ms. Vaught had issued to employees?

22    A.  Well, this is the first performance warning I've seen.

23    Q.  Colleen would have been one of Ms. Vaught's subordinates?

24    A.  Yes.

25            MS. BERTRAND:  And let's -- if we could, Ms. Ellig,       13:35:55
```

```
 1   just highlight the first sentence, please, starting with "the
 2   number of ads."
 3   BY MS. BERTRAND:
 4   Q.  Please just --
 5   A.  "The number of ads you viewed last night was a lot higher      13:36:05
 6   than normal and there was no action taken on them."
 7   Q.  Let's pause right there.
 8         When you read this, as Ms. Vaught's second-line
 9   supervisor, what do you interpret that to mean?
10   A.  Well, that Colleen is probably just hitting approve,           13:36:23
11   approve, approve, approve, and Joye is catching that in the
12   reports.
13   Q.  And if someone's hitting approve, approve, approve,
14   approve, that means they're not looking carefully at the ad;
15   right?                                                             13:36:48
16   A.  That's correct.
17   Q.  And it looks like she said, "I found a bunch of violations
18   that were missed."
19         Do you recognize those links in a general sense?
20   A.  They look like links from the moderation admin system.  So    13:36:56
21   they would go to specific ads.
22   Q.  So Colleen could go back in there and say, oh, yeah, missed
23   that one; correct?  Anyone could click back in there and catch
24   the mistake; right?
25   A.  I'm sorry?                                                     13:37:18
```

UNITED STATES DISTRICT COURT

1    Q.  That maybe wasn't a good question.  I apologize.

2    A.  Yeah.

3    Q.  So if you clicked on one of those links -- let's say you're

4    Colleen and you click on one of those links.  You could go in

5    and see, oh, yeah, ooh, I should have caught that one?                13:37:30

6    A.  Yes.

7    Q.  And we have four links there, it looks like?

8    A.  Yes.

9    Q.  And then at the end, Ms. Vaught tells Colleen what?

10   A.  She says, "This is a warning.  Slow down.  Pay attention to    13:37:47

11   the ads closely.  This is the kind of thing that can get

12   someone fired."

13           MS. BERTRAND:  I would ask, please, to show the

14   witness -- this has not been admitted yet, so it'll be for the

15   witness only -- Exhibit 6258.                                       13:38:06

16   BY MS. BERTRAND:

17   Q.  Are you able to see that, Mr. Ferrer?

18   A.  I do see it.

19   Q.  Okay.  In general terms, what are you looking at?

20   A.  I'm seeing Joye do a review of a moderation -- moderator's    13:38:19

21   work, Colleen, on February 27th, 2014.

22   Q.  And that's the joye -- J-O-Y-E -- @backpage.com email that

23   this is from?

24   A.  That's correct.

25   Q.  And it's sent to colleen@backpage.com; correct?                 13:38:39

```
 1   A.  Yes, it is.

 2   Q.  Cc'ed to Andrew.  That would be Mr. Padilla?

 3   A.  Yes, it is.

 4   Q.  And sara@backpage.com; right?

 5   A.  That's correct.                                    13:38:50

 6   Q.  And what's Ms. Vaught, as you understand it, as her

 7   second-line supervisor, telling this employee?

 8   A.  Ms. -- Ms. Vaught is finding some pretty bad violations in

 9   the ads that Colleen approved.

10   Q.  And she tells her what?  To do what?                13:39:10

11   A.  "Please slow down and read carefully.  There isn't much

12   more room for mistakes like these."

13   Q.  And then she actually signed it Joye at the end with the

14   links; right?

15   A.  Yes, she does.                                      13:39:23

16   Q.  So, again, we have here also four links to different ads

17   that Colleen let slip through; right?

18   A.  We do.

19   Q.  Did you participate in any hiring and firing decisions of

20   moderators?                                             13:39:36

21   A.  I suggested the hiring of one moderator.

22   Q.  Who was that?

23   A.  Jed Brunst's son.

24   Q.  Did you ever suggest the firing of a moderator?

25   A.  Did I ever what?                                    13:39:52
```

```
 1   Q.  Suggest the firing of a specific moderator.
 2   A.  I think there's an email where I state that somebody missed
 3   something and they should be fired, but I really didn't intend
 4   somebody be fired.  But I think I was frustrated.
 5   Q.  Is it fair to say that as a moderator at Backpage, if you        13:40:15
 6   let too many slip through, you risked being fired?
 7             MS. BERTRAND:  Thank you.
 8             THE WITNESS:  If you let too many ads get through our
 9   posting rules, could you risk being fired?  I believe -- yes.
10             MS. BERTRAND:  And -- thank you.                           13:40:41
11             And before I forget, I'm just going to change topics
12   and talk to the Judge just for a moment.
13             I'd move 6258 into evidence.
14             MR. RAPP:  No objection.
15             THE COURT:  6258 may be admitted and published.           13:40:51
16        (Exhibit 6258 admitted into evidence.)
17             MS. BERTRAND:  And I apologize.  If we may publish to
18   the jury and let them take a look at what we've been talking
19   about.  I thought it had been published.
20   BY MS. BERTRAND:                                                     13:41:16
21   Q.  How often did you interact with Ms. Vaught?
22   A.  Not very often.
23   Q.  Did she have a reputation in your company that you knew
24   about --
25   A.  Did she have --                                                  13:41:31
```

```
 1   Q.  -- for job performance?

 2   A.  -- a reputation in the company?

 3   Q.  Uh-huh.  For job performance.

 4   A.  I think she did, and it was a good reputation.

 5   Q.  She was careful; correct?                              13:41:42

 6   A.  I think she was careful, and she had a good work ethic.

 7   She moved from Phoenix to Dallas.  I never heard any complaints

 8   of moderators about Joye's supervision.

 9   Q.  So did she have a reputation for being accurate?

10   A.  I think she's detailed and accurate, yes.             13:42:05

11   Q.  And a reputation for being dependable?

12   A.  She's very dependable.

13   Q.  And a reputation for being trustworthy?

14            MR. RAPP:  Objection.  Relevance.

15            THE COURT:  Overruled.                           13:42:22

16            THE WITNESS:  I'd say she's very good at -- yeah.

17   Yes, she could follow the instructions that were given to her

18   regarding moderation.

19   BY MS. BERTRAND:

20   Q.  I recall you talking with one of the other lawyers -- I    13:42:54

21   apologize, I don't remember who -- about a meeting at -- with

22   NCMEC after which Backpage became more aggressive with its

23   reporting.

24            Do you need to get some water?  I can wait for a

25   minute.  Do you want some water?                          13:43:12
```

1    A.  No, I'm good.  I'm good.  I just spilled some all over me.

2    Q.  Oh.

3    A.  Go ahead.

4    Q.  All right.

5          MS. BERTRAND:  Madam court reporter, may I have the          13:43:20

6    question read back.

7       (Record read.)

8          THE WITNESS:  There was a meeting with NCMEC where

9    Don Moon asked us to be more aggressive with the reporting to

10   help NCMEC get more reports.                                       13:43:46

11   BY MS. BERTRAND:

12   Q.  After that meeting, who was tasked with the more aggressive

13   reporting to NCMEC?

14   A.  I know that we communicated that to -- we, meaning I

15   communicated that to Andrew.  I'm not so sure we communicated     13:44:09

16   it direct to Joye.  But I presume, because Joye was overseeing

17   NCMEC reports, that Andrew told Joye.

18   Q.  All right.  All right.  I'm going to change topics.

19          We've talked about -- and we talked about

20   Director Mueller's -- just for the record, there's someone,       13:44:32

21   like a child or a bird, screaming?

22          THE COURT:  Yes.  It's -- I think it's a child, but

23   there's only so much we can do about that.

24          MS. BERTRAND:  It's okay.  I'm just glad it's not me.

25       ///

```
 1    BY MS. BERTRAND:

 2    Q.  So we -- we talked about Director Mueller's certificate a

 3    little bit.

 4          Do you know whether or not any of the moderation staff

 5    ever made presentations to law enforcement organizations?        13:44:56

 6    A.  Yes.

 7    Q.  What kinds of presentations would they give to law

 8    enforcement?  If you know.

 9    A.  I have a general recollection of those reports -- or those

10    presentations.  Very similar to the ones that I've made.  Talk   13:45:15

11    about how to subpoena records and what information we need and

12    how we can respond.

13    Q.  Did you ever go to any of these law enforcement meetings

14    with members of the moderation team?

15    A.  I can recall two meetings that they went on, and I did not   13:45:37

16    go on those meetings.

17    Q.  Is one of them in Los Angeles?

18    A.  One was in Los Angeles, yes.

19    Q.  And that was Andrew Padilla and Joye Vaught presenting?

20    A.  Along with Liz McDougall, I believe.                         13:45:54

21    Q.  And do you recall what law enforcement agencies were

22    attending that event?

23    A.  They were.

24          Oh, do I recall which ones?

25    Q.  Yes.                                                         13:46:09
```

1    A.  Oh.  I -- I don't.

2    Q.  Do you remember --

3    A.  It was in Los Angeles, so I assume it's Los Angeles PD.

4    Q.  Was it a big -- like a conference or, like, just a meeting?

5    If you know.                                                         13:46:23

6    A.  I don't know.

7    Q.  Do you know whether or not Mr. Padilla at that event

8    presented a handbook for law enforcement to use?

9    A.  I think he handed out the law enforcement guide.  It might

10   have been more, though.                                             13:46:45

11   Q.  I'm sorry?

12   A.  He would have worked with Liz on what was presented.

13   Q.  And was another event in New Orleans?  If you know.

14   A.  There was.

15   Q.  What -- do you have a specific recollection of what that        13:46:56

16   event was?

17   A.  They met with law enforcement in New Orleans, but I -- I

18   don't really know anything more than that.

19   Q.  Now --

20   A.  It was Joye, Andrew, Liz.                                       13:47:10

21   Q.  You don't know what they presented at that meeting?

22   A.  What's that?

23   Q.  You don't know what they presented at that meeting?

24   A.  I think it was the company narrative on, you know, how to

25   get records.                                                        13:47:26

Q.   Subpoenas?

A.   Subpoenas.   What the records mean.

Q.   What you need -- what to do in an emergency; right?

A.   That's right.

Q.   So those would be those exigencies you were talking about I think with Mr. Eisenberg?                                        13:47:36

A.   Yes.   Exigent circumstance.   You can get us a subpoena later.

Q.   Right.   Just call us.   It doesn't matter if it's 2:00 in the morning.   We'll help you; right?                           13:47:50

A.   Well, sometimes we don't answer at 2:00 in the morning.

Q.   Right.   And sometimes it gets missed.   But that was the intention; right?

A.   Yes.

Q.   And you mentioned that guide also told law enforcement what the information was that they were getting.   Is that accurate?    13:48:01

A.   Yeah.   Explained the information that we had secured and what it meant.

Q.   Uh-huh.   So, for example, I'm imagining that if they requested information on a specific ad and Backpage sent them what they had, that would include who -- by email who placed the ad; right?                                                     13:48:27

A.   Correct, the email address.

Q.   A phone number maybe?

A.   Phone number would be in the text.   Later on we would have        13:48:44

```
1   it be a field that we would collect that data late.
2   Q.  Type of credit card used?
3   A.  Payment data would normally only be provided if they made a
4   second request to us.
5   Q.  That needed an additional subpoena or just -- they just --      13:48:59
6   if they needed it --
7   A.  It would --
8   Q.  -- they would ask?
9   A.  They would have to specifically request payment data,
10  because it was much more difficult to get that data.               13:49:10
11  Q.  I could imagine there's some other privacy issues around
12  that versus who's getting the add?
13  A.  We didn't store the credit card number.  Credit card
14  numbers are stored with the processor.  We had so many
15  processors.  Which one do we get it from?                          13:49:25
16  Q.  It's a lot of work.
17  A.  Yeah, it's complicated.
18  Q.  But what law enforcement would get in response to a
19  subpoena, of course, depending on what the subpoena requests,
20  is much more than just the face of the ad; right?                  13:49:44
21  A.  Yes.  There was other data, important data.
22  Q.  Do you know whether or not that law enforcement guide also
23  showed law enforcement how to kind of move around Backpage and
24  what to look for, how to search?
25  A.  In the guide that was presented during these meetings?         13:50:01
```

```
 1   Q.   Yes.

 2   A.   You know, I'm not familiar with that.

 3   Q.   Well, that's fine.

 4   A.   I don't know.

 5   Q.   We talked about the FBI certificate from Director Mueller.      13:50:13

 6        How did you find out you were receiving that FBI

 7   certificate?

 8             MR. RAPP:  Objection.  Asked and answered.

 9             THE COURT:  Overruled.

10             THE WITNESS:  I think I received a phone call from      13:50:29

11   Special Agent Barker letting me know.  He wanted to know my

12   title at the time.

13   BY MS. BERTRAND:

14   Q.   Uh-huh.

15   A.   And I think he told me that he was putting in -- putting me   13:50:41

16   in for some award -- some award.

17   Q.   Do you remember how you received the award?  Like did you

18   go to an event, or did they, you know, put it in the mail?

19        How -- how'd that happen?

20   A.   It just comes in the mail.                                    13:50:58

21   Q.   Where'd you put it once you got it?

22   A.   That's a good question.  What -- what time frame?

23   Q.   When you got it.

24   A.   When I got it?

25   Q.   When it -- when it arrives and you open it and say --         13:51:15
```

```
 1  A.  I think I left it on the desk.

 2  Q.  Your desk?

 3  A.  Yes.

 4  Q.  At Backpage?

 5  A.  Let's see.  This would have been 2011.  At the Phoenix        13:51:23

 6  office.

 7  Q.  And that award comes in, like, a little cover, like a book,

 8  right, and you open the book up; right?

 9  A.  Yeah.  It's a little plastic cover, yeah.

10  Q.  It's got FBI on the front of it or Justice Department on       13:51:39

11  the front of it?

12          MR. RAPP:  Objection.  Relevance.

13          THE COURT:  Sustained.

14  BY MS. BERTRAND:

15  Q.  You displayed it on your desk?                                13:51:45

16  A.  For a while.

17  Q.  When'd you move it?

18          MR. RAPP:  I'll object to the relevance.

19          THE COURT:  Sustained.

20  BY MS. BERTRAND:                                                  13:51:58

21  Q.  You may not have a recollection of this, so I'm just going

22  to ask you.  And if you do, great.  If you don't, so be it.

23          Do you recall getting a call from an investigator in

24  California regarding an ad placed in the Sacramento area?

25          MR. RAPP:  Objection.  Foundation and hearsay.           13:52:17
```

```
 1            THE COURT:  Well, he can answer if he remembers

 2   receiving a call.

 3            THE WITNESS:  Did I receive a call from law

 4   enforcement regarding records from the Sacramento area?  What

 5   time frame?                                                        13:52:37

 6   BY MS. BERTRAND:

 7   Q.  I believe it was 2014.  And it's not for records.

 8            Do you remember receiving a call from an investigator

 9   telling you there was a prostitution ad up and you need to take

10   it down?                                                           13:52:50

11            MR. RAPP:  Well, I'll object.  This is hearsay.  I

12   don't know what it's being offered for.

13            MS. BERTRAND:  Well --

14            THE COURT:  Sustained.

15   BY MS. BERTRAND:                                                   13:53:00

16   Q.  Do you --

17            MS. BERTRAND:  Pardon me?

18            THE COURT:  It's the form of the question.

19   BY MS. BERTRAND:

20   Q.  Do you recall ever removing ads at the request of law          13:53:04

21   enforcement?

22   A.  Yes.

23   Q.  Did some law enforcement have your direct number?

24            MR. RAPP:  Objection.  Foundation.

25            THE COURT:  Overruled.                                    13:53:20
```

1          THE WITNESS:  Yes, they did.

2     BY MS. BERTRAND:

3     Q.  How'd they get that?

4     A.  My phone number was listed in a database, the DOJ database.

5     Q.  As the person to call?                                          13:53:33

6     A.  Yes.

7     Q.  And that -- you're talking about the United States

8     Department of Justice database?

9     A.  Yes.

10    Q.  And if an officer or someone from USDOJ called and said,        13:53:42

11    hey, I think this ad's -- this ad looks like prostitution, what

12    would you do?

13    A.  That's -- they didn't call regarding that.  They usually

14    called -- they called -- if they called my cell number, it was

15    some kind of exigent circumstance where they needed records,       13:54:10

16    and usually involving somebody -- some underage for sex

17    trafficking of some type.

18    Q.  Some type of emergency that needed immediate help?

19    A.  Yes.

20    Q.  You mentioned the move to Dallas.  Mr. Padilla moved to        13:54:29

21    Dallas.  And that was what, 2011?

22    A.  I thought both Joye and Andrew moved in 2012, along with

23    some Phoenix moderators.

24    Q.  Why not just hire new people in Dallas?

25    A.  We wanted continuity.                                          13:54:54

```
 1   Q.  Would it have been expensive to retrain people in Dallas?
 2            MR. RAPP:  Objection.  Relevance.
 3            THE COURT:  Sustained.
 4   BY MS. BERTRAND:
 5   Q.  You brought Mr. Padilla with you?                              13:55:13
 6   A.  Yes.
 7   Q.  And Ms. Vaught?
 8   A.  Yes.
 9   Q.  Do you recall how many moderators you brought with you to
10   Dallas from the Phoenix office?                                    13:55:24
11   A.  No.  It's -- it's certainly six to eight at least.
12   Probably more.
13   Q.  I think in talking with the government about what you have
14   termed credit card Armageddon, you mentioned that that -- that
15   created some real financial binds for Backpage.  Is that fair?     13:55:57
16   A.  Yes.
17   Q.  I recall you saying -- I -- I don't remember if it was on
18   direct or cross -- that you were worried about making payroll.
19   A.  That's correct.
20   Q.  Did you ever miss a payroll?                                   13:56:12
21   A.  Did I ever miss a payroll?  No.
22   Q.  Did you ever -- ever express to Mr. Padilla that Backpage
23   might not make payroll?
24            MR. RAPP:  Objection.  Foundation.
25            THE COURT:  Overruled.                                    13:56:38
```

```
 1            THE WITNESS:  No.
 2    BY MS. BERTRAND:
 3    Q.  Did you ever tell Ms. Vaught that Backpage may not make
 4    payroll?
 5            MR. RAPP:  Same objection.                        13:56:48
 6            THE COURT:  Overruled.
 7            THE WITNESS:  No.
 8            MS. BERTRAND:  Your Honor, I'm just checking my notes.
 9    May I step back and confer with my colleagues --
10            THE COURT:  Yes.                                  13:57:07
11            MS. BERTRAND:  -- quickly?
12            Thank you.
13            Thank you for that indulgence, Your Honor.  Nothing
14    further.
15            THE COURT:  May I see counsel at sidebar?         13:58:58
16        (Sidebar discussion begins on the record.)
17            THE COURT:  Can you hear me?
18            THE COURT REPORTER:  Yes.
19            THE COURT:  So I'm confused, because I thought when
20    you admitted en mass all of these stipulated exhibits that I  13:59:37
21    had said you've got to give them some context to the jury.  I
22    don't know if you're planning to do that in some other way with
23    other witnesses.  I just -- I wanted to clarify that.
24            MS. BERTRAND:  That was what I wanted to double-check
25    with my colleagues about and just make sure we were all on the  13:59:58
```

```
 1    same page.
 2            At this point we just got to admit -- we will put the
 3    context in through other witnesses, but we were not going to
 4    put 100 in front of them right now.
 5            THE COURT:  Okay.  I just wanted to make sure.          14:00:12
 6            MS. BERTRAND:  Thank you for the reminder.  Yes.
 7            Do I have concurrence with my colleagues on that?
 8            MR. LINCENBERG:  No.  I did want to raise something
 9    outside the presence of the jury.
10            MS. BERTRAND:  Well, that's different.  That's just as 14:00:26
11    to this issue.
12            MR. FEDER:  Just so we know what you've done -- what
13    you have done.  Maybe you could give a couple of examples maybe
14    so we know what you've done.
15            MS. BERTRAND:  Okay.                                   14:00:33
16            THE COURT:  Well --
17            MS. BERTRAND:  I'll just do, like, the first --
18            THE COURT:  Well, however you wish to present your
19    case.  I just was not -- I was confused --
20            MS. BERTRAND:  Sure.                                   14:00:39
21            THE COURT:  -- because that was what I understood to
22    happen.  But if you're bringing them in through other
23    witnesses, then --
24            MS. BERTRAND:  Uh-huh.
25            THE COURT:  -- that's fine.  So, in any event --       14:00:47
```

```
 1              MS. BERTRAND:  Put them in now?

 2              I'll just put them in now and do it as a quick slide

 3    show so they have an idea but not have him talk about them.

 4    Just --

 5              THE COURT:  I mean --                              14:01:00

 6              MS. BERTRAND:  Sure.

 7              Thank you.  No.  Thanks for pointing that out.  I

 8    appreciate it.

 9              MR. LINCENBERG:  Well, I want to raise something.  I

10    can do it at the break --                                   14:01:07

11              THE COURT:  Yes.

12              MR. LINCENBERG:  -- for --

13              THE COURT:  Yes.

14        (End of sidebar discussion.)

15              THE COURT:  And, counsel, we'll aim to take our     14:01:30

16    afternoon recess roughly about 2:40.

17              MS. BERTRAND:  Okay.  Ms. Ellig, I'm going to ask for

18    your help with this.  Starting with Exhibit 5174, would you

19    please publish that to the jury?  This has been admitted.

20              That's not it.  Okay.                             14:01:56

21              That's 5174?

22              Okay.  5175.

23    BY MS. BERTRAND:

24    Q.  Mr. Ferrer, that's an email to you from a Michael Barker,

25    February 16, 2011; correct?                                 14:02:17
```

```
 1   A.  Yes.

 2   Q.  Regarding a sting?

 3   A.  Yes, it is.

 4         MS. BERTRAND:  Ms. Ellig, would you please go to 5220.

 5         THE COURT:  Well, let me double-check.  Has the jury      14:02:35

 6   had --

 7         MS. BERTRAND:  Oh, sorry.

 8         THE COURT:  -- an opportunity to review that exhibit?

 9         MS. BERTRAND:  Okay.  We'll give them time.

10         Let's go to 5220, Ms. Ellig, please.                     14:02:49

11   BY MS. BERTRAND:

12   Q.  This looks to be to the help desk, Mr. Ferrer?

13   A.  Yes.

14   Q.  Did -- who monitored the help desk?

15   A.  Usually Subpoena Compliance.                               14:03:15

16   Q.  Who would that be?  Ms. Nickel?

17   A.  Well, at what time frame?

18   Q.  Well, it looks like May 2013.

19   A.  Well, let's see.  It could be Ms. Nickel, but I think, if

20   you look above, it's Issa.  She sort of also responded to      14:03:34

21   help@backpage.

22   Q.  And that's from a Detective Sergeant John Mazure,

23   Lyndhurst, New Jersey?

24   A.  Yes.

25   Q.  Thank you.                                                 14:03:50
```

UNITED STATES DISTRICT COURT

```
 1              MS. BERTRAND:  Has the jury had enough time?
 2         May we see 5221, Ms. Ellig.
 3         We'll do 5222.  That's fine.
 4    BY MS. BERTRAND:
 5    Q.  This is to the help desk again; correct?          14:04:11
 6    A.  Yes.
 7    Q.  Rich Petrie at the Toronto, Canada, Police; right?
 8    A.  That is correct.
 9    Q.  "Thank you very much for your assistance" is the first
10    line; right?                                          14:04:30
11    A.  That is correct.
12    Q.  And he also says, "You guys have been the best and easiest
13    to deal with"; right?
14    A.  That's what it states.
15              MS. BERTRAND:  Ms. Ellig, let's do 5223.    14:04:45
16    BY MS. BERTRAND:
17    Q.  This appears to be from the Chicago area, Cook County;
18    correct?
19    A.  Correct.
20    Q.  To the help desk?                                 14:04:59
21    A.  Yes.
22    Q.  And it looks like the staff was actually sending more
23    information to Cook County here, correct, or to The Village of
24    Alsip?
25    A.  Yes.  They're finding ads on other websites and putting it  14:05:18
```

```
 1    in a document to send to law enforcement.
 2              MS. BERTRAND:  Let's do 5224, Ms. Ellig.
 3    BY MS. BERTRAND:
 4    Q.  It's the City of Tulsa; right?
 5    A.  From the help desk --                              14:05:36
 6    Q.  Yes.
 7    A.  -- yes.
 8    Q.  Or to the help desk, it seems.
 9    A.  I can barely hear you.
10    Q.  I'm so sorry.  I'm doing my best.                  14:05:47
11              There's a Tracy Zeller.  It looks like she's with --
12    he or she is with the City of Tulsa; correct?
13    A.  Correct.
14    Q.  Thanking Backpage saying they've really gone above and
15    beyond; right?                                        14:06:02
16    A.  That is what it states.
17              MS. BERTRAND:  Ms. Ellig, could you please advance to
18    5225.
19    BY MS. BERTRAND:
20    Q.  And that appears to be from ICE --                14:06:16
21    A.  Yes.
22    Q.  -- Department of Homeland Security?
23    A.  Yeah, from Issa.
24    Q.  And Jodie Donaghy thanking Backpage; correct?
25    A.  Oh, yes.                                          14:06:31
```

```
 1            MS. BERTRAND:  Let's do this, Judge.  Because there's
 2    a hundred one of these, I don't want to do this to anybody in
 3    the afternoon.  Maybe we could just skip to, like, 5258 and
 4    give another example, and then we can move on.
 5            THE COURT:  However you wish.                        14:06:57
 6            MS. BERTRAND:  Thank you.
 7    BY MS. BERTRAND:
 8    Q.  This is from Rick Barnard, City of Lakewood, Washington;
 9    right?
10    A.  Yes, it is.                                             14:07:08
11    Q.  Saying, "Thank you, this is extremely helpful to my case";
12    right?
13    A.  Yes.
14    Q.  These seem like a representative sample to you of the types
15    of thank you's you would receive from law enforcement for     14:07:18
16    Backpage's assistance?
17    A.  Say that again.  What was that question?
18    Q.  I'll do my best.
19    A.  Yes.
20    Q.  Do these, that we've reviewed and showed the jury, look    14:07:28
21    like a representative sample of the types of thank you's that
22    Backpage would receive from law enforcement for Backpage's
23    assistance?
24    A.  Yes.
25            MS. BERTRAND:  Your Honor, I have nothing further.    14:07:46
```

```
 1   Thank you so much.

 2            THE COURT:  Okay.

 3            MS. BERTRAND:  Thank you, Mr. Ferrer.

 4            THE COURT:  All right.  Mr. Rapp, I assume you have

 5   redirect?                                                     14:07:57

 6            MR. RAPP:  I do, yes.

 7            THE COURT:  All right.

 8            MS. BERTRAND:  Do you want this?

 9            MR. RAPP:  No.  Thank you.

10            MS. BERTRAND:  Okay.                                 14:08:01

11                    REDIRECT EXAMINATION

12   BY MR. RAPP:

13   Q.  Mr. Ferrer, these thank you's that we've been looking at,

14   did those law enforcement officers, did they -- did you ever

15   disclose to them the prostitution marketing strategies that   14:08:20

16   we've been discussing the last couple weeks?

17   A.  We didn't disclose our prostitution marketing activities.

18   Q.  How about the -- the nature of moderation in the way you've

19   described it the last couple weeks.

20            Did you ever disclose that to them?                  14:08:47

21   A.  We didn't disclose that the priority of moderation was

22   revenue retention and that it was done incrementally so that

23   users could catch up to the new rules.

24   Q.  And regarding the presentations that counsel was just

25   talking about, I believe the presentation to -- sorry -- the  14:09:07
```

1  presentation that you gave in Los Angeles to some law

2  enforcement officials, you were -- were you there?

3  A.  I was not there.

4  Q.  Okay.  Do you know whether or not Ms. Vaught or Mr. Padilla

5  disclosed to those law enforcement official these prostitution        14:09:30

6  marketing strategies that you were engaged in?

7  A.  They would not.

8  Q.  How about the true nature of moderation in the way you've

9  described it?  Did they explain that to them?

10        MR. EISENBERG:  Objection.  Asked and answered.        14:09:52

11        THE COURT:  Overruled.

12        THE WITNESS:  We didn't explain to them that

13  moderation was done in an incremental fashion in order to

14  retain the revenue.  We didn't ban users for violating the

15  posting rules.  They could try again, and they could post        14:10:11

16  again.  It was very good customer service.

17        MR. LINCENBERG:  -- move to strike the narrative.

18  Nonresponsive.

19        THE COURT:  Overruled.

20  BY MR. RAPP:        14:10:30

21  Q.  Regarding the emails that counsel for Ms. Vaught just

22  showed you from her client, Joye Vaught, do you recall those --

23  the emails where she was sort of criticizing one of the

24  moderators about their job?

25  A.  Yes.        14:10:48

1  Q.  Does that mean that those postings would not have been

2  posted if there was a -- a term or an image removed?

3          MS. BERTRAND:  Objection.  Calls for speculation.

4          THE COURT:  Overruled.

5          THE WITNESS:  I'm -- it all sort of depends on the          14:11:08

6  timeframe.  And if I recall correctly, it -- it's -- they may

7  or may not have been removed.  It -- it depends on if the user

8  was egregious and had multiple violations.

9  BY MR. RAPP:

10 Q.  All right.  And if the user had -- was egregious, in your     14:11:28

11 words, or had multiple violation, was it only then that they

12 were banned?

13 A.  It was -- they were only banned if it was -- if -- if --

14 well, they were banned if they used stolen credit cards.  That

15 was the top priority.                                             14:11:48

16 Q.  Why was that the top priority?

17 A.  To protect the merchant account.  We couldn't afford to

18 have charge-backs.  It would create negative attention for Visa

19 and MasterCard.

20 Q.  With respect to this certificate that you received from the   14:12:03

21 FBI, the director of the FBI, did you ever disclose to the FBI

22 these prostitution marketing strategies you've been testifying

23 about?

24 A.  No.

25 Q.  Did you have that opportunity?                                14:12:21

1   A.  Later, when I pled guilty.

2   Q.  All right.  Well, then you disclosed it?

3   A.  Then I did.

4   Q.  You disclosed it in these interviews that have been

5   discussed here during your direct and your cross-examination?   `14:12:38`

6   A.  Correct.

7   Q.  Yeah, but in all the testimony that you have given where

8   you were authenticating postings in -- in federal court, did

9   you disclose it to the FBI or the federal prosecutors?

10          MR. LINCENBERG:  Objection.  Asked and answered.   `14:13:04`

11          THE COURT:  Overruled.

12          THE WITNESS:  I didn't disclose our prostitution

13   marketing activities or that moderation was a sham when I

14   testified as a custodian of record.

15   BY MR. RAPP:   `14:13:19`

16   Q.  All right.  And since we're talking about the Department of

17   Justice, did you actually meet with the Department of Justice?

18   A.  We did.

19   Q.  Yes.  Who?  Who?  Just you?

20   A.  No.  Michael Lacey, myself, and Jim Larkin, along with --   `14:13:28`

21   Q.  What?

22   A.  -- an attorney.

23   Q.  When was that?

24   A.  Give me a minute.

25          Maybe 2000 -- late 2010 or 2011.   `14:13:44`

```
 1   Q.  All right.  During those meetings, did you disclose to the

 2   Department of Justice, with Mr. Lacey sitting there with you,

 3   the prostitution marketing strategies?

 4           MR. FEDER:  Beyond the scope of cross.  Objection.

 5           THE COURT:  Overruled.                                    14:14:03

 6           THE WITNESS:  We did not.

 7           MR. RAPP:  I want to show you Exhibit 228, which,

 8   Madam Clerk, I believe is in evidence.

 9           THE COURTROOM DEPUTY:  Yes.

10           MR. RAPP:  And would request permission to publish.     14:14:24

11   Thank you.

12   BY MR. RAPP:

13   Q.  You might recall just a few minutes ago or earlier today

14   this was shown to you.

15           Do you remember this exhibit?                            14:14:33

16   A.  I do.

17   Q.  Do you know looking at this exhibit where the -- where the

18   offer to meet was located?

19   A.  I do.

20   Q.  Okay.  How can you tell?                                     14:14:46

21   A.  There was a field called "location" right there.  So the

22   location would be east -- east of strip on Tropicana.

23           MS. BERTRAND:  Objection, Your Honor.  It's

24   speculating as to that's where anything is going to happen.

25           THE COURT:  Well, that wasn't the question.              14:15:08
```

UNITED STATES DISTRICT COURT

1          Overruled.

2    BY MR. RAPP:

3    Q.  Well, do you know by looking at this posting whether the

4    offer was for the person in the -- in the ad to go to -- to

5    somebody or for them to come to -- to her?                    14:15:25

6          MS. BERTRAND:  Objection.  Leading.

7    BY MR. RAPP:

8    Q.  Can you tell just by looking at this?

9          MS. BERTRAND:  Objection.  Leading.

10         THE COURT:  Overruled.                                   14:15:35

11         THE WITNESS:  I -- I don't see any incall or outcall.

12   What I do see is that she's working from the Tropicana Hotel.

13         Oh, never mind.  There's incall.

14   BY MR. RAPP:

15   Q.  All right.                                                 14:15:49

16   A.  So --

17   Q.  What does that mean to you?

18   A.  Incall means that you go to her.

19   Q.  Is there anything in this ad that defense counsel showed

20   you that tells you that this is an offer for prostitution?     14:16:05

21   A.  Yes.

22   Q.  What is it?

23   A.  There are two items.  One is GFE, and the other is the TER

24   ID.  It's put in an obfuscated fashion so a filter's not taking

25   it out.                                                        14:16:30

```
 1   Q.  All right.  And just why does that tell you that this is a

 2   offer for sex for money?

 3   A.  Because you wouldn't get -- you wouldn't be highly

 4   reviewed, in my opinion, unless it was sex for money.

 5          MS. BERTRAND:  Objection.  Speculation.  Improper        14:16:47

 6   opinion.

 7          THE COURT:  Overruled.

 8   BY MR. RAPP:

 9   Q.  Highly reviewed where?

10   A.  On TER.                                                     14:16:55

11   Q.  Now, I want to show you an exhibit just for your eyes only.

12          Do you see that?  Do you see the exhibit there?

13   A.  I do.

14   Q.  And it -- is this a PowerPoint?

15   A.  Yes, it is.                                                 14:17:37

16   Q.  And can you tell by looking at this exhibit where this

17   PowerPoint came from?

18   A.  This exhibit came from the Village Voice Media Company.

19   Q.  Okay.  And I just want to go back to page 1 of this

20   exhibit.                                                        14:18:05

21          Can you tell from looking -- well, first of all, how

22   do you know this is from the Village Voice Media?

23   A.  There's a big logo on the first page that says, "Village

24   Voice Media."

25   Q.  All right.  And do you know what year this is from?        14:18:19
```

1        MR. LINCENBERG:  Objection.  There's no foundation for

2   any of this.  He's just reading.

3        MR. FEDER:  And beyond the scope of cross.

4        MR. RAPP:  Not so fast.

5   BY MR. RAPP:                                            14:18:31

6   Q.  Let me go to page --

7        THE COURT:  Well --

8        MR. RAPP:  -- 17.

9        THE COURT:  -- what's the foundation, Mr. Rapp?

10  BY MR. RAPP:                                            14:18:41

11  Q.  So do you recognize this document that's on your screen?

12  A.  Yes.  It's an org chart.

13  Q.  As a matter of fact, didn't counsel for Mr. Lacey show you

14  this organization chart during his cross-examination?

15  A.  Yes, he did.                                        14:18:58

16  Q.  And didn't counsel for Mr. Brunst, the chief financial

17  officer, didn't he show you this exhibit?

18       MS. BERTRAND:  Objection.  Leading and argumentative.

19       THE WITNESS:  It wasn't this exhibit.

20       MR. LINCENBERG:  Your Honor?                       14:19:12

21       THE COURT:  Wait.  Wait.  Don't speak over one

22  another.

23       Mr. Rapp had asked a question.

24       What was the objection, Ms. Bertrand?

25       MS. BERTRAND:  Leading and argumentative.          14:19:19

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Well, it is leading, Mr. Rapp.

 2              MR. RAPP:  All right.

 3              THE COURT:  But -- and please take a moment to let

 4    Mr. Ferrer answer before restating a question.

 5    BY MR. RAPP:                                              14:19:35

 6    Q.  Is this -- is this the exhibit that you were shown --

 7              MR. LINCENBERG:  Objection.

 8    BY MR. RAPP:

 9    Q.  -- by defense counsel?

10              MR. LINCENBERG:  Objection.  The exhibit was 6243.  14:19:45

11              MR. RAPP:  All right.  Madam Clerk, can you go to the

12    document camera, please.

13              THE COURTROOM DEPUTY:  Yes.

14    BY MR. RAPP:

15    Q.  I'm showing you -- boy, old school.                   14:20:06

16              I'm showing you --

17              THE COURT:  Can you --

18    BY MR. RAPP:

19    Q.  -- 62 -- 6243.

20              Do you see --                                   14:20:14

21              THE COURT:  Can you turn --

22    BY MR. RAPP:

23    Q.  -- that on your screen?

24              THE COURT:  Can you turn it?

25              MR. RAPP:  Yeah.                                14:20:18
```

1          THE COURT:  It's sideways.

2          Okay.  Thank you.

3          THE WITNESS:  Yes, I see it.

4   BY MR. RAPP:

5   Q.  Okay.  And then looking at the exhibit, would you agree          14:20:24

6   with me that 6243 is identical to page 17 of Exhibit 5?

7   A.  Yes, I do.

8          MR. RAPP:  All right.  So going back to the computer,

9   I would move to admit page -- just page 1 of United States

10  Exhibit 5, and then page 17.          14:21:02

11         MR. LINCENBERG:  Objection.  Foundation.

12         THE COURT:  Overruled.

13         It may be admitted, and it may be published.

14     (Exhibit 5, page 1 and page 17, admitted into evidence.)

15         MR. RAPP:  Just those two pages.          14:21:11

16         THE COURT:  Just those two pages.

17         MR. RAPP:  Thank you, Judge.

18  BY MR. RAPP:

19  Q.  So looking at the first -- the first page, would you agree

20  that this -- what's the date of this PowerPoint?          14:21:33

21  A.  It's January 2006.

22  Q.  All right.  And then going back to page 17, is -- do you

23  recognize this corporate structure?

24  A.  I do.

25  Q.  Is this the corporate structure as you knew it in 2006?          14:21:56

1    A.  It is.

2    Q.  As a matter of fact, is this the corporate structure from

3    2004 to 2006?

4    A.  I think the difference might be there were fewer papers --

5    Q.  All right.                                                          14:22:19

6    A.  -- in 2004 because --

7    Q.  When you say "fewer papers," you're down here; right?

8    A.  Yes.  I'm -- I'm over here.  Newsweekly Publishers.

9            So at this time, it must include the acquisition of

10   the Village Voice.                                                      14:22:35

11   Q.  Okay.  And so when counsel for Mr. Brunst was asking --

12   talking about Exhibit 6243 being in 2011, this is actually the

13   structure back in 2006?

14   A.  Correct.

15   Q.  All right.  What happened -- and so he also asked you about         14:22:57

16   some of the -- the names on this corporate structure.

17           Do you remember those questions?

18   A.  Yes.

19   Q.  And so what happened to the corporate structure in 2012?

20   A.  In 2012, the papers are under a different management group.         14:23:21

21   Q.  Do the papers get sold?

22   A.  They do.  They get sold.  They get sold to an employee-lead

23   management group.

24   Q.  All right.  And what about this area over here, the

25   business managers?  What happens to that?                              14:23:47

1  A.  That would -- that would be gone, too.

2  Q.  And counsel for Mr. Brunst asked you about these other

3  names up here.  You see that sort of second tier of people.

4       When you were talking about the employee management

5  group, what happened to Christine Brennan?                    14:24:09

6  A.  It's my understanding she stayed with the employee

7  management group.

8  Q.  All right.  Scott Tobias?

9  A.  He went with the employee management group, along with

10  Ruxton, which is below.                                       14:24:25

11  Q.  Scott Spear?

12  A.  No.  He didn't go.

13  Q.  What about Jeff Mars?

14  A.  He went with the new owners, yeah, of the newspapers.

15  Q.  Gerard Goroski?                                           14:24:38

16  A.  Yes.  He went --

17  Q.  Diana Fraser?

18  A.  I don't think she's at -- what time frame?  After the

19  purchase?

20  Q.  2012.                                                     14:24:51

21  A.  Yeah, I think she had left the company.  She's gone.

22  Q.  All right.  In 2012, what was the entity that was

23  generating revenue for the four people on this chart?

24  A.  Backpage.

25  Q.  Where are you?                                            14:25:12

 1    A.  I am somewhere below Backpage, LLC.

 2    Q.  All right.  Okay.

 3         Now, in 2011, what were you trying -- what were they

 4    trying to do with Backpage?

 5    A.  In 2011, there was a time period when we were trying to          14:25:32

 6    sell Backpage.

 7    Q.  All right.  And we looked at -- on -- we looked on direct,

 8    but also on cross you were shown a PowerPoint, Exhibit 120.

 9         Do you remember that?

10    A.  I'd have to see it.                                             14:26:00

11    Q.  Let me help.

12         Do you remember this PowerPoint?

13    A.  Yes, I do.

14    Q.  And do you -- can you -- can you remind the jury what -- so

15    what was this PowerPoint used for?                                  14:26:19

16    A.  I believe this is the presentation with -- with the goal of

17    selling Backpage.

18    Q.  All right.  And who did you -- who did you do this with?

19    A.  We had traveled to New York, Jed Brunst and myself, and

20    made presentations.                                                 14:26:42

21    Q.  All right.  Now, looking at Exhibit 120, page 17, there was

22    some questions by Mr. Brunst's attorney about whether or not

23    Mr. Brunst really was the CFO of Backpage.

24         Do you remember that line of questioning?

25    A.  Yes.                                                            14:27:07

```
 1   Q.  All right.
 2            MR. LINCENBERG:  Objection.  Misstates the question.
 3            THE COURT:  Well, he said "questioning," so overruled.
 4   BY MR. RAPP:
 5   Q.  So here, what is Mr. Brunst identified as?                    14:27:16
 6   A.  In the post-transaction management team, he will be the
 7   CFO, VVMH, Village Voice Media Holdings, and Backpage.com.
 8   Q.  Okay.  So as of 2011, and then once the newspapers were
 9   sold, what was Mr. Brunst's position within Backpage?
10   A.  He's the current CFO of Backpage --                           14:27:56
11   Q.  All right.
12   A.  -- .com.
13   Q.  Now showing you -- and also this is the same.  If we look
14   at slide 17, does -- does slide 17 of this PowerPoint that you
15   were traveling around with Mr. Brunst trying to sell it, does    14:28:32
16   it talk about your approach to the adult section?
17   A.  Yes, it does.
18   Q.  What does it say?
19            MR. FEDER:  Excuse me.  What exhibit is this?
20            MR. RAPP:  Well, this is 120.                            14:28:51
21            MR. FEDER:  Well, on the screen it says 6189.
22            MR. RAPP:  No.  That's not right.  That's the next
23   exhibit.  We'll get there.
24            That's -- it's -- the exhibit on the screen is 120,
25   page 17.                                                         14:29:07
```

1    BY MR. RAPP:

2    Q.  Yes, what --

3    A.  Um --

4    Q.  What is the approach on the adult category in this

5    PowerPoint based upon the -- the figures that you have in the        14:29:17

6    PowerPoint?

7    A.  It's "maintain a vibrant general purpose classifieds site

8    strengthens Backpage's defensible market position in the adult

9    category.  Creates the mainstream environment for site

10   participants and allows plausible deniability for exposure."          14:29:40

11   Q.  And what did that mean?

12   A.  It's the veneer of a general classified site.  It gives us

13   some plausible deniability, although 94 percent of our

14   revenue's coming from adult.

15   Q.  And the category within adult?                                    14:29:59

16   A.  Email escorts.

17   Q.  Now, this was shown -- this was a defense exhibit.  This

18   was 6189, admitted into evidence.

19         Do you remember this exhibit?

20   A.  I do.                                                             14:30:13

21   Q.  And -- and what is this exhibit?

22   A.  So the -- this is an application form to try to get a

23   merchant account with a company in Bulgaria called

24   eMerchantPay.

25   Q.  And why did you have to do that?                                  14:30:30

 1    A.  Because we were not successful in securing U.S. banks, and

 2    our U.S. bank was terminating us.

 3    Q.  And who among the members of Backpage -- do you know what

 4    year this is, by the way?  Do you recall?  Ballpark?

 5    A.  If I recall ballpark, I'm going to say 2013.          14:30:50

 6    Q.  What -- why do you say 2013?  Did something happen in 2013?

 7    A.  That was the time that Litle was terminating our agreement,

 8    so we would lose credit card processing in the U.S.

 9    Q.  All right.  And so just looking at this, the Defense

10    Exhibit 6189, can you just interpret this information here for   14:31:12

11    the -- up here in the -- in the corporation details?

12    A.  Yes.  So there's a European company, and it's called

13    Classified Solutions, LTD.  It's, you know -- it's Backpage

14    with a European company name.

15    Q.  All right.  And why is it a European company name?    14:31:35

16    A.  Well, we need a European company name -- we need a European

17    company to get processing from a European bank.

18    Q.  And does this tell us during that time period what the

19    monthly sales volume was?

20    A.  It does.  It says 10 million.                          14:31:57

21    Q.  All right.  And the number of monthly transactions?

22    A.  1.2 million.

23    Q.  And you've talked about Litle.  Is Litle referenced on here

24    as being your previous processor?

25    A.  Yes.  Right here.                                      14:32:19

 1   Q.  And why did -- and why don't you have Litle?  Why are you

 2   going to Bulgaria?

 3              MR. LINCENBERG:  This is all asked and answered,

 4   Your Honor.

 5              THE COURT:  Sustained.                          14:32:29

 6   BY MR. RAPP:

 7   Q.  Let's go to the next page.

 8              And does it tell you what the -- the volume is, the

 9   monthly processing volume for Backpage?

10   A.  It -- it does.  It has some details on the volume.      14:32:47

11   Q.  All right.  What does it -- what do they -- what are they

12   telling?

13   A.  Well, what's interesting here is that 1 percent of our

14   transactions are from -- from Europe, and we're trying to get a

15   European bank, but we only have 1 percent European            14:33:08

16   transactions.

17   Q.  And what -- what significance does that have --

18   A.  You --

19   Q.  -- in your submission of this application?

20   A.  Well, European banks, if they're going to give you a      14:33:22

21   merchant account for MasterCard and Visa, they want you to have

22   a lot of European transactions.  So we obviously do not.

23   Q.  All right.  And then down here it has consumer cards and

24   commercial cards.

25              Can you interpret that?                          14:33:44

1    A.  I -- I really can't.

2    Q.  Okay.  Fair enough.

3    A.  I think one's more of a business and the other one's a

4    consumer.  I don't know where we got those numbers from.

5    Q.  Okay.  Well, do you know who was -- who was in charge of          14:33:58

6    submitting this application?

7    A.  Well, we -- we, the company, worked closely with Patricia

8    Webber, who was the consultant to help us.

9    Q.  All right.

10   A.  Yeah.                                                             14:34:15

11   Q.  And then -- and so are you on here as some type of an owner

12   or vice president or director?

13   A.  I am not.

14   Q.  All right.  And here at the time, does it tell us what the

15   percentage ownership is of Mr. Brunst, Mr. Lacey, and               14:34:34

16   Mr. Larkin?

17   A.  It does.

18   Q.  And what is -- what is their percentage ownership?

19   A.  John Brunst, 6 percent.  Michael Lacey, 44 percent.  James

20   Larkin, 44 percent.                                                 14:34:55

21   Q.  And those are the percentage ownership of Backpage; right?

22   A.  Correct.

23   Q.  Post-2012, any other -- any other entity generating

24   revenue -- revenue on a monthly basis for them?

25   A.  Not to my knowledge.  Certainly nothing comparable to           14:35:18

1    Backpage.

2    Q.  In 2013, how much -- there's a lot of questions by the

3    defense here about your compensation.

4           What -- how much is Backpage making in 2013?

5           MR. LINCENBERG:  Objection.  This is asked and          14:35:35

6    answered.

7           THE COURT:  Overruled.

8           MS. BERTRAND:  And it --

9           THE WITNESS:  It's -- it's generating over 100 million

10   in revenue per year.                                           14:35:42

11   BY MR. RAPP:

12   Q.  And these three gentlemen here have a percentage owner of

13   that over $100 million in revenue?

14   A.  That's correct.

15   Q.  Now, Mr. Spear's not on here, but does he have -- is he the   14:35:53

16   other minority percentage here that's not reflected?

17   A.  Yes, he is.

18   Q.  And in terms of a director -- and you've identified

19   yourself as a director.  But who's identified as the director

20   on the eMerchantPay application for the bank in Bulgaria?        14:36:21

21   A.  John Brunst is the director.

22   Q.  All right.  But you are on this.

23   A.  I am?

24   Q.  Well, you are.

25           What's this?  What's a merchant technical contact?     14:36:43

1    What is that?

2    A.   So I'm the contact that will be emailed the specifications

3    on how to configure the payment gateway.

4    Q.   Why aren't you identified as the director like Mr. Brunst

5    or the vice president that you --                                14:37:04

6            MR. LINCENBERG:   Your Honor, this is asked and

7    answered.   It's argumentative.

8            THE COURT:   Overruled.

9            He may answer the question.

10           THE WITNESS:   I'm not the -- I'm not the director as    14:37:11

11   in terms of an executive.   Jed Brunst is the managing director,

12   who -- who created the company Classified Solutions, LTD, and

13   that's held by the beneficial owners.

14           So I'm an employee.

15   BY MR. RAPP:                                                     14:37:36

16   Q.   How about these other two individuals here?   Who are they?

17   A.   They're also employees.

18   Q.   All right.

19   A.   Joe is a technical contact.   Mark Lu's a financial

20   accountant.                                                      14:37:47

21   Q.   All right.   Now, when Mr. -- counsel for Jed Brunst was

22   asking you about various internal operations of Backpage, for

23   example, moderation, what connection -- well, let me ask you.

24   Did you hire outside moderators?

25   A.   Yes.                                                        14:38:11

```
 1   Q.  How did -- how were they paid for?
 2   A.  We had to send a -- we received an invoice, and we would
 3   pay that invoice.  It would be paid by the -- well, it all
 4   depends.  It was often paid in Phoenix when Scott Spear was
 5   overseeing it.  And then later when it was under my name, the        14:38:34
 6   payments were paid out of Dallas.
 7   Q.  All right.  And were those -- were the -- were the -- were
 8   they, the moderators, budgeted for, the cost?  We -- were those
 9   part of the budget?
10            MR. LINCENBERG:  This is asked and answered five            14:38:56
11   times.
12            THE COURT:  Overruled.
13            THE WITNESS:  It's a significant expense that's in the
14   budget and has to be approved.  And if we're going to hire more
15   moderators than we have in the budget, then we have -- I have       14:39:07
16   to get approval.
17   BY MR. RAPP:
18   Q.  From whom?
19   A.  I have to ask Scott Spear.  Scott Spear communicates with
20   the other owners.                                                    14:39:17
21   Q.  All right.
22            THE COURT:  All right.  Mr. Rapp, we are at the time
23   for our afternoon break.
24            And so I admonish the jury just to remember not to
25   come to any conclusion.  And just please enjoy the 20-minute        14:39:30
```

 1    break.  Be prepared to come in promptly at 3:00.

 2              Please all rise for the jury.

 3         (Jury not present at 2:39 p.m.)

 4         THE COURT:  And, Mr. Ferrer, you may step down.

 5         (The witness leaves the proceedings.)                    14:40:05

 6         THE COURT:  Okay.  All right.  Mr. Lincenberg, you

 7    wish to raise an issue?

 8              MR. LINCENBERG:  Yes.

 9              MS. BERTRAND:  Your Honor, may I?

10              May my client be excused to use the ladies' room?  She  14:40:23

11    is --

12              THE COURT:  Yes.  Yes.

13              MS. BERTRAND:  Okay.  Thank you.

14              MR. LINCENBERG:  Your Honor, we got an exhibit

15    yesterday.  It's a new exhibit.  I'm not even sure there's a   14:40:31

16    number assigned to it yet, but it's -- it's relating to

17    Exhibit 886 and 886a.  It's a redlined version of it.

18              This deals with this issue that Mr. Ferrer looked at

19    over the break and then came back.  And we got new Jencks on

20    this as well.                                                 14:40:56

21              MR. RAPP:  Judge, I might be able to short-circuit

22    this.  I don't intend to go into this at all.

23              MR. LINCENBERG:  Okay.  Thank you, Your Honor.

24         THE COURT:  All right.  Let's stand in recess.

25         (Recess from 2:41 p.m. to 3:00 p.m.)                      14:41:06

```
 1            (Jury not present at 3:00 p.m.)

 2            THE COURT:  All right.  Just before the jury comes in,

 3    they had a pressing concern.  The very special and unusual

 4    circumstance of our Diamondbacks apparently are on a streak.

 5    So tomorrow they have a game, and many of the jurors travel to      15:00:36

 6    the East Valley.  They'd like to have an early start so they

 7    can have an early release.

 8            So I've compromised with them and told them if they

 9    can be here at 8:30 for an 8:45 prompt start, we'll take a

10    45-minute lunch, and then we'll -- we will release them at 4:00      15:00:55

11    so that they can meet -- beat some of that, what I understand

12    may be restricted traffic.  And so that is how we will proceed.

13            MR. CAMBRIA:  Your Honor, would you please inform them

14    the government objects?

15            THE COURT:  They will be on their own to do so, if          15:01:18

16    they wish.

17            Okay.  So let's have the jurors in.

18            I thought you were going to say that Mr. Rapp was a

19    Dodgers fan.

20            MR. CAMBRIA:  He's that -- he's that also.                  15:01:40

21            MR. RAPP:  Not a chance.

22            MR. EISENBERG:  Are you wearing blue?

23            THE COURT:  All rise for the jury.

24        (Jury present at 3:02 p.m.)

25            THE COURT:  All right.  Please be seated.                   15:02:36
```

```
 1              And Mr. Ferrer is on the witness stand.

 2              Mr. Rapp, you may continue.

 3              MR. RAPP:  Thank you, Your Honor.

 4    BY MR. RAPP:

 5    Q.  Mr. Ferrer, one of the exhibits defense counsel reviewed      15:02:44

 6    with you was Exhibit 23.

 7              Do you remember this exhibit?  It's on your screen.

 8    A.  Yes, I do.

 9              MR. RAPP:  Move -- move to publish Exhibit 23.

10              THE COURT:  Yes, it may be published.                   15:02:57

11    BY MR. RAPP:

12    Q.  And was part of Exhibit 23, so -- just so we know what

13    we're talking about, it's the 2008 budget proposal that we've

14    talked about on -- both on direct and it also was discussed

15    with you on cross?                                                15:03:12

16    A.  Yes.

17    Q.  And in 2008 -- or 2007 going into 2008, was The Erotic

18    Review part of the budget?

19    A.  Yes, it was.

20    Q.  And would you access -- well, when did you start, if you      15:03:28

21    know, accessing or receiving Google Analytics reports?

22    A.  Huh?  Almost at the start of Backpage's launch.

23    Q.  Okay.  And then -- and were those Google Analytic reports

24    and -- that demonstrated the referral sites to Backpage, were

25    they discussed at these budget meetings?                         15:04:02
```

1   A.  They were.  Not -- not initially 2004, 2005, 2006.  We

2   weren't discussing it as much.  2007, it was very much

3   discussed.

4   Q.  All right.  And so there was -- there was -- your

5   testimony -- and you were questioned about the excitement, for          15:04:19

6   lack of a better word, on the referral traffic that you were

7   receiving from The Erotic Review.

8          Do you remember those questions?

9   A.  Yes.

10  Q.  All right.  And then looking at Exhibit 1925, this -- this          15:04:36

11  jumps way ahead to 2013.

12          And when you first started the -- the Google An- --

13  obtaining the Google Analytics reports, how much did it cost

14  you?

15  A.  It was free from 2004 to approximately 2013.  But then the          15:05:06

16  site had grown so much, it's now in the billions of page views,

17  that Google now wants us -- wants the company to -- Backpage to

18  pay.

19  Q.  How much -- based upon this email exchange you have with

20  Mr. Brunst, how much is Google -- Google Analytics, how much do          15:05:31

21  they want to charge you to get this report on a monthly or

22  daily basis?

23          MR. LINCENBERG:  Your Honor, objection.  This is all

24  just repeating direct.  Asked and answered.  Cumulative.

25          THE COURT:  Well, I'll overrule it.          15:05:44

1          But go through it limitedly, Mr. Rapp.  It has been

2    reviewed.

3    BY MR. RAPP:

4    Q.  Well, so, just to be clear, did -- did defense counsel for

5    Mr. Brunst show you this exhibit?                              15:05:53

6    A.  Yes.

7    Q.  All right.  And how much now is -- is Google Analytics

8    charging you to receive these reports?  If you can tell from

9    this exhibit.

10   A.  Yeah, it's -- it's down below further.                     15:06:08

11   Q.  All right.  Let's see if I can get there quickly.

12          MR. LINCENBERG:  It's all been asked and answered.

13          THE COURT:  I've given Mr. Rapp limited leeway.

14   BY MR. RAPP:

15   Q.  Do you see that?                                           15:06:35

16   A.  I do.

17   Q.  How much are they charging?

18   A.  It looks like the fee will be $150,000 annual.

19   Q.  All right.  And at this point, who was the biggest

20   referring site in 2013 to Backpage?                           15:06:50

21   A.  The Erotic Review.

22   Q.  How about in 2012, when -- when we just looked at

23   Exhibit 120, when Mr. Brunst was the chief financial officer?

24          MR. LINCENBERG:  Again, just repeating testimony.

25   Asked and answered.                                           15:07:12

 1            THE COURT:  Overruled.

 2            THE WITNESS:  The Erotic Review.

 3            I can't remember a year where The Erotic Review wasn't

 4   on top until maybe the very, very end.

 5   BY MR. RAPP:                                                15:07:24

 6   Q.  All right.  And then looking at another exhibit, counsel

 7   for Mr. Brunst showed you Exhibit 1924.

 8            Do you see that?

 9   A.  Yes, I do.

10   Q.  And is this a email that -- and you've looked at the     15:07:38

11   attachment, but does this -- does this have to do with the page

12   views and Google Analytics?

13            MR. LINCENBERG:  Objection.  Exceeds the scope.  I

14   never used 1924.

15   BY MR. RAPP:                                                15:08:01

16   Q.  Well, wait a minute.  Did -- did counsel ask you about

17   Google Analytics?

18   A.  Yes.

19   Q.  Okay.  Is this -- does this show that he's receiving the

20   Google Analytics reports?                                   15:08:12

21            MR. LINCENBERG:  Same objection.

22            THE COURT:  Overruled.

23            THE WITNESS:  Yes.  Jed Brunst, Jim Larkin, Scott

24   Spear are receiving the Google Analytics page views by

25   category.                                                   15:08:24

1    BY MR. RAPP:

2    Q.  All right.  And Exhibit 1926.

3         Do you see that?

4    A.  I do.

5         MR. LINCENBERG:  Again, exceeds the scope of cross.    15:08:41

6    It's just repeating direct testimony.

7         THE COURT:  I'm go going to sustain the objection.

8         Mr. Rapp, let's move on.

9         MR. RAPP:  All right.

10   BY MR. RAPP:                                               15:09:05

11   Q.  Mr. Brunst's counsel asked you whether or not Mr. Brunst

12   went to the United States Senate related to the -- what we

13   refer to as the PSI, or the senate subcommittee report

14   investigating Backpage.

15        MR. LINCENBERG:  Mis- -- mis- -- I think it misstates.   15:09:25

16   There's no testimony at all about Mr. Brunst being at the

17   Senate or anything.

18        THE COURT:  Well, it's a compound question.  So just

19   rephrase the question, Mr. Rapp.

20   BY MR. RAPP:                                               15:09:41

21   Q.  Did -- did Mr. Brunst -- was Mr. Brunst with you at the

22   United States Senate related to the Senate investigating

23   Backpage?

24   A.  No, he was not.

25   Q.  Was the report that they issue, was it publicly available?   15:09:53

CARL FERRER - REDIRECT EXAMINATION                    87

1   A.  Yes, it was.

2   Q.  Were the -- were the proceedings --

3           MR. LINCENBERG:  And this is just repeating direct

4   examination testimony.

5           MR. RAPP:  He opened the door to the Senate.          15:10:10

6           THE COURT:  Well --

7           MR. LINCENBERG:  There's no opening the door.

8           THE COURT:  Well, let --

9           MR. LINCENBERG:  The report was publicly available.

10  It was testified to.                                          15:10:18

11          THE COURT:  You had an objection.  Let me respond to

12  that first before you start arguing the objection.

13          I'm going to overrule the objection.

14          You may ask a new question, Mr. Rapp.

15  BY MR. RAPP:                                                  15:10:31

16  Q.  All right.  And so during this time frame of 2015 to 2017,

17  were you having contact that covered the time period where you

18  went to the United States Senate, were you having contact with

19  Mr. Brunst?

20  A.  Yes.                                                      15:10:51

21  Q.  All right.  And, as a matter of fact, we looked at an

22  exhibit, did we not, where shortly thereafter the Senate,

23  Mr. Brunst sends you an email where he, with the owners,

24  approves a bonus for you?

25          Do you recall that?                                   15:11:12

1    A.  I do.

2    Q.  Why is Mr. Brunst and the owners approving a bonus for you

3    since you own the website?

4           MR. LINCENBERG:  Objection.  Calls for speculation,

5    and the area is asked and answered.                          15:11:26

6           MR. FEDER:  He's also including -- it's compound, or

7    he's including a lot of the so-called owners in the question.

8           THE COURT:  Well, as to the first objection, I will

9    sustain.

10          As to the other, I think we've all heard what         15:11:42

11   Mr. Ferrer believes are the owners.

12          But let's go -- move forward, Mr. Rapp, and rephrase

13   your question.

14          MR. RAPP:  All right.

15   BY MR. RAPP:                                                 15:11:53

16   Q.  Why were the owners deciding your compensation in 2017?

17          MR. LINCENBERG:  Well, same objection.

18          THE COURT:  Sustained.

19   BY MR. RAPP:

20   Q.  There were questions from counsel for Mr. Spear about age  15:12:08

21   verification.

22          Do you remember that?

23   A.  Yes.

24   Q.  In fact, I think one of the terms that was referenced was

25   it was ridiculous.                                          15:12:27

 1            Do you remember that?

 2    A.  I think I'm --

 3    Q.  This is on cross-examination.

 4    A.  Yeah.  Yes.

 5    Q.  All right.  Why did you not do age verification?          15:12:33

 6    A.  We terminated the age verification technology that we were

 7    using because the owners didn't want to go through with it.

 8    Q.  All right.

 9            MR. FEDER:  Your Honor, that brings up something that

10    this Court has made an order on.  And this is improper to bring    15:13:01

11    up.  There -- this is essentially a 106 violation per *McKenna*.

12            THE COURT:  Overruled as to the question that was just

13    asked.

14            And, again, here, Mr. Rapp, let's also have clarity

15    with regard to when you're asking Mr. Ferrer about owners --      15:13:20

16            MR. RAPP:  All right.

17            THE COURT:  -- in the plural.

18            MR. RAPP:  All right.

19            THE COURT:  Thank you.

20    BY MR. RAPP:                                                      15:13:29

21    Q.  All right.  Who are the owners?

22    A.  Jim Larkin, Michael Lacey, and Scott Spear, Jed Brunst.

23    Q.  All right.  And can you explain why you didn't do age

24    verification?

25    A.  There was a --                                                15:13:44

 1              MR. FEDER:  Same objection.

 2              And may there being a continuing one, unless the Court

 3     is going to allow us to talk about --

 4              THE COURT:  Overruled.

 5              Mr. Rapp.                                              15:13:56

 6     BY MR. RAPP:

 7     Q.  And why is that?

 8     A.  The director -- board -- director of the board didn't want

 9     to go through with age verification because he felt like there

10     was a right to post anonymously.                               15:14:08

11     Q.  All right.  And what about any expense related to it?

12     A.  The expense was really insignificant.  I think we had only

13     spent $10,000.

14     Q.  All right.  Well, if you were going to do in-person age

15     verification, would that have been expensive?                  15:14:26

16     A.  Okay.  Now, that's different.  That in-person would have

17     been prohibitively expensive.

18     Q.  Okay.  Let's look at 1766.  It's in evidence.

19              Well, let's look at, first, 1760 -- 1766.  This was

20     discussed with you by counsel for Mr. Spear.                   15:14:59

21              Do you remember -- can you take a look at that email,

22     and tell me if -- if you recall that -- that email, and then

23     I'll show you the attachment.

24     A.  Yes.

25     Q.  Okay.  Do you remember this email?                         15:15:12

1    A.  I do.

2    Q.  All right.  And then showing you 1766a, do you remember the

3    questions from counsel for Mr. Scott Spear about this?

4    A.  Yes, I do.

5    Q.  All right.  And the -- the questions were, how is it that          15:15:29

6    you know that this is a prostitution posting?

7    A.  Yes, that's what I was asked.

8    Q.  All right.  And in looking at this, is there any way at all

9    that you can determine whether this is a advertisement for sex

10   for money that involves prostitution?                                  15:15:56

11          MR. FEDER:  Calls for speculation.

12          THE COURT:  Overruled.

13          THE WITNESS:  Yes, I can.

14   BY MR. RAPP:

15   Q.  Can you tell -- explain that to the jury, please.                  15:16:05

16   A.  Well, Sophie's saying, "For my review and all sorts of

17   insider info," go to the Dollar -- dbspsychoroundup, which is

18   the Dollar Bill PsychoRoundup Blog.  And it's filled with

19   reviews of prostitutes.

20   Q.  Okay.  Is it -- is it similar in any respect to -- based           15:16:29

21   upon your review of it, is it similar in any respect to the

22   other review sites like The Erotic Review?

23   A.  It is similar, but not as sophisticated as The Erotic

24   Review.

25   Q.  All right.  And what do you mean by that?                          15:16:50

1   A.  It's -- I recall that the Dollar Bill PsychoRoundup is just

2   like a lot of individual blog postings.

3   Q.  All right.  Now, there was questions about your -- well,

4   let me just ask you about -- you've testified on direct and

5   then on cross about subpoenas.                              15:17:17

6        Do you remember that?

7   A.  Yes.

8   Q.  And -- and how you would provide subpoenas to law

9   enforcement.

10  A.  Correct.                                                15:17:24

11  Q.  And what cost, if any, was associated with you complying

12  with those subpoenas?

13  A.  We needed a staff of -- well, it depends on the time frame;

14  right?  If we want to use roughly 2015, I would say there was a

15  staff of four to five people that were handling subpoena       15:17:48

16  requests, bundling up the records, sending them to law

17  enforcement.

18  Q.  And then there was a -- questions from counsel for

19  Mr. Lacey about how you would maintain the information on

20  the -- on the servers and -- and I believe his question       15:18:11

21  suggested there was some costs associated with that.

22        Is there a cost associated with that?

23  A.  Not really.  These are the ads that are in the database.

24  They're just hidden from any kind of public view.  And we're

25  just accessing those records.                               15:18:28

1          And then we're going to store the fulfilled subpoena

2     on a -- you know, on another server.  But this cost of that

3     space is insignificant.

4     Q.  All right.  And when you -- on cross-examination you were

5     questioned about these -- these cases that you've -- you've --          15:18:47

6     you've testified, these federal cases.  We talked a little bit

7     about that from the outset of my redirect of you.

8          Do you remember that?

9     A.  Yes.

10    Q.  One of the -- one of the -- the testimony is you -- you          15:18:58

11    testified -- testified that you were trying to keep ads legal

12    by removing genitalia and sex for money.

13         Do you remember testifying to that in another case

14    where you were authenticating Backpage postings?

15    A.  Yes.          15:19:19

16    Q.  All right.  Were -- were you -- were you trying to do that?

17    Were you trying to keep the -- the ads legal by removing the

18    genitalia and the sex for money references?

19    A.  We were trying to make the ads less obvious prostitution.

20    So the answer is that I was not correct.          15:19:37

21    Q.  All right.  Now, there were some questions about the

22    security -- safety and security specialist, Hemu Nigam?

23    A.  Yes.

24    Q.  Do you remember on cross-examination you were asked

25    questions about that?          15:19:57

1    A.   Yes.

2    Q.   How long did he actually work for Backpage?

3    A.   A year and a half, I believe.

4    Q.   All right.

5    A.   Came onboard fall of 2010.  And then -- well, not even          15:20:11

6    that.  And then he was gone mid-year 2011.  So it was months.

7    Q.   As a matter of fact, we looked at an exhibit that was

8    actually his termination letter.

9         Do you remember that exhibit?

10   A.   Yes.                                                            15:20:28

11   Q.   I can pull it up, but you -- you remember Mr. Larkin --

12   who -- who terminates him?

13   A.   That would be a Larkin decision.

14   Q.   All right.  And so he comes in in -- do you remember what

15   month he starts in 2010?                                            15:20:41

16   A.   He came in when we were flooded with content.  I thought it

17   would have been the fall of 2010, when Craigslist shut down

18   their --

19   Q.   All right.

20   A.   -- adult section.                                              15:20:55

21   Q.   Can you remind the jury when Craigslist shut down?

22   A.   I believe it was September 2010.

23   Q.   All right.  And then jumping into 2011, did -- you've

24   testified to these meetings that you had at NCMEC and Polaris?

25   A.   Yes.                                                           15:21:12

CARL FERRER - REDIRECT EXAMINATION                        95

```
 1    Q.  Did the relationship -- what I mean is the owner's

 2    relationship, did it change with respect to Mr. Hemu after the

 3    meetings at NCMEC and Polaris?

 4            MR. FEDER:  Foundation.

 5            THE COURT:  Sustained.                                    15:21:30

 6            MR. RAPP:  Okay.

 7    BY MR. RAPP:

 8    Q.  What was -- was Mr. Nigam's recommendations implemented

 9    after the meeting with NCMEC and Polaris?

10    A.  It was not.  He was sidelined.                               15:21:54

11    Q.  Why was he sidelined?

12    A.  He had recommended that we shut down the adult section,

13    make money from Google ads.  And that just was not a

14    sustainable revenue model --

15    Q.  All right.                                                   15:22:10

16    A.  -- for Backpage.

17            You couldn't even run Google ads in the adult section,

18    so -- and we had little or no traffic.

19            MR. FEDER:  Move to strike as beyond the scope.

20            THE COURT:  Overruled.                                   15:22:24

21    BY MR. RAPP:

22    Q.  Well, there was some questions about Google.  And what is

23    the difference between these two platforms, Backpage and

24    Google?  There were questions about Google on

25    cross-examination.                                               15:22:34
```

```
 1    A.   Yeah.   It's two different business models.   So Backpage,

 2    like Craigslist, where you can create an ad.   You cannot create

 3    an ad on Google.   Well, I guess you could.   You could do their

 4    AdSense or AdWords.   But Google's main core product is it

 5    scrapes other sites, it indexes them, and then it makes it          15:22:58

 6    available to users who -- who do keyword searches so that they

 7    can get to the relevant information.

 8           So it -- it's really an index of other websites and

 9    other content.

10    Q.   All right.   Now, you also were questioned on                   15:23:14

11    cross-examination about after Mr. Hemu -- Mr. Nigam's

12    departure, another person came in by the name of Liz McDougall.

13           Do you remember that?

14    A.   Yes.

15    Q.   And at some point did you receive any direction from           15:23:27

16    Mr. Larkin about how you should approach Ms. McDougall?

17              MR. FEDER:   Beyond the scope.

18              THE COURT:   Overruled.

19              THE WITNESS:   I'm trying to recall.

20              Is this when Liz first came on board?                      15:23:53

21    BY MR. RAPP:

22    Q.   Yes.

23    A.   Yes.   Larkin sent an email, and there was a conversation

24    that she would be replacing Hemu Nigam, I believe.

25    Q.   Right.   And in terms of information that you were             15:24:13
```

```
 1   providing, she comes into -- to Backpage?
 2   A.  Yes.
 3   Q.  And do you have --
 4           THE COURT:  Can you use the microphone --
 5           MR. RAPP:  Yes.                              15:24:25
 6           THE COURT:  -- Mr. Rapp.
 7           MR. RAPP:  Yes, ma'am.  I'm sorry about that.
 8   BY MR. RAPP:
 9   Q.  And did you have meetings with her?
10   A.  Do I have meetings with her?                    15:24:30
11   Q.  Yes.  Do you have meetings with her?
12   A.  Yes.
13   Q.  Does she show up at meetings involving moderation?
14   A.  She did.
15   Q.  At -- at some point do you have a conversation with  15:24:39
16   Mr. Larkin about what information you should provide
17   Ms. McDougall?
18           MS. BERTRAND:  Judge, objecting -- objection.
19   Leading.
20           MR. FEDER:  And beyond the scope --          15:24:52
21           MR. LINCENBERG:  It's beyond the scope.
22           MR. FEDER:  -- of cross.
23           THE COURT:  Sustained as to leading.  Overruled
24   otherwise.
25       ///
```

BY MR. RAPP:

Q.  Any discussions with Mr. Larkin about Ms. McDougall?

A.  Lots of discussions and at different time frames.

We kept the revenue reports from her.  We didn't want
to talk to her about revenue.  And later on, some of her
suggestions were just considered too destructive to the
Backpage revenue model, so we would sideline her on -- or, you
know, disagree with her.  She couldn't win some battles.

Q.  All right.  There was some questions -- well, strike that.

There were some questions about applications for
credit card processing.  And you made a comment about -- in the
process of applying for credit card processing, you made a
comment of death by Google Search.

Do you remember that?

A.  Yes.

Q.  Can you explain what you meant by that.

A.  If you fill out an application and you have Backpage.com as
the website on the credit card merchant account application, if
someone does a search in Google News under Backpage.com, they
are going to see hundreds of stories of arrests for criminal
activity.

Q.  Okay.  And are those related to postings on Backpage?

A.  They are.  Almost entirely in the adult section.

Q.  All right.  And would you -- did you also see, for example,
the expose that was done by Amber Lyon from CNN?  Would you

1    find that on Google?

2           MS. BERTRAND:  Objection.  Goes beyond the scope of

3    cross.  Asked and answered.  Leading.

4           THE COURT:  Sustained.  Sustained as beyond the scope

5    of cross.                                                    15:27:01

6           And it has been asked and answered, Mr. Rapp.

7           MR. RAPP:  Thank you.

8    BY MR. RAPP:

9    Q.  There was some questions by counsel for Mr. Lacey about

10   him -- his involvement with Backpage.                        15:27:17

11          Do you remember that?

12   A.  Yes.

13   Q.  But -- well, let's look at -- while I'm looking for that,

14   in the interest of time, was Mr. Lacey with you at a meeting at

15   NCMEC?                                                       15:27:35

16   A.  Yes, he was.

17   Q.  Was he at a meeting with -- at -- with the Auburn

18   Theological Seminary?

19   A.  Yes, he was.

20   Q.  Was -- did you exchange emails with him regarding the     15:27:47

21   Amber Lyon expose?

22          MS. BERTRAND:  Objection.  Leading.  Asked and

23   answered.  Goes beyond the scope of cross.

24          THE COURT:  Overruled.

25          THE WITNESS:  Yes.                                     15:28:07

CARL FERRER - REDIRECT EXAMINATION

1   BY MR. RAPP:

2   Q.  How about the Nick Kristof articles?

3   A.  Yes.

4        MR. RAPP:  And going back to Exhibit 5, page 17.  We

5   looked at this earlier.  And I'd ask -- request to publish.          15:28:25

6   BY MR. RAPP:

7   Q.  By 2012, what was Mr. Lacey's source of revenue on a

8   monthly basis?

9   A.  Backpage.com.

10  Q.  There were some questions as recent as today about this law    15:28:45

11  enforcement guide.

12        Do you remember that?

13  A.  Yes.

14  Q.  Did -- can you tell -- can you explain to the jury what

15  this law enforcement guide was all about?                           15:28:56

16        MR. EISENBERG:  Objection, Your Honor.  It's a broad

17  question.  "All about."

18        THE COURT:  Yes.  Rephrase the question, Mr. Rapp.

19  BY MR. RAPP:

20  Q.  What -- what was the purpose of the law enforcement guide?      15:29:09

21  A.  The purpose of the law enforcement guide was to reduce the

22  amount of back-and-forth communication between law enforcement

23  and support.  If we could just provide them all the information

24  they needed, it would, you know, reduce that, the emails back

25  and forth.  We just had so much volume.                             15:29:30

UNITED STATES DISTRICT COURT

```
 1   Q.  All right.  Did -- you never disclosed in this law
 2   enforcement report these internal strategies that you had
 3   regarding the super posters and aggregation and The Erotic
 4   Review, did you?
 5   A.  We did not.                                          15:29:44
 6   Q.  All right.  And about really the -- the true nature of
 7   moderation, as you've described it --
 8            MS. BERTRAND:  Objection.
 9   BY MR. RAPP:
10   Q.  -- through your testimony?                           15:29:54
11            MS. BERTRAND:  Objection.  Counsel's testifying
12   regarding the true nature of moderation.
13            THE COURT:  Sustained.
14   BY MR. RAPP:
15   Q.  Well, how about did you -- did you describe it in the way  15:30:00
16   you've characterized it in -- in your testimony here in the
17   last couple weeks?
18            MS. BERTRAND:  Objection.  Vague.
19            THE COURT:  Sustained.
20   BY MR. RAPP:                                             15:30:10
21   Q.  How would you characterize moderation?
22   A.  Moderation was done to protect the revenue model.  So it
23   was done incrementally, allow users to adjust, but essentially
24   the same users.  They -- they learned to stop posting sex act
25   pics or to use certain code words.                       15:30:30
```

```
 1   Q.  All right.  And with respect to -- there was some questions
 2   with -- on cross-examination about these declarations.
 3            Do you remember those questions?
 4   A.  I do.
 5   Q.  All right.  Now, first, were you asked to sign some          15:30:47
 6   declarations?
 7   A.  I was.
 8   Q.  Did those declarations contain the prostitution marketing
 9   strategies?  Whoever you were filling these declarations out,
10   did it -- did it disclose the prostitution marketing            15:31:02
11   strategies?
12   A.  It did not.
13   Q.  Is there a reason why it didn't?
14   A.  It -- that would be pretty damning.
15   Q.  Now, you're not on this chart as of 2006.  And it goes all   15:31:15
16   the way up to 2015; right?
17   A.  Correct.
18   Q.  Why wasn't Mr. -- why didn't Mr. Lacey sign these
19   declarations?  Why didn't he sign them?
20   A.  I don't know.                                                15:31:37
21            MR. CAMBRIA:  Objection.  Calls for speculation.  I
22   object.
23   BY MR. RAPP:
24   Q.  Do you know?
25            MR. CAMBRIA:  He just --                                15:31:45
```

1          THE COURT:  Let me sustain the objection first, and

2     then you can ask your next question.

3     BY MR. RAPP:

4     Q.  Do you know why?

5     A.  I have -- I believe it was because --                    15:31:50

6          MR. CAMBRIA:  No.  I object to what he believes.  He

7     said he didn't know.

8          THE COURT:  Sustained.

9     BY MR. RAPP:

10    Q.  Do you know?  I mean, do you know the reason?            15:31:56

11    A.  I know the reason.

12    Q.  All right.

13    A.  Or I su- -- I can't say with absolute 100 percent

14    certainty.

15         MR. CAMBRIA:  Then I object to it.                       15:32:05

16         THE COURT:  Sustained.

17    BY MR. RAPP:

18    Q.  But did he sign -- as the 44-percent owner of Backpage, did

19    he sign one declaration?

20    A.  He did not.                                               15:32:18

21    Q.  Yes or no?

22    A.  He didn't.  No, he did not sign any declarations.

23    Q.  How about the chief financial officer that we've seen in

24    Exhibit 120, page 7, where he is identified as the chief

25    financial officer of Backpage?  Did he sign these declarations?  15:32:32

1   A.  He did not sign any declarations.

2   Q.  And Mr. Spear?

3   A.  Mr. Spear did not sign any declarations.

4   Q.  There was an exchange between you and Mr. Brunst --

5   Mr. Brunst's attorney about whether you would be fired if you          15:32:57

6   sent an email about -- that you were promoting prostitution.

7           Do you remember that?

8   A.  Yes.

9   Q.  As a matter of fact, weren't you given a draft of an

10  article about -- from Mr. Lacey?          15:33:16

11          Do you remember that?

12  A.  I do.

13  Q.  Wasn't he acknowledging -- was he -- what was he

14  acknowledging in that article?

15          MR. CAMBRIA:  Object to the leading.          15:33:26

16          THE COURT:  Well, he rephrased the question so it was

17  not leading in the end.

18          You may answer.

19          THE WITNESS:  He was -- he stated that he was bringing

20  transparency to the oldest profession in the world.          15:33:38

21  BY MR. RAPP:

22  Q.  And -- and what -- when you read that, what did you do with

23  that line?

24  A.  I asked that it be stricken.  We don't want to acknowledge

25  prostitution.          15:33:54

UNITED STATES DISTRICT COURT

```
 1    Q.  All right.  After the sale in 2015, did you decide your own

 2    compensation as now the owner of Backpage?

 3    A.  I did not.

 4    Q.  Why not?

 5    A.  Because the covenants give me certain rules that I had to      15:34:14

 6    follow, and compensation is determined by the -- by either Jim

 7    Larkin, Scott Spear, or Jed Brunst, or Michael Lacey.

 8    Q.  Could you hire and fire employees?

 9    A.  Not the key department heads.  I had to get their

10    permission.  So when we did terminate a CTO, I had to get their    15:34:43

11    permission.

12    Q.  All right.  Let's look at Exhibit 77 [sic].

13              THE COURT:  What exhibit?

14              MR. RAPP:  Exhibit 177.

15              Let's see.  Let's look at 1- -- instead -- I've          15:35:23

16    changed my mind.  Let's look at 178.

17    BY MR. RAPP:

18    Q.  Did you have emails with banks that involved reputational

19    concerns that they had with Backpage?

20    A.  Yes.                                                           15:35:49

21    Q.  All right.  Let me show you 178.

22              Do you remember this email?

23    A.  I do.

24    Q.  All right.  Was there some type of reputational concern

25    from this bank?                                                    15:36:19
```

UNITED STATES DISTRICT COURT

```
 1   A.  There was.  From US Bank.

 2   Q.  Yeah.  And -- and what was the reputational concerns?

 3   A.  They had --

 4           MR. LINCENBERG:  Objection.  Calls for speculation.

 5           THE COURT:  Well, if he knows, he can answer.          15:36:34

 6           Otherwise it would be speculation, Mr. Rapp.

 7   BY MR. RAPP:

 8   Q.  Do you know?

 9   A.  I just know that they had terminated --

10           MR. LINCENBERG:  Move to strike.                       15:36:42

11           THE COURT:  Well, he can -- the answer will remain.

12   He said he just knows that they terminated.

13           Let's move forward, Mr. Rapp.

14           MR. RAPP:  All right.

15   BY MR. RAPP:                                                   15:36:54

16   Q.  Let's look at 1616a -- 616a.

17           You were questioned about this on cross-examination --

18   A.  Correct.

19   Q.  -- right?

20           Is this a deceptive email from Scott Spear with Jed   15:37:10

21   Brunst copied on this?

22           MR. LINCENBERG:  Well, that's been asked and answered

23   ad nauseam.

24           THE COURT:  Overruled.  He may answer.

25           THE WITNESS:  Yes, it's deceptive, because it gives us  15:37:28
```

UNITED STATES DISTRICT COURT

1    the appearance of doing something when we're not doing

2    anything.  This is where we sacrificed the personals categories

3    that have little or no revenue.

4    BY MR. RAPP:

5    Q.  All right.  And in the budget meetings that you had,                    15:37:41

6    would -- did you discuss the fact that these particular

7    categories were -- was there discussions about what categories

8    generated the most revenue?

9    A.  Oh, absolutely.

10   Q.  All right.  And then looking at 763, this -- you were                    15:38:01

11   questioned about this on cross-examination.  This is a -- this

12   is an email from Mr. Brunst to you and Mr. Larkin?

13   A.  Yes, it is.

14   Q.  All right.  And then down here, do you see that, "Indirect

15   im-" -- "revenue impact initiatives"?                                        15:38:42

16          Can you explain those -- those -- the -- the sort of

17   the points underneath --

18   A.  Sure.

19   Q.  -- under either those.

20          MR. LINCENBERG:  This is beyond cross.                                15:38:53

21          MR. RAPP:  Well, no.  He asked about this exhibit.

22          THE COURT:  No.  Overruled.

23          THE WITNESS:  So the indirect revenue impact

24   initiatives are, I believe, increasing prepaid credit cards,

25   improving the UX, which means improving the user experience.                 15:39:11

1   BY MR. RAPP:

2   Q.  What does that mean?

3   A.  It just means make the site visually more compelling.

4   Q.  To whom?

5   A.  To the consumer.  In our case johns of the female escorts          15:39:23

6   category.  We would like lots of pictures.  So we want the

7   picture to fill the entire phone screen.  Like Instagram.

8   Q.  Okay.  And gift credits, private messaging?

9   A.  So, yeah, gift -- we didn't go forward with this

10  development, but it's on here as a possibility that consumers          15:39:49

11  of the content could gift credits as a thank you to the users

12  who were posting content.  But we knew we had to limit that

13  amount to not exceed -- like, it couldn't be very much.  It

14  was -- the idea -- it was really fraught with peril, because

15  then johns could essentially pay a prostitute by gifting              15:40:14

16  credits.  And we decided to -- we just can't go there.

17  Q.  All right.  Goes too far.

18          All right.  Let's look at Exhibit 500.

19          Now, this is -- this was reviewed with you both on

20  direct and cross-examination.                                         15:40:34

21          So, first, in November of 2015, who is the owner of

22  the website?

23  A.  Well, I am the nominal owner as of April 2015.  But in

24  July 2015, the whole business model changed.

25  Q.  All right.  But you're not on this email?                         15:40:58

UNITED STATES DISTRICT COURT

1    A.   I am not.

2    Q.   And this is an email from Mr. Brunst to whom?

3    A.   It's an email --

4            MR. LINCENBERG:  This is cumulative and argumentative.

5            THE COURT:  Overruled.                              15:41:13

6            THE WITNESS:  It's an email to Mr. Brunst, who is

7    communicating with BDO, the accountants for the company.

8    BY MR. RAPP:

9    Q.   Okay.  And, actually, when you were questioned about this

10   email on cross-examination, you made the comment of Backpage   15:41:27

11   was a sinking boat.

12           Can you explain to the jury what you meant in the

13   context of -- of reviewing this email?

14   A.   So the company went from generating 10 to 12 million in

15   gross revenue per month to now, without the ability to use     15:41:48

16   MasterCard or Visa, to losing money.  And so it's a -- it

17   really, without MasterCard or Visa -- and the fact is we had to

18   go free to keep the model going.  So now we've increased

19   expense without any increase in revenue.

20   Q.   All right.  Mr. Brunst makes a reference to the move to the 15:42:15

21   top in the auto post.

22           What is he telling this person at BDO when you're not

23   copied on this email?  What is he referencing there?

24           MR. LINCENBERG:  Calls for speculation.  He's not on

25   the email.                                                     15:42:33

1        THE COURT:  Well, he can -- if he can review that

2    portion that Mr. Rapp has asked him to and if he has an opinion

3    about it, he can state it.

4        THE WITNESS:  So Mr. Brunst is very much aware that

5    the upgrade features now are moved to the top and auto repost.          15:42:49

6    That's going to be the primary revenue model while Backpage is

7    free.  So the free ads will get buried.  But if you want your

8    ad to be on top, you're going to have to be a paid ad.  And so

9    move to the top and auto repost are ways to make your ad a paid

10   ad.                                                                      15:43:11

11   BY MR. RAPP:

12   Q.  All right.  So this is 2015.

13        Let's just go back to Exhibit 6189, page 7.

14        This goes back to the merchant is -- does this -- do

15   you see where it -- do you -- it's on your screen there, but            15:43:30

16   this is in evidence.

17        MR. RAPP:  I'd ask that it be published, 6189.  I'm

18   sorry.  I might have said 7.  My fault.  6189.

19        THE WITNESS:  Yes, I see it.

20   BY MR. RAPP:                                                            15:43:44

21   Q.  All right.  Is this -- does it -- is this reference the

22   same thing that's -- that he's referencing in 2015?  Does it

23   have anything to do with premium placement?

24   A.  The premium placement options are the auto repost, move to

25   the top, sponsor ads.                                                   15:44:01

UNITED STATES DISTRICT COURT

1  Q.  All right.  Same -- so that was -- that was in place back

2  in 2013?

3  A.  Yes.

4  Q.  All right.  Now, in 2014 -- the defense had you take a look

5  at this pie chart.                                                15:44:30

6         This is in Exhibit 1049b, page 6 for the record.

7         Do you see that on your screen?

8  A.  I do.

9         MR. RAPP:  And that's in -- that's in evidence.

10 BY MR. RAPP:                                                      15:44:49

11 Q.  And so in 2014, was there some effort that -- do you recall

12 this being part of a PowerPoint?

13 A.  I do.  Nathan Kopecky and I had worked on this at Jed

14 Brunst's request.

15 Q.  All right.  And did you know why Mr. Brunst was requesting   15:45:04

16 this?

17 A.  I -- I thought he was trying to sell it.

18 Q.  Sell what?

19 A.  Sell the -- sell the company, you know.

20 Q.  Right.                                                       15:45:17

21 A.  But later on I came to learn that he was trying to figure

22 out a valuation to ultimately sell it to me.

23 Q.  All right.  Did they find any other buyer in 2014?

24 A.  No.  No.

25 Q.  Is this -- so is this the -- we talked about 2011.  Is this  15:45:32

```
 1   the second time Mr. Brunst is trying to sell Backpage?

 2   A.  Yes.

 3   Q.  Okay.  And what -- did you know if there was any serious

 4   buyer in 2014?

 5          MS. BERTRAND:  Objection.  Leading and vague as to          15:45:49

 6   "serious" -- "serious buyer."

 7          THE COURT:  Overruled as to leading.  Well, overruled.

 8          THE WITNESS:  I do not believe there was any serious

 9   buyer.

10   BY MR. RAPP:                                                       15:46:05

11   Q.  All right.  Is there anything -- is there anything

12   inaccurate about these -- this pie chart?

13   A.  Yes.

14   Q.  Okay.  What is it?

15          MR. LINCENBERG:  Asked and answered.                       15:46:15

16          THE COURT:  Overruled.

17          I'll give you some leeway, Mr. Rapp.

18          MR. RAPP:  Thank you, Your Honor.

19          THE WITNESS:  Can I answer?

20   BY MR. RAPP:                                                       15:46:24

21   Q.  Yes.  Yes.

22   A.  The ads by category breakdown, like jobs, automotive, those

23   are -- those are feeds that are coming in.  So those are just

24   robot.  They're -- they're machine-generated ads.  They're not

25   user-generated ads.                                               15:46:46
```

 1          So this is kind of a ploy that we -- it was a ploy to

 2    create that veneer of a general classified site that we got all

 3    these job ads, but they were almost entirely feeds.

 4    Q.  Okay.  Counsel showed you 5364.  This is page 5.

 5          Do you see that?                                          15:47:20

 6          MR. RAPP:  I believe that's in evidence.

 7          THE WITNESS:  I do.

 8    BY MR. RAPP:

 9    Q.  All right.  And you were --

10          MR. RAPP:  I believe it's in evidence; right?           15:47:29

11          THE COURTROOM DEPUTY:  I'm looking.

12          I have September 28.

13          THE COURT:  Yes, I have it --

14          MR. RAPP:  All right.

15          THE COURT:  -- admitted.

16          Thank you.  My apologies.

17    BY MR. RAPP:

18    Q.  You were questioned by defense about this.

19          Do you remember that?

20    A.  Yes.                                                       15:47:57

21    Q.  And you made a comment that this sort of concealed the

22    ownership.

23          Can you explain this to -- to the jury how this --

24    this proposed structure was concealing the ownership?

25          MR. LINCENBERG:  As the question notes, he already       15:48:15

UNITED STATES DISTRICT COURT

```
 1    explained this.  Asked and answered.

 2            THE COURT:  Well, I'll give you just some slight

 3    leeway, Mr. Rapp, but it has been asked and answered.

 4            You may respond, Mr. Ferrer.

 5            THE WITNESS:  So these two companies are held by this    15:48:31

 6    company, which is then held by these two companies, which then

 7    goes to a corp called Amstel.  And we wanted to create the

 8    impression here that this is a Dutch company.  In fact, there

 9    was -- yeah.  We even put out a press release saying that

10    Backpage was owned by a Dutch company.                          15:49:01

11    BY MR. RAPP:

12    Q.  Well, was there -- was there a -- a brick and mortar Dutch

13    company that -- that --

14    A.  No.  It's all just holding companies.

15    Q.  All right.                                                  15:49:14

16    A.  Shell companies.

17    Q.  Okay.  And there has been a reference to holding companies.

18            What did you understand that to mean, a holding

19    company?  What is that?

20    A.  So there's an operating company, and then above it would be 15:49:25

21    another company called a holding company.  And it's my

22    understanding it's -- it's a way to sort of make it more

23    difficult to find the ultimate beneficiary owner.

24    Q.  All right.  Okay.  Looking at 54- -- Exhibit 5427.

25            Do you see that there?                                  15:50:01
```

UNITED STATES DISTRICT COURT

```
 1    A.  I do.

 2          MR. RAPP:  I believe 5427 is in evidence.

 3    BY MR. RAPP:

 4    Q.  You -- is this -- is this the loan agreement?

 5    A.  It is.  This is the U.S. loan agreement for the U.S.        15:50:21

 6    portion.

 7          MR. RAPP:  Just for the record, this is 5427, page 1.

 8          And I'm just going to go to 5427, page 55.

 9    BY MR. RAPP:

10    Q.  And, so, the loan agreement during the sale, who -- what     15:50:39

11    owner signed the loan agreement?

12    A.  It's signed by John Brunst, which I know as Jed Brunst.

13    Q.  Right.

14          And were some of these -- the reference to these

15    holdings and investments, are these some of these holding        15:51:00

16    companies that you were referring to a few seconds ago?

17    A.  Yeah.  I think these are the holding companies on the

18    owner's side.

19    Q.  Okay.  And then yours -- is this that you've identified up

20    here, the Dutch company, that's -- is that the Dutch company     15:51:21

21    that you were just referring to --

22    A.  Yes.

23    Q.  -- that -- okay.

24          And -- and, in fact, without going through all these

25    loan agreements, every single loan agreement related to this     15:51:33
```

```
 1   purchase, what owner signed that -- those loan agreements?
 2   A.  Jed Brunst.
 3   Q.  And then going forward after the sale, you have identified
 4   Mr. Brunst as the bill collector.
 5             What -- what did you mean by that?                      15:51:53
 6             MS. BERTRAND:  Objection.  Asked and answered.
 7             THE COURT:  Overruled.
 8             THE WITNESS:  Meaning we're in a continual state of
 9   forbearance after credit card Armageddon.  And Jed --
10   Mr. Brunst wanted me to contact the credit card companies that   15:52:13
11   still had reserves or owed Backpage money and collect that
12   money and then use it to make interest payments.
13   BY MR. RAPP:
14   Q.  All right.  And -- so you -- you've raised this forbearance
15   agreement.                                                       15:52:32
16             Let's just look at one of these in -- while we're
17   looking at it, I'll ask you some questions about some of the --
18   the questions defense counsel asked you about the forbear- --
19   forbearance agreement and analogizing it to a mortgage on a
20   house.                                                           15:52:50
21             Do you remember that?
22   A.  Yes.
23   Q.  All right.  Is that -- based upon your experience here in
24   the purchase of this website -- well, are you also a homeowner?
25   A.  I am.                                                        15:53:05
```

1    Q.  All right.  Is that a -- in your view, is that a fair

2    analogy?

3    A.  It's not.  I've had mortgages.  I cannot even imagine going

4    to the lender saying, look, I need a forbearance for -- for a

5    year.                                                              15:53:20

6          I just don't see that happening.

7    Q.  Okay.  What -- what, in your experience, happens when you

8    start -- when you stop paying your mortgage?

9    A.  Your -- your home -- you're kicked out of the home.  The

10   home is repossessed by the bank.                                  15:53:38

11   Q.  In the time -- how many forbearance agreements did you sign

12   from 2000 -- from April 2015 going forward for three years to

13   2018?

14   A.  Well, there's two -- two loans, so there's two forbearance

15   agreements.  So I want to say maybe six or eight forbearance      15:53:54

16   agreements.

17   Q.  Was there any occasion where one of the owners, Mr. Lacey,

18   Mr. Brunst, Mr. Spear said, just like the bank, we're taking

19   back the website?

20   A.  No.  They didn't.  I got the impression they didn't want to   15:54:14

21   take it back.  They just wanted to keep me at the helm.

22   Q.  All right.  Let's look -- well, there was some questions by

23   counsel for Mr. Brunst about this big accounting firm,

24   Deloitte.

25          Do you remember that?                                      15:54:46

1    A.   Yes.

2    Q.   And Deloitte -- I believe your testimony is, correct me if

3    I'm wrong, is Deloitte dropped you, Backpage, as a client.

4         Is that what happened?

5    A.   Yes.  It was either Backpage or the entire company, Village    15:54:57

6    Voice Media.

7    Q.   All right.  And do you know why?

8    A.   Reputational risk.

9    Q.   All right.  And was it ever disclosed to Deloitte these --

10   these internal prostitution marketing strategies that we've          15:55:18

11   been talking about?

12              MR. LINCENBERG:  Objection.  Calls for speculation.

13              THE COURT:  No.  Overruled.  He can answer if he

14   knows.

15              THE WITNESS:  No.  We did not disclose that.              15:55:28

16   BY MR. RAPP:

17   Q.   What about this -- this -- this exchange with BDO, this --

18   this consulting company?  Was it ever disclosed to them?

19   A.   No.

20   Q.   All right.  Mr. Brunst asked you -- not Mr. Brunst.            15:55:42

21   Mr. Brunst's counsel asked you about this conversation that you

22   had with -- with Mr. Brunst.

23         Do you remember that, about closing down the website?

24   A.   Yes, in --

25   Q.   Can --                                                         15:56:02

1    A.  -- 2012.

2    Q.  -- you remind --

3          Sorry.  Didn't mean to cut you off.

4          Can you remind the jury where that conversation

5    went -- was at?                                      15:56:08

6    A.  We had that conversation in San Francisco on the street in

7    2012.

8    Q.  All right.  And what was -- what -- what did you say to

9    Mr. Brunst?

10   A.  I said that, looking at the projections on revenue, we     15:56:22

11   could still have a viable business model if we end up shutting

12   down the adult section, because there was some discussion about

13   doing that.  And that -- Mr. Brunst said that we could still

14   earn a very good salary by running the site with just

15   therapeutic massage and personals.                   15:56:47

16   Q.  All right.  And why would you be able to make money just in

17   those two categories?

18   A.  Because we would do it the same way that Craigslist had,

19   you know, where -- where a number of their adult services users

20   just migrated to massage and -- and the personal section.    15:57:05

21          So we -- I had done a projection on revenue for

22   Mr. Brunst, and it was well over $20 million that could be

23   generated.

24   Q.  And did -- did Mr. Brunst, as the chief financial officer

25   in 2012, did he -- did he do that?                   15:57:26

 1    A.  He did not.

 2            MR. RAPP:  I don't have anything further, Your Honor.

 3    Thank you.

 4            THE COURT:  All right.  Mr. Ferrer, we thank you for

 5    your testimony.  You are not, however, released from your        15:57:43

 6    subpoena.  You just wait further word from your counsel and --

 7    but, nevertheless, you may step down.

 8            And the government may call its next witness.

 9            MR. STONE:  Thank you, Your Honor.

10            The government calls Jess Adams.                          15:58:02

11            THE COURT:  Sir, please come forward, and my courtroom

12    deputy will administer the oath to you.

13            THE COURTROOM DEPUTY:  Please raise your right hand.

14       (JESS ADAMS, a witness herein, was duly sworn or

15    affirmed.)                                                        15:58:31

16            THE COURTROOM DEPUTY:  If you would please proceed to

17    the witness stand there.

18            MR. ADAMS:  Thank you.

19            THE COURTROOM DEPUTY:  Speak into the microphone.  And

20    there's water there if you need it.                              15:58:37

21            MR. ADAMS:  Thank you.

22                          DIRECT EXAMINATION

23    BY MR. STONE:

24    Q.  Good afternoon, sir.

25            Could you introduce yourself to the jury.                15:58:50

```
 1   A.  Good afternoon.  My name is Jess Adams.

 2   Q.  Mr. Adams, where do you currently live?

 3   A.  I live in Phoenix, Arizona.

 4   Q.  And how long have you lived in Phoenix, Arizona?

 5   A.  I've lived in Phoenix, Arizona, for 32 years.  I moved to        15:59:00

 6   Arizona in 1991.

 7           THE COURT:  Can you, sir, just bend that microphone

 8   closer to you.  Thank you.

 9           THE WITNESS:  Sorry.

10   BY MR. STONE:                                                        15:59:12

11   Q.  You said you moved here in 1991?

12   A.  Yes, sir.

13   Q.  Where'd you move here from?

14   A.  The state of Vermont.

15   Q.  You grew up in Vermont?                                          15:59:18

16   A.  Yes, sir.

17   Q.  And why did you move to Arizona?

18   A.  Moved to Arizona to attend Arizona State University.

19   Q.  You graduated from Arizona State.

20   A.  Yes, sir.                                                        15:59:28

21   Q.  When?

22   A.  1995.

23   Q.  What did you study?

24   A.  I studied accounting.

25   Q.  How old are you, sir?                                            15:59:34
```

A.  I'm 50 years old.

Q.  Could you describe to the jury what type of work you've done since you graduated from Arizona State?

A.  Sure.  I primarily worked in accounting, worked -- did some banking.  Primarily accounting/bookkeeping.                    15:59:49

Q.  At some point did you begin to work at a company called Backpage.com?

A.  Yes, I did.

Q.  When, approximately, did you start work at Backpage?

A.  April 2007.                                                   16:00:08

Q.  And how long did you work at Backpage?

A.  I worked at Backpage for three years.  I left Backpage in the summer of 2010.

Q.  Did you do some work for Backpage after you left?

A.  Yes, sir.  I did some consulting work after I left.         16:00:29

Q.  And at some point did you stop doing all work for Backpage?

A.  Yes, sir.  My recollection is 2011, I ceased doing any work for them.

Q.  All right.  So you worked at Backpage between April 2007 and sometime in 2011?                                             16:00:44

A.  Yes, sir.

Q.  All right.  What was the process for getting hired at Backpage?

A.  I answered -- I was working with contract services staffing companies.  So, to my recollection, Professional Employment      16:01:00

JESS ADAMS - DIRECT EXAMINATION

123

1   Solutions provided me with a lead, an opportunity to interview

2   for the Backpage.com accountant position.

3   Q.  And so you had an interview?

4   A.  Yes.  I interviewed with Beth Cook, who was the controller

5   of Village Voice Media, which owned Backpage.com.                    16:01:15

6   Q.  Did you interview with anyone else?

7   A.  After I completed the interview with Beth Cook, she took me

8   into Mr. Scott Spear's office, and he interviewed me as well.

9   Q.  Where did this interview occur?

10  A.  12th Street and Jefferson, at the New Times Building on         16:01:30

11  Jefferson.

12  Q.  All right.  So you interviewed first with Beth -- Beth

13  Cook, and then you interviewed with Scott Spear?

14  A.  Yes.

15  Q.  And approximately how long did the interview last?             16:01:43

16  A.  Maybe an hour for each.

17  Q.  All right.  And what position were you interviewing for?

18  A.  I was interviewing for accountant for Backpage.com.

19  Q.  And you obviously were hired.  You start shortly after the

20  interview?                                                          16:02:01

21  A.  Yes.  Yes, I did.

22  Q.  And what was your title when you started at Backpage in

23  April 2007?

24  A.  I recall it was staff accountant, but I was an accountant.

25  Q.  Did your position change at some point at Backpage?           16:02:12

UNITED STATES DISTRICT COURT

1   A.  Yes, it did.

2   Q.  What did it -- what was the -- well, let me rephrase that.

3        Did you have a new position, or a new title?

4   A.  I was given a new title during my course of employment of

5   business manager.                                                   16:02:27

6   Q.  All right.  When you worked at Backpage, where did you

7   physically work?

8   A.  I worked at the New Times campus in the executive suite at

9   12th Street and Jefferson.

10  Q.  Okay.  "Executive suite."  Give the jury a sense for what    16:02:41

11  that means.

12  A.  Sure.  It was the -- the C-suite, where the ownership and

13  executives for Village Voice Media had their offices.

14  Q.  Who else sat in the executive suite?

15  A.  The offices were Mr. Larkin, Jim Larkin.  And then outside   16:02:54

16  of his office sat his administrative assistant.  And then there

17  was Mr. Spear's office.  Outside of his office was his

18  administrative assistant, Heather Dobbins.  And then myself.  I

19  sat outside of Mr. Spear's office.  The next office was Jed

20  Brunst.  And outside of his office sat his administrative         16:03:16

21  assistant, Kate Obermiller.  Further down the hall, there would

22  have been offices for Beth Cook, the controller of Village

23  Voice Media.  Outside of her office the ending accountant was

24  Louise Carl, who was the staff accountant for Village Voice

25  Media.  Excuse me.  Farther down the hall would have been Diana   16:03:35

1  Fraser, who was the vice president of human resources for

2  Village Voice Media.

3  Q.  Mr. Adams, just make sure the microphone is close to you.

4  A.  Sorry, sir.

5  Q.  You're cutting just in and out just a little bit.                    16:03:47

6          In terms of who you reported to, did you have a boss?

7  A.  Yes.

8  Q.  Who?

9  A.  My boss was Scott Spear.  I also reported to Carl Ferrer,

10  as he was the president of Backpage, so he could give me duties   16:04:01

11  and responsibilities to fulfill.  And I also reported to Beth

12  Cook, the controller of Village Voice Media, for

13  accounting-related issues for Backpage.com.

14          So audit requests, bank reconciliation, journal

15  entries, those kinds of things would have been under the           16:04:17

16  purview of Beth Cook.  But Scott Spear was my boss.  I sat

17  outside of his office.

18  Q.  You interacted a lot with Mr. Spear?

19  A.  Yes.

20  Q.  Okay.  I want to show you what's been admitted into             16:04:29

21  evidence as Exhibit 899.

22          MR. RAPP:  That's not it.

23          THE COURTROOM DEPUTY:  Oops.

24          MR. RAPP:  Not it.

25          MS. BERTRAND:  That looks nice.                             16:04:54

UNITED STATES DISTRICT COURT

 1            THE COURT:  It's not you running, Mr. Stone, is it?

 2            MR. STONE:  No, it isn't.

 3            Let me figure this out.

 4            MR. FEDER:  When he had a ponytail.

 5            MR. STONE:  All right.  Let's try that again.          16:05:53

 6            THE COURTROOM DEPUTY:  Are you restarting?

 7            MR. STONE:  What's that?

 8            THE COURTROOM DEPUTY:  Did you restart?

 9            MR. STONE:  No.  Is it --

10            THE COURTROOM DEPUTY:  It's -- here.  Let me try      16:06:11

11  again.  It's not -- can you unplug and plug back in?

12            MR. STONE:  All right.

13  BY MR. STONE:

14  Q.  All right.  Exhibit 899, which is admitted.

15            Do you recognize this document, sir?                 16:07:34

16  A.  Yes.

17  Q.  What is it?

18  A.  This is an email from Carl Ferrer to Scott Spear with me --

19  with myself cc'ed, described as docs you requested for budget.

20            MR. STONE:  All right.  Can we pull up Exhibit 899e,  16:08:01

21  which is also in evidence.  That's a different -- yeah.

22            THE COURT:  Do we have the hard copies?

23            Why don't you have one of your fellow AUSAs hand him

24  the hard copies.  Or have Liliana show them to you.  Let's keep

25  moving forward.                                                16:09:07

JESS ADAMS - DIRECT EXAMINATION

```
 1              MR. STONE:  All right.  899e's now up.
 2              Go to the second page, the top of the second page,
 3    please, the part that says "Jess Adams."
 4    BY MR. STONE:
 5    Q.  All right.  Sir, do you see this on your screen?          16:09:17
 6    A.  Yes, I do.
 7    Q.  All right.  Is this a description of your job title as
 8    business manager?
 9    A.  Yes, it is.
10    Q.  And the first sentence here, it says, "Oversee and manage  16:09:27
11    credit card settlement, fraud and chargeback control"; correct?
12    A.  Yes.
13    Q.  What's that mean?
14    A.  The users who posted ads on Backpage.com who had to make a
15    payment utilized credit cards in order to make those payments.  16:09:44
16    So part of my job duties was to perform the batch credit card
17    settlement at the end of the day and then to handle if a -- if
18    a credit card transaction was reversed, if the person who
19    received the charge said it was unauthorized, they would file a
20    chargeback claim to their bank saying that it was an            16:10:01
21    unauthorized charge, and that would be a chargeback to
22    Backpage.com.  I would research those, just determine who was
23    committing fraud against the Backpage.com site.
24    Q.  So during your time at Backpage, that was something that
25    you managed; correct?                                          16:10:15
```

128

1   A.  Yes.  Yes.

2   Q.  Okay.  The next line talks about Google's AdSense revenue

3   allocation and Google Analytics traffic reporting and custom

4   profile management.

5        Were those duties that you had at Backpage?          16:10:29

6   A.  Yes.

7   Q.  What -- what did that mean?

8   A.  There's two components:  Google's AdSense revenue was ads

9   that Google placed on Backpage.com's sites.  And Backpage had

10  revenue sharing agreements with different licensees and      16:10:42

11  business partners per contract.  So I was responsible for

12  taking that Google Ad Sense revenue and allocating it out to

13  the different partners per the revenue splits per their

14  licenses.

15       The Google Analytics traffic reporting refers to the   16:10:57

16  usage of Google Analytics to determine the traffic that

17  Backpage.com received.  And traffic is both visits to a website

18  and visitors and number of page views that they view.  So all

19  of that traffic reporting was done via Google Analytics.

20  Q.  And what did you do in terms of harnessing or managing    16:11:17

21  the -- that traffic reporting?

22  A.  I obviously pulled all of the reports for traffic at

23  management's request.  They had a profile with Google Analytics

24  that the technical team at Desert Net and worked with the

25  Google Analytics people to implement that code on the website.  16:11:36

JESS ADAMS - DIRECT EXAMINATION

129

1    I pulled the report out of the Google Analytics domain.

2    Q.  All right.  Next part talks about all revenue traffic

3    reporting and payment to VVM and non-VVM partners, affiliates,

4    and sales rep.

5         What -- first off, is that part of your job?                16:11:53

6    A.  Yes.

7    Q.  And what did that mean?

8    A.  All revenue refers to any type of revenue that came into

9    Backpage.com.

10        So, again, Backpage.com had licenses and contracts          16:12:02

11   with other partners, and so I -- my job was to determine what

12   portion of revenue that was coming into Backpage.com went to

13   which relevant partner.  Many different revenue types.  Many

14   different contracts.  I was responsible for allocating that

15   revenue.                                                          16:12:23

16        Traffic reporting, as we said earlier, Google

17   Analytics was the source of traffic data, so I would pull

18   reports for that traffic and report to management.

19        Payment to VVM and non-VVM partners, again, refers to

20   that revenue sharing between the different licensees and         16:12:37

21   partners that Village Voice had per the contracts that they

22   would have had in effect.

23        Affiliates would have referred to a -- the public

24   affiliate program that Backpage implemented when I was there,

25   which allowed users to receive payments back for referring      16:12:52

UNITED STATES DISTRICT COURT

JESS ADAMS - DIRECT EXAMINATION

1    advertisers to the Backpage site.

2          Sales reps refers to the Backpage.com internal staff

3    who are also eligible for commission payments.

4    Q.  All right.  So the next part here, it talks about you also

5    provide regular financial and management reporting, budgets,          16:13:12

6    and suggest improvements to business strategies.

7          Is that -- was that right?

8    A.  Yes.

9    Q.  And what did that entail?

10   A.  Regular financial and management reporting included the          16:13:23

11   revenue reports that were generated monthly, which was a

12   summary of all the different types of revenue that Backpage.com

13   was receiving, as well as all the traffic reporting.  There was

14   a -- a master spreadsheet that came out every month that was

15   called the -- the revenue report.  That -- I was responsible          16:13:40

16   for compiling and submitting that report.

17         Budgets refers to the annual process at the end of

18   each year where we would work together to determine what the

19   budget would be for the following year for Backpage.com and

20   then any discussions of how they would get there.                     16:13:57

21   Q.  Let me focus on the budget process that you mentioned at

22   the end there.

23         That was part of your duties during your time at

24   Backpage?

25   A.  Yes.                                                              16:14:07

JESS ADAMS - DIRECT EXAMINATION

131

1   Q.  And what did that involve?

2   A.  The budget process involved myself and Scott Spear working

3   together.  We would use the phrase granular.  We would look at

4   each -- each market month by month for the following year and

5   determine what -- predict what we -- you know, what we thought        16:14:25

6   the traffic would be for each of those markets and what the

7   revenue would be for each different revenue type.  And that was

8   in the same format as that monthly revenue report that I'm

9   talking about.

10          And then after that budget was compiled and approved        16:14:39

11  by the executive team, that became the guiding document for

12  Backpage.com for the following year.

13  Q.  How long would that take you to prepare?

14  A.  It was intensive.  Weeks.  Gathering data from multiple

15  sources.  I remember distinctly at least one cycle going in        16:14:58

16  everyday in a -- in a row, over the weekends, working with

17  Scott pretty extensively to try to generate the budget.

18  Q.  Would you then present the budget to -- to anyone in the

19  company?

20  A.  At the end, yes.  At the end of the budget process there        16:15:16

21  was a presentation meeting to the executive team at Village

22  Voice Media.

23  Q.  When usually would those presentations occur?

24  A.  They had to be done when the budget was completed.  So

25  either at the end of December or beginning of January, when all        16:15:31

UNITED STATES DISTRICT COURT

1    the documents were -- were submitted.  My memory is January,

2    after the year had closed.

3    Q.  And who would be in those meetings?

4    A.  Again, there were at least three in the time that I was

5    there.  What I recall the attendees being, myself; obviously          16:15:46

6    Scott Spear, because he was leading the presentation; Carl

7    Ferrer would be there; Scott's executive assistant, Heather

8    Dobbins; Mr. Larkin would have been in attendance.  I know that

9    Beth Cook and Jeff Mars, the controller and vice president of

10   finance at Village Voice Media, would be there.  Jed Brunst,         16:16:07

11   the CFO of Village Voice Media, would be in attendance.

12   Q.  All right.  Also there's a line here that you would adjust

13   e-commerce pricing strategies and suggest automated processes

14   to optimize revenue and content.

15           Did you do that when you were at Backpage?                    16:16:31

16   A.  I'm -- not much.  I mean, I had input into primarily fraud.

17   That would have been my -- my biggest impact.

18   Q.  Okay.  And we just moved to another exhibit that's already

19   been admitted.

20           But I think the last part of the previous exhibit            16:16:45

21   talked about managing legal requests and subpoenas.

22           Do you recall that?

23   A.  Yes.

24   Q.  Was that part of your job when you worked at Back- --

25   Backpage?                                                             16:16:56

133

1  A.  Yes.  I was responsible for subpoena compliance.

2  Q.  And what did -- what did that entail?

3  A.  It involved providing user records at the request of a law

4  enforcement agency.

5  Q.  Do you recall during your time at Backpage how many                16:17:08

6  subpoenas would come in, say, on a weekly basis?

7  A.  They grew in time.  When I first took over subpoenas in

8  2007, I might not even do one a day.  By the end of the time

9  that I was responsible for subpoena compliance, I could do a

10  dozen in a day.                                                       16:17:31

11        So I would say I did hundreds of subpoena compliance

12  when I worked for them.

13  Q.  And throughout your time at Backpage, did -- did it ever

14  change your reporting structure?  Who your supervisors were,

15  supervisor was, did that ever change?                                 16:17:46

16  A.  No.  The entire time I worked there, I worked for Scott

17  Spear.  I also answered, like I said, to Carl Ferrer and to

18  Beth Cook.

19  Q.  All right.  I'm going to show you what has been admitted

20  into evidence as Exhibit 23.                                          16:17:57

21        Sir, do you recognize this exhibit?

22  A.  Yes.

23  Q.  What is it?

24  A.  It's the 2008 Budget and Business Plan for Backpage.com.

25  Q.  Okay.  Is this something that you worked on?                      16:18:12

JESS ADAMS - DIRECT EXAMINATION

134

A.  I would have generated data for this, yes, for sure.  I
believe the text would have been typed up either by Scott Spear
or by his administrative assistant, Heather Dobbins.

Q.  So you had a role in helping prepare this document?

A.  Yes.                                                      16:18:27

Q.  And would -- would this have been the budget and business
plan that was then presented to all the executives in January?

A.  Yes.

Q.  And you would have been in that meeting?

A.  Yes.                                                      16:18:37

Q.  And you mentioned that -- you remember Defendant Brunst
being in that meeting?

A.  Yes, I do.

Q.  And Defendant Spear was presenting with you?

A.  Yes, absolutely.  He led the budget meetings any time I was  16:18:48
in attendance.

        MR. STONE:  Okay.  Let's go to page 3.  And the --
let's highlight the first three paragraphs there.

BY MR. STONE:

Q.  All right.  The first paragraph reads, "In terms of       16:19:12
marketing, we struck a deal with TheEroticReview.com, TER, with
reciprocal links."

        Actually that's the first sentence of the first
paragraph.

        Sir, do you know what TheEroticReview.com is?         16:19:25

UNITED STATES DISTRICT COURT

JESS ADAMS - DIRECT EXAMINATION

135

```
 1   A.  Yes.
 2   Q.  What is it?
 3   A.  It is a review site for escorts or prostitutes.
 4   Q.  You say "escorts or prostitutes."
 5           What do you mean?                                   16:19:37
 6   A.  Without looking at the site right now, the content that I
 7   remember being on that site when I was working for Backpage.com
 8   was -- described prostitution activity.  There may have been
 9   escort activity on that site as well that was non-prostitution
10   related.  But what I remember the point of The Erotic Review   16:19:55
11   was to review prostitutes.
12   Q.  You remember looking at The Erotic Review during your time
13   at Backpage?
14   A.  I'm certain that I would have clicked a link on it in the
15   course of my employment, yes.                                 16:20:08
16   Q.  And you recall what the review looked like?
17   A.  They described sex acts in exchange for -- there was a
18   review of what types of sexual activities the person on The
19   Erotic Review would perform.
20   Q.  In that first sentence, it talks about reciprocal links.   16:20:22
21           Do you know what that is?
22   A.  Yes.
23   Q.  What is it?
24   A.  Reciprocal links, to me, means that Backpage.com would have
25   an ad on its site that would include a link that would go back   16:20:34
```

UNITED STATES DISTRICT COURT

```
 1   to The Erotic Review, and in exchange for that, The Erotic
 2   Review would have on their site a link that would go back to
 3   Backpage.com.
 4   Q.  During your course of employment at Backpage, did you see
 5   the reciprocal link program in action?                       16:20:51
 6   A.  Yes.
 7   Q.  So you were able to observe links on Backpage that went to
 8   The Erotic Review and vice versa?
 9   A.  Yes.
10   Q.  Next sentence reads, "It created huge brand awareness in   16:21:02
11   this niche industry and increased page views from TER by
12   120,000 per day."
13          My question is, would you have -- were you managing
14   pulling that information that showed that the page views
15   increased by 120,000 per day?                                 16:21:23
16   A.  Yes.  Since I was responsible for generating traffic
17   reports, I would have been able to generate data about which
18   sites were referring traffic to Backpage.com.
19   Q.  And we'll look at a few of those in a little bit, but do
20   you recall if The Erotic Review was high up in the referral   16:21:40
21   rankings?
22   A.  Yes.  The Erotic Review is a major referring site for
23   Backpage.com.
24   Q.  Was -- in your -- in terms of your understanding, was the
25   relationship with The Erotic Review important to Backpage?    16:21:53
```

1   A.  Yes.

2   Q.  Why?

3   A.  I was in charge of making -- submitting invoices and

4   payments with them.  They talked about it all the time.  They

5   brought awareness to it in their meetings, in their budget          16:22:06

6   presentations.  Clearly it was an important relationship with

7   Backpage.

8   Q.  Was it partly because it was increasing these page views?

9   A.  It was a tremendous source of traffic.  Yes.

10  Q.  And this was something that was discussed in these budget       16:22:22

11  meetings that you were in?

12  A.  It's right in the budget document.  Yes.

13  Q.  Okay.  You're also mentioned in this budget document;

14  correct?

15  A.  Yes.                                                            16:22:31

16  Q.  It talks about coming on board to take over accounting and

17  reporting responsibilities in much the same way that you just

18  testified about?

19  A.  Yes.

20        MR. STONE:  Okay.  How about Exhibit 24?  Do we               16:22:40

21  have -- are you able to pull that up?

22  BY MR. STONE:

23  Q.  Let me ask you.  You worked there, as you testified, from

24  2007 to 2011.  Were you part of the budget -- these budget

25  meetings each year that you were there?                             16:23:02

```
 1   A.  Yes.  And my involvement would have grown, obviously, each

 2   year.  When I started there in 2007, I was a new employee.  By

 3   the time I'd been there 2010, we'd gone through the budget

 4   process twice already.  It was the third time.

 5   Q.  And did the process that you went through to prepare and      16:23:22

 6   then present for the budget meetings, did that change

 7   significantly over the course of your years there?

 8   A.  No.  Again, just in terms of intensity, just the dollars

 9   grew, the pressures grew, the attention grew.

10   Q.  Okay.  I think now on -- on your screen this is admitted      16:23:40

11   Exhibit 24.

12            Do you recognize this Exhibit, sir?

13   A.  Just disappeared.

14            MR. STONE:  24 has been admitted?

15            THE COURTROOM DEPUTY:  Correct.                          16:23:54

16            MR. STONE:  24 and 24a have both been admitted.

17   BY MR. STONE:

18   Q.  So we'll highlight that for you.

19            Do you recognize this document, sir?

20   A.  Yes.                                                          16:24:04

21   Q.  What is it?

22   A.  That's an email from Carl Ferrer to me dated December 15th,

23   2008, it refers to a how are we going to get their document?

24   Q.  Do you remember this how are we going to get their

25   document?                                                        16:24:17
```

1   A.  Yes.  As part of the budget process, there was usually a

2   how will you -- you would achieve the plan kind of document.

3   Q.  And "you" meaning who?

4   A.  Oh, Backpage.com and its staff.

5   Q.  All right.  Let's look at 24a.  It's right there.  This is          16:24:30

6   the attachment to this email.

7         And let me ask you to confirm.  Is this the attachment

8   to that email?

9   A.  Yes.

10  Q.  All right.  Let's look at --                                        16:24:42

11        Well, before we look at number 7, I want to ask you

12  generally, what -- what does this document show?

13  A.  It's a guiding document for how Backpage.com was going to

14  achieve its business objectives for the following year.

15  Q.  Okay.  How they were going to achieve their business                16:24:59

16  objectives; correct?

17  A.  Yes.  Yes.

18  Q.  All right.  Look at number 7.

19        MR. STONE:  Or if we could highlight number 7.

20  BY MR. STONE:                                                           16:25:09

21  Q.  7a, "TER high page view per referral," that's the same TER

22  that we were just -- that you were just testifying about?

23  A.  Yes.  TER was the acronym for The Erotic Review.

24  Q.  And that email was dated December 15th, 2008.  So was that

25  for the budget in 2009?                                                 16:25:29

1    A.  Yes.

2            MR. STONE:  And then if we can go to the last item on

3    page 2 of this same exhibit.  On page 2, "The opportunities for

4    us," at the very bottom.

5    BY MR. STONE:                                                        16:26:05

6    Q.  Okay.  Now this says, "The opportunities for us in 2009

7    include."

8            Do you know what that means?

9    A.  Yes.  That's the opportunities that Backpage.com saw for

10   the coming year.                                                     16:26:15

11   Q.  For -- opportunities for what?

12   A.  For them to increase their business and to hit their budget

13   goals, which was to increase their business.

14   Q.  So are these fairly important for Backpage's business, as

15   to your understanding?                                               16:26:29

16   A.  Yes.  These would have been key points that the executives

17   would have expected to yield the financial results that they

18   were looking for.

19   Q.  The very last bullet point reads, "We have made a special

20   buy with TER in terms of high quality referrals"; is that           16:26:46

21   right?

22   A.  That's what that says.

23   Q.  And did you have a -- an understanding for what that meant

24   in terms of a special buy?

25   A.  I'm -- I believe it's referring to the invoice payments         16:26:55

 1   that Backpage.com --

 2           MR. FEDER:  Objection as to speculation --

 3           THE WITNESS:  Oh.

 4           MR. FEDER:  -- it sounds like.

 5           THE COURT:  Well, lay some foundation, Mr. Stone.      16:27:07

 6           MR. STONE:  Sure.

 7   BY MR. STONE:

 8   Q.  You helped prepare this document --

 9   A.  Yes.

10   Q.  -- correct?                                              16:27:12

11           And you had an understanding about The Erotic Review?

12   A.  Yes.

13   Q.  And you were just testifying about the referrals.

14           Well, let's look at that.  It says "high quality

15   referrals."                                                  16:27:25

16           Do you know what that means?

17   A.  Yes.

18   Q.  What does that mean?

19   A.  A high quality referral would be someone who sent traffic

20   to Backpage.com, and that the traffic they sent would be --   16:27:32

21   would stick around, would use the site and would be a valuable

22   user for the site.

23   Q.  Okay.  And you had an understanding that The Erotic Review

24   was sending high quality referrals to Backpage?

25   A.  Yes.  And it says it right in their budget document.  Yes.  16:27:45

142

Q.  Okay.  And did -- so do you have an understanding of the
special buy with TER to obtain or -- to -- to get these high
quality referrals?

A.  Yes.

Q.  Let me ask you another question.  Were you in charge of          16:28:01
handling Backpage's invoices during your time at Backpage?

A.  If -- yes.  If Backpage received a bill, then I would enter
it into the accounting system and get approval to pay it.  I
would print a check, obtain a signature, and mail the payment
to the -- the invoice sender.                                        16:28:21

Q.  Who would you get approval from?

A.  Mr. Spear.

Q.  And you -- you said "obtain a signature."

         Would you obtain a signature from someone as well?

A.  Yes.  Mr. Spear would sign the checks.                           16:28:32

Q.  During your time at Backpage, did you receive invoices from
The Erotic Review?

A.  Yes.

Q.  And for what?  Do you know?

A.  The invoices that I recall seeing from The Erotic Review         16:28:45
said "banner ad placement."

         That was what the invoices stated.

Q.  And do you remember about how much money the invoice was
for?

A.  I believe it was $4,000 monthly.                                 16:28:58

```
 1   Q.  And you were in charge of then getting a check for that
 2   $4,000 invoice?
 3   A.  Correct.  I would have submitted the invoice, printed a
 4   check, received a signature from Mr. Spear, and mailed a
 5   payment to The Erotic Review.                                16:29:14
 6   Q.  And so was it your understanding that Backpage was sending
 7   money to The Erotic Review so they could receive these high
 8   quality referrals?
 9   A.  That was my understanding, yes.
10            THE COURT:  Mr. Stone, we are at our break point --   16:29:25
11            MR. STONE:  Okay.  Thank you.
12            THE COURT:  -- for the afternoon.
13            Members of the jury, we are now completed for today.
14   However, I understand that some of you are concerned about
15   tomorrow's traffic pattern given our hopeful Dbacks outcome.  16:29:41
16   With that in mind, we will start at 8:45.  And we can only
17   leave early if we reduce our lunch period to, again,
18   45 minutes.  And if we do two things:  If we're able to all
19   come in at 8:45 promptly to begin the trial, take our 45-minute
20   lunch recess, then I will have you leave at 4:00 o'clock, no   16:30:09
21   later than that, so you can maneuver around that traffic.
22            So keep those conditions in mind.  If you're all here
23   promptly and ready to go at 4:00 -- excuse me -- 8:45 in the
24   morning, then we will stick to that schedule.
25            With that, just remember the admonishment and just    16:30:27
```

UNITED STATES DISTRICT COURT

 1   have an enjoyable -- enjoyable evening.

 2            Please all rise for the jury.

 3        (Jury not present at 4:30 p.m.)

 4            THE COURT:  All right.  And for those who are in the

 5   gallery, just please remember to stay a few minutes longer.    16:31:05

 6   Let the members of the jury leave uninterrupted.

 7            And we will then proceed to be in place and ready to

 8   go at 8:45.  And let's hope that we stick to that schedule.

 9            Do you anticipate this witness to be on the stand all

10   day tomorrow?                                                  16:31:23

11            MR. STONE:  No, Your Honor.

12            THE COURT:  Okay.  And so I do have your lineup of

13   witnesses and exhibits.

14            MR. STONE:  Yes.

15            THE COURT:  And that has not changed?                 16:31:30

16            MR. STONE:  Maybe another half hour or 45 minutes.

17   I'm very direct.

18            THE COURT:  Okay.  All right.  With that, we will

19   adjourn for the evening.

20            MR. CAMBRIA:  Your Honor, can we either put something 16:31:40

21   on the record now or in the morning?

22            THE COURT:  Why don't you do it now since hopefully

23   we'll have an earlier start.

24            MR. CAMBRIA:  I believe that under *Crawford*, we should

25   have been given the opportunity to recross the witness who not 16:31:51

                    UNITED STATES DISTRICT COURT

```
 1    only discussed some things that needed clarification, but

 2    raised some new issues.

 3             Thank you.

 4             THE COURT:  Well --

 5             MR. CAMBRIA:  I understand what the practice is here,    16:32:04

 6    but --

 7             THE COURT:  Well --

 8             MR. CAMBRIA:  -- I'm making that for the record.

 9             THE COURT:  -- I guess the -- the argument needs to be

10    more precise.  I'm not entirely sure what you're referring to    16:32:13

11    in terms of he raised new issues or arguments.  So if you want

12    to be clear about that, then maybe I can think about it.  I'm

13    just not sure entirely what it is that you're referring to.  So

14    perhaps just raise it again tomorrow morning.

15             MR. CAMBRIA:  That'd be fine.  Thank you.                16:32:36

16             THE COURT:  Okay.  Have a good evening.

17             MR. STONE:  Liliana, can I figure this out?  I

18    apologize.  Could you publish so that I can figure it out?

19             THE COURTROOM DEPUTY:  Okay.  Sure.

20             THE COURT:  And let me just say, counsel, before you     16:32:45

21    leave, in particular, if you're having problems with the

22    computer, you have hard copies.  Be at the ready.  Have those

23    hard copies available for your witness so we don't waste this

24    valuable time.

25             MR. STONE:  Yes, Your Honor.  Understood.                16:33:03
```

(Proceedings adjourn at 4:33 p.m.)

---oOo---

JESS ADAMS - DIRECT EXAMINATION

1

2

3

4

5                    **C E R T I F I C A T E**

6

7          I, CATHY J. TAYLOR, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15          DATED at Phoenix, Arizona, this 10th day of October,

16  2023.

17

18

19                            */s/Cathy J. Taylor*

20                            Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25

UNITED STATES DISTRICT COURT