UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Phoenix, Arizona |
| Michael Lacey, et al., | ) | October 11, 2023 |
| | ) | 12:46 p.m. |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 16**

**(P.M. SESSION)**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    For the Government:
         UNITED STATES ATTORNEY'S OFFICE
3        By:  **Mr. Kevin M. Rapp, Esq.**
              **Mr. Andrew C. Stone, Esq.**
4             **Mr. Peter Shawn Kozinets, Esq.**
              **Ms. Margaret Wu Perlmeter, Esq.**
5             **Mr. Daniel G. Boyle, Esq.**
         40 North Central Avenue, Suite 1800
6        Phoenix, Arizona  85004-4408
         kevin.rapp@usdoj.gov
7        peter.kozinets@usdoj.gov
         andrew.stone@usdoj.gov
8        margaret.perlmeter@usdoj.gov
         - and -
9        UNITED STATES DEPARTMENT OF JUSTICE
         By:  **Mr. Austin Berry, Esq.**
10       1301 New York Avenue NW, 11th Floor
         Washington, DC  20005
11       austin.berry2@usdoj.gov

12   For the Defendant Michael Lacey:
         LIPTSITZ GREEN SCIME CAMBRIA, LLP
13       By:  **Mr. Paul J. Cambria, Esq.**
         42 Delaware Avenue, Suite 120
14       Buffalo, New York  14202
         pcambria@lglaw.com

15
     For the Defendant Scott Spear:
16       KESSLER LAW OFFICE
         By: **Mr. Eric Walter Kessler, Esq.**
17       6720 North Scottsdale Road, Suite 210
         Scottsdale, Arizona  85253
18       eric.kesslerlaw@gmail.com
         - and -
19       FEDER LAW OFFICE, PA
         By:  **Mr. Bruce S. Feder, Esq.**
20       2930 East Camelback Road, Suite 160
         Phoenix, Arizona  85016
21       bf@federlawpa.com

22

23

24

25

                    UNITED STATES DISTRICT COURT

**A P P E A R A N C E S (Cont'd)**

For the Defendant John Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    By:  **Mr. Gopi K. Panchapakesan, Esq.**
         **Mr. Gary S. Lincenberg, Esq.**
    1875 Century Park E, Suite 2300
    Los Angeles, California  90067
    gpanchapakesan@birdmarella.com
    glincenberg@birdmarella.com
    aneuman@birdmarella.com

For the Defendant Andrew Padilla:
    DAVID EISENBERG, PLC
    By:  **Mr. David S. Eisenberg, Esq.**
    3550 North Central Avenue, Suite 1155
    Phoenix, Arizona  85012
    david@deisenbergplc.com

For the Defendant Joye Vaught:
    JOY BERTRAND, ESQ, LLC
    By:  **Ms. Joy Malby Bertrand, Esq**
    P.O. Box 2734
    Scottsdale, Arizona  85252-2734
    Joy@joybertrandlaw.com

UNITED  STATES  DISTRICT  COURT

1                              **I N D E X**

2   **SUMMARY OF COURT PROCEEDINGS:**                          **PAGE**

3   Proceedings Outside the Presence of the Jury            5
    Proceedings Outside the Presence of the Jury           73
4   Motion for Mistrial                                    76
    Proceedings outside the presence of the Jury          138
5   Motion for Mistrial                                   145

6

7   **WITNESSES FOR THE GOVERNMENT:**                          **PAGE**

8   Breahannah Leary
            Direct Examination (Cont'd) by Ms. Perlmeter    8
9           Cross-Examination by Ms. Bertrand              10
            Cross-Examination by Mr. Cambria               15
10          Cross-Examination by Mr. Kessler               18
            Redirect Examination by Ms. Perlmeter          36
11  Isaac Luria
            Direct Examination by Mr. Berry                38
12          Cross-Examination by Mr. Cambria               78
            Cross-Examination by Mr. Eisenberg            105
13          Redirect Examination by Mr. Berry             107
    Mickey Hansen
14          Direct Examination by Mr. Kozinets            113

15

16                              **EXHIBITS**

17  **NO.**      **DESCRIPTION**                                **REC'D**

18  466       Email from Ferrer to Hansen re American      128
              Express, 04/22/2015
19            DOJ-BP-0004929197

20  466a      Attachment. AMEX_Screen_shot                129
              DOJ-BP-0004929198
21
    470       Email from Ferrer to Hansen re American      131
22            Express, 04/24/2015
              DOJ-BP-0005064721
23
    475       American Express Merchant Reference Guide,   117
24            April 2015
              DOJ-BP-0004694982- DOJ-BP-0004695047

25

                       UNITED STATES DISTRICT COURT

1          **P R O C E E D I N G S**

2      (Proceedings reconvene at 12:46 p.m.)

3      (Jury not present at 12:46 p.m.)

4          THE COURT:  All right.  Please be seated.

5          Let me -- let me just ask, Ms. Perlmeter, you          `12:46:30`

6  referenced something about the government's stating its

7  position in Doc. 1614.  That did not look like an appropriate

8  document citation, and I wondered if that, what you were

9  referencing, was the government's trial brief.

10         MS. PERLMETER:  It's 1642.  That's what I thought I     `12:46:52`

11  said, but if I said some other number, I apologize.

12         THE COURT:  Okay.  And who has their cell phone on?  I

13  can hear that ringing.

14         AUDIENCE MEMBER:  I just turned it off, Your Honor.

15         THE COURT:  Thank you.                                  `12:47:08`

16         Now, let me also say that I reviewed very quickly the

17  Court's prior ruling back in May of 2021 at Document 1156.  And

18  while it, once again, admonished the government not to

19  introduce lengthy testimony regarding a day in the life of the

20  prostitute or prostitution, the testimony that was indicated   `12:47:38`

21  that could be introduced were areas about how ads were created,

22  drafted, edited, and paid for.

23         And so the Court will remind counsel of that as well

24  and, also, that it goes to notice that these ads were placed on

25  Backpage.                                                      `12:48:12`

1        Now, Mr. Kozinets.

2        MR. KOZINETS:  Thank you, Your Honor.

3        On Sunday evening we received an email, and the Court

4    did, too, from Mr. Panchapakesan about three exhibits that the

5    defense hopes to introduce through the government's witness,          12:48:25

6    Mickey Hansen, from American Express.

7        There are two exhibits that I just briefly wanted to

8    bring to the Court's attention that we would object to.  They

9    are Exhibit 6234 and 6235.  They were both documents that were

10   filed as exhibits in the *Backpage.com vs. Dart* litigation in       12:48:44

11   the Northern District of Illinois.  They both reflect

12   communications from Sheriff Dart's office with other people at

13   American Express but not Mickey Hansen.

14       The first is an email chain from the sheriff's office

15   with certain PR personnel at American Express.  Mr. Hansen is        12:49:04

16   not on any of the emails.  My understanding is he's never seen

17   or doesn't recall ever seeing them.  The -- the emails are

18   hearsay, and they do raise the risk of getting into

19   Sheriff Dart related issues, which are confusing and involve

20   other issues, and we would argue fall within the scope of the        12:49:30

21   Court's prior orders, including Doc. 1643 at pages 9 through

22   11.

23       I could show you part of one of the documents, if

24   you'd like, on the document camera.

25       THE COURT:  No, not at this time.                                12:49:43

```
1              And was there another matter you wished to raise?

2         MR. KOZINETS:  The second exhibit is just a letter

3    from the sheriff's office to the CEO of American Express

4    just -- just kind of lotting American Express for past actions,

5    but it's not something that involves the witness that we are     12:49:59

6    going to call.  He's not copied on it, didn't receive it, and

7    it's not relevant to his testimony.

8         THE COURT:  All right.  I'll take a look at those two

9    exhibits, and then perhaps I can have a conversation with

10   Mr. Lincenberg tomorrow.                                         12:50:17

11        MR. LINCENBERG:  Your Honor, I could respond now.

12        MR. KOZINETS:  In the second --

13        THE COURT:  Let's move forward with the trial.  Let's

14   bring the witness back.  And, as you know, we're on a condensed

15   time frame.  I want to make sure that we have our jurors out,    12:50:33

16   as I promised, and so we can take these matters up later.

17        MR. KOZINETS:  Thank you.

18        MR. STONE:  Your Honor, what time are you

19   contemplating the afternoon break?

20        THE COURT:  I hope around 2:10, 2:15 now.                   12:50:48

21        MR. STONE:  Thank you.

22        THE COURT:  Please all rise for the jury.

23      (Jury present at 12:51 p.m.)

24        THE COURT:  And come to order.

25        All right.  Please be seated.                               12:51:46
```

UNITED STATES DISTRICT COURT

BREAHANNAH LEARY — DIRECT EXAMINATION (Cont'd)                    8

 1          The record will reflect the presence of the jury.  The

 2   witness is on the witness stand.

 3          And, Ms. Perlmeter, you may continue.

 4      (BREAHANNAH LEARY, a witness herein, was previously duly

 5   sworn or affirmed.)

 6                  DIRECT EXAMINATION (Cont'd)

 7   BY MS. PERLMETER:

 8   Q.  Good afternoon, Ms. Leary.

 9   A.  Good afternoon.

10   Q.  I want to direct your attention to Exhibit 216.            12:52:11

11          MS. PERLMETER:  If we could please have that up again.

12   Okay.  Scroll down to the words in the ad.

13   BY MS. PERLMETER:

14   Q.  All right.  Can you read this?  And -- and who -- this is

15   your ad, right, Ms. Leary?                                     12:53:06

16   A.  Correct.

17   Q.  And who is Alexis?

18   A.  Alexis?  That is myself.

19   Q.  Is that the name that you used?

20   A.  Yes.  That's an alias.                                     12:53:14

21   Q.  What do you mean by "pleasing you is my mission"?

22   A.  I didn't write this.

23   Q.  Okay.  But in terms of the Backpage ad, what did you

24   understand would happen when people called in response to it?

25          MR. CAMBRIA:  Calls for speculation.                    12:53:31

                     UNITED STATES DISTRICT COURT

BREAHANNAH LEARY — DIRECT EXAMINATION (Cont'd)                    9

```
 1              MS. BERTRAND:  Objection.  Calls for speculation and

 2    hearsay.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  "Pleasing you is my mission."

 5              That -- to me, that is any sexual act that the john      12:53:38

 6    would want.

 7    BY MS. PERLMETER:

 8    Q.  And what does 24/7 mean?

 9              See further down in the middle of the ad it says,

10    "Period available, 24/7"?                                          12:53:52

11    A.  Yes.

12    Q.  What does that mean?

13    A.  24 hours a day, seven days a week.

14              MS. PERLMETER:  I'm going to call up 216a.  We could

15    show that to the room.  And I'm going to page down to the text.    12:54:18

16    BY MS. PERLMETER:

17    Q.  The second ad, are you also available 24/7?

18    A.  Correct, from what the ad says.

19    Q.  And are you going by the name Alexis again?

20    A.  Yes.                                                           12:54:46

21    Q.  And where it says that this is not -- this ad is not in any

22    form an ad for solicitation, slash, prostitution, what do

23    you -- how do you interpret that?

24    A.  I interpret that that is a lie.  It is an ad for

25    prostitution.  I interpret it as they wrote it for law            12:55:03
```

UNITED STATES DISTRICT COURT

1    enforcement.

2    Q.  Now, we have the two ads for you here and posted in the

3    Denver marketplace, and then the second one the Fort Collins

4    marketplace.

5           Were you also -- when you were with Mr. Franklin, were     12:55:20

6    you also posted in other cities?

7    A.  Yes.  I was posted in other cities and other states.

8    Q.  And how long were you with Mr. Franklin?

9    A.  About four to five months.

10   Q.  Okay.  And after that four- to five-month period, did you    12:55:31

11   stop working with Mr. Franklin?

12   A.  I did.

13          MS. PERLMETER:  Okay.  All right.  No further

14   questions.

15          THE COURT:  All right.  Mr. Cambria?                        12:55:43

16          MR. CAMBRIA:  Your Honor, Ms. Bertrand's going first,

17   if that's all right.

18          THE COURT:  Ms. Bertrand.

19          MS. BERTRAND:  Thank you.

20          May I proceed?                                              12:55:52

21          THE COURT:  Yes.

22                         CROSS-EXAMINATION

23   BY MS. BERTRAND:

24   Q.  Good afternoon.

25   A.  Good afternoon.                                                12:56:19

BREAHANNAH LEARY - CROSS-EXAMINATION                              11

```
 1   Q.  What -- what last name do you prefer to use?  Hodges?
 2   Leary?
 3   A.  Leary.
 4   Q.  Ms. Leary.  Thank you.  Nice to meet you.
 5   A.  Nice to meet you.                                        12:56:28
 6   Q.  I represent a woman named Joye Vaught.  I think you
 7   testified when talking with the government that you all haven't
 8   met, so I'm just letting you know why I'm standing here.
 9   A.  Oh, okay.
10   Q.  I think you testified that you're currently -- are you     12:56:40
11   currently working?
12   A.  No.  I'm unemployed.
13   Q.  All right.  Before -- what was the last job you held?
14   A.  I'm sorry?
15   Q.  What was the last job that you held?                      12:56:52
16   A.  I was an administrative director of a memory care facility.
17   Q.  You mentioned having an -- using an alias online of Alexis
18   Roxx; is that correct?
19   A.  No.  That's incorrect.  It was --
20   Q.  Okay.                                                     12:57:13
21   A.  -- Alexis Foxx.
22   Q.  Alexis Foxx.
23        Have you ever used the alias Alexis Roxx, R-O-X-X?
24   A.  No, not that I can recall.
25   Q.  But you've used the alias Alexis Foxx, F-O -- how many Xs?  12:57:23
```

UNITED STATES DISTRICT COURT

1    A.  Two.

2    Q.  Have you ever used Alexis Foxx or Alexis Roxx in other

3    online forums or platforms?

4    A.  On platforms?

5    Q.  Uh-huh.                                                    12:57:53

6    A.  Can you repeat the question?  I'm not sure I understand.

7            MS. BERTRAND:  Madam court reporter, could you please

8    read the question back.

9        (Record read.)

10           THE WITNESS:  I have used Alexis Foxx.                 12:58:12

11   BY MS. BERTRAND:

12   Q.  And that was on what platforms?

13           MS. PERLMETER:  Objection.  Relevance.

14           THE WITNESS:  To be honest, I don't recall.

15           THE COURT:  Well, let me -- let me rule on the         12:58:25

16   objection.

17           Overruled.

18           You may answer.

19           THE WITNESS:  I'm sorry.  I don't recall.

20   BY MS. BERTRAND:                                               12:58:39

21   Q.  Could one of them have been xxx.nude.com?

22   A.  No.  I have heard of it.

23   Q.  And it's your testimony today that you've never posted on a

24   platform as Alexis Roxx, R-O-X-X?

25   A.  I have never.                                             12:59:00

UNITED STATES DISTRICT COURT

```
 1              MS. PERLMETER:  Objection.  Asked and answered.
 2              THE COURT:  Sustained.
 3    BY MS. BERTRAND:
 4    Q.  What about as Roxx, Alexis?
 5              MS. PERLMETER:  Objection.  Asked and answered.         12:59:07
 6              THE COURT:  Sustained.
 7    BY MS. BERTRAND:
 8    Q.  Do you have a Twitter handle?
 9    A.  I'm sorry?
10    Q.  What's your name on Twitter?                                  12:59:12
11    A.  I don't have a Twitter.
12    Q.  Do you have a Pornhub name?
13    A.  I do not.
14    Q.  Do you use the alias Inkd, I-N-K-D, Female --
15    A.  I do not --                                                   12:59:25
16    Q.  -- on any platform?
17    A.  -- no.  I had a Instagram account that was that, but it is
18    now deleted.
19    Q.  When was that deleted?
20    A.  A while back.                                                 12:59:34
21    Q.  What about a website called Webcam Women?
22              MS. PERLMETER:  Objection.  Relevance.
23              THE COURT:  Sustained.
24    BY MS. BERTRAND:
25    Q.  Do you know whether or not you -- or, I believe -- was her    12:59:50
```

```
 1   name Michelle?
 2           I'm sorry if I'm -- your -- your friend, that was
 3   Michelle?
 4   A.  Michelle.  She was also in the case, but I wouldn't call
 5   her a friend.                                              13:00:07
 6   Q.  Okay.  The other woman that you referred to was Michelle,
 7   and then the man you referred to is the pimp.
 8           Do you recall whether or not the ads you looked at at
 9   Backpage were posted anywhere else?
10   A.  I do not recall.                                       13:00:22
11   Q.  Do you recall telling the FBI when meeting with them that
12   for much of the time that these ads were placed you were a
13   regular drug user?
14           MS. PERLMETER:  Objection.  Relevance.
15           MS. BERTRAND:  Goes to ability to recall.          13:00:44
16           THE COURT:  Overruled.
17   BY MS. BERTRAND:
18   Q.  Do you recall telling them that?
19   A.  Yes.
20   Q.  Were you a regular drug user at this time that these ads 13:00:50
21   were placed?
22   A.  I was forced to take Molly.  So, yes.
23   Q.  Molly?
24   A.  Molly.  I was forced.
25   Q.  And this was the -- this is by the same person that you -- 13:01:00
```

UNITED STATES DISTRICT COURT

 1   you went to when you left your boyfriend's house?

 2   A.  Yes.

 3   Q.  Did you ever speak to anybody, I'll say, before 2016,

 4   anybody who worked for Backpage.com?

 5   A.  No.                                                        13:01:32

 6          MS. BERTRAND:  Thank you.  I have nothing further of

 7   this witness.

 8          THE COURT:  Mr. Cambria?

 9                      CROSS-EXAMINATION

10   BY MR. CAMBRIA:                                               13:01:45

11   Q.  Good afternoon.

12   A.  Good afternoon.

13   Q.  Do you recognize anybody over here?

14   A.  Yes.

15          THE COURT:  Let the record reflect the attorney is    13:01:58

16   starting out at government's back table.

17          MR. CAMBRIA:  Yes.

18   BY MR. CAMBRIA:

19   Q.  Do you recognize any of these gentlemen?  This fellow here?

20   A.  No, none of those three.                                 13:02:08

21          THE COURT:  You need to stay by the microphone,

22   Mr. Cambria.

23          MR. CAMBRIA:  Oh, sorry.

24   BY MR. CAMBRIA:

25   Q.  You don't or you do?                                     13:02:15

```
 1    A.   None of those three.

 2    Q.   Okay.  The money that you paid to Backpage was for ad

 3    space, was it not?

 4    A.   Correct.

 5    Q.   Pardon?                                                    13:02:30

 6    A.   Yes.

 7    Q.   Sorry.  I'm a little hard of hearing here.

 8         And you indicated that you place an ad and a phone

 9    would ring.

10         Would you make some kind of agreement in that phone      13:02:45

11    call with the person?

12    A.   Yes.  There was usually an agreement to meet.

13    Q.   I'm sorry?

14    A.   Yes.  There was usually an agreement to meet up.

15    Q.   To meet --                                                13:02:57

16    A.   Usually.

17    Q.   -- right?

18    A.   That's what it got to.

19    Q.   But you didn't discuss any activity during that phone call,

20    did you?                                                       13:03:04

21    A.   Sometimes, yes.

22    Q.   Sometimes.  All right.

23         But -- so somebody would call.  You would tell them

24    where to meet you or you would go to them; correct?

25    A.   Correct.                                                  13:03:16
```

```
 1    Q.  And then when you got together, you had a discussion as to

 2    what activities you would agree to for what price; correct?

 3    A.  Correct.

 4    Q.  And any of the money that you may have received from those

 5    activities, did you send any of that to Backpage?                    13:03:35

 6    A.  No.

 7    Q.  And as far as any ads that you posted -- well, here.

 8    Strike that.

 9         Did you post on any other websites?

10    A.  No.                                                              13:03:54

11         MS. PERLMETER:  Objection.  Relevance.

12         THE COURT:  Overruled.

13         THE WITNESS:  No.

14    BY MR. CAMBRIA:

15    Q.  Okay.  And as far as the ad was concerned that you put on,       13:04:00

16    that was composed by you and somebody else?

17    A.  I'm sorry.  Can you repeat the question?

18    Q.  Yes.  The ad, whatever ad that you put on Backpage, was

19    something that you composed or you and this gentleman that you

20    referred to composed; correct?                                       13:04:25

21    A.  Incorrect.

22    Q.  Who composed it?

23    A.  Mr. Franklin would compose my ads for me.

24    Q.  Okay.  But it wasn't somebody at Backpage who created your

25    ad?                                                                  13:04:37
```

```
 1    A.  No.

 2    Q.  No.  You just paid them for ad space; correct?

 3    A.  Correct.

 4            MR. CAMBRIA:  That's all.

 5            THE COURT:  Mr. Lincenberg?                        13:04:46

 6            MR. EISENBERG:  No questions, Your Honor.

 7            THE COURT:  I'm sorry.  I called on --

 8            MR. PANCHAPAKESAN:  We have no questions, Your Honor.

 9            THE COURT:  I called on Mr. Panchapakesan.

10            MR. PANCHAPAKESAN:  No questions, Your Honor.       13:04:57

11            THE COURT:  All right.  And none from Mr. Eisenberg, I

12    take it?

13            MR. EISENBERG:  Correct, Your Honor.

14            THE COURT:  Mr. Kessler?

15            MR. KESSLER:  Yes.  Thank you.                     13:05:04

16                      CROSS-EXAMINATION

17    BY MR. KESSLER:

18    Q.  Good afternoon, ma'am.

19    A.  Good afternoon.

20    Q.  We've never met, have we?                             13:05:15

21    A.  No.

22    Q.  My name is Eric Kessler.  I represent one of the

23    individuals who used to own Backpage.

24            Do you understand that?

25    A.  Okay.                                                 13:05:27
```

UNITED STATES DISTRICT COURT

BREAHANNAH LEARY - CROSS-EXAMINATION

19

```
 1   Q.  Okay.
 2        THE COURT:  Mr. Kessler, can you speak up just a
 3   little bit.
 4        MR. KESSLER:  Yes.  I will try.
 5   BY MR. KESSLER:                                            13:05:35
 6   Q.  You mentioned early in your direct examination -- and so
 7   that we know what we're talking about, that's when the
 8   prosecutor was asking you questions.
 9   A.  Okay.
10   Q.  You mentioned that with the assistance of a friend you were  13:05:47
11   able to put together, through cutting and pasting and so forth,
12   your own ad.  And you put it in the escort section of Backpage.
13   Is that accurate?
14   A.  That is correct.
15   Q.  I'm sorry.  Say again?                                 13:06:08
16   A.  That is correct.
17   Q.  Thank you.
18        And you continued to do that until such time as you
19   began to work with Mr. Franklin; is that right?
20   A.  Off and on, yes.  I was on the weekends.              13:06:22
21   Q.  Can you estimate when you first -- timewise when you first
22   posted an ad on Backpage?
23   A.  In 2012.
24   Q.  Can you refine that a little bit more to the month?
25   A.  I would say winter months.                            13:06:46
```

UNITED STATES DISTRICT COURT

```
 1   Q.   Okay.  And there was -- there were some questions about
 2   drug usage more during the time that you were with
 3   Mr. Franklin, but during those -- during the time that you
 4   decided to first post your ad on Backpage, were you taking,
 5   either on a regular basis or periodically, any illicit          13:07:20
 6   substances?
 7   A.   No --
 8   Q.   Or abusing --
 9   A.   -- not at that time.
10   Q.   -- alcohol?                                                 13:07:29
11   A.   No, not in 2012.
12   Q.   When did that start?
13   A.   That started in 2015.
14   Q.   Is that when you and Mr. Franklin started working together?
15   A.   Correct.                                                   13:07:42
16   Q.   How many -- if you can recall, how many different ads did
17   you compose before Mr. Franklin came into the picture that you
18   then posted on Backpage?
19   A.   I would probably say 15, 20.
20   Q.   Were they all the same ad that you would just repost, or   13:08:13
21   were they different ads?
22   A.   I would repost.
23   Q.   Were any of those approximately 15 ads different than any
24   of the other 15 ads?
25   A.   Yes.                                                       13:08:27
```

BREAHANNAH LEARY - CROSS-EXAMINATION

21

```
1   Q.  In what way?
2   A.  Just photos.
3   Q.  Just the photos?
4   A.  Yeah.  That was back in 2012, from what I recall.
5   Q.  Okay.  So from 2012 until 2015, when Mr. Franklin came into      13:08:35
6   the picture, you created all your own ads.  There were roughly
7   15 of them.  And you posted all of them on Backpage under the
8   escorts section; correct?
9   A.  Correct.
10  Q.  The text of each of the 15 ads remained the same, though;       13:08:54
11  correct?
12  A.  Not that I can recall.
13  Q.  I'm not sure how to take that answer.  Are you saying you
14  just don't know?
15  A.  I just don't remember.  Yeah.                                    13:09:11
16  Q.  Okay.  But you do remember that among those 15 or so ads,
17  some of the images of you changed; correct?
18  A.  Back in 2012, yes.
19  Q.  Okay.  I'm -- just so we're clear, I -- I don't -- I'm not
20  intending to try to trip you up here.  We're talking about the      13:09:33
21  time before Mr. Franklin came into your life.  We're talking
22  about 2012 up until Mr. Franklin in 2015.
23  A.  Oh, okay.
24  Q.  Are we clear on that?
25  A.  Yes.                                                            13:09:47
```

UNITED STATES DISTRICT COURT

BREAHANNAH LEARY - CROSS-EXAMINATION

22

```
 1    Q.  Okay.  You had mentioned in response to the prosecutor's

 2    questions that there were occasions where you would post.

 3    Again, we're talking about those 15 or so ads with Backpage.

 4    But what appeared on the Backpage site that could be viewed by

 5    the general public was different in some way from what you had        13:10:15

 6    sent in to Backpage to post.

 7          Do you remember that testimony?

 8    A.  Yes.

 9    Q.  If you can recall, it -- just give me an estimate.  Of the

10    15 or so ads that you posted during this period of time, how         13:10:34

11    many of them were changed by the time they reached the public

12    version of Backpage?

13    A.  From what I can recall, probably over half.

14    Q.  Okay.  Now, on any of those occasions when the ads were

15    changed, did you get a message, probably by email, from             13:11:00

16    Backpage telling you that you had done something incorrectly?

17    A.  It just said it had been flagged.

18    Q.  Did any of those messages tell you that you had used an

19    improper image?

20    A.  Not that I recall.  It just said flagged.                       13:11:24

21    Q.  Okay.  Did you ever follow up on that with anyone at

22    Backpage?

23    A.  No.  I never did.

24    Q.  You just let the ad run the way Backpage had changed it;

25    correct?                                                            13:11:46
```

BREAHANNAH LEARY - CROSS-EXAMINATION
23

1   A.  Correct.

2   Q.  Can you give me -- again, if you can recall.  I'm not

3   asking you to speculate.  But, if you can recall, can you give

4   me at least one example of how an ad of yours, again, one of

5   these 15, was changed?                                          13:12:09

6   A.  It was the photos that were taken out of the ad.  Some

7   photos that I would put up would be there, and then later on a

8   few photos would be missing of that same ad.

9   Q.  Okay.  Is that the way it was with all the -- the changes

10  that were made?                                                 13:12:33

11  A.  That I noticed, yes.  It was the photos.

12  Q.  Did you ever notice that the ad appeared to be missing some

13  words, some text, some terms that you had put into the ad when

14  you submitted it?

15  A.  I don't recall at the moment.                               13:12:51

16  Q.  Did you ever get a message back from Backpage, likely by

17  email, that you had used an incorrect or a banned term?

18  A.  No.

19  Q.  Or that you had violated the terms of use?

20  A.  No.                                                         13:13:13

21  Q.  When you first posted on Backpage, do you recall there were

22  a few disclaimers?  Like, for example, one of them was you have

23  to be at least 18 years of age to post on this site --

24  A.  Yes.

25  Q.  -- correct?                                                 13:13:34

1    A.  Yes.  Yes.

2    Q.  And were you at least 18 years of age?

3    A.  Yes, I was.

4    Q.  Do you also recall that there was a section that you had to

5    read through that was called terms of use?                      13:13:47

6    A.  Yes.  I remember that, terms of use.

7    Q.  Did you read that?

8    A.  I did not read it all the way through.

9    Q.  Why not?

10   A.  I guess, just like with everything, I kind of just scrolled  13:13:59

11   to the bottom and click okay and move on.

12   Q.  Well, the parts that you did read through, do you have any

13   recollection?

14   A.  Just the ones you have to be 18, and that was it.

15   Q.  As far as the terms of use, do you have any recollection of  13:14:20

16   the terms telling you what are the permissible and

17   impermissible uses of the Backpage site?

18          MS. PERLMETER:  Objection.  Asked and answered.  She's

19   testified she doesn't recall.

20          THE COURT:  Sustained.                                    13:14:36

21   BY MR. KESSLER:

22   Q.  And then along came Mr. Franklin, and he began creating ads

23   to be posted; correct?

24   A.  Correct.

25   Q.  Let me back up a second.                                     13:15:02

UNITED STATES DISTRICT COURT

BREAHANNAH LEARY - CROSS-EXAMINATION

25

```
1              In the time that you started posting on Backpage and
2    Mr. Franklin coming into your life, did you post anywhere else?
3              MS. PERLMETER:  Objection.  Asked and answered.
4              MR. KESSLER:  I did not ask her that question.
5              THE COURT:  Well, your prior counsel -- prior counsel      13:15:22
6    did, but I'll permit it.
7              You may answer.
8              MR. KESSLER:  Oh.
9    BY MR. KESSLER:
10   Q.  Did you -- during that approximately three-year period of        13:15:29
11   time, those 15 ads that you made yourself, did you post any of
12   them or any other ads on any other adult site?
13             MS. PERLMETER:  Objection.  412.
14             THE COURT:  Overruled.
15             THE WITNESS:  No, not that I can recall.                    13:15:52
16   BY MR. KESSLER:
17   Q.  If you had, do you think you would have recalled that?
18   A.  Posting an ad on another website --
19   Q.  Yes.
20   A.  -- in 2012?                                                      13:16:02
21   Q.  Between 2012 and 2015.
22   A.  No.
23   Q.  If you had posted an ad on another website, do you think
24   that you would remember that?
25             THE COURT:  Mr. Kessler, she said no.                      13:16:12
```

UNITED STATES DISTRICT COURT

BREAHANNAH LEARY - CROSS-EXAMINATION
26

```
 1            MR. KESSLER:  Oh, I'm sorry.  I could not hear her.
 2            Could we have Exhibit 216 that's in evidence up.
 3   BY MR. KESSLER:
 4   Q.  This, I think, is an ad that you testified earlier was
 5   created by Mr. Franklin; is that correct?                    13:16:45
 6   A.  Correct.
 7   Q.  He posed you and took the photographs?
 8   A.  Isis and Mr. Franklin.
 9   Q.  Pardon me?
10   A.  Isis.  One of the other females.                         13:16:59
11   Q.  Oh, okay.
12   A.  Yes.
13   Q.  I have to tell you, your screen covers the bottom of your
14   face, and so I have a hard time --
15   A.  I'm sorry.                                                13:17:10
16   Q.  -- seeing you.
17            Let me -- let me do this.  I'll just scoot you over
18   here.
19            Okay.  Better.
20            So Mr. Franklin or somebody else at his direction    13:17:21
21   helped pose you and take the photographs that appeared in this
22   ad; correct?
23   A.  Correct.
24   Q.  And Mr. Franklin, according to your testimony, wrote all of
25   the text?                                                     13:17:36
```

UNITED STATES DISTRICT COURT

BREAHANNAH LEARY - CROSS-EXAMINATION

27

```
 1   A.  From my understanding, it was him and Isis --
 2   Q.  Okay.
 3   A.  -- who wrote them, yes.
 4   Q.  So it was Mr. Franklin and somebody working at his
 5   direction?                                                    13:17:46
 6   A.  Correct.
 7   Q.  But you did not?
 8   A.  I did not.
 9        MR. KESSLER:  If we could go to the next page.  And
10   the next page.                                                13:18:03
11   BY MR. KESSLER:
12   Q.  Do you see this disclaimer?
13   A.  Yes.
14   Q.  Can you read it, please.
15   A.  It says, "By contacting me in any way you agree you are not  13:18:16
16   involved with any kind of law enforcement that is entrapment
17   any cash exchange is for companionship & for" -- I don't know.
18   I can't read the rest of it.
19        MR. KESSLER:  And if we could go to the next page so
20   she could finish reading.                                     13:18:39
21        I guess that's the end of it.
22        THE WITNESS:  My --
23   BY MR. KESSLER:
24   Q.  Oh, there is a little bit more for you.
25   A.  Yes.  It's for my -- I don't know what that last word is.  13:18:46
```

```
 1   Q.  Portfolio?

 2   A.  Portfolio?

 3   Q.  Is that what it says?

 4   A.  I don't know.

 5          THE COURT:  I don't know that any of us know what that      13:18:56

 6   says.

 7          THE WITNESS:  I can't read that.

 8   BY MR. KESSLER:

 9   Q.  Okay.

10   A.  Make that out.                                                 13:19:01

11   Q.  All right.  But none the -- nonetheless, your ad, this

12   particular one that was created primarily by Mr. Brock [sic]

13   contained that disclaimer; correct?

14   A.  Correct.

15   Q.  And you were asked about that by one of the defense            13:19:14

16   attorneys, and you said that that was for the benefit of law

17   enforcement.

18          I think I'm paraphrasing your answer, but --

19          MS. PERLMETER:  Objection.

20   BY MR. KESSLER:                                                    13:19:27

21   Q.  -- that's the way I understood it.  That was for law

22   enforcement?

23          MS. PERLMETER:  Objection.  Misstates testimony.  No

24   one's lodged any question about this -- this text yet.

25          MR. KESSLER:  That's not true.                              13:19:37
```

```
 1              THE COURT:  Well, there was a line of questioning
 2    related to the area but not in particular to this particular
 3    portion of the ad.
 4              MR. KESSLER:  All right.  Then I'll just ask the
 5    question.                                                        13:19:47
 6    BY MR. KESSLER:
 7    Q.  Why is that disclaimer in your ad?
 8              MS. PERLMETER:  Objection.  Calls for speculation.
 9              THE COURT:  Sustained.
10    BY MR. KESSLER:                                                  13:20:00
11    Q.  Did you put it there?
12    A.  No.
13    Q.  Do you know why Mr. Franklin put it there?
14    A.  I'm sorry.  Your glass just hit the mic when you --
15    Q.  Do you know why Mr. Franklin put it there?                   13:20:12
16    A.  He was trafficking.
17    Q.  Okay.  This is a disclaimer saying that this has nothing to
18    do with prostitution and that anything -- any thoughts to the
19    contrary constitutes entrapment.
20              MS. PERLMETER:  Objection.  Misstates the text of the  13:20:32
21    image.
22              MR. KESSLER:  I'm paraphrasing, Judge.
23              THE COURT:  Well, he can -- he's entitled to
24    paraphrase, but let him finish asking the question before you
25    object.                                                          13:20:42
```

BREAHANNAH LEARY - CROSS-EXAMINATION
30

```
 1              All right.  Mr. Kessler.
 2     BY MR. KESSLER:
 3     Q.  Let me reask the question.
 4              This disclaimer makes clear, does it not, that the
 5     purpose for hiring you is not for prostitution.  It is for a     13:20:58
 6     companionship and that any thoughts to the contrary constitute
 7     entrapment, or something to that effect.
 8              Isn't that what it says?
 9     A.  I am not sure.
10     Q.  Well, let's go back to that slide.                           13:21:24
11              MR. KESSLER:  Go to the previous slide.
12     BY MR. KESSLER:
13     Q.  "By contacting me in any way you agree you are not involved
14     with any kind of law enforcement that is entrapment any cash
15     exchange is for companionship &" -- and then we can't read that  13:21:49
16     bottom line.
17              But you agree that's what it says?
18     A.  That does read what it says.
19     Q.  It doesn't say that it's for sex?
20     A.  No.                                                          13:22:03
21     Q.  In fact --
22              MR. KESSLER:  If we could go to the next slide.  And
23     the next one.  Let's get to the text.
24     BY MR. KESSLER:
25     Q.  Here's the text of your ad.  Is there anything in the text   13:22:15
```

BREAHANNAH LEARY - CROSS-EXAMINATION

31

```
 1   of your ad -- are you able to read that?

 2   A.  Yes, sir.

 3   Q.  Is there anything in the text of your ad that says that you

 4   will perform some sex act in exchange for money?

 5   A.  I'm sorry.  I didn't write the ad, so I'm reading it.      13:22:40

 6   Q.  Go ahead and read it, please.

 7   A.  No, it does not say that.

 8   Q.  Okay.  You had begun your testimony on direct examination

 9   indicating that you placed an ad in Backpage and then, with the

10   help of Mr. Franklin, placed ads, such as this, so that you      13:23:18

11   could engage in prostitution; correct?

12   A.  Correct.

13   Q.  This is while you were living in Colorado?

14   A.  I'm born and raised in Colorado.

15   Q.  Well, that's nice, but that's not my question.               13:23:36

16   A.  Oh.  I misunderstood.

17   Q.  This is while you were living in Colorado?

18   A.  Oh, while?  Yes.  This is while I was living in Colorado.

19   Q.  You're holding yourself out, at least back at that time, to

20   the jury here as a prostitute; correct?                          13:23:59

21   A.  Yep.

22   Q.  What is your understanding of what prostitution is in

23   Colorado?

24   A.  It's change -- exchanging any -- any act -- any sex act for

25   any means to live; money, food, a home.                         13:24:19
```

UNITED STATES DISTRICT COURT

BREAHANNAH LEARY - CROSS-EXAMINATION

32

```
 1   Q.  What kind of sex acts?

 2   A.  Any sex acts.

 3   Q.  Anything?

 4   A.  That's my idea of prostitution?  Is --

 5   Q.  Let me ask you this.                              13:24:32

 6   A.  -- that the question?

 7   Q.  Let me ask you this.

 8   A.  Okay.

 9   Q.  Let's say somebody calls you up in response to this ad and

10   you set up a meeting, a date --                       13:24:41

11   A.  Uh-huh.

12   Q.  -- and it's a guy, and he meets you.  You guys agree on a

13   price, and he says, you know, today I just want to see you

14   naked, so I'm going to sit here and, for whatever price, I want

15   you to take off your clothes and model in front of me.   13:25:06

16        Now, would you consider that prostitution?

17   A.  Yes, I would.

18   Q.  Okay.  When Mr. Franklin was acting as your pimp, as you

19   call him, did he ever take the time to explain to you what is

20   or is not legal in terms of prostitution?             13:25:41

21   A.  Mr. Franklin?  We were barely allowed to use the restroom,

22   so, no, he did not explain anything to me.

23   Q.  Okay.  But you believed then, and apparently now, that

24   meeting a man in a hotel room where there is no contact

25   whatsoever between you and the man constitutes prostitution; is   13:26:07
```

UNITED STATES DISTRICT COURT

 1   that true?

 2        MS. PERLMETER:  Objection.  Asked and answered.

 3        THE COURT:  Sustained.

 4        MR. KESSLER:  I didn't ask -- I didn't ask it that

 5   way.                                                          13:26:19

 6        THE WITNESS:  That --

 7        THE COURT:  Yes.  I'll overrule the objection.

 8        THE WITNESS:  All right.  Can you repeat the question?

 9   BY MR. KESSLER:

10   Q.  Sure.  You're telling us that back then and now your     13:26:28

11   understanding of prostitution is that prostitution --

12   prostitution can occur if a man comes to your hotel room and

13   gives you money but there is no physical contact between the

14   two of you; correct?

15   A.  I believe so.  In my --                                  13:26:50

16   Q.  All right.

17   A.  -- mind, yes.  That is at this point.  Back then, no.

18   Q.  You were asked some questions earlier, but I want to maybe

19   be more particular about them.

20        You posted on Pornhub under the inked female category,   13:27:13

21   didn't you?

22        MS. PERLMETER:  Objection.  Asked and answered.

23        THE COURT:  Oh.

24        MS. PERLMETER:  Objection.  Asked and answered and

25   412.                                                         13:27:24

BREAHANNAH LEARY - CROSS-EXAMINATION

34

 1            THE COURT:  Sustained.

 2            MR. KESSLER:  I don't know what 412 is, but I -- I

 3    haven't asked her that question.

 4            THE COURT:  Ms. Bertrand did, but --

 5            MR. KESSLER:  I asked it a little bit different.        13:27:36

 6            THE COURT:  All right.  Well, I sustained the

 7    objection.  Ask a different question, Mr. Kessler.

 8    BY MR. KESSLER:

 9    Q.  Have you ever -- not just now but ever posted or advertised

10    yourself on the site known as pornhub.com?                    13:28:02

11            MS. PERLMETER:  Objection.  Asked and answered.

12            MR. KESSLER:  I'm asking for a time.

13            MS. PERLMETER:  And relevance.  And 412.

14            THE COURT:  Well, I --

15            MR. KESSLER:  The Court's already ruled on relevance.  13:28:24

16            THE COURT:  I'm going to sustain.

17    BY MR. KESSLER:

18    Q.  On May 31st, 2018, isn't it true that you posted and

19    advertised yourself for sex on Twitter, which included

20    #bootypie and #bigbootytuesday?                               13:28:58

21    A.  No, I did not post those.  I was also under another

22    gentleman at the time who was posting that.  I do recall that

23    now.

24    Q.  Okay.  So you didn't post it, but it was -- but you were

25    posted by somebody?                                           13:29:18

BREAHANNAH LEARY - CROSS-EXAMINATION
35

```
 1    A.  Correct.

 2    Q.  Okay.  Well, let me go back to the -- the Pornhub posting

 3    then.

 4            Was -- were you posted by somebody else on Pornhub?

 5            MS. PERLMETER:  Objection.  Relevance and 412.  Asked     13:29:32

 6    and answered.

 7            THE COURT:  Sustained.

 8    BY MR. KESSLER:

 9    Q.  Somebody else posted you on Twitter; correct?

10            MS. PERLMETER:  Objection.  Asked and answered.  412.     13:29:41

11            THE COURT:  Well, she may answer yes or no, but beyond

12    that I'm going to not permit.

13    BY MR. KESSLER:

14    Q.  Isn't that true?

15    A.  Yes.                                                          13:29:54

16    Q.  And is the date that I gave you accurate?  I'll remind you

17    it was May 31st of 2018.

18    A.  The year sounds right.

19    Q.  How long were you posted on Twitter?

20            MS. PERLMETER:  Objection.  412.  Relevance.              13:30:10

21            THE COURT:  Sustained.

22            MR. KESSLER:  Ms. Leary, thank you.  That's all I

23    have.

24            THE WITNESS:  Thank you.

25            THE COURT:  Ms. Perlmeter?                                13:30:31
```

UNITED STATES DISTRICT COURT

1          MS. PERLMETER:  May I begin?

2                    REDIRECT EXAMINATION

3    BY MS. PERLMETER:

4    Q.  Ms. Leary, just a point of clarification.

5          You had been asked questions about a friend and about          13:30:47

6    Michelle.  So the person who introduced you to Backpage in the

7    beginning, you said that that person was your friend --

8    A.  Correct.

9    Q.  -- is that -- is that correct?

10   A.  Right.          13:31:00

11   Q.  Okay.  And then later on when you were engaged with

12   Mr. Franklin or, you know, working for Mr. Franklin, someone

13   named Michelle entered your life?

14   A.  Correct.

15   Q.  So are Michelle and your -- the friend the same or          13:31:14

16   different people?

17   A.  Those are two different people.

18   Q.  Okay.  Regarding dates where men wanted to just watch you

19   take off your clothes --

20   A.  Uh-huh.          13:31:32

21   Q.  -- how often did that happen?

22   A.  Very rarely or never.

23   Q.  Oh, yeah.  Did that happen at all?  Do you recall that ever

24   happening?

25   A.  I don't recall that ever happening.  Not with my          13:31:46

BREAHANNAH LEARY - REDIRECT EXAMINATION
37

1   experience.

2   Q.  Okay.  And in terms of men responding to Backpage

3   advertisements of you, how often was it that someone -- that

4   you engaged in a sexual act with that person?

5   A.  Every time.                                              13:32:02

6   Q.  Okay.  And in terms of sexual act, I mean in an act of

7   either oral sex, sexual intercourse, things like that.

8   A.  Yeah.

9   Q.  Okay.  And is that what happened when you met with men who

10  were responding to your ads on Backpage?                     13:32:19

11  A.  Yes.  Correct.

12          MS. PERLMETER:  Anything else?

13          Okay.  Nothing further.

14          THE COURT:  The witness may step down.

15          Is she excused from subpoena by the government?      13:32:27

16          MS. PERLMETER:  Yes, Your Honor.

17          THE COURT:  Any reason to hold the subpoena?

18          Hearing none.

19          MR. KESSLER:  No.

20          THE COURT:  Ma'am, thank you for your testimony.  You 13:32:37

21  are excused.  You are released from your subpoena.

22          Please call your next witness.

23          MR. BERRY:  Thank you, Your Honor.  The United States

24  calls Isaac Luria.

25          THE COURT:  Sir, please come forward to the courtroom 13:32:53

```
 1   deputy and be sworn.

 2          THE COURTROOM DEPUTY:  Please raise your right hand.

 3       (ISAAC LURIA, a witness herein, was duly sworn or

 4   affirmed.)

 5          THE COURTROOM DEPUTY:  Step over to the witness stand.   13:33:11

 6          THE COURT:  You may proceed.

 7          MR. BERRY:  Thank you, Your Honor.

 8                      DIRECT EXAMINATION

 9   BY MR. BERRY:

10   Q.  Good afternoon, Mr. Luria.                                 13:33:45

11   A.  Hi.

12   Q.  Good to see you.

13          Would you please state and spell your first name for

14   the jury.

15   A.  Isaac, I-S-A-A-C.                                          13:33:53

16   Q.  And would you please state and spell your last name for the

17   jury as well.

18   A.  Luria, L-U-R-I-A.

19   Q.  How old are you, sir?

20   A.  40.                                                        13:34:06

21   Q.  Are you married?

22   A.  Yes.

23   Q.  Do you have any children?

24   A.  I do.  Three.

25   Q.  What are their ages?                                       13:34:13
```

```
 1    A.  They're 13, 11, and 8.

 2    Q.  And where do you work right now?

 3             THE COURT:  Can you hold one -- one second.

 4             I hear a -- an alarm.  I don't know if that's

 5    immediately outside.                                         13:34:30

 6             And now it stopped.  Okay.  So someone triggered an

 7    alarm again.

 8             All right.  You can continue.

 9             MR. BERRY:  All right.  Thank you.

10    BY MR. BERRY:                                                13:34:45

11    Q.  I think I was asking you, where do you work now?

12    A.  At the Nathan Cummings Foundation.

13    Q.  And what is the Nathan Cummings Foundation?

14    A.  It's a private family foundation based in New York City.

15    It distributes resources to those who advocate for social    13:34:58

16    justice causes.

17    Q.  Okay.  And how long have you been there?

18    A.  About six years now.

19    Q.  Did you graduate college?

20    A.  I did.                                                   13:35:13

21    Q.  Where did you go to school?

22    A.  Trinity College in Hartford, Connecticut.

23    Q.  And did you get a degree?

24    A.  I did.

25    Q.  What was your degree?                                    13:35:22
```

UNITED STATES DISTRICT COURT

40

```
 1              What was your degree in?
 2   A.   American studies.
 3   Q.   I'm sorry?
 4   A.   American studies.
 5   Q.   Okay.  Did you used to work for an organization called    13:35:31
 6   Auburn Theological Seminary?
 7   A.   I did.
 8   Q.   What is that?
 9   A.   It is a leadership training institute for faith leaders to
10   support their social justice work in the world.               13:35:49
11   Q.   And when did you work there?
12   A.   From about 2009 until 2016.
13              Excuse me.   2015 --
14   Q.   You said social justice --
15   A.   The end of 2015.                                         13:36:09
16   Q.   I'm sorry.  I cut you off.  Say that again.
17   A.   From 2009 to the end of 2015.
18   Q.   Okay.  And you said it does social justice work.  For those
19   who may be unfamiliar with that terminology, could you please
20   explain that to the jury.                                     13:36:23
21   A.   Yeah.  If I'm -- faith leaders, rabbis, imams, Christian
22   pastors, Catholic priests, all of whom had deep relationships
23   in their community and wanted to see their communities better,
24   for people without means to have access to housing, healthcare,
25   good food.  And we supported their work in a variety of       13:36:43
```

UNITED STATES DISTRICT COURT

ISAAC LURIA - DIRECT EXAMINATION
41

1   communities and contexts.

2   Q.   And what were your jobs there at Auburn Theological

3   Seminary?

4   A.   I supported a technology rebuild of all of our internal

5   databases.   I was also a trainer for faith leaders doing          13:37:00

6   communications work and organizing work in their communities,

7   supporting them in their campaigns.   And then I also was the

8   organizing director for a digital platform we ran called

9   Groundswell.

10  Q.   Explain Groundswell to the jury.                              13:37:17

11  A.   Groundswell was a place where faith leaders and other

12  people of faith could go to take action in their community to

13  make their communities a better place.

14  Q.   And how did Groundswell function in that regard?

15  A.   We would -- we opened -- had an open petition platform      13:37:32

16  where people could start petitions, and then they received

17  training and coaching support from us to -- to get more names

18  on those petitions and to try to achieve the change that they

19  wanted to see.

20  Q.   And did Groundswell have an online presence?               13:37:47

21  A.   It did.   We had about a -- at the end of my time at Auburn

22  about 200,000 people nationwide that were part of the work on

23  Groundswell.

24  Q.   And there was a website --

25  A.   Yes.                                                        13:37:59

1    Q.   -- associated with it?

2    A.   Yes.

3    Q.   Okay.

4    A.   Groundswell Movement.

5    Q.   And who was the leader of Auburn during your time there,    13:38:03

6    from 2009 to 2015?

7    A.   Our president, the Reverend Dr. Katharine Henderson.

8    Q.   Okay.  And did you work closely with her?

9    A.   Yes.  And she -- she hired me for the job.

10   Q.   And just explain to the jury, just give us a sense of what    13:38:20

11   the size of the organization is, the number of people that work

12   there, that sort of thing.

13   A.   Yeah.  At the time that I worked there, we were maybe

14   15 people, and the budget was between 5 and $7 million total.

15   We had a small endowment that helped cover our costs and --    13:38:36

16   yeah.  So we were a midsize nonprofit.

17   Q.   During your time at Auburn, did you ever deal with an issue

18   related to Backpage.com?

19   A.   Yes.

20   Q.   When did you become aware of Backpage?    13:38:50

21   A.   In 2009, I attended a breakfast that Auburn --

22        MS. BERTRAND:  Objection.  Goes beyond the scope of

23   the question.

24   BY MR. BERRY:

25   Q.   You said in 2009 -- oh.    13:39:04

```
 1   A.  Yes.

 2          MR. BERRY:  Just let her -- let the judge rule for

 3   just a second.

 4          THE COURT:  Well, yes.  Let -- I'm going to overrule

 5   the objection.  He was starting to answer as to how he became    13:39:11

 6   aware.

 7          So you may continue.

 8   BY MR. BERRY:

 9   Q.  So you said you became aware in 2009; correct?

10   A.  Yes.                                                         13:39:20

11   Q.  And if you would please explain to the jury, how did you

12   become aware of Backpage in 2009?

13   A.  There was somebody who came to speak to a group of us at

14   Auburn explaining about sex trafficking and prostitution and

15   that there were places, websites, where people could go to      13:39:37

16   access those -- those services.

17   Q.  And did you have an opportunity in 2009 to go on Backpage

18   and observe what it looked like with your own eyes?

19   A.  I did.

20   Q.  Please describe for the jury what you recall seeing when     13:39:55

21   you went to Backpage in 2009.

22   A.  Advertisements for sex.

23   Q.  Can you elaborate a little bit more on that.

24   A.  I mean, there were many on the page.  There were many

25   different listings of different ways that people could purchase  13:40:11
```

 1    sex from people in a -- in the neighbor -- in the location

 2    where you were.

 3    Q.   Okay.  Did you ever meet any of the owners of Backpage?

 4    A.   Yes.

 5    Q.   Who?                                                        13:40:31

 6    A.   Jim Larkin and Michael Lacey.

 7    Q.   And do you know approximately when you met those folks?

 8    A.   In the -- late in 2011.

 9    Q.   And where did you meet these folks?

10    A.   At a conference room that Auburn Theological Seminary       13:40:53

11    rented from the Union Theological Seminary near Riverside

12    Church on the Upper West Side of Manhattan.

13    Q.   And why did you have this meeting at Union Theological with

14    Larkin and Lacey in late 2011?

15    A.   We had gathered a group of faith leaders who were outraged  13:41:13

16    over sex trafficking occurring on the site, specifically the

17    prostitution of children and --

18            MR. CAMBRIA:  Object to foundation.

19            THE COURT:  Well --

20            MR. BERRY:  He's testified --                           13:41:32

21            MR. CAMBRIA:  And hearsay.

22            MR. FEDER:  And 403.

23            THE COURT:  Well --

24            MR. BERRY:  If I could be heard?

25            He's testified --                                       13:41:40

```
 1                THE COURT:  Well --

 2                MR. BERRY:  Go ahead.

 3                THE COURT:  -- I'm going to overrule.  He was

 4   describing the gathering of the group, and he can further

 5   testify about that.  But let's move on.                      13:41:49

 6   BY MR. BERRY:

 7   Q.  Was this meeting significant from your perspective?

 8   A.  Yes.

 9   Q.  Why?

10   A.  We had been attempting to meet with Backpage executives for  13:41:59

11   a number of months to communicate our concerns over the

12   website.

13   Q.  All right.  And we'll come back to the details of that

14   meeting in a moment, but let's back up before this late 2011

15   meeting.                                                     13:42:17

16          Do you recall Auburn publishing something in the New

17   York Times?

18   A.  Yes.

19   Q.  Do you recall approximately when that was in relation to

20   this meeting?                                                13:42:33

21   A.  It was about six weeks beforehand, in October of 2011.

22   Q.  And where was it published?

23   A.  In the New York Times.

24   Q.  And describe for the jury, as best you can, what it was.

25   A.  It was --                                                13:42:51
```

```
 1                MS. BERTRAND:  Objection.  Calls for hearsay.

 2                MR. CAMBRIA:  Object.  Hearsay.

 3                MS. BERTRAND:  And relevance, but hearsay.

 4                THE COURT:  Overruled.

 5    BY MR. BERRY:                                             13:43:00

 6    Q.  You can answer the question.

 7    A.  It was a letter, an open letter to Backpage executives

 8    asking them to shut down Backpage.com because of the concerns

 9    with child sex trafficking and the selling of children for sex.

10                MS. BERTRAND:  Same objection.  Hearsay.  Move to   13:43:14

11    strike.

12                MR. CAMBRIA:  Join.

13                THE COURT:  Overruled.

14    BY MR. BERRY:

15    Q.  How big was the -- did you say it was an open letter?    13:43:25

16    A.  It was.

17    Q.  Did you have to pay to publish it?

18    A.  Yes.  It was a full-page paid ad.

19    Q.  A full-page paid ad in the New York --

20    A.  In the New York --                                    13:43:37

21    Q.  -- Times?

22    A.  -- Times, yes.

23    Q.  About how much did that cost your nonprofit organization?

24    A.  About $75,000.

25    Q.  Was it unusual for Auburn to take out full-page ads in the   13:43:45
```

```
 1    New York Times?

 2              MR. EISENBERG:  Objection.  Leading.

 3              THE WITNESS:  Yes.

 4              MR. EISENBERG:  Relevance.

 5              THE COURT:  Overruled.                          13:44:04

 6              THE WITNESS:  Yes.

 7    BY MR. BERRY:

 8    Q.  It was unusual?

 9    A.  It was unusual.

10    Q.  In fact, I think you said you were there from '09 to '15.  13:44:07

11    In the time that you were there, approximately six years, how

12    many times did you all do this?

13    A.  This one time.

14    Q.  One and only one?

15    A.  Correct.                                              13:44:22

16    Q.  Could you please describe the content of the ad that was

17    posted in the New York Times in October of 2011.

18              MR. CAMBRIA:  Object.  Hearsay.  401/403.

19              MS. BERTRAND:  Join.

20              MR. BERRY:  This goes -- this is a notice, Your Honor.  13:44:40

21              MR. FEDER:  And 106.

22              THE COURT:  Let me see counsel at sidebar.

23         (Sidebar discussion begins on the record.)

24              THE COURT:  All right.  Can you hear me?

25              THE COURT REPORTER:  Yes.                       13:45:13
```

UNITED STATES DISTRICT COURT

1          THE COURT:  There's several objections.  One was

2    notice.  I don't know what that is in reference to.  So who

3    made that --

4          MR. BERRY:  He's saying this goes to --

5          THE COURT:  Okay.                                    13:45:22

6          MR. BERRY:  That's my response.

7          THE COURT:  The second concern I have is, and I don't

8    remember what the exhibit looked like, but I know that there

9    was a prior ruling that there is nothing to be entered into

10   with the record regard -- regarding morality or the motive   13:45:32

11   reference to the Theological Society because it's -- it would

12   bend into the prejudicial area.  So I just reviewed that ruling

13   a few moments ago.

14         So to the extent that testimony will come out, I'm

15   going to sustain any objection related to that pursuant to that  13:45:54

16   order.

17         What was the other objection?

18         MR. EISENBERG:  One was relevance, Your Honor.

19         THE COURT:  Well --

20         MR. EISENBERG:  We don't know whether it was seen by   13:46:04

21   any of the clients.  And even if it had been, it has nothing to

22   do with this meeting and the extent of the meeting of the

23   people who were there.

24         THE COURT:  Well --

25         MR. EISENBERG:  It was just published, and now it's   13:46:17

ISAAC LURIA - DIRECT EXAMINATION

49

1    publicly open.

2            THE COURT:  Well, I think the relevance speaks for

3    itself in terms of why they had the meeting and they attended

4    the meeting in the first instance.  The inference being that

5    had it not been for this posting, Mr. Larkin, Mr. Lacey would        13:46:29

6    not have shown up at the Theological Society.  So it actually

7    is notice --

8            MR. EISENBERG:  I don't know.

9            THE COURT:  -- so --

10           MR. EISENBERG:  I'm sorry.

11           THE COURT:  But what I'm saying --

12           MR. EISENBERG:  Yes.

13           THE COURT:  -- is that to the extent you're going to

14   go down this avenue about what it said, and if there's anything

15   in the advertisement that relates to morality objections,           13:46:48

16   ethical objections, or anything of that nature, sex

17   trafficking, child sex trafficking, I'm not going to permit it.

18           MR. BERRY:  I understand, Your Honor.  If I could be

19   heard just briefly --

20           THE COURT:  Yes.

21           MR. BERRY:  -- on that?

22           So I've got to thread the needle here.  So obviously

23   this was an organization of faith-based leaders who were coming

24   at this from a different angle than the Attorney Generals, for

25   example, but they were still trying to get Backpage to shut the     13:47:13

ISAAC LURIA - DIRECT EXAMINATION

50

1    site down.  So I was asking an open-ended question to avoid a

2    leading objection.

3          If, based upon what Your Honor's saying, I'm going to

4    have to do a little bit more direct questioning to say, did

5    this letter say X or did this letter say Y, in order to thread        13:47:27

6    the needle, because otherwise an open-ended response, what did

7    the ad say, that's going to come out.  And I can't stop him

8    from saying that.

9          THE COURT:  And that's the slippery slope.  So I will

10   permit you to do that, but just be mindful --                          13:47:41

11         MR. BERRY:  Understood.

12         THE COURT:  -- that if he starts going down that

13   avenue, you're going to have to cut him off.

14         MR. BERRY:  Yes.  Yes, Your Honor.

15         MR. CAMBRIA:  Well, my position is that all the               13:47:51

16   morality stuff and so on should not be taken out of the article

17   because this is not -- and I think you should read the article,

18   because it's extremely prejudicial.  It has a number of

19   conclusions, and it's all hearsay.  And there's -- there's no

20   way we can confront whoever wrote this thing or any of the            13:48:07

21   so-called conclusions that are in it.  And that's the problem

22   with this.

23         The morality part, it should be in here.  This is --

24         THE COURT:  Okay.

25         MR. CAMBRIA:  This is legal.                                  13:48:22

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Well, I'm not going to reevaluate the
 2    Court's prior order with regard to that.
 3              MR. BERRY:  Well, if the defense is okay with morality
 4    language and the United States is okay with it, I think we
 5    could --                                                          13:48:37
 6              THE COURT:  Well, then the whole thing comes in.
 7              MR. EISENBERG:  No.  We don't want it in at all.
 8              MR. BERRY:  I'm actually not going to offer the ad at
 9    all.  I just want him to describe it.
10              THE COURT:  Follow the ruling and go on.              13:48:47
11              MR. CAMBRIA:  Your Honor, with all due respect, I
12    think you need to review this, because it has a number of
13    ultimate conclusions.  Clearly hearsay.  It's clearly hearsay.
14              MR. BERRY:  It's not being offered for --
15              MR. CAMBRIA:  That's nonsense.  If you didn't have --  13:49:00
16    if it wasn't being offered for the truth, it wouldn't be
17    offered at all.  That's what they want them to believe.
18              THE COURT:  But I'm not permitting the article to come
19    in.  That's the point.
20              MR. CAMBRIA:  I thought that you --                   13:49:12
21              THE COURT:  No.  I'm not permitting the article to
22    come in.
23              MR. CAMBRIA:  Okay.
24              THE COURT:  He's -- he can try to elicit what the
25    purpose of the article was and why the meeting occurred, but    13:49:19
```

1    he's not going to introduce the article.

2          MR. CAMBRIA:  He shouldn't be in a position to say

3    what's in the article.

4          THE COURT:  Well, he can.

5          MR. BERRY:  I can ask him questions about what his          13:49:31

6    involvement was with the writing of it, and I can lay the

7    foundation for that.

8          MR. CAMBRIA:  I'm just saying I don't -- he shouldn't

9    be able to bring out what's in the article because it's

10   hearsay.                                                          13:49:40

11         MR. EISENBERG:  Your Honor, I have a suggestion.  If

12   it's being offered in order to encourage the Backpage

13   defendants to come to the table, then why doesn't the

14   government simply link the article up with that event, that is

15   it got them to come in.  And I think --                          13:49:55

16         MR. BERRY:  That's where we're going.

17         MR. EISENBERG:  Okay.  Then you don't need the article

18   except to say that the article caused Lacey and Larkin to come

19   to this meeting.

20         MR. BERRY:  But the jury needs to understand what was      13:50:05

21   the content of the article that would encourage two maximum

22   owners of the company to be willing to travel across country

23   and have a meeting with these people.

24         THE COURT:  And that is permitted.  That is permitted

25   without getting into those statements of morality and ethical    13:50:18

ISAAC LURIA - DIRECT EXAMINATION

53

1    issues.

2            MR. CAMBRIA:  But the hearsay is still happening.

3            THE COURT:  It goes to knowledge.  It goes to

4    knowledge.

5            MR. FEDER:  Can I address this knowledge, this notice       13:50:29

6    issue, because --

7            THE COURT:  Quickly.

8            MR. FEDER:  Okay.  Unilaterally you've allowed to go

9    into a bunch of notice stuff.

10           THE COURT:  As to this.                                     13:50:40

11           MR. FEDER:  We have no counter to show that there's a

12   different side of this story so we aren't put in the position

13   of trying to cross-examine basically smoke, but we're not

14   allowed to bring in other articles, like the Wall Street

15   Journal article that we requested be admitted that the Court     13:50:53

16   denied us.

17           THE COURT:  Well --

18           MR. FEDER:  It has an even-handed explanation.

19           MR. CAMBRIA:  Response of the Attorney General.

20           THE COURT:  You were trying to bring it in for other      13:51:01

21   purposes in addition to that, and the other purposes --

22           MR. FEDER:  And the reason --

23           THE COURT:  Don't speak over me, Mr. Feder, please.

24   We need a clean record.

25           MR. FEDER:  Agreed.                                       13:51:11

 1                THE COURT:  You have a tendency to cut me off.

 2                MR. FEDER:  I'll try not to.

 3                THE COURT:  Try.

 4                Now, let's go back.  We're finished on this issue.

 5                MR. BERRY:  Thank you.                              13:51:25

 6          (Sidebar discussion begins on the record.)

 7                THE COURT:  All right.  You may proceed.

 8                MR. BERRY:  Thank you, Your Honor.

 9    BY MR. BERRY:

10    Q.  Okay.  Mr. Luria, I am going to ask you a couple of        13:51:56

11    specific questions about the content of the letter.

12          Do -- first of all, do you recall generally what it

13    said?

14    A.  Yes.

15    Q.  Were you involved in crafting the language that was        13:52:09

16    included in the ad?

17    A.  Yes.

18    Q.  Were you personally involved?

19    A.  Yes.

20    Q.  Okay.  And you testified this is the only time you all ever 13:52:17

21    published such a thing; correct?

22    A.  Correct.

23    Q.  So you have a -- still have a good memory of that here all

24    these many years later?

25    A.  Yes.                                                       13:52:30

1    Q.   Okay.  Did the ad address the issue of prostitution in some

2    form on Backpage?

3    A.   Yes.

4    Q.   Did the ad make a request of the owners of Backpage?

5    A.   Yes.                                                          13:52:52

6    Q.   Did that request involve asking the owners to shut down the

7    adult section of Backpage?

8    A.   Yes.

9    Q.   Now, after the ad was published, did you write and publish

10   something in the Huffington Post related to Backpage?            13:53:11

11   A.   Yes.

12   Q.   And did that take place after the New York Times ad, before

13   the meeting?

14   A.   Yes, I think so.  Yes.

15   Q.   Did what you published also make reference to prostitution   13:53:29

16   in some form on Backpage?

17   A.   Yes.

18   Q.   And did it also ask Backpage to shut down the adult

19   section?

20   A.   Yes.                                                          13:53:49

21   Q.   Now, before the New York Times ad, so before the meeting in

22   late 2011, before the New York Times ad, before the Huffington

23   Post article, were you involved in communications between

24   Auburn and Backpage representatives of some kind?

25   A.   Yes.                                                          13:54:16

1    Q.  Do you recall approximately when those communications

2    began?

3    A.  Around August 2011.

4    Q.  And what was the form of those communications?

5    A.  A request for a meeting to express our concerns.          13:54:29

6    Q.  All right.  Let me rephrase it.

7         When I say "the form," was it phone?  Email?

8    A.  It started with email.

9    Q.  Okay.  Did those communications ultimately lead to the

10   meeting in late 2011 with Jim Larkin and Mike Lacey?          13:54:45

11   A.  Yes, but I don't think we would have had a meeting without

12   the publication of the ad.

13   Q.  Okay.  Explain that to the jury.

14   A.  They were -- we were attempting to have a meeting to

15   communicate our concerns about Backpage and what was happening  13:55:03

16   on the site.

17         MS. BERTRAND:  Objection, Your Honor.  Hearsay.

18         THE COURT:  Overruled.

19         MS. BERTRAND:  Move to strike.

20   BY MR. BERRY:                                                 13:55:12

21   Q.  You can continue.

22   A.  And they were dragging their feet on having a meeting.  We

23   could -- we wanted to have one quickly because we felt urgency

24   about the issue at hand.  And they were not willing to meet

25   quickly and wanted to have all of the faith leaders that signed  13:55:28

```
 1    the letter.
 2            MR. FEDER:  Object to the narrative and as
 3    nonresponsive.
 4            MR. BERRY:  I've asked him to explain.
 5            THE COURT:  Well, overruled.                      13:55:36
 6            You -- but at this juncture, let's go ahead and ask
 7    another question.
 8            MR. BERRY:  Will do, Your Honor.
 9    BY MR. BERRY:
10    Q.  So you were having communications with Backpage folks;  13:55:45
11    correct?
12    A.  Yes.
13    Q.  And were you trying to have a meeting with them?
14    A.  Yes.
15    Q.  Were they willing to do so at that time?              13:55:56
16    A.  It seemed like they were, but the conditions were not --
17    they were -- they were putting conditions on the meeting that
18    were unreasonable.
19    Q.  Okay.  Then ultimately the New York Times ad gets
20    published; correct?                                       13:56:11
21    A.  Yes.
22    Q.  Did the tenor of those communications about a meeting
23    change --
24    A.  Yes.
25    Q.  -- after the publication of the ad?                   13:56:17
```

UNITED STATES DISTRICT COURT

ISAAC LURIA - DIRECT EXAMINATION
                                                                    58

```
 1    A.  Yes.

 2    Q.  How?

 3    A.  They became more litigious, meaning that they were

 4    communicating through lawyers and -- and threatening tones.

 5    And they were open to scheduling a meeting.              13:56:28

 6    Q.  But they were also open -- more open to scheduling?

 7    A.  Correct.

 8    Q.  Okay.  So you said this took place in -- in late 2011.

 9             Do you remember if it was in December or another

10    month?                                                   13:56:41

11    A.  The meeting?

12    Q.  Yes.

13    A.  Yes, the meeting took place in December.

14    Q.  Okay.  And you said it took place in New York City;

15    correct?                                                 13:56:50

16    A.  Correct.

17    Q.  And explain to the jury, who may not have been to New York,

18    sort of where the meeting was in relation to anything else that

19    they might be familiar with, like New York -- Times Square or

20    something.                                               13:57:04

21    A.  North of Times Square on the edge of Harlem in the Upper

22    West Side.  It's -- it's a very famous religious area.  It's

23    where Riverside Church is, the Interchurch Center, and Union

24    Theological Seminary.  It's next to Columbia.

25    Q.  And Columbia is what?                                13:57:20
```

UNITED STATES DISTRICT COURT

1    A.   A university.

2    Q.   A prestigious university in New York; correct?

3    A.   Yes.

4    Q.   And who -- who attended this meeting, to the best of your

5    memory?                                                                     13:57:33

6         And you don't have to name each person, but just sort

7    of generally, who were the folks that were there?

8    A.   A group of representatives from the Backpage executive team

9    and a lawyer.   And then a number of faith leaders.   The

10   Reverend Dr. Katharine Henderson, the president of Auburn; our    13:57:50

11   executive vice president, the Reverend John Vaughn; and a of

12   couple other faith leaders that signed the letter.   Bishop Gene

13   Robinson.   The Reverend Donna Schaper as well.

14   Q.   Okay.   And the -- the folks on the Auburn side, so to

15   speak, the faith leaders, were they all religious faith leaders   13:58:07

16   of some kind?

17   A.   Yes.   It was a diverse group.

18   Q.   Okay.   And I said you don't have to tell me the names of

19   the folks who were there, but when we talk about the Backpage

20   folks, can you name who you recall being there?                    13:58:19

21   A.   Yes.   I recall a lawyer.   I believe that was Ed McNally.

22   Mike Lacey and Jim Larkin.   And I believe there was one other

23   person.

24   Q.   And do you see any of those folks in the courtroom here

25   today?                                                             13:58:35

1    A.  I do.

2    Q.  Who do you see in the courtroom today?

3    A.  I see Mike Lacey.

4    Q.  Okay.  Can you please -- and if you need to stand up to do

5    so, that's fine.  Could you please identify Mike Lacey in the          13:58:45

6    courtroom by an article of clothing that he's wearing and

7    approximately where he's sitting.

8    A.  He's wearing a white shirt and has one of those ties that's

9    like a -- got a -- like a line tie.  I don't know what they

10   call it.  Excuse me.  I'm from New York.                               13:59:01

11   Q.  A bolo tie?

12   A.  A bolo tie.

13   Q.  All right.

14   A.  And black glasses.

15         MR. BERRY:  All right.  Would the record please               13:59:09

16   reflect that the witness has identified the defendant, Mike

17   Lacey?

18         THE COURT:  It may.

19         MR. BERRY:  Thank you.

20   BY MR. BERRY:                                                          13:59:17

21   Q.  Now, if you would, please explain to the jury the demeanor

22   that you observed of the Backpage folks when you all got in the

23   room together.

24   A.  I think everybody was nervous.  And they were, too.  They

25   seemed ready to get down to business.                                  13:59:31

```
 1    Q.  Did you all shake hands?
 2    A.  We all did, yes.
 3    Q.  Was it jovial?  Businesslike?  What was it like?
 4    A.  No.  It was not -- it was very businesslike.  It was not
 5    jovial or warm.                                                  13:59:47
 6    Q.  Okay.  If you would, just kind of set the stage and explain
 7    to the jury, where's everybody sitting in this room?
 8    A.  We're sitting around a square -- large square set of
 9    tables.  Religious leaders on one side, and the Backpage
10    representatives were invited to take a seat across from them.    14:00:03
11    Q.  And where were you sitting in this room?
12    A.  I was sitting off to the side.
13    Q.  Okay.  Were there any other folks like you that were
14    sitting off to the side?
15    A.  No.                                                          14:00:18
16    Q.  So you've got the -- the big wigs at the table, and Isaac
17    Luria is sitting on the side?
18    A.  Exactly right.  Yes.
19    Q.  All right.
20    A.  Yeah, that's right.                                          14:00:28
21    Q.  Did you clearly see and hear everything that took place in
22    that meeting?
23    A.  I did.  I was actually supposed to take notes, so I did
24    that.
25    Q.  Okay.  Were you nervous in the beginning?                    14:00:38
```

1    A.   I was.

2              MR. CAMBRIA:   Object to the relevancy of --

3              THE COURT:   Overruled.

4    BY MR. BERRY:

5    Q.   So once everyone was seated, what happened next?          14:00:53

6    A.   Katharine opened with a prayer that we might be able to

7    listen to one another and keep the kids that we were advocating

8    for at the center of our conversation.   Then -- should I keep

9    going or --

10   Q.   Let's stop there for just a second.                        14:01:14

11             Let's -- we've talked about the ad and the article and

12   the desire to have this meeting and the -- the things that were

13   said in those ads.

14             Was -- was the purpose of this meeting the same in

15   terms of trying to get Backpage to shut down the adult section?  14:01:31

16   A.   Yes.

17   Q.   That was the point?

18   A.   The point was to get them to reconsider their ways and to

19   shut down Backpage, yes.

20   Q.   Okay.  And we're going to talk about that without getting   14:01:40

21   too religiousy, if we can, if you understand my meaning about

22   that.

23   A.   I'll do my best.

24   Q.   Okay.  So there was a prayer.  And then who started talking

25   for Backpage?                                                    14:02:01

```
 1    A.   Jim Larkin.

 2    Q.   Okay.  And what were the things that he was saying?

 3    A.   He was going over with a prepared statement the arguments

 4    for why Backpage was actually a good thing to have in the

 5    world, because it would be able to help law enforcement catch      14:02:18

 6    people who were selling children for sex or prostituting

 7    children.

 8    Q.   You said he read a prepared statement?

 9    A.   He did.

10    Q.   Did he talk about content moderation?                         14:02:35

11    A.   He did.

12    Q.   Did he talk about working with law enforcement?

13    A.   Yes.

14    Q.   And did he make an argument for why they should not shut

15    down the site?                                                     14:02:52

16    A.   Yes.  He thought it was both a free speech issue and a good

17    thing that they -- they had a relationship with law

18    enforcement.

19    Q.   Then after the -- did the Backpage folks say anything more

20    at -- in the beginning in that part of it, in their               14:03:09

21    presentation?

22    A.   They said other things about their religious commitments,

23    but I'm going to try not to be too --

24    Q.   They talked about their religious commitment?

25    A.   Yes.  Jim Larkin talked about the fact that he was a          14:03:21
```

```
 1   Catholic.

 2   Q.  Okay.  And then after that was done, what happened next?

 3   A.  We responded to the opening statement with -- and

 4   Bishop Gene Robinson, who was the one who took the mic for us,

 5   and he communicated that under no circumstances would we be          14:03:40

 6   comfortable with a website that allowed child sex trafficking

 7   or child prostitution to happen.

 8   Q.  Okay.  And that message was communicated to --

 9   A.  Yes.

10   Q.  -- Mr. Lacey and the others?                                     14:03:59

11          Is that a yes?

12   A.  Yes.

13   Q.  Sorry.

14          And if you would, just let me finish my question

15   before you answer.  I -- I get it.  You know what I'm trying to      14:04:06

16   get at.

17   A.  Okay.

18   Q.  That way the court reporter can get us down sequentially

19   and the record looks clear.

20          Is that okay?                                                 14:04:15

21   A.  Okay.

22   Q.  Thank you.

23          While the bishop was -- was making the -- the Auburn

24   side of the argument about why they should shut this site down,

25   did -- did you observe anything about Mr. Lacey?                     14:04:26
```

UNITED STATES DISTRICT COURT

```
 1           MR. CAMBRIA:  Object to the leading.
 2           THE COURT:  Overruled.
 3   BY MR. BERRY:
 4   Q.  You can answer --
 5   A.  Yes.
 6   Q.  -- the question.
 7           I'm sorry?
 8   A.  Yes, I did observe something about Mr. Lacey.
 9   Q.  What did you observe?
10   A.  That he was growing increasingly agitated.
11   Q.  Did he do anything as the bishop was talking?
12   A.  Yes.  He -- he ended up interrupting the bishop and
13   beginning to express his views.
14   Q.  And, if you would, please explain to the jury what were
15   those views that he was articulating?
16           MR. FEDER:  Relevance.
17           THE WITNESS:  He would --
18           MR. FEDER:  Hearsay.
19           THE COURT:  Overruled.
20           THE WITNESS:  He was frustrated that we were having
21   this meeting.  He didn't understand why religious leaders would
22   stick their noses in his -- in Backpage's business, and that he
23   also said something to the effect of adults -- consenting
24   adults can do what consenting adults want to do.  Why would you
25   stop them?
```

14:04:35
14:04:40
14:05:06
14:05:14
14:05:38

UNITED STATES DISTRICT COURT

```
 1    BY MR. BERRY:
 2    Q.  And what did you take that to mean when he said that --
 3              MR. CAMBRIA:  Object.
 4    BY MR. BERRY:
 5    Q.  -- based upon the overall conversation?              14:05:50
 6              MR. BERRY:  I think Mr. Cambria had an objection.
 7              MR. CAMBRIA:  It's not relevant.
 8              THE COURT:  Okay.  I was waiting for the -- I was
 9    waiting for the basis --
10              MR. CAMBRIA:  Well --                           14:05:58
11              THE COURT:  -- for the objection.  I'll sustain.
12    BY MR. BERRY:
13    Q.  Did you -- based upon the whole tenor of the conversation,
14    the lead-up to the meeting, everything that had been said up to
15    that point, when he said that, were you able to draw a         14:06:10
16    conclusion about what you -- what you understood him to be
17    trying to convey to everyone in that room?
18              MR. CAMBRIA:  That's objected to.
19              THE COURT:  Overruled.
20              MR. CAMBRIA:  Calls for a conclusion.  That's why.  14:06:25
21              MS. BERTRAND:  It's also speculative.
22              THE COURT:  It was -- well, the question's calling for
23    his --
24              MR. CAMBRIA:  Yeah.
25              THE COURT:  -- experience and his opinion as to what  14:06:34
```

UNITED STATES DISTRICT COURT

```
 1   he saw.
 2           MR. CAMBRIA:  It's calling for a conclusion.
 3           THE COURT:  Yes.
 4           MR. CAMBRIA:  And speculation.
 5           THE COURT:  Overruled.                              14:06:40
 6           MR. FEDER:  And relevance.
 7           THE COURT:  Overruled.
 8       Do you need to reask the question or have the court
 9   reporter read it back?
10           MR. BERRY:  I think I'll be okay, but let's check with 14:06:46
11   Mr. Luria.
12   BY MR. BERRY:
13   Q.  Do you understand what my question was about were you able
14   to draw a conclusion --
15   A.  Yes.                                                    14:06:53
16   Q.  -- about what he meant, what you understood him to mean?
17   A.  Yes.
18   Q.  Please explain that.
19   A.  It wasn't just my conclusion.
20   Q.  Well, let's only talk about yours.                      14:06:59
21   A.  My conclusion was that he believed prostitution was
22   occurring on the website and that that was legitimate.
23           MR. CAMBRIA:  Object to that and move that it be
24   struck.
25           THE COURT:  Overruled.                              14:07:17
```

BY MR. BERRY:

Q.  At any point did -- while Mr. Lacey was talking, did
Mr. Larkin do anything?

A.  Mr. Larkin attempted to get Mr. Lacey to stop talking.

Q.  How did the meeting ultimately end?                          14:07:30

A.  We engaged in dialogue for a few more -- you know, 10 or
20 more minutes.  At that -- after Mr. Lacey's remarks,
Bishop Robinson engaged him again and said:  I'm not talking
about right now.  I'm not talking about prostitution between
adults.  I'm talking about the prostitution of children.  Can't   14:08:04
we agree that that's out of bounds?

Q.  And what was their response to that?

A.  This is what we're doing with law enforcement.  This is how
we're trying to stop that.

Q.  Did -- was there ever an ultimate ask of Backpage during      14:08:20
that meeting?

A.  Yes, to shut down the site.

Q.  And what was the response of -- of Mr. Lacey or Mr. Larkin?

A.  No.

Q.  I'm sorry?                                                    14:08:39

A.  The answer was no.

Q.  No what?

A.  I will not -- they will not shut down the site.

        We also asked if they would shut down the site while
we were in dialogue as well, and they also said no.              14:08:49

1   Q.  Explain that to the jury.

2   A.  Well, we felt urgently that every day unconscionable acts

3   were happening on the platform on Backpage, and if they would

4   shut it down while we engaged in dialogue.

5           MR. FEDER:  Relevance.  Move to strike as                      14:09:07

6   nonresponsive.

7           MR. BERRY:  I asked him to explain it.

8           MR. FEDER:  His explain is irrelevant.

9           THE COURT:  Overruled.

10  BY MR. BERRY:                                                          14:09:16

11  Q.  You can keep explaining.

12          Do you need me to --

13  A.  That if we were able to get Backpage shut for any period of

14  time, that that would be a victory.

15  Q.  And they said?                                                     14:09:24

16  A.  No.

17  Q.  In the days and weeks following the meeting, did you have

18  an opportunity to observe the website Backpage again?

19  A.  Yes.

20  Q.  And what did you observe?                                          14:09:37

21  A.  That it was online and continuing to operate.

22  Q.  Had they made any changes that you could discern?

23  A.  Not that I noticed.

24  Q.  Did you learn anything about the traffic reports on the

25  site?                                                                  14:09:54

1   A.   Yes.

2   Q.   Explain that to the jury.

3   A.   One of the things that we monitored was how much traffic

4   the site was getting, and that helped us understand how many

5   ads were being posted on the site.                                    14:10:05

6           MS. BERTRAND:   Your Honor, objection.   Lack of

7   foundation.   Hearsay.

8           THE COURT:   Overruled.

9   BY MR. BERRY:

10  Q.   You may keep going.                                              14:10:13

11  A.   And we believed that, based on traffic reports, that

12  traffic was going up for the site.

13  Q.   It was actually going up?

14  A.   Correct.

15  Q.   And the site was not shut down?                                  14:10:21

16  A.   Correct.

17  Q.   Did you and Auburn take any additional actions after the

18  meeting?

19  A.   Yes.

20  Q.   What actions did you all take?                                   14:10:36

21  A.   We sent letters to Backpage representatives immediately

22  after the meeting summarizing our arguments and asking and

23  pleading with them to shut down the site.   They responded also

24  with letters of their own written by their lawyer in which they

25  shared with us -- with us.                                            14:10:59

1    Q.  You don't have to get into what this is they're saying, but

2    there were continued exchanges?

3    A.  Yes.

4    Q.  Okay.  Meaning additional actions.  I mean, did -- did your

5    campaign against Backpage, did you all take any additional          14:11:10

6    actions?

7    A.  We did.

8    Q.  Explain that to the jury.

9    A.  We continued throughout the end of the winter and early

10   spring to collect petitions from the general public to --          14:11:19

11   asking Backpage to -- and Village Voice Media at the time was

12   the owner of Backpage, for Village Voice Media to shut down

13   Backpage.

14   Q.  Did you do anything to target advertisers with Village

15   Voice?                                                              14:11:35

16   A.  We did.  Following the delivery of the petitions to the

17   Village Voice headquarters --

18          MR. EISENBERG:  Objection, Your Honor, as to the

19   relevance of this.  It doesn't go to notice.

20          MR. BERRY:  If I could be heard?                             14:11:47

21          THE COURT:  I'm going to overrule.

22   BY MR. BERRY:

23   Q.  You may go ahead.

24   A.  We delivered petitions to Village Voice headquarters in

25   New York with a rally of about 75 people and faith leaders.  We    14:11:55

```
 1    put boxes of petitions outside their office doors and stacked

 2    kids' shoes, the shoes of children, outside the door to

 3    symbolize the people that had been sold for sex on Backpage.

 4           Following that, we initiated -- because we did not

 5    receive a positive outcome.  You know, there was no -- the      14:12:22

 6    Backpage continued to operate.  We began to speak to

 7    advertisers on Village Voice Media properties informing them

 8    that Backpage was providing a platform for prostitution of

 9    children and that they should know about that.  Those

10    advertisers like Best Buy --                                    14:12:45

11           MR. EISENBERG:  Same objection, Your Honor.  Excuse

12    me.  Same objection.  It doesn't go to notice.  This is a

13    political --

14           THE COURT:  Overruled.

15    BY MR. BERRY:                                                   14:12:53

16    Q.  You may keep going.

17    A.  Advertisers included Target, Best Buy, a number of

18    airlines.  And when informed, a number of them actually pulled

19    their advertising.

20           We decided to do that because we knew that only          14:13:04

21    financial pain for the company would choose -- would have them

22    choose to shut down this site.

23           MR. BERRY:  If I could have just a second.

24           THE COURT:  You have about two more minutes before we

25    take our break.                                                 14:13:22
```

```
 1          MR. BERRY:  Perfect.  I think I'm done.  Just give me

 2   one second.

 3          Pass the witness, Your Honor.

 4          THE COURT:  All right.  Well, since we're on -- at

 5   that stage, the witness may step down for our afternoon break.   14:13:40

 6          And, members of the jury, just remember the

 7   admonition.  We'll be on our 20-minute afternoon break.  And

 8   then hopefully we aim to get out promptly at 4:00 so that we

 9   can beat all of that traffic.

10          So please all rise for the jury.                          14:13:57

11          2:35.

12          THE COURT:  Sir, you may step down.

13      (Recess from 2:13 p.m. to 2:33 p.m.)

14      (Jury not present at 2:33 p.m.)

15          THE COURT:  Before we have the witness in,              14:33:58

16   Mr. Eisenberg.

17          MR. EISENBERG:  Thank you, Your Honor.

18          Your Honor, I am going to address the Court with

19   respect to this testimony by Mr. Luria, and it's in the context

20   of now we've gotten beyond what Your Honor has ordered with      14:34:16

21   respect to what can happen with this witness and what he can

22   testify to and what I believe has now been a -- the jury has

23   been prejudiced, highly prejudiced by this testimony.

24          First I'm going to start with what Mr. Luria quoted

25   the bishop, I think it's Bishop Robinson, saying at the meeting  14:34:39
```

```
 1    where he says:  I'm -- I am not talking about adult

 2    prostitution.  I am talking about child prostitution.

 3           And that is an element of this case that, I believe,

 4    the Court has painstakingly directed the government to avoid.

 5           The next thing that happened was now we're beyond the     14:35:01

 6    meeting.  And outside of that meeting later on, I think the

 7    testimony of Mr. Luria was that they were doing up petitions.

 8    That must be the seminary was doing up petitions against

 9    Backpage.  And they put shoes of children outside the door.  I

10    assume that's the door, perhaps, of where Backpage is located.   14:35:23

11           So children has now been mentioned twice with respect

12    to this case, and the jury has heard it.  And I believe that's

13    highly prejudicial to the point where we have a tainted jury.

14           The next thing he said was, "We spoke to advertisers

15    to try to get them," I believe in the context of taking their   14:35:44

16    business away from Backpage.

17           Whatever that has to do with notice, which is what I

18    think Auburn was originally offered for, is way beyond a

19    notice, and now we're getting into the advocacy of the seminary

20    in terms of what they are trying to do.                          14:36:03

21           Well, that's not the issue for this jury, but they've

22    been advised by the seminarian that prostitution was taking

23    place, including child prostitution.

24           So I think we've come to the point, Your Honor, where

25    the jury's tainted.                                              14:36:20
```

1          THE COURT:  All right.  Mr. Berry?

2          MR. BERRY:  Thank you, Your Honor.

3          With regard to what he said about the bishop trying to

4     articulate a distinction between adult prostitution and child

5     prostitution, Mr. Luria used the word prostitution.  And that's          14:36:37

6     what's the critical point here, is that whether it had to do

7     with children, force, not forced, independent, not independent,

8     with a pimp, the case is about prostitution, and he used the

9     word prostitution.  He didn't use the world child sex

10    trafficking, which is arguably more problematic.          14:36:56

11         But really importantly at this point, Your Honor, I

12    think the defendants' motion with regard to this issue have

13    been dramatically undermined by the 101 exhibits that they

14    moved into evidence in the cross-examination of Mr. Ferrer.

15         I'm happy to brief and articulate this for the Court,          14:37:16

16    but there are dozens of instances in the exhibits that they

17    introduced and admitted at trial that reference child sex

18    trafficking, juveniles, juveniles being rescued, pimps, things

19    like that.  At this point, Your Honor, the defense has now

20    admitted as much, if not more evidence with regards to child          14:37:38

21    sex trafficking than the United States has, and we think that

22    argument is now moot.

23         But the bottom line is what Mr. Luria said was the

24    word prostitution, and that's what the statute says.

25         THE COURT:  Well, I'll make my ruling.  And we'll          14:37:53

UNITED STATES DISTRICT COURT

1    continue on because my recollection of this witness's

2    testimony, in fact, I think also included the fact that

3    Mr. Lacey, Mr. Larkin were expressing to them, we'll help in

4    any way we can, law enforcement, with regard to children.  So

5    it undercuts that notion in my -- in my view, which is really          14:38:20

6    irrelevant, but I think it's fair to say that the -- some of

7    the jurors could see it that way as well.

8            And so, to that point, I don't think it's my

9    conclusion that the witness's testimony has tainted the jury at

10   this point.  And there's been cumulative evidence to show that,        14:38:50

11   indeed, they were communicating and publishing to the world

12   that they were communicating with law enforcement.

13           But let me move to a different point here.  So your

14   objection is noted.  I didn't hear you move for a mistrial, but

15   that's the inference that I drew.                                       14:39:18

16           MR. EISENBERG:  And I intended to do that, Your Honor.

17           THE COURT:  And so I'm not going to grant that --

18           MR. EISENBERG:  Right.

19           THE COURT:  -- based on what I view the -- the

20   witness's testimony to be so far.                                      14:39:26

21           MR. CAMBRIA:  Could I make one comment about that

22   issue before you move to the next one?

23           THE COURT:  Yes.

24           MR. CAMBRIA:  Yeah.

25           THE COURT:  Quickly.                                           14:39:35

ISAAC LURIA - DIRECT EXAMINATION

1    MR. CAMBRIA:  Two things:  In all the exhibits that
2  were moved in, there was no accusation that Backpage was
3  committing any kind of child trafficking.  That's number 1.
4  And -- and so there's -- that's a vast difference.

5    Here that's exactly what this witness is saying their    14:39:55
6  mission was, is to communicate to Backpage that they were, in
7  fact, trafficking children.  And then they talk about putting
8  all the little shoes and so on, which is very emotional,
9  very -- very much prejudicial, Your Honor.  I say that as a
10  father of six girls.  I know that bothers me that they would --   14:40:18
11  you know, just that optic.  And that's the difference.

12    There was no accusation against us in any of these
13  at -- attaboys, if you will, that were put in under -- that the
14  exhibit he was talking about, 100 -- 101, I think it was, as
15  opposed to now, as to what he's saying here now.    14:40:39

16    He clearly said that they accused Backpage of that,
17  and then the demonstrative was the shoes and so on to make it
18  even more visually prejudicial.  That's the difference.

19    THE COURT:  Well, and I'll remind defense counsel that
20  I think it was Mr. Lincenberg, and everyone joined in, who said   14:40:59
21  no more correcting curative instruction to this jury that none
22  of our clients are charged with child trafficking.

23    And so you've made your position known on that.  I was
24  inclined to raise it at this juncture because of the one
25  statement he made about the shoes at the door, but we're beyond   14:41:21

 1    that now.

 2             And so your objection is noted and my ruling stands.

 3             MR. CAMBRIA:  Could I comment on the Lincenberg thing?

 4    That's because no instruction could undo the situation.

 5             THE COURT:  Well --                              14:41:40

 6             MR. CAMBRIA:  No instruction could eliminate the

 7    prejudice.

 8             THE COURT:  Well, I disagree, and I will give the

 9    instruction at the end of the trial.

10             Now, let me just raise one other point -- or, no.  Let  14:41:46

11    me just have the jury in, because I'll raise it at the end of

12    the day.  And so let's have the witness on the stand and the

13    jury in.

14             All rise for the jury.

15        (Jury present at 2:42 p.m.)                           14:42:39

16             THE COURT:  All right.  Please be seated.

17             And the witness -- excuse me.  I'm sorry.  The record

18    will reflect the witness is on the stand and the jury is

19    present.

20             And, Mr. Cambria, you may continue.               14:43:18

21             MR. CAMBRIA:  Thank you.

22                          CROSS-EXAMINATION

23    BY MR. CAMBRIA:

24    Q.  Good afternoon, Mr. Luria.

25    A.  Good afternoon.                                        14:43:27

                      UNITED STATES DISTRICT COURT

```
 1    Q.  Is it fair to say that each side, so to speak, was quite

 2    passionate about their beliefs; in other words, all the

 3    religious people and then Mr. Larkin, Mr. Lacey, the First

 4    Amendment people?

 5    A.  At the -- at the meeting?                              14:43:43

 6    Q.  Yes.

 7    A.  Yes.

 8    Q.  Okay.  And I can't hear, so I have to put these babies on.

 9    A.  Okay.

10    Q.  And so there was a degree of e- -- of emotion at that    14:43:54

11    particular meeting, was there not?

12    A.  Yes.

13    Q.  I mean, the religious leaders 100 percent believe in what

14    they believe in.  Fair to say?

15    A.  Yes.                                                     14:44:11

16    Q.  And clearly Mr. Larkin, Mr. Lacey are passionate about

17    their First Amendment, and so on; correct?

18    A.  I'm not sure I would agree.

19    Q.  Okay.  Well, they obviously were talking about their

20    beliefs, were they not?                                     14:44:28

21    A.  They were, but they had a financial interest.

22    Q.  Well, so did you.  So do the religious leaders.

23          Don't the religious leaders --

24    A.  In what sense?

25    Q.  Don't the religious leaders ask for money?              14:44:39
```

ISAAC LURIA - CROSS-EXAMINATION
80

```
 1    A.  To help people.

 2    Q.  That's obviously what the goal is; correct?  But they,

 3    nevertheless, ask for money, don't they?

 4    A.  I don't see the comparison at all.

 5    Q.  That wasn't the question.                                    14:44:56

 6         The question is that they request for money by

 7    religious organizations all the time; isn't that true?

 8         MR. BERRY:  Objection.  Asked and answered.

 9         THE COURT:  Overruled.

10    BY MR. CAMBRIA:                                                  14:45:07

11    Q.  Isn't that true?

12    A.  Technically, yes.

13    Q.  Okay.  As a matter of fact, in some of the communications

14    here that dealt with Backpage, wasn't there also an area on

15    there where you could -- where you were soliciting for money?   14:45:25

16    A.  Yes.

17    Q.  So religious leaders obviously also ask for money for

18    things they believe in emotionally; correct?

19         THE COURT:  Mr. Cambria, I'm sorry.  I'm going to have

20    to have you use the microphone.                                 14:45:44

21         MR. CAMBRIA:  Stay here?

22         THE COURT:  Yes.

23         MR. CAMBRIA:  Okay.  Sorry.

24    BY MR. CAMBRIA:

25    Q.  True?                                                       14:45:50
```

UNITED STATES DISTRICT COURT

ISAAC LURIA - CROSS-EXAMINATION

```
 1   A.  The comparison to beliefs in prostitution you're making

 2   is --

 3   Q.  Well, that's your opinion; correct?

 4   A.  No.

 5   Q.  Okay.  Well, at this meeting was there a discussion about    14:45:56

 6   the number of Catholic priests that have committed crimes

 7   against young people?

 8   A.  There was.

 9   Q.  Ah.  And, of course, that's serious, is it not?

10   A.  It is.                                                       14:46:11

11   Q.  Did you take out an ad in the New York Times about that?

12   A.  We did not.

13   Q.  No.

14        Well, you know for a fact that that happened; correct?

15   A.  Yes.                                                         14:46:22

16   Q.  And by religious people of all individuals?

17   A.  Yes.

18   Q.  And, still, that didn't motivate any of your religious

19   leaders there to take out an ad in the New York Times and

20   complain about it?                                               14:46:36

21   A.  I think there's a difference in the systemic --

22   Q.  I'm sure --

23   A.  -- financial --

24   Q.  -- you do.

25        But nobody has done that, have they?                       14:46:44
```

UNITED STATES DISTRICT COURT

1    A.  I mean, not -- I just -- again, I don't think the

2    comparison is fair.

3    Q.  I -- fine.

4         The question was, has anybody done that?  Anybody

5    criticized their own for things that actually happened?    `14:46:54`

6    A.  That -- in that room, absolutely people criticized --

7    Q.  Okay.

8    A.  -- their own.

9    Q.  Did you take out an ad, or did you just keep it in the

10   room?                                                       `14:47:04`

11   A.  We -- they've published op-eds.  They've said so in

12   closed-door meetings.  They've done lots.

13        I mean, if you knew these leaders, you wouldn't be

14   saying this.

15   Q.  Okay.  Well, the point is that there are -- isn't there an   `14:47:14`

16   old saying about cast the first stone?

17   A.  Yes.

18   Q.  Okay.  Well, let's get back to this.

19   A.  Shockingly.

20   Q.  You said -- it is.                                       `14:47:29`

21        You set this meeting up, and the point of the meeting

22   was supposedly to have a dialogue between the religious leaders

23   and the people at Backpage to discuss an issue; correct?

24   A.  Uh-huh.

25   Q.  And your --                                             `14:47:47`

```
 1              THE COURT:  Is that a yes?
 2    BY MR. CAMBRIA:
 3    Q.  -- side --
 4              THE COURT:  Please answer yes or no.
 5              THE WITNESS:  Yes.  Excuse me.                    14:47:52
 6              MR. CAMBRIA:  Oh, they don't have an uh-huh key on the
 7    typer, or whatever.
 8    BY MR. CAMBRIA:
 9    Q.  So, anyway, the point was to have a meeting and see whether
10    or not differences could be resolved; true?               14:48:04
11    A.  If we could convince them that Backpage should be shut
12    down.
13    Q.  Okay.  Were you familiar with the fact that when the adult
14    section of Craigslist was shut down that it was a negative and
15    not a positive?                                            14:48:21
16              MR. BERRY:  Objection.  Foundation.
17              THE COURT:  Sustained.
18              MR. CAMBRIA:  I'm asking if he's familiar with it.
19              MR. BERRY:  Objection to the form.
20              THE WITNESS:  Your definition of negative and         14:48:30
21    positives haven't been communicated.
22              MR. BERRY:  Let him rule -- let the judge rule.
23    BY MR. CAMBRIA:
24    Q.  I'm going to --
25              THE COURT:  Wait.  There was an objection.  Let me    14:48:38
```

ISAAC LURIA - CROSS-EXAMINATION

84

```
 1    rule.
 2             I sustain the objection.
 3             MR. CAMBRIA:  Okay.
 4    BY MR. CAMBRIA:
 5    Q.  Are you familiar with the fact that when Craigslist took       14:48:43
 6    down their adult section that the ads migrated to other areas
 7    on Craigslist?
 8    A.  Yes.
 9    Q.  Okay.  And you --
10    A.  I'm sorry.  I'm not familiar with the migrating to other       14:49:03
11    areas of Craigslist.  I am to Backpage, yes.
12    Q.  Okay.  Well, we're talking about Craigslist now.  I'm
13    asking you -- because Backpage hadn't shut down the adult
14    section.  Craigslist did.
15             You know that; right?                                     14:49:16
16    A.  Uh-huh.
17    Q.  Did you --
18    A.  Yes.
19    Q.  -- know that then?
20    A.  Yes.                                                           14:49:19
21    Q.  Okay.  And did you follow up as to whether or not that was
22    a good thing or a bad thing?
23    A.  We considered it in our discussions and believed that
24    ultimately it would be better if Backpage were to shut down.
25    Q.  That's not the question.  The question was, you knew about     14:49:29
```

UNITED STATES DISTRICT COURT

ISAAC LURIA - CROSS-EXAMINATION

85

```
 1   Craigslist.  You knew they shut down the adult section.
 2           And the question was, did you know that that turned
 3   out to be a negative thing?
 4           MR. BERRY:  Objection.  Foundation.
 5           THE WITNESS:  I don't know that.              14:49:45
 6   BY MR. CAMBRIA:
 7   Q.  You don't.  Okay.
 8           THE COURT:  I'll sustain the objection, but the answer
 9   may stay.
10           Go ahead.                                     14:49:53
11           MR. CAMBRIA:  Thank you.
12   BY MR. CAMBRIA:
13   Q.  Do you recall that you were interviewed by an FBI agent?
14   A.  Yes.
15   Q.  All right.  And they created a typed?             14:50:02
16   A.  Yes.
17   Q.  Yeah.  And you reviewed that, did you not?
18   A.  I've been shown it, but I don't -- I have not reviewed it
19   recently.
20   Q.  Well, when they showed it to you, did you close your eyes  14:50:13
21   or something?
22   A.  Could I see the document in question?
23   Q.  No.  I'm just asking you a question.
24           Did you review it?
25   A.  They scrolled quickly through it a couple of months ago.   14:50:24
```

UNITED STATES DISTRICT COURT

ISAAC LURIA - CROSS-EXAMINATION

86

```
 1   Q.  I see.  Well, do you recall that you said that you got the
 2   impression that Lacey did not object to adult prostitution?
 3            MR. BERRY:  Objection, Your Honor.  You can't impeach
 4   with another person's statement.
 5            MR. CAMBRIA:  This was his statement.                    14:50:55
 6            MR. BERRY:  This witness --
 7            THE COURT:  Well, a --
 8            MR. BERRY:  -- has not identified -- adopted the
 9   agent's report.
10            MR. CAMBRIA:  Oh, all right.                             14:51:01
11            THE COURT:  I'm going to --
12            MR. CAMBRIA:  I'll take care of it.
13            THE COURT:  I'll sustain.
14            MR. CAMBRIA:  I'll do it.
15            THE COURT:  Mr. Cambria, let's not talk over one         14:51:06
16   another.  Okay?
17            MR. CAMBRIA:  I apologize, Your Honor.
18            THE COURT:  All right.  Thank you.
19   BY MR. CAMBRIA:
20   Q.  You reviewed that statement, did you?                        14:51:11
21   A.  I -- I did a few months ago.
22   Q.  All right.  Did you disagree with what was in there, what
23   they said you said?
24   A.  There were some issues with the timeline, and I -- I said
25   that -- said so at the time.                                     14:51:25
```

UNITED STATES DISTRICT COURT

```
 1    Q.  All right.  Just the timeline?
 2    A.  I'm not sure if that's the full -- I mean, I'd love to see
 3    the document.  I feel like it's being hidden from me.
 4    Q.  Who's hiding it from you?
 5    A.  Well, I asked for it, and I haven't received it.          14:51:35
 6    Q.  Because I'm still asking you questions about your memory.
 7         When you reviewed the statement, did you point out
 8    anything other than the timeline?
 9    A.  Not that I recall.
10    Q.  Okay.  Do you recall saying that you got the impression   14:51:49
11    that Mr. Lacey was okay with adult prostitution?
12    A.  I believe I said that, yes --
13    Q.  All right.
14    A.  -- but I'm not -- again, I would like to see the document.
15    Q.  All right.  But my -- the next question, though, is this:  14:52:06
16    You're not claiming that he made a statement like that.  You
17    said that was your impression; correct?
18    A.  It was the thrust of his arguments in the meeting.
19    Q.  But you used the word "impression," did you not?
20    A.  I don't know if that was my word or the agent's word.     14:52:22
21    Q.  Okay.  Now, but you didn't -- you just told us that you
22    didn't object to anything except the timeline.
23    A.  Again, the phrasing of the sentence could mean that the
24    agent said that or I did, and I'd like to see the sentence.
25    Q.  Okay.  Do you recall objecting to anything but the        14:52:38
```

 1  timeline?

 2  A.  I don't think so, no.

 3  Q.  Okay.  Now, next thing.  You had a -- an agreement that

 4  there was going to be a meeting between several religious

 5  leaders and people from Backpage; correct?                    14:52:55

 6  A.  Yes.

 7  Q.  All right.  And you had set that up.  And there was how

 8  many religious organizations that were originally going to be

 9  part of that?

10  A.  There were, I believe, 16 signatories, all of whom signed  14:53:05

11  in personal capacities, not organizational capacities.

12  Q.  Okay.  And so originally the agreement with the Backpage

13  people was that all those religious leaders were going to show

14  up?

15  A.  That was not the agreement.  That's what they wanted.      14:53:23

16  Q.  All right.  What was the agreement?

17  A.  There was not an agreement to have a meeting that included

18  all of them.  We said we would have representatives join us.

19  Q.  All right.  How many were there?

20  A.  I believe there were four, maybe -- no, there were five.  I  14:53:37

21  believe there were five.

22  Q.  Out of 16?

23  A.  Correct.

24  Q.  Okay.  And that meeting, the religious leaders had an

25  attorney with them, did they not?                             14:53:50

```
 1   A.  To protect against --
 2   Q.  I'm not asking that.
 3           The question is, did they have an attorney with them?
 4   A.  Yes.  Absolutely.
 5   Q.  All right.  And now you want to tell us to protect what?        14:54:00
 6   A.  Are you asking a question?
 7   Q.  Yes.
 8   A.  What's -- what's the question?  I'm sorry.
 9   Q.  All right.  Let's start this way:  The religious leaders
10   were there, and they had their own attorney; correct?             14:54:12
11   A.  Yes.
12   Q.  All right.  And Mr. Lacey and Larkin were there, and they
13   had their attorney --
14   A.  Yes.
15   Q.  -- correct?                                                    14:54:19
16           All right.  And do you remember his name?
17           MR. BERRY:  Objection.  Irrelevance about the
18   attorney, Your Honor.
19           THE COURT:  Sustained.
20           MR. CAMBRIA:  Irrelevant?                                  14:54:31
21           MR. BERRY:  And prior order.
22   BY MR. CAMBRIA:
23   Q.  All right.  But there's no denying that there were
24   attorneys there from both sides?
25   A.  Yes.                                                           14:54:41
```

```
 1    Q.  All right.  Now, did there come a time when the religious
 2    people put out a statement, if you will, about Backpage to
 3    advertisers?
 4    A.  Yes.
 5    Q.  And was there a request by the Backpage attorney,         14:54:59
 6    Mr. McNally, that their, meaning Backpage's, response to your
 7    letter be sent to these people as well?
 8    A.  Yes.
 9    Q.  And one of the things that your religious group indicates
10    that they stand for is transparency; right?                   14:55:26
11    A.  I'm not sure where you got that word.
12    Q.  Well, religiously, if you're religious leaders, are they
13    transparent, this group --
14    A.  I mean, it's --
15    Q.  -- that you're of?                                        14:55:42
16    A.  It's a value that religious folks have, sure.
17    Q.  Okay.  And they want to be open and honest; correct?
18    A.  Yes.
19    Q.  Okay.  And so when you submitted your letter, if you will,
20    to various advertisers, Backpage said, well, we would like to 14:56:01
21    submit our response to that --
22            MR. BERRY:  Objection.
23    BY MR. CAMBRIA:
24    Q.  -- right?
25            MR. BERRY:  Hearsay.                                  14:56:11
```

UNITED STATES DISTRICT COURT

ISAAC LURIA - CROSS-EXAMINATION
91

```
 1              THE COURT:  Sustained.
 2   BY MR. CAMBRIA:
 3   Q.  You were there to hear that?
 4              THE COURT:  Well, sustained.
 5   BY MR. CAMBRIA:                                        14:56:15
 6   Q.  Were you specifically contacted by Mr. McNally asking you
 7   to distribute Backpage's response to your letter?
 8              MR. BERRY:  Again, objection.  Hearsay.  Hearsay as to
 9   what Mr. McNally asked or said.
10              THE COURT:  Sustained.                      14:56:32
11   BY MR. CAMBRIA:
12   Q.  Were you asked to distribute a letter --
13   A.  What --
14   Q.  -- answering your allegations in what you submitted?
15              MR. BERRY:  Again.  Objection.  Same.        14:56:43
16              MR. CAMBRIA:  How could that be --
17              THE COURT:  Overruled.
18              He could answer yes or no.
19              MR. CAMBRIA:  Thank you.
20              THE WITNESS:  Yes, we were asked --          14:56:50
21   BY MR. CAMBRIA:
22   Q.  All right.
23   A.  -- that.
24   Q.  And did that happen?
25   A.  No.                                                14:56:53
```

UNITED STATES DISTRICT COURT

```
 1   Q.  And you were -- you were the one asked to do it; correct?
 2   A.  I communicated that interest to the team that was working
 3   on it, and no one felt that we needed an addendum on our views.
 4   Q.  Well, how about a clarification on your views?
 5   A.  Why would we do that from --                                    14:57:12
 6   Q.  Maybe to --
 7   A.  -- our side?
 8   Q.  -- get to the truth.
 9   A.  We had enough information to make good judgments about what
10   was occurring on the site.                                         14:57:21
11   Q.  So somebody else's difference of opinion you disregarded?
12   A.  This is not a difference of opinion.  It's a statement of
13   fact.
14   Q.  That's your position.
15   A.  Were children being prostituted on Backpage?                   14:57:31
16   Q.  Yeah, the -- the letter that they wanted to submit
17   basically went down chapter and verse answering your letter,
18   did it not?
19   A.  It did.
20   Q.  It did.                                                        14:57:47
21          And the decision was made by you and others not to
22   give the others that you sent your letter to the benefit of the
23   other side; correct?
24   A.  Correct.
25   Q.  And, in fact, didn't you suggest, well, why don't you          14:58:00
```

UNITED STATES DISTRICT COURT

```
 1   communicate with them yourselves?

 2   A.  They had every right to.

 3   Q.  But that's what you suggested; right?

 4   A.  They were their advertisers.

 5   Q.  I understand.                                        14:58:12

 6   A.  It's their business --

 7   Q.  That's not my question.

 8   A.  -- partners.

 9        THE COURT:  All right.  Please do not speak over one

10   another.                                                 14:58:17

11        Listen to the question carefully and answer it if you

12   can.

13   BY MR. CAMBRIA:

14   Q.  So the question was, you indicated to Mr. McNally that if

15   they want to communicate, they should do it themselves;    14:58:31

16   correct?

17   A.  Yes.

18   Q.  All right.  And then you were asked, okay, can we have a

19   list of the people that you communicated with; right?

20   A.  We said no.  Yes.                                    14:58:44

21   Q.  And you said -- you said yes.

22        You gave them a partial list, didn't you?

23   A.  At -- yes, it was a partial list.

24   Q.  Yeah.  And didn't they point out to you that they thought

25   California and Colorado were left off the list?          14:58:59
```

```
 1            MR. BERRY:  Objection.  Hearsay.
 2            THE COURT:  Sustained.
 3    BY MR. CAMBRIA:
 4    Q.  Well --
 5    A.  Yes.                                              14:59:07
 6    Q.  -- all right.
 7            THE COURT:  Okay.  Well --
 8    BY MR. CAMBRIA:
 9    Q.  So --
10            THE COURT:  -- let me -- we've lost a little control   14:59:11
11    here this afternoon.
12            Listen to the question.  Answer it if you can.  When
13    there's an objection, please let me rule, and then --
14            THE WITNESS:  Okay.
15            THE COURT:  -- we can continue from there.  All right?  14:59:22
16            MR. BERRY:  Your Honor, if I could?
17            Mr. Luria's obviously not a lawyer.
18            THE COURT:  Yes.
19            MR. BERRY:  Perhaps it would be helpful if you
20    explained what you mean when you say "sustained" or          14:59:29
21    "overruled."
22            THE COURT:  All right.  I thought maybe you had
23    covered that with him.
24            MR. BERRY:  I thought I did, but maybe I didn't.
25            THE COURT:  All right.  When I sustain an objection,   14:59:37
```

```
 1    that means don't say anything else.  If I overrule the
 2    objection --
 3              THE WITNESS:  Okay.
 4              THE COURT:  -- you may answer it.  Okay?
 5              THE WITNESS:  Okay.                           14:59:46
 6              THE COURT:  And if you need to have the question
 7    repeated to you because that exchange has occurred, I
 8    completely understand.  You may ask to do that.
 9              THE WITNESS:  Okay.
10              THE COURT:  All right.  And Mr. Cambria promises not  14:59:53
11    to speak over you when you're answering.
12              MR. CAMBRIA:  Hand to God.
13    BY MR. CAMBRIA:
14    Q.  Question:  So the list that you gave them wasn't complete,
15    was it?                                                 15:00:05
16    A.  Yes.
17    Q.  It was?
18    A.  I'm sorry.  It was not complete.
19    Q.  Not.
20              And they pointed out that they believed that  15:00:11
21    California and Colorado were left off the list; correct?
22    A.  Yes.
23    Q.  And you said, well, the reason for that is when you were
24    putting the list together, your mother-in-law got in a car
25    accident, hit a deer, and you couldn't -- you didn't put the --  15:00:24
```

 the list together?

A. I made an error. Yes.

Q. Yeah. But that's what you said. She hit a deer, and that's the reason why two were left out; correct?

A. Yes. 15:00:38

Q. Okay. So then eventually what happened is your letter went out, and their letter responding did not go to all the same organizations; correct?

A. Yes.

Q. Now, of the religious leaders who were there that day, to your knowledge, have any of them participated with law enforcement authorities to investigate abuse, sexual abuse, whether it be men, women, or so on? 15:01:03

MR. BERRY: Objection. Foundation and relevance.

THE COURT: Sustained. 15:01:33

BY MR. CAMBRIA:

Q. Well, my question is, to your knowledge, did anyone in that room have experience with working with law enforcement to fight crime involving prostitution?

MR. BERRY: Objection. Relevance. 15:01:49

THE COURT: Overruled.

MR. CAMBRIA: It's completely --

THE COURT: He may answer if he can.

BY MR. CAMBRIA:

Q. You can answer that, please. 15:01:56

1   A.  I'm thinking back to the group.  They have a variety of

2   different community experience.  Some had experience working

3   with law enforcement as pastors on the street.  Some had

4   experience working with particularly trans youth, who are often

5   trafficked.  A number of them worked with -- over the years of          15:02:14

6   their ministry with different communities that had experienced

7   sexual violence.

8           So, yeah, there were a number of people who had -- who

9   had experience.

10  Q.  Do you know if any of them had provided records to law             15:02:26

11  enforcement authorities that helped them fight

12  prostitution-type crimes?

13  A.  I'm -- I don't know about that.

14  Q.  Do you know whether or not any of them have appeared as

15  fact witnesses in trials to help?                                       15:02:43

16  A.  I don't know.

17  Q.  Do you -- have you at any time learned of the numbers of

18  subpoenas that Backpage has responded to for police authorities

19  in connection with investigations?

20  A.  I did receive some of that information during this effort.          15:03:06

21  Q.  Okay.

22  A.  I don't remember it offhand.

23  Q.  All right.  And how about did you receive any information

24  about how many times people from Backpage testified for the

25  prosecution?                                                            15:03:23

```
 1              MR. BERRY:  Objection.  Relevance.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  I don't remember specifically.

 4    BY MR. CAMBRIA:

 5    Q.  But you remember that you were given that information.  You    15:03:37

 6    just don't remember the specifics?

 7    A.  Specific details, no, I don't.

 8    Q.  No.  Okay.

 9              Do you know whether or not some of the membership --

10    how many religious organizations were represented that day when    15:03:57

11    the Backpage people came up?

12    A.  I think 12 different organizations.  But it was a mix of

13    them, and it's hard to be specific.  There were denominations

14    which were different than, obviously, individual churches.

15    Q.  Okay.  Were any of them representatives of Catholic            15:04:20

16    churches?

17    A.  No.

18    Q.  No.

19              Were -- did you -- do you know whether or not -- do

20    you know who the Episcopal church and leader was who was at        15:04:31

21    that meeting?

22    A.  Well, there were two leaders.  Bishop Gene Robinson was the

23    leader who spoke on behalf of us.  But the other Episcopal

24    leader on the letter, Bishop Schori, was not present, and she

25    led the Episcopal church at that time.                             15:04:50
```

ISAAC LURIA - CROSS-EXAMINATION
99

```
 1   Q.   Did you know that Bishop Schori had hired in her church an
 2   admitted child molester priest?
 3   A.   I did hear --
 4              MR. BERRY:  Objection.
 5              THE WITNESS:  I did hear --                              15:05:04
 6              MR. CAMBRIA:  We need the answer.
 7              MR. BERRY:  Relevance.
 8              MR. CAMBRIA:  Very relevant.
 9              MR. BERRY:  Prejudicial.  It doesn't pertain to this
10   case.                                                              15:05:13
11              THE COURT:  Sustained.
12              MR. CAMBRIA:  I can't ask that question?
13              THE COURT:  I sustained the objection, Mr. Cambria.
14              MR. CAMBRIA:  Okay.
15   BY MR. CAMBRIA:                                                    15:05:21
16   Q.   Well, here.  Let me ask you this question:  Of the group
17   that was there that day, do you know if any of them had filed a
18   public protest against the leader of that Episcopal church?
19              MR. BERRY:  Again, objection.  Relevance.
20              THE COURT:  Sustained.                                  15:05:41
21   BY MR. CAMBRIA:
22   Q.   So is it your belief that the people who showed up there
23   that day representing various religious organizations were in
24   some way immune from criticism for activities that might have
25   happened in their churches --                                     15:05:58
```

UNITED STATES DISTRICT COURT

```
 1              MR. BERRY:  Objection.
 2   BY MR. CAMBRIA:
 3   Q.  -- that were against the law?
 4              MR. BERRY:  Objection.  Compound question.
 5              THE COURT:  As to the form of the question, sustained.    15:06:05
 6              Mr. Cambria, you can re- -- rephrase.
 7              MR. CAMBRIA:  Your Honor, I'd like to ask that.  He
 8   responded to the question that I asked and with regard to the
 9   former Catholic priest at the Episcopal, and I wanted to follow
10   that up to see if they did anything about it.                       15:06:33
11              THE COURT:  Well, rephrase the question.  It was
12   compound, so --
13   BY MR. CAMBRIA:
14   Q.  Well, we established, did we not, that the Episcopal church
15   had hired a priest who was a pedophile?                             15:06:45
16              MR. BERRY:  Objection.  That issue was sustained by
17   the Court.
18              THE COURT:  It was sustained.
19              MR. CAMBRIA:  I'm asking that we revisit then, Your
20   Honor.  I think it's relevant to see if they did anything about    15:06:55
21   it.
22              MR. BERRY:  Objection.  Asked and answered.
23              THE COURT:  It has been asked and answered,
24   Mr. Cambria.  And I sustained the objection, so let's move on.
25              MR. CAMBRIA:  Okay.                                      15:07:08
```

```
 1    BY MR. CAMBRIA:

 2    Q.  Are you familiar with -- I'm sorry.  I may have asked this

 3    already.  I'm starting to turn the corner here, I guess.

 4          Are you -- I -- are you familiar -- are you familiar

 5    with the fact that if a website is something that's offshore,      15:07:27

 6    not under the jurisdiction of the United States authorities,

 7    that process cannot be served on them?

 8          MR. BERRY:  Objection.  Foundation.  Compound.

 9          THE COURT:  Well, I think he -- he can answer yes or

10    no because it's calling for whether he's familiar with the         15:07:50

11    subject.  So if he can answer -- he can answer yes or no if he

12    is.

13          THE WITNESS:  Yes.

14    BY MR. CAMBRIA:

15    Q.  And so if, for example, in Craigslist's situation the adult    15:08:01

16    section was shut down and that traffic went to an overseas

17    platform, a subpoena wouldn't do any good, would it?

18          MR. BERRY:  Objection.  Relevance.

19          THE COURT:  Sustained.

20    BY MR. CAMBRIA:                                                     15:08:56

21    Q.  Are you familiar with any of the statistics of NCMEC?

22          Do you know what NCMEC is?

23    A.  Yes.

24    Q.  All right.  Are you familiar with whether or not

25    organizations like Facebook have reported 20 million incidents     15:09:11
```

```
 1    of in- -- situations involving children and criminal acts?

 2    A.  I'm familiar that Facebook reported them, but I don't know

 3    the number specifically.

 4    Q.  Well, it was a very significant number.

 5    A.  Significant, yes.                                              15:09:34

 6    Q.  Yes.

 7         And has this group that was having a discussion with

 8    Backpage, have they met with anybody from Facebook to see

 9    whether or not there's certain portions of Facebook that should

10    be shut down?                                                      15:09:56

11              MR. BERRY:  Objection.  Relevance.

12              THE COURT:  Overruled.

13              THE WITNESS:  We did not.  We were focused on

14    Backpage.

15    BY MR. CAMBRIA:                                                    15:10:05

16    Q.  Okay.  And how about TikTok?  You know that TikTok has also

17    reported over 20,000 incidents involving children?

18    A.  I don't know if TikTok was around when I was working on

19    this.

20    Q.  Okay.  What other groups were around when you went -- that    15:10:18

21    had high report numbers to NCMEC?

22    A.  I'm not sure.  I'd have to look at the report again.

23    Q.  But there were others, were there not?

24    A.  There were.

25    Q.  And did your group contact any of them and see whether or     15:10:30
```

```
1   not they should change the way they operate?
2   A.  Our intent was to ensure that --
3   Q.  That's not the question.
4   A.  -- Backpage --
5   Q.  The question is, did you contact any of them to discuss        15:10:43
6   that their ways of operating should be changed?
7   A.  We coordinated with other groups who did.
8   Q.  Oh, okay.  What -- and so what groups, then, did you ask to
9   change their protocols or change the way they operated?
10  A.  We coordinated with the National Center for Missing and        15:11:03
11  Exploited Children, who talked with us about the most important
12  threats to kids being trafficked, and they identified Backpage.
13  Q.  Yeah.  But, also, it -- Backpage was nothing compared to
14  the reports from Facebook.
15  A.  We appreciated the expertise of the leading organization on    15:11:21
16  the issue.
17  Q.  Well, Facebook was over 20 million, wasn't it?
18  A.  Again, I don't have the statistics in front of me.
19  Q.  And Facebook, you know, is a million-dollar-plus
20  contributor to NCMEC?                                              15:11:34
21          You know that?
22  A.  Did not.
23  Q.  Did not.
24          And they're -- TikTok, multimillion-dollar
25  contributor.                                                       15:11:43
```

UNITED STATES DISTRICT COURT

1          Did you know that?

2     A.  I did not.

3          MR. BERRY:  Objection to foundation and relevance,

4     Your Honor.

5          MR. CAMBRIA:  I asked him if he knew.                    15:11:48

6          THE COURT:  Sustained.

7     BY MR. CAMBRIA:

8     Q.  Have you ever gone on the website of Backpage -- I'm sorry.

9     Not Backpage -- of Facebook?

10    A.  Yes.                                                      15:12:06

11    Q.  All right.  Have you typed in the word -- the letters GFE?

12    A.  Ah, no.

13    Q.  No.

14          Have you typed in female escort?

15    A.  No.                                                       15:12:19

16    Q.  No.

17          Were you aware of a substantial number of law

18    enforcement agencies thanking Backpage for their assistance in

19    fighting crime involving adults, children, sexual activities?

20    A.  I was aware that some congratulated, but I was also aware  15:12:58

21    of the Attorneys General who thought that Backpage should shut

22    down.

23    Q.  Yeah.  But the Attorney General didn't ask for records and

24    fight crime in the streets like the law enforcement agencies

25    do, did they?                                                 15:13:15

ISAAC LURIA - CROSS-EXAMINATION
105

```
 1              MR. BERRY:  Objection to foundation and relevance.

 2   BY MR. CAMBRIA:

 3   Q.  Well, that's common knowledge, is it not?

 4              THE COURT:  I'm going to sustain the objection.

 5              MR. CAMBRIA:  Okay.  That's all I have.              15:13:24

 6              THE COURT:  All right.  Ms. Bertrand?

 7              MS. BERTRAND:  I have nothing of this witness.  Thank

 8   you.

 9              THE COURT:  Mr. Panchapakesan?

10              MR. PANCHAPAKESAN:  Nothing, Your Honor.            15:13:37

11              THE COURT:  Mr. Feder or Mr. Kessler?  Mr. Feder?

12              MR. FEDER:  No, thanks.

13              THE COURT:  Mr. Eisenberg?

14              MR. EISENBERG:  Yes, Your Honor.

15                           CROSS-EXAMINATION                     15:13:48

16   BY MR. EISENBERG:

17   Q.  Mr. Luria, good afternoon.

18   A.  Good afternoon.

19   Q.  I represent the gentleman to my left, Mr. Padilla.

20              He wasn't at that meeting that you talked about --  15:13:54

21   A.  Correct.

22   Q.  -- correct?

23   A.  Yes.

24   Q.  He -- yes, he wasn't?

25   A.  He was not at the meeting.                                15:14:00
```

UNITED STATES DISTRICT COURT

1   Q.  All right.  Thank you, sir.

2        I'm going to follow up just a little bit on what my

3   colleague, Mr. Cambria, asked you about, TikTok and Facebook,

4   so it's going to be very defined.

5        First, when did you leave Auburn?                     15:14:14

6   A.  The end of 2015.

7   Q.  Okay.  Do you still maintain any kind of relationship with

8   the people there or the seminary itself?

9   A.  I do.

10  Q.  Do you know since you have left Auburn whether the seminary  15:14:29

11  has approached TikTok with respect to the issue of its content?

12  A.  I do not.

13  Q.  Same question with respect to Facebook.  And, again, I'll

14  just put it in context.

15       Do you know whether the seminary since you have left     15:14:47

16  has contacted Facebook with respect to its content?

17  A.  I do not.

18  Q.  And do you know -- well, are you currently associated, sir,

19  with any seminary or religious organization?

20  A.  Define "associated."                                    15:15:03

21  Q.  Yeah.  Work for.  A member of.

22       How about that?  A member of?

23  A.  No.

24       MR. EISENBERG:  Okay.  Thank you, Your Honor.

25       THE COURT:  All right.  Yes, Mr. Berry, you may          15:15:14

UNITED STATES DISTRICT COURT

```
 1      redirect.
 2                         REDIRECT EXAMINATION
 3      BY MR. BERRY:
 4      Q.  Mr. Luria, you were asked some questions by Mr. Cambria
 5      about how both sides in this meeting were passionate.            15:15:48
 6             Do you remember that?
 7      A.  I do.
 8      Q.  And you started to give an answer that's saying, I'm not
 9      sure I would agree, and then you weren't permitted to finish
10      that.                                                            15:16:01
11             Would you please explain what you meant by that.
12      A.  I think one of us, one group entered the room, particularly
13      the religious leaders, passionate about how to protect children
14      from online prostitution, and the other group was trying to
15      protect their business interests.                                15:16:16
16      Q.  And then Mr. Cambria was asking you questions about how
17      Backpage is trying to make money and the religious leaders are
18      asking people for money.  And you said, "I don't see the
19      comparison."
20             And you weren't really allowed to finish that thought.    15:16:36
21      Would you explain what you were thinking there.
22      A.  I think if --
23             MR. FEDER:  Excuse me.  Relevance.  Hearsay.
24             THE COURT:  Overruled.
25         ///
```

1    BY MR. BERRY:

2    Q.  You may answer.

3    A.  I think there is a significant difference between running a

4    business that facilitates the prostitution of children and

5    earning money off of that and raising money to achieve justice        15:16:59

6    in your community and to prevent that from happening.  I'm

7    proud of every dollar we raised to stop the scourge of

8    Backpage.

9    Q.  And the money that your organization, when you were at

10   Auburn, raised, what -- what were you all trying to do with          15:17:16

11   that money when you raised it?

12          MR. CAMBRIA:  Object to relevance.

13          THE COURT:  Overruled.

14   BY MR. BERRY:

15   Q.  You can answer.                                                   15:17:26

16   A.  To support the work of the staff doing research on the

17   issue; to meet with people who had been through, you know,

18   prostituting themselves on Backpage so we could learn about

19   what was happening; to maintain the websites that supported our

20   petitions; to contact media organizations to get the word out;      15:17:47

21   to produce online videos so that we could share this kind of

22   information with more people.

23   Q.  You were also asked questions about Catholic priests

24   committing crimes against young people and how you all didn't

25   take out an ad in the New York Times about that.                     15:18:22

1          Do you remember that line of questioning?

2   A.  Yes, I do.

3   Q.  And you started to say, "I think there is a difference,"

4   and you don't think the comparison is fair.

5          Could you please explain that.                              15:18:33

6   A.  Well, everybody who commits a crime should be held

7   accountable.  And today we're here to talk about the

8   accountability of Backpage.  And that was what we were trying

9   to do in our campaign.  There was a systemic effort to earn

10  money.                                                             15:18:49

11         MR. FEDER:  Objection.  It goes beyond the scope and

12  is irrelevant.

13         THE COURT:  Overruled.

14         Mr. Cambria probed it in his questioning, so -- but

15  let's move forward, Mr. Berry, and ask a new question.            15:19:03

16         MR. BERRY:  Okay, Your Honor.

17  BY MR. BERRY:

18  Q.  You were asked a question about a decision was made to not

19  provide Backpage's argument that they supplied to Auburn to

20  give to the advertisers.                                          15:19:47

21         Do you remember that line of questioning?

22  A.  I do.

23  Q.  Could you please explain why Auburn chose not to forward on

24  Backpage's defense.

25  A.  I mean, have you ever attached a counter-opinion to your     15:20:01

```
 1    opinions when you've shared them?

 2              I mean, I think it's a ridiculous idea.

 3    Q.  Why?

 4    A.  That counter-opinion was defending the prostituting of

 5    children, and that was exactly what we were fighting against.    15:20:14

 6              MR. CAMBRIA:  That's objected to.

 7              MS. BERTRAND:  Objection.  Misstates the opinion.

 8              THE COURT:  I'm going to sustain the objection and ask

 9    the jury to disregard the answer.

10              MR. FEDER:  Move to strike, too.                       15:20:31

11              THE COURT:  And it will be stricken.

12    BY MR. BERRY:

13    Q.  During the -- Mr. Cambria was asking you several questions

14    about the meeting and things that took place and was said

15    during that meeting.                                             15:20:45

16              Do you remember those different --

17    A.  Yes.

18    Q.  -- questions about the meeting?

19    A.  Yes.

20    Q.  Okay.  Do you remember whether Mr. Larkin or Mr. Lacey ever  15:20:49

21    told you guys about a website called The Erotic Review?

22              MR. CAMBRIA:  Your Honor, object.  Outside the scope.

23              THE COURT:  Sustained.

24    BY MR. BERRY:

25    Q.  You were asked questions about whether Auburn ever met with  15:21:22
```

1    anybody from Facebook or some of these other --

2    A.   Yes.

3    Q.   -- online social media platforms.

4          Do you remember that?

5    A.   Yes.                                                    15:21:30

6    Q.   And you started to give an answer where you said, "Our

7    intent," and then you weren't permitted to -- to finish.

8          Could you please finish that thought.

9    A.   After consulting with numerous partners who worked on this

10   issue, we were all united -- unanimous that addressing          15:21:44

11   Backpage --

12          MR. CAMBRIA:  Object for the hearsay.

13          THE COURT:  Overruled.

14          MR. BERRY:  Could we read back what he was saying so

15   he could finish his thought.                                    15:22:04

16      (Record read.)

17   BY MR. BERRY:

18   Q.   You could finish.

19   A.   -- that addressing Backpage would be our top priority, that

20   it would influence other actors in the space to not do what      15:22:24

21   Backpage was doing.

22   Q.   You were asked questions about the back-and-forth letters

23   between Auburn and the Backpage representatives.

24          Do you remember that?

25   A.   Yes.                                                       15:22:37

ISAAC LURIA - REDIRECT EXAMINATION                112

 1   Q.  And Mr. Cambria was asking you several questions along the

 2   lines of that back and forth?

 3   A.  Yes.

 4   Q.  Okay.  In any of that back and forth, did they ever mention

 5   The Erotic Review?                                            15:22:50

 6   A.  No.

 7             MS. BERTRAND:  Objection.  Same objection as --

 8   outside the scope of cross and relevance.

 9             THE COURT:  Sustained.

10             MR. BERRY:  No further questions, Your Honor.        15:23:01

11             THE COURT:  All right.  May the witness be excused

12   from the government --

13             MR. BERRY:  Yes, Your Honor.

14             THE COURT:  -- subpoena?

15             Any objection to being released from subpoena by     15:23:08

16   defense?

17             All right.

18             MR. FEDER:  No, Your Honor.

19             THE COURT:  All right.  Thank you, sir.

20             THE WITNESS:  Thank you.                             15:23:16

21             THE COURT:  Your testimony is complete.  You are

22   released from your subpoena, and you may step down from the

23   witness stand.

24             The government may call its next witness.

25             Who is the next witness?                            15:23:33

```
 1            MR. KOZINETS:  The next witness is Mickey Hansen.

 2            MR. EISENBERG:  I'm sorry.  Who?

 3            MR. CAMBRIA:  Who's next?

 4            MR. KOZINETS:  Mickey Hansen.

 5            THE COURT:  All right.  Sir, please come forward and    15:23:49

 6    be sworn by the courtroom deputy.

 7            THE COURTROOM DEPUTY:  Please raise your right hand.

 8        (MICKEY HANSEN, a witness herein, was duly sworn or

 9    affirmed.)

10            THE COURTROOM DEPUTY:  If you'd please step over to      15:24:01

11    the witness stand, and make sure you speak into the microphone.

12            THE COURT:  Do you need a moment, Liliana, to retrieve

13    the exhibits?

14            All right.  Give Liliana just one moment.

15            MR. KOZINETS:  May we begin, Your Honor?               15:24:45

16            THE COURT:  Yes, you may.

17            MR. KOZINETS:  Thank you.

18                        DIRECT EXAMINATION

19    BY MR. KOZINETS:

20    Q.  Good afternoon, Mr. Hansen.  I'm Peter Kozinets, one of the  15:24:50

21    attorneys for the United States here.

22            Can you please state your name for the record.

23    A.  Sure.  My name is Mickey Hansen.

24    Q.  And can you spell your first and last name, please.

25    A.  M-I-C-K-E-Y.  Last name is H-A-N-S-E-N.                    15:25:03
```

UNITED STATES DISTRICT COURT

1    Q.   Thank you.

2         And where do you live?  Where do you live?

3    A.   I live in Phoenix, Arizona.

4    Q.   And do you work in Phoenix?

5    A.   I do.                                              15:25:15

6    Q.   And where do you work?

7    A.   I work for American Express.

8    Q.   Did you attend school here in Arizona?

9    A.   I did.  I have a bachelor's degree in industrial

10   engineering and an MBA from Arizona State University.   15:25:30

11   Q.   Thank you.

12        And how old are you, sir?

13   A.   I'm 55.

14   Q.   And you mentioned that you work for American Express.

15        How long have you worked there?                    15:25:38

16   A.   I've worked for American Express for 26 years.

17   Q.   And what is your current title?

18   A.   I am the vice president of Global Acquisition Capabilities.

19   Q.   Can you briefly describe what American Express is.

20   A.   American Express is a financial services company.  Most  15:25:57

21   predominantly most people associate it with a company that

22   issues charge and credit cards to cardholders.  And then we

23   also do acquisition directly and indirectly of merchants where

24   those card members can use their cards to purchase services and

25   products.                                               15:26:18

```
 1    Q.  Thank you.

 2            And you told us your -- your title.  How long have you

 3    been in your current position for?

 4    A.  I've been in my current role approximately 15 years.

 5    Q.  All right.  And that would cover the years 2015 to 2018?        15:26:29

 6    A.  Yes.

 7    Q.  And what does your unit do?

 8    A.  We manage relationships with third-party partners who

 9    acquire merchants on our behalf for acceptance of the American

10    Express card.                                                      15:26:49

11    Q.  And does your unit also have a merchant oversight role as

12    well?

13    A.  We do.  My organization, we -- we set up partners.  We

14    oversee them to ensure that they are overseeing the merchant

15    that they acquire on their behalf to meet the program rules and    15:27:04

16    requirements that we set forth.

17            MR. KOZINETS:  I'd like to show the witness only

18    Exhibit 475.

19    BY MR. KOZINETS:

20    Q.  Mr. Hansen, do you see anything on the screen in front of      15:27:35

21    you?

22    A.  I do.

23    Q.  Do you recognize it?

24    A.  Yes.  This is our American Express Merchant Reference Guide

25    from April of 2015.                                                15:27:44
```

1    Q.  What is the American Express Merchant Reference Guide?

2    A.  These are the rules and regulations for acceptance of a --

3    as a merchant.  The rules that you must abide by to meet the

4    American Express requirement.

5              JURY PANEL MEMBER:  We can see the screen.                    15:28:01

6              THE COURT:  Oh.  I'm sorry?

7              JURY PANEL MEMBER:  We can see the exhibit on the

8    screen.

9              THE COURT:  Oh, okay.  All right.  Can he move the

10   screen?                                                                 15:28:13

11             No.  The other way.

12             MR. BERRY:  They don't want to see.

13             THE COURT:  Thank you, jurors.  You are very diligent.

14   I appreciate it.

15   BY MR. KOZINETS:

16   Q.  So are these basically rules that apply to the merchants

17   who participated in the American Express system?

18   A.  Correct.

19   Q.  And this set of rules here, what is the date on this?

20   A.  April 2015.                                                         15:28:35

21   Q.  Were these rules the same rules that were in effect from

22   2015 to 2018?

23   A.  They were.  They are.

24             MR. KOZINETS:  I move to admit this exhibit.

25             MR. PANCHAPAKESAN:  No objection.                             15:28:55

                    UNITED STATES DISTRICT COURT

```
 1              THE COURT:  It may be admitted, and it may be
 2   published.
 3              (Exhibit 475 admitted into evidence.)
 4              MR. KOZINETS:  Thank you, Your Honor.
 5   BY MR. KOZINETS:
 6   Q.  We're now displaying on this screen the purchase reference
 7   guide that you just described.  And I'd like to direct your
 8   attention to page 16 of the guide.
 9              Do you see that in front of you?
10   A.  I do.                                                        15:29:26
11   Q.  And what is reflected on this page?
12   A.  The -- it's titled the prohibited uses of the card.
13   Q.  And what are -- what is sort of the -- the concept, the
14   purpose of having these prohibited uses as set forth here?
15   A.  It outlines prohibitions for using the American Express     15:29:44
16   card as a merchant.  You must not do these -- do these things.
17   Q.  Okay.  I'd like to direct your attention to the tenth
18   bullet point.  And I'll locate it for you.
19              Do you see that there, sir?
20   A.  I do.                                                        15:30:08
21   Q.  And what is it that this bullet point covers?
22   A.  It covers prohibition of use -- of doing anything that's
23   unlawful or illegal or would be fraudulent-type transactions.
24   And then it gives some examples of -- of what those are as to
25   be illustrative, not all-inclusive.                             15:30:29
```

```
 1    Q.  So accepting payment, for instance, for unlawful or illegal

 2    activities is something that merchants are prohibited from

 3    doing --

 4    A.  Correct.

 5    Q.  -- under this rule?                                      15:30:38

 6    A.  Correct.

 7    Q.  And there is a -- a final item here.

 8          Do you see this one here, sir?

 9    A.  I do.

10    Q.  And what does it say?                                    15:30:54

11    A.  "Other items of which we notify the merchant."

12    Q.  And what is this prohibition or rule meant to cover?

13    A.  This gives us the ability if there's anything that a

14    merchant is doing that we would perceive as an impact or a risk

15    to our brand, that we have the right to cancel that merchant or  15:31:10

16    to end our relationship with them.

17    Q.  I see.

18          MR. KOZINETS:  And I'd like to take this down for --

19    for now.

20    BY MR. KOZINETS:

21    Q.  Sir, are you familiar with the website Backpage.com?

22    A.  I am.

23    Q.  How did that website come to your attention?

24    A.  In approximately 2014, we were made aware --

25          MR. CAMBRIA:  I object.  Hearsay.                      15:31:55
```

```
 1              THE COURT:  Overruled.

 2    BY MR. KOZINETS:

 3    Q.  You may continue.

 4    A.  Okay.

 5              In approximately 2014, there was a human -- human        15:32:02

 6    trafficking symposium in New York, and they had reached out to

 7    American Express and -- and asked if we were aware that we

 8    allowed acceptance at Backpage.com.  They were insinuating that

 9    they breached that or they were involved in human trafficking,

10    prostitution.                                                      15:32:29

11              And so at that time we evaluated our relationship with

12    Backpage.com as a merchant.

13    Q.  So, just to be clear, this -- this is how -- it was in

14    connection with this forum that you first heard about

15    Backpage.com?                                                      15:32:43

16    A.  Yes.  Yes.

17    Q.  And how -- how specifically was this brought to your

18    attention?  Did -- was this relayed to you?  Did a committee

19    ask you to look into this?

20    A.  So they did.  They have -- reporters and others were          15:32:56

21    reaching out to our public affairs asking if we knew if -- if

22    we were aware of our --

23              MS. BERTRAND:  Objection.  Hearsay.

24              THE COURT:  Overruled.

25    BY MR. KOZINETS:
```

```
 1    Q.  You may continue.
 2    A.  -- if we were -- we were aware of our acceptance at this
 3    merchant.
 4          And then we have a Merchant Evaluation and
 5    Cancellation Committee where we review internally merchants for    15:33:19
 6    potential infractions of our rules to determine whether we want
 7    to continue our relationships with them.
 8    Q.  Let's for a quick second talk about that committee, the
 9    Merchant Evaluation Cancellation Committee.
10          Who generally sits on that committee at American          15:33:36
11    Express?
12    A.  So we have a -- the general managers for the different
13    business units who manage merchant relationships.  I'm on there
14    as one of the folks who manages our indirect merchant
15    relationships.                                                  15:33:53
16    Q.  And how often does the committee meet?
17    A.  It meets periodically.  Usually every two to three months.
18    Q.  So did there come a time when the committee asked you
19    specifically to review Backpage.com?
20    A.  Yes.  It came up on our next meeting after -- after that     15:34:10
21    notification or that reach-out from the reporters.  And so at
22    that point we reviewed the content on Backpage.com for
23    potential violation or risk to American Express.
24    Q.  And did you -- so approximately what time -- approximately
25    when did you start to look at Backpage?                         15:34:36
```

1   A.   That would have been November of 2015.

2   Q.   2015 or --

3   A.   Oh, sorry.  '14.  2014.

4   Q.   2014; correct?

5   A.   Yes.                                                    15:34:48

6   Q.   Okay.  And so at that time did you personally look at the

7   website with your own eyes?

8   A.   I did.

9   Q.   And did you see anything there that raised any concerns

10  regarding the American Express system?                      15:34:59

11  A.   We did.  Myself and then other members of that committee as

12  we looked at it, their -- the language for the ads in the

13  adults services section could be -- could insinuate that it had

14  other services besides dating and escort, potentially

15  prostitution and those type of activities.                  15:35:21

16  Q.   What was it -- was there anything specifically about these

17  ads that gave rise to these concerns that --

18  A.   It was just the -- the implied nature of many of them that

19  implied that you could get those type of services, which we

20  were uncomfortable with.                                    15:35:41

21  Q.   "Those type of services" being?

22  A.   Prostitution.

23  Q.   And do you recall when you looked at the site yourself, the

24  volume of these types of ads that gave rise to these concerns

25  in the adult section?                                       15:35:55

1  A.  There was several in that section.  But I didn't look at

2  the entire section to do kind of a survey, so I wouldn't be

3  able to tell you what the overall volume of it was.

4  Q.  Okay.

5  A.  But enough that we knew that we saw it across that adult          15:36:09

6  sec- -- services section pretty frequently.

7  Q.  You saw those ads across the adult services section?

8  A.  Yes.

9  Q.  And in -- at least such a -- such a volume that gave rise

10 to this concern that you're now articulating?                        15:36:25

11 A.  It did.

12 Q.  So when -- so did you report back to the committee?

13 A.  We did.  As a committee, we voted to cancel our

14 relationship with Backpage.com based on that.

15           And then so I reached out to --                            15:36:46

16 Q.  Well, let me --

17 A.  Okay.

18 Q.  -- stop you right there.

19           So was this at a committee meeting that occurred in

20 2014?                                                                15:36:55

21 A.  It was.  In November 2014.

22 Q.  November 2014.

23           And so a decision was made to terminate Backpage for

24 all terms --

25 A.  Yes.                                                             15:37:04

1   Q.  -- with respect -- okay.

2          So not to have any American Express acceptance by

3   Backpage for any reason whatsoever?

4   A.  Correct.

5   Q.  All right.  So what happened next?  I mean, did -- were you          15:37:14

6   tasked with conveying that decision to American Express?

7   A.  Yes.  So I reached out to Jetpay, which is our partner who

8   acquired Backpages -- Backpage.com for American Express

9   acceptance.  I spoke with the owner, Trent Voigt, and

10  instructed him that that's what we would like to do.          15:37:35

11         He asked if -- if we could hold off on cancelling.  He

12  would like to set up a -- a call with himself and with the CEO

13  of Backpage.com, Carl Ferrer, to walk through their processes

14  before we took that action.

15  Q.  Okay.  And did you then talk with Mr. Ferrer?          15:37:51

16  A.  I did.

17  Q.  And did he -- what did he share with you about -- you know,

18  in an effort to -- to change your mind or to change American

19  Express's mind?

20  A.  He shared what their internal policies and practices are          15:38:14

21  for evaluating ads in the adult -- adult section as well as

22  shared several articles and publications of where they had

23  worked with law enforcement to -- to take down prostitution

24  rings who had placed ads through that -- through that section.

25  Q.  Through the adult section --          15:38:36

1    A.   Adult section --

2    Q.   -- on Backpage?

3    A.   -- yes.

4    Q.   So did -- let's talk about the articles for a second.

5            So the articles that he provided, basically, I think          15:38:43

6    it's your testimony that they discussed investigations or

7    pros- -- prosecutions involving ads on Backpage?

8    A.   Correct.

9    Q.   And the nature of those investigations or pros- -- or

10   prosecutions dealt with what sort of activity?                         15:39:06

11   A.   As I recall, the majority of them were prostitution rings,

12   where they would then set up stings based on those ads and

13   people answering those.

14   Q.   So did Mr. Ferrer sharing these articles with you allay

15   your concerns about the nature of these ads that you reviewed          15:39:28

16   on Backpage?

17   A.   It did not.   It did not lessen our concerns that this was

18   occurring on those ads.

19           MR. CAMBRIA:   Asked and answered, Your Honor.

20           THE COURT:   Overruled.                                        15:39:45

21           THE WITNESS:   The ads in the adult section that --

22   that prostitution could be what they were advertising because

23   they --

24           MR. CAMBRIA:   Calls for a yes-or-no answer, Your

25   Honor.                                                                 15:39:58

```
 1            THE COURT:  Well, do you want to -- I've lost track,
 2   Mr. Cambria --
 3            MR. CAMBRIA:  Yeah.
 4            THE COURT:  -- because you were speaking over the
 5   witness.                                                      15:40:04
 6            MR. CAMBRIA:  I had to.
 7            THE COURT:  So let's -- let's ask the next question --
 8            MR. KOZINETS:  Okay.
 9            THE COURT:  -- Mr. Kozinets.
10            MR. KOZINETS:  Thank you, Your Honor.                 15:40:15
11   BY MR. KOZINETS:
12   Q.  So you were explaining that these articles didn't alleviate
13   your concerns?
14   A.  No, they did not.
15   Q.  And why is that?                                          15:40:24
16   A.  They supported some of our concern that the ads potentially
17   were for prostitution at times, and so that we were
18   uncomfortable with that being a possibility.
19   Q.  Okay.  Now, you said that he also shared certain
20   information about controls or things that they were doing in   15:40:47
21   this area as well; correct?
22   A.  That is correct.
23   Q.  And did his description of their internal process or
24   controls, did that alleviate your concerns about the nature of
25   what was being advertised here, of what you were seeing on the 15:41:07
```

UNITED STATES DISTRICT COURT

1    website?

2    A.  It did not.

3    Q.  And why is that?

4    A.  Because with those controls, they were still -- we still

5    viewed it as there was still opportunities and potential          15:41:18

6    inferences that those were services -- prostitution and those

7    were services that were offered through those ads.

8    Q.  Did -- so I take it that you continued to discuss these

9    issues with Mr. Ferrer?

10   A.  Yes.                                                          15:41:37

11   Q.  And did there come a time where you suggested to him that

12   Backpage simply close its adult section?

13   A.  We did.

14   Q.  And was -- was that a suggestion that American Express

15   wanted you to make as a way of resolving how to move forward     15:41:59

16   with Backpage?

17   A.  It was a -- a compromise that we -- we came to.  We were

18   asked is there a way we could keep the site open -- site -- or

19   keep American Express acceptance for many of the other services

20   and ads.                                                         15:42:18

21          And so we looked at it, and the compromise was if

22   there was a way to restrict American Express acceptance on the

23   adult section, where that would be prohibited, then we

24   potentially could come forward with a solution to retain

25   acceptance for the other -- the rest of the site.                15:42:34

1   Q.  So I think we may have skipped ahead one step.

2            Just initially, though, was it the -- the suggestion

3   of American Express to Backpage first, why don't you just shut

4   down your adult section altogether?

5   A.  We were.  That was the intent.  And the original message          15:42:50

6   was to end our relationship for the entire site.

7   Q.  And how did Backpage respond to that?

8   A.  That's where they asked us if we would reconsider and what

9   options we could do.  And they provided the additional

10  information of how they oversee the adult section, because that       15:43:06

11  was our -- our area of concern.

12  Q.  Right.  Okay.

13           So you were then starting to talk about a sort of

14  compromise.  And after some additional back and forth with

15  Backpage, did you believe that American Express and Backpage          15:43:27

16  had come to an agreement about Backpage's acceptance of

17  American Express?

18  A.  We did.

19  Q.  And what was the agreement?

20  A.  The -- the agreement was to prohibit or restrict the use of       15:43:43

21  American Express cards for transactions on the adult services

22  section, and that was to restrict the payment when it took --

23  when it was attempted and also put a message saying that

24  American Express acceptance was not offered for that service --

25  for that section.                                                     15:44:05

```
 1   Q.  And I'd like to show you an Exhibit 466.

 2           THE COURT:  What was that?

 3           MR. KOZINETS:  Sorry.  466.  And there is -- well,

 4   let's start with this one.

 5   BY MR. KOZINETS:

 6   Q.  Do you see it on your screen?

 7   A.  I do.

 8   Q.  And do you recognize this?

 9   A.  I do.  It is an email from Carl Ferrer to myself.

10   Q.  And does the email -- the first couple lines of the email    15:44:42

11   describe part of the agreement that you believed you had

12   reached with Backpage?

13   A.  It does.

14   Q.  And what is the date of this email?

15   A.  April 22nd, 2015.                                            15:44:56

16           MR. KOZINETS:  I would move to admit the email.

17           MR. KESSLER:  No objection.

18           THE COURT:  It may be admitted, and it may be

19   published.

20           MR. KOZINETS:  Published.                                15:45:10

21           Thank you, Your Honor.

22           (Exhibit 466 admitted into evidence.)

23   BY MR. KOZINETS:

24   Q.  I'm going to blow up the top part so it's a little easier

25   to see.                                                         15:45:17
```

UNITED STATES DISTRICT COURT

1              So this is the April 22nd, 2015, email message from

2     Mr. Ferrer -- Ferrer, I think you were describing.

3     A.  Correct.

4     Q.  And does it refer to an attached screenshot?

5     A.  It does, yes.                                                15:45:42

6     Q.  And was it your understanding that people would see that --

7     would see the error message to the screenshot if they tried to

8     use American Express to buy an adult ad on Backpage?

9     A.  That is correct.

10    Q.  I'd like to show you what's been marked as Exhibit 466a.     15:46:05

11             Do you see Exhibit 466a on your screen?

12    A.  I do.

13    Q.  What is it?

14    A.  It is a screenshot of the message that you would receive if

15    you tried to pay for an ad on the adult section using American   15:46:25

16    Express.

17    Q.  On the adult section of Backpage?

18    A.  Yes.

19    Q.  Was this the screenshot attached to the email we were just

20    looking at?                                                      15:46:36

21    A.  It was.

22             MR. KOZINETS:  Move to admit 466a, Your Honor.

23             THE COURT:  Yes, it may be admitted and published.

24             (Exhibit 466a admitted into evidence.)

25         ///

1   BY MR. KOZINETS:

2   Q.  And so just highlighting the banner message here, what does

3   it say, Mr. Hansen?

4   A.  It says, "Payment update:  AMEX is no longer accepted for

5   adult postings on May 1st."                                      15:47:05

6   Q.  And that would be May 1st, 2015, at this point?

7   A.  It was, yeah.

8   Q.  So was it your understanding that this message would

9   actually appear on Backpage whenever somebody tried to use

10  American Express to buy an adult ad on Backpage?                 15:47:21

11  A.  Yes.

12          MR. KOZINETS:  I'd like to show Mr. Hansen only

13  Exhibit 470.

14  BY MR. KOZINETS:

15  Q.  Do you see an exhibit on your screen?                        15:47:51

16  A.  Yes.

17  Q.  And do you recognize it?

18  A.  I do.

19  Q.  What is it?

20  A.  It is an email from Carl Ferrer to myself on April 24th,     15:47:58

21  2015.

22  Q.  And does it describe or summarize the agreement that you

23  believed you had reached with Backpage about --

24  A.  Yes.

25  Q.  -- American Express?                                         15:48:17

MICKEY HANSEN - DIRECT EXAMINATION                131

 1   A.  Yes.  The title of the email is Changes Completed by
 2   May 1st.
 3            MR. KOZINETS:  Okay.  Move to admit Exhibit 470.
 4            MR. PANCHAPAKESAN:  No objection.
 5            THE COURT:  Yes, it may be admitted, and it may be          15:48:27
 6   published.
 7            (Exhibit 470 admitted into evidence.)
 8   BY MR. KOZINETS:
 9   Q.  And I think I neglected to ask you.  What is the date of
10   this email?                                                         15:48:37
11   A.  April 24th, 2015.
12   Q.  So between April 22nd and April 24th, 2015, you and
13   Backpage were finalizing kind of this -- this agreement
14   reflected here?
15   A.  Correct.                                                        15:48:53
16   Q.  And kind of negotiating, coming to an agreement that this
17   is how you would proceed going forward?
18   A.  Correct.
19   Q.  And, to the best of your knowledge, you know, starting on,
20   you know, May 1st, at least, was Backpage actually displaying       15:49:11
21   that message on its payment screen when somebody tried to buy
22   an adult ad with an American Express?
23   A.  Yes, that is correct.
24   Q.  So -- and, to the best of your understanding, Backpage had,
25   in fact, disabled the ability of consumers to use American          15:49:30

UNITED STATES DISTRICT COURT

```
 1   Express to buy adult ads?

 2   A.  Correct.

 3   Q.  Did there come a time after Backpage took these steps that

 4   you learned that Backpage, in fact, was still allowing

 5   customers to use American Express to buy adult ads on its site?   15:49:58

 6   A.  We did.

 7   Q.  And was it your understanding that they were doing that

 8   through the sort of way of having customers use the credit

 9   card, the American Express credit card, to buy something called

10   credits?                                                          15:50:21

11            MR. PANCHAPAKESAN:  Objection.  Leading and

12   speculation.

13            THE COURT:  Sustained.

14   BY MR. KOZINETS:

15   Q.  What was your understanding of how they were allowing        15:50:26

16   American Express --

17            MR. PANCHAPAKESAN:  Objection.  Speculation.

18            THE COURT:  Overruled.

19   BY MR. KOZINETS:

20   Q.  What was your understanding of how they were allowing        15:50:37

21   American Express cardholders to, you know, then use their cards

22   to buy adult ads?

23   A.  We were made aware -- made aware that there was a way that

24   they could purchase credit on the Backpage.com site using their

25   American Express and then use those credits to purchase ads on   15:50:55
```

133

1   the adult -- in the adult section.

2   Q.  And did this violate the agreement that you had reached

3   with Backpage?

4   A.  It did.  Our intent was to prohibit using American Express

5   to purchase any ads on the adult section.                    15:51:07

6   Q.  You thought you had an agreement to absolutely prohibit the

7   use of American Express to buy female escorts and other similar

8   ads on the adult section, just period, full stop; right?

9   A.  Correct.

10  Q.  What did you do when you learned about this situation?     15:51:28

11  A.  I reached out to Carl and asked him how we would stop that

12  as soon as possible.

13  Q.  And I'd like to show you Exhibit 474, which has been

14  admitted previously.

15         THE COURT:  Yes.  He may be shown, and it may be        15:51:51

16  published.

17  BY MR. KOZINETS:

18  Q.  And I neglected to identify the date of this email, but

19  we'll just -- all right.

20         Do you see on Exhibit 474 an email dated July 10th,     15:52:33

21  2015?

22  A.  I do.

23  Q.  And what are you -- what did you say here in this email to

24  Mr. Ferrer?

25  A.  It's an email from myself to Carl where I was asking him   15:52:47

UNITED STATES DISTRICT COURT

```
 1   for time to -- to discuss removing AMEX as a payment option for
 2   credits --
 3   Q.  And --
 4   A.  -- because we found that you could use those to purchase
 5   ads on the adult services section.                                    15:53:06
 6   Q.  And what did Mr. Ferrer do?  Did -- did he follow through
 7   on your request?
 8   A.  He -- he did take that away to see what they could do to
 9   prohibit using the American Express for credits for the adults
10   only section.  And the end result was that there was not a way     15:53:29
11   to block it for just that section.  It would block it where you
12   couldn't use it for anything.
13   Q.  So -- so he -- he wouldn't stop -- or said that he couldn't
14   stop the use of credits to buy these adult ads?
15   A.  Correct.                                                         15:53:46
16   Q.  So how did American Express respond to that?
17   A.  We cancelled our relationship at that time.
18   Q.  Cancelled it for all purposes?
19   A.  We did.
20   Q.  Now I want to show you Exhibit 469, which has been             15:53:56
21   previously admitted.  469.
22           MR. PANCHAPAKESAN:  And, Your Honor, I'm going to
23   object on foundation.  This witness is not on the email.
24           THE COURT:  Yes.  Before we go any further, maybe just
25   lay some foundation.                                                 15:54:28
```

```
 1              MR. KOZINETS:  Sure.
 2    BY MR. KOZINETS:
 3    Q.  Mr. Hansen, have -- in the course of preparing to testify
 4    today, did you see this email?
 5    A.  I was made aware of this, yes.                          15:54:42
 6    Q.  You were made aware of this email?
 7              MR. PANCHAPAKESAN:  Your Honor, I'll object.  That's
 8    not sufficient foundation if he's not on the email.
 9              THE COURT:  Let him lay foundation.  I don't think he
10    was finished.                                              15:54:53
11    BY MR. KOZINETS:
12    Q.  And did -- did you -- you -- you reviewed the email, and
13    did you come to an understanding about what was being discussed
14    in the email?
15              MS. BERTRAND:  Objection.                        15:55:13
16              MR. PANCHAPAKESAN:  Objection.  It's vague as to time.
17              MS. BERTRAND:  Also calls for speculation.
18              THE COURT:  Sustained as to vagueness as to time.
19    BY MR. KOZINETS:
20    Q.  Did -- did you come to learn -- and just with respect to  15:55:29
21    the -- do you see the date on this email?
22    A.  I do.  April 22nd, 2015.
23    Q.  Okay.  And did you -- did you come to learn -- and this
24    is -- this is after AMEX had terminated Backpage.
25              You came to see this email?                      15:55:55
```

1    A.  I did.

2    Q.  And I'll just -- I'll show you a little bit more of it.

3            Did you learn from looking at this that around the

4    time of April 22nd, 2015, Backpage reached out to its American

5    Express customers to inform them about this credit process?     15:56:29

6            MS. BERTRAND:  Objection.

7            MR. PANCHAPAKESAN:  Your Honor, same objection on

8    foundation.  I don't think we're there yet.

9            MS. BERTRAND:  This hasn't been admitted yet.  And

10   leading.                                                        15:56:39

11           THE COURT:  It is.

12           MR. KOZINETS:  It's in evidence.

13           MS. BERTRAND:  It is?  Sorry about that.  Okay.  Well,

14   still leading.

15           THE COURT:  I'm going to sustain Mr. Panchapakesan's    15:56:47

16   objection.

17           MR. KOZINETS:  Which was?

18           THE COURT:  Let's move on.

19           MR. KOZINETS:  I'm sorry.  What was --

20           THE COURT:  As to foundation --                        15:56:57

21           MR. KOZINETS:  Okay, Your Honor.

22           THE COURT:  -- with respect to this specific email.

23           MR. KOZINETS:  Okay.

24   BY MR. KOZINETS:

25   Q.  Had --                                                     15:57:05

137

1          MR. KOZINETS:  I'll just take it off.

2          THE COURT:  Well, why don't we --

3          MR. KOZINETS:  Can I just ask one?

4          THE COURT:  Yes, you can.

5          MR. KOZINETS:  Sorry.  Thank you.                   15:57:16

6    BY MR. KOZINETS:

7    Q.  Had you known in April of 2015 that Backpage notified users

8    that they could use American Express to buy credits and then

9    buy adult ads with those credits, had you known that then,

10   would you still have moved forward with this agreement with    15:57:33

11   Backpage?

12         MR. PANCHAPAKESAN:  Lacks foundation.

13         THE COURT:  Overruled.

14         MR. PANCHAPAKESAN:  Calls for speculation.

15         THE WITNESS:  We would not because that was our           15:57:41

16   agreement, which was to restrict using your American Express in

17   totality in the adult ads section.

18   BY MR. KOZINETS:

19   Q.  Had you known this, would you have terminated Backpage at

20   that time?                                                     15:57:51

21   A.  We would have.

22   Q.  And why would you have done that?

23   A.  Because that was the only reason -- only way we would allow

24   continued acceptance with Backpage.com, is to block any access

25   for payment using American Express on the adult section.       15:58:01

UNITED STATES DISTRICT COURT

138

```
 1   Q.  If you knew at that time that they were telling you that
 2   they were going to block adult ads but telling their customers
 3   that they could get around this, what would you have done?
 4   A.  We would have cancelled at that time.
 5            MR. KOZINETS:  Okay.                                    15:58:17
 6            THE COURT:  All right.  So this seems to be a natural
 7   breaking point for you, Mr. Kozinets.
 8            So, as I promised our jurors, we'll have them leave at
 9   4:00.  And we're about two minutes away from that time.  And at
10   the same time, I'll -- let me just indicate that at the request  15:58:35
11   of our jury, we will resume the same schedule as we were on
12   today.  So we will begin promptly at 8:45.  That is, again, the
13   promise that our jurors have made, that they will be here and
14   ready to resume their seats.
15            And so what I will do, though, is hopefully you will    15:58:54
16   be occupied by other things this evening and you will not think
17   about the case, come to any conclusions, do any research about
18   anyone who's testified so far today or about the things talked
19   about, but just enjoy a pleasant evening.  And I hope you all
20   make it to your destination safely.                             15:59:13
21            Please all rise for the jury.
22       (Jury not present at 3:59 p.m.)
23            THE COURT:  I didn't hear the door close.  Can you
24   check.  Are they -- all right.  There we are.
25            All right.  Before anyone leaves, let me just raise a   15:59:56
```

UNITED STATES DISTRICT COURT

1    couple questions.

2           Mr. Panchapakesan, you wanted to make a record, and it

3    will help me when I look at Exhibit 6234 and 6235 as to this

4    witness.  And so you can do that at this point.

5           MR. PANCHAPAKESAN:  Thank you.                            16:00:17

6           So the background, which I think Mr. Kozinets got

7    into, is this question of Mr. Hansen became aware at some point

8    that credits were being -- American Express cards were being

9    used to buy credits on Backpage.

10          What he said in his July 18th, 2019, interview with      16:00:33

11   the government is that he was made aware of this by

12   Sheriff Dart.  He says in his interview with the government

13   that in July 2015, AMEX was contacted by -- contacted by a

14   third party, a sheriff, who reached out about Backpage's

15   practice of allowing customers to use AMEX to purchase credits. 16:00:53

16          And so that kind of leads into the two exhibits.  So

17   the first one, which is 6234, these -- this is the July 2015

18   email thread between someone from Sheriff Dart's office and

19   some American Express personnel.  And this is the email where

20   American Express is made aware of its credits -- the credits    16:01:20

21   issue.  There's a back and forth, and then eventually American

22   Express says:  We'll contact Backpage and not allow our cards

23   to be used to buy credits.

24          6235 is an attachment to that email.  It's a letter

25   from Sheriff Dart to the CEO of American Express.  He's         16:01:41

1   basically -- he's writing to inform AMEX that Dart has sent

2   cease and desist letters to Visa and MasterCard, and that's

3   sort of the companion to the email.

4           And so the -- the relevance is, you know, I would

5   intend to elicit from the witness that he became aware of the          16:02:04

6   credits issue through Sheriff Dart, there was a back and forth

7   between Dart's office and AMEX, and then that is what

8   precipitated the termination and American Express not allowing

9   its cards to be used for credits.

10          Now, I think that Mr. Kozinets raised that Mr. Hansen          16:02:25

11  is not on the email, and so a couple of responses on -- on

12  that.  One is he's indicated in his interview with the

13  government that he's aware of the sheriff raising this issue.

14  That's one.

15          And two is, I think I could lay some foundation as to          16:02:44

16  this being an internal AMEX email, that he's familiar with the

17  individuals who are on the email, the roles, that sort of

18  thing, so to lay sufficient foundation for that to come in.

19          But that's the background.  I have no intention of

20  getting into the litigation or the complaint.  AMEX wasn't          16:03:01

21  really even part of that, because I think they terminated

22  the -- their acceptance of cards for adult ads in April of

23  2015, which was before Visa and MasterCard got those letters.

24  So it's not even a risk that I would get into that.  It's just

25  really for this narrow purpose of the credits issue.          16:03:22

1    THE COURT:  So do I understand you to say that you

2    would not be introducing Exhibit 6235, the letter from Dart to

3    the CEO of American Express, only you would have it for the

4    witness to refresh his recollection, or something of that

5    nature?                                                          16:03:46

6    MR. PANCHAPAKESAN:  Well, the only purpose for which I

7    would use 6235 is to show that American Express was on notice

8    that Visa and MasterCard had received the cease and desist

9    letters.  And I wouldn't go any further than that.  And I think

10   that it informs what happens next, because American Express, my   16:04:00

11   sense, is they probably have no interest in getting into a back

12   and forth with Dart given on what's going on with Visa and

13   MasterCard, and so they just -- they terminate the

14   relationship.

15   THE COURT:  Well, I'll look at the exhibit in its              16:04:15

16   totality this evening, and I'll let you know my ruling in the

17   morning.

18   MR. PANCHAPAKESAN:  Okay.  Thank you.

19   THE COURT:  All right.

20   MR. KOZINETS:  Sorry.  Can I say one or two things on         16:04:22

21   that?

22   THE COURT:  Yes.

23   MR. KOZINETS:  Thank you, Your Honor.

24   So that letter really has nothing to do with this

25   credits issue or Mr. Hansen.  He didn't receive the letter.    16:04:29

1    It -- it doesn't encourage American Express to terminate

2    Backpage.  They had already, you know, done that.  So the

3    letter -- this letter, 6- -- what is it?  6230 --

4              THE COURT:  6234 or 62- -- yeah, 6234.

5              MR. KOZINETS:  35.                                      16:04:50

6              THE COURT:  I'm sorry.  35.

7              MR. KOZINETS:  So 35.  35.  It's just totally

8    irrelevant.

9              THE COURT:  Well, I think that remains to be seen.  So

10   certainly I think if the witness is asked a question, then       16:04:59

11   we'll see whether it's relevant or not.

12             MR. KOZINETS:  Okay, Your Honor.

13             And then as to the email chain, the 34, the exhibit

14   that ends in 34, that also isn't something that was sent to

15   Mr. Hansen.  He -- he is generally aware that, you know, the     16:05:20

16   sheriff's office had notified his company about the credits

17   thing, but this whole -- like the nitty-gritty of any sort of

18   back and forth with Sheriff Dart's office he just wasn't privy

19   to, so --

20             THE COURT:  All right.  Okay.  I'll look at it in that  16:05:38

21   context and the context in which Mr. Panchapakesan has

22   presented it.

23             MR. KOZINETS:  Thank you.

24             THE COURT:  Now, let me just say, during -- I think it

25   was Ms. Bertrand and Mr. Kessler's cross-examination of the      16:05:51

1    witness, Ms. Leary, I sustained a couple of objections related

2    to Rule 412, and hopefully now Mr. Kessler's had a time to look

3    at that rule.

4         This is a little bit of a complex area, because on the

5    one hand my recollection is -- of the witness's testimony was          16:06:12

6    she did some self-posting between 2012 and 2015, and it was

7    only at the juncture of 2015 that she was using this other

8    person who was posting her and others.  And so to the extent

9    Rule 412 -- Ms. Perlmeter, I'm speaking about your witness.

10        MR. BERRY:  Sorry.  I asked her a question.  That's my          16:06:40

11   fault, Your Honor.

12        THE COURT:  All right.  So I want to be very cautious

13   and careful and make sure that you are very careful in the

14   remainder of your -- who you refer to as victim witnesses, if

15   there are any to be heard from, that you be very careful about          16:06:59

16   restricting your objections using 412 only as they relate to

17   the allegations in the indictment.  So, in other words, if

18   there were circumstances where these individuals were posting

19   themselves, I don't think the rule applies.

20        And so I may have -- I may have sustained an objection          16:07:24

21   that probably could have been overruled during Mr. Kessler's

22   cross-examination, because he was talking about areas of

23   posting at other places from the time period of 2012 to 2015,

24   which I understood that her testimony was she was doing that

25   herself.  And so, hence, the -- the other sexual conduct of          16:07:55

```
 1   victim does not apply.  So be very cautious and aware of that.

 2         All right.  Is there anything further before we

 3   adjourn for the day from the government?

 4         MR. BERRY:  Your Honor, on that point I would ask the

 5   Court to take a look at 412(b)(1)(B) and -- which says that      16:08:12

 6   it's okay if that sort of thing is offered by the prosecutor.

 7   It is not okay when the defense tries to get into that.

 8         THE COURT:  Well, again, the rule protects the victim.

 9   And if there is no allegation that she is a victim at the

10   time -- she was doing her own self-posting.  So she can't       16:08:38

11   create her own victimization, in other words.

12         MR. BERRY:  I understand.

13         THE COURT:  And that is the context in which I'm

14   referring.

15         MR. BERRY:  I understand, Your Honor.  Thank you.         16:08:50

16         THE COURT:  All right.  Okay.  And so is there

17   anything from defense before we adjourn?

18         MR. LINCENBERG:  Yes, Your Honor.

19         THE COURT:  Oh, let me clarify.  Tomorrow I've now --

20   the government has had an opportunity to respond to the renewed  16:09:00

21   objections.  I'll have a ruling for you in the morning on those

22   areas that were covered.

23         Mr. Lincenberg?

24         MR. LINCENBERG:  Could I have one moment to consult

25   with counsel?                                                   16:09:15
```

1            THE COURT:  Yes.

2        (Brief pause.)

3            MR. LINCENBERG:  Your Honor, the defense just wants to

4    make something clear for the record, if it wasn't clear at the

5    sidebar.                                                              16:09:38

6            We move for a mistrial based upon all of the child

7    trafficking testimony that they intentionally elicited from

8    Mr. Luria.  It went far beyond even the outrageous testimony at

9    the first trial with -- with -- with this gentleman talking

10   about, you know, throwing shoes of children at the -- at the      16:09:59

11   building and so forth.

12           THE COURT:  I think it was placing a box of shoes.

13           MR. LINCENBERG:  Placing a box of shoes.  Right.

14           So we move for a mistrial.

15           THE COURT:  Who wishes to be heard from the              16:10:12

16   government?

17           MR. BERRY:  Your Honor, I think Your Honor's already

18   sort of addressed this particular argument that they made

19   earlier regarding the testimony elicited regarding child sex

20   trafficking and those sorts of areas.                            16:10:27

21           As this Court has ruled, as long as it's tethered

22   directly to a defendant and it's limited and it doesn't go into

23   a day in the life, then it is permissible.  Mr. Luria did just

24   that.  He tethered everything to a meeting involving Mr. Lacey

25   and Backpage specifically and the owners, including Mr. Larkin.  16:10:44

1    And his testimony was -- even when he mention the word "child,"

2    it was always in conjunction with the word "prostitution."  And

3    that's what is charged in this case.  So whether it's an adult

4    or a child, it doesn't matter.

5              And so we would ask you to deny their motion.          16:10:58

6              MS. BERTRAND:  Your Honor, this is Joy Bertrand.  I'd

7    like to respond to that, if I may?

8              THE COURT:  Reply, you mean?

9              MS. BERTRAND:  I -- yeah.  Answer that, yes.

10             That is -- the government has said that a couple of    16:11:11

11   times, and it's a misrepresentation of what's required to tie

12   that type of evidence, to bring that type of evidence in.  It

13   not only must be tied to a defendant, but also a count in the

14   indictment.  And that's clear in that order.  I -- I don't have

15   it immediately in front of me, but I know we've gone back and    16:11:34

16   forth about that.  It's not that it's one or the other.  It is

17   a conjunctive in that order.

18             One of the defendants and a count in the indictment

19   and this evidence, other than a meeting with Mr. Lacey, somehow

20   the -- the government now is going to say it involves leaving    16:11:57

21   boxes of shoes in front of people's offices isn't tied to a

22   defendant, but it is certainly not tied to one of the

23   substantive counts in the indictment.

24             And that's going to be an ongoing issue with this type

25   of evidence.  They can't tie it to subsequent counts in the     16:12:13

1    indictment.

2             THE COURT:  I'll look at the order, but I don't recall

3    that specifically.  And -- and I will -- I will just say that

4    Mr. Cambria, in fact, raised it in his cross-examination.

5             And so I think you've got to be careful on both sides.   16:12:34

6    And here, too, the orders -- the previous orders of the Court

7    recognize that child prostitution is a subset of trafficking.

8    You simply -- because you have people under the age of 18 who

9    qualify as children.

10            And so, again, I think that with respect to the          16:12:57

11   witness's testimony, it did follow the contours of the prior

12   order, what was permissive -- permissible to come in, without

13   having all of the inflammatory language of morality, and so on

14   and so forth.

15            I was going to suggest offering a limiting              16:13:24

16   instruction, once again, to remind the jury of this, but I've

17   been asked a couple of times now by defense to not do so.  And

18   so you've in many ways sort of tied my hands to that because

19   you think it's prejudicial to your -- your clients.

20            And so -- but I will review the order for those -- for   16:13:51

21   that language, Ms. Bertrand, and I'll let you know my ruling

22   tomorrow.

23            MR. CAMBRIA:  I didn't raise anything about child

24   por- -- what's that?

25            THE COURT:  I wrote it down in my notes here as you     16:14:05

1    were asking the question about child prostitution.

2            MR. CAMBRIA:  Yeah.  That came up on direct, Your

3    Honor, and then I -- you know, you have to deal with it once

4    it's on direct.  But I didn't inject that into the case.  I --

5    I haven't lost it yet.  I'm close.                          16:14:19

6            THE COURT:  Well, I'll look at the transcript.  I

7    believe I heard it from your lips.  And so --

8            MR. CAMBRIA:  Yeah.

9            THE COURT:  -- I'll review that.  Okay.

10           MR. CAMBRIA:  No.                                    16:14:31

11           MR. EISENBERG:  Your Honor, I'm sorry.  I know we all

12   want to go.  It's just that on direct, as elicited by counsel

13   for the government, the witness said that Bishop Robinson --

14   yes, Robinson was not comfortable with the website because it

15   had child pornography happening.  These -- this is kind of my  16:14:49

16   characterization -- not characterization of it, my summary of

17   it.  So that occurred on direct.  We don't have any option at

18   that point.

19           Further on down he talked about putting shoes, talking

20   about child --                                               16:15:10

21           THE COURT:  We've already covered that, Mr. Eisenberg.

22           MR. EISENBERG:  Well, Your Honor, it's not correct to

23   say that it was raised on cross-examination by the defendants,

24   with -- with due respect.  I'm not trying to --

25           THE COURT:  Well, I'm not saying the entirety was      16:15:20

1    raised, but there were portions of Mr. Cambria's

2    cross-examination where he did raise child prostitution.

3            I'll look at the transcript again, and I will take

4    your motion for mistrial under advisement, and I'll give you my

5    ruling in the morning.                                      16:15:36

6            MR. EISENBERG:  Thank you, Your Honor.

7            THE COURT:  All right.  We are adjourned.

8            Remember, we are starting at 8:45.

9            THE COURTROOM DEPUTY:  All rise.

10        (Proceedings conclude at 4:15 p.m.)                    16:15:45

11                        ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICKEY HANSEN - DIRECT EXAMINATION

1

2

3

4

5                          **C E R T I F I C A T E**

6

7          I, CATHY J. TAYLOR, do hereby certify that I am duly

8  appointed and qualified to act as Official Court Reporter for

9  the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11 a full, true, and accurate transcript of all of that portion of

12 the proceedings contained herein, had in the above-entitled

13 cause on the date specified therein, and that said transcript

14 was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 23rd day of October,

16 2023.

17

18

19                                  /s/ Cathy J. Taylor
                                   _____
20                                 Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25                                                              16:16:12

UNITED STATES DISTRICT COURT