UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) No. 2:18-cr-00422-DJH |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Phoenix, Arizona |
| Michael Lacey, et al., | ) October 13, 2023 |
| | ) 8:52 a.m. |
| Defendants. | ) |
| | ) |

**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 18**

**(A.M. SESSION)**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2     For the Government:
          UNITED STATES ATTORNEY'S OFFICE
3         By:  **Mr. Kevin M. Rapp, Esq.**
               **Mr. Andrew C. Stone, Esq.**
4              **Mr. Peter Shawn Kozinets, Esq.**
               **Ms. Margaret Wu Perlmeter, Esq.**
5         40 North Central Avenue, Suite 1800
          Phoenix, Arizona  85004-4408
6         kevin.rapp@usdoj.gov
          peter.kozinets@usdoj.gov
7         andrew.stone@usdoj.gov
          margaret.perlmeter@usdoj.gov
8         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
9         By:  **Mr. Austin Berry, Esq.**
          1301 New York Avenue NW, 11th Floor
10        Washington, DC  20005
          austin.berry2@usdoj.gov
11
      For the Defendant Michael Lacey:
12        LIPTSITZ GREEN SCIME CAMBRIA, LLP
          By:  **Mr. Paul J. Cambria, Esq.**
13        42 Delaware Avenue, Suite 120
          Buffalo, New York  14202
14        pcambria@lglaw.com

15    For the Defendant Scott Spear:
          KESSLER LAW OFFICE
16        By: **Mr. Eric Walter Kessler, Esq.**
          6720 North Scottsdale Road, Suite 210
17        Scottsdale, Arizona  85253
          eric.kesslerlaw@gmail.com
18        - and -
          FEDER LAW OFFICE, PA
19        By:  **Mr. Bruce S. Feder, Esq.**
          2930 East Camelback Road, Suite 160
20        Phoenix, Arizona  85016
          bf@federlawpa.com

21

22

23

24

25

```
 1              A P P E A R A N C E S (Cont'd)

 2    For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 3        By:  Mr. Gopi K. Panchapakesan, Esq.
               Mr. Gary S. Lincenberg, Esq.
 4        1875 Century Park E, Suite 2300
          Los Angeles, California  90067
 5        gpanchapakesan@birdmarella.com
          glincenberg@birdmarella.com
 6        aneuman@birdmarella.com

 7    For the Defendant Andrew Padilla:
          DAVID EISENBERG, PLC
 8        By:  Mr. David S. Eisenberg, Esq.
          3550 North Central Avenue, Suite 1155
 9        Phoenix, Arizona  85012
          david@deisenbergplc.com
10
      For the Defendant Joye Vaught:
11        JOY BERTRAND, ESQ, LLC
          By:  Ms. Joy Malby Bertrand, Esq
12        P.O. Box 2734
          Scottsdale, Arizona  85252-2734
13        Joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        **I N D E X**

2   **SUMMARY OF COURT PROCEEDINGS:**                    **PAGE**

3   Proceedings Outside the Presence of the Jury          6
    Proceedings Outside the Presence of the Jury         90
4   Proceedings Outside the Presence of the Jury         91
    Proceedings Outside the Presence of the Jury        154

5

6
    **WITNESSES FOR THE GOVERNMENT:**                    **PAGE**
7
    Eric Murry
8           Cross-Examination by Mr. Cambria             13
            Redirect Examination by Ms. Perlmeter        18
9   Jessika Svengard
            Direct Examination by Mr. Rapp               25
10          Cross-Examination by Ms. Bertrand            45
    Brian Griffin
11          Direct Examination by Mr. Berry              49
            Cross-Examination by Mr. Kessler             86
12          Cross-Examination by Mr. Cambria            101
            Redirect Examination by Mr. Berry           103
13  Quoc Thai
            Direct Examination by Mr. Stone             106
14

15                        **EXHIBITS**

16
    **NO.**       **DESCRIPTION**                       **REC'D**
17
    211c      Victim #4 Additional Backpage ads          38
18            USAO-BP-0033004 - USAO-BP-0033019

19  1479      Summary Exhibit -Money Laundering Counts   135
              Tracing USAO-BP-0032699-USAO-BP-0032732
20
    1480      Summary Exhibit - Backpage Gross Revenue   121
21            by Ad Category USAO-BP-014976

22  1481      Summary Exhibit - Annual Revenue for       128
              Business Entities USAO-BP-0025779
23

24

25

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 1545 | Summary Exhibit - Website Technologies LLC Revenue Through GoCoin USAO-BP-0025780 | 141 |
| 1691 | Summary Exhibit - Payments from Website Tech to Cereus Properties USAO-BP-0032733 | 147 |

UNITED STATES DISTRICT COURT

<u>**P R O C E E D I N G S**</u>

        (Proceedings reconvene at 8:52 a.m.)

        (Jury not present at 8:52 a.m.)

            THE COURT:  All right.  Good morning.  And please be
seated.                                                                08:52:56

            I think Mr. -- well, let me -- let me do something
here.

            The record will reflect the presence of counsel.  And
we do not have our jury or our witness.

            But I understand, Mr. Kessler, you wanted to address      08:53:17
the Court.

            MR. KESSLER:  I did.  Good morning, Your Honor.

            THE COURT:  Good morning.

            MR. KESSLER:  Yesterday we experienced something new,
at least new for us, which was this idea of the witness on            08:53:30
cross-examination said -- hesitating for a moment or two,
especially when asked a question relating to foundation.  And
Ms. Perlmeter would very quickly jump in and say, "The witness
is hesitating, so he doesn't know."

            And then, Your Honor, you would sustain most of those.    08:54:00
That's not a proper objection.  I -- in -- and I want -- I want
to make a record that if a foundational question is asked of
the witness, the mere fact that the witness hesitates, it may
be because the witness is thinking about the question.  And the
witness should be able to answer yes or no.  And the witness        08:54:27

1    may or may not establish foundation.  But when the government

2    jumps in and makes that kind of an objection, it deprives the

3    witness of the ability to answer, and, you know, it -- it can

4    be viewed as coaching.

5          THE COURT:  Well, I don't have the same recollection          08:54:51

6    as you, Mr. Kessler.  I recall that Ms. Bertrand asked that

7    particular witness a couple times in different ways a very

8    broad question.  "How many subpoenas have you served in 2-" --

9    "since 2002?"

10          Now, she did say that, but "How many subpoenas have          08:55:12

11   you served?"

12          And this gentleman has been a law enforcement

13   officer for 26 years.  And he hesitated, and then she asked him

14   again in a different way.  He hesitated.  He clearly didn't

15   recall.  So he was struggling.  So he clearly didn't          08:55:30

16   understand.

17          And I was waiting for Ms. Bertrand, frankly, to say:

18   Okay.  In the last ten years?  In the last five years?

19          But she didn't.  So he didn't have a recollection.

20          So in -- in terms of the speaking objection, I would          08:55:49

21   agree, and I think that we can move forward in a different

22   fashion.  But I thought that this witness couldn't answer

23   because it wasn't confined in terms of years.

24          MR. KESSLER:  Your Honor, I -- I counted, just from my

25   own notes, six different times that Ms. Perlmeter made that          08:56:15

UNITED STATES DISTRICT COURT

1    kind of an objection.  And I agree.  Maybe Ms. Bertrand could

2    have refined her question.  There are ways to properly do that,

3    by objecting to the form of the question.  But to simply object

4    because the witness is thinking about it and then suggest that

5    the witness doesn't know, that's -- that's not a recognized   08:56:46

6    objection that I know of.

7          And -- and, Your Honor, you would sustain the

8    objection.  And the witness hasn't even told us whether he

9    understands the question or whether he's just thinking to try

10    to come up with an answer.   08:57:05

11          THE COURT:  Well, I -- my recollection is he said that

12    he didn't know, that it -- he couldn't say.

13          MR. KESSLER:  Okay.  I --

14          THE COURT:  So he made a -- he made a statement that

15    he didn't have a recollection.   08:57:16

16          MR. KESSLER:  In -- in some cases, that's true.  But

17    in about a half dozen cases, that's not correct.  The witness

18    wasn't able to -- to answer because the objection was made, and

19    Your Honor sustained it.  And Ms. Bertrand never had an

20    opportunity.   08:57:35

21          THE COURT:  Oh, she had plenty of opportunity.  She

22    had opportunity to refine her examination.  And had she done

23    that, we wouldn't have this problem.

24          MR. KESSLER:  But the --

25          THE COURT:  So, Mr. Kessler, what's the point?   08:57:46

```
 1            MR. KESSLER:  Well, I want it to stop.

 2            THE COURT:  Well --

 3            MR. KESSLER:  That's not a proper objection.  The

 4   objection would be to the form of the question.

 5            THE COURT:  All right.                              08:57:56

 6            MR. KESSLER:  Too broad -- --

 7            THE COURT:  Yes.

 8            MR. KESSLER:  -- for example.

 9            THE COURT:  I agree.

10            MR. KESSLER:  But this business of sending a message  08:58:02

11   to the witness just because the witness is delaying a couple

12   seconds and then the Court sustaining that, I think that's

13   improper.  And the proper objection is to the form of the

14   question.

15            I just don't want that to continue.  It started     08:58:22

16   yesterday, and I don't want it to continue.

17            THE COURT:  And the way that we're going to move

18   forward is in that fashion, Ms. Perlmeter.

19            And the way that we avoid that is a more refined

20   cross-examination.                                           08:58:37

21            MR. KESSLER:  Certainly.

22            THE COURT:  All right.  Okay.  Let's move forward.

23            MS. PERLMETER:  May I make a record?

24            THE COURT:  Yes.

25            MS. PERLMETER:  So this happened on -- in no less than  08:58:48
```

1   three subsets of questions.  First, Ms. Bertrand asked how many

2   times the witness has served as a case agent, how often he's

3   chaired.  She asked him to quantify a number of things in a

4   precise manner that he is unable to do so based on the number

5   of years that he's been in law enforcement.                    08:59:04

6           So first she asked him to quantify the number of times

7   that he sat as a case agent at a trial.  Then he -- then she

8   asked him how many subpoenas that she -- he has served to law

9   enforcement -- to -- to Backpage.  And then she asked Mr.  --

10  or Detective Murry how many arrests that he's made in his      08:59:21

11  career.  All very difficult questions to answer, even for

12  someone who has not been a law enforcement officer as long as

13  Detective Murry.

14          Now, the objection was -- the question was asked:  How

15  many times?  How many times?                                   08:59:36

16          And the -- and when the witness did not answer after a

17  period of time, the objection was speculation.  Because if the

18  witness does not know, we do not want the witness to sit on the

19  witness stand and try to come up with their best guess, which

20  is what Ms. Bertrand then tried to do.  Because after asking a  08:59:55

21  series of questions about how many, how many, how many times,

22  that she then -- and seeing the witness unable to answer the

23  question, she then switched it to, well, can you give me an

24  estimate, which in this context or the context of yesterday

25  afternoon was synonymous with can you guess.                   09:00:11

1          So we're just trying to prevent having a witness guess

2    about something that they are -- that they aren't sure about,

3    which is what the rule requires for every witness.

4          THE COURT:  All right.  The record has been made, and

5    we will move forward in the way that I mentioned.                    09:00:27

6          And let's have the jury in.

7          MR. KESSLER:  Thank you, Your Honor.

8          MS. BERTRAND:  And so the Court's not surprised, I'm

9    going to say I'm done with this witness when the jury comes

10   out, and I think one of my colleagues is going to pick it up --     09:01:10

11         THE COURT:  Well, who's --

12         MS. BERTRAND:  -- from here.

13         THE COURT:  Who's the colleague?  Who's ready?

14         MS. BERTRAND:  I think it's Kessler or Mr. Cambria.

15         MR. KESSLER:  It will be Mr. Feder.                           09:01:22

16         MS. BERTRAND:  Mr. Feder.

17         Mr. Eisenberg, were you going to cross-examine this

18   witness as well?

19         MR. EISENBERG:  No.

20         MS. BERTRAND:  It's just Paul.                                09:01:37

21         Okay.  It'll be Mr. Cambria.

22         THE COURT:  Mr. Cambria.  Okay.  Looking forward --

23   looking forward to it.

24         MR. CAMBRIA:  I'm not -- what's everybody saying?

25         MS. BERTRAND:  You're next when the jury comes out.          09:01:49

```
 1              MR. CAMBRIA:  Oh, okay.

 2              THE COURT:  Oh, you can stand at ease.  We're missing

 3     one juror.

 4              MS. BERTRAND:  Oh, okay.

 5              THE COURT:  We'll make an inquiry.                     09:02:01

 6        (Brief pause.)

 7              THE COURT:  And just -- I just wanted to clarify my

 8     request of defense counsel.  If by the end of today you could

 9     send to chambers and to government counsel a -- a revised or

10     refined witness list, I'd appreciate that.                     09:02:24

11              MS. BERTRAND:  We've started working on that, Your

12     Honor.

13              THE COURT:  Okay.  Thank you.

14              MS. BERTRAND:  We'll do our best.

15              Your Honor, we're informal until the other juror      09:02:47

16     arrives?

17              THE COURT:  Yes.

18              MS. BERTRAND:  Okay.

19              THE COURT:  Yes.

20        (Brief pause.)                                              09:03:48

21              THE COURT:  Okay.  She'll be here momentarily.  She's

22     in the building.

23        (Brief pause.)

24              THE COURT:  All rise for the jury.

25        (Jury present at 9:06 a.m.)                                 09:06:10
```

```
 1              THE COURT:  All right.  Please be seated.

 2              And good morning, members of the jury.

 3              The record will reflect their presence.  The witness

 4   is on the witness stand.

 5              And, Ms. Bertrand, you may continue.          09:06:40

 6              MS. BERTRAND:  Good morning, Your Honor.

 7              Good morning.

 8              At this time, Ms. Vaught -- on behalf of Ms. Vaught, I

 9   pass the witness to my colleagues.

10              Thank you.                                    09:06:52

11              THE COURT:  All right.  Thank you.

12              And Mr. Cambria.

13         (ERIC MURRY, a witness herein, was previously duly sworn or

14   affirmed.)

15                        CROSS-EXAMINATION                   09:06:59

16   BY MR. CAMBRIA:

17   Q.  Good morning.

18   A.  Good morning, sir.

19   Q.  How long have you been in vice?

20   A.  I've been there since 2002.                          09:07:04

21   Q.  Okay.  And am I correct that you indicated that you posted

22   a review on The Erotic Review?

23   A.  Yes.

24   Q.  And it was fake, if you will?

25   A.  It was fictitious, yes.                              09:07:22
```

ERIC MURRY - CROSS-EXAMINATION

14

```
 1   Q.  All right.  And are you familiar with whether or not
 2   certain providers post fake reviews about other providers as
 3   kind of a business competition?
 4          MS. PERLMETER:  Objection.  Calls for speculation.
 5   Relevance.                                              09:07:46
 6          THE COURT:  Overruled.  He can answer if he's aware.
 7          MR. CAMBRIA:  I'll put my ears on now.  I can't hear.
 8          THE WITNESS:  I'm not aware of that, sir.
 9   BY MR. CAMBRIA:
10   Q.  Okay.  In any event, are you familiar with a -- kind of a   09:07:53
11   reward system with The Erotic Review if you post a, quote,
12   favorable review, you get some kind of VIP status, or something
13   like that?
14   A.  I'm familiar of -- I believe it's just if you place a
15   certain number of reviews.  I don't know if they have to be    09:08:18
16   favorable or not.  But I do recall there was some sort of
17   something.  If you placed a certain number of reviews, that you
18   could get, I don't know, a certain amount of time of VIP
19   membership.
20   Q.  So it's kind of some sort of reward program if you post    09:08:34
21   reviews?  Is that fair to say?
22   A.  Yeah, I guess if you want to call it a reward program.
23   But, yeah, you can -- if you post reviews, you can get VIP
24   membership for a certain amount of time.
25   Q.  So you get free stuff if you post reviews?  VIP membership?   09:08:52
```

1   You don't have to pay for it if you post reviews?

2   A.  Correct.

3   Q.  Is that fair?

4   A.  Correct.

5   Q.  All right.  So is there a way to tell whether someone is          09:09:01

6   making up a review so that they could get the VIP status or

7   that it's a real review?

8   A.  I'm not aware of any way to tell that.

9   Q.  Okay.  Was there a -- an opportunity for you to, let's say,

10  review a review and then go out and see whether or not it was        09:09:23

11  accurate?

12  A.  When you say "review a review," what do you mean by that?

13  Q.  Well, you read a review on The Erotic Review.

14  A.  Okay.

15  Q.  And then was there a time when you went out and tried to          09:09:40

16  verify what was in that review?

17  A.  No.

18  Q.  So -- so somebody could write a review and -- and say that

19  they were young and beautiful and in great shape and, you know,

20  Arnold Schwarzenegger wants to go out with them kind of thing,       09:09:58

21  and it could be totally made up?

22        MS. PERLMETER:  Objection.  Calls for speculation.

23        THE COURT:  Sustained.

24  BY MR. CAMBRIA:

25  Q.  Well, what I'm saying is, as far as you -- as far as your        09:10:10

ERIC MURRY - CROSS-EXAMINATION

```
 1    situation, you never verified what was in a review and

 2    determined whether or not it was an exaggeration or a

 3    falsehood, et cetera?

 4            MS. PERLMETER:  Objection.  Asked and answered.

 5            THE COURT:  Overruled.                                   09:10:27

 6            THE WITNESS:  Correct.

 7    BY MR. CAMBRIA:

 8    Q.  Okay.  So is -- is -- was there any way for you to tell in

 9    your experience with The Erotic Review whether or not a review

10    was factual?                                                    09:10:47

11            MS. PERLMETER:  Objection.  Asked and answered.

12            THE COURT:  Overruled.

13            THE WITNESS:  There is no way for me to verify whether

14    the information was true.

15    BY MR. CAMBRIA:                                                 09:10:57

16    Q.  And, indeed, you successfully put up a fake, if you will,

17    review; true?

18    A.  Correct.

19    Q.  And so would you agree that that demonstrates that the

20    reviews on The Erotic Review are not reliable?                  09:11:14

21    A.  I would -- I would have no way of knowing that, sir.  I --

22    I can only testify to my review was not accurate.  I mean, it

23    wasn't real, I guess.

24    Q.  Okay.

25    A.  I don't know about anyone else's.                           09:11:34
```

ERIC MURRY - CROSS-EXAMINATION

```
 1   Q.  And The Erotic Review was something that you were aware of
 2   for what, quite some time?
 3   A.  Yes, sir.
 4   Q.  And it was -- people who work in vice, it was common
 5   knowledge as to what The Erotic Review was or what it did or      09:11:53
 6   what it didn't do?
 7   A.  Correct.
 8   Q.  And so if you were looking at websites that in some way
 9   referred to The Erotic Review, it wouldn't be any secret as to
10   what The Erotic Review did or purported to do?                    09:12:11
11   A.  I guess I'm not following that question.
12   Q.  Oh, okay.
13   A.  I'm sorry.
14   Q.  No.  I'm sorry.  It's my question.  If you couldn't
15   understand it, I failed.                                          09:12:24
16          What I'm saying is that The Erotic Review was no big
17   secret.  People who were in the vice business, if you will,
18   knew that it was out there and that it purportedly had reviews?
19   A.  Correct.
20          MR. CAMBRIA:  All right.  That's all.  Thank you.          09:12:40
21          THE COURT:  All right.  Mr. Kessler?  Mr. Feder?
22          MR. KESSLER:  No questions.
23          THE COURT:  Mr. Eisenberg?
24          MR. EISENBERG:  No questions, Your Honor.
25          THE COURT:  And I think I asked Mr. Panchapakesan.         09:12:54
```

```
 1              MR. PANCHAPAKESAN:  Nothing, Your Honor.
 2              THE COURT:  All right.  May the -- oh, Ms. Perlmeter.
 3                        REDIRECT EXAMINATION
 4    BY MS. PERLMETER:
 5    Q.  Good morning, Detective.                            09:13:17
 6    A.  Good morning.
 7    Q.  Just to highlight a few things.
 8              You were asked about the VIP membership with The
 9    Erotic Review.
10    A.  Yes.                                                09:13:25
11    Q.  Can you tell us what kinds of -- were there two types of
12    memberships you could have with The Erotic Review?
13    A.  Yes.  There was a free one, and that provided kind of
14    limited information in the reviews.  And then there was a VIP
15    membership, which provided additional details on -- on the   09:13:39
16    reviewer.
17    Q.  And you were asked some questions about the reliability of
18    the reviews on The Erotic Review and whether or not you ever
19    did any follow-up investigative work to kind of test out the
20    people who were posting reviews.                        09:13:57
21              Is -- do you recall that?
22    A.  Yes.
23    Q.  And you said you -- that you did not do that?
24    A.  Correct.
25    Q.  However, in your investigative experience, have you seen  09:14:04
```

UNITED STATES DISTRICT COURT

```
 1    The Erotic Review or references to The Erotic Review on
 2    Backpage ads that were posted in the escort section?
 3    A.  Yes, I have.
 4    Q.  And was that just on a one occasion, or was it for a
 5    duration of years?                                         09:14:25
 6    A.  I would say a duration of years.
 7    Q.  And if the reviews on The Erotic Review were all fake, as
 8    defense counsel suggested, do you think that you would have --
 9           MR. CAMBRIA:  Object.
10    BY MS. PERLMETER:
11    Q.  -- continued to see The Erotic Review --
12           THE COURT:  Wait.
13    BY MS. PERLMETER:
14    Q.  -- being referenced in Backpage ads --
15           THE COURT:  There was a --                          09:14:43
16    Q.  -- in the escort section?
17           THE COURT:  Ms. Perlmeter, there was an objection.
18           MS. PERLMETER:  Oh, I hadn't finished my question,
19    so --
20           MR. CAMBRIA:  Oh, okay.  Calls for --               09:14:47
21           THE COURT:  What was that?  I can't hear you,
22    Mr. Cambria.
23           MR. CAMBRIA:  Yeah.  I'm saying calls for speculation.
24           Oh, sorry.  My microphone wasn't on.
25           Calls for speculation, Your Honor.                  09:15:00
```

ERIC MURRY — REDIRECT EXAMINATION

20

 1          THE COURT:  Sustained.

 2   BY MS. PERLMETER:

 3   Q.  If the reviews on -- if a website -- what was the purpose

 4   of The Erotic Review as to -- as to your knowledge?

 5          MR. FEDER:  Asked and answered.                          09:15:16

 6          THE COURT:  Overruled.

 7          THE WITNESS:  It was to provide a place where

 8   customers of prostitutes could go and post a review describing

 9   their experience that they had with this person.

10   BY MS. PERLMETER:                                               09:15:30

11   Q.  And, in your experience, do you think that the website

12   would continue The Erotic Review if the information being

13   provided on the website was not helpful?

14          MR. CAMBRIA:  Your Honor --

15          MR. EISENBERG:  Calls for speculation.                   09:15:40

16          MR. CAMBRIA:  -- I object to what he thinks.

17          MR. EISENBERG:  Objection, Your Honor.  Calls for

18   speculation.

19          THE COURT:  Overruled.  He can answer within his

20   experience.                                                     09:15:46

21          THE WITNESS:  I don't believe so.

22   BY MS. PERLMETER:

23   Q.  Are you aware of any business relationship between The

24   Erotic Review and Backpage?

25   A.  I'm sorry.  Did you say am I aware of any business          09:15:58

1    relationship?

2    Q.  A business relationship.

3    A.  No, I'm not.

4    Q.  You had talked a little bit yesterday -- on

5    cross-examination you were asked questions about how many          09:16:09

6    subpoenas you've served to Backpage over the years.

7    A.  Yes.

8    Q.  And did you recall -- and my question is, did you serve a

9    subpoena to Backpage for every single Backpage ad that you

10   encountered throughout your career?                                09:16:24

11   A.  Absolutely not.

12   Q.  And you had mentioned that you would serve subpoenas to

13   Backpage in -- in your bigger cases, and you had defined bigger

14   case with, like, cases involving a pimp.

15          Do you recall that?                                         09:16:40

16   A.  Correct.

17   Q.  What kind of cases involving prostitution on Backpage would

18   you not need to serve a subpoena to Backpage for?

19   A.  If we were just doing, like, a simple -- like a hotel

20   operation where the individual would come out, I would meet        09:16:53

21   with her, and we'd get a -- excuse me --

22   Q.  Do you need some water?

23   A.  I probably should.  I'm sorry, everyone.

24          Thank you.

25          If we were just doing the hotel operation, the              09:17:05

 1    individual came out and I got a prostitution deal with her, I

 2    wouldn't -- there'd be really no -- no need for me to obtain

 3    some subscriber information or anything like that.  I have

 4    the -- I have the individual right there who posted the ad, so

 5    there'd be -- there's really no point in getting it.                    09:17:25

 6    Q.  So there were times once you had the individual and then

 7    you had the Backpage ad itself, that was sufficient for you to

 8    move forward --

 9              MR. CAMBRIA:  Object to the leading.

10              THE COURT:  Sustained.                                        09:17:37

11    BY MS. PERLMETER:

12    Q.  In those instances, what type of information did you need

13    to be able to move forward with your case?

14    A.  Just the -- basically the individual's name and birthday,

15    you know, identifying information, and then she was processed         09:17:51

16    accordingly like.  And that was pretty much the end of it.  We

17    would just document everything and -- and submit it.

18    Q.  Okay.  With the one Backpage ad?

19    A.  Yes.

20    Q.  And what -- and then when -- in terms -- in cases where you       09:18:05

21    did serve the subpoena, what information were you seeking from

22    Backpage?

23    A.  I would ask, if I remember correctly, the -- just the --

24    who -- who posted the ad and if they placed any other ads using

25    that same information.                                                09:18:25

```
 1   Q.  Okay.  So in cases where you would want information beyond
 2   the one Backpage ad?
 3   A.  Correct.
 4   Q.  Okay.  Are you familiar -- you were asked some questions
 5   yesterday about the Arizona statute --                          09:18:35
 6        THE COURT:  Can I --
 7   BY MS. PERLMETER:
 8   Q.  -- for prostitution.
 9        THE COURT:  I'm sorry, Ms. Perlmeter.  I'm going to
10   have to ask you a huge favor.  And this is going forward with   09:18:41
11   all of my court reporters.  Can you just slow your cadence
12   down.
13        MS. PERLMETER:  Okay.
14        THE COURT:  You have a very quick cadence, and I can
15   feel my court reporter is, you know, tasked.  So if you can     09:18:50
16   just be aware of that.
17        MS. PERLMETER:  All right.
18        THE COURT:  Thank you.
19   BY MS. PERLMETER:
20   Q.  All right.  Detective, do you recall being asked yesterday  09:19:00
21   afternoon about Arizona Revised Statutes and the Arizona
22   statute for prostitution?
23   A.  Yes.
24   Q.  Okay.  Are you familiar with a federal statute that
25   discusses the promotion of prostitution business enterprises?   09:19:11
```

 1          MS. BERTRAND:  Objection.  Relevance.  Calls for a

 2  legal conclusion per the government's objections yesterday.

 3          THE COURT:  Overruled.

 4          I think you covered some of that ground, so I'll give

 5  Ms. Perlmeter some latitude here.                              09:19:27

 6          THE WITNESS:  No, ma'am.  I'm not very well-versed on

 7  the federal codes.  Sorry.

 8  BY MS. PERLMETER:

 9  Q.  Do you know what the defendants are charged with in this

10  case?                                                          09:19:36

11  A.  No, I don't.

12          MS. PERLMETER:  All right.  No further questions, Your

13  Honor.

14          THE COURT:  All right.  May the witness be released

15  from the subpoena?                                             09:19:45

16          MS. PERLMETER:  Yes.

17          THE COURT:  Any objection by defense?

18          MR. CAMBRIA:  No.

19          MR. EISENBERG:  No.

20          THE COURT:  All right, sir.  Thank you very much for   09:19:55

21  your testimony.  You may step down, and you are released from

22  your subpoena.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  Please call your next witness.

25          MR. RAPP:  The United States calls Jessika Svengard.   09:20:02

UNITED STATES DISTRICT COURT

1          THE COURT:  Ma'am, please come forward to my courtroom

2   deputy and be sworn.

3          THE COURTROOM DEPUTY:  Please raise your right hand.

4      (JESSIKA RENEE SVENGARD, a witness herein, was duly sworn

5   or affirmed.)                                                  09:20:17

6          THE COURTROOM DEPUTY:  If you would please step over

7   to the witness stand, and be sure to speak into the microphone.

8          THE COURT:  You may proceed.

9          MR. RAPP:  Thank you.

10                    DIRECT EXAMINATION                           09:20:46

11  BY MR. RAPP:

12  Q.  Ma'am, could you state your full name, and spell your last

13  name for the record, please.

14  A.  Jessika Renee [phonetic] Svengard.  My last name is

15  S-V-E-N-G-A-R-D.                                               09:20:55

16  Q.  And where are you from?

17  A.  I am from the Southeast.

18  Q.  Where did you grow up?

19  A.  I grew up in a suburb of Seattle, Washington.

20  Q.  Did you attend school there, in the Seattle of -- in the   09:21:05

21  suburb of Seattle, Washington?

22  A.  I did.

23  Q.  What was -- what's the suburb called?

24  A.  Auburn, Washington.

25  Q.  All right.  And now are you employed?                      09:21:14

JESSIKA SVENGARD - DIRECT EXAMINATION

26

```
 1    A.  I am.

 2    Q.  What do you do?

 3    A.  I own a tree service.  And I also am an advocate, and I do

 4    trainings for law enforcement, mental health providers, CPS,

 5    and et cetera.                                              09:21:32

 6    Q.  Okay.  Married?

 7    A.  I am engaged to be married.

 8    Q.  All right.  Any children?

 9    A.  I have two.

10    Q.  Ma'am, have you ever heard of Backpage.com?            09:21:40

11    A.  Yes, I have.

12    Q.  How is it that you have heard of Backpage.com?

13    A.  I was sold on that website.

14    Q.  All right.  When did that occur?

15    A.  In the year 2010.                                      09:21:55

16    Q.  I forgot to ask you, ma'am.  How old are you?

17    A.  I'm 28.

18    Q.  How were you -- in 2010, how were you introduced to

19    Backpage.com?

20    A.  I -- a girl posted -- wanted me to post on there, and she  09:22:10

21    took pictures of me and then posted me on Backpage.com.

22    Q.  All right.  Can you explain how she did that.

23    A.  She took pictures of me in a hotel room and then got on the

24    website and produced an ad and then posted it.

25    Q.  All right.  Can you tell the jury what type of device was  09:22:33
```

UNITED STATES DISTRICT COURT

```
1   used?  A phone?  A computer?  An iPad?

2   A.  At that particular time it was a phone, but later on I

3   would be posted by a computer.

4   Q.  All right.

5          MS. BERTRAND:  Your Honor, I'm going to object to this        09:22:50

6   line of questioning.  It doesn't pertain to any of the charged

7   counts in the indictment.

8          THE COURT:  Well, overruled.

9   BY MR. RAPP:

10  Q.  Now, was this -- this woman that you have identified, was       09:22:59

11  she the only one that posted you on Backpage.com?

12  A.  No.

13  Q.  Did somebody else do that?

14  A.  Yes.  His name was Baruti Hopson.

15  Q.  All right.  Can you explain how he went about posting you       09:23:14

16  on Backpage.com.

17  A.  He would -- he took pictures of me with a digital camera

18  and then uploaded those pictures to his computer and would post

19  ads from his computer.

20  Q.  All right.  When you were posted on Backpage.com, do you        09:23:30

21  know approximately when in 2010 this occurred?

22  A.  In June.

23  Q.  Okay.  Was there a particular city you were posted in?

24  A.  Not necessarily.  It was more in one area than others, but

25  I would post in several different cities around Seattle.           09:23:59
```

JESSIKA SVENGARD - DIRECT EXAMINATION

28

```
 1    Q.  All right.  And do you know back in 2010 how many times you
 2    were posted on Backpage.com?
 3    A.  I mean, I would say roughly over a hundred easy.
 4    Q.  Okay.  And once -- did you have occasion to observe your
 5    posting or your ad when it was live on the site?                   09:24:24
 6    A.  Meaning, like, after I would have posted it?
 7    Q.  Yes.
 8    A.  Yes.
 9    Q.  Is there anything that you did with the posting once it was
10    live on the site?                                                  09:24:37
11    A.  There would be times where when you would post an ad it
12    would start going down on a list as more people would post ads,
13    so we would refresh our ad in order for it to become at the top
14    of the list.  So when you'd click on Backpage, it would be the
15    first listing you would see.                                       09:24:54
16    Q.  All right.  Was there ever an occasion where after you
17    submitted the posting to Backpage.com you observed it on the
18    site, and was there any changes to the posting?
19    A.  There was -- there was only one time I can say that I saw
20    that happen, and it was in regards to I had put dollar signs in    09:25:15
21    one of the ads.  And once I saw it live on the website, they
22    were not there anymore.
23    Q.  Ma'am, did you have to pay to post the -- the ad on
24    Backpage.com?
25    A.  Yes, you did.                                                  09:25:32
```

UNITED STATES DISTRICT COURT

1    Q.  All right.  How do you know that?

2    A.  Because I or Baruti Hopson would have to pay to do that.

3    Q.  Okay.  Can you explain to the jury how that -- that

4    happened.  Do you know?

5    A.  So after you've made your ad, in order for it to go up on          09:25:44

6    the website you would have to enter credit card information in

7    order for it to be able to get posted.

8    Q.  Okay.  Did you observe -- well, first, did you use a credit

9    card to -- to pay to have your ad posted?

10   A.  I would use one that was given to me, yes.                         09:26:03

11   Q.  All right.  Who would give it to you?

12   A.  Baruti Hopson.

13   Q.  Did you -- did you also observe him using the credit

14   card --

15   A.  Yes.                                                               09:26:13

16   Q.  -- to -- you did?

17   A.  Yes, I did.

18   Q.  All right.  And do you know what type of credit card he

19   used?

20   A.  It was like a prepaid card that you could load money onto.         09:26:18

21   Q.  All right.  How do you know that?

22   A.  Because I would go with him to put the money on the card.

23   Q.  Where would you go?

24   A.  To, like, cash checking places.  Or even, like, sometimes

25   Walmarts could do it.  And he would just tell them how much he         09:26:36

UNITED STATES DISTRICT COURT

```
 1    would want to put on the card, and they would do that for a
 2    small fee, I'm sure.
 3    Q.  All right.  Did the -- did the posting have any text in it?
 4    A.  Yes.
 5    Q.  Okay.  Can you -- can you explain to the jury what type of        09:26:50
 6    text was in the post.
 7    A.  You're saying text; correct?
 8    Q.  Text.  I'm sorry.
 9    A.  Okay.
10    Q.  Yeah, text.  Like was there any type of a message within         09:26:59
11    the posting?
12    A.  Yeah.  Usually a description of myself; my body, my weight,
13    things that I would do.  Anyone knows to, you know, sexual acts
14    that I could do.
15    Q.  Who wrote the text?                                              09:27:17
16    A.  Baruti Hopson or myself.
17    Q.  After the ad was submitted, what happened?
18    A.  The --
19         MS. BERTRAND:  Objection.  Vague as to time and to
20    what ad.                                                             09:27:33
21         THE COURT:  All right.  Mr. Rapp, do lay some
22    foundation as to time frame.
23    BY MR. RAPP:
24    Q.  Can you -- can you give the jury an idea of the -- the time
25    frame these postings -- I believe your testimony was you were        09:27:42
```

UNITED STATES DISTRICT COURT

1    posted about a hundred times.

2           Do you have a sense of the time frame that that

3    occurred?

4    A.  Yeah.  From June of 2010 to roughly August of 2010.

5    Q.  All right.  And during that time frame, after the ad was          09:27:56

6    posted, what, if anything, happened?

7    A.  A cell phone would start ringing, and people would call to

8    meet up with me to have sex.

9    Q.  All right.  And was this your cell phone?

10   A.  It was -- no.  No.                                                 09:28:14

11   Q.  Whose -- do you know whose it was?

12   A.  It was Baruti Hopson's.

13   Q.  All right.  And when -- when you would receive these calls,

14   did you go anywhere?

15   A.  At times, yes.                                                     09:28:30

16   Q.  Where would you go?

17   A.  Either to somebody's house or a hotel room.

18   Q.  All right.  And, ma'am, once you went to the house, to

19   the -- or to a hotel room, what, if anything, would happen?

20   A.  I would engage in acts of prostitution for -- and then            09:28:47

21   leave.

22   Q.  All right.  And who would you -- who would you engage in

23   acts of prostitution with?

24   A.  With the people calling.  So I would refer to them as johns

25   or a purchaser or a buyer.                                            09:29:03

1    Q.  Okay.  After you engaged in these acts of prostitution,

2    were you paid any money?

3    A.  Yes.

4    Q.  What, if anything, did you do with that money after you

5    were paid?                                                      09:29:21

6    A.  I would have to give it to Baruti Hopson, and he would use

7    that money to put money on the prepaid cards or to buy, like,

8    outfits or lingerie for me to wear.

9            MR. RAPP:  All right.

10           MS. BERTRAND:  Your Honor, objection.  Before we go      09:29:40

11   forward, objection to the line of questioning in 401 and 403

12   and the Court's prior rulings.

13           THE COURT:  Well, I would just give Mr. Rapp a little

14   bit of leeway here, but hopefully he won't go any much -- any

15   further.                                                        09:29:57

16           MR. RAPP:  Well --

17           THE COURT:  I'll sustain in terms of going further

18   than Mr. Rapp.

19           Well, let me -- let me -- give me one moment.

20           I'm going to overrule myself, give Mr. Rapp a little     09:30:11

21   bit of leeway here.

22           MR. RAPP:  Thank you, Your Honor.

23   BY MR. RAPP:

24   Q.  You -- I think your testimony was that sometimes you went

25   to hotel rooms?                                                 09:30:27

JESSIKA SVENGARD - DIRECT EXAMINATION          33

```
 1   A.  Correct.

 2   Q.  Did those hotel rooms belong to these -- these individuals

 3   you've identified as johns?

 4   A.  Either them or we would get our own hotel room for people

 5   to come see us.                                          09:30:42

 6   Q.  When -- when you say "we," do you mean Mr. Hopson?

 7   A.  Correct.

 8   Q.  And who would pay for that hotel room?

 9   A.  Mr. Hopson would.

10   Q.  How about the manner in which you -- you got to the hotel  09:30:50

11   room?  How would you get there?

12            MS. BERTRAND:  Your Honor, same objection to this line

13   of questioning.

14            THE COURT:  Overruled.

15            THE WITNESS:  He would drive us there.             09:31:02

16   BY MR. RAPP:

17   Q.  All right.  In his car?

18   A.  Yes.

19   Q.  And I think you were talking about some of the money that

20   he spent.                                               09:31:07

21            Did he -- when you say he was buying you clothes, was

22   that for purposes of -- of engaging in these acts of

23   prostitution?

24            MS. BERTRAND:  Objection.  Leading.

25            THE COURT:  Sustained.                             09:31:24
```

UNITED STATES DISTRICT COURT

1    BY MR. RAPP:

2    Q.  Why would he buy you the clothes?

3    A.  So either to take more pictures in lingerie or to have

4    outfits to wear when I would go see the johns.

5    Q.  Was there any other money that he spent on you personally?    09:31:35

6            MS. BERTRAND:  Objection, Your Honor.  401/403.  The

7    Court's prior orders.

8            THE COURT:  Overruled.  And, again, I'll give Mr. Rapp

9    a little leeway here.

10           THE WITNESS:  Can I answer?    09:31:52

11   BY MR. RAPP:

12   Q.  You can.

13   A.  Okay.  He would -- okay.  I'm sorry.  Can you ask --

14   Q.  Sure.

15   A.  Okay.    09:31:58

16   Q.  The money -- so, just so we're clear, the -- you received

17   money from these individuals you've identified as johns after

18   the acts of prostitution.

19           When you got that money, you gave it to Mr. Hopson?

20   A.  Correct.    09:32:12

21   Q.  And did Mr. Hopson spend any of that money on you

22   personally?

23   A.  There was times where he would get my hair died or get my

24   nails done.  And then besides that, just buying me the

25   lingerie.  But that was about -- that was about it.    09:32:29

```
 1    Q.  Were those things related to any of the things he was doing
 2    with respect to Backpage.com?
 3              MS. BERTRAND:  Objection.  Vague and leading.
 4              THE COURT:  Form of the question.  I would sustain
 5    that, Ms. -- Ms. Bertrand.                              09:32:48
 6              But, Mr. Rapp, maybe if you rephrase.
 7    BY MR. RAPP:
 8    Q.  Why was he spending the money?
 9    A.  In order for me to look better for prostitution, I guess.
10    I don't -- for lack of a better word.                   09:33:04
11    Q.  All right.  Fair enough.
12              During the time that you were with Mr. Hopson, did you
13    observe whether or not he had any legitimate source of income?
14              MS. BERTRAND:  Objection, Your Honor.  Well outside
15    the relevance of anything that's going on in this indictment.  09:33:19
16              THE COURT:  Overruled.
17              MR. CAMBRIA:  It calls for --
18              MS. BERTRAND:  And calls for a conclusion and
19    speculation.
20              THE COURT:  Well, she can testify as to what she      09:33:30
21    observed.  And so overruled.
22              THE WITNESS:  And, no, he did not have any other job.
23    BY MR. RAPP:
24    Q.  Did you see him go off to a job in the morning?
25              MS. BERTRAND:  Objection.  Asked and answered.       09:33:45
```

UNITED STATES DISTRICT COURT

 1            THE COURT:  I'm sorry.  Did you -- I didn't -- I

 2   didn't hear the question.

 3            MR. RAPP:  Oh.

 4            THE COURT:  You moved from -- you moved from the

 5   microphone, so reask the question.                              09:33:52

 6            MR. RAPP:  I'll withdraw the question.

 7   BY MR. RAPP:

 8   Q.  So have you looked at -- we've been talking about these

 9   postings.  Have you -- have you looked at those postings at

10   some point in advance of your testimony today?                 09:34:03

11   A.  I have.

12   Q.  I'm showing you for your eyes only United States 211c.

13            Ma'am, do you see that on your screen?

14   A.  I do.

15   Q.  And would you -- how many postings approximately are in   09:34:25

16   United States 211c?

17            I'll just go through them for you.

18            MS. BERTRAND:  Objection.  The jury has not seen this

19   yet.  I'd ask that it not be described to the jury.

20            MR. RAPP:  I'm not describing it.                      09:34:46

21            THE COURT:  Well, he hasn't said anything yet,

22   Ms. Bertrand, so why don't you wait for the next step.

23   BY MR. RAPP:

24   Q.  How many approximately would you say?

25   A.  How many did you just show me?                             09:34:56

1    Q.  Yeah.

2    A.  About, like, seven to ten maybe.

3    Q.  All right.  How do you know these -- are these your

4    postings?

5    A.  They are.                                                    09:35:09

6    Q.  How do you know that?

7    A.  I'm in pictures, and I recall making these or being around

8    when they were made.

9    Q.  All right.  And -- and is there a name used in these

10   postings?                                                        09:35:21

11   A.  There is.

12   Q.  Is it your name?

13   A.  No, it's not.

14   Q.  Is it a name that you used for these postings?

15   A.  Yes.                                                         09:35:29

16   Q.  Is the date range of these postings the -- the same date

17   range we've been talking about here during the time you were

18   being posted on Backpage.com?

19   A.  Yes.

20          MR. RAPP:  All right.  Move to admit United States       09:35:41

21   211c.

22          MS. BERTRAND:  Objection.  Relevance.  401/403.  This

23   Court's prior orders regarding relevance to the indictment.

24          THE COURT:  Overruled as to each of the objections.

25   They may be admitted, and they may be published.                09:35:59

JESSIKA SVENGARD - DIRECT EXAMINATION

38

```
 1                (Exhibit 211c admitted into evidence.)

 2                MR. RAPP:  Thank you.

 3     BY MR. RAPP:

 4     Q.  So I'm showing you what's on your screen, ma'am.

 5                Do you see that there?                          09:36:15

 6     A.  Yes.  Yes, I do.

 7     Q.  Okay.  Do you recognize this as one of your postings?

 8     A.  Yes.

 9     Q.  All right.  And what was the date of this particular

10     posting?                                                  09:36:26

11     A.  June 27th of 2010.

12     Q.  All right.  And do you recall the -- the -- sort of the

13     text in -- in the -- in the top part here?  Can you read what

14     that says?

15     A.  I do recall it.  "No discounts.  Well worth it.  No     09:36:40

16     discounts.  18."

17     Q.  All right.  And when it said "no discounts," ma'am, what

18     was that referring to?

19     A.  That the price that I give you you have to pay.

20     Q.  All right.  And -- and you had said that you used a -- this  09:36:57

21     wasn't your correct name; right?

22     A.  Correct.

23     Q.  What about -- what about the age?  Is -- is -- did you use

24     your real age?

25     A.  No, I did not.                                         09:37:11
```

UNITED STATES DISTRICT COURT

JESSIKA SVENGARD - DIRECT EXAMINATION

39

```
 1    Q.  All right.  Let's just look at the text quickly.

 2              Is --

 3              THE COURT:  Mr. Rapp?

 4              MR. RAPP:  Yes, ma'am.

 5              THE COURT:  Ms. Svengard, do you need a moment?      09:37:19

 6              THE WITNESS:  No.  I'm okay.  Thank you.

 7              THE COURT:  All right.

 8    BY MR. RAPP:

 9    Q.  We certainly can take a moment if you need to?

10    A.  No.  I'm okay.                                            09:37:27

11    Q.  Okay.

12    A.  I'm a crier.  It's okay.

13    Q.  All right.  So is this the text of the -- of -- of the

14    posting?

15    A.  It is.  Correct.                                         09:37:38

16    Q.  All right.  And we've been talking about the name.  Is

17    that -- is -- is this the name that -- that was used?

18    A.  Yes.

19    Q.  And down here, do you see that?

20    A.  Yeah.  Where it says "incall and outcall"?               09:37:53

21    Q.  Yeah.  Can you tell the jury what, if anything, that means.

22    A.  So an incall would be when we ourselves, me and Mr. Hopson,

23    would have a hotel room and you could come to see me there.

24    And an outcall would mean that Mr. Hopson and I would travel to

25    wherever you are and I can see you where -- at your location.  09:38:13
```

UNITED STATES DISTRICT COURT

1   Q.  All right.  And I just want to point your attention to this

2   email up here.

3         Do you recognize that email?

4   A.  Yes.

5   Q.  How do you recognize it?                                    09:38:26

6   A.  It was Mr. Hopson's email.

7   Q.  All right.  And just real quickly, were these the images

8   that were posted?

9   A.  Yes.

10  Q.  Are they you?                                               09:38:46

11  A.  Yes, they are.

12  Q.  Okay.  Let's go to the next posting.

13        Is -- is this another posting?

14  A.  Yes.

15  Q.  And is this -- and is this in the same time frame?         09:39:00

16  A.  Yes, it is.

17  Q.  And what's the date on this posting?

18  A.  July 9th of 2010.

19  Q.  And this one actually has a different age.

20        Do you see that?                                          09:39:17

21  A.  Yes.  It says that I was 19.

22  Q.  Is that an accurate age?

23  A.  No.

24  Q.  And then down here, ma'am, it has -- it says "702."

25        Do you see that?                                          09:39:30

UNITED STATES DISTRICT COURT

1              And it has written out three.  Can you explain what
2    that is.
3    A.  So it was a way to deter law enforcement from, I guess,
4    being able to identify the phone number.  It sounds silly now,
5    but it was just something we would do to not get caught by the          09:39:49
6    police.
7    Q.  How do you know that?
8    A.  That's what Mr. Hopson told me.
9    Q.  Okay.  And then let's go quickly to the next one.
10             Do you see this -- this posting here?                          09:40:02
11   A.  Yes.
12   Q.  Do you recognize it?
13   A.  Yes, I do.
14   Q.  And is this also one of the postings during that same time
15   frame?                                                                  09:40:16
16   A.  Yes.
17   Q.  All right.  And let's just look quickly at the text.
18             Same thing with respect to the phone number?
19   A.  Correct.
20   Q.  And also a reference to incall and outcall?                         09:40:23
21   A.  Correct.
22   Q.  And also the -- the images on the right side of -- of my
23   right side of the screen, is -- are those also you?
24   A.  Yes, they are.
25   Q.  Okay.  Let's go to the next one.                                    09:40:36

1          Same thing here?

2   A.  Correct.

3   Q.  In July of 2010?

4   A.  Yes.

5   Q.  This reference to right here, can you explain that.          09:40:51

6   A.  That is regarding to the incall or outcall.  You could

7   come -- I could come to you, or you could come to me.  "See you

8   soon."

9   Q.  All right.  And then the phone number, is that the same?

10  Were you engaging in the same sort of trying to conceal the --   09:41:15

11  the phone number?

12  A.  Correct.  Yes.

13  Q.  Okay.  And also down here, incall/outcall as well --

14  A.  Yes.

15  Q.  -- right?                                                    09:41:25

16          All right.  Going on to the next one.  Same type of

17  posting.  In July of 2010?

18  A.  Yes.

19  Q.  Not your correct name?

20  A.  No.                                                         09:41:48

21  Q.  Does this have a description of you physically?

22  A.  Yes, it does.

23  Q.  All right.  Let's go to the next one.

24          Do you see the top part there that has the number 120?

25  A.  Yes, I do.                                                  09:42:12

```
 1   Q.  Can you explain what those figures mean.

 2   A.  Yeah.  So the 120 with the two Hs would be 120 for a half

 3   hour with me.  And the 150 with the Hr would be 150 to spend an

 4   hour with me.

 5   Q.  $120, 100 -- I mean, 120 for half hour; $150 for an hour?        09:42:32

 6   A.  That's correct.

 7   Q.  All right.  All right.  In terms of the text in here, does

 8   it also reference the -- that time increment --

 9   A.  It does.

10   Q.  -- with --                                                       09:42:58

11   A.  Oh.

12   Q.  -- with the reference to -- this is a reference to money

13   down here?

14   A.  Yes.

15   Q.  All right.  And then some of the text here, we'll just look     09:43:04

16   at it really quick.

17           Do you see where I've highlighted here?

18   A.  Yes.

19   Q.  Can you explain to the jury what that means.

20   A.  Just essentially meaning I'm going to give them sexual           09:43:18

21   favors for being special to me.

22   Q.  All right.  Let's go to the next one.

23           With regard to this one, this has different text than

24   some of the previous ones.  Fair?

25   A.  Yes.                                                             09:43:48
```

JESSIKA SVENGARD - DIRECT EXAMINATION                          44

1   Q.  All right.  Can you -- do you see this, where I've

2   highlighted?

3   A.  Yes, I see it.

4   Q.  To the best of your ability, can you -- can you explain

5   what that meant back in 2010 to you.                    09:44:01

6   A.  It's -- if you are reading between the lines, I'm not a

7   massage therapist and I'm not a professional, but I can give

8   you a body rub as, like, a sexual favor or could lead to a

9   sexual favor for somebody.

10  Q.  Okay.  And then same thing with respect to the phone  09:44:22

11  number?

12  A.  Yes.

13  Q.  Let's go to this one.

14          This is now -- is this one now in August of 2010?

15  A.  It is.                                               09:44:40

16  Q.  And does it have those same type of references,

17  Ms. Svengard, into the 150 per hour?

18  A.  It does.

19  Q.  Down here as well?

20  A.  Correct.                                             09:44:57

21  Q.  And then same reference here --

22  A.  Yes.

23  Q.  -- that we just talked about on the previous one; right?

24  A.  Yes, correct.

25  Q.  Okay.  I give them specials for being special.      09:45:07

UNITED STATES DISTRICT COURT

```
 1              Okay.  And then the outcall/incall?
 2   A.  Yeah.  That one says "outcall/anywhere," so I would have
 3   only been doing outcalls at the time of that posting.
 4   Q.  All right.  In September of 2010, did you have -- do you
 5   recall a specific appointment to meet a john or a customer?     09:45:31
 6   A.  I do.
 7   Q.  And did you go somewhere to meet that person?
 8   A.  Yes.  I went to the hotel room that they had given me the
 9   address for.
10   Q.  All right.  And did you meet with a john during that --     09:45:47
11   that occasion in September of 2010?
12   A.  I had planned to, yes, but it was actually a undercover
13   officer.
14              MR. RAPP:  All right.  Okay.  I don't have anything
15   further.  Thank you.                                            09:46:04
16              And thank you, Ms. Svengard.
17              THE WITNESS:  Thank you.
18              THE COURT:  All right.  Mr. Cambria?
19              Ms. Bertrand?
20              MS. BERTRAND:  I'm tasked with going first, if that's  09:46:14
21   all right, Your Honor.
22              THE COURT:  Yes.  Please come forward.
23                         CROSS-EXAMINATION
24   BY MS. BERTRAND:
25   Q.  Good morning, Ms. Svengard.                                 09:46:28
```

```
 1   A.  Good morning.

 2   Q.  My name's Joy Bertrand.  I represent Joye Vaught.  I don't

 3   think we've met before, so I just wanted to introduce myself

 4   before we spoke.

 5        Baruti Hopson's in prison now; right?          09:46:39

 6   A.  Correct.

 7   Q.  The -- the woman that you mentioned who took the photos of

 8   you initially was a friend of yours?  An ex- -- now ex-friend,

 9   but at the time a friend of yours?

10   A.  I would have classified her as a friend at first, yes.   09:46:55

11   Q.  Her name was Candace?

12   A.  Yes.

13   Q.  Is -- do you know if Candace is in prison now?

14   A.  I do not know.

15   Q.  Do you know whether or not law enforcement in the      09:47:06

16   prosecution of Baruti Hopson sought material and information

17   from Backpage?

18   A.  I'm sorry?

19        MR. RAPP:  Objection.  Relevance.  Objection.

20   Foundation.  Relevance.                          09:47:20

21   BY MS. BERTRAND:

22   Q.  If you know.

23        THE COURT:  Sustained.

24   BY MS. BERTRAND:

25   Q.  The day that -- in September of 2010, when you encountered   09:47:28
```

1    law enforcement, law enforcement had set this up through

2    Backpage, a Backpage ad; correct?

3              MR. RAPP:  Objection.  Objection.  Foundation.

4              THE COURT:  Sustained.

5    BY MS. BERTRAND:                                          09:47:48

6    Q.  Do you know how the person you believed was a john

7    contacted you, knew how to contact you?

8              MR. RAPP:  Same objection.

9              THE COURT:  Overruled.

10             THE WITNESS:  Through a Backpage ad.  That would be my   09:48:02

11   understanding.

12             MS. BERTRAND:  Okay.  Thank you.  I have nothing

13   further.

14             THE COURT:  Mr. Rapp?

15             Oh.  Oh, I'm sorry.  I didn't give anybody else an   09:48:13

16   opportunity.

17             Mr. Panchapakesan?

18             MR. PANCHAPAKESAN:  No, Your Honor.

19             THE COURT:  Mr. Kessler?

20             MR. KESSLER:  No, Your Honor.                       09:48:21

21             THE COURT:  Mr. Eisenberg?

22             MR. EISENBERG:  I'm going to yield back to my

23   colleague, Ms. Bertrand, if that's all right.

24             THE COURT:  I thought you were done.

25             MS. BERTRAND:  He's handing off to me so I can ask one   09:48:32

thing.

THE COURT: Oh, I'm sorry. Yes.

MS. BERTRAND: It's -- I only had one cup of coffee coming in, so I stepped away too fast. So I apologize.

BY MS. BERTRAND: 09:48:43

Q. Ms. Svengard, have you ever met Andrew Padilla?

A. No.

Q. Have you ever met Scott Spear?

A. No.

Q. Have you ever met Jed Brunst? 09:48:51

A. No.

Q. Have you ever met Joye Vaught?

A. No.

Q. Have you ever met Michael Lacey?

A. No. 09:49:01

MS. BERTRAND: No.

That's all I have. Thank you, Your Honor.

THE COURT: All right. Thank you.

Mr. Rapp?

MR. RAPP: That won't be necessary. Thank you. 09:49:06

THE COURT: All right. May the witness be released from the subpoena?

MR. RAPP: Yes.

THE COURT: Any objection by defense?

MR. CAMBRIA: No, Your Honor. 09:49:14

1        MR. FEDER:  No.

2        THE COURT:  All right.  Thank you, ma'am.  You may

3  step down.  We appreciate your testimony.

4        Call your next witness.

5        MR. BERRY:  Thank you, Your Honor.  The United States      09:49:25

6  calls Brian Griffin.

7        THE COURT:  Sir, do come forward to my courtroom

8  deputy and be sworn.

9        THE COURTROOM DEPUTY:  Please raise your right hand.

10     (BRIAN GRIFFIN, a witness herein, was duly sworn or

11  affirmed.)

12        THE COURTROOM DEPUTY:  Thank you.  Please proceed to

13  the witness stand, and make sure to speak into the microphone.

14        THE WITNESS:  Good morning, Your Honor.

15        THE COURT:  Good morning.      09:50:09

16     Mr. Berry, whenever you're ready.

17        MR. BERRY:  Thank you.  One second.

18     All right.  I'm ready, Your Honor.

19                    DIRECT EXAMINATION

20  BY MR. BERRY:      09:50:18

21  Q.  Good morning.  Lieutenant; correct?

22  A.  Yes, sir.  Good morning.

23  Q.  Please state your first name, and spell it for the jury.

24  A.  First name is Brian, B-R-I-A-N.  Last name is Griffin,

25  G-R-I-F-F-I-N.      09:50:56

UNITED STATES DISTRICT COURT

1    Q.  Beat me to the second question.  Thank you.

2           In what state do you live?

3    A.  Massachusetts.

4    Q.  How old are you, sir?

5    A.  46 years old.                                        09:51:05

6    Q.  Where do you work?

7    A.  I work for the Town of Northborough Massachusetts Police

8    Department.

9    Q.  And how long have you worked there?

10   A.  23 years.                                            09:51:14

11   Q.  Could you please explain to the jury your history, the work

12   history in law enforcement, please.

13   A.  Sure.  I've been a police officer for 23 years.  Upon

14   graduating college, I was hired by the Town of Northborough

15   Massachusetts Police Department.  That police department put me  09:51:29

16   through a six-month police academy.  Upon graduating the

17   academy, I entered the department as a patrol officer where I

18   served for about three to four years answering 911 calls,

19   responding for calls for service.  I was promoted to detective

20   and served in that role for about 15 years.  I was then         09:51:52

21   promoted to a sergeant and oversaw the investigation unit.  And

22   my current position is a lieutenant where I see -- oversee

23   day-to-day operations of the police department.  I oversee

24   internal affairs, accreditation, and training.

25   Q.  Thank you.                                           09:52:11

51

1          Now, if you would, please just give us a sense as to

2   sort of the size of your police department and the community

3   that you serve.

4   A.  Sure.  We're a small community located about 45 minutes

5   west of Boston.  We're a bedroom community.  We have          09:52:23

6   approximately 17,000 people that live in the community.

7   Describe it as a middle to upper middle class community.

8   Q.  And for those who might not be familiar with what it means

9   to be a bedroom community, can you explain your -- your

10  understanding of that as best --                             09:52:43

11  A.  Sure.  That a lot of our residents work in Boston.  They go

12  to work during the day in Boston.  They come back to our

13  community at night, and that's where they reside.

14  Q.  That's where they sleep?

15  A.  That's correct.                                          09:52:55

16  Q.  Work elsewhere; sleep there.

17          What about the size of your police department?

18  A.  We're a small agency of about 30 full-time employees.

19  Q.  In recounting your history in law enforcement, did you

20  indicate that you had any general training on how to be a    09:53:10

21  police officer?

22  A.  That's correct.

23  Q.  And what was that training?

24  A.  Six months in a police academy.

25  Q.  Okay.  And you've been with law enforcement for 23 years  09:53:18

1    now?

2    A.   That's correct.

3    Q.   Okay.  And did you receive any more specific training on

4    how to investigate prostitution offenses?

5    A.   Yes, I did.                                                09:53:30

6    Q.   Please explain that a little bit.

7    A.   Say from 2010 we started having a lot of issues with

8    prostitution in our community, so I would put in for training

9    sponsored oftentimes by our local district attorney's office to

10   familiarize ourselves with how to investigate these type of    09:53:50

11   cases.

12   Q.   Okay.  And so you did go to some of those trainings?

13   A.   Yes, I did.

14   Q.   Okay.  How many prostitution-related investigations have

15   you worked in your career?                                     09:54:01

16   A.   I would say a couple dozen.  Less than 50 but over 20.

17   Q.   Okay.  Are you familiar with Backpage.com?

18   A.   Yes, I am.

19   Q.   When did you become aware of Backpage?

20   A.   It was probably around 2011-2012.                         09:54:18

21   Q.   And how did you become aware of it?

22   A.   It started -- we started receiving information from other

23   law enforcement agencies that a lot of the prostitutes were

24   going to this web page.  So it kind of was shared information

25   from law enforcement to law enforcement that this was the new  09:54:40

1    place where -- to go to investigate these type of crimes.

2    Q.  Okay.  Did you ever utilize Backpage in any of your law

3    enforcement investigations?

4    A.  Yes, I did.

5    Q.  Please explain that to the jury.                           09:54:54

6    A.  During my time in investigations, it was routine during the

7    week that our detectives would go on that web page,

8    specifically the escort section, to look to see who was

9    advertising in our community.  So it was a routine practice

10   that we would monitor that web page.                           09:55:18

11   Q.  And when you say "monitor," explain to the jury how you

12   would do that.

13   A.  Go on to the web page.  Right-hand section, there was a

14   section for escorts.  You would select your state,

15   Massachusetts, and then it broke it down into various large    09:55:37

16   cities.  So the closest large city near my community is

17   Worcester, Massachusetts.  So we would click on Worcester,

18   Massachusetts, and then we could -- in the search feature, we

19   could search for our town specifically from -- so that would be

20   Northborough, and we would see who was working in our town that 09:55:56

21   night.

22   Q.  And for those of us who are not familiar with the -- the

23   town names, how do we spell Worcester?

24   A.  Worcester?

25   Q.  Yeah.                                                       09:56:11

1   A.  W-O-R-C-E-S-T-E-R.  Worcester.

2   Q.  Got it.  Thank you.

3        So you would go on, look at that -- that area, and

4   then how would you sort of localize it and get it even closer

5   to Northborough?                                          09:56:26

6   A.  Again, I would search -- I would typically type in my town

7   name or I would search the road where I had a couple of motels

8   located on, which was Route 9.

9   Q.  Okay.  Did you ever do what's called a reverse sting?

10  A.  Yes.                                                  09:56:42

11  Q.  Explain to the jury what that is.

12  A.  So a reverse sting, basically law enforcement would place

13  an ad where our -- our goal would be to have the johns, the

14  customer, come to us.  So we would post an ad as if we were the

15  prostitute.  We would post it, and, yeah, we would have the    09:57:04

16  johns come to us at one of our local motels.  And we would

17  typically arrest the person.

18  Q.  Okay.  So did that involve creating an ad and posting it on

19  Backpage?

20  A.  That's correct.                                       09:57:18

21  Q.  And what was your involvement with the ad portion?

22  A.  I wasn't really involved.

23        MR. KESSLER:  Objection.  Foundation.  Time.

24        THE COURT:  Well, lay some foundation then, Mr. Berry.

25        MR. BERRY:  Sounds good.                            09:57:35

UNITED STATES DISTRICT COURT

1    BY MR. BERRY:

2    Q.   You said you've done these reverse stings; correct?

3    A.   Correct.

4    Q.   What time period are we talking about in your 23 years in

5    law enforcement were you doing these types of stings?          09:57:44

6    A.   This is probably 2012 to 2016 or '17.

7    Q.   Okay.  All right.  So when we're talking about the reverse

8    stings that you're doing in Northborough, we're talking this

9    time period, 2012-2016?

10   A.   That's correct.                                            09:58:10

11   Q.   Okay.  How often would you all do these stings?

12   A.   A couple times a year.  So in -- in that time frame, we

13   probably did maybe six or seven reverse stings.

14   Q.   Okay.  So back to my question about the creation of the ads

15   for the reverse sting.                                          09:58:31

16          Did you personally create the ads?

17   A.   No.

18   Q.   All right.  Was there someone else on the task force who

19   did that?

20   A.   That's correct.                                            09:58:40

21   Q.   Were you familiar with what the ad looked like once it was

22   created by a colleague?

23   A.   Yes.

24   Q.   Are you able to discuss what it looked like; words,

25   pictures, things like that?                                    09:58:50

1  A.  Yes.

2  Q.  Okay.  You have familiarity with what those ads were?

3  A.  Yes.

4  Q.  All right.  Tell the jury a little bit about how you all

5  tried to -- what you did to create the ad.  Not necessarily the          09:58:58

6  step by step but the content.

7  A.  We would put -- you know, in the title of the -- of the ad,

8  we would put something that would catch someone's attention,

9  but we also had to be mindful of the words we used.  We

10 couldn't put, for instance, sex for a fee.  We would have to          09:59:21

11 use come see us for a good time, for instance.

12         We would then -- so we would place, you know, a title.

13 We would typically put an age that we were pretending to be,

14 for instance, 23, which would be 23 years old.  And then when

15 you'd click on the ad, the ad would come up, which would give          09:59:45

16 you a little bit more information about what we were

17 essentially trying to relay to the potential customer, so a

18 little more bio, again, without using words that would raise a

19 red flag.  We would discuss possibly a cost for coming to see

20 us and an hour amount or a -- you know, usually, for instance,          10:00:13

21 we would put $50 for a half hour or $100 for an hour, and then

22 we would leave a phone number to contact us at.

23 Q.  How did you all -- how did you learn how to do that?  How

24 did you -- how did you learn what needed to go in these ads?

25 A.  Just by reading what was already on the Backpage.  We would          10:00:32

UNITED STATES DISTRICT COURT

1    read other ads that were out there and kind of mirror what was

2    already out there.

3    Q.  Once the ad was posted, what would happen next?

4    A.  We would wait for the phone to ring.

5    Q.  How long would you have to wait?                          10:00:51

6    A.  Minutes.

7    Q.  And once the phone started ringing, what would happen?

8    A.  We would typically have a female undercover

9    officer answering those phone calls.  She would have

10   conversation with the potential customer.  They would discuss   10:01:10

11   things such as what that customer was looking for, for

12   instance, if it was oral sex.  They would discuss how long that

13   customer would want to be with the undercover, and then they

14   would discuss for the john or the customer to come to her

15   location, which was at one of our motels.                    10:01:33

16   Q.  And what would you put in your ad to make it clear to the

17   viewer, the john, that it was intended to be an ad for

18   prostitution?

19   A.  I'm sorry.  Could you repeat that question?

20   Q.  Sure.  It was a -- it was convoluted.  I apologize.      10:01:49

21        What would the -- what would be the content of the ad

22   that you would put in there that was intended to convey you

23   were a -- a prostitution ad?

24   A.  Again, we would use language such as come have fun with me,

25   are you looking for a good time, things to that nature.  And   10:02:07

UNITED STATES DISTRICT COURT

1    then generally during the conversation over the phone, it would

2    be a little more detailed.

3    Q.  What about the photos?  Were those intended for any

4    purpose?

5    A.  The photos were typically, yes, to get the attention of the          10:02:19

6    john.  They were, you know, often, you know, revealing

7    pictures.

8    Q.  Revealing pictures of what?

9    A.  It would -- you know, of an attractive female.  The

10   blurred-out face.  But, you know, scantily clad, things like          10:02:38

11   that.  Clothes.  Excuse me.

12   Q.  They weren't pictures of Mickey Mouse?

13   A.  No.

14   Q.  All right.  How often did you post these decoy ads on

15   Backpage?          10:02:49

16   A.  As I said, we did them maybe a couple times a year.

17   Q.  Okay.  Over this four-year period of time?

18   A.  Yeah, exactly.

19   Q.  Okay.  And what section did you post in?

20   A.  Escort section.          10:03:00

21   Q.  And in your training and experience working Backpage

22   investigations, what did you come to understand escort meant?

23   A.  Sex for a fee.

24   Q.  Now, we -- we started with reverse sting, what you called

25   reverse stings.          10:03:17

1              What is a sting as opposed to a reverse sting?

2    A.   Yeah.  So, I mean, a sting would be, as I said, oftentimes

3    our detectives would go on the Backpage when they came -- when

4    they came on shift.  They would see that there was one or two

5    people that had advertised in our community.  The undercover          10:03:35

6    officer would either call or text the number that was provided

7    in the advertisement and have a discussion with the -- the

8    female.  And generally that discussion led to the female

9    offering sex for a fee over the phone.

10   Q.   And so to do those stings, you would be looking at ads that      10:03:58

11   were already on Backpage?

12   A.   That's correct.

13   Q.   Not law enforcement-created ads?

14   A.   Correct.

15   Q.   How many ads on Backpage escort section would you say            10:04:12

16   you've reviewed in your law enforcement career?

17   A.   Over a hundred but under 200.

18   Q.   Okay.  In the course of reviewing those hundred-plus ads

19   and the dozen -- two dozen, I think you said, in prostitution

20   cases you've investigated using Backpage, did you come to learn      10:04:42

21   the terminology that was used in those ads?

22   A.   Yes, I did.

23   Q.   Were there any commonly used terms when you would review

24   those ads and work those cases?

25   A.   Yes, there were.                                                 10:04:56

1   Q.  Explain those to -- to the jury as best you can recall.

2   A.  There -- a couple words that are -- were often included in

3   the ads were the words incall and outcall.

4   Q.  Okay.  And what did those mean?

5   A.  An incall is when the prostitute wants the john of a          10:05:14

6   customer to come to her, and an outcall would be that she is

7   willing to go out to his location.

8   Q.  Are there any other code words that come to mind that you

9   can think of?

10  A.  There was, you know, hidden, you know, language, you know,    10:05:33

11  for oral sex.  They would use the term maybe a B and a J with

12  an underscore.  They would also -- oftentimes also hide their

13  phone numbers.  They would spell out their phone numbers, not

14  actually write the -- the number itself down.  So that, yeah,

15  it was -- it was like a hidden language.                         10:05:58

16  Q.  All right.  Explain the -- the significance of this

17  spelling out the phone number.

18  A.  Yeah.  So if they were -- I mean, you know, most of us here

19  would probably write out our phone numbers using the actual

20  number.  So, for instance, if you were write -- if you were     10:06:11

21  writing the number 3, they write it out, right, T-H-R-E-E.  And

22  then if the next number would be 5, they would write out

23  F-I-V-E.

24       And what I learned was oftentimes they did this to

25  conceal their identity a little bit.  Because if you were to go  10:06:30

1   to a search engine, such as Google, and type in that phone

2   number, her phone number, it's going to automatically pop up

3   with her ads.  But if you spelled it out, it would be a lot

4   more difficult to find out who she was.

5   Q.  And why were they trying to hide their identity if they're          10:06:47

6   advertising their services?

7   A.  Because what they were doing was illegal.

8   Q.  Now, do you recall an incident that happened in

9   Northborough that you investigated in September of 2013?

10  A.  Yes.                                                                 10:07:03

11  Q.  Were you -- what was your role with the police department

12  at that time?

13  A.  I was a -- a detective.

14  Q.  Where were you when this incident began that you started

15  investigating?                                                          10:07:21

16  A.  I was a -- I was in an unmarked police vehicle parked

17  outside the Motel 6, which is located at Route 9 in

18  Northborough, Massachusetts.

19  Q.  And what happened?  Explain to the jury what happened.

20  A.  So I was --                                                         10:07:37

21          MR. KESSLER:  Objection.  That calls for a narrative.

22          THE COURT:  Sustained.

23  BY MR. BERRY:

24  Q.  All right.  So you're sitting in your -- we'll do this --

25  we'll do this slowly.                                                   10:07:47

1      You're sitting in your unmarked car outside the

2  Motel 6; is that correct?

3  A.  That's correct.

4  Q.  Was there a dispatch call that you heard?

5  A.  Yes, there was.                                          10:07:54

6  Q.  What did you learn from that dispatch call?

7  A.  The dispatch --

8          MS. BERTRAND:  Objection.  Hearsay.

9          THE COURT:  Overruled.

10  BY MR. BERRY:                                               10:08:04

11  Q.  You may answer.  Go ahead.

12  A.  The dispatch received a phone call from a store clerk.  The

13  store clerk had concerns about two young females who had gone

14  into her store, and they told her that --

15          MR. KESSLER:  Objection.  That part is hearsay.     10:08:18

16          THE COURT:  Sustained.

17  BY MR. BERRY:

18  Q.  So the -- the clerk -- the dispatch call says a clerk

19  called -- saw two young females?

20  A.  Correct.                                                10:08:26

21  Q.  Okay.  Was there some concern about the females?

22  A.  Yes, there was.

23  Q.  All right.  Were the females described?

24  A.  Yes, they were.

25  Q.  What was the description of what the females looked like? 10:08:36

```
 1            MR. KESSLER:  Objection.  Form of the question.  I'm

 2   not sure where the description is coming from.

 3            MR. BERRY:  Well, that's where we're headed, because

 4   it's going to establish what he does next.

 5            THE COURT:  Yes.  So overruled.                    10:08:50

 6   BY MR. BERRY:

 7   Q.  Go ahead.

 8   A.  Could you repeat the question?

 9   Q.  Yeah.  The -- what was the description of the two females

10   that you heard on the dispatch call?                       10:08:58

11   A.  There were two females.  They were young.  One was

12   described as a heavy white female, and the other was described

13   as a small Hispanic female who was wearing pajama pants with,

14   like, a -- a leopard skin pattern to them.

15   Q.  And you heard this description?                        10:09:20

16   A.  I did.

17   Q.  And did you happen to see those two girls?

18   A.  Yes, I did.

19   Q.  Explain to the jury the sort of sequence there.

20   A.  So I was in an unmarked police car parked outside the  10:09:34

21   Motel 6.  I had seen two females fitting that description leave

22   the store and walk into the Motel 6.

23   Q.  And then?

24   A.  And then we had received a call.  Then the call came in

25   right after that.                                          10:09:56
```

```
 1    Q.  Okay.  So just somewhat coincidental, you happened to be

 2    sitting in the Motel 6 parking lot, hear this call, and see

 3    these two girls?

 4    A.  That's correct.

 5    Q.  All right.  Once you saw them and realized, wait, that's      10:10:06

 6    what I just heard, what did you do next?

 7    A.  I spoke to the store clerk to just get some more

 8    information.

 9    Q.  All right.  Did you learn what room they were staying in?

10    A.  I did.                                                        10:10:19

11    Q.  What did you do after you spoke to the clerk?

12    A.  I spoke to the clerk at the hotel, learned what room.

13    Q.  Without learning -- without saying what the clerk told you

14    in any specific detail at all, just after you talked to the

15    clerk, what did you do next?                                      10:10:43

16    A.  I went onto the Backpage website.

17    Q.  And why -- you hear a dispatch call, you see these two

18    girls, you talked to the clerk -- the hotel clerk, and then

19    your next step is to go on Backpage?

20    A.  That's correct.                                              10:11:00

21    Q.  Why?

22    A.  The concern was they were prostitutes.

23    Q.  Okay.

24    A.  I went on the Backpage because over the last couple of

25    years in my role so many of our cases started there, and I knew  10:11:09
```

UNITED STATES DISTRICT COURT

1    if they were working as prostitutes at a hotel in my community

2    that I would most likely be able to find them on the Backpage.

3    Q.  And so you went on Backpage looking for them.  What

4    happened when you got on Backpage?

5    A.  I searched.  I looked for the prostitutes who were working    `10:11:27`

6    in my community, and I found an ad.  And looking at the

7    pictures on the ad, it appeared to be the same girls that I'd

8    seen walking from the store back to the hotel.

9    Q.  So you see an ad.  You think it might be them?

10   A.  Right.                                                        `10:11:50`

11   Q.  What do you do next?

12   A.  There was a phone number listed, so I called the phone

13   number.

14   Q.  And when you called the phone number, did anyone answer?

15   A.  Yes.                                                          `10:12:03`

16   Q.  Who answered the phone?

17   A.  A female who was later identified as Destinee Ortiz.

18   Q.  Destinee Ortiz?

19   A.  That's correct.

20   Q.  Do you know how to spell her name?  And if you don't, it's   `10:12:14`

21   not a -- it's not a pop quiz.

22   A.  I could spell Ortiz for you.  That would be O-R-T-I-Z.

23   Q.  All right.

24   A.  I'm not sure about Destinee.

25   Q.  In your discussions with Destinee, what -- what transpired   `10:12:30`

```
 1   in that conversation between you and her?
 2   A.  I told Destinee --
 3           MR. KESSLER:  Objection.
 4           THE WITNESS:  -- that I was --
 5           MR. KESSLER:  Objection.  Hearsay.                10:12:40
 6           MR. BERRY:  This is to establish what he does next,
 7   Your Honor.
 8           THE COURT:  Sustained.
 9           Well, you can rephrase.
10   BY MR. BERRY:                                             10:12:48
11   Q.  All right.  So you had a discussion with her on the phone;
12   correct?
13   A.  Correct.
14   Q.  All right.  As a consequence of that discussion, what did
15   you do next?                                             10:13:00
16   A.  I made an appointment to see her.
17   Q.  And what was your understanding of what that appointment
18   was going to be for?
19   A.  I was going to pay her for sex.
20   Q.  And based upon -- for what kind of sex, if --          10:13:12
21   A.  Oral sex.
22   Q.  -- that was discussed?
23   A.  Oral sex.
24   Q.  And if you would, please just let me finish the question
25   before you answer.  That way we can have the court reporter get  10:13:23
```

 1   it down in the right sequence and we're not tripping over each

 2   other.

 3            So you said it was for oral sex; correct?

 4   A.  Yes.

 5   Q.  Okay.  And was that based upon the conversation that you          10:13:33

 6   had, you felt like you had an agreement?

 7   A.  Yes.

 8   Q.  All right.  So you have this agreement to go have oral sex

 9   with this Destinee person; correct?

10   A.  Correct.                                                          10:13:49

11   Q.  Was there a price agreed to?

12   A.  Yes.

13   Q.  And what did you do next after you hung up the phone?

14   A.  She provided me with the room number she was staying at at

15   the Motel 6.  I had myself and several officers went to the          10:14:02

16   room she was staying in, and I knocked on the door.

17   Q.  All right.  Let's back up one step.

18            From the time you observed them with -- heard the

19   call, you observed them?

20   A.  Correct.                                                         10:14:20

21   Q.  How soon after that did you make this call?

22   A.  Less than a half an hour.

23   Q.  Okay.  So within 30 minutes of seeing them, you found them

24   on Backpage, and you've made a call?

25   A.  That's correct.                                                  10:14:33

1    Q.  And you've set up the date at that point?

2    A.  Yes, I did.

3    Q.  All right.  And then how long after that before you

4    actually went to the room?

5    A.  This all happened within an hour.                    10:14:42

6    Q.  Okay.  So you said something about several other officers.

7    Explain to the jury what was -- how did law enforcement handle

8    this situation?

9    A.  Yeah.  I would have had myself, who was in plain clothes,

10   and then I would have had uniformed police officers with me.   10:14:56

11   Yeah.

12   Q.  And did you all go to the room?

13   A.  Yes, we did.

14   Q.  What did you do next?

15   A.  I would have knocked on the door.  And the uniformed       10:15:05

16   officers would have been standing to the left and to the right

17   of me so that when Destinee looked out the peephole or opened

18   the door slightly, she would just see a -- me, a plain-clothed

19   person, who she would have assumed was a customer.

20   Q.  And so they don't see the -- the uniformed officers.       10:15:27

21   You're the undercover guy.  You look like just the johns, is

22   what you're trying to do?

23   A.  That's correct.

24   Q.  All right.  Did Destinee open the door?

25   A.  Yes, she did.                                              10:15:39

1    Q.  At that point what did you do?

2    A.  I immediately identified myself as a police officer, and

3    the uniformed officers at that point showed themselves.

4    Q.  And what -- did you observe anyone else in the room?

5    A.  Yes, I did.                                                    10:15:55

6    Q.  Who else did you observe in the room?

7    A.  This -- I observed the heavy-set female who was on the bed.

8    Q.  And was there anyone else in the hotel room area?

9    A.  Yes.  There was a -- a male who was located in the

10   bathroom.                                                          10:16:17

11   Q.  All right.  And did you identify him?

12   A.  Yes, I did.

13   Q.  Who was he?

14   A.  Rodney Sully.

15   Q.  And what was his role?                                         10:16:24

16   A.  He was a john.

17   Q.  He was --

18   A.  He was there as a customer.

19   Q.  Right.  So he was another john that was already in the

20   room?                                                              10:16:33

21   A.  That's correct.

22   Q.  Is that -- did that surprise you?

23   A.  Very much so.

24   Q.  Was that a little bit unusual?

25   A.  Yes.                                                           10:16:39

1    Q.  Did you understand what the situation was?

2    A.  Not immediately, but we learned.

3    Q.  What did you come to understand?

4    A.  Rodney Sully was there.  He was a cab driver for Worcester,

5    Massachusetts, and had seen the girls outside earlier in the          10:16:51

6    night.  And he provided them with a room because their room had

7    expired.  They had to check out.  So Rodney provided them with

8    a room and ultimately had sex with them.

9    Q.  After identifying the three individuals, Destinee, the

10   other female, and Sully in the room, what happened next?            10:17:14

11   A.  We separated everybody to interview them and ultimately

12   arrested Rodney Sully for various charges.

13   Q.  And what happened to the girls?

14   A.  We called for an ambulance and brought them to the local

15   hospital for an exam.                                                 10:17:37

16   Q.  All right.  So Sully wasn't a pimp?

17   A.  He was not.

18   Q.  Did the -- in the course of your investigation, did you

19   ultimately learn that there was a pimp involved with Destinee?

20   A.  That's correct.                                                   10:17:49

21   Q.  And explain just very briefly, what is a pimp?

22   A.  A pimp is --

23            MR. KESSLER:  Objection.  That calls for hearsay.

24            THE COURT:  Overruled.

25            ///

1   BY MR. BERRY:

2   Q.  Go ahead.

3   A.  A pimp is --

4          MR. KESSLER:  Objection.  Foundation then.  How does

5   he know this?                                                    10:18:02

6          THE COURT:  Well, I think he laid sufficient

7   foundation for his background in investigating these types

8   of --

9          MR. KESSLER:  No, this particular question.

10          THE COURT:  Did you hear the question, Mr. Kessler?      10:18:14

11          Why don't you ask the question again clearly.

12          MR. BERRY:  Sure.

13   BY MR. BERRY:

14   Q.  What is a pimp?

15   A.  A pimp is a boss, a CEO of a prostitute.                    10:18:27

16   Q.  What do you mean by that?

17   A.  He is in charge of the girl.  He provides her with clothes,

18   oftentimes a place to live, money, and he is in charge of

19   scheduling johns to come visit the girl.

20   Q.  Was that consistent -- your -- your understanding of what a 10:19:01

21   pimp is, is that consistent with the pimp in this case involved

22   with Destinee?

23   A.  Yes.

24          MR. KESSLER:  Objection.  Again, it calls for hearsay,

25   and it lacks foundation.                                        10:19:16

1       MR. BERRY:  He's talking about the investigation he

2   conducted, Your Honor.

3       THE COURT:  Overruled.

4   BY MR. BERRY:

5   Q.  You may answer.                                          10:19:22

6   A.  Would you repeat the question?

7       MR. KESSLER:  Your Honor, it -- my objection is -- is

8   based on -- on how he would know this.

9       THE COURT:  He was the investigator, Mr. Kessler.

10      MR. KESSLER:  But he would get a --                      10:19:33

11      THE COURT:  Okay.  Let's not --

12      MR. KESSLER:  -- the information from some source.

13      THE COURT:  Let's not have a speaking objection.  I've

14  overruled the objection, the initial objection.

15      So let's move forward, Mr. Berry.                        10:19:42

16  BY MR. BERRY:

17  Q.  Mr. Griffin, how did you learn your name?

18  A.  I'm sorry?  Could you --

19  Q.  Your first name, Brian, how did you learn what your first

20  name was?                                                    10:19:51

21  A.  How did I learn it?

22  Q.  Yes.

23  A.  My mother gave it to me.

24  Q.  Okay.  Thank you.

25  A.  Okay.                                                    10:19:54

1          MR. KESSLER:  Objection.  Move to strike.  That's a

2     mockery.

3          THE COURT:  Sustained.

4          Let's all take a moment.  Take a breath.  Pay

5     attention to the question and the answer, and then let's move          10:20:04

6     forward.

7     BY MR. BERRY:

8     Q.  So you -- you mentioned things that the pimp does when you

9     were just talking about a pimp generally?

10    A.  That's correct.          10:20:14

11    Q.  And the question that drew the objection that you're now

12    allowed to answer is, was that consistent with what your

13    understanding of the pimp in Destinee's case?

14    A.  Yes.

15    Q.  Did he control the money?          10:20:26

16    A.  He did.

17    Q.  Did he buy the hotel room?

18         MR. KESSLER:  Objection.  It's still hearsay, and it

19    lacks foundation how he knew this.

20         THE COURT:  All right.  Let's -- let's go again and          10:20:33

21    lay the foundation for this witness's experience in knowing

22    this, Mr. Berry.

23         MR. KESSLER:  Your Honor, I'm speaking about the pimp

24    in this case, not in general.

25         THE COURT:  Well, you can lay some foundation for that          10:20:49

 1   as well, Mr. Berry.

 2   BY MR. BERRY:

 3   Q.  How did you learn that there was a pimp involved in this

 4   case?

 5   A.  Through my interview of Destinee.                          10:20:57

 6        MR. KESSLER:  And I -- so I renew my objection to

 7   hearsay.

 8        THE COURT:  Overruled.

 9   BY MR. BERRY:

10   Q.  Did you ultimately identify this person?                  10:21:08

11   A.  Yes.

12   Q.  Was that person ever held accountable?

13   A.  No.

14   Q.  Now, the -- you said something about being the boss or CEO

15   of the prostitute.                                            10:21:24

16        Would you say that the -- the pimp is the owner of the

17   business?

18   A.  Yes.

19   Q.  Now I'm going to show you -- oops.  One second.

20        MR. BERRY:  I'd like to show the witness what's          10:21:41

21   already in evidence as Government's Exhibit 212 and 212a.

22   BY MR. BERRY:

23   Q.  Do you see that?

24   A.  Yes.

25   Q.  So we got 212 on the left and 212a on the right.          10:22:28

1  A.  Correct.

2  Q.  Have you ever seen those before?

3  A.  Yes.

4  Q.  What are they?

5  A.  These were the Backpage ads that I discovered during this                    10:22:35

6  investigation that we just talked about.

7  Q.  So this was the ad that you found within that first hour?

8  A.  Yes.  Correct.

9  Q.  Let's go to a few portions of it.  So first and foremost,

10  what's the title?                                                              10:23:03

11  A.  "Get Freaky Tuesday.  Come spend ur day with us, 19."

12  Q.  What's that 19?

13  A.  Their age.

14  Q.  And what was the date of this posting?

15  A.  September 10th, 2013, at 3:54 p.m.                                         10:23:15

16  Q.  And the first two photos here in 212, do you recognize the

17  individual in those photos?

18  A.  Yes.

19  Q.  Who is it?

20  A.  Destinee Ortiz.                                                           10:23:28

21  Q.  And we see the bottom of a photo in 212a.  Was that the

22  other female?

23  A.  Yes.

24  Q.  All right.  Now let's look at some of the text.

25        Do you recall this text when you looked at this ad                      10:23:43

1   back then?

2   A.  Yes.

3   Q.  If you would, please read off the text to the jury.

4   A.  "Our dazzling smile & stunning personality will keep you

5   coming back for more.  We keep ourselves well manicured,          10:24:00

6   hygienically kept & always classy.  Doing incalls and outcalls

7   2 girl for 1 or 2 girl special.  Call or text us at

8   five0eight-nine33-eight52one."

9   Q.  And so this has that incall/outcall language you were

10  talking about previously; correct?                                10:24:24

11  A.  Correct.

12  Q.  And what about this 2 girl for 1 or 2 girl special?  What

13  did that mean to you as an investigator of these types of

14  crimes?

15  A.  So if the customer or the john wanted two girls at the same   10:24:33

16  time, he most likely would receive a discount -- a discount for

17  that, a special.  Or if he just wanted one girl, it would

18  probably be a different cost.

19  Q.  And this is the location that you were talking about,

20  this --                                                           10:24:50

21  A.  Correct.

22  Q.  -- Town of Worcester; is that correct?

23  A.  That's correct.

24  Q.  I'll say it correct --

25  A.  Worcester.

1  Q.  -- eventually.

2          What about Westborough and Route 9?  Explain that.

3  A.  Westborough is -- borders Northborough.  It's actually on

4  the east, not on the west.  And Route 9 is in my community in

5  Northborough.                                        10:25:08

6  Q.  I'm not going to ask you to repeat -- or explain that.

7  A.  Okay.

8  Q.  All right.  Back in the description, what about this in

9  your investigation suggested to you this was an ad for

10  prostitution?                                        10:25:20

11  A.  Just immediately seeing those pictures of Destinee in those

12  positions wearing that type of clothing.  This is clear in

13  my -- from my training and experience that this person is

14  advertising sex for a fee.  And just the -- the title alone,

15  the dialogue in the ad, it just absolutely is a red flag for me  10:25:41

16  that this is a prostitution ad.

17  Q.  Are there any other specific words in the -- the text of

18  the ad that were indicative of prostitution to you?

19  A.  "Coming back for more.  Well manicured.  Hygienically

20  correct."                                            10:26:03

21          The -- yeah, just almost every line has something that

22  kind of screams prostitution.

23  Q.  Now, looking at this ad all by itself in a vacuum, with no

24  other -- no other information, do you feel that you could

25  arrest the person who posted this ad for a prostitution offense  10:26:35

 1    in the state of Massachusetts?

 2            MR. CAMBRIA:  Object to what he feels.

 3            MR. BERRY:  All right.  I'll rephrase.

 4            THE COURT:  Yeah.  Sustained.

 5    BY MR. BERRY:                                              10:26:46

 6    Q.  In your training and experience as a law enforcement

 7    officer, would you arrest someone based upon the text, the

 8    content of this ad alone?

 9    A.  No.

10    Q.  Why not?                                              10:27:01

11    A.  I need -- I need more.  I need to -- this is a first step;

12    right?  Seeing this ad is a first step in an investigation.  I

13    need to do a little more work as an investigator.

14    Q.  Okay.  And what would those additional steps be?

15    A.  I would place a phone call to the ad and have conversation  10:27:18

16    with the person on the other end of the phone.  And if that

17    conversation led to us talking about sex for a fee, then I'm

18    building my case.

19            So that's how I would build our cases.

20    Q.  And have you seen ads that were similar in nature in terms  10:27:33

21    of types of photos, types of language?

22    A.  Yes.

23    Q.  What was similar about them?

24    A.  Could you repeat the question, please.

25    Q.  Sure.  I asked if they were similar.  You said yes.      10:27:50

```
 1            I said, what was similar about other ads that we're
 2   not looking at compared to the ones we are looking at?
 3   A.  Sure.
 4            MS. BERTRAND:  Objection.  Vague.
 5            MR. BERRY:  I'm asking him if he --                      10:28:02
 6            MS. BERTRAND:  Lack of foundation.
 7            THE COURT:  Well, overruled.
 8   BY MR. BERRY:
 9   Q.  You can answer.
10   A.  Thank you.                                                   10:28:07
11            It -- oftentimes the ad, when you click on it, you'd
12   see similar pictures, like the one seen here of Destinee, of
13   females in provocative poses wearing very limited clothing.
14   You'd hear -- you'd see the language that would, as I kept
15   calling a red flag.  Oftentimes there was not necessarily a     10:28:28
16   dollar amount discussed, but you would -- they would talk about
17   one-hour specials or two-hour specials, or in this case, a
18   two-girl special and then always a phone number provided and
19   the poster's age.
20   Q.  So all these other similar ads, have you ever arrested      10:28:44
21   someone for prostitution based solely on the ad?
22   A.  No.
23   Q.  Okay.  Why not?
24   A.  I don't have enough.  I need to do more work on my end as
25   an investigator.                                                10:28:57
```

```
 1   Q.  Notwithstanding the fact that you've -- you need to do more
 2   work, do you still think this is an ad for prostitution?
 3   A.  100 percent.
 4   Q.  When you've called other ads on Backpage that you talked
 5   about in your other investigations, have you ever encountered          10:29:12
 6   prostitutes in those instances?
 7   A.  Yes.
 8   Q.  Have you ever called an ad like this in those other
 9   instances and it turned out to not be a prostitute?
10   A.  No.                                                                 10:29:27
11   Q.  So you're saying 100 percent of the time you've called
12   these ads, that's what it's turned out to be?
13   A.  Yes.
14   Q.  Are you familiar with a federal statute called the Travel
15   Act?                                                                    10:29:39
16   A.  No.
17   Q.  Are you familiar with the federal crime of promotion of a
18   prostitution business enterprise?
19   A.  No.
20   Q.  Do you know how that federal crime differs from the crime          10:29:45
21   of prostitution in Massachusetts?
22           MS. BERTRAND:  Objection.  He just said he doesn't
23   know about it.
24           MR. BERRY:  I'm asking him another --
25           THE COURT:  Sustained.                                         10:29:56
```

UNITED STATES DISTRICT COURT

 1   BY MR. BERRY:

 2   Q.  So do you know how the other -- the two crimes differ?

 3   A.  No.

 4           MS. BERTRAND:  Judge?

 5   BY MR. BERRY:                                                    10:30:01

 6   Q.  Are you familiar with --

 7           THE COURT:  Well, let me --

 8           MR. BERRY:  Oh, I'm sorry.

 9           THE COURT:  He said he did not know about those two

10   statutes, so I'll sustain the objection.                        10:30:08

11   BY MR. BERRY:

12   Q.  All right.  Let me ask you about a different crime.

13           Are you familiar with the crime of conspiracy to

14   promote or facilitate the promotion of a prostitution business

15   enterprise?                                                     10:30:20

16   A.  No.

17   Q.  Are you aware of whether Backpage utilized something called

18   a strip ad filter?

19           MS. BERTRAND:  Objection.  Leading.

20           THE COURT:  Overruled.                                  10:30:34

21           He may answer if he is aware.

22           THE WITNESS:  I'm not aware of that.

23   BY MR. BERRY:

24   Q.  Are you aware of whether Backpage would remove the most

25   obvious sex-act-for-money language from ads?                    10:30:44

```
 1   A.  I heard that they may do that if the --
 2              MS. BERTRAND:  Objection.  Then it's hearsay.  Move to
 3   strike.
 4              THE COURT:  Well, I will sustain the objection, and
 5   Mr. Berry can rephrase.                                          10:30:56
 6   BY MR. BERRY:
 7   Q.  Are you aware of whether certain words were removed from
 8   ads that were posted?
 9   A.  Yes.
10              MR. FEDER:  Asked and answered.  Leading.            10:31:10
11              THE COURT:  Overruled.
12   BY MR. BERRY:
13   Q.  So let's -- there was an objection, and you spoke and the
14   judge.  So what was your answer?
15   A.  Yes.                                                        10:31:17
16   Q.  So, yes, you were aware that they would sometimes do that?
17   A.  Correct.
18   Q.  Okay.  Are you aware of Backpage's moderation practices,
19   what are called moderation practices?
20   A.  No.                                                         10:31:30
21   Q.  Are you -- do you know what the -- The Erotic Review is?
22   A.  It's -- yeah, it's a web -- it's a web page.
23   Q.  Okay.
24   A.  Website.
25   Q.  Do you know anything more about it than that, that it's a   10:31:41
```

```
 1    website?
 2    A.  It gave reviews.
 3              MR. KESSLER:  Objection.
 4              THE COURT:  Let me ask --
 5              MR. KESSLER:  Objection.  It's a yes-or-no question.    10:31:52
 6              THE COURT:  Sustained.
 7    BY MR. BERRY:
 8    Q.  So I'm sorry.  Let me try that again.
 9              Do you know what The Erotic Review is?
10    A.  Yes.                                                        10:31:59
11    Q.  All right.  Did you become familiar with it in the course
12    of your law enforcement investigations?
13    A.  Yes.
14    Q.  All right.  What is it?
15              MR. CAMBRIA:  Calls for hearsay.                      10:32:08
16              THE COURT:  Overruled.
17    BY MR. BERRY:
18    Q.  You can answer.
19    A.  It's a review website.  It reviews prostitutes.
20    Q.  What would you equate it to?                               10:32:17
21    A.  Kind of like a Trip Advisor, if you will.  It -- like Trip
22    Advisor gives you ratings of restaurants and hotels, this gives
23    you ratings and reviews of prostitutes.
24    Q.  Are you aware of any relationship between Backpage and The
25    Erotic Review?                                                 10:32:40
```

UNITED STATES DISTRICT COURT

1   A.  No.

2   Q.  Are you aware of any relationship between Backpage and

3   so-called super posters?

4   A.  No.

5   Q.  Are you aware of Backpage's aggregation methods?                    10:32:51

6           MR. FEDER:  Relevance.

7           THE COURT:  Overruled.

8           THE WITNESS:  No.

9   BY MR. BERRY:

10  Q.  Are you aware of whether Backpage took ads from Craigslist          10:33:00

11  and posted them on Backpage?

12          MR. FEDER:  Relevance.

13          MS. BERTRAND:  Leading.

14          THE COURT:  Overruled.

15          THE WITNESS:  No.                                               10:33:10

16  BY MR. BERRY:

17  Q.  Are you aware of any meetings between any of the owners of

18  Backpage and people at NCMEC?

19          MR. FEDER:  Relevance.

20          MS. BERTRAND:  Objection.  Relevance.  Leading.                 10:33:19

21  Counsel's testifying.

22          THE COURT:  Overruled.

23          He may answer if he is aware --

24          THE WITNESS:  No --

25          THE COURT:  -- or not.                                         10:33:28

1        THE WITNESS:  -- I'm not.

2        Sorry, Your Honor.

3  BY MR. BERRY:

4  Q.  Thank you.

5        Are you aware of any meetings between the owners of    10:33:32

6  Backpage and people at Polaris?

7        MS. BERTRAND:  Objection.  Foundation as to why he

8  would even know.

9        MR. FEDER:  Relevance and hearsay.

10        THE COURT:  All right.  Well, we have a foundation    10:33:41

11  objection.  So, Mr. Berry, if you wish to lay some foundation,

12  you may, otherwise I'll sustain the objection.

13        MR. BERRY:  Yes, Your Honor.  I'm trying to establish

14  that by asking simply is he aware.

15        MR. CAMBRIA:  Object to the -- Your Honor, you said no    10:33:54

16  speaking objections.  Shouldn't be any speaking --

17        THE COURT:  Yes.

18        MR. CAMBRIA:  -- attempts to verify --

19        THE COURT:  All right.  Mr. Berry --

20        MR. CAMBRIA:  You know what I'm talking about.    10:34:05

21        MR. BERRY:  I'll try it differently.

22        THE COURT:  Yes.

23  BY MR. BERRY:

24  Q.  Do you know what Polaris is?

25  A.  No.    10:34:10

```
 1   Q.  Do you know what the Auburn Theological Seminary is?

 2              MS. BERTRAND:  Objection.  Relevance.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  No.

 5              MS. BERTRAND:  And foundation.                      10:34:19

 6   BY MR. BERRY:

 7   Q.  Are you aware of any documentaries about Backpage?

 8              MS. BERTRAND:  Objection.  Relevance.  Foundation.

 9              THE COURT:  Overruled.

10              THE WITNESS:  No.                                  10:34:31

11              MR. BERRY:  Pass the witness.

12              THE COURT:  All right.  Let me just make one inquiry

13   of the jury.

14              I was inclined to take our morning break at 40 after

15   the hour.  That would put us back in court at 11:00.  Can you  10:34:43

16   hold out for five minutes?  If you can't, raise your hand.  All

17   right.

18              Now, who is coming forward for defense?

19              I see Mr. Kessler standing up, so I assume it's you.

20              MR. KESSLER:  Thank you, Your Honor.               10:35:04

21                        CROSS-EXAMINATION

22   BY MR. KESSLER:

23   Q.  It's Lieutenant?

24   A.  Yes, sir.

25   Q.  Good morning.                                            10:35:16
```

BRIAN GRIFFIN - CROSS-EXAMINATION

87

```
 1   A.  Good morning, sir.
 2   Q.  My name is Eric Kessler.  I represent one of the defendants
 3   to my left.
 4   A.  Okay.
 5   Q.  So when you went through your work history as a police      10:35:26
 6   officer, it looks like you started at the beginning, which was
 7   the academy.
 8   A.  That's correct.
 9   Q.  And you've managed over 23 years to work yourself just
10   about to the top.                                               10:35:45
11           You're a lieutenant now; correct?
12   A.  That's correct.
13   Q.  And who do you answer to?
14   A.  The chief of police.
15   Q.  So you're second in line?                                   10:35:54
16   A.  That's correct.
17   Q.  All right.  Congratulations.
18   A.  Thank you.
19   Q.  I want to ask you about that incident that occurred at the
20   hotel with the two young girls.                                 10:36:09
21           Isn't it true that you learned that Mr. -- was it
22   Scully?
23   A.  Sully.
24   Q.  Sully.  Mr. Sully, the man that was in the room with the
25   two girls, did not answer a Backpage ad in order to make       10:36:31
```

UNITED STATES DISTRICT COURT

```
 1   contact with these girls?
 2   A.  That's correct.
 3   Q.  In fact, Backpage had nothing to do with those two girls
 4   being together with that man?
 5   A.  That's correct.                                          10:36:47
 6   Q.  Other than to provide you with the phone number to call one
 7   of those girls, that's the only connection between Backpage and
 8   that incident; correct?
 9   A.  Correct.
10   Q.  When you did -- or participated in any of these sting ads,  10:37:10
11   where the police placed the ad with Backpage -- and, by the
12   way, how many times were you involved in some manner with those
13   operations?
14   A.  A half a dozen times, I would say.
15   Q.  Okay.  And can you give me the approximate time page --    10:37:46
16   time range?
17   A.  I would say 2012 to 2016, to the best of my memory.
18   Q.  And I think you testified that you personally did not
19   construct the ad; is that correct?
20   A.  That's correct.                                           10:38:07
21   Q.  But you were aware of somebody, in fact, constructing it,
22   how they knew what to say, and so forth?
23   A.  Correct.
24   Q.  And how to post it?
25   A.  Correct.                                                  10:38:20
```

BRIAN GRIFFIN - CROSS-EXAMINATION

89

```
 1   Q.  Do you know whether any of those approximate half dozen ads

 2   when posted were rejected or bounced back by Backpage?

 3   A.  I don't know.  I don't -- I don't know the answer to that.

 4   Q.  Okay.

 5   A.  Unaware.                                                    10:38:40

 6   Q.  You mentioned in response to a number of Mr. Berry's

 7   questions that neither this particular ad that we saw,

 8   Exhibit 212, nor any of the other Backpage ads that you've seen

 9   would provide you with sufficient justification to arrest

10   anybody; correct?                                              10:39:09

11   A.  Correct.

12   Q.  In your training and then in your experience as a police

13   officer and a sergeant and then a lieutenant and detective, you

14   learned that in order to arrest somebody, you had to have what

15   is commonly referred to as probable cause; correct?            10:39:33

16   A.  Correct.

17   Q.  I mean, you don't want to arrest somebody that had nothing

18   to do with anything illegal; right?

19   A.  Correct.

20   Q.  In your experience and career, what has -- what has the     10:39:43

21   concept of probable cause come to mean for you?

22   A.  More probably than not.

23   Q.  Okay.

24          THE COURT:  Mr. Kessler, we'll leave that as the last

25   question and answer, and we will permit the jury to take the    10:40:07
```

90

```
 1    morning break, as well as counsel.

 2           Members of the jury, just remember the admonishment,

 3    not to come to any conclusions but to continue to keep an open

 4    mind and not to otherwise discuss the matter.  We'll stand at

 5    recess and be ready to come in at 11:00.  And if we can, we'll     10:40:23

 6    push forward until 12:30, unless there's a need to take another

 7    additional break.

 8           So please all rise for the jury.

 9           And, sir, you may step down.

10           THE WITNESS:  Thank you.                                    10:40:42

11       (Jury not present at 10:40 a.m.)

12           THE COURT:  Now, let me just make one observation.

13    You may not agree with the Court's ruling, but try not to

14    react.  I've heard -- I've heard many deep sighs and

15    convers- -- convers- -- conversations among one another.  We      10:41:22

16    have a very observant jury here.  Be mindful that your

17    microphones are on.  And I think we should be okay in terms of

18    how we proceed forward, but do be mindful of that.

19           MR. FEDER:  Judge?

20           THE COURT:  Yes.                                            10:41:41

21           MR. FEDER:  I left something at the gate today.  If

22    I'm not back by 11:00, just go forward.  Okay?

23           THE COURT:  Well, good luck.  I hope it's nothing

24    valuable.

25           MR. FEDER:  It's not -- it's not that bad.                  10:41:52
```

UNITED STATES DISTRICT COURT

```
 1        (Recess from 10:42 a.m. to 11:01 a.m.)

 2        (Jury not present at 11:01 a.m.)

 3             THE COURT:  All right.  Let me just say I sustained

 4   a --

 5             MR. BERRY:  Your Honor.  Do you want the witness off?    11:01:44

 6             THE COURT:  Yes, please.  Sir, just for one moment,

 7   please.

 8             MR. CAMBRIA:  And don't --

 9             THE COURT:  Can we put that on the record?

10             THE COURT REPORTER:  I didn't hear that.              11:02:04

11             THE COURT:  All right.  Let me just say, and I meant

12   to say this previously, I sustained a number of objections with

13   regard to the witness this morning and a couple previous --

14   previously regarding questions that the government asked about

15   the buying of outfits, who paid for the hotel rooms.  And there   11:02:31

16   were some relevance objections.  I'd ask all counsel to be

17   mindful and read the second element of Count 2 through 51, and

18   that is why I sustained the objection.

19             And so let's have the witness back on, and we'll bring

20   the jury in.                                                   11:02:53

21             MR. KESSLER:  You mean sustain or overrule?

22             THE COURT:  I overruled.  I'm sorry.  I misspoke.  I

23   overruled those objections.

24             MR. STONE:  Okay.

25             Mr. Kessler is always at the ready to let me know what   11:03:09
```

```
 1    I'm doing wrong.

 2            MR. KESSLER:  No.

 3            THE COURT:  All rise for the jury.

 4        (Jury present at 11:04 a.m.)

 5            THE COURT:  All right.  Please be seated.          11:05:02

 6            The record will reflect the presence of the jury.  The

 7    witness is on the stand.

 8            And, oh, I've sort of lost my way.  Let me remind

 9    counsel of when you're objecting, because there's multiple

10    counsel, I've completely disregarded how it impacts the court   11:05:22

11    reporter.  I'm going to ask you to not object over one another,

12    and I'll try my best to give you an opportunity to object in an

13    appropriate way that we can make a very clean record.  Thank

14    you.

15            Mr. Kessler, you may continue.                          11:05:42

16            MR. KESSLER:  Thank you, Your Honor.

17    BY MR. KESSLER:

18    Q.  Welcome back, Lieutenant.

19            When we took the break, you were responding to a

20    question where I had asked what probable cause means to you.    11:05:56

21            And tell me if I'm wrong, but what I heard you say is

22    more probably than not?

23    A.  That's correct.

24    Q.  Okay.  And that is the -- the working principle that you

25    have learned to utilize in your career when determining whether 11:06:18
```

 1    to arrest somebody?

 2    A.   That's correct.

 3    Q.   All right.  Including in the area of prostitution?

 4    A.   Correct.

 5    Q.   And excuse me if you've -- you've answered this on direct      11:06:30

 6    examination.  I don't recall.  But in your career,

 7    approximately how many prostitution-related arrests have you

 8    made yourself or been part of?

 9    A.   Two dozen --

10    Q.   Okay.                                                          11:06:52

11    A.   -- roughly, give or take.

12    Q.   Thank you.

13         Now, we were talking about this idea that you could

14    not arrest based upon the ad because you didn't have probable

15    cause; correct?                                                     11:07:09

16    A.   Correct.

17    Q.   And you've stated that that's really your starting point.

18    You have more work to do.

19    A.   That's correct.

20    Q.   Work in terms of investigation?                               11:07:19

21    A.   Correct.

22    Q.   And at least with respect to stings, where the target is

23    the john, he's responding to a police-posted ad, I think you

24    called that a reverse sting?

25    A.   Yes.  That's usually what we'd call it.                        11:07:42

 1   Q.  So the next step in the investigative process is to engage

 2   that john, the responder, in a telephone conversation with a

 3   fake prostitute; correct?

 4   A.  Correct.

 5   Q.  That fake prostitute being a police officer?                   11:08:02

 6   A.  Typically a female police officer.

 7   Q.  And at that time does the -- to your knowledge, does the

 8   female officer posing as a prostitute make an effort to try to

 9   discuss the terms of the act, including the -- the cost and

10   specifically what's going to happen during that phone call?        11:08:30

11   A.  Yes.

12   Q.  And is that phone call typically recorded?

13   A.  No.

14   Q.  Okay.  So in a hypothetical case, you're running a reverse

15   sting, a man responds to an ad, you have the female police        11:08:48

16   officer posing as the prostitute takes the call, engages the

17   john, and they discuss a -- some sexual conduct between the two

18   of them that -- that's going to happen for a specific price;

19   correct?

20   A.  Correct.                                                       11:09:11

21   Q.  Do you have probable cause then to go arrest the guy?

22   A.  Yes.

23   Q.  Yeah.  But you don't know who he is?

24   A.  Correct.

25   Q.  All right.  So you can't arrest him?                           11:09:20

1    A.   Because I don't know who he is.

2    Q.   Right.  Okay.

3         If it's a non-sting scenario, where you are simply

4    investigating possible prostitution, the only way for you, as

5    the investigator, to build your case is to get the information      11:09:50

6    necessary to satisfy the prostitution laws; correct?

7    A.   Correct.

8    Q.   In Massachusetts, I believe that requires that there be

9    evidence that somebody agreed to or actually did engage in

10   sexual conduct with another for a fee; correct?                     11:10:16

11   A.   That's correct.

12   Q.   All right.  And if it's not a sting operation, the chances

13   are next to none that you would get that information during

14   that initial phone call; correct?

15   A.   Correct.                                                        11:10:37

16   Q.   In fact, has it been your experience working in this area

17   that typically the so-called prostitute will not normally

18   engage in those sorts of details with the prospective john on

19   the telephone or by text?

20   A.   It depends.  I -- we've -- both -- we've had conversations      11:11:10

21   where they've been pretty explicit, and some of the females

22   were not as detailed.

23   Q.   Right.  They -- they want to wait until the john shows up?

24   A.   That's correct.

25   Q.   All right.  And if you are not present or you don't have       11:11:26

```
 1   some ability to hear and see the meeting at the location

 2   decided upon by the john and the alleged prostitute, you don't

 3   know -- you have no way of knowing what they're agreeing to

 4   do --

 5              MR. BERRY:  Objection.                            11:11:54

 6   BY MR. KESSLER:

 7   Q.  -- right?

 8              MR. BERRY:  Compound question.

 9              THE COURT:  Well, overruled.

10              THE WITNESS:  Could you repeat the question, please?   11:12:00

11   BY MR. KESSLER:

12   Q.  Sure.  If you're not present, either electronically or

13   personally, when the alleged prostitute and the -- and the john

14   make their deal, so to speak, in other words, discuss the

15   details, the sexual conduct and the fee, you have no way to    11:12:21

16   know what that agreement is; correct?

17   A.  So you're talking about not the stings?  This is just --

18   Q.  Right.

19   A.  Okay.  That -- that is correct.  Yeah, we would -- we would

20   need to see it, hear it, or -- yeah, we'd need a little more.   11:12:41

21   Q.  And until such time as -- and I'll just say a man and a --

22   we're talking about for purposes of these questions a woman who

23   is soliciting a man.  Okay?

24   A.  Okay.

25   Q.  We understand it could be different combinations, but for   11:13:06
```

UNITED STATES DISTRICT COURT

1  this I'm talking -- talking woman and man.

2  A.  I understand.

3  Q.  Okay.  Until the woman and the man reach an agreement on

4  what the sexual conduct will be and what the fee will be, there

5  has been no crime of prostitution; correct?                    11:13:35

6  A.  Correct.

7  Q.  You understand that the law in Massachusetts, I'm sure you

8  know this, but it requires sexual conduct between the man and

9  the woman; right?

10  A.  Correct.                                                   11:14:01

11  Q.  So in a lot of these ads where on their face they don't

12  state what the sex act is that is being offered or what the

13  cost will be, you know, a john could come and -- and meet with

14  the -- the woman, and they may agree on something for a fee,

15  but it doesn't necessarily have to be an illegal form of sexual   11:14:29

16  conduct, does it?

17  A.  I suppose.

18  Q.  Yeah.  Maybe the man just wants to go on a walk --

19  A.  Correct.

20  Q.  -- with the lady.                                         11:14:41

21  A.  Perhaps.

22  Q.  That would not be illegal?

23  A.  Not at all.

24  Q.  Even if he paid her?

25  A.  Correct.                                                  11:14:47

1   Q.  Maybe he wants a nonsexual massage for which he's willing

2   to pay.

3           That would not be illegal, would it?

4   A.  No.

5   Q.  Maybe he would like the lady to give him a massage that is      11:14:59

6   nonsexual and he's willing to pay.

7           That would not be illegal?

8   A.  Correct.

9   Q.  Or maybe the -- the fellow who responds to the ad just

10  wants the lady to take off her clothes and model for him for a      11:15:21

11  fee.

12          That would not be illegal?

13  A.  No, it would not.

14  Q.  And maybe he wants her to take off her clothes, model, and

15  dance without touching him.                                         11:15:37

16          That would not be illegal, would it?

17  A.  No, it wouldn't.

18  Q.  And, quite possibly, he might want the woman to watch the

19  man do all of those same things, for which he is willing to pay

20  the woman to watch him; correct?                                    11:15:57

21  A.  Correct.

22  Q.  That would not be illegal?

23  A.  No.

24  Q.  And so absent law enforcement being present in some form,

25  based upon these ads, you don't know that a -- an illegal act       11:16:18

```
 1    of prostitution is going to be agreed upon or take place;
 2    correct?
 3    A.  Correct.
 4    Q.  And when it comes to arresting somebody, you don't just
 5    assume, do you?                                                    11:16:42
 6    A.  No.
 7    Q.  What -- what do you do in order to make the arrest?
 8    A.  You need to have probable cause.
 9    Q.  And how are you going to establish that?
10    A.  I've built my case.  I've learned information.  I've          11:16:54
11    established probable cause based off of my investigation that
12    got me to that level.
13    Q.  All right.  And -- and how are you going to get the
14    information that you need to satisfy probable cause?
15    A.  By talking to people.  Interviewing them.  Seeing what        11:17:16
16    happened.
17    Q.  You mean after the fact?
18    A.  Not always.
19    Q.  In your community, as well as others surrounding the
20    greater Boston area, the various municipalities license           11:17:33
21    different types of adult workers.
22            Are you familiar with that?
23    A.  Adult workers such as?
24    Q.  Strippers.
25    A.  Yes.  There's -- it's a license -- licensed establishments.   11:17:51
```

UNITED STATES DISTRICT COURT

```
 1    Q.  Right.  And the strippers themselves have to be licensed?

 2    A.  I don't know.

 3    Q.  The -- these various cities have codes that allow for the

 4    licensing of escorts; correct?

 5            MR. BERRY:  Objection.  Foundation.              11:18:09

 6            THE COURT:  Well, lay some foundation --

 7    BY MR. KESSLER:

 8    Q.  Well --

 9            THE COURT:  -- Mr. Kessler.

10    BY MR. KESSLER:                                          11:18:14

11    Q.  -- are you familiar with any of the municipalities in your

12    location that license escorts?

13    A.  No.

14    Q.  Have you ever had the occasion to reach out to Backpage

15    while investigating an alleged act of prostitution or something  11:18:39

16    related thereto to get information from Backpage that would

17    assist in your investigation?

18    A.  No.

19    Q.  Do you know if your department has?

20    A.  I don't believe so.                                 11:18:56

21            MR. KESSLER:  Thank you.  That's all I have.

22            THE WITNESS:  Thank you, sir.

23            THE COURT:  All right.  Anyone else?

24            Mr. Cambria?

25        ///
```

1                        CROSS-EXAMINATION

2    BY MR. CAMBRIA:

3    Q.  Good afternoon, Lieutenant.

4    A.  Good morning, sir.

5    Q.  Are you familiar with the fact that there are fake reviews          11:19:35

6    on The Erotic Review?

7    A.  No, I'm not.

8    Q.  Do you know who just testified before you?

9    A.  I have no idea.

10   Q.  All right.  You indicated to us in the scenario here that          11:19:54

11   you used Backpage to get a phone number to make a phone call;

12   correct?

13   A.  That's correct.

14   Q.  All right.  And so, to that degree, getting that phone

15   number assisted you in performing your duty as a police               11:20:18

16   officer; correct?

17   A.  That's correct.

18   Q.  And then you made a phone call and to one of the ladies who

19   answered from inside that motel; correct?

20   A.  That's correct.                                                   11:20:34

21   Q.  And at that point in time that phone call is where you had

22   the conversation with the author, and that's the point where

23   you decided that you had your probable cause; correct?

24   A.  Correct.

25   Q.  All right.  And so that phone call was a critical link in         11:20:52

UNITED STATES DISTRICT COURT

 1   arresting somebody for prostitution?

 2   A.  Correct.

 3   Q.  Was there ever a contemplation of charging the phone

 4   company for that critical link?

 5            MR. BERRY:  Objection.  Relevance.                  11:21:15

 6            THE COURT:  Overruled.

 7            THE WITNESS:  Could you repeat the question?

 8   BY MR. CAMBRIA:

 9   Q.  Yeah.  Was there ever a consideration of charging that

10   phone company for that critical link?                        11:21:25

11   A.  No.

12   Q.  No.  All right.

13            Is it fair to say, then, that on that particular day

14   you utilized Backpage to assist you in enforcing the

15   prostitution laws?                                           11:21:47

16   A.  Yes.

17            MR. CAMBRIA:  Thank you.

18            THE COURT:  Ms. Bertrand?

19            MS. BERTRAND:  Nothing from me.  Thank you.

20            THE COURT:  All right.  Mr. Panchapakesan?          11:21:57

21            MR. PANCHAPAKESAN:  No, Your Honor.

22            THE COURT:  Mr. Eisenberg?

23            MR. EISENBERG:  No, Your Honor.  Thank you.

24            THE COURT:  All right.  Mr. Berry?

25            MR. BERRY:  Very brief redirect, Your Honor.        11:22:06

```
 1                   REDIRECT EXAMINATION
 2    BY MR. BERRY:
 3    Q.  Lieutenant, you were asked several questions about
 4    Massachusetts prostitution laws.
 5             Do you remember that?                          11:22:25
 6    A.  Yes.
 7    Q.  Is that a Chapter 272, Section 53A?
 8    A.  Yes, it is.
 9    Q.  Are you familiar with that statute?
10    A.  Yes.                                                11:22:34
11    Q.  Are you aware that it says that whoever agrees to engage or
12    offers to engage in sexual conduct would be in violation?
13    A.  Yes.
14             MR. KESSLER:  Objection.  Leading.
15             THE COURT:  Well, sustained.                   11:22:50
16             MR. KESSLER:  And move to strike the answer.
17             THE COURT:  And the answer will be stricken as I
18    sustained the objection.
19    BY MR. BERRY:
20    Q.  Do you have the statute memorized in your head?     11:22:59
21    A.  No.
22    Q.  Do you recall what are the elements, just as best you can?
23    A.  Yes.
24    Q.  Go ahead.
25    A.  Whoever offers to engage or has that conversation about  11:23:07
```

```
 1   what's going to happen is -- would be enough, or if the actual

 2   act happens.

 3   Q.  So if the act happens, then --

 4   A.  Yeah, we have it.

 5   Q.  But short of an act actually happening, what's enough?     11:23:21

 6   A.  The simple discussion of it.

 7   Q.  You were asked some questions by Mr. Kessler and then again

 8   by Mr. Cambria about the utility of Backpage and your

 9   investigation.

10           How would you characterize its utility in your           11:23:40

11   prosecution investigations?

12   A.  It was a resource that I went to to help aid in my

13   investigations.

14   Q.  Would you consider Backpage a -- a good partner to you in

15   your investigations?                                             11:23:57

16           MR. EISENBERG:  Objection, Your Honor.  It's been

17   asked and answered.

18           THE COURT:  Overruled.

19   BY MR. BERRY:

20   Q.  You can answer that.                                         11:24:02

21   A.  Could you ask that again, please.

22   Q.  Sure.  The question was -- you said that they were a

23   resource.  Would you consider them to be a good partner to law

24   enforcement in that regard?

25           MS. BERTRAND:  Objection.  Lacks foundation.             11:24:12
```

 1              MR. FEDER:  Relevance, too.

 2              THE COURT:  Overruled.

 3    BY MR. BERRY:

 4    Q.  You can answer.

 5    A.  No.                                                    11:24:19

 6    Q.  Why not?

 7    A.  I never --

 8              MR. FEDER:  Relevance.

 9              THE COURT:  Well, overruled.

10    BY MR. BERRY:                                              11:24:31

11    Q.  You can answer.

12    A.  I don't think I could pick up the phone and call them and

13    ask them about specifics.  No, I -- they were not a good

14    partner.

15              MR. BERRY:  Okay.  No further questions.         11:24:44

16              THE COURT:  All right.  May the witness be released

17    from his subpoena by the government?

18              MR. BERRY:  Yes.

19              THE COURT:  Any objection by defense?

20              MR. CAMBRIA:  No, Your Honor.                    11:24:55

21              MR. KESSLER:  No, Your Honor.

22              THE COURT:  All right.  Sir, we thank you very much

23    for your testimony, and you are released from your subpoena.

24    You are free to leave.

25              THE WITNESS:  Thank you.  Have a nice day.       11:25:04

 1            THE COURT:  Thank you.  You, too.  Have a safe trip

 2    home.

 3            THE WITNESS:  Thank you.

 4            THE COURT:  And the government may call its next

 5    witness.                                                   11:25:11

 6            MR. STONE:  Yes, Your Honor.  The government calls

 7    Quoc Thai.

 8            THE COURTROOM DEPUTY:  Please raise your right hand.

 9       (QUOC THAI, a witness herein, was duly sworn or affirmed.)

10            THE COURTROOM DEPUTY:  Step over to the witness stand, 11:25:27

11    and please be sure to speak into the microphone.

12            THE WITNESS:  Sure.

13            Hello.

14                        DIRECT EXAMINATION

15    BY MR. STONE:                                              11:25:43

16    Q.  Sir, could you introduce yourself to the jury, please.

17    A.  My name is Quoc Thai.

18    Q.  Maybe get a little closer.

19    A.  Little closer?

20            My name is Quoc Thai.                              11:25:59

21    Q.  Would you spell that, please.

22    A.  Q-U-O-C.  Last name is T-H-A-I.

23    Q.  Sir, have you previously worked in federal law enforcement?

24    A.  I have, yes.

25    Q.  Are you now retired?                                  11:26:08

1   A.  Yes, I am.

2   Q.  What do you do for work now?

3   A.  I trade stocks and options contracts.

4   Q.  Let's talk about your federal law enforcement career.

5   Okay?                                                      11:26:19

6   A.  Yes.

7   Q.  When did it start?

8   A.  It started in 2010.

9   Q.  And where did you work in 2010?

10  A.  At IRS Criminal Investigation.                         11:26:28

11  Q.  What did you do for IRS Criminal Investigation?

12  A.  I worked as a special agent.

13  Q.  All right.  As a special agent, what were some of your

14  duties?

15  A.  My primary role was to investigate financial crimes.  That   11:26:39

16  included crimes related to criminal tax as well as money

17  laundering.

18  Q.  All right.  And we'll get back into some of those

19  specifics, but I want to know how long you worked as a special

20  agent for IRS Criminal Investigation?                      11:26:59

21  A.  I worked with IRS for nine years.

22  Q.  And ended in 2019?

23  A.  Yes.

24  Q.  All right.  Have you worked for any other federal law

25  enforcement agencies after the IRS?                        11:27:10

QUOC THAT - DIRECT EXAMINATION                      108

```
 1    A.  Yes.  I transferred over to the U.S. Postal Inspection

 2    Service.

 3    Q.  Okay.  And what did you do for the U.S. Postal Inspection

 4    Service?

 5    A.  I worked as a U.S. postal inspector.                      11:27:21

 6    Q.  What type of -- well, what -- what were your duties, and

 7    what did you do as a postal inspector?

 8    A.  Postal Inspection Service does a variety of crimes.  We

 9    investigate anything and everything relating to the postal

10    system and crimes associated.  So that could include assaults, 11:27:36

11    robberies, burglaries, you know, any kind of break-in, anything

12    even including mail fraud, mail theft, and associated money

13    laundering, narcotics crimes related to the Postal Service.

14    Q.  While you were a postal inspector, did you continue your

15    work in financial crimes?                                     11:27:59

16    A.  Absolutely.  Yes.

17    Q.  All right.  A few more questions about your background, and

18    then we'll get back to some of the cases you worked on.

19         Where did you grow up?

20    A.  Phoenix, Arizona.                                         11:28:16

21    Q.  High school here?

22    A.  Yes, sir.  Central High.

23    Q.  Did you attend college?

24    A.  I did, yes.

25    Q.  Where?                                                    11:28:21
```

UNITED STATES DISTRICT COURT

```
 1   A.  Pepperdine University.

 2   Q.  What did you study?

 3   A.  International business.

 4   Q.  Okay.

 5           THE COURT:  Can I just ask both you and --        11:28:26

 6           MR. CAMBRIA:  Slow down.

 7           THE COURT:  -- the witness just to slow down the

 8   cadence.  You've --

 9           THE WITNESS:  Sure.

10           THE COURT:  -- got a court reporter here --       11:28:34

11           THE WITNESS:  Yes.

12           THE COURT:  -- and she's struggling to keep up with

13   you.  And I'm struggling to keep up with you as well.  So just

14   take it -- take it slow.

15           THE WITNESS:  Yes, Your Honor.                    11:28:42

16   BY MR. STONE:

17   Q.  All right.

18   A.  Yes.

19   Q.  College at Pepperdine?

20   A.  Pepperdine University, yes.                           11:28:50

21   Q.  And what did you study?

22   A.  International business.

23   Q.  Did you graduate?

24   A.  Yes, I did.

25   Q.  What year?                                            11:29:00
```

1    A.  2002.

2    Q.  Any grad school?

3    A.  Yes.  I went to Pepperdine University again for a master's

4    in business administration.

5    Q.  Is that in -- also referred to as an MBA?                  11:29:11

6    A.  Yes.

7    Q.  And what year did you graduate with an MBA?

8    A.  In 2017.  Oh, wait.  I'm sorry.  2007.

9    Q.  All right.  Did you go to work after you obtained your MBA?

10   A.  I did, yes.                                                 11:29:37

11   Q.  Generally, what did you do?

12   A.  I did any number of roles relating to finance, business,

13   and IT, and engineering.  So I was a project manager of a

14   company that was trying to implement a financial system into

15   their engineering sort of product.  I was a senior financial   11:29:53

16   analyst for an IT company.  And, you know, just a -- any number

17   of similar projects and jobs like that.

18   Q.  And those are from the years 2007 to 2010?

19   A.  That's right.

20   Q.  And how old are you?                                       11:30:10

21   A.  I'm 43.

22   Q.  All right.  Back to 2010 when you began your career with

23   the IRS.

24          Did you undergo any training?

25   A.  I did, yes.                                                11:30:24

QUOC THAT - DIRECT EXAMINATION

111

```
1    Q.  What type of training?

2    A.  I went through two sections of training.  The first section

3    was your basic investigator training.  That included training

4    as far as search warrants, arrest warrants, how to do technical

5    driving, defensive tactics.  Your standard police training.          11:30:43

6    And then I went to what they call sort of your add-on training,

7    which is agency specific.

8              So that -- for the IRS, that included a lot of

9    investigative training in terms of proving and tracing funds

10   and how they move.  So in the event that the criminal subjects     11:31:03

11   are hiding money from -- for tax purposes, they're -- they're

12   tax evading or if they're laundering their money, we -- we're

13   trained on various techniques on how to trace that money and

14   follow it through all of their accounts.

15   Q.  Okay.  How long did that training -- how long were you in     11:31:24

16   that training?

17   A.  The total amount of training I received was for six months.

18   Q.  Did you learn any strategies in reviewing financial records

19   during that six months?

20             MR. PANCHAPAKESAN:  Objection.  Vague as to              11:31:46

21   strategies.

22             THE COURT:  Well, sustained.

23   BY MR. STONE:

24   Q.  Did you train at all in reviewing financial records?

25   A.  I did.  Extensively.                                           11:31:54
```

UNITED STATES DISTRICT COURT

QUOC THAT - DIRECT EXAMINATION                    112

```
 1   Q.  What was your training in that regard?
 2   A.  We had two basic families and techniques of, you know, sort
 3   of families of techniques.  One was sort of your direct methods
 4   of proof, and that was when we would trace records and
 5   specifically through from one transfer of funds to another          11:32:16
 6   transfer of funds, and you could identify the specific wire or
 7   the specific check and how it would move very clearly and
 8   specifically through funds.
 9        The other way was an indirect -- indirect methods of
10   proof, and that is just essentially determining when funds were     11:32:35
11   moving based on associated money movements or associated facts
12   that would connect -- that would determine for us that money
13   was moved or money was received.
14   Q.  So you had training on a direct method?
15   A.  Yes.                                                            11:32:58
16   Q.  And an indirect method?
17   A.  Indirect methods, yes.
18   Q.  And were those the strategies that you were trained on?
19   A.  Yes.
20   Q.  All right.  Let's focus on your nine years as an IRS            11:33:05
21   special agent.  What type of cases did you work on during those
22   nine years?
23   A.  When I started, my focus was on tax fraud cases.  So that
24   included tax evasion, false subscription, which means that
25   you're filing tax returns that are untrue.  That also included     11:33:29
```

UNITED STATES DISTRICT COURT

 1   associated crimes such as identity theft and any number of tax

 2   fraud cases.  I then transitioned over more to cybercrime and

 3   cyber-enabled cases, and that, you know -- it was all within

 4   the sort of financial crimes circle.

 5   Q.  Did you work on any cases that involved digital currency?    11:33:52

 6   A.  Oh, yes, I did.

 7   Q.  Generally, what is digital currency?

 8   A.  Simply put, digital currency is just like electronic money.

 9   Q.  Okay.  What's an example of digital currency?

10   A.  The most popular digital currency right now is Bitcoin.      11:34:09

11   Q.  Did you work on cases involving money laundering during

12   your nine years at the IRS?

13   A.  I did, yes.

14   Q.  And money laundering as a term, generally what does that

15   mean to you?                                                     11:34:32

16        MR. PANCHAPAKESAN:  Objection.  It calls for a legal

17   conclusion.

18        THE COURT:  Overruled.

19        THE WITNESS:  Money laundering generally is just the

20   concealment of funds that were acquired, like illegal funds      11:34:43

21   from a crime.  Crime -- oh, it -- it's the movement of funds

22   that were acquired illegally.

23   BY MR. STONE:

24   Q.  Concealment or the moving of funds that were acquired

25   illegally?                                                       11:35:02

114

1    A.  Yes.

2    Q.  Is that your answer?

3    A.  That's right.

4    Q.  And the Court's going to give instruction to the jury about

5    precisely the money laundering counts that are associated in    11:35:09

6    this case.  This is just your general description of it;

7    correct?

8    A.  Yes, that's right.

9    Q.  And the cases you worked on when you were a United States

10   postal inspector, focusing on the financial fraud cases, could   11:35:27

11   you describe some of those cases you worked on as a postal

12   inspector.  Similar type cases?

13   A.  Similar type cases, yes.  There were numerous fraud cases

14   where people are using, you know, false identities, filing, you

15   know, false records, stealing identities and then, you know,     11:35:52

16   committing bank fraud and -- and wire fraud and things like

17   that.  Yeah.

18   Q.  Okay.  While you were a postal inspector, were you

19   designated as a subject matter expert in anything?

20   A.  Yes.  I was one of eight subject matter experts in money     11:36:08

21   laundering.

22   Q.  You said "one of eight."  One of eight in what?  One of

23   eight where?  In the state of --

24   A.  Oh, in the United States.  The whole agency, you know, they

25   went through and identified people with big cases and knowledge  11:36:22

1    of money laundering, and they wanted to collect all of us and

2    have us review and update their money laundering training.  So

3    I was one of the eight people to help produce this money

4    laundering training.

5    Q.  All right.  And as your time either as a IRS special          11:36:40

6    agent or a postal inspector, did you provide any trainings?

7    A.  Oh, yeah.  A lot, yeah.

8    Q.  Would you describe some of them.

9    A.  Well, I would regularly provide training in cybercrime,

10   digital currency, and how they relate to financial crimes       11:37:01

11   and -- and tax collection.

12   Q.  Where would -- let me ask you another question.  Where

13   would you provide those trainings?

14   A.  Oh, all over.  I mean, I would provide it to civil or fraud

15   auditors, you know -- you know, in all sorts of -- sort of IRS   11:37:19

16   entities, as civilian entities, as well as law enforcement

17   entities.  I would work with local law enforcement, federal law

18   enforcement, in the area of narcotics and explain to them how

19   digital currency was being moved in narcotics trafficking

20   organizations.                                                    11:37:38

21          That was really a big interest of mine and something

22   that I worked really hard to -- to help facilitate the

23   knowledge of around Los Angeles and around the country.

24   Q.  Okay.  So you gave trainings on digital currency?

25   A.  Oh, yes.  All the time.                                       11:37:53

```
 1   Q.  During your time as a special agent or as a postal

 2   inspector, did you receive any awards?

 3   A.  Oh, yes.  I received a U.S. Attorney's award for a Bitcoin

 4   dark net case that I worked in 2015 through 2017.

 5   Q.  Okay.  Sir, are you familiar with this matter, the matter       11:38:09

 6   that you're testifying --

 7   A.  I am, yes.

 8   Q.  -- before the jury?

 9           And how are you familiar with it?

10   A.  I was originally brought on to help review records relating      11:38:35

11   to digital currency, transfers as well as the general financial

12   transactions.

13   Q.  When did you begin your work on this case?

14   A.  Approximately 2017.

15   Q.  And you mentioned that you reviewed records related to           11:38:50

16   digital currency; correct?

17   A.  Yes.

18   Q.  And records related to financial transactions generally?

19   A.  Yes.

20   Q.  Okay.  Where did you -- or what documents did you review?        11:39:05

21   Generally.

22   A.  Generally a lot of bank documents.  And just financial

23   records across the board.

24   Q.  How did you obtain these bank documents and financial

25   records?                                                            11:39:24
```

UNITED STATES DISTRICT COURT

QUOC THAI - DIRECT EXAMINATION

```
 1    A.  I obtained the majority of them through grand jury

 2    subpoenas.

 3    Q.  All right.  And, generally, could you tell the jury what a

 4    grand jury subpoena is.

 5    A.  A grand jury subpoena is a request by the government for     11:39:31

 6    documents or witness testimony.

 7    Q.  You send a subpoena to a bank, and the bank would do what?

 8    A.  They would provide the records that you requested.  And you

 9    would specifically identify the types of records that you're

10    looking for.                                                     11:39:51

11    Q.  Records associated with certain accounts?

12    A.  Records related to certain accounts, certain individuals,

13    you know, in -- within certain time frames.

14    Q.  Okay.  How did you receive the records?  In what form?

15    A.  They were received in two basic forms:  You had your --      11:40:07

16    your physical documents.  They might mail you a big stack of

17    documents, or they might send you the records in a digital

18    version.

19    Q.  What did you do when you received -- received them?

20    A.  Well, we had to process them and review them, you know,      11:40:21

21    just get them all together.

22    Q.  How would you get them all together?

23         Let's -- let's break it down into the two categories.

24    The paper documents, what would you do?

25    A.  Oh, we would scan them.  And then once scanned -- and then   11:40:35
```

UNITED STATES DISTRICT COURT

QUOC THAT - DIRECT EXAMINATION                          118

1    sometimes we'd have, like, giant stacks of documents, boxes and

2    boxes of documents.  We'd send them through our sort of speedy

3    scanners.  And from there we'd organize them according to the

4    types of documents we received, and then we would process them

5    through sort of text recognition software.  And then from there    11:40:54

6    they would be ready to review for processing and -- and

7    investigative work.

8    Q.  So you'd make the paper documents -- or you'd turn the

9    paper documents into electronic --

10   A.  Yes.                                                            11:41:10

11   Q.  -- documents?

12   A.  Basically, yeah.

13   Q.  And you -- would they then become searchable as electronic

14   documents?

15   A.  Yes.  That's -- that was the main goal, so that we could        11:41:16

16   take the voluminous documents and make them searchable.

17   Q.  The other category, I guess, when they send you just the

18   electronic records, you get to skip a step, perhaps?

19   A.  In some cases, yes.  In some cases they're encrypted.  In

20   some cases they're compressed.  We'd have to try to make them       11:41:33

21   reviewable in one way or another, yes.

22   Q.  Do you have a sense for about how many financial records

23   and other documents you reviewed in this matter?

24   A.  Oh, well in excess of 100,000.

25   Q.  Now, in excess of 100,000.  Did you review every single         11:41:48

UNITED STATES DISTRICT COURT

QUOC THAT - DIRECT EXAMINATION

119

1  page of -- of those records?

2  A.  No, I did not.

3  Q.  What did you do?

4  A.  Well, what I did was I identified key individuals and key

5  accounts that I knew had funds that I was interested in          11:42:02

6  investigating in, and I would try to link those accounts

7  through transactions across the various accounts.

8  Q.  So, in other words, you'd run some searches?

9  A.  Oh, yes.  I'd run searches.  Make notes.  Make connections.

10  Run more searches.  Make more notes.  And repeat for hours       11:42:26

11  and hours and hours.  Days and months.  Yes.

12  Q.  As part of your role in this case, were you asked to

13  prepare summaries of these financial records?

14  A.  I have been, yes.

15  Q.  Did you prepare these summaries?                             11:42:43

16  A.  Yes, I did.

17  Q.  In preparing these summaries, did you base the exhibits on

18  these financial records you just testified about?

19  A.  Yes, I did.

20  Q.  You testified that you received a lot of financial records   11:43:01

21  from banks.  Did you also review Backpage's internal records

22  and internal documents?

23  A.  Yes, I did.

24        MR. STONE:  All right.  I'd like to show for the

25  witness's eyes only two exhibits, if we can.  The first is      11:43:27

UNITED STATES DISTRICT COURT

QUOC THAI - DIRECT EXAMINATION

120

```
 1    already in evidence.  It's 355b.  And the second is
 2    Exhibit 1480.
 3            THE WITNESS:  I see a "no signal."
 4    BY MR. STONE:
 5    Q.  Hold on.                                          11:43:48
 6    A.  Okay.
 7            THE COURTROOM DEPUTY:  Are you connected?
 8            THE COURT:  It says "no signal."
 9            Are you connected?
10    BY MR. STONE:                                         11:44:08
11    Q.  There it is.
12    A.  Oh, yes.  I see them.
13    Q.  All right.  I'm going to draw your attention to
14    Exhibit 1480.
15            Was this a document that -- that you prepared?  11:44:18
16    A.  Yes.
17    Q.  And did you use what's on the screen as Exhibit 355b as
18    a -- to support the document that you prepared?
19    A.  I did, yes.
20    Q.  What did you do?                                  11:44:37
21    A.  I just extracted and copied over those figures directly
22    into my spreadsheet.
23    Q.  Okay.  And then on Exhibit 1480, did you make some
24    calculations and add some information?
25    A.  Yes.  I added the three columns to the right as well as the  11:44:52
```

```
1    totals -- total row on the bottom and the title on top.
2    Q.  Okay.  And how did you come up with these calculations that
3    you added?
4    A.  Well, that column for monthly adult totals is directly
5    pulled from the column of adult, you know, the first column        11:45:12
6    over to the left.
7    Q.  And the percentage of revenue generated from adult section,
8    did you make those calculations?
9    A.  I -- they were just directly drawn from one column to the
10   other.                                                             11:45:36
11   Q.  Okay.  But that wasn't in the original exhibit; correct?
12   A.  That wasn't -- yes, that's right.
13   Q.  So you added that?
14   A.  Yes, I added.  Yeah.
15          MR. STONE:  All right.  Move to admit Exhibit 1480.         11:45:44
16          MR. PANCHAPAKESAN:  No objection, Your Honor.
17          THE COURT:  Yes, it may be admitted.
18          (Exhibit 1480 admitted into evidence.)
19          MR. STONE:  And permission to publish, Your Honor.
20          THE COURT:  It may be published, yes.                       11:45:52
21   BY MR. STONE:
22   Q.  Okay.  Let's -- now the jury's seeing it, sir.
23   A.  Uh-huh.
24   Q.  Exhibit 355b.
25          MR. STONE:  Let's just highlight the first column on        11:46:01
```

 1    the left, and then let's pull up the first column on your

 2    Exhibit 1480.

 3    BY MR. STONE:

 4    Q.  Is it not on your screen, sir?

 5    A.  Oh, I could -- I could see it.                         11:46:11

 6    Q.  All right.

 7    A.  Yes, sir.

 8    Q.  It might be easier if you look on to your screen --

 9    A.  Yeah, sure.  Of course.

10    Q.  -- rather than behind you.                             11:46:18

11    A.  Of course.

12    Q.  Okay.  Explain to the jury what we are looking at here,

13    please.

14    A.  This is a breakdown per month of ad revenue for the adult

15    entertainment section on Backpage.com.                     11:46:33

16    Q.  And these -- these are not figures that you came up with,

17    are they?

18    A.  No, they're not.

19    Q.  Where did you obtain these figures?

20    A.  They were obtained in our search warrant evidence.      11:46:43

21    Q.  Right.  From this document that we're actually looking at?

22    A.  Yes, from this document.

23    Q.  Okay.  And it says "Gross Revenue Per Section," [as read],

24    and then it has some dates on the left.

25          Do you see that, sir?                                 11:46:58

1    A.  Yes.

2    Q.  What do those dates indicate?

3    A.  They indicate the month and year of those -- you know,

4    those rows.

5    Q.  So Backpage revenue per month.  And then to the right          11:47:10

6    there's an amount for each month; is that correct?

7    A.  Yes, that's right.

8    Q.  All right.  And then on your exhibit, which is on the

9    right, there's a total at the bottom; is that correct?

10   A.  Yes, that's right.                                             11:47:25

11   Q.  And what's the total?

12   A.  $138,850,097.36.

13   Q.  And is that just the sum of October 2010 through

14   November 2012?

15   A.  That's right, yes.                                             11:47:40

16         MR. STONE:  All right.  Let's take that -- not the

17   exhibits, but we can take off the -- the highlights there.

18         Let's go to the next category on each of the exhibit

19   and pull that up for the jury.

20   BY MR. STONE:

21   Q.  Hard to read, so we're trying to pull it up.

22   A.  Sure.

23   Q.  Now, the top of both of these columns say "buy/sell/trade."

24         Do you have an understanding of what that means?

25   A.  Not exactly.  I -- it's just buy/sell/trade, I guess.          11:48:15

QUOC THAT - DIRECT EXAMINATION

```
 1   Q.  Okay.  And then it has months, and then it has money

 2   associated with those months.

 3          Is that, in your understanding, the revenue in that

 4   category for each month?

 5   A.  Yes.                                                        11:48:33

 6   Q.  All right.  And going all the way down --

 7          MR. STONE:  Okay.  We can take that off the screen.

 8   Thank you.

 9          Now let's just highlight Exhibit 1480.  And, if you

10   can, just go across the top.  And maybe we take both of them   11:48:46

11   down and just have 1480 up.  Just pause for a second.

12   BY MR. STONE:

13   Q.  All right.  Now, this is the exhibit you prepared; correct?

14   A.  Yes, that's right.

15          MR. STONE:  All right.  Why don't we just highlight      11:49:06

16   the top portion where we can go across all of the categories.

17   Maybe bring it out instead of highlight.  Sorry about that.

18   BY MR. STONE:

19   Q.  So going from left to right, are these, in your

20   understanding, different categories for advertisements on      11:49:31

21   Backpage.com?

22   A.  Yes, that's right.

23   Q.  Again, we looked at the first one.  That was adult

24   entertainment.

25          Are all the rest of them non-adult entertainment        11:49:41
```

1   categories?

2   A.   To the best of my knowledge.

3   Q.   Fair.

4           MR. STONE:   All right.   Let's then just pull up the

5   second-to-third final categories.   Right here.                    11:49:53

6   BY MR. STONE:

7   Q.   Okay.   Now, you testified that these were the columns where

8   you added to the -- to the document; correct?

9   A.   Yes, that's right.

10  Q.   And the first column, that was the adult revenue totals?       11:50:10

11  A.   That's right.   Yes.

12  Q.   And the second column is what?

13  A.   A total of all the other columns.

14  Q.   All the other columns.

15          And you testified, to the best of your recollection,        11:50:28

16  that's all the non-adult content on Backpage?

17  A.   That's right.   Yes.

18  Q.   And what is the ultimate total of that for these years,

19  which is at the bottom, I believe.

20  A.   Yes.   For the total monthly adult, as I stated earlier, it    11:50:40

21  was 138 million and change.   And the non-adult is

22  $8,208,658.90.

23  Q.   All right.   Now, focusing your attention on the final

24  column, the title reads, "Percentage of Revenue Generated from

25  Adult Section."                                                      11:51:05

1        Just explain to the jury what this -- what this is.

2   A.   What I did was I added the -- the total adult and the total

3   non-adult together, and I divided the monthly adult against the

4   total to determine the percentage of the monthly adults, you

5   know, revenue against the total.  And I identified that the          11:51:26

6   adult section was responsible for over --

7   Q.   Why don't you just start with the first -- either -- the

8   one at the top.  Explain how you got to 97.12 percent.

9   A.   Okay.  So that's easy.  I added 1,172,000 and change plus

10  300 -- 34,000 and change, and I received a total.  And that         11:51:55

11  total is the total amount that was received by Backpage.com.

12  What I then did was I took the 1,100,000 and change and I

13  divided it by the total that I identified, and I received a

14  percentage, which was 97.12 percent.

15  Q.   So you figured out the adult percentage of revenue that        11:52:17

16  Backpage earned in that particular month?

17  A.   In that particular month, yes.

18  Q.   And did you do the same all the way down the column?

19  A.   Yes, I did.

20  Q.   And then at the bottom there's also a percentage.  What        11:52:30

21  does that percentage represent?

22  A.   That percentage recommend -- represents a average of the

23  total percentages up that column.

24  Q.   And what is that percentage?

25  A.   94.42 percent.                                                 11:52:44

1    Q.  And so did that represent, over the course of from

2    October 2010 to November 2012, the percentage of revenue that

3    Backpage earned that was from the adult category?

4    A.  That's right.  Yes.

5            MR. STONE:  All right.  I'd like to show to the                11:53:15

6    witness an exhibit that's not admitted into evidence.  It's

7    Exhibit 1481.

8    BY MR. STONE:

9    Q.  Sir, was this an exhibit that you prepared?

10   A.  It is, yes.                                                         11:53:31

11   Q.  I want to focus just on the top portion.  And my question

12   to you, sir, is, what -- generally, what is this, without going

13   into the specifics?

14   A.  These are just the revenues received by the various

15   entities associated with Backpage.                                     11:53:52

16   Q.  What records did you review to create this summary?

17   A.  Internal records to the various entities.  Accounting

18   records.

19   Q.  Okay.  Now, let's focus on the bottom half, which has --

20   well, let me ask you generally what this is.                           11:54:11

21   A.  This is income received by Mr. Lacey, Mr. Larkin,

22   Mr. Brunst, and Mr. Spear.

23   Q.  What records did you review to prepare this part of the

24   exhibit?

25   A.  Tax records.                                                       11:54:23

 1            MR. STONE:  I move to admit Exhibit 1481.

 2            MR. PANCHAPAKESAN:  No objection, Your Honor.

 3            THE COURT:  Yes, the exhibit may be admitted.  It may

 4     be published.

 5            MR. STONE:  Thank you, Your Honor.                    11:54:35

 6            (Exhibit 1481 admitted into evidence.)

 7     BY MR. STONE:

 8     Q.  All right.  The first part of this summary reads, "Annual

 9     Revenue for Business Entities for the Years 2013-2018"; is that

10     correct?                                                     11:54:47

11     A.  That's right.  Yes.

12     Q.  All right.  Let's focus in on that top portion that has the

13     revenue numbers.  And let's start with the first company name,

14     which is Backpage.com.  Okay?

15     A.  Yes.                                                     11:55:01

16     Q.  You have revenue associated with Backpage.com in years

17     2013, 2014, and 2015; is that right?

18     A.  That's right.

19     Q.  And do -- based on the records, do you know why there's not

20     revenue associated with Backpage.com after 2015?             11:55:17

21     A.  Well, after 2015, I understand that the business was sold

22     to Mr. Ferrer.

23     Q.  Okay.  And there's now a different company here, Website

24     Tech.

25            Are you familiar with that company?                   11:55:37

1    A.   Yes.

2    Q.   Is it Website Technologies?

3    A.   It is Website Technologies.

4    Q.   And this Ad Tech BV, are you familiar -- and are you

5    familiar with records associated with both of those companies?    11:55:47

6    A.   Yes, I have.

7    Q.   All right.  Generally, what are those companies?

8    A.   Those companies are companies that --

9         THE COURT:  Bless you.

10        THE WITNESS:  -- subsequently received revenue from    11:55:56

11   Backpage.com.

12        MR. STONE:  Bless you.

13        THE COURT:  Bless you.

14   BY MR. STONE:

15   Q.   I believe your answer was those companies received revenue    11:56:05

16   from Backpage.com?

17   A.   Yes.

18   Q.   So all of the money that's listed here, where did that

19   money -- or what -- what is the money?  Where did the revenue

20   come from?    11:56:18

21   A.   It all was generated from the website of Backpage.com.

22   Q.   All right.  Do you -- in looking at the records, do you

23   have an understanding for where Website -- or what Website

24   Technologies was?

25   A.   Website Technologies was a company registered in the United    11:56:36

1   States.

2   Q.  What about Ad Tech BV?  Where was that company registered?

3   A.  In the Netherlands.  Sorry.  My pronunciation.

4   Netherlands.

5   Q.  All right.  In 2015 -- well, let's look at the numbers                11:56:48

6   here.

7           2013, what was the revenue for Backpage?

8   A.  112,694,191.

9   Q.  All right.  And in 2014?

10  A.  $134,928,026.                                                          11:57:10

11  Q.  Okay.  Now, in 2015, it's split between these three

12  companies; correct?

13  A.  That's right.

14  Q.  And you testified that was the year where you observed

15  records that showed that the company was sold?                            11:57:28

16  A.  Yes, that's right.

17  Q.  And do you know who sold it and who was on the receiving

18  end of the sale?

19  A.  I identified a -- a number of documents showing that

20  Mr. Brunst, Mr. Lacey, Mr. Larkin, and Mr. Spear sold it to              11:57:46

21  Mr. Ferrer.

22  Q.  Okay.  And there's money now associated with Website Tech

23  and Ad Tech BV.

24          Is -- who decided that the money would now be

25  associated with -- with these companies, or what did you                 11:58:03

QUOC THAI - DIRECT EXAMINATION

131

```
 1   observe when you looked at the records?

 2           MR. CAMBRIA:  Object to foundation.

 3           MR. STONE:  I'll withdraw it, and I'll ask a better

 4   question, Your Honor.

 5           THE COURT:  All right.                            11:58:11

 6   BY MR. STONE:

 7   Q.  In reviewing the records, do you know why there are now

 8   three companies listed here?

 9   A.  Because going forward after 2015, the revenues were

10   recognized through those companies.                       11:58:28

11   Q.  Okay.  Same revenue, just in a different name of a company?

12   A.  Yes.

13   Q.  Also in 2015, in your review of the records, did -- was

14   there anything that happened to Backpage?

15   A.  The -- it looks like the credit card companies no longer  11:58:45

16   were accepting credit card payments for advertisements on

17   Backpage.

18   Q.  And that happened in 2015?

19   A.  Yes, around the middle of 2015.

20   Q.  Okay.  And then what was the total amount of revenue in  11:59:01

21   2015?

22   A.  107,154,668.

23   Q.  Okay.  2016, now the money's no longer accounted for in

24   Backpage but just in Website Tech and Ad Tech BV; is that

25   right?                                                    11:59:21
```

UNITED STATES DISTRICT COURT

1    A.  That's right.

2    Q.  And what was the revenue for 2016?

3    A.  $128,545,667.

4    Q.  And then moving forward, 2017, what was the revenue figure?

5    A.  134,629,000.                                                    11:59:35

6    Q.  Did you say 134?

7    A.  135,629,000.  I'm sorry.

8    Q.  All right.  And then in 2018, what was the revenue?

9    A.  $25,648,092.

10   Q.  Obviously 2018, there's a serious reduction in the revenue.    11:59:57

11          Do you have an understanding of why that is?

12   A.  That's the time when the federal agent -- federal

13   government seized the Backpage.com website.

14   Q.  Do you know about when that occurred?

15   A.  Approximately April of 2018.                                   12:00:12

16   Q.  So this was revenue just for January, February, March --

17   March --

18   A.  Yeah.

19   Q.  -- of that year?

20   A.  And maybe a few days in April.                                 12:00:20

21   Q.  All right.  Let's go to the bottom half of this exhibit.

22          All right.  Michael -- there's four names listed on

23   the left.

24          Who are those individuals?

25   A.  Those individuals are the owners of Backpage.com.              12:00:44

```
 1    Q.  Okay.  And you mentioned that you obtained these figures
 2    through tax records?
 3    A.  That's right.  Yes.
 4    Q.  And do these figures include income that these individuals
 5    earned from Backpage?                                        12:01:00
 6    A.  That's right.  It does.
 7    Q.  And in terms of the amounts, how much of these income
 8    figures generally come from Backpage, in your review of the
 9    records?
10    A.  A great majority of them.                                12:01:17
11    Q.  A great majority --
12    A.  Yes.
13    Q.  -- of the amounts here came from Backpage?
14    A.  Yes, that's right.
15          MR. STONE:  All right.  And let's take the zooming      12:01:23
16    down so we can see the whole exhibit, please.
17    BY MR. STONE:
18    Q.  And you can see now the revenue for 2013 on the top and the
19    income for 2013 for the owners on the bottom; right?
20    A.  Yes, that's right.                                       12:01:45
21    Q.  And you have that for the years 2013, 2014, and 2015?
22          So as comparison side by side here, on the right is
23    the revenue for Backpage; on the left the income earned by
24    these four individuals; correct?
25    A.  Yes, that's right.                                       12:02:04
```

1    MR. STONE:  All right.  Why don't we look at 2014.

2    BY MR. STONE:

3    Q.  Again, on the left here, the 114 million, that's the income

4    for the four owners --

5    A.  Yes.                                                    12:02:23

6    Q.  -- correct?

7    A.  Yes, that's right.

8    Q.  And on the right is Backpage revenue earned for that year?

9    A.  Yes, that's right.

10   Q.  Finally, 2015.  On the right, Backpage revenue; correct?   12:02:31

11   A.  Yes.

12   Q.  And on the left, the income earned by the four owners;

13   correct?

14   A.  That's right.  Yes.

15          MR. STONE:  Okay.  All right.  I want to show for the   12:03:02

16   witness's eyes only Exhibit 1479, please.

17   BY MR. STONE:

18   Q.  Sir, do you recognize this exhibit?

19   A.  I do.

20   Q.  Was this an exhibit that you prepared?                   12:03:17

21   A.  It was.

22   Q.  And how did you prepare this exhibit?

23   A.  I reviewed the financial records and made connections

24   between the various accounts and identified key financial

25   transactions.                                               12:03:33

1    Q.  What does this exhibit show?

2    A.  It shows the transfer of funds between one account to

3    other -- from accounts to accounts.

4    Q.  Okay.  And does it track -- or what -- what transactions

5    were you focused on in preparing this exhibit?                    12:03:47

6    A.  Transactions relating to funds from Backpage.com and

7    through the various entities ultimately landing in the accounts

8    of the defendants.

9    Q.  All right.  And do these transactions relate to charges

10   against any defendants?                                           12:04:08

11   A.  Yes, they do.

12   Q.  Do you know, are these the money laundering charges in this

13   case?

14   A.  Yes, they are.

15   Q.  Do you know who is charged with money laundering offenses    12:04:16

16   of the five defendants that are sitting over here?

17   A.  Mr. Lacey, Mr. Brunst, and Mr. Spear.

18           MR. STONE:  Okay.  I move to admit Exhibit 1479.

19           MR. PANCHAPAKESAN:  No objection, Your Honor.

20           THE COURT:  Yes.  1479 is admitted and may be            12:04:36

21   published.

22           (Exhibit 1479 admitted into evidence.)

23           MR. STONE:  Thank you, Your Honor.

24   BY MR. STONE:

25   Q.  All right.  So now the jury can see the exhibit.  And just   12:04:44

QUOC THAT - DIRECT EXAMINATION

136

```
 1   describe what they're seeing here.
 2   A.   In this instance, we see a flowchart for Account 53.
 3   Specifically, a transaction between Website Technologies and
 4   Cereus Properties.
 5            For the purpose of explaining the format of my chart      12:05:03
 6   here, the first line you'll see is the company name that owns
 7   or has control over the bank account.  The second line will
 8   have -- will be the bank that the funds were held in.  The
 9   third line will be the last four digits of that particular
10   account.                                                          12:05:26
11            And then, of course, same with Cereus Properties.
12   You'll see that it's Cereus Properties with funds at Arizona
13   Bank & Trust, and the account is 62 -- it ends in 622 -- 6211.
14   Q.   All right.  You testified about Website Technologies.  I
15   don't think we've heard anything about Cereus Properties.        12:05:45
16            From your review of the reports, do you have an
17   understanding of what Cereus Properties is?
18   A.   Cereus Properties appears to be an entity used to pay the
19   various payroll expenses of the -- of the activity relating to
20   the Backpage.com.                                                 12:06:06
21   Q.   Okay.  Do you know who -- do you know if Cereus Properties
22   had a chief financial officer?
23   A.   I do know that it was Mr. Brunst.
24   Q.   All right.  And did you observe from the records what would
25   happen to money that was transferred to Cereus Properties?       12:06:23
```

UNITED STATES DISTRICT COURT

1    A.  Yes, I did.

2    Q.  What happened?

3    A.  Frequently money would land from Website Tech, and within

4    the same day or the next day it would be transferred out, you

5    know, to Mr. Larkin, Mr. Lacey, Mr. Brunst, and Mr. Spear.          12:06:43

6    Q.  The four owners?

7    A.  The four owners, yeah.

8    Q.  So money would hit Cereus Properties' account and then

9    would go to the four owners?

10   A.  Yes.  Almost immediately.                                        12:06:53

11   Q.  Did you observe Cereus Properties being used for anything

12   else?

13   A.  Not really.  It was primarily a -- like a payroll company.

14   Q.  You say "payroll."  Who was it paying?

15   A.  The -- primarily the owners, but a few -- quite a few of        12:07:05

16   the other employees as well.

17   Q.  Okay.  All right.  Let's focus on the first ten counts,

18   which will be the first ten pages of this flowchart for summary

19   exhibit, Counts 53 through 62.  Okay?

20   A.  Yes.                                                            12:07:40

21   Q.  Did all of those counts involve similar transactions?

22   A.  They did, yes.

23   Q.  Similar to what the jury is seeing on their screen here

24   that's listed as Count 53?

25   A.  Yes, that's right.                                              12:07:50

UNITED STATES DISTRICT COURT

1    Q.   Okay.  So what -- what was the transaction?  From what

2    company to what company?

3    A.   From Website Tech to Cereus Properties.

4    Q.   You mentioned that Website Tech had -- or in 2015 became

5    the company that held Backpage.com revenue; correct?        12:08:08

6    A.   Yes, that's right.  Was receiving it.

7    Q.   Was receiving it.

8         So when the jury sees Website Technologies in this

9    summary chart, are they to understand that that is always

10   Backpage.com revenue?                                       12:08:27

11   A.   Yes, that's right.

12   Q.   In the year -- now we're looking at Count 54.  The date is

13   what?

14   A.   May 18th, 2016.

15   Q.   Was this after the credit card stopped doing bus- -- or   12:08:44

16   strike that.

17        Was this after the credit card issue that you already

18   testified to?

19   A.   This was -- yes, it was after.  Yes.

20   Q.   I believe you testified that that occurred at some point in  12:08:59

21   2015.

22   A.   Yeah.  Middle of 2015, yes.

23   Q.   All right.  Were you able to observe from the records

24   revenue that was flowing into Website Technologies?

25   A.   Oh, yes.                                                12:09:11

139

```
 1   Q.  What types of sources was Website Technology receiving the
 2   money from?
 3   A.  Oh, all sorts of different sources.  I identified sources
 4   from digital currency exchangers as well as Posting Solutions,
 5   which was a -- like -- that used -- was used to receive money     12:09:33
 6   orders.
 7   Q.  All right.  Well, what's a money order?
 8   A.  A money order is a -- functions like a check, and you --
 9   but you would just have to pay for it with a -- a -- a party
10   that will sell you the money order in the amount that you write   12:09:48
11   the money order for.
12   Q.  If I wanted a money order, where could I go to get one?
13   A.  For example, you might go to the postal -- a Post Office,
14   and you buy a money order for 500 bucks.  You give the postal
15   worker $500.  They would issue you a -- and a service fee of,     12:10:04
16   you know, however much, and then they would give you a money
17   order for $500.  And then you could use that to pay for
18   whatever you need to pay for, like rent or whatever else.
19   Q.  If I received a money order that was worth $500, how do I
20   use it?                                                           12:10:25
21   A.  Oh, you would --
22   Q.  Send it to someone?
23   A.  Yeah.  Oh, they -- if you're the customer of the money
24   order, you would take the money order and you'd pay your -- the
25   person you need to pay.  Once the person is paid, they could      12:10:34
```

1   just take that money order and deposit it into their bank

2   account.

3   Q.  All right.  So could you physically hand the money order to

4   someone?

5   A.  Oh, of course.                                    12:10:45

6   Q.  What's another way to get the money order to someone?

7   A.  Oh, you could mail it to them.  You have to physically give

8   it to them.

9   Q.  All right.  You mentioned revenue that was earned through

10  digital currency, I believe; is that correct?          12:11:00

11  A.  That's right, yes.

12  Q.  And you were -- from your review of the records, you were

13  able to observe that as well?

14  A.  Yes, that's right.

15       MR. STONE:  All right.  Let's look at, for the         12:11:10

16  witness's eyes only, Exhibit 1545.

17  BY MR. STONE:

18  Q.  Sir, that should be on your screen.

19       Do you recognize this exhibit?

20  A.  I do.  Yes.                                        12:11:22

21  Q.  Was this an exhibit that you prepared?

22  A.  Yes, it was.

23  Q.  What documents did you review to prepare this exhibit?

24  A.  I reviewed documents relating to GoCoin and Website Tech.

25  Q.  All right.  GoCoin is what?                        12:11:36

QUOC THAI - DIRECT EXAMINATION

1   A.  It's a digital currency exchanger.

2   Q.  What does that mean?

3   A.  They provide the service of either buying your digital

4   currency and exchanging it with cash or vice versa.  They'll

5   give you cash for digital currency that you have.  And they do          12:11:52

6   it for a fee.

7           MR. STONE:  Move to admit Exhibit 1545.

8           MR. PANCHAPAKESAN:  No objection.

9           THE COURT:  Yes, it may be admitted and published.

10          (Exhibit 1545 admitted into evidence.)                         12:12:05

11  BY MR. STONE:

12  Q.  Now the jury can see this exhibit.

13          Sir, the top part has total credits.  What does that

14  mean?

15  A.  That means -- oh, that means that it's the amount of money          12:12:16

16  that was converted over from digital currency and of -- by

17  GoCoin and transferred into an account belonging to Website

18  Technologies.

19  Q.  All right.  And the date there, is that the dates that you

20  reviewed for this exhibit?                                             12:12:36

21  A.  Yes, that's right.

22  Q.  January 15th through May 2017?

23  A.  That's right.  Yes.

24          MR. STONE:  All right.  Let's look at the body of the

25  exhibit.  If we can blow it up.  Thank you.                           12:12:44

UNITED STATES DISTRICT COURT

BY MR. STONE:

Q.  What's the jury looking at, sir?

A.  This is a monthly total of the credits that were transferred from GoCoin to Website Tech.

Q.  Website Tech received the credits in U.S. dollars?                    12:12:57

A.  U.S. dollars, yes.

Q.  And your understanding from your review of the records is that GoCoin had converted the digital currency into the U.S. dollars beforehand?

A.  Yes, that's right.                                                     12:13:12

Q.  So we look at the first month here, January 2015, and then on the right-hand side it says "Sum of Credit," and it's $35,000 and some change; correct?

A.  Yes, that's right.

Q.  So your testimony is that that was the amount of money that   12:13:25 then was transferred to Website Tech?

A.  Yes.

Q.  Moving down we are seeing subsequent months and how much money was transferred to Website Tech?

A.  Yes.                                                                   12:13:41

Q.  All right.  So what -- how much is the next month?

A.  $13,039.10.

Q.  And fair to say that for the next one, two, three, four months, a fairly low amount; correct?

A.  Low amounts, yes.                                                      12:13:56

1    Q.  All right.  And then in July of 2015, what do we see?

2    A.  We see almost a tenfold increase month over month.

3    Q.  Do you have an understanding of why there was a tenfold

4    increase in July of 2015?

5    A.  I believe it was a response to the credit card companies no          12:14:09

6    longer accepting credit card payments for advertisements on

7    Backpage.com.

8    Q.  And then the next month, August, what happens?

9    A.  August, the amounts, you know, converted double -- almost

10   doubled from the last month.                                             12:14:27

11   Q.  All right.  And September similar to August.  Fair?

12   A.  Yeah, similar.

13   Q.  And then what happens in October of 2015?

14   A.  It almost doubles again.

15   Q.  And skipping to December, what happens?                              12:14:38

16   A.  Oh, I -- it increases by nearly a million dollars from

17   November.

18   Q.  So in looking at these records in preparing this exhibit,

19   what does that tell you about what was happening with

20   Backpage's business?                                                     12:14:55

21   A.  The customers of Backpage were con- -- sort of adapting and

22   paying Backpage through digital currency with a lot more

23   frequency than they did before --

24   Q.  Excuse me.

25   A.  -- at the beginning of 2015.                                         12:15:12

QUOC THAI - DIRECT EXAMINATION

144

Q.  Were you able to tell from the records what type of digital

currency customers were using?

A.  Primarily Bitcoin.

Q.  And this traces all the way to May of 2017?

A.  Yes.  That's right.                                    12:15:30

Q.  And the numbers.  What do the numbers do between

December 2015 and May 2017?

A.  They -- they stay pretty stable, around 2 million.  You

know, 1.7 to 3.5 million.

Q.  But -- but certainly far greater than at the -- at the --   12:15:49

those first few months in 2015.  Fair?

A.  Yeah.  They never go back down under a million, even under

1.6 million, 1. -- yeah, 1.6 million.

Q.  And where does all this money go?

A.  It goes into the accounts of Website Technologies.          12:16:08

         MR. STONE:  All right.  Can we pull up Exhibit 1479

and put it side by side with Exhibit 1545 for the jury, please.

BY MR. STONE:

Q.  When we get it up, sir, I want to ask you some questions

about --                                                        12:16:30

         MR. STONE:  1479.

BY MR. STONE:

Q.  -- questions about the two exhibits.  Okay?

A.  Okay.

Q.  Now, looking at this first page of 1479, that's in May of    12:16:39

1  2016?

2  A.  Yes.

3  Q.  And looking at Exhibit 1545, we can see in May of 2016 the

4  money that Website Technologies received from GoCoin; correct?

5  A.  Yeah, that's right.                                    12:17:08

6  Q.  And so that number is what?

7  A.  The -- the number is $3,564,376.

8  Q.  And that was money that Website Technologies received?

9  A.  Yes.

10 Q.  That the -- the 2000 -- May 2016 number from Exhibit 1545?  12:17:25

11 A.  Yes, that's right.  Yes.

12 Q.  You testified already that that wasn't the only source of

13 money that Website Technologies was receiving at that time;

14 correct?

15 A.  Yes, that's right.                                     12:17:38

16 Q.  Just one part of it?

17 A.  One part of it.

18       MR. STONE:  All right.  Let's go to Exhibit -- or

19 Count 54.  Keep both of these up.  Just go to the next page.

20 BY MR. STONE:                                              12:17:52

21 Q.  And that's also a May transaction; correct?

22 A.  Yes, that's right.

23       MR. STONE:  All right.  And let's go to the next one.

24 BY MR. STONE:

25 Q.  Also May?                                              12:18:00

1   A.   That's right.

2   Q.   Count 56, May 31st.

3          MR. STONE:   Go to Count 57.

4   BY MR. STONE:

5   Q.   And that's June.   Why don't we look at how much money          12:18:10

6   GoCoin sent to Website Technologies in June of 2016.

7          What's that amount, sir?

8   A.   $2,894,618.

9   Q.   All right.

10          MR. STONE:   And we can keep scrolling on Exhibit 1479.   12:18:25

11   BY MR. STONE:

12   Q.   We see another June transaction.   And in July.

13          July, what's the amount that GoCoin sent to Website

14   Technologies?

15   A.   2,862,489.                                                     12:18:42

16          MR. STONE:   All right.   We'll keep scrolling.

17   BY MR. STONE:

18   Q.   Count 60.   Also a July transaction; correct?

19   A.   Yes, that's right.

20   Q.   Count 61.   Now we're into August.                            12:18:53

21   A.   Yes.

22   Q.   And the amount that Website Technologies received from

23   GoCoin in August of 2016 was what?

24   A.   3,126,636.97.

25   Q.   All right.   And then let's go to Count 62.                    12:19:12

And that's another August transaction; correct?
A. That's right. Yes.
MR. STONE: All right. I'd like to take Exhibit 1475 down and for the witness's eyes show him -- show him Exhibit 1691, please. 12:19:50
BY MR. STONE:
Q. Sir, is that on your screen?
A. Yes, it is.
Q. Do you recognize that exhibit?
A. I do. 12:19:58
Q. What is it?
A. It is a total summary of payments from Website Tech to Cereus Properties from December of 2015 through August of 2016.
Q. And was this a document that you prepared?
A. It was. 12:20:15
Q. And what records did you review when preparing this document?
A. I reviewed -- reviewed bank records from Website Tech and Cereus Properties.
MR. STONE: Okay. Move to admit Exhibit 1691. 12:20:27
MR. PANCHAPAKESAN: No objection.
THE COURT: Yes, it may be admitted and published.
(Exhibit 1691 admitted into evidence.)
MR. STONE: All right. Let's highlight -- not highlight, but let's zoom in on 1691, please. Okay. 12:20:40

BY MR. STONE:

Q.   And explain to the jury what they are seeing on their

screens, please.

A.   These are individual transactions that occur on that date

and for those amounts.  I -- for the purpose of citations, I          12:20:53

would identify the page number they belong on as well as the

Bates number, which is a number that we used internally to

identify what record we were referring to.

Q.   Okay.  And so these were amounts that were transferred from

Website Tech to Cereus Properties on certain dates?                   12:21:13

A.   That's right.  Yes.

Q.   Do some of these transactions match some of the counts that

we just reviewed?

A.   Oh, yes, they do.

        MR. STONE:  Let's zoom out if we can.  And then just       12:21:23

zoom in on the entire Exhibit 1691, please.

BY MR. STONE:

Q.   So there's a total at the bottom of the page; is that

right?

A.   Yes, that's right.                                               12:21:44

Q.   And what's the total?

A.   39,249,211.

Q.   What does -- well, let me ask you this:  Does that

represent money earned from Backpage.com?

A.   It does.                                                         12:21:58

1   Q.  And you know that because it went to Website Tech first and

2   then went to Cereus Properties?

3   A.  That's right.

4   Q.  So all the money that the jury just reviewed from

5   Exhibit 1479 associated with Counts 53 through 62 came from          12:22:12

6   what company?

7          I -- let me strike that.

8          Where was -- where was that money earned?  What -- how

9   was that money earned on all the counts, from 53 to 62?

10  A.  From the -- from the Backpage.com website.                       12:22:28

11         MR. STONE:  All right.  We can take down -- let's just

12  put Exhibit 1479, page 11, on the full screen if we can,

13  please.  Go to Count 63.

14  BY MR. STONE:

15  Q.  And, sir, this is a different type of transaction than what      12:23:07

16  we just looked at; correct?

17  A.  Yes, that's right.

18  Q.  All right.  What is this?

19  A.  This is a transfer of -- this is payment to -- from

20  Backpage.com to a bank in India.                                     12:23:18

21  Q.  All right.  Do you have any other information about this

22  transaction other than the date, the amount, and where it was

23  sent?

24  A.  No, I don't.

25         MR. STONE:  Okay.  Let's go to Count 64.                      12:23:33

QUOC THAI - DIRECT EXAMINATION

150

BY MR. STONE:

Q.  Now, this is also a different transaction, is it not?

A.  Yes, that's right.

Q.  All right.  What -- what is the jury reviewing here?

A.  Oh, it's a transfer from Ad Tech BV based in the    `12:23:47`

Netherlands of an amount transferred to Cereus Properties of

$5,005,732.

Q.  Okay.  And, again, this went to Cereus Properties?

A.  Yes, that's right.

Q.  Cereus Properties was the recipient for Counts 53 to 62 as    `12:24:09`

well; correct?

A.  Yes.

Q.  All right.  Do you know where Cereus Properties' account

was located?

A.  At -- in Arizona.    `12:24:18`

Q.  At this Arizona Bank & Trust?

A.  Yes, it -- yes, that account.

Q.  So for Counts 64 through 68, are those similar types of

transactions?

A.  Yes, they're right -- that's right.    `12:24:38`

Q.  They go from what company to what company?

A.  Ad Tech BV to Cereus Properties.

Q.  And the dates and amounts change for each of these counts;

is that right?

A.  That's right.  Yes.    `12:24:53`

UNITED STATES DISTRICT COURT

QUOC THAI - DIRECT EXAMINATION                    151

1    Q.  You mentioned Ad Tech BV was a Netherlands company, a Dutch

2    company?

3    A.  Yes.  It was registered in the -- in the Netherlands.

4         MR. STONE:  All right.  Let's go to Count -- the next

5    page.                                                            12:25:20

6    BY MR. STONE:

7    Q.  And this shows Counts 69 and 70; is that right?

8    A.  Yes, that's right.

9    Q.  Now, for the first counts that we reviewed, Counts 53

10   through 68, do you know who was charged with those money         12:25:34

11   laundering counts?

12   A.  You're talking about --

13   Q.  Were Counts 53 through 68 -- let me rephrase.

14        Were all of the three defendants who you had testified

15   earlier are charged with money laundering counts, were they      12:25:50

16   charged with Counts 53 through 68?  If you know.

17   A.  I -- I can't -- I can't recall based on the records.  I

18   know that Cereus Properties was associated with those counts,

19   and Cereus Properties is related to Mr. Brunst.

20   Q.  Okay.  On this, which is -- there's a Count 69 and a         12:26:09

21   Count 70.

22        Are these counts that are alleged against

23   Defendant Michael Lacey and Defendant Brunst?

24   A.  Yes, they are.

25        MR. STONE:  Okay.  Let's start from the left-hand          12:26:30

QUOC THAI - DIRECT EXAMINATION

```
 1    side.  Maybe we can just highlight the first bit here, the --
 2    the first part of that where it goes from Backpage to Camarillo
 3    Holdings.
 4              THE WITNESS:  Yes.
 5    BY MR. STONE:                                              12:26:43
 6    Q.  All right.  What -- what does this signify?
 7    A.  This shows an amount -- amount of transfers between
 8    Backpage.com's website -- or Backpage.com's account at US Bank
 9    transferring $6.5 million of funds to Camarillo Holdings
10    between the date of, you know, February -- February 4th, 2013,  12:27:04
11    to February 25th, 2013.
12    Q.  All right.  So it's money that transferred in from those
13    dates, about three weeks in February of 2013?
14    A.  Yes, that's right.
15    Q.  Were you able to review records to see if there were        12:27:19
16    additional transfers from this Backpage.com US Bank to
17    Camarillo Holdings' BMO Harris Bank in subsequent months?
18    A.  Oh, yes.
19    Q.  Okay.  What did you review -- I'm sorry.  Strike that.
20              What months did you review moving forward?           12:27:39
21    A.  So I identified the months starting on February 4th, 2013,
22    through to June 9th, 2014.
23    Q.  Was there something that happened on June 9th, 2014?
24    A.  The account was closed.
25    Q.  Okay.  So you actually looked, moving forward, from         12:28:01
```

UNITED STATES DISTRICT COURT

1  February 2013 to June of 2014?

2  A.  Yes.

3  Q.  And in those let's call it 16 months, were you able to

4  observe how much money was transferred from Backpage.com to

5  Camarillo Holdings?                                    12:28:14

6  A.  Yes.  I identified $99 million transferred from

7  Backpage.com to Camarillo Holdings.

8          THE COURT:  Mr. Stone, you have about one minute.

9          MR. STONE:  Okay.  I'll make use of it.

10 BY MR. STONE:                                          12:28:28

11 Q.  Camarillo Holdings.  I'm not sure that the jury's seen that

12 in your chart.  What is it?

13 A.  Camarillo Holdings appears to function in the same way

14 Cereus Properties functioned, where they would receive funds

15 from the primary business entity, in this case Backpage.com,   12:28:44

16 and it would be used to pay the various owners and the various

17 payroll responsibilities of, you know, the Backpage.com as a

18 whole.

19 Q.  In your review of the records, did Camarillo Holdings have

20 a chief financial officer?                             12:29:00

21 A.  Yes, they did.

22 Q.  Who was it?

23 A.  Mr. Brunst.

24          THE COURT:  All right.  Shall we leave it at that for

25 the moment?                                            12:29:09

```
 1              MR. STONE:  Yes, Your Honor.

 2              THE COURT:  Now, members of the jury -- and the

 3    witness may step down.

 4              THE WITNESS:  Yes.

 5              THE COURT:  Members of the jury, I'm going to again      12:29:20

 6    remind you of the admonishment, not to come to any conclusions

 7    over the weekend, not to research any of the individuals who

 8    have so far testified or any of the places discussed, not to

 9    discuss the matter amongst your family, your friends, or to do

10    any sort of research.  And that -- that includes even           12:29:42

11    consulting dictionaries or documents about some of the

12    terminology heard.  And that is so that you continue to keep an

13    open mind until the case is handed over to you.

14              And so if you remember that admonishment, we'll be

15    fairly okay.  And I do anticipate that you be ready to come in   12:30:00

16    on Tuesday and resume your seats at 9:00 a.m. promptly.  So

17    with that, have a pleasant weekend.

18              And all rise for the jury.

19         (Jury not present at 12:30 p.m.)

20              THE COURT:  And again I remind those who are present   12:30:36

21    in the gallery to permit the jury to leave the courtroom and

22    the facility uninterrupted.  So if you would just remain for a

23    few minutes.

24              And let me just inquire, Mr. Stone, once we continue

25    with this witness, who are the anticipated next witnesses?      12:30:59
```

1          MR. STONE:  Well, we have a number of witnesses who

2   are flying in from out of town.  And I'm not sure we have the

3   exact lineup who will go after Mr. Thai, but we will send that

4   out later today.

5          THE COURT:  All right.  And so -- and will you also be          12:31:18

6   sending along associated exhibits, to the extent you know?

7          MR. STONE:  Yes, Your Honor.

8          THE COURT:  All right.  And then, again, by the end of

9   today, I would anticipate receiving in the chambers mailbox a

10  revised version, if there is to be one, of the defendants'          12:31:34

11  witness list as well.

12          And with that, is there any matter that the government

13  needs to raise?

14          MR. RAPP:  Just small, Judge.

15          I think by Wednesday afternoon we will be able to give          12:31:46

16  the Court a pretty good idea where we are in our case so that

17  the defense can plan accordingly and the Court can instruct the

18  jury as to where we're at.

19          THE COURT:  All right.  Okay.  I appreciate that.

20          Anything from defense counsel?          12:32:04

21          MR. CAMBRIA:  No, Your Honor.

22          THE COURT:  All right.  With that, have a pleasant

23  weekend.  We'll see you on Tuesday.

24      (Proceedings adjourn at 12:32 p.m.)

25                      ---oOo---

1

2

3

4

5                        **C E R T I F I C A T E**

6

7          I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 23rd day of October,

16   2023.

17

18

19                              /s/ Cathy J. Taylor
                                _____
20                              Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25