1                   **UNITED STATES DISTRICT COURT**

2

3                   **FOR THE DISTRICT OF ARIZONA**

4                   _____

5    United States of America,      )
                                     )    No. 2:18-cr-00422-DJH
6              Plaintiff,            )
                                     )
7              vs.                   )    Phoenix, Arizona
                                     )    October 23, 2023
8    Michael Lacey, et al.           )    9:07 a.m.
                                     )
9              Defendants.           )
     _____ )

10

11

12

13          **BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

14          **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15          **TRIAL - DAY A.M. SESSION**

16

17

18

19

20

21   Official Court Reporter:
     Hilda Elizabeth Lopez, RMR, FCRR
     Sandra Day O'Connor U.S. Courthouse, Suite 312
22   401 West Washington Street, Spc 30
     Phoenix, Arizona 85003-2151
23   (602) 322-7256

24   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription
25

```
 1                    A P P E A R A N C E S

 2

 3     For the Government:
            UNITED STATES ATTORNEY'S OFFICE
            By:  Mr. Kevin M. Rapp, Esq.
 4               Mr. Peter S. Kozinets, Esq.
                 Mr. Andrew C. Stone, Esq.
 5               Ms. Margaret Wu Perlmeter, Esq.
            40 North Central Avenue, Suite 1200
 6          Phoenix, Arizona 85004
            kevin.rapp@usdoj.gov
 7          peter.kozinets@usdoj.gov
            andrew.stone@usdoj.gov
 8          margaret.perlmeter@usdoj.gov

 9     For the Government:
            UNITED STATES DEPARTMENT OF JUSTICE
10          By:  Mr. Austin Berry, Esq.
            1301 New York Avenue, NW, 11th Floor
11          Washington, DC 20005
            austin.berry2@usdoj.gov
12
       For the Defendant Michael Lacey:
13          LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
            By:  Mr. Paul J. Cambria, Jr., Esq.
14          42 Delaware Avenue, Suite 120
            Buffalo, NY 14202
15          pcambria@lglaw.com

16
       For the Defendant Scott Spear:
17          FEDER LAW OFFICE, P.A.
            By:  Mr. Bruce S. Feder, Esq.
18          2930 East Camelback Road, Suite 160
            Phoenix, AZ 85016
19          bf@federlawpa.com
            - and -
20          KESSLER LAW OFFICE
            By:  Mr. Eric Walter Kessler, Esq.
21          6720 N. Scottsdale Road, Suite 210
            Scottsdale, AZ 85253
22          eric.kesslerlaw@gmail.com

23

24

25
```

For the Defendant John Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    LINCENBERG & RHOW, P.C.
    By:  **Mr. Gopi K. Panchapakesan, Esq.**
        **Mr. Gary S. Lincenberg, Esq.**
    1875 Century Park E, Suite 2300
    Los Angeles, CA 90067
    gpanchapakesan@birdmarella.com
    glincenberg@birdmarella.com


For the Defendant Andrew Padilla:
    DAVID EISENBERG, P.L.C.
    By:  **Mr. David S. Eisenberg, Esq.**
    3550 North Central Avenue, Suite 1155
    Phoenix, AZ 85012
    david@deisenbergplc.com


For the Defendant Joye Vaught:
    JOY BERTRAND, ESQ., L.L.C.
    By:  **Ms. Joy M. Bertrand, Esq.**
    P.O. Box 2734
    Scottsdale, AZ 85252
    joy@joybertrandlaw.com

UNITED STATES DISTRICT COURT

# P R O C E E D I N G S

        (The following proceedings took place outside the
presence of the jury.)

        (Proceedings commence at 9:07 a.m.)                    09:07:40

        THE COURT:  All right.  Good morning.  Please be
seated.  All right.  Let me just tell counsel that I have -- I
looked at the transcript.  I looked at some of the cases with
regard to the Rule 29 motion, and I did take the matter under
advisement and I will reserve my decision on that motion as I    09:09:03
am permitted to do under Rule 29(b).

        And so I want to this morning turn to the pending
motions regarding Defendant Brunst's motion to testify about
his state of mind and to which each of the defendants have
filed a joinder and put forth specific proffers of testimony,    09:09:32
and I'd like to go through that with you so that you can then,
as you had indicated, determine the extent of your case in
chief.

        So I want to say that on my review on the totality of
the motions, the defendants basically take issue again with the  09:10:06
Court's prior ruling on the admissibility of advice-of-counsel
testimony and the Court's preclusion of past litigation related
to Backpage.

        So as to the advice of counsel, I have already held
that evidence of attorney advice, even when used to negate       09:10:37

```
1    scienter, still has to show certain things to be relevant and

2    not unduly prejudicial, as I've previously ruled, before it can

3    come into evidence.  Before it can come into evidence.  So let

4    me restate the rule.  The defendants who claim a good-faith

5    basis on reliance of an attorney must show first that they made      09:11:11

6    a complete disclosure to the professional, complete disclosure

7    to the attorney, that they requested the professional's advice

8    as to the legality of the contemplated action; that they

9    received advice, that it was legal, whatever that contemplated

10   action was, was legal, and that then they relied in good faith      09:11:43

11   on that advice.

12           Now, if that showing is not made, you cannot rely on

13   the professional's advice to negate scienter.  That was what

14   the Court ruled previously.  I've reiterated that ruling at

15   various stages throughout the trial.                                09:12:09

16           So as for Mr. Brunst's motion, Mr. Brunst says, quote,

17   he "rarely met with counsel who had handled litigation relating

18   to the adult advertising," end quote, but nevertheless wants to

19   introduce evidence that he relied on advice that counsel gave

20   to Backpage, quote, "on the lawfulness of Backpage's adult         09:12:33

21   advertising."  I will allow Mr. Brunst an opportunity to

22   proffer the necessary foundation for this evidence.

23           So if Mr. Brunst can say that he made a complete

24   disclosure to an identified attorney, not just general

25   attorneys, throughout the course of the time period regarding      09:13:04
```

1   the legality of publishing these or like ads on Backpage, and

2   he received advice from an attorney, not some unnamed person in

3   a law firm, that Backpage's publishing these ads were legal and

4   that he relied in good faith on that specific advice, then the

5   evidence will be relevant and admissible and relate to his          09:13:40

6   good-faith defense.

7       But here again, all of the prerequisites must be

8   satisfied, and that's because we risk jury confusion, and I've

9   already said that to permit otherwise some generalized

10  good-faith advice because we hired lawyers is prejudicial to        09:14:09

11  the government because they would have an opportunity to probe

12  who those lawyers were, what it was that those lawyers were

13  opining on, what they relied on in order to make their

14  determinations.

15      Now, so I guess just to make it pretty clear, even if          09:14:36

16  a complete disclosure was made, the testimony may be found

17  irrelevant if the lawyers weren't asked for advice on whether

18  Backpage's publication of escort ads like those in the

19  superseding indictment were lawful, or if they didn't follow

20  that attorney's advice.  And so I adhere to the ruling, I           09:15:24

21  adhere to the prerequisites, and so if you can make a proffer

22  that you have met those prerequisites, then you can probe that

23  further with your client.

24      I want to also just say with regard to Mr. Brunst's

25  motion, the same prerequisites will be required for the            09:15:54

UNITED STATES DISTRICT COURT

1  Sableman memo, which is proffered at Exhibit 5507, and any

2  transfer of that memo to the defendants; any communications or

3  advice given by Hemanshu Nigam, Liz McDougall, Don Moon,

4  Samuel Fifer, and this includes the exhibits that are noted in

5  Mr. Lacey's motion.  No defendant has so far put forth any of      09:16:32

6  the four prerequisites, and I note that in all of your joinder

7  motions you've all relied on this good faith, I'm sorry, good

8  faith about general advice on nonrelated legal issues.

9       I noted that Mr. Brunst said, quote, "Mr. Brunst did

10  not have a lot of direct interaction with Mr. Moon, but was      09:17:10

11  familiar with Mr. Moons's advice on the First Amendment."  And

12  again, he says this without saying what Mr. Moon was asked to

13  provide advice about and what he relied on in making that

14  determination.

15       Now, I don't think it's an advice-of-counsel issue for      09:17:35

16  Mr. Brunst, Spear and Lacey to testify that they were all aware

17  of the expenses that they paid for hiring lawyers that

18  represented Backpage.  I want to also make clear because it was

19  mentioned in Mr. Lacey's motion that the Court here is not

20  saying that each defendant has to produce evidence that they      09:18:04

21  sought advice as to each of the 50 charged ads.  The Court has

22  nowhere made that requirement in no prior order, but rather

23  that they asked for legal advice about permitting users to post

24  sex-for-money ads on Backpage, and that Backpage was profiting

25  from those sex-for-money ads.  So I'm not limiting the defense      09:18:37

1    in that way.

2           Similarly, I want to address again the motions raised

3    prior litigation and the defendant's reliance on prior

4    litigation.  Let me just take a moment to say that indeed I did

5    look at one of the prior Court's rulings, and I have repeatedly      09:19:08

6    said that mention of Section 230, that the CDA does not -- is

7    not relevant here, but I noted in a prior ruling that as

8    Mr. Feder points out, and as I focused in on, there was a

9    limited ability to bring in testimony, and this was, quote,

10   "Testimony that Section 230 was meant to incentivize Internet       09:19:55

11   providers to engage in moderation practices will be allowed."

12   This is in response to motions in limine where the defendants

13   proffered an expert to talk about the CDA and Section 230.  The

14   prior court basically prohibited any testimony or evidence of

15   the policy behind the CDA, hypotheticals related to whether or      09:20:24

16   not it would apply to this litigation, but did say very

17   clearly, "Testimony that Section 230 was meant to incentivize

18   Internet providers to engage in moderation practices will be

19   allowed."

20           The issue there really for me is one that the prior         09:20:48

21   court did not have the benefit of subsequent briefing by the

22   parties.  And in looking over the time that followed and the

23   litigation that followed after the prior court made this ruling

24   on the motions in limine prior to the first trial, it, to me,

25   has become very crystal, crystalized, that to permit the           09:21:22

defendants to do that would indeed lead to confusion for the

jury and it would essentially, in my view, what would end up

happening is, if you get someone, somebody, perhaps law

professor or whomever, maybe one of the defendants who can say

they were aware that Section 230 was meant to incentivize                09:21:56

moderation, then what ends up happening is we're going to have

to have some explanation of what Section 230 is and what the

CDA is, and we go down this rabbit hole of irrelevant testimony

that will lead to confusion.

        And so because, again, I've pointed out that nowhere          09:22:30

have I seen case law that the CDA or Section 230 immunizes this

type of activity posting sex-for-money advertisements, I'm

going to adhere to my ruling and not permit that type of

evidence to come in.

        Now, I want to put forward my findings with regard to        09:23:06

the state of mind evidence that the defendants have

collectively and individually proffered.  I do find that some

of the proffered testimony would be admissible under the state

of mind exception to show good faith.

        So for example, with regard to Mr. Brunst, he                09:23:50

certainly can testify that within the relevant time period that

no auditor ever told him they believed Backpage was unlawfully

facilitating prostitution or engaging in money laundering.  He

can also testify as to his understanding of why banks withdrew

work from Backpage or did not withdraw their business from           09:24:20

1  Backpage.  He can testify that the auditors sought letters from

2  counsel on litigation risks doing business with Backpage, and

3  he can testify whether or not he referred those auditors to

4  counsel, Backpage counsel or other counsel, but he cannot

5  testify as to what the lawyers told the auditors because that          09:24:55

6  would be inadmissible hearsay.

7          Now, Mr. Brunst's understanding of why Backpage had to

8  seek overseas moderators and banking, that's all relevant, and

9  he can testify to his understanding about why they went

10 overseas.  Testimony that Mr. Brunst, quote, was also "aware          09:25:22

11 that some state law enforcement attacked Backpage" and that

12 "He was also aware that none ever succeeded in their legal

13 threats or actions," however, is irrelevant because those legal

14 threats or actions are not relevant to the allegations here,

15 the indicted Travel Act violations.                                    09:25:58

16         Indeed, I want to point out in Mr. Brunst's motion, he

17 adds the caveat that they ever succeeded, and that testimony

18 will certainly open the door the litigation that the government

19 points out, which is contrary to that statement.

20         Testimony from Mr. Brunst, Spear, Padilla and               09:26:26

21 Ms. Vaught that they relied on statements from Mr. Ferrer,

22 Mr. Larkin and Mr. Lacey that the sex-for-money ads were

23 protected by the First Amendment or that they were not

24 promoting or facilitating prostitution by placing the

25 sex-for-money ads may also be introduced, but no defendant can       09:26:50

1    testify that Mr. Lacey, Mr. Larkin or Mr. Ferrer told them that

2    that understanding came from legal counsel.  Again, that would

3    be inadmissible hearsay.

4         Now, they can certainly put forward evidence of their

5    role and responsibility in Backpage.  For example, Mr. Lacey          09:27:26

6    can certainly tell the jury that he was the editor in chief and

7    what all of those responsibilities entailed.  He can also

8    testify that he oversaw the operation or the employees that he,

9    as he put it, oversaw the employees who created the content of

10   the publications.  He can also testify as to his belief and          09:27:55

11   understanding that he was protected by the First Amendment in

12   publishing sex-for-money ads.  But again, if he says that

13   Mr. Larkin told him that a lawyer told him that, then that's

14   inadmissible hearsay.

15        As for Mr. Padilla and Ms. Vaught, they certainly can           09:28:22

16   testify about their role as moderators, the supervisor, the

17   moderator, and they can also testify that they were encouraged

18   by their supervisors to work with law enforcement to attend

19   conferences on moderation or on law enforcement training.  They

20   too are entitled to put forward an advice-of-counsel defense         09:28:55

21   only if they meet the first prerequisites, and until then they

22   can't say that they relied on advice of counsel.  In

23   particular, Liz McDougall.

24        Now, Ms. Vaught certainly can testify that she went to

25   Liz McDougall's office one day, showed her one of the                09:29:25

1   advertisements or a similar advertisement offering sex for

2   money with a link to the TER, and said to Liz McDougall, "Is

3   this illegal?  Are we breaking any state, federal, regulatory

4   laws?"  She certainly can do that.  But we don't have the

5   foundation for that yet, and I don't know anything like that          09:29:58

6   has been produced in discovery.

7          As for Mr. Padilla, he can testify that he was told by

8   his supervisors, quote, "to remove entire ads rather than

9   merely stripping out terms," and that he was following that

10  directive.  But he can't in a backdoor way say that Liz               09:30:22

11  McDougall was a lawyer hired to supervise moderation,

12  therefore, because she was a lawyer being licensed to practice

13  law forms the basis basically of his good faith.  That is, as

14  we discussed ad nauseam, what the advice-of-counsel rule is for

15  to avoid that.                                                        09:30:54

16         And so there is testimony that certainly could come in

17  from each of the defendants in terms of their role, their

18  responsibilities, what they understood they were doing, but

19  again, you have to be mindful that much of what you've

20  proffered so far includes layers of hearsay run afoul of advice      09:31:23

21  of counsel and so, therefore, I'm restricting any testimony in

22  that way.

23         I think I've addressed the majority of what you've put

24  forward, and let me just ask counsel for Mr. Brunst, are there

25  any remaining questions that you might have?                          09:31:58

1          MR. LINCENBERG:  Thank you, Your Honor.  First, let me

2     ask the Court, is the Court open to any argument?  Government

3     counsel filed a brief yesterday morning.  I had prepared to

4     respond to some of the points.  I would propose to do it in the

5     context of the Court's tentative order or order on that, but I        09:32:27

6     first want to make sure that I'm understanding whether the

7     Court is going to permit argument.

8          THE COURT:  Well, I think what I had indicated last

9     week was I would permit the government some time to respond,

10    and I thought, and maybe I didn't do this, I thought I didn't     09:32:50

11    permit a reply.  I've looked at the government's response and

12    I've made my determination based on the totality of the filings

13    that are before me.  I mean, Mr. Lincenberg, really, on the one

14    hand, I don't want to revisit anything related to advice of

15    counsel, the Communications Decency Act.  Those matters in my     09:33:12

16    mind are settled.  I don't want to hear argument about the *Dart*

17    litigation.  I think I've settled that time and time again.

18    The proffered exhibits, for example, that you provided.  But if

19    you feel compelled to make a record with regard to that, you

20    can, and if you feel like you have or need clarity as to what     09:33:39

21    I've just ruled, then certainly I will let you ask questions

22    for that purpose.

23          MR. LINCENBERG:  Well, let me try to focus it then.  I

24    think what I'd like to do is, I don't want to rehash my

25    arguments.  I think we made them clearly.  The Court, I think     09:33:57

UNITED STATES DISTRICT COURT

1   for the most part has issued a clear ruling.  There's a couple

2   questions I have.  Let me just hit one or two complete

3   misstatements in the government's opposition brief for the

4   record and then move on.

5           So one of them has to do with the *Dart vs. Backpage*          09:34:12

6   litigation, and it's been one the government's consistent

7   themes that these cases are irrelevant because people weren't

8   told about The Erotic Review.  I note that we specifically

9   addressed that at page 10 of our motion on the bottom where we

10  said, "Allegations regarding 'sponsored ads,' an affiliate          09:34:38

11  program, and reciprocal links were a part of the *Dart* record."

12  We cited to Exhibit 5902 at page 480 and 491, which is the

13  appendix in the *Dart* appeal.  Page 491, for example,

14  specifically lays out where the sheriff had talked about,

15  quote, "links to other well-known sex trafficking sites on its          09:35:03

16  website," some sites like myredbook, The Erotic Review, XC.net

17  and others, et cetera, et cetera.

18          So I wanted to point that out because it has been a

19  central part of their theme trying to distinguish these cases

20  as if that's relevant to notice when the government's entire          09:35:23

21  case has been putting in things like Attorney General letters

22  and so forth, which don't worry about what was or was not

23  present, this sort of general notice to the defense.  But I

24  will move on.  I wanted to make that point.  I will move on.

25          Just with regard to the Court's statements this          09:35:42

morning, first I would note, again, the Court started out

talking about the factors for advice of counsel.  As we stated

many times, Mr. Brunst's defense is not an advice-of-counsel

defense.  As the Court can see from our proffer, it's not an

advice-of-counsel defense, so I would respectfully suggest that

the Court's statements on this point are irrelevant unless the

Court is making a ruling that no defendant can argue good faith

based upon all the different factors in their mind unless they

first establish an advice-of-counsel defense.

        Lawyers were one of the many parties that made

statements over the years in court cases that were part of

Mr. Brunst's brain when we're moving forward, and the, the

Court's ruling that, for example, there's a credit card

Armageddon, and then the jury is left to wonder, well, what is

Mr. Brunst doing after that?  And when the answer is lawyers

are dealing with this where they should deal with it, which is

in a courtroom, and he's paying attention to that, that's out.

That, in our view, goes to good faith.  Doesn't matter whether

he's part of a team that is sitting there going back and forth

with the lawyer as to what factors relate to this.

        Second, the Court made a comment about the Sableman

memo, Exhibit 5507, and I think the Court mentioned that it

can't be discussed that this was transferred to defendants.

Just to refresh the Court's recollection, this was a memo that

was transferred to BMO in 2010 and the Court precluded us from

1    bringing that out on cross-examination of Mr. Ferrer, and so

2    we're left with a record where the government is arguing that

3    there was a lack of transparency, lies, however they phrased

4    it, in connection with the dealings with BMO and the other side

5    of that is not in.                                              09:37:59

6          Third, with regard to where Your Honor indicated that

7    some state of mind evidence would be admissible, and Your Honor

8    is referencing, for example, Mr. Brunst can testify that no

9    auditor said that it was unlawful.  As I understand the Court's

10   ruling, the testimony would simply be, "No auditor told me it   09:38:23

11   was unlawful," and not go into any of the bases for why that

12   might be reasonable or what steps were taken.  Not simply that

13   they were referred to attorneys, but that auditors engaged with

14   attorneys.  These were people that were reviewing litigation

15   coming to these determinations.  As I understand, we can't      09:38:48

16   really get to the meat of what underpins why this would be

17   relevant to Mr. Brunst.

18         THE COURT:  Well, the way that you characterize Mr.

19   Brunst's testimony was, well, he was arms length away from any

20   lawyer.  He wasn't involved in any of those communications.  So 09:39:06

21   the problem here is how then does he get to that information

22   but through what will amount to hearsay embedded in hearsay.

23         MR. LINCENBERG:  Oh, it is hearsay.

24         THE COURT:  Then you've got that hurdle to overcome.

25         The other part of this is, what is it that the            09:39:26

1    auditors were told or shown or given to make their

2    determination?  Now, certainly if Mr. Brunst can say, yes, I

3    pulled out a portfolio of either the charged ads or similar ads

4    and, oh, by the way, yes, I also told them about here's a link

5    that they can attach, and the link really is not -- the TER            09:39:51

6    link is really not necessary.  He can just show them a Backpage

7    ad, a sex-for-money ad, then, sure, he can say, yes, this is

8    what I gave to the auditors, and they looked at it and in their

9    view then they took that to their lawyer.  As far as I know,

10   then we maintained the contracts or whatever.                          09:40:15

11           So that's the missing part here, and this -- these are

12   the layers of hearsay that you're going to have a difficult

13   time overcoming unless you can say that Mr. Brunst can get on

14   the stand and say, yes, I gave them a portfolio of our

15   sex-for-money ads.                                                     09:40:38

16           MR. LINCENBERG:  The hearsay is an easy issue to

17   overcome because it's not being offered for the truth.  This is

18   being offered to show why he does whatever level of due

19   diligence he does, the feedback he gets to the auditors.  The

20   way a CFO interacts with an auditor in connection with the             09:40:54

21   portfolio, the part of the audit reported that deals with

22   contingent liabilities is putting auditors in charge with -- in

23   touch with outside counsel.

24           The auditors -- everybody is well aware of similar

25   ads, quote-unquote, similar ads.  It's all over the litigation        09:41:17

that is going back and forth with auditors.  It's all over

when -- if the auditors can be put in touch with counsel who

are doing this litigation, they can ask every question they

want, and Mr. Brunst is performing his role and that -- and

where his good faith stems from, it stems from the fact that          09:41:36

auditors -- he's doing what he should be doing.  Auditors,

there is outstanding litigation, these are the lawyers you can

talk to.  Auditors will take whatever steps they want to do,

which is fairly extensive because it's an audit, and then the

feedback is there is no going concern issues.                         09:41:57

So without being able to get into the meat of why his

state of mind is one of good faith, to simply say no auditor

said it was unlawful adds a little bit, but it doesn't provide

any of the depth of why that is good faith.

All right.  The next point I would make, Your Honor,       09:42:22

is the Court mentioned that if cases were brought in, the

government points out that some opinions were counter and it

would open the door.  It would absolutely open the door.  We

have no problem with opening the door.

THE COURT:  I know you don't because it's unrelated        09:42:39

litigation, civil litigation.

MR. LINCENBERG:  It's not unrelated.

THE COURT:  It's unrelated litigation, and I already

held that.

MR. LINCENBERG:  I would just say that the Court          09:42:50

1    indicated it would open the door to litigation involving,

2    quote-unquote, prostitution ads, we welcome that discussion

3    because at the end of the day it shows my client to be innocent

4    if the jury understands that, but the Court has ruled and I

5    just wanted to note, if there is any doubt, we have no problem    09:43:10

6    with the government exploring this.

7         There is a lot of evidence that they can explore that

8    goes to weight.  If they want to come in and cross-examine,

9    "Well, do you know what facts were disclosed to these lawyers?"

10   That's relevant cross-examination.  That's fine.  We would    09:43:25

11   welcome that.

12        The last point I would say, Your Honor, is, and this

13   is sort of a point of clarification, the Court, I think I just

14   missed some of what the Court said, the Court said something

15   about with regard to First Amendment protection that it can be    09:43:39

16   introduced but not that it came from counsel.  Now, correct me,

17   I am not sure I heard it right.  I just want to make sure I

18   understand what the Court's rulings are.

19        THE COURT:  What I said was all of the defendants can

20   testify that they relied on statements from Mr. Ferrer,    09:44:02

21   Mr. Larkin, Mr. Lacey that the sex-for-money ads that they were

22   publishing were protected by the First Amendment, but that was

23   their mantra or their belief, and to continue to do it because

24   they were protected by the First Amendment.  They just can't

25   come and say that Mr. Lacey, Mr. Larkin or Mr. Ferrer told them    09:44:28

UNITED STATES DISTRICT COURT

1    that their understanding came from lawyers because we get into

2    that advice-of-counsel prerequisite again.

3              So of course, if Mr. Padilla, for example, says:

4    Yeah, Mr. Lacey held a big meeting and he said, look, I showed,

5    you know, lawyer X, Y and Z the ad and I asked them                    09:44:54

6    point-blank, "Is this against the law, any federal, state law

7    regulation," what have you, and "I gave them the ad and this is

8    the advice letter that I have back," then we're getting

9    somewhere, but beyond that they can't do that.

10             So certainly if Mr. Padilla says, "Yes, I relied on        09:45:16

11   good faith by my president, my CEO, my CFO, that what I was

12   doing was okay under the First Amendment," they can testify to

13   that.

14             MR. LINCENBERG:  I'll have to leave to Mr. Lacey's

15   counsel what he may intend to do.  Obviously as we've            09:45:37

16   proffered, my client is not in those discussions.  His good

17   faith doesn't stem from that direct communication.  It stems

18   from the memos that he passed on to him and he forwards to the

19   bank and so forth.

20             I would note that on a number of occasions in our        09:45:53

21   crosses of Mr. Ferrer the Court precluded us from getting into

22   First Amendment references.

23             THE COURT:  No, I did not --

24             MR. LINCENBERG:  If I --

25             THE COURT:  No, I did not.                              09:46:06

1           MR. LINCENBERG:  If I may finish.

2           THE COURT:  No.  I want to make sure I don't miss this

3     point.  The only person I ever heard ask the question, and it

4     maybe was three times, was Mr. Cambria.  He asked specific

5     questions related to the First Amendment.  No other counsel

6     did.  I listened and I waited for it, in fact, and so that's

7     not because I prohibited it.

8           In fact, Mr. Cambria did it and was permitted to do

9     it.  So I just want to make the record clear on that.

10          MR. LINCENBERG:  Okay.  If I respectfully just can

11    finish.

12          THE COURT:  Yes.

13          MR. LINCENBERG:  I respectfully disagree, and I can

14    point to some examples.  So, for example, one of the e-mails to

15    BMO where the government blacked out the Larkin e-mail, the

16    Court, number one, allowed it all to be blacked out.  Number

17    two said, "Mr. Lincenberg, you can mention in there that Larkin

18    said the words 'free speech,'" it was like two or three words

19    in there, "but excluding the discussion of the First Amendment

20    there," and there's other examples of that.  But I think also

21    relevant to this and where the Court has left us is, you know,

22    if you want to say that Larkin mentioned the First Amendment,

23    you can do that, but you can't give the meat of why that would

24    be good faith to rely on it; that is, after enumerable

25    discussions with counsel and legal cases.

09:46:22
09:46:41
09:46:56
09:47:23
09:47:45

```
 1              So I think that's where we're at and why we disagree

 2    with the Court's ruling.  Thank you, Your Honor.

 3              THE COURT:  Mr. Cambria.

 4              MR. CAMBRIA:  Good morning, Your Honor.

 5              THE COURT:  Good morning.                            09:48:04

 6              MR. CAMBRIA:  I just wanted to add, I do agree --

 7              THE COURT:  Can you pull the microphone a little

 8    closer to you?  Okay.  Thank you.

 9              MR. CAMBRIA:  Try to stop it.  I do join in the

10    comments of -- is this ringing here?  Maybe it's that.        09:48:18

11              I join in Mr. Lincenberg's arguments.  But the problem

12    that I see is that what's been allowed so far are statements

13    without any particular foundation that the defendants are

14    violating the law from whatever group, religious or otherwise,

15    to negate good faith without allowing what the defendants were 09:48:44

16    told from other groups, individuals, lawyers, et cetera, that

17    they were not violating the law.

18              So it seems to me what's happened is we have a

19    situation where the government has introduced all of this

20    information and no particular foundation whatsoever that we're  09:49:04

21    acting in bad faith, if you will, and then we can't counter it

22    with statements of the same cannon, if you will, from others,

23    and I just think that's a fundamental problem that's been

24    created in this case.

25              Thank you.                                           09:49:28
```

1          THE COURT:  All right.  Thank you.

2          Mr. Eisenberg.

3          MR. EISENBERG:  Yes, Your Honor, I just want to be

4   clear on what Your Honor said just a moment ago.  And that is,

5   Mr. Padilla can say, "I relied on Carl Ferrer, for example,                  09:49:42

6   that what we were doing was legal," and that, did you also say,

7   Your Honor, that in the context of that discussion he would

8   have had to show Mr. Ferrer a specific ad?

9          THE COURT:  No.  I think what I said was not specific

10  to Mr. Ferrer, but with regard to the First Amendment because                09:50:08

11  Mr. Ferrer, as you know, is not a lawyer.  So with regard to

12  any conversations related to his supervisors telling him, "You

13  know, we're protected under the First Amendment," he can say

14  that, but what I also said -- oh, on that point, you can

15  continue.                                                                     09:50:35

16         MR. EISENBERG:  Well, so if there's a discussion not

17  relevant, not related to a specific ad, but simply in the

18  context of those two men meeting and this issue comes up, "Are

19  we doing this?  Are we legal?  Is what we're doing legal?"  And

20  Mr. Ferrer says, in effect, "Yes," Mr. Padilla could testify to              09:50:57

21  that?

22         THE COURT:  Yes.

23         MR. EISENBERG:  Okay.  All right.

24         THE COURT:  Mr. Feder.

25         MR. FEDER:  A little further clarification.  Exhibits                  09:51:21

UNITED STATES DISTRICT COURT

```
 1    have been admitted where a person named Steve Suskin, who was
 2    the general counsel of Backpage, makes a presentation to
 3    everybody regarding the legalities, characterized as the
 4    legalities of Backpage.  Is the Court saying he can testify as
 5    to what he told everybody?                                         09:51:44
 6              THE COURT:  Mr. Suskin?
 7              MR. FEDER:  Yes.
 8              THE COURT:  If it relates to Travel Act violations.
 9    If he was presenting something related to a question as to
10    Travel Act violations, prostitution ads, sex for money.           09:51:59
11              MR. FEDER:  Well --
12              THE COURT:  The statutes are the multiple statutes
13    that are charged in the indictment, Washington state, Arizona,
14    A.R.S., prostitution, so the question has to be presented to
15    him.  And to the extent that he's opining on, "Are we breaking    09:52:23
16    any state laws that prohibit sex-for-money acts or
17    advertisement?" That to me is the critical part.  No one has
18    provided that query to any lawyer whether they be employed
19    internal to Backpage or external.  I have not seen that proffer
20    other than that far-removed memorandum by some unknown lawyer,    09:52:59
21    a junior associate someplace in New York, I have never seen any
22    evidence of documentation, e-mail questions posed to a lawyer,
23    "By the way, Mr. Suskin, will you cover whether or not we're in
24    violation of state laws that prohibit sex-for-money
25    advertisement or activity, prostitution?"  So that's the layer    09:53:31
```

```
 1    that I'm looking for, yes.
 2            MR. FEDER:  Second, if Mr. Suskin or anybody else were
 3    to circulate the Sableman memorandum.
 4            THE COURT:  Well, let's me look at that Sableman
 5    memorandum because as my memory serves me, I saw a couple of      09:53:52
 6    legal advice memos or letters and they were all over the board.
 7    They were talking about First Amendment, Fourteenth Amendment,
 8    search and seizure.  They were talking about all kinds of
 9    things, and so I'd like to see specifically what that
10    circulated memorandum was.  And again, what prompted that         09:54:21
11    circulated memorandum?  What was the advice being sought?
12            MR. FEDER:  Well, there is two of them actually.  Both
13    of them are exhibits.
14            THE COURT:  Tell me what the exhibits are.
15            MR. FEDER:  I don't -- we just gave you one of them.      09:54:34
16    Hold on one second.  There is two of them that I think -- it's
17    probably 5507, 5508 or something like that, 'cause one of them
18    was to address the impending Washington state statute.
19            THE COURT:  Well, here, like I say, here again it's
20    reference to Section 230.                                         09:55:00
21            MR. FEDER:  It does.  It's a general advice memorandum
22    from a prominent First Amendment lawyer in Missouri who's a
23    partner in a firm there.  I mean, I think there's a preface in
24    there of what he's been asked to do and why.
25            THE COURT:  Yes, I recall seeing this, and --            09:55:28
```

1        MR. FEDER:  There's two, Judge.  I would have to find

2   the other one, but -- and one of these is the one that

3   Mr. Brunst, I believe, attached to send to the bank.

4        MR. LINCENBERG:  That was the Sableman memo,

5   Mr. Feder.  That was 5507, 5508, the Sableman memo.          09:55:51

6        MR. FEDER:  There we go.  Thank you.

7        THE COURT:  So where is the request for work on this?

8   Who requested him to do this and what was the question that he

9   was asked?

10       MR. FEDER:  You know, I can't tell you that I remember   09:56:18

11  seeing a letter, here's what we want you to do.  One of them,

12  again, was to address the legality of the Washington, the

13  proposed Washington state statute.

14       THE COURT:  Right, which has nothing to do with this

15  case or the allegations in them.                             09:56:33

16       MR. FEDER:  Well, but it does have to do with, I mean,

17  again, this is not hearsay, it is to give these folks advice on

18  what, on the effect this would have and its legality and how to

19  attack it, and it doesn't -- it's just giving them comfort that

20  what they are doing is proper versus the other evidence that   09:56:55

21  the Court has allowed over and over again which suggests that

22  they should have known, whoops, that they were doing something

23  wrong.  This is the counter, and it's the comeback, and it

24  shows good faith.

25       THE COURT:  But it's missing the layer because you're    09:57:15

UNITED STATES DISTRICT COURT

1    bringing in as advice of counsel, and what you're talking about

2    is sort of a backdoor way to avoid the advice-of-counsel

3    dilemma that you're faced with.  And so certainly someone asked

4    him a question.  Certainly somebody said and paid for this very

5    lengthy memorandum, which is all over the board.  So if you can      09:57:43

6    produce to me what it was that was asked of him and that he

7    gave this advice, again, that's what you have to do, but you

8    just can't wave around memorandums that have generally talked

9    about the First Amendment, opined about pending state laws or

10   proposed state laws and not provide the Court or share with the     09:58:21

11   government what it was specifically that he was asked to base

12   his legal opinion on.  And so it is, I mean, for me that is --

13   that's what you have to do in order to get Mr. Suskin, excuse

14   me, Mr. Sableman to come in and testify about what he was asked

15   to do or to get any one of your clients or the other defendants    09:58:57

16   to do that.

17        So that's kind of where we are, Mr. Feder.  Anything

18   more?

19        MR. FEDER:  I don't think so, Judge.  I know the Court

20   hasn't had a chance to reread these memoranda, but my              09:59:11

21   recollection is, the preface is I have been asked to do --

22   Mr. Sableman writes:  I've been asked to do A, B, C, to, for

23   instance, provide an analysis of proposed statute, Washington

24   statute such and such and so and so, and then he does the

25   analysis and it's pretty simple.                                   09:59:32

```
1          THE COURT:  Well, his analysis is with regard to,

2     again, a federal statute, and that federal statute being the

3     CDA.

4          MR. FEDER:  There's not any question that he talks

5     about all of the reasons why this particular proposed          09:59:44

6     Washington state statute will fail because it's

7     unconstitutional under the First Amendment, because it is

8     protected by Section 230 of the CDA, and a variety of other

9     bases, but it -- it's not irrelevant, but it is the effect that

10    it had on these defendants that is the important part, and that  10:00:06

11    is relevant to good faith without it being advice.  I mean, it

12    is kind of an advice of counsel.  But I believe's there's been

13    some case law submitted to the Court where somebody went to a

14    seminar and listened to a lawyer give tax advice and was able

15    to present that to a jury.                                       10:00:27

16         So this is, again, we're --

17         THE COURT:  The facts of that case were very distinct.

18    I remember that case.  I remember reading it and found it

19    doesn't apply to your motion at that time.  So anyway, that's

20    where we are, Mr. Feder.                                         10:00:45

21         MR. FEDER:  Okay.  Thank you.

22         THE COURT:  Ms. Bertrand.

23         MS. BERTRAND:  Thank you.  Your Honor, I ask for one

24    point of clarification regarding an issue discrete to

25    Ms. Vaught.                                                      10:01:05
```

1        THE COURT:  Yes.

2        MS. BERTRAND:  Ms. Vaught testified before a federal

3    Grand Jury in Washington.  In my review of her transcript it

4    appears that the investigation was very similar to the one that

5    ends up being brought here.  I don't believe the transcript        10:01:22

6    shows the specific charges being investigated, but to have

7    federal jurisdiction they would have to have something like the

8    Travel Act.  Is the Court allowing evidence that Ms. Vaught

9    testified before that Grand Jury in, I think, 2012?  And then

10   nothing came of it, and from that she didn't think -- it has       10:01:49

11   nothing to do with what lawyers told her.  It just has to do

12   with her own experience on a federal Grand Jury.

13       THE COURT:  I guess the question then becomes, let's

14   say Ms. Vaught gets on the witness stand and says that in fact

15   she was required or subpoenaed to testify in the Western          10:02:09

16   District of Washington before a Grand Jury, the question then

17   becomes, was she the target or was she a subpoenaed witness?

18   She would have known that if she received a target letter,

19   obviously.  So I don't necessarily know then that it's relevant

20   if she testified and she was not charged.  Do you see what the     10:02:37

21   dilemma is?

22       MS. BERTRAND:  Sure.

23       THE COURT:  Now, she certainly could say that she had

24   testified in proceedings about Backpage posting sex-for-money

25   ads.  I don't know why you couldn't ask her, "What ever came of    10:03:00

```
 1    that Grand Jury investigation?"  And if she says to her
 2    understanding nothing, I mean, I don't find that to be
 3    inadmissible --
 4            MS. BERTRAND:  Okay.
 5            THE COURT:  -- based on her knowledge.                    10:03:16
 6            MS. BERTRAND:  I just want to make sure we have a
 7    clear record as we are talking.  I don't believe Ms. Vaught was
 8    treated as a target in that investigation.  I know she did
 9    receive a proffer letter that's discussed in her testimony.  I
10    guess the issue is, in terms of her state of mind, nothing came  10:03:37
11    of it, but she was also being asked about Backpage's practices.
12    So when she went back of the office and nothing came of it,
13    would that be evidence of good faith?  "Apparently we're not
14    doing anything wrong.  I went to Seattle and testified and told
15    them what I knew about Backpage, specifically talked about       10:03:56
16    moderation practices, and who were moderators, how they do it.
17    So looks like things are okay from my end."
18            That would be the kind of testimony that I think would
19    be -- I just want to make sure before we have any
20    misunderstandings that we're clear about that.  It's not only   10:04:17
21    her conduct, the organization she was working for didn't get in
22    trouble, so she would have no reason to think what they are
23    doing is illegal.
24            THE COURT:  It can come in in a limited fashion in
25    terms of what, in her mind, she relied upon, but again, in a    10:04:32
```

limited fashion because what I don't want to do then is to

have -- to get into a position where the government is going to

have to produce evidence of what the Washington, Western

Washington District investigation was about and whether or not

it was related to a Travel Act violation charge or money                10:04:56

laundering charge or whatever it might be, because then it ends

up creating this mini trial within a trial, and that's -- I

don't want to waste the jury's time on that, and I don't want

to confuse the jury, and that's the dilemma that we get into

with that type of testimony, but she certainly can, in a                10:05:19

limited way, testify the effect it had on her in terms of

knowing she never heard about it again or whatever it was, and

she just went about her business.  I mean, I think that's fine

and that's relevant to her.

    MS. BERTRAND:  Okay.  Thank you for that                          10:05:40

clarification.

    THE COURT:  All right.  Who wishes to come forward if

there is anything in terms of clarification from the

government?

    MR. KOZINETS:  I do, Your Honor.  Thank you.  Thank                10:05:52

you.  I just have a few brief points on all of this.  First of

all, with respect to the discussion of the Sableman memorandum,

in addition to the other prerequisites of advice of counsel

that Your Honor talked about in connection with that memo, we

think paramount is the lack of a complete disclosure of all            10:06:24

material facts.  We discussed that on page 8 of our response
brief.

      And as Your Honor noted, the memo discusses a link,
the CDA, which is precluded by the Court's prior orders,
getting into discussion of that.  Then the memo makes
statements that indicate that there was in fact a lack of full
disclosure.  So pages 13 and 16 of the memo talk about how
Village Voice doesn't promote or even acquiesce in ads for
illegal serves, but takes efforts not to promote or publish
those kinds of ads.  We think that is really reflective of a
complete lack of full disclosure at the time.

      And then on page 17, if Your Honor recalls the
argument we had on Friday morning, I mentioned the *People vs.
Lurie* case from the state of California, Mr. Sableman also
talks about that case in his memo on page 17.  He says, "Well,
there are cases like Lurie where intent to promote prostitution
may be inferred in situations such as where a grossly
disproportionate volume of the company's business involves
prostitution or prostitution-related advertising or services."
He says, "These exceptions clearly do not apply to Village
Voice Media."

      And as the trial evidence shows, that clearly did not
reflect a full disclosure of all material facts because we have
Mr. Brunst just a year after this memo co-authoring Exhibit 120
showing that 94 percent of the company's revenue came from the

1   adult section, and we have, you know, presented witness after

2   witness and document after document showing that those ads were

3   prostitution ads.

4        So for all of these reasons, you know, we think that

5   that memo simply cannot come in.                          10:08:22

6        A brief comment or two regarding the western district

7   matter that was just discussed.  As Your Honor noted, Doc 1444,

8   that was the order that you issued on December 29th, 2021,

9   page 12, Judge Logan had considered the relevance of that

10  matter and had made clear that it was wholly separate from this  10:08:49

11  case.  That's quoted in your order.  The time frame of that

12  matter corresponds with the McKenna case, it predates the *Dart*

13  case, it's been about 2012.  And we know that the evidence that

14  this case is based on predominantly comes from the internal

15  memoranda e-mails and other information that the company, that  10:09:13

16  Backpage was compelled to produce years later in 2016,

17  compelled by the U.S. Senate subpoena, compelled by the Arizona

18  Grand Jury investigation.

19       And so for those and other reasons that are reflected

20  elsewhere in the record, I think in sealed filings about orders  10:09:36

21  from that matter, that really was entirely separate from this

22  case.  So --

23       THE COURT:  Before you move on from that, though, but

24  I think although it may be wholly separate, and if it was a

25  2012 matter, nevertheless, the fact that Ms. Vaught was        10:09:55

1    subpoenaed to testify and she came away from that experience of

2    testifying before a Grand Jury, which I'm sure by any measure

3    would be important for any individual and leave some sort of

4    impression upon them, she certainly can say that because

5    nothing came of it, or she was never informed of any, anything          10:10:28

6    that came of it, that goes to her state of mind, and I think

7    that is permissible.

8         Of course, you can come up and say, well, didn't that

9    take place very early on, and they were looking at activities

10   in 2010 or, you know, 2009 that had nothing to do with what          10:10:52

11   we're talking about here.  You know, there's ways that you can

12   bring out the fact that this was a different case, a different

13   time, different statutes and so on.

14        MR. KOZINETS:  Right.  But I think as Your Honor

15   talked about, there is the danger of devolving into this kind          10:11:15

16   of mini trial and really going down a rabbit hole into matters

17   that are wholly separate and irrelevant to the matters that are

18   before the Court and the jury here, so --

19        THE COURT:  And I will make sure not to do that.  And

20   like I said, it's going to be very limited in terms of that          10:11:35

21   testimony to questions, I think, Ms. Bertrand proffered.  You

22   can have two questions on cross, and that's how we will address

23   it.

24        Anything further?

25        MR. KOZINETS:  Just one final point, Your Honor.          10:11:57

There was some discussion from counsel for Mr. Brunst about a,

some sort of misrepresentation in the government's brief, and

we respectfully disagree with that.  Mr. Brunst's counsel cited

Exhibit 5902, pages 480 and 491, for the proposition that there

was some sort of disclosure of Backpage's internal business

practices that had been made in the *Dart* litigation.

In fact, that document that was cited was nothing came

from Sheriff Dart.  It was a civil complaint filed in District

Court in the District of Massachusetts in the *Doe vs. Backpage*

litigation, so there was just allegations in that civil

complaint.

And the one or two references to TER or sponsorship

ads there come nowhere close to the mountain of evidence that

subsequently emerged showing Backpage's internal practices,

internal communications, including testimony from Backpage

insiders that was not available in that litigation.  So the

notion that the *Dart* litigation involved anything close to the

internal insider information we have here is simply not true.

That's all I have, Your Honor.

THE COURT:  All right.  Thank you.

MR. KOZINETS:  Thank you.

THE COURT:  Now, let me -- let me just make an

inquiry.  I think the government was asked to revise the form

of verdict.  Have you been able to accomplish that?

MR. STONE:  Yes, Your Honor, and I believe we sent the

```
 1   e-mail last night to chambers.
 2            THE COURT:  And I will give defense counsel an
 3   opportunity to review that.  We made the revision as requested
 4   by defense counsel, but otherwise we're going to use the
 5   proposed form of verdict that the government presented for the      10:14:09
 6   reasons that I did agree, after looking at it a little bit more
 7   carefully, the defense proposal included what amounted to mini
 8   instructions, and so I removed that verbiage and we'll use this
 9   sort of box description that the government had in its proposed
10   form with modification taking out those descriptions of the 50      10:14:34
11   ads.
12            The other question that I left was the jury
13   instructions.  And upon further review, there were only a few
14   of them that really needed to be perfected, and what I intend
15   to do is I'd like to, I note defendants wish to meet with their     10:15:01
16   individual counsel to determine then what the next steps are.
17   I think, if I remember correctly, defendants had produced a
18   witness list of some five individuals.
19            MR. STONE:  I believe it's up to seven, Your Honor.
20            THE COURT:  All right.  And those are seven              10:15:22
21   individuals that do not include your respective clients; is
22   that correct?  Hearing yes from Mr. Cambria.
23            So what we will do then is we have our jury coming in
24   at 1:00 o'clock and we can resume the trial with whomever is --
25   who is the first witness that you're intending to call?           10:15:47
```

UNITED STATES DISTRICT COURT

1          MR. EISENBERG:  Mr. Snyder, Your Honor.

2          THE COURT:  Mr. Snyder.  Okay.  And the witness,

3    Mr. Snyder, do you have an idea of how long direct examination

4    of that witness will go?

5          MR. EISENBERG:  I will say not very long, Your Honor.          10:16:07

6    I can't put it in minutes, but he will be straight to the

7    point.

8          THE COURT:  And then who is the second witness?

9          MR. CAMBRIA:  I believe it's Mr. Becker, Your Honor.

10         THE COURT:  And do you have an idea, Mr. Cambria, I'm          10:16:26

11   just trying to get an idea as to how the afternoon will go, do

12   you have an idea of the --

13         MR. CAMBRIA:  I think it will probably take me

14   30 minutes to 45 minutes to put that in.

15         THE COURT:  All right.  And then I think what we can          10:16:44

16   do is give you the overnight to meet and confer with your

17   clients to determine whether or not what course you wish to

18   take with them, but then resume trial tomorrow with the

19   remainder of your three or -- doing the math wrong -- who is

20   our math major?                                                     10:17:11

21         MS. BERTRAND:  Wasn't a major --

22         MR. CAMBRIA:  Not Mr. Feder.

23         THE COURT:  The five remaining witnesses that you

24   have -- sorry.  Did I say five or seven, were there seven or

25   five?                                                               10:17:25

1          MR. CAMBRIA:  There was one witness that I had named

2    Dougherty, and Mr. Stone indicating they were objecting.  The

3    history on that is apparently when the Court said to us, is

4    there any way you can indicate that you can trim down your

5    witness list, both sides, the government gave a purported list,          10:17:42

6    we gave one, and what had happened was Dougherty apparently was

7    originally listed for Larkin, and so automatically anybody

8    listed for Larkin came off that list.

9          Subsequent to that, however, I interviewed

10   Mr. Dougherty, and it was my opinion that he had relevant          10:18:03

11   evidence as to my client.  So I properly noticed that.

12         And Mr. Stone, I believe it was, said, "Well, you took

13   him off the first list, so we are going to object because you

14   took him off the first list."  I think we took him off because

15   he was a Larkin witness and we just automatically took off all          10:18:23

16   the Larkin witnesses, but I believe that he's relevant.  And I

17   just recently spoke to him and came to that conclusion, and I

18   did give him the appropriate notice.  So I feel that I should

19   be able to call him.  He won't be very long.  There aren't any

20   exhibits in connection with him, and so I'd like to have that          10:18:43

21   clarified so I can schedule him.

22         THE COURT:  Well, if you think he has relevant

23   evidence to --

24         MR. CAMBRIA:  I do.

25         THE COURT:  -- to your client, then he should be          10:18:57

permitted to testify.  It can't be a surprise to the government

that he was on the witness list.  Certainly you've been noticed

of him for months now.  And so in any event, he can testify.

        MR. CAMBRIA:  Thank you.

        THE COURT:  Just one moment.  All right.  We will

leave your jury instructions for later, but I do want to just

tell you that, give you my thoughts again.  I opined on this

before.  To the extent that you put in the testimony that I've

discussed earlier regarding good faith, you certainly could

have the good-faith instruction.  It might be modified a bit,

but I'll keep that in for now.

        I always had the question about deliberate

indifference, and I think depending on how the testimony goes

in the defense case, and depending on whether or not there's

testimony about reliance on others, I think it might, it might

come in, it might be used, but I'll make that determination

later.

        We've already addressed some of the issues.  There was

an outstanding issue that, Mr. Cambria, you raised about the

definition of the New York State prostitution offenses that

were proposed by the government in their instruction, which at

that time is, or I think at this point is 18.1, and I permitted

you to provide the Court with additional briefing on your

argument, but I never received that.  I don't know if that's

something you wanted to raise or revisit, but I never received

UNITED STATES DISTRICT COURT

1    any briefing and so I just wanted to point that out.

2         MR. CAMBRIA:  I didn't realize that we were invited to

3    do that.  I appreciate that, and we'll --

4         THE COURT:  Well, let me just remind you that I told

5    you you could do that back on July the 30th.                    10:21:56

6         MR. CAMBRIA:  I'm not disputing that, Your Honor.  I

7    just don't remember.

8         THE COURT:  All right.  So in any event, I wanted to

9    mention that.

10        As I understand it, you all, the defense, have          10:22:12

11   submitted your Revised Proposed Jury Instructions this morning

12   and I have not seen the government's, but I wanted to make sure

13   that you understood where we were.  There were two other

14   instructions that were lingering out there that I didn't really

15   see any argument about or response to.  There was an          10:22:40

16   August 18th filing of the Government's Proposed Forfeiture Jury

17   Instruction, and I frankly didn't see that on the docket.

18        I think we addressed the objection, the August 24th

19   defendant's objection to the government's proposed limiting

20   instruction, and that was at Document 1730, so look at that and  10:23:16

21   make sure that I resolve that.

22        Now, in prior rulings in the prior court, she did make

23   a finding that the money laundering counts remain even if the

24   jury determines that a Travel Act offense fails.  And because

25   of that ruling and because that is the law, at least with     10:23:55

1    respect to Sections 1956(C) and 57(C), 1957(C), I wonder if

2    there needs to be some short instruction to the jury about

3    that.  And so I throw that out to you for your consideration

4    and we can revisit that.

5           And so I'll take a look at the Revised Proposed                10:24:30

6    Instructions that the defendants have provided.  Again, I'm not

7    going to revisit any of the ones I previously settled upon.

8    There were just some of these that were out there and I had not

9    made a final ruling on, and we can take that up in a manner

10   that is conducive to keeping the trial moving along.                  10:24:56

11          So with that --

12          MR. STONE:  Two quick things.  We submitted a filing

13   yesterday about 4:00 o'clock on jury instructions.

14          THE COURT:  Okay.

15          MR. STONE:  I just pointed out a few minor issues.            10:25:10

16          THE COURT:  Okay.

17          MR. STONE:  Just to make sure you had that.

18          THE COURT:  Okay.

19          MR. STONE:  Second thing, Your Honor, this ties in

20   with the forfeiture jury instructions.  The defendants have the      10:25:20

21   right to elect, should there be a conviction here, whether to

22   try the forfeiture part of this trial to the jury or to Your

23   Honor, and we really need to know that sooner rather than

24   later, like maybe by today, so that we can get all -- so that

25   we make sure we are not wasting the jury's time.  We have            10:25:40

1    finalized jury instructions, finalized verdict form, and a

2    number of things that we with would roll right into that

3    presentation, should there be convictions, that would cause the

4    forfeiture aspect of the case to move forward.

5           If they elect to go before Your Honor, I think it          10:25:55

6    could be done through motions and you wouldn't have the time

7    pressure because the jury could be excused, but if they are

8    electing to try that aspect of the case to the jury, we need to

9    know.

10          THE COURT:  Well, you have that question to deal with       10:26:12

11   too.  I'll give you until tomorrow morning to make that

12   determination.  Tomorrow morning at 9:00 you can let the

13   government know what you elect to do with regard to that.

14          And anything more?

15          MR. RAPP:  Just a couple housekeeping matters.  One of      10:26:32

16   the witnesses that is not proposed by the defense is

17   Carl Ferrer, and I believe you gave until this morning whether

18   or not they were going to alert us to that so that we could

19   coordinate that, so I would like to have him released from his

20   subpoena.                                                          10:26:55

21          The second issue is if some or all the defendants

22   choose not to take the stand, there has to be some time carved

23   out for that questioning by the Court on that issue, and I am

24   not sure when that's going to take place.

25          THE COURT:  Well, I'm sorry if I wasn't clear.  I gave      10:27:11

counsel until tomorrow.  I gave them this evening to meet and

confer with their respective clients so that they can make that

determination and certainly let me know at the earliest

convenience.

Now, to be fair, a named defendant could change their

mind and I have no control, and I think they are permitted to

do that.  So to the extent they know, then I'd like you to give

that information over to the government by tomorrow so that we

understand what our timing looks like with this jury.  I feel

comfortable that we are within a good time frame that we have

this jury committed to, but I don't want to make that cause for

delay.  So you have -- you have at least until overnight to

meet with your respective clients and come to some

determination, at least to let the government know and to let

them prepare for that, and that should be done by tomorrow at

9:00 a.m.

Anything further from the government?

MR. RAPP:  No.

THE COURT:  Anything further from defense?

MR. CAMBRIA:  Yes.  We submitted a specific First

Amendment memo, Your Honor, yesterday with regard to our belief

as to the appropriate instructions that the Court should give,

so we did that so that you'd have in front of you the

authorities and the arguments in writing and you would be able

to take that as you wish.

1          THE COURT:  And really, I will say that I did read it.

2     I reread it because it was familiar to me.  I remembered it,

3     and it is essentially a reurging of my prior ruling on the

4     First Amendment, and at this point I don't find the legal basis

5     on which to do so.                                                10:29:30

6          And in fact, because of the, and I should say,

7     Mr. Cambria, even though you made it in the Motion for

8     Acquittal, as a legal proposition now at least there is some

9     evidence in the record that really distinguishes this case from

10    those cases that were cited in that memorandum, which in my     10:29:54

11    view makes them controlling but also bolster the Court's prior

12    order, and so I'll just say that about it, and I may have more

13    to say.

14          MR. CAMBRIA:  One of the discrete things is that the

15    Ninth Circuit cases which we've cited there specifically do not  10:30:21

16    authorize a "related to" language.  The cases clearly require

17    that the speech necessarily on its face be such that it's not

18    protected by the First Amendment as opposed to the language

19    which is included in your proposed instruction which talks

20    about "related to."  And that is a very glaring departure from   10:30:50

21    what the Ninth Circuit said, and we laid those cases out, Your

22    Honor.

23          THE COURT:  Thank you, Mr. Cambria.

24          Anything further from defense?

25          MR. CAMBRIA:  No.                                          10:31:06

1          MR. EISENBERG:  Yes, Your Honor, I do, and this is a

2     housekeeping issue.  I think the Court is pretty clear about

3     the fact that the scheduling is somewhat in flux because

4     counsel and client have to consult about whether the client is

5     going to testify, and I am raising it in the context about oral          10:31:26

6     arguments or final arguments to the jury.  It's pretty hard to

7     determine now when that will take place, but it appears to me

8     it would be sometime by the end of this week, but it's

9     impossible to really predict.  I just don't want to be caught

10    suddenly with having the arguments the very same day that we          10:31:46

11    perhaps find ourselves with no witnesses and no one else is

12    going to be testifying.  That would be a hardship.  I know we

13    can't predict that at this point.

14          THE COURT:  Well, you know, you're right.  It -- there

15    is going to have to be built in some flexibility to do that.          10:32:06

16    And as I recall at the opening of the case, the opening

17    arguments really amounted to almost two days when you look at

18    all the hours put together, and so I understand that we're

19    going to have to build that in.  We're also going to have to

20    build in time for me to read voluminous instructions to them          10:32:29

21    before those closing arguments, and the two should not be

22    separated.  That's my view.  And I will try to work the

23    schedule such that that doesn't happen because I want them to

24    have those instructions fresh in their minds when they are

25    listening to your arguments, and then the government's rebuttal          10:32:47

1    close.

2          So I think if we carve out two days for that process,

3    that's probably the safer choice.  So I'll look at and think

4    about the timing, excuse me, in that regard, but that is not to

5    say that you are to have your witnesses prepared and ready to          10:33:08

6    go, those that you have provided to the government and the

7    Court, promptly on time 9:00 a.m. tomorrow, 1:00 o'clock today,

8    so that we can keep on track to the best that we can.

9          If we need to adjourn early on Friday in order to

10   accommodate that not only perfecting those instructions but           10:33:32

11   reading them to the jury and then permitting you to go forward

12   with your closing arguments, then we can do that.  We can move

13   that next week, if necessary, but let's just see how it goes

14   today and midday tomorrow and then we can make those decisions.

15         MR. EISENBERG:  Thank you, Your Honor.                          10:33:53

16         MR. BERRY:  I just want to be clear that -- this is

17   Austin Berry speaking.  Sorry, Your Honor.  We just received

18   notice this morning of a list of additional witnesses that the

19   defense intends to recall.  You may recall back on Friday that

20   we asked for them to provide us whoever they were going to be        10:34:07

21   called on Wednesday by Sunday.  We received that this morning.

22   I wanted the Court to be aware of that.  They gave us a list

23   of, I don't know, ten plus witnesses and zero exhibits with any

24   of those witnesses, and I just want the Court to be aware of

25   that.                                                                 10:34:23

1           THE COURT:  Well, it sounds like the case is getting

2     longer, not shorter, Mr. Eisenberg.  Turn over those exhibits

3     not only to the government, but let Liliana know what you

4     intend to use with those witnesses.  It's a reciprocal

5     arrangement that I have between the two of you.  Adhere to it.          10:34:42

6           All right.  If there's nothing further, we are

7     adjourned until promptly 1:00 o'clock.

8        (Proceedings concluded at 10:34 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                        **C E R T I F I C A T E**

5

6           I, HILDA E. LOPEZ, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9           I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 25th day of October,

15   2023.

16

17

18
                              s/Hilda E. Lopez_____
19                            HILDA E. LOPEZ, RMR, FCRR

20

21

22

23

24

25