2:18-cr-00422-DJH, October 25, 2023 A.M.

1          **UNITED STATES DISTRICT COURT**                    12:00:59

2          **FOR THE DISTRICT OF ARIZONA**

3                  _____

4

United States of America,          )
5                                   )                          12:00:59
                        Plaintiff,  )
6    vs.                            )
                                    )  2:18-cr-00422-DJH
7    **Michael Lacey, et al.,**     )
                                    )
8                       Defendants. )
                                    )  October 25, 2023
9    _____ )  9:03 a.m.
                                    )
10                                                             12:00:59

11

12        **BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

13        <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

14              JURY TRIAL - DAY 24 A.M.

15                                                             12:00:59

16

17

18

19

20                                                             12:00:59

21   Official Court Reporter:
     **Elaine Cropper, RDR, CRR, CCP**
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC 35
23   Phoenix, Arizona  85003-2151
     elaine_cropper@azd.uscourts.gov
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription      12:00:59

                    United States District Court

2:18-cr-00422-DJH, October 25, 2023 A.M.

## I N D E X

### TESTIMONY

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Defense Witnesses | | | | |
| STANLEY COOK | 6 | 11 | 17 | |
| RICHARD YERMAN | 19 | 32 | 43 | |
| JOHN DOUGHERTY | 45<br>88, 89 | 50 | 87 | |
| CHARLES STROUSE | 93 | 99 | | |

### E X H I B I T S

| Number | | Ident | Rec'd |
|---|---|---|---|
| 3000 | Facebook profile for John E. Dougherty | 79 | |
| 3012 | Email from Yerman to Spear, "Happy February" | 34 | 35 |
| 3014 | Email from Stan Cook to Spear, | 13 | |

### MISCELLANEOUS NOTATIONS

| Item | Page |
|---|---|
| Proceedings outside the presence of the jury | 71 |

### RECESSES

| | Page | Line |
|---|---|---|
| (Recess at 10:39; resumed at 10:57.) | 71 | 1 |

United States District Court

12:00:59
12:00:59
12:00:59
12:00:59
12:00:59
12:00:59

2:18-cr-00422-DJH, October 25, 2023 A.M.

1          <u>A P P E A R A N C E S</u>                    12:00:59

2

   For the Government:
3            **KEVIN M. RAPP, ESQ.**
             **PETER S. KOZINETS, ESQ.**
4            **ANDREW C. STONE, ESQ.**
             **MARGARET WU PERLMETER, ESQ.**
5            U.S. Attorney's Office                        12:00:59
             40 N, Central Ave., Ste. 1800
6            Phoenix, AZ  85004-4408
             kevin.rapp@usdoj.gov
7            peter.kozinets@usdoj.gov
             andrew.stone@usdoj.gov
8            margaret.perlmeter@usdoj.gov

9            **AUSTIN M. BERRY, ESQ.**
             U.S. Department of Justice
10           Child Exploitation and Obscenity Section     12:00:59
             1301 New York Ave., NW, 11th Fl.
11           Washington, D.C.  20005
             austin.berry2@usdoj.gov

12

13  For the Defendant Michael Lacey:
             **PAUL J. CAMBRIA, JR., ESQ.**
14           Lipsitz Green Scime Cambria, L.L.P.
             42 Delaware Ave., Ste. 120
15           Buffalo, NY  14202                            12:00:59
             pcambria@lglaw.com

16

17  For the Defendant Scott Spear:
             **BRUCE S. FEDER, ESQ.**
18           Feder Law Office, P.A.
             2390 E. Camelback Road, Ste. 160
19           Phoenix, AZ  85016
             bf@federlawpa.com

20                                                         12:00:59
             **ERIC W. KESSLER, ESQ.**
21           Kessler Law Office
             6720 N. Scottsdale Rd., Ste. 210
22           Scottsdale, AZ  85253
             eric.kesslerlaw@gmail.com

23

24

25  ///                                                    12:00:59


                   United States District Court

2:18-cr-00422-DJH, October 25, 2023 A.M.

1            **A P P E A R A N C E S** (Continued)                    12:00:59

2

   For the Defendant John Brunst:
3            **GOPI K. PANCHAPAKESAN, ESQ.**
             **GARY S. LINCENBERG, ESQ.**
4            Bird Marella Boxer Wolpert Nessim Drooks
   Lincenberg & Rhow, P.C.
5            1875 Century Park E. Ste. 2300                            12:00:59
             Los Angeles, CA  90067
6            gpanchapakesan@birdmarella.com
             glincenberg@birdmarella.com
7

   For the Defendant Andrew Padilla:
8            **DAVID S. EISENBERG, ESQ.**
             David Eisenberg, P.C.
9            3550 N. Central Ave., Ste. 1155
             Phoenix, AZ  85012
10           david@deisenbergplc.com                                   12:00:59

11 For the Defendant Joye Vaught:
             **JOY MALBY BERTRAND, ESQ.**
12           Joy Bertrand, Esq., L.L.C.
             P.O. Box 2734
13           Scottsdale, AZ  85252-2734
             joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

2:18-cr-00422-DJH, October 25, 2023 A.M.

| | | |
|---|---|---|
| 1 | **P R O C E E D I N G** | 12:00:59 |
| 2 | (Court was called to order by the courtroom deputy.) | |
| 3 | (The defendants are present and out of custody.) | |
| 4 | (Proceedings begin at 9:03.) | |
| 5 | THE COURT:  All right:  Please be seated. | 09:02:59 |
| 6 | Mr. Kessler, you had asked regarding this Exhibit | |
| 7 | 5507 about the content in Section 3.  The only part, in | |
| 8 | addition to that which I specified that I think is fairly | |
| 9 | irrelevant, is subsection E.  So take a look at that and you | |
| 10 | can let me know if you think otherwise.  Subsection E, starts | 09:03:49 |
| 11 | at page 29. | |
| 12 | MR. FEDER:  E like Ernest? | |
| 13 | THE COURT:  Yes.  Subsection E which starts at page | |
| 14 | 29 so take a look at that. | |
| 15 | MR. KESSLER:  All right, Your Honor. | 09:04:10 |
| 16 | THE COURT:  All right.  Is the next witness ready? | |
| 17 | MR. FEDER:  Yes. | |
| 18 | THE COURT:  And who is that witness? | |
| 19 | MR. FEDER:  That is going to be Stan Cook. | |
| 20 | THE COURT:  All right.  Stan Cook.  So let's have the | 09:04:23 |
| 21 | jury in. | |
| 22 | All rise for the jury. | |
| 23 | (Jury enters at 9:05.) | |
| 24 | THE COURT:  All right.  Please be seated.  I actually | |
| 25 | thought that we may have a delayed start because you all were | 09:05:32 |

United States District Court

STANLEY COOK - Direct

1  out last night celebrating.  Well, in any event, we welcome you          09:05:35
2  back, members of the jury.
3          And you may call your next witnesses, Mr. Feder.
4          MR. FEDER:  The defense would call Stan Cook.
5          THE COURT:  Mr. Cook, please be sworn by my courtroom          09:05:57
6  deputy.
7          COURTROOM DEPUTY:  Please raise your right hand.
8          (STANLEY COOK, a witness herein, was duly sworn or
9  affirmed.)
10         COURTROOM DEPUTY:  Please make yourself comfortable          09:06:07
11 on the witness stand and please be sure to speak into the
12 microphone.  Thank you.
13         THE COURT:  And Mr. Feder, you may proceed when
14 you're ready.
15                        **DIRECT EXAMINATION**                           09:06:20
16 BY MR. FEDER:
17 Q.   And do you have the microphone close?
18 A.   I think so.
19 Q.   State your name.
20 A.   My name is Stanley Paul Cook.                                      09:06:32
21 Q.   And what you do for a living, Mr. Cook?  What do you do
22 for a living?
23 A.   I'm an independent real estate broker.
24 Q.   Where?
25 A.   San Diego, California.                                            09:06:46

United States District Court

STANLEY COOK - Direct

1  Q.   Could you give us a relatively brief rundown of your        09:06:49
2  employment history?
3  A.   Okay.
4  Q.   Relatively brief.
5  A.   Brief, okay.  Really the last 25 years I was in real        09:06:59
6  estate from 1980 on.  I moved to California in '98 to join a
7  group building self-storage facilities, did that for 10 years,
8  and then I went back to being an independent real estate broker
9  in California.
10 Q.   Before the judge interjects, you need to speak a little     09:07:17
11 bit slower so that we can all understand you, okay?
12 A.   Okay.
13 Q.   Real estate in California or real estate in Phoenix or
14 both?
15 A.   Both.  I'm licensed as a broker both in California and      09:07:32
16 Arizona.
17 Q.   And how much time did you spend during your life in
18 Phoenix?
19 A.   How much time do I spend now?
20 Q.   How much time did you?                                      09:07:50
21 A.   Oh, the family moved here in 1962.  I stayed here until
22 roughly 1998, then I moved to California.
23 Q.   And do you know a person named Scott Spear?
24 A.   I do.
25 Q.   How?                                                        09:08:08

United States District Court

STANLEY COOK - Direct

| | |
|---|---|
| 1 | A.   My parents and his parents were very friendly back in the | 09:08:12 |
| 2 | very early 1960s and as a result, I became friends with Scott. |
| 3 | We were the same age and we basically grew up together. |
| 4 | Q.   What kinds of things did you -- well, how old were you |
| 5 | when you first met him? | 09:08:34 |
| 6 | A.   I was 12. |
| 7 | Q.   Have you stayed in touch with him since then? |
| 8 | A.   He's one of my best friends.  I see him all the time. |
| 9 | Q.   Since '12, could you give us a little bit of an overview |
| 10 | of your contact with Scott? | 09:08:50 |

A.   My parents and his parents were very friendly back in the
very early 1960s and as a result, I became friends with Scott.
We were the same age and we basically grew up together.

Q.   What kinds of things did you -- well, how old were you
when you first met him?

A.   I was 12.

Q.   Have you stayed in touch with him since then?

A.   He's one of my best friends.  I see him all the time.

Q.   Since '12, could you give us a little bit of an overview
of your contact with Scott?

A.   We went to different high schools but we played golf
together in Scottsdale.  We remained very friendly.  I would
visit him -- he went to school in California.  I went to school
here.  I would go over and see him once or twice a year.  After
college we still stayed very close.  He was the best man at my
wedding, I was at his wedding.  We just retained a close
friendship ever since that time, nothing's changed.

Q.   You've indicated that you've had a number of weddings.

A.   Scott has -- Scott is the only person who has been at all
three of my weddings and I was lucky enough to meet him on his
honeymoon and spend time with he and his wife at that time.

Q.   Did you actually go on Mr. Spear's honeymoon with him?

A.   I did.  I met them in Las Vegas and we had dinner together
and for a couple of days we spent time together.  It was a
little bit unusual but it was a lot of fun.

STANLEY COOK - Direct

```
 1   Q.   Have you been in contact with Mr. Spear over the last five    09:10:10
 2   years since, say, April of 2018?
 3   A.   I have.
 4   Q.   How much contact have you had with Mr. Spear over that
 5   period?                                                            09:10:21
 6   A.   My family -- all my family lives in Phoenix so when I
 7   would come to visit my family, I would see him when he was
 8   available so I would see him occasionally when I came back to
 9   Phoenix.
10   Q.   If you had to put a number on it, how much contact would      09:10:49
11   you say you've had with Mr. Spear since you and he have been 12
12   years old?
13   A.   I don't know if I can quantify it except to say that it's
14   been continuous.  There's never been an interruption in our
15   friendship in those 61 years.                                      09:11:09
16   Q.   And what level of trust do you have in Mr. Spear?
17   A.   Complete.
18   Q.   Give us a flavor for the kinds of occasions other than
19   playing golf that you had with Mr. Spear?
20   A.   Well, back to the golf thing, we celebrated 50 years of       09:11:36
21   playing golf together and then we celebrated 60 years of
22   playing golf together with two other buddies who were part of
23   that small group.  But other than that, I would say coming
24   over, having dinner, we would talk on the phone.  My daughter
25   cuts his hair.  I mean, there's so many connections that have      09:12:01
```

United States District Court

STANLEY COOK - Direct

| | |
|---|---|
| 1 | been seamless over the years. | 09:12:06 |
| 2 | Q.   You understand that Mr. Spear has been charged in the |
| 3 | indictment that you are here in the courtroom about; right? |
| 4 | A.   Yes, I do. |
| 5 | Q.   Have you and Mr. Spear talked about the case? | 09:12:22 |
| 6 | A.   We have, just -- I mean, I knew the minute he was |
| 7 | indicted.  It was public information and we've discussed it and |
| 8 | not the case itself but the fact that he was involved and I -- |
| 9 |         MR. KOZINETS:  Objection.  Relevance. |
| 10 |        THE COURT:  Sustained. | 09:13:00 |
| 11 | BY MR. FEDER: |
| 12 | Q.   How would you characterize your opinion of Mr. Spear's |
| 13 | honesty? |
| 14 | A.   I have no doubt about his honesty. |
| 15 | Q.   How would you characterize your opinion about his | 09:13:21 |
| 16 | law-abiding nature? |
| 17 |        MR. KOZINETS:  Objection.  401, 403, 404. |
| 18 |        THE COURT:  Overruled. |
| 19 | BY MR. FEDER: |
| 20 | Q.   You can answer. | 09:13:37 |
| 21 | A.   Can you repeat that? |
| 22 | Q.   No. |
| 23 |        MR. FEDER:  Can the court reporter read it back? |
| 24 |        (The following question was read: How would you |
| 25 |         characterize your opinion about his law-abiding | 09:13:50 |

United States District Court

STANLEY COOK - Cross

1          nature?)

2     A.    In my experience, I've never known Scott to do anything

3     that wasn't law-abiding.

4               MR. FEDER:  That's all I have.  Thanks.

5               THE COURT:  Mr. Kozinets?

6                    **CROSS - EXAMINATION**

7     BY MR. KOZINETS:

8     Q.    Good morning, Mr. Cook.  I'm Peter Kozinets.  I represent

9     the United States.

10    A.    Good morning.

11    Q.    We've never met before, have we?

12    A.    No.

13    Q.    When were you first contacted by the defense about this

14    case?

15    A.    Just a few weeks ago, yeah.

16    Q.    And was it by phone or email, text message?

17    A.    It was by email.

18    Q.    And did you meet with a lawyer or somebody else from the

19    defense?

20    A.    No.

21    Q.    Just talk on the phone?

22    A.    Just talk on the phone.

23    Q.    Did they send you anything to look at, to prepare?

24    A.    Nothing.

25    Q.    Nothing?  Are you aware that for several years Mr. Spear

09:13:50

09:14:26

09:14:53

09:15:10

09:15:32

09:15:46

United States District Court

STANLEY COOK - Cross

| | | |
|---|---|---|
| 1 | was the Executive Vice President of Village Voice Media? | 09:16:07 |

A.    I was, yes.

Q.    And that Village Voice Media owned Backpage.com?

A.    I knew that.

Q.    Did Mr. Spear talk about his job with you?                09:16:25

          MR. FEDER:   Objection, relevance, which was sustained

by the Court earlier.

          THE COURT:   Overruled.

          THE WITNESS:   May I ask you to repeat that?

BY MR. KOZINETS:                                               09:16:43

Q.    Did Mr. Spear talk with you about his job?

A.    He did but in -- just that he was always busy flying

around and meetings but that was the extent of it.

Q.    Did he tell you that he was a co-owner of Backpage?

A.    He did.                                                   09:17:10

Q.    Did he tell you that escort ads on Backpage are

prostitution ads?

A.    I'm going to ask you to repeat that again.  I didn't hear

the last part.

Q.    Let me rephrase it.  Did he tell you that there were     09:17:31

prostitution ads on Backpage?

A.    No.

Q.    Have you ever looked at Backpage yourself?

A.    No.  I've glanced at the -- it used to be on the back page

of the *New Times* weekly.                                     09:17:49

13

STANLEY COOK - Cross

1  Q.   Not at the website?                                                09:17:53

2  A.   Never.

3         MR. KOZINETS:  I would like to show the witness an

4  exhibit, Exhibit 3014, that we've marked.

5         Your Honor, may I approach the witness?                          09:18:35

6         THE COURT:  Yes.  Do we have that exhibit?

7  BY MR. KOZINETS:

8  Q.   Do you see the exhibit in front of you, sir?  Do you see

9  that exhibit, sir?

10 A.   Yes, I do.                                                         09:19:29

11 Q.   Have you had a chance to read it?

12 A.   I do -- I did.  Yes.  I read it.

13        MR. FEDER:  Excuse me, Your Honor.  This was just

14 disclosed like this morning.

15        MR. KOZINETS:  This is an impeachment exhibit.  It              09:19:40

16 was produced in discovery.

17        MR. FEDER:  Object to its use, number one.  Number

18 two, these are self-serving an improper hypotheticals.

19        THE COURT:  Well, he hasn't asked a question yet, Mr.

20 Feder, so I may permit him to proceed.                                  09:19:57

21 BY MR. KOZINETS:

22 Q.   Sir, do you remember sending this email to Mr. Spear on

23 September 4, 2012, 9:42 a.m.?

24 A.   I do not.

25 Q.   Does looking at this refresh your recollection as to              09:20:14

United States District Court

STANLEY COOK - Cross

1   sending this email to Mr. Spear?                          09:20:19

2   A.   It has my name as a from and those are my initials at the

3   bottom.

4   Q.   You've no reason to doubt that you sent this to Mr. Spear?

5   A.   No.                                                   09:20:29

6   Q.   And do you see that in this email you forwarded an

7   NPR story to Mr. Spear?

8   A.   Yes.

9   Q.   With the title "Village Voice to Split From Ad Site."

10  A.   I do.                                                 09:20:53

11  Q.   And that the story that you sent him states:  Backpage.com

12  has been accused of facilitating sex-trafficking and activists

13  have been pressuring *The Village Voice* to shut down its Adult

14  classified --

15        MR. FEDER:  I'm going to object to him reading       09:21:06

16  something that is not in evidence.  It's hearsay and move to

17  strike.

18        THE COURT:  Well, sustained and I'm going to strike

19  the question.

20        So rephrase your question if you have one.           09:21:14

21        MR. KOZINETS:   Okay.

22  BY MR. KOZINETS:

23  Q.   So based on this story that you sent to Mr. Spear, you

24  were aware that Backpage had ads that -- that Backpage was

25  being criticized for posting?  Just a yes-or-no question.   09:21:40

United States District Court

STANLEY COOK - Cross

1   A.   You mentioned ads so there's --                              09:21:53

2   Q.   Were you aware of that, sir?

3           MR. FEDER:  Objection.  Self-serving, an improper

4   hypothetical.

5           THE COURT:  Overruled.                                    09:22:10

6           You may answer if you were aware.

7           THE WITNESS:  I was aware of what was in this article

8   of course.

9   BY MR. KOZINETS:

10  Q.   Thank you, sir.                                              09:22:23

11          Did you know that Backpage had a reciprocal link

12  agreement with The Erotic Review?

13          MR. FEDER:  Objection.  Improper self-serving

14  statement that is trying to reiterate their assertions, number

15  one; and improper hypothetical, number two.                      09:22:41

16          MR. KOZINETS:  I'm just asking if he knows.

17          THE COURT:  He can answer "Yes" or "No" if he knows.

18          THE WITNESS:  No.

19          THE COURT:  So I'll overrule the objection.

20          MR. FEDER:  May there be a continuing objection to       09:22:55

21  this line?

22          THE COURT:  Yes.

23          MR. FEDER:  Thank you.

24          THE WITNESS:  My answer is no.

25  \\\

United States District Court

16
STANLEY COOK - Cross

1    BY MR. KOZINETS:                                                09:23:04

2    Q.    Do you know that Backpage had an aggregation process of

3    taking prostitution ads from other sites and putting them on

4    Backpage?

5    A.    No.                                                       09:23:11

6    Q.    Did Mr. Spear ever discuss with you the work that he did

7    on Backpage in connection with these business relationships?

8    A.    No.

9    Q.    Did you know about commissions that Backpage paid to super

10   posters who brought thousands of prostitution ads onto          09:23:36

11   Backpage?

12   A.    No.

13         MR. FEDER:  Continuing objection; right, Judge?

14         MS. BERTRAND:  Objection.  Counsel is testifying and

15   misstating the evidence that he's testifying to.                09:23:46

16         THE COURT:  Overruled.  This is cross-examination.

17         So Mr. Kozinets, I'll give you limited leeway but

18   let's move on.

19         MR. KOZINETS:  Thank you, Your Honor.

20   BY MR. KOZINETS:                                                09:23:59

21   Q.    Did you know that numerous other national news

22   organizations in addition to NPR had published or aired stories

23   making it well-known that Backpage was a website for

24   prostitution?

25         MR. FEDER:  In addition to the continuing objection,      09:24:21

United States District Court

STANLEY COOK - Redirect

| 1 | compound, hearsay. | 09:24:23 |

THE COURT:  Overruled.

THE WITNESS:  No.

BY MR. KOZINETS:

Q.   Is it fair to say that you didn't know anything about
Backpage's business practices?

A.   That would be fair.

Q.   Thank you.

MR. KOZINETS:  No further questions.

THE COURT:  Mr. Feder?

**REDIRECT EXAMINATION**

BY MR. FEDER:

Q.   Mr. Cook, did you know that Carl Ferrer was making more
money from competing with Backpage than he was making through
his salary at Backpage?

MR. KOZINETS:  Objection.  Leading.

THE COURT:  Sustained.

MR. FEDER:  Could the witness be shown Exhibit 1835?

MR. KOZINETS:  Objection, Your Honor.  Beyond the
scope.

MR. FEDER:  He asked him about TER.

THE COURT:  Well, let me see what 1835 is first and I
don't think there has been any foundation laid for his
knowledge of Mr. Ferrer so I think you've got a little bit of
work to do, Mr. Feder.

STANLEY COOK - Redirect

| | | |
|---|---|---|
| 1 | MR. FEDER:  Okay. | 09:25:48 |
| 2 | BY MR. FEDER: | |
| 3 | Q.  Have you ever heard of The Erotic Review Mr. Cook? | |
| 4 | A.  No. | |
| 5 | Q.  Were you aware about anything that Backpage did other than | 09:25:55 |
| 6 | this article that you noticed on NPR? | |
| 7 | A.  No. | |
| 8 | Q.  Notwithstanding what the prosecutor just asked you, do you | |
| 9 | still have the same opinion about Mr. Spear's honesty and | |
| 10 | law-abiding nature? | 09:26:17 |
| 11 | MR. KOZINETS:  Objection.  Leading. | |
| 12 | THE COURT:  Sustained. | |
| 13 | BY MR. FEDER: | |
| 14 | Q.  Notwithstanding the questions that you were just asked by | |
| 15 | the prosecutor, what, if any, opinion do you still have | 09:26:24 |
| 16 | regarding Mr. Spear's law-abiding nature and truthfulness? | |
| 17 | A.  Unchanged.  100 percent. | |
| 18 | MR. FEDER:  That's all I have.  Thanks. | |
| 19 | THE COURT:  May the witness be excused from the | |
| 20 | subpoena? | 09:26:42 |
| 21 | MR. FEDER:  Yes. | |
| 22 | THE COURT:  Any objection from the Government? | |
| 23 | MR. KOZINETS:  No objection, Your Honor. | |
| 24 | THE COURT:  Sir, we thank you for your testimony. | |
| 25 | You are excused from your subpoena.  You may step down. | 09:26:49 |

United States District Court

19

RICHARD YERMAN - Direct

| | | |
|---|---|---|
| 1 | THE WITNESS:  Thank you. | 09:26:52 |
| 2 | (Witness excused.) | |
| 3 | THE COURT:  Call your next witness. | |
| 4 | MR. KESSLER:  Your Honor, the defense calls Rick | |
| 5 | Yerman.  Y-E-R-M-A-N. | 09:26:59 |
| 6 | THE COURT:  Sir, please be sworn by my courtroom | |
| 7 | deputy. | |
| 8 | COURTROOM DEPUTY:  Please raise your right hand. | |
| 9 | (RICHARD YERMAN, a witness herein, was duly sworn or | |
| 10 | affirmed.) | 09:27:45 |
| 11 | THE WITNESS:  I do. | |
| 12 | COURTROOM DEPUTY:  If you would step over to the | |
| 13 | witness stand and please be sure to speak into the microphone. | |
| 14 | **DIRECT EXAMINATION** | |
| 15 | BY MR. KESSLER: | 09:28:02 |
| 16 | Q.   Good morning, sir.  Could you tell the Court and the jury | |
| 17 | your name and spell both your first and last name. | |
| 18 | A.   Richard Yerman.  Y, as in yes, E-R-M-A-N. | |
| 19 | Q.   Thank you.  What do you do for a living right now? | |
| 20 | A.   I'm a realtor in Colorado. | 09:28:24 |
| 21 | Q.   You live in Colorado? | |
| 22 | A.   Yes. | |
| 23 | Q.   And do you know an individual by the name of Scott Spear? | |
| 24 | A.   Yes. | |
| 25 | \\\ | |

United States District Court

RICHARD YERMAN - Direct

1  Q.    Before we get into your relationship with Scott let's talk    09:28:38

2  briefly about your employment history beginning with your first

3  venture?

4  A.    First real, real job was I guess I was 16 working at A.J.

5  Bayless here in Phoenix, bag boy.  After that I held a bunch of    09:29:06

6  different retail jobs, rentals, tuxedos, sales.  Got involved

7  doing some construction work, manual labor, building tenant

8  build-outs and retail spaces and then I was kind of between

9  work and was invited to become an advertising sales account

10 executive.    09:29:36

11 Q.    When and where was that?

12 A.    That would be -- well, I'm sorry.  Let me go back from

13 that.  We developed a business here in Phoenix called World

14 Records back in the mid-seventies.

15 Q.    Who, if you don't mind, who is "we"?    09:29:53

16 A.    Scott Spear and I.

17 Q.    The two of you went into business together?

18 A.    Yes.

19 Q.    How many World Records stores did you and Scott own at the

20 peak of the business?    09:30:11

21 A.    At the peak there were seven retail stores.

22 Q.    How did you meet Scott?

23 A.    Met Scott in the early seventies through a friend of mine

24 from high school when we were in college.

25 Q.    Where was that?    09:30:26

United States District Court

RICHARD YERMAN - Direct

1  A.   That would have been in Southern California.  I believe he          09:30:26

2  was at Occidental College.

3  Q.   As a result of meting Scott at that time, did you develop

4  a friendship with Scott?

5  A.   Yes.                                                                 09:30:39

6  Q.   And what developed out of the friendship?

7  A.   That business relationship kind of came about as a result

8  of our friendship.  We had common interests in music.

9  Q.   Are you and Scott roughly the same age?

10 A.   I'm just a few months older, yes.                                    09:30:56

11 Q.   How old were you when you and Scott opened your first

12 World Records store?

13 A.   24.

14 Q.   How long did you and Scott operate World Records?

15 A.   Roughly about four to five years as I recall.  I mean it            09:31:16

16 was the seventies.

17 Q.   Did there come a time that the two of you together exited

18 that business?

19 A.   Yes.  Pretty close to each other.  Late seventies.

20 Q.   And how did that occur?                                              09:31:40

21 A.   The distributor that we were buying product from, we

22 weren't in debt to them but they were really supporting the

23 business and they just wanted to go in a different direction.

24 They were -- it just didn't fit our needs.

25 Q.   Did you and Scott sell World Records?                                09:31:59

United States District Court

RICHARD YERMAN - Direct

1    A.    Yeah.  Yes.  We did.                                    09:32:01

2    Q.    Following -- now, what year would that have been?

3    A.    Again, I'm not exactly clear but '78 I want to say.

4    Q.    Late seventies?

5    A.    Yes.                                                    09:32:14

6    Q.    Did your friendship with Scott continue after the sale of

7    World Records?

8    A.    Yes.

9    Q.    What did you do vocationally after you sold World Records?

10   A.    I had a lot of odd things, kind of jack-of-all trades.  I   09:32:34

11   went back and worked with a friend in doing some light

12   construction work again for a few years.

13   Q.    Did you eventually end up working for *New Times*?

14   A.    Yes.

15   Q.    Approximately when was that?                            09:32:50

16   A.    That would be early eighties, '80, '81.

17   Q.    Was Scott working in some capacity for *New Times*, the

18   *Phoenix New Times*, when you went to work for that same entity?

19   A.    Yes.

20   Q.    Do you know at that time what Scott's position was with    09:33:13

21   the *Phoenix New Times*?  Now we're talking early eighties?

22   A.    Yeah.  I don't know what his title was.  He was part of

23   the management team.  As I recall, he was a lot of business

24   operations.

25   Q.    How long did you work for *New Times*?                  09:33:31

United States District Court

RICHARD YERMAN - Direct

| | | |
|---|---|---|
| 1 | A.   Here in Phoenix, about two years. | 09:33:35 |
| 2 | Q.   What did you do when you left *Phoenix New Times*? | |
| 3 | A.   They asked me, because of some of my retail and management | |
| 4 | background from the record stores, to go to Denver for one of | |
| 5 | the first properties that they bought.  It was called Westward. | 09:33:52 |
| 6 | Q.   Okay.  Thank you.  You say "they."  To whom are you | |
| 7 | referring? | |
| 8 | A.   The management, Jim Larkin, Hal Smith who was the sales | |
| 9 | director? | |
| 10 | Q.   So you went to Denver to work at a paper that the *Phoenix* | 09:34:10 |
| 11 | *New Times* that recently purchased? | |
| 12 | A.   Yes. | |
| 13 | Q.   And what did you do at that paper? | |
| 14 | A.   My title was associate publisher and advertising director | |
| 15 | so I -- business and advertising. | 09:34:24 |
| 16 | Q.   At some point did your employment relationship with | |
| 17 | management -- and you mentioned Jim Larkin -- at the *New Times* | |
| 18 | come to an end? | |
| 19 | A.   About two years. | |
| 20 | Q.   Two years? | 09:34:46 |
| 21 | A.   Again, early, mid-'80s. | |
| 22 | Q.   Would it be safe to say that you then did unrelated work | |
| 23 | thereafter? | |
| 24 | A.   Yeah.  I -- yes. | |
| 25 | Q.   And eventually you ended up doing what you're doing now? | 09:35:03 |

United States District Court

RICHARD YERMAN - Direct

| | | |
|---|---|---|
| 1 | A.    Yeah.  It took a while.  I stayed in advertising.  I was | 09:35:06 |
| 2 | involved in with radio and television and other print | |
| 3 | advertising. | |
| 4 | Q.    And what do you do now? | |
| 5 | A.    I am a realtor. | 09:35:16 |
| 6 | Q.    Very well.  After you stopped working for the *New Times* or | |
| 7 | its entities, I think you said early to mid-eighties -- | |
| 8 | A.    M'hum. | |
| 9 | Q.    Is that yes? | |
| 10 | A.    Yes. | 09:35:33 |
| 11 | Q.    Okay.  Thank you. | |
| 12 |         -- did you continue with your friendship relationship | |
| 13 | with Mr. Spear? | |
| 14 | A.    Yes, very much. | |
| 15 | Q.    Can you describe how that friendship continued for the | 09:35:50 |
| 16 | succeeding several decades? | |
| 17 | A.    We remained in fairly constant contact even though I was a | |
| 18 | state removed and we would get together socially and | |
| 19 | communicate a lot by phone and keep in touch with each other. | |
| 20 | I would visit occasionally.  I had other friends here in | 09:36:12 |
| 21 | Phoenix so I had reasons to come back. | |
| 22 | Q.    Based upon being a business partner of Mr. Spear and then | |
| 23 | working for the same entity, the *New Times*, did you have an | |
| 24 | opportunity to observe and understand Scott Spear's business | |
| 25 | habits? | 09:36:44 |

United States District Court

RICHARD YERMAN - Direct

1    A.   Yes.                                                              09:36:45

2    Q.   And the way he conducted business?

3    A.   Yes.

4              MR. RAPP:  Objection.  Foundation.

5              THE COURT:  Sustained.  And you can lay some               09:36:53

6    foundation?

7              MR. KESSLER:  I don't know where it's lacking.  I

8    just asked him if he knew.

9              MR. RAPP:  When?

10             MR. KESSLER:  Oh.  Time.  Okay.                            09:37:03

11   BY MR. KESSLER:

12   Q.   You worked with Scott in World Records up until the early

13   eighties?

14   A.   Yes.  Another couple of years and even in Denver.

15   Q.   During those times, did you have an opportunity to observe     09:37:24

16   how Scott went about doing his job?

17             MR. RAPP:  Objection.  Relevance.

18             THE COURT:  Overruled, but I don't think the

19   witness -- and maybe I missed it.  I can't recall when the

20   relationship, business relationship or working together ceased.     09:37:47

21   I mean, I think he said in the eighties and then he worked for

22   *New Times* but I guess beyond that, I'm trying to figure out.

23             MR. KESSLER:  Let me clarify that.

24   BY MR. KESSLER:

25   Q.   When was the last time you worked for the same employer        09:38:03

RICHARD YERMAN - Direct

1  with whom Scott Spear was working?                                    09:38:05

2  A.    That would have been in the early, mid-eighties with

3  Westward in Denver.

4  Q.    Okay.  And then you've told us that you did other things

5  but you maintained your friendship?                                   09:38:18

6  A.    Yes.

7  Q.    And do you still consider yourself a close friend of

8  Mr. Spear?

9  A.    Absolutely, yes.

10 Q.    Based upon your experiences as a partner in a business         09:38:40

11 with Mr. Spear as well as your experiences working for the same

12 employer as Mr. Spear, were you able to form an opinion as to

13 the manner in which Scott Spear conducted business?

14 A.    Yes.

15       MR. RAPP:  Objection.  Relevance and foundation as to          09:39:05

16 the time period of this case.

17       THE COURT:  Sustained.  Sustained as to the time

18 period.  I mean, he can talk about his observation in the

19 eighties.

20       MR. KESSLER:  That's when I'm asking him.                       09:39:20

21       THE COURT:  So you're confining it to in the

22 eighties, his understanding --

23       MR. KESSLER:  Yeah.  The foundation I think I laid

24 was they worked together as partners and then they worked up

25 until the mid-eighties at the same employer, *Phoenix New Times*.  09:39:32

United States District Court

RICHARD YERMAN - Direct

1              THE COURT:  Yes.  So you're inquiring about the                    09:39:37

2     eighties; is that correct?

3              MR. KESSLER:  That's correct.

4              THE COURT:  Okay.

5              I'm going to sustain the objection.                               09:39:42

6     BY MR. KESSLER:

7     Q.   Was Mr. Spear a detail-oriented person?

8              MR. RAPP:  Objection.  Relevance.

9              THE COURT:  Sustained.

10             MR. KESSLER:  This is a character witness.                         09:39:57

11             THE COURT:  Well, I understand that, Mr. Kessler, but

12    if you're inquiring about work issues versus being personally

13    familiar with him outside of the work, then maybe you should

14    lay some foundation as to that so we won't get those types of

15    objections.                                                                09:40:21

16    BY MR. KESSLER:

17    Q.   When you left *New Times* and no longer worked with Scott

18    but you maintained your friendship, from time to time did you

19    have an opportunity to speak with Scott about his business,

20    what he was doing?                                                         09:40:41

21             MR. RAPP:  Objection as to foundation.  When?

22             THE COURT:  Well, the question was when you left *New*

23    *Times* so you can start with that and maybe lay a little bit

24    more foundation for time frame.

25             Thank you, Mr. Kessler.                                           09:41:01

United States District Court

RICHARD YERMAN - Direct

1   BY MR. KESSLER:                                                          09:41:03

2   Q.   So, again, after you left *New Times*, you continued your

3   friendship with Scott.  Did you, from time to time, speak with

4   Scott about the business that he was conducting for *New Times*?

5   A.   Yeah, but it really -- in really general terms, just when      09:41:21

6   they were expanding and no details.

7   Q.   Most of those post-employment for you, post-*New Times*

8   employment contacts with Scott were more on the personal

9   relationship or friendship you have with him?

10  A.   Yes.                                                            09:41:42

11          MR. RAPP:  Objection.  Leading.

12  BY MR. KESSLER:

13  Q.   Based upon the universe --

14          MR. RAPP:  I believe there's an objection pending.

15  Leading.                                                             09:41:58

16          THE COURT:  Sustained.

17  BY MR. KESSLER:

18  Q.   Based upon the universe of contacts that you had had with

19  Scott from when you first met him until 2018, did you form a

20  belief as to his character trait as it pertains to law-abiding?     09:42:17

21          MR. RAPP:  Objection.  Vague.  Universe of contacts?

22          MR. KESSLER:  Your Honor, that is a foundation.  I've

23  laid that.

24          THE COURT:  Lay some foundation for what you mean by

25  that with this witness and then we can go from there,               09:42:44

United States District Court

RICHARD YERMAN - Direct

```
 1   Mr. Kessler.                                                  09:42:47

 2   BY MR. KESSLER:

 3   Q.    From the time you met Mr. Spear, entered business with

 4   him, as a co-employee and then during your friendship with

 5   Mr. Spear, did you ever know of Mr. Spear to violate the law?  09:43:03

 6              MR. RAPP:  Objection.  Relevance.

 7              THE COURT:  Overruled.

 8              THE WITNESS:  No.

 9   BY MR. KESSLER:

10   Q.    So did you form an opinion, based on what I just said    09:43:20

11   about Mr. Spear's character trait regarding being or not being

12   law-abiding?

13   A.    Yes.

14   Q.    What was that opinion?

15   A.    Well, I've always found him to be detailed and disciplined 09:43:42

16   and ethical, almost to a fault.

17   Q.    What do you mean by that?

18   A.    Well, he was always careful and always would seek --

19   during our business relationship --

20              MR. RAPP:  Objection.  This calls for hearsay.      09:43:59

21              THE COURT:  Well, I'll let the answer stand but

22   sustain the objection for the potential of hearsay.

23              So maybe ask a new question, Mr. Kessler.

24   BY MR. KESSLER:

25   Q.    Let me back up and asking you essentially the same       09:44:19
```

United States District Court

30

RICHARD YERMAN - Direct

| 1 | question.  You said he was honest, ethical, detail-oriented to | 09:44:22 |
| 2 | a fault or something like that.  Is that a fair paraphrase of | |
| 3 | your answer? | |
| 4 | A.   Yes. | |
| 5 | Q.   What do you mean "to a fault"? | 09:44:37 |
| 6 | A.   I'm a little more laid back I guess would be the phrase. | |
| 7 | You know, just to detail that, he was an incredibly detailed | |
| 8 | person and, you know, the advice that I would give him was the | |
| 9 | best I could give.  But he would always seek expert counsel. | |
| 10 | MR. RAPP:  Objection.  Nonresponsive.  Move to | 09:45:08 |
| 11 | strike. | |
| 12 | THE COURT:  Sustained as to the last statement. | |
| 13 | The jury will disregard the last statement of the | |
| 14 | witness. | |
| 15 | BY MR. KESSLER: | 09:45:24 |
| 16 | Q.   Based upon all of your contact and your relationship with | |
| 17 | Mr. Spear, did you form an opinion as to his character trait as | |
| 18 | to honesty? | |
| 19 | A.   Yes. | |
| 20 | Q.   What was that opinion? | 09:45:41 |
| 21 | A.   Honesty is a great description. | |
| 22 | Q.   What do you mean by that? | |
| 23 | A.   He was always very direct with me and with our associates | |
| 24 | and employees.  I'm never aware that he ever misled me. | |
| 25 | MR. RAPP:  Objection.  Relevance and nonresponsive. | 09:46:02 |

United States District Court

RICHARD YERMAN - Direct

| | | |
|---|---|---|
| 1 | THE COURT:  Sustained. | 09:46:05 |
| 2 | MR. KESSLER:  Again, Your Honor, this is -- | |
| 3 | THE COURT:  Well, he was going beyond the question | |
| 4 | asked so that's why I sustained the objection. | |
| 5 | BY MR. KESSLER: | 09:46:16 |
| 6 | Q.   I'm not sure I got a really direct answer so let me ask | |
| 7 | you again.  Did you form an opinion as to Mr. Spear's character | |
| 8 | trait for honesty? | |
| 9 | MR. RAPP:  Objection.  Asked and answered. | |
| 10 | THE COURT:  It was asked and it was answered, Mr. | 09:46:29 |
| 11 | Kessler. | |
| 12 | MR. KESSLER:  It's a preliminary question. | |
| 13 | BY MR. KESSLER: | |
| 14 | Q.   What was the basis of your opinion? | |
| 15 | A.   You are either honest or you aren't, and I think you know | 09:46:44 |
| 16 | that about people that you know. | |
| 17 | Q.   And was he or was he not? | |
| 18 | A.   Yes. | |
| 19 | MR. RAPP:  Objection.  Asked and answered. | |
| 20 | THE COURT:  It was but I'll overrule. | 09:46:53 |
| 21 | BY MR. KESSLER: | |
| 22 | Q.   Have you and I ever met before today? | |
| 23 | A.   No. | |
| 24 | Q.   Have we spoken to each other before today? | |
| 25 | A.   Once. | 09:47:26 |

RICHARD YERMAN - Cross

| | | |
|---|---|---|
| 1 | Q.   Once?  And when was that? | 09:47:27 |
| 2 | A.   Two nights ago I believe. | |
| 3 | Q.   Was that by telephone? | |
| 4 | A.   Yes. | |
| 5 | Q.   Have you and I exchanged any written materials? | 09:47:36 |
| 6 | A.   No. | |
| 7 | Q.   Have I ever provided you with any documents to review in | |
| 8 | connection with your anticipated testimony? | |
| 9 | A.   No. | |
| 10 | Q.   Have you ever provided me any documents in connection with | 09:47:55 |
| 11 | your anticipated testimony? | |
| 12 | A.   No. | |
| 13 | Q.   Thank you. | |
| 14 |         MR. KESSLER:  That's all I have. | |
| 15 |         THE COURT:  Thank you.  Mr. Kessler. | 09:48:17 |
| 16 | **CROSS - EXAMINATION** | |
| 17 | BY MR. RAPP: | |
| 18 | Q.   Good morning, Mr. Yerman. | |
| 19 | A.   Good morning. | |
| 20 | Q.   You did not work with Mr. Spear from 2004 to 2018, did | 09:48:30 |
| 21 | you? | |
| 22 | A.   No. | |
| 23 | Q.   You know that he worked for Backpage.com during that time | |
| 24 | frame?  Correct? | |
| 25 | A.   I know he worked for *New Times*. | 09:48:44 |

RICHARD YERMAN - Cross

| | | |
|---|---|---|
| 1 | Q.   Well, you know, sir, that he worked for Backpage.com, did | 09:48:47 |
| 2 | you not? | |
| 3 | A.   I wasn't aware he had a direct relationship there, no. | |
| 4 | Q.   Well, you've exchanged some emails with Mr. Spear over the | |
| 5 | years, have you not, about the problems he was having in his | 09:49:01 |
| 6 | capacity with Backpage.com, did you not? | |
| 7 | A.   Oh, yeah.  Yes, sir, yes. | |
| 8 | Q.   And, specifically, you exchanged some emails with | |
| 9 | Mr. Spear about the Attorney Generals putting pressure on | |
| 10 | Backpage; correct? | 09:49:25 |
| 11 | A.   I don't recall but I may have. | |
| 12 | Q.   All right.  Well, do you remember telling Mr. Spear that | |
| 13 | when you heard about the -- you were sending him bad vibes to | |
| 14 | the random State AGs on your behalf, stopped short of voodoo | |
| 15 | dolls -- | 09:49:53 |
| 16 |       MR. KESSLER:  Objection.  Apparently the prosecutor | |
| 17 | is reading from a document that not in evidence. | |
| 18 |       THE COURT:  Sustained. | |
| 19 |       MR. RAPP:  Well,let's take care of that.  I would | |
| 20 | like to show the witness. | 09:50:03 |
| 21 |       MR. KESSLER:  Objection to the unprofessional -- | |
| 22 |       THE COURT:  Stop.  Stop.  All right.  Okay.  Let's -- | |
| 23 |       MR. RAPP:  Let me show the witness -- | |
| 24 |       THE COURT:  Let me first, Mr. Rapp, don't make any | |
| 25 | solicited statements. | 09:50:19 |

United States District Court

RICHARD YERMAN - Cross

1     And Mr. Kessler, as prior directive by the Court,                09:50:21

2  refrain from making speaking objections.

3     So let's move forward.

4     MR. RAPP:  May I approach, Your Honor.

5     THE COURT:  Yes, please.                                         09:50:34

6  BY MR. RAPP:

7  Q.  Sir, could you take a look at Exhibit 3012.

8     Do you recognize that email?

9  A.  I don't recall it but it appears to be from me.

10 Q.  All right.  But do you remember exchanging emails with          09:51:24

11 Mr. Spear about the State Attorney Generals cracking down on

12 Backpage?  You remember having those discussions; right?

13 A.  Aside from this email, no.

14 Q.  Well, the email says that --

15     MR. KESSLER:  Objection.  It's not in evidence.                 09:51:45

16     THE COURT:  Well, there was no question, Mr. Kessler.

17 So --

18     MR. KESSLER:  He started to read from it.

19     THE COURT:  Overrule the objection.

20     Mr. Rapp, refrain from reading from an exhibit that             09:51:58

21 has not been admitted.

22     MR. RAPP:  Very well.

23     THE COURT:  Let's move forward.

24 BY MR. RAPP:

25 Q.  But from the email, you clearly had some conversations          09:52:05

United States District Court

RICHARD YERMAN - Cross

| | |
|---|---|
| 1 | with Mr. Spear about the Attorney Generals putting pressure on | 09:52:09 |
| 2 | Backpage; right? |
| 3 | A.   Again, I don't recall conversations aside from now just |
| 4 | having seen this email from 10 years ago. |
| 5 | Q.   So are you saying, sir, that you don't remember sending | 09:52:24 |
| 6 | that email? |
| 7 | A.   Not directly, no. |
| 8 |         MR. RAPP:  I would now move to admit 3012. |
| 9 |         MR. KESSLER:  No objection. |
| 10 |         THE COURT:  Yes.  It may be admitted and may be | 09:52:35 |
| 11 | published. |
| 12 |         (Exhibit Number 3012 was admitted into evidence.) |
| 13 |         MR. RAPP:  Madam Clerk, can I ask that you -- |
| 14 | BY MR. RAPP: |
| 15 | Q.   So, sir, on this email you say, "Just checking in between | 09:52:59 |
| 16 | 'client triage' issues."  Correct? |
| 17 | A.   That's what it says, yes. |
| 18 | Q.   "Hope the business transition is going smoothly, have been |
| 19 | sending bad vibes to random State AG's on your behalf." |
| 20 |         Correct? | 09:53:16 |
| 21 |         THE COURT:  One moment, Mr. Rapp. |
| 22 |         Can the members of the jury see that?  It's very |
| 23 | cloudy on our overhead but you can read that clearly?  Okay.  I |
| 24 | see those heads shaking yes so let's proceed, Mr. Rapp.  Now |
| 25 | it's moved again.  Let's get it to a proper place, Mr. Rapp, so | 09:53:42 |

RICHARD YERMAN - Cross

1  that everyone can see it.                                              09:53:46

2  BY MR. RAPP:

3  Q.   You said to him, "I have been sending bad vibes to random

4  State AG's on your behalf"; right?

5  A.   That's what it reads.                                            09:54:02

6  Q.   That's what you said, though; right?

7            MR. KESSLER:  Objection.  Asked and answered.

8            THE COURT:  Overruled.

9  BY MR. RAPP:

10 Q.   That's what it says?                                             09:54:11

11 A.   Yes.

12 Q.   You wrote it?  Yes?

13 A.   Yes.

14 Q.   I mean, your name is up here?

15 A.   Yes.                                                             09:54:20

16 Q.   Rick Yerman to Scott Spear.  Happy February; right?

17 A.   Yes.

18 Q.   "Stopped short of voodoo dolls, (have you tried that?)"

19         You sent that; right?

20 A.   Yes.                                                             09:54:35

21 Q.   So, sir, you had conversations with Mr. Spear about the

22 state AGs; right?

23 A.   I guess I was aware they were being prosecuted, yes.

24 Q.   And did you come to learn that the State AGs had sent

25 Backpage some letters asking them to shut down their website?       09:55:01

RICHARD YERMAN - Cross

| | | |
|---|---|---|
| 1 | Were you aware of that? | 09:55:06 |
| 2 | A.   No. | |
| 3 | Q.   Did you ever look that up? | |
| 4 | A.   No. | |
| 5 | Q.   And you know, because you're here, that Mr. Spear has been | 09:55:12 |
| 6 | charged with certain crimes; right? | |
| 7 | A.   Yes. | |
| 8 | Q.   And you went out and look at the indictment in this case; | |
| 9 | right? | |
| 10 | A.   I don't recall. | 09:55:29 |
| 11 | Q.   You don't recall if you -- you've known Mr. Spear for | |
| 12 | quite some time, haven't you? | |
| 13 | A.   Yes. | |
| 14 | Q.   And you learned that he was charged with certain offenses | |
| 15 | that now has resulted in this federal trial; right? | 09:55:41 |
| 16 | A.   Yes. | |
| 17 | Q.   And you didn't take the opportunity to actually read what | |
| 18 | those charges were? | |
| 19 | A.   No. | |
| 20 | Q.   Did you think that in reading those charges that might | 09:55:58 |
| 21 | affect whether or not you think he's law-abiding? | |
| 22 |           MR. KESSLER:  Objection.  It's speculation, violates | |
| 23 | the Fifth Amendment. | |
| 24 |           THE COURT:  Overruled. | |
| 25 |           THE WITNESS:  Okay.  Can you -- I'm not clear on | 09:56:13 |

United States District Court

RICHARD YERMAN - Cross

1   that.                                                                09:56:16

2   BY MR. RAPP:

3   Q.   Sure.  Do you think reading the indictment in this case,

4   do you think that would have any effect on your opinion that

5   you've just given on whether or not he's law-abiding?             09:56:23

6           MR. KESSLER:  Objection.  It's speculation.

7           THE COURT:  Overruled.

8           THE WITNESS:  You're asking if it would change my

9   opinion of him?

10  BY MR. RAPP:                                                       09:56:34

11  Q.   Yes.

12  A.   No.

13  Q.   Okay.  Well, do you know anything about the internal

14  prostitution marketing strategies for Backpage.com?  Do you

15  know anything about that?                                          09:56:44

16  A.   No.

17  Q.   Do you know they had this relationship with a prostitution

18  review site called The Erotic Review?  Do you know anything

19  about that?

20  A.   No.                                                          09:56:54

21  Q.   Do you know that they would aggregate prostitution ads

22  from --

23          MR. KESSLER:  Object to the form of the question.

24  Object to the form of the question.  Prostitution ads are the

25  prosecutor's opinion.                                             09:57:10

United States District Court

RICHARD YERMAN - Cross

1          THE COURT:  Sustained.                                    09:57:14

2    BY MR. RAPP:

3    Q.   Well, how about this:  Do you know whether or not they

4    would steal ads from other websites to put on their website at

5    Backpage.com?                                                   09:57:25

6          MR. KESSLER:  Object to the form of the question.

7    The word "steal."

8          THE COURT:  Sustained.

9    BY MR. RAPP:

10   Q.   Did you know that they aggregated ads from other websites  09:57:32

11   to put on their website?  Did you know that?

12   A.   No.

13   Q.   Did you know that they had this relationship with super

14   posters that would bring volumes of ads, prostitution ads, to

15   Backpage?  Did you know that?                                   09:57:45

16          MR. KESSLER:  Object to the form of the question.

17   Prostitution is the prosecutor's opinion.

18          THE WITNESS:  Well, sustained.

19          MR. RAPP:  All right.

20   BY MR. RAPP:                                                    09:58:04

21   Q.   Did you know that the United States Senate did a

22   comprehensive 53-page report on Backpage facilitating

23   prostitution?  Did you know that?

24          MS. BERTRAND:  Objection.  That report is not in

25   evidence, Your Honor, and I don't believe there's been --       09:58:17

United States District Court

RICHARD YERMAN - Cross

1    THE COURT:  Well, no.  Overruled.  He can answer if      09:58:20

2  he is aware "Yes" or "No."

3  BY MR. RAPP:

4  Q.   Did you know that?

5  A.   No.                                                   09:58:26

6  Q.   Did you know that there were 830 internal emails attached

7  to that report?  Did you review those?

8    MS. BERTRAND:  Your Honor, objection as to testifying

9  about a document that is not in evidence.

10    THE COURT:  Overruled.                                  09:58:38

11    MR. LINCENBERG:  It assumes facts not in evidence.

12    THE COURT:  Overruled.

13    THE WITNESS:  Could you restate that?

14  BY MR. RAPP:

15  Q.   Did you review the 830 internal Backpage emails that   09:58:48

16  supported that Senate subcommittee report?  Did you read that?

17  A.    No.

18    MS. BERTRAND:  Same objection.

19    THE COURT:  Well, as to the form of the question, you

20  rephrased it, Mr. Rapp, so I will sustain.                 09:59:01

21  BY MR. RAPP:

22  Q.   Do you think reading that Senate subcommittee report that

23  evaluated Backpage, do you think that might change your opinion

24  of the business practices Mr. Spear was engaging in from 2004

25  to 2018?  Do you think that might change it?              09:59:18

RICHARD YERMAN - Cross

1          MR. KESSLER:  Objection.  Speculation.  He said he      09:59:22

2    didn't read it.

3          THE COURT:  Sustained.

4    BY MR. RAPP:

5    Q.   My question was different.                               09:59:27

6          THE COURT:  No.

7          MR. RAPP:  Would it change his opinion?

8          THE COURT:  Well, Mr. Rapp, I heard him say he didn't

9    know about it and so that was the reason I sustained the

10   objection.                                                    09:59:37

11   BY MR. RAPP:

12   Q.   Sir, do you read *The New York Times*?

13   A.   I think I get the morning summary.

14   Q.   All right.  Do you know who Nicholas Kristof is?

15   A.   Columnist I believe.                                     09:59:52

16   Q.   Yes.  Did you read any of his series of articles on

17   Backpage?

18   A.   No.

19   Q.   You never did?

20   A.   Not that I'm aware of.                                   10:00:01

21   Q.   Did Mr. Spear ever point those out to you?

22   A.   No.

23   Q.   Did -- do you ever watch CNN?

24   A.   I'm sorry?

25   Q.   Do you ever watch CNN?                                   10:00:11

RICHARD YERMAN - Cross

1   A.   Yes.                                                            10:00:13

2   Q.   All right.  Did you see an exposé on Backpage that was

3   broadcast twice called Selling the Girl Next Door?  Did you see

4   that?  It was about Backpage.com.  Did you see that on CNN?

5   A.   No.  I don't recall that.                                       10:00:29

6   Q.   Did Mr. Spear ever point that out to you in any of your

7   discussions?

8   A.   No.

9   Q.   How about Anderson Cooper, did you ever see a

10  representative from Backpage.com being interviewed by Anderson     10:00:49

11  Cooper on CNN?

12  A.   Not that I recall, no.

13  Q.   Were you aware of any of the documentaries on Backpage.com

14  or on Netflix?  Did you ever come to know of those?

15  A.   No.                                                            10:01:11

16  Q.   Well, sir, would you agree with me that your opinion of

17  Mr. Spear is not really based upon the information that is

18  available about Backpage.com?  Would you agree with me?

19            MR. KESSLER:  Objection.  It's argumentive.

20            THE COURT:  Overruled.                                     10:01:32

21            THE WITNESS:  Can you restate that?  I'm not clear on

22  that.

23            MR. RAPP:  Ma'am, could you restate the question,

24  please.

25            (The following question was read:  Well, sir, would      10:01:38

United States District Court

RICHARD YERMAN - Redirect

1          you agree with me that your opinion of Mr. Spear is          10:01:38

2          not really based upon the information that is

3          available about Backpage.com?  Would you agree with

4          me?)

5          THE WITNESS:  Again, I'm not clear on that.          10:02:03

6   BY MR. RAPP:

7   Q.   Okay.  Did you make any effort, sir, in advance of your

8   testimony today to educate yourself on Backpage.com?

9   A.   No.

10  Q.   You didn't Google it to see, you know, what it's all          10:02:19

11  about, that you might be questioned about it if you showed up

12  in federal court?  Did you do anything like that?

13          MR. KESSLER:  Objection.  He already said no.

14          THE COURT:  Sustained.

15          MR. RAPP:  I don't have anything further.          10:02:33

16                    **REDIRECT EXAMINATION**

17  BY MR. KESSLER:

18  Q.   Mr. Yerman, the opinions you've already expressed

19  regarding various character traits that you attribute to Scott,

20  over what period of time were those opinions formed?          10:03:00

21  A.   Well, it's now 53 years of friendship.

22  Q.   And did any of the questions, insinuations, whatever that

23  was put to you by the prosecution just a few minutes ago change

24  your mind?

25          MR. RAPP:  Objection, leading.          10:03:24

United States District Court

|    |                                                                          |          |
|----|--------------------------------------------------------------------------|----------|
| 1  | THE COURT:  Overruled.                                                   | 10:03:26 |
| 2  | THE WITNESS:  No.                                                        |          |
| 3  | MR. KESSLER:  Thank you.  That's all I have.                            |          |
| 4  | THE COURT:  All right.  May the witness be excused                      |          |
| 5  | from subpoena?                                                          | 10:03:37 |
| 6  | MR. KESSLER:  Yes.                                                       |          |
| 7  | THE COURT:  Any objection from the Government?                          |          |
| 8  | Mr. Rapp?                                                                |          |
| 9  | MR. RAPP:  Oh, no, Your Honor.  Thank you.                              |          |
| 10 | THE COURT:  Sir, you are excused from subpoena.  We                    | 10:03:46 |
| 11 | thank you for your testimony.  You may exit the courtroom.             |          |
| 12 | THE WITNESS:  Thank you.                                                |          |
| 13 | (Witness excused.)                                                      |          |
| 14 | THE COURT:  Call your next witness.                                     |          |
| 15 | Call your next witness.                                                 | 10:04:04 |
| 16 | MR. CAMBRIA:  I'm looking for him, Your Honor.  They                   |          |
| 17 | are bringing him in, Your Honor.                                        |          |
| 18 | THE COURT:  Well, who is the next witness?                             |          |
| 19 | MR. CAMBRIA:  I'm sorry?                                                 |          |
| 20 | THE COURT:  Can you call the next witness, Mr.                         | 10:04:36 |
| 21 | Cambria.  Let us know his name, please.                                |          |
| 22 | MR. CAMBRIA:  Yes.  This is John Dougherty.                            |          |
| 23 | THE COURT:  Good morning, sir.  Please be sworn by my                  |          |
| 24 | courtroom deputy.                                                       |          |
| 25 | COURTROOM DEPUTY:  Please raise your right hand.                       | 10:04:47 |

United States District Court

```
 1              (JOHN DOUGHERTY, a witness herein, was duly sworn or    10:04:49

 2    affirmed.)

 3              COURTROOM DEPUTY:  If you would step over to the

 4    witness stand, please, and speak into microphone.

 5                         DIRECT EXAMINATION                            10:05:04

 6    BY MR. CAMBRIA:

 7    Q.   Good morning, sir.  Would you state your name for the

 8    record, please.

 9    A.   My name is John Dougherty.  D-O-U-G-H-E-R-T-Y.

10    Q.   And what is your current employment?                         10:05:22

11    A.   I'm a free-lance investigative reporter and writer for

12    private clients.  I have a company called Investigative Media.

13    Q.   And where is that located?

14    A.   Tempe, Arizona.

15    Q.   Was there ever a time that you worked for the *New Times*    10:05:41

16    newspapers?

17    A.   Yes.  I was employed by the *Phoenix New Times*.

18    Q.   All right.  And during the course of that employment, did

19    you encounter Michael Lacey?

20    A.   Yes.                                                         10:05:55

21    Q.   And can you tell the jury, based upon your knowledge,

22    observations, and so on, what Mr. Lacey's job was with the *New

23    Times* newspapers?

24              MS. PERLMETER:  Objection.  Foundation as to time.

25              THE COURT:  Sustained.                                  10:06:19
```

United States District Court

46
JOHN DOUGHERTY - Direct

1      MR. CAMBRIA:  Can you give us the years or months or          10:06:20

2  days that you worked there?

3      THE WITNESS:  I worked there for 13 years.

4      MR. CAMBRIA:  All right.

5  BY MR. CAMBRIA:                                                   10:06:26

6  Q.   And when was that?

7  A.   That was from March 1, 1993, to the middle of September,

8  2006.

9  Q.   And during that period of time, can you tell the ladies

10 and gentlemen of the jury what Mr. Lacey's role was at those      10:06:45

11 newspapers?

12 A.   Mr. Lacey was the editor-in-chief of the newspaper and all

13 the newspapers that were under the *New Times* umbrella, which

14 was about -- it grew rapidly during my period but it came close

15 to 20 papers around the country.                                  10:07:08

16 Q.   And based on your own observation, what actual function

17 did he perform?

18 A.   Well, as the editor-in-chief, he was extensively involved

19 in all of the reporting and major decisions that each newspaper

20 made.  He also conducted -- served as my line editor on a        10:07:27

21 number of major feature stories which is an extensive job,

22 requires a tremendous amount of time.  He also was a working

23 journalist in the sense that he produced major investigative

24 pieces and wrote columns for the paper.

25      So Mr. Lacey's role at that time was to run the              10:07:49

United States District Court

JOHN DOUGHERTY - Direct

1  editorial operations not only in Phoenix but across the                    10:07:52

2  country.

3  Q.   Did he have an office anywhere near yours?

4  A.   My office was directly across the hall from Mr. Lacey's.

5  Q.   And you indicated that he supervised individuals at the               10:08:08

6  other newspapers?

7  A.   Yes.  He was in charge of making all of the key hiring

8  decisions at all of the newspapers, the editors and frequently

9  made major decisions on the staff writers at each of the papers

10 and other sub editors.                                                     10:08:29

11 Q.   And you indicated that he also authored articles himself?

12 A.   Yes.  He wrote numerous articles over the period of time I

13 was there as well as doing line editing of major stories that I

14 was personally involved in.

15 Q.   And what does line editing mean?                                      10:08:48

16 A.   Line editing is a very comprehensive process in which a

17 reporter gathers the information, will write the first drafts

18 of the story, and then you go back and forth working with the

19 editor to refine the story so it is ready to go when we publish

20 it.  We try to take care of all of the issues that may be with           10:09:06

21 the story obviously in house.  So the editor plays an

22 absolutely essential role in the production of a new story.

23 Q.   To your knowledge, did the newspapers win any awards?

24 A.   The *Phoenix New Times* and the other newspapers, including

25 papers such as *The Village Voice*, won many, many national             10:09:28

United States District Court

JOHN DOUGHERTY - Direct

| | | |
|---|---|---|
| 1 | awards including a Pulitzer Prize. | 10:09:32 |
| 2 | Q.   What's a Pulitzer Prize? | |
| 3 | A.   Pulitzer Prize is the highest award that you can receive | |
| 4 | in journalism.  It is the most coveted award that is out there. | |
| 5 | The Pulitzer is a big deal. | 10:09:45 |
| 6 | Q.   And did Mr. Lacey have any involvement in that? | |
| 7 | MS. PERLMETER:  Objection.  Relevance. | |
| 8 | MR. CAMBRIA:  I'm sorry.  I didn't hear the | |
| 9 | objection. | |
| 10 | THE COURT:  It was relevance. | 10:09:57 |
| 11 | MR. CAMBRIA:  Oh.  Okay. | |
| 12 | THE COURT:  Well, I'll overrule. | |
| 13 | I am going to ask you to ask him when that was, Mr. | |
| 14 | Cambria. | |
| 15 | BY MR. CAMBRIA: | 10:10:08 |
| 16 | Q.   Sure.  When was that? | |
| 17 | A.   When did the paper win the Pulitzer? | |
| 18 | Q.   Yes, sir. | |
| 19 | A.   I don't know the exact year. | |
| 20 | Q.   Was it while you were there? | 10:10:16 |
| 21 | A.   I believe so. | |
| 22 | Q.   Okay.  To your knowledge and observation, was Mr. Lacey a | |
| 23 | free speech advocate? | |
| 24 | MS. PERLMETER:  Objection.  Relevance. | |
| 25 | THE COURT:  Overruled. | 10:10:38 |

United States District Court

JOHN DOUGHERTY - Direct

1          THE WITNESS:  Absolutely.  The reason why I was at

2    the *Phoenix New Times* is because we totally believed in and

3    fought for the First Amendment start to finish.  My whole

4    career as a journalist was based on Freedom of Information Act,

5    the right to know, and the right to publish what we believed to

6    be the truth.

7    BY MR. CAMBRIA:

8    Q.   Were there divisions of the -- well, let me make it more

9    specific.  Was there a business side versus an editorial side?

10   A.   Yes.  At the *Phoenix New Times* as well as any major

11   news-gathering organization there's usually two separate

12   divisions within the overall operation.  On one hand you have

13   the revenue-generating side which comes from the advertising.

14   And on the other hand, you have the editorial side of the news

15   organization such as the *New Times*.  Never the two should meet

16   because you keep them separate so that the advertising side,

17   the revenue side, has no influence over the editorial decisions

18   that are made on the editorial side.

19   Q.   Are you familiar with Backpage.com?

20   A.   I am.

21   Q.   And how are you familiar with that?

22   A.   I've just heard of it.

23   Q.   Well, Backpage.com, if it was in the business of selling

24   ads, what side of that divide would it fall on, the business

25   side or the editorial side?

10:10:45

10:10:59

10:11:21

10:11:42

10:12:01

10:12:26

JOHN DOUGHERTY - Cross

| | | |
|---|---|---|
| 1 | MS. PERLMETER:  Objection.  Leading. | 10:12:29 |
| 2 | THE COURT:  Overruled but I do think there should be | |
| 3 | some foundation laid for how he is aware.  I think he just | |
| 4 | said, "I just heard of it," and I don't know whether that means | |
| 5 | he just heard of it or he just generally heard of it. | 10:12:38 |
| 6 | BY MR. CAMBRIA: | |
| 7 | Q.   Did you understand -- was Backpage an advertising site, to | |
| 8 | your knowledge? | |
| 9 | A.   Yes.  I mean, Backpage sold ads so it was part of the | |
| 10 | Advertising Department. | 10:12:57 |
| 11 | Q.   Okay.  So what side of that divide would it fall on? | |
| 12 | A.   Under the business side and the revenue side of the | |
| 13 | department which was run by the business side of the paper. | |
| 14 | Q.   Okay. | |
| 15 | MR. CAMBRIA:  That's all I have. | 10:13:12 |
| 16 | THE COURT:  All right.  I take it, Ms. Perlmeter, you | |
| 17 | are going to cross-examine? | |
| 18 | **CROSS - EXAMINATION** | |
| 19 | BY MS. PERLMETER: | |
| 20 | Q.   Good morning, Mr. Dougherty.  Did I say that correctly? | 10:13:56 |
| 21 | A.   Dougherty. | |
| 22 | Q.   Okay.  Mr. Dougherty.  Sir, when were you first contacted | |
| 23 | by the defense to schedule your participation in this case? | |
| 24 | A.   I talked to the defense attorney on Monday. | |
| 25 | Q.   Prior to that, did you have any communications with any | 10:14:14 |

JOHN DOUGHERTY - Cross

| | | |
|---|---|---|
| 1 | member of the defense team, attorneys, paralegals, legal | 10:14:16 |
| 2 | assistants, any member of the defense staff? | |
| 3 | A.   No. | |
| 4 | Q.   Did you do anything to prepare for the meeting? | |
| 5 | A.   I'm sorry.  I didn't understand. | 10:14:31 |
| 6 | Q.   Did you do anything to prepare for the meeting? | |
| 7 | A.   For this? | |
| 8 | Q.   For your meeting with the attorney? | |
| 9 | A.   No.  We had a phone conversation, two.  Two phone | |
| 10 | conversations. | 10:14:40 |
| 11 | Q.   During those two phone conversations, did they send you | |
| 12 | anything to review prior to having them? | |
| 13 | A.   No. | |
| 14 | Q.   And after the conversations, did they send you anything to | |
| 15 | review? | 10:14:52 |
| 16 | A.   No. | |
| 17 | Q.   Did you send the attorneys or any member of the defense | |
| 18 | staff anything for them to review? | |
| 19 | A.   I sent one text message. | |
| 20 | Q.   Okay.  What was the substance of that text message? | 10:15:01 |
| 21 | A.   The subject of the text message was I thought that it was | |
| 22 | unusual that the Court had a relationship with John McCain. | |
| 23 | Q.   And which attorney did you send that message to? | |
| 24 | A.   I'm sorry? | |
| 25 | Q.   Which attorney did you send that message to? | 10:15:26 |

United States District Court

52

JOHN DOUGHERTY - Cross

```
 1   A.    Paul Cambria.                                            10:15:28

 2   Q.    Now, you've talked about Michael Lacey in your testimony.

 3   It seems like you've known him for a number of years; is that

 4   right?

 5   A.    You are speaking too fast and I have hard of hearing.  I'm   10:15:39

 6   sorry.

 7   Q.    I will slow down.

 8   A.    Thank you.

 9   Q.    You've known Mr. Lacey for a number of years; is that

10   correct?                                                      10:15:46

11   A.    Yes.

12   Q.    Do you know anything of the other defendants in this case?

13   A.    I know professionally two of the defendants.

14   Q.    Which ones?

15   A.    Scott Spear and Jed Brunst.                             10:15:56

16   Q.    Okay.  Can you -- just so the jury is clear that you know

17   who you are talking about, do you mind pointing out Mr. Lacey

18   in the courtroom by identifying where he's seated and maybe

19   what he's wearing?

20   A.    Well, Mike is the gentleman right there with the hand up   10:16:11

21   and I don't know if Jed and Scott -- there's Jed Brunst way

22   back there and Scott.  I haven't seen those gentlemen in years.

23           MR. CAMBRIA:  Your Honor, I submit this is outside

24   the scope of direct.

25           THE COURT:  Overruled.                                10:16:30
```

United States District Court

JOHN DOUGHERTY - Cross

| | | |
|---|---|---|
| 1 | MS. PERLMETER:  So -- may the record reflect that | 10:16:34 |
| 2 | this witness has identified Michael Lacey? | |
| 3 | THE COURT:  Yes. | |
| 4 | BY MS. PERLMETER: | |
| 5 | Q.  And, sir, if you could clarify again, it sounds like you | 10:16:40 |
| 6 | recognize Jed Brunst; is that correct? | |
| 7 | A.  Jed and Scott but -- again, I've not seen the gentlemen in | |
| 8 | many years. | |
| 9 | Q.  Let's break it down.  Can you point out where Mr. Jed | |
| 10 | Brunst is seated? | 10:16:52 |
| 11 | A.  Jed is all the way in the second row in the back and Scott | |
| 12 | is this gentleman right here (indicating). | |
| 13 | Q.  Did Mr. Spear just stand up? | |
| 14 | A.  Yes. | |
| 15 | MS. PERLMETER:  May the record reflect that the | 10:17:05 |
| 16 | witness has just identified Mr. Spear? | |
| 17 | THE COURT:  It may. | |
| 18 | MS. PERLMETER:  And may the record reflect that the | |
| 19 | witness has identified Mr. Jed Brunst? | |
| 20 | THE COURT:  Yes. | 10:17:17 |
| 21 | BY MS. PERLMETER: | |
| 22 | Q.  Okay.  Mr. Dougherty, you told us on direct examination | |
| 23 | that you've been on Backpage.com; is that correct? | |
| 24 | A.  I heard about Backpage.com. | |
| 25 | Q.  You've heard about Backpage.com.  Have you actually | 10:17:44 |

United States District Court

JOHN DOUGHERTY - Cross

1   visited the website?                                           10:17:47

2   A.   No.

3   Q.   So you've never been to www.backpage.com?

4   A.   No.

5          THE COURT:  And, again, Ms. Perlmeter, let's slow      10:17:55

6   down the pace a little bit.  Thank you.

7   BY MS. PERLMETER:

8   Q.   Are you aware that the website advertises in the Adult

9   section?

10         MR. CAMBRIA:  Your Honor.  I object to this.  He's      10:18:06

11  indicated he's never looked at the website.

12         THE COURT:  Sustained.  Well, no, I'm going to permit

13  the answer.  He can answer "Yes" or "No" if he's aware.

14         MR. CAMBRIA:  Well, what I'm objecting to is the

15  litany of all of the things that she's going to claim were on  10:18:20

16  the website to a witness who said he's never seen the website.

17         THE COURT:  Well, let's not make predictions,

18  Mr. Cambria, so overruled.

19         And please proceed.

20         Ms. Perlmeter, you may reask the last question and if   10:18:34

21  the witness has an answer, "Yes" or "No," he may answer.

22  BY MS. PERLMETER:

23  Q.   Sir, are you aware that Backpage.com has an Adult

24  advertising section?

25  A.   Yes.                                                      10:18:45

United States District Court

JOHN DOUGHERTY - Cross

```
 1          MR. CAMBRIA:  How did I do on the prediction, Your      10:18:45
 2   Honor?  This is exactly what I objected to.
 3          THE COURT:  Overruled.
 4          Let's have decorum in the courtroom.
 5   BY MS. PERLMETER:                                              10:18:59
 6   Q.   Sorry.  There was a lot going on.  So are you aware, sir,
 7   that Backpage.com had an advertising section called Adult?
 8   A.   Yes.
 9   Q.   And have you had an opportunity to -- sounds like you have
10   spoken to Mr. Lacey probably multiple, many times over the     10:19:14
11   years that you've known him; is that correct?
12   A.   Yes, definitely.
13   Q.   Has Mr. Lacey ever referred to prostitutes as hookers to
14   you?
15   A.   No.                                                       10:19:29
16   Q.   So he's never said to you, "Hey, the women in these ads
17   are hookers"?
18   A.   No.
19   Q.   Has he ever said to you that Backpage is a good thing
20   because it gives transparency to the oldest profession?        10:19:40
21   A.   We had no conversations whatsoever about Backpage, period.
22   Q.   But you have had an occasion to speak with Mr. Lacey on
23   many occasions about a wide myriad of topics; correct?
24   A.   Absolutely.  He was my editor.
25   Q.   Are you aware that Mr. Lacey has a temper?                 10:20:02
```

United States District Court

JOHN DOUGHERTY - Cross

| | | |
|---|---|---|
| 1 | MS. BERTRAND:  Objection. | 10:20:07 |
| 2 | MR. CAMBRIA:  The relevance of that, Your Honor. | |
| 3 | THE COURT:  Sustained. | |
| 4 | BY MR. RAPP: | |
| 5 | Q.  Are you aware that Mr. Lacey can become very emotional at | 10:20:11 |
| 6 | certain times? | |
| 7 | MR. CAMBRIA:  Same objection, Your Honor.  I don't | |
| 8 | know what this stuff is. | |
| 9 | THE COURT:  Sustained. | |
| 10 | BY MR. RAPP: | 10:20:20 |
| 11 | Q.  Are you aware that Mr. Lacey engages in profanity when | |
| 12 | speaking with members of his staff? | |
| 13 | MS. BERTRAND:  Objection.  Relevance. | |
| 14 | THE COURT:  Overruled. | |
| 15 | THE WITNESS:  Please restate the question.  I'm | 10:20:33 |
| 16 | sorry. | |
| 17 | BY MS. PERLMETER: | |
| 18 | Q.  Are you aware that Mr. Lacey uses profanity when speaking | |
| 19 | with members of his staff? | |
| 20 | MR. FEDER:  Relevance. | 10:20:44 |
| 21 | THE COURT:  Overruled. | |
| 22 | THE WITNESS:  I'm trying to recall whether I ever | |
| 23 | heard him say something profane to me directly and I don't | |
| 24 | remember anything like that.  Maybe people had said that he | |
| 25 | used profane language but never to me. | 10:21:00 |

United States District Court

JOHN DOUGHERTY - Cross

BY MS. PERLMETER:                                                    10:21:14

Q.   Are you aware that Mr. Lacey had a meeting at the National

Center of Missing and Exploited Children where he lost his

temper?

A.   No.                                                            10:21:23

          MR. CAMBRIA:  I object to that.  He laid no

foundation to know how he would ever know something like that

so I submit --

          THE COURT:  Well, let's not have the speaking

objection.  You made an objection.  Let me rule.  I'll sustain   10:21:32

the objection.

          MR. CAMBRIA:  Thank you.

          THE COURT:  Don't thank me.  Don't not thank me.

          MR. CAMBRIA:  I did thank you.

          THE COURT:  I know.  I said do not thank me.  It's     10:21:42

part of my job.

BY MS. PERLMETER:

Q.   Are you aware of Mr. Lacey having meetings with religious

leaders at the Auburn Theological Seminary?

A.   No.                                                            10:21:55

Q.   So because you're not aware of those meetings, you're also

not aware that Mr. Lacey lost his temper during that meeting?

          MR. CAMBRIA:  Your Honor, I object to that.

          THE COURT:  Sustained.  Let's move on, Ms. Perlmeter.

\\\

JOHN DOUGHERTY - Cross

1  BY MS. PERLMETER:                                    10:22:07

2  Q.   So you know that Mr. Lacey was the owner of Backpage.com

3  for a period of time; correct?

4  A.   I was aware that the *New Times* organization had sold

5  Backpage or split it off from the newspaper at some point in   10:22:19

6  time and that Lacey and Larkin were involved with Backpage at

7  that point.

8  Q.   Okay.  So you're aware that at some point the Backpage

9  website was sold and separated -- or was separated from the

10  newspapers?                                          10:22:40

11  A.   That's correct.

12  Q.   Let's back up a step.  Are you aware that there was a time

13  when Mr. Lacey sold his interest in the newspapers associated

14  with Village Voice Media?

15  A.   Yes.  It was national news.                     10:22:54

16  Q.   Did that happen around 2012?

17  A.   That sounds about right.

18  Q.   Any reason to dispute that?

19  A.   I'm sorry?

20  Q.   You don't disagree with that?                   10:23:05

21  A.   No.  I mean, it was national news.  It was all over the

22  place.

23  Q.   So after Mr. Lacey sold his interest in the newspapers,

24  were you aware that he was -- he still had control over -- he

25  was now focusing his energy on Backpage.com?         10:23:17

United States District Court

JOHN DOUGHERTY - Cross

1          MR. CAMBRIA:  I object.  There's no evidence of that,    10:23:20
2     Your Honor.  That assumes a facts not in evidence.
3          THE COURT:  Well, overruled.
4          THE WITNESS:  I have no idea.
5     BY MS. PERLMETER:                                              10:23:31
6     Q.   So after -- is your testimony today that after Mr. Lacey
7     sold his interest in Village Voice Media and the newspapers
8     that you no longer had an understanding on what Mr. Lacey was
9     doing to make a living?
10    A.   That's correct.                                          10:23:45
11    Q.   So after 2012 you have no knowledge of what Mr. Lacey was
12    doing to generate income for himself?
13    A.   No, I have no knowledge.
14    Q.   But you're aware that there was a website Backpage.com?
15    A.   Yes.  Again, that's national news.  There was multiple   10:24:01
16    trials across the country.
17    Q.   Now, are you aware that Backpage was sold in 2015 to an
18    employee?
19    A.   I remember reading that in the news story.
20    Q.   So is the basis of your knowledge reading stuff in the   10:24:17
21    paper?
22    A.   Yes.  I mean, again, this was news that was easily
23    available to anybody who was interested.
24    Q.   But you didn't have conversations with Mr. Lacey -- it
25    sounds like you did not have conversations with Mr. Lacey about 10:24:31

United States District Court

JOHN DOUGHERTY - Cross

1   the intricacies of what was going on with the business?   10:24:33

2   A.   No.

3   Q.   So conversations about looking for potential buyers for

4   the website are not conversations you would have had with him?

5   A.   Absolutely not.   10:24:47

6   Q.   And how much potentially that the website was sold for

7   were not conversations you had with him?

8   A.   No.

9   Q.   And the fact that they were having a need to establish

10   banking opportunities in foreign countries was not a   10:24:59

11   conversation that you had with him?

12   A.   No.

13   Q.   Now, you've said that you read the no further questions.

14   So are you aware that national news publications have issued

15   reports, articles, documentaries, about Backpage.com over the   10:25:17

16   years?

17          MR. FEDER:  Relevance, self-serving statements,

18   allegations.

19          THE COURT:  Overruled.

20          THE WITNESS:  I'm aware of them but I did not closely   10:25:28

21   follow them.

22   BY MS. PERLMETER:

23   Q.   So are you aware that CNN's Amber Lyons ran a documentary

24   called Selling the Girl Next Door?

25          MR. FEDER:  Same objections.  May there be a   10:25:40

JOHN DOUGHERTY - Cross

| | | |
|---|---|---|
| 1 | continuing one to this line of questioning? | 10:25:42 |
| 2 | THE COURT:  There may be a continuing objection. | |
| 3 | Overruled. | |
| 4 | THE WITNESS:  I may have heard about it but, again, I | |
| 5 | wasn't following this closely. | 10:25:48 |
| 6 | BY MS. PERLMETER: | |
| 7 | Q.   And you read *The New York Times*; correct? | |
| 8 | A.   Yes. | |
| 9 | Q.   Are you familiar with Nicholas Kristof? | |
| 10 | A.   I'm sorry? | 10:25:54 |
| 11 | Q.   Are you familiar with a columnist named Nicholas Kristof? | |
| 12 | A.   Yes. | |
| 13 | Q.   Are you aware that he ran columns about prostitution | |
| 14 | occurring on Backpage? | |
| 15 | A.   I'm aware of that. | 10:26:05 |
| 16 | Q.   Are you aware that Mr. Kristof also ran a documentary | |
| 17 | called A Path Appears discussing prostitution occurring on | |
| 18 | Backpage? | |
| 19 | A.   I'm not aware of that. | |
| 20 | Q.   Were you aware that Andersen Cooper on CNN aired segments | 10:26:24 |
| 21 | about prostitution taking place on Backpage? | |
| 22 | A.   No. | |
| 23 | Q.   Are you aware that in 2017 Netflix aired a documentary | |
| 24 | entitled I am Jane Doe documenting the prostitution of women on | |
| 25 | Backpage? | 10:26:43 |

United States District Court

JOHN DOUGHERTY - Cross

| | | |
|---|---|---|
| 1 | A.   No. | 10:26:44 |
| 2 | Q.   Sir, in 2016, did you receive a $5,000 check from | |
| 3 | Mr. Lacey? | |
| 4 | A.   I did. | |
| 5 | Q.   And did you receive that check from Mr. Lacey through his | 10:27:00 |
| 6 | attorney, Mr. Becker, at the firm Becker & House? | |
| 7 | A.   I don't know who sent it to me.  It came in the mail. | |
| 8 | Q.   It just randomly showed up in your mailbox? | |
| 9 | A.   Yes.  There was a letter included with it but that was it. | |
| 10 | Q.   Did the letter say -- give you instructions on providing | 10:27:23 |
| 11 | your information so that you would not have to pay the gift | |
| 12 | tax? | |
| 13 | A.   I don't remember. | |
| 14 | Q.   Did you pay the gift tax on that $5,000? | |
| 15 | A.   I don't know.  I probably reported it as income. | 10:27:35 |
| 16 | Q.   Were you expecting that money from Mr. Lacey? | |
| 17 | A.   A number of people in the organization received those | |
| 18 | checks and so I was not surprised when I received a check like | |
| 19 | many, many other people who work at *New Times* for many years | |
| 20 | did so. | 10:27:57 |
| 21 | Q.   So you're aware that you and many fellow journalists | |
| 22 | associated with the *New Times* over the years received a $5,000 | |
| 23 | check from Mr. Lacey in 2016? | |
| 24 | A.   Yes. | |
| 25 | Q.   That was something that was discussed within the | 10:28:11 |

United States District Court

JOHN DOUGHERTY - Cross

| | | |
|---|---|---|
| 1 | journalism community; right? | 10:28:13 |
| 2 | A.    Yeah.   I mean, it was news within the journalism | |
| 3 | community. | |
| 4 | Q.   Are you aware that the revenue for those $5,000 checks | |
| 5 | came from proceeds obtained from Backpage.com? | 10:28:23 |
| 6 |             MR. CAMBRIA:   Object.   Assumes a fact not in | |
| 7 | evidence. | |
| 8 |             THE COURT:   Sustained. | |
| 9 | BY MS. PERLMETER: | |
| 10 | Q.   Were you aware that around that time or by that time, | 10:28:47 |
| 11 | 2016, Mr. Lacey was under pressure from different groups like | |
| 12 | Attorneys General, nongovernmental organizations, and different | |
| 13 | forms of media about prostitution taking place on Backpage.com? | |
| 14 |             MR. CAMBRIA:   Object.   Speculation.   Assumes facts | |
| 15 | not in evidence. | 10:29:06 |
| 16 |             THE COURT:   Overruled. | |
| 17 |             MR. CAMBRIA:   Characterization by the questioner that | |
| 18 | is not supported by facts in evidence. | |
| 19 |             THE COURT:   Overruled on all grounds, Mr. Cambria. | |
| 20 |             THE WITNESS:   There was lots of media about it so I | 10:29:20 |
| 21 | was aware of it. | |
| 22 | BY MS. PERLMETER: | |
| 23 | Q.   And, sir, I want to talk to you now about what you've | |
| 24 | dedicated your life to.   You've been a life-long journalist; is | |
| 25 | that correct? | 10:29:33 |

United States District Court

JOHN DOUGHERTY - Cross

| | | |
|---|---|---|
| 1 | A.   Yes. | 10:29:34 |
| 2 | Q.   About 40 years now? | |
| 3 | A.   Yes. | |
| 4 | Q.   So you understand that as a journalist, you have -- it | 10:29:39 |
| 5 | sounds like you talked about this during your direct.  You have | |
| 6 | a duty and a responsibility to your editor; correct? | |
| 7 | A.   That's correct. | |
| 8 | Q.   And also to your readers? | |
| 9 | A.   That's correct. | |
| 10 | Q.   So understand that it's important for a journalist to | 10:29:54 |
| 11 | gather facts? | |
| 12 | A.   That's right. | |
| 13 | Q.   And that it's important for a journalist to be independent | |
| 14 | and impartial? | |
| 15 | A.   That's correct. | 10:30:07 |
| 16 | Q.   And you agree that a journalist has a duty to its editor, | |
| 17 | it's paper and to the public to report things that are facts? | |
| 18 | A.   That's correct. | |
| 19 | Q.   So in your 40 years of being a journalist, sir, have | |
| 20 | you -- before you write an article or before you write an | 10:30:22 |
| 21 | article or before you publish a story, do you investigate? | |
| 22 | A.   Absolutely. | |
| 23 | Q.   So does that entail maybe speaking to witnesses? | |
| 24 | A.   Gathering information as a reporter entails many different | |
| 25 | facets, including talking to numerous sources, filing public | 10:30:40 |

United States District Court

JOHN DOUGHERTY - Cross

| | |
|---|---|
| 1 | records requests, often having to go to court to get documents | 10:30:46 |
| 2 | from Government agencies that don't want to supply them.  It | |
| 3 | can be confrontational and it's a very time-consuming, | |
| 4 | difficult process. | |
| 5 | Q.   But you agree that it's a process that a reporter must do | 10:31:00 |
| 6 | to gather all the facts necessary to write and publish a story? | |
| 7 | A.   That's what we did at *New Times*. | |
| 8 | Q.   And sometimes you would -- and sometimes you would go to | |
| 9 | locations, right, relevant locations?  If you're, for example, | |
| 10 | covering a baseball game, you might go to the baseball game to | 10:31:22 |
| 11 | speak to people who are attending the game? | |
| 12 | A.   Yes.  You would go on location often -- most of time it's | |
| 13 | better to be on location. | |
| 14 | Q.   And that's because you're trying to gather as much | |
| 15 | information as you can? | 10:31:40 |
| 16 | A.   That's correct. | |
| 17 | Q.   Now, in doing your investigations, have you had an | |
| 18 | opportunity where you receive conflicting information, maybe a | |
| 19 | person one says X, person two says Y?  Has that happened to | |
| 20 | you? | 10:31:53 |
| 21 | A.   That happens all the time. | |
| 22 | Q.   Now, when you receive conflicting information, is it your | |
| 23 | duty as a journalist to kind of try to flesh that out? | |
| 24 | A.   Yes. | |
| 25 | Q.   You want to try to figure out what is accurate? | 10:32:04 |

United States District Court

JOHN DOUGHERTY - Cross

1  A.   That's true.                                          10:32:06

2  Q.   And in doing that, do you consider the person that you are

3  speaking to's knowledge of what they are talking about?

4  A.   You want to establish the credibility of the people you're

5  interviewing and make assessments from there.              10:32:17

6  Q.   And part of that is considering what the person may know

7  about whatever it is they are talking about; correct?

8  A.   Yes.

9  Q.   And you want to consider their ability to see or perceive

10 an event that they are talking to you.   True?             10:32:33

11 A.   Yes.   If you're talking about X and somebody was over at

12 Y, that person is irrelevant.

13 Q.   You want to consider a witness's memory; right?   How good

14 is their memory when they are talking about thing?   Fair?

15 A.   Yes.                                                   10:32:51

16 Q.   For example, if someone had a good memory about something,

17 you may put more weight on that person's statement than someone

18 who didn't really remember something?

19 A.   Yes.

20 Q.   And then would you take the information provided to you by  10:33:01

21 the people that you spoke to and try to compare it with other

22 information you maybe able to gather about your story?

23 A.   Yes.

24 Q.   And that would include perhaps those court documents that

25 you were talking about is what would you consider, hey, is what  10:33:18

United States District Court

JOHN DOUGHERTY - Cross

1  this person told me consistent with these court documents that    10:33:22
2  I'm reviewing?
3  A.    Court documents and other documents.
4  Q.    And you would agree that you would try to obtain all the
5  information that you can before you formulated an opinion about    10:33:36
6  an event?
7  A.    I would try to gather all the information that I can but I
8  was very careful to avoid adopting an opinion.    That's a
9  different thing.    News judgment and opinion are separate.
10 Q.    Okay.   But you would try to gather all the information you    10:33:54
11 could before you published a story?
12 A.    Yes.
13          THE COURT:   Ms. Perlmeter, I think we're at a good
14 breaking point for our morning break.    I lost track of time.    I
15 had intended to take our break five minutes ago.    10:34:06
16          And so members of the jury, we will take our morning
17 recess at this time.    Again, I admonish you to remember the
18 rules that you are not to come to any conclusions or to discuss
19 the case in any way with -- amongst yourselves or with anyone
20 else, just simply enjoy your break. I'll have Liliana come in    10:34:31
21 to retrieve you in about 20 minutes.
22          Please all rise for the jury.
23          (Jury departs at 10:34.)
24          THE COURT:   Sir, you may step down.
25          MS. PERLMETER:   Your Honor, when the jury is gone, I    10:35:02

United States District Court

JOHN DOUGHERTY - Cross

1    have a matter.                                                                    10:35:04

2              THE COURT:  All right.  Go ahead, Ms. Perlmeter.

3              MS. PERLMETER:  Yes, Your Honor.  I would move for

4    the production of this witness's statements pursuant to 26.2.

5    He has testified that he has sent substantive statements to the   10:35:19

6    defense team in relation to his testimony in this case.

7              MR. CAMBRIA:  I didn't hear that.

8              THE COURT:  Mr. Cambria, can you turn on your

9    microphone, please.  You keep making statements and I hear them

10   faintly and I don't know if you're making comments to yourself   10:35:38

11   or you're asking for a ruling from the Court.  My courtroom I

12   don't run in a way that is a back and forth argument.  This

13   isn't Law and Order and so if you're going to make an

14   objection, make it clearly, state the objection.  Don't simply

15   comment under your breath about what is being asked.  That is   10:36:04

16   not -- I don't take that to be an objection and sometimes I'm

17   confused by it.

18             MR. CAMBRIA:  I apologize, Your Honor.

19             THE COURT:  And I also want to say that there's

20   chatter going on in the courtroom that, again, maybe owing to   10:36:15

21   my own sensitive ear I can hear.

22             Mr. Lincenberg, you've done it throughout the trial.

23   Please refrain from doing so or move yourself back from the

24   table and turn away when you have to speak with co-counsel or

25   your client.                                                     10:36:35

United States District Court

JOHN DOUGHERTY - Cross

1          And so Ms. Perlmeter, my recollection of this          10:36:36

2     witness's testimony was that his commentary was about the Court

3     and so if there's something more than that that I missed, I

4     didn't hear it.

5          MS. PERLMETER:  Yes, Your Honor.  That is what he          10:36:51

6     testified to and I think it's relevant because he is testifying

7     in this case.  His statement was about this court who is

8     presiding over this case and United States is entitle to see

9     the context of that message to evaluate how it may want proceed

10    with this witness.  Does this witness have any biases?  Are          10:37:09

11    there any issues to credibility that the United States can

12    explore based on the statements that he provided to the

13    defense?  I don't know that.

14         THE COURT:  Let's have a proffer because I have to

15    have a thick skin, and I do, and this court is not the one on          10:37:23

16    trial.  While the witness or any witness may have some feeling

17    about this court, it's irrelevant to the proceeding.

18         So I ask for Mr. Cambria and his investigators to

19    produce or look at whatever it is that that information

20    exchange was and if you believe it is related to the testimony,          10:37:47

21    turn it over again.

22         MS. PERLMETER:  Your Honor, we have no objection if

23    the defense wants to proceed as they did yesterday.  I think

24    they provided the messages to the Court first for an *in camera*

25    review, that's fine with us.  If they want to produce it          10:38:05

JOHN DOUGHERTY - Cross

 1  directly to us, we have no objection to that.                          10:38:08

 2          MR. CAMBRIA:  I don't have anything, Your Honor.  I

 3  remember the comment but I don't have anything I can turn over.

 4          THE COURT:  Well, your client might and the

 5  investigators might.                                                   10:38:18

 6          MR. CAMBRIA:  No.

 7          THE COURT:  The gentleman, Mr. Cambria, testified

 8  that he wrote some statement with regard to the court in a

 9  prior relationship and sent it to somebody, so it's your

10  responsibility to ask the question about whether anybody else      10:38:33

11  received anything from this gentleman, when he sent it, whether

12  or not it has been preserved, and that's all I'm saying, that

13  you have an obligation to investigate.

14          And so with that, let's stand in recess.

15          MR. LINCENBERG:  Your Honor, before we break for        10:38:55

16  recess, I want to do a short cross-examination of this witness.

17  I'm not sure what the Court's order is going to be but just so

18  the Court is aware of it.

19          THE COURT:  I'm sorry.  You're going to cross-examine

20  the current witness on the stand?                                     10:39:11

21          MR. LINCENBERG:  Yes, briefly.  I have some questions

22  for him.

23          THE COURT:  Can you stand, Mr. Lincenberg?  The

24  decorum, frankly, it's taxing my judicial temperament.

25          COURTROOM DEPUTY:  All rise.                                  10:39:30

United States District Court

JOHN DOUGHERTY - Cross

1          (Recess at 10:39; resumed at 10:57.)                    10:39:31

2          (Proceedings outside the presence of the jury.)

3          THE COURT:  All right.  Please be seated.  And before

4     we bring the witness in, sir, can you step out?

5          All right.  The record will reflect that the jury is    10:58:07

6     not present.

7          Mr. Lincenberg, let me ask a point of clarification.

8     You asked to cross-examine the witness.  You mean direct

9     examine?

10         MR. LINCENBERG:  I think it would be a                   10:58:26

11    cross-examination but my questions are -- it's not that it's

12    going to be a matter of whether they are leading or not.  It's

13    just to clarify a couple of points.

14         THE COURT:  Well, no.  Just technically I think --

15    here's the procedural situation that needs to be clarified.  If  10:58:48

16    any defense counsel wishes to direct examine a witness, a

17    defense witness, you should do so in succession.  That way --

18    because what I fear is if Mr. Cambria finishes, he's on

19    cross-examination.  Mr. Cambria comes up and redirects.  Then

20    you come up and direct.  Government is going to have to          10:59:21

21    cross-examine based on whatever your line of questioning may be

22    and so it's -- going forward, it's better procedurally that if

23    you intend to direct examine any of the defense witnesses, that

24    you do so before the Government cross-examines, okay?

25         MR. LINCENBERG:  Happy to follow that protocol, sure.    10:59:46

JOHN DOUGHERTY - Cross

1          THE COURT:  But now, Mr. Cambria can redirect and                10:59:50

2    then you can follow.  It will, though, give the opportunity to

3    the Government to cross once you're done.

4          MR. LINCENBERG:  That's fine.  It's sort of treating

5    him as if he's my witness.  He's not my witness.  I'm just          11:00:05

6    cross-examining him.

7          THE COURT:  But he's not adverse to your client.

8          MR. LINCENBERG:  No.

9          THE COURT:  So that's the dysfunction so let's

10   proceed in that way.                                                  11:00:16

11         All right.  So let's have the witness in.

12         I'm sorry, yes, Mr. Cambria?

13         MR. CAMBRIA:  Well, there was a request as to a

14   communication that he referred to.  I do not believe this

15   communication falls within that rule.  What I would like to         11:00:35

16   do -- I was able to print it and what I would like to do is

17   submit it to you first and hopefully you'll agree.  And if so,

18   then there's nothing to turn over.

19         THE COURT:  Yes.  You can come forward with it.

20         MR. CAMBRIA:  The way I read the rule is, it has to          11:00:57

21   be substantive and deal with the substance of the testimony.

22         THE COURT:  It's not relevant.

23         MR. CAMBRIA:  Thank you.

24         Liliana, you can give that back to him?  Actually,

25   let me reserve it.                                                    11:01:19

United States District Court

JOHN DOUGHERTY - Cross

1        MS. PERLMETER:  Thank you, Your Honor.  May I make a          11:01:30

2   statement for the record?  The Government, the United States,

3   we would just urge that the defense continue to follow their

4   obligations under 26.2.  It does take away from the jury's time

5   to ask the line of questions and then take the break and then      11:01:40

6   they have to go find it and then the Court needs to review it.

7   If they could just do this in advance of their witnesses that

8   they have been planning to call I think it would help

9   streamline the process, Your Honor.

10       MR. LINCENBERG:  And, Your Honor, we know that we             11:02:02

11  received no material from the Government's 20 plus witnesses.

12  We made requests and the Court denied them.  We, again, ask

13  that the Government turn over all of their text and email

14  communications with all of their witnesses or representatives

15  of those witnesses.                                                11:02:18

16       THE COURT:  Well, Mr. Lincenberg, I think you were in

17  court yesterday afternoon when Mr. Feder made the precise

18  request and with regard to Mr. Feder's request, your request is

19  the same.  I am not going to order the production of

20  generalized material where there has been no showing, as there    11:02:37

21  was yesterday, that there was a communication about what was

22  going to be testified to.

23       And so I'm going to say this; that going back before

24  the trial, defense counsel asked me to order the production of

25  witnesses and associated exhibits seven days in advance rather    11:03:03

JOHN DOUGHERTY - Cross

1  than the 48 that the Government sought.  I can't imagine if I          11:03:10

2  agreed with that and imposed that order, that you would have

3  been able to do that because sitting here today, I have a list

4  of five people we've gone through.  We're on the third and if

5  we run out of witnesses this afternoon and I have an idle jury      11:03:34

6  sitting by, I'm not beyond the point of requiring whomever it

7  is that is responsible for whatever the missing witness may be

8  to start imposing fines so that we can reimburse the Court for

9  the costs of an idle jury.

10          There are multiple orders requiring production and          11:04:01

11  notice of witnesses.  I've never confronted this issue before.

12          Have your witnesses ready to go and if this witness

13  is off the stand by lunchtime, you need to have your witnesses

14  prepared this afternoon.

15          We are going until 4:30.                                   11:04:34

16          Let's bring the jury in.

17          All rise for the jury.

18          (Jury enters at 11:05.)

19          THE COURT:  All right. please be seated.

20          The record will reflect the presence of the jury.          11:05:47

21  Let's have our witness resume the witness stand.

22          Sir, please come forward and you may take the witness

23  seat.

24          And Ms. Perlmeter, when you are ready, you may

25  continue.                                                         11:06:10

United States District Court

JOHN DOUGHERTY - Cross

| | | |
|---|---|---|
| 1 | BY MS. PERLMETER: | 11:06:13 |
| 2 | Q.   Good morning, sir. | |
| 3 | A.   Good morning. | |
| 4 | Q.   Did you speak with anyone from the defense about your | |
| 5 | testimony over the break? | 11:06:18 |
| 6 | A.   No. | |
| 7 | Q.   We had left off with some questions about journalism and | |
| 8 | how -- the fact-finding process that journalists like you go | |
| 9 | through. | |
| 10 | Now, you would agree that when you publish an | 11:06:30 |
| 11 | article, if you do not have all the facts and maybe facts that | |
| 12 | are unknown to you, that your article wouldn't be complete; | |
| 13 | correct? | |
| 14 | A.   My article would be what? | |
| 15 | Q.   It would not be complete. | 11:06:43 |
| 16 | A.   Well, it would be complete in that time and space and then | |
| 17 | you would update it with more information as it became | |
| 18 | available. | |
| 19 | Q.   So it would be complete as to the information that you had | |
| 20 | at the time? | 11:06:54 |
| 21 | A.   There's a saying in journalism you go with what you have | |
| 22 | based at that time. | |
| 23 | Q.   Sir, I asked if you just publish based on the information | |
| 24 | that you had at the time, it would be complete based on the | |
| 25 | information that you had at the time; is that correct? | 11:07:05 |

United States District Court

JOHN DOUGHERTY - Cross

1   A.   Yes.  Yes.                                                    11:07:06

2   Q.   Thank you.  Sir, you had also talked about on your direct

3   examination about the Pulitzer Prize?

4   A.   Yes.

5   Q.   Are you aware that and you were talking about how *The*        11:07:16

6   *Village Voice Media's* papers won that award.  Do you recall

7   that?

8   A.   I wasn't sure if it was *The Village Voice*.  I recall the

9   *New Times* organization won a Pulitzer, but I don't know which

10  paper won the Pulitzer.                                            11:07:30

11  Q.   So you're not aware that it was actually the *Los Angeles*

12  *Times* back in 2007.

13  A.   That sounds like it to me but, like I said, I wasn't aware

14  of which paper.

15  Q.   So you're not aware that the writer who won the Pulitzer      11:07:41

16  was John Gould writing for the *Los Angeles Times*?

17  A.   That sounds familiar, yeah.

18  Q.   And he won the award based on his writing as a food

19  critic; correct?

20  A.   Yes.                                                          11:07:53

21  Q.   Sir, and you have a Facebook account; correct?

22  A.   Yes.

23  Q.   And it's a public account that people can go to and see

24  what you are posting; correct?

25  A.   Sure.                                                         11:08:09

United States District Court

JOHN DOUGHERTY - Cross

1    Q.   And you're pretty active on that account; right?          11:08:12

2    A.   Off and on.

3    Q.   You've posted some pictures of dogs, for example,

4    recently?

5    A.   Yeah.  I love my dogs.                                    11:08:18

6    Q.   And you had this account back in April of 2018; correct?

7    A.   Probably.

8    Q.   If I told you that you did, would you have any reason to

9    dispute that?

10   A.   No.                                                       11:08:28

11   Q.   And your Facebook account name is John E. Dougherty;

12   correct?

13   A.   Yes.

14   Q.   And you told us that you follow national media generally.

15   A.   Sure.                                                     11:08:44

16   Q.   And Reuters, Reuters.com.  R-E-U-T-E-R-S is a national

17   media source; correct?

18   A.   Yes.

19   Q.   And back in April of 2018 you learned from the --

20   A.   What year, please.                                        11:08:57

21   Q.   2018.

22   A.   '18.

23   Q.   Back in 2018, you learned that the Backpage CEO, Carl

24   Ferrer, had pleaded guilty in this case and was going to

25   testify against Mr. Lacey and Mr. Larkin; correct?            11:09:09

JOHN DOUGHERTY - Cross

| | | |
|---|---|---|
| 1 | A.   I guess so.   I don't remember what you're talking about | 11:09:14 |
| 2 | but if it's on there, it's on there. | |
| 3 | Q.   And you have on occasion posted news article links on your | |
| 4 | Facebook profile; correct? | |
| 5 | A.   Please slow down.   I'm sorry. | 11:09:25 |
| 6 | Q.   Okay.   Fair. | |
| 7 |           THE COURT:   Yes.   I agree. | |
| 8 | BY MS. PERLMETER: | |
| 9 | Q.   Sir, you agree that over the years you have posted links | |
| 10 | to news articles like the one I mentioned also from Reuters on | 11:09:36 |
| 11 | your Facebook profile? | |
| 12 | A.   I have.   I have. | |
| 13 | Q.   And you recall posting an article from Reuters about Carl | |
| 14 | Ferrer deciding to plead guilty and agreeing to testify in this | |
| 15 | case in April of 2018? | 11:09:52 |
| 16 | A.   I do not recall.   I post many articles so if that | |
| 17 | happened, it happened. | |
| 18 | Q.   Do you have any reason to dispute me? | |
| 19 | A.   No. | |
| 20 | Q.   And you know how Facebook also has the function where you | 11:10:02 |
| 21 | can provide status updates? | |
| 22 | A.   Sure. | |
| 23 | Q.   You can write words about your posts, for example? | |
| 24 | A.   Okay. | |
| 25 | Q.   Are you aware of that? | 11:10:12 |

JOHN DOUGHERTY - Cross

1    A.    Yes.

2    Q.    And you use that function?

3    A.    Yeah.  I've commented on news stories.

4    Q.    And in commenting on your posting of this article, did you

5    write:  Now that Backpage inside flips on Lacey and Larkin, bad

6    news for this duo who once ran a great newspaper chain that

7    broke countless stories.  They traded that legacy in a chase

8    for gold derived from prostitution --

9          MR. FEDER:  Wait a minute.  She's reading from a

10   document not in evidence.  Can we see what she's reading from?

11         THE COURT:  Can you show that?

12         MS. PERLMETER:  Let's show the witness Exhibit 3000

13   please.

14         THE COURT:  Ms. Perlmeter, why don't you have that

15   distributed to counsel?  Sounds like Mr. Feder says he has not

16   seen it.

17         When you're ready.

18         MS. PERLMETER:  Just for the record, the Court paused

19   to give the members of the defense an opportunity to review the

20   exhibit as well as the witness.

21   BY MS. PERLMETER:

22   Q.    Sir, have you had an opportunity to review Exhibit 3000?

23   A.    Yeah, I'm reading it.

24   Q.    Now, I want to focus your attention on the top posting.

25   A.    I see it.

United States District Court

JOHN DOUGHERTY - Cross

1    THE COURT:  Wait, wait, wait, slow down Ms.                11:12:36

2  Perlmeter.

3    And, sir, please don't speak over the question.  We

4  have a court reporter.  Please just pause before you answer the

5  question.                                                    11:12:45

6    All right.  Slowly.

7  BY MS. PERLMETER:

8  Q.   Have you had an opportunity, sir, to review Exhibit 3000?

9  A.   Yes, I'm reading it right now.

10 Q.   Do you need more time to review it?                     11:12:55

11 A.   No, I don't.

12 Q.   Has your recollection been refreshed after reviewing this

13 exhibit?

14 A.   Yes.

15 Q.   Now, I would ask you to please put the exhibit face down.  11:13:03

16 Can you put it face down and then if you need to refer to it

17 again, just let me know and we'll take that opportunity.

18    So is that your Facebook profile?

19 A.   Yes.

20 Q.   In April of 2018 did you post on Facebook a link from      11:13:20

21 Reuters regarding Mr. Ferrer's decision to plead guilty in this

22 case?

23 A.   Yes.

24 Q.   And did you also post a status update some words that you

25 wrote in relationship to your posting?                        11:13:35

JOHN DOUGHERTY - Cross

1   A.   Yes.                                                                11:13:37

2   Q.   Did you say, "Backpage insider" --

3          MR. CAMBRIA:  Object to reading from it.

4          THE COURT:  Sustained.

5   BY MS. PERLMETER:                                      11:13:57

6   Q.   Mr. Dougherty, could you please pick up Exhibit 3000 and

7   look at it again?  I would like to direct your attention to

8   April 12, 2018, the top of the page.  Do you see that?

9   A.   Yes.

10   Q.   Okay.  The first word is Backpage.  Do you see that?    11:14:09

11   A.   Yes.

12   Q.   Now, I would ask for you to read that paragraph to the

13   jury.

14          MR. CAMBRIA:  I object to it.  Not in evidence.

15   BY MS. PERLMETER:                                      11:14:22

16   Q.   Is that your statement, sir?

17   A.   I'm sorry.  I didn't follow that sequence.

18   Q.   Is that your --

19          THE COURT:  Wait, wait.  There was an objection and I

20   was delayed.                                              11:14:33

21          Sustain the objection.

22          You can start asking your question.

23   BY MS. PERLMETER:

24   Q.   Can you please read the first paragraph or only paragraph

25   for that posting?                                        11:14:47

82

JOHN DOUGHERTY - Cross

1    A.   Well, it has my time --                                      11:14:51

2              MR. CAMBRIA:  Objection.

3              THE COURT:  I sustained the objection.  It's not in

4    evidence, Ms. Perlmeter, so don't have him read from it.

5    BY MS. PERLMETER:                                                 11:14:58

6    Q.   Have you made any statements on Facebook about Backpage?

7    A.   Apparently I did.

8    Q.   And 2018 in April did you say that --

9              MR. CAMBRIA:  I object again.

10             THE COURT:  Well, are you moving for its admission?     11:15:10

11             MS. PERLMETER:  Not at this time.  I'm asking him if

12   he previously made a statement and then he can answer "Yes" or

13   "No."

14             THE COURT:  Why don't you ask him to read the

15   paragraph and then you can ask him a question?                    11:15:20

16             MS. PERLMETER:  Okay.

17   BY MS. PERLMETER:

18   Q.   Sir, do you understand that you are allowed to read that

19   first paragraph to the jury, the only paragraph under April 12,

20   2018?  Do you understand what paragraph I'm --                    11:15:30

21             THE COURT:  No.  No.  No.  I'm sorry.  Let me clarify

22   what I mean, Ms. Perlmeter.  He can read the paragraph to

23   himself and then you can ask a question.

24             MS. PERLMETER:  Okay.

25             THE WITNESS:  Okay.  Yes, I've read the paragraph to    11:15:43

United States District Court

JOHN DOUGHERTY - Cross

1   myself.                                                      11:15:45

2   BY MS. PERLMETER:

3   Q.    Okay.   Is that something that you wrote?

4   A.    Yes.

5   Q.    Did you write that, "Backpage insider flips on Lacey and   11:15:49

6   Larkin" --

7              MR. FEDER:   Objection.   Hearsay.

8              THE COURT:   Overruled.

9              THE WITNESS:   Yes, I wrote it.

10  BY MS. PERLMETER:                                            11:15:58

11  Q.    Did you write that it was "bad news for this duo who once

12  again great newspaper chain that" --

13             MR. CAMBRIA:   Again, Your Honor.   Objection.

14             THE COURT:   Wait, wait.   There was an objection.

15             MR. CAMBRIA:   It's not in evidence, Your Honor.   11:16:10

16             THE COURT:   It is not.

17             And, again, Ms. Perlmeter, without reading the

18  exhibit that is not in evidence you, may ask a question.

19  BY MS. PERLMETER:

20  Q.    Sir, what did you write in that post?                  11:16:26

21  A.    I wrote about the Reuters wrote a news story about one of

22  the insiders flipping on Mr. Lacey and Mr. Larkin and that he

23  had exchanged a plea bargain with a sentence for up to five

24  years and I said that's a heavy sentence on a plea bargain.

25  It's unclear if this guy going to testify against Lacey and   11:16:52

JOHN DOUGHERTY - Cross

1   Larkin and I provided my opinion that the --                     11:16:55

2   Q.   Okay.  Sir.  I just wanted you to talk about what you

3   wrote about.

4   A.   Yeah.  Well, that's what I'm --

5   Q.   Okay.  So as it pertains to the words that are in this       11:17:05

6   posting, sir.

7   A.   That's what I'm doing.  And I made one comment about the

8   significance of this and I characterized it as such, as an

9   opinion based on the news story, that this was a situation in

10  which it appeared that the Lacey and Larkin --                    11:17:26

11          MR. FEDER:  Objection as to hearsay.

12          THE COURT:  Overruled.

13          THE WITNESS:  I'll just read the sentence.  Is that

14  okay?

15  BY MS. PERLMETER:                                                 11:17:38

16  Q.   It's fine with me.

17          MR. FEDER:  Same objection.

18          THE COURT:  Overruled.

19  BY MS. PERLMETER:

20  Q.   That way it's accurate if you want to just read the          11:17:43

21  paragraph, please.

22          THE COURT:  There's a miscommunication.  He said he

23  can read the sentence, not the paragraph.

24  BY MS. PERLMETER:

25  Q.   Okay.  Are you talking about the second sentence and the     11:17:51

United States District Court

JOHN DOUGHERTY - Cross

1  third sentence?                                                           11:17:54

2  A.    I think it's important to read the paragraph in context.

3  Could I do that?

4  Q.    I have no problem with that.

5            THE COURT:  Yes, you may.                                       11:18:06

6            THE WITNESS:  All right.  This is a Facebook post

7  that I posted.

8            THE COURT:  Well, again, read the paragraph.  Don't

9  narrate.

10           THE WITNESS:  All right.  It says, "backpage insider    11:18:16

11  flips on Lacey and Larkin" --

12           MR. FEDER:  Object again to something that is not in

13  evidence and reading it in.  It's hearsay and it's not in

14  evidence.

15           THE COURT:  Are you moving for the admission?  And it   11:18:25

16  would be irrelevant.

17           MS. PERLMETER:  As to the one paragraph, Your Honor,

18  so we'll have to redact or excise this from the other

19  statements.

20           THE COURT:  You may make an objection for the record.   11:18:39

21           MR. CAMBRIA:  Objected to.

22           THE COURT:  What did you say, Mr. Cambria?

23           MR. CAMBRIA:  I said it's objected to, Your Honor.

24           THE COURT:  All right.  Overruled.  The one paragraph

25  may be admitted and the remainder may be redacted.              11:18:53

United States District Court

JOHN DOUGHERTY - Cross

1          MS. PERLMETER:  Okay.                                    11:18:58

2     BY MS. PERLMETER:

3     Q.   And so in that context --

4          THE COURT:  And members of the jury, it will be

5     refined so that we only provide to you what this witness is    11:19:05

6     testifying about.

7          You may move forward.

8          MS. PERLMETER:  May I approach the witness to

9     retrieve the exhibit so that we can put it on the Elmo for the

10    jury?                                                          11:19:18

11         THE COURT:  Yes.

12         And here, too, members of the jury, if you're having

13    difficulty seeing it, do let me know and we'll have the counsel

14    make sure that you can.

15         Can you see that all?  Okay.  Thank you.                 11:20:08

16         And I think at this juncture, Ms. Perlmeter, it's

17    better just have the jurors read to themselves what is on that

18    exhibit.

19         MS. PERLMETER:  Yes, Your Honor.

20         THE COURT:  And just look up when you're ready.          11:20:41

21         You may proceed, Ms. Perlmeter.

22         MS. PERLMETER:  I have no further questions for the

23    witness, Your Honor.

24         THE COURT:  Mr. Cambria?

25

United States District Court

JOHN DOUGHERTY - Redirect

**REDIRECT EXAMINATION**

11:20:49

BY MR. CAMBRIA:

Q.   Mr. Dougherty, you had indicated that you had received a
check for $5,000.  What's that all about?

A.   It's my understanding that the check was sent to a number     11:21:10
of employees, former employees, at *New Times* after some sort of
business deal had occurred and it was just a check that was
sent to us.  There was no request for anything and I accepted
it and it was a small pittance of the amount of money they had
paid me over my career.  So to me, it had no influence beyond     11:21:34
it was nice to receive.

Q.   All right.  This was done for reporters, editors?

A.   Yeah.  I'm not sure how many people received it but I
think a large number did of reporters, editors.  I don't know
of other folks who were associated with the paper received it     11:21:51
as well.

Q.   Sort of a thank-you?

A.   Yeah.  It was a thank-you for years of service.

Q.   And you have been shown this document just a minute ago
and a comment you made in there, was it based on whatever this     11:22:04
Reuters article was?

A.   Yeah.  The article was based on what the reporting was as
well as the fact that this guy Ferrer had flipped on *New Times*
Lacey and Larkin and other defendants.

Q.   Okay.                                                        11:22:24

United States District Court

JOHN DOUGHERTY - Direct

| | | |
|---|---|---|
| 1 | MR. CAMBRIA:  That's all I have. | 11:22:30 |
| 2 | THE COURT:  All right.  Sir, we have one other | |
| 3 | counsel who wish to examine you. | |
| 4 | So, Mr. Lincenberg, please step forward. | |
| 5 | MR. FEDER:  I may have some questions now that I've | 11:22:41 |
| 6 | seen this exhibit. | |
| 7 | **DIRECT EXAMINATION** | |
| 8 | BY MR. LINCENBERG: | |
| 9 | Q.   There was a question where there was a sale of the | |
| 10 | business in 2012.  Do you recall that the sale actually took | 11:22:52 |
| 11 | place in 2013? | |
| 12 | A.   I don't know.  I was not following it closely.  If that is | |
| 13 | when it took place, that's when it took place. | |
| 14 | Q.   And there were some questions asked about the steps that | |
| 15 | you go through to do a thorough investigation when you're | 11:23:10 |
| 16 | writing a story and I have a few questions with respect to | |
| 17 | that. | |
| 18 | First, is one of the things that you do is when you | |
| 19 | are talking to a source of information when somebody is | |
| 20 | supplying information? | 11:23:23 |
| 21 | MS. PERLMETER:  Objection.  Leading. | |
| 22 | THE COURT:  It is leading but I'll permit a little | |
| 23 | leeway but direct questioning, Mr. Lincenberg. | |
| 24 | BY MR. LINCENBERG: | |
| 25 | Q.   Do you evaluate whether or not that person has an interest | 11:23:34 |

United States District Court

JOHN DOUGHERTY - Direct

1  in the outcome of the case?                                      11:23:37

2  A.   Yes.

3  Q.   And do you evaluate whether or not that person who is

4  telling you a story is receiving benefits for the story they

5  are telling you?                                                 11:23:45

6         MS. PERLMETER:  Objection.  Leading.

7         THE COURT:  Sustained.

8  BY MR. LINCENBERG:

9  Q.   Do you consider whether or not that person is unbiased or

10 biased?                                                          11:23:55

11 A.   Yes.

12 Q.   And do you try to evaluate whether when that person is

13 recalling things, he is conveniently not recalling things that

14 would harm his statement while remembering everything that

15 tells the opposite?                                              11:24:11

16         MS. PERLMETER:  Objection.  Leading, argumentative.

17         THE COURT:  Sustained.

18         MR. LINCENBERG:  Thank you, Your Honor.  I have

19 nothing further.

20         THE COURT:  Mr. Feder?  Again, we're on direct.         11:24:21

21               **DIRECT EXAMINATION**

22 BY MR. FEDER:

23 Q.   Do you still have Exhibit 3000 in front of you,

24 Mr. Dougherty?

25         THE COURT:  He does not.                                11:24:37

United States District Court

JOHN DOUGHERTY - Direct

1      MR. FEDER:  Can he have it, please.                              11:24:39

2      THE COURT:  Ms. Perlmeter, did you retrieve the

3  exhibit?

4      MS. PERLMETER:  Oh, I did.

5  BY MR. FEDER:                                                        11:25:17

6  Q.   The statement about chase for gold derived from

7  prostitution.  Do you see that?

8  A.   Yes, I do.

9  Q.   You have no information that any money was obtained by

10 Backpage from prostitution, do you?                                  11:25:25

11     MS. PERLMETER:  Objection.  Leading.

12     THE COURT:  Sustained.

13 BY MR. FEDER:

14 Q.   What, if any, information do you have that any moneys made

15 by Backpage was from prostitution?                                   11:25:32

16     MS. PERLMETER:  Objection.  Leading, foundation.

17     THE COURT:  Overruled.  Overruled as to leading --

18 I'm sorry.  Overruled as to leading.

19     Sustained as to foundation.

20 BY MR. FEDER:                                                        11:25:46

21 Q.   The only thing you knew about this when you wrote this was

22 this Reuters story?

23     MS. PERLMETER:  Objection.  Leading.

24     THE COURT:  Sustained.

25 \\\

United States District Court

JOHN DOUGHERTY - Direct

| | | |
|---|---|---|
| 1 | BY MR. FEDER: | 11:25:54 |
| 2 | Q.   What information did you have other than Reuters about | |
| 3 | this subject matter when you wrote this? | |
| 4 | MS. PERLMETER:  Objection.  Foundation. | |
| 5 | THE COURT:  Well, he can answer what, if any, | 11:26:02 |
| 6 | information and maybe lay some foundation. | |
| 7 | THE WITNESS:  I have no other information.  It was | |
| 8 | based on the Reuters story. | |
| 9 | BY MR. FEDER: | |
| 10 | Q.   So when you made that statement, it was just speculation | 11:26:12 |
| 11 | based on the article that you read; right? | |
| 12 | MS. PERLMETER:  Objection.  Argumentive. | |
| 13 | THE COURT:  Overruled. | |
| 14 | THE WITNESS:  Yes. | |
| 15 | BY MR. FEDER: | 11:26:21 |
| 16 | Q.   What, if any, information did you have that any moneys | |
| 17 | made by Backpage came from prostitution other than the story? | |
| 18 | MS. PERLMETER:  Objection.  Foundation. | |
| 19 | THE COURT:  Overruled. | |
| 20 | THE WITNESS:  I have no information. | 11:26:32 |
| 21 | BY MR. FEDER: | |
| 22 | Q.   This was just a reaction, was it not, Mr. Dougherty? | |
| 23 | A.   It was -- | |
| 24 | MS. PERLMETER:  Objection.  Leading. | |
| 25 | THE COURT:  Sustained. | 11:26:42 |

United States District Court

JOHN DOUGHERTY - Direct

BY MR. FEDER:                                                    11:26:43

Q.   What, if anything, caused you to write something like that

other than speculation and opinion?

          MS. PERLMETER:  Objection.  Calls for speculation.

          THE COURT:  Sustained.                                11:26:59

          MR. FEDER:  Nothing further.  Thanks.

          THE COURT:  All right.  Do you wish to do limited

recross?

          MS. PERLMETER:  No, Your Honor.  Thank you.

          THE COURT:  May the witness be excused from subpoena?  11:27:06

          MR. CAMBRIA:  May I ask a question, Your Honor?

          THE COURT:  No.

          MR. CAMBRIA:  Okay.

          THE COURT:  You had ample opportunity for your direct

and redirect, Mr. Cambria.                                      11:27:19

          MR. CAMBRIA:  I understand.

          THE COURT:  All right.  So may the witness be excused

from subpoena?

          Any objection?

          MR. CAMBRIA:  My question, by the way, would be based  11:27:31

on --

          THE COURT:  Well, I don't want to have a highlight of

your question, Mr. Cambria; all right?

          So may the witness be excused from subpoena by the

Government?                                                     11:27:42

United States District Court

CHARLES STROUSE - Direct

| | | |
|---|---|---|
| 1 | MS. PERLMETER:  No objection. | 11:27:42 |
| 2 | THE COURT:  Sir, we thank you for your testimony. | |
| 3 | You may step down and you may leave the courtroom. | |
| 4 | (Witness excused.) | |
| 5 | THE COURT:  Call your next witness. | 11:27:50 |
| 6 | MR. CAMBRIA:  Mr. Strouse. | |
| 7 | THE COURT:  Sir, come forward and be sworn. | |
| 8 | COURTROOM DEPUTY:  Please raise your right hand. | |
| 9 | (CHARLES STROUSE, a witness herein, was duly sworn or | |
| 10 | affirmed.) | 11:28:39 |
| 11 | THE WITNESS:  I do. | |
| 12 | COURTROOM DEPUTY:  If you would state your full name | |
| 13 | for the record and spell your last name. | |
| 14 | THE WITNESS:  Charles Edward Strouse.  S-T-R-O-U-S-E. | |
| 15 | THE COURT:  Whenever you're ready, Mr. Cambria. | 11:29:04 |
| 16 | MR. CAMBRIA:  Thank you very much, Your Honor. | |
| 17 | **DIRECT EXAMINATION** | |
| 18 | BY MR. CAMBRIA: | |
| 19 | Q.   Mr. Strouse, could you indicate to the ladies and | |
| 20 | gentlemen of the jury how you're employed? | 11:29:12 |
| 21 | A.   I'm sorry? | |
| 22 | Q.   How you are employed? | |
| 23 | A.   I am the assistant director of the Lee Caplin School of | |
| 24 | Journalism at Florida National University in Miami. | |
| 25 | Q.   All right.  And how long have you held that position? | 11:29:25 |

CHARLES STROUSE - Direct

1   A.   About four years.                                      11:29:32

2   Q.   At any time did you work for the *New Times* newspapers?

3   A.   I did.

4   Q.   And when was that?

5   A.   From 1998 to 2019 I believe.                           11:29:47

6   Q.   And were you familiar with Michael Lacey?

7   A.   Michael Lacey hired me as an editor or first as a managing

8   editor and then as -- to two different editor positions.

9   Q.   And during your employment there, can you indicate to us

10  what Mr. Lacey's job was?                                   11:30:17

11  A.   He was executive editor of the *New Times* chain so he

12  oversaw all of the editor, and all of the copy and all of the

13  hiring for what -- a chain that eventually had 17 newspapers.

14  I think they had 11 when I was hired.

15  Q.   And as editor, what was his job, to your observation?   11:30:40

16  A.   Well, his job was to sort of set the pace and the tone for

17  the entire chain.  We talked regularly about stories.  We would

18  talk regularly about hiring and who to hire and why to hire

19  them and what the potential drawbacks are, just like any other

20  business, but he was kind of the guy on top of all of the      11:31:02

21  editorial, both in what we wrote and who did it.

22  Q.   Which one of the particular papers did you work for?

23  A.   I started -- well, I was always in South Florida so I ran

24  the Miami newspaper called *Miami New Times* for I think about 12

25  years.  And I think I was editor of our Broward newspaper for   11:31:27

United States District Court

CHARLES STROUSE - Direct

1   about five and I was managing editor of the Miami newspaper for   11:31:31

2   several years as well.

3   Q.   And how is it that you would interface with Mr. Lacey if

4   you were working out of Florida?

5   A.   Well, in a number of ways.  We would obviously talk a lot   11:31:46

6   about stories.  That was -- Mike loved stories, I'm sure he

7   still does, and so we would talk about how to frame them, what

8   to tell, who to report with, what would make a good story.  So

9   we did a lot of that.  Also, again, when I hired folks, he

10   would look at the résumé and we would talk over whether it was   11:32:08

11   a good one and whether it wasn't, what -- what kind of person

12   we should hire and what would build the paper and he consulted

13   on that regularly.

14   Q.   To your knowledge, did he visit any of the newspaper

15   locations around the country?   11:32:28

16   A.   Yeah.  He regularly came to Miami and a little less to

17   Fort Lauderdale.  But he regularly came to Miami because it was

18   one of the first papers in the chain and every year at least

19   once and sometimes more.

20   Q.   Why?   11:32:45

21   A.   Again, to sort of -- he was, you know, the king of the

22   kingdom.  He wanted to see that things were working, when

23   things weren't.  He would tell you what you might do better.

24   We would talk about things -- we did a best of issue every

25   year.   11:33:06

United States District Court

CHARLES STROUSE - Direct

1              MR. BERRY:  Objection, Your Honor.  Testifying in the   11:33:08

2    narrative.

3              THE COURT:  Sustained.

4    BY MR. CAMBRIA:

5    Q.   With regard to the newspaper operation, was there a   11:33:15

6    Business section?

7    A.   No.  Our paper did not have a Business section.

8    Q.   Okay.  Of the multiple papers, did any of them have a

9    Business section?

10   A.   No.   11:33:33

11   Q.   Were there -- was there advertising in any of these

12   newspapers?

13   A.   Yes, there was.

14   Q.   Okay.  Assuming that is a business advertising, then would

15   the papers have had a Business section?   11:33:48

16   A.   I'm not sure I understand the question.

17   Q.   Well, what I'm saying is you said that they had ads and I

18   said assuming ads are business, would they have a Business

19   section.  Are you following me?

20   A.   Well --   11:34:05

21   Q.   Do advertisements in the newspapers constitute Business

22   section?

23   A.   No.

24   Q.   Okay.  All right.  Is there a -- to your knowledge, is

25   there a separation of business from editorial in newspapers?   11:34:23

United States District Court

CHARLES STROUSE - Direct

1   A.   Oh, very strong.  I mean, I worked at *Miami Herald* and the       11:34:28

2   *Los Angeles Times* before coming to *New Times* and they were on

3   different floors.  And in our newspapers there was a wall

4   that -- between the -- always a wall between the business and

5   the editorial side so that there would be -- specifically so      11:34:46

6   that there would be no mixing of those two very separate

7   things.

8   Q.   Why is that?

9   A.   Because you can't buy what we write, because the idea of

10  journalism, right, is that you report on what's happening and     11:34:59

11  you don't care who buys the ad.  If they do something wrong or

12  if they, you know, deserve to be something that deserves

13  criticism, you got to be free to do that.

14  Q.   In your opinion, was Mr. Lacey a strong First Amendment

15  advocate?                                                         11:35:22

16  A.   I worked for Mike for 15 years and as I said --

17         MR. BERRY:   Objection, Your Honor.  Calls for a

18  yes-or-no answer.

19         THE COURT:   Sustained.

20  BY MR. CAMBRIA:                                                   11:35:33

21  Q.   First of all, "Yes" or "No"?

22  A.   Yes, very strong.

23  Q.   And what's your basis for saying that?

24  A.   He advocated, again, for us -- if a business had done

25  something wrong, if a restaurant stunk, we had writers that       11:35:44

United States District Court

CHARLES STROUSE - Direct

1    could say that, whether or not they bought advertising.  That        11:35:51

2    was just not -- the two sides never mixed.  It was oil and

3    vinegar.

4    Q.   Do you know whether or not as part of his business he

5    traveled to the other newspapers?  How do you know that?          11:36:02

6    There's no shake your head key on the machine over there.  You

7    have to say something.  Do you understand what I'm saying?  You

8    shook your head yes.  You have to say something.

9    A.   I'm sorry.  Yeah, I know he traveled to other newspapers,

10   yes.                                                               11:36:19

11   Q.   Okay.  And do you know whether or not he also wrote

12   articles?

13   A.   That was part of the reason I wrote the job.  He was an

14   executive editor who wrote regularly, well.

15   Q.   Thank you.                                                    11:36:33

16          THE COURT:  Wait, wait, wait.  Is there any other

17   defense counsel who wish to direct?  Mr. Feder, Mr. Kessler?

18          MR. FEDER:  No.

19          THE COURT:  Ms. Bertrand?

20          MS. BERTRAND:  No, thank you.                               11:36:53

21          THE COURT:  Mr. Eisenberg?

22          MR. EISENBERG:  No, Your Honor.

23          THE COURT:  All right.  Thank you.

24          You may proceed.

25          MR. BERRY:  Thank you, Your Honor.                          11:37:00

United States District Court

CHARLES STROUSE - Cross

1          MR. CAMBRIA:  Oh, thanks.  I appreciate it.                    11:37:13

2                    **CROSS - EXAMINATION**

3    BY MR. BERRY:

4    Q.   Good morning, Mr. Strouse.

5    A.   Good morning.                                                   11:37:25

6    Q.   Thank you for being here.  Were you subpoenaed to testify

7    here today?

8    A.   I was not.

9    Q.   You came voluntarily?

10   A.   I have.                                                         11:37:30

11   Q.   You like Mr. Lacey quite a bit, don't you?

12   A.   I do.  I respect him and I like him.

13   Q.   And you've known him a long time obviously; correct?

14   A.   Since 1998.

15   Q.   When were you first contacted by the defense about coming      11:37:42

16   to testify here today?

17          MR. CAMBRIA:  Boy.

18          THE WITNESS:  Very recently.

19   BY MR. BERRY:

20   Q.   And I appreciate that.  "Very recently" can mean different     11:37:56

21   things to different folks.  Would you say it was within the

22   last week, last month, last year?

23   A.   In the last month.

24   Q.   Okay.  How were you contacted?

25   A.   By telephone I believe.                                        11:38:13

United States District Court

CHARLES STROUSE - Cross

1   Q.   Were there other forms of communication with anyone                    11:38:19

2   associated with the defense?  And when I say that, I mean not

3   just Mr. Cambria or Mr. Lacey, but any of their staff, any

4   investigators representing them in some capacity?  Did you have

5   any communications with any of those folks?                                 11:38:35

6   A.   None.

7   Q.   Who did you communicate with?

8   A.   I believe with the office of Mr. Lacey's attorney.

9   Q.   That's Mr. Cambria?

10  A.   Yes.                                                                    11:38:47

11  Q.   So dealt with someone at his office?

12  A.   Yeah.

13  Q.   Is that a yes?

14  A.   Yes.  That is a yes.

15  Q.   And do you know who that person was?                                    11:38:56

16  A.   Again, in the last couple days.  Erin I think.

17  Q.   Erin McCampbell maybe?

18  A.   I guess, yeah.

19  Q.   Have you seen that person before?

20  A.   Nope.  Before she called me you mean?                                   11:39:16

21  Q.   Yes.

22  A.   Before she called me you mean?

23  Q.   Correct.

24  A.   Never.

25  Q.   Do you see that person in the courtroom today?                         11:39:22

United States District Court

CHARLES STROUSE - Cross

1    A.   Well, we talked over the phone so I'm not sure what --    11:39:24
2    Q.   When you said before today, I just thought maybe you met
3    them today.
4    A.   I did.  I don't know if I see her here.
5    Q.   Okay.    11:39:32
6    A.   But I'm not a great memory for faces either.  I'm not
7    sure.
8    Q.   Did any of those communications include text messages?
9    A.   No, sir.
10   Q.   Email?    11:39:45
11   A.   No, sir.
12   Q.   You hesitated for a second.
13   A.   Because I wanted to make sure that I didn't -- think it
14   through.  2023 you confuse text messages and speech but I
15   believe it was all telephone, yes.    11:40:03
16   Q.   So you don't think there were any written communications
17   between you and anyone with the defense?
18   A.   I think I asked what the name of the courthouse was when I
19   arrived this morning and I got a text message with the name of
20   the courthouse but that's the only thing I could think of.    11:40:23
21   Q.   So there was a text but it was just about the address?
22   A.   Exactly.
23   Q.   Anything written that had anything to do with your
24   testimony here today?
25   A.   Absolutely nothing, no, sir.    11:40:36

United States District Court

CHARLES STROUSE - Cross

1   Q.   Were you ever asked to review anything in advance of your                11:40:42

2   testimony here today?

3   A.   Review anything?  I mean, I spoke with the attorney about

4   the questions that he might ask me.

5   Q.   Oh.  Okay.  So were those provided to you in a written                   11:40:57

6   form?

7   A.   They were not.

8   Q.   Oh.  Okay.  So you met with them.  They asked you some

9   questions to see what you would say, you gave them answers and

10  that was it?                                                                  11:41:08

11  A.   That's correct.

12  Q.   All right.  That's fine.

13           So when I say review, were you asked to read

14  anything?

15  A.   No, nothing.                                                             11:41:19

16  Q.   Okay.  When was the last time that you spoke to Mr. Lacey?

17  A.   Maybe a couple months ago I was passing through town and

18  we, you know, stopped and had lunch or dinner or something I

19  think it was.

20  Q.   Where all did you have lunch?                                            11:41:44

21  A.   Pardon me?

22  Q.   Where was it?  Where did you eat?

23  A.   Near his home in -- I'm from Miami so I don't know Phoenix

24  very well.  It was the Valley.

25  Q.   I'm from Texas.  I wouldn't know the difference.  But if                 11:41:59

CHARLES STROUSE - Cross

1   you know.                                                        11:42:02

2   A.    Not that far from here.

3   Q.    Paradise Valley?

4   A.    Pardon me?

5   Q.    Was it Paradise Valley?                                    11:42:06

6   A.    Yes, Paradise Valley.  That's right.

7   Q.    So it was a restaurant near his home in Paradise Valley?

8   A.    Correct.

9   Q.    Do you remember what kind of restaurant it was?

10  A.    I remember we ate outdoors and I think I had tuna which    11:42:17

11  seemed odd in Phoenix, Arizona but whatever.

12  Q.    You're still alive.  A brave man for a guy from Florida.

13  So ate outdoors, it was a couple of months ago.  Was it still

14  hot outside?

15          MR. FEDER:  Judge, objection to this line of            11:42:43

16  questioning as not relevant.  Outside the scope.

17          MR. BERRY:  I'm trying to get into what he spoke and

18  what the length of that time was.  I'm trying to establish the

19  time frame, whether it was after the trial already started.

20          THE COURT:  I thought I heard him say a couple of        11:42:57

21  months ago so I think with that time frame, let's move on.

22  BY MR. BERRY:

23  Q.    Let's clarify.  Had the trial already begun at that point?

24  A.    No, sir.

25  Q.    So a couple months ago but the trial had not begun?       11:43:07

United States District Court

CHARLES STROUSE - Cross

1   A.   The trial had not begun.  Maybe it was -- May or --    11:43:09

2   Q.   So it was before August 29 then?

3   A.   Yeah.

4   Q.   So more than two months ago?

5   A.   Yes, sir.                                              11:43:18

6   Q.   Okay.  What did you guys talk about at that time?

7   A.   I remember asking about his kids and his family and he

8   asked about my family.  We -- you know, I had left journalism

9   to teach so we talked some about the differences in what I'm

10  doing now compared to what I did for decades running the      11:43:42

11  papers.

12  Q.   All right.  Before this meeting that you're talking about

13  that now we've established is before August 29, when had you

14  seen or talked to Mr. Lacey before that?

15  A.   We talk regularly on and off through the years, even after  11:44:00

16  I left.  I mean, we would talk by phone.  I was here -- I had

17  been here maybe twice or maybe three times.

18  Q.   Twice or three times in what time period?

19  A.   Oh, the last 10 years.

20  Q.   Oh, not twice or three times in 2023.  Twice or three     11:44:16

21  times in 10 years?

22  A.   No.  The only time I can think of that I had been here in

23  '23 was that one revisit where I had an uncle who was 90

24  something years old.

25  Q.   Let's stop there.  The question is, before this meeting   11:44:32

United States District Court

CHARLES STROUSE - Cross

1   sometime a few months ago with Mr. Lacey, approximately when    11:44:35
2   was the last time you talked to Mr. Lacey before that?
3   A.   By phone, maybe a year before that.
4   Q.   Okay.  And you talked to Mr. Lacey about Backpage
5   obviously; correct?                                             11:45:01
6   A.   You know, I guess.  A little.  Not really.  My
7   relationship with Mike has long been talking about stories that
8   we like and things that we're interested in.  The issue must
9   have come up but I've got to tell you, I don't remember -- it's
10  never been -- and, again, this dates back to the paper.  It's   11:45:22
11  never been part of my relationship to speak with Mike about
12  Backpage and I never knew him to even bring it up in
13  conversation.
14  Q.   So you said you talked about things that you were
15  interested in, you were each interested in; correct?            11:45:35
16  A.   Yeah.
17  Q.   Do you think he was interested in the company that he was
18  making millions of dollars from?
19            MR. CAMBRIA:  I object to that question, the form of
20  the question.                                                   11:45:44
21            THE COURT:  Sustained as to form.
22  BY MR. BERRY:
23  Q.   Was he interested in Backpage?
24  A.   I don't know.  I mean, it did not come up in conversation
25  to my memory.                                                   11:45:56

United States District Court

CHARLES STROUSE - Cross

1   Q.   Has he ever told you that escort ads are actually just                11:45:59
2   hooker ads?
3            MS. BERTRAND:   Objection.   Lacks foundation.
4            MR. BERRY:   I'm asking "Yes" or "No" has he.
5            MS. BERTRAND:   Still lacks foundation as to basis to             11:46:12
6   ask the question.
7            THE COURT:   Sustained as to foundation.
8   BY MR. BERRY:
9   Q.   Have you ever gone to Backpage.com?
10  A.   No, never.   I've never seen it.                                      11:46:20
11  Q.   You've never gone to the website?
12  A.   Why would I.?   No.
13  Q.   Well, why wouldn't you?
14           MR. EISENBERG:   Objection, Your Honor.   It's
15  argumentative.                                                            11:46:33
16           THE COURT:   Sustained.
17  BY MR. BERRY:
18  Q.   Well, you asked me the question, "Why would you?"   So that
19  seems like you have a thought about it.   What's the thought?
20  A.   I've never gone to Backpage.com.   I can't tell you why.             11:46:44
21  Never interested me.
22  Q.   So you have no basis of knowledge --
23           THE COURT:   Okay.   Don't speak over one another,
24  please.
25           MR. BERRY:   Sorry.                                              11:46:55

United States District Court

CHARLES STROUSE - Cross

1   BY MR. BERRY:                                                  11:46:56

2   Q.   Go ahead.  Do you have anything else to say about that?

3   A.   No.

4   Q.   Okay.  So you have no basis of knowledge about the very

5   reason we're in trial here?                                   11:47:03

6            MS. BERTRAND:  Objection.  Argumentative.

7            THE COURT:  Overruled.

8            THE WITNESS:  I have certainly read newspaper stories

9   about the issue that's at hand here.

10  BY MR. BERRY:                                                  11:47:36

11  Q.   You were obviously familiar with the fact that Mr. Lacey

12  was an owner of Backpage, though; correct?

13  A.   Yes, sir.

14  Q.   Are you familiar with something called The Erotic Review?

15  A.   The erotic --                                             11:47:50

16  Q.   The Erotic Review?

17  A.   No.

18  Q.   No knowledge about that?

19  A.   Never heard of it.

20  Q.   So did you have any knowledge about the internal          11:48:04

21  strategies of Backpage?

22  A.   Absolutely not.

23  Q.   But did you mention that you had read stuff about Backpage

24  in other news articles and things like that; correct?

25  A.   Yeah.                                                     11:48:25

United States District Court

CHARLES STROUSE - Cross

1  Q.   Without saying articles or saying what they said, do you                    11:48:28

2  remember the outlets that you read them in?

3  A.   I remember obviously the *Arizona Republic* I read.   Online

4  the *Reason Magazine* I think did a piece which somebody sent to

5  me.   What else?   The *New York Times* had a story.   I read that.    11:48:44

6  I subscribe to most American -- I'm a professor of journalism

7  so I subscribe to a lot of websites.

8  Q.   Sorry.   Go ahead.   Were you finished?   I'm sorry.

9  A.   Yes.

10  Q.   Okay.   Thank you.                                                          11:49:09

11  A.   Please.

12  Q.   So you're aware of course -- *The New York Times*.   Are you

13  familiar with Nick Kristof of *The New York Times*?

14  A.   Yes.

15  Q.   So you know that he's written about Backpage; correct?          11:49:19

16  A.   A very long time ago I believe, yeah.   I don't remember --

17          MR. BERRY:   Objection.   Nonresponsive.

18          THE WITNESS:   Please ask the question again.

19          THE COURT:   So, yes, I'll sustain.   Reask the

20  question.                                                                        11:49:34

21          MR. BERRY:   Thank you, Your Honor.

22  BY MR. BERRY:

23  Q.   So you're aware that Nick Kristof has written about

24  Backpage, "Yes" or "No"?

25  A.   Yes, sir.                                                                    11:49:42

CHARLES STROUSE - Cross

1    Q.   And that Nick Kristof's publications, articles, columns --          11:49:43

2    I guess we should call them columns; right?

3    A.   Yes, sir.

4    Q.   His columns about Backpage are about prostitution on the

5    site; correct?          11:49:55

6            MR. FEDER:   Leading, relevance, self-serving.

7            THE COURT:   Overruled.   Overruled.

8    BY MR. BERRY:

9    Q.   You may answer, sir.

10   A.   I believe so, yes.          11:50:03

11   Q.   And are you aware that the *Wall Street Journal* has written

12   about Backpage?

13   A.   I've not read anything in the *Wall Street Journal* about

14   Backpage.

15   Q.   You don't read the *Wall Street Journal*; correct?          11:50:12

16   A.   (Witness nods head).

17   Q.   Professor of journalism but you don't read the *Wall Street*

18   *Journal*.

19   A.   I get it every day.

20           MS. BERTRAND:   Objection.   Argumentive, Your Honor.          11:50:22

21           THE COURT:   Sustained.

22   BY MR. BERRY:

23   Q.   What about CNN, are you familiar with that news

24   organization?

25   A.   Yes, sir.          11:50:30

CHARLES STROUSE - Cross

1   Q.   Are you familiar with a documentary called Selling the          11:50:31
2   Girl Next Door that was about Backpage?
3   A.   I didn't see it, no.
4   Q.   That wasn't my question, was it?
5   A.   Am I aware of it?  No.                                           11:50:43
6   Q.   So you're not even aware that there was a documentary?
7   A.   I am not.
8   Q.   Are you aware that there was a documentary called I am
9   Jane Doe?
10          MR. FEDER:  Objection.  Self-serving.  Hearsay,              11:50:54
11   relevance.
12          THE COURT:  Overruled.
13          MR. FEDER:  May there be a continuing objection?
14          THE COURT:  Yes.
15          MR. FEDER:  Thanks.                                          11:51:04
16   BY MR. BERRY:
17   Q.   You may answer, sir.
18   A.   No, I'm not.  I've not seen it.
19   Q.   And are you aware of Nick Kristof's documentary called A
20   Path Appears?                                                       11:51:15
21   A.   I know that he wrote about it but, no, I didn't know that
22   he made a documentary, no, sir.
23   Q.   You don't have any doubt, do you, that Mike Lacey is aware
24   of the criticism of prostitution on Backpage?
25          MR. CAMBRIA:  I object to that, Your Honor.  He can't        11:51:37

United States District Court

CHARLES STROUSE - Cross

1    speak for the state of mind of my client.                    11:51:39

2            THE COURT:  Sustained.

3    BY MR. BERRY:

4    Q.   Would you characterize Mr. Lacey as flashy with his money

5    or tight with his money --                                   11:52:04

6            MR. CAMBRIA:  Object to the relevance.

7    BY MR. BERRY:

8    Q.   -- or something else?

9            THE COURT:  Well, sustained.

10   BY MR. BERRY:                                                 11:52:13

11   Q.   You testified a moment ago that you can't -- people can't

12   buy what you write; correct?

13   A.   Correct.

14   Q.   All right.  Have you ever received a $5,000 check from

15   Mr. Lacey through one of his lawyers?                         11:52:23

16   A.   Yes.

17   Q.   Did you receive that check in the fall of 2016?  Isn't

18   that correct?

19   A.   I don't remember exactly when but yeah, makes sense.

20   Q.   Sounds about right?                                      11:52:38

21   A.   All right.

22   Q.   And, in fact, the check came from a law firm called Becker

23   & House from John Becker?

24   A.   Maybe.  I don't remember that.

25   Q.   It didn't come from him directly; correct?              11:52:48

CHARLES STROUSE - Cross

1   A.   Correct.                                                    11:52:50

2   Q.   And before you got the check, there was a letter

3   requesting your contact information; isn't that right?

4   A.   Yeah, makes sense.  Actually, I'm not even sure there was.

5   I mean --                                                        11:53:06

6   Q.   Not even sure there was what?

7   A.   Mike had my contact information.

8   Q.   Okay.

9   A.   Maybe.

10  Q.   But you got a $5,000 check.  Do you remember that?         11:53:14

11  A.   I got a $5,000 check.  Yes, sir, I did.

12  Q.   All right.  If you would, please, wait for my question to

13  finish so the court reporter can get your answer --

14  A.   I apologize.

15  Q.   -- so both of us don't get our hands slapped.             11:53:23

16        Now, the letter that you got told you that it was a

17  gift from Mr. Lacey; correct?

18  A.   I don't think that's the case.  In fact -- and again, it's

19  been a long time but I kind of remember getting this check and

20  wondering what the heck it was about.                          11:53:45

21  Q.   You were unclear; right?  It came out of the woods?

22  A.   I wasn't clear what it was about.  I'm sorry.  I'm sorry.

23  I apologize.

24  Q.   You were unclear; it came out of the blue; correct?

25  A.   Yes, sir.                                                  11:53:58

CHARLES STROUSE - Cross

1    Q.   Okay.  So sitting here right now, you don't remember the       11:53:59

2    purpose of it?

3    A.   Nope.

4    Q.   And in fact, wouldn't you say --

5    A.   I don't think there was a stated -- I'm sorry.  I'm doing       11:54:10

6    it again.  Go ahead.  I'm trying to . . .

7    Q.   Remind me when you worked for *New Times*?

8    A.   From 1998 to 2019.

9    Q.   Oh.  Okay.  So you were working there in 2012 when

10   Mr. Lacey sold the papers and kept Backpage?                        11:54:33

11   A.   Yes, sir.

12   Q.   '12, '13, maybe I got that wrong.  Something like that?

13   A.   '13 I think it was.

14   Q.   Does that sound correct?

15   A.   Yes.                                                           11:54:43

16   Q.   So in 2016 when you get a check for $5,000 from Mr. Lacey,

17   he no longer had anything to do with the papers; isn't that

18   correct?

19   A.   That is correct.

20   Q.   But he did have something to do with Backpage; right?          11:54:59

21   A.   No.

22   Q.   He didn't have anything to do --

23   A.   I'm sorry.  I thought you said I had nothing to do -- he

24   must have.  I don't know.  I guess if that's when he owned

25   Backpage and then -- yeah, he did.                                  11:55:16

United States District Court

CHARLES STROUSE - Cross

1  Q.   And I'm not accusing you of anything about Backpage.  I'm                11:55:18

2  asking did he have an association with Backpage at the time you

3  received a $5,000 check?

4  A.   I guess so, yes.

5  Q.   He certainly didn't have an association with the "Times"                 11:55:31

6  any more; correct?

7  A.   I'm sorry.

8  Q.   He certainly didn't have any association with the *New*

9  *Times* any more at that point; correct?

10 A.   No.  He was no longer executive editor.                                 11:55:40

11 Q.   Did you cash the check?

12 A.   Yes, sir.

13 Q.   What did you spend it on?

14 A.   I have three kids in college.  It only went -- I don't

15 know.  It disappeared.                                                        11:55:57

16         MR. CAMBRIA:  Amen.

17 BY MR. BERRY:

18 Q.   Do you know anything about -- let me rephrase.  Withdrawn.

19         Did you know that several people testified in this

20 case that they did not receive any of the money from the pimps                11:56:30

21 that sold them on Backpage?

22         MS. BERTRAND:  Objection.  Relevance.

23         MR. EISENBERG:  Relevance.

24         MS. BERTRAND:  Goes outside the scope of direct.

25         MR. BERRY:  This is cross.  There's no scope.                         11:56:42

CHARLES STROUSE - Cross

1       THE COURT:  Sustained as to relevance unless you can          11:56:46

2  lay some foundation.  Overruled as to that last objection.

3  BY MR. BERRY:

4  Q.  Did you know vast majority of the revenue from

5  Backpage.com came from the Escort section; correct?          11:57:04

6       MS. BERTRAND:  Objection.

7       MR. CAMBRIA:  Foundation.

8       THE COURT:  Sustained as to foundation.  You can lay

9  some foundation.

10 BY MR. BERRY:          11:57:14

11 Q.  Do you know what was the big generator of revenue on

12 Backpage.com?

13      MR. FEDER:  Self-serving, hearsay, relevance.

14      THE COURT:  Overruled.

15      THE WITNESS:  I really know nothing about the          11:57:25

16 business of Backpage so -- I mean, I know what I've read and

17 people have certainly made that allegation but I don't know.

18 BY MR. BERRY:

19 Q.  And it doesn't matter whether you believe it or not, the

20 source of your information, you understand, don't you, that the   11:57:42

21 revenue driver for Backpage was the Escort section; correct?

22      MR. CAMBRIA:  I object to that.

23      THE COURT:  Overruled.  He can answer "Yes" or "No"

24 if he knows.

25      THE WITNESS:  I have no firsthand knowledge, no.          11:57:55

United States District Court

CHARLES STROUSE - Cross

1   BY MR. BERRY:                                                    11:58:01

2   Q.   You know it from what -- you've read it; correct?

3           MR. BERRY:  I'm sorry, Your Honor.

4           THE COURT:  No.  I was just going to say you can have

5   the witness if he can answer that last question but then we're   11:58:07

6   going to break.

7           MR. BERRY:  Let's just break now, Judge.  I'm fine

8   with that.

9           THE COURT:  All right.

10          Members of the jury, we will stand for our lunch         11:58:16

11  recess.  We will take the customary hour recess for lunch and

12  so, again, remember the admonition.  We are still continuing

13  with witnesses and be prepared to come back into court in an

14  hour's time.

15          Please all rise for the jury.                            11:58:35

16          (Jury departs at 11:58.)

17          THE COURT:  And, sir, you may step down.

18          All right.  Before we go to recess, I only have one

19  witness listed beyond this witness.  I have -- I have been

20  noticed I think early this morning or late last night that you   11:59:15

21  have a Ms. Mehlman-Orozco.  You best have that witness ready to

22  go and have one of your tomorrow witnesses on standby.

23          All right.

24          MR. STONE:  Your Honor, just briefly.  About

25  Dr. Mehlman-Orozco, I just wanted to point out there was a       11:59:37

United States District Court

CHARLES STROUSE - Cross

1    previous court order about her testimony at doc 1081, pages 19                    11:59:42

2    and 20 and I just wanted to get that -- make you aware in case

3    there's objections that rely on that.

4                THE COURT:  Doc 1081?

5                MR. STONE:  At pages 19 and 20.                                       12:00:00

6                THE COURT:  All right.

7                MR. STONE:  And there may be references to the

8    defendants' disclosure of the expert, because it is an expert

9    witness, at doc 500, page six.

10               THE COURT:  All right.  Thank you.  We'll stand in               12:00:18

11   recess.

12               MR. FEDER:  One other thing.  Mr. Stone and I talked

13   about the potential of a witness named Steve Suskin.  They are

14   going to have an objection I think, given the Court's orders

15   yesterday morning, which precipitated the potential to call            12:00:28

16   Mr. Suskin --

17               THE COURT:  Can you speak into the microphone, Mr.

18   Feder?  You're soft-spoken.

19               MR. FEDER:  I know but I try my best.  But we're

20   unclear as to whether or not the Court is imposing the advice          12:00:40

21   of counsel elements to Mr. Suskin in regard to two things that

22   we would try to get from him.  If the Court wants to talk about

23   it now, we can.  If you want to wait until whenever.  But my

24   understanding is, Mr. Mehlman-Orozco may be done shortly after

25   we come back so we kind of need to clarify whether or not              12:01:01

CHARLES STROUSE - Cross

1    Mr. Suskin can testify.                                      12:01:06

2            THE COURT:  Well, I'm a bit confused, Mr. Feder.  I

3    have ad nauseam said the violation of counsel stands and if

4    this is a gentleman who is a lawyer who gave legal advice, then

5    we are going to have to require the prerequisite elements of    12:01:27

6    the advice of counsel and not only that, but I would like to

7    see any exhibits that you intend to bring forward with this

8    witness as I have ad nauseam ordered.  You are to provide the

9    witness and the associated exhibits and I don't have anything

10   before me with regard to Mr. Suskin.                           12:01:53

11           So, yes, the answer to your question is yes.  The

12   advice of counsel applies to him.  If he can produce what he is

13   asked, what he was giving a legal opinion on, then that is

14   necessary.  And what his response was to the precise question

15   asked.                                                         12:02:20

16           So, yes, Mr. Feder, I am invoking the advice of

17   counsel throughout the remainder of the trial.

18           MR. FEDER:  Can I be specific so we're not repeating

19   things?  One, we talked about Mark Sableman's opinion yesterday

20   that the Court reviewed, from 2010.  There is a transit letter   12:02:37

21   from Suskin to Mr. Spear giving him that opinion.  The

22   testimony, as I understand it, would be that Suskin himself had

23   contacted Sableman asking for an opinion.  There may or may not

24   have been a PowerPoint that was sent that we've already seen in

25   this trial and that was the basis of Sableman's opinion.        12:03:03

CHARLES STROUSE - Cross

1    That's number one.

2              Number two, also --

3              THE COURT:  The PowerPoint is the basis of his

4    opinion.

5              MR. FEDER:  Suskin doesn't remember sending the

6    PowerPoint but there may be.  But he remembers asking Sableman

7    to give -- to render this opinion.  So, I mean, you know,

8    you've asserted this advice of counsel where you have to give

9    the basis and give all the information that you have, et

10   cetera, that just doesn't apply here so that's issue number

11   one.

12             Issue number two is there's been exhibits here about

13   presentations to the *New Times* staff where Ferrer would present

14   on moderation, Spear might present on some other subject and

15   Mr. Suskin would present on the legal aspects of it.  And he

16   would testify, if allowed, about what he would tell the

17   moderators including Spear and others here in those sessions.

18             THE COURT:  The legal aspects, what does that mean?

19             MR. FEDER:  The applicability of -- I know he can't

20   talk about Section 230.  But the First Amendment.

21             THE COURT:  Well, that's fine.  He can say yes, I

22   told them generally what we're doing is First Amendment

23   protected, but there has to be some foundation laid as to what

24   he was asked to provide.

25             MR. FEDER:  Okay.  And then that kind of summarizes

United States District Court

12:03:08

12:03:16

12:03:35

12:03:57

12:04:17

12:04:33

CHARLES STROUSE - Cross

1   it.  There may be one other thing but I need to talk to counsel        12:04:37

2   at lunch.

3           MR. STONE:  Your Honor, the only thing I would say

4   is, not only the question would be what he was asked to provide

5   but what was provided to him.  That is the big missing piece,          12:04:45

6   because if he wasn't provided all of the information about

7   Backpage's business practices, it is irrelevant what his advice

8   is.

9           THE COURT:  And that is the advice of counsel

10  prerequisite and that's what I'm talking about, Mr. Feder.             12:04:59

11          So you can discuss amongst yourselves what the

12  objections are going to be during his testimony.  You can

13  provide to my court the exhibits that you intend to introduce

14  through him and including what he was provided in order to make

15  his opinions.  So with that we'll stand in recess.                     12:05:20

16          COURTROOM DEPUTY:  All rise.

17          (Whereupon, these proceedings recessed at 12:05 p.m.)

18                          *  *  *  *  *

19

20

21

22

23

24

25

United States District Court

1                    C E R T I F I C A T E                    12:05:27

2

3           I, ELAINE M. CROPPER, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of     12:05:27

6   Arizona.

7

8           I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled    12:05:27

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15          DATED at Phoenix, Arizona, this 26th day of October,    12:05:27

16  2023.

17

18

19

20                          s/Elaine M. Cropper                     12:05:27

21                  _____

22                   Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                  12:05:27

                     United States District Court