UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Phoenix, Arizona |
| Michael Lacey, et al., | ) | October 25, 2023 |
| | ) | 1:03 p.m. |
| Defendants. | ) | |
| | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 24**

**(P.M. SESSION)**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2   For the Government:
         UNITED STATES ATTORNEY'S OFFICE
 3       By:  Mr. Kevin M. Rapp, Esq.
              Mr. Andrew C. Stone, Esq.
 4            Mr. Peter Shawn Kozinets, Esq.
              Ms. Margaret Wu Perlmeter, Esq.
 5       40 North Central Avenue, Suite 1800
         Phoenix, Arizona  85004-4408
 6       kevin.rapp@usdoj.gov
         peter.kozinets@usdoj.gov
 7       andrew.stone@usdoj.gov
         margaret.perlmeter@usdoj.gov
 8       - and -
         UNITED STATES DEPARTMENT OF JUSTICE
 9       By:  Mr. Austin Berry, Esq.
         1301 New York Avenue NW, 11th Floor
10       Washington, DC  20005
         austin.berry2@usdoj.gov
11
     For the Defendant Michael Lacey:
12       LIPTSITZ GREEN SCIME CAMBRIA, LLP
         By:  Mr. Paul J. Cambria, Esq.
13       42 Delaware Avenue, Suite 120
         Buffalo, New York  14202
14       pcambria@lglaw.com

15   For the Defendant Scott Spear:
         KESSLER LAW OFFICE
16       By: Mr. Eric Walter Kessler, Esq.
         6720 North Scottsdale Road, Suite 210
17       Scottsdale, Arizona  85253
         eric.kesslerlaw@gmail.com
18       - and -
         FEDER LAW OFFICE, PA
19       By:  Mr. Bruce S. Feder, Esq.
         2930 East Camelback Road, Suite 160
20       Phoenix, Arizona  85016
         bf@federlawpa.com
21

22

23

24

25
```

**A P P E A R A N C E S (Cont'd)**

For the Defendant John Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    By:  **Mr. Gopi K. Panchapakesan, Esq.**
         **Mr. Gary S. Lincenberg, Esq.**
    1875 Century Park E, Suite 2300
    Los Angeles, California  90067
    gpanchapakesan@birdmarella.com
    glincenberg@birdmarella.com
    aneuman@birdmarella.com

For the Defendant Andrew Padilla:
    DAVID EISENBERG, PLC
    By:  **Mr. David S. Eisenberg, Esq.**
    3550 North Central Avenue, Suite 1155
    Phoenix, Arizona  85012
    david@deisenbergplc.com

For the Defendant Joye Vaught:
    JOY BERTRAND, ESQ, LLC
    By:  **Ms. Joy Malby Bertrand, Esq**
    P.O. Box 2734
    Scottsdale, Arizona  85252-2734
    Joy@joybertrandlaw.com

1                        **I N D E X**

2      **SUMMARY OF COURT PROCEEDINGS:**                          **PAGE**

3      Proceedings Outside the Presence of the Jury              5
       Proceedings Outside the Presence of the Jury             69
4      Proceedings Outside the Presence of the Jury             73
       Proceedings Outside the Presence of the Jury            102
5      Rule 29 Motion                                          103

6


7      **WITNESSES FOR THE GOVERNMENT:**                          **PAGE**

8      Charles Strouse
               Cross-Examination (Cont'd) by Mr. Berry          16
9              Redirect Examination by Mr. Cambria              23
       Kimberly Mehlman-Orozco
10             Direct Examination by Ms. Bertrand               31
               Cross-Examination by Mr. Stone                   54
11             Redirect Examination by Ms. Bertrand             98

12


13                        **EXHIBITS**

14     **NO.**        **DESCRIPTION**                             **REC'D**

15                            NONE

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

1

2      (Proceedings reconvene at 1:03 p.m.)

3      (Jury not present at 1:03 p.m.)

4           THE COURT:  All right.  Please be seated.

5           The record will reflect that the counsel are present          13:03:16

6      with their clients.  We do not have a witness on the stand.

7           There are a couple of matters I want to address.

8           Thank you.

9           So, Mr. Cambria, you had indicated that there is a

10     witness by the name of Strouse that you intend to call.          13:04:17

11          MR. BERRY:  That's who's on the stand right now.

12          THE COURT:  I'm sorry.  This witness?

13          MR. CAMBRIA:  Yes --

14          THE COURT:  This is --

15          MR. CAMBRIA:  -- that's the witness.          13:04:31

16          THE COURT:  This is the witness, Strouse?

17          MR. CAMBRIA:  Correct.

18          THE COURT:  It dawned on me, though -- we're beyond

19     the point now, but it dawned on me that he was never listed on

20     your original witness list.  And so I point out this fact          13:04:45

21     because the Court never had an opportunity to query the jury

22     during voir dire as to whether or not they knew this

23     individual.  And so here we are with Mr. Strouse on the stand.

24     He's testified for at least a half an hour.

25          And so I throw that back to counsel to determine          13:05:12

1   whether or not there's something that needs to be done here

2   procedurally, because they had never been asked or the witness

3   has never been identified to them prior to being seated.

4       MR. CAMBRIA:  Right.  I didn't realize he wasn't on

5   that original list, Your Honor.  I -- I'm floating in paper and     13:05:38

6   memories.  And maybe it's my advanced age, but I thought

7   that -- I thought that he had been disclosed.  I didn't know

8   that.

9       MR. BERRY:  Your Honor -- and I apologize.  I had

10  intended to bring this to the Court's attention.  I knew -- I      13:05:55

11  had -- I had figured that out.  I'd gone back and looked at

12  lists.  And I was pretty confident that it had not been

13  disclosed, but I made the decision that what I was going to

14  tell the Court was that notwithstanding the fact that he has

15  not been disclosed, the United States is still prepared to        13:06:11

16  cross-examine him.

17      I understand what you're saying about we should have

18  at least queried the jury potentially about him.  I think the

19  prejudice here is basically waived by the defendants, and the

20  United States is not seeking any kind of remedy in terms of,      13:06:24

21  like, striking his testimony or anything like that at this

22  point.  I think given the fact that he was a journalist in

23  Miami for all this time, I felt reasonably comfortable that it

24  was unlikely, unlike some of the other witnesses that may be

25  coming through.                                                    13:06:41

1    So, as a matter of procedure, I think the Court could

2    certainly query the jury about that, but I think that might

3    create more problems than it solves.  And the real danger here,

4    of course, is, is there a prejudice to the defense.  And the

5    defense was the one who called him.  And so, therefore, there          13:06:55

6    should be no prejudice in that regard.  Or to the extent there

7    was any, they would have waived it, is my position.  But I'm

8    open to other suggestions.

9    THE COURT:  Well, you can -- you can make that

10   determination in terms of whether or not you're waiving any          13:07:13

11   potential prejudice that a juror or jurors may be familiar with

12   him, whether in person or in writing, and you can let me know

13   in a few minutes while you ponder that.

14   The second issue that I have is with regard to

15   Ms. Mehlman-Orozco, who is on your list for this afternoon.           13:07:40

16   And here I went back into the docket.

17   And, Mr. Feder, at -- at what's lodged as

18   Document 500, you present a proffer of what she's going to

19   testify to.  And these are the areas that you proffered:  The

20   effect of imposing liability on Backpage for advertisements          13:08:11

21   placed by third parties, that's one area; the utility of online

22   commercial advertisements to law enforcement in identifying and

23   rescuing victims of sex trafficking, the second area; sex

24   trafficking and/or prostitution, third area; causation or lack

25   thereof; the practice of Backpage, Craigslist, Facebook,             13:08:39

1    Google, and other Internet providers as such practices pertain

2    to these issues.

3          And I note in the prior order, Document 1081 that was

4    filed by the Court in October of 2020, the -- the previous

5    order basically says that the liability with regard to Backpage          13:09:14

6    is a -- I think there's a "sic" in there -- is a role for the

7    jury.  Second, it is not relevant to this case whether online

8    commercial advertising has some use in identifying and rescuing

9    victims of sex trafficking.  And so those are areas that you

10   cannot go into.                                                           13:09:47

11         Now, then the Court goes further and says testimony

12   about the practices of Backpage may be relevant to -- to rebut

13   the government's expert testimony.  But here there have been no

14   government experts who have testified.

15         And then she -- the prior Court makes an observation     13:10:13

16   that there is vague -- vagueness as to then what is it that

17   this propounded expert's going to testify about.  And it goes

18   on to state that no testimony will be allowed as to the effect

19   of imposing liability on Backpage for advertisements placed by

20   third parties or any other policy testimony.                             13:10:40

21         And then it further goes on to say -- because there

22   are vagaries there, and one of them that -- that I'll point out

23   is -- is this area about the practices of Backpage and other

24   Internet providers as such practices pertain to these issues.

25   But in that motion in limine, the proffer of her testimony, you          13:11:07

1  do not explain what those issues are.

2       And so I need to know what those issues are to

3  determine whether they are relevant.  I -- in reading it, I

4  assume you were talking about moderation and aggregation.  I

5  don't know because it's unclear.  And so I'm going to adhere to          13:11:33

6  the prior order.

7       And I guess with those restrictions, then, can you

8  give me a proffer as to what this witness is going to testify

9  to?  Because at this juncture, if she's called, then I'll be --

10 before she testifies, I think it -- the government would be          13:11:56

11 entitled to voir dire her.

12      MS. BERTRAND:  Your Honor, may I be heard?  I'm the

13 person assigned to that witness.

14      THE COURT:  It was assigned -- okay.  Yes.  I'm sorry.

15 I kept referring to Mr. Feder because he filed the original          13:12:08

16 motion.  And I looked at her CV, which was attached, as well.

17      So, yes, Ms. -- I'm sorry.  I didn't mean to ignore

18 you there.  I thought Mr. Feder was taking this.

19      MS. BERTRAND:  That's okay.  We're here now.

20      And, also, I've spoken a little bit to the government          13:12:20

21 about this.  I -- I have no interest or desire to go anywhere

22 even near the bounds, the outer bounds of the Court's order at

23 1081.

24      I would note that the -- the government was allowed to

25 elicit in its case-in-chief opinion testimony through its law          13:12:38

1    enforcement witnesses and through Hyer and Ferrer regarding

2    what you can and cannot tell from an online escort ad.  And

3    that was allowed over objection for lack of notice as to an

4    expert.  So that would be one area that I think we can address,

5    is what you can and cannot tell from an online ad.                13:13:10

6         I have no -- no plan to go near the what happened

7    after Backpage shut down, has that had an impact on law

8    enforcement, anything like that.  Obviously, if the government

9    brings up anything like that in cross-examination, the --

10   that's on them.                                                   13:13:34

11        But my proffer would be as follows:  That we cannot --

12   I believe that this expert will testify that you cannot assume

13   that prost- -- that escorting or any other type of commercial

14   sex work equals prostitution.  And that has been a theme of the

15   government's case from its opening statement forward.  This --   13:13:57

16   Ms. -- Dr. Mehlman-Orozco's CV shows she's well-qualified to

17   talk about that.

18        Next would be that historically -- and I don't plan

19   that this is going to be lengthy testimony -- historically

20   commercial sex has been advertised for centuries.  And she can  13:14:21

21   offer examples.  She actually has examples of blue books from

22   brothel guides, basically, from New Orleans.  I told her we're

23   not putting those on because they weren't disclosed, but

24   there's an example of brothel guides.

25        Today in Las Vegas, just outside of the casinos, you       13:14:42

can find what are called Tart, T-A-T-R -- T -- T-A-R-T cards

that are basically little business cards with suggestively

dressed woman and, you know, $50 special.  We don't know boo

from looking at that ad what -- what that tart card is, what

it's for.                                                      13:15:07

    And then the last area that she would get into is

simply in her experience in responding to online ads, be they

on Backpage or other places, interviewing people who have

posted the ads, interviewing people who have responded to the

ads, responding to the ads herself, not as a customer but as a   13:15:30

researcher, that she can say you cannot assume that

prostitution will occur even based on a -- a very racy ad.  It

can be any number of possibilities going on in that ad.  And

until you're in the room talking with the other person, to the

extent there is another person, you don't know.                13:15:56

    That is the -- I just want to make sure I don't miss

anything, but that is what I anticipate she will testify to.

    I'll also note, while we're talking about her

testimony, so the Court knows, after the Court issued its order

yesterday regarding disclosure of prior communication with       13:16:18

witnesses, I had to go through and redact email, but I have

turned over to the government prior correspondence that

Dr. Mehlman --

            THE COURT:  Can I just interrupt one second?

            MS. BERTRAND:  Sure.                               13:16:34

1           (The Court and the courtroom deputy confer.)

2           MS. BERTRAND:  And I don't mind pending this

3    conversation, but I just want to let the Court know that I've

4    turned over both electronically and in print form redacted

5    correspondence where the expert is talking directly about        `13:16:49`

6    topics that may -- may touch on her potential testimony.  I did

7    not disclose scheduling and, like, here's where the courthouse

8    is, get here by 10:30, anything like that.  But substance I

9    have turned over to the government.

10          That -- that's where I see this going.  I don't expect    `13:17:06`

11   it to be lengthy testimony, but I certainly think it will be

12   helpful to the jury and pertain to issues that are the crux of

13   this case.

14          THE COURT:  Who is taking the witness?

15          MR. STONE:  I am, Your Honor.                             `13:17:24`

16          THE COURT:  Yes.

17          MR. STONE:  All right.  So just a couple points.

18          The disclosure -- okay.  So, as I understood -- let me

19   back up.

20          As I understood Ms. Bertrand's proffer, there were       `13:17:41`

21   three main areas that she was going to explore with this

22   witness:  One is what someone may be able to determine from an

23   online escort ad; two was historically commercial sex has been

24   advertised for centuries; and three was her response to certain

25   ads that had been posted.                                        `13:18:02`

1      I don't think that number 2, this historically

2 commercial sex has been advertised for centuries, is relevant.

3 I don't see on Doc. 500, page 6, which is this disclosure of

4 the topics that Dr. Mehlman-Orozco is going to testify about,

5 that that's included.  And even if it were, I -- it -- I don't      `13:18:25`

6 think it matters to the questions before this jury on whether

7 commercial sex has been advertised for centuries.  That's my

8 position on that.

9      The third category, this response to ads, that's

10 certainly not disclosed on Doc. 500.  And I don't quite know      `13:18:42`

11 what the relevance would be on that, but that seems to have --

12 that would have been a fairly straightforward disclosure.  And

13 that's not included, unless the argument is when you write sex

14 trafficking and/or prostitution in any topic, touching that

15 would be included.  But I think you need more under Rule 16,      `13:19:04`

16 certainly the new Rule 16.  The -- arguably, we were under the

17 old Rule 16 when this was -- when this occurred.

18      The first topic of what you can tell from an online

19 escort ad, I think that's likely fair game, and she could ask

20 questions about her opinion on this.  She's been -- as I      `13:19:23`

21 understand it, she's testified as an expert in other cases --

22 cases.  She's testified on behalf of Backpage in other cases.

23 So I think that would be fair to explore that.  And then

24 certainly the government would cross her on that topic.

25      But I think the topics 2 and 3 really shouldn't be      `13:19:39`

1    part of this witness's examination.

2         THE COURT:  Well, I will just say, because the

3    disclosure was vague as to what her testimony was, I was

4    inclined not to permit her to testify.  But it is true that the

5    government has put forth numerous witness testimony about law        13:20:07

6    enforcement opinions as to the ads that were placed, and

7    non-law enforcement opinions about those ads that were placed

8    on Backpage, which are the subject of the indictment.

9         So I -- I do believe that Ms. Mehlman-Orozco should be

10   permitted to testify about what you can or cannot tell from an      13:20:34

11   ad that has been placed on Backpage or that may be in -- in

12   evidence and that she can express whether or not you can assume

13   that prostitution occurs because of those advertisements.

14        I do find that it is going to be irrelevant and

15   confuse -- confusing as to any sort of historic content --          13:21:09

16   context with regard to prostitution ads, whether it be -- they

17   be etched on rock or on parchment, or now on the Internet.  I

18   think that's irrelevant.  And certainly I think her responding

19   to these ads, first of all, is kind of curious, but it's not

20   relevant.                                                            13:21:37

21        So she -- she can go into that limited area once you

22   lay the foundation for her background and expertise in the

23   area.

24        And so --

25        MS. BERTRAND:  Your Honor, if I may -- may I come up?         13:21:52

```
 1            THE COURT:  Yes.  Yes.
 2            MS. BERTRAND:  We need to still finish up with
 3    Mr. Strouse --
 4            THE COURT:  Yes.
 5            MS. BERTRAND:  -- but I would just ask before we put    13:22:03
 6    Dr. Mehlman-Orozco on the stand I have just two minutes to tell
 7    her what the parameters --
 8            THE COURT:  Yes.
 9            MS. BERTRAND:  -- of what the Court orders are so
10    things go smoothly --                                          13:22:16
11            THE COURT:  Yes.
12            MS. BERTRAND:  -- once she's up on the stand?
13            THE COURT:  Absolutely.  I appreciate that.  Fair.
14            MS. BERTRAND:  All right.  Thank you.
15            THE COURT:  Now, with regard to this witness who's on   13:22:22
16    the stand, Mr. Cambria, you called him as a witness --
17            MR. CAMBRIA:  Yes.
18            THE COURT:  -- and so I assume that you are waiving
19    any allegation of prejudice because we had not given the jury
20    an opportunity to know his identity before they were seated?   13:22:42
21            MR. CAMBRIA:  Correct.
22            THE COURT:  Ms. Bertrand?
23            MS. BERTRAND:  Correct.
24            THE COURT:  Mr. Lincenberg?
25            MR. LINCENBERG:  Yes, Your Honor.                       13:22:52
```

UNITED STATES DISTRICT COURT

1    THE COURT:  Mr. Feder?

2    MR. FEDER:  Yes.

3    THE COURT:  Mr. Eisenberg?

4    MR. EISENBERG:  Yes, Your Honor.

5    THE COURT:  All right.  So the Court will not make the    13:23:00

6  inquiry of the jury.

7    All right.  With that, let's have the witness in, and

8  then we can bring the jury in.

9    Sir, you may resume the seat.

10    THE WITNESS:  Should I be standing?    13:24:02

11    THE COURT:  I'll tell you when.

12    THE WITNESS:  Okay.  All right.

13    THE COURT:  All rise for the jury.

14    I thought I heard them.

15    (Jury present at 1:25 p.m.)    13:25:34

16    THE COURT:  All right.  Please be seated.

17    And thank you for your patience, members of the jury.

18    The record will reflect the witness is on the witness

19  stand.

20    And, Mr. Berry, you may continue your examination.    13:26:09

21    MR. BERRY:  Thank you, Your Honor.

22              CROSS-EXAMINATION (Cont'd)

23  BY MR. BERRY:

24  Q.  Good afternoon, Mr. Strouse.  When we left off before

25  lunch, we were talking a little bit about the $5,000 check that    13:26:23

CHARLES STROUSE - CROSS-EXAMINATION (Cont'd)                    17

 1   you received.

 2           Do you recall that?

 3   A.  Yes, sir.

 4   Q.  Okay.  And do you think that receiving that money affects

 5   your credibility to be here to testify on behalf of Mr. Lacey?    13:26:37

 6   A.  No, I don't think so.

 7   Q.  Now, you're a professor of journalism; correct?

 8   A.  Yes, sir.

 9   Q.  So you're familiar with journalism ethics?

10   A.  Yes, sir.                                                      13:26:48

11   Q.  One of those ethics is to act independently; correct?

12   A.  Yes, sir.

13   Q.  And one of the ways that you can act independently is to

14   avoid conflicts of interest; correct?

15   A.  Yes, sir.                                                      13:27:02

16   Q.  And another way to act independently is to disclose

17   conflicts of interest that are unavoidable, because that

18   sometimes happens; correct?

19   A.  Yes, sir.

20   Q.  And so you want to disclose and for the purpose of           13:27:16

21   transparency; correct?

22   A.  Yeah.

23   Q.  Is that a yes?

24   A.  That's a yes, sir.

25   Q.  Okay.  So why didn't you disclose that $5,000 in your       13:27:25

1  direct exam?

2  A.  Why didn't I disclose it what?  Please repeat.

3  Q.  The $5,000 that the person who called you here to testify

4  had paid you, why didn't you disclose that when Mr. Cambria was

5  talking to you?                                                13:27:40

6  A.  I'm not writing a story about this proceeding in any way.

7  I haven't.  I won't.  I'm here.  And so it's not a journalistic

8  thing.  Moreover, when you asked me about it, I disclosed it.

9  So I think -- I don't think I hid anything.  I don't think I

10 was dishonest in any way.                                      13:28:00

11 Q.  You didn't think it was important to bring up before?

12 A.  As I understand it, courts work where the -- you ask me

13 questions and I answer them, which is somewhat different than

14 if I'm a journalist and I'm asking you questions.

15 Q.  Fair enough.                                               13:28:16

16         One of the questions I asked you previously was about

17 your knowledge of the content of Backpage; correct?

18 A.  Correct.

19 Q.  And you testified that you were still at the Miami New

20 Times when Mr. Lacey left with Backpage and the papers went    13:28:30

21 with some other folks; right?

22 A.  Yes, sir.

23 Q.  In fact, you wrote about that on September 24th, 2012, in

24 the Miami New Times, didn't you?

25 A.  I -- I -- if I did, I don't remember.                      13:28:42

1    Q.   Okay.

2    A.   But I --

3    Q.   Do you have any reason to dispute the fact that you wrote

4    something about how Lacey and Larkin had gone off with Backpage

5    and were no longer part of the New Times?                         13:28:57

6    A.   I don't remember that column.  If I did -- I mean, I've

7    written roughly 10,000 pieces of journalism in my career, and I

8    don't remember that one, no.

9    Q.   Sure.

10        MR. BERRY:  May I approach the witness, Your Honor?          13:29:13

11        MR. CAMBRIA:  Do you have a copy for me?

12        MR. BERRY:  I do.

13        MR. CAMBRIA:  Thank you.

14        THE COURTROOM DEPUTY:  Staple it.

15        MR. BERRY:  It's on -- oh, sorry.  Yeah.                     13:29:29

16   BY MR. BERRY:

17   Q.   I'm showing you what's been marked as Government's

18   Exhibit 3002.

19        Do you see that, sir?

20   A.   Yes, sir.                                                    13:29:47

21   Q.   Do you recognize it?

22   A.   Yes, sir.

23        Well, do I recognize the logo of the paper and the

24   four paragraphs that I wrote as an intro to somebody else's

25   work?  Yeah.                                                      13:30:05

CHARLES STROUSE - CROSS-EXAMINATION (Cont'd)
20

```
 1    Q.  Do you recognize your own by line?
 2    A.  Yes, sir.
 3    Q.  It has your name on it; right?
 4    A.  Yep.
 5    Q.  So that you're the author of this; correct?              13:30:10
 6    A.  Yes, sir.
 7    Q.  To the public, to the world, this looks -- this is put out
 8    by the Miami New Times as something you said; correct?
 9    A.  Can I explain what this is or --
10    Q.  It's a yes-or-no question.                               13:30:25
11         Did you put it out under your by line?
12    A.  Yes.
13    Q.  And isn't that intended to inform the public of who wrote
14    it?
15    A.  To be, as you said, transparent, yes.                    13:30:34
16    Q.  Okay.  Are you suggesting that you did not write it?
17    A.  Can I explain what this is?
18    Q.  I'm asking, are you saying to this jury that you did not
19    write this?
20    A.  I'm saying, yes, I wrote the four-paragraph intro to --   13:30:49
21    what you didn't print here was what this was about.  This was a
22    four-paragraph intro into a note.  And it says there was a
23    note -- note from corporate that follows.
24    Q.  Sure.  Okay.  I'm tracking you now.  I'm tracking you.
25         What your -- your complaint is that what I did not       13:31:08
```

```
 1    include was someone else's words?
 2    A.  Yes, sir.
 3    Q.  Right.  So I did not include Mr. Lacey and Mr. Larkin's
 4    words underneath the part that says "Mike and Jim's note";
 5    correct?
 6    A.  Correct.
 7    Q.  But I did include your words; correct?
 8    A.  Yes, sir.
 9    Q.  All right.  So that's what I want to focus on, is your
10    words --
11    A.  Okay.
12    Q.  -- okay?  You're on the stand.  That's who I want to talk
13    about right now.  Okay?
14         I'll give you a second to read it.  It looks like --
15    A.  Uh-huh.
16    Q.  -- you're reading it right now.
17    A.  Okay.
18    Q.  Are you done?
19    A.  Yes, sir.
20    Q.  Okay.  Great.
21         I want to draw your attention to paragraph 3.
22    A.  Okay.
23    Q.  Okay.  It starts with, "The big news."
24         Do you see that?
25    A.  Uh-huh.
```

13:31:24

13:31:32

13:31:42

13:32:23

13:32:34

UNITED STATES DISTRICT COURT

```
 1    Q.  What was the big news?

 2    A.  Do you want me to read it?

 3    Q.  Sure.

 4    A.  "The big news in all of this is that Miami New Times and

 5    New Times Broward Palm Beach" -- both of which I oversaw at the    13:32:44

 6    time --

 7    Q.  Let's stop there.  That's not what it says, does it?

 8    A.  I'm sorry.  I was explaining that.

 9            -- "will have nothing more to do with Backpage.com,

10    the much maligned website that has been accused of further" --    13:32:54

11    "furthering underage sex trafficking."

12    Q.  You wrote that?

13    A.  Yes.

14    Q.  All right.  And then in the final paragraph, the last

15    sentence, you start it, "But I look forward."                      13:33:09

16            Do you see that?

17    A.  Uh-huh.

18    Q.  What did you say there?

19    A.  "But I look forward to more of the award-winning work we

20    have done in South Florida without the baggage of this            13:33:22

21    website."

22            MR. BERRY:  Pass the witness.

23            THE COURT:  Mr. Cambria?

24            MR. CAMBRIA:  Yeah.

25        ///
```

```
 1                    REDIRECT EXAMINATION
 2  BY MR. CAMBRIA:
 3  Q.  This makes reference to a note.  Were you responding to a
 4  note or commenting on a note?
 5        Do you see the bottom?                              13:33:50
 6  A.  Yes.
 7  Q.  Yeah.  Do you remember what the note was about?
 8  A.  Yes.
 9  Q.  What was that?
10        MR. BERRY:  Objection.  Hearsay, Your Honor.        13:33:56
11        MR. CAMBRIA:  Well, under 106, it seems to me, Your
12  Honor, he says this was a comment on a note, so we need to know
13  what the note is.
14        THE COURT:  Well, he can generally explain what his
15  understanding of the note was without -- well, it's not even   13:34:10
16  before him in terms of the content.  So I'll give you some
17  leeway.
18  BY MR. CAMBRIA:
19  Q.  Go ahead.
20        THE COURT:  And describe what the note was about.   13:34:21
21        THE WITNESS:  The note was about the guys who had
22  founded the paper separating from it.  And it was a lengthy
23  note.  There are four paragraphs that I wrote, and then there
24  was a lengthy note from them saying why they were leaving and
25  what exactly was happening.                               13:34:39
```

CHARLES STROUSE - REDIRECT EXAMINATION
24

```
 1   BY MR. CAMBRIA:
 2   Q.  Okay.
 3   A.  Now the exact detail of that I don't remember because it
 4   was 11 years ago, but I -- you know, you do this kind of thing
 5   fairly often.  You get something from corporate.          13:34:48
 6           THE COURT:  All right.  So --
 7           THE WITNESS:  Okay.
 8           THE COURT:  -- you've answered the question.  Thank
 9   you.
10           THE WITNESS:  Okay.  Thank you.                   13:34:55
11   BY MR. CAMBRIA:
12   Q.  Okay.
13   A.  Sorry.
14   Q.  With regard to -- you were asked about what you had read
15   concerning -- I'm making these things tweak here -- what you  13:35:05
16   had read concerning Backpage, if you'd read any articles, and
17   so on; correct?
18   A.  Yes, sir.
19   Q.  All right.  Do you remember you mentioned reading --
20   reading a Reason article?                                 13:35:19
21   A.  Yep.
22   Q.  Do you remember what that was about?
23           MR. BERRY:  Objection, Your Honor.  This is going to
24   call for hearsay.
25           MR. CAMBRIA:  They introduced it and asked him about  13:35:28
```

UNITED STATES DISTRICT COURT

```
 1  what he read.
 2          THE COURT:  Sustain the objection.
 3  BY MR. CAMBRIA:
 4  Q.  Well, do you remember what the government asked you as far
 5  as the other articles that you read -- that you read, or not?      13:35:44
 6  A.  What the government asked me about the other articles?
 7  Q.  Yeah.
 8  A.  He asked me where I read them and what content was, I
 9  think.  I don't remember exactly.  No.
10  Q.  Well, what was the content of the Reason article?             13:36:02
11          MR. BERRY:  Objection again.  Calling for hearsay.
12          MR. CAMBRIA:  They opened this door.
13          THE COURT:  Well, sustained.
14          MR. CAMBRIA:  My position is they opened --
15          THE COURT:  Well --                                      13:36:17
16          MR. CAMBRIA:  -- this door, Your Honor.
17          THE COURT:  -- and the government -- the jurors may
18  use their own recollection, but I'll sustain the objection
19  because he didn't remember.
20          MR. CAMBRIA:  Well, he --                                13:36:30
21          THE COURT:  So --
22          MR. CAMBRIA:  -- didn't say he didn't remember, Your
23  Honor.
24          THE COURT:  Well, go ahead and ask him, and then we'll
25  see what happens.                                                13:36:38
```

UNITED STATES DISTRICT COURT

CHARLES STROUSE - REDIRECT EXAMINATION

26

 1              MR. CAMBRIA:  Okay.

 2              THE COURT:  How's that?

 3              MR. CAMBRIA:  The floor's not going to fall out here,

 4    is it?  Okay.

 5              THE COURT:  You keep accusing me of putting a trapdoor        13:36:45

 6    there.

 7              MR. CAMBRIA:  Yeah.  I -- let's see what happens.

 8    BY MR. CAMBRIA:

 9    Q.  Well, let's start this way generally:  Do you remember what

10    the *Reason* Article contained?                                         13:36:56

11    A.  I remember that the *Reason* article generally cleared --

12              MR. BERRY:  Objection.  That's a yes-or-no question.

13              THE COURT:  Sustained.

14              You can answer yes or no, sir.

15    BY MR. CAMBRIA:                                                         13:37:07

16    Q.  So you do generally remember what --

17    A.  Yes.

18    Q.  -- the article said?

19              All right.  And can you give us an indication as to

20    what the content was?                                                  13:37:16

21    A.  My memory is that the article looked at the big picture and

22    declared that the prosecution was not really justified.

23              MR. BERRY:  Objection, Your Honor.  This is the --

24    precisely the hearsay that I was objecting to.

25              THE COURT:  Sustained.                                       13:37:37

CHARLES STROUSE - REDIRECT EXAMINATION
27

```
 1              The jury will disregard the last question -- excuse
 2    me -- the last statement.
 3              MR. FEDER:  Judge, just for the record, this is not
 4    for the truth but for something different.
 5              THE COURT:  It's Mr. Cambria's witness.          13:37:52
 6              MR. CAMBRIA:  Yeah.  No, I agree with that, Your
 7    Honor.
 8              THE COURT:  All right.
 9              MR. CAMBRIA:  I'm just going step by step here.
10              THE COURT:  Go ahead.                            13:38:00
11              MR. CAMBRIA:  And we're offering it for, you know,
12    what he -- they asked him about what things were you exposed
13    to, and so on.  I'm now asking him, and he identified this.  So
14    now I'm asking him what was the exposure.
15              THE COURT:  And he answered the question, so let's  13:38:16
16    move forward.
17    BY MR. CAMBRIA:
18    Q.  And so what -- what -- I'm sorry.  What was the exposure?
19              In other words, what were you exposed to in this
20    article information-wise?                                 13:38:24
21              MR. BERRY:  Objection, Your Honor.  Again, calling for
22    hearsay.
23              THE COURT:  Sustained.
24              He answered the question, so let's move on.
25              MR. CAMBRIA:  All right.                         13:38:40
```

UNITED STATES DISTRICT COURT

CHARLES STROUSE - REDIRECT EXAMINATION                28

```
 1   BY MR. CAMBRIA:
 2   Q.  Did the -- was the article in contrast to the other
 3   articles they asked you about?
 4   A.  Yes.
 5   Q.  And was the article indicating that Backpage was --        13:38:54
 6         MR. BERRY:  Again, objection, Your Honor.  He's about
 7   to introduce hearsay in the content of his question.
 8         THE COURT:  Sustained --
 9         MR. CAMBRIA:  Okay.
10         THE COURT:  -- as -- as to the attempt.                  13:39:11
11         I'll ask you to be cautious and rephrase, Mr. Cambria.
12         MR. CAMBRIA:  All right.
13   BY MR. CAMBRIA:
14   Q.  So of the articles that they asked you about that you read,
15   this one -- was this one contrary to the others that they      13:39:28
16   referred to and asked you about?
17         MR. BERRY:  Objection.  Asked and answered.
18         THE COURT:  Overruled.
19         You may answer, sir.  Yes or no?
20         THE WITNESS:  Yes.                                       13:39:45
21   BY MR. CAMBRIA:
22   Q.  Okay.  You were asked about this check.  When did this
23   check happen?
24   A.  In the neighborhood of 2016, I believe is what --
25   Q.  All right.  So that was quite some time ago.               13:40:03
```

UNITED STATES DISTRICT COURT

CHARLES STROUSE - REDIRECT EXAMINATION
29

```
 1          All right.  And was it your understanding that you
 2   were the only one who received a check like this?
 3   A.  No, sir.
 4   Q.  We had some testimony from another witness that -- who had
 5   said they received --                                            13:40:26
 6          MR. BERRY:  Objection, Your Honor --
 7   BY MR. CAMBRIA:
 8   Q.  -- in this case --
 9          MR. BERRY:  -- in what Mr. Cambria is about to
10   introduce to this witness, who has not been able to watch the    13:40:31
11   testimony for a reason.
12          THE COURT:  Sustained.
13          MR. CAMBRIA:  Your Honor, I'm asking about something
14   that has been testified to in this case today.
15          THE COURT:  Well, you're restating testimony of a         13:40:41
16   witness, and --
17          MR. CAMBRIA:  I was going to ask him.
18          THE COURT:  -- and -- and it would be improper,
19   especially because the jury has to make that determination as
20   to what the witness testified to.                                13:40:51
21          So go ahead.
22          MR. CAMBRIA:  Okay.
23   BY MR. CAMBRIA:
24   Q.  Was it ever called to your attention that Mr. Lacey had
25   sent checks out to former writers and editors as a thank you     13:41:01
```

UNITED STATES DISTRICT COURT

CHARLES STROUSE - REDIRECT EXAMINATION                30

1  for the years they've worked together?

2  A.  Could you repeat that?  I couldn't quite hear you.

3  Q.  I said, did it come to your attention that Mr. Lacey had

4  sent checks out to editors and writers he had worked with in

5  the past as a thank you?                                    13:41:19

6  A.  Yes.

7  Q.  And is that your understanding of the check you got?

8  A.  Yeah.

9  Q.  All right.  And the fact that you got that check, did that

10 influence the truth or not of what you were telling us here    13:41:39

11 today, what you testified to?

12 A.  In no way.

13          MR. CAMBRIA:  All right.  That's all.

14          Thank you.

15          THE COURT:  Thank you.                              13:41:48

16          May the witness be excused from subpoena?

17          Mr. Cambria?

18          MR. CAMBRIA:  Yes, Your Honor.

19          THE COURT:  All right.

20          MR. BERRY:  No objection.                           13:41:58

21          THE COURT:  All right.  Sir, we thank you for your

22 testimony.  You are excused from subpoena.  You may step down

23 and leave the courtroom.

24          THE WITNESS:  Thank you.

25          THE COURT:  All right.                              13:42:06

UNITED STATES DISTRICT COURT

 1              The government may call its next witness.

 2              And I'll give you two minutes, Ms. Bertrand.

 3              MS. BERTRAND:  And it's -- it's been 22 years, but I'm

 4    no longer with the government.

 5              THE COURT:  I'm sorry.  Sorry.  My -- my error.        13:42:15

 6              MS. BERTRAND:  That's okay.

 7              THE COURT:  I may need that coffee after all.

 8         (Brief pause.)

 9              THE COURT:  Ma'am, please come forward and be sworn by

10    my courtroom deputy.                                            13:43:51

11              THE COURTROOM DEPUTY:  Please raise your right hand.

12         (KIMBERLY MEHLMAN-OROZCO, a witness herein, was duly sworn

13    or affirmed.)

14              THE COURTROOM DEPUTY:  Could you state your full name,

15    and spell your last name for the record.                        13:44:06

16              MS. MEHLMAN-OROZCO:  Dr. Kimberly Mehlman-Orozco.

17    M-E-H-L-M-A-N, hyphen, O-R-O-Z-C-O.

18              THE COURTROOM DEPUTY:  Please proceed to the witness

19    stand.

20              THE COURT:  Whenever you're ready to proceed,          13:44:26

21    Ms. Bertrand.

22              MS. BERTRAND:  Thank you, Your Honor.

23                         DIRECT EXAMINATION

24    BY MS. BERTRAND:

25    Q.  Good afternoon, Doctor.                                     13:44:33

                   UNITED STATES DISTRICT COURT

```
 1   A.  Good afternoon.

 2   Q.  Ma'am, would you please introduce yourself to us starting

 3   with your educational background.

 4   A.  So, as I mentioned to the court reporter [sic], my name is

 5   Dr. Kimberly Mehlman-Orozco.  I am a PhD-educated              13:44:44

 6   criminologist.  So I have a PhD in criminology, a master's

 7   degree in justice law in crime policy, and a bachelor's degree

 8   in administration of justice.

 9   Q.  Okay.  Where are your degrees from?

10   A.  George Mason University.                                   13:45:00

11   Q.  And what do you -- we'll come back to your education in

12   just a moment.

13          What do you currently do for a living?

14   A.  I am CEO of Break the Chain, which is a company that

15   provides expert witness testimony in criminal and civil trials 13:45:15

16   related to human trafficking predominantly across the country.

17   I also serve as executive director of Freedom Light, which is a

18   nonprofit that provides training and technical assistance to

19   businesses that are looking to combat trafficking.

20          THE COURT:  Ma'am, I'm going to ask you to be very      13:45:32

21   conscious of your cadence while speaking.  You are speaking

22   very quickly.  And so we have the court reporter here, and so I

23   want to make sure that we get everything that you're saying on

24   the record.  And just be mindful that you do speak very

25   quickly.                                                       13:45:50
```

UNITED STATES DISTRICT COURT

```
 1              THE WITNESS:  I apologize, Your Honor.  That's not the

 2    first time I've heard that.  I'm from the east coast, so please

 3    pardon that.

 4              THE COURT:  Thank you.

 5    BY MS. BERTRAND:                                          13:45:59

 6    Q.  So with regard -- let's go back to your education.  Your --

 7    your bachelor's degree was in?

 8    A.  It's in administration of justice.  I graduated cum laude

 9    with honors from George Mason University.

10    Q.  In general terms, what does a degree in administration of   13:46:12

11    justice entail?

12    A.  For all three degrees, just simply speaking, it's a degree

13    in criminology.  I am a criminologist, but my area of expertise

14    is in the commercial sex industry and sex trafficking.

15    Q.  What does it mean to be a criminologist?              13:46:32

16    A.  It's a type of social scientist who studies crime.  I'm

17    trained in qualitative and quantitative research methods.  So

18    conducting interviews, in -- in writing my books, in my

19    peer-review journal articles I've conducted qualitative

20    interviews with convicted traffickers, commercial sex         13:46:58

21    consumers, victims of trafficking, as well as consenting sex

22    workers.  So a lot of interviews as well as quantitative

23    research.  So evaluation of high-level statistics.  For

24    example, the FBI's Uniform Crime Report and things like that.

25    Q.  So for lay people, qualitative is more -- oops --       13:47:16
```

1    interviews, re- -- reading, research.  Quantitative is math.

2    Fair?

3    A.  I think that's a --

4    Q.  Is that a --

5    A.  -- fair description.                                            13:47:31

6            So quantitative, you're trying to quantify a

7    phenomenon.  You're looking at statistical data or information.

8    So sort of the what of an issue; prevalence, incidents, things

9    like that.

10           And with qualitative interviews, so conducting          13:47:44

11   in-depth interviews with people, you're looking at the why, so

12   why something might happen.

13   Q.  And your master's degree is also in administration of

14   justice?

15   A.  It's in justice law and crime policy, but, again, it's all    13:47:57

16   within the -- the field of criminology.

17   Q.  What was your master's research focused on?

18   A.  I believe at the time I was looking at crime -- incidents

19   of crime among foreign national populations.  Because when I

20   finished my master's program, as well with my PhD, there          13:48:20

21   weren't any -- any quantitative data collections on commercial

22   sex or sex trafficking, and my department was heavily

23   quantitative.  So the FBI had not yet had even a data point on

24   sex trafficking.  So there wasn't a quantitative data at the

25   time.                                                             13:48:39

KIMBERLY MEHLMAN-OROZCO - DIRECT EXAMINATION
35

1  Q.  When did you get your master's?

2  A.  My master's was conferred -- there -- I think at the end of

3  2009, and my PhD in 2012.

4  Q.  And for your PhD, did you have to write and defend a

5  thesis?                                                          13:48:53

6  A.  Yes.  A dissertation.

7  Q.  What was your dissertation on?

8  A.  It was on the 287(g) program, again, related to immigration

9  and crime.  Because at -- in 2012, there wasn't a quantitative

10  data point on sex trafficking.                                  13:49:07

11  Q.  So at some point you started studying sex working?

12  A.  So I took a number of graduate-level courses for -- to

13  confer my degrees.  For example, one of my courses during

14  graduate school was human smuggling and human trafficking

15  taught by Dr. Loui Shelley, who's another scholar that studies  13:49:28

16  sex work, sex trafficking, human trafficking.  So several of my

17  classes focused on that for my graduate-level coursework.  But

18  my research in the field, I would say, became more heavily

19  focused on trafficking after my graduation.

20  Q.  What year do you think you started really looking at        13:49:47

21  this -- this -- it's a broad area, but when did you start

22  looking at sex work?

23  A.  I would say I started looking at it in graduate school, so

24  in 2006.  But when I started to be more heavily focused, I

25  would say once the FBI released data on sex trafficking, which  13:50:04

UNITED STATES DISTRICT COURT

1    was in 2013, and I think it was published in 2014.  So the

2    FBI's Uniform Crime Report had that first data point collected

3    in 2013 on sex trafficking.

4    Q.  And let's start with just an estimate.  How many

5    peer-reviewed publications do you have?                          13:50:26

6    A.  So some might consider my book peer reviewed because it was

7    reviewed by peers and published in an academic press.  It's

8    used to train law enforcement on how to identify trafficking.

9    But as far as peer-reviewed journal articles, I think maybe

10   four, two of which I was the sole author on.  So I would say    13:50:51

11   that might encompass peer-reviewed journal articles.

12   Q.  And those -- let's -- let's start with the -- the journal

13   articles.  In general terms, what were the topics of those

14   publications?

15   A.  So two of them are on human trafficking identification      13:51:10

16   among dentists.  So those were the co-authored articles.

17         But the other two, one was related to safe harbor

18   laws, specifically safe harbor laws where further -- there are

19   state laws that further decriminalize sex work for minors.  And

20   so it was looking after a safe harbor law was passed whether    13:51:36

21   minors continued to be arrested for prostitution.  So that's

22   one of the articles.

23         The other one was a peer-reviewed journal article that

24   published my in-depth qualitative interviews with convicted sex

25   traffickers, which is also published in my book, but it was a   13:51:51

1   more in-depth scholarly piece.  And I think that was in The

2   Journal of Trends in Organized Crime.  But I also actively

3   serve as a peer reviewer for journals.

4   Q.  We'll get to that.

5       You mentioned that your -- your -- you have a book          13:52:08

6   that is used for law enforcement training?

7   A.  Yes, ma'am.

8   Q.  Would you please share the title of the book, and then

9   we'll talk in more specifics.

10  A.  The title of the book is Hidden in Plain Sight:  America's   13:52:20

11  Slaves of the New Millennium.  That's the subtitle.  That's the

12  one that's used to train law enforcement on human trafficking

13  identification.

14  Q.  And have you written any other books?

15  A.  Yes.  I also have a book on terrorism.  I have a couple of   13:52:37

16  children's books that are related to exposing kids to the risks

17  of trafficking in a kid-friendly way.  And I'm working on my

18  third book that looks at the evolution of commercial sex in the

19  United States and intersection with sex trafficking.

20  Q.  Do you -- have you taught at the college level or higher?    13:53:03

21  A.  Yes.

22  Q.  All right.  Could you please describe -- describe for the

23  jury the type of coursework you have taught.

24  A.  I have taught courses at my alma mater, George Mason

25  University, as well as the number 1 ranked criminology school   13:53:21

 1   in the country, which is University of Maryland College Park.

 2          My courses include introduction to criminology or

 3   introduction to criminal justice, race, and crime.  I had a

 4   special topics course that I designed on foreign nationals in

 5   crime that heavily focused on sex trafficking and smuggling,        13:53:39

 6   similar to the courses that I've taken.  But I taught a number

 7   of different courses.  And I think I did one directed study at

 8   a PhD level, I think at Prescott College, and that was a sex

 9   trafficking course.

10   Q.  What -- by "directed study," is that where someone's          13:53:58

11   working on their PhD and you're, like, their advisor?  Is

12   that -- or something like that?

13   A.  Sort of.  It's like an independent study.  So you don't

14   have a class, you don't have regular lectures, but you are

15   working with that person towards a publishable piece, for          13:54:14

16   example, or a thesis paper.

17   Q.  You mentioned that you -- you do peer review yourself.

18   Could you please explain that work, and then we'll talk about

19   for whom you've done that type of peer review.

20          What does that mean, to do peer review for journals?       13:54:33

21   A.  So to get an academic study published, you don't just

22   submit it to an editor.  Typically the editor will send it out

23   to a peer-review panel of other experts within the field on a

24   particular subject matter.  They give ratings, and they

25   basically state whether their recommendation is to publish the     13:54:52

UNITED STATES DISTRICT COURT

```
 1    piece, to do a revise and resubmit, or to reject it.
 2            And so editors will look for people who have
 3    experience in certain areas relevant to the subject matter
 4    that's being put forth.  I actively serve as a peer reviewer
 5    for The Journal of Human Trafficking.                          13:55:10
 6    Q.  And what types of articles have you peer reviewed for that
 7    journal, if you recall?
 8    A.  Articles on human trafficking.
 9    Q.  Okay.  I guess -- I wasn't sure if there were, like,
10    specific --                                                    13:55:24
11    A.  I did give you one example of which that is in print.  So
12    one example of which that did go to print was an article that
13    was put forth by researchers at Harvard University and the
14    Department of Homeland Security.  They were doing an evaluation
15    of their training protocols to see whether there was an        13:55:41
16    evidence base or whether there was information retained from
17    the Blue Campaign Training.  So I was a peer reviewer for that
18    study.  It is now in print as of 2023.  So that's a recent one.
19    Q.  Doctor, is this the first time you have testified in a
20    federal courtroom?                                             13:56:05
21    A.  No, ma'am.
22    Q.  Can you give an estimate as to how many times you have
23    testified in a federal matter.
24    A.  At trial or during a Daubert hearing or been admitted?
25    Q.  Generally.  Let's just start with how many times you've    13:56:24
```

UNITED STATES DISTRICT COURT

```
 1   testified, and then we'll break that down.

 2   A.  So you only want federal, not state; correct?

 3   Q.  If they're running together, we can just note that, but --

 4   A.  Okay.  It's just hard for me to delineate because I do

 5   civil and criminal, and there's federal and state.  And I would    13:56:42

 6   say maybe a half dozen times.

 7   Q.  Federal?

 8   A.  Federal.

 9   Q.  What about state courts?

10   A.  Also maybe a half dozen.  A lot of cases don't make it to      13:56:52

11   trial.

12   Q.  Uh-huh.

13   A.  So I didn't testify, but I might have been disclosed,

14   something like that.

15   Q.  And you mentioned a difference between what lawyers call a      13:57:01

16   Daubert, D-A-U-B-E-E -- D-A-U-B-E-R-T, hearing versus a trial.

17   But, in general terms, you kind of lump those together for the

18   half dozen times in federal court?

19   A.  Yes, ma'am.

20   Q.  Same thing in state court?                                     13:57:24

21   A.  Yes.

22   Q.  And in those times that you testified in federal court, was

23   that as an expert witness?

24   A.  Yes, ma'am.

25   Q.  Same thing in state court?  Was that as a expert witness?      13:57:41
```

1    A.  Yes, ma'am.

2    Q.  Are you on -- if you know, are you on any expert witness

3    panels?

4    A.  Yes.  I'm the only human trafficking expert admitted to the

5    Los Angeles -- sorry.  I'm going to try to speak slower.  I get          13:57:58

6    this every time I testify -- at the Los Angeles Superior Court

7    Panel of Experts.  I'm the only human trafficking expert, to my

8    knowledge, admitted to that panel since 2017, I believe.

9    Q.  When you have testified in federal court, whether it's in

10   a -- a pretrial hearing or in a trial, have you testified for          13:58:21

11   only one side or either side, prosecution and defense, or --

12   oops -- both?

13   A.  I typically --

14          MS. BERTRAND:  Bless you.

15          THE WITNESS:  Bless you.                                        13:58:38

16          I typically am retained by a prosecution, but I do

17   both.

18   BY MS. BERTRAND:

19   Q.  Do you do any other work for the United States Department

20   of Justice currently?                                                  13:58:59

21   A.  Not currently, but I recently served as a peer reviewer for

22   the Office of Justice Programs National Institute of Justice

23   for grant proposals that were submitted by nonprofits.  So they

24   had contacted me to serve as a paid peer reviewer, I think,

25   last year.                                                             13:59:20

```
 1    Q.  And in what type of context were these nonprofits applying
 2    for grants?
 3    A.  I can't speak to specifics for privacy reasons --
 4    Q.  Oh, okay.
 5    A.  -- but, generally speaking, it were -- it was nonprofits,      13:59:34
 6    law enforcement organizations, service providers that put forth
 7    research proposals that they were seeking funding for looking
 8    at human trafficking issues.
 9    Q.  Thank you.
10          MS. BERTRAND:  At this point, Your Honor, I would like      13:59:50
11    to proceed treating Dr. Mehlman-Orozco as a -- as an expert.
12          THE COURT:  Is there an objection?
13          MR. STONE:  In what area?
14          MS. BERTRAND:  Human trafficking and prostitution.
15          MR. STONE:  No objection.                                   14:00:08
16          THE COURT:  Yes, she may be so treated.
17          MS. BERTRAND:  All right.  Thank you.
18    BY MS. BERTRAND:
19    Q.  All right.  We talked a little bit about the types of
20    research that you've done.  In conducting that research, have     14:00:18
21    you reviewed online commercial sex advertisements?
22    A.  Yes, ma'am.
23    Q.  Overall, in different forums, how many of these
24    advertisements do you think you've reviewed for your research?
25    A.  During the entirety of my career?                            14:00:45
```

KIMBERLY MEHLMAN-OROZCO - DIRECT EXAMINATION

43

```
 1    Q.   Yes.
 2    A.   I couldn't quantify, but my estimation would be tens of
 3    thousands, if not hundreds of thousands.
 4    Q.   And have you had the opportunity in reviewing those
 5    advertisements to also meet any of the people who placed the    14:01:06
 6    advertisements?
 7    A.   Yes, ma'am.
 8    Q.   And what about meeting people who were responding to the
 9    advertisements?
10    A.   Yes, ma'am.                                                 14:01:24
11    Q.   And as part of your research, have you responded to
12    advertisements?
13    A.   For research purposes, yes.
14    Q.   Okay.  Okay.  What types of advertisements have you
15    responded to for research purposes?                             14:01:41
16    A.   Advertisements for erotic massage, for -- for things that
17    were a little bit more vague but in personal sections.  So in
18    personal sections, sending surveys, sending -- looking for
19    respondents.
20         So it's a methodology.  I know this might sound a          14:02:02
21    little odd, but when you're looking at clandestine populations,
22    like commercial sex consumers or commercial sex providers or
23    people who fall under that general umbrella, there is no
24    sampling frame for you to sample from.
25         So responding to the ads and collecting information is     14:02:21
```

KIMBERLY MEHLMAN-OROZCO - DIRECT EXAMINATION

44

1    a known methodology sometimes known as snowball sampling, where

2    you're looking for a seed, and they're referring you to others

3    for conducting qualitative research in the field, so ...

4    Q.  You've mentioned a phrase, and I want to make sure we all

5    understand what the -- the meaning is as you're using it.  You          14:02:39

6    mentioned "commercial sex."

7           When you use the phrase "commercial sex," what type of

8    conduct are you referring to?

9    A.  I think that the term "commercial sex" encompasses a myriad

10   or a wide variety of different sub-activities.  Some                     14:03:03

11   potentially consensual; some nonconsensual.  It can include

12   webcam girls.  It can include BDSM clubs.  It can include --

13   Q.  Let's go slow.  All right.

14          Webcam girls, like OnlyFans, thing likes that?

15   A.  It can be OnlyFans.  It can be other subscription-based             14:03:28

16   sites.  It can include a number of others.

17          If you want me --

18   Q.  Go ahead.

19   A.  -- to go through a list.

20   Q.  You said BDSM.  For those of us that don't work in this            14:03:38

21   world regularly, what is BDSM?

22   A.  Generally speaking, it's bondage/sadomasochism.  There are

23   clubs that cater to that that could be considered under the

24   umbrella of commercial sex work, an example of which -- as I

25   mentioned, I'm from the east coast.  The Crucible is a club            14:03:59

```
 1    that caters to BDSM and --

 2              MR. STONE:  Your Honor, I object to the narrative.

 3              THE COURT:  Sustained.

 4    BY MS. BERTRAND:

 5    Q.  What other types of conduct would fall under your          14:04:07

 6    definition of commercial sex?

 7    A.  Foot fetish pages.

 8    Q.  What's that?

 9    A.  It is where people can sell pictures of their feet.  They

10    can sell their socks.  They could sell their pantyhose.  They  14:04:23

11    can sell videos of their feet.

12              But the reason why it falls under that umbrella, it's

13    for titillation or sexually based arousal purposes and there is

14    a money exchange.

15    Q.  Okay.  What about, like, dancers/strippers?  Would that --  14:04:42

16    are those falling under commercial sex in your definition?

17    A.  Yes, it could be a dancer or stripper working at a club.

18    Dancer or stripper going out to an individual potentially for a

19    bachelor party.  Some travel.  There could be pornography as a

20    type of sex work.  They're all so different subtypes of         14:05:07

21    pornography, depending on whether it's produced pornography or

22    whether it's amateur or, quote/unquote, Gonzo pornography.

23              There are a number of different subtypes of commercial

24    sex activity that fall under that larger umbrella.

25    Q.  Massage?                                                   14:05:24
```

```
 1    A.  Absolutely.

 2    Q.  Erotic massage?

 3    A.  Erotic massage, yes.

 4    Q.  In your experience, Doctor -- well, let me -- let me

 5    rephrase that, please.                                        14:05:46

 6         In your research, did that include viewing commercial

 7    sex advertisements on Backpage.com?

 8    A.  Yes, ma'am.

 9    Q.  In what sections on Backpage.com did you, as part of your

10    research, review commercial sex advertising?                 14:06:08

11    A.  What -- in what parts of my research?  So --

12    Q.  What parts of the Backpage.com did you go to to look at

13    ads?

14         I assume you weren't in automotive.

15    A.  No.                                                       14:06:27

16    Q.  All right.  Where were you?

17    A.  Again, from looking at a ad just high level, you cannot --

18         MR. STONE:  Objection.  Nonresponsive.

19         THE COURT:  Sustained.

20    BY MS. BERTRAND:                                              14:06:39

21    Q.  Just what sections of the Backpage did you go to for your

22    research?

23    A.  Body rubs.  I think one was related to parties and events.

24    One was related to personals.  And then prior to the shuttering

25    of the adult section, adult services section.                14:06:52
```

KIMBERLY MEHLMAN-OROZCO - DIRECT EXAMINATION

47

1    Q.  Just generally in the adult services section.  So that

2    included escorts --

3    A.  Yes.

4    Q.  --  is that correct?

5        Were you able as a researcher to determine whether or          14:07:06

6    not -- well, let me --

7        MS. BERTRAND:  I'm sorry, Judge.  Let me back up.

8    BY MS. BERTRAND:

9    Q.  Is prostitution a subsection, in your mind, of commercial

10   sex?                                                                14:07:35

11   A.  No, not the way that I conceptualize it.

12   Q.  Okay.  So prostitution is --

13   A.  Oh, hold on.  What was the question again?  Sorry.  I think

14   I misheard.

15   Q.  That's okay.                                                    14:07:46

16       In your definition of commercial sex, is prostitution

17   a subsection of commercial sex?

18   A.  Yes.  Sorry.  Thank you.

19   Q.  Okay.  How do you define -- so we're all using the same

20   terms, how do you define prostitution?                             14:07:59

21   A.  Sexual intercourse or a sexual service in exchange for

22   money or something of value.

23   Q.  What do you con- -- what do you consider a sexual service?

24       Because we talked about the feet thing.  Would that be

25   a sexual service?                                                   14:08:16

UNITED STATES DISTRICT COURT

```
1          MR. STONE:  Your Honor, foundation and asking for
2   seemingly a legal conclusion.  The -- she is an expert.  She
3   can talk about this a little bit, but I don't think we should
4   get into the specifics.
5          THE COURT:  Sustained as to that last question,     14:08:29
6   Ms. Bertrand.
7   BY MS. BERTRAND:
8   Q.  And how many advertisements on Backpage.com in the adult
9   services section can you estimate you have reviewed in your
10  research?                                                   14:08:50
11  A.  Thousands is the best estimation.  Maybe tens of thousands.
12  Q.  In that research, view -- where you viewed these Back- --
13  I'm just going to limit it to Backpage for now -- did you have
14  occasion to ever meet the person posting the ad you reviewed?
15  A.  Not meet and interview.  Not on Backpage.              14:09:18
16  Q.  Not on Backpage?
17  A.  On other commercial sites and advertisement forums.
18         THE COURT:  Just -- I'm sorry.  You just kind of
19  lowered your voice there.  I had a hard time hearing that.
20         THE WITNESS:  On other forums that were dedicated to  14:09:36
21  commercial sex.  So Evil Empire is -- is one where I did meet
22  and interview somebody who was advertised there.
23  BY MS. BERTRAND:
24  Q.  In your experience in reviewing the thousands, by your
25  estimate, ads on Backpage, were you, in your experience, able  14:10:01
```

UNITED STATES DISTRICT COURT

1   to draw a conclusion about the service specifically being

2   offered in a specific ad?

3          MR. STONE:  Objection.  The question was vague and

4   compound.

5          THE COURT:  I'll sustain because she testified that        14:10:20

6   she reviewed thousands.  And so I -- I guess I think it merits

7   a little bit more probing --

8          MS. BERTRAND:  Okay.

9          THE COURT:  -- before you ask that question,

10  Ms. Bertrand.                                                     14:10:39

11  BY MS. BERTRAND:

12  Q.  How many escort ads did you review in reviewing the adult

13  services section of Backpage?

14  A.  I would say -- again, I don't have a -- a concrete number,

15  but it would be --                                                14:10:53

16  Q.  Would you talk into the microphone.  Sorry.

17  A.  -- thousands, if not tens of thousands.

18  Q.  And that's over what time period?

19          You came out of graduate school in --

20  A.  I would say from -- oh, sorry.                                14:11:04

21  Q.  Go ahead.  Go ahead.  No.

22  A.  I would say from maybe 2013 or '14 until 20- -- late 2017,

23  early 2018.

24  Q.  When -- did you stop when Backpage shut down?

25  A.  Yes, ma'am.  Well, actually, no, I didn't stop when          14:11:29

```
 1   Backpage shut down, because there's the Way Back Machine.  So I
 2   still reviewed ads for various cases that I worked on --
 3   Q.  Okay.
 4   A.  -- using the Way Back, which is an Internet archive.
 5   Q.  Right.  So even after the website was shut down, you've        14:11:45
 6   still seen ads that are part -- part of your research?
 7   A.  Correct.
 8   Q.  That are ads that were posted on Backpage?
 9   A.  Correct.
10   Q.  And that includes ads in the escort section?                   14:11:56
11   A.  Correct.
12   Q.  In viewing those ads, have you ever, ever in viewing those
13   ads been able to include -- conclude from the face of the ad
14   alone what services are being offered in the ad?
15   A.  To conclude, no.                                               14:12:26
16   Q.  And why is that?
17   A.  Because the ads could be posted by a number of different
18   individuals.  And just because there's certain language in the
19   ad does not mean that it's actually being provided to make a
20   conclusion of that caliber.                                        14:12:50
21   Q.  In your experience researching, advertising for commercial
22   sex on Backpage, what have you seen are the potentials going on
23   behind the face of the ad?
24           MR. STONE:  Objection.  Vague.
25           THE COURT:  Sustained.                                     14:13:19
```

KIMBERLY MEHLMAN-OROZCO - DIRECT EXAMINATION
51

```
 1   BY MS. BERTRAND:
 2   Q.  Well, let me ask it this way:  It's fair to say that in
 3   some instances those ads are offering prostitution; right?
 4           MR. STONE:  Objection.  Leading.
 5           THE COURT:  Sustained.                          14:13:29
 6   BY MS. BERTRAND:
 7   Q.  What types of parties have you known to be placing the ads
 8   based on your research?
 9   A.  It could be a sex worker.  It could be a pimp.  It could be
10   a law enforcement officer.  It could be a researcher.  It could 14:13:51
11   be a graduate student.  I've worked on cases where it was a
12   scammer looking to rob the people who were responding to the
13   ad.  It could be a nonprofit that's doing outreach.  It could
14   be a number of different entities.  It could be somebody
15   engaging in survival sex during COVID -- the COVID pandemic.    14:14:15
16   Survival sex.  There was an uptick of people exchanging
17   sexual --
18           MR. STONE:  Objection.  Narrative.
19           THE COURT:  Sustained.  And it's beyond the scope of
20   this witness's testimony.                                       14:14:29
21   BY MS. BERTRAND:
22   Q.  You mentioned it could be nonprofits.  You've -- you've
23   seen where nonprofits have posted ads in the escort section of
24   Backpage?  That's your experience?
25   A.  Not only did they post the ads on Backpage, but they had it 14:14:50
```

1    as a demonstration for law enforcement during trainings, which

2    I participated in.  So I was part of trainings where there was

3    a live demonstration of posting an ad on Backpage as part of

4    the training to law enforcement.

5    Q.  And you mentioned outreach.  What type of outreach work          14:15:14

6    have you seen ads in the Backpage adult services section used

7    for in your experience?

8    A.  Organizations attempting to quantify the number of

9    potential commercial sex consumers any given area by the number

10   of people responding to an ad.  I have seen nonprofits,             14:15:38

11   churches, task forces respond to the ads trying to offer

12   services and get people help potentially of the commercial sex

13   industry, if -- if that's what they're assuming based off of

14   the response.

15         But I've -- I've seen it both ways, them responding to       14:15:59

16   ads as well as posting ads.

17   Q.  Have you seen ads in your experience where they're trying

18   to basically get someone in the door?

19   A.  Yes.

20   Q.  Can you explain that to the jury, please.                       14:16:18

21   A.  So in the erotic massage industry, sometimes erotic -- or

22   sometimes massage parlors that do not provide erotic massages

23   will post an ad suggesting that they provide those services to

24   get male customers to come in, but once they come in, no sexual

25   service is provided.  So it's like a false advertisement, a         14:16:41

UNITED STATES DISTRICT COURT

KIMBERLY MEHLMAN-OROZCO - DIRECT EXAMINATION

53

```
 1   bait and switch.  They pretend like they're offering something,
 2   but then they go in and no sexual service is provided.
 3   Q.  Thank you.
 4           MS. BERTRAND:  May I step back and just --
 5           THE COURT:  Yes.                                        14:16:56
 6           MS. BERTRAND:  -- consult with my colleagues quickly?
 7           THE COURT:  Yes, you may.
 8           MS. BERTRAND:  Thank you.
 9   BY MS. BERTRAND:
10   Q.  Are you familiar with a website called The Erotic Review?   14:17:18
11   A.  Yes.
12   Q.  Or is it also known as TER?
13   A.  Yes.
14   Q.  As a researcher, what is The Erotic Review to you?
15   A.  It's a website that's used for commercial sex consumers to   14:17:30
16   post reviews of their alleged services procured.
17   Q.  In your experience as a researcher, do you know whether or
18   not those reviews can be treated as truthful?
19           MR. STONE:  Objection.  Vague.
20           THE COURT:  Overruled.                                  14:18:00
21   BY MS. BERTRAND:
22   Q.  Please answer.
23   A.  In my experience, sometimes noncommercial sex consumers
24   will post fake reviews in order to appear to be a commercial
25   sex consumer so that they can mine information from other       14:18:20
```

UNITED STATES DISTRICT COURT

1    posters, because obviously commercial sex consumers might be

2    vigilant to law enforcement posing as a commercial sex

3    consumer.  But if you have more reviews or it looks like you

4    did patronize potential providers, there can be fake reviews

5    posted on there as well.                                      14:18:39

6            MS. BERTRAND:  Thank you.

7            Your Honor, I have nothing further.

8            THE COURT:  Mr. Stone.

9            MR. STONE:  Thank you.

10                      CROSS-EXAMINATION                          14:18:49

11   BY MR. STONE:

12   Q.  Good afternoon, ma'am.

13   A.  Good afternoon.

14   Q.  All right.  So you asked -- or you answered a lot of

15   questions about commercial sex; right?                        14:19:46

16   A.  I don't know if I would say that's a lot.  I usually

17   testify for an entire day, so I wouldn't say too many.

18   Q.  Well, that's fair.  It's subjective.

19           You answered questions about commercial sex?

20   A.  Yes, I did.                                               14:19:59

21   Q.  And, in your view, commercial sex is a larger subset, and

22   prostitution makes up one piece of the commercial sex.

23           Is that what I understood?

24   A.  Yes, I would say so, the way that I conceptualize it.  And

25   obviously underneath that large umbrella of commercial sex, you 14:20:18

1  have consenting sex, you have nonconsenting commercial sex.  So

2  I think that there are a number of ways that you can

3  conceptualize what might fit under there.

4  Q.  Okay.  You agree with me, though, that prostitution's

5  illegal in this country in almost -- well, every state except a    `14:20:34`

6  few parts in Nevada?

7  A.  Well --

8  Q.  Hold on.  You -- you don't agree with that?  That's yes or

9  no.  Yes or no on that one.

10  A.  It's not a yes or no, and I'm going to tell you why,    `14:20:45`

11  because Cy Vance in New York decriminalized prostitution.  So

12  it's technically not illegal, but -- or it's technically not

13  legal, but it is allowed and not enforceable.

14       So Cy Vance decriminalized it following a

15  recommendation from Amnesty International to decriminalize sex    `14:21:07`

16  work.  So my understanding, in New York City it is not

17  prosecuted, both erotic massage parlors and prostitution.

18       As well as -- as you had mentioned, there are some

19  counties within Nevada and -- and so on and so forth.

20  Q.  Okay.  You've written a number of articles; right?    `14:21:26`

21  A.  Yes.  I think several dozen or so.

22  Q.  And I've read -- read a few of those.

23       Decriminalized is not the same as being legal.  I

24  think I read that in one of yours.  Fair?

25  A.  Yes, that is fair, and that is correct.    `14:21:45`

1    Q.  So it can be illegal even though it's been decriminalized.

2    Yes?

3    A.  Yes, sir.

4    Q.  So what this Cy Vance did in New York when he

5    decriminalized it, it's still illegal.  That's your testimony?        14:21:59

6           It may not be prosecutable, but it's illegal.  Fair?

7    A.  My understanding is that it is decriminalized; and,

8    therefore, my understanding is that in New York City still

9    technically against the law, even though it is not enforced.

10   Q.  Okay.  So let's make it simple.  It's still illegal in          14:22:17

11   New York.  Yes?

12   A.  I think decriminalization is sort of a hybrid between

13   legality and illegality.

14          So I understand what you're trying to get me to commit

15   to.  But the way I conceptual it, as a social scientist, is         14:22:29

16   that there's -- it's a hybrid.

17   Q.  Okay.  Well, I think I've read where you talk about

18   decriminalizing doesn't mean it's illegal.

19          But let's just leave it there, because this all

20   happened after 2018, didn't it?                                      14:22:43

21   A.  Yes, sir, I believe it did.

22   Q.  All right.  And, ma'am, you're being paid to be here today;

23   right?

24   A.  Yes, sir, I am.

25   Q.  What's your hourly rate?                                         14:22:53

UNITED STATES DISTRICT COURT

 1    A.   For this case or my typical hourly rate?

 2    Q.   Well, I have an email where you are emailing your hourly

 3    rate to the defense as $750 per hour; is that right?

 4    A.   That is correct.

 5    Q.   Okay.  That was in 2021.  Has it gone up since then?      14:23:10

 6    A.   It has for civil cases.  But that's not what I'm being paid

 7    in this case.

 8    Q.   Okay.  But this is what you emailed as your rate, $750 per

 9    hour?

10    A.   I believe so, yes.                                        14:23:21

11    Q.   And you generally require a minimum of, at least in cases

12    with this complexity, of like 160 hours.  Is that fair?

13    A.   It depends on how much discovery that I'm going to be

14    reviewing.  So that's what I estimated, not knowing how much

15    discovery or any documents that I'd be reviewing.             14:23:38

16    Q.   All right.  And so you told defense counsel to budget

17    between 120- and $150,000 for your work on this case.  Fair?

18    A.   As a -- an estimate, yes.

19    Q.   You've done other work on Backpage's behalf previously?

20    A.   Yes, I have.                                              14:24:05

21    Q.   Were you -- were you involved in another matter?

22    A.   Civil matter, yes.

23    Q.   Were you paid for that matter?

24    A.   Yes, sir.

25    Q.   How much were you paid?                                   14:24:24

```
 1   A.  I don't recall.

 2   Q.  $20,000?

 3   A.  Maybe.

 4   Q.  $50,000?

 5   A.  I don't recall.  Honestly.                        14:24:32

 6   Q.  Okay.  More than 50,000?

 7   A.  Again, I don't recall.  I mean, I can tell you what I'm

 8   charging for civil cases now, but I don't remember the Backpage

 9   matter, how many hours were billed or how much I was paid.

10   Q.  What are you charging now for civil cases?         14:24:49

11   A.  1,125 per hour, and I typically estimate up to 150 hours.

12   And so -- but usually it'll be under that.  So I try to bill

13   judiciously.  So I would say on average it's about 80 hours of

14   work to review discovery and produce a report.

15   Q.  So what's that, about 80 grand per case?           14:25:10

16   A.  80 to 100.

17   Q.  And what percentage of your income is made up as serving as

18   an expert witness or consultant?

19   A.  I would say for expert witness and consultant it's

20   100 percent, but not all consultancy is expert witness          14:25:26

21   testimony.  As I mentioned, I do training and technical

22   assistance for various businesses on how to combat trafficking.

23   Q.  Okay.  Fair.

24         All right.  I have one of your articles that I'd like

25   to -- for you to see.  And this is exhibit -- marked as         14:25:48
```

```
 1   Exhibit 3016.
 2           Do you have that before you?
 3   A.  Yes.
 4   Q.  Is this an article that you wrote?
 5   A.  Typically with the articles that I write -- where was this    14:26:27
 6   published?
 7           It depends on the publication.  But usually the
 8   majority of the substance is something I write, but the
 9   headline is typically authored by the editor.  So it depends on
10   where this one was published.                                     14:26:45
11   Q.  So is that a yes, this is an article you wrote?
12   A.  Yes.
13   Q.  I mean, it has your name on it, doesn't it?
14   A.  Yes, it does.
15   Q.  So fair that this is -- the language in this three-page        14:26:58
16   document is the language you wrote?  You wrote this?
17   A.  As I mentioned, it depends on who the publisher is.
18   Everything in the substance, in the text I can say that I wrote
19   it.  And maybe there was some edits here and there from the
20   editor.  But typically, depending on the publication -- for       14:27:26
21   example, USA Today, they rewrite my --
22   Q.  Okay.  I think --
23   A.  -- headline --
24   Q.  -- you're a little beyond my question.
25           But it -- so I just want to make clear that the           14:27:36
```

UNITED STATES DISTRICT COURT

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

60

```
 1   language in the body --
 2   A.  Yes.
 3   Q.  Let me modify that -- in the body is yours?
 4   A.  Yes.
 5   Q.  You wrote that?                                          14:27:44
 6   A.  Yes, sir, minus whether there were some minor edits from
 7   the editor.
 8   Q.  Okay.
 9   A.  But, yes, the large volume of it would be words that I
10   wrote.                                                       14:27:52
11   Q.  Fair enough.
12          And take a look at the first paragraph here, if you
13   would.
14          You reviewed it, ma'am?
15   A.  Yes, sir.                                                14:28:10
16   Q.  And this was written May 30th, 2017; correct?
17   A.  That's when it was published.
18   Q.  Yes, you're right.  Published on May 30th, 2017.  Written
19   sometime before.
20          That's --                                             14:28:22
21   A.  Yes.
22   Q.  -- fair enough; right?
23          Okay.  And you're -- you remember writing that for the
24   last seven years, sex workers and sex traffickers have posted
25   advertisements on the escort, adult, and dating sections of  14:28:34
```

UNITED STATES DISTRICT COURT

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION
61

```
 1    Backpage?
 2           Do you remember writing that?
 3    A.  I think what I wrote was --
 4    Q.  If I can -- I think that's just yes or no.
 5           Do you remember writing that?                    14:28:44
 6    A.  That's not what the sentence says.
 7           So if you want me to read the sentence --
 8    Q.  Well --
 9    A.  -- I'll read it.
10    Q.  -- why don't I read it.                             14:28:50
11           "For the last seven years, sex workers and sex
12    traffickers have posted advertisements on the escort, adult,
13    and dating sections of the website."
14           Now, there's a little bit more, but I'm not going to
15    read that.                                              14:29:03
16           Is that the sentence that you wrote?
17    A.  That is part of the sentence that I wrote.
18    Q.  Okay.  But you wrote those words; right?
19    A.  Yes.
20    Q.  All right.  So you knew that Backpage on the escort, adult,   14:29:11
21    and dating sections had advertisements from sex traffickers;
22    correct?
23    A.  Yes.
24    Q.  And from sex workers?
25    A.  Yes, sir.                                           14:29:27
```

UNITED STATES DISTRICT COURT

1   Q.  And sex workers can be prostitutes; right?

2   A.  They can be prostitutes.  They can be escorts.  They could

3   be a number of things.  But that is correct.

4   Q.  All right.  But your testimony to this jury is sex workers

5   can be prostitutes when there's an exchange of a sex act for        14:29:44

6   money; right?

7   A.  Yes.

8   Q.  All right.  And then you were asked questions from

9   Ms. Bertrand about how it's hard to determine, in your opinion,

10  in looking at an ad whether that ad is for prostitution.           14:30:00

11          That was your testimony; right?

12  A.  Yes, sir, that is correct.

13  Q.  And you mentioned a few different people who could be

14  posting other than the prostitute; right?

15  A.  Yes, sir.                                                       14:30:13

16  Q.  You gave, like, a list?

17  A.  Yes, sir.

18  Q.  And it included law enforcement?

19  A.  Yes, sir.

20  Q.  Task forces?                                                    14:30:24

21  A.  Yes, sir.

22  Q.  People who were, I guess, within law enforcement.  They're

23  doing it as some sort of model to show others how to post an

24  ad?

25          I think you had some testimony on that.                     14:30:36

UNITED STATES DISTRICT COURT

 1   A.  Nonprofit organizations that do training for law

 2   enforcement.  Yes, sir.

 3   Q.  Nonprofit organizations.  Okay.

 4        But your testimony is that all of those ads that are

 5   posted are posted to be like prostitution ads.  It's just that    14:30:47

 6   some non-prostitutes were posting the ad?

 7        Is that -- that's what -- is it -- is that my

 8   understanding of your testimony?

 9   A.  I'm not sure I'm understanding your question.

10   Q.  Okay.                                                          14:31:02

11   A.  And --

12   Q.  Let me give you a hypothetical.

13   A.  Okay.

14   Q.  Law enforcement posts an ad in the escort section of

15   Backpage.                                                          14:31:09

16   A.  Okay.

17   Q.  Why are they -- why are they posting an ad on the escort

18   section of Backpage?

19   A.  Likely to catalyze an investigation.

20   Q.  An investigation.  Investigation into --                       14:31:18

21   A.  Commercial sex.

22   Q.  -- people committing prostitution offenses, perhaps?

23   A.  Investigation into commercial sex consumers.

24   Q.  Okay.  And so when you're saying "commercial sex

25   consumers," you have to mean people who engage in or as johns     14:31:33

1    who engage with prostitutes, because you just talked about

2    other parts of commercial sex not being illegal; right?

3    A.   Typically they refer to themselves as mongers or hobbyists,

4    but, yes.  You used the word johns, which can be used as well.

5    But persons who respond to commercial sex advertisements can      14:31:50

6    include an individual who might be trying to procure commercial

7    sex services, among a number of different other examples that I

8    provided earlier.

9    Q.   But law enforcement is not interested in someone who wants

10   to look at feet.  Isn't that fair?                                14:32:04

11   A.   I'm not going to opine on what law enforcement might be

12   interested in.  They -- they could be.  I know that sometimes a

13   number of businesses do want persons who are into niche types

14   of sexual exchanges off of the platforms, but --

15   Q.   Okay.  I --                                                  14:32:23

16   A.   -- it's not elicited --

17          THE COURT:  Don't --

18          THE WITNESS:  -- potentially.

19          THE COURT:  Don't speak over one another, please.

20          MR. STONE:  I'm sorry, Your Honor.                         14:32:28

21   BY MR. STONE:

22   Q.   I just want to be clear here.  When you were giving the

23   example of the foot fetish to Ms. Bertrand, you were talking

24   about prostitution?

25          Because that's the only -- that's how I understand         14:32:38

1    your last answer to make sense.  If law enforcement is

2    interested, it would involve a prostitution act; correct?

3    A.  I think you might be misunderstanding what I had stated.

4            Separate from law enforcement, somebody might post an

5    ad on a platform like that selling foot fetish pictures or          14:33:00

6    trying to initiate an exchange, for example, to catalyze a

7    sugar dating experience or to drive them to another website.

8            There are a myriad of different examples of why

9    someone might post on those subsections of the platform --

10   Q.  But --                                                          14:33:19

11   A.  -- but law enforcement certainly is one.

12   Q.  I understand that answer.

13           I think my question back to you was, law enforcement

14   wouldn't be interested in posting an ad for some sort of legal

15   foot fetish issue --                                                14:33:31

16           MS. BERTRAND:  Objection.

17   BY MR. STONE:

18   Q.  -- would they?

19           MS. BERTRAND:  Asked and answered.

20           THE COURT:  Overruled.                                      14:33:37

21   BY MR. STONE:

22   Q.  Do you understand my question, ma'am?

23   A.  Of whether law enforcement would post an advertisement for

24   foot fetish looking for people responding to a foot fetish ad?

25           I have not seen that, if that's the question, but --        14:33:48

1   Q.  Well --

2   A.  -- it's separate.

3   Q.  -- hold on.  I think we're overcomplicating it.

4   A.  Okay.

5   Q.  You're an expert on sex trafficking?                    14:33:55

6   A.  Yes, sir.

7   Q.  You know that law enforcement is interested in catching or

8   finding and prosecuting those involved in sex trafficking

9   offenses.  Fair?

10  A.  Among other things, yes.                                14:34:09

11  Q.  Okay.  Can you agree with me that they are interested in

12  people committing criminal acts?

13  A.  Yes, sir.

14  Q.  All right.  So when law enforcement posts an ad on the

15  escort section of Backpage, as you testified to on direct, it's   14:34:26

16  relating to a potential criminal act; right?

17  A.  It depends on the situation.  If you want to give me an

18  anecdote or an example.  But, yes, that can be a situation in

19  which law enforcement can post an advertisement.

20  Q.  In your review of Backpage in the adult section, did you    14:34:52

21  see any ads that you were able to determine were for legal

22  escort ads?

23  A.  Ostensibly from looking at an ad, it's not possible to

24  determine whether it's a legal escort or an illicit service --

25  Q.  Okay.                                                    14:35:21

1   A.   -- or a fake ad to catalyze a robbery just from looking at

2   the ad alone.

3   Q.   All right.  Let's take a look at some ad titles.  I'm going

4   to show you what's been admitted as Exhibit 2046.  And so this

5   is from Backpage.com.                                         14:35:44

6        Do you see that, ma'am?

7   A.   Yes, sir.

8   Q.   And you're familiar with this page?

9        You've reviewed thousands of ads on Backpage; right?

10  A.   Yes, sir.                                                14:35:57

11  Q.   So this is very familiar to you?

12  A.   Yes, sir.  And it's from the Way Back Machine archive as

13  well.

14  Q.   Which is something you're also familiar with?

15  A.   Yes, sir, it is.                                         14:36:04

16  Q.   And this is ads that are from Dallas, Texas, the escort

17  section of Backpage; correct?

18  A.   Yes.  That's what it appears to be, uh-huh.

19  Q.   Over here is an ad for The Erotic Review, which you're

20  familiar with; right?                                        14:36:25

21  A.   It's a posting for The Erotic Review.  Yes, that's correct.

22  Q.   And you mentioned that that's a website that people use to

23  rate prostitutes and other sex workers; correct?

24  A.   Yes, sir.

25  Q.   And when -- you've looked at The Erotic Review; right?   14:36:41

1  A.  Yes, sir.  Of course.

2  Q.  And it -- there's pages there that will inform the person

3  who's on the page the service that the escort provides; right?

4  A.  There is information that can describe what service might

5  be offered, yes.                                              14:37:11

6  Q.  Well, in your review of The Erotic Review, you recall

7  seeing that it will have something that says "sex, yes," on The

8  Erotic Review web page?

9  A.  Yes, sir.  But if you've reviewed any commercial sex

10  consumer review forum, there often are multiple reviews by the  14:37:28

11  same alleged provider, and sometimes they will have one thing

12  checked while the others will say it's not checked so that

13  sexual services were not provided.  They will have differences

14  in description of the female provider.  For example, one

15  consumer potentially saying she has large breasts, while       14:37:47

16  another one saying they're small breasts.

17       There are oftentimes a lack of consistency across the

18  reviewers, and that's why there's not necessarily a reliability

19  determination of what's in there.  So even if it's checked off,

20  that doesn't necessarily mean that it's verified to be accurate  14:38:02

21  or true.

22       MR. STONE:  Your Honor, objection.  Nonresponsive.

23  Move to strike.  It was a yes-or-no question.

24       THE COURT:  Yes.  I'll sustain the objection and

25  strike the answer, and the jury will disregard.               14:38:15

```
 1            I think, members of the jury, we are at a -- a good
 2    breaking point for our afternoon 20-minute break.  And, again,
 3    I will remind the jury of the admonition, to continue to keep
 4    that open mind and not to discuss the matter, conduct any
 5    research on any witness that has testified so far.  Just simply    14:38:35
 6    be ready to return into the courtroom in approximately
 7    20 minutes.  And, again, I beg your indulgence.  Once in a
 8    while we get carried away with other matters that we need to
 9    address, but I -- I will try to be close to that 20-minute mark
10    this time.                                                          14:38:56
11            So with that, please all rise for the jury.
12        (Jury not present at 2:38 p.m.)
13            THE COURT:  And, ma'am, you may step down.
14            THE WITNESS:  Do you want me to leave this here?
15            THE COURT:  Yes, please.                                    14:39:27
16            All right.  Please be seated.
17            Let me just make inquiry.  The next witness on -- on
18    the list that I have is Mr. Suskin.  And did you come to some
19    determination during the lunch hour or break, Mr. Stone, as to
20    whether or not the production of that disclosed information on      14:40:01
21    which he rendered that opinion was provided?
22            MR. STONE:  No, there hasn't been anything provided to
23    us, Your Honor.
24            MR. FEDER:  Judge, I emailed Mr. Stone half an hour
25    ago or so that we're not going to call Mr. Suskin based on the     14:40:17
```

```
 1    Court's ruling not only in the past, but I think this morning
 2    or early afternoon.
 3              THE COURT:  Okay.  I -- the only reason I asked was
 4    because I was going to suggest maybe permitting the government
 5    to voir dire him outside of the presence of the jury, but since      14:40:32
 6    you are no longer going to disclose him.
 7              So who is the next witness after this witness?
 8              MR. FEDER:  My understanding is this is the last
 9    witness.
10              THE COURT:  All right.  Okay.  Well, we'll see how        14:40:44
11    long we go and -- well, let me -- by my review, Mr. Stone,
12    you've only begun your -- well, I don't know.  I shouldn't
13    characterize it as you've only begun your cross-examination.
14              Do you have a rough estimate of how much longer you're
15    going to go?                                                          14:41:06
16              MR. STONE:  Yeah.  15 minutes.
17              THE COURT:  Okay.  And then, Ms. Bertrand, redirect?
18              MS. BERTRAND:  Maybe 15, 20 minutes.  I don't think
19    it'll be lengthy.
20              THE COURT:  Okay.  So that puts us roughly at about,        14:41:19
21    I'd say, being generous, about quarter to 4:00.
22              And so the question, then, is if there are no other
23    witnesses and no other testimony, then do you have any other
24    witness that you intend to call --
25              MR. STONE:  No, Your Honor.                                 14:41:41
```

 1             THE COURT:  -- in a rebuttal case?

 2             MR. STONE:  No rebuttal case.

 3             THE COURT:  All right.  So I want to be able to --

 4             MR. BERRY:  Wait.

 5             MR. STONE:  Oh, I guess, Your Honor, we were just        14:41:50

 6    wondering if there had been an inquiry on whether the -- the

 7    Court is going to ask the individual defendants whether they're

 8    going to testify or not?

 9             THE COURT:  Well, I guess when I -- that's technically

10    correct.                                                         14:42:06

11        Why don't when we come back before -- after the break,

12    I'll ask you individually so that -- I know I told you that you

13    had overnight to discuss all of this and to let us know in the

14    morning, but given the status of the situation, I'll come in

15    before the jury comes in and ask that individual question.       14:42:23

16        So going back to my original question, no rebuttal

17    witness -- no rebuttal witness by the government?

18             MR. STONE:  Correct, Your Honor.

19             THE COURT:  All right.  So if there is no additional

20    testimony, including the defendants, then I want to be able,     14:42:39

21    then, to perfect those jury instructions, give you overnight to

22    look at those.  And I would suggest then reconvening at 9:00 in

23    the morning to go over that.  Possibly we will have those

24    perfected by the -- the noon hour, and we could have the jury

25    in.  We will still adhere to the half-day jury schedule on       14:43:16

1    Friday.

2            The only other alternative that I would pose to you is

3    that we release the jury for the remainder of the week, bring

4    them back in on Tuesday, and begin with instruction and then

5    closing argument.                                              14:43:35

6            So I leave you with those considerations.  You will

7    talk amongst yourselves and let me know what your decision is.

8    All right.

9            MR. STONE:  Your Honor, the only thing I'd put on the

10   record is that I talked to defense counsel about forfeiture,   14:43:49

11   and, as I understand it, they are electing to try the

12   forfeiture case, if it is necessary, to the jury.

13           THE COURT:  Well, and what would that consist of?

14           MR. STONE:  Well, it would -- the way it's been done

15   in my experience is that if there is a guilty verdict for any   14:44:06

16   of the counts that would then lead to a forfeiture, then Your

17   Honor would let the jury know that they're not quite done and

18   that the -- there will be some additional jury instructions

19   related to that.  There will be one, possibly two witnesses

20   from the government and a very short summation typically.       14:44:26

21           THE COURT:  Well, we're with- -- I think we're still

22   within our time frame to conclude the case and have them

23   deliberate.  And depending on how deliberations go.  Again,

24   their service ends on the 9th.

25           MR. STONE:  Yes.  Two weeks from tomorrow, I think,     14:44:58

1    Your Honor.

2         THE COURT:  Yes.  And so that should inform your

3    decision about how we proceed for the remainder of the week --

4         MR. STONE:  Yes.

5         THE COURT:  -- so --                                  14:45:12

6         MR. STONE:  And we would -- we would be for pushing

7    forward and -- and using the jury's time this week.

8         THE COURT:  All right.  So I'll leave you with those

9    considerations, and we'll return in 15 minutes.

10        THE COURTROOM DEPUTY:  All rise.                       14:45:24

11        (Recess from 2:45 p.m. to 3:03 p.m.)

12        (Jury not present at 3:03 p.m.)

13        THE COURTROOM DEPUTY:  All rise.

14        THE COURT:  Let's keep the witness in the witness room

15   for now.                                                   15:03:54

16        The record will reflect the presence of counsel and

17   clients without the jury present.

18        And so before the break I asked you to consider a

19   couple of things.  It's my understanding at this posture this

20   is the last witness.                                       15:04:10

21        And so, Mr. Cambria, is Mr. Lacey going to testify?

22        MR. CAMBRIA:  The answer's no, Your Honor.

23        THE COURT:  Ms. Bertrand, is Ms. Vaught going to

24   testify?

25        MS. BERTRAND:  No, madam.                             15:04:23

 1          THE COURT:  Mr. Lincenberg, is Mr. Brunst going to

 2   testify?

 3          MR. LINCENBERG:  No, Your Honor.

 4          THE COURT:  Mr. Feder, is Mr. Spear going to testify?

 5          MR. FEDER:  No.                                          15:04:32

 6          THE COURT:  Mr. Eisenberg, is Mr. Padilla going to

 7   testify?

 8          MR. EISENBERG:  No, Your Honor.

 9          THE COURT:  All right.  Well, given that, this is how

10   I -- I think is the best course of procedure:  We'll finish    15:04:40

11   with this witness.  I'll release the jury.  I'll ask them to

12   reconvene tomorrow at 1:00 o'clock.  And at 1:00 o'clock, when

13   they come in, I will then have the defense rest its case, and

14   I'll ask for any rebuttal from the government, and then we can

15   proceed to reading them the instruction.  It's my recollection 15:05:16

16   from the final pretrial conference that you preferred them to

17   be instructed before the closing argument.

18          And in order to give us time tomorrow to finalize

19   those few objections that I've been provided -- the majority of

20   them are matters that I can take care of, but I want to make    15:05:41

21   sure that I have a clear record as to my determination to some

22   of the contested substantive instructions.  And so I will ask

23   counsel to come back to court tomorrow morning at 9:30 so we

24   can go through that process.  Hopefully it won't take but an

25   hour or so.  And then upon reading those instructions, I'll     15:06:07

 1    expect the government to go forward with its closing argument.

 2    And whether or not that starts at 3:00 o'clock or 2:30, be

 3    prepared to go to 4:30.  And if you need to come back on Friday

 4    morning, we'll continue that on Friday morning and see how far

 5    we go.  We'll reconvene next Tuesday with the continuation of          15:06:34

 6    the closing statements.  That's how we will proceed.

 7            In looking at the calendar, I wanted to make sure that

 8    we gave sufficient time for this jury to consider the matter,

 9    and, if necessary, then we would have to then have them

10    continue on for the forfeiture matter.  So that's, I think, a         15:06:52

11    very tight timeline for them so that they don't expire.

12            All right.  So --

13            MR. BERRY:  Your Honor, could I ask a question about

14    your practice whenever you go to give the jury instructions.

15    Is it Your Honor's practice that each juror will receive a copy       15:07:10

16    of those instructions to follow along with?

17            THE COURT:  Yes.

18            MR. BERRY:  Okay.  And will each one be able to take

19    that back into the deliberations room, or just one copy?

20            THE COURT:  We generally provide one copy.                     15:07:22

21            MR. BERRY:  Okay.

22            THE COURT:  And --

23            MR. BERRY:  So they should be instructed that the

24    notes that they're taking on the copy that they're looking at

25    will not be available to them?                                        15:07:33

 1                I just want to make sure I understand.

 2           THE COURT:  That's correct, although I've never seen a

 3      juror jot down notes.  But I'm busy reading the instructions,

 4      so I don't know.  But I'll let them know that as well.

 5           MR. BERRY:  Okay.                                              15:07:45

 6           THE COURT:  Okay.

 7           MR. LINCENBERG:  Your Honor?

 8           THE COURT:  Yes.

 9           MR. LINCENBERG:  Your Honor, the defense will be

10      renewing our Rule 29 motion, and it's our hope to get a          15:07:51

11      favorable ruling from the Court on all of it, or at least parts

12      of it.  And it will be helpful to have that ruling before we

13      put together our closings.

14           THE COURT:  Well, what I suggest you do, then, is be

15      prepared to make that motion.                                     15:08:14

16           Well, now, logistically what then happens is the jury

17      comes in, you close the case, and then I have to excuse them

18      again for you to make the -- the motion?  Is that what you're

19      saying?

20           MR. LINCENBERG:  Unless the Court wants to have it          15:08:34

21      deemed made now, which is at the close of the evidence.  And

22      we've extensively set forth our bases.  I don't think we need

23      more argument.  The Court -- if the Court has more questions --

24           THE COURT:  Well --

25           MR. LINCENBERG:  -- we would, of course, be prepared,      15:08:52

1    but -- but I just want to bring this back on the Court's

2    attention.

3         THE COURT:  Well, the -- the rule is, as I understand

4    it, as my practice has been, if I reserve the ruling, the

5    ruling then relates to at the time -- the evidence at the --        15:09:08

6    before the time the motion was made.  So if there's something

7    in addition to that that you wish to argue, then I could

8    suggest that you do it this afternoon.

9         MR. LINCENBERG:  That's fine.  I can say on behalf of

10   Mr. Brunst there's no further arguments.  There's been no          15:09:29

11   further evidence.  And we'll renew it and submit.

12        But we just want to make sure that -- obviously, the

13   Court can reserve it and continue to reserve it.  We think

14   we've raised some pretty substantial matters.  Our hope would

15   be that the Court would be prepared to address some of it.          15:09:44

16        THE COURT:  Well, I'll let the counsel do that after

17   we release the jury.

18        All right.  So let's have the witness in.

19        Ma'am, please resume your seat.

20        All rise for the jury.                                          15:10:37

21      (Jury present at 3:11 p.m.)

22        THE COURT:  All right.  Please be seated.

23        The record will reflect the presence of the jury.  The

24   witness is on the witness stand.

25        Mr. Stone, you may continue.                                    15:11:42

 1              MR. STONE:  Thank you, Your Honor.

 2   BY MR. STONE:

 3   Q.  And we were discussing The Erotic Review before the break.

 4          Do you remember that?

 5   A.  Yes, sir.                                                    15:11:48

 6   Q.  Are you aware of the relationship that Backpage.com had

 7   with The Erotic Review?

 8   A.  I believe I'm aware of the allegations related to an

 9   alleged relationship of some kind.

10   Q.  So is that a yes?                                            15:12:04

11   A.  I do not know the details of any relationship.  So, no, I

12   would not say I'm aware of any relationship.

13   Q.  So that's --

14   A.  I do --

15   Q.  So that's a no?                                              15:12:14

16          Just kind of one or two.  You can pick one.

17   A.  I'm aware of the allegations from the government on that

18   alleged relationship --

19   Q.  Okay.  So --

20   A.  -- so --                                                     15:12:25

21   Q.  -- you're not aware of any of the details of the

22   relationship?

23   A.  Correct.  I'm not aware of what the government has been

24   able to prove in relation to that.

25   Q.  Okay.  So that's a no, you're not aware of the details of    15:12:37

                    UNITED STATES DISTRICT COURT

 1   the relationship?

 2   A.  Other than what the allegations are.  Correct.

 3   Q.  So you are not aware of the fact that Backpage was paying

 4   The Erotic Review for a reciprocal link program --

 5           MS. BERTRAND:  Objection.                          15:13:03

 6   BY MR. STONE:

 7   Q.  -- correct?

 8           MS. BERTRAND:  Goes beyond the scope of direct.  This

 9   is a closed cross jurisdiction.

10           THE COURT:  Overruled.                             15:13:10

11           She may answer.

12           THE WITNESS:  I have not seen any evidence of any

13   payments related to -- from Backpage to The Erotic Review.  So

14   I've not reviewed any evidence in relation to that whatsoever.

15   BY MR. STONE:                                              15:13:23

16   Q.  So that's a no?

17   A.  Do you want to state the question again just to be clear?

18   Q.  Yes.  And I'm going to -- I'm going to do my best --

19   A.  Sure.

20   Q.  -- to ask you short questions that are either yes or no.  15:13:32

21   If you can't answer yes or no, you can let me know that.  Okay?

22           And so my question is, you're not aware of the details

23   for this relationship between Backpage and The Erotic Review;

24   correct?

25   A.  Other than what is in the allegations, I am not aware of  15:13:51

 1    any details.

 2            And I understand that you would like me to answer a

 3    yes or no, but I'm trying to be as forthcoming as possible with

 4    my understanding.  So that's -- that's how I would like to

 5    answer.                                                    15:14:05

 6            THE COURT:  Well, I think, ma'am, having testified

 7    previously --

 8            THE WITNESS:  Yes.

 9            THE COURT:  -- listen to the question that's asked and

10    answer the question as it is asked.  You know, the -- you'll   15:14:13

11    have an opportunity to provide additional answers, but let's --

12    we're going to have this problem if that doesn't happen.  Okay?

13            So let's continue.

14            THE WITNESS:  Yes, ma'am.

15            THE COURT:  Bless you.                              15:14:32

16            THE WITNESS:  Bless.

17            MS. BERTRAND:  Bless you.

18    BY MR. STONE:

19    Q.  All right.  So reciprocal links that were posted on the

20    Backpage site and The Erotic Review that allowed users to go   15:14:39

21    from one to the other, that's not a factor you are aware of;

22    correct?

23    A.  I --

24            MS. BERTRAND:  Objection.  Relevance.  Foundation.

25            THE COURT:  Sustained as to foundation.             15:14:53

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION
81

```
 1    BY MR. STONE:
 2    Q.  Well, ma'am, you testified that you looked through
 3    thousands of ads; correct?
 4    A.  Thousands or tens of thousands, yes.
 5    Q.  Tens of thousands.                                    15:15:04
 6    A.  Yes.
 7    Q.  And that you were designated an expert in sex trafficking
 8    and prostitution, I believe; right?
 9    A.  Yes, sir.
10    Q.  And you are a professor at I think you said the number 1 15:15:15
11    ranked -- is it criminology school in the country?  University
12    of Maryland?
13    A.  Not -- not presently.  I've taught classes there --
14    Q.  Taught classes there --
15    A.  -- in the past.                                       15:15:29
16    Q.  -- at the number 1.
17         And does that relate to your testimony today in terms
18    of looking at ads on platforms like Backpage and The Erotic
19    Review?
20    A.  Does that relate to my --                             15:15:38
21    Q.  Does your teaching -- did you teach on that subject?
22    A.  On commercial sex advertisements?
23    Q.  Yes.
24    A.  In online review platforms, yes.
25    Q.  Okay.  So you're familiar with these platforms; right? 15:15:51
```

1    A.  Yes, sir.  I'm familiar with a number of different

2    platforms.

3    Q.  But you're not familiar of the fact that Backpage and The

4    Erotic Review were putting reciprocal links to move back and

5    forth -- for allowing the users to move back and forth from the          15:16:10

6    website; right?

7    A.  I am familiar with the fact that other websites post and

8    have advertisements --

9              MR. STONE:  Your Honor --

10             THE WITNESS:  -- on different websites.                          15:16:21

11             MR. STONE:  -- nonresponsive.  I move to strike.

12             THE COURT:  Sustained.

13             And the answer will be stricken as nonresponsive, and

14   the jury will disregard.

15   BY MR. STONE:                                                             15:16:38

16   Q.  Ma'am, what did you review before your -- your testimony

17   here today?

18   A.  In preparation for my testimony?

19   Q.  Yes.

20   A.  Nothing that I can recall.                                           15:16:49

21   Q.  The indictment in this matter?  Did you review that?

22   A.  No, I did not review that in preparation for my testimony

23   here today.

24   Q.  Have you review -- reviewed it before?

25   A.  Yes, in the past.                                                    15:17:03

```
 1    Q.  Have you reviewed the Senate Report that was published

 2    about Backpage?

 3    A.  Yes, sir, I have.  Not in preparation for testimony today,

 4    but in the past, just --

 5    Q.  You have reviewed it?                                        15:17:13

 6    A.  -- to clarify.

 7            In the past, yes.

 8    Q.  Let's look at Exhibit 2046.  We were looking at this before

 9    the break.

10            MR. STONE:  Why don't we focus in on -- we'll focus in   15:17:27

11    on one of these ad titles.

12    BY MR. STONE:

13    Q.  Ma'am, do you see that?

14    A.  Yes, sir.

15    Q.  And that's language for an ad on Backpage; correct?         15:17:46

16    A.  Yes, sir.

17    Q.  And it reads, "All Day All Night until," and then it reads,

18    "Sweet Greek"; correct?

19    A.  Yes, sir.

20    Q.  Do you understand what Greek means?                         15:17:57

21    A.  Yes, sir.

22    Q.  Does it mean anal sex?

23    A.  It can.  It can also mean Greek related to Greece.  But in

24    this context, I would say it's suggestive that it's related to

25    anal sex.                                                       15:18:11
```

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

1    Q.  In your expert opinion?

2    A.  Possibly.

3    Q.  This ad's talking about anal sex?

4    A.  Again, based off of the context, it could be.  It could be

5    a false advertisement for anal sex.  It could be an actual                    15:18:21

6    advertisement for anal sex.

7            But within the realm of commercial sex exchanges, the

8    term Greek is a known pseudonym for anal sex.

9    Q.  And the 125, 100 until 3:00 a.m., you'd agree that's an ad

10   written -- in that ad -- in that title it's talking about some               15:18:45

11   exchange of money.  Fair?

12   A.  Possibly, yes.

13   Q.  And you testified before that you -- you can't know if this

14   is a prostitution ad because it could be a fake ad.  It could

15   be a fake prostitution ad; right?                                            15:19:01

16   A.  It could be a fake prostitution ad --

17   Q.  Isn't that right?

18   A.  -- that's correct.

19   Q.  And so you can't know if this was a real prostitution ad or

20   a fake prostitution ad just by looking at it; right?                         15:19:12

21   A.  Or if it's a prostitution ad at all.

22   Q.  Oh, so you don't agree in your expert opinion that this

23   language is indicative of prostitution?

24   A.  It's suggestive of possible prostitution.  But in the realm

25   of possibilities, there could be other possibilities as well.               15:19:30

UNITED STATES DISTRICT COURT

1   Q.  Within the realm of possibility, there -- it could be for

2   something else?

3   A.  Potentially.

4   Q.  Why don't we move to another one of the ad titles.

5        Going down the page, do you see this ad title, ma'am?     15:19:46

6   A.  Yes, sir.

7   Q.  "Tight, Sweet, and Discrete.  $40.  30 minutes F/S

8   Specials."

9        And you know what F/S specials are; right?

10  A.  Within commercial sex exchanges, F/S can stand for full     15:20:08

11  service, which means vaginal intercourse or full intercourse.

12  Q.  Okay.  And so this is another ad title that's suggestive of

13  prostitution in your opinion; correct?

14  A.  Possibly.

15  Q.  Okay.                                                       15:20:25

16  A.  But it could also be a fake ad.  So it could.  Again, the

17  language is suggestive of that.

18  Q.  I think my question was, this is suggestive?

19        And so you would agree with that; right?

20  A.  Yes --                                                      15:20:36

21  Q.  But it --

22  A.  -- it could be suggestive.

23  Q.  It could be a fake prostitution ad?

24  A.  Correct.

25  Q.  And is your testimony that -- well, let me ask you this:    15:20:42

```
 1    You know that Backpage was earning over $100 million a year?

 2             MS. BERTRAND:  Objection.  Relevance.

 3             THE COURT:  Overruled.

 4             MS. BERTRAND:  Foundation.

 5             THE WITNESS:  I don't recall the exact number of how         15:20:58

 6    much Backpage was earning --

 7    BY MR. STONE:

 8    Q.  Would it --

 9    A.  -- per year.

10    Q.  I'm sorry to inter- -- jump over you.                           15:21:03

11             Would it surprise you to learn that they were earning

12    over $100 million a year from the years 2013 through 2017?

13             MS. BERTRAND:  Same objection.  Relevance and

14    foundation.

15             THE COURT:  Well, you can -- I'll sustain as to            15:21:14

16    foundation.

17             MR. STONE:  Well, I'm just asking is she aware, Your

18    Honor.

19             Actually, you're right.  Let me rephrase.

20    BY MR. STONE:                                                      15:21:24

21    Q.  Are you aware that between the years 2013 and 2017 Backpage

22    earned over $100 million a year?

23             MS. BERTRAND:  Same objection.

24             THE COURT:  Overruled.

25             THE WITNESS:  I don't know how much they were earning     15:21:32
```

```
 1   per year or how much they were earning on any given year.
 2   BY MR. STONE:
 3   Q.  Do you know the percentage of the revenue that was from
 4   adult ads?
 5            MS. BERTRAND:  Objection.  Goes beyond the scope.        15:21:44
 6   Relevance.  Foundation.
 7            THE COURT:  Overruled.  She's testifying as an expert
 8   in the area generally, so she can answer.
 9            THE WITNESS:  Could you rephrase your question or
10   repeat it, please.                                               15:21:58
11            MR. STONE:  Madam court reporter, could you repeat it,
12   please.
13       (Record read.)
14            THE WITNESS:  No, I do not.  I don't know offhand what
15   percentage.                                                      15:22:11
16   BY MR. STONE:
17   Q.  You don't know the percentage?
18   A.  No.
19   Q.  Is it, in your expert opinion, that -- well, I'll strike
20   that.
21            We are looking at Exhibit 2- -- 2046.  And there are
22   dozens of ads for any given day here.  Is that fair?
23   A.  In -- I can't see the full exhibit, but in my experience in
24   reviewing the platform, there can be dozens of ads posted on a
25   daily basis depending on the geography.                         15:22:51
```

1    Q.  And you looked at the website a lot and were fairly -- you

2    were very familiar with it; right?

3    A.  I would say that I was very familiar with it, yes.

4    Q.  And you were familiar that there could be upwards of a

5    couple thousand ads on -- for any given city on any given day;          15:23:05

6    right?

7    A.  Again, it depends on the geography, but, yes --

8    Q.  It could be?

9    A.  -- it's possible.

10        Sure.                                                               15:23:14

11   Q.  So lots -- lots of ads.

12        And it -- do you have a sense for how many of those

13   ads were actual prostitution ads and how many were these fake

14   ads that you've testified about?

15        MS. BERTRAND:  Objection.  Calls for speculation.                   15:23:25

16        MR. STONE:  She's an expert, Your Honor.

17        THE COURT:  Overruled.

18        THE WITNESS:  No, because, as I testified to earlier,

19   it's not possible to discern from simply looking at the ad

20   which ones are fake, which ones are actual, which ones were put         15:23:37

21   up by law enforcement, which ones were put up by service

22   providers or researchers, for example.  Academics have

23   published peer-review journal articles if they're posting the

24   fake ads and responses to them.

25        So from looking at this, it's not possible from an                 15:23:54

1    empirical reliable perspective to determine what percentage

2    were sex work, non-sex work, alleged sex work -- sex work or

3    purported sex work.  It's not possible to determine.

4    BY MR. STONE:

5    Q.  Okay.  In looking at these ads, would you agree that they          15:24:08

6    are suggestive of prostitution?

7    A.  Do you want me to comment on one particular ad or --

8    Q.  I just --

9    A.  -- all of them?

10   Q.  I'd like you to answer my question, which is, in looking at        15:24:26

11   these ads on this exhibit, are these ads suggestive of

12   prostitution?

13   A.  And the answer to that is possibly, but I can't see the

14   full ad from this high-level listing.

15          So, for example, one says, "I'm lovely blonde Amanda            15:24:46

16   and I've got big, big boobs."

17          That in and of itself is not suggestive of sex work.

18   And I don't know what's inside of that advertisement.  I don't

19   know who responded to it.

20          So, again, from looking at the ad, I cannot discern            15:25:01

21   what is sex work or prostitution or non-sex work.  But some of

22   them, like the one you have highlighted, yes, it can be

23   suggestive -- suggestive of sex work.

24   Q.  In your experience, was Backpage making most of its money

25   off fake prostitution ads?                                            15:25:17

```
 1              MS. BERTRAND:  Objection.  Foundation.
 2              MR. STONE:  I'm laying foundation.  She's testified
 3    about fake prostitution ads.
 4              THE COURT:  Hold on.
 5              Sustain the objection, Mr. Stone.                    15:25:30
 6    BY MR. STONE:
 7    Q.  Well, in -- in your experience, had -- when you go through
 8    a website like Backpage.com, where there's pages and pages of
 9    these ads, is it your experience that half of them are fake
10    ads?                                                          15:25:56
11    A.  Again, as I had mentioned to you previously, you cannot
12    discern which one of them is fake or not fake.  And so it's not
13    quantifiable.  I cannot tell you if it's 50 percent or 75 or
14    90.  There are no reliable data for any expert to testify to on
15    the percentage of these ads that were fake or posted by a      15:26:16
16    non-sex worker versus a sex worker versus a prostitute versus a
17    trafficking victim.  That data does not exist.
18    Q.  Perhaps I misunderstood your direct examination where you
19    testified that you actually spoke with people who were posting
20    ads and went out and met people who had posted ads on Backpage. 15:26:35
21              Was that right?
22    A.  Yes, sir, that is correct.
23    Q.  And, in your experience for that, were over half fake ads?
24    A.  As I had described early on, there's a difference between
25    quantitative data, where you can quantify and give a           15:26:55
```

 1    percentage, versus qualitative data.

 2          What you're describing is a qualitative interview, in

 3    which case you cannot generalize and say what percentage.  It

 4    would not be deemed reliable.  You do not have the power to

 5    estimate a percentage based off of that.                    15:27:12

 6          And so the way that you've asked that question is,

 7    what percentage?  It's not possible to calculate using

 8    qualitative data.

 9    Q.  Got it.

10          So your testimony is that in looking at a Backpage     15:27:22

11    website, you can't tell what the ads are for prostitution or

12    how many of the ads are for prostitution?

13    A.  In looking at --

14    Q.  It's yes or no, ma'am.

15    A.  Could you repeat the question?                           15:27:38

16          I understand, but as an expert I -- sometimes it's not

17    possible.  So I don't -- if you want to repeat the question.  I

18    can't --

19    Q.  Sometimes it's not possible --

20    A.  It's not --

21    Q.  -- to answer yes or no?

22    A.  -- possible to answer yes or no.

23          THE COURT:  Okay.  Don't talk over one another,

24    please.

25          MR. STONE:  I'll ask it again, Your Honor.             15:27:52

UNITED STATES DISTRICT COURT

```
 1    BY MR. STONE:
 2    Q.  Your testimony is that you don't know how many of these ads
 3    are prostitution ads?  Yes or no?
 4    A.  It is my testimony that it is not possible to calculate.
 5    So, no, I do not.                                                   15:28:08
 6    Q.  Okay.  So you -- your testimony isn't all that helpful to
 7    the jury on this part, is it?
 8            MS. BERTRAND:  Objection.  Objection.  Argumentative.
 9            THE COURT:  Sustained.
10    BY MR. STONE:                                                       15:28:24
11    Q.  Let me just switch gears for a second, ma'am.
12            You've provided your definition of commercial sex
13    today; correct?
14    A.  Yes, sir.
15    Q.  And that's your understanding and your opinion; right?         15:28:32
16    A.  Of the overarching what commercial sex encompasses, yes.
17    That is a simplified explanation of it.
18    Q.  That's your opinion?
19    A.  Yes, sir.
20    Q.  And you understand that the Court will instruct the jury on    15:28:46
21    the law at the end of this case, do you not?
22    A.  Absolutely.
23    Q.  And it may be different from your definition; right?
24    A.  Yeah, I -- yes.  I understand that it may be different than
25    what my definition is.  And I understand what my role is as an     15:29:01
```

1   expert witness.

2   Q.  All right.  Let's look at Exhibit 214, which has been

3   admitted.

4          MR. STONE:  And I ask that it be published.

5          THE COURT:  Yes, it may be published.                    15:29:22

6   BY MR. STONE:

7   Q.  Ma'am, do you see this exhibit that's on your screen?

8   A.  Yes, sir.

9   Q.  And can you tell if that's a Backpage ad?

10  A.  Yes, it appears to be a Backpage ad.                        15:29:34

11  Q.  And your testimony is that you can't tell if this ad's for

12  prostitution; right?

13  A.  From the ad alone, no, it is not possible to discern and

14  confirm that this is a prostitution advertisement.

15  Q.  Because it could be a fake ad?                              15:29:51

16  A.  It could be a fake ad.

17  Q.  All right.  Let's look at 214a, which is admitted.

18          And is this a Backpage ad?

19  A.  Yes, it appears to be a Backpage ad as well.

20  Q.  And this is another ad that you cannot determine whether    15:30:06

21  it's an ad for prostitution?

22  A.  From looking at this ad alone, I cannot confirm whether it

23  is a verified ad for prostitution or not.

24  Q.  Because, again, it could be a fake ad?

25  A.  It absolutely could be a fake ad.                           15:30:22

1    Q.  All right.  How about Exhibit 222, which is admitted?

2           Is this a Backpage ad, ma'am?

3    A.  It appears to be a Backpage ad, yes.

4    Q.  And you can't determine if this ad is for prostitution;

5    correct?                                                         15:30:42

6    A.  In and of itself, no.  It does not appear that there's

7    anything that can confirm or create a determinative opinion on

8    whether this is a confirmed advertisement for prostitution or

9    not.

10   Q.  Would there be anything that the ad could say that would    15:30:55

11   confirm that it's an ad for prostitution, in your opinion?

12   A.  In and of the ad itself, without corroboration from

13   external sources, no, I don't think there's anything that can

14   make a determinative conclusion.  And in my experience, that's

15   my understanding of why the ad in and of itself is not          15:31:28

16   typically actionable.

17   Q.  Okay.  So if there was an ad -- I'm going to give you a

18   hypothetical here, ma'am -- that read, I will give you sex for

19   $150, that ad in and of itself would not -- that language would

20   not be enough for you to determine whether that ad was for      15:31:51

21   prostitution?

22   A.  That language alone is not enough to determine it's an ad

23   for prostitution, especially considering that I have personally

24   worked on cases where the defendant posted ads like that and

25   ended up robbing people and not providing commercial sex        15:32:11

```
 1    services.
 2    Q.  It was a fake prostitution ad in that case?
 3    A.  In that particular anecdotal example, yes, it was a fake
 4    ad.
 5    Q.  So there could be a web page -- or a website with a million    15:32:23
 6    ads, each one of them says $100 for sex, but in your opinion we
 7    wouldn't be -- we wouldn't know whether all those ads were for
 8    prostitution or not?
 9    A.  You would not.
10          MS. BERTRAND:  Objection.  Asked and answered, Judge.       15:32:41
11          THE COURT:  Overruled.
12          THE WITNESS:  So the question is, if there is a
13    website with 100 ads, I would not be able to determine whether
14    they were all fake or real based off of that itself?
15    BY MR. STONE:                                                     15:32:55
16    Q.  Well, it -- close, but maybe I'll break it down because it
17    was a long question.
18          All right.  Here's another hypothetical for you,
19    ma'am.  All right?  Are you with me?
20    A.  I'm with you.                                                 15:33:02
21    Q.  Website --
22    A.  Uh-huh.
23    Q.  -- has a million ads on it --
24    A.  Okay.
25    Q.  -- and each ad says $100 for sex.                            15:33:06
```

1    A.  Okay.

2    Q.  Are you able to determine whether those are ads for

3    prostitution?

4            MS. BERTRAND:  Objection.  Speculation.  Hypothetical.

5    Lack of foundation.                                          15:33:17

6            THE COURT:  Overruled.  It's within her realm of

7    testimony.

8            THE WITNESS:  Again, I would not be able to conclude

9    whether each individual one was conclusive or whether it was an

10   ad for prostitution.                                         15:33:30

11           Now, if there were 100 million ads, is it likely --

12   more likely than not, based off of probabilities, that some of

13   them might be prostitution?  Yes, it is possible.  And it is

14   probable that some of them would be for prostitution.  And some

15   of them would be potentially for sugar dating, and some of them  15:33:46

16   would be fake, and some of them would be posted by law

17   enforcement, and some of them might be posted by victim service

18   providers.

19           So there's just a number of different hypotheticals

20   that could explain the posting of that ad, and from the ad     15:34:00

21   itself you would not be able to conclude one way or another.

22           MR. STONE:  All right.  Just a moment, Your Honor.

23   BY MR. STONE:

24   Q.  All right.  Just one more exhibit, ma'am.

25           This is Exhibit 218 that has been admitted.           15:34:37

UNITED STATES DISTRICT COURT

```
 1              MR. STONE:  So I'll ask that it be published.
 2    BY MR. STONE:
 3    Q.  All right.  And is this a Backpage ad?
 4              MR. STONE:  Why don't you back up so she can see it.
 5              THE WITNESS:  It's a bit cut off, but, yes, it appears    15:34:58
 6    to be a Backpage ad.
 7    BY MR. STONE:
 8    Q.  Okay.  And then we'll zoom in on the language of the ad.
 9              And in the middle it says, "I do half hour sessions
10    that vary in donation prices.  80 for head, $120 for hooking up    15:35:15
11    without head, and 150 for hooking up with head."
12              Do you see that?
13    A.  Yes, sir, I do.
14    Q.  So consistent with your testimony, this would be an ad that
15    you would not be able to determine was for prostitution?          15:35:29
16    A.  It absolutely could be an ad for prostitution, but there's
17    no way to determine one way or another.  It could also be a
18    fake ad.
19              Typically ads will also sometimes say these pictures
20    are true, because fraudulent pictures or pictures sourced from     15:35:43
21    other websites can be posted in ads that do not comport with
22    whoever the poster is.
23              So this could be an ad for prostitution for certain,
24    but there's no way to verify from the language in the ad
25    itself.                                                            15:36:00
```

```
 1    Q.  But you can't say for certain; right?

 2    A.  Yes, sir.

 3         MR. STONE:  All right.  That's it, Your Honor.  Thank

 4    you.

 5         THE COURT:  All right.  Ms. Bertrand.                    15:36:12

 6                   REDIRECT EXAMINATION

 7    BY MS. BERTRAND:

 8    Q.  Doctor, what is your hourly rate in this case, if you know

 9    offhand?

10    A.  My recollection is that it was approved for 350 an hour.   15:36:40

11    That's $350.

12    Q.  Right.  Right.

13         You talked with the government about where

14    prostitution is legal, and you mentioned Nevada in some places?

15    A.  In some counties in Nevada.                               15:37:04

16    Q.  Do you happen to know which counties in Nevada allow?

17         MR. STONE:  Objection.  Relevance.

18         THE COURT:  Sustained.

19    BY MS. BERTRAND:

20    Q.  But there are some counties in Nevada that allow it?      15:37:20

21    A.  Yes, ma'am.

22    Q.  You talked with the government at length about what you can

23    tell from the face of an ad.

24         They just passed you back to me; right?

25    A.  Yes, ma'am.                                               15:37:51
```

 1   Q.  And so we're clear, for all we know, with any given ad,

 2   before we have any background on the ad, for all we know it

 3   could be for any number of purposes; correct?

 4          MR. STONE:  Objection.  Leading.

 5          THE COURT:  I'll overrule.                            15:38:09

 6          THE WITNESS:  The question was for any number of

 7   purposes?

 8   BY MS. BERTRAND:

 9   Q.  Sure.

10   A.  Correct.                                                 15:38:16

11   Q.  In your experience, have you ever met a commercial sex

12   worker who was actually an escort?

13   A.  An escort as in somebody who is not providing sexual

14   services for money but just for their time?  Yes.

15   Q.  Have you known whether or not those escorts that you've met   15:38:39

16   advertised online?

17   A.  Yes.  I think that most escorts do in this day and age

18   advertise on -- online.

19   Q.  Is it -- you were talking with the government about The

20   Erotic Review.                                              15:39:27

21          What has been your experience with whether or not

22   posts regarding the same provider are consistent?

23          MR. STONE:  Objection.  Asked and answered, I think,

24   Your Honor.

25          THE COURT:  I'll overrule.                           15:39:50

1          THE WITNESS:  It depends.  Oftentimes I would say it's

2     more often than not there is variation in a review of a

3     purported provider.  And by that I mean there might be

4     inconsistencies with the description of the provider, the

5     alleged service provided, the amount of money exchanged.          15:40:14

6          Sometimes providers will use the acronym YMMV, which

7     stands for your mileage may vary, which is indicative -- you're

8     making a face that you haven't heard of that one.

9     BY MS. BERTRAND:

10    Q.  I've never heard of that one.                                 15:40:33

11    A.  It's indicative of you might have different experiences

12    with this same person.  So, for example, one person could

13    patronize somebody who's claiming to provide an erotic massage

14    and no sexual services are exchanged, and another person might

15    receive F/S, or full service, and another person might receive   15:40:55

16    Greek.  And some of those services might be turned down for

17    various -- a variety of reasons.  But commercial sex providers

18    often exert their agency to choose what they will do and if

19    they will do something.

20          THE COURT:  I'm sorry, but I lost the question in that      15:41:15

21    narrative.  So let's ask --

22          MS. BERTRAND:  Let's have --

23          THE COURT:  -- a new question.

24          MS. BERTRAND:  -- the court reporter -- oh, okay.

25    Sorry.                                                            15:41:24

UNITED STATES DISTRICT COURT

```
 1            THE COURT:  Well, ask a new question.

 2            And answer only the question asked, please.

 3            THE WITNESS:  Okay.  I apologize.

 4   BY MS. BERTRAND:

 5   Q.  Would there be any relationship that Backpage had with      15:41:51

 6   other sites like The Erotic Review that would change any of the

 7   opinions you've offered today?

 8   A.  As far as whether you can discern from an ad whether it is

 9   sex work or not?  No.  It -- any relationship or exchange or

10   cross-posting does not change the -- do not -- does not change   15:42:20

11   those opinions.

12            MS. BERTRAND:  May I just check with my colleagues --

13            THE COURT:  Yes.

14            MS. BERTRAND:  -- please, just to make sure?

15            Your Honor, I have nothing further.  Thank you.        15:42:30

16            THE COURT:  Okay.

17            MS. BERTRAND:  I'd ask that this witness be excused.

18            THE COURT:  Yes.  May she be released from subpoena?

19            MS. BERTRAND:  Yes.

20            THE COURT:  Any objection?                             15:42:40

21            MR. STONE:  No objection, Your Honor.

22            THE COURT:  Ma'am.  Thank you for your testimony.  You

23   may step down.  You are excused.

24            THE WITNESS:  Thank you.

25            THE COURT:  All right.  Members of the jury, this is   15:42:50
```

our last witness of the day, and so you -- you have a early

dismissal.  And we will delay a start time for you tomorrow.

There are some procedural matters that I have to discuss that

may take a little bit of time, and I don't want you to be just

waiting around in the jury room.  And so I think we can get          15:43:13

everything done and ready for you to resume your chair, and if

you would be ready to come into court at 1:00 p.m. tomorrow

afternoon.  And we will continue on until the routine 4:30 p.m.

finish for the day.

        And, again, it's vitally important for you to continue      15:43:39

to keep an open mind; not to make any determination, either

individually or collectively; to even discuss the matter

amongst yourselves, with your family members, or anyone else;

not to conduct any research about the people that we've heard

from or the places that have been discussed.  Just to continue      15:44:00

to keep that open mind until we have handed the case over to

you.

        And so I'll expect you to be available and ready to

resume your seat at 1:00 p.m. tomorrow.

        All rise for the jury.                                      15:44:13

     (Jury not present at 3:44 p.m.)

        THE COURT:  All right.  Again, I remind those who are

present in the courtroom to permit the jurors to leave

uninterrupted.  Do remain in the courtroom for a few

more minutes.                                                       15:44:54

```
 1        And at this point -- let me clarify.  I may have
 2   misspoke.  The start time tomorrow will be 9:30 for counsel,
 3   and at that time we will hopefully perfect those final jury
 4   instructions that are outstanding.  And because we are at the
 5   posture where none of the defendants are going to testify,       15:45:19
 6   there are no other witnesses, Mr. Lincenberg had an opportunity
 7   to renew his Rule 29 motion.
 8        Is there anyone else who wishes to be heard?
 9        MR. FEDER:  On the Rule 29 or something different?
10        THE COURT:  On the Rule 29 right now.                         15:45:41
11        MR. EISENBERG:  Your Honor, if I may go forward --
12        THE COURT:  Yes.
13        MR. EISENBERG:  -- at this point?
14        I do renew my motion.  I'm not going to make any
15   further argument.  I don't think there was anything covered in    15:45:53
16   the government's -- I'm sorry -- in the -- yeah, since the
17   motion was made before that would cast any new light on it, on
18   my motion.
19        THE COURT:  All right.  Thank you, Mr. Eisenberg.
20        Mr. Feder?                                                    15:46:07
21        MR. FEDER:  Same as Mr. Eisenberg.
22        THE COURT:  You adopt his well-reasoned argument?
23        MR. FEDER:  As always.
24        THE COURT:  All right.  Yes, Ms. Bertrand.
25        MS. BERTRAND:  I join with my colleague,                      15:46:16
```

1    Mr. Eisenberg, as well.

2              THE COURT:  All right.  Thank you.

3         Mr. Cambria?

4         MR. CAMBRIA:  Yes, Your Honor.  What I had indicated

5    in the past, and also I think that with regard to Count 100 in          15:46:25

6    the face of the FBARs that are now in evidence and

7    unchallenged, that concealment issue has been resolved and that

8    for that -- for that reason, you know, we have alleged that

9    there wasn't sufficient evidence to go forward on any of the

10   counts, but clearly documentary evidence with regard to                15:46:52

11   Count 100.

12             And at some time today -- I'm still a little confused

13   about the schedule for summations vis-a-vis settling the

14   instructions.  I would like to be in a position to know the

15   final instruction before I start tuning up my summation.  And I        15:47:11

16   don't know how that logistically can happen with the schedule

17   that you've set from the standpoint for, you know, if we don't

18   resolve that until tomorrow, which apparently is the current

19   schedule.

20             THE COURT:  Can you come forward to the podium?  I'm         15:47:31

21   just having --

22             MR. CAMBRIA:  Certainly.

23             THE COURT:  -- a little bit of a difficulty.  It's a

24   bit of a strain.  You're --

25             MR. CAMBRIA:  I'm sorry about that, Your Honor.             15:47:39

1          Anyway, obviously I would like to have the benefit of

2   the final instructions before a -- you know, I put my summation

3   together.  And it looks like, at least from what you're

4   suggesting, that there's a potential that defense might sum up

5   Friday or -- as opposed to simply putting -- do it all on          15:47:58

6   Thursday -- do it all on Tuesday.  And this way we've got the

7   instructions, if we could tune up our summations, and counsel

8   can talk about making sure we don't repeat things that

9   shouldn't be repeated, and all the rest of it.

10          THE COURT:  I'm -- I'm going to quote a description          15:48:21

11   that you gave me very early on.

12          MR. CAMBRIA:  Uh-oh.

13          THE COURT:  "I was born ready."

14          MR. CAMBRIA:  Oh, I didn't say -- I didn't say that,

15   Your Honor.                                                         15:48:34

16          THE COURT:  Oh, I have -- I think it's --

17          MR. CAMBRIA:  No, I did say that.  Oh, I agree I said

18   that, but I -- the final instructions are pretty critical to

19   which way I'm going to go.

20          THE COURT:  All right.  So let me then clarify for          15:48:47

21   you.  And I certainly -- the government can chime in here with

22   what -- my expectations may be higher than -- than they --

23   their own.

24          What -- because we need the morning to perfect those

25   final instructions.  I need to have time to do that myself.  I     15:49:09

```
 1   want to make sure that you're able to make a record on those

 2   objections.  I've got to have them ready in a perfected manner

 3   so that the jury can follow along.  There are voluminous jury

 4   instructions.  That's going to take a while.  I will then

 5   permit the government to begin their opening [sic] argument.          15:49:32

 6        You're all aware of the number of counts and the

 7   amount of evidence.  I anticipate -- and correct me if I'm

 8   wrong.  Maybe there's some super expeditious way that the

 9   government intends to do this, but I anticipate roughly they

10   start their opening around 3:00 o'clock maybe, 2:30, whenever    15:49:56

11   we come back from a break.  Because this jury has been promised

12   to be released at 4:30, my guess is they'll have to continue

13   their closing argument Friday morning.

14        The length of the opening argument wasn't that lengthy

15   for the government, but I don't know who's making the          15:50:22

16   summation, but how long you intend to go?  At least at this

17   point, I would think that you have an approximate length of

18   time.

19        MR. RAPP:  About an hour and a half.

20        THE COURT:  Hour?                                         15:50:41

21        MR. RAPP:  Hour and a half to an hour and 45 minutes.

22   I mean, I really -- you're right.  There's 100 counts, but

23   we -- we are endeavoring to get through.  We just think there's

24   diminishing returns after a couple hours.

25        THE COURT:  You're right.  We have attention span        15:51:03
```

UNITED STATES DISTRICT COURT

1    issues of everyone.  My -- I always tell counsel that the

2    average opening argument should be no more than 20 minutes,

3    because after that you get a little fidgety from the jury.

4            But, in any event, so let's ballpark it at two hours.

5            MR. RAPP:  Fair enough.                        15:51:27

6            THE COURT:  So the defense should be ready to proceed

7    with their closing Friday.  And the reason why this is so is

8    because, as I mentioned before, we have that tight window of

9    time in which you're going to each individually make your

10   closing arguments, government's going to have an opportunity to   15:51:53

11   make their rebuttal close, and then we have the jury

12   deliberation time.  And depending on how that goes, then we

13   have the potential of the forfeiture matter.  And so that abuts

14   us right to the day that they're going to -- that their service

15   is to end and that we assured them that they would end.          15:52:21

16           And so certainly one of you will be ready by Friday.

17   You'll have those jury instructions in hand.  And so that's how

18   we will proceed.

19           All right.  So with that, be prepared to come in at

20   9:30.  And I will have my courtroom staff direct you to the      15:52:46

21   jury instructions that I am going to primarily focus on so

22   it'll hopefully shortcut that time as well.

23           MR. RAPP:  Judge, I just have a small housekeeping

24   matter.

25           In our -- in our trial brief that we filed before the    15:53:06

UNITED STATES DISTRICT COURT

1    trial, we had requested that we be given the opportunity to

2    provide photographs of the witnesses to the jury as the trial

3    went along because of the length of the trial so they could

4    correlate the testimony with the -- with the particular

5    witness.  The Court wasn't inclined to allow us to do that,                    15:53:28

6    which was fine.

7              Obviously, we -- we have taken pictures of these

8    witnesses, and we have -- we intend in our argument to have

9    those pictures, for example.  You know, obviously the postings

10   of the victims who testified to their postings, they look quite      15:53:44

11   different now, and so the jury should be, obviously, allowed to

12   recall which -- what the witness looked like on the stand.

13             And so we have that for all of our witnesses so they

14   can understand who it was who said what and -- and all that so

15   they can understand this evidence in a two-month trial with          15:54:03

16   nearly 2,000 exhibits.

17             With respect to the defendants, we have never obtained

18   their booking photos.  We have very vanilla driver's license

19   photos.  The same argument goes for them, so they can

20   understand it.  And, as the Court might recall, at some point         15:54:22

21   during this trial I think this jury didn't know who was who.

22   They -- they wanted to have them introduced again.

23             And so we would ask that we be able to use these very

24   vanilla photographs that are nothing more than driver's license

25   photographs -- they're not booking photos.  They're not in           15:54:40

1     jumpsuits.  There's not one of those things that you see in

2     booking photos -- so they can understand what -- what witness

3     is -- what defendant is saying something in a particular email

4     or in a particular meeting so the jury is not confused about

5     that.                                                              15:55:00

6           So that's -- that's our request.

7           MS. BERTRAND:  Your Honor, the defense objects to

8     which -- to the -- well, first of all, to the fact that they

9     continue taking pictures of witnesses after the Court told them

10    not to.  That's issue 1.                                          15:55:12

11          Second of all, the defendants are sitting right here.

12    And they didn't have that many witnesses.  It's not that hard

13    to keep track of them.  And what the jury wanted to be reminded

14    of is, frankly, what lawyers are assigned to whom, not that

15    they had trouble following along with the evidence or who's     15:55:29

16    who.  These have not been entered into evidence.  They're --

17    they're not evidence.  They -- they're not properly proffered

18    as what, demonstratives?

19          But I think the bigger -- I go back to the judge told

20    them -- this Court told them not to do it, and they did it       15:55:50

21    anyway.  And now they're coming to you and saying, let us use

22    it.

23          That's not okay.

24          THE COURT:  Well, let me -- let me just make a couple

25    observations.  This has been a very lengthy trial.  There have   15:56:03

been a number of witnesses who have testified.  The witnesses

that the government is proposing, I think, are those individual

people who appeared and testified that that was their ad.  And

even though the length of the -- the trial may tax the

witness's [sic] memory, I think if you can do a good enough job    15:56:36

at describing the witness on the witness stand -- this has been

a very attentive jury, and they have been very observant.

They've been taking notes.  And so my sense is they will have

recall, and I don't think the photographs are necessary.

        I made the observation when you proposed using the       15:57:09

photographs of the individual defendants in the beginning that

they looked like possible booking photographs.  And I apologize

that they were not, and they are obviously driver's license

photos.  And even so, I agree with Ms. Bertrand that the --

this jury has seen these individuals in court every day, and so    15:57:37

I don't think it's necessary to bring photographs forward in a

PowerPoint or any sort of fashion.  They can -- they can see

them for themselves.  And so I'm not going to permit it.

        All right.  So with that, then we will see you at

2:00 -- 2:30 -- 9:30 tomorrow morning.                            15:57:58

        Wait.  All counsel meet with Liliana.  She's going to

give you the list of exhibits that have been admitted into

evidence.  She's going to require someone from the government

and every defense counsel to certify that what was admitted is

going back.  It's your signature, so make sure you do that.      15:58:22

1   Meet with her in terms of those exhibits, and do so sooner

2   rather than later, especially if we're going to move towards

3   opening instructions.  In any event, I would say by tomorrow

4   after we let the jury go, you should make that your first

5   priority, because we're going to immediately send those back to   15:58:49

6   the jury.

7          All right.  With that, we will stand in recess until

8   9:30 tomorrow.

9          MR. FEDER:  And, Judge, would the Court entertain a

10  character witness jury instruction?   15:59:02

11         THE COURT:  Did you provide one?

12         MR. FEDER:  I have not provided one, but there -- the

13  character witness just testified today.  I can get you

14  something overnight.

15         THE COURT:  Share it with the government.  If you can   15:59:12

16  come to agreement, that's better.  If not, then I'll look at

17  it, but submit it no later than 7:00 o'clock this evening.

18         THE COURTROOM DEPUTY:  All rise.

19      (Proceedings adjourn at 3:59 p.m.)

20                        ---oOo---

21

22

23

24

25

1

2

3

4

5                            **C E R T I F I C A T E**

6

7           I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15          DATED at Phoenix, Arizona, this 25th day of October,

16   2023.

17

18

19                              */s/ Cathy J. Taylor*
                                _____
20                              Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25