GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

AUSTIN M. BERRY (Texas Bar No. 24062615, austin.berry2@usdoj.gov)
U.S. Department of Justice
Child Exploitation and Obscenity Section
1301 New York Avenue, NW, 11th Floor
Washington, D.C. 20005
Telephone (202) 412-4136
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| United States of America, | CR-18-422-PHX-DJH |
| Plaintiff, | **UNITED STATES' RESPONSE TO DEFENDANTS' ORAL MOTION TO DISMISS** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

1

**SUMMARY OF ARGUMENT**

Defendants seek dismissal based on a draft asset tracing document that consists of information the United States disclosed to Defendants *over three years ago*. The United States provided the same statements to Defendants in nearly verbatim form when it produced two civil seizure affidavits in 2018, and when it served a related civil forfeiture complaint in 2020. (*See* Exhibits 1-3, attached.) As shown in a line-by-line comparison prepared by the United States (Exhibit 8, attached), these long-ago produced documents contain every material statement in the draft. Moreover, the draft was written by an agent who didn't testify at the trial, and no witness had adopted or approved of the draft. The draft isn't *Jencks* and doesn't contain any *Brady* or *Giglio* information that had not already been produced. For these and other reasons, the United States complied with its disclosure and discovery obligations—and Defendants' motion should be denied.

**FACTUAL BACKGROUND**

**I.     Inspector Versoza Prepared the Draft Asset Tracing Document**

Defendants' motion is premised on an email the United States produced in an abundance of caution in anticipation of former Special Agent Quoc Thai's testimony during the forfeiture phase of the trial. On October 18, 2023, after Thai's trial testimony, he emailed asset forfeiture AUSA Dan Boyle. (Oct. 18, 2023, email attached as Exhibit 4.) The email discussed Thai's availability to meet with AUSA Boyle, "I'm generally free after 1 and could make exceptions most days after 9AM." (Ex. 4.) It also attached "the latest draft of the tracing document that [Postal Inspector Lyndon Versoza] and I put together years ago." (Ex. 4.) The attached document is titled, "Backpage Investigation, Asset Tracing Master Document Draft." ("Draft," attached as Exhibit 5.)

The relevant facts about the Draft include the following, which Inspector Lyndon Versoza and former SA Thai would testify to if so requested by the Court.

The purpose of the Draft was to serve as a repository to support asset forfeiture arising out of the Backpage investigation. Inspector Versoza prepared the Draft. Former SA Thai reviewed the Draft and made some formatting and line edit suggestions, but did

not actually draft any part of the document.

The Draft formed the basis for Inspector Versoza's affidavits in support of several seizure warrants issued by the Central District of California in 2018. (*See, e.g.*, Versoza Affidavit, filed 4/26/2018, Case No. 2:18-MJ-01000, Doc. 3-1, Bates No. DOJ-BP-0004598397-524 (attached as Exhibit 1); Versoza Affidavit, filed 10/31/2018, Case No. 2:18-MJ-2872, Doc. 3-1, Bates No. DOJ-BP-0004719085-327 (attached as Exhibit 3).)

Defendants have long had access to the civil seizure affidavits. The United States produced the first affidavit to Defendants in discovery on July 2, 2018. (7/2/2018 discovery letter, attached as Exhibit 6.) The United States produced the second affidavit to Defendants on November 30, 2018. (11/30/2018 discovery letter, attached as Exhibit 7.)

The Draft was also used as a basis for the United States' Consolidated Master Verified Complaint for Forfeiture ("Civil Forfeiture Complaint") in a civil forfeiture action in the Central District of California. (*See* First Amended Consolidated Master Verified Complaint for Forfeiture, filed June 1, 2020, Case No. CV-18-8420-RGK-PJW, Doc. 108, Central District California (attached as Exhibit 2).) Inspector Versoza verified the complaint, and the United States filed it on the Central District of California's public docket on June 1, 2020. (*See* Ex. 2 at 1, 90.) All Defendants have been made aware of that action, and Lacey, Brunst, and Spear have even filed claims in it—and have routinely received ECF service of the filings in that case. (*See, e.g.*, Case No. CV-18-8420-RGK-PJW, Doc. 57 (claim filed by Lacey), Doc. 59 (claim filed by Spear), Docs. 73 and 75 (notices of appearance filed by Gary S Lincenberg and Gopi K Panchapakesan on behalf of Claimant John Brunst); *see also* Exhibit 9 (attached) (ECF filing notification showing service of Doc. 108 on counsel for Lacey, Brunst, and Spear).)

The Draft itself is not a final document. Inspector Versoza used it as the starting point for his seizure warrant affidavits, but he would then review the underlying transactions to ensure the information included in the affidavits was correct. (*See, e.g.*, Ex. 5 at 70 ("Tracing to be completed on Monday.").) The information included in the Draft still needed to be completed and finalized, which Inspector Versoza did before certifying

the seizure warrant affidavits and the Civil Forfeiture Complaint.

In addition to the fact that former SA Thai did not prepare the Draft, he also did not rely on it in preparing for his trial testimony in this case. Instead, Thai drafted his own document titled "Master Table," which the United States produced to Defendants on February 11, 2020. (Feb. 11, 2020, email from A. Stone to defense counsel, attached as Exhibit 10.) That spreadsheet contained all the notes and citations to bank records that Thai used in both (a) preparing the summary exhibits, and (b) preparing for his trial testimony regarding the money laundering counts.

After Thai's trial testimony, he began to prepare for his potential testimony related to asset forfeiture. Thai referenced the Draft in the email to AUSA Boyle because the information relates to asset forfeiture. Accordingly, and in an abundance of caution, the United States produced the email.

## II. The Civil Seizure Affidavits and the Civil Forfeiture Complaint Disclose Nearly Verbatim the Contents of the Draft

The language in the Draft was incorporated nearly verbatim into the civil seizure affidavits and the Civil Forfeiture Complaint discussed above. To show this, the United States has prepared Exhibit 8. Exhibit 8 reproduces each paragraph of the Draft and corresponding language found in the affidavits, the complaint, and other bank records—all of which were either produced to Defendants in this case in discovery, or publicly filed and served on Defendants in the Central District of California. Simply put, Exhibit 8 shows that all the information contained in the Draft was previously disclosed and known to Defendants.

The following excerpt of Exhibit 8 is illustrative—it shows, on a line-by-line basis, how paragraphs 32-36 of the Draft were reproduced in nearly identical form in Exhibit 1—Inspector Versoza's 4/26/2018 civil seizure affidavit, produced to Defendants in July 2018 (*see* Ex. 6):

| | |
|---|---|
| 32. Fio Bank accounts '2226,'2231, '2230 are located in the Czech Republic, and held in the name of Gold Leaf SRO. All funds and securities in these accounts are held for Backpage.com by a third party, Gold Leaf SRO. According to FERRER and the Service Level Agreement ("SLA") between Ad Tech BV, a Backpage owned company and Gold Leaf SRO, the funds and/or securities in these accounts are the criminally derived proceeds of Backpage ads, including ads promoting prostitution. | 10(n). SUBJECT ACCOUNT 18D: Fio Bank, in the Czech Republic, account number CZ7020100000002001002226, is an account held in the name of Gold Leaf SRO. All funds and securities in this account are held for Backpage.com by a third party, Gold Leaf SRO.<br><br>10(o). SUBJECT ACCOUNT 18E: Fio Bank, in the Czech Republic, account number CZ7620100000002101002231, is an account held in the name of Gold Leaf SRO. All funds and securities in this account are held for Backpage.com by a third party, Gold Leaf SRO.<br><br>10(p). SUBJECT ACCOUNT 18F: Fio Bank, in the Czech Republic, account number CZ8520100000002501002230, is an account held in the name of Gold Leaf SRO. All funds and securities in this account are held for Backpage.com by a third party, Gold Leaf SRO.<br><br>(Ex. 1 at ¶ 10.)<br><br>66(b). SUBJECT ACCOUNTS 18D, 18E, and 18F are accounts held by a third party, Gold Leaf SRO. According to Ferrer and Service Level Agreements ("SLA") between Ad Tech BV, a Backpage owned company and Gold Leaf SRO, which I have reviewed, the funds and/or securities in these accounts are the criminally derived proceeds of Backpage ads, including ads promoting prostitution.<br><br>(Ex. 1 at ¶ 66.) |
| 33. The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage. According to FERRER, the arrangement between Gold Leaf, | 66(b). The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage. According to Ferrer, the arrangement between Gold Leaf, SRO, and Backpage |

| | |
|---|---|
| SRO, and Backpage was put into place to evade what he called a "blockade by credit card companies." FERRER explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage. | was put into place to evade what he called a "blockade by credit card companies." Ferrer explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage.<br><br>(Ex 1 at ¶ 66.) |
| 34.  As one of the ways around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments. | 66(b).  As one of the ways around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments.<br><br>(Ex 1 at ¶ 66.) |
| 35.  According to FERRER, this use of foreign third-parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads. | 66(b).  According to Ferrer, this use of foreign third parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads.<br><br>(Ex 1 at ¶ 66.) |
| 36.  FERRER said that Gold Leaf SRO existed for the sole purpose of funneling to Backpage accounts otherwise prohibited credit card payments for Backpage ads. FERRER explained that these accounts are owned by Backpage and are not co-mingled with other funds, and are therefore subject to seizure and forfeiture to the United States. | 66(b).  Ferrer said that Gold Leaf SRO existed for the sole purpose of funneling to Backpage accounts otherwise prohibited credit card payments for Backpage ads. Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds, and are therefore subject to seizure and forfeiture to the United States.<br><br>(Ex 1 at ¶ 66.) |

(Ex. 8 at 19-21.)

**ARGUMENT**

The United States has complied with its discovery obligations. The Draft wasn't *Jencks* and didn't contain any *Brady* or *Giglio* information that hadn't already been produced. (*See* Exs. 1-3.) The Draft also wasn't subject to Rule 16. The Draft only arguably became discoverable when former SA Thai attached it to an email discussing his potential testimony related to the forfeiture phase. But the Draft itself provided Defendants with no new material information—Defendants were aware of everything in the document because it either had been produced by the United States in discovery over five years ago, or was included in the First Amended Consolidated Master Verified Complaint for Forfeiture filed by the United States in June 2020, of which all Defendants are fully aware. Defendants Lacey, Brunst, and Spear, through attorneys who represent them in this criminal trial, then filed two motions to dismiss the civil forfeiture action. (CV-18-8420-RGK-PJW, Central District of California, Docs. 111 and 112; *see* Exhibit 11, attached.)

Accordingly, even if the Court found that the Draft should have been disclosed sooner, Defendants suffered zero prejudice, because all of the information contained in the Draft had been disclosed years ago.

## I.   **The Draft Isn't *Jencks***

Defendants argued in their oral motion to dismiss that the Draft may be *Jencks* of former SA Thai and Carl Ferrer. Those arguments do not square with the evidence.

The Jencks Act requires the United States "to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). "The term 'statement' . . . means—a written statement made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1).[1]

---

[1] Rule 26.2 also discusses the obligation to disclose a witness's statement, but expands the obligation to the defense. "After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony." Fed.

The Draft isn't a "written statement made by" Carl Ferrer. The Draft was not "signed or otherwise adopted or approved" by him. 18 U.S.C. § 3500. Further, all statements attributed to Ferrer in the Draft were produced to Defendants in the Versoza affidavits. (Exs. 1 & 3.)

The Draft also isn't *Jencks* for Quoc Thai. As an initial matter, former SA Thai was not the author of the Draft, nor did he contribute substantively to the document, so the document isn't a "written statement made by" him. Defendants may argue that because Thai reviewed the Draft and offered some line edits and formatting suggestions he "adopted or approved" it, but that point is dubious. *United States v. Begaye*, 236 F.R.D. 448, 451-454 (D. Ariz. 2006) (testifying agent who read and relied on another agent's written report was not *Jencks* for the testifying witness). Assuming *arguendo* that Thai did "adopt or approve" the document, the Draft still isn't *Jencks*—for two reasons.

First, the document is a draft and wasn't intended as a final "statement." In *United States v. Kaiser*, 660 F.2d 724, 731-32 (9th Cir. 1981), the Ninth Circuit held that when a draft was "neither intended as a final statement nor [] a contemporaneously written factual account of what a witness said" then it wasn't "adopted or approved" by the agent and isn't producible. The court found no violation of *Jencks* where an agent discarded his handwritten rough draft of an investigative report, explaining:

> The Jencks Act requires, in part, that the Government produce written statements made by a witness and "signed or otherwise adopted or approved by him." 18 U.S.C.s 3500(e)(1). The draft of the report here was not intended as a final report. Nor was the draft similar to witness interview notes which are intended only to be factual accounts of what a witness said.

*Id.* at 731-32 (citing *United States v. Harris*, 543 F.2d 1247, 1252 (9th Cir. 1976).

In *United States v. Steele*, 2020 WL 4726704, at *5 (W.D. Wash. Aug. 13, 2020), the district court similarly held that the United States need not produce drafts of a special agent's affidavit in support of a criminal complaint. The United States, relying on *Kaiser*, argued that the agent's "drafts are not producible because 'under a plain reading of the

R. Crim. P. 26.2(a). A "witness's 'statement' means: a written statement that the witness makes and signs, otherwise adopts or approves." Fed. R. Crim. P. 26.2(f)(1).

statute (or Rule 26.2), a draft statement that is not signed or otherwise adopted or approved is not a written statement for purposes of Jencks.'" *Id.* The court agreed, finding that because the draft affidavit wasn't "substantially different from the final version" and the special agent never "intended to approve or adopt earlier drafts," the draft affidavit wasn't "producible Jencks material." *Id.* So too, here: the statements in the Draft aren't substantially different from the finalized civil seizure affidavits and Civil Forfeiture Complaint discussed above (Exs. 1-3), and no agent or witness ever intended to approve or adopt the Draft.

Second, the Draft didn't relate to Thai's trial testimony. The document, as evidenced by its use exclusively in supporting the seizure warrants and civil forfeiture complaint, did not relate to the money laundering counts that Thai testified about at trial. Indeed, Thai did not rely on the Draft to prep for trial, but instead drafted his own document titled "Master Table," which the United States produced to Defendants on February 11, 2020. (Ex. 10.)

Finally, even if the Court finds that the Draft should have been produced earlier, Defendants have suffered no prejudice, because they have received all this information— nearly verbatim—from other sources, including the seizure warrant affidavits and Civil Forfeiture Complaint. (Exs. 1-3, 8.) *See, e.g., Rosenberg v. United States*, 360 U.S. 367, 371 (1959) ("[Where] the same information that would have been afforded had the document been given to defendant was already in the possession of the defense by way of the witness' admissions while testifying, it would deny reason to entertain the belief that defendant could have been prejudiced by not having had opportunity to inspect the letter."); *United States v. Terragna*, 390 F. App'x 631, 639 (9th Cir. 2010) ("Because the interview notes that defendants received included [the witness's] substantially verbatim statements, defendants were not prejudiced by the Government's failure to produce formal summaries of those statements.").

In sum, there was no *Jencks* violation, let alone any conduct sufficient to warrant the extreme sanctions of dismissal or stricken testimony that Defendants seek here.

## II.     *Brady* and *Giglio* Do Not Apply

In making their oral motion to dismiss, Defendants attempted to couch the Draft's recent disclosure as a *Brady* or *Giglio* violation. (*See generally* Transcript of the November 8, 2023 status conference.) Defendant Brunst's counsel argued that Carl Ferrer's cross examination would have been materially different if the Draft had been disclosed previously. This argument strains credulity.

An allegation that the prosecution failed to disclose material evidence is governed by *Brady v. Maryland*, 373 U.S. 83, 87, (1963). Under Brady, "[t]he government violates its constitutional duty to disclose material exculpatory evidence where (1) the evidence in question is favorable to the accused in that it is exculpatory or impeachment evidence, (2) the government willfully or inadvertently suppresses this evidence, and (3) prejudice ensues from the suppression (i.e., the evidence is 'material')." *Jones v. Ryan*, 691 F.3d 1093, 1102 (9th Cir. 2012) (citation and quotations omitted). When evidence isn't suppressed, *Brady* and *Giglio* aren't implicated. *Id.*

Here, no evidence was actually suppressed, so neither *Brady* nor *Giglio* applies. In the draft document, there are 23 paragraphs that attribute statements to Carl Ferrer. (Ex. 5 at ¶¶ 30, 32, 33, 35-38, 40-43, 45-47, 50, 51, 53-56, 59, 60, 65.) Each of these paragraphs is included nearly verbatim in Inspector Versoza's two seizure warrant affidavits. (Exs. 1 & 3.) Every single statement attributed to Ferrer was part of these affidavits. (*See* Ex. 8 at 18-34.) These Ferrer statements have been in Defendants' possession since November 2018. (Exs. 6 & 7.) If anything, the two affidavits provide more detailed information about Ferrer's statements than the draft document. (*See* Ex. 8 at ¶¶ 30, 32, 37, 42, 50, 53-54, 59.) Because no statements by Ferrer were suppressed—and the contents of the Draft were previously disclosed to Defendants years ago—neither *Brady* nor *Giglio* applies. *United States v. Marashi*, 913 F.2d 724, 734 (9th Cir. 1990) (when the substance of the information has already been disclosed, then the non-disclosed information is "merely cumulative impeachment evidence and thus [] not *Brady* material"); *United States v. Kennedy*, 890 F.2d 1056, 1061 (9th Cir. 1989) ("no *Brady* violation when the undisclosed evidence was

cumulative to evidence presented at trial"); *see also United States v. Van Brandy*, 726 F.2d 548, 551 (9th Cir. 1984) (defendant must not only make a showing that the non-disclosed evidence is material and favorable to defendant, but also that it has not been included in any report provided to defendant).

### III.    Rule 16 Does Not Apply, and Defendants Suffered Zero Prejudice

Defendant's oral motion to dismiss did not invoke Rule 16. Nevertheless, the United States preemptively notes that there has been no Rule 16 violation. As an initial matter, this Draft falls under the protection of Rule 16(a)(2). That rule "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2). *See also United States v. Amlani*, 111 F.3d 705, 713 (9th Cir. 1997) ("We agree with the district court that the government is not obligated under Rule 16(a)(2) to turn over internal government documents . . . . Rule 16(a)(2) clarifies that a defendant has an interest in the actual evidence in the government's control, not the government's records of that evidence.").

Even if the protection of Rule 16(a)(2) didn't apply, the Draft was not discoverable under Rule 16. In accordance with the rule, the United States must disclose certain categories of information if the defendant makes a request for such information. The only category the Draft could possibly implicate is "documents and objects." Fed. R. Crim. P. 16(a)(1)(e). That section reads in pertinent part, "Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data . . . if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense." But the Draft wasn't material to trial preparation regarding the money laundering counts, and former SA Thai did not rely on it in creating the summary exhibits or preparing for his testimony.

Finally, even if the Draft could be deemed material, all the information contained in the Draft was previously produced and known to Defendants. (*See* Exs. 1-3, 8.) Accordingly, Defendants suffered no prejudice. *See, e.g.*, *United States v. Christensen*, 624

F. App'x 466, 481-82 (9th Cir. 2015) ("any Rule 16 violation was harmless because the [fact] was common knowledge"); *United States v. Gee*, 695 F.2d 1165, 1168 (9th Cir. 1983) (finding that failure to provide transcript of a tape-recorded conversation pre-trial did not prejudice defendant's rights at trial, when defendant had the tape recording).

Simply put, the United States complied with its disclosure and discovery obligations, and Defendants face no prejudice. For these same reasons, Defendants' alternative requests for relief should denied. In addition to seeking dismissal of the entire case, Defendants seek partial dismissal, striking Thai's testimony, and/or an evidentiary hearing. None of these requests are warranted or needed, given the clear fact that Defendants already had the Draft's information in their possession—as Exhibit 8 demonstrates. Production of the Draft before trial would have failed to change the evidence presented at trial in any meaningful way, since Defendants were already armed with all the facts identified in the Draft.

In these circumstances, Defendants' motion should be denied.

## CONCLUSION

For the foregoing reasons, Defendants' oral motion to dismiss or for other relief should be denied.

Respectfully submitted this 13th day of November, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

*s/Andrew C. Stone*
KEVIN M. RAPP
MARGARET PERLMETER
PETER KOZINETS
ANDREW STONE
DANIEL BOYLE
Assistant U.S. Attorneys

AUSTIN M. BERRY
Trial Attorney

1

2

**CERTIFICATE OF SERVICE**

3    I hereby certify that on November 13, 2023, I electronically transmitted the attached

4  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

5  Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance

6  as counsel of record.

7

8  *s/ Daniel Parke*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28