# Exhibit 3 – Part B

Case 2:18-mj-02031-DUTY *SEALED* Document 1-1 *SEALED* Filed 08/13/20 Page 2 of 77 Page 76 of
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 3 of
121 Page ID #:327

2.    Prior to my service as a U.S. Postal Inspector, I
attended the University of Southern California in Los Angeles,
where, in 2001, I received a bachelor's degree.  While in
college, I was the website administrator for a non-profit media
company in Los Angeles where, among other things, I learned
about domain names, domain name servers, and remote hosting.
Following college, from 2002 to 2005, I served as a law
enforcement officer with the U.S. Immigration and Naturalization
Service, which later became U.S. Customs and Border Protection.
There, among other things, I worked on cases involving human
smuggling and international sex trafficking.

3.    I am familiar with the facts and circumstances
described herein.  This affidavit is based upon my personal
involvement in this investigation, my training and experience,
and information obtained from various law enforcement personnel
and witnesses, including information that has been reported to
me either directly or indirectly.  This affidavit does not
purport to set forth my complete knowledge or understanding of
the facts related to this investigation.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and part only.  All
figures, times, and calculations set forth herein are
approximate.

- 2 -

ATTACHMENT B

DOJ-BP-0004719160

## II. **SUMMARY AND PURPOSE OF AFFIDAVIT**

4.      This affidavit is made in support of applications for warrants to seize all funds held in certain SUBJECT ACCOUNTS[1] (identified specifically below at paragraph 10), all owned, controlled, or held for the benefit of "Backpage.com" (referred to herein as "Backpage"), associated entities, and their owners and operators.

A. Background

5.      This case is being investigated by the USPIS, the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service-Criminal Investigation ("IRS-CI"), with assistance from the Los Angeles Joint Regional Intelligence Center.

6.      The focus of the investigation has been on violations by Backpage, its associated entities, and their owners and operators, of Title 18, United States Code, Sections 1591(a), 1952(a)(3)(A) and (b)(i)(1) (Interstate and Foreign Travel in Aid of Racketeering Enterprise); and Title 18 U.S.C. §§ 1956 and 1957, (Money Laundering).

7.      From speaking with other agents in this investigation,

---

[1] The numbering of the SUBJECT ACCOUNTS picks up from prior warrant applications for different accounts, the contents of which have already been seized or restrained following seizure warrants issued in this District.  *See* 18-MJ-711; 18-MJ-712; 18-MJ-713; 18-MJ-715; 18-MJ-716; 18-MJ-178; 18-MJ-720; 18-MJ-721; 18-MJ-722; 18-MJ-723; 18-MJ-724; 18-MJ-751; 18-MJ-752; 18-MJ-797; 18-MJ-798; 18-MJ-996; 18-MJ-1863; and 18-MJ-1864.

- 3 -

ATTACHMENT B

DOJ-BP-0004719161

Case 2:16-mj-02732-DUTY *SEALED* Document 1068-2 *SEALED* Filed 10/13/20 Page 78 of
136  Page ID #:502
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18  Page 5 of
121  Page ID #:329

and reviewing emails, internal documents, and other records
related to this investigation, I know the following:

     a.    Backpage.com, LLC, incorporated in Delaware in
2004, is an internet-based company that allows customers to post
on-line classified advertisements.  These advertisements include
sections dedicated to a variety of matters, including adult,
automotive, community, dating, jobs, local places, musicians,
rentals and services.  Backpage receives between 75 million to
100 million unique internet visitors per month.

     b.    Backpage realizes profits in the tens of millions
of dollars per year from adult advertisement.  Historically,
adult ads, where Backpage advertisers post sex trafficking ads,
constitute less than ten percent of all advertisements posted on
the website.  However, the adult ads generate over 90 percent of
Backpage's revenue.  In short, Backpage derives almost all its
revenue and profits from adult service ads, including
advertising for sex trafficking.[2]

---

[2] According to Backpage accounting records, for the period May 1
to May 31, 2014, over 90% of Backpage's revenues derived from
what they characterized as "adult entertainment."  Backpage's
internal documents suggest that this 90% figure has been
consistent since its 2004 inception.

ATTACHMENT B

DOJ-BP-0004719162

Case 2:18-mj-02431-DUT Document 1968-2 *SEALED* 13/28 Page 79 of 77 Page 79 of
Case 2:18-mj-02031-DUT   SEALED* Document 5-1 *SEALED   Filed 08/07/18   Page 6 of
136   Page ID #:503
121   Page ID #:330

        c.    In or about 2004, operators Michael Lacey

("Lacey"), James Larkin ("Larkin"), and Carl Ferrer ("Ferrer")

created Backpage.  There were also two minority owners; John

Brunst ("Brunst"), who owned 5.67 percent; and Scott Spear

("Spear"), who owned 4.09 percent.  From 2004 until 2015, Lacey

and Larkin oversaw the website's policies and strategic

direction.  In 2015, Lacy and Larkin purportedly sold all or

substantially all of their interests in Backpage to Ferrer.[3]

However Lacey and Larkin retained significant control over the

website, and both Lacey and Larkin continue to receive tens of

millions of dollars of annual distributions of Backpage revenue.

        d.    While not an original owner, Ferrer was one of

the original officers of Backpage, having initially served as

Backpage's vice-president, and later as CEO.  Ferrer is also the

CEO of several Backpage related entities in the Netherlands,

including "Website Technologies," "Amstel River Holdings," and

---

For example, between October 6, 2014, and May 31, 2015,
Backpage grossed almost $105 million from advertising "adult
entertainment."  During this same period, Backpage grossed only
$1.6 million from all other advertisements combined.  Assuming
that Backpage has accurately estimated that 90% of its revenues
are generated from "adult" and "escort" ads, Backpage has
generated as much as $500 million in prostitution-related
revenue since 2004.

[3] From my review of financial records related to Ferrer's 2015
agreement to purchase Backpage, it appears that, through a
series of loans from other Backpage Operators to be repaid by
Ferrer, Ferrer agreed to purchase Backpage for approximately
$400 million.

                        - 5 -

DOJ-BP-0004719163

Case 2:18-cr-00422-SPL Document 1968-2 *SEALED* Filed 11/13/23 Page 6 of 77 Page 80 of
136 Page ID #:504
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 7 of
121 Page ID #:331

"Ad Tech BV."

  e. Michael Thomas Gage ("Gage") has no formal position at Backpage, but is the President, Chief Executive Officer, Treasurer, and Secretary of another Backpage controlled entity, "Posting Solutions," a wholly owned subsidiary of Backpage that receives payments from Backpage advertisers. According to his social media profile, Gage is also the Chief Financial Officer of Website Technologies. Based on emails he has sent and wire transfer information, Gage appears to control much of the international and domestic financial transactions of Backpage and its related entities.

  f. Daniel Hyer ("Hyer") at one time was the Sales and Marketing Director of Backpage. He remains an account signatory for Backpage controlled entities, including Website Technologies.

  8. Throughout this affidavit, the individuals identified in paragraphs 7(c) through (f), along with others not named in this affidavit, are collectively referred to as the "Backpage Operators."

  9. Based on a review of publicly available materials obtained in the course of the investigation, and my review of the Backpage website, I have learned the following:

  a. The majority of the paid advertisements on the Backpage website relate to prostitution activities in violation

          - 6 -

of 18 U.S.C. §§ 1591 and 1952.

      b. As further described below, Backpage itself, as well as its operators, who are in control of the SUBJECT ACCOUNTS (as defined below), is in the business of promoting the trafficking of children and adults for sex. Sex trafficking of adults is a violation of 18 U.S.C. § 1952, and sex trafficking of children is a violation of 18 U.S.C. 1591, each of which statutes is a Specified Unlawful activity ("SUA") within the meaning of federal law. (*see* 18 U.S.C. § 1956(c)(7)(A), identifying as SUA certain "racketeering activity" as defined in 18 U.S.C. § 1961(a)).

      c. The SUBJECT ACCOUNTS are located both inside and outside the United States. The domestic accounts have received wire transfers from places outside of the United States or have received funds traceable to wire transfers from places outside of the United States, which funds Backpage has used to promote sex trafficking, in violation of 18 U.S.C. § 1956(a)(2)(A) (International Money Laundering). Some of the SUBJECT ACCOUNTS have received transfers or deposits in excess of $10,000 traceable to the SUA, in violation of 18 U.S.C. § 1957 (Money Laundering Spending Statute).

      d. Backpage, until recently, controlled numerous domain names that have since been seized by the government pursuant to a seizure warrant issued in this district in case

- 7 -

DOJ-BP-0004719165

no. CR. Misc. 2:18-MJ-00711.[4] The Seized Domains are registered

by "ASCIO TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar

that manages the reservation of internet domain names. A domain

registrar serves to ensure that a registered domain name, like

each of the Seized Domains, is not double sold. Additionally, a

domain registration will allow the owner of the domain to direct

internet traffic to a company's webserver. The Seized Domains

were found to have been acquired and maintained with funds

traceable to the money laundering scheme described herein,

specifically with funds from an account seized pursuant to a

separate seizure warrant in case no. CR. Misc. 2:18-MJ-00721,

and the Seized Domains were the mechanism Backpage used to

promote the prostitution and sex trafficking activity described

below.

B. SUBJECT ACCOUNTS

   10.  This affidavit is offered in support of applications

for warrants to seize all funds and securities held in the

---

[4] On March 28, 2018, the Honorable Patrick J. Walsh, United
States Magistrate Judge for the Central District of California,
issued seizure warrants for certain Backpage owned or controlled
domain names (see 18-MJ-00711). On April 6, 2018, pursuant to
that warrant, Backpage.com was seized and ceased operations.
The domain names seized pursuant to that warrant are referred to
herein as the "seized domains."

- 8 -

ATTACHMENT B

DOJ-BP-0004719166

Case 2:18-cr-00422-SPL Document 968-2 *SEALED* 13/28 Filed Page 9 of 77 age 83 of
136   Page ID #:507
Case 2:18-mj-02031-DUTY  SEALED* Document 5-1 *SEALED*  Filed 08/07/18  Page 10 of
121   Page ID #:334

following U.S. and foreign bank accounts[5] (hereinafter referred
to collectively as the "SUBJECT ACCOUNTS"):

      a.   SUBJECT ACCOUNT 26:[6]  Funds in the amount of
$2,412,785.47 originating from MidFirst Bank account number
8061024139.  This account was held in the name of John Becker
with Michael Lacey as the sole beneficiary.  The account was
closed by the bank and used to purchase an un-negotiated
cashier's check #317503 from MoneyGram.

      b.   SUBJECT ACCOUNT 27:  Bank of America account
50033414 in an "Interest on Lawyers Trust Account" ("IOLTA")
held in the name of Davis Wright Tremaine.  Based on my
conversations with Backpage CEO, Carl Ferrer, and Bank of
America employees, I believe that Backpage or Backpage

_____

[5] Pursuant to 18 U.S.C. § 981(b)(3), this Court has authority to
issue a seizure order for foreign accounts ("Notwithstanding the
provisions of Rule 41(a) of the Federal Rules of Criminal
Procedure, a seizure warrant may be issued . . . in any district
in which a forfeiture action may be filed . . . and may be
transmitted to the central authority of any foreign state for
service with any treaty or other international agreement").
[6] Previously, on July 19, 2018, the Honorable Rozella Oliver,
United States Magistrate Judge for the Central District of
California, issued a seizure warrant to MidFirst Bank (see MJ-
1864).  However, upon service of the warrant on MidFirst Bank, I
learned that Midfirst Bank contracted with a third party for the
purchase of a cashier's check, and the funds have been
transferred to an account with MoneyGram.  Upon learning of the
prior seizure warrant for these funds served upon MidFirst Bank,
MoneyGram has stopped payment on the check in anticipation of a
seizure warrant related to these funds and directed to MoneyGram.

- 9 -

ATTACHMENT B

controlled entities are the beneficiaries of this account. As
further described and traced in this affidavit, $8,778,802.96 of
funds from this account are criminally derived proceeds from
Backpage. From my conversations with bank employees, I
understand that, as of the date of this affidavit, SUBJECT
ACCOUNT 27 currently holds approximately $3 million or $4
million in funds, which is less than the approximately
$8,778,802.96 in funds that have been traced to the alleged
criminal activity.

### III. **APPLICABLE LAW**

11. There is probable cause to believe that funds and/or
securities on deposit in the SUBJECT ACCOUNTS are subject to
seizure and forfeiture by the United States under the following
provisions:

a. 18 U.S.C. § 981(a)(1)(A), because the funds
and/or securities are involved in, and traceable to, one or more
transactions or attempted transactions in violation of 18 U.S.C.
§ 1956(h) (Conspiracy to Launder Money), 18 U.S.C. § 1956(a)(2)
(International Money Laundering for Promotion), and 18 U.S.C. §
1957 (Financial Transactions Involving Illicit Proceeds).
Pursuant to 18 U.S.C. § 981(a)(1)(A), any property involved in a
transaction, or attempted transaction, in violation of 18 U.S.C.
§§ 1956 or 1957, or any property traceable to such property, is
subject to forfeiture to the United States; and

- 10 -

ATTACHMENT B

Case 2:18-cr-00422-DJH Document 1968-2 Filed 11/13/23 Page 14 of 77 Page 85 of
136 Page ID #:509
Case 2:18-mj-02031-DUT SEALED Document 5-1 *SEALED Filed 08/07/18 Page 12 of
121 Page ID #:336

b.    18 U.S.C. § 981(a)(1)(C), because the funds
and/or securities constitute and are derived from proceeds
traceable to one or more violations of 18 U.S.C. § 1956(h), 18
U.S.C. § 1956(a)(2), and 18 U.S.C. § 1957.

12.   Title 18 U.S.C. § 1956 prohibits, among other things,
financial transactions involving the proceeds of SUAs --
committed or attempted (1) with the intent to promote further
predicate offenses; (2) with the intent to evade taxation; (3)
knowing the transaction is designed to conceal the source,
location, ownership or control of the proceeds; or (4) knowing
the transaction is designed to avoid anti-laundering financial
reporting requirements. 18 U.S.C. § 1956(h) prohibits two or
more parties agreeing to accomplish the unlawful purpose of
money laundering.

13.   Title 18 U.S.C. § 1957 prohibits a party from
knowingly engaging in a monetary transaction in excess of
$10,000 with property that is criminally derived from some SUA.

14.   Title 18 U.S.C. § 1956(a)(2) (International Money
Laundering for Promotion) makes it a crime to transport,
transmit, or transfer, or attempt to transport, transmit, or
transfer, monetary instruments or funds (including funds that
are not criminal proceeds) from the United States to or through
a place outside the United States, or to the United States from
or through a place outside the United States, with the intent to

- 11 -

DOJ-BP-0004719169

promote some SUA, as that term is defined in 18 U.S.C. §
1956(c)(7).

15. The "Travel Act," 18 U.S.C. § 1952(a), an SUA,
prohibits, in part, the use of the mail or any facility in
interstate or foreign commerce with the intent to otherwise
promote, manage, establish, carry on, or facilitate the
promotion, management, establishment, or carrying on of any
unlawful activity, by any person who thereafter performs or
attempts to perform an act to promote, manage, establish, carry
on, or facilitate the promotion, management, establishment and
carrying on of such unlawful activity. "Unlawful Activity," as
defined in 18 U.S.C. § 1952(b), includes prostitution offenses
in violation of the laws of the state in which such acts are
committed or in violation of the laws of the United States.
Prostitution is illegal in the State of California. (*See, e.g.*,
Cal. Penal Code § 647(b).)

16. Sex trafficking of juveniles or any person by means of
force, fraud or coercion, is a violation of 18 U.S.C. § 1591, an
SUA.

## IV.  **DIGITAL CURRENCY/BITCOIN**

17. Digital currency (also known as crypto-currency) is
generally defined as an electronic-sourced unit of value that
can be used as a substitute for fiat currency (*i.e.*, currency
created and regulated by a sovereign government). It exists

- 12 -

DOJ-BP-0004719170

Case 2:18-cr-00422-SDJL Document 1968-2 Filed 11/13/23 Page 13 of 77 Page 87 of
136 Page ID #:511
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 14 of
121 Page ID #:338

entirely on the Internet and is not stored in any physical form.
It is not issued by any government, bank, or company, but is
instead generated and controlled through computer software
operating on a decentralized peer-to-peer network. Digital
currency is not illegal in the United States and may be used for
legitimate financial transactions. However, it is often used to
conduct illegal transactions, such as the sale of controlled
substance, or as in this investigation, to purchase ads to
promote prostitution.

18. Bitcoin is a type of digital currency accepted by
Backpage. Bitcoin payments are recorded on a public ledger that
is maintained by peer-to-peer verification, and is thus not
maintained by a single administrator or entity. Individuals can
acquire Bitcoins either by "mining" them or purchasing Bitcoins
from other individuals. An individual can "mine" Bitcoins by
allowing his/her computing power to verify and record the
Bitcoin payments into a public ledger. Individuals are rewarded
for this by being given newly created Bitcoins. Bitcoins can be
bought and sold in fractions.

19. Backpage also accepts other digital currencies,
including Litecoin, Bitcoin Cash, and Ether. Sometimes called
"alt-coins," because they are alternatives to Bitcoins, these
digital currencies were created after Bitcoin to address
perceived weaknesses or problems with Bitcoin technology. Based

- 13 -

ATTACHMENT B

DOJ-BP-0004719171

Case 2:20-mj-00422-DUTY Document 1-1 *SEALED* Filed 11/13/23 Page 14 of 77 Page 88 of
136 Page ID #:512
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 15 of
121 Page ID #:339

on my review of Backpage transactions, the majority of
Backpage's digital currency transactions are in Bitcoin.

20. An individual can send and receive Bitcoins through
peer-to-peer digital transactions or by using a third-party
broker. Such transactions can be done on any type of computer,
including laptop computers and smart phones.

21. Digital currency is generally stored in digital
"wallets," which essentially store the access codes that allows
individuals to conduct digital currency transactions on the
public ledger. To access digital currency on the public ledger,
an individual must use a public address (or "public key") and a
private address (or "private key"). The public address can be
analogized to a bank account number, while the private key is
like a password used to access an online account.

22. Even though the public addresses of those engaging in
Bitcoin transactions are recorded on the public ledger, the true
identities of the individuals or entities behind the public
addresses are not. If, however, an individual or entity is
linked to a public address, it would be possible to determine
what transactions were conducted by that individual or entity.
For these reasons, digital currency transactions are described
as "pseudonymous," meaning they are partially anonymous.

- 14 -

ATTACHMENT B

DOJ-BP-0004719172

Case 2: Case 2:18-cr-00422-DJH Document 1968-2 *SEALED* 11/13/23 Page 15 of 77 Page 89 of
136 Page ID #:513
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 16 of
121 Page ID #:340

## V. **STATEMENT OF PROBABLE CAUSE**

### C. Buying a Backpage Ad

23.   In February 2018, I visited Backpage.com and, posing
as an advertising purchaser, engaged in the regular process of
posting an ad in the Backpage "Dating" section, which is one of
the places on Backpage.com where prostitution ads are commonly
found.   Through this process, I learned the following:

a.   A person looking to post an advertisement on
Backpage (an "advertiser") must first create an account.  Once
an account is created, the advertiser clicks on a link called
"Post an ad," which will then toggle certain categories
regarding where the ad should be posted (e.g., "Los Angeles,"
"Riverside," etc.) and under what category the ad should appear
(e.g., "Dating," "Adult," etc.).   The advertiser also has the
option to post pictures and videos.   In the adult sections,
opting to post in more than one geographical area, or opting to
post more frequently occurring ads will increase the
advertisement price.   Currently, Backpage.com charges $5 per ad
posted in the adult sections.   In some of the non-adult and non-
dating sections I checked, there was no charge at all to post an
ad.

b.   Once an advertiser selects the desired options,
he or she is required to enter a phone number, a link to a
social media page (such as Facebook), and an email address.   The

- 15 -

DOJ-BP-0004719173

Backpage website claims to verify the advertiser's phone number before he or she can continue on to actually purchasing an ad.

     c.    In order to pay for Backpage ads, an advertiser must first buy "credits." Backpage offers several ways for an advertiser to acquire credits:

     i.    A Backpage advertiser may mail gift cards, checks, and money orders to "Posting Solutions" at a P.O. Box in Dallas, Texas (as further described below, this P.O. Box is associated with Posting Solutions and Seized Account 1).[7]

     ii.    Backpage directly accepts credit card payment through a third-party credit card payment processor.

     iii.    Backpage also accepts several types of digital currency (specifically, Backpage accepts Bitcoin, Bitcoin Cash, Litecoin, and Ethereum). If the advertiser selects this option, Backpage provides a digital currency wallet address where the advertiser can send the electronic transfer of · the digital currency.

---

[7] I have reviewed the cash purchase of USPS money orders subsequently directed to this P.O. Box. Between September 2014 and June 2016, several millions of dollars in money orders were purchased in what appears to have been structured transactions (*i.e.*, transactions carried out in a manner intended to avoid certain reporting requirements that USPS maintains for money order purchases greater than $3000). Based on my review, hundreds of these money orders include email addresses with words consistent with prostitution, such as "sex" or "sexy."

ATTACHMENT B

DOJ-BP-0004719174

Case 2:18-mj-02031-DUTY *SEALED* Document 1-1968-1 *SEALED* Filed 08/07/18 Page 91 of
136    Page ID #:515
Case 2:18-mj-02031-DUTY *SEALED*  Document 5-1 *SEALED*  Filed 08/07/18  Page 18 of
121  Page ID #:342

iv.    Backpage also accepts cash, but only through
third party payment processors.  Based on information gathered
during this investigation, I believe that once the third-party
payment processor receives cash, it converts the cash into
digital currency and then electronically transfers that digital
currency to a Backpage digital currency wallet.

24.  Digital Currency is processed through the subject
accounts in the following way:

a.    When Backpage receives digital currency, it will
aggregate the digital currency and then transfer it to a third-
party exchanger like GoCoin.[8]

b.    In exchange for the digital currency, the exchanger
transfers U.S. dollars from its foreign bank accounts into
Backpage operating accounts, such as Seized Account 1.  The
exchanger, if it so elects, may then sell its Bitcoin on various
Bitcoin markets.

25.  I reviewed records obtained from GoCoin.  From this
review, I estimate that between 5 to 10 percent of the ads posted
on Backpage.com are ads within the Central District of California

---

[8] GoCoin is a digital currency exchanger that converts Bitcoin,
Litecoin and another digital currency into fiat currency, like
the U.S. Dollar or the Euro.  GoCoin is owned by Manx
Broadcasting Corporation, based in the Isle of Man.  GoCoin has
offices in Singapore and Santa Monica, California and appears to
hold bank accounts in several countries outside the United
States.

- 17 -

DOJ-BP-0004719175

Case 2: Case 2:18-2-00422-SJH Document 1268-1 Filed 11/13/23 Page 18 of 77 Page 92 of
136  Page ID #:516
Case 2:18-mj-02031-DUTY *SEALED*  Document 5-1 *SEALED*   iled 08/07/18  Page 19 of
121  Page ID #:343

(including Los Angeles and Orange Counties).  For example, between

January 10 and February 3, 2016, approximately 500,000 ads were

posted on Backpage.com and paid for with Bitcoin, for which

Backpage received over $3,840,000 in revenue.  Of these

approximately 500,000 ads, approximately 28,400 were posted only

in LosAngeles.Backpage.com, Ventura.Backpage.com,

SanLuisObispo.Backpage.com, OrangeCounty.Backpage.com, and

SanGabrielValley.Backpage.com.  These specific ads generated

approximately $184,479 in revenue.

D. Backpage Promotion of Prostitution and Sex Trafficking

26.  I have reviewed several Backpage ads that were used to

sell minors for sex and forcibly traffic adult women for sex.  I

have also reviewed the criminal records of certain of the pimps

and sex traffickers, most of whom were convicted after having used

Backpage to advertise their victims.  From this review, I learned

the following:

a.    Between 2014 and 2015, a pimp sold S.F., a minor

girl, for sex.  The pimp advertised S.F. on Backpage's "Escort"

section in the Los Angeles area of California and in Arizona.  The

ad contained phrases such as "New In Town" and "Sexy Dark Asian

Bombshell with a Nice & Tight {Booty}."  The ad selling S.F. on

Backpage included multiple pictures showing her legs, stomach,

shoulders and buttocks.  Later, the pimp was arrested and

convicted on state sex trafficking charges, and sentenced to 196

- 18 -

ATTACHMENT B

DOJ-BP-0004719176

years imprisonment.

   b. Between 2014 and 2015, the same pimp sold A.C., a minor girl, for sex. In November 2014, at the age of 17, A.C. was first sold for sex through a Backpage ad using phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire." The Backpage ad selling A.C. included pictures of her showing her legs, stomach, shoulder, and buttocks, and posed her in sexually provocative positions.

   c. Between November 2015 and December 2015, in a different incident, a pimp drove two women and four minor girls (T.S., S.L., K.O., and R.W.) from Columbus, Ohio to a hotel in St. Charles, Missouri. The next day, the pimp told the girls to post ads on Backpage.com. Some of the girls took calls and engaged in paid sex acts with Backpage customers who responded to the ads. The ads the girls posted included pictures of them sitting on the bed showing their buttocks. Another image I saw was of a naked girl's body pressed against a mirror. Other pictures appeared more mundane, such as images of girls posing clothed in front of a mirror. However, these ads used phrases like "I'm sweet as a treat maybe even sweeter" and "not a lot need to be said. my pic are 100% real." In 2017, this pimp was convicted on sex trafficking charges and a federal court sentenced him to 300 months in prison.

   d. In or around 2010, in Washington, J.S., a minor

- 19 -

Case 2:18-cr-00422-DJH Document 968-2 *SEALED* 11/13/23 Page 20 of 77 Page 94 of
136  Page ID #:518
Case 2:18-mj-02031-DUTY *SEALED*  Document 5-1 *SEALED*  Filed 08/07/18  Page 21 of
121  Page ID #:345

girl, was sold for sex through the use of Backpage ads.  J.S.'s
pimp drafted the ads that were placed on Backpage ad containing
words and phrases such as, "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and
"IT WONT TAKE LONG AT ALL."  The ads also included pictures of
J.S. in provocative positions showing her breasts and buttocks.
On March 29, 2011, the pimp who sold J.S. for sex was sentenced to
over 26 years imprisonment on charges related to sex trafficking.

     e.    Between in or around 2011 and 2016, a female
victim, D.O., who was between the ages of 14 and 19 during those
years, was sold for sex through Backpage ads.  D.O.'s female pimp
instructed D.O. that Backpage was the safest place to advertise
because Backpage did not require age verification.  D.O.'s
Backpage ads included words and phrases that were indicative of
prostitution, such as "roses" (money) and "back door" (anal sex).
Some of the customers who responded to D.O.'s Backpage ads forced
D.O. to perform sexual acts at gunpoint, choked her to the point

ATTACHMENT B

DOJ-BP-0004719178

of having seizures, and gang-raped her.[9]

27. I have reviewed documents and reports from multiple state and government agencies and authorities regarding Backpage's promotion of sex trafficking and prostitution. From these reports, and from my review of internal Backpage correspondence following Backpage management receiving these reports, I am aware that all levels of Backpage management are aware of Backpage's role in promoting criminal activity. For example:

    a.   On September 21, 2010, a group of state attorneys general wrote a letter to Backpage observing that "ads for prostitution—including ads trafficking children—are rampant on the site," and arguing that "[b]ecause Backpage cannot, or will not, adequately screen these ads, it should stop accepting them

---

[9] Using these examples, I also reviewed financial transactions for some of these ads. Using email addresses and other identifiers associated with the Backpage ads, I reviewed GoCoin records for some of these transactions. From these records, I found bitcoin payments associated with the email addresses used to post the ads, which transactions were processed by GoCoin. For example, in the case involving victims S.F. and A.C. (described in paragraphs 26(a) and (b)) prosecuted in Arizona, the bitcoin payments for these ads were made in November and October 2015.   In the case involving T.S., S.L., K.O., and R.W. (described in paragraph 26(c)) prosecuted in Missouri, the bitcoin payments were made in October and November 2015.   As described in paragraph 45 of this affidavit, between December 2015 and June 2016, over 130 wires from Slovakia from GoCoin, totaling over $16.8 million was sent to a Website Technologies account at Branch Bank & Trust Company account number 1440001712008.   Between December 2015 and October 2016, 32 wires totaling $48 million were sent from the BBT Account to a Cereus Properties Account 9361116211 at Arizona Bank and Trust, which made its way into 11 accounts named in prior seizure warrants.

- 21 -

ATTACHMENT B

DOJ-BP-0004719179

Case 2:18-cr-00422-SJH Document 1968-2 Filed 11/13/23 Page 22 of 77 Page 96 of
136 Page ID #:520
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 23 of
121 Page ID #:347

altogether." The state AGs acknowledged that this step would
cause Backpage to, "lose the considerable revenue generated by the
adult services ads," but stated that "no amount of money can
justify the scourge of illegal prostitution, and the misery of the
women and children who will continue to be victimized in the
marketplace provided by backpage."

      b.    Following this letter, on September 25, 2010,
Ferrer wrote an email explaining that Backpage was unwilling to
delete ads that included terms indicative of prostitution because
doing so would "piss[] off a lot of users who will migrate
elsewhere" and force Backpage to refund those customers' fees.

      c.    In January 2017, the U.S. Senate Subcommittee on
Permanent Investigations ("Subcommittee") conducted a lengthy
investigation into sex trafficking and Backpage. I have reviewed
the Subcommittee's 50-page report entitled "Backpage.com's Knowing
Facilitation of Online Sex Trafficking." This report concluded,
among other things, that virtually all of Backpage's "adult" ads
are actually solicitations for illegal prostitution services and
that "Backpage has maintained a practice of altering ads before
publication by deleting words, phrases, and images indicative of
criminality, including child sex trafficking . . . . Those
practices served to sanitize the content of innumerable
advertisements for illegal transactions—even as Backpage
represented to the public and the courts that it merely hosted

- 22 -

ATTACHMENT B

DOJ-BP-0004719180

content others had created." In response to the Subcommittee's report, Backpage purported to shut down the "adult" section of its website. However, based on my review of several thousands of Backpage ads, I believe that the prostitution ads simply migrated to other sections of the website, where they remain to this day.

     d. On August 5, 2011, Backpage received a letter from the mayor of Seattle. This letter warned, "Seattle Police have identified an alarming number of juvenile prostitutes advertised on Backpage.com since January 2010," and explained that Backpage was dissimilar from other companies whose products and services are "occasionally or incidentally" utilized by criminals because "[y]our company is in the business of selling sex ads" and "your services are a direct vehicle for prostitution." The letter also recommended that Backpage require in-person age verification for all of the "escorts" depicted in its ads. Based on knowledge gained through this investigation, I do not believe that Backpage has ever instituted an in-person age verification.

     28. I have reviewed internal documents, emails, and correspondence among Backpage employees and management. From those emails I have learned that Backpage has instituted policies and procedures designed to maintain its promotion of sex trafficking and prostitution, but which "sanitize" some of the language Backpage customers use to advertise in order to make the advertising of sex trafficking less overt. From my review of

- 23 -

Case 2:18-cr-00422-SAL LEDocument 1968-1 Filed 11/13/23 Page 24 of 77 Page 98 of
136 Page ID #:522
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 25 of
121 Page ID #:349

Backpage documents, I know that Backpage refers to this practice as "moderation." For example:

a. In April 2008, Ferrer wrote an email explaining that, although he was "under pressure to clean up phoenix's adult content," he was unwilling to delete prostitution ads because doing so "would put us in a very uncompetitive position with craig[slist]"[10] and result in "lost pageviews and revenue." Thus, Ferrer instructed Backpage's technical staff to edit the wording of such ads by removing particular terms that were indicative of prostitution, and then allow the remainder of the ad to be featured on Backpage's website.

b. On October 8, 2010, a Backpage manager sent an email threatening to fire any Backpage employee who acknowledged, in writing, that a customer was advertising prostitution: "Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . . This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job."

c. On October 16, 2010, the same Backpage manager again sent an email to a large group of Backpage employees that

[10] Craigslist is a competing internet based advertising company that features classified ads.

- 24 -

DOJ-BP-0004719182

Case 2:21-cr-00422-DJH Document 1968-2 Filed 11/13/23 Page 25 of 77 Page 99 of
136 Page ID #:523
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 26 of
121 Page ID #:350

contained two attachments providing guidance on how to "moderate"
ads. The first was a PowerPoint presentation that displayed a
series of 38 nude and partially-nude photographs, some of which
depicted graphic sex acts. Next to each picture was an
instruction as to whether it should be approved or disapproved by
a Backpage moderator. These instructions included "Approve. Nude
rear shots are okay as long the model is not exposing her anus or
genitalia." and "Approve. Rear shot okay. Transparent wet
panties okay." The second was an Excel spreadsheet identifying 50
terms (all of which were indicative of prostitution) that should
be "stripped" from ads before publication. The Backpage manager
concluded the email by stating, "[I]t's the language in ads that's
really killing us with the Attorneys General. Images are almost
an afterthought to them."

   d. On October 16, 2010, the same Backpage manager sent
a separate internal email explaining, "I'd like to still avoid
Deleting ads when possible," that "we're still allowing phrases
with nuance," and that "[i]n the case of lesser violations,
editing should be sufficient."

   e. On October 25, 2010, Ferrer sent an email
acknowledging that the "[i]llegal content removed" through
Backpage's moderation processes was "usually money for sex act."
This email also explained that, after the "sex act pics are
removed," the "ad text may stay."

- 25 -

ATTACHMENT B

DOJ-BP-0004719183

Case 2:18-mj-02031-DUTY *SEALED* Document 1968-2 *SEALED* Filed 08/07/18 Page 26 of 77age 100 of
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 27 of
121 Page ID #:351

   f. On October 27, 2010, a different Backpage manager
sent an internal email stating that Backpage was "editing 70 to
80%" of the ads it received from customers.

   g. On June 7, 2011, Ferrer received an inquiry from a
law enforcement official about a particular ad that included the
term "amber alert." In response, Ferrer acknowledged this might
be "some kind of bizarre new code word for an under aged person."
Ferrer then forwarded this exchange to a Backpage manager and
instructed that the term "amber alert" be added to Backpage's
"strip out" list. I believe that this email indicates that
Backpage did not require all future ads involving this particular
coded term for the prostitution of a child to be blocked from
Backpage, but merely required that such ads be edited before
publication.

   h. On August 31, 2011, Backpage managers exchanged
emails in which they discussed a list of 100 "solid sex for money
terms." Later emails indicate that this list of terms would
change but, in general, the list prohibited use of certain terms
that Backpage management and employees too closely identified with
the obvious promotion of sex trafficking and prostitution.

   i. Based on knowledge gained during this investigation
and my training and experience, I believe that this manager
acknowledged that a large proportion of the ads originally
submitted by Backpage's customers contained text and pictures that

- 26 -

ATTACHMENT B

DOJ-BP-0004719184

Case 2:18-mj-02032-DUTY *SEALED* Document 1-1 *SEALED* Filed 11/13/23 Page 27 of 77 of 101 of
136  Page ID #:525
Case 2:18-mj-02031-DUTY *SEALED*  Document 5-1 *SEALED*   led 08/07/18  Page 28 of
121  Page ID #:352

were indicative of sex trafficking.  Nevertheless, Backpage would
still publish those ads after editing them to appear less obvious
in promoting illegal activity.  Using the words the Backpage
manager used in the email described in paragraph 28(d) above, I
believe that Backpage sex trafficking ads have adapted to
Backpage's moderation policy by using "phrases with nuance" when
promoting sex trafficking.  Also, based on knowledge gained during
this investigation, and my training and experience, I believe
that, following the implementation of "moderation," Backpage's
list of prohibited terms needed to change and evolve to adjust to
the reality of Backpage advertisers' use of new code words to
promote prostitution.  That is, once a coded word or phrase not
previously associated with sex-for-money would become too familiar
and associated with certain sex trafficking activities in the
Backpage community of advertisers, Backpage's "moderation" policy
would need to adapt by adding such words or phrases to the
"blocked" list or risk being too obvious in its promotion.

    29.  Based on my review of several thousand Backpage ads and
internal Backpage documents and correspondence, I believe that
Backpage's policy of "moderation" only caused ads explicitly
promoting sex trafficking to become more coded and implicit in the
ads' purpose.  I have reviewed several thousand Backpage ads
posted in the various "adult" categories of Backpage (including
"massage," "dating," "escort" and others).  From this review, I

- 27 -

ATTACHMENT B

DOJ-BP-0004719185

learned the following:

a.   Well over half of the Backpage classified ads in these categories use terms and phrases that, in my training and experience, I believe to be consistent with sex trafficking and prostitution. These terms and phrases include, "roses" (money, e.g., "150 roses/half hour"), "in-call" (where the customer goes to the prostitute's location), "outcall" (where the prostitute goes to the customer's location), "GFE" (girlfriend experience), and "PSE" (porn star experience).

b.   Other Backpage ads use language that can be mostly free of coded language, but that include sexually provocative pictures. In my training and experience, the sexually suggestive images included in these ads are typical of ads for prostitution. For example, one such ad posted in Backpage's Los Angeles dating section depicted images of a woman on a bed with her buttocks presented in a sexual manner; another included a picture of a woman's cleavage; others included pictures of women posing in sexual positions wearing lingerie and pictures of a woman bending over revealing her naked buttocks.

c.   Based on knowledge gained through this investigation, and my training and experience, I believe that Backpage's policy of moderation has had its intended effect. Moderation has caused and allowed otherwise neutral or innocuous terms to be understood within the Backpage community as coded

- 28 -

Case 2:18-mj-02031-DUTY *SEALED* Document 1068-2 *Filed 10/13/22 Page 29 of 77 Page 103 of
136 Page ID #:527
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 30 of
121 Page ID #:354

language for sex trafficking and prostitution. Because of this
evolving use of coded terms, a reader of such ads who is familiar
with the particular vocabulary used in Backpage "adult" ads may
readily identify coded terms and images indicating an ad for
prostitution, while an uninitiated reader may not understand these
terms at all, or at least not as being associated with sex-for-
money.

   30.  Notwithstanding many Backpage advertisements' use of
seemingly innocuous language in promoting prostitution, based on
my conversations with law enforcement officers around the country
and from my review of law enforcement officers' statements and
reports regarding Backpage, I believe that the majority of
Backpage ads that appear in the traditionally "adult" categories
(such as "escort," "massage," or "body rubs") are actually
advertisements promoting sex trafficking or prostitution. For
example, in August 2015, the Detective-Sergeant in charge of the
Seattle Police Department's Vice/High Risk Victims Unit and Human
Trafficking Task Force made a sworn statement that provided, in
pertinent part,

      Since 2014, the Seattle Police Department has made arrests
      that include hundreds of related charges, such as charges
      for patronizing a prostitute/sexual exploitation, hundreds
      of charges for prostitution, dozens of charges [of]
      Promoting Prostitution, up to 100 charges for Commercial
      Sexual Abuse against a Minor and have investigated dozens
      of rape reports involving victims who are prostitutes and
      one murder of a prostitute. As a result of hundreds of
      investigations, the Seattle Police Department Vice/High

                              - 29 -

Risk Victims Unit has found that Backpage.com has become the primary web site in Seattle/Washington State for those looking to solicit a prostitute, post prostitution ads or traffic prostitutes and minors.

Vice/High Risk Victims Unit Detectives also make use of this site to respond to ads posted under the 'escorts' and 'body rubs' categories posing as male customers and successfully arrest females and males who charge undercover operatives money in exchange for sex.  To date, no Detective within the Seattle Police Department's Vice/High Risk Victims Unit has ever found a legitimate 'escort', (person who charges simply for companionship with no offer of sex) or 'masseuse', (person offering legitimate and licensed massage therapy rather than sex) while responding to ads placed in these categories on Backpage.com.

As stated previously, every time the Seattle Police Department Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com, we have found that the ad was a posting for illegal activity.  The Seattle Police Department Vice/High Risk Victims Unit has not once found that the individual posting or responding to one of our decoy ads in the adult section of Backpage.com was in fact seeking any type of innocent, legal activity. In my professional experience, the adult section of Backpage.com not only contains ads for illegal activity, including prostitution, solicitation and trafficking, but it is a primary source for such ads and is well known for that purpose in the sex trafficking industry in the city of Seattle and State of Washington.

Additionally, in August 2015, the Sergeant Detective who is

Commander of the Human Trafficking Unit ("HTU") for the Boston,

Massachusetts Police Department made a sworn statement that

provided, in pertinent part,

Since 2009, the [HTU] has made numerous arrests that include enticement of a minor into prostitution, sex trafficking of a minor, sex trafficking of an adult, forcible rape . . . and sex for a fee for soliciting a prostitute.

- 30 -

ATTACHMENT B

DOJ-BP-0004719188

Case 2:18-cr-00422-SPL Document 1968-2 *SEALED* 13/28 Page 31 of 77 105 of
136  Page ID #:529
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED*    iled 08/07/18  Page 32 of
121  Page ID #:356

As a result of investigations, the HTU has found that
Backpage.com is the go-to Web site in Boston for those
looking to solicit a prostitute, post prostitution ads,
and recruit and traffic young women and minors.   The
detectives have been able to identify numerous would-be
exploiters by setting up decoy ads and responding to ads
on the site.  The have arrested pimps, traffickers and
buyers who facilitate prostitution and fuel the harmful
and violent sex trade.  Backpage.com is the number one
site that detectives go to in order to look for underage
girls who are on the run and are being commercially
sexually exploited by pimps.

Since 2010, the HTU has arrested over 100 buyers of sex of
both adults and minors through Backpage.com ads
exclusively in hotel stings.

Since 2013, 12 individuals have been charged in federal
court for sex trafficking of both minors and adults.   In
all these aforementioned cases, Backpage.com played a
pivotal role in facilitating these crimes.

Detectives of the HTU often get tips about illegal
activity concerning ads posted on the escort, adult and
massage sections of Backpage.com.  In almost every case
detectives have found that in fact there was illegal
activity which resulted in fines, arrests, or further
investigations of sex trafficking.

Therefore, in my professional experience as a law
enforcement officer for over thirty years, the adult
section of Backpage.com not only contains ads for illegal
activity, including prostitution, solicitation and
trafficking, but it is also the primary source for such
ads and well known for that purpose in the sex trafficking
industry in Boston, Massachusetts.  Backpage.com's adult
section provides a vehicle and anonymity for its users who
exploit and traffic young women and girls.  . . . It is my
humble opinion that the adult section of Backpage.com
serves no legitimate service and nearly all the cases we
find associated with it involve pimp controlled
prostitution.

    31.  Almost all "adult"-type Backpage ads list phone numbers

or emails for a potential customer to use to make contact with the

- 31 -

ATTACHMENT B

DOJ-BP-0004719189

advertiser. I have compared a sample of phone numbers and emails
found within Backpage ads with phone numbers and emails that
frequently are included in the memo section of some of the checks
that Backpage advertisers use to pay Backpage for those ads. From
my review, I have found that very often the same number and/or
email appears in multiple Backpage ads as the contact information
to make an appointment. For example:

a. A $25 USPS Money Order purchased on June 15, 2017,
in Duarte, California, made payable to "Posting Solutions PO BOX
802426, Dallas, TX," and thereafter deposited into a Seized
Account, included writing on the money order listing a phone
number and the words "Dulce Latina." From a search of Backpage
ads, I found almost 800 advertisements listing the same phone
number found on the $25 USPS Money Order.

b. A $20 USPS Money Order purchased in Sacramento,
California, and later deposited into a Seized Account, included
writing listing a phone number and the words "love my lips." From
a search of Backpage ads, I found almost 1300 advertisements
listing the same phone number found on the $20 USPS Money Order.

c. A $150 Wells Fargo Bank Money Order, purchased in
Arizona, and made payable to "Posting Solutions," included an
email and the words, "red hot stuff". From an internet search of
the email address listed on this $150 money order, I found
advertisements on several female escort websites that directed

- 32 -

ATTACHMENT B

DOJ-BP-0004719190

Case 2:18-cr-00422-DJH Document 1968-2 *SEALED* Filed 11/13/23 Page 33 of 77
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 34 of
121 Page ID #:358
136 Page ID #:531

customers to contact an Arizona phone number ending in 2397. I
then searched Backpage.com records for this phone number and found
approximately 760 ads that included this same phone number. My
review of these Backpage ads revealed images indicative of
prostitution. For example, one such ad posted on Backpage's
"massage" section included sexual images such as a woman lying on
a bed wearing lingerie and a woman laying naked on her stomach.
One of the ads describes, "Pampering provider | Body Rub Massage |
Body Shampoo | Body Scrub | 4 hands | Walk ins or appointment."
From my training and experience, I know that legal massage
advertisements do not typically depict sexual images. This
advertisement depicted sexual images and included terms like "4
hands," which I know to be coded language describing a massage
given to a customer by two women. Such advertisements are often
indicative of prostitution.

32. Despite the fact that several thousand Backpage ads
shared the exact same phone number or email address to contact the
advertiser, these same ads included sexually suggestive images of
hundreds of *different* women. Based on my training and experience,
multiple different women do not share the same email address or
phone number when posting ads for dating. Rather, in my training
and experience, such ads are consistent with ads posted by pimps
or prostitution agencies that are using the same phone number or
email to advertise several different women (or girls) to

- 33 -

DOJ-BP-0004719191

prospective prostitution clients.

33. On March 28, 2018, in the District of Arizona, a grand jury returned a 93 count indictment charging certain Backpage Operators with criminal violations of 18 U.S.C. § 371 (Conspiracy), § 1952 (Travel Act—Facilitation of Prostitution), § 1956 (Money Laundering), § 1957 (Financial Transactions Involving Illicit Proceeds), and including Forfeiture Allegations pursuant to 18 U.S.C. §§ 981 and 982 (seeking criminal forfeiture of, among other assets, the Seized Accounts and the Seized Domains). A copy of that indictment is attached hereto (as Exhibit A) and incorporated herein as though fully set forth.

34. On July 25, 2018, also in the District of Arizona, a grand jury returned a 100 count "First Superseding Indictment" charging certain Backpage Operators with additional criminal violations of 18 U.S.C. § 371 (Conspiracy), § 1952 (Travel Act— Facilitation of Prostitution), § 1956 (Money Laundering), § 1957 (Financial Transactions Involving Illicit Proceeds), and including Forfeiture Allegations pursuant to 18 U.S.C. §§ 981 and 982 (seeking criminal forfeiture of, among other assets, the Seized Accounts and the Seized Domains). Additionally, the grand jury made specific findings of probable cause for forfeitability of all the Seized and Restrained Accounts listed in this affidavit. Further, the grand jury specifically found probable cause that the funds held in SUBJECT ACCOUNT 26 were subject to forfeiture. A

— 34 —

ATTACHMENT B

DOJ-BP-0004719192

copy of the "First Superseding Indictment" is attached hereto (as Exhibit B) and incorporated herein as though fully set forth.

E. THE SEIZED ACCOUNTS AND SUBJECT ACCOUNTS[11]

1. Seized Account 1

i. Foreign Transfers Into SEIZED ACCOUNT 1

35.   While Backpage accepts payments for ads from third-parties, for the purpose of this affidavit, I will focus on advertising payments made via the Posting Solutions' P.O. BOX using cash, money orders, or digital currency.

36.   From my review of Posting Solutions' application for the USPS Dallas, Texas P.O. BOX, I learned that it was registered to "Website Technologies, LLC/Backpage.com." Also listed on the P.O. BOX Application were the names of several Backpage Operators, including Ferrer.

37.   I have reviewed bank records for Seized Account 1. Based on my review, I know the following:

a.   On February 15, 2017, Posting Solutions LLC, located at 13601 Preston Rd., Ste. 801E, Dallas, Texas 75240, opened Prosperity Bank account number 216887188 (Seized Account

---

[11] Because of the extensive movement of money by the Backpage operators, it is necessary to include here a discussion both of the accounts targeted in the prior warrant applications (referred to herein as Seized Accounts 1 through 17, 22 and 25; or Restrained Accounts 18 through 21B, 23 and 24) and of the SUBJECT ACCOUNTS.

- 35 -

ATTACHMENT B

DOJ-BP-0004719193

1, which lists Gage as the sole signatory on the account).

      b.   Gage is the President, Chief Executive Officer, Treasurer and Secretary of Posting Solutions LLC.

    38.  Based on my knowledge of this investigation, having spoken to law enforcement personnel, and my review of the financial records, when an advertiser purchases an ad for prostitution using digital currency, the payments to Backpage (and certain subsequent expenditures) then proceed in the following manner:

      a.   A "poster" of a prostitution ad on backpage.com would pick a payment method, for example, through Bitcoin payments as previously described above.

      b.   The poster would already have Bitcoin or Backpage would direct the poster to a third-party exchanger in order to buy Bitcoin.

      c.   Backpage would then provide the poster with a wallet address to send the specific amount of Bitcoin.

      d.   The poster would receive credit to then post ads on Backpage.

      e.   In batches, generally valued in hundreds of thousands of dollars, Backpage would sell the Bitcoin to a third party exchanger, frequently "GoCoin," in order to convert the Bitcoin into U.S. or foreign currency, which GoCoin generally holds in foreign bank accounts.

- 36 -

ATTACHMENT B

DOJ-BP-0004719194

Case 2:18-mj-02382-DUTY *SEALED* Document 1-1 *SEALED* Filed 04/13/23 Page 37 of 77 Page 111 of
136 Page ID #:535
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 38 of
121 Page ID #:362

f.    GoCoin would wire funds from these foreign accounts
to either 1) Backpage controlled foreign accounts, or 2) Backpage
controlled domestic operating accounts.

g.    Backpage operators would hold these receiving
accounts in the names of entities controlled by Backpage, such as
Ad Tech BV, Posting Solutions (Seized Account 1 is held in the
name of Posting Solutions), Website Technologies, or Cereus
Properties (Seized Account 2A is held in the name of Cereus
Properties).

h.    These funds that originated from foreign
transactions would be used to pay for services, like Verizon in
Los Angeles, or would be transferred to Backpage Operators'
accounts and accounts held in their family members' names.

39. I have reviewed records of wire transfers from countries
outside the United States deposited into the Seized Account 1.
Just for the period of August 1 through September 1, 2017, Seized
Account 1 received over $2.7 million in wire transfers from
outside the United States. For example:

a.    On or about August 16, 2017, a company called
"Binary Trading SG PTE LTD" ("Binary Trading") wired $535,500 from
an account in Singapore into Seized Account 1. Based on my review
of records related to this transaction, Binary Trading is a name

- 37 -

ATTACHMENT B

DOJ-BP-0004719195

Case 2:18-mj-02872-DUTY *SEALED* Document 1968-2 *SEALED* Filed 11/13/23 Page 38 of 77 Page 112 of
136 Page ID #:536
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* led 08/07/18 Page 39 of
121 Page ID #:363

used by GoCoin.[12]

     b.    On or about August 17, 2017, Binary Trading wired another $528,500 from a Singapore account into Seized Account 1.

     c.    On or about August 30, 2017, a company named "TRILIX PTE LTD," listing the same Singapore address as Binary Trading and GoCoin, in four wires ranging from $385,450 to $492,250, sent approximately $1,717,750 from a Singapore account into Seized Account 1. Memo lines from these wires list "GC" or "GC FOR INTERNET SERVICES." I understand "GC" to mean GoCoin.

     ii. Seized Account 1 Payments for Backpage Operations

    40.    I have reviewed outgoing payments from Seized Account 1 and found that substantial percentages of these payments are for the operation of Backpage.com. For example, between July and October, 2017, Seized Account 1 wired over $1.1 million to pay for the following:

     a.    Between July and October 2017, Seized Account 1 wired $570,530 to Verizon Digital Media Services in Los Angeles.

     b.    On August 4, 2017, Seized Account 1 wired $4,137 to "Netnames," also known as ASCIO, to pay for the registration renewal of all the Seized Domains, including Backpage.com.

     c.    In August 2017, Seized Account 1 sent numerous

---

[12] Further, according to GoCoin's website, GoCoin maintains offices at the Singapore address listed on the $535,500 wire from "Binary Trading."

ATTACHMENT B

DOJ-BP-0004719196

automated clearinghouse payments to "Netchex Tax Prep Clients" totaling over $437,000. From a review of their website, I learned Netchex is a human resources company that provides payroll and other such services to Backpage.

     d.   Within a one-week period beginning on August 2, 2017, Seized Account 1 wired approximately $77,800 to S&W Payroll Services. An online search of S&W Payroll indicated that S&W Payroll is owned by Netchex. As stated above, Netchex is a human resource service, and S&W Payroll appears to be Netchex's payroll division.

     e.   On August 11, 2017, Seized Account 1 wired $5,319.79 to the Telesign Corporation, located in Marina del Ray, California. According to their website, Telesign is a communications platform that delivers security for websites.

     f.   On August 18, 2017, Seized Account 1 wired $1,497 and $6,984, respectively, to two separate data backup companies for Backpage's on-line data backup.

    41.  Based on my review of bank records for Seized Account 1 throughout the existence of the account, these types of transactions and expenditures were typical.

    2. Seized Account 2A

       i. Transfers From Seized Account 1

    42.  From my review of bank documents, I have learned that Seized Account 2A is a Compass Bank business bank account owned

ATTACHMENT B

DOJ-BP-0004719197

Case 2:18-mj-02031-DUTY *SEALED* Document 1968-2 *Filed 11/13/23 Page 40 of 77 114 of
136 Page ID #:538
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* iled 08/07/18 Page 41 of
121 Page ID #:365

by "Cereus Properties LLC," identifying Spear as the sole
signatory. My review revealed that this account was funded with
transfers from Seized Account 1. On average, during each month
of 2017, Seized Account 1 transferred several hundred thousand
dollars into Seized Account 2A. For example:

    a.   On July 25, 2017, Seized Account 1 sent two wire
transfers totaling about $566,562.47 to Seized Account 2A.

    b.   On August 8, 2017, Seized Account 1 sent a wire
totaling $62,198.51 to Seized Account 2A.

    c.   On August 31, 2017, Seized Account 1 sent a wire
transfer totaling $487,491.45 to SU Seized Account 2A.

    d.   On September 15, 2017, Seized Account 1 sent a wire
transfer totaling $91,672.67 to Seized Account 2A.

    e.   On October 2, 2017, Seized Account 1 sent a wire
transfer totaling $471,766 to Seized Account 2A.

        ii.  Foreign Transfers into Seized Account 2A

    43.  I have reviewed financial records from a foreign bank
in the Netherlands (the "Foreign Account"). I have also
reviewed emails related to this account. From my review of
these records, I learned the following:

    a.   The Foreign Account was opened in March 2015 and
is held in the name of Ad Tech BV, a Netherlands based company,
and identifies Ferrer as the CEO and Gage as the CFO.

    b.   From March 2015 through November 2017, the

- 40 -

ATTACHMENT B

DOJ-BP-0004719198

Case 2:18-mj-02482-DUTY *SEALED* Document 1068-2 *SEALED* Filed 11/13/23 Page 41 of 77 Page ID #:18 115 of 136 Page ID #:539

Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 42 of 121 Page ID #:366

Foreign Account received millions of dollars from Binary Trading SG PTE, Limited, the same company GoCoin used to wire funds into Seized Account 1. In an April 4, 2017, email to employees of the bank that maintains the Foreign Account, Gage explained,

> Binary Capital is our trading partner, they hold money in trust for Go Coin [sic]. Rather than incurring 3 sets of wire fees which make our transactions unprofitable, they act as our agent and disburse payments directly from our trust account to our merchant.

c. During this same period, the Foreign Account wire transferred several million dollars into Seized Account 2A. For example, an April 25, 2017, an email from Gage to individuals at the bank holding the Foreign Account directed the bank to wire "USD $2,337,048" to Seized Account 2A. Thereafter, I reviewed a wire record and confirmed that on April 25, 2017, the Foreign Account wired $2,337,048 into Seized Account 2A, as Gage directed in his email. In reviewing the records, I found the following additional wires sent to Seized Account 2A:

i. In December 2016, the Foreign Account wired approximately $1 million dollars to Seized Account 2A.

ii. On February 28, 2017, the Foreign Account wired $2,324,390 into Seized Account 2A.

iii. On March 30, 2017, the Foreign Account wired $2,247,858 into Seized Account 2A.

iv. On May 31, 2017, the Foreign Account wired $2,335,076 to Seized Account 2A.

- 41 -

ATTACHMENT B

DOJ-BP-0004719199

Case 2:18-cr-00422-DJH Document 1968-2 *SEALED* Filed 11/13/23 Page 42 of 77 Page 116 of
136  Page ID #:540
Case 2:18-mj-02031-DUTY *SEALED*  Document 5-1 *SEALED*  iled 08/07/18  Page 43 of
121  Page ID #:367

v.    On June 28, 2017, the Foreign Account wired
$2,324,390 to Seized Account 2A.

vi.    July 27, 2017, the Foreign Account wired
$10,928 to Seized Account 2A.

iii.    Seized Account 2A Payments for Backpage Operations

44.  I then reviewed Seized Account 2A records for payments
to promote Backpage operations.  From March through December
2017, Seized Account 2A paid over $9,000 to "Cox
Communications," an internet services company that provides
voice-over-internet phone and cable services.  I believe that
Backpage uses Cox Communications to facilitate its internet
presence and promote its sale of prostitution advertising.

3. Seized Account 2B

45.  I reviewed records Seized Account 2A and Seized
Account 2B.  On February 2, 2018, Seized Account 2A wired
transferred $135,956.59 into Seized Account 2B.  I am aware of
no other funding sources for Seized Account 2B.

4. Seized Account 3A, 3B, 3C

46.  I have reviewed records for Seized Account 3A as well
as the following accounts:  Branch Banking & Trust account
number 1440001712008, belonging to Website Technologies (as
detailed above, a Backpage controlled entity), held in Arizona
("BBT Account"); Arizona Bank & Trust account number 9361116211

- 42 -

ATTACHMENT B

DOJ-BP-0004719200

Case 2:18-mj-02318-DUTY *SEALED* Document 68-2 *SEALED* Filed 10/13/23 Page 118 of 77ge 117 of
136  Page ID #:541
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED*  iled 08/07/18  Page 44 of
121  Page ID #:368

belonging to Cereus Properties, held in Arizona ("AZBT
Account"). From this review, I learned the following:

    a.    Between December 14, 2015, and January 15, 2016,
in approximately 26 wires, a GoCoin account in Slovakia
transferred over $2.5 million to the BBT Account in the United
States.

    b.    On January 15, 2016, the BBT account wired
$189,571 to Verizon in Los Angeles, California, in payment for
Backpage internet services.

    c.    Between January 21, 2016, and August 31, 2016, in
approximately 27 wires, the BBT Account transferred
approximately $48 million to the AZBT Account.

    d.    Between March 1, 2016, and July 1, 2016, the AZBT
Account wired $892,426 into Seized Account 3A.

47.  According to records for Seized Account 3A, 3B, and
3C:

    a.    On September 14, 2017, Seized Account 2A wired
$50,162.05 into Seized Account 3A.

    b.    On October 12, 2017, Seized Account 3A wired
approximately $21,500 into Seized Account 3B.

    c.    On January 5, 2018, Seized Account 3A wired
approximately $600,000 into Seized Account 3C.

- 43 -

ATTACHMENT B

5. Seized Account 4

48. From my review of the records for Seized Account 4 (belonging to Spear), I learned that on or about March 16, 2016, Seized Account 3A transferred $250,000 into Seized Account 4 as an opening deposit. On March 20, 2018, Live Oak Bank confirmed that these funds have remained in Seized Account 4 since the account was opened.

6. Seized Account 5A and 5B

49. I have reviewed financial records related to Seized Accounts 5A and 5B, held in the name of Natasha Spear, Scott Spear's adult daughter. From this review, I learned the following:

a. On February 23, 2017, Seized Account 3A wired approximately $50,000 into Seized Account 5A.

b. On the February 23, 2017, Seized Account 3A wired $50,000 into Seized Account 5B.

7. Seized Account 6

50. From my review of financial records related to Seized Account 2A, 2B and 6, I learned the following:

a. On October 2, 2017, Seized Account 2A wired approximately $297,795 into Seized Account 6.

- 44 -

DOJ-BP-0004719202



### 8. Seized Accounts 7A, 7B, and 7D

51. From my review of financial records of Account 7C[13] and Seized Accounts 2A, 2B, 7A, 7B, 7D, and 12A, I learned the following:

    a. On July 6, 2017, Seized Account 2A wired $971,651.51 into Seized Account 7A.

    b. On July 28, 2017, Seized Account 7A wired $400,000 into Seized Account 7B.

52. From my review of financial records of Seized Account 1 and Account 7C, as well as those concerning the Veritex Bank account ending in -1462, held in the name of Posting Solutions ("Account -1462"),[14] I learned the following:

---

[13] Previously, by way of affidavit in support of a seizure warrant, the government contemplated seizing an "Account 7C," held by C.F. at all relevant times. Since then, Account 7C has been the subject of a separate agreement with the account holder.

[14] Veritex Bank is a U.S. bank located in Dallas, Texas. Posting Solutions opened Veritex Bank account -1462 on or about January 5, 2017.

- 45 -

ATTACHMENT B

DOJ-BP-0004719203

Case 2:18-cr-00422-DLD-Document 1968-2 *Filed 11/13/23 Page 46 of 77 120 of
136  Page ID #:544
Case 2:18-mj-02031-DUTY  SEALED*  Document 5-1 *SEALED*   Filed 08/07/18  Page 47 of
121  Page ID #:371

a.    On January 13, 2017, and January 20, 2017, a GoCoin

account in Singapore wired a total of approximately $1,318,800

into Account -1462.

b.    In February 2017, Account -1462 wired a total of

$5,395 to Verizon, in Los Angeles.

c.    On August 8, 2017, Seized Account 1 wired $62,000 into

Seized Account 12A.

d.    On November 3, 2017, Seized Account 12A wired $100,000

into Seized Account 7D.

9. Seized Accounts 7E

53.   I have reviewed the financial records of The Foreign

Account, Seized Account 2A, Wells Fargo Bank account -9863,[15]

Seized Account 25, and Seized Account 7E, I learned the

following:

a.    On December 2, 2016, the Foreign Account wired

$324,055.85 to Seized Account 2A.

---

[15] Wells Fargo Bank account -9863 is held in the name of "Voice
Media Group." Lacy and Larkin owned Village Voice Media, which
in turn owned Backpage and other media publications. Around
2012, Larkin, Lacey, and other Backpage operators sold certain
small media publications to the Voice Media Group, but retained
their ownership of Backpage. However, based on regular payments
that continued to be made from Voice Media Group to Lacy and
Larkin following the sale, I believe that Backpage Operators
still own a portion of Voice Media Group, or at least Backpage
Operators may be carrying the loan or part of the loan that
funded the sale of the small publications to Voice Media Group.

- 46 -

ATTACHMENT B

DOJ-BP-0004719204

Case 2:16-mj-02492-DUTY Document 1-5-1 *SEALED* Filed 08/07/18 Page 47 of 77 age 121 of
136   Page ID #:545
Case 2:18-mj-02031-DUTY  SEALED*  Document 5-1 *SEALED*   Filed 08/07/18   Page 48 of
121   Page ID #:372

       b.    On December 8, 2016, the Foreign Account wired
$499,970.00 to Seized Account 2A.

       c.    On December 27, 2016, the Foreign Account wired
$199,970.00 to Seized Account 2A.

       d.    On September 19, 2017 Seized Account 2A wired
$83,063 to Wells Fargo Bank account -9863 (see Paragraph 53).

       e.    Between September 20, 2017, and December 8, 2017,
in a total of 7 wire transfers, Wells Fargo Bank account -9863
sent a combined total of $944,729.25 to Seized Account 25.

       f.    On December 13, 2017, Seized Account 25 wired
$406,211.10 to Seized Account 7E.

      10.    Seized Account 8A, 8B, 8C, and 8D

   54.   From my review of the records for Seized Accounts 2A
and 2B, 8A, and 8B, I learned the following:

       a.    On February 2, 2018, Seized Account 2A wired
$28,337 into Seized Account 8A.

       b.    Also on February 2, 2018, Seized Account 2A wired
$28,337 into Seized Account 8B.

   55.   From my review of Seized Account 1, 8C, and 8D, I
learned the following:

       a.    On August 2 and August 8, 2017, Seized Account 1
wired $33,700 and $44,000, respectively, to S&W Payroll, a
company Backpage uses to pay its employees.

- 47 -

ATTACHMENT B

DOJ-BP-0004719205

Case 2:18-mj-02031-DUTY *SEALED* Document 1-1068-2 *Filed 10/13/22 Page 48 of 77 Page 122 of
136   Page ID #:546
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED*   iled 08/07/18   Page 49 of
121   Page ID #:373

        b.    Between August 11, 2017, and December 1, 2017,

S&W Payroll wired a total of $207,125.81 into Seized Account 8C.

        c.    Between November 3, 2017, and December 8, 2017,

Seized Account 8C wired $57,500 into Seized Account 8D.

        11.   Seized Account 9

        56.   From my review of the records for Seized Account 2A

2B, and 9, I learned that on February 2, 2018, Seized Account 2A

wired $734,603.70 into Seized Account 9.

        12.   Seized Account 10

        57.   From my review of records for Seized Accounts 2A and

10, I learned that on February 2, 2018, Seized Account 2A wired

$94,154.89 into Seized Account 10.

        13.   Seized Account 11

        58.   From my review of Seized Accounts 1, 8C, 8D, and 11,

as well as Account -1462 (as described in Paragraph 51 above, a

Posting Solutions' Veritex Bank account), I learned the

following:

        a.    On January 4, 2017, GoCoin's Singapore account

wired $489,500 into Account -1462, and on January 20, 2017,

GoCoin's Singapore account directed two additional wires, for

$358,150 and $470,150, respectively, into Account -1462 (for a

total of $1,317,800 wired from GoCoin's Singapore account into

Account -1462).

                            - 48 -

DOJ-BP-0004719206

Case 2:18-cr-00242-SPL Document 1068-2 *SEALED* 13/28 Page 49 of 77 123 of
Case 2:18-mj-02031-DUTY SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 50 of
136 Page ID #:547
121 Page ID #:374

b. On January 24, 2017, Account -1462 wired approximately \$1.3 million into S&W Payroll.

59. On January 27, 2017, an S&W Payroll account wired a total of \$9,913.53 into Seized Account 11.

14. Seized Accounts 12A and 12B

60. From my review of financial records for Seized Account 1, 12A, and 12B, I learned the following:

a. On August 8, 2017, Seized Account 1 wired \$62,000 into Seized Account 12A.

61. On December 8, 2017, Seized Account 12A wired \$20,000 into Seized Account 12B.

15. Seized Account 13

62. From my review of financial records for Seized Accounts 1, 12A, and 13, I learned the following:

a. In January 2017, eized Account 1 wired \$62,000 into Seized Account 12A.

b. On August 16, 2017, Seized Account 12A wired \$20,000 into Seized Account 13.

16. Seized Account 14

63. I have reviewed records for Seized Account 14 as well as the following accounts: the BBT Account; the AZBT Account; Charles Schwab account number 49074693 in the name of Larkin ("Schwab Account"); Northern Trust Company account number 2389562 under the name "Ocotillo Family Trust," belonging to

- 49 -

DOJ-BP-0004719207

Case 2:16-mj-02382-DUTY SEALED* Document 1868-2 *SEALED* Filed 11/13/23 Page 50 of 77 age 124 of
136  Page ID #:548
Case 2:18-mj-02031-DUTY SEALED*  Document 5-1 *SEALED*   Filed 08/07/18  Page 51 of
121  Page ID #:375

James Larkin" ("Northern Trust Account"); and Morgan Stanley
account number 237-061673 belonging to James Larkin and his
wife, Margaret Larkin (the "Morgan Stanley Account").
Additionally, I have reviewed GoCoin transactions related to
certain ads posted on Backpage, specifically including ads that
related to child victims A.C., S.F., T.S., S.L., K.O., and R.W.
(previously described in paragraph 26, above).[16]  Finally, I
reviewed emails associated with the email addresses used to post
some of the ads promoting the trafficking of A.C., S.F., T.S.,
S.L., K.O., and R.W.  From this review I learned the following:

    a.   On September 6, 2015, a bitcoin account
associated with the owner of the email address who trafficked
A.C. and S.F. paid Backpage about $4 worth of bitcoin in order
to post an ad promoting the trafficking of those victims in Palm
Springs, California.

    b.   On September 15, 2015, an email from the same
email address owner indicated a payment to Backpage of about $8
worth of bitcoin in order to "Fund Account" for
palmsprings.backpage.com.  Based on information I have learned
through this investigation, I believe that to "Fund Account"

---

[16] As previously described, the pimp who trafficked A.C. and
S.F. was convicted and sentenced to 196 years' imprisonment, and
the pimp who trafficked T.S., S.L., K.O., and R.W. was convicted
and sentenced to 300 months' imprisonment.

ATTACHMENT B

DOJ-BP-0004719208

Case 2:16-mj-02432-DUV4-23-DJHE-Document 1068-2 *SEALED* Filed 11/13/23 Page 51 of 77 age 125 of
136   Page ID #:549
Case 2:18-mj-02031-DUTY  SEALED*  Document 5-1 *SEALED*   iled 08/07/18   Page 52 of
121   Page ID #:376

means that the email address owner provided bitcoin to Backpage
as payment for credit to be used at a later time to pay for
Backpage ads.

      c.    On October 6, 2015, the same email address owner
paid Backpage about $1 worth of bitcoin to "Fund Account" on
palmsprings.backpage.com.

      d.    On October 30, 2015, a bitcoin account associated
with the owner of the email address who trafficked T.S., S.L.,
K.O., and R.W. paid Backpage about $1 worth of bitcoin in order
to post an ad promoting the trafficking of those victims in
Columbus, Ohio.

      e.    On November 2, 2015, this same email address
owner paid Backpage about $1 worth of bitcoin to "Move Ad to Top
of Listings" in the Columbus, Ohio Backpage ads.

      f.    On November 21, 2015, this same email address
owner paid Backpage about $1 worth of bitcoin to Backpage for
credit for that email owner's Backpage ad account.

      g.    During the period of September 4, 2015, and
November 23, 2015, Backpage advertisers used bitcoin to purchase
about 1,000,000 "adult" ads from Backpage.  Backpage then sold
that bitcoin to GoCoin for approximately $8.6 million.  Included
among the bitcoin sold to GoCoin during this period were the six
payments the pimps made to Backpage to purchase ads to promote
child prostitution.

- 51 -

ATTACHMENT B

DOJ-BP-0004719209

     h.    During the period of December 14, 2015, through December 29, 2015, a GoCoin account held in Slovakia wired over $1.25 million to the BBT Account in the United States. Based on my review of GoCoin's financial records and GoCoin's pattern of payments to Backpage for bitcoin sales, I believe that this $1.25 million represented GoCoin's partial payment to Backpage for the bitcoin Backpage sold to GoCoin during the period of September 4, 2015, through November 23, 2015.

     i.    On December 31, 2015, the BBT Account wired $811,424 to the AZBT Account.

     j.    On January 11, 2016 the AZBT Account wired approximately $1.3 million to the Schwab Account.

     k.    On January 14, 2016, the Schwab Account wired approximately $13.5 million to the Northern Trust Account.

     l.    In July 21, 2017, the Northern Trust Account wired $6.014 million to the Morgan Stanley Account.

     m.    In or about November 2017, Morgan Stanley elected to terminate its business relationship with Larkin.

     n.    Following this, on November 30, 2017, Larkin wired all the funds then held the Morgan Stanley Account, about $10 million dollars, to Seized Account 14.

     o.    Some of the funds in Seized Account 14 were used, among other things, to purchase bonds and/or securities, which assets remain held in Seized Account 14.

- 52 -

ATTACHMENT B

DOJ-BP-0004719210

Case 2:18-cr-00422-DJH Document 1968-2 *SEALED* 11/43/23 Page 53 of 77 127 of
136 Page ID #:551
Case 2:18-mj-02031-DUTY SEALED* Document 5-1 *SEALED* iled 08/07/18 Page 54 of
121 Page ID #:378

17.    Seized Accounts 15A through 15G

64.    I have reviewed records for Seized Account 15 as well
as the following accounts: the BBT; the AZBT Account; Wells
Fargo Bank Account number 6324184891, belonging to John Brunst
("WFB Account -891"); and Wells Fargo Bank Account number
00007910147474, belonging to the Brunst Family Trust ("WFB
Account -474"). Additionally, I have reviewed GoCoin
transactions related to certain ads posted on Backpage,
specifically including ads that related to child victims A.C.,
S.F., T.S., S.L., K.O., and R.W. (previously described in
paragraph 26, above.) Finally, I reviewed emails associated
with the email addresses used to post some of the ads promoting
the trafficking of A.C., S.F., T.S., S.L., K.O., and R.W. From
this review I learned the following:

a.    On September 6, 2015, a bitcoin account
associated with the owner of the email address who trafficked
A.C. and S.F. paid Backpage about $4 worth of bitcoin in order
to post an ad promoting the trafficking of those victims in Palm
Springs, California.

b.    On September 15, 2015, an email from the same
email address owner indicated a payment to Backpage of about $8
worth of bitcoin in order to "Fund Account" for
palmsprings.backpage.com. Based on information I have learned
through this investigation, I believe that to "Fund Account"

- 53 -

means that the email address owner provided bitcoin to Backpage as payment for credit to be used at a later time to pay for Backpage ads.

      c.    On October 6, 2015, the same email address owner paid Backpage about $1 worth of bitcoin to "Fund Account" on palmsprings.backpage.com.

      d.    On October 30, 2015, a bitcoin account associated with the owner of the email address who trafficked T.S., S.L., K.O., and R.W. paid Backpage about $1 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Columbus, Ohio.

      e.    On November 2, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to "Move Ad to Top of Listings" in the Columbus, Ohio Backpage ads.

      f.    On November 21, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to Backpage for credit for that email owner's Backpage ad account.

      g.    During the period of September 4, 2015, and November 23, 2015, Backpage advertisers used bitcoin to purchase about 1,000,000 "adult" ads from Backpage. Backpage then sold that bitcoin to GoCoin for approximately $8.6 million. Included among the bitcoin sold to GoCoin during this period were the six payments the pimps made to Backpage to purchase ads to promote child prostitution.

- 54 -

ATTACHMENT B

DOJ-BP-0004719212

h.     During the period of December 14, 2015, through
December 29, 2015, a GoCoin account held in Slovakia wired over
$1.25 million to the BBT Account in the United States.  Based on
my review of GoCoin's financial records and GoCoin's pattern of
payments to Backpage for bitcoin sales, I believe that this
$1.25 million represented GoCoin's partial payment to Backpage
for the bitcoin Backpage sold to GoCoin during the period of
September 4, 2015, through November 23, 2015.

i.     On December 31, 2015, the BBT Account wired
$811,424 to the AZBT Account.

j.     On December 6, 2016 the AZBT Account wired
$161,459 to the WFB Account -891.

k.     On January 4, 2017, the AZBT Account wired
another $258,841 to the WFB Account -891.

l.     On January 5, 2017, the WFB Account transferred
$300,000 to WFB Account -474.

m.     On May 19, 2017 the WFB Account -474 wired about
$1.5 million into Seized Account 15A.

n.     On May 23, 2017 Seized Account 15A transferred
about $350,000 to Seized Account 15B.

o.     On June 7, 2017, Seized Account 15A transferred
about $1.34 million to Seized Account 15C.

p.     On September 13, 2017, Seized Account 15C
transferred about $581,000 to Seized Account 15D.

- 55 -

ATTACHMENT B

DOJ-BP-0004719213

Case 2:18-cr-00422-SPL Document 1968-2 *SEALED* 11/13/23 Page 56 of 77 age 130 of
Case 2:18-mj-02031-DUTY SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 57 of
136 Page ID #:554
121 Page ID #:381

      q.    On September 13, 2017, Seized Account 15C
transferred about $250,000 to Seized Account 15E.

      r.    On September 13, 2017, Seized Account 15C
transferred about $250,000 to Seized Account 15F.

      s.    On September 15, 2017, Seized Account 15C
transferred about $500,000 to Seized Account 15G.

     18.   Seized Accounts 16A, 16B, 16C, 16D, 16E, 16F, 16G,

    16H, and 16I

65. From my review of financial records related to Seized
Accounts 2A, 6, 7B, and 9, and Seized Accounts 16A, 16B, 16C,
16D, 16E, 16F, 16G, 16H, and 16I, I learned the following:

      a.    On December 2, 2016, the Foreign Account (first
described in paragraph 42, above) wired $324,055.85 to Seized
Account 2A (Compass Bank account – 3873).

      b.    On December 8, 2016, the Foreign Account wired
$499,970.00 to Seized Account 2A.

      c.    On December 27, 2016, the Foreign Account wired
$199,970.00 to Seized Account 2A.

      d.    From March through December 2017, Seized Account
2A paid over $9,000 to "Cox Communications," an internet
services company that provides voice-over-internet phone and
cable services. I believe that Backpage uses Cox Communications
to facilitate its internet presence and promote its sale of
prostitution advertising.

DOJ-BP-0004719214

e.    On May 31, 2017, Seized Account 2A wired approximately $676,808.04 into Seized Account 16A.

f.    On June 30, 2017 Seized Account 16A transferred $600,000 to Seized Account 16B.

g.    On April 16, 2018, Lacey personally went into the Republic Bank of Arizona, withdrew $500,000 from Seized Account 16A and opened Seized Account 16C with an initial deposit of the $500,000 he had just withdrawn from Seized Account 16A.

h.    On or about February 15, 2018, Lacey drafted two checks totaling $1.2 million, which he used to fund his "CDARS" accounts at Republic Bank of Arizona. The first check was drawn from Seized Account 6 in the amount of $600,000. The second check was drawn from Seized Account 9, also in the amount of $600,000. The combination of these two checks totaling $1.2 million were split and deposited between Seized Account 16D (which received $600,000), Seized Account 16E (which received $300,000) and 16F (which received $300,000).

i.    On or about February 8, 2018, Larkin drafted a $1 million check drawn from Seized Account 7B and made payable to Republic Bank of Arizona in order to fund his "CDARS" accounts at that bank. Seized Account 16G received $500,000, Seized Account 16H received $250,000, and Seized Account 16I received $250,000.

- 57 -

ATTACHMENT B

DOJ-BP-0004719215

19.     Seized Account 17

66.  I have reviewed records for Seized Account 17 as well as the following accounts: the BBT Account; the AZBT Account; Arizona Bank & Trust annuity trust account numbers 9361121967, 9361121972, 9361121986, 9361121991, and 9361122014, all held in Lacey's name ("AZBT Annuity Accounts"); and Johnson Financial account number 1000879992 held in an IOLTA with Lacey as the sole beneficiary.  From this review, I learned the following:

a.     Between December 14, 2015, and January 15, 2016, in approximately 26 wires, a GoCoin account in Slovakia transferred over $2.5 million to the BBT Account in the United States.

b.     On January 15, 2016, the BBT account wired $189,571 to Verizon in Los Angeles, California, in payment for Backpage internet services.

c.     Between January 21, 2016, and August 31, 2016, in approximately 27 wires, the BBT Account transferred approximately $48 million to the AZBT Account.

d.     Between April 1, 2016, through October 6, 2016, in approximately 12 transactions, the AZBT Account transferred over $18 million to the AZBT Annuity Trust Accounts.

e.     On December 29, 2016, Lacey's AZBT Annuity Trusts Accounts sent five wires totaling $16.5 million to the Johnson Financial Bank Account.

- 58 -

ATTACHMENT B

DOJ-BP-0004719216

Case 2:18-mj-02031-DUTY *SEALED* Document 1968-2 *SEALED* Filed 11/13/23 Page 59 of 77 Page 133 of
136  Page ID #:557
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED*   led 08/07/18  Page 60 of
121  Page ID #:384

f.   On January 3, 2017, the Johnson Financial Account
wired the $16.5 million to the Seized Account 17 in Hungary.

20.   Restrained Accounts 18A, 18B, 18C, 18D, 18E, 18F,

18G, 18H, 18I, 18J, 18K, and 18L

67.  On April 5, 2018, pursuant to a plea agreement in the
District of Arizona, Ferrer plead guilty to a single-count
information charging him with a violation of 18 U.S.C. § 371,
conspiracy to violate 18 U.S.C. §§ 1952 (the Travel Act) and
1956 (money laundering).  As part of his plea agreement, Ferrer
agreed to "take all steps within his power to forfeit to the
United States all corporate assets and other property owned or
controlled by Website Technologies, LLC, which own and operates
the Backpage website, as well as corporate assets and other
property owned or controlled by Backpage.com, LLC, Posting
Solutions LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC
Tech Group CV."  That same day, also in the District of Arizona,
Backpage.com, LLC and related entities plead guilty to 18 U.S.C.
§ 1956(h) (money laundering conspiracy).

68.  On April 17 and April 18, 2018, along with other law
enforcement agents and prosecutors, I spoke with Ferrer and his
attorneys in Phoenix, Arizona.  Following this in-person
interview, I also have spoken with Ferrer on the phone and
communicated via email.  From my review of Service Level

- 59 -

ATTACHMENT B

Agreements ("SLAs"),[17] financial records related to Restrained

Accounts 18, and records and statements provided by Ferrer, I

know the following:

      a.    Restrained Accounts 18A, 18B, 18C are accounts

owned by Ad Tech BV and controlled by Backpage. According to

Ferrer, all funds in this account are the criminally derived

proceeds of ads promoting prostitution. According to Ferrer,

Restrained Accounts 18A, 18B, and 18C are accounts receivable

bank accounts. Payment processors and merchant processors would

take credit card payments, and payments such as bitcoin payments

from Backpage customers for prostitution and other ads, and

would transfer these funds to accounts such as Restrained

Accounts 18A, 18B and 18C. Per his plea agreement and his

cooperation, Ferrer has agreed to surrender these funds and/or

securities to the United States.

      b.    Restrained Accounts 18D, 18E, and 18F are

accounts held by a third party, Gold Leaf SRO. According to

Ferrer and SLAs between Ad Tech BV, a Backpage owned company and

Gold Leaf SRO, which SLAs I have reviewed, the funds and/or

securities in these accounts are the criminally derived proceeds

of Backpage ads, including ads promoting prostitution. The SLAs

---

[17] Service Level Agreements are service related contracts,
commitments, and agreements between a service provider and a
client.

- 60 -

Case 2:18-mj-02031-DUTY *SEALED* Document 1068-2 *SEALED* Filed 11/13/23 Page 61 of 77 Page 135 of
136 Page ID #:559
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 62 of
121 Page ID #:386

state that 99.5% of the net proceeds are to be paid to Ad Tech
BV, which is owned by Backpage. According to Ferrer, the
arrangement between Gold Leaf, SRO, and Backpage was put into
place to evade what he called a "blockade by credit card
companies." Ferrer explained that beginning around 2015, U.S.
credit card companies such as MasterCard and Visa refused to
process credit card payments for Backpage due to the negative
press surrounding sex trafficking and prostitution content on
Backpage. As one of the ways around this "blockade," Backpage
Operators set up agreements with foreign persons and partners to
"franchise" websites for the sole purpose of accepting credit
card payments. According to Ferrer, this use of foreign third-
parties and foreign accounts allowed Backpage to continue to
accept credit card payments for prostitution ads while
concealing from the credit card companies that the payments were
for Backpage ads. Ferrer said that Gold Leaf SRO existed for
the sole purpose of funneling to Backpage accounts otherwise
prohibited credit card payments for Backpage ads. Ferrer
explained that these accounts are owned by Backpage and are not
co-mingled with other funds, and are therefore subject to
seizure and forfeiture to the United States.

   c.   Restrained Accounts 18G, 18H, and 18I are
accounts held by a third party, Protecttio SRO. According to
Ferrer and an agreement between Protecttio SRO and Ad Tech BV,

- 61 -

ATTACHMENT B

DOJ-BP-0004719219

which I have reviewed, the arrangements between these entities are essentially the same as the Gold Leaf SRO arrangement. This business arrangement existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade. Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.

d.    Restrained Accounts 18J, 18K, 18L are accounts held by a third party, Varicok SRO. According to Ferrer and an agreement between Varicok SRO and Ad Tech BV, which I have reviewed, the arrangement is essentially the same as the Gold Leaf SRO, and Protecttio SRO. This business arrangement existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade. Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.

21.    Restrained Accounts 19A, 19B, 19C, and 19D

69. From speaking with Ferrer and reviewing financial records, I learned the following:

a.    Restrained Accounts 19A, 19B, 19C, and 19D, are owned by Ad Tech BV, with Ferrer as the ultimate beneficial

− 62 −

Case 2:18-cr-00422-SMB Document 968-2 *SEALED* Filed 11/13/20 Page 63 of 77 Page 1 of 49
Page ID #:561
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* filed 08/07/18 Page 64 of 121 Page ID #:388

owner.   According to Ferrer, Restrained Accounts 19A, 19B, 19C and 19D are accounts receivable banking accounts.   Payment processors and merchant processors would take credit card payments, and payments such as bitcoin payments from Backpage customers for prostitution and other ads, and would transfer these funds to accounts such as Restrained Accounts 19A, 19B, 19C, and 19D.   These accounts contain funds and/or securities that are criminally derived and are subject to forfeiture. Ferrer and Backpage has agreed to surrender these funds and/or securities as they are criminally derived.

22.   Restrained Account 20

70.   From speaking with Ferrer and reviewing financial records, I learned the following:

a.   Restrained Account 20 at Knab Bank in the Netherlands is an account held by a third party, Procop Services BV.   According to Ferrer the arrangement is essentially the same as the Gold Leaf SRO and Protecttio SRO, as described with respect to Restrained Accounts 19.   This business arrangement existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade.   Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.

- 63 -

ATTACHMENT B

Case 2:18-mj-02031-DUTY *SEALED* Document 1968-2 *SEALED* Filed 11/13/23 Page 64 of 77 Page 2 of 49
Page ID #:562
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 65 of
121 Page ID #:389

23. Restrained Accounts 21A and 21B

71. From speaking with Ferrer and reviewing financial
records and business agreements, I learned the following:

a. Restrained Account 21A is an account in the
Netherlands held in the name of Gulietta Group BV. According to
Ferrer and the relevant SLA, the funds and/or securities in this
account are derived from selling advertisements online, most of
which are for prostitution advertisements. The SLAs state that
99.5% of the net proceeds are to be paid to Ad Tech BV, which is
owned by Backpage. According to Ferrer, the arrangement between
Guilietta Group BV and Ad Tech BV (Backpage) was put into place
to evade the same credit card "blockade" described in with
regard to Restrained Accounts 18D, 18E, and 18F. Ferrer
explained that these accounts are owned by Backpage and are not
co-mingled with other funds and/or securities, and are therefore
subject to seizure and forfeiture to the United States.

b. Restrained Account 21B is an account in the
Netherlands held in the name of UnivsersAds BV. According to
Ferrer and the SLAs between the companies, the funds and/or
securities in this account are derived from selling
advertisements online, most of which are for prostitution
advertisements. The SLAs state that 99.5% of the net proceeds
are to be paid to Ad Tech BV which is owned by Backpage.
According to Ferrer, the arrangement between UniversAds BV and

- 64 -

ATTACHMENT B

DOJ-BP-0004719222

Case 2:18-mj-02031-DUTY *SEALED* Document 1968-2 *Filed 11/13/23 Page 66 of 77 Page 3 of 49
Page ID #:563
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 66 of
121 Page ID #:390

Ad Tech BV or Backpage was put into place to evade the same
credit card blockade described above. Ferrer explained that
these accounts are owned by Backpage and are not co-mingled with
other funds and/or securities, and are therefore subject to
seizure and forfeiture to the United States.

    24.    Seized Account 22



DIAGRAM OF ILLICT FUNDS TRACED TO SUBJECT ACCOUNT 22

    72.    I have reviewed records for Seized Account 22 as well
as the following accounts:  Branch Banking & Trust account
number 1440001712008, belonging to Website Technologies (as
detailed above, a Backpage controlled entity), held in Arizona
("BBT Account"); Arizona Bank & Trust account number 9361116211
belonging to Cereus Properties, held in Arizona ("AZBT
Account"); Charles Schwab account number 49074693 belonging to
James Larkin ("Schwab Account"); and Pershing, LLC Account
number RG001121 belonging to the Acacia Conservation Fund, a
hedge fund that banks with Pershing LCC ("Pershing Account").
Additionally, I have reviewed GoCoin transactions related to
certain ads posted on Backpage, specifically including ads that
related to child victims A.C., S.F., T.S., S.L., K.O., and R.W.

- 65 -

DOJ-BP-0004719223

(previously described in paragraph 26, above.) Finally, I reviewed emails associated with the email addresses used to post some of the ads promoting the trafficking of A.C., S.F., T.S., S.L., K.O., and R.W. From this review I learned the following:

t.   On September 6, 2015, a bitcoin account associated with the owner of the email address who trafficked A.C. and S.F. paid Backpage about $4 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Palm Springs, California.

u.   On September 15, 2015, an email from the same email address owner indicated a payment to Backpage of about $8 worth of bitcoin in order to "Fund Account" for palmsprings.backpage.com. Based on information I have learned through this investigation, I believe that to "Fund Account" means that the email address owner provided bitcoin to Backpage as payment for credit to be used at a later time to pay for Backpage ads.

v.   On October 6, 2015, the same email address owner paid Backpage about $1 worth of bitcoin to "Fund Account" on palmsprings.backpage.com.

w.   On October 30, 2015, a bitcoin account associated with the owner of the email address who trafficked T.S., S.L., K.O., and R.W. paid Backpage about $1 worth of bitcoin in order

- 66 -

ATTACHMENT B

DOJ-BP-0004719224

Case 2:18-mj-02031-DUTY *SEALED* Document 1-1 *SEALED* Filed 11/13/18 Page 67 of 77 Page 5 of 49
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 68 of 121 Page ID #:392
Page ID #:565

to post an ad promoting the trafficking of those victims in Columbus, Ohio.

x. On November 2, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to "Move Ad to Top of Listings" in the Columbus, Ohio Backpage ads.

y. On November 21, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to Backpage for credit for that email owner's Backpage ad account.

z. During the period of September 4, 2015, and November 23, 2015, Backpage advertisers used bitcoin to purchase about 1,000,000 "adult" ads from Backpage. Backpage then sold that bitcoin to GoCoin for approximately $8.6 million. Included among the bitcoin sold to GoCoin during this period were the six payments the pimps made to Backpage to purchase ads to promote child prostitution.

aa. During the period of December 14, 2015, through January 29, 2015, a GoCoin account held in Slovakia wired about $3,959,557.78 million to the BBT Account in the United States. Based on my review of GoCoin's financial records and GoCoin's pattern of payments to Backpage for bitcoin sales, I believe that this $3,959,557.78 million represented GoCoin's partial payment to Backpage for the bitcoin Backpage sold to GoCoin during the period of September 4, 2015, through November 23, 2015.

- 67 -

ATTACHMENT B

Case 2:18-mj-02031-DUTY SEALED* Document 1-2 *SEALED* Filed 11/13/18 Page 68 of 77 Page 6 of 49
Case 2:18-mj-02031-DUTY SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 69 of
121 Page ID #:393
Page ID #:566

bb. During the period of March 23, 2016, through March 31, 2016, in three transactions, the BBT Account wired $3,694,813.60 to the AZBT Account.

cc. During the period of April 1, 2016, through July 1, 2016, in five transactions, the AZBT Account wired $5,750,294 to the Schwab Account.

dd. On July 1, 2016, the Schwab Account wired $15 million to Seized Account 22.

ee. During the period of August 2, 2016, through October 6, 2016, in six transactions, the AZBT Account wired $9,550,315 to the Schwab Account.

ff. On January 3, 2017, the Schwab Account wired $2.5 million to Seized Account 22.

gg. On January 4, 2017, the Schwab Account wired $2.5 million to Seized Account 22.

    25.    Restrained Account 23

73. On April 5, 2018, pursuant to a plea agreement in the District of Arizona, Ferrer plead guilty to a single-count information charging him with a violation of 18 U.S.C. § 371, conspiracy to violate 18 U.S.C. §§ 1952 (the Travel Act) and 1956 (money laundering). As part of his plea agreement, Ferrer agreed to "take all steps within his power to forfeit to the United States all corporate assets and other property owned or controlled by Website Technologies, LLC, which own and operates

- 68 -

DOJ-BP-0004719226

Case 2:18-cr-02069-TOR Document 968-2 *SEALED* 13/29ed Page 69 of 77 age 7 of 49
Case 2:18-mj-02031-DUTY SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 70 of
Page ID #:567
121 Page ID #:394

the Backpage website, as well as corporate assets and other
property owned or controlled by Backpage.com, LLC, Posting
Solutions LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC
Tech Group CV." That same day, also in the District of Arizona,
Backpage.com, LLC and related entities plead guilty to 18 U.S.C.
§ 1956(h) (money laundering conspiracy).

74. On April 17 and April 18, 2018, along with other law
enforcement agents and prosecutors, I spoke with Ferrer and his
attorneys in Phoenix, Arizona. Following this in-person
interview, I have also spoken with Ferrer on the phone and
communicated via email. Additionally I have communicated with
United Kingdom law enforcement regarding these accounts. From
my review of these SLAs,[18] financial records related to
Restrained Account 23, and records and statements provided by
Ferrer and U.K. Law Enforcement, I understand that Restrained
Account 23 contains funds consolidated by U.K. Law Enforcement
and a payment processing company called Cashflows Europe
Limited. This account contains funds from three separate
entities that U.K. Law Enforcement restrained following the
indictments and information charging Backpage and its operators.

---

[18] Here, the SLAs are between Backpage (as the "client") and
entities that Ferrer referred to as "third-party affiliate
companies," such as Guilietta Group B.V., Proccop Services B.V.,
Universads B.V., Proteccio SRO, and Olist OU and Ad Tech B.V.

- 69 -

DOJ-BP-0004719227

Case 2:18-mj-02031-DUTY *SEALED* Document 1968-2 *SEALED* Filed 11/13/23 Page 70 of 77 Page 8 of 49
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 71 of 121 Page ID #:395
Page ID #:568

That is, Restrained Account 23 contains funds from (1) Gulieta Group B.V.; (2) Procop Services B.V.; (3) Universads B.V.; and (4) Proteccio SRO, (collectively referred to as, the "Entities").

75.  According to Ferrer and the four separate SLAs between (1) Ad Tech BV, a Backpage owned company, and Guilietta Group B.V.; (2) Backpage and Procop Services B.V.; (3) Backpage and Universe Ads B.V.; and (4) Backpage and Proteccio SRO, all of which I have reviewed, the funds and/or securities held by these entities are the criminally derived proceeds of Backpage ads, including ads promoting prostitution. All four SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage. According to Ferrer, the arrangements between these Entities, and Backpage were put into place to avoid what Ferrer described as, "a blockade [of Backpage] by credit card companies." Ferrer explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage. As a way around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments. According to Ferrer, this use of foreign third-parties and foreign accounts allowed Backpage to continue to

- 70 -

ATTACHMENT B

DOJ-BP-0004719228

Case 2:18-mj-02031-DUTY *SEALED* Document 1-2 *SEALED* Filed 11/13/18 Page 71 of 77 Page 9 of 49
Page ID #:569
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 72 of
121 Page ID #:396

accept credit card payments for prostitution ads while
concealing from the credit card companies that the payments were
for Backpage ads. Ferrer said that the Entities existed for the
sole purpose of funneling to Backpage accounts otherwise
prohibited credit card payments for Backpage ads. Ferrer
explained that these funds are owned by Backpage and are not co-
mingled with other funds.

26. Restrained Account 24

76. From speaking with Ferrer and reviewing financial
records and business agreements, I learned that Restrained
Account 24 is an account maintained in the Republic of Estonia,
held in the name of Olist OU. According to Ferrer and the SLAs,
the funds and/or securities in this account are derived from
selling advertisements online, most of which ads are for
prostitution advertisements. The SLAs state that 99.5% of the
net proceeds are to be paid to Ad Tech BV, which is owned by
Backpage. According to Ferrer, the arrangement between Olist OU
and Ad Tech BV (Backpage) was put into place to avoid the same
credit card "blockade" described in relation to Restrained
Accounts 23. Ferrer explained that these accounts are owned by
Backpage and are not co-mingled with other funds and/or
securities.

- 71 -

ATTACHMENT B

DOJ-BP-0004719229

Case 2:18-cr-02297-DJH Document 1968-2 *Filed 11/13/23 Page 72 of 77 Page 10 of
49 Page ID #:570
Case 2:18-mj-02031-DUTY SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 73 of
121 Page ID #:397

27.    Seized Account 25



77.    I have reviewed the financial records of The Foreign
Account in the Netherlands, Seized Account 2A, Wells Fargo Bank
account -9863 (see Paragraph 53, above), and Seized Account 25.
From this review I learned the following:

a.    On December 2, 2016, the Foreign Account in the
Netherlands wired $324,055.85 to Seized Account 2A.

b.    On December 8, 2016, the Foreign Account wired
$499,970.00 to Seized Account 2A.

c.    On December 27, 2016, the Foreign Account wired
$199,970.00 to Seized Account 2A.

d.    On September 19, 2017, Seized Account 2A wired
$83,063 to Wells Fargo Bank account -9863.

e.    Between September 20, 2017, and December 8, 2017,
in a total of seven wire transfers, Wells Fargo Bank account -
9863 sent a combined total of $944,729.25 to Seized Account 25.

f.    On December 13, 2017, Seized Account 25 wired

- 72 -

DOJ-BP-0004719230

Case 2:18-mj-02031-DUTY *SEALED* Document 1968-2 *SEALED* Filed 11/13/23 Page 73 of 77 Page 11 of
49 Page ID #:571
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* led 08/07/18 Page 74 of
121 Page ID #:398

$406,211.10 to Seized Account 7E.

      28.    SUBJECT ACCOUNT 26



    78.   From my review of financial records for Account -1462
(as described in Paragraph 51 above, Account -1462 is the
Posting Solutions' Veritex Bank account), Seized Account 2A and
SUBJECT ACCOUNT 26, I learned the following:

    a.   On January 4, 2017, GoCoin's Singapore account
wired $489,500 into Account -1462, and on January 20, 2017,
GoCoin's Singapore account directed two additional wires, for
$358,150 and $470,150, respectively, into Account -1462
(totaling $1,317,800 wired from GoCoin's Singapore account into
Account -1462).

    b.   On or about February 23, 2017, Account -1462 sent
two payments, a wire of $443,014 and a check for $27,887.41 to
Seized Account 2A.

    c.   Between March 30, 2017, and September 14, 2017,
Seized Account 2A sent five wires totaling $4,058.063.65 to
SUBJECT ACCOUNT 26.

    d.   In July 2018, SUBJECT ACCOUNT 26 was closed and a
cashier's check totaling $2,412,785.47 was issued to Michael

- 73 -

DOJ-BP-0004719231

Case 2:18-mj-02031-DUTY Document 5-1 *SEALED* Filed 08/07/18 Page 74 of 77 Page 12 of
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 75 of
121 Page ID #:399

Lacey's Annuity Fund held by his attorney. As of the date of
this affidavit, this check has not been negotiated.

29.    SUBJECT ACCOUNT 27



79.    On April 5, 2018, pursuant to a plea agreement in the
District of Arizona, Ferrer plead guilty to a single-count
information charging him with a violation of 18 U.S.C. § 371,
conspiracy to violate 18 U.S.C. §§ 1952 (the Travel Act), and
1956 (money laundering).  As part of his plea agreement, Ferrer
agreed to "take all steps within his power to forfeit to the
United States all corporate assets and other property owned or
controlled by Website Technologies, LLC, which own and operates
the Backpage website, as well as corporate assets and other
property owned or controlled by Backpage.com, LLC, Posting
Solutions LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC
Tech Group CV." That same day, also in the District of Arizona,
Backpage.com, LLC and related entities plead guilty to 18 U.S.C.
§ 1956(h) (money laundering conspiracy).

- 74 -

DOJ-BP-0004719232

Case 2:19-mj-02087-DUTY  *SEALED*  Document 1-2  *SEALED*  Filed 11/13/23  Page 75 of 77 Page 13 of
49  Page ID #:573
Case 2:18-mj-02031-DUTY  *SEALED*  Document 5-1 *SEALED*   Filed 08/07/18  Page 76 of
121  Page ID #:400

80.   From speaking with Ferrer and reviewing financial
records, I learned that SUBJECT ACCOUNT 27 is an IOLTA account
held in the name of the law firm Davis Wright Tremaine ("DWT").
Based on my conversations with Backpage CEO, Carl Ferrer, and
Bank of America employees, I believe that Backpage or Backpage
controlled entities are the beneficiaries of this account.  This
account has received $8,778,802.96 of unearned funds in
prepayment of future legal services.  These funds are owned by
Backpage, but held by DWT and are subject to forfeiture.

81.   Based upon my review of the financial records SUBJECT
ACCOUNT 27, Seized Account 1, Posting Solutions Veritex Bank
account -1462, and the Foreign Account, I learned the following:

a.      Between January 13, 2017, and January 20, 2017, a
GoCoin account wired $1,318,800 to Posting Solution Veritex Bank
-1462.

b.      On June 22, 2017, Veritex Bank account -1462
wired $1,000,000 into SUBJECT ACCOUNT 27.

c.      On April 27, 2017, the Foreign Account Wired
$2,500,000 to SUBJECT ACCOUNT 27.

d.      On April 28, 2017, the Foreign Account Wired
$2,500,000 to SUBJECT ACCOUNT 27.

e.      On May 24, 2017, Seized Account 1 wired $500,000
into SUBJECT ACCOUNT 27.

f.      On September 13, 2017, Seized Account 1 wired

- 75 -

ATTACHMENT B

Case 2:18-mj-02031-DUTY SEALED* Document 1968-2 *SEALED* Filed 10/13/23 Page 76 of 77 Page 14 of
49 Page ID #:574
Case 2:18-mj-02031-DUTY SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 77 of
121 Page ID #:401

$1,000,000 into SUBJECT ACCOUNT 27.

      g.    On September 27, 2017, the Foreign Account wired

about $778,802.96 into SUBJECT ACCOUNT 27.

      h.    On October 20, 2017, Seized Account 1 Wired

$500,000 into SUBJECT ACCOUNT 27.

| Date(s) | Approximate Amount of Wire Transfers from Foreign Account and Veritex Bank - 1462 | | | Credits into SUBJECT ACCOUNT 27 | |
|---|---|---|---|---|---|
| | From | To | Amount | Amount | To |
| 1/13/2017 – 1/20/2017 | GoCoin | Veritex Bank - 1462 | 1,318,800.00 | | |
| 4/27/2017 | GoCoin | | | 2,500,000.00 | Subject Account 27 |
| 4/28/2017 | GoCoin | | | 2,500,000.00 | Subject Account 27 |
| 5/24/2017 | Seized Account 1 | | | 500,000.00 | Subject Account 27 |
| 08/16/2017 – 08/30/2017 | GoCoin Singapore | Seized Account 1 | 2,700,000.00 | | |
| 9/13/2017 | Seized Account 1 | | | 1,000,000.00 | Subject Account 27 |
| 9/27/2017 | Foreign Account | | | 778,802.96 | Subject Account 27 |
| 10/20/2017 | Seized Account 1 | | | 500,000.00 | Subject Account 27 |

## VI.    CONCLUSION

      82.    For the reasons stated above, there is probable cause

to believe that the funds and/or securities on deposit in

ATTACHMENT B

DOJ-BP-0004719234

Case 2:18-mj-02031-DUTY SEALED* Document 1968-2 *Filed 11/13/23 Page 77 of 77 Page 15 of
49 Page ID #:575
Case 2:18-mj-02031-DUTY SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 78 of
121 Page ID #:402

SUBJECT ACCOUNT 26 and SUBJECT ACCOUNT 27 are subject to seizure and forfeiture by the United States under the following provisions:

a.    18 U.S.C. § 981(a)(1)(A), because the funds and/or securities in SUBJECT ACCOUNT 26 and SUBJECT ACCOUNT 27 are involved in, and traceable to, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(h) (Conspiracy to Launder Money), 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion), and 18 U.S.C. § 1957 (Financial Transactions Involving Illicit Proceeds); and

b.    18 U.S.C. § 981(a)(1)(C), because the funds and/or securities in SUBJECT ACCOUNT 26 and SUBJECT ACCOUNT 27 constitute and are derived from proceeds traceable to one or more violations of 18 U.S.C. § 1591 and 18 U.S.C. § 1952.

/s/
_____
Lyndon Versoza
U.S. Postal Inspector

Subscribed to and sworn to me
this 7th day of August, 2018

/s/ Jacqueline Chooljian
_____
United States Magistrate Judge

- 77 -

ATTACHMENT B

DOJ-BP-0004719235