**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 15, 2023 |
| Michael Lacey, et al. | ) | 11:04 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TRIAL - DAY 33 - CONTINUED EVIDENTIARY HEARING AND**

**JURY QUESTIONS**

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                       A P P E A R A N C E S

 2
     For the Government:
 3       UNITED STATES ATTORNEY'S OFFICE
         By:  Mr. Kevin M. Rapp, Esq.
 4            Mr. Peter S. Kozinets, Esq.
              Mr. Andrew C. Stone, Esq.
 5            Ms. Margaret Wu Perlmeter, Esq.
              Mr. Daniel Boyle, Esq.
 6       40 North Central Avenue, Suite 1200
         Phoenix, Arizona 85004
 7       kevin.rapp@usdoj.gov
         peter.kozinets@usdoj.gov
 8       andrew.stone@usdoj.gov
         margaret.perlmeter@usdoj.gov
 9
     For the Government:
10       UNITED STATES DEPARTMENT OF JUSTICE
         By:  Mr. Austin Berry, Esq.- Appeared telephonically
11       1301 New York Avenue, NW, 11th Floor
         Washington, DC 20005
12       austin.berry2@usdoj.gov

13   For the Defendant Michael Lacey:
         LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
14       By:  Mr. Paul J. Cambria, Jr., Esq.
         42 Delaware Avenue, Suite 120
15       Buffalo, NY 14202
         pcambria@lglaw.com

16

17   For the Defendant Scott Spear:
         FEDER LAW OFFICE, P.A.
18       By:  Mr. Bruce S. Feder, Esq.
         2930 East Camelback Road, Suite 160
19       Phoenix, AZ 85016
         bf@federlawpa.com
20       - and -
         KESSLER LAW OFFICE
21       By:  Mr. Eric Walter Kessler, Esq.
         6720 N. Scottsdale Road, Suite 210
22       Scottsdale, AZ 85253
         eric.kesslerlaw@gmail.com

23

24

25
```

```
 1

 2   For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 3       LINCENBERG & RHOW, P.C.
         By:  Mr. Gary S. Lincenberg, Esq.
 4       1875 Century Park E, Suite 2300
         Los Angeles, CA 90067
 5       gpanchapakesan@birdmarella.com
         glincenberg@birdmarella.com
 6

 7   For the Defendant Andrew Padilla:
         DAVID EISENBERG, P.L.C.
 8       By:  Mr. David S. Eisenberg, Esq.
         3550 North Central Avenue, Suite 1155
 9       Phoenix, AZ 85012
         david@deisenbergplc.com
10

11   For the Defendant Joye Vaught:
         JOY BERTRAND, ESQ., L.L.C.
12       By:  Ms. Joy M. Bertrand, Esq.
         P.O. Box 2734
13       Scottsdale, AZ 85252
         joy@joybertrandlaw.com
14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1

2

3          (Proceedings commence at 11:04 a.m.)

4          THE COURT:  All right.  Please be seated.  This is the

5    continuation of the evidentiary hearing from yesterday.  Let me          11:04:58

6    remind those that are in the public seating area, there is a

7    notation outside of my courtroom that no cell phones are to be

8    used.  And so if you feel compelled that you need to use the

9    telephone, please step out.  That includes texting, including

10   looking at social media, so on and so forth, and that's to          11:05:21

11   prevent any recording of this proceeding.  And so if you don't

12   step out, you will see from time to time we have deputy

13   marshals come in.  I have instructed them that if you are on

14   your cell phone, you will be asked to leave.

15          All right.  Let's proceed.          11:05:40

16          MR. STONE:  Your Honor, quickly, just had a thought.

17   Given the limited nature of this evidentiary hearing and the

18   five or six items that Your Honor was hoping to hear from the

19   evidence, I'm not sure we need to hear from any further

20   witnesses on this issue.  The question that is before the Court          11:05:56

21   on this is whether this 91-page document was Jencks of

22   Mr. Thai, and I believe based on his testimony there is

23   sufficient information for the Court to rule on that.

24          There's also an issue that's been raised with Jencks

25   and Mr. Ferrer, but there is clearly no indication that he even          11:06:17

1    read this document, much less approved it.  If Your Honor is

2    inclined to hear from further witnesses, and we do have

3    Inspector Versoza and Carl Ferrer here and available, I'd

4    really think there is just a couple questions that would need

5    to be asked of either of them, and Your Honor could do it          11:06:37

6    yourself.

7           You know, for Inspector Versoza, I think the questions

8    are:  Did you write this document?  And was it intended as a

9    final version?  I think those two questions would help the

10   Court if there is still some questions on those regards or on      11:06:53

11   those particular issues.

12          And for Mr. Ferrer, it would be simply:  Did you see

13   the draft?  And if you saw it, did you adopt it?  I don't think

14   there is any other evidence that is needed for the Court to

15   make this determination.  I think we can move forward with some    11:07:06

16   argument from the parties if the Court is so inclined, but I

17   think in terms of keeping this limited and making useful time

18   of the -- making use of the Court's time, proper use, I don't

19   think we really need to hear from these other witnesses.

20          THE COURT:  Well, I guess I want to just ask you,          11:07:26

21   Mr. Stone, there's an allegation, or somewhat of an allegation

22   that there is also exculpatory material in there, and I -- I am

23   curious about that because I've parsed through the documents.

24          And in looking at exhibit, I think it's 12, or, sorry,

25   Exhibit 8, No. 8, it appears to me that those paragraphs that      11:07:55

1    are in that draft report were included in publicly-filed

2    forfeiture proceedings, and counsel were representing clients

3    in those proceedings.

4         But I think the position that the defendants have put

5    forth was that there was potential exculpatory material that      11:08:28

6    could have been gone into in Mr. Ferrer's testimony, and so I'd

7    like a little bit more of a record developed on that particular

8    topic.  I asked the defendants to give me pincites to some of

9    the transcripts in which they thought there could have been

10   additional examination of Mr. Ferrer; for example, what would    11:08:54

11   have been the outcome if they would have had this particular

12   document, and that's what I'm interested in as well.

13        MR. STONE:  Your Honor, I think the papers do a better

14   job of explaining that issue, and I can explain why.  In the

15   defendants' motion, this is Document 1967, they go through a      11:09:14

16   number of paragraphs on page 4 and 5 about these examples of

17   this alleged exculpatory information that would have permitted

18   them to cross-examine Mr. Ferrer differently, and they cite to

19   paragraphs in Exhibit A and they cite to those paragraphs.

20        THE COURT:  Well, I think, though, and I will make the       11:09:47

21   assumption, but I will ask Mr. Lincenberg, I don't take that to

22   be the totality of what you were going to put forward as

23   different evidence, is that correct, those bullet points on

24   page 4?

25        MR. LINCENBERG:  I think page -- pages -- pages 4            11:10:11

1    through 7 cover some of that.  I think it's page 7 that has

2    footnotes which go into some of the pincites.

3          And Your Honor, as a general matter, our position is

4    not whether there were -- there was information that we had.

5    It's that Mr. Thai was a witness who the government called.  He          11:10:43

6    was available.  Our defense, mine in particular, was focused on

7    a lack of credibility of Mr. Ferrer and limits on Mr. Thai's

8    testimony.

9          And based upon the fact that we now have what we

10   believe is a prior report from Mr. Thai, and certainly a          11:11:00

11   document he was well aware of and reviewed and agreed with, we

12   could have used him as well to impeach Mr. Ferrer.

13         And so we set out some of those examples -- some of

14   the examples where there is inconsistencies, for example, with

15   Mr. Ferrer's testimony.  Dealing with -- three of the examples          11:11:24

16   that come to mind are Posting Solutions, the role of Michael

17   Gage, and Mr. Ferrer's involvement with foreign entities.  This

18   report lays out, for example, that he was the ultimate business

19   owner of the foreign entities.

20         Some of the pincites on his Posting Solutions          11:11:47

21   testimony are in the footnote.  I can grab the brief.  I think

22   it's footnote 2.  Footnote 2 and 3 deal with, one of them is

23   Ferrer's testimony, and one of them are arguments that Mr. Rapp

24   made in his closing that we dealt with.

25         Some of the other things that are not exact pincites          11:12:07

1    because throughout, you know, part of the debate that the

2    defense and the government were having about a lot of these

3    entities was the government trying to suggest that Mr. Brunst

4    was centrally involved in setting them up and running them and

5    so forth.                                                        11:12:31

6            And here we have a witness who is in court with a

7    report which contains statements of Mr. Ferrer where Mr. Ferrer

8    is making statements to, let's even just assume it's for

9    Versoza.  We know from the reports we've gotten that Mr. Thai

10   was involved in the interviews of Mr. Ferrer, but there's       11:12:52

11   inconsistencies.

12           In the 302s we received, it did not contain much

13   detail about the wires and the tracing.  There was some

14   references to the different accounts and businesses that the

15   government referred to as shell companies.  Much more detail     11:13:13

16   about statements that Ferrer is making to government's agents

17   show up in Exhibit A.  So those are some of the points with

18   inconsistencies with Ferrer.

19           There were other points we were pointing out about

20   inconsistencies between Mr. Thai's testimony and things in his   11:13:31

21   report.  One example that we highlight is the payroll point.

22   Mr. Thai in his examination, frankly on cross-examination, was

23   very much:  I didn't look at the purpose behind any of these

24   wires or anything, so forth and so on.  Even if you just accept

25   what Mr. Thai says in his e-mails, that Exhibit A is a joint     11:13:59

1  report, or a Versoza report, even if you accept it at that,

2  there is all of this discussion about purpose and how it

3  constitutes money laundering and subject to forfeiture and

4  alike, and there's an inconsistency with regard to payment of

5  payroll.                                                              11:14:20

6          Now the government might have an answer to it, but in

7  the report it talks about this Prosperity Bank account, I think

8  it was out of the Prosperity Bank account, where they talk

9  about how that was used to pay Backpage payroll, and Mr. Thai

10  had that testimony about the Cereus Properties account being    11:14:45

11  used to pay Backpage payroll, which we believe was untrue and

12  was one of the things that Mr. Rapp argued in his closing, and

13  we have the pincite to that in our brief.

14          One additional thing that I think Mr. Feder wants to

15  add is we received more Jencks yesterday.  This includes prior   11:15:06

16  e-mails from Mr. Ferrer with Mr. Versoza and the like.

17  Mr. Feder and Mr. Cambria are in a better position to address

18  that, but I think it also expands the issue that we're raising

19  about discovery that wasn't produced that takes it to a whole

20  other level, and this would also, I think, be the subject of    11:15:34

21  the examination that counsel want to do with Mr. Versoza and

22  Mr. Ferrer, and they can address that if the Court wants to go

23  into that in greater detail.

24          THE COURT:  Well, I guess the central question in my

25  mind is as it relates to all of this, is the disclosure.  The    11:15:53

1    Exhibit A material, which is the focus of the hearing, is it

2    your position that none of that material, the substance of it,

3    had been previously produced?

4           MR. LINCENBERG:  No.  The government is correct that a

5    lot of the substance was previously produced.                    11:16:28

6           THE COURT:  And so that goes to the next point, how

7    can it then be a surprise to you, either through Mr. Thai's

8    testimony or Mr. Ferrer's, as to how they would testify when

9    you had the material that you could have examined them on?

10          MR. LINCENBERG:  Well, two things.  First, the Court    11:16:53

11   asked me is it your position that none of it was previously

12   produced, and I said, no, a lot of it was.  I don't believe it

13   was all.

14          THE COURT:  The material, the substance.

15          MR. LINCENBERG:  The substance of it.  So for example,  11:17:07

16   Ferrer's statements in there, the fact that Ferrer is making

17   certain statements not produced.  But what's more important to

18   us is the source of the document.  And if you accept our

19   position that this is Jencks, or even if the Court doesn't

20   accept it but accepts that it's relevant material for          11:17:29

21   cross-examination of Mr. Thai, who is the witness they called

22   for all of the wire transfers, not Versoza, that we now have a

23   prior statement of him.

24          I can't just take in the same manner a prior statement

25   of Versoza and cross-examine Thai with it.  It's not that I    11:17:46

1    couldn't try, but my experience, and there were a lot of

2    objections at times by the government, where I would try to do

3    an impeachment, or co-counsel would, and the Court ruled, well,

4    that's not that person's prior statement or something that they

5    are necessarily familiar with.  This is something that clearly,       11:18:07

6    it's either a prior statement or at least it's part of the work

7    that, as Mr. Thai says, you know, I produced the summary charts

8    that went into this if you look at these e-mails and so forth,

9    and it opens up a whole new area where we now have a witness on

10   the stand, who is the only witness they are calling in this          11:18:28

11   case, to go through wires and money, the money laundering

12   counts and so forth, where we can use that document for

13   impeaching him and use that document with him to also impeach

14   Mr. Ferrer.

15        MR. STONE:  Your Honor, if I may, based on                       11:18:48

16   Mr. Lincenberg's argument, it really supports my initial

17   argument is that it hinges on Mr. Thai.  What is important to

18   the defense through Mr. Lincenberg's argument is that is this

19   document tied to Mr. Thai?  Is it his Jencks?  If it's his

20   Jencks, they can cross-examine him on this information despite        11:19:08

21   the fact that all this information was previously produced in

22   other sources, including, I might add, every single statement

23   attributed to Mr. Ferrer, and that's in Exhibit A, and usually

24   they are disclosed in more detail in other documents.

25        But because the defense's whole point here is that               11:19:24

1   this was a document that relates to Mr. Thai, meaning it's his

2   Jencks, there is now evidence in the record for Your Honor to

3   make that determination, and we don't need to have anymore

4   witnesses on this issue since it only relates to Mr. Thai.

5          MR. LINCENBERG:  Well, but again, it's Mr. Thai's --     11:19:45

6   it's a document that it's either Mr. Thai's report or not.  In

7   the 2019 e-mail from Mr. Thai to Mr. Stone, you know, "Lyndon

8   and I put together flow charts and notes for the seizure

9   warrants."

10         For them to say that, well, we have a seizure warrant,   11:20:05

11  so you already knew this, and it's Versoza who did it, but this

12  is the guy who we now see in an e-mail putting together all

13  this stuff, which that part is consistent with his testimony at

14  trial.  It's inconsistent, I think, with the impression he is

15  leaving in the hearing yet.  Mr. Thai writes:  I thought those  11:20:25

16  items would be good to use as a basis for the summary charts.

17  Then he says, but I wanted to format that material to whatever

18  you think would flow best.  And his testimony yesterday was:  I

19  just did some formatting.  He's basically saying:  I put

20  together all these charts with Lyndon and flow and this and     11:20:43

21  that, and I also wanted to format it.  It's not that all I did

22  was formatting.

23         He also writes a couple weeks ago, again, calling it

24  "the document that Lyndon and I put together years ago."  And

25  Mr. Stone, because he's a man of integrity, which is why I      11:20:58

think there is some inquiries that should be made of Mr. Stone,

and I don't know if Mr. Boyle is relevant or not to this.  It

says:  We're producing the attached e-mail in -- in our

continued efforts to comply with the Jencks.  As we did for

trial, we reviewed our files to determine whether there were

any communications that could be deemed a statement under 3500.

We have determined that the attached e-mail may fit into that

category.

        So this is produced to us because of Mr. Stone getting

this in front of them and focusing on it and saying:  You know

what, I better produce this.  He may say it's potentially

Jencks or maybe Jencks, we think it is Jencks, but that's where

we are left.

        MR. STONE:  That further supports where there should

be no evidence, no additional evidence for this hearing.  That

was just a legal argument.  Your Honor has the e-mails from

Mr. Thai, you have his testimony from yesterday, and you can

make the determination based on that evidence.  Happy to argue

this more, but I think at this point we are just making

arguments.

        MR. LINCENBERG:  Well, I think it's relevant for other

counsel to talk about the other e-mails that we also just

received.

        THE COURT:  Well, I haven't seen them and I am not

going to take up something blindly.  You certainly can provide

```
 1   it to the Court, give me an argument why you think it's Jencks,

 2   we can be back here again, but I am not going to entertain it

 3   now.

 4          Does anyone have anything further to inquire on

 5   Document 1967, any other counsel?  Mr. Kessler.                    11:22:35

 6          MR. KESSLER:  I do not, but Mr. Feder does.

 7          MR. FEDER:  Judge, as to what's already been before

 8   the Court?

 9          THE COURT:  Yes.

10          MR. FEDER:  No.  We would have asked Mr. Ferrer and        11:22:48

11   Mr. Versoza follow-up questions about whether or not there are

12   other reports, whether or not there are other 302s and things

13   like that, but then the new disclosure that was made last night

14   by the government, number 51, indicates, number one, that

15   there's been Bates numbers, the same Bates number on different    11:23:04

16   documents, which throws into question the entirety of their

17   disclosure, number one.

18          And then number two --

19          THE COURT:  How so?

20          MR. FEDER:  I will give you an example, Judge.  There      11:23:19

21   is an e-mail to Mr. Stone this morning, USABP Bates number

22   0037964, that is on one of these Way Back Machine Backpage that

23   may have been an exhibit in the trial, and then there is

24   another with the exact same page that is an e-mail from

25   Mr. Versoza in 2018 with Ferrer.  So that's one issue.           11:23:44
```

1          The second issue is part of the disclosure last night,

2   disclosure 51, was an e-mail exchange indicating that

3   Mr. Ferrer is sending Versoza listings of retainers paid of all

4   the lawyers for Backpage, one of which is Nanci Clarence to the

5   tune of $4 million.                                          11:24:14

6          Maybe the Court remembers my sterling

7   cross-examination of Mr. Ferrer when I was trying to get him to

8   talk about how much money he had paid Nanci Clarence, whether

9   or not it was Backpage money, et cetera, and he feigned not

10  knowing anything about it, and this e-mail that we are talking  11:24:31

11  about is a 2018 e-mail.  That was what was in the new

12  disclosure last night.  I mean, that's what there would be, and

13  I think --

14          THE COURT:  It's from 2018?

15          MR. FEDER:  Sorry.                                   11:24:44

16          THE COURT:  Did you say it was from 2018?

17          MR. FEDER:  Yes.  So if the Court doesn't want us to

18  get into apples and oranges, that's okay, but Ferrer and

19  Versoza are here.  I am happy to give the Court copies of that

20  and the Court can review it, as can the government, but that's  11:25:00

21  what was in their disclosure last night.  I am not exactly sure

22  of the time, but around 5:00 o'clock.

23          THE COURT:  Was that a document that was previously

24  provided, this 2018 e-mail?

25          MR. RAPP:  No, it hasn't been.                        11:25:16

1          MR. FEDER:  This was just a sampling, but at least to

2    me the most relevant.

3          MR. STONE:  Your Honor.

4          MR. FEDER:  It goes directly to the cross-examination

5    of Mr. Ferrer when he feigns ignorance.  Obviously had we had          11:25:35

6    that e-mail, that would have been an impeachment; clearly

7    Giglio.

8          THE COURT:  Or it would have been refreshing

9    recollection.

10          MR. FEDER:  Either one.          11:25:47

11          THE COURT:  Yes.

12          MR. STONE:  Your Honor, I think that expands what the

13    evidentiary hearing is for.  I am not saying we shouldn't take

14    it up.  I just think Your Honor should be well informed with

15    what the documents are, and we can provide those to Your Honor.          11:25:59

16    We can take it up at a later date, but I think right now for

17    the issue before Your Honor, we should handle that and --

18          THE COURT:  Well, I think, Mr. Stone, the unresolved

19    question, and the way that I read the defendants' motion is

20    that this Exhibit A, it's also alleged it was adopted or a          11:26:18

21    statement of Mr. Ferrer, and certainly I think they are

22    entitled to ask him to what extent he reviewed the statement,

23    if in fact he contributed it to it, if he was part of the

24    drafting process and so on and so forth.  I'm not going to make

25    any assumptions about what his answers would be, and whether or          11:26:52

1    not he used it to prepare for his testimony.

2           I think those are relevant inquiries, but it seems to

3    me, though, and at bottom with regard to Exhibit A, there

4    should not have been surprise because from everything that I've

5    heard, it has not been refuted that the underlying material had

6    been produced; in other words, you had the capacity to mine the

7    information, they were in publicly-filed documents in other

8    cases related to the forfeiture proceedings in California, and

9    there should not have been any reason that you could not have

10   pulled these documents or the underlying material to examine

11   Mr. Thai, to examine Mr. Ferrer.  I think that's the issue.

12          And I have not heard anything to the contrary.  And so

13   I don't find that there was any sort of purposeful hiding of

14   that material by the government, and I find it difficult to

15   make a prejudicial finding to the defendants because of that.

16          I mean, to be sure, there are millions of reams of

17   documents that you have had to pull through, but certainly when

18   you have the same counsel that are involved in the asset

19   forfeiture proceedings in different courts on which document

20   Exhibit A 1 provides information about, you should have

21   knowledge of it.  You have information about it.  And so you

22   didn't use it, for whatever reason, in your examination.

23          And at least at this juncture without anything more, I

24   don't find that the material in Exhibit A 1 is Jencks material.

25   A witness under oath has testified that he did not write the

11:27:27

11:27:59

11:28:39

11:29:02

11:29:38

document.  He contributed to the formatting, some of the

corrections made in it.  It's a document that he obviously left

service prior to his testimony, and it was a document, I think,

that he had from back in November of 2021, which was the

version that he submitted.  He didn't adopt the document as his

own.

        In fact, when Mr. Lincenberg questioned him about

paragraphs in the document, he seemed confused, unaware of what

the content was, so that tells me even more that he didn't

participate in the drafting of it.

        The government produced a, I think what he

characterized as the spreadsheet from which he developed his

testimony and his, which was developed throughout the course of

his investigation.  And I also think it's relevant here that

these are -- there seem to be two different responsibilities by

these two different individuals.  Mr. Thai was looking at the

claims in the superseding indictment for its development, and

then we have this other part two, where are the assets being

used, which is somewhat related, but also very different.

        And so I do make the finding that Exhibit A does not

include Jencks material.  I'll look at the motion and the parts

of the document and the exhibits a little bit closer again as

to this other issue about exculpatory information, but at

bottom, I think the character of the argument is, for example,

for Mr. Lincenberg that Mr. Brunst wasn't a signatory to many

1    of these items, but those points were made.  They were made

2    over and over and over again.  They were made in closing

3    arguments.  And so it's -- it would have been cumulative if it

4    was something of a different statement.  That's the question

5    that I have to look at in terms of any sort of exculpatory or          11:32:15

6    favorable information.

7            And so that's my preliminary ruling at least as to the

8    question about whether it constitutes Jencks material.  I'll go

9    back and examine the exhibits further in terms of whether or

10   not it's Bradio -- Bradio -- mixing the two together -- Brady        11:32:41

11   or Giglio, although I learned long ago that it's Giglio, you

12   know that, Mr. Cambria.

13           MR. CAMBRIA:  I do.

14           THE COURT:  And so I will look at it further and make

15   that determination.  But in that regard, is there any               11:33:01

16   further -- I will let defendants because it was their motion

17   make a final argument or if you have final points that you wish

18   to direct me to in your exhibits, I will take a look at those.

19           MR. LINCENBERG:  Just one further point that

20   Mr. Cambria has a point.  Just in terms of citations, if the        11:33:20

21   Court is going to go back and look at it, from the Quoc Thai

22   direct examination, the citation dealing with payroll was

23   October 13th, which is Day 17, and it's page 136, lines 18

24   through 20, for example, was one of the citations that I don't

25   believe was in the brief.  At page 138, Mr. Thai talks about        11:33:49

Posting Solutions at the top of the page.  I think those are

the two I was going to bring to the Court's attention.

THE COURT:  So page 136 and 138?

MR. LINCENBERG:  136 and 138, and then I'd also bring

to the Court's attention, it's a little more tangential, but on

the cross-examination, which the Court may recall was two days

later, it was Day 19, page 34 through 36, has some testimony

dealing with loan payments, which I think is also inconsistent

with the report.

THE COURT: All right.  Mr. Cambria.

MR. CAMBRIA:  Thank you.  Two things on two subjects.

On the current subject, there clearly were several versions of

this exhibit.  And under the *Bibbero* case, which is Ninth

Circuit case, 749 F.2d 581, we're entitled to all those

versions.  In fact, in that case there were several versions of

a DEA report not turned over, and the Court reversed the

conviction.

So we would like to have those versions so that we can

fully examine the statements or potential statements that would

have been available to us for cross.

THE COURT:  Let me stop you right there because I -- I

don't want to lose the question to Mr. Stone.  Was the -- I'm

operating on the understanding that this financial account

tracing document, was this the version used for the search, the

search warrant applications on the seizure case?

1          MR. STONE:  Well, this, I think the testimony from

2    Mr. Thai was this document seemed to grow over time, but what

3    Your Honor will be able to determine is when comparing the

4    language from Exhibit A to the search warrant, is that does

5    change a little bit, and often times it expands in the warrant          11:36:33

6    affidavit because they are taking this draft document and then

7    expanding it or modifying it slightly to put it into the

8    affidavits.

9          And so, yeah, it's often times verbatim, but there are

10   modifications, for example, with the Ferrer statements in          11:36:54

11   looking at, I think there is 23 Ferrer statements cited in

12   Exhibit A, which are all in the affidavits for the warrants.

13   There is about half of them more information provided that

14   supports the Ferrer's statements.

15         THE COURT:  So as to the versions that Mr. Cambria is          11:37:13

16   referring to, are those prior versions, and would they also

17   have been included in those affidavits?

18         MR. STONE:  I think Mr. Thai testified that the last

19   two versions that he had have now been turned over to the

20   defense, and there was only one change in it and it was like a          11:37:36

21   date that he put on the first page.  The -- in 2018 there are

22   two affidavits that are attached to our motion.  One earlier in

23   2018 and one, I think, October or November of 2018.  So that

24   includes a lot of the exact information from these documents,

25   but then you look at the civil seizure, sorry, the civil          11:37:59

1   complaint supporting forfeiture in CDCA, which was filed in

2   June of 2020, which I believe is Exhibit 2 to our motion, and

3   that would, you know, reflect information that had been

4   developed between 2018 and 2020.

5        So between those three, they are going to have all the   11:38:19

6   information that derives from or comes from Exhibit A.

7        THE COURT:  All right.

8        MR. CAMBRIA:  Our position on that, Your Honor is a

9   couple of different things.  Number one, we don't know any of

10  that unless we see all the versions.  And to the Court's point   11:38:37

11  about, well, all this information was in another document,

12  there's a difference between another document not authored by

13  the person who is on the stand who could simply say:  Well, I

14  don't know, or I haven't seen it, or whatever.  And we wouldn't

15  know that unless we examined them as opposed to:  You made this   11:38:58

16  statement.  Here it is.

17       So without all the versions, and there's several

18  versions, it's obvious from looking at this, what was sent.  In

19  fact, there was even one referred to as a future version one

20  that they were supposed to get.  So we need to see all the   11:39:22

21  versions before you can make a determination as to whether all

22  the information was provided.  Even if all the information was

23  provided, it's a much different situation to impeach someone

24  with something they said as opposed to referring them to

25  something someone else said.  So that's why that would be   11:39:39

1    important.

2           The other thing is we did make a discovery request for

3    any communications between Versoza, Thai, Ferrer, relating to

4    this report, and we haven't had any response on that.

5           The other issue that I wanted to include is yesterday     11:39:56

6    we got this Jencks material.  We are now specifically including

7    that in our motion with regard to Jencks, and the reason is --

8           THE COURT:  Mr. Cambria, I just said that I'd like it

9    in a separate matter.

10          MR. CAMBRIA:  That would be fine, but can I just give     11:40:17

11   an intro to this?

12          THE COURT:  You can highlight it, yes.

13          MR. CAMBRIA:  We have indicated that it's

14   Exhibit 6273, which we have given you a copy of.  What is

15   important about this is it is, it is an e-mail from Carl Ferrer   11:40:33

16   to Versoza and Baum, his attorney, with several attachments.

17   It's July 13th of 2018.  All right.  So clearly before he was a

18   witness.

19          What's critical about this is that one of the things

20   that it demonstrates is a subject matter that was attempted to   11:40:58

21   be covered in cross-examination, which was benefits that he

22   would have received as a result of his plea bargain, and one of

23   them would be the utilization of otherwise seized or seizable

24   money for his legal defense.  At the time there were a number

25   of questions asked of him about trying to pin down how much      11:41:27

that was, and he indicated repeatedly he couldn't remember,

couldn't remember, couldn't remember.

Well, this particular e-mail from him attaches a

schedule, and in that schedule is a $4 million payment to his

lawyer, and so that would clearly have been something very

important to cross-examine him on, to confront him with when he

indicated he couldn't recall.  Do you recall the questions was

like:  Was it 100,000?  Was it 200?  And this:  I don't

remember.  I don't remember.  It's hard to believe that a jury

would think he wouldn't remember $4 million.  And obviously the

jury could weigh that $4 million benefit that he got as a

result of his plea bargain in determining his credibility, a

witness very, very critical to the prosecution's case.

So with regard to this exhibit, which a copy of which

you can review, it clearly is a statement of Mr. Ferrer because

it is sent by Mr. Ferrer, and it includes this financial

information with it and indicates that it includes this

financial information.

So here is a very critical piece that could have been

used for cross-examination on a very major witness.  There's no

doubt it's a statement.  This is absolute self-authenticating

as a statement.  There is no doubt that it relates to his

testimony, which is what you need for Jencks, because he was

asked specifically about monies to his lawyers, and there is no

doubt that it would have an impact, reasonably speaking, on any

1    juror that part of his deal was to get $4 million plus.

2            So we have this to hand up.  They just gave it to us

3    yesterday.  We asked them if they claim that it was previously

4    disclosed.  Mr. Rapp indicated today the answer to that is no,

5    and so here it is.                                          11:43:43

6            MR. LINCENBERG:  I'm advised by the paralegal that

7    these documents were provided to the Court this morning, so the

8    Court has them, and it's a number of e-mails.  Some of them

9    also deal with payroll, which relates to one of the issues I

10   had raised earlier about Exhibit A where Mr. Versoza is going  11:43:59

11   back and forth with Ferrer about what company is doing payroll

12   for Backpage.

13           THE COURT:  Well, I haven't seen them, so I am sure

14   they are somewhere.

15           But in any event, yes, Ms. Bertrand.                11:44:14

16           MS. BERTRAND:  Thank you, Your Honor.  May I approach?

17           THE COURT:  Yes, please do.

18           MS. BERTRAND:  I have two comments to make sure there

19   is a clear record here.  The first is regarding the Central

20   District of California matters.  I don't believe my client is  11:44:37

21   party to those.  I don't believe I have been recipient of any

22   discovery as to that.  I obviously had discovery in this

23   matter.  I'm not sure if Mr. Padilla is named in that Central

24   District of California matter.  I don't believe he is.  But I

25   think that that -- that is an important distinction here with  11:45:00

1    regards to at least two defendants that whatever has gone on in

2    those matters, we have not been party to.

3          I acknowledge we are in a JDA, so we share a lot of

4    different information, but that doesn't mean we share -- there

5    is no guarantee that Mr. Eisenberg and I have the same universe          11:45:22

6    of information regarding that seizure and forfeiture litigation

7    that the other defendants do.  I don't -- I don't recall in the

8    case file I received from Mr. Weiss four-plus years ago that

9    there was any indication that that would pertain to my client.

10   So I just want to make that record clear.                                11:45:46

11          And the second --

12          THE COURT:  To be clear, it's because your client was

13   not charged with any of the forfeiture counts.

14          MS. BERTRAND:  Right.  Yes, ma'am.

15          THE COURT:  All right.                                            11:45:59

16          MS. BERTRAND:  The second, it's more of just a

17   comment, Your Honor, that the Court might want to entertain or

18   not, but I'm troubled that there was even the delay in these

19   new disclosures, and the government hasn't given a reason why.

20   Why don't just give it to us?  Why not give it to us,                    11:46:17

21   especially stuff predating 2019?  Why not give it to us with

22   these initial Jencks deadline?

23          Related to that, why now resist us talking to these

24   witnesses again to see what happened and to see what really,

25   and flesh this out?  This issue with Ferrer is very troubling           11:46:39

1    because we now have -- we had Mr. Ferrer on the stand saying, I

2    am going to round numbers here, but I think he said more

3    than -- he met with the government more than 30 times.  When we

4    pressed him about communication with the government, he would

5    get mealymouthed and said things like:  Well, my lawyer was the          11:47:00

6    one doing that.

7           We now know Mr. Ferrer was communicating directly with

8    these agents.  Whether his lawyer was cc'd on those e-mails or

9    not is irrelevant.  We didn't receive those e-mails.  There is

10   nothing about this that could possibly be excused.                       11:47:23

11          And it would have greatly impacted my ability to

12   cross-examination whether Ferrer.  Imagine, Your Honor, if

13   there is an e-mail where he says:  I don't know why Joye Vaught

14   is in this.  Why do you keep bringing her up?  Or she was a

15   minor player.  She didn't have any control.  Maybe there is,           11:47:44

16   maybe there isn't, but I don't know because we never received

17   those e-mails.

18          So I think that this idea that we can just write this

19   off as not prejudicial, or that, you know, Joy, you had all the

20   information anyway; you did a great job with him.  If any of my         11:48:02

21   cross-examination of Mr. Ferrer could have been different

22   because of these e-mails, it's material, and I should have

23   received it.  That's all I have, Your Honor.  Thank you.

24          THE COURT:  Final word.

25          MR. STONE:  Just quickly, and just on the first issue           11:48:19

1    that Ms. Bertrand raised.

2         The only potential issue with Exhibit A that could

3    apply to Ms. Vaught or Mr. Padilla were the Ferrer statements.

4    There is 23 statements, as I said before.  Each one of those

5    was contained in more detail in the affidavits.  The affidavits          11:48:35

6    were produced in this case in 2018, and that's Exhibit 6 and 7

7    to our motion.  So that was -- that was in the discovery, and

8    Ms. Bertrand and Mr. Eisenberg had that.  Thank you, Your

9    Honor.

10         THE COURT:  Well, you know, the -- my observation is          11:49:05

11   this, just with regard to Exhibit A:  Having made my

12   determination, I don't find it to qualify as Jencks material,

13   and as such, arguably the government didn't have to disclose

14   it, but in any event, the material related to it had been

15   disclosed.  I'll look at the other matter with regard to the          11:49:30

16   Thai testimony in the transcript as well as Mr. Ferrer's when I

17   examine this late disclosure.

18         And is there anything further then from the

19   government?

20         MR. STONE:  No, Your Honor.  Thank you.          11:49:51

21         THE COURT:  Anything further from defendants?

22         MR. CAMBRIA:  I'd still like to get the versions if we

23   could, Your Honor.

24         THE COURT:  I will look at the case you cited and

25   determine that.          11:50:05

UNITED STATES DISTRICT COURT

1              Mr. Eisenberg, you're standing.

2              MR. EISENBERG:  I am, Your Honor.  May I address the

3     Court?

4              THE COURT:  Yes.

5              MR. EISENBERG:  Your Honor, I think the point has been          11:50:12

6     well made, and I am not going to rehash it.  I would

7     appreciate, of course, the Court looking at what was disclosed

8     by us, I think, last night.

9              The bottom line for me is whatever cross-examination

10    there could have been of Mr. Ferrer that was not undertaken          11:50:25

11    because we didn't have all of the material could very well have

12    caused this jury, which is only, as far as I can tell, come

13    back with a guilty -- I am sorry -- a verdict on one count, it

14    may have had an impact.  Obviously the jury has the case now,

15    but I find this really very important with respect to the          11:50:48

16    failure to disclose how much money was paid to Mr. Ferrer's

17    attorney at a time when he was on the stand and he could not

18    recall.

19             His credibility is essentially the whole case against

20    at least my client, Your Honor, and I know the Court is going          11:51:07

21    to consider this, so I just thought I would echo what my

22    colleagues have said.  Thank you, Your Honor.

23             THE COURT:  All right.  Thank you.  There being

24    nothing further, then I will take that other matter under

25    advisement as it relates to Exhibit A and whether or not it          11:51:21

UNITED STATES DISTRICT COURT

1    includes exculpatory or impeachment material, and then I'll

2    look at the other late disclosures and we will proceed.

3            MR. FEDER:  Judge, as to the other disclosure, does

4    the Court want some kind of pleading to point out the various

5    ways those disclosures are relevant?                    11:51:46

6            THE COURT:  That would be helpful, but if you can, do

7    so soon.  Time is of the essence.  When can you have that to

8    me, Mr. Feder?

9            MR. FEDER:  I will do my best.

10           MR. CAMBRIA:  We haven't withdrawn our request to     11:52:00

11   examine the witnesses, Your Honor.

12           THE COURT:  I'm sorry.

13           MR. CAMBRIA:  I said we have not withdrawn our request

14   to examine the witnesses.  I would like to have the other

15   versions before that happens.                          11:52:10

16           THE COURT:  I will consider that as well.

17           MR. CAMBRIA:  Appreciate that.  Thank you.

18       (Proceedings concluded at 11:52 a.m.)

19       (Proceedings reconvened at 1:53 p.m.)

20           THE COURT:  Please be seated.  And I know my law clerk   13:53:28

21   has handed out copies of the juror's question, and the juror's

22   question is, "Page 47 in the instructions covers good faith.

23   Can good faith be applied to all counts or is good faith tied

24   to a particular charge?"

25           It is signed Juror No. 2.                        13:53:56

```
 1              My review of the instructions are indeed that the

 2      good-faith instruction covers all counts.  What is the

 3      government's position?

 4              MR. STONE:  We agree, Your Honor.

 5              THE COURT:  Who wishes to speak from defense?          13:54:28

 6              MS. BERTRAND:  Hi.  Good afternoon.  We agree as well.

 7              THE COURT:  All right.  And so the Court will simply

 8      answer the question that the good-faith instruction can be

 9      applied to all counts.

10              MR. CAMBRIA:  Thank you.                               13:54:48

11              THE COURT:  All right.  We are adjourned.

12          (Proceedings concluded at 1:54 p.m.)

13          (Proceedings reconvened at 3:32 p.m.)

14              THE COURT:  All right.  Please be seated.  Has the

15      government had an opportunity to review the question?         15:32:28

16              MR. STONE:  Yes, Your Honor.

17              THE COURT:  Have the defendants' counsel reviewed the

18      question?

19              MS. BERTRAND:  Yes.

20              MR. EISENBERG:  We have, Your Honor.                   15:32:39

21              THE COURT:  The question reads, "If a defendant is

22      found not guilty in charge one per page 27 lines 14 and 15, can

23      the same defendant be found guilty of charges 2-51?  If they

24      were not found to be a member of the conspiracy?"

25              And it's signed by Juror No. 2.                        15:33:17
```

1          The reference to page 27, that is the *Pinkerton*

2     instruction, line 14 through 15 are the fourth -- is the fourth

3     element, and that reads:  Fourth, a defendant was a member of

4     the same conspiracy at the time the Travel Act offense was

5     committed.                                                    15:33:48

6          And I just want to remind counsel that this is

7     actually a version of what the jury asked yesterday.  In fact,

8     it's almost, not quite identical, but it's -- the only

9     difference is that in that question, which was, "If a defendant

10    is found not guilty in charge #1, but found guilty in charges   15:34:21

11    #2-51, can the defendant be charged in Counts 2-51?"  And then

12    they go forward to say, "The question was a concern due to

13    page 27, lines 10-11."

14         Lines 10 through 11, as you will recall, are the

15    second element.  And my recollection is that the Court answered  15:34:47

16    that question "Yes" and referred them back to instruction,

17    separate crime is charged in a separate count and separate

18    consideration of the individual counts at page 16.  It also

19    referred them back to the substantive Travel Act instruction.

20         And so because the two are very similar, I'm inclined    15:35:32

21    to do the same, but only refer them back to the deciding the

22    case as to each crime charged separately.

23         MR. STONE:  Your Honor, I agree it's a similar

24    question, but they point to a different part of the *Pinkerton*

25    instruction on page 27.  I think they point to the fourth      15:36:05

1   element, rather than the second element.  So I think we -- the

2   Court could be a little bit more helpful in clarifying this

3   issue for the jury, and so a response to be something like,

4   "Yes, pursuant to or in accordance with or under the

5   instructions starting on page 30."                          15:36:32

6        Because these are alternative theories of liability,

7   the question is a good one in the sense that if they find that

8   one of the individual defendants is not a member of the

9   conspiracy, they can't be found guilty under a *Pinkerton*

10  theory, but they certainly can be found guilty under the      15:36:49

11  substantive Travel Act charge, which is starts on page 30.

12       So we don't know what the jury, where they are in

13  their deliberations, but the answer to this question is clearly

14  "Yes," but it would have to be under the instruction that

15  starts on page 30.  And so I think if we fashion an answer in  15:37:13

16  that regard, that would be the most helpful.

17       THE COURT:  Who wishes to speak?

18       MR. EISENBERG:  We both, Your Honor.  Thank you.

19       Ms. Bertrand can go first, Your Honor.

20       MS. BERTRAND:  Thanks.  Good afternoon.  Your Honor, I    15:38:00

21  would suggest to the Court that we not go beyond the specific

22  language of the question, which is applying lines 14 and 15 of

23  page 27:  Can a defendant be found guilty if they are not part

24  of the conspiracy?  The answer to that is "No."  Per that -- if

25  that is the line that they have a question about, the answer is  15:38:35

1    "No."  They have not come back and said:  Well, what if we go

2    to page 30 and apply this and that and the other, they have

3    those instructions.  That has never been a sticking point, and

4    they were referred to this instruction yesterday.  The sticking

5    point is this *Pinkerton* instruction.  And the literal answer to      15:38:52

6    that is if this person is not a member of the conspiracy, you

7    cannot use this instruction to find them guilty.

8           And as I suggested yesterday, we either do not give a

9    "Yes" or a "No," or here the answer is "No."  Applying those

10   two lines, nothing else.  If they have another question, they      15:39:19

11   know how to ask it.  They've been very clear about that.  I

12   don't think it's appropriate to jump ahead and guess what their

13   next question would be.

14          So my suggestion, Your Honor, would be to simply say,

15   "No" or to simply say, "The instruction on page 27 is your      15:39:37

16   guide."  I don't know if Mr. Eisenberg has more to add, but

17   that's my portion of this argument.

18          MR. EISENBERG:  Your Honor, if it may please the

19   Court, the other thing I would add is that, I remember the

20   question from the other day centered on lines 10 and 11.  The      15:40:00

21   difference between the question yesterday and the one today is

22   on line 10 it talks about a person was a member of the

23   conspiracy, and that could have included Mr. Ferrer.  Doesn't

24   require that a defendant be a member in the second element.

25   But the fourth element clearly says, "A defendant was a member      15:40:27

1   of the same conspiracy."

2          I think in addition to, direct them to another charge

3   in the indictment by the Court does -- it would champion, if

4   you will, Your Honor, a different approach because it comes

5   from the Court, and I think that is not really what, A, it                    15:40:50

6   isn't what they've asked for; and B, I think it overbears what

7   the jury is entitled to do, which is decide the matter

8   themselves.

9          They have the instructions with the Travel Act and I

10  am sure that they have considered them.  So I agree with my       15:41:07

11  colleague.  The answer to this question is "Yes."  The

12  defendant had to have been --

13          MS. BERTRAND:  The answer would be "No."

14          MR. EISENBERG:  No.  The way they worded it.  Okay.

15  No.                                                               15:41:21

16          MS. BERTRAND:  The answer would be "No."

17          MR. EISENBERG:  I get my no's and yeses mixed up.

18          THE COURT:  Mr. Stone.

19          MR. STONE:  Well, look, we can't just say "No" and not

20  say "Yes" under instruction 30 'cause that's misleading.  I       15:41:47

21  have no issue doing both.  Under the theory on page 27, if the

22  defendant was found not to be a member of the conspiracy, he or

23  she could not be found guilty of the charges 2 through 51, but

24  the same defendant could be found guilty under the theory

25  that's articulated starting on page 30.                           15:42:10

1          MS. BERTRAND:  Your Honor, I think if they want to ask

2     questions about an alternative theory of liability, they have

3     more question forms and pens in the back.

4          MR. STONE:  It's just a misleading answer, Your Honor.

5          MR. EISENBERG:  Well --                              15:42:27

6          THE COURT:  It's not helpful.  I mean, you've made

7     that point, and it's not helpful.  It's just a response to what

8     Mr. Stone said.  It is an interesting choice of words now that

9     I look at it, why is -- can somebody opine on why the

10    distinction between reference to the person versus a defendant   15:43:02

11    in the second and third lines that says, "that person."  The

12    fourth line then says, "a defendant"?

13         MR. STONE:  Of course.  I would be happy to.  The

14    *Pinkerton* theory, let me just make sure I am tracking what your

15    question was, see, first, a member of the conspiracy, this is    15:43:28

16    the first element, committed the Travel Act offense.  It just

17    needs to be a member of the conspiracy.  Doesn't need to be a

18    named defendant in this action.  We've litigated this issue

19    numerous times in this matter.

20         And the second element tracks the first.  That person     15:43:43

21    was a member of the conspiracy charged in Count 1 of the

22    indictment.

23         Third, that person committed the Travel Act offense in

24    furtherance of the conspiracy.

25         And then fourth goes to the individual defendant who       15:43:55

1    they would be finding guilty through this theory.

2           Fourth, a defendant was a member of the same

3    conspiracy as the person who committed the actual Travel Act

4    offense.

5           So that's why the language is a little bit different.    15:44:08

6           THE COURT:  Thank you for reminding me of that.

7           MS. BERTRAND:  And Your Honor, I think that's why it

8    is important to stick with the question that they asked and not

9    expound on other theories.  The jury has for two days struggled

10   with *Pinkerton* --                                           15:44:26

11          THE COURT:  Let me stop you there.  The question does

12   refer to charges 2 through 51.

13          MS. BERTRAND:  Yes.

14          THE COURT:  And so I don't know how you're saying that

15   they are not considering that.                               15:44:35

16          MS. BERTRAND:  Your Honor, what I'm saying is the

17   hang-up is with this *Pinkerton* instruction at lines 14 and 15.

18   And the answer is, if applying lines 14 and 15, if they are not

19   part of the conspiracy, they cannot be found guilty applying

20   lines 14 and 15.                                             15:45:05

21          MR. STONE:  Your Honor, we agree with that.  It just

22   needs to be complete that they could find him under the

23   substantive count.

24          MS. BERTRAND:  That's where the defense objects.  It

25   is not appropriate when answering jury questions to go beyond   15:45:26

UNITED STATES DISTRICT COURT

the question.  And while, yes, it is addressing charges 2

through 51, but so is the *Pinkerton* instruction, and that is --

that is where their process is.  I don't think it's appropriate

for us to jump ahead in the process for them.  It is

appropriate to stick with the question and the instruction          15:45:47

about which they have a question.

          MR. STONE:  Your Honor, our job is to clarify, not to

hide the ball by not giving the full answer here.

          MR. FEDER:  Do not advocate.

          MS. BERTRAND:  There is nothing about hiding the ball     15:46:04

about answering their question directly.  What we also cannot

do is suggest to them that there's a different way to convict

on this case when we don't know if they already addressed that.

The question is this specific instruction, and that only.

          MR. STONE:  Well, if they have addressed it then it       15:46:26

will be an easy deliberation for them.  They can just disregard

that part of the --

          MS. BERTRAND:  We cannot assume that.

          THE COURT:  Well, I do think answering the question

reference to the Travel Act instruction is appropriate because     15:46:43

they are asking the question whether or not someone can be

convicted of a Travel Act offense.  It clearly says that.  Can

the same defendant be found guilty of charges 2 through 51,

which are the Travel Act offenses.

          MS. BERTRAND:  However --                                  15:47:13

1          THE COURT:  That's the end of the question.

2          MS. BERTRAND:  But the beginning of the question, the

3    first phrase of that question is, "Per page 27 lines 14 and

4    15." So the call of the question, which also --

5          THE COURT:  Which also refers to the Travel Act, lines          15:47:30

6    14 and 15.

7          MS. BERTRAND:  They certainly do.  The call of the

8    question from the jury is, how do we apply lines 14 and 15?

9    Nothing further.

10         THE COURT:  I do think the response, at a minimum,          15:47:54

11   should refer them back to separate consideration of the

12   individual counts.  That's what we've asked them to do in the

13   instruction.

14         MS. BERTRAND:  The struggle is, Your Honor, that they

15   received that yesterday and they have the same question.  So          15:48:22

16   they've gotten that answer before.  That doesn't seem to be

17   where the struggle for this jury lies.  And I think going

18   beyond and trying to guess is overbroad.  They were told

19   yesterday to consider these counts separately, to consider the

20   defendants separately.  They referred back to the Travel Act          15:48:52

21   specific elements.  That did not answer their question, and now

22   they are simply asking, can we under these two lines on

23   page 27, find someone guilty?  The answer is "No" if the person

24   is not a member of the conspiracy.

25         MR. STONE:  Your Honor, we answered this very similar          15:49:23

question yesterday.  To answer it "No" today will be extremely

confusing for this jury.  If we're going to add "No," then we

need to just make it clear that there is a "Yes" here and it is

the substantive instruction on page 30.

THE COURT:  And really that is the -- that is the     15:49:42

concern is the consistency, and that's why I pulled out the

last question because it's extraordinarily similar, and I think

that the appropriate response should be at least similar to the

manner which the Court answered the latter question.

MS. BERTRAND:  Any of my colleagues want to comment?     15:50:17

I just want to make sure none of my colleagues are being frozen

out here.

Your Honor, we tried that approach yesterday.  The

jury is indicating that's not the answer they need help with.

THE COURT:  Well, that wasn't the question.  It's a     15:50:48

similar question.  It's not the same.

MS. BERTRAND:  Similar question regarding the same set

of instructions on page 27, but as we've noted discrete.  As

the Court noted, there is a discrete difference in the

language.  And I would also note defense objected yesterday to     15:51:11

the answering of the question "Yes."  I think here what is

critical is that the jury be told applying page 27 lines 14 and

15, the answer is "No."

THE COURT:  Well, it may be more concise to answer the

question that a defendant who you find not guilty in what they     15:51:52

```
 1   refer to as charge 1, can be found guilty of charges in Count 2

 2   through 51 even if not a member of the conspiracy.

 3           MS. BERTRAND:  Your Honor, I think that that goes

 4   beyond the question, and I also think it directs them basically

 5   to find the defendant guilty, and that's far more direction          15:52:37

 6   than is proper.

 7           Here, if the Court were going to point out an

 8   alternative theory, it should be something to the effect of:

 9   Applying lines 14 and 15 at page 27 --

10           THE COURT:  Well, I can't single -- well, no, you            15:53:12

11   can't parse out the instruction that way.  You have to read it

12   in total.

13           MS. BERTRAND:  But they did.

14           THE COURT:  I understand that.

15           MS. BERTRAND:  And so the answer is "No" applying            15:53:22

16   that.  There are alternatives that are possible, but applying

17   the strict language of this, the answer is "No."  The jury has

18   also been directed to look at page, I believe it's 30 that has

19   the Travel Act instructions, but the answer to this question is

20   "No."                                                                15:53:55

21           THE COURT:  Well, I actually think an explanation that

22   relates back to the Travel Act is, again, important or at least

23   the way they referred to it as charges 2 through 51, and it

24   really is related to the instruction that reads, "You must

25   decide the case of each defendant on each crime charged against     15:54:55
```

1    that defendant separately.  Your verdict on one count as to any

2    defendant should not control your verdict on any other count."

3    And therefore, answering the question in the way that you

4    suggest would be misleading and it would not be in harmony with

5    the prior instructions.                                          15:55:27

6            MS. BERTRAND:  Your Honor, the question pertains to

7    *Pinkerton* liability.

8            THE COURT:  I understand that, Ms. Bertrand.  Give me

9    a moment.

10           The Court proposes this:  If a defendant is found not    15:59:22

11   guilty in Count 1, you are to consider the remaining charges as

12   to each defendant separately.

13           MS. BERTRAND:  That's fine.

14           THE COURT:  Mr. Stone.

15           MR. STONE:  I think we can provide more clarification     15:59:50

16   and drop the reference to the substantive instruction or the

17   Travel Act on page 30, because there's a chance that they are

18   confused, as maybe they think that the United States had to

19   prove up both.

20           THE COURT:  Well, I think the reason that I included     16:00:13

21   the remaining charges separately is because it doesn't single

22   out the Travel Act charges, which obviously they are concerned

23   about, but it directs them that they are to separately consider

24   each individual count as to each defendant, and I think it's a

25   broader way of getting to answer their question.                 16:00:43

1          MR. STONE:  I understand that, Your Honor.  My concern

2    is if they think that the United States still needs to prove up

3    the *Pinkerton* theory in conjunction or in addition to the

4    substantive Travel Act.  There isn't really a part of the

5    instruction that says these are separate theories of liability.          16:01:02

6    You can go under one theory, you can go under the other, and

7    clearly they are struggling with this *Pinkerton* instruction,

8    and so I was -- we think that to clarify and point them to

9    instruction 30 or the instruction that begins on page 30 would

10   be helpful.                                                               16:01:22

11          MS. BERTRAND:  Your Honor --

12          THE COURT:  Well, I am going to have the final word.

13   I'm going to answer the question in the way that I propose, so

14   the answer will be:  If a defendant is found not guilty in

15   Count 1, you are to consider the remaining charges as to each          16:01:36

16   defendant separately.

17          It incorporates and encompasses all of the counts,

18   including the Travel Act, and that's how I will resolve it.

19          MR. STONE:  Your Honor, I'm sorry, I just missed it,

20   is it to each of the remaining charges?                                 16:01:59

21          THE COURT:  As to each.  I'm sorry.  It reads:  You

22   are to consider the remaining charges as to each defendant

23   separately.

24          MR. STONE:  Would it be okay, we offer that it would

25   be each of the remaining charges as to each of the defendants          16:02:19

1    separately?

2            THE COURT:  Yes.

3            MS. BERTRAND:  Sorry, what did Mr. Stone just say?

4            THE COURT:  It will read:  If a defendant is found not

5    guilty in Count 1, you are to consider each of the remaining          16:02:31

6    charges as to each defendant separately.

7            MR. LINCENBERG:  Your Honor, may I make just a record

8    of our objection?

9            THE COURT:  Yes.

10           MR. LINCENBERG:  We object.  We don't think that that         16:02:48

11   answers the question.  This question is dealing with element

12   four of the conspiracy count.  It's not dealing with each

13   defendant or anything.  It's asking specifically about if a

14   defendant that they may have in mind is found not guilty in

15   Count 1, and they are asking about element four and nothing          16:03:08

16   further.  And the answer should only be -- it should be "No"

17   and it should be restricted to -- the answer should be

18   restricted to element four.

19           MS. BERTRAND:  I concur with my colleague, Your Honor.

20   I think the danger of the government's interpretation is that        16:03:29

21   we don't know that they haven't already gone through page 30

22   and decided that that doesn't apply here.  It is --

23           THE COURT:  I am not putting any reference into

24   page 30.

25           MS. BERTRAND:  Then my suggestion would be, Your            16:03:45

1    Honor, that in addition to the language the Court has included,

2    the answer still "No."

3             MR. CAMBRIA:  Still "No."

4             MS. BERTRAND:  The exact answer to:  Can we convict if

5    they weren't a member of the conspiracy?  Not applying that                    16:04:00

6    rule they can't.

7             THE COURT:  All right.  I will answer the question in

8    the way that I outlined, and please return the question to my

9    law clerk.

10            MR. CAMBRIA:  We join in that too, Your Honor.                         16:04:14

11            THE COURT:  Sorry, what was that?

12            MR. CAMBRIA:  We all join in that, in our objections.

13       (Proceedings concluded at 4:04 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **C E R T I F I C A T E**

3

4          I, HILDA E. LOPEZ, do hereby certify that I am duly

5    appointed and qualified to act as Official Court Reporter for

6    the United States District Court for the District of Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 16th day of November,

13   2023.

14

15

16                              s/Hilda E. Lopez_____

17                              HILDA E. LOPEZ, RMR, FCRR

18

19

20

21

22

23

24

25