GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

AUSTIN M. BERRY (Texas Bar No. 24062615, austin.berry2@usdoj.gov)
U.S. Department of Justice
Child Exploitation and Obscenity Section
1301 New York Avenue, NW, 11th Floor
Washington, D.C. 20005
Telephone (202) 412-4136
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | CR-18-422-PHX-DJH |
| Plaintiff, | **UNITED STATES' RESPONSE TO DEFENDANTS' FIRST SUPPLEMENT TO MOTION TO DISMISS (Doc. 1972)** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

**SUMMARY OF ARGUMENT**

Defendants' supplemental motion to dismiss or for other relief should be denied. The supplement is based on the United States' recent disclosure of 18 emails from Carl Ferrer relating to the forfeiture phase of this case. The emails date from April to August 2018, and they all involve Ferrer's post-plea assistance with the United States' efforts to locate Backpage-related assets for possible seizure and forfeiture. The Ferrer forfeiture emails do not concern the subject matter of Ferrer's testimony during the guilt phase of the trial. Moreover, the lion's share of the information in the emails had previously been disclosed to Defendants in other, more detailed documents, and Defendants thoroughly cross-examined Ferrer at trial. Although under the United States' broad disclosure policies these emails would have likely been turned over earlier, their disclosure was not required under the Jencks Act during the trial phase of this case. Even if otherwise, the United States' earlier non-disclosure of the Ferrer forfeiture emails was due entirely to inadvertence, and the United States promptly produced the emails upon learning of them. For these and other reasons explained below, the United States has conscientiously complied with its discovery and disclosure obligations in this case—and Defendants' requests for the extreme sanctions of dismissal or striking testimony should be denied.

**FACTUAL BACKGROUND**

**A.   The United States Promptly Disclosed the Ferrer Forfeiture Emails Upon Learning They Had Not Been Produced**

On Thursday, November 9, 2023 Defendant Brunst orally moved to dismiss the case based on an alleged *Jencks* violation related to Quoc Thai. (Docs. 1958, 1966, 1967.) The Court ordered briefing by Monday, November 13, 2023, at noon. (Doc. 1958.) The United States immediately started preparing an exhibit, later filed at Doc. 1966-7, comparing the asset tracing document at issue (Doc. 1966-4) to seizure warrant affidavits filed in California federal court in 2018 by Postal Inspector Lyndon Versoza (Docs. 1966-1, 1968-1, 1968-2.) These affidavits were disclosed in this case in 2018. (Docs. 1966-5, 1966-6.)

In preparing Doc. 1966-7, the United States noticed a reference in one of the 2018

affidavits to email communications between Inspector Versoza and Carl Ferrer. (Doc. 1968-2 at 59 ("Following [an] in-person interview [on April 17-18, 2018], I also have spoken with Ferrer on the phone and communicated via email."). Because the prosecution team did not immediately recall whether the referenced emails had been disclosed as part of the several million documents produced in this case since 2018, the prosecution team asked Inspector Versoza to search his files for the referenced emails.

On November 9, 2023, Inspector Versoza identified a sub-folder on his laptop titled "Emails re Carl" that was contained in his "Forfeiture" folder. Within that sub-folder he located another sub-folder titled "Saved." Within the "Saved" sub-folder there were 18 emails between Versoza and Ferrer (the "Ferrer forfeiture emails"). The emails were saved in a manner indicating to Inspector Versoza they had been previously produced. His emails are automatically deleted unless he separately saves them to his computer, so he generally only saves emails when he plans on producing them in discovery. Because he had saved the Ferrer forfeiture emails, he believed they had been produced.

The prosecution team continued working through the weekend on its response to Defendants' motion to dismiss. On Monday, November 13, prosecutors asked IRS-CI Special Agent Richard Robinson to search the Relativity database of discovery to determine whether the Ferrer forfeiture emails had been produced. These searches require some work due to the sheer size of discovery—over 11 million pages.

That evening, SA Robinson searched Relativity for Inspector Versoza's email address "(laversoza@uspis.gov)" and "Carl." The search yielded two emails between Inspector Versoza and Ferrer relating to the seizure of Backpage's servers in April 2018.

The next day, Tuesday, November 14, Inspector Versoza shared the Ferrer forfeiture emails with the prosecution team, and SA Robinson reported that he couldn't find these emails in the Relativity database. The prosecution team immediately determined that the Ferrer forfeiture emails should be disclosed because they were arguably *Jencks* for the then-upcoming forfeiture trial, and the United States wanted to disclose them as soon as the trial team became aware of their existence. AUSA Rapp sent an email to defense

counsel at 12:02pm that tried to attach the emails. (Nov. 14, 2023 email from K. Rapp to defense counsel, attached as Exhibit 1 at 2.) Due to the size of the attachments, that email failed to send. Two hours later, the United States notified the defense that the emails had been uploaded to USAfx—an application the United States uses for document productions.

**B.    While The Ferrer Forfeiture Emails Did Not Relate To Ferrer's Trial Testimony; The Lack of Prior Disclosure Was Entirely Inadvertent**

Inspector Versoza's main role in the Backpage investigation concerned asset forfeiture. He was the affiant on multiple seizure warrants (Docs. 1966-1, 1968-1, 1968-2) and the verified civil forfeiture complaint (Doc. 166-2) in the Central District of California.

The Ferrer forfeiture emails concerned asset forfeiture. In his plea agreement, Ferrer agreed to provide forfeiture assistance to the United States:

> b.    Forfeiture Assistance: The defendant stipulates and agrees that, upon entry of his guilty plea, he will take all steps within his power to forfeit to the United States all corporate assets and other property owned or controlled by Website Technologies, LLC ("Website Technologies"), which owns and operates the Backpage website, as well as all corporate assets and other property owned or controlled by Backpage.com [and related entities]. Such steps shall include, but not be limited to, agreeing to the forfeiture of the . . . bank accounts, cryptocurrency, and other financial instruments owned or controlled by such entities. . . .

(*United States v. Ferrer*, 18-CR-464-DJH, Plea Agreement, Doc. 7-2 at ¶ 3(b).)

The 18 Ferrer forfeiture emails all involve communications concerning assets that Inspector Versoza reviewed for possible identification and inclusion in his asset seizure warrant affidavits and/or the civil forfeiture complaint that he verified.[1]

Inspector Versoza intended to disclose these communications. First, he saved the emails so that the United States Postal Inspection Service system wouldn't automatically delete them. Second, he segregated these emails into a separate folder, which is consistent with how he categorizes emails that will be produced in discovery. Third, he understood that all emails exchanged with trial witnesses should at least be provided to the prosecutors

---

[1] Defendant Spear attached all the emails to his Supplemental Motion (Doc. 1972-1). To ease the Court's review, the United States has included all of Ferrer's actual statements from these emails in the attached chart. (Chart attached as Exhibit 2.)

- 3 -

to analyze whether the emails constituted *Jencks/Brady/Giglio* or otherwise should be disclosed. On January 8, 2019, AUSA Rapp sent an email to the prosecution team that attached a draft witness list. (Email from K. Rapp to Prosecution Team, attached as Exhibit 3.) In the email, AUSA Rapp wrote, "We have two pressing deadlines: Jencks statements are due to defense by 2/25 and witness list (and preliminary exhibit list) are due on 4/1. We will review the witness list on 1/14 to determine if all statements have been forwarded to Relativity." (*Id.*) Inspector Versoza understood, both through this email and his training and experience, that emails with trial witnesses should be disclosed to the prosecutors to make a determination about whether the communications should be produced—even when, as is the case here, the subject of the emails do not apply to the witness's trial testimony.

On November 9, 2023, when Inspector Versoza reviewed the sub-folder containing the Ferrer forfeiture emails, he believed that those emails had been disclosed. It wasn't until the evening of November 13, 2023, after SA Robinson searched the 11 million plus pages of discovery in Relativity that the United States confirmed that the Ferrer forfeiture emails had not been produced. When the United States learned this, it moved expeditiously to produce the documents, sending the Ferrer forfeiture emails to Defendants the next day.

**C.     The Ferrer Forfeiture Emails Cover Previously Disclosed Subjects**

The Ferrer forfeiture emails cover subjects that have all been independently disclosed to Defendants. First, generally, the emails pertain to Ferrer's stipulation to "take all steps within his power to forfeit to the United States all corporate assets and other property owned or controlled by" the entity that owned and operated Backpage, and related entities. (*United States v. Ferrer*, 18-CR-464-DJH, Plea Agreement, Doc. 7-2 at ¶ 3(b).)

Second, the majority of attachments in the Ferrer forfeiture emails related to attorney IOLTA accounts that the United States subsequently seized. This is documented in Inspector Versoza's October 31, 2018 seizure warrant affidavit, which the United States filed in the Central District of California in 2018, produced to Defendants in 2018, and recently filed as Doc. 1968-1. Paragraphs 10(a)-10(q) outline 17 attorney IOLTA accounts that received Backpage proceeds. (Doc. 1968-1 at 10-15.) The affidavit provides more

detailed information about these accounts than the attachments to the Ferrer forfeiture emails. (*Compare* Doc. 1968-1 at 10-15 *with* Ex. 2.)

Third, one of the specific issues Defendant Spear argues was prejudicial relates to the money paid to Ferrer's lawyers at the Clarence Dyer & Cohen law firm ("Clarence Dyer"). Defendant Spear points to a series of prepayments to lawyers representing a variety of entities and individuals associated with Backpage, including $4 million to Clarence Dyer. (*See* Feder Law email to Chambers and counsel dated 11/15/23 attaching Defense Exhibit 6273, attached as Exhibit 4.) But that figure does not shed light on the amount of money that Ferrer's lawyers were paid *after* Ferrer pleaded guilty and agreed to cooperate with the United States in April 2018.

Here are the relevant facts that relate to Ferrer's representation by Clarence Dyer. Between Backpage's sale to Ferrer in 2015 and Ferrer's guilty plea in April 2018, Backpage paid millions of dollars to over a dozen law firms. (Doc. 1968-1 at ¶¶ 10(a)-10(q).) According to Ferrer, Defendant Brunst and Don Bennett Moon would direct Ferrer to make these payments. (Ferrer MOI, dated June 11, 2019, at ¶ 2, attached as Exhibit 5.) As Ferrer explained, "Early on there would be invoices and they wouldn't make payments without an invoice. Later on payments to law firms were all retainers. Backpage staff would be told to send a check to a given law firm." (Ex. 5 at ¶¶ 2(a)-(b).)

In October 2016, Clarence Dyer began representing Ferrer. (Doc. 193-9, ¶ 8.) Backpage paid Clarence Dyer substantial sums well before Ferrer pleaded guilty in April 2018. A portion of that money is captured by the disclosed bank records:

| Date | Payee | Type | Amount | Bates No | Disclosure Date |
|---|---|---|---|---|---|
| 3/20/2017 | Clarence Dyer & Cohen LLP | Wire | $ 250,000.00 | DOJ-BP-0004921163 | January 13, 2020 |
| 3/20/2017 | Clarence Dyer & Cohen LLP | Wire | $ 250,000.00 | DOJ-BP-0004921164 | January 13, 2020 |
| 3/30/2017 | Clarence Dyer & | Wire | $ 79,733.13 | DOJ-BP- | January 13, 2020 |

- 5 -

| | | | | | | |
|---|---|---|---|---|---|---|
| | Cohen LLP | | | | 0004921164 | |
| 4/27/2017 | Clarence Dyer & Cohen LLP | Wire | $ | 500,000.00 | DOJ-BP-0005036155 | January 13, 2020 |
| 7/14/2017 | Clarence Dyer & Cohen LLP | Wire | $ | 143,552.56 | DOJ-BP-0005036173 | January 13, 2020 |
| 9/28/2017 | Clarence Dyer & Cohen LLP | Wire | $ | 154,565.23 | DOJ-BP-0005039710 | January 13, 2020 |
| | | | $ | 1,377,850.92 | | |

(Jan. 13, 2020, discovery letter, attached as Exhibit 6.)

Ferrer's plea agreement makes clear that he could use money paid by Backpage to Clarence Dyer before his guilty plea, but "any funds remaining in the . . . IOLTA bank accounts at the conclusion of the litigation" were subject to forfeiture. (*United States v. Ferrer*, 18-CR-464-DJH, Doc. 7-2 at ¶ 8(a).) Defendants Lacey, Spear, and Brunst all filed verified petitions asserting that they each had a "right, title, and interest" in the Clarence Dyer IOLTA accounts. (18-CR-464-DJH, Doc. 29 at 12, Doc. 33 at 13-14, Doc. 34 at 12-13.)

The amount of money paid by Backpage to Clarence Dyer *before* Ferrer pleaded guilty in April 2018 is of no relevance. The key question, as asked by defense attorneys during Ferrer's cross examination, is how much money Ferrer's attorneys were permitted to keep *after* his agreement to cooperate with the United States.

At trial, Ferrer was questioned at length about his cooperation with the United States and benefits he received. Ferrer testified on direct examination that he pleaded guilty to crimes in federal court and Texas and California state courts, and that part of his guilty pleas included providing assistance to investigators and prosecutors. (9/22/23 A.M. Daily Tr. at 53.) He knew his assistance could be considered at sentencing, but acknowledged that no promises had been made regarding what his sentences would be. (*Id*.)

On cross-examination, defense counsel highlighted many benefits of Ferrer's

- 6 -

cooperation. Defense counsel questioned Ferrer about whether he knew, when he pled guilty in April 2018, about the sentence he'd be facing if he did not plead guilty; in response, Ferrer testified "I do have a recollection that it was substantial[.]" (9/26/23 A.M. Daily Tr. at 67-68.) Counsel underscored the potential sentencing benefits of cooperation. (9/26/23 A.M. Daily Tr. at 70-71; *see also* 9/28/23 A.M. Daily Tr. at 99-100.) Ferrer testified that the prosecutors "have complete discretion to advocate for" him at sentencing. (9/26/23 A.M. Daily Tr. at 73; *see also* 9/28/23 A.M. Daily Tr. at 104-108 (same).)

Defense counsel questioned Ferrer about assets he had "been allowed to keep" as part of his agreement with the government. These assets included Ferrer's personal residence in Frisco, Texas (9/28/23 P.M. Daily Tr. at 10); a "multi-million dollar" residence that was purchased in cash for his now ex-wife with Backpage proceeds (9/28/23 P.M. at 12-14); a Mercedes vehicle that he purchased right before he entered the plea (9/26/23 AM Daily Tr. at 74); and a speedboat and another Mercedes vehicle purchased for his ex-wife with Backpage proceeds (9/28/23 P.M. Daily Tr. at 12-14).

Defense counsel also asked whether part of Ferrer's motivation for pleading guilty and cooperating involved "being able to retain money that was from BP to pay the large attorneys' fees that you spoke about . . .?" (9/26/23 P.M. Daily Tr. at 15-16.). Ferrer answered, "[I]t is a benefit." (9/28/23 P.M. Daily Tr. at 16.) Counsel questioned Ferrer about how much money Ferrer's lawyers had been paid since they began talking with prosecutors in February 2018, and Ferrer answered that he did not know:

> Q. You don't know if it's been millions of dollars, hundreds of thousands of dollars, $5, no information whatsoever?
> A. Well, obviously I know it's not; it's more than $5.
> Q. Okay. Let's try this out, how about over a $100,000?
> A. Yes.
> Q. How about over a million dollars?
> A. I don't think so.

(9/26/23 A.M. Daily Tr. at 8).)

Defense counsel focused on "the Backpage money that's being used to pay your lawyers for the last five years"—since Ferrer agreed to cooperate in 2018. (9/26/23 A.M. Daily Tr. at 18-19.) Ferrer testified that his lawyers were being paid from a "prepaid

account," and that "the balance that's being used to pay my lawyers, whatever is left over will be forfeited." (9/26/23 A.M. Daily Tr. at 18-19.) Ferrer testified that he did not know how much had been charged against that account, or its remaining balance. (9/26/23 A.M. Daily Tr. at 18-19.) Another defense lawyer asked Ferrer about "the amount that was deposited into [his] attorney trust account (10/10/23 A.M. Daily Tr. at 105). The question did not clarify the time frame involved, and Ferrer testified that he could not recall the amount that had been placed in his attorney trust account. (10/10/23 A.M. Daily Tr. at 106.)

Other documents show that, by April 2018, Backpage and Ferrer, had no idea how much of the $4 million pre-paid to Clarence Dyer remained. Indeed, one of the attachments to the Ferrer forfeiture emails listed Clarence Dyer in a category titled, "other potential liabilities bills not received." (USAO-BP-0038120, attached as Exhibit 7.) In that spreadsheet, Clarence Dyer is listed as having "potential work not billed." (*Id.*) In the same spreadsheet, Davis Wright Tremaine is listed under the Backpage payables section as being owed over $380,000. (*Id.*) This despite Davis Wright Tremaine receiving $6.25 million— as documented in the same spreadsheet sent by Website Technologies Controller Stefanie Parks, that listed the $4 million sent to Clarence Dyer. (Ex. 4 at 4.)

In short, Defendants knew that a benefit Ferrer received under his plea agreement was that his Clarence Dyer attorneys could continue to use the money paid to the firm by Backpage. The Ferrer forfeiture emails did not disclose how much money was available to that firm as of the time that Ferrer pleaded guilty.

**ARGUMENT**

**I.    The Ferrer Forfeiture Emails and Attachments Aren't *Jencks***

    **A.    The Emails Are Not *Jencks***

The Jencks Act states that, after a government witness has testified at trial, "the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). As pertinent here, the Act narrowly defines a "statement" as "a written statement made by said

witness and signed or otherwise adopted or approved by him[.]" 18 U.S.C. § 3500(e)(1).

Defendants have the burden "to show that the [materials at issue] qualify . . . as witness's 'statements' for purposes of the Jencks Act." *United States v. Michaels*, 796 F.2d 1112, 1117 (9th Cir. 1986). Here, the 18 emails at issue do not qualify as "a written statement made by [Ferrer] and signed or otherwise adopted or approved by him" that "relates to the subject matter as to which [Ferrer] has testified." 18 U.S.C. § 3500(b), (e)(1).

Ferrer's statements in the emails did not relate to the subject matter of his trial testimony. Ferrer's testimony, particularly on direct examination, involved Defendants' activities during Backpage's existence. It did *not* address the details of the assistance Ferrer rendered to the United States *after* Backpage shut down—and *after* he pleaded guilty and agreed to assist the United States in identifying Backpage-related assets for possible seizure and forfeiture. But that is the exact subject matter of the Ferrer forfeiture emails.

Notably, the emails fall within a narrow band of time from April to August 2018 (following Ferrer's April 5, 2018 guilty plea). All of the emails were aimed at keeping Inspector Versoza informed about Backpage's assets, including their location and amounts, so that the assets could be properly identified and/or seized for forfeiture purposes. Many of Ferrer's statements in the emails were questions to Backpage Controller Stefanie Parks seeking details about which accounts held what money for forfeiture purposes. In other instances, Ferrer's emails merely transmitted or forwarded the statements of others, e.g., Parks, in response to questions from Inspector Versoza. (Ex. 2 at 1-4, 6 ("See attached info you requested"; "See below and attached"; "Here is the info you need.").)

The most voluminous email statements by Ferrer are the first email, dated April 20, 2018. (Ex. 2 at 1.) In that email, Ferrer tried to explain where bank accounts were located and their balances for purposes of seizure and forfeiture. Thus, the email relates to Ferrer's anticipated testimony in the forfeiture phase of the case, not the guilt phase. On July 9-10, 2018, Ferrer sent emails to Parks asking about how much an entity owed Backpage, and indicating that the receivables could be something the United States might seek for forfeiture. (Ex. 2 at 1-2.) Ferrer then forwarded Parks's responses to Inspector Versoza.

A few days later, on July 13, 2018, Ferrer emailed Parks and directed her to send him a document containing "prepayments and prepayments to attorneys," and a master list of monies transferred to the United States, again for purposes of asset forfeiture. (Ex. 2 at 2-3.) The attachment to this email—from Parks—contains the $4 million prepaid line item to Ferrer's counsel, Clarence Dyer, identified in Defendants' supplemental motion. (*See* Suppl. at 3; Ex. 4 at 4.) The same day, July 13, 2018, Ferrer also forwarded information to Inspector Versoza about a company, Paymitco, that owed Backpage money, again for collection and forfeiture purposes. (*Id.*)

On July 17, 2018, Ferrer forwarded documents and discussed money transferred from CryptoCapital. (Ex. 2 at 3.) On July 19, 2018, he responded to a question from Inspector Versoza about Backpage's payroll in February 2014. (Ex. 2 at 3.) On July 26, 2018, Ferrer informed Michael Gage that a bank account should be maintained, and forwarded the exchange to Inspector Versoza. (Ex. 2 at 3.)

On August 2, 2018, Ferrer forwarded emails between Versoza and Parks with nothing more than a "see below" or "see attached" added to those chains. (Ex. 2 at 3.) On August 3, 2018, Ferrer described a conversation with Parks. He tried to explain payments made in May that are reflected on an attached spreadsheet. Again, this relates not to his testimony at trial, but to the forfeiture phase. (Ex. 2 at 3-4.) Also on August 3, 2018, Ferrer sent an email regarding attorneys he had previously hired and funds used to pay them; he also forwarded exchanges between Parks and Versoza regarding monies used to pay a victim. (Ex. 2 at 4.) On August 6, 2018, Ferrer again discussed accounts and what could be done with them for seizure/forfeiture purposes. (Ex. 2 at 4-5.) On August 7, 2018, Ferrer directed Parks about instructions from Inspector Versoza relating to a cryptocurrency account. (Ex. 2 at 5.) On August 21, 2018, Ferrer inquired of Inspector Versoza what to do with about $40,000 in an account. (Ex. 2 at 5.) This too deals with forfeiture issues as it relates to the seizure of monies earned by Backpage.

Because none of these statements related to the subject matter of Ferrer's trial testimony, the United States did not have to disclose them as *Jencks* during the guilt phase

of the trial.

### B. The Attachments

Most of the emails from Ferrer between April and August 2018 contain attachments. But the attachments to the emails from Ferrer do not qualify as *Jencks* statements. "The Jencks value of a statement is defined by the identity of the speaker and quality of the speech, not the medium for communicating the statement." *United States v. Pac. Gas & Elec. Co.*, 2016 WL 3185008, at *8 (N.D. Cal. June 8, 2016). Indeed, in *United States v PG&E*, the defendant argued that because the United States disclosed certain emails under an early *Jencks* disclosure policy, that "necessarily renders any attached documents Jencks materials." *Id*. But the district court found "[t]his argument is utterly lacking in merit," ruling that the attachments did not have to be disclosed by the United States. *Id*.

The spreadsheet attachments are not "written statements made by" Carl Ferrer. The attachments were not authored or made by him, but rather by Backpage's Controller, Stefanie Parks. It is unknown what information she relied upon to prepare the spreadsheets. Because Ferrer was not the author of the spreadsheets, nor did he contribute substantively to them, they aren't a "written statement made" or adopted or approved by him. Accordingly, they were not Ferrer's "statements" and do not require production under the Jencks Act. *See, e.g., United States v. Reed,* 575 F.3d 900, 921 (9th Cir. 2009) (no Jencks Act violation where there was no evidence that the statements were made, adopted or approved by any of the witnesses); *United States v. Bettencourt,* 614 F.2d 214, 215-16 (9th Cir. 1980) (when government witness testified based on the report of another officer, the Jencks Act did not cover the report because it "was not 'made by' the witness"); *United States v. Blas*, 947 F.2d 1320, 1327 and n.6 (7th Cir. 1991) (reports reviewed by the witness—but not authored by him—were not Jencks Act "statements").

Even if Ferrer "adopted or approved" the spreadsheets, they aren't *Jencks* because they didn't relate to Ferrer's trial testimony. Importantly, Ferrer was questioned by neither the United States nor any defense counsel about his efforts in assisting Inspector Versoza in locating assets for forfeiture after he agreed to cooperate in April 2018. Therefore, the

18 emails and their attachments did not relate to his testimony and, again, did not constitute *Jencks*. *United States. v. Butenko*, 384 F.2d 554, 568 (3d Cir. 1967), *vacated on other grounds*, 394 U.S. 165 (1969) ("a defendant is not entitled to statements when they do not relate to the subject matter as to which the witness has testified on direct examination, even though they relate to the subject matter of the indictment, information or investigation"; "Congress was very careful" in so limiting the Jencks Act's scope); *United States v. Bin Laden*, 397 F. Supp. 2d 465, 501 (S.D.N.Y. 2005) ("[A]s the Jencks Act itself makes clear, a statement's mere relation to the subject matter at issue in a case does not render it producible"; "only a statement related to a witness's testimony is producible.").

## II. The United States Acted in Good Faith and Defendants Suffered No Prejudice[2]

Even if the Court finds that these materials otherwise qualified as *Jencks* statements, the United States acted in good faith and the recent disclosure did not prejudice Defendants.

The Court has discretion not to impose sanctions for noncompliance with the Jencks Act. *United States v. Echeverry*, 759 F.2d 1451, 1456 (9th Cir. 1985). Whether to impose a Jencks Act remedy "generally depend[s] on (1) a consideration of the culpability of the government, and (2) the injury resulting to the defendants." *Echeverry*, 759 F.2d at 1456. "[W]hen there is no prejudice, a witness's testimony need not be stricken." *Reed*, 575 F.3d at 921 (citation omitted). *See, e.g., United States v. Sterling*, 742 F.2d 521, 524-25 (9th Cir. 1984) (no abuse of discretion to decline *Jencks* sanctions where other available materials enabled a vigorous cross-examination).

Indeed, no sanctions are required "where the government acted in good faith" and an "acceptable substitute or summary" was available. *United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1031-32 (9th Cir. 2009). *See Echeverry*, 759 F.2d at 1456 (upholding denial of sanctions where non-disclosure "was inadvertent and not in bad faith," the United States

---

[2] To the extent Defendants attempt to frame their supplement as a *Brady* issue, the Court should resolve the matter under the rubric of *Jencks*: "When the defense seeks evidence which qualifies as both Jencks Act and *Brady* material, Jencks Act standards control." *United States v. Jones,* 612 F.2d 453, 455 (9th Cir. 1979); *accord United States v. Alvarez,* 358 F.3d 1194, 1211 (9th Cir. 2004); *see also United States v. Gomez*, 2014 WL 231984, at *5 (N.D. Cal. Jan. 21, 2014) ("the Jencks Act trumps *Brady*") (citation omitted).

produced other Jencks Act material before trial, and the material at issue "[was] generally duplicative of information previously disclosed" such that the defense was "not deterred from a thorough cross-examination"); *Sterling*, 742 F.2d at 525 (affirming no sanctions where "the government's failure was totally inadvertent," the government had "dutifully endeavored to comply with" the Act, and "counsel was able vigorously to cross-examine [with] available materials"); *United States v. Finnegan*, 568 F.2d 637, 642 (9th Cir. 1977) (no sanctions where "[t]he record show[ed] the trial court's satisfaction that this witness was examined 'quite thoroughly'").

### A. The Non-Disclosure Was Entirely Inadvertent

The United States' non-disclosure was totally inadvertent and not due to any willful attempt to conceal statements. When Inspector Versoza located the Ferrer forfeiture emails, he believed they had already been disclosed because of how they had been saved and segregated. It wasn't until the evening of November 13, 2023, when Agent Robinson searched more than 11 million pages produced in discovery, that the United States learned the emails had not been produced. The United States produced them the next day. These facts are similar to *United States v. Dupuy*, 760 F.2d 1492, 1497 (9th Cir. 1985), where:

> The court's finding that the prosecutor had acted in good faith was based upon the prosecutor's prompt disclosure (within a few hours) upon discovery of the document. The late discovery was due to the volume of the documents and the fact that a case agent had been directed to go through the file and make copies of all pertinent documents to give to the defendants. Although he found the unedited version, he failed to discover the edited version. This oversight could not be labeled as a "willful avoidance and egregious dereliction of the prosecutor's statutory obligation." [citation omitted] Neither a mistrial nor a striking of Jackson's testimony was required.

*See also, e.g.*, *United States v. Paillet*, 668 F. App'x 256 (9th Cir. 2016) (no abuse of discretion where record did not show prejudice or "anything more than mere negligence").

Moreover, the United States endeavored to comply with 18 U.S.C. § 3500 throughout this case. The plea agreements that extended benefits to Ferrer and related Backpage entities were disclosed months after Defendants' indictment and arrest. (*See, e.g.*, CR 18-465-PHX-DJH, Doc. 7-1.) The parties then negotiated a series of scheduling orders (*see, e.g.*, Doc. 121), which were adopted by this Court. (*See, e.g.*, Doc.

131.) Among other things, the parties agreed to disclose Jencks Act information in advance of trial. (*See id*. at 2.) The United States then disclosed Jencks Act statements of Ferrer years before 18 U.S.C. § 3500 required, and notified the Court. (Doc. 733.) In addition, the vast majority of Jencks Act statements were email exchanges between Ferrer and co-conspirators, including Defendants, which were disclosed well before trial. Many were included on the United States' exhibit list and admitted at trial.

### B. Defendants Suffered No Prejudice Because They Received Similar Information and Subjected Ferrer to Extensive Cross-Examination

The Ferrer forfeiture emails involved information about specific assets, including IOLTA account payments, that were described in even greater detail in other documents long ago produced to Defendants. (*Compare* Doc. 1968-1 at 10-15 *with* Ex. 2). *Cf. Rosenberg v. United States*, 360 U.S. 367, 371 (1959) (no prejudice where the same information is available to defendant).

Moreover, Defendants had an arsenal of facts regarding the benefits that Ferrer received or could receive as a result of his cooperation with the United States—and they broadly cross-examined him regarding those benefits at trial. Defendants had access to Ferrer's guilty plea and cooperation addendum; the Preliminary Order of Forfeiture—which specified the precise benefits Ferrer negotiated with the United States relating to his attorneys' fees, *see* CR-18-464-DJH, Doc. 2 at 13-14; and millions of documents produced in discovery, including nearly $1.4 million in bank wires of payments to Ferrer's personal attorneys that predated his cooperation.

Defendants have failed to demonstrate how their cross-examination of Ferrer would have been any different had the forfeiture emails been known to them earlier. After Ferrer testified on direct for approximately seven trial days, five defense attorneys cross-examined him over four full trial days—spanning September 22, 26, 27, 28, 29, and October 10, and covering about 786 transcript pages.

As pertinent to Defendants' supplement, the key question, as asked by defense attorneys during Ferrer's cross examination, is how much money Ferrer's attorneys were

permitted to keep *after* his agreement to cooperate with the United States. Counsel questioned Ferrer about how much money Ferrer's lawyers had been paid *since* they began talking with prosecutors in February 2018, and Ferrer answered that he did not know. (9/26/23 A.M. Daily Tr. at 8.) While he didn't think they had been paid over a million dollars, he was unable to provide the information requested by defense counsel. (9/26/23 A.M. Daily Tr. at 8.) Ferrer testified that his lawyers were being paid from a "prepaid account," and that "the balance that's being used to pay my lawyers, whatever is left over will be forfeited." (9/26/23 A.M. Daily Tr. at 18-19.) Ferrer testified that he did not know how much had been charged against that account, or its remaining balance. (9/26/23 A.M. Daily Tr. at 18-19.) The bottom line is that Ferrer was unsure of the balance that remained *after* he began cooperating—and Stefanie Parks's spreadsheet showing a $4 million payment *before* cooperation was irrelevant to his testimony on that point.

To the extent Defendants argue that they could have refreshed Ferrer's memory with the spreadsheet and further impeached him in some way, Defendants have failed to demonstrate how such information would have moved the needle for the jury. The jury clearly engaged in a thoughtful and careful deliberation, finding no defendant guilty of all charged counts, finding Lacey guilty of one count, and acquitting Padilla and Vaught altogether. Given the robust cross-examination of Ferrer and extensive closing arguments focused on his credibility, it's difficult to conclude that the jury would have rendered a more favorable decision based on this additional information.

In sum, Defendants vigorously crossed Ferrer, and production of the Ferrer forfeiture emails would not have materially added to the cross-examinations' effectiveness. No Jencks Act remedy should be imposed. *See, e.g.*, *United States v. Dobbs*, 357 F. App'x 767, 770 (9th Cir. 2009) ("As in [*Dupuy*], the late disclosure did not prejudice Defendant, and there is no evidence of bad faith. There also is no 'reasonable probability that, had the evidence been [timely] disclosed to the defense, the result of the proceeding would have been different.'") (citation omitted); *United States v. Adams*, 938 F.2d 96, 98 (8th Cir. 1991) (affirming denial of sanctions were the belatedly produced statement "would not

have materially added to the [cross-] examination's effectiveness").

Defendants' request for the extraordinary remedy of dismissal is particularly misplaced. "A district court may dismiss an indictment on any of three grounds: (1) due process, (2) inherent supervisory powers (protecting the integrity of the judicial process), and (3) statutory grounds." *Reed*, 575 F.3d at 921 (citation omitted). Dismissal "is a drastic measure" that is disfavored. *United States v. Isgro*, 974 F.2d 1091, 1098 (9th Cir. 1992).

The Jencks Act's text does not authorize dismissal. *See* 18 U.S.C. § 3500(d). Nevertheless, "[a] district court may exercise its supervisory power 'to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter illegal future conduct." *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) (citations omitted). But "because dismissing an indictment with prejudice encroaches on the prosecutor's charging authority, this sanction may be permitted only in cases of flagrant prosecutorial misconduct." *Id.* at 1085 (quotations and citation omitted). "[F]lagrant misconduct cannot be an accidental or merely negligent failure to disclose[.]" *United States. v. Bundy*, 968 F.3d 1019, 1038 (9th Cir. 2020).

The United States non-disclosure of Ferrer's forfeiture emails was at most "accidental or merely negligent." *Id*. Before trial, the United States disclosed millions of documents, including memoranda of numerous interviews with Ferrer and other witnesses, Ferrer and Backpage's plea agreements, and Ferrer's cooperation addendum. Post-trial, within a day of confirming that the email subfolder containing the Ferrer forfeiture emails had not been produced, the prosecutor wrote to defense counsel to inform them of the oversight and provide the emails. That's the opposite of "flagrant misconduct"—and Defendants' motion should be denied. *See, e.g., United States v. Sanft*, 2023 WL 5428065, at *10 (W.D. Wash. Aug. 23, 2023) (denying motion to dismiss where the government had conscientiously complied with its discovery obligations and promptly notified the defense about its discovery of inadvertently non-disclosed material).

For the same reasons, *Brady* and *Giglio* do not apply. *See Jones v. Ryan*, 691 F.3d

- 16 -

1093, 1102 (9th Cir. 2012). As shown above, the emails all involved Ferrer's post-plea assistance with identifying assets for seizure and forfeiture—and Defendants have long known about Ferrer's guilty plea and cooperation. Defendants subjected Ferrer to a thorough four-day cross examination. There was no suppression of material exculpatory or impeachment evidence, and Defendants were not prejudiced.

### III. Defendants' Supplement Raises Other Issues that Do Not Warrant Relief

#### A. Double-Bates Stamps

The United States discovered that the Ferrer forfeiture emails likely were not produced on Monday evening, November 13—and produced them the next day. In its haste, the United States inadvertently used Bates numbers that had been used for other documents. (*See* Ex. 1 at 1.) On November 16, 2023, the United States sent defense counsel an email correcting this discrepancy. (*Id.* ("After review we determined that thirteen documents in Disclosure 51 had bates numbers that overlapped with the documents provided in Disclosure 48. Those thirteen documents have been renumbered and . . . should no longer overlap with the documents provided in Disclosure 48.").) The United States has resolved this issue.

#### B. Proton Mail

Defendants' assertion that they were prejudiced because the Ferrer forfeiture emails revealed Ferrer's use of Proton Mail is a nonstarter. (Supp. at 3-4.) Defendants have long known that Ferrer—like Defendants Lacey, Spear, and Brunst—all switched to Proton Mail in 2016. (9/21/23 P.M. Daily Tr. at 78-79 (Ferrer testifying that they switched to Proton Mail because it's "an email service provider that would be difficult . . . for the Government to subpoena"); Ferrer 2/5/19 MOI, at ¶ 130, attached as Exhibit 8 ("Ferrer began using ProtonMail after [his 2016 California arrest]").) This is no surprise: many trial exhibits showed Ferrer's and other Defendants' exchanges of Proton Mails during the charged conspiracy. (*See* Trial Exs. 1235-38, 1240, 1242-43, 1246.)

### CONCLUSION

Defendants' supplemental motion to dismiss or for other relief should be denied.

Respectfully submitted this 27th day of November, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

<u>s/ Kevin M. Rapp</u>
KEVIN M. RAPP
MARGARET PERLMETER
PETER KOZINETS
ANDREW STONE
DANIEL BOYLE
Assistant U.S. Attorneys

AUSTIN M. BERRY
Trial Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

<u>s/ Daniel Parke</u>