GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

AUSTIN M. BERRY (Texas Bar No. 24062615, austin.berry2@usdoj.gov)
U.S. Department of Justice
Child Exploitation and Obscenity Section
1301 New York Avenue, NW, 11th Floor
Washington, D.C. 20005
Telephone (202) 412-4136
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>Michael Lacey, et al.,<br><br>　　　　　Defendants. | CR-18-422-PHX-DJH<br><br>**UNITED STATES' RESPONSE TO DEFENDANTS' MOTION FOR A NEW TRIAL (Doc. 2009)** |

In "exceptional cases" where "the evidence preponderates heavily against the verdict," courts may grant a new trial under Fed. R. Crim. P. 33(a). *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984). The evidence comes nowhere close to meeting this standard—and Defendants' Motion should be denied.

## I. The Rule 29 Grounds Do Not Support Defendants' Rule 33 Motion

In two conclusory sentences, Defendants "incorporate by reference" and assert that the bases of their Rule 29 motions support granting a new trial under Rule 33. Mot. at 1. This argument fails for the same reasons Defendants' Rule 29 arguments fail. The jury heard 21 government witnesses and received over 400 government exhibits during the 34-day trial. Docs. 1993, 1994. The witnesses included Backpage insiders Carl Ferrer, Dan Hyer, and Jess Adams; John Shehan from NCMEC; Brad Myles from the Polaris Project; Isaac Luria from the Auburn Theological Seminary; Mickey Hansen from American Express; Lin Howard from Arizona Bank and Trust; numerous police officers (Det. Murray, Lt. Griffin, Det. Fritze) and victims (B.L., A.B., J.S., N.F., A.C., A.B., A.S.W. (sister of a victim), J.T., M.L.); and former IRS-Criminal Investigation Special Agent Quoc Thai. Doc. 1994. The evidence showed that Defendants deliberately built Backpage into a massive prostitution advertising website, generated hundreds of millions of dollars from selling ads for illegal prostitution, and then laundered the proceeds through a complex web of domestic and foreign accounts. *See generally* United States' Responses to the Rule 29 Motions filed by Lacey, Spear, and Brunst. This evidence does not warrant the extraordinary remedy of a new trial under Rule 33. *Rush*, 749 F.2d at 1371.

## II. Defendants' Discovery Arguments Do Not Support Dismissal or a New Trial

The United States incorporates by reference its response (Doc. 1990) to Defendants' supplement regarding Ferrer's emails with U.S. Postal Inspector Lyndon Versoza concerning the forfeiture phase of the trial. Doc. 1972.

Defendants next assert that the United States "refused . . . to produce nearly all the factual information developed during" a separate investigation of Backpage conducted by the U.S. Attorney's Office for the Western District of Washington (WDWA) in 2012-13.

Mot. at 2. Defendants speculate about what that investigation "determined" and assert, without support, that unspecified materials from the investigation are "plainly exculpatory and impeaching." Mot. at 3. Defendants have already litigated this issue—and lost.

In 2019, in granting a motion to compel destruction of inadvertently disclosed documents, Judge Logan found that the WDWA investigation was "wholly separate" from this criminal case. Doc. 1454, 12/3/2021 Hr'g Tr. at 56:11-16 (quoting Doc. 449-1 at 4). And in 2021, this Court denied Defendants' motion to compel regarding the WDWA investigation. Doc. 1444 at 14-15. In responding to Defendants' motion (Doc. 1281), the United States explained that WDWA investigation materials are neither exculpatory nor material for many reasons. Doc. 1326 at 3, 9-13. These reasons include the avalanche of evidence that emerged after that investigation, including Backpage's compelled disclosure of hundreds of thousands of internal documents in 2015-15, the U.S. Senate's investigation and its resulting report BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING in 2017, and the guilty pleas of Backpage's CEO, Carl Ferrer, Dan Hyer, and the Backpage operating entities in 2018. Doc. 1326 at 9-13. As shown by the plea agreements and a raft of additional evidence, Backpage promoted prostitution by, among other things, aggregating prostitution ads from competing websites, forming relationships with bulk prostitution advertisers or "super posters," and developing a reciprocal link and cross-marketing business relationship with The Erotic Review—a prostitution review site that left no doubt about Defendants' intent to promote prostitution. *See* Doc. 1326 at 9-13. The Court found no reason to reconsider previous orders that addressed the *Brady* and *Giglio* issues raised by Defendants (Docs. 339, 449, and 1028), refused to dismiss the case, and declined to find that the United States had intentionally concealed or refused to produced exculpatory materials. Doc. 1444 at 15.

Defendants offer nothing new, other than to assert that "the entirety of the government's case" now requires a different result. Mot. at 5. But the United States put on the same case at trial that it had laid out in its Superseding Indictment and the briefing that the Court considered when issuing its prior Orders. *See, e.g.*, Doc. 230 *passim*; Doc. 649,

*passim*; Doc. 1326 at 5-9. Defendants also ignore that the United States in fact searched its files and disclosed factual materials relating to the WDWA investigation to Defendants, including grand jury testimony, interview memoranda, hand written notes of interviews, and additional reports and documents. *See, e.g.*, Doc. 1281 at 5-6; Doc. 1326 at 3, 13. The notion that the United States "steadfastly refused" (Mot. at 2) to produce these materials is incorrect. Nor does Defendants' suggestion that the United States used the investigation "as a sword"— based on one vague sentence from Ferrer's 11 days of testimony—support the "exceptional" relief Defendants seek. *Rush*, 749 F.2d at 1371; *cf.* Mot. at 2-3 and n.3.

**III.   The United States Did Not Elicit "False or Misleading Testimony" from Ferrer**

    **A.   Ferrer Truthfully Testified that He Corresponded with P.R.**

Defendants' assertion that Ferrer's testimony conveyed the "false impression" that he emailed directly with P.R. is a non-starter. Mot. at 4-7. As Defendants concede, Ferrer testified that he corresponded with P.R. via email. Mot. at 5, quoting 9/14/23 P.M. Tr. at 79:7-9 ("Q. [D]id you have e-mail exchanges with somebody by the name of [P.R.]? A. Yes."). He had an independent recollection of those exchanges, which occurred from 2010 to 2018. *Id.; see also id*. at 79:10-12 ("Q. [O]ver what time period approximately did those e-mail exchanges take place? A. Approximately 2010 to 2018. There's a lot of e-mails.").

From his interactions with her, Ferrer concluded that P.R. "was engaged in prostitution." 9/14/23 p.m. Tr. at 80:6. Like other prostitutes who advertised on Backpage, P.R. kept violating the site's posting rules, but "we would let her back in," "much like we had done with all of the other advertisers in Female Escort sections. They would get a pass. They wouldn't be banned if they posted ads violating the rules. They would get to try again." 9/15 a.m. Tr. at 7:14-21. And to reward her for past business, P.R. received "promo codes" for free or discounted ads. *See* Exs. 162, 164.

This approach illustrated the moderation strategy that Backpage developed in response to outside criticism. Larkin and Spear directed Ferrer to "not throw the baby out with the bathwater," 9/14/23 p.m. Tr. at 25:20-26:7, leading to "cosmetic changes" that didn't impact revenue. 9/15/23 a.m. Tr. at 9:1-10:23. While the company adopted various

1  moderation policies, users were continually given additional chances to post. They weren't
2  blocked; "[t]hey could just post again." 9/12/23 p.m. Tr. at 60:7.

3        Ferrer testified about several emails he exchanged with P.R.  In Ex. 162, P.R.
4  complained about the removal of an image from one of her ads, and Ferrer testified that
5  she provided him that image as an email attachment. 9/14/23 p.m. Tr. at 84:24-85:11; Exs.
6  162, 162a. Ferrer confirmed that Ex. 163 was an email exchange between himself and P.R.
7  9/14/23 p.m. Tr. at 86:3-15. He testified that Ex. 164 was a marketing email that he "would
8  write up and then have Scott Spear approve before I sent it out." 9/14/23 p.m. Tr. at 89:19-
9  90:5. Ex. 165 was another marketing email that Ferrer drafted, sent to Spear for approval,
10 and "remember[ed] sending." 9/14/23 p.m. Tr. at 94:12- 96:23. Ferrer testified that Ex. 168
11 was an email that he received from P.R. 9/14/23 p.m. Tr. at 99:23-100:4.

12       Defendants note that Ferrer testified on cross-examination that the address
13 appearing on these emails, Carl@backpage.com, was a marketing email address that others
14 at Backpage could access and respond from. Mot. at 6; 10/10/23 a.m. Tr. at 104:3-23. But
15 Ferrer never testified that the emails with P.R. that he discussed at trial (Exs. 162-165 and
16 168) reflected communications with anyone other than himself. And even if his testimony
17 indicates any conflict in the evidence (it does not), neither Rule 29 nor Rule 33 would
18 justify the relief Defendants seek. *United States v. Renzi*, 2013 WL 12216505, at *4 (D.
19 Ariz. Oct. 25, 2013) ("[T]hat witnesses gave inconsistent or conflicting testimony does not
20 establish that such testimony was false.") (citing *United States v. Croft,* 124 F.3d 1109,
21 1119 (9th Cir. 1997)); *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en
22 banc) (under Rule 29, conflicts in the evidence are resolved in favor of the verdicts).

23       The notion that the government's questioning suggested that the prosecutor knew
24 Ferrer's testimony was false is also incorrect. Mot. at 6. In several questions, the prosecutor
25 queried Ferrer about what P.R. asked him, and what he wrote, said, or did. *See, e.g*., 9/14/23
26 P.M. Tr. at 81:10 ("can you read what she's asking you here?"); *id*. at 81:20 ("What does
27 she say to you here…?"); *id*. at 82:9-11 ("So what are you doing in response to [P.R.'s]
28 issues? What are you trying to do to assist her in any respect?"); *id*. at 85:5-6 ("Does she

provide you as an attachment the image that got removed? A. Yes, she does."); *id*. at 86:13-15 ("So 163, is this also an e-mail exchange between you and [P.R.]? A. Yes, it is."); *id*. at 88:5 ("what are you saying here to [P.R.] [referencing Ex. 164]?"); *id.* at 90:22 (what is she saying here to you?"). While the prosecutor sometimes referenced the email address used in the emails, this record doesn't show the prosecutor elicited false testimony about Ferrer's correspondence with P.R. *Cf*. Mot. at 5-7.

Defendants' claim that the prosecutor improperly referenced P.R.'s emails in closing argument lacks merit. The excerpt Defendants cite accurately paraphrases P.R. statements. *Compare* Mot. at 7, citing 10/27/31 a.m. Tr. at 10:5-14, *with* Exs. 162, 164.

### B. Defendants' "Materiality" Assertions Miss the Mark

Alternatively, Defendants can't show that the allegedly false suggestion that Ferrer corresponded with P.R. "could have affected the judgment of the jury." Mot. at 7. Ferrer ran the website's daily operations, including marketing and moderation. *See* 9/12/23 p.m. Tr. at 16:10-12; *id.* at 12:21-11, 14:24-9. Even if an employee other than Ferrer responded to P.R.'s complaints by repeatedly restoring her posting privileges and giving her discounts, the employee would have simply been implementing the policies and procedures that Larkin, Spear, and Ferrer had developed to give Backpage's adult ads a veneer of legality without harming the bottom line. *See* Resp. to Spear's Rule 29 Mot. at 3-6.

More broadly, Defendants' "materiality" argument reasserts their claim that if they didn't know about or take any action regarding any particular charged ads, they can't be found guilty. *See* Mot. at 5. That's not the law of the case. Rather, Defendants' policies and procedures, and their implementation of those policies and procedures, show they had the requisite mens rea and actus reus to be found guilty of conspiring to violate the Travel Act and of violating the Travel Act as charged in Counts 2-51.

In Doc. 793, for example, the Court reviewed the allegations in the Superseding Indictment, which laid out the same evidence that the United States presented to the jury—including evidence showing the strategies that Defendants intentionally pursued to build and maintain their website as the internet's leading source of prostitution ads. The Court

ruled that Defendants' specific knowledge of each of the 50 ads charged in Counts 2-51 is unnecessary. Rather, the Court found that if the SI's allegations are proven, then Defendants could be found guilty of promoting prostitution business enterprises—notwithstanding their individualized knowledge of any particular ads. Doc. 793 at 15-20.

The Court analyzed several cases, including *Smith v. California*, 361 U.S. 147 (1959), *Mishkin v. New York*, 383 U.S. 502, 511 (1966), and *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974), "conclude[d] none of these cases mandate the *mens rea* requirement described by Defendants," and instead "agree[d] with the Government that intent to promote or facilitate prostitution is sufficient." Doc. 793 at 15. *See id*. at 15 ("Defendants argue the First Amendment requires the Government to prove that each Defendant was aware of each ad that make up the fifty Travel Act counts and knew that each ad proposed illegal transactions. The Court is not persuaded that the First Amendment demands such a standard."). The Court also ruled: "The alleged facts in the SI, taken as true, establish Defendants had the specific intent to promote prostitution in violation of the Travel Act. They conspired together to do so. The conspiracy was successful and resulted in the 50 ads for prostitution that now make up 50 counts of violating the Travel Act." Doc. 793 at 20. The Court reaffirmed these findings in June 2023, in Doc. 1587 at 12-13. *See also* Doc. 649, Resp. at 30-44.

In Doc. 946, the Court similarly recognized that the SI's "allegations certainly describe a course of conduct where Defendants facilitated 'unlawful activity,' including numerous pimps, prostitutes and traffickers in violation of the Travel Act." Doc. 946 at 13. *See id*. at 14 (the SI "alleges a continuous course of criminal conduct").

And in Doc. 1643, the Court determined that evidence of the prostitution marketing strategies that Defendants used to grow Backpage was highly relevant to showing Defendants' knowledge and intent regarding the ads at issue. Defendants had moved in Doc. 1591 to preclude "evidence of alleged strategies to increase purported 'prostitution' ads on the site not specific to these fifty ads"—including evidence of (1) moderation, (2) Backpage's reciprocal link partnership with the Erotic Review (TER), and (3) content

aggregation. Doc. 1591 at 3. Denying the motion, the Court found:

> Given the nature of the SI's allegations, these categories of evidence are relevant to show Defendants knowledge of the ads, how and why they were created and their intended purposes. Further, it is relevant to show whether Defendants "intended to promote a business of prostitution" by posting the ads. (*See* Doc. 1272 at 3). Finally, the Court already found that facts that pre-date the 2013 allegations were relevant as evidence demonstrating "furtherance of the charged conspiracy." Therefore, evidence of ad moderation, Backpage's "reciprocal" advertising/link program with the Erotic Review, and content "aggregation' to secure future advertising revenues will not be precluded to the extent that (1) the SI provides notice to Defendants of these acts, and (2) the acts demonstrate Defendants' knowledge, intent and conduct in furtherance of the conspiracy's objective[.]

Doc. 1643 at 6.

Defendants also ignore the Court's *Pinkerton* instructions, which show that each Defendant need not have been personally aware of the specifics of each ad or personally involved in that ad's publication, if it was reasonably foreseeable—under the policies Defendants implemented as part of the conspiracy charged in Count 1—that such violations would be committed in furtherance of the conspiracy. Doc. 1998 at 27; Doc. 649, Resp. at 14. The Court has long approved of *Pinkerton*'s applicability here. Doc. 793 at 19.

The evidence shows how the website's owners, including Lacey, Brunst, and Spear, each played vital roles in developing Backpage into the internet's leading source of prostitution ads, and then worked to maintain the website's preeminence in that "niche" market. *See* Doc. 2019 at 1-7; Doc. 2020 at 14-17; Doc. 2021 at 1-9; Ex. 23 at 3. Consistent with the Court's Orders, that evidence shows the actions they took to perpetuate Backpage's publication of these and other prostitution ads.

**IV.  The United States Did Not Make Improper Opening and Closing Arguments**

    **A.  Defendants' "Object of the Conspiracy" Argument Lacks Merit**

The United States incorporates by reference its discussion of this argument in its Response to Brunst's Rule 29 Motion, Doc. 2019 at 9-10.

    **B.  This Case Does Not Involve an "Impermissible Boundless Conspiracy"**

Citing a single passage from Doc. 946 at 13, Defendants assert the conspiracy in Count 1 is cabined by the 50 ads charged in the substantive Travel Act counts, Counts 2-

51. *See* Mot. at 8-9. Not so. The United States could have charged Count 1 without charging any substantive Travel Act counts; Counts 2-51 merely reflect examples of the scores of such violations the resulted for Defendants' operation of Backpage. As the Court has repeatedly recognized, Count 1 alleges a 14-year conspiracy spanning 2004 to 2018, and conduct before 2013 is clearly relevant to the charge. Doc. 1643 at 4 ("[T]he Court has already clarified that the Government may introduce proof of the entirety of the scope of the conspiracy."); Doc. 1643 at 6 ("[T]he Court already found that facts that pre-date the 2013 allegations were relevant as evidence demonstrating 'furtherance of the charged conspiracy.'"); 10/26/23 a.m. Tr. at 24:25-25:1.

At trial, the United States argued, and presented evidence showing, that Defendants were engaged in a conspiracy with others to make Backpage successful as a prostitution advertising website. This evidence showed a "chain," not a "hub-and-spoke," conspiracy. *Cf.* Mot. at 9. "A chain conspiracy refers to a situation in which there are numerous conspiring individuals, each of whom has a role in a 'chain' that serves the conspiracy's object. . . . The success of each 'link' in the chain depends on the success of the others, even though each individual conspirator may play a role that is separated by great distance and time from the other individuals involved." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 553 (S.D.N.Y. 2014). In a wheel or hub-and-spoke conspiracy, in contrast, "one person typically acts as a central point while others act as 'spokes' by virtue of their agreement with the central actor. *Id*. at 554. Here, the Defendants, Ferrer, Hyer, and others performed different roles and relied on each to develop, and profit from, Backpage's growth into the internet's leading source of prostitution ads. This was a chain conspiracy, not a "rimless wheel conspiracy." Mot. at 9.

The pimps who paid and used Backpage's services to promote and carry on their own criminal enterprises provided revenues that powered Backpage's continued success, and can also be fairly considered part of the conspiracy. *Cf. Ulbricht*, 31 F. Supp. 3d at 556 ("Silk Road was nothing more than code unless and until third parties agreed to use it. When third parties engaged in unlawful narcotics transactions on the site, however,

Ulbricht's design and operation gave rise to potential conspiratorial conduct.").

In all events, "the form of the conspiracy is not as important as a determination that at least one other person joined in the alleged conspiratorial agreement with [the defendant]." *Ulbricht*, 31 F. Supp. 3d at 557. And the proof at trial established that Spear and Brunst conspired with Ferrer and others to promote, or facilitate the promotion of, prostitution enterprises in violation of the Travel Act. *See generally* Responses to Spear's and Brunst's Rule 29 Motions. For all these reasons, Defendants' untimely request for reconsideration of the Court's denial of their prior motion to dismiss Count 1 and their other requests for relief regarding that count should be denied.

### C. Trial References to "Promoting Prostitution" Do Not Warrant Relief

Contrary to the law of the case—and common sense—Defendants assert that the United States should have been prohibited from telling the jury that Defendants used many business strategies to market and promote prostitution. Mot. at 9-11. Defendants litigated this issue before, and lost. For years, the United States has alleged that Defendants' pursued several strategies to establish Backpage as the internet's leading source of prostitution ads. *See, e.g.*, Doc. 230, SI¶¶ 9-11, 34. The Court has long recognized that these and other facts alleged in the SI, taken as true, "establish defendants had the specific intent to promote prostitution in violation of the Travel Act. They conspired together to do so. The conspiracy was successful and resulted in the fifty ads for prostitution that now make up fifty counts of violating the Travel Act." Doc. 793 at 20. *See also* Doc. 1643 at 6.

The statements about which Defendants complain (Mot. at 9-11) fit well within the contours of the Court's Orders. For example, Defendants complain about references in the prosecution's opening statement to Defendants' use of "three different strategies to market and promote prostitution" (Mot. at 10)—evidence the Court found relevant in its pretrial rulings (Doc. 1643 at 6). Defendants also complain about references to the Travel Act charges, which concern promoting, or facilitating the promotion of, prostitution business enterprises. Mot. at 10-11. Defendants are not entitled to a new trial simply because prosecutors did not repeat the Act's text verbatim each time they referenced the charges.

Defendants' related assertion that the evidence did not sufficiently tie Ferrer to Backpage's prostitution advertising, including the charged 50 ads, also lacks merit. (Mot. at 11.) The jury heard extensive evidence about Ferrer's involvement in Backpage's prostitution advertising; he testified for nearly 11 days about his management of the site's publication of millions of prostitution ads. Not only did he communicate directly with P.R., the prostitute who posted several of the charged ads, but he managed and ran the day-to-day operations of the website throughout its 14-year lifespan.

### D. The Government Didn't Repeatedly Tell the Jury It Could Convict Without Specific Intent

The Court instructed the jury that it would inform the jury about the law as it applies here. *See, e.g.*, Doc. 1998 at 2 ("It is also your duty to apply the law as I give it to you[.]"). Accordingly, the jury—which is presumed to follow the Court's instructions—knew to look to the Court, and not the lawyers, about what the law required. *United States v. Reyes*, 660 F.3d 454, 468 (9th Cir. 2011).[1] The instructions required proof of specific intent and provided relevant definitions. Doc. 1998 at 30. The Court also directed the jury to consider "both direct and circumstantial evidence," and left it to the jury "to decide how much weight to give any evidence." Doc. 1998 at 8.

Because direct evidence of wrongful intent is "rarely available," "intent may be inferred from circumstantial evidence." *United States v. Kirst*, 54 F.4th 610, 623 (9th Cir. 2022) (cleaned up). A defendant's specific intent to facilitate unlawful activity may be inferred from knowledge in any one of several circumstances, including "evidence of any unusual volume of business with prostitutes," such as where "sales for illegal use amount to a high proportion of the seller's total business." *People v. Lauria*, 59 Cal. Rptr. 628, 632-33 (Cal. Ct. App. 1967).

---

[1] Moreover, the Court instructed the jury that "statements" and "arguments" by the lawyers "are not evidence": "[W]hat the lawyers have said in their opening statements, will say in their closing arguments, and have said at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers state them, your memory of them controls." Doc. 1998 at 7.

Furthermore, a website operator may be found to have the requisite intent when the defendant's website was designed or tailored to further illegal activity. *See, e.g.*, *United States v. Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014) ("The Indictment does not allege that Ulbricht is criminally liable simply because he is alleged to have launched a website that was—unknown to and unplanned by him—used for illicit transactions. If that were ultimately the case, he would lack the *mens rea* for criminal liability. Rather, Ulbricht is alleged to have knowingly and intentionally constructed and operated an expansive black market for selling and purchasing narcotics and malicious software and for laundering money. This separates Ulbricht's alleged conduct from the mass of others whose websites may—without their planning or expectation—be used for unlawful purposes."); *United States v. Omuro*, N.D. Cal. No. 14-CR-336, Doc. 70 at 1-3 (court accepted guilty plea and convicted www.myRedBook.com founder Eric Omuro under the Travel Act, 18 U.S.C. § 1952(a)(3)(A); his website hosted thousands of ads posted by prostitutes in the western United States); *United States v. Hurant*, E.D.N.Y. No. 16-CR-45, Doc. 117 at 1, 6 13-14 (court accepted guilty plea and convicted www.Rentboy.com founder Jeffrey Hurant for violating the Travel Act; Hurant admitted he "was well aware…that the escort ads he posted…were thinly-veiled proposals of sexual services in exchange for money"; *id*. Doc. 125 at 2 (like Backpage, Hurant's employees often rejected ads with explicit offers of sex for money "but allow[ed] the ad to be resubmitted with different language. In many cases, Rentboy.com employees would just edit the advertisement's language and approve it.").

The evidence here showed, among other things, that Backpage managers and employees helped customers craft their ads to reduce the risk of law enforcement detection without changing the underlying message (moderation); created ads for prostitutes and pimps and offered to publish them for a trial period for no or reduced fees (aggregation); entered into affiliation agreements with bulk prostitution advertisers like Dollar Bill (super posters); paid thousands of dollars to The Erotic Review, a Yelp-like website for buyers and sellers of commercial sex, in a cross-referral/cross-linkage business arrangement; purchased and published "feeds" of legitimate ads to falsely portray Backpage as a general

1  classified advertising website for the sake of "plausible deniability"; tried to suppress
2  negative news coverage; and laundered Backpage proceeds through domestic and overseas
3  accounts. *See, e.g.*, Doc. 2021 at 1-9. Simply put, the proof at trial gave the jury abundant
4  evidence from which to infer Defendants' intent.

5        Against this backdrop, Defendants' complaints about the prosecutor's references to
6  Defendants' sources of knowledge that their website was promoting prostitution businesses
7  falls flat. Mot. at 11-13. Defendants' cherry-pick the prosecutor's reference to Backpage's
8  receipt of thousands subpoenas in closing argument, but the United States' opening and
9  rebuttal closing arguments focused on far more evidence of knowledge and intent than that
10 single data point. *Compare* Mot. at 11-12 *with* 10/26/23 p.m. Tr. at 52:17-88:7, 10/27/23
11 a.m. Tr. at 6:4-35:1, and 11/1/23 a.m. Tr. at 37:21-70:12. Prosecutors have "wide latitude
12 in closing arguments," and "considerable leeway to strike hard blows based on the evidence
13 and all reasonable inferences from the evidence." *United States v. Wilkes*, 662 F.3d 524,
14 538 (9th Cir. 2011). Oratorical flourish and argumentative characterizations are allowed.
15 *United States v. Chavez*, 895 F.2d 1418 (9th Cir. 1990); *United States v. Sayetsitty*, 107
16 F.3d 1405, 1409 (9th Cir. 1997). Taken in context, the reference to the "thousands of
17 subpoenas" Backpage received was well within the bounds of acceptable argument, and
18 hardly rises to the level of entitling Defendants to a new trial under Rule 33.

19       Nor did the prosecutor's rebuttal closing argument mischaracterize the law or the
20 jury instructions about whether any Defendant knew about any specific charged ad. *See*
21 Mot. at 12. As discussed *supra* at 5-7, the Court has repeatedly held that the United States
22 may prove the charges against Defendants without necessarily showing a defendant's
23 personal, direct knowledge of individual ads.

24       The prosecutor did not mischaracterize the 50 substantive Travel Acts as "just a
25 sample." Mot. at 12. The jury heard testimony from many witnesses showing prostitution
26 advertising was rampant on Backpage, Backpage's adult category—and in particular its
27 "escorts" section—became synonymous with prostitution, and Backpage made the
28 overwhelming majority of its money from prostitution advertising. *See, e.g.*, Doc. 2021 at

6-7; Doc. 2019 at 4. Moreover, the prosecutor fairly referenced the conspiracy charge in Count 1, which charged Defendants with conspiring to commit Travel Act violations "covering the 14-year life of the conspiracy"—not just the 50 ads charged in Counts 2-51. Doc. 230 ¶¶ 195-199; 11/1/23 a.m. Tr. at 50:10-11. Viewing the prosecutors' closing arguments—and the trial evidence—as a whole, there was no improper suggestion "that incriminating evidence had not been put before the jury." Mot. at 12.

Defendants' suggestion that the United States urged the jury to convict Brunst based solely on the amount of money he made from Backpage (Mot. at 13) lacks merit. The trial evidence detailing his role in ensuring the success of the conspiracy is outlined in the United States' response to Brunst's Rule 29 motion, incorporated by reference. And the United States' closing arguments about Brunst covered far more evidence than his income—indeed, the prosecutors discussed Brunst 44 times through the opening and rebuttal closings. *See* 10/26/23 p.m. Tr. at 52:17-88:7; 10/27/23 a.m. Tr. at 6:4-35:1; 11/1/23 a.m. Tr. at 37:21-70:12.

### E. The United States Did Not "Improperly Exhort[ ] The Jury To Convict" Based on Ads "Protected by the First Amendment"

The United States incorporates by reference its response to the First Amendment argument in Spear's Rule 29 motion, and supplements with the following.

The United States' argument that communications from state Attorneys General and other third parties put Defendants on notice that "they are not on solid ground" didn't improperly suggest that Backpage's prostitution ads weren't protected by the First Amendment. Mot. at 13-14. First, the "not on solid ground" statement fell well within the permissible bounds of closing argument, particularly given what even Defendants admit was a "prodigious amount" of notice evidence from law enforcement leaders, non-governmental organizations, clergy, and journalists. Mot. at 12. "Not on solid ground" is a fair rhetorical comment—Defendants received a ton of notice that they were publishing prostitution ads, yet they engaged in further efforts to publish those ads. *See Wilkes*, 662 F.3d 524 at 538.

Second, Defendants' argument seeks to relitigate several Orders that expressly permitted the use of such evidence at trial. *See, e.g.*, Doc. 1165 at 3-4 ("If Defendants received notice of third parties' perceptions of their reputation as the leading source of sexually illicit ads, then the lack of action on the part of Defendants to stop prostitution ads from being posted on Backpage.com tends to prove that they intended to facilitate unlawful activity"); *id*. at 5 (allowing such evidence to show notice and knowledge, but not for truth); *id*. at 7 ("The evidence is probative to show Defendants' knowledge of Backpage's reputation, which is relevant to Defendants' intent to facilitate an unlawful activity under the Travel Act."); Doc. 1212 at 10 ("The fact that numerous third parties informed the Defendants of the prostitution ads present on Defendants' website may be validly used to prove that the Defendants had knowledge of the ads' existence.")

Third, this argument ignores the considerable evidence showing that prostitution advertising was rampant on Backpage. *See, e.g.*, Doc. 2021 at 1-7. On this record, the United States didn't "exhort" the jury to convict for impermissible reasons.

**V.    A New Trial Isn't Warranted Based on Defendants' Hearsay Evidence Claims**

Defendants asserted the United States used notice evidence "for the truth" twice in closing argument. Mot. at 15. The first asserted use rehashes the "not on solid ground" argument addressed above. Defendants next complain the United States argued that a clip from the CNN documentary showed that Backpage had cornered the market on prostitution ads because all you had to do was post on Backpage and the "phone started ringing in minutes." Mot. at 15. But that information tracked testimony from several victims and other witnesses, which was admitted for the truth, and which showed that posters on Backpage's Escorts section received nearly immediate responses from Johns. *See, e.g.*, 10/11/23 a.m. Tr. at 123:22-124:4 (B.L.—the victim in Counts 16-17—testifying that she would "just copy[ ] the lingo" from other Backpage Escort ads, and after she posted on the website "[w]ithin a minute my phone was ringing off the hook"); 10/17/23 a.m. Tr. at 85:14-86:3 (N.F. testifying that after her ads posted on Backpage's Escorts section "I started getting a lot of phone calls" and "text messages" "within minutes"); 10/12/23 p.m. Tr. at 32:13-23

("escort" on Backpage meant "prostitution"); 10/12/23 a.m. Tr. at 75:5-9, 77:23-20 (A.B. would "copy and paste" from other Backpage ads, and then "start getting calls and text messages" from Johns). The clip was evidence that Defendants were on notice of this dynamic. Defendants' motion does not support the extraordinary remedy of a new trial.

### VI. The Court's Finalization of the Jury Instructions Before Closing Arguments Did Not "Highly Prejudic[e]" the Defense

Defendants largely succeeded in their efforts to persuade the Court to modify the First Amendment instruction, mainly by replacing "relating to illegal activity" with "speech that proposes an illegal transaction." Mot. at 16; Doc. 1998 at 48. The Court modified the Travel Act instruction, including the "specific intent" definition, in a manner Defendants "welcomed." Mot. at 16.

While Defendants complain that they were prejudiced by not having the finalized instructions earlier, they provide no examples of how their trial presentations would have differed. Their opening statements and closing arguments were full of arguments that the ads on Backpage didn't propose illegal transactions. *See, e.g.*, 9/12/23 a.m. Tr. at 35:1-2 ("Unless the ad says sex for money, a sex act for money, what is there?"); *id.* at 41:19-22 (the charged ads "are suggestive," but "[t]hat's not illegal"); 10/31/23 a.m. Tr. at 21:19-22 ("Unless [the ad] is explicitly on its face sex-for-money, you can't tell and sometimes even then you can't tell."); *id.* at 23:23-25 ("[Y]ou cannot tell from the face of the ad that it is an ad for prostitution. Even Anya Beck whose ad had '$80 for head' on it."); 11/1/23 a.m. Tr. at 15:8-14 ("The only time the government can start to regulate it is when it is the speech on the page is explicitly, patently, obviously for criminal conduct."). Defendants were undeterred from making these arguments.

Defendants' unsupported assertion that the First Amendment instruction given "would have allowed for a viable advice of counsel defense" is conclusory, and wrong. Mot. at 17. Defendants make no proffer of how they could have satisfied the required showings for that defense based on the instruction. *See* Doc. 1643 at 12-13.

And the notion that defense counsel lacked sufficient time to adjust their closings

based on the final instructions is not supported by the record. *Cf.* Mot. at 17. Lacey's counsel had nearly a day with the instructions before starting his closing argument on October 27, 2023. And because he was the counsel who chiefly advocated for the modified First Amendment instruction, it's difficult to see how he might have been prejudiced by the Court's adoption of changes he sought. The remaining counsel had 3½ or more days to study the final instructions before their closings on October 31-November 1, 2023.

Defendants also fail to support their assertion that the Court admitted "large quantities of evidence" "that would not have been relevant under" the finalized First Amendment instruction. Mot. at 17. For its part, the United States has argued for the last six years that Defendants' website was singularly focused on making money from selling advertisements for illegal prostitution. *E.g.*, Doc. 230 ¶¶ 33-34. The government's "notice" evidence remained as salient as ever under the finalized First Amendment instruction.

## VII. The Jury Instructions Did Not Lead to "Legally Invalid" Convictions

Defendants' three final arguments lack merit. First, Defendants *agree* the First Amendment instruction "included the correct legal standard," but assert that more was required. Mot. at 17. The United States responds to this argument in its Response to Spear's Rule 29 Motion, which it incorporates by reference here. *See* Doc. 2021 at 9-13.

Second, the specific intent definition in the Travel Act instruction follows Ninth Circuit law, which focuses on "specific intent to facilitate an activity which the accused knew to be unlawful under state law." *United States v. Polizzi*, 500 F.2d 856, 876–77 (9th Cir. 1974) (quoted in Doc. 1587 at 6). *See United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974) (the government must show defendants had "specific intent to promote, manage, establish, carry on or facilitate one of the prohibited activities"). In Doc. 793, the Court found that "[t]he Government's proposed *mens rea* standard, specific intent to promote or facilitate prostitution, is consistent with *Gibson*, *Tavelman*, and *Polizzi*—the Ninth Circuit cases discussing intent requirements of the Travel Act." Doc. 793 at 18.[2] As

---

[2] Ninth Circuit cases decided after *Gibson* confirm that the intent required by the Travel Act is "intent to promote an unlawful activity." *United States v. Tavelman*, 650 F.2d 1133,

explained at pages 6-7 and 10-11, *supra*, specific intent can be inferred from an array of facts—including those that the jury received here. And as the verdict form made clear, the Travel Act counts were tied to the specific ads identified in those counts, identified for the jury by the ads' corresponding publication dates, exhibit numbers, and geographic locations. Doc. 1978 at 1-26.

The Court's instructions were consist with prior rulings, Ninth Circuit caselaw, and the trial evidence—which showed Defendants knew the vast majority of their "adult" ads were for prostitution and intentionally promoted or facilitated that unlawful activity via their website's operations. *See* Doc. 2019 at 1-7; Doc. 2020 at 14-17; Doc. 2021 at 1-9.

Defendants' passing reference to *United States v. Hansen*, 599 U.S. 762 (2023), doesn't change the analysis. Mot. at 18. *Hansen* addresses a different statute, 8 U.S.C. § 1324(a)(1)(A)(iv), and doesn't examine the Travel Act's unique text and structure, 18 U.S.C. § 1952(a)(3). Doc. 1628, Resp. at 6-7, 13-15; Doc. 1626-3 at 98-99; Doc. 1641 at 5-7). If Defendants claim that traditional aiding-and-abetting elements must be grafted onto the Travel Act under *Hansen*, Defendants are wrong for the reasons in Doc. 1628, Resp. at 6-17, incorporated by this reference.

Third, having a single Travel Act instruction for the 50 Travel Acts did not improperly allow the jury to "mix and match" elements, find specific intent "unconnected to a count," or find "specific intent through proof of general intent." Mot. at 18-19. The jury rendered special verdicts that parsed out each of the 50 Travel Act counts, and carefully discriminated between the different counts and the different Defendants in rendering its verdicts. The jury considered each Defendant and each count separately, as it was instructed to do. Doc. 1978 at 1-44; Doc. 1998 at 16; *see also* Doc. 1999 at 2-3, 7.

## CONCLUSION

Defendants' Motion for a New Trial (Doc. 2009) should be denied.

---

1138 (9th Cir. 1981); *United States v. Gordon*, 641 F.2d 1281, 1284 (9th Cir. 1981); *United States v. Stafford*, 831 F.2d 1479, 1482 (9th Cir. 1987); *United States v. Winslow*, 962 F.2d 845, 852 (9th Cir. 1992).

Respectfully submitted this 22nd day of December, 2023.

> GARY M. RESTAINO
> United States Attorney
> District of Arizona
>
> NICOLE M. ARGENTIERI
> Acting Assistant Attorney General
> Criminal Division, U.S. Department of Justice
>
> *s/ Peter S. Kozinets*
> KEVIN M. RAPP
> MARGARET PERLMETER
> PETER KOZINETS
> ANDREW STONE
> DANIEL BOYLE
> Assistant U.S. Attorneys
>
> AUSTIN M. BERRY
> Trial Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Daniel Parke*