Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: 602.257.0135
bf@federlawpa.com
*Attorney/Knapp Counsel for Scott Spear*

Eric W. Kessler, Esq. (AZ Bar No. 009158)
KESSLER LAW GROUP
9237 E. Via De Ventura, Suite 230
Scottsdale, AZ 85258
Telephone: 480.644.0093
Eric@kesslerlawgroup.net
*Attorney for Scott Spear*

Gary Lincenberg (CA Bar No. 123058, *admitted pro hac vice*)
Gopi Panchapakesan (CA Bar No. 279856, *admitted pro hac vice*)
BIRD MARELLA BOXER WOLPERT, NESSIM DROOKS LINCENBERG RHOW, PC
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: 310.201.2100
glincenberg@birdmarella.com
gpanchapakesan@birdmarella.com
*Attorneys for John Brunst*

Paul J. Cambria (NY Bar No. 1430909, *admitted pro hac vice*)
Erin McCampbell Paris (NY Bar No. 4480166, *admitted pro hac vice*)
LIPSITZ GREENE SCHIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: 716.849.1333
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>vs.<br><br> Scott Spear, *et al*.,<br><br>                    Defendants. | Case No. CR18-00422-PHX-DJH<br><br>**DEFENDANT SPEAR'S REPLY RE: RULE 29 MOTION CONCERNING ALL COUNTS OF CONVICTION**<br><br>*(ORAL ARGUMENT REQUESTED)*<br><br>*(Assigned to the Hon. Diane J. Humetewa)* |

1

Defendant Spear, by his attorneys undersigned, hereby files his Reply to his Rule 29 motion, and requests this Court to enter a judgement of acquittal as to the counts of conviction against him.

**I.      THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT CONVICTION ON ANY COUNT.**

**1.      A Review Of The Response Filed By The Government Demonstrates Its Failure To Respond To And Therefore Failure To Prove That:**

a.      Moderation, aggregation, reciprocal link to The Erotic Review ('TER'), publishing super-posters ads are illegal. It is obvious that the moderation of ads is not only legal, but encouraged by Section 230 of the CDA, given that this Court initially ordered that the defense could present the expert testimony of Eric Goldman to state this fact (Doc. 1081); This premise of the government's case constituted legal behavior unless proven otherwise.

b.      any of the ads contained in Counts 2-18 were the product of moderation, aggregation, linked or otherwise connected to TER, or an ad from a super-poster. To the contrary, the testimony was that as of the time Elizabeth MacDougal was hired in spring 2012, moderation of ads stopped, and the aggregation, reciprocal links to TER, ads submitted by super-posters, and all of the other so called "marketing techniques" claimed by the government had been terminated.  In Counts 2-18, there was no demonstration any of these practices affected these ads in any way.

c.      As of 1/1/2013, Mr. Spear was not a supervisor of the ads and/or a participant in the ads that appeared in Backpage given that Elizabeth McDougal's employment. This includes Counts 2-18, and any of the ads after 1/1/2013.

d.      Mr. Spear never saw any of the ads contained in Counts 2-18 or any other ad after 1/1/2013 or had any contact with any advertiser. Interestingly, the email correspondence between the email address carl@backpage.com and Pamela Robinson that were admitted as exhibits were dated before 1/1/2013 (*See* Exhibits 162-165, and 168).

2

The Pamela Robinson ads listed in the indictment were Exhibits 504-513, and were dated substantially after any alleged communications between Carl@backpage.com and Ms. Robinson. There was no correspondence or other proof offered or admitted that the Pamela Robinson ads listed in the Counts were seen by anyone, including Mr. Spear, Mr. Ferrer. or Mr. Hyer.

        e.     any evidence that Mr. Ferrer, Mr. Hyer, or any defendant had any discussion with one another to conspire to commit or actually commit Travel Act and Money Laundering violations. A review of the exhibits and trial testimony shows an absence of any such discussion.  Given the willingness of Mr. Ferrer and Mr. Hyer to testify to the minutae of Backpage operations from 2004 to 2018, it is a noticeable omission that the prosecutors failed to elicit or present any such testimony or exhibits demonstrating this basic element.

**2. The Elements Of The Travel Act Were Not Satisfied.**

There also was no evidence to satisfy the elements of the Travel Act, as it pertains to Counts 2-18.  Specifically, in this Court's Travel Act Jury Instruction (Doc. 1998, pg. 30) there must have been evidence that the defendant violated both the first and second elements. Given the acquittals of defendants Brunst, Padilla and Vaught on Counts 2018, and Defendant Lacey's hung jury on these counts, the government must have presumably proven an action by Mr. Spear that he both "used a facility in interstate commerce with specific intent to promote or facilitate the promotion of any business enterprise involving prostitution offenses…" , and that "…after doing so, the defendant performed an act that did promote or facilitate the promotion, of any business enterprise involving prostitution offenses, specifically, by publishing on backpage.com, the ads listed in Counts 2-18, of the indictment" (Emphasis added).  There was no act, communication, or any other evidence indicating Mr. Spear, distinct from the other defendants satisfied either of these elements. As a matter of fact, there appears to be no acts, communications, or other evidence that was demonstrated to show that even Mr. Ferrer and/or Mr. Hyer violated the statute.

### 3. Strict Scrutiny Of The Evidence Against Mr. Spear.

Given the First Amendment backdrop of the superseding indictment and the counts of conviction, this Court must focus on the specific acts of Mr. Spear to determine the sufficiency of the evidence, as opposed to the actions of others. (*See*, *Hellman v. United States*, 298 F.2d 810, 813 (9th Cir. 1962); *United States v. Spock*, 416 F.2d. 165, 173, *United States v. Montour*, 944 F.2d 1019, 1024 (2nd Cir. 1991) (When the ultimate objective of a group, of which the defendant is a member, is legal, but the means chosen to accomplish that end involved both legal and illegal activities, a court will apply *strictissimi juris* to ensure that the defendant was personally involved with the illegal aspects of the group activity.), and *United States v. McKee*, 506 F.3d 225 (3rd Cir. 2006).

### II.     THE FIRST AMENDMENT REQUIRES ACQUITTAL.

This Court's final jury instructions recognized that the First Amendment protected Backpage's publication of adult advertisements unless "an ad propose[d] an illegal transaction." Doc. 1998 at 48:3-7. Spear does not seek to "relitigate" the instruction, but rather he challenges whether the government's evidence cleared that legal hurdle and he contends that it failed to do so, as a matter of law.[1]

The government argued to the jury, and now argues to the Court, that the jury could determine that an otherwise facially lawful ad for escort services "proposed an illegal transaction" if it contained so-called "code words" that might sometimes be associated with prostitution. That position is inconsistent with the United States Supreme Court's holding in *Pittsburgh Press*,[2] with decisions of the Ninth Circuit construing *Pittsburgh*

---

[1]  Judge Brnovich's denial of Defendants' motion to dismiss on First Amendment grounds has no bearing on Spear's Rule 29 motion. Doc. 793. That ruling only addressed whether the indictment was sufficient and did not address the sufficiency of the government's evidence. "[T]he Court takes the allegations on their face and does not consider the adequacy of the evidence when reviewing whether an indictment is sufficient." *Id*. at 12:27-28. "The proper forum for challenging whether there is adequate evidence is at trial." *Id*. at 3:3-4.

[2]  *Pitt. Press Co. v. Pitt. Comm. on Human Relations*, 413 U.S. 376, 377-80 (1973).

4

*Press*,[3] with decisions of the Second and Third Circuits construing *Pittsburgh Press*,[4] and with the holdings of the United States District Courts in Washington and New Jersey in *McKenna* and *Hoffmann*.[5]  The government seeks to distinguish these cases but raises either spurious arguments or distinctions without a difference.

In *Pittsburgh Press*, the Supreme Court held that the publication of classified ads proposing facially unlawful transactions (employment ads expressing unlawful sex preferences) were not protected by the First Amendment.  The government argues that *Pittsburgh Press* created a sweeping exception to the First Amendment but the Supreme Court narrowly cabined its decision to employment ads expressly proposing unlawful transactions, whether directly through the text of an individual ad or indirectly through the placement of an otherwise facially lawful ad in a category expressly proposing an unlawful sex preference (*e.g.*, "Male Help Wanted"):

> *We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes.  Nor would the result be different if the nature of the transaction were indicated by placement under columns captioned 'Narcotics for Sale' and 'Prostitutes Wanted' rather than stated within the four corners of the advertisement…We hold only that the Commission's modified order, narrowly drawn to prohibit placement in sex-designated columns of advertisements for nonexempt job opportunities, does not infringe the First Amendment rights of Pittsburgh Press.*

*Id.* at 388.  In subsequently construing *Pittsburgh Press*, the Ninth, Second, and Third Circuits all have narrowly construed the First Amendment exception for "speech proposing an illegal transaction" recognized in *Pittsburgh Press*.

Each of Spear's Travel Act convictions is premised on an ad for escort services,

---

[3]  *E.g., IMDb.com Inc. v. Bacerra*, 962 F.3d 1111, 1123 (9th Cir. 2020) (holding state statute restricting speech unconstitutional); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 821 (9th Cir. 2013) (holding state statute restricting commercial speech unconstitutional).

[4]  *Greater Phila. Chamber of Comm. v. City of Phila.*, 949 F.3d 116, 142 & n.170 (3d Cir. 2020); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 114 (2d Cir. 2017).

[5]  *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 (D.N.J. Aug. 20, 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1279 (W.D. Wash. 2012).

which can encompass a wide range of lawful activities, including sexual services such as stripping and autoeroticism that stop short of prostitution.  There can be no dispute that escort services are lawful and that the First Amendment protects both the posting of escort ads and the publication of escort ads, notwithstanding the more limited nature of the First Amendment's protections for commercial speech.  Spear's convictions were not predicated on ads expressly proposing sex for money transactions nor on the publication of ads in a facially unlawful category like "Prostitution Services," which puts this case outside of the narrow First Amendment exception recognized in *Pittsburgh Press*.

The government argues that the ads underlying Counts 2-18 satisfy the requirements of *Pittsburgh Press'* exception for speech proposing an illegal transaction because they contained "coded prostitution transaction terms," such as "clean," "discrete," "hygienic," "real pics," "roses," "donation," "independent," "New in Town," and "in call."  Doc. 2021 at 10:16-27.  But none of these so-called "code words" are codes for a sex act or for prostitution itself, none of the ads underlying the convictions contained any codes for a sex act (with consideration flowing from the ad being placed in the escort services category) or for prostitution itself, and none of those terms causes any of the ads to *propose* an illegal act.  Rather, the so-called "code words" are just words *associated* with prostitution or sometimes used by people engaging in prostitution offenses.  Regardless of whether the use of such terms may have increased the likelihood that an escort ad was *associated* with prostitution, an escort ad using one of those terms cannot be said to *propose* a sex for money transaction.

The government also argues that the ads underlying Spear's convictions proposed illegal transactions:  because one ad used text, rather than numbers, to provide a phone number; because Backpage deleted saucy pictures from some of the ads (none of which were sex act pictures); because the ads were on Backpage (which the government says "indicated the ads were for prostitution" (Doc. 2021 at 10:8-11)); and because many of the ads expressly disclaimed being solicitations of prostitution (which the government claims was "proof that the ads offered illegal services" (*id*. at 11:16-17)).

6

Those claims all are absurd and amount to little more than the government saying that the ads proposed illegal transactions because the government says they did.[6]

The difference between an ad proposing prostitution and an ad merely being associated with prostitution (or, more accurately, looking like it might be associated with prostitution) matters because the First Amendment protects the publication of escort ads that might be *associated* with prostitution or that might result in prostitution, provided the ads do not *propose* unlawful sex for money transactions.[7] *Valle del Sol*, 709 F.3d at 821 ("*Central Hudson*'s legality requirement…focused on the content of affected speech—*i.e.*, whether the speech proposes an illegal transaction—instead of whether the speech is associated with unlawful activity.").

In *Valle del Sol*, the State of Arizona defended a state statute proscribing commercial speech on the grounds that the speech was related to unlawful activity.  709 F.3d at 821. The Ninth Circuit distinguished the facts in *Valle del Sol* from *Pittsburgh Press*, saying that the speech at issue in *Pittsburgh Press* "proposed an illegal transaction," whereas the Arizona statute at issue proposed to "regulate speech proposing a legal transaction where the speech is conducted in an unlawful manner." *Id.* at 822.  The Court then held that "[n]othing in *Pittsburgh Press* … suggests that we should expand our inquiry beyond whether the affected speech proposes a lawful transaction to whether the affected speech is conducted in a lawful manner." *Id.*; *accord IMDB*, 962 F.3d 1122 (rejecting an interpretation of *Pittsburgh Press* that would "permit the restriction not only of speech

---

[6] The government also claims that Ferrer "knew" that Pamela Robinson (who was associated with the ads in Counts 3, 6-11, and 18) was a prostitute, but there is no evidence in the record that Pamela Robinson in fact was a prostitute or that Ferrer "knew" that to be the case.  To the contrary, Ferrer merely testified that, based solely on looking the ads and emails, he was of the *opinion* that Robinson was a prostitute.  9/14/23 Tr. at 80:4-6 (Q. What is your—what is your opinion based upon the e-mail exchanges and postings?  A. That Pamela Robinson was engaged in prostitution.").  Moreover, the government never established that Ferrer reached that opinion *before* he began cooperating with the government.  And, critically, the government never established that Ferrer shared that opinion with Spear or any other defendant before doing so during his testimony.

[7] The government does not contend that any defendant ever saw any of the charged ads or had actual knowledge of the ads, the persons posting them, or the activities of those persons, so there is no path to a First Amendment exception based on actual knowledge by a defendant.  The same also is true for the cooperators, which forecloses *Pinkerton* liability (as discussed at length in the motion for a new trial, Ferrer was not a party to the emails with Pamela Robinson).

that proposes an illegal activity but also facially inoffensive speech that a third-party might use to facilitate its own illegal conduct").[8]  At trial, the government's evidence largely focused on establishing that adult ads on Backpage.com resulted in prostitution offenses and the government now seeks to bootstrap that evidence into a finding that facially lawful ads proposed illegal transactions, but the government merely invites the Court to do what the Ninth Circuit has instructed it must not—expand its inquiry beyond whether the charged ads proposed lawful transactions.

The government dismisses _McKenna_ and _Hoffman_ as "Section 230" cases, while utterly _ignoring_ the fact that each decision expressly rejected the government's position regarding coded speech and implicit offers of sex for money _on First Amendment grounds_.  _McKenna_, 881 F. Supp. 2d at 1279; Hoffman, 2013 WL 4502097 at *10. Likewise, in dismissing the holding of the Second Circuit construing the "speech proposing an illegal transaction" from _Pittsburgh Press,_ the government claims the case said, "nothing about coded solicitations of illegal transactions" (Doc. 2021 at 13:8-10), but the holding _forecloses_ the government's argument on coded speech.  _Centro de la Comunidad_, 868 F.3d at 114 (narrowly construing _Pittsburgh Press_ to apply only if the consummation of the transaction proposed "would _necessarily_ constitute an illegal act").

The government relies on _United States v. White_, 610 F.3d 956, 960 (7th Cir. 2010), but that case is readily distinguished, as it involved both first party speech (pimp/prostitute) and the solicitation—neither of which are at issue here.  The government cites no authority for the proposition that a publisher can be prosecuted for publishing facially lawful speech that uses coded language to propose an illegal transaction—because there is none.  A prostitute or pimp can be prosecuted for using a facially lawful ad to facilitate their own prostitution crimes, since they would have _actual knowledge_ that the ad was intended to promote their criminal activity, but that does not

---

[8]  The government argues that neither of these decisions involved coded speech, which is true, but also irrelevant.  Spear cited the cases for their holdings narrowly construing the _Pittsburgh Press_ exception and rejecting the expansive reading of that exception proposed by the government.  The differences in the underlying facts in each case has no bearing on the holdings construing _Pittsburgh Press_ nor on the strictures of the First Amendment when the government seeks to restrict or punish speech.

mean that a third-party publisher of the same ad is not protected by the First Amendment. *McKenna*, 881 F. Supp. 2d at 1279, 1281 ("The pimp that publishes the advertisement certainly 'knows' whether his offer is for sex, whether explicitly or implicitly.  However, what does it mean for the website operator to 'know' that an advertisement 'implicitly' offers sex? … The third-party publication of offers to engage in illegal transactions does not fall within 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection.").

Finally, to the extent the government's response might be read to suggest that the ads associated with Counts 2-18 initially proposed illegal transactions but that Backpage.com moderators altered the text of the ads so they no longer proposed illegal transactions, there was absolutely no evidence at trial to support that suggestion. Moreover, Ferrer admitted that Backpage.com moderators were not permitted to edit the text of ads after the fall of 2012, well before any of the charged ads were published.

RESPECTFULLY SUBMITTED this 27th day of December, 2023.

**FEDER LAW OFFICE, P.A.**

*s/ Bruce Feder*
Bruce Feder
*Knapp Counsel for Scott Spear*

**KESSLER LAW GROUP**

*s/ Eric Kessler*
Eric Kessler
*Attorneys for Scott Spear*

**BIRD MARELLA BOXER WOLPERT, NESSIM DROOKS LINCENBERG RHOW, PC**

*s/ Gary Lincenberg*
Gary Lincenberg
*Attorneys for Jed Brunst*

**LIPSITZ GREENE SCHIME CAMBRIA, LLP**

*s/ Paul Cambria*
Paul Cambria
*Attorneys for Michael Lacey*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 16, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

Clerk of the Court
United States District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street
Phoenix, AZ 85003
Efiling: https://ecf.azd.uscourts.gov/cgi-bin/login.pl

THE HONORABLE DIANE J. HUMETEWA
United States District Court
Email: Humetewa_chambers@azd.uscourts.gov

Andrew Stone Andrew.Stone@usdoj.gov
Daniel Boyle Daniel.Boyle2@usdoj.gov
Peter Kozinets Peter.Kozinets@usdoj.gov
Joseph Bozdech Joseph.Bozdech@usdoj.gov
Margaret Perlmeter Margaret.Perlmeter@usdoj.gov
Kevin Rapp Kevin.Rapp@usdoj.gov
Austin Berry berry2.austin@usdoj.gov
*Attorneys for United States of America*

By: */s/ M. Evans*