1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   United States of America,                    No. CR-18-00422-PHX-DJH

10                 Plaintiff,               **ORDER**

11  v.

12  Michael Lacey, et al.

13                 Defendants.

14

15         On Thursday, November 9, 2023, Defendant Brunst orally moved to dismiss the

16  case based on alleged violations under the Jencks Act, 18 U.S.C. § 3500.  (Docs. 1958;

17  *see also* Trial Tr., 11/9/2023, Doc. 1986 ("Oral Mt. Tr.")).[1]  In accordance with the Court's

18  order for supplemental briefing (Doc. 1958), Defendants collectively filed a "Motion to

19  Dismiss or Strike Testimony, and Request for a Hearing Due to the Government's Jencks

20  and *Brady* violations" (Doc. 1967) ("Initial Motion") and a "First Supplement" thereto

21  (Doc. 1972).[2]   The Court held a hearing on November 14, 2023 (Doc. 1971; Trial Tr.,

22  11/14/2023, Doc. 1987 ("Jencks and *Brady* Hr'g Tr.")), in which it took testimony from

23  Government   witness   Quoc Thai,   and   then   held   a   supplemental   hearing   on

24  November 15, 2023 (Doc. 1974; Trial Tr., 11/15/2023, Doc. 1988 ("Jencks and *Brady* Hr'g

25

26

27  [1]  The Government filed a "Response to Defendants' Oral Motion to Dismiss"
    (Docs. 1966; 1968).

28  [2] The United States (the "Government") filed a Response to the First Supplement (Doc.
    1990) and Defendant Spear filed a Reply.  (Doc. 2005).

Tr. #2").  The Court now rules on the unresolved issues raised by Defendants. [3]

## I.     Relevant Facts and Law

Defendants bring their Initial Motion and First Supplement asserting violations under *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*") and the Jencks Act.  Defendants broadly claim that the Government failed to disclose evidence that was favorable to Defendants, thus crippling their cross-examination of Government witness Quoc Thai ("Thai") and Government cooperating witness Carl Ferrer ("Ferrer"). Defendants argue that the Government violated their due process rights, which warrants dismissal of the Superseding Indictment (Doc. 230) or, alternatively, that certain testimony be struck.

### A.     Disclosures Under *Brady*

A prosecutor must disclose evidence favorable to an accused; otherwise, he violates a defendant's due process rights if the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution.  *Brady*, 373 U.S. at 87.  The discovery under *Brady* must be "material" or "favorable" to the defense.  *Woods v. Sinclair*, 764 F.3d 1109, 1127 (9th Cir. 2014) (citing *Kyles v. Whitley*, 514 U.S. 419, 436–37 (1995)). The test for materiality is whether the requested evidence might affect the outcome of the trial.  *United States v. Agurs*, 427 U.S. 97, 104 (1976); *United States v. Michaels*, 796 F.2d 1112, 1116 (9th Cir. 1986).  The Government's duty to disclose *Brady* material is "an ongoing duty" to (1) "learn of any favorable evidence known to the others acting on [its] behalf," *United States v. Yan Juan Zhen*, 2015 WL 727923, *2 (D. Nev. Feb. 19, 2015) (quoting *Kyles*, 514 U.S. at 432)) and (2) disclose exculpatory evidence and other evidence that is favorable to the accused, including impeachment evidence.  *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154–55 (1972)). A request from the defense is not required to trigger the Government's duty to disclose.  *See Banks v. Dretke*, 540 U.S. 668, 695–96 (2004).

---

[3] Defendants requested oral argument in their Initial Motion.  The Court held hearings in which it heard arguments and witness testimony. (*See* Oral Mt. Tr., Doc. 1971; Jencks and *Brady* Hr'g Tr., Doc. 1987; and Jencks and *Brady* Hr'g Tr. #2, Doc. 1988).  Thereafter, Defendants supplemented their argument because the Government provided them with additional lates disclosures.  The Motions are now fully briefed, and the Court will not be aided by additional oral argument on the issues.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.     Disclosures Under the *Jencks* Act**

The Jencks Act (the "Act") serves as an additional discovery tool that imposes the following requirements:

> (a)     In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial [; and]
>
> (b)     After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(a)–(b).  The Act narrowly defines "statements" as: (1) writings made by the witness and "signed or otherwise adopted or approved by him;" or (2) accounts which are "a substantially verbatim recital" of the witness's oral statements "recorded contemporaneously with the making of such oral statement."  *Id*. § 3500(e)(1)–(2).

The Jencks Act trumps and limits *Brady's* compulsory requirements. *United States v. Griffin,* 659 F.2d 932, 936 (9th Cir.1981), *cert. denied*, 456 U.S. 949 (1982).  If a witness statement is exculpatory, then the Jencks Act's timing requirements control. *United States v. Alvarez*, 358 F.3d 1194, 1211 (9th Cir. 2004).  ("When the defense seeks evidence which qualifies as both Jencks Act and *Brady* material, the Jencks Act standards control.").  The Act provides sanctions for noncompliance: "the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared." 18 U.S.C § 3500(d).   However, a district court has discretion to refuse to impose sanctions for noncompliance.  Generally, a court's decision to strike a witness's testimony for not compliance with the Jencks Act "should rest on (1) a consideration of the culpability of the government for the unavailability of the material and (2) the injury resulting to the defendants."  *United States v. Riley*, 189 F.3d 802, 806 (9th Cir. 1999) (quoting *United*

1
2
3

*States v. Sterling,* 742 F.2d 521, 524 (9th Cir. 1984)).  Though a defendant need not prove prejudice to show a Jencks Act violation, when there is no prejudice, a witness's testimony need not be stricken.  *Id*.

4

**II.     Discussion**

5
6
7
8
9
10
11
12
13

Defendants move for a dismissal of the indictment, or in the alternative, an order striking Government witnesses Thai and Ferrer's testimony due to the Government's failure to make timely disclosures under the Jencks Act and *Brady*.  Defendants' Initial Motion challenges testimony relating to money transfers through accounts referenced in the November 4, 2021, Financial Account Tracing Report by Thai and Postal Inspector Lyndon Versoza ("PI Versoza") (Doc. 1966-4) ("the Report").  (*See* Doc. 1967 at 3). Defendants' First Supplement challenges various disclosures made by the Government during trial that contained emails by Ferrer.  (Doc. 1972 at 3).  The Court will address Defendants' Initial Motion and First Supplement in turn.

14
15

**A.     Defendants' Initial Motion (Doc. 1967): the November 4, 2021, Financial Account Tracing Report**

16
17
18
19
20
21
22
23

On November 8, 2023, the Government disclosed Thai's email transmitting the Report as part of its ongoing Jencks disclosure, stating a belief that "it may fit into that category[.]"  (Exh. 6268).  The Report is 90 pages and describes tracing activity for numerous bank accounts, trusts, credit unions, websites, and listed properties.[4] (*See generally* Doc. 1966-4).  The Report also includes information on when each account was established, and in some cases, the origin of the respective funds.  (*Id*.)  For each account listed, the Report documents the location of the account; the account holder; and various wire transfers to and from each account, including transfers and payments to

24

---

25
26
27
28

[4] The Report includes information on: Prosperity Bank Account, Compass Bank Account, National Bank of Arizona Live Oak Bank Ascensus Broker Services, First Federal Savings and Loan of San Rafael, Republic Bank of Arizona, Bank of America, San Francisco Fire Credit Union Green Bank, Perkins Coie Trust Company Account, Alliance Bernstein, K&G, FIO Bank, Bank Frick, Knab Bank, Rabo Bank, Acacia Conservation Fund Saxo Payments Account, LHV Bank, Compass  Bank Midfirst Bank, a listing of Ascio/WMB Inc websites and listed properties by address and location.  (*See generally* Doc. 1966-4).

entities and individuals such as Ferrer, Backpage Operators, Defendant Spear, Defendant Brunst, and Defendant Lacey.  (*Id*.)

### 1.      Quoc Thai's Testimony

Defendants posit the Report is Jencks material because Thai referred to it in an email as "the tracing document that Lyndon and I [Thai] put together years ago." (Doc. 1967 at 3; Exh. 6266).  The Court held an evidentiary hearing on November 14, 2023, to further probe the extent that Thai was involved in developing the Report.  (*See* Doc. 1971; Jencks and *Brady* Hr'g Tr., Doc. 1987).  Thai testified that he did not write the Report, rather PI Versoza did.[5]  (Jencks and *Brady* Hr'g Tr., Doc. 1987 at 36).  Thai stated he contributed to the Report by "reviewing [it] for any kind of grammatical issues and organizing the table of contents and other things."  (*Id*. at 40; *see also id.* at 45).  He testified that his role was "building out and proving up the money laundering charges, charges 53 through 100" and that PI Versoza was "primarily focused on the asset forfeiture."  (*Id*. at 40).  Thai stated he did not use the Report as a basis for his summary charts, and he rather "used the source material and built it up from scratch[.]"  (*Id*. at 41).  He explained the Report "wasn't thorough enough for [his] purposes" as he was focused on the money laundering charges, and "that [the Report] was kind of an asset forfeiture document."  (*Id*. at 43).

On cross-examination, Thai clarified that the work he conducted—which focused on money laundering charges—was separate from PI Versoza's work—which focused on asset forfeiture tracing.  (*Id*. at 51).  Thai disagreed that his work showed up in the Report or his trial exhibit (Exh. 1479) because his work started after he received subpoenaed financial documents, which was separate from PI Verzosa's work. (Jencks and *Brady* Hr'g Tr., Doc. 1987 at 51).  He further testified that he did not compare his work to that in the Report.  (*Id*. at 51–52).  Thai was unable to answer Counsel for Defendant Brunt's basic questions about information referenced in the Report.  (*Id*. at 55–57).

### 2.      The Report is not Quoc Thai's Jencks Material

At the supplemental hearing on November 15, 2023, the Court found the Report was

---

[5] PI Versoza was not a listed trial witness.

not Thai's Jencks material.  (Jencks and *Brady* Hr'g Tr. #2, Doc. 1988 at 18). *See also United States v. Bernard*, 623 F.2d 551, 558 n.21 (9th Cir. 1980) (as revised) (discussing the contours of what qualifies as Jencks material under 18 U.S.C. § 3500(e)).  Thai's testimony showed the Report was not "signed or otherwise adopted or approved" by Thai, nor did it include accounts which are "a substantially verbatim recital" of his oral statements.  18 U.S.C. § 3500(e).  Indeed, Thai struggled to answer basic questions about the Report's content.  He further testified that he did not write it, nor did he use it in preparation for his testimony.  Defendants' supplemental filings do not raise new arguments, and the Court finds the developed record supports its initial finding.

Even if Thai adopted statement(s) in the Report, the Government points out that the Report's content was previously disclosed to Defendants prior to trial.  (Doc. 1990 at 2). The Government states the Report's contents were included in various seizure warrants by PI Versoza that were filed in a related 2018 ancillary proceeding in California federal court. (Docs. 1966-1; 1968-1; 1968-2).  (*See* Doc. 1966-7 (comparing the Report to previously disclosed documents)).  These seizure warrants were disclosed that same year to Counsel for Defendant Lacey, Defendant Brunst, and Defendant Spear.  (Docs. 1966-5; 1966-6). The record thus shows that Defendants have been aware of the Report's content since 2018. So, their claimed prejudice is unsubstantiated.

Furthermore, the Court is not persuaded by Defendants' assertion that they could have used the Report to impeach Thai on a critical issue about the money laundering charges.  Defendants maintain that "the [G]overnment elicited (false) testimony from Thai that 'Cereus Properties appears to be an entity used to pay the various payroll expenses of the . . . activity relating to Backpage.com.'" (Doc. 1967 at 5–6 (citing Doc. 1923 at 136)). Defendants further contend "[t]here was not a shred of evidence at trial or anything in the discovery produced by the government corroborating Thai's assertion regarding Cereus Properties." (*Id*. at 6).  They claim that because the Report states that "Prosperity Account Bank . . . wired [money] . . . to S&W Payroll, **a company Backpage uses to pay its employees,**" the Report contradicted Thai's testimony.  (*Id*.)  Yet, the Report was not

authored by Thai so it could not be used to impeach him.[6]  Thai represented he conducted his own investigations.

In any event, the Government's "First Amended Consolidated Master Verified Complaint for Forfeiture" (Doc. 1966-2), which was filed in *United States v. $1,546,076.35 In Bank Funds Seized From Republic Bank of Arizona Account '1889, et. al.,* No. CV-18-8420-RGK(PJWx) (N.D. Cal. June 1, 2020), contain similar allegations—that is, Cereus Property assets "are alleged to have been traceable to SUA, involved in  money laundering, or both, *and was used as a funnel account to pay Backpage Operators*" and, relatedly, other use of Prosperity Bank accounts.  (Doc. 1966-2 at 48 (emphasis added)).  So, Defendants were aware of the allegations about how Cereus Property *and* Prosperity Banks accounts were used because they are alleged in their related forfeiture case.  Defendants cannot now fain surprise or claim they were hindered from a more vigorous cross-examination of Thai about his supporting evidence or lack thereof.

**B.      Defendants' First Supplement (Doc. 1972): Carl Ferrer's Emails**

On November 14, 2023, the Government turned over another 26 pages of documents to Defendants.  (Doc. 1972-1).  The Government states it did so as part of their related forfeiture case.  (Doc. 1990 at 2–4).   The documents include emails between Ferrer and PI Versoza in July 2018 wherein Ferrer responds to and answers questions about the location of and use of accounts, and forwards information and spreadsheets to PI Versoza.  (Doc. 1972-1).  Ferrer also asks questions of "Stephanie Parks" via Proton Mail about prepaid legal payments, and retainer wire confirmations, and forwards these emails to PI Versoza.  (*Id*. at 5–8).  Ferrer also used a Proton email address in communicating with PI Versoza and others.  (*Id*.).  These communications occurred after the Government filed the present matter.

In their First Supplement, Defendants state they had not fully reviewed and analyzed the effect of the late disclosures to their case.  (Doc. 1972).  They note, however, an email that contradicted Ferrer's testimony "that he did not know how much the retainers were."

---

[6] Defendants' argument about Posting Solutions meets the same fate for the same reasons.

(*Id*. at 3).  Defendants further argue the email demonstrated that "Mr. Ferrer, Michael Gage, and Stephanie Parks communicated with the government using protonmail.com email addresses" while part of the government's trial presentation was an assertion that the use of protonmail.com was indicative of criminal intent.  (*Id.*)  The Government says that the late disclosures were inadvertent, unintentional, and were part of the eventual forfeiture trial, and "do not concern the subject matter of Ferrers testimony during the guilt phase of the trial."  (Doc. 1990 at 2).  The Court disagrees with the latter assertion.

### 1.     Carl Ferrer's Jencks Material

The Superseding Indictment alleges Defendants committed money laundering by funneling Backpage.com proceeds through various bank accounts and transactions flowing in and out of those accounts.  (Doc. 230 at 44–92).  The Government's cooperating witness, Ferrer, testified at length about how Backpage.com's proceeds were funneled into these accounts and who benefited from them.  Defendants posited that Ferrer was the one who controlled and benefitted from the Backpage.com operation.  The late disclosures include Ferrer sending PI Versoza a list of his international merchant and treasury accounts in which he had amassed proceeds from Backpage.com.  (*See* Doc. 1972-1 at 1).  It is of no moment that the email would be produced at an eventual forfeiture proceeding because Ferrer's email was relevant to the subject matter of his testimony.  Further, that email was written "signed or otherwise approved or adopted" by him.  It is therefore Jencks material under 18 U.S.C. § 3500(e).

Ferrer's forwarded emails on payments wired or transferred to IOLTA or retainer accounts, however, are of a different ilk.  They are forwarded emails written by others explaining what amount has been or will be paid in lawyer fees and retainers and from what accounts.  They are neither Jencks, nor *Brady*, nor *Giglio* material.  The Court finds that the Government erred in failing to produce the emails written by Ferrer listing his merchant and treasury accounts.  Nonetheless, these late disclosure does not warrant dismissal of the case or striking Ferrer's testimony because the material had been previously disclosed, albeit in a variety of forms.

Moreover, Defendants' access to these late disclosures had no prejudicial effect on

their cross-examination of Ferrer on the benefits of his plea agreement. To be sure, the cross-examination was exceedingly thorough. Counsel for Defendant Brunst practically went paragraph by paragraph through Ferrer's plea agreement attempting to extract his understanding of all its benefits. (*See generally* Trial Tr., 9/26/2023, Doc. 1830 (reflecting extensive cross-examination of Ferrer by Counsel to Defendant Spear and Counsel to Defendant Brunst)). Counsel focused on the Government's agreement that enabled Ferrer to keep assets from Backpage.com to pay his attorneys fees. (*Id*. at 11). Though Ferrer could not recall the precise amount (as listed in the 2018 email communications), he testified that he did not think it was over $1,000,000. (*Id.* at 12). Counsel for Defendant Spear's questions related to the number of attorneys Ferrer employed, their locations and hourly rates. He asked Ferrer "to be clear, the money, the Backpage money that's being used to pay your lawyers for the last five years, have . . . you been paying those bills or has somebody else been paying those bills?" (*Id*. at 22). Ferrer answered, "the balance that's being used to pay my lawyers, whatever is left over will be forfeited." (*Id*.) When asked "you don't' know how much has been charged, right?" Ferrer stated "I haven't been paying very close attention to it . . . I do get billings, but I just really don't look at them." (*Id*.)

Defendants argue that late disclosures prevented them from impeaching Ferrer or refreshing his recollection on the $4,000,000 plus from the Backpage.com proceeds that Ferrer used to pay to his lawyers. (Doc. 1972 at 3). Yet, the disclosures of Ferrer's emails forwarding to PI Verzosa statements of fees paid and from what source is not Ferrer's Jencks statement. And, given the thoroughness and totality of Ferrer's cross-examination, it is difficult for the Court to see how refreshing Ferrer's recollection that $4,000,000, rather than $1,000,000 , was paid to his attorneys fees so far could result in prejudice. The Government's late disclosure therefore does not warrant striking testimony and falls far short of warranting dismissal of the case.

### 2.     *Brady/Giglio* Disclosures

The Court next turns to Defendants' claim that the Ferrer emails were produced in violation of *Brady*. The Government asserts that it did not suppress the emails or disclosures so no violation occurred. (Doc. 1966 at 10). The Court agrees.

1
2
3
4
5
6
7
8
9
10
11
12

As mentioned *infra*, the Government has an ongoing obligation to disclose *Brady* material that includes material evidence favorable to defendants, is exculpatory or includes impeachment evidence. The test for materiality is whether the requested evidence might affect the outcome of the trial. *Agurs,* 427 U.S. at 104.  The Government asserts that Ferrer's statements, with slight modifications, are included in PI Versoza's two seizure warrant affidavits which have been in the Defendant's possession since November 2018. (Doc. 1966 at 10).  It asserts that those affidavits provide more detailed information than what was recently disclosed.  (*Id*.).  The Court's review of the seizure affidavits and the Ferrer emails shows the Court that the Government previously produced "the substance of the information" and that the Ferrer emails and Versoza Report are cumulative evidence which Defendants have been aware.  (Doc. 1966-7 at 19–21); *see United States v. Marashi*, 913 F.2d 724, 734 (9th Cir. 1990).  Therefore, no *Brady* violation has occurred.

13
14
15
16
17
18
19
20
21
22
23
24
25
26

The Court acknowledges it is problematic that the Government claimed in its rebuttal closing that Defendants started using Proton Mail "because they know what they're doing is wrong, and they are trying to reduce the ability to see the evidence of that." (Doc. 1972 at 3).  Indeed, such a statement demonstrates a lack of awareness that the Government's own agents were communicating with its cooperating witness routinely through his Proton Mail.  Nonetheless, the Government's statement is consistent with the record testimony of Ferrer that Defendants would routinely change methods of email communication to avoid detection.  Moreover, "[i]mproprieties in counsel's arguments to the jury do not constitute reversible error unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge." *United States v. Navarro*, 608 F.3d 529, 535–36 (9th Cir. 2010) (quoting *United States v. Guess*, 745 F.2d 1286, 1288 (9th Cir. 1984)).  The Court also instructed the jury that the Counsels' summations are not evidence.  So, the Governments' statement does not warrant dismissing the case.

**III.   Conclusion**

27
28

The Court finds that the Report did not constitute Government Witness Thai's Jencks statement.  No Jencks violation occurred.  The Court further finds that Government

cooperating witness Ferrer's written email to PI Versoza (Doc. 1972-1 at 1) is Jencks material and that the Government failed to produce it after he testified.  However, the Government's Jencks violation did not result in prejudice to Defendants.  Finally, the Court finds that the Government previously disclosed substantial duplicative information in the Report and Ferrer emails to Defendants and thus no *Brady* violation occurred.

Accordingly,

**IT IS ORDERED** that Defendants' "Motion to Dismiss or Strike Testimony, and Request for a Hearing Due to the Government's Jencks and *Brady* violations" (Doc. 1967) is **DENIED**.

Dated this 7th day of February, 2024.

Honorable Diane J. Humetewa
United States District Judge