Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com

Eric W. Kessler, Esq. (AZ Bar No. 009158)
KESSLER LAW GROUP
9237 E. Via De Ventura, Suite 230
Scottsdale, AZ 85258
Telephone: 480.644.0093
Eric@kesslerlawgroup.net
*Attorneys for Scott Spear*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No. CR18-00422-PHX-DJH-003 |
|---|---|
| Plaintiff, | **DEFENDANT SCOTT SPEAR'S SENTENCING MEMORANDUM** |
| vs. | |
| Scott Spear, *et al*., | *(Assigned to the Hon. Diane J. Humetewa)* |
| Defendants. | |

The defendant, Scott Spear, by and through his attorneys undersigned, and pursuant to 18 U.S.C. §3553, hereby files his sentencing memorandum and submits that a sentence of probation or time served with supervised release, to include community service hours is the appropriate result. As more fully set forth in the memorandum below, this request is supported by 18 USC 3553, the incongruent and unconstitutional sentencing guideline application, and the First, Fifth, Sixth & Eighth Amendments to the U.S. Constitution.

RESPECTFULLY submitted this 19th day of August, 2024.

**FEDER LAW OFFICE P.A.**

*s/ Bruce Feder*
Bruce Feder
*Attorneys for Scott Spear*

1

# MEMORANDUM OF POINTS AND AUTHORITIES

Our criminal justice system is meant to punish people who knowingly and intentionally violate the law. Sex traffickers, particularly those who prey on children, deserve serious punishment. But Scott Spear is no sex trafficker, and this is not a sex trafficking matter. He is not remotely close to the category of offenders these laws and a tortured interpretation of the guidelines seek to punish. To be sure, Mr. Spear did not intentionally break any law; indeed, he believed wholeheartedly that his actions conformed to the law, consistent with the principled and law-abiding life he has lived. Notwithstanding this truth, he now faces a sentence that, if imposed, will inevitably result in an actual sentence of death by prison.

## I. OVERVIEW.

The government wants this Court to believe that Backpage.com is akin to the worst pimp in the nation. Mr. Spear and his co-defendants wrongly became the scapegoats in a time of unprecedented hysteria surrounding sex trafficking. The government relentlessly pursued men who made every effort to ensure that their conduct conformed to the law. Now, continuing its scorched earth approach, the government asks this Court to condemn *a 73-year-old man, who has never been in trouble a day in his life,* to die in prison.

Ultimately now, this case is about sparing a life. That is because if this Court sends Scott Spear to prison, his life is effectively over. This is true from a statistical and practical standpoint, where lack of medical and mental health care, advanced age, and an ugly and unwarranted sex offender/sex trafficker label will make prison not just unbearable, but almost certainly un-survivable.

This has been an unprecedented prosecution. It has been a case fueled by politics, hysteria, and personal animus. This is a case where, time and time again, competent lawyers advised Mr. Spear that what Backpage was doing was legal. This is a case where Backpage went to courts across the land and won every case, typically on First Amendment grounds. In short, they had every reason to believe they were operating within the boundaries of the law. The fact that a jury has determined, in a case of first impression, that they did not, has no bearing on the ever-important intent requirement that is central to every criminal prosecution.

In truth, an ordinary citizen might have caved under the relentless pressure and pursuit of the federal government. But these are not ordinary people; and it's not because they are

unabashed outlaws. Rather, they have long been First Amendment warriors who were doing their level best to operate within the law. Their continued conduct wasn't about flouting the law, it was about holding fast to the rights and protections they wholeheartedly believed, and were legally advised, were guaranteed to them under the law.

Mr. Spear did not simply discover "First Amendment religion" when he was affiliated with Backpage. His identity, indeed, the entire culture of the company, was always premised on the unwavering belief in the First Amendment. They have always been ready, willing, and able to fight to uphold those beliefs and stand up for First Amendment principles.

The government is champing at the bit to put Scott Spear in a cage. Its previous request for immediate custody, a decades-long sentence, and a higher-level prison classification, confirms what those who follow the case have long since known to be true: This is a vendetta years in the making, and Scott Spear may now suffer the pains of conviction for alleged crimes he did not even know he was committing. It appears the government hopes the defendant's appeals will never be heard it the onerous prison conditions the government is obviously aware of causes their deaths (*See*, Declarations of Mark Allenbaugh and Jane Perdue, attached hereto as **Exhibits 1** and **2**).

The sentence imposed must be "sufficient, but not greater than necessary to comply with the provisions of law". 18 U.S.C §3553(a). Generally, the district courts are granted the authority to engage in individualized sentencing. Circumstances must indicate that the sentence was substantively reasonable. <u>Gall v. United States</u>, 128 S. Ct. 586, 597 (2007).

## II. 18 U.S.C. § 3553 FACTORS

### A. The Nature & Circumstances of the Offense

This is a case of first impression, with myriad substantial issues for appeal. The convictions occurred after a 3+ month (second) trial in 2023, and extensive motion practice since April, 2018. As the Court is aware, this case involves the first completed trial of the government's attempt to criminally prosecute owners of a social media site for ads published by third parties on that site. The offense conduct parallels some of the many issues to be resolved on appeal that will result in dismissal of all of the charges or a new trial if found in favor of the defendants:

1) the third-party ads forming the basis of the Travel Act and money-laundering

3

convictions are protected by the First Amendment;

2) the First Amendment jury instructions given by the Court violate the First Amendment;

3) the government was improperly allowed to argue and the convictions were improperly based on a defendant's general intent instead of requiring proof of specific intent as required. (*See, *Backpage v. Lynch, 216 F.Supp.3d 96 (2016)).

4) notwithstanding prior rulings by Judge Brnovich before the first trial, and this Court's preliminary conspiracy instructions to the jury, the government was allowed to improperly argue a boundless conspiracy, unconnected to the 50 Travel Act ads listed in the superseding indictment;

5) the ads in counts 2-18 do not overtly solicit any illegal sex act and cannot constitute criminal act as a matter of law;

6) the insufficiency of evidence demonstrating Mr. Spear never met an alleged advertiser, never saw the ads contained in counts 2-18, and was not in charge of the moderation of ads in Backage as of February, 2012;

7) the government's repeated presentation of evidence alleging child sex trafficking violated Sixth Amendment fair trial rights;

8) the improper and prejudicial admission of the so-called 'notice' evidence argued by the government as substantive evidence;

9) the improper preclusion of the defense 'evidence responding to the notice' evidence violated fair trial rights of the defendants, and Rule 106 of the Federal Rules of Evidence;

10) the improper preclusion of the defense to present evidence of good faith and their theory of defense, including the defendants' 6th Amendment's right to testify;

11) the improper preclusion of the defense use and discovery of government disclosures demonstrating the governments knowledge of the impropriety of its prosecution and prosecuting theory (*See,* article from Reason Magazine attached hereto as **Exhibit 3**);

12) the multiple *Brady* violations involving the improper non-disclosure of impeaching information that could have been used to cross-examine the government's primary witness.

13) Notwithstanding prior rulings, the defendants were precluded from using Section 230 and the First Amendment to cross-examine and present expert testimony.

This is not an exhaustive list, but should be considered as it pertains to Mr. Spear's offense conduct.

When considering how Mr. Spear ends up involved in the Back Page controversy, the history of his career is pertinent. Specifically, Mr. Spear began working for the New Times Weekly newspapers in Phoenix in the 1980s. A fundamental part of its founders' vision for New Times, the protection and advocacy of the First Amendment freedoms, was an important part of these newspapers' media position, and the newspapers often wrote controversial stories that the traditional news media avoided. As a result, New Times and then Village Voice Media took provocative positions that sometimes necessitated litigation and lawyers advice on the legal balance of their media content. The revenue of the New Times/Village Voice Media companies was ad based.

Mr. Spear became a 'jack of all trades' for these companies, using his real estate, and record business promotion acumen and experience. As has been indicated, the creation of Backpage occurred when James Larkin and Carl Ferrer decided to compete with Craigslist for ad sales in the relatively new Internet media atmosphere. Backpage began by merely posting the ads that used to appear on the 'back' pages of the New Times/Village Voice Media newspapers.

Among his other duties for the majority owners, Mr. Spear was tasked with supervising Carl Ferrer and Ferrer's creation of Backpage as it pertained to building the site, obtaining ads, and ultimately crafting detailed rules meant to ensure that the language of those ads were not only legal, but that the 'Playboy' graphics standard the Backpage executives agreed was appropriate was adhered to.

Because of the relative newness of the Internet, and the legal standard that would apply to advertising on this new media, Backpage frequently sought and received legal advice as to the application of the First Amendment, and Section 230 of the Communications Decency Act "(CDA 230)" (enacted 1996). In this regard, Mr. Spear and the other defendants read and/or were told by Don Moon no later than 1/1/2013 that the advertising published in Backpage was protected by the First Amendment and CDA 230, as (admitted Trial Exhibit 171, attached hereto as **Exhibit 4**). Similarly, the written opinion letters of Mark Sableman, a St. Louis based First Amendment lawyer with the law firm of Thompson Colburn, LLP, advised Mr. Spear and the

5

other defendants that Backpage and its practices and ads were similarly protected by the First Amendment from both civil litigation and state and federal criminal prosecution (**Exhibits 5A-B**).

The assurances of legality did not stop with the given specific legal advice that they received or were told about by these and other prominent lawyers in the media and First Amendment fields. Mr. Ferrer testified to other similar legal advice received. The Backpage litigation against civil litigants, and public officials regarding state statutes and/or efforts to enjoin or criminalize the Backpage business model were uniformly successful and corroborated the legal advice. This includes the *Dart* decision (which unequivocally asserted that as long as some of the ads in Backpage were not *overtly* for prostitution, there was First Amendment protection) (the *Dart* decision was recently cited with approval by the United States Supreme Court, NRA v. Vullo, 602 U.S. 11, 18 (5/2024)). The Seventh Circuit and numerous Federal District Court, including the Court decisions in *McKenna*, *Hoffman* and others similarly indicated First Amendment and CDA 230 protection (indicating for example that requiring personal contact with advertisers violated the First Amendment).

In an effort to assure that Backpage was in legal compliance, Backpage hired, in-house compliance lawyers to advise them (Steve Suskin). Elizabeth McDougall and Don Moon took over supervision of the moderation of the ads in February, 2012 (**Attachment 6A-F)** and (Trial Transcript 9/26/23, A.M. Session, pgs. 92-93). As the Court will remember, as of 2/2012, any adult aggregation effort by Backpage had stopped, The Erotic Review was no longer substantially advertising on Backpage, and any super posters had been terminated as advertisers. The focus of aggregation then turned to non-adult advertising with millions of dollars allocated to the sales and aggregation efforts of the company. Ms. McDougall, a former lawyer for Craigslist and at the national law firm *Perkins Coie*, had assumed the role Mr. Spear had in regard to moderation of ads on Backpage. Given these circumstances, Mr. Spear had every reason to believe Backpage was in legal compliance. Notwithstanding the unsupported convictions on counts 2 through 18, there is no evidence at trial that Mr. Spear knew of the ads contained in these counts, knew the advertisers, saw these ads, knew they had been posted on Backpage, or had anything whatsoever to do with them. There was no evidence presented that demonstrated the specific intent required (*See,* Backpage v. Lynch, 216 F.Supp.3d 96 (2016)).

Mr. Spear's role at Backpage was substantially reduced to being cc'd on emails, and handling various budgetary, real estate, vendor contracts and other miscellaneous jobs after early 2012.

This reduction in role coincided with the mental health concerns discovered/identified in 2011 by Dr. Alvin Burstein regarding Mr. Spears additional diagnoses, and prescribed medications to address mental health conditions.

**B. History and Characteristics of Scott Spear**

Scott Spear is a 73-year-old man who comes before the Court with an unblemished criminal history, a life of good works, service to his community and family, and a host of medical and mental health issues. The several letters of support submitted for sentencing uniformly describe Mr. Spear as honest, caring, law-abiding, generous, industrious, and hard-working.

Mr. Spear came from a modest background, that was not without trauma. His parents marriage ended when he was four years old. His biological father attempted to kidnap him at age five, grabbing him off his bicycle and taking him to the Cleveland airport. Thankfully, he was returned to his mother a day later. Within a year, she re-married to a good man whom Mr. Spear has always considered to be his true dad.

Mr. Spear was a bright child, but he never reached his full potential in school, likely because what we now know was a lifetime of suffering from ADHD. He struggled with this for decades, but only received an official diagnosis in 2011. He struggled with his weight and his coordination as a young person, and was teased and bullied at school.

Through hard-work and perseverance, he earned a scholarship to Occidental College, graduating cum laude in 1972. After graduation, he began his professional life. He has always had an entrepreneurial spirit. His first business was a record store in Phoenix, "World Records." It was there he learned about business, marketing, sales and promotional events. This is the first instance where he understood one of his strengths: recognizing opportunities others did not see, and doing battle with large competitors and surviving. Along with his partner, he expanded the business to include seven stores. Unfortunately, the market was soon overtaken by the big record retailers, but he was 'proud' that when the stores were sold, he left with $1500 in his pocket. In other words, notwithstanding the immense competition, he left with the business in the black.

7

Mr. Spear then spent a year in commercial real estate sales where he learned the fundamentals and nuances of the real estate business.

He put his marketing, promotional and real estate savvy to great use when he began his career with the New Times in 1980. There he helped build the paper into a national publication, known for its reputation for hard-hitting journalism, free speech principles, and publishing controversial pieces that mainstream media outlets were to afraid to touch. The paper also contributed significantly to the community by running events such as the New Times 10K race, which grew to more than 10,000 participants annually, and generated revenues for multiple charities. He was proud of this work and for the paper's community contributions and its relentless efforts to fight for First Amendment principles (**Exhibit 7**).

Among his other accomplishments, Mr. Spear also organized a national trade association for newspaper similar to the New Times, started a telephone company that significantly increased earnings for the company and built a successful well organized circulation system for the papers.

Eventually, as one the paper's main revenue source of classified ads was being overrun by another large competitor, Craigslist, New Times created Backpage.com. The mission of this endeavor was to take on Craigslist, secure a portion of the free classified ad market, and to survive and thrive in the new digital world. These endeavors, like much of the traditional print media going back to the 1950's, included advertisements for adult services. Mr. Spears' talent for finding "adapt or die" business models in a rapidly changing and highly competitive environment had always been his superpower. But in this case, it became his kryptonite.

Scott Spear has never been a law breaker. He is not a man who has ever been motivated simply by money, nor is he someone who ever had to resort to criminal activity of any kind to make a living. Had he believed that he and his colleagues were committing crimes with Backpage.com, he would have either made efforts to shut down that side of the business, or left the company altogether. No amount of compensation would have been worth the ordeal he has experienced at the hands of the federal government over the last six years. His life of good works and clean criminal history is the best evidence of this.

Mr. Spear has always made efforts to contribute to his community, with his time, his money, and his expertise. He has donated countless dollars and hours to organizations such as

the Arizona School for the Arts, Desert Stages Theatre, Greasepaint Youth Theatre, Valley Youth Theatre (downtown Phoenix), Childsplay (Tempe), Fountain Hills Youth Theatre, and Theatreworks (Peoria).

In just one example, Scott procured theatre-grade seats installed at Desert Stages and at Greasepaint Youth Theatre. He worked for a number of years on both short and long term projects for these theaters, and joined Greasepaint's Board of Directors in 2010, becoming board President in late 2011. Both theaters continue to thrive due in part to his contributions over the years. **(See Exhibit 8A-)**.

Supporting local youth theatre is near and dear to Mr. Spear because of his daughter's love of theatre and performance, starting at age three. His daughter was named the "Youth Actress of the Year" for Arizona in 2012 for her performance in Greasepaint's production of *Les Miserables*. She went on to earn a B.A. from Occidental College, that included a minor in theatre. From there she earned a Masters in directing from Essex University in London.

Scott Spear has also given generously to other educational institutions, such as his and his daughter's alma mater. Along with much other financial support for Occidental, he also funded a summer internship in 2015.

It is no accident that "history and characteristics" of the accused is first on the list of 3553 factors. A person must be judged by the totality of his life's work. The fact that he has done his level best to live a law abiding, productive, humble, and generous life should weigh heavily in this Court's decision as to whether to end his life by sending him to prison. This claim is not hyperbole given, among other things, his age and his medical and mental health conditions.

Mr. Spear's medical and mental health issues are well documented in the Pre-Sentence Report. (Doc. 2120) What is not reflected in the PSR is Mr. Spears' life expectancy, and the BOP's total inability to care for an inmate like Scott Spear. Life expectancy is different, and not surprisingly, worse, for incarcerated individuals, as documented in Exhibits 1 and 2. Mr. Spears' typical life expectancy would be exponentially reduced if he is imprisoned. Given the peer-reviewed, widely accepted study by Evelyn Patterson, his life expectancy is reduced by two years for every year of incarceration. Consequently, any sentence of imprisonment means Scott Spear will likely die in prison, as indicated in Exhibits 1 and 2.

The chaos, understaffing, and lack of medical and mental health care is well-documented,

as is the problems that would be caused by the government orchestrated an improper effort to designate the defendants as sex offenders. Recently, some district courts have refused to send defendants to local prisons that had documented improper prison conditions (*See*, U.S. v. Colucci (E.D.N.Y. 8/5/2024)).

Courts have recognized the onerous conditions of confinement as a ground for a variance. As the Supreme Court held long ago on a related issue, "susceptibility to prison abuse and the burdens of successive prosecutions" can serve as grounds for a downward departure. Koon v. United States, 518 U.S. 81, 113 (1996). Other courts have held similarly. *See United States v. Redemann*, 295 F. Supp. 2d 887, 896 (E.D. Wisc. 2003) ("For a defendant who faces more onerous conditions of confinement than the typical defendant, the court can impose a shorter prison sentence and obtain the same punitive effect. A departure is warranted because at least one of the purposes of sentencing -- just punishment -- is satisfied by a shorter sentence."); *United States v. Pressley*, 473 F. Supp. 2d 1303, 1315 (N.D. Ga. 2006) ("As the Eleventh Circuit had authorized a departure for the lengthy and onerous conditions of confinement to which the defendant was subject in the multi-year sentencing process,, this Court had indicated that it would depart down approximately 30 months for those condition.").

It should also be noted that not only will Mr. Spear suffer from the BOPs inability to pay full attention to his special needs, he will suffer as a result of the inevitable unwanted attention he will attract from his fellow inmates. He will not be given a "camp" placement due to the orchestrated nature of the charge. He will therefore be housed with more sophisticated, more dangerous, and more predatory class of inmates. To make matters worse, he will be entering the system with the unwarranted "sex trafficking" label. This will make him the target of other offenders. (See Exhibits 1 and 2). Indeed, he may end up spending the majority of his sentence in protective custody (i.e. solitary confinement). It's hard to imagine a more excruciating and sad end of a life well-lived. This Court simply cannot countenance such a cruel and unusual result under these circumstances.

Given the congressional and executive recognition of conditions in Federal prisons, a sentence of imprisonment in this case will amount to an 8th Amendment violation. (*See,* Estelle v. Gamble, 429 U.S. 97 (1976); Hutto v. Finney, 437 U.S. 678, 685 (1978); Rhodes v. Chapman,

452 U.S. 337 (1981); <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991); <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).

It shouldn't escape notice that NAAG, NCMEC, Polaris, and others allowed to testify at the 2023 Trial were unsuccessful in changing CDA 230 until after the relevant indictment in this case. The news were characterized as the "anti-Backpage" laws, implying there should have been no criminalization of the ads that are at issue in this case.

**C. The Need for the Sentenced Imposed To Reflect The Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense.**

Although this case, as this court frequently asserted before and during trial, was not charged as a prostitution or sex offense, the government improperly made it into one. The subject matter of prostitution is too long-standing, and too controversial to use as a gauge for assessing the seriousness of the offense in the present case.

This case involves the novel prosecution of a social media site accused of improperly allowing third-party advertisers to post suggestive ads purportedly for prostitution. It is obvious from the trial evidence that some of the very ads that form the basis of some of the convictions were obtained by Backpage from Google, and were/are similar to ads published in Facebook, X, and many of the large and small social media sites existent before and after the demise of Backpage. The substantial trial evidence, given by the law enforcement witnesses, and Ferrer's testimony that United States attorneys around the United States used the testimony and cooperation of Carl Ferrer, Andrew Padilla, Joye Vaught, and others at Backpage to assist law enforcement, indicates Backpage attempted to be a good citizen, not a bad one. The demise of Backpage at the instance of the United States government, has obviously not reduced prostitution or made it any easier to investigate and prosecute. Mr. Ferrer's aspersions notwithstanding, Backpage spent substantial assets and allocated numerous employees to help law enforcement. Most persons engaged in criminal wrongdoing attempt to hide their actions from the attention of law enforcement, and do not assist them in prosecuting lawbreakers.

It appears the government knew it had insufficient proof to support a prosecution. The government 'inadvertently' disclosed documents showing the lack of evidence **(See Exhibit 3).** As such, to impose such an egregious sentence in a case of first impression would actually serve to promote *disrespect* for the law.

Punishment is not measured merely in years in prison; it comes in all forms. Indeed, Mr. Spear has suffered massive consequences because of this prosecution. He has lost his home, his marriage, his relationship with friends and family, and potentially his life savings He now lives a modest existence in a small Phoenix condominium **(Exhibit 10)**. He has a deeply uncertain financial future even if he does not end up in prison. The stress and strain of the multi-year ordeal have deteriorated his already vulnerable body and mind.

Given all of the circumstances, a sentence of probation with community service will acknowledge the novelty of the prosecution, and promote respect for the law and just punishment given the substantial punishment already implemented against Mr. Spear and the other defendants – seizure of assets, cessation of Backpage, negation of the sales contract indebtedness, divorce, alienation of family relationships, and exacerbation of physical and mental health concerns.

**D. The Need for the Sentenced Imposed To Afford Adequate Deterrence To Criminal Conduct And To Protect The Public From Further Crimes Of The Defendant.**

The government's seizure of Backpage has deterred it from any further operation. This prosecution will *never* deter others from engaging in similar publications. Indeed, the evidence shows that result will be to increase the prevalence of these publications, because those who seek to engage in this business have moved their efforts out of the country, and likely beyond the reach of U.S. law enforcement. Moreover, there was ample evidence that Mr. Spear and his colleagues provided substantial assistance to law enforcement to identify child victims and those who would exploit them. According to various sources, that kind of assistance to help stem the tide of sex trafficking has been diminished or demolished as nefarious actors will be well beyond the reach of American law enforcement. Thus, as for general deterrence, it's quite questionable as to what if any effect convicting or incarcerating Mr. Spear will have.

In terms of specific deterrence, Mr. Spear never set out to commit crimes in the first instance, and he certainly has no plans to do so in the future. His age, physical (spine and respiratory) ailments and mental health concerns foreclose any ability to engage in any improper conduct even if this 73-year-old person who had never engaged in any improper conduct prior to the present indictment was so inclined.

RESPECTFULLY SUBMITTED this 19th day of August, 2024.

                                       **FEDER LAW OFFICE P.A.**

                                        *s/ Bruce Feder*
                                        Bruce Feder
                                        *Attorneys for Scott Spear*

# CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

Clerk of the Court
United States District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street
Phoenix, AZ 85003
Efiling: https://ecf.azd.uscourts.gov/cgi-bin/login.pl

THE HONORABLE DIANE J. HUMETEWA
United States District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street
Phoenix, AZ 85003
Email: Humetewa_chambers@azd.uscourts.gov

Erin E. McCampbell, emccampbell@lglaw.com
Paul J. Cambria, pcambria@lglaw.com
Gary S. Lincenberg, glincenberg@birdmarella.com
Gopi K. Panchapakesan, gpanchapakesan@birdmarella.com
Eric Kessler, Eric@Kesslerlawgroup.net
Bruce Feder, bf@federlawpa.com
*Attorneys for Defendants*

Kevin Rapp, Kevin.Rapp@usdoj.gov
Aron Ketchel, Aron.Ketchel@usdoj.gov
Margaret Perlmeter, Margaret.Perlmeter@usdoj.gov
John Kucera, John.Kucera@usdoj.gov
Austin Berry, berry2.austin@usdoj.gov
Peter Kozinets, Peter.Kozinets@usdoj.gov
*Attorneys for United States of America*

By: */s/ M. Evans*