**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-PHX-DJH |
| Plaintiff, | **RESTITUTION ORDER** |
| v. | |
| Scott Spear - 003<br>John Brunst - 004, | |
| Defendants. | |

The Government has filed a Memorandum regarding Restitution and the Remission Process as to Defendants Scott Spear and John Brunst ("Defendants"). (Doc. 2274). Defendant Brunst has filed a Response (Doc. 2280), which Defendant Spear has joined (Doc. 2283), and the Government has filed a Reply. (Doc. 2291). The Court held restitution hearings on January 3rd and 6th, 2025. (Docs. 2295 & 2298). After the hearings, the Court ordered the parties to "simultaneously file supplemental briefing within 14 days re: the restitution statute as it pertains to victims not included in the indictment." (Doc. 2298). The Government and Defendant Brunst have each filed a supplemental motion. (Docs. 2318 & 2320). Defendant Spear has also joined in Defendant Brunst's supplemental Motion. (Doc. 2319).

I.    **Background**[1]

This matter spans seven years and thousands of court documents. A three-month Jury Trial in this matter commenced on August 29, 2023. (Doc. 1741). On

---

[1] The facts are fully set forth in the Court's Order on the Defendant's Rule 29 Motion (Doc. 2063) and will not be wholly repeated here.

November 16, 2023, the Jury found Defendant Spear guilty of Conspiracy to Commit Travel Act[2] violations (Count 1); the Travel Act violations alleged in Counts 2–18; Conspiracy to Commit Money Laundering (Count 52); Domestic Concealment of Money Laundering (Counts 53–62); and Transactional Money Laundering (Counts 71–78, 85, and 93). He was found not guilty of the Travel Act violations alleged in Counts 19–51, and the money laundering counts alleged in Counts 63–68.

The Jury also found Defendant Brunst guilty of Conspiracy to Commit Travel Act violations (Count 1); Conspiracy to Commit Money Laundering (Count 52); domestic Concealment Money Laundering (Counts 53–62); International Promotional Money Laundering (Counts 64–68); and Transactional Money Laundering (Counts 78–84, 86–93). He was found not guilty of the Travel Act violations alleged in Counts 2–51, and of one count of International Promotional Money Laundering (Count 63). Now, the Government seeks restitution on behalf of several Claimants who allege they were victims of Defendants' convicted conduct.

### A.    Backpage.com's History

At trial, the Government established the following relevant facts:

Launched in 2004 in Phoenix, Arizona, Backpage.com was an online website offering classified ads for a variety of goods and services. (Trial Tr., Doc. 1786 at 6:6–11)). Defendants owned Backpage.com with Mr. James Larkin ("Mr. Larkin") from its inception in 2004 until the website was sold to Mr. Carl Ferrer ("Mr. Ferrer") in April of 2015. (*Id.*) Defendants had leadership roles in Backpage.com's parent company Village Voice Media ("Village Voice") during that time: Mr. Brunst served as Chief Financial Officer ("CFO"); and Mr. Spear was an Executive Vice President ("VP"). (Trial Ex. 5)). Backpage.com started as a competitor to Craigslist, an online advertising site that "was eroding into the revenue of [Village Voice] newspapers." (Trial Tr., Doc. 1786 at 25:24–25)). To generate revenue, Backpage.com initially decided that it would only charge for

---

[2] The Travel Act makes it a federal offense for a person to use a facility in interstate commerce with the intent to promote or facilitate the promotion of an unlawful activity— here, facilitating the promotion of prostitution. 18 U.S.C. § 1952(a)(3).

"Adult" ads.   (*Id*. at 26:10–11).   The Adult section on Backpage.com contained the categories "Female Escorts"; "Male Escorts"; "Transsexual Escorts"; "Body Rubs"; "Adult Jobs"; and "Phone and Web."  (*Id*. at 6:18–20).  Mr. Ferrer characterized the ads in the Female Escort section of Backpage.com between 2004 and 2009 as prostitution ads. (*Id*. at 7:10–12).   These types of ads were profitable because escorts "needed repeat business" so they would often post their ads every day.  After Craigslist closed its Adult section in 2010, Backpage.com experienced exponential growth in "revenue from online prostitution ads."  (Trial Tr., Doc. 1793 at 35:23–36:9)).   From 2010 through 2012, Backpage.com's Adult section yielded $138,850,097.36 compared to $208,658.90 from its non-Adult sections, i.e., a 94.2% difference in profits.  (Trial Ex. 1480)).

### B.   Defendants' Convictions

At trial, Defendants orally moved for a judgment of acquittal on all charges under Federal Rule of Criminal Procedure 29 ("Rule 29") at the close of the Government's case. (Doc. 1903 at 19–93).  The Court exercised its discretion under Rule 29(b) to reserve its ruling until after the Jury returned its verdict.  (Doc. 1852).  On April 23, 2024, the Court issued its written ruling, finding that the evidence supporting Counts 66–99 as to Defendants Brunst and Spear was insufficient; the Court, however, denied the Motion as to their other counts of conviction, including, but not limited to, Defendants' convictions for conspiracy to commit Travel Act violations in Count 1 and Spear's Travel Act convictions in Counts 2–18.  (April 23, 2024, Order on Rule 29 Motions, Doc. 2063 at 19, 25, 73).

The Court will briefly restate the conduct it found sufficiently supports the convictions related to the restitution Claimants to determine whether the Claimants are entitled to restitution.

### 1.   Conduct Supporting Defendants' Conspiracy Convictions

The Jury found Defendants Spear and Brunst guilty of conspiracy to commit Travel Act violations under 18 U.S.C. § 371.  "To prove a conspiracy under 18 U.S.C. § 371, the government must establish: (1) an agreement to engage in criminal activity, (2) one or more

1    overt acts taken to implement the agreement, and (3) the requisite intent to commit the
2    substantive crime." *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016) (citation
3    and internal quotation marks omitted).

4        The Government's theory for this count was that between 2004–2018, there was an
5    agreement among the Defendants to facilitate the promotion of prostitution businesses by
6    posting their sex for money ads on Backpage.com, as charged in the Travel Act Counts;
7    that each Defendant became a member of the conspiracy knowing of at least one of its
8    objects— "to make money"—and intending to help accomplish it; and that one of the
9    members of the conspiracy performed at least one overt act on or after March 28, 2013, for
10   the purpose of carrying out the conspiracy.  (Final Jury Instructions, Doc. 1998 at 24).

11       The Court found that there was sufficient evidence that Defendants were engaged
12   in a conspiracy because: (1) they knew the demand for Adult ads was especially high in
13   proportion to Backpage.com's total business; that Backpage.com derived the majority of
14   its revenues from its Female Escort section—ads Mr. Ferrer characterized as prostitution
15   ads; and that the sale of ads that led to prostitution offenses became the dominant portion
16   of Backpage.com's business (Doc. 2063 at 21); and (2) the object of the conspiracy was to
17   make money through an agreement to violate the Travel Act (*id*. at 25).

18               **2.       Conduct Supporting the Substantive Travel Act Violations**

19       Mr. Spear was found guilty of committing the Travel Act violations charged in
20   Counts 2–18.[3]  Claimants related to ads posted in Counts 2, 4, 5, 12–15, and 15 and 16 are
21   seeking restitution from Defendants.

22       To show that Defendant Spear violated the Travel Act by selling and publishing
23   prostitution ads on Backpage.com, the Government was required to establish that he "in
24   some significant manner associated" himself with the ad poster's prostitution business
25   enterprise, or that one of his co-conspirator's committed a Travel Act offense in furtherance
26   of the conspiracy such that liability extended to Spear under *Pinkerton v. United States*,
27   328 U.S. 640 (1946). (Doc. 1998 at 29–30); *United States v. Gibson Specialty Co*., 507

28
_____
[3] Mr. Brunst was acquitted of all Travel Act Counts.

F.2d 446, 449 (9th Cir. 1974); *United States v. Long*, 301 F.3d 1095, 1103 (9th Cir. 2002).

In its Order on Defendants' Rule 29 Motion, the Court found that "Mr. Spear's role in making Backpage.com a platform from which prostitution could be advertised is sufficient to establish his specific intent to facilitate the promotion of the prostitution businesses posting the ads in Counts 2–18." (Doc. 2063 at 30). The Court stated that the evidence sufficiently showed that "Mr. Spear, in the interest of making money, directly helped develop moderation and editing policies that facilitated the promotion of prostitution and allowed Backpage.com to continue to accept payment from pimps, traffickers, and prostitutes for posting the illegal ads." (*Id*.) The Court also found that "there was sufficient evidence adduced that Mr. Ferrer, a co-conspirator, also significantly associated himself with and helped promote the poster's enterprises such that his acts in relation to the ads in Counts 2-18 were fairly attributed to Mr. Spear under a *Pinkerton* theory of liability." (Doc. 2063 at 30–31).

### a.    Count 2

The Jury convicted Mr. Spear of violating the Travel Act in Count 2 of the Superseding Indictment ("SI"), which alleged Defendants used Backpage.com to post a prostitution ad on September 10, 2013, in Massachusetts—an illegal act in that state. (Doc. 2063 at 32). This Count involves Claimant #6, D.O., who was identified as Victim 5 in the SI (Doc. 230). (Doc. 2275 at 2).

Brian Griffin, a Sergeant with the Northborough Police Department ("Sgt. Griffin"), testified that in September 2013 he was alerted to suspicious circumstances of two females loitering around a hotel room. (Trial Tr., Doc. 1923 at 62–70). Believing that they may be involved in prostitution, Sgt. Griffin went to Backpage.com and found an ad depicting one of the females. (Trial Tr., Doc. 1923 at 64–65; Trial Exs. 212, 212a). This ad is the subject of Count 2. Sgt. Griffin called the ad number and made an appointment to see D.O., to pay her for oral sex. (Trial Tr., Doc. 1923 at 66). Upon entering the hotel room, Sgt. Griffin observed a male "John" in the bathroom and learned that he paid for the hotel room in exchange for sex. (*Id*. at 70).

### b.    Counts 4 & 5

The Jury convicted Mr. Spear of committing Travel Act offenses in Counts 4 and 5. These Counts involved Claimant #3, N.F.,[4] who was identified as Victim 8 in the SI (Doc. 230).  N.F. identified the ads from Counts 4 and 5 as ads her pimp posted of her on Backpage.com.  (Tr. Trans., Doc. 1898 at 96–98).  N.F. testified that she became familiar with Backpage.com when she saw her pimp use it to post her ads.  (*Id*. at 82).  She believed Backpage.com was a website "for girls to use [] to escort and to get trafficked."  (*Id*.) According to her, "escort" meant "to exchange a sexual act for money or a gift."  (*Id*.)  She testified that she would not create her ads, that her pimp created and posted them.  (*Id*.) She understood that she was advertised for sex acts for money "so my pimps could make money off of me."  (*Id*. at 83).  N.F. testified that every ad posted of her was an offer of sex for money. (*Id*. at 99).  She testified that she would not keep the money but that the pimps would.  (*Id*. at 94–95).

### b.    Counts 12–15

Count 12 is a California Backpage.com ad posted on November 23, 2014, and Count 13 is a California Backpage.com ad posted on January 29, 2015. (Doc. 230 at 51). Prostitution is illegal in California. (Doc. 1998 at 32). Count 14 is an Arizona Backpage.com ad posted on January 31, 2015, and Count 15 is an Arizona Backpage.com ad posted on January 31, 2015. (Doc. 230 at 51). Prostitution is illegal in Arizona. (Doc. 1998 at 32).

Claimant #2, A.C.,[5] who was identified as Victim 10 in the SI (Doc. 230), testified that she was advertised for an "exchange of money for sex acts" on Backpage.com from November 2014 through January 2015 in Oceanside, San Diego, and other places in California and in Phoenix. (Trial Tr., Doc. 1897 at 30–38).  A.C. identified herself and a woman called "Storm" in the ads associated with Counts 12–15. (*Id*. at 32–35, 47–48). She said Storm was part of a group she was in that was "being trafficked" by a man she referred

---

[4] N.F. is one of the claimants (Claimant #3) seeking restitution from Defendants. (Doc. 2275).

[5] A.C. is one of the claimants seeking restitution from Defendants.  (Doc. 2275).

to as "L.G." (*Id*.)  She testified that L.G. was her pimp and that L.G. and a woman named Star, another girl that was being trafficked by L.G., would create and post her ads on Backpage.com. (*Id*. at 32–33).

A.C. testified that L.G. and Star took pictures of her in lingerie and then used those photos in her Backpage.com ads.  (*Id*. at 33–34).  A.C. said L.G. would post her ad using his cell phone.  (*Id*. at 34).  Upon the ad being posted, "clients"—meaning "the men that would want to exchange money for sex"—would call and text for sex.  (*Id*. at 35).  After engaging in sexual intercourse with the client, A.C. would text L.G. and he would arrive and retrieve the money.  (*Id*. at 37–39).  A.C. testified that she did not observe L.G. to have a job other than being a pimp.  (*Id*. at 45).  A.C. testified that L.G. thought they could make a lot of money during the Super Bowl so she, L.G., Storm, and Star traveled from California to Arizona in January.  (*Id*. at 37-38).  She testified that L.G. or Star provided the car, and once in Arizona, L.G. purchased a hotel room and Storm began writing her Backpage.com ad profile.  (*Id*. at 41).  A.C. had a few "dates" while in Phoenix.  Eventually, she and Storm agreed to meet a customer who requested "a two-girl special." (*Id*. at 43).  The customer ended up being an undercover police officer. After that, A.C. stopped working for L.G. (*Id*. at 54).

### c.    Counts 16 & 17

Counts 16 and 17 alleged that prostitution ads were posted on Backpage.com in Colorado on February 4 and 18, 2015, respectively. (Doc. 230 at 51).  Prostitution is illegal in Colorado. (Doc. 1998 at 33–34).

Claimant #4, B.F.,[6] who was identified as Victim 11 in the SI (Doc. 230), testified that she posted herself on Backpage.com in Denver, Colorado from approximately 2012 through 2015. (Trial Tr., Doc. 1920 at 122– 24). She copied and pasted other ads and used the "lingo" on Backpage.com to create her own ads.  (*Id*.)  She testified that her ad would often appear differently than as she originally posted; that sometimes her picture was removed, or the ad would be pushed to the bottom and require her to repost it so it would

---

[6] B.F. is a claimant seeking restitution.  (Doc. 2275).

go to the top. (*Id*. at 124). She stated that even when her picture was removed, the rest of the ad's content would remain. (*Id*. at 125). Once posted, she said her telephone would ring and she would "go to and have dates with the gentlemen" which she said meant "acts of prostitution." (*Id*.).

In January 2015, B.F. began to work for Brock Franklin ("Franklin"), who wanted to post her on Backpage.com. (*Id*. at 128–29). When she arrived at his home, she observed other women living there. (*Id*.). Franklin and "one of his girls" Isis, took photos of her in a hotel room in Denver where she posed in various positions wearing lingerie. (*Id*. at 131). She testified that for the four to five months she was involved with Franklin, she engaged in daily acts of prostitution for him and that he only permitted her to perform acts of oral sex. (*Id*. at 132–34). Once she received money for the act, it would be immediately handed over to Franklin. (*Id*.). B.F. identified herself in Trial Exhibit 216 as the photos that were taken of her the first night she moved in with Franklin. (*Id*. at 138). She stated that the ad was posted on February 4, 2015, in Denver. (*Id*.). She also identified herself in Trial Exhibit 216a as an ad posted in Ft. Collins, Colorado on February 18, 2015. She testified that both advertisements lead to acts of prostitution. (*Id*.).

### C.    Sentencing

The Court held a sentencing hearing on August 28th, and 29th, 2024, as to all Defendants. (Doc. 2171). The Court sentenced Defendant Brunst to a term of one hundred and twenty (120) months of incarceration and imposed a $50,000.00 fine against him. (Doc. 2193 at 1). The Court sentenced Defendant Spear to one hundred and twenty (120) months of incarceration but waived the fee against him. (Doc. 2180 at 1).

### D.    Restitution Hearing

The Government now requests restitution for twelve Claimants seeking restitution on behalf of eleven Claimants or their next of kin. (*Id*. at 1). The Government seeks the following claims:[7]

(1) A.B. seeking $47,290.00

---

[7] The Court notes that the Government assigned each Claimant a numeric reference that is different from that assigned in the SI.

1     (2) A.C. seeking $95,314.00

2     (3) N.F. seeking $7,038,128.00

3     (4) B.F. seeking $984,300.00

4     (5) M.L. seeking $2,508,673.00

5     (6) D.O. seeking $5,949,554.00

6     (7) C.M.'s next of kin seeking $48,397.79

7     (8) D.R.'s next of kin seeking $2,205,220.00

8     (9) J.R. seeking $4,753.00 plus $10,950 per year

9     (10) E.S.'s next of kin seeking $5,000,000.00

10     (11 & 12) C.W.'s next of kin seeking $4,000.00 and $10,270.00, respectively.

11 (*See* Docs. 2275 at 1–3; 2275-1 at 13; and 2275-4 at 3).

12 At the restitution hearing, Dr. Sharon Cooper, a Developmental-Behavioral and

13 Forensic Pediatrician, testified to the physical harms Claimant #3, N.F., and Claimant #6,

14 D.O., suffered due to being trafficked on Backpage.com and the costs associated with their

15 future medical treatments. (Doc. 2315). Dr. Stan Smith, Ph.D., an economist and President

16 of Smith Economics Group Ltd., also testified about the value of certain losses subsequent

17 to the sex trafficking victimization. (Doc. 2316). The Court finds that Dr. Cooper and Mr.

18 Smith have the requisite knowledge, skill and experience to opine on their findings and

19 their conclusions are based on reliable methodologies within their respective fields. Their

20 reports and testimony also aid the Court in its determination.

21 Dr. Cooper authored a report of findings for N.F. and D.O. related to mental health,

22 physical health, background, education and upbringing. (*Id.* at 16). Her report includes an

23 "associated annual cost for health care" based on a determination of the cost of rape,

24 medication management, inpatient and outpatient care and other factors. Dr. Cooper

25 testified that her findings were based upon her interviews with the referenced victims.

26 However, her opinions were also informed by national studies from 1998 to the present

27 about the types of chronic disorders that effect victims, including minors, who have been

28

abused (including through sex trafficking)[8] over time. (*Id*. 18-19). Her analysis also touched on the effects to victims who have had sexually provocative images posted online and which may be permanent. Given that Dr. Cooper's analysis and report relate to common experiences of all Claimants seeking restitution, the Court considers her testimony as relevant background for the Claimants referenced here because they are similarly situated to N.F. and D.O.

Dr. Smith also testified to the impact that being trafficked would have on the victims' earning capacity. (Doc. 2316). Dr. Smith calculated the value of losses post-sex trafficking on Backpage.com of D.O., which include 1) the loss of wages and employee benefits; and 2) the present value of future life care. Dr. Smith reviewed Dr. Cooper's report of findings on D.O. and incorporated her findings related to mental and physical health into his analysis. Dr. Smith's report states that "[t]his study includes those who have not experienced extreme sexual assault and abuse as D.O. did while being sex trafficked on Backpage.com and thus, likely underestimates the impact on earnings and employment." (*Sealed* Doc. 2275-6). Like Dr. Cooper, the Court finds that Dr. Smith's conclusions are relevant background for the Claimants referenced here because they are similarly situated to D.O.

### 1.    Dr. Cooper's Report and Testimony on Medical Costs

Dr. Cooper estimates the Claimants' annual cost for several "medical diagnoses" including the cost of rape, bipolar disorder, stomach issues, sleep apnea, migraines, bee sting anaphylaxis immunotherapy and other disorders. (Doc. 2275-4 at 26–28; Doc. 2275-6 at 32–34). At the restitution hearing, she testified that in victims of abuse, especially minors, metabolism can become derailed. (Doc. 2315 at 17). She also noted that a victim's baseline cortisol levels can "reset" when abuse is "profound." (*Id*.) She clarified that when a victim has been "victimized significantly, and especially if you've been victimized over a relatively prolonged period of time, your cortisol level will rise and will not come back

---

[8] Dr. Cooper and Dr. Smith submitted expert reports in this matter. (*Sealed* Docs. 2275-4 & 2275-6). They both use the term "sex trafficking" in their reports. The Court understand this to be a general descriptor of what occurred and not to refer to the statutory definition of sex trafficking which was not a charge in this case.

to a normal level. This causes diseases in the human body." (*Id*.)  Dr. Cooper stated that this can lead to concerns of gastrointestinal discomfort, ulcer disease or ulcerative colitis. (*Id*. at 18).

The Court asked about the impact to victims who have had pictures taken of them that can be displayed later.  (*Id*. at 20).  Dr. Cooper stated that this can exacerbate and prolong the victim's victimization as middle-aged victims will still be notified if child sexual abuse material ("CSAM") of them is found.  (*Id*. at 22).  The Court asked Dr. Cooper if she can link N.F.'s medical diagnoses to her victimization.  Dr. Cooper linked N.F.'s bipolar disorder, PTSD, recurrent epistaxis, recurrent sinusitis, and polyarticular osteoarthritis (not her anaphylaxis) to her victimization.  (*Id*. at 23–31).  She specifically stated that victims of sex trafficking can have microfractures of the thoracic and lumbar spine "because when you are being sexually assaulted multiple times a day, the positioning of your body may very well foster overflexion of the thoracic spine and the lumbar spine." (*Id*. at 32).  Dr. Cooper clarified that the cost of treatment for anaphylaxis was not included in N.F.'s restitution request.  (*Id*. at 37).  Dr. Cooper, on direct examination, further clarified that even preexisting conditions N.F. and D.O. may have had would have been exacerbated by their victimization "because of the toxic levels of cortisol that occurs when these patients become so stressed as one is in sex trafficking victimization." (*Id*. at 38).

### 2.    Dr. Smith's Testimony and Report on Reduced Income

Dr. Smith estimates three scenarios of lost earnings ranging from $1.2m to $3.6m over the course of Claimants' lives.  (Doc. 2275-4 at 42; Doc. 2275-6 at 48).  These earning estimate that the Claimants would work until the age of 67.  (*Id*.)  He estimated the Victims' wages based on: (1) the average earnings of all females with a high school degree (scenario one); (2) the average earnings of a female with some college (scenario 2); (3) and the average earnings of a female with a bachelor's degree (scenario 3).  (Doc. 2275-4 at 37–38).  In his report, Dr. Smith details that victims of sex trafficking have lower annual earning on average.  (Doc. 2275-4 at 41).

As mentioned *supra*, the Court will apply these opinions and conclusions to

qualifying Claimants as they are all generally similarly situated as having been posted on Backpage.com.

## II.    Discussion

"Federal courts have no inherent power to award restitution, but may do so only pursuant to statutory authority." *United States v. Follet*, 269 F.3d 996, 998 (9th Cir. 2001) (citations omitted). Statutory authority commonly derives from the Victim and Witness Protection Act ("VWPA") (18 U.S.C. § 3663) and the Mandatory Victims Restitution Act ("MVRA") (18 U.S.C. § 3663A).

The Government seeks restitution for twelve Claimants who say they suffered injuries as a result of being posted on Backpage.com under 18 U.S.C. § 3663, the Victim Witness Protection Act. (Doc. 2274 at 7). Defendants argue that the Court should accept the Government's initial invitation to defer to the ongoing remission process, which the Court has discretion to do under the VWPA. (Doc. 2280 at 8). Defendants also argue that the Claimants here are not "victims" under the VWPA and that the alleged claims are not compensable. (*Id*. at 11, 17). The Court will first address whether the Claimants are, or are not, victims under the VWPA.

### A.    Who is a "Victim" under the VWPA

The VWPA states that the Court "may order, . . . in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense, or if the victim is deceased, to the victim's estate." 18 U.S.C. § 3663(a)(1)(A). The term "victim" means "a person directly ***and*** proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id*. at (a)(2). The Supreme Court has held that "the language and structure of the [VWPA] make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990).

After *Hughey*, the VWPA was amended to further define a victim as "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2) (1990). In *Gamma Tech*, the Ninth Circuit

specifically stated that:

> It is clear from our cases that the phrase "directly resulting" means that the conduct underlying the offense of conviction must have caused a loss for which a court may order restitution, but the loss cannot be too far removed from that conduct . . . [A] [d]efendant's conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct. The causal chain may not extend so far, in terms of the facts or the time span, as to become unreasonable.

*United States v. Gamma Tech Industries, Inc.*, 265 F.3d 917, 928 (9th Cir. 2001) (citations omitted). The government bears the burden of proving, by a preponderance of the evidence, that the defendants' offenses proximately caused the losses incurred by the victim. *See United States v. Kennedy*, 643 F.3d 1251, 1263 (9th Cir. 2011).

### 1.    Claimants Named or Referenced in the Counts of Conviction

The Court easily finds that the Claimants specifically named in the Travel Act counts of conviction (Counts 2–18)— D.O. (Count 2), N.F. (Counts 4 and 5), A.C. (Count 14), and B.F. (Counts 16 and 17)—are victims under the VWPA. D.O., N.F., A.C., and B.F. were illegally advertised on Backpage for prostitution services and the evidence at trial showed that Defendants knew the ads in Counts 2, 4, 5, 14, 16 and 17 were illegal ads for prostitution and that Defendants were directly involved in ensuring the ads were sufficiently white-washed so that they could continue to receive payment for them. The Court so found in its Rule 29 Order, for example, when it found that "[Defendant] Spear, in the interest of making money, ***directly*** helped develop moderation and editing policies that facilitated the promotion of prostitution and allowed Backpage.com to continue to accept payment from pimps, traffickers, and prostitutes for posting the illegal ads." (Doc. 2063 at 30) (emphasis added). This conclusion is bolstered by the Court's finding that "Mr. Ferrer, a co-conspirator, also significantly associated himself with and helped promote the poster's enterprises such that his acts in relation to the ads in Counts 2–18 were fairly attributed to Mr. Spear under a *Pinkerton* theory of liability." (*Id.*) Accordingly, these Claimants were "directly harmed by the defendant's criminal conduct

in the course of the scheme, conspiracy, or pattern" thereof.  18 U.S.C. § 3663(a)(2).

Though Claimants #1 (A.B.), #5 (M.L.), #7 (C.M), #9 (J.R.), #10 (E.S.), and #11 & #12 (C.W.) are not specifically identified in ads charged under the specific Travel Act counts, all are referenced in the SI in regard to Count 1 for Conspiracy to Violate the Travel Act.  The evidence at trial showed that both Defendants' and their co-conspirators' actions harmed these Claimants over the course of their conspiracy to make money by posting illegal ads for prostitution.  18 U.S.C. § 3663(a)(2).  For example, N.F.'s testimony that she was advertised so that her pimps could make money off of her combined with the significant association attributed to all co-conspirators under *Pinkerton.*  (Doc. 2063 at 30–35).  Thus, the Claimants who are named and/or referenced in the SI's counts for which Defendants were convicted of are "victims" within the meaning of the VWPA.  18 U.S.C. § 3663; *Gamma Tech*, 265 F.3d at 927.

### 2.    Claimant #8—D.R.—is not Named in the Superseding Indictment

The more difficult question is whether the D.R., who is not named in the SI, qualifies as a victim under the VWPA.

D.R.'s next of kin seeks $14,500.45 for funeral expenses, $2,267,154.00 for lost future earnings, $9,857.29 for costs associated with participation with Court and $14,550.00 for expert fees.[9]  (Doc. 2324-5 at 3).  The VWPA states that "[i]n the case of a victim who is . . . deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section."  18 U.S.C.A. § 3663(a)(2).  D.R.'s next of kin may receive restitution from the Defendants if she meets the criteria of a "victim" of the Defendants' crimes under the VWPA.

D.R. was murdered on December 24, 2016.  (Doc. 2315 at 92; Doc. 2063 at 41). She was not named in the SI.  (*See* Doc. 2275 at 8). And, as her victim representative pointed out, "murder was not an object of [the] conspiracy" for which the Defendants were

---

[9] The victims legal representative includes reimbursement for alcohol and food, which are obviously improper requests.  (*See* Doc. 2324-5).

convicted (Doc. 2316 at 91). Though the Government did not introduce evidence or testimony of D.R. being advertised on Backpage.com during trial, it did provide testimony, during the restitution hearing, that she was advertised on the website. (Doc. 2315 at 81–82). Lead FBI Agent Landau (retired) testified that they identified D.R. through postings on Backpage.com. (*Id*.) Agent Landau stated that D.R. was posted by a "pimp" and murdered by a "john." (*Id*. at 82). She testified that she did not know either Defendant Brunst or Spear. (*Id*.) As a result of D.R.'s murder, Charles McFee was convicted of Conspiracy to Commit Sex Trafficking of Children by Force, Fraud or Coercion in the Northern District of Illinois on June 13, 2019. (Doc. 2280-4). He and his co-defendant, Joseph Hazley were ordered to pay $14,329.29 in restitution to D.R.'s next-of-kin, Y.R. (*Id*.)

The Government argues that D.R. is entitled to restitution from the Defendants in this case. It asserts at the hearing that each "pimp" was an unindicted co-conspirator in its case because their sex-for-money offers could not be successful without "Mr. Brunst and Mr. Spear actively assisting the pimps in posting those ads[.]" (Doc. 2315. at 86–87). They reason that Brunst and Spear should be held responsible for any acts flowing out of Backpage.com's advertisement. Yet, the Ninth Circuit has established guardrails to avoid attenuated restitution orders by requiring the government to "show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the conduct and the loss is not too attenuated (either factually or temporally)." *Gamma Tech Industries, Inc*., 265 F.3d at 924. While the Court acknowledges that there was sufficient evidence that minors like D.R. were being offered on Backpage.com along with adult women who either advertised themselves or were advertised by others, it is too attenuated to find Brunst and Spear responsible for the acts of McFee and Hazley in committing the murder of D.R. Thus, she is not a "victim" under the VWPA and is not entitled to restitution from the Defendants here. 18 U.S.C.A. § 3663. However, her next of kin are not foreclosed from seeking compensation through the remission fund.

**B.      Claimants Who are Entitled to Restitution**

Eleven Claimants seek restitution from Defendants, as noted *supra*.  The government must prove the amount of the loss.  *United States v. Gossi*, 608 F.3d 574, 580 (9th Cir. 2010).  The amount of restitution will be upheld "if the district court is able to estimate, based upon facts in the record, the amount of the [victims] loss with some reasonable certainty."  *United States v. Doe*, 488 F.3d 1154, 1159–60 (9th Cir. 2007).  However, restitution need not be measured with "mathematical precision."  *Doe,* 488 F.3d at 1159-60.  The Court will address each Claimants' claim in turn.

**1.      Claimant #1 - A.B.**

A.B. seeks $47,290.00.  (Doc. 2275-1 at 13).  She is seeking $40,000.00 in lost services and alleges that she "estimate[s] this amount based on [her trafficker's] requirement of making $1,000 per night and the pattern [they] worked 2-3 nights per week until [she] lost [her] job, and then 5 nights per week until his arrest."  (*Id.*)  She also seeks $4,950.00 for lost wages from losing her day job ("$11.25/hr x 40 hrs/wk x 11 weeks (February 14, 2013-May 7, 2013) = $4,950") and $2,340.00 in therapy costs.  (*Id.*)

The Government stipulates that A.B. is only entitled to $7,290.00 for lost wages and therapy costs.  (Doc. 2291 at 10).  This amount encompasses $4,950.00 that A.B. states she lost from missing work as well as $2,340.00 for 117 visits with her therapist, Sarah Probst, at Pneuma Counseling.  (Doc. 2275-1 at 13; Doc. 2324 at 2).  To support her claims, A.B. attached her 2013 Income Tax Return showing that she made $23,172.00 in gross income that year.  (*Id*. at 3).  She has also attached several letters from Kaiser Permanente and Moda Health which show her therapy visits.  (*E.g.*, Doc. 2275-1 at 16).

The Court finds that A.B. is entitled to $2,340.00 in restitution for therapy costs, but not the claimed $4,950.00.  A.B. has not submitted any evidence of where she worked or how much she made.  Restitution need not be measured with "mathematical precision."  *Doe*, 488 F.3d at 1159–60.  However, the amount of loss sustained by a victim as a result of the Defendants' offense is the Government's burden to bear by a preponderance of the evidence.  *See* 18 U.S.C. § 3664(e).  Neither the Government nor A.B. included information

1    "sufficient for the court to exercise its discretion in fashioning a restitution order"—which

2    must be included.  18 U.S.C.A. § 3664(a).  Without such information, the Court cannot

3    find that A.B. is entitled to $4,950.00 for lost wages; but she may still seek compensation

4    through the remission process.

5                    **2.        Claimant #2 – A.C.**

6            A.C. seeks $95,314.00 for costs she incurred from 2014 through 2018.  (Doc. 2275-

7    3 at 9).  A.C. was named in counts 12 through 15 of the SI and testified that she was

8    trafficked through Backpage.com.  (Doc. 1897 at 30–38).  A.C. seeks lost wages for a job

9    she was "thinking of working" as well as modeling opportunities she avers she lost out on.

10   (*Id*. at 1).   A.C. also seeks compensation for money she has spent on therapy and

11   medications due to her time being trafficked as well as costs for future therapy.  (*Id*. at 1–

12   8).

13           The Court will not grant A.C. restitution for lost wages as this claim is unsupported.

14   18 U.S.C.A. § 3664(a) ("The report shall include, to the extent practicable, a complete

15   accounting of the losses to each victim.").  However, the Court will grant A.C. the medical

16   costs she seeks as these costs are supported by the record, which includes a letter from

17   A.C.'s psychologist stating that A.C. has been in her care since September 10, 2012.

18   (Doc. 2275-3 at 15).

19           Again, restitution need not be measured with "mathematical precision."  *Doe*, 488

20   F.3d at 1159–60.  The Court will assume an average of $150.00 per hour for therapy costs

21   based on the statements that A.B. submitted.  (*See e.g.*, Doc. 2275-1 at 17).  A.C. submits

22   that she sees Dr. Swan twice a month for a total of twenty-four sessions a year.  (*See*

23   Doc. 2275-3 at 8).  So, over the course of a year, A.C. spends $3,750 on therapy costs.  (*See*

24   *id*.)  A.C. seeks reimbursement for these costs from 2014 through 2058.  (Doc. 2275-3).

25   The Court will reimburse her for her past therapy costs and ten years of future therapy

26   costs.  Therefore, A.C. is entitled to $75,000.00 for therapy costs from 2014 through 2024

27   as well as ten years of future therapy costs.[10]  18 U.S.C. § 3663(b)(2)(A).  A.C. can also

28   _____

[10] 20 years of therapy costs multiplied by $3,750.00 for costs per year equals $75,000.00.

1    seek any compensation for her unapproved claims through the remission process.

2               **3.    Claimants #3 & #6 – N.F. & D.O.**

3         Victims N.F. and D.O. are represented by the same law firm and utilize the same

4    experts to support their claims, so, the Court will analyze their claims in unison.  N.F. was

5    identified in Counts 4 and 5 and testified that she was advertised for sex acts for money on

6    Backpage.com "so my pimps could make money off of me."  (Doc 1898 at 83; Trial Exs.

7    214 and 214a).  D.O. was identified as the victim in Count 2.  (Doc. 1923 at 65).  N.F. and

8    D.O. were both minors when they were trafficked on Backpage.com.  (Doc. 2275-6 at 1;

9    Doc. 2275-4 at 2).  They are both victims under the VWPA.  18 U.S.C.A. § 3663.

10        NF seeks $7,038,128.00 in restitution.  (Doc. 2275 at 1).  She seeks $3,387,148.00

11   for the cost of future treatment and counseling and $3,650,980.00 for lost wages.

12   (Doc. 2275-4 at 3).  These figures are supported by the reports of two expert witnesses: Dr.

13   Cooper and Dr. Smith.  (*Id*.)  She and Claimant #6, D.O., also seek $29,222.04 in trial

14   preparation and restitution costs shared between them.  (Doc. 2324-1 at 3).

15        D.O. seeks $5,949,554.00 in restitution: $2,298,818.00 for the cost of future

16   treatment and counseling and $3,650,736.00 for lost wages and reduced income.  (Doc.

17   2275-6 at 2).  The Court will first address N.F. and D.O.'s medical claims before moving

18   on to their lost wage claims.

19               **i.    Medical Costs**

20        Dr. Cooper estimates the Claimants' annual cost for several "medical diagnoses"

21   including the cost of rape, bipolar disorder, stomach issues, sleep apnea, migraines, bee

22   sting anaphylaxis immunotherapy and other disorders.  (Doc. 2275-4 at 26–28; Doc. 2275-

23   6 at 32–34).  On cross examination, Dr. Cooper noted that many of the costs she estimated

24   are the "absolute minimum" for Claimants who are victimized many times, such as the

25   average lifetime cost of rape which she reports at $122,000.  (Doc. 2315 at 53).  When

26   asked about an interfamilial sexual assault which occurred before N.F. was posted on

27   Backpage.com, Dr. Cooper testified that there is "no comparison to having been sexually

28   assaulted by an individual in her home" versus being trafficked.  (*Id*. at 57–58).

The Court finds Dr. Cooper's estimations of medical costs precise enough to entitle Claimants to recovery. As Defendants note, "some precision" is required when calculating restitution. "Speculation and rough justice are not permitted." *United States v. Anderson*, 741 F.3d 938, 954 (9th Cir. 2013). However, "exact precision is not required and district courts do have a degree of flexibility in accounting for a victim's complete losses; thus, a 'reasonable estimate' will suffice." *Id*. Upon reading Dr. Cooper's report and considering her testimony, the Court finds that she has provided a reasonable estimation of the Claimants' medical costs which stem from being trafficked. *See id*.

Dr. Cooper specifically estimates the following costs for N.F. which are supported:
- Cost of Rape - Lifetime Costs of $122,461.00
- IBS - $26,550.00 annually
- Migraines - $6,575.00 annually
- Recurrent Epistaxis - $6,000.00
- Recurrent Sinusitis - $1,542.00
- Gastroesophageal Reflux Disease - $736.00 annually
- Allergic Rhinitis - $7,950.00
- Polyarticular Osteoarthritis - $8,135.00 annually
- Dyspareunia and Endometriosis/Pelvic Inflammatory Disease - $10,002.00 annually
- Hypoactive Sexual Desire Disorder – $5,503.00 annually
- Complex PTSD - $3,060.00

(Doc. 2275-4 at 26–28). The Court will grant N.F.'s request for five years of associated medical costs. So, N.F. is entitled to $497,633.00 in medical costs.[11]

Dr. Cooper estimates the following costs for D.O.:
- Cost of Rape - Lifetime Costs of $122,461.00
- Distal Arthrogryposis - Annual Medical Costs $2,118.00
- Gastroesophageal Reflux Disease - $736.00 annually
- Allergic Rhinitis - $7,950.00
- Post-Traumatic Osteoarthritis - $8,135.00 annually
- Migraines - $6,575.00 annually
- Dyspareunia and Endometriosis/Pelvic Inflammatory Disease - $10,002.00 annually

---

[11] Five years of the annual and lifetime costs listed above: $122,461 + $132,750 + $32,875 + $30,000 + $1,542 + $3,680 + $7,950 + $40,675 + $32,875 + $50,010 + 27,515 + $15,300 = $497,633.00.

- Hypoactive Sexual Desire Disorder – $5,503.00 annually
- Ventral Hernia - $5,432.00
- Schizoaffective Disorder – Depressive Subtype with Suicidal Ideations - $15,957.00 annually
- Complex PTSD - $3,060.00

(Doc. 2275-6 at 32–33).  The Court will grant D.O.'s request for five years of associated medical costs.  So, D.O. is entitled to $396,273.00 in medical costs.[12]

### ii.    Reduced Income

N.F. seeks $3,650,980.00 for lost wages, and DO seeks $3,650,736.00.  (Doc. 2275-4 at 3; Doc. 2275-6 at 2).  Claimants rely on the expert report of Dr. Smith, who estimates three scenarios of lost earnings ranging from $1.2m to $3.6m over the course of Claimants' lives.  (Doc. 2275-4 at 42; Doc. 2275-6 at 48).

The language in the VWPA is identical to the language in the Mandatory Victim Restitution Act ("MVRA").  *Compare* 18 U.S.C. § 3663A *with* 18 U.S.C. § 3663(b)(2).  In *Cienfuegos*, the Ninth Circuit explicitly held that the plain language of the MVRA ("the court shall order . . . that the defendant make restitution to . . . reimburse the victim for income lost by such victim as a result of such offense") "contemplates an award of restitution to the victim's estate for future lost income and certainly does not expressly exclude such an award."  *United States v. Cienfuegos*, 462 F.3d 1160, 1164 (9th Cir. 2006).  Therefore, the Court can reimburse Claimants for the earning impairments Dr. Smith finds they will suffer due to their victimization.

The Court finds Dr. Smith's report and testimony persuasive.  It also finds that his "Scenario 1," a net loss of earnings ranging from $1,222,265.00 to $1,981,619.00 applicable for these Claimants as they are, as Dr. Smith noted, both average minor females whose earnings can be assumed to be based on completion of high school.  (Doc. 2316 at 16; 2275-4 at 42; Doc. 2275-6 at 50).  Thus, N.F. and D.O. are entitled to $305,643.25.00[13]

---

[12] Five years of the annual and lifetime costs listed above: $122,461.00 + $10,590.00 + $3,680.00 + $7,950.00 + $40,675.00 + $32,875.00 + $50,010.00 + $27,515.00 + $5,432.00 + $79,785.00 + $15,300.00 = $396,273.00

[13] $1,222,265.00, the low end of the range for loss of earnings, is calculated to reimburse claimant NF through age 67.  She is currently 27 as she was born in 1998.  Therefore, Dr. Smith has calculated her lost wages for forty years of her life.  The Court will only

for ten years of restitution due to the impairment on their earning capacity being posted on Backpage.com caused them. *See Cienfuegos*, 462 F.3d at 1164.

### iii.    Trial Preparation and Restitution Costs

N.F. and D.O. also jointly seek $29,222.04 in trial participation and restitution costs. (Doc. 2324-1 at 3). This encompasses fees for their experts and their attorneys. (*Id.*) The Court finds that these reimbursements are allowable under the VWPA's reimbursement scheme for "attendance at proceedings related to the offense," i.e., the restitution hearing with some modification. *See* 18 U.S.C.A. § 3663(b)(4) (allowing reimbursement for "expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.").

Claimants seek $12,544.00 for Dr. Cooper's participation, $8,332.50 for Dr. Smith's participation and $8,345.54 for their attorneys' costs. (Doc. 2324-1 at 3). The Court finds all of these costs appropriate.[14] In sum, Claimants are entitled to $28,222.04 in trial participation and restitution costs to be split evenly between them, or $14,111.02 each.

In total, N.F. is entitled to $817,387.27 and D.O. is entitled to $716,027.27.[15]

### 3.    Claimants #4 and #5 – B.F. and M.L.

Claimants #4 and #5, "B.F." and "M.L.",[16] both utilize the same expert witness to

---

reimburse claimants for ten years of lost wages. So, they are entitled to $305,643.25 in lost wages ($305,643.25 equals $1,222,573.00 multiplied by 25% (ten years out of forty years total)).

[14] The Court takes exception to Ms. Notis-McConarty and Mr. Montgomery's inclusion of reimbursement for their dinners and drinks, including "Gran Jefe Tequila" for $15 and a $48 order of Chilean Sea Bass. (Doc. 2324-1 at 94). Counsel cannot seriously expect to recover the cost of a $285.00 dinner as a restitution fee. Reviewing the exhibit that Counsel has provided, the Court estimates that they are seeking approximately $1,000.00 in meal reimbursements which it will deduct this from Claimants' sought fees. *See Anderson*, 741 F.3d at 954 ("exact precision is not required and district courts do have a degree of flexibility in accounting for a victim's complete losses").

[15] N.F.'s reimbursement is for medical costs of $497,633.00, lost future earnings of $305,643.25, and $14,111.02 for half of the trial participation and restitution costs. D.O.'s is for $396,273.00 for medical costs, lost future earnings of $305,643.25 and $14,111.02 for half of the trial participation and restitution costs.

[16] Defendants argue that M.L. cannot recover restitution because she was a willing participant engaged in misdemeanor prostitution. (Doc. 2280 at 17). Indeed, Claimants

- 21 -

support their claims for restitution, so, the Court will analyze their claims in unison. Claimant #4, B.F., originally sought $984,300.00 in restitution. (Doc. 2275 at 1). After the hearing, however, she supplemented her supporting documentation with a report from her purported expert, Edith Wong, CPA, CFE, and now seeks $1,237,403.00. (Doc. 2324-2 at 2).[17] B.F. was identified in Counts 16 and 17. (Doc. 2063 at 38). She testified that she was forced to take "Molly" by her pimp.[18] (Doc. 1920 at 14). Claimant # 5, M.L., testified that she engaged in sex work on Backpage.com for two different pimps, one in Colorado and one in Las Vegas, Nevada. (Doc. 1902 at 120–21).

### i.    M.L.

M.L. originally projected her total future treatment costs between $285,288.00 and $1,413,673.00. (Doc. 2145 at 43). She now seeks $559,985.00 for PTSD treatments and therapy for the next ten years as well as pre-restitution treatment costs. (Doc. 2324-2 at 25–31). Specifically, she seeks $28,235.00 in pre-restitution reimbursement, $195,000.00 for Specialized Trauma Specific Psychotherapy, $156,000.00 for Somatic and Body-Based Therapies, $48,000.00 for Neurofeedback therapy, $39,000.00 for Hyperbaric Oxygen therapy and $93,750.00 for continuing psychiatric care. (*Id.*) M.L. does not seek lost

---

who willingly engaged in prostitution cannot receive restitution. *See United States v. Lazarenko*, 624 F.3d 1247, 1252 (9th Cir. 2010) ("as a general rule, a participant in a crime cannot recover restitution."). But Defendants' argument ignores the fact that M.L. worked for two different pimps and that her second pimp made her immediately hand over any money earned through her sex work. (Doc. 1902 at 122). A claimant can start off as a willing participant only to become a victim once forced or coerced to engage in prostitution unwillingly. Such is the case with M.L., so, the Court finds that she is a victim under the VWPA. 18 U.S.C.A. § 3663.

[17] Defendants argue that Dr. Wong and her sources, Kate Keisel and Dr. Robert Moran, should be subject to cross-examination before the Court considers their expert reports. (Doc. 2341 at 12). The Court finds that Dr. Wong's report and the evidence she relies upon are sufficiently reliable as to negate the necessity for cross-examination here. *See Williams v. Oklahoma*, 358 U.S. 576, 584 (1959) ("[Where] the guilt of the accused has been properly established, the sentencing judge . . . is not restricted to evidence derived from the examination and cross-examination of witnesses in open court but may, consistently with the Due Process Clause of the Fourteenth Amendment, consider responsible unsworn or 'out-of-court' information relative to the circumstances of the crime and to the convicted person's life and characteristics.").

[18] "Molly," otherwise known as Ecstasy, is a synthetic psychoactive drug. *See Ecstasy Or MDMA (also Known As Molly)*, UNITED STATES DRUG ENFORCEMENT ADMINISTRATION, https://www.dea.gov/factsheets/ecstasy-or-mdma-also-known-molly (last visited July 1, 2025).

wages.  (*Id*.)  These costs are supported and the Court will award M.L. $559,985.00 for PTSD treatments and therapy for the next ten years as well as pre-restitution treatment costs.

### ii.    B.F.

B.F. originally supported her claim with a letter from Dr. Matthew Brett, her primary care physician.  (Doc. 2275-5 at 8).  Dr. Brett explains that B.F. has PTSD, Addison's disease, has had to take suboxone to stay off opiates, and has numerous other medical conditions which he says she will have to manage for the rest of her life.  (*Id*.)  He also states that all her conditions were related to or exacerbated by her "abduction" and that treatments will require tens of thousands of dollars annually.  (*Id*. at 8–9).

B.F. seeks $1,237,403.00 in total recovery.  (*Id*. at 25).  She seeks $208,761.00 in pre-restitution costs (including $159,229.00 in lost wages and $36,877.00 in treatment and medication costs), as well as medical costs through the end of her life.  (*Id*. at 25, 35–36).  These costs are supported, as discussed below.

First, the pre-restitution medical costs are supported as these costs relate to counseling and medication B.F. has sought related to the trauma she suffered from being posted on Backpage.com.  (Doc. 2324-2 at 22).  Second, as for her lost wages, $918,000 of the original $984,300 B.F. sought in restitution was related to the lost profits her "traffickers" yielded over the two years and eight months she was posted on Backpage.com. (Doc. 2275-5 at 11).  In its Reply, the Government agreed with Defendants that Claimants, including B.F., could not be awarded restitution for amounts earned by pimps trafficking them on Backpage.com.  (Doc. 2291 at 10).  Now, it appears that she has narrowed her lost wages claim to $159,229 through her expert, Dr. Wong, which relates to lost work hours from 2015 through 2024.  (Doc. 2324-2 at 55).  Dr. Wong includes this claim because B.F. "has experienced periods when she was unable to work due to continuing trauma from her trafficking."  (*Id*. at 24).  Dr. Wong has prepared a detailed exhibit showing the time periods she claims B.F. was unable to work, such as 2015, where she lost 1,566 work hours which results in a total loss of $18,006.00 since B.F. was making

minimum wage of $11.50 per hour at her hotel job at the time. (*Id*. at 55). She also calculates certain losses for January 1, 2023, through September 30, 2024, as B.F. had a job making $22 per hour but quit for mental health reasons. (*Id*.) Finally, B.F. seeks healthcare costs through 2065. (Doc. 2324-2 at 57). The Court will award her these costs for ten years, which equals $253,980.00.[19]

In sum, B.F. is entitled to $450,086.00: $159,229.00 in lost wages, $36,877.00 in pre-restitution treatment and medication costs and $253,980.00 for ten years of future counseling and medication costs.

### 4.    Claimant # 7 – C.M.

C.M.'s next of kin purportedly seek $48,397.79 but the Court has not been apprised as to what this request is for. (Doc. 2275 at 2). In fact, the Government's sheet which shows where each Victim's request is supported does not list a pin cite for this request. (*Id*.) It instead cites generally to Doc. 2129, its Sentencing Memorandum, then to Exhibit 1, which is an FBI report with no relevance to C.M.'s claim. So, the Court cannot discern what $48,397.79 seeks to reimburse and the request will be denied. CM's next of kin can still attempt to recover through the remission fund, however.

### 5.    Claimant # 9 – J.R.

J.R. seeks $4,753.50 for counseling and acupuncture treatment she has received as well as $7,200.00 per year for the future cost of counseling. (Doc. 2145 at 26–27). J.R. was named in the SI as a victim who was sold for sex. (Doc. 230 at ¶ 168). The Court will therefore award her $4,753.50 for medical costs already incurred as well as grant her restitution for ten years of therapy, which equates to $72,000.00.

### 6.    Claimant # 10 – E.S.

E.S.'s next of kin seek $1,782,230.00 in lost wages, $509,992.00 in psychiatric costs, $323,514.88 in medical costs and $13,593,719.00 for the future care of M.K.,[20] ES's

---

[19] Dr. Wong calculates the yearly costs of counseling to total $18,720.00, office appointments at $1,278.00, and medication at $5,400.00. (Doc. 2324-2 at 36–37). Ten years of these costs equal $253,980.00.

[20] The Government has acquiesced that only victims who "personally suffer bodily injury" can recover under the VWPA. (*See* Doc. 2291 at 11 (citing *United States v. Dayea*, 73 F.

minor daughter. (Doc. 2324-6 at 2). E.S. is named in the SI and alleges she was trafficked between 2009 and 2013. (Doc. 230 at ¶ 160).

The $323,514.88 Claimant seeks are related to medical bills from the Cleveland Clinic. (Doc. 2324-16 at 15). E.S.'s medical bills are related to her gastrointestinal diseases.[21] (Doc. 2324-6 at 8). The Court finds that this claim is supported and will award E.S.'s next of kin the $323,514.88. E.S.'s next of kin also seek $509,992.00 in past mental health care expenses. (Doc. 2324-6 at 8). The estate has engaged an expert to estimate these costs as she was treated in at least four different states. (*Id.* at 9). Ms. Roxanne Benoit estimates E.S.'s cost of mental health care to be $509,992.00 from the time of her trafficking through the year of her death. (*Id.*) The following is a chart Ms. Benoit prepared for E.S.'s total lifetime costs from 2010 through 2022:

| Year | Comprehensive Inpatient Psychiatric Care DRG H2013 [1] Inpatient Care 1-2 times per year 4-6 weeks per stay | Individual Psychotherapy CPT 90837 [2] Counseling 3-4 hours per month | Physician Services CPT 99214 [2] Medication Management 1 visit per month | Case Management [3] Coordinate Services 1-3 hours per month | Annual | NOTES |
|---|---|---|---|---|---|---|
| 2010 | $506 | $6,983 | $1,965 | $2,250 | $11,704 | 1. Comprehensive Inpatient Psychiatric Care price source is Fair Health Benchmark from 2020-2024. Prices in red indicate estimates based on an average price increase of 54.39% between years 2020-2024. |
| 2011 | $782 | $7,142 | $2,061 | $2,250 | $12,235 | |
| 2012 | $1,207 | $7,304 | $2,162 | $2,450 | $13,123 | |
| 2013 | $1,863 | $7,469 | $2,268 | $2,450 | $14,050 | 2. Individual Psychotherapy and Physician Services price source is Medical Fees Directory for 2015-2018 and 2020-2024 (2019 is not available). Prices in red indicate estimates based on an average price increase of 2.27% for Individual Psychotherapy and 4.90% for Physician Services between years 2015-2018 and 2020-2024. |
| 2014 | $2,876 | $7,639 | $2,379 | $2,450 | $15,344 | |
| 2015 | $4,441 | $7,812 | $2,496 | $2,600 | $17,349 | |
| 2016 | $6,856 | $8,064 | $2,592 | $2,600 | $20,112 | |
| 2017 | $10,585 | $8,400 | $2,748 | $2,700 | $24,433 | |
| 2018 | $16,342 | $8,106 | $2,700 | $2,700 | $29,848 | |
| 2019 | $25,231 | $8,008 | $2,826 | $2,800 | $38,865 | |
| 2020 | $38,955 | $8,190 | $2,964 | $2,800 | $52,909 | 3. Usual, Customary, and Reasonable rates based on professional experience. |
| 2021 | $101,115 | $8,484 | $3,108 | $2,900 | $115,607 | |
| 2022 | $129,413 | $8,736 | $3,264 | $3,000 | $144,413 | |
| Total Lifetime Costs from 2010 to 2022 | | | | | $509,992 | |

3d 229, 231 (9th Cir. 1995) (noting that the VWPA is not the equivalent of a wrongful death statute under which very broad recovery is permitted)). So, the Court will not award M.K. compensation for her care, but she may still seek compensation through the remission fund.

[21] Dr. Cooper testified that victims of sex trafficking are more likely to have gastrointestinal issues. (Doc. 2315 at 19).

(Doc. 2324-17 at 10). The Court finds that these costs are overestimated given the actual costs that Claimants 2 and 9 have submitted. So, the Court will instead award E.S.'s estate $7,200.00 a year for her mental healthcare costs, or $86,400.00. *See Doe*, 488 F.3d at 1159–60 (noting that restitution need not be measured with "mathematical precision.").

Finally, as for the $1,782,230.00 sought in lost wages, the Court finds that lost wages are appropriate but will reduce the sought amount. To support the claim for lost wages, E.S.'s estate retained Dr. Harvey Rosen, an economist. (Doc. 2324-6 at 9). Dr. Rosen estimates that the value of E.S.'s lost wages were between $1,320,218.00 and $1,635,007.00. (*Id.*) The Court has already found that Claimants #3 and #6 are entitled to $305,643.25 in restitution due to the impairment on their earning capacity being trafficked caused them based on their expert's report. *See supra* Section II.B.3. To be consistent, the Court will award E.S.'s estate $305,643.25 in restitution due to the impairment on her earning capacity being trafficked caused her. *See Cienfuegos*, 462 F.3d at 1164.

In sum, E.S.'s estate is awarded $716,558.13 in restitution: $323,514.88 in medical bills, $305,643.25 in lost wages and $86,400.00 in past metal healthcare costs E.S.'s estate is entitled to. 18 U.S.C.A. § 3663.

### 8. Claimant #11 – C.W.

C.W.'s next of kin, Claimants 11 and 12, seek $4,000.00 in funeral costs as well as $10,270.00, also for funeral costs as well as lost wages and therapy for C.W.'s mother. (Doc. 2275 at 2–3). The SI alleged that C.W. was sold for sex on Backpage.com in 2015 and 2016 and that she was murdered by a customer on August 15, 2015. (Doc. 230 at ¶ 175). Similar to Claimant #8, C.W.'s murder is too attenuated to find Brunst and Spear responsible for the act. *Gamma Tech Industries, Inc.*, 265 F.3d at 924 (the government is required to show that "the causal nexus between the conduct and the loss is not too attenuated."). Thus, she is not a "victim" under the VWPA and is not entitled to restitution from the Defendants here. 18 U.S.C.A. § 3663. However, her next of kin are not foreclosed from seeking compensation through the remission fund.

/ / /

## 9.    Conclusion

In sum, the Claimants are entitled to the following relief:

- Victim #1 - A.B. is entitled to $4,950.00 for lost wages.

- Victim #2 – A.C. is entitled to $75,000.00 for ten years of past and future therapy costs.

- Victim #3 – N.F. is entitled to $817,387.27: $497,633.00 in medical costs, $305,643.25.00 for her lost earning capacity and $14,111.02 for half of the trial participation and restitution costs for Dr. Cooper and Dr. Smith.

- Victim #4 - B.F. is entitled to $450,086.00: $159,229.00 in lost wages, $36,877.00 in pre-restitution treatment and medication costs and $253,980.00 for ten years of future counseling and medication costs.

- Victim #5 – M.L. is entitled to is entitled to $559,985.00: $28,235.00 in pre-restitution reimbursement, $195,000.00 for Specialized Trauma Specific Psychotherapy, $156,000.00 for Somatic and Body-Based Therapies, $48,000.00 for Neurofeedback therapy, $39,000.00 for Hyperbaric Oxygen therapy and $93,750.00 for continuing psychiatric care.

- Victim #6 – D.O. is entitled to $716,027.27: $396,273.00 for medical costs, lost future earnings of $305,643.25 and $14,111.02 for half of the trial participation and restitution costs for Dr. Cooper and Dr. Smith.

- Victim #9 – J.R. is entitled to $76,753.50: $4,753.50 for medical costs already incurred as well as ten years of therapy.

- Victim #10 – E.S. (J.K.) is entitled to $716,558.13: $323,514.88 in medical bills, $305,643.25 in lost wages and $86,400.00 in past metal healthcare costs E.S.'s estate is entitled to.

Any Claimant whose claim was unsupported for purposes of restitution may still seek compensation through the remission process.

## C.    Restitution must be Paid by Defendants, not the Remission Fund

As the parties note, they have entered into a stipulation regarding the disposition of most of the assets seized in this and related matters. (Doc. 2274 at 6; Doc. 2280 at 8). This remission process is currently ongoing in the Central District of California and is being overseen by the Department of Justice's Money Laundering and Asset Recovery Section ("MLARS"). (Doc. 2274 at 6). The Government states that this process will be utilized to provide compensation for pecuniary losses caused to the potentially thousands of

individuals who were posted on Backpage.com.  (*Id.* at 2).  So, the Court must decide whether the restitution the Court has ordered shall be paid from the remission fund or personally by Defendants.

The Government argues that "Given Brunst and Spear's net worth—and the return of property to them pursuant to the forfeiture settlement—they cannot show that they lack the financial resources to make an order of restitution appropriate."  (Doc. 2274 at 12). Defendants argue that the remission fund was supposed to resolve all of their financial obligations and that the assets they have are meant to provide for their families since they are in prison and will not likely generate income upon their release.  (Doc. 2280 at 30). They assert that "declining to order restitution will not deprive these . . . claimants of compensation . . . [as] they can avail themselves of the remission process[.]" (Doc. 2280 at 23).  The Court disagrees.  The Court declines to defer to the remission process because, as the Government argues, the stipulated settlement does not preclude a restitution order.  (Doc. 2274-1 at 13 ("this agreement does not and cannot bind the Court in the Criminal Action, and the Parties have no agreement as to any criminal restitution which may be sought or ordered in the Criminal Action")).[22]

The VWPA mandates that the Court shall consider "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate" in determining whether to order restitution.  18 U.S.C. § 3663(B)(i)(II).  The remission fund was created through forfeited funds.  "[C]riminal forfeiture and restitution are separate remedies with different purposes."  *United States v. Davis*, 706 F.3d 1081, 1083 (9th Cir. 2013).  "Forfeiture is imposed as punishment for a crime; restitution makes the victim whole again." *Id.*  In fact, a defendant "may be required to pay restitution and forfeit the same amounts."  *United States v. Newman*, 659 F.3d 1235, 1241 (9th Cir. 2011) (citation omitted).

---

[22]  Furthermore, this restitution Order will likely differ from any order granting the victims compensation through the remission process as the VWPA specifically allows for compensation for a victims' participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense, such as the restitution hearing. *Compare* 28 C.F.R. §9.8(c) *with* 18 U.S.C. § 3663.

At the restitution hearing, the parties discussed the remission fund and the money forfeited and returned to Defendants.  $215 million was forfeited by Defendants Lacey, Brunst, Spear, Mr. Larkin's estate, and the company.  (Doc. 2316 at 91).  Defendant Brunst's counsel stated that $40 million was returned to the Defendants, with "a couple of million dollars" being returned to Defendant Brunst.  (*Id*. at 92).  Counsel clarified that $2.5 million was returned to him through the remission process and that he forfeited over $7 million of his own funds to the remission fund.  (*Id*.)  Defendant Spear states that he forfeited 60% of $1.4 million seized from him and that 40% was returned to him—or approximately $560,000.00.  (Doc. 2319 at 3).

As the Government argues, Defendants cannot show that they lack the financial resources to pay appropriate restitution.  While the Court must consider Defendants financial resources, the financial needs and earning ability; the Court must also consider the amount of the loss sustained by each victim as a result of the offense.  18 U.S.C. § 3663(B)(i).  The Victims who were named in the indictment and able to show entitlement to restitution must be compensated by Defendants as they were directly and proximately harmed as a result of their involvement in the conspiracy to commit Travel Act offenses. 18 U.S.C. § 3663(B)(2).

The restitution statutes support this conclusion.  Section 3664, the section on procedures for restitution enforcement, states that "[i]n no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution." 18 U.S.C. § 3664(f)(1)(B).  Furthermore, the Ninth Circuit has held that this section "requires a district court to set the amount of the defendant's restitution obligation 'in the first instance' *without regard to forfeited funds*." *United States v. Doe*, 374 F.3d 851, 856 (9th Cir. 2004) (quoting *United States v. Bright*, 353 F.3d 1114, 1122 (9th Cir. 2004) (emphasis added)). Thus, it would be improper for the Court to consider the remission fund in ordering restitution.  *Id*. (stating "offsetting a restitution order by the value of forfeited funds is not permitted where victims have not received compensation from those funds.").  However,

the recovery the Victims have received here cannot be recovered a second time through remission. *See id.*

Accordingly,

**IT IS ORDERED** granting the United States' Supplemental Motion re: Restitution Requests (Doc. 2318) as set forth herein.

**IT IS FURTHER ORDERED** that Defendant Scott Spear shall pay restitution totaling $3,414,137.17 to the following victims in the following amounts:

- Victim #1 - A.B. is entitled to $2,340.00 for therapy costs.

- Victim #2 – A.C. is entitled to $75,000.00 for ten years of past therapy costs and ten years of future therapy costs.

- Victim #3 – N.F. is entitled to $817,387.27: $497,633.00 in medical costs, $305,643.25.00 for her lost earning capacity and $14,111.02 for half of the trial participation and restitution costs for Dr. Cooper and Dr. Smith.

- Victim #4 – B.F. is entitled to $450,086.00: $159,229.00 in lost wages, $36,877.00 in pre-restitution treatment and medication costs and $253,980.00 for ten years of future counseling and medication costs.

- Victim #5 – M.L. is entitled to is entitled to $559,985.00: $28,235.00 in pre-restitution reimbursement, $195,000.00 for Specialized Trauma Specific Psychotherapy, $156,000.00 for Somatic and Body-Based Therapies, $48,000.00 for Neurofeedback therapy, $39,000.00 for Hyperbaric Oxygen therapy and $93,750.00 for continuing psychiatric care.

- Victim #6 – D.O. is entitled to $716,027.27: $396,273.00 for medical costs, lost future earnings of $305,643.25 and $14,111.02 for half of the trial participation and restitution costs for Dr. Cooper and Dr. Smith.

- Victim #9 – J.R. is entitled to $76,753.50: $4,753.50 for medical costs already incurred as well as $72,000.00 for ten years of therapy.

- Victim #10 – E.S. (J.K.) is entitled to $716,558.13: $323,514.88 in medical bills, $305,643.25 in lost wages and $86,400.00 in past metal healthcare costs E.S.'s estate is entitled to.

**IT IS FURTHER ORDERED** that Defendant Spear's restitution obligation shall be paid **jointly and severally** with Defendant Brunst until restitution is paid in full. Defendant Spear shall pay a total of $3,417,037.17 in criminal monetary penalties, due immediately. Having assessed the Defendant's ability to pay, payment of the total criminal

monetary penalties is due as follows: Balance is due in equal monthly installments of $2,000 over a period of 34 months to commence within 30 days of release from imprisonment. Payment of criminal monetary penalties is due during imprisonment at a rate of not less than $25 per quarter and payment shall be made through the Bureau of Prisons' Inmate Financial Responsibility Program. Criminal monetary payments shall be made to the Clerk of U.S. District Court, Attention: Finance, Suite 130, 401 West Washington Street, SPC 1, Phoenix, Arizona 85003-2118. Payments should be credited to the various monetary penalties imposed by the Court in the priority established under 18 U.S.C. § 3612(c). The Court hereby waives the imposition of interest and penalties on any unpaid balance.

**IT IS FURTHER ORDERED** that Defendant John Brunst shall pay restitution totaling $3,414,137.17 to the following victims in the following amounts:

- Victim #1 - A.B. is entitled to $2,340.00 for therapy costs.
- Victim #2 – A.C. is entitled to $75,000.00 for ten years of past therapy costs and ten years of future therapy costs.
- Victim #3 – N.F. is entitled to $817,387.27: $497,633.00 in medical costs, $305,643.25.00 for her lost earning capacity and $14,111.02 for half of the trial participation and restitution costs for Dr. Cooper and Dr. Smith.
- Victim #4 – B.F. is entitled to $450,086.00: $159,229.00 in lost wages, $36,877.00 in pre-restitution treatment and medication costs and $253,980.00 for ten years of future counseling and medication costs.
- Victim #5 – M.L. is entitled to is entitled to $559,985.00: $28,235.00 in pre-restitution reimbursement, $195,000.00 for Specialized Trauma Specific Psychotherapy, $156,000.00 for Somatic and Body-Based Therapies, $48,000.00 for Neurofeedback therapy, $39,000.00 for Hyperbaric Oxygen therapy and $93,750.00 for continuing psychiatric care.
- Victim #6 – D.O. is entitled to $716,027.27: $396,273.00 for medical costs, lost future earnings of $305,643.25 and $14,111.02 for half of the trial participation and restitution costs for Dr. Cooper and Dr. Smith.
- Victim #9 – J.R. is entitled to $76,753.50: $4,753.50 for medical costs already incurred as well as $72,000.00 for ten years of therapy.

- Victim #10 – E.S. (J.K.) is entitled to $716,558.13: $323,514.88 in medical bills, $305,643.25 in lost wages and $86,400.00 in past metal healthcare costs E.S.'s estate is entitled to.

**IT IS FURTHER ORDERED** that Defendant Brunst's restitution obligation shall be paid **jointly and severally** with Defendant Spear until restitution is paid in full. Defendant Brunst shall pay a total of $3,465,837.17 in criminal monetary penalties, due immediately. Having assessed the Defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:  Balance is due in equal monthly installments of $2,000 over a period of 34 months to commence within 30 days of release from imprisonment.  Payment of criminal monetary penalties is due during imprisonment at a rate of not less than $25 per quarter and payment shall be made through the Bureau of Prisons' Inmate Financial Responsibility Program.  Criminal monetary payments shall be made to the Clerk of U.S. District Court, Attention: Finance, Suite 130, 401 West Washington Street, SPC 1, Phoenix, Arizona 85003-2118.  Payments should be credited to the various monetary penalties imposed by the Court in the priority established under 18 U.S.C. § 3612(c).  The Court hereby waives the imposition of interest and penalties on any unpaid balance.

Dated this 3rd day of July, 2025.

Honorable Diane J. Humetewa
United States District Judge